ARTHUR A. HARTINGER (SBN 121521)
ahartinger@publiclawgroup.com
LINDA M. ROSS (SBN 133874)
lross@publiclawgroup.com
KEVIN P. MCLAUGHLIN (SBN 251477)
kmclaughlin@publiclawgroup.com
RENNE SLOAN HOLTZMAN SAKAI LLP
1220 Seventh Street, Suite 300
Berkeley, California 94710
Telephone: (510) 995-5800
Facsimile: (415) 678-3838

Attorneys for Defendant
CITY AND COUNTY OF SAN FRANCISCO

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL A. STITT, TONY GRANDBERRY, and HEDY GRIFFIN, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> THE SAN FRANCISCO MUNICIPAL TRANSPORTATION AGENCY; CITY AND COUNTY OF SAN FRANCISCO; and DOES 1-20, <br><br> Defendants. | Case No. 12-cv-03704-YGR <br><br> **DECLARATION OF CHESTER HANVEY, PH.D. IN SUPPORT OF MOTION TO DECERTIFY COLLECTIVE ACTION AND CLASS ACTION** <br><br> Date:   September 6, 2016 <br> Time:   2:00 p.m. <br> Judge: Hon. Yvonne Gonzalez Rogers <br> Ctrm.: 1, 4th Floor <br>     1301 Clay Street <br>     Oakland, CA 94612 <br><br> Action Filed:  July 16, 2012 <br> Trial Date:    November 29, 2016: |

I, CHESTER HANVEY, declare as follows:

1. The facts stated herein are based on my personal knowledge and, if called as a witness, I could and would competently testify thereto.

## EXECUTIVE SUMMARY

2. I have been retained by the City of San Francisco Municipal Transportation Agency ("SFMTA") in relation to the lawsuit *Stitt et al. v. The San Francisco Municipal Transportation Agency, et al.* I previously submitted an expert report in this matter on May 10, 2016 that addressed a declaration by Richard Drogin, Ph.D. dated December 31, 2013 filed in support of Plaintiffs' class certification motion ("Original Drogin Declaration'), and several issues related to collecting valid and reliable estimates of unpaid wages and the use of statistical extrapolation to estimate class wide damages based on data from a sample. Since that report was written, Dr. Drogin submitted a second declaration on May 10, 2016 ("Second Drogin Declaration') in which he reported the results of a statistical analysis that was intended to estimate damages for all class members. I have been asked to review and evaluate the Second Drogin Declaration to determine the degree to which the results he reported can be relied upon as an accurate estimate of class-wide damages. I submitted a second expert report on June 13, 2016 that summarized my opinions. This declaration contains the same opinions that were included in my second expert report.

3. Dr. Drogin's results suffer from three critical flaws. First, his calculations are based on flawed data. Estimates of unpaid time, upon which his entire analyses rest, came from two sources: self-reports from a sample of Operators and estimates of travel time from an online trip planner. There are significant deficiencies in both of these datasets. Self-report data are subject to numerous biases if the data collection procedure is not properly designed. Professionals who collect self-report data typically include numerous features to minimize or eliminate these biases. However, Dr. Drogin presented no evidence to show that any steps were taken to ensure that the self-report data that he used were reliable or

DECLARATION OF CHESTER HANVEY, PH.D. IN SUPPORT OF MOTION TO DECERTIFY COLLECTIVE ACTION AND CLASS ACTION - Case No. 12-cv-03704-YGR

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

valid. Based on what was reported, it appears that the attorneys for the plaintiff were directly involved in the data collection process which is a significant violation of professional standards[1]. This violation alone undermines the credibility of all the self-report data Dr. Drogin relied upon. This and other violations in the self-report data collection are discussed below. Second, the travel time database appears to have been calculated manually and contains numerous errors, which are discussed below. There is no evidence that Dr. Drogin performed any evaluation of the quality or validity of the underlying self-report or travel time data which also violates professional guidelines in statistical analysis[2].

4.      Dr. Drogin also embedded numerous assumptions into his analysis that are shown to be false by other data. Specifically, he assumed that all Operators start every day at the division, even when their run starts at a different location ("relief point"). Similarly, he assumed that all Operators end every day at the division, even when their run ends at a relief point. Finally, he also assumed that all Operators travel between the division and the relief points using public transportation and thus every trip for every Operator takes the same amount of time each time they make it. Based on these assumptions Dr. Drogin calculated unpaid travel time for Operators. The observation data that was collected in this matter show that all of these assumptions are false which further undermines the accuracy of Dr. Drogin's results.

5.      In addition, the sample of Operators who provided self-report data is susceptible to non-response bias. Even though the original sample of 400 is asserted to have been randomly selected, 23% of that group did not provide self-reports (called "non-responders"). If the group of responders and group of non-responders differ in meaningful ways (e.g., division, vehicle type, run time), the sample is not considered random because certain types of operators are more likely to be included in the sample and the results will be biased. According to professional practice, it is a researcher's responsibility to evaluate the extent to which the two groups differ to determine the extent to which non-responders biased

RENEE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

---

[1] See Diamond (2003)
[2] American Statistical Association (1999)

DECLARATION OF CHESTER HANVEY, PH.D. IN SUPPORT OF MOTION TO DECERTIFY
COLLECTIVE ACTION AND CLASS ACTION - Case No. 12-cv-03704-YGR

the results[3]. I have seen no evidence that this evaluation was done so the amount of error potentially caused by non-response bias is not known.

## EXPERT QUALIFICATIONS

6.    I am an Associate Director at Berkeley Research Group (BRG), a global consulting firm specializing in providing expert services in a variety of legal contexts. I regularly perform consulting projects related to labor and employment litigation including allegations of wage and hour violations and discrimination. In my career, I have worked with more than 100 public and private sector organizations, mostly in response to active litigation. Previously, I was a Senior Consultant at Lamorinda Consulting where I also specialized in labor and employment litigation matters. I have extensive experience studying wage and hour compliance and conducing statistical analysis to evaluate damages for wage and hour matters.

7.    I earned my Ph.D. in industrial/organizational (I/O) psychology with a minor in statistics from the University of Houston. I have published and regularly present my work at professional conferences on topics including wage and hour issues and statistics. Most notably, I am co-editor of the recently published book *Practitioner's Guide to Legal Issues in Organizations,* which provides practical guidance to Human Resource practitioners and experts studying aspects of employment law that are commonly litigated. I authored the chapter in that volume on Wage and Hour Litigation. I have also taught courses in statistics and research design. A more detailed description of my qualifications can be found in my CV, which is attached as Exhibit A.

## BACKGROUND

8.    The City and County of San Francisco retained BRG in October 2015 to conduct a study to determine the actual time that SFMTA Operators spend performing specific tasks before and after their runs. I understood that a lawsuit has been filed, *Stitt et al. v. The San Francisco Municipal*

---

[3] Diamond (2003)

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

*Transportation Agency, et al.,* in which Plaintiffs allege, among other things, that they are required to perform several tasks for which they are not compensated[4]. BRG conducted a study that included time-and-motion observations of more than 200 SFMTA Operators before or after shifts. An expert report describing the details of that study and the results was prepared by my colleague, Elizabeth Arnold on May 10, 2016. I also submitted a report on May 10, 2016 that summarized my opinions regarding the Original Drogin Declaration in support of Plaintiffs' class certification motion and several issues related to collecting valid and reliable estimates of unpaid wages and the use of statistical extrapolation to estimate class wide damages based on data from a sample.

9.      After my first report was written, Dr. Drogin submit a second declaration on May 10, 2016 in which he reported the results of a statistical analysis that was intended to estimate damages for all class members. I have been asked to review and evaluate the Second Drogin Declaration to determine the degree to which the results he reports can be relied upon as an accurate estimate of class-wide damages. In addition to the Second Drogin Declaration, I also reviewed the contents of an electronic folder containing hundreds of files that Dr. Drogin produced to defense counsel after he submitted his second declaration, observation data and the Rebuttal Report of Elizabeth Arnold, and Rebuttal Report of Mary Furst and Adrian Fleissig. These materials, along with various academic sources cited throughout the report, form the basis for my opinions.

### DR. DROGIN'S ANALYSES ARE BASED ON FLAWED DATA

10.     The value of any statistical analysis is dependent on the quality of the underlying data. This is a fundamental principle in statistics[5]. Dr. Drogin's analyses were based on estimates of Operators' unpaid time from two sources: self-report data from a sample of Operators and estimates of travel time obtained from the trip planner found at 511.org. My review of the underlying data identified

---

[4] See Second Amended Complaint, filed March 6, 2013
[5] For example, one author writes "Most statistics books assume you are using good data, just as a cookbook assumes you are not buying rancid meat and rotten vegetables." (Wheelan, 2013, p. 111)

DECLARATION OF CHESTER HANVEY, PH.D. IN SUPPORT OF MOTION TO DECERTIFY COLLECTIVE ACTION AND CLASS ACTION - Case No. 12-cv-03704-YGR

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

significant deficiencies in both data sources. These deficiencies in the data undermine any analyses based on them and all of Dr. Drogin's conclusions.

11.    Dr. Drogin provides no evidence supporting the validity of the self-report data or the travel time data and does not describe any actions taken to ensure that the data are valid. The failure to report the adequacy of the data is a direct violation of the American Statistical Association's *Ethical Guidelines for Statistical Practice* which state that it is a statistician's responsibility to "report the sources and assessed adequacy of the data."[6] The same ethical guidelines further state that "it is also necessary to understand the theory, data, and methods used in each statistical study."[7] My evaluation of the quality of the underlying data identified numerous problems with the data, many of which are described below.

**Self-report Data**

12.    Most of the critical components of Dr. Drogin's damages model were estimated from the self-reports made by a sample of class members. The self-reports were documented in declarations from 305 Operators in which Operators provided estimates of time spent performing four activities: Start Travel Wait Time, Turn-in Time, Late at Relief, Late at Division[8]. It appears that Dr. Drogin accepted all self-reports as valid and used them as a basis for his damages model.

13.    Without careful design, self-report data are subject to numerous biases and inaccuracies. These issues have been documented in volumes of empirical research[9]. One particularly useful reference that describes considerations when collecting self-reports in the context of litigation is the *Reference Guide on Survey Research*[10]. This chapter outlines many best practices for collecting valid and reliable self-report data including surveys and interviews. To my knowledge, no information has been produced

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

---

[6] American Statistical Association (2016), Section B.4
[7] American Statistical Association (2016), Discussion #5
[8] See Second Drogin Report, section 7.a.iv.1
[9] See, for example, Diamond (2003), Kahneman, Slovic, & Tversky (1982), Schwarz, & Oyserman (2001), Sudman, Bradburn, & Schwarz (1996)
[10] Diamond (2003)

5

by Dr. Drogin or the plaintiffs' attorneys to demonstrate that *any* of these best practices were followed. Dr. Drogin does not provide sufficient detail regarding who actually collected data from the sample but his description indicates that the plaintiffs' attorneys were directly involved in the data collection as reports were collected via affidavits[11]. This is a clear violation of professional practice[12] and creates the possibility of biased results. This violation alone is sufficient to undermine all of the self-report data collected.  In addition, there is no evidence that most other professional standards for valid data collection were met,  For example, the following issues all have the potential to create inaccuracies in the data and none of them have been sufficiently described:

- What information was provided to Operators prior to giving their time estimates (e.g., instructions given)?
- Who collected the data?
- What experience and training did the data collectors have in scientific data collection?
- What questions were Operators asked (i.e., how were the questions worded)?
- What mode was used to collect the data (e.g., written, phone)?
- How were questions from Operators answered?
- What discussion occurred after estimates were given by Operators and did any of them change their responses after these discussions?
- What steps were taken to ensure that all Operators had a consistent and accurate understanding of key terms used in the questions (e.g., "Turn-in Time", "Late at Division")?
- What steps were taken to ensure Operators excluded non-compensable activities from their time estimates?
- What efforts were made to facilitate memory of the Operators before giving their responses?
- What procedures were put in place to identify careless or dishonest responses?
- How were possible changes over time taken into account?
- Who entered the data into the database and what steps were taken to ensure there were no data entry errors?

14.    A professionally designed and conducted data collection procedure used in a litigation context should include a detailed description of the design and execution of the data collection so that it can be closely scrutinized for objectivity, clarity and relevance, completeness and consistency[13].  It does not appear that this was done here.

---

[11] Second Drogin Declaration, 7.a.iii.2
[12] "….the attorney should have no part in carrying out the survey." (Diamond, 2003, p. 374)
[13] Diamond (2003)

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

DECLARATION OF CHESTER HANVEY, PH.D. IN SUPPORT OF MOTION TO DECERTIFY
COLLECTIVE ACTION AND CLASS ACTION - Case No. 12-cv-03704-YGR

15.     Another form of known self-report bias that is particularly relevant to this case is the tendency of people to over-report the amount of time they spend performing work tasks[14]. This is compounded by the possibility that Operators have financial motivation to provide higher estimates. There is no indication that any effort was made to eliminate this potential bias or identify inaccurate responses.   The data show that several Operators provided extremely high estimates of time that are well beyond the estimates of the majority of the other Operators.  For example, five Operators reported that they spent an average of 1 hour every single shift waiting for their vehicle to arrive.   These estimates are well beyond the average of 19.5 minutes that the other Operators reported.

16.     Another Operator (Rochelle Larry) reported that her vehicle is late an average of 45 minutes every day she has worked, both at the division and at the relief points.  Ms. Larry's estimates are 15 minutes higher than any other Operator's estimate at a relief point and seven minutes higher than other Operator's estimate at the division.  Her estimates are also inconsistent with many other Operators who reported an average late time of five or fewer minutes.  The existence of these extreme outliers[15] indicate either that these Operators have a very different experience than other Operators or their self-reports are inaccurate.  An analysis of vehicle GPS data show that for Ms. Larry, the latter is true – self-reports greatly exaggerated actual late time.  More specifically, Mary Furst and Adrian Fleissig found that Ms. Larry's vehicle was actually late an average of four minutes across the 1,063 runs she worked and her vehicle was never more than 20 minutes late[16].  They found similar overestimates by several other Operators who provided self-report data[17].  Overestimates in the self-reported data, such as these, increase the average time estimates in the sample, which Dr. Drogin then appears to have applied to around 2.5 million Operator runs in his database.  When extrapolating to this many runs, even a small

---

[14] See, for example, Duncan & Hill (1985), Robinson & Bostrom (1984), Mellow & Sider (1983)
[15] I defined an "extreme outlier" as more than 3 Standard Deviations above or below the average
[16] See Rebuttal Report of Mary Furst and Adrian Fleissig, Paragraph 43a
[17] See Rebuttal Report of Mary Furst and Adrian Fleissig, Paragraph 43b-43e

DECLARATION OF CHESTER HANVEY, PH.D. IN SUPPORT OF MOTION TO DECERTIFY
COLLECTIVE ACTION AND CLASS ACTION - Case No. 12-cv-03704-YGR

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

overestimate in the sample would results in millions of dollars of overestimated damages[18]. Because there is no way to determine the extent to which the self-reported data are biased (because no information about the methodology was provided), the actual error rate in Dr. Drogin's calculations is not known.

17.    In addition, 83% of the Operators' self-reports were given in 5-minute increments (e.g., 5 minutes, 10 minutes, 15 minutes, etc). It is highly unlikely that the average time spent by Operators on these activities actually occurred in exact 5-minute increments. It is far more likely that most Operators "rounded" their estimates to the nearest five minutes. Rounded estimates are at best, imprecise and at worst, inaccurate. All analyses based on these data are similarly affected. Because many of the activities at issue are only a few minutes in duration (e.g., "turn-in time"), rounding to the nearest 5-minute increment can have a large proportional impact on the results.

**Travel Time Data from 511.org**

18.    The second source of data upon which Dr. Drogin relied was travel time estimates generated from an online travel planner found on 511.org. The data appear in Appendix 4 to the Second Drogin Declaration. I reviewed this database and found that it was not prepared consistent with professional standards. Each row in the database represents a run start/end combination. For example, a run that begins at the Green division and ends at the Embarcadero relief point has a start/end combination of Green Garage/Embarcadero and would have an estimate for total travel time associated with it (i.e., travel time to get back to the Green division after exiting the vehicle at Embarcadero). According to Dr. Drogin's methodology, total travel time is made up of four components: Walk Time (First Leg), Wait Time, Travel Time, Walk Time (Second Leg)[19] and each of these four components are included in the table he provides in Appendix 4. Logically, the total travel time for all start/end combinations should equal the sum of those four components. However, my review of the dataset showed that the same

---

[18] As an example, if the sample overestimated unpaid time by just 1 minute per day, extrapolating that estimate to 2 million other days results in an overestimate of 33,333 unpaid hours. At an average straight-time rate of $20 per hour ($30 OT rate), this results in a overestimate in total damages of $1 million.
[19] See Second Drogin Declaration, Appendix 4

DECLARATION OF CHESTER HANVEY, PH.D. IN SUPPORT OF MOTION TO DECERTIFY
COLLECTIVE ACTION AND CLASS ACTION - Case No. 12-cv-03704-YGR

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

formula was not used consistently to calculate total travel time for all of the roughly 600 possible start/end combinations in the dataset. This can easily be seen by examining the data in Dr. Drogin's Appendix 4. A few examples from Dr. Drogin's Appendix 4 are shown in Table 1 below.

**Table 1: Inconsistencies in Calculation for Travel Time In Dr. Drogin's Appendix 4**

| Row | Division | Piece Start Location | Piece End Location | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | FLN | BRYANT & 6TH ST | BRYANT & 6TH ST | 1.05 | 26 | 0.0 | 0 | 0.00 | 0 | 52.0 |
| 2 | FLN | BRYANT & 6TH ST | FLYNN GARAGE | 1.05 | 26 | 0.0 | 0 | 0.00 | 0 | 26.0 |
| 3 | FLN | HARRISON & 6TH ST | TRANSBAY TERMINAL | 0.00 | 0 | 0.0 | 0 | 0.00 | 0 | 68.0 |

Note. Column headers are taken directly from Dr. Drogin's Appendix 4: B=Walk Distance (miles) First Leg. C=Walk Time (First leg), D=Wait Time, E=Travel Time, F= Walk Distance (miles) Second Leg, G=Walk Time (Second Leg), H=Total Travel Time

19.     In Rows 1 and 2 in Table 1, the values in columns B-G are identical. However, the total travel time (Column H) is 52 minutes in Row 1 and 26 minutes in Row 2. In Row 3 the values of all columns are zero, but Row 3 has a total travel time (Column H) of 68 minutes. A review of Appendix 4 reveals many similar problems that are not explained in Dr. Drogin's declaration. For example, 183 of the start/end combinations (30%) have zero time in columns B-G but some travel time (an average of 70 minutes) calculated in Column H (as illustrated by Row 3 in Table 1 above). These type of issues call into question the accuracy of the entire travel time database and therefore Dr. Drogin's conclusions.

20.     The materials that Dr. Drogin produced include a Microsoft Excel file that appears to be Appendix 4 in a different format. Upon inspection of that file, I found that the formula used in Column H to calculate total travel time was manually adjusted and thus not consistent for many of the rows. In other words, the same formula was not used to calculate total travel time for all start/end combinations without any explanation. For some start/end combinations, the formula sums the values in columns C,D,E,G. For other start/end combinations, the formula simply applied the value in Column H from a different start/end combination. For other start/end combinations, Column H is computed by adding the values in Column H from two separate start/end combinations. For other start/end combinations, the formula sums columns C,D,E,G and then multiplies the sum by two. Having different formulas in

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

9

different rows is not consistent with professional practice because it makes replicating results impossible (without proper explanation, which Dr. Drogin did not provide) and is highly error-prone.

21.     Indeed, many errors were found in this dataset. Attempts to replicate the travel time estimates showed that the travel times Dr. Drogin used were overestimated in most cases and underestimated in others[20]. The inability to obtain consistent results when measuring the same thing multiple times means that the data, by definition, are unreliable[21]. It is not possible to conduct a valid statistical analysis based on unreliable data.

**DR. DROGIN'S ANALYSES INCLUDE INAPPROPRIATE ASSUMPTIONS**

22.     In addition to the deficiencies in the underlying data, Dr. Drogin's analyses also included numerous unsupported assumptions. The most impactful is the assumption that all Operators start and end their day at the division, regardless of where their run actually starts or ends[22]. Based on this assumption, Dr. Drogin assigned some amount of unpaid travel time to nearly every run. For runs that start at a relief point, Dr. Drogin assumed that the Operator starts their day at the division and then travels to the relief point. For runs that end at a relief point, Dr. Drogin assumes that the Operator goes back to the division after their run ends. Further, for runs that start and end at a relief point (even when the run starts and ends at the exact same location), Dr. Drogin assumes that the Operator starts at the division, travels to the relief point, completes their run and then travels back to the division.

23.     Defense counsel has informed me that plaintiffs have justified this assumption for runs that begin at a relief point by stating that all Operators go the division to read the bulletin before each run. However, the observational data collected in several divisions shows that this assumption is false – most Operators who start at a relief point do not read the bulletin boards before their run begins[23]. This

---

[20] See Rebuttal Report of Mary Furst and Adrian Fleissig
[21] See, for example, Kaye & Freedman (2003), Shadish, Cook & Campbell (2002)
[22] Second Drogin Declaration, 4.b.1
[23] See Rebuttal Report of Elizabeth Arnold

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

false assumption resulted in a massive overestimate of unpaid time because the average travel time associated with the start of each run was approximately 30 minutes per day[24].

24.      Dr. Drogin justifies the assumption for runs that end a relief point by stating that all Operators must travel back to the division after their runs is to pick up their personal vehicle[25]. However, this logic further assumes that all Operators drove a personal vehicles to division and had to return to the division to pick up their vehicles after their shift.  Operators who took public transportation or were dropped off at the division before their run, for example, would have no reason to go back to the division after their run ended at a relief point.  Again, observation data showed this assumption to be false as some Operators did not go back to the division after their run had ended[26].  Operators were observed taking BART out of San Francisco and riding public transportation to other non-division locations after concluding their shift at a relief point.  This false assumption also resulted in a massive overestimate of unpaid time because the average travel time associated with the end of each run in Dr. Drogin's analyses was approximately 28 minutes per day[27].

25.      Dr. Drogin further assumes that it takes all Operators the same amount of time to travel between the division and each relief point each day.  Again, the observation data shows this assumption to be false.  Operators were observed arriving at relief point using multiple modes of transportation including riding a bicycle, being dropped off by another diver in a personal vehicle, and driving their own personal vehicle[28].  The travel time database that Dr. Drogin used assumed that all Operators took

---

[24] This is the average travel time from the Second Drogin Declaration, Appendix 4, for all start/end combinations that did not start at a division. For runs that neither started nor ended at a division, half of the time was allocated to start of shift travel time and the other half allocated to end of shift travel time
[25] Second Drogin Declaration, 4.b.1
[26] See Rebuttal Report of Elizabeth Arnold
[27] This is the average travel time from the Second Drogin Declaration, Appendix 4, for all start/end combinations that did not end at a division. For runs that neither started nor ended at a division, half of the time was allocated to start of shift travel time and the other half allocated to end of shift travel time
[28] See Rebuttal Report of Elizabeth Arnold

DECLARATION OF CHESTER HANVEY, PH.D. IN SUPPORT OF MOTION TO DECERTIFY
COLLECTIVE ACTION AND CLASS ACTION - Case No. 12-cv-03704-YGR

1    public transportation (if it was more than 1 mile from the division)[29], an assumption that results in

2    inaccurate estimates for all the Operators who took a different mode of transportation.

### THE OPERATOR SAMPLE WAS NOT RANDOM DUE TO NON-RESPONDERS

3

4       26.     Even when a sample is drawn randomly for a population, it may be the case that only a

5    portion of those selected actually participate.  When there are differences between the group of people

6    who participate ("responders") and the group who do not ("non-responders"), non-response bias occurs.

7    Non-response bias is a serious concern for researchers because it can result in biased sample data and

8

9    therefore biased results.  If, for example, Operators from a particular division were more likely to

10   respond, the sample cannot be considered random and the results from the sample would be biased

11   toward the experiences from Operators in that division.  The same is true for any factor that may impact

12   Operator behavior such as vehicle type, whether they start or end their run at the division, tenure, or

13   personal practices (e.g., arrival time before runs).

14       27.     The more non-responders in a sample, the more susceptible the results are to non-

15   responses bias.  Of the 400 Operators who were randomly selected to participate in this exercise, 95

16   (23%) did not provide a declaration. This is not considered a high response rate[30].  The list of non-

17   responders and the reason they did not provide data are listed in Appendix 5 of the Second Drogin

18   Declaration.  This list includes 27 Operators who were either listed as "Could not be contacted" or "Did

19   not provide complete declaration."  These labels are not clearly defined but they suggest that some

20

21   Operators "self-selected" out of the sample.  For example, those who did not want to participate would

22   likely not respond to efforts to reach them and would be labelled as "Could not be contacted" and those

23   who refused to participate after being contacted would presumably be listed as "Did not provide a

24   complete declaration."  The option to self-select out of a sample is particularly likely to lead to non-

25   response bias in this context because Operators who do not believe they have any unpaid time (and

26

27

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

---

[29] See Second Drogin Declaration, 7.a.i.1
[30] A "high response rate" has been defined as 80% or higher (Diamond, 2003; p. 384)

DECLARATION OF CHESTER HANVEY, PH.D. IN SUPPORT OF MOTION TO DECERTIFY
COLLECTIVE ACTION AND CLASS ACTION - Case No. 12-cv-03704-YGR

would have provided smaller time estimates) may not have the same motivation to participate. Removing these Operators from the sample will cause averages from the remaining Operators in the sample to be inflated.

28.     Professional practice when collecting data from a sample is to assess the likelihood that non-response bias occurred by evaluating the extent to which the non-responders differ from the responders. It is the responsibility of the party collecting the data and presenting the results "to analyze the level and sources of nonresponse, and to assess how that nonresponse is likely to have affected the results."[31] There is no evidence that this was done so the error rate associated with non-response bias is unknown.

## CONCLUSION

29.     I was asked to review and evaluate the Second Drogin Declaration to determine the degree to which the results he reported can be meaningfully relied upon as an accurate estimate of class-wide damages. I found three central flaws which undermine the value of all of his calculations. First, his analyses are based on flawed underlying data. Self-report data were not collected consistent with professional standards and errors were found in the travel time database. Second, the analyses included three false assumptions: Operators always start their day at the division, Operators always end their day at the division, and Operators always take public transportation between the division and the relief points. These three assumptions have been shown to be false by observation data and result in massive overestimates of unpaid time (roughly a half hour per day). Finally, the sample of Operators who provided self-report data is highly susceptible to non-response bias. Inconsistent with professional practice, no evidence was presented to determine the extent to which non-response bias impacted the results. These issues are sufficient to undermine all of Dr. Drogin's calculations.

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

---

[31] Diamond (2003), p. 383

13

30.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on this 1st day of July 2016, at San Diego, California.

CHESTER HANVEY

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

14

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

1

# References

2 American Statistical Association, Committee on Professional Ethics (2016). *Ethical Guidelines for*

3 *Statistical Practice.* Retrieved from: http://www.amstat.org/about/pdfs/EthicalGuidelines.pdf

4 Diamond, S. S. (2003) Reference Guide on Survey Research. In *Reference Manual on Scientific*

5 *Evidence (3rd Edition).* National Academies Press: Washington, DC.

6 Duncan, G. J., & Hill, D. H. (1985). An Investigation of the Extent and Consequences of Measurement

7 Error in Labor Economic Survey Data. *Journal of Labor Economics,* 3(4), 508-522.

8
9 Kaye, D. H. & Freedman, D. A., 2003). Reference Guide on Statistics. In *Reference Manual on Scientific*

10 *Evidence (3rd Edition).* National Academies Press: Washington, DC.

11 Kahneman, D., Slovic, P. & Tversky, A. (1982). *Judgment Under Uncertainty: Heuristics and Biases.*

12 Cambridge University Press: New York, NY.

13 Mellow, W. & Sider, H. (1983). Accuracy of Response in Labor Market Surveys: Evidence and

14 Implications. *Journal of Labor Economics,* 1(4), 331-344.

15 Robinson, J. & Bostrom, A. (1984). The overestimated workweek? What time diary measures suggest.

16 *Monthly Labor Review,* January, 11-23.

17
18 Schwarz, N. & Oyserman, D. (2001). Asking questions about behavior: Cognition, communication and

19 questionnaire construction. *American Journal of Evaluation,* 22, 127-160.

20 Sudman, S., Bradburn, N.M., & Schwarz, N. (1996). *Thinking About Answers: The Application of*

21 *Cognitive Processes to Survey Methodology.* Jossey-Bass: San Francisco, CA.

22 Shadish, W.R., Cook, T.D., & Campbell, D.T. (2002). *Experimental and quasi-experimental designs for*

23 *general casual inference.* Houghton Mifflin Company; Boston, MA.

24 Wheelan, C. (2013). *Naked Statistics: Stripping the Dread from the Data.* W.W. Norton & Co.: New

25 York, NY.

26

27

# EXHIBIT A

Curriculum Vitae



**CHESTER HANVEY, PH.D.**
BERKELEY RESEARCH GROUP, LLC
2200 Powell Street, Suite 1200 | Emeryville, CA 94608
Direct: 510.874.5963
chanvey@thinkbrg.com

## SUMMARY

Chester Hanvey provides consulting services on labor and employment matters in both litigation and non-litigation contexts. Dr. Hanvey has worked with more than 100 organizations across a range of industries including public and private sectors. He specializes in designing and conducting job analyses and conducting statistical analyses to evaluate wage and hour compliance, appropriateness of class certification, allegations of discrimination, and damages. He has authored chapters and journal articles and regularly gives presentations on topics including wage and hour litigation, class certification, and statistical analyses. Most notably, he is the editor of *HR Practitioner's Guide to Legal Issues in Organizations*, a book that offers practical guidance for evaluating a variety of employment legal issues. His experience includes:

*Wage and Hour*
- Misclassification (e.g., FLSA and State Exemptions, Independent Contractor)
- Off-the-Clock Work (e.g., Security Checks, Walking time, Donning/Doffing)
- Meal and Rest Breaks (e.g., missed, short or late breaks, on-duty meal breaks)
- Time Clock Policies (e.g., time shaving, improper rounding)
- Damages Estimates (e.g., unpaid time, overtime, penalties, interest)
- Statistical Issues (e.g., class certification, sampling)

*Discrimination*
- Adverse Impact Analysis
- Test Validation (Public and Private sector)
- Compensation Equity
- Physical Abilities Testing
- Disabilities (e.g., Essential Functions)

## EDUCATION

**Ph.D.** Industrial/Organizational Psychology (Minor: Statistics), University of Houston, 2011

**M.A.** Industrial/Organizational Psychology, University of Houston, 2008

**B.A.** Psychology (Minor: Spanish), University of Texas at Austin, 2005

1



## PRESENT EMPLOYMENT

**2015-Present    Associate Director**
*Berkeley Research Group, Emeryville, CA*

## PREVIOUS EMPLOYMENT

**2014-2015    Senior Managing Consultant**
*Berkeley Research Group, Emeryville, CA*

**2012-2014    Senior Consultant**
*Lamorinda Consulting, LLC., Orinda, CA*

**2008-2012    Consultant**
*Lamorinda Consulting, LLC., Orinda, CA*

**2008    Instructor**
*University of Houston, Houston, TX*

**2007-2008    Teaching Fellow / Lab Instructor**
*University of Houston, Houston, TX*

**2007-2008    Consultant (Independent Contractor)**
*Lamorinda Consulting, LLC., Orinda, CA*

**2006    Consultant (Independent Contractor)**
*Development Dimensions International, Inc. (DDI), Bridgeville, PA*

## EXPERT TESTIMONY

*Johnson et al. v. The City and County of San Francisco* (2015), Case No. CV 09-5509 JSW (N.D. Cal.).  Testimony given at deposition.

## PROFESSIONAL AFFILIATIONS

Society of Industrial and Organizational Psychology (SIOP), Member
American Psychological Association (APA), Member
San Diego Industrial and Organizational Professionals (SDIOP), Member

2



## SERVICE

SIOP Visibility Committee, Member (2015-2016)
SIOP Speed Mentor, Topic: Legal Issues (2014)
SIOP Conference Reviewer (2011-2015)
Southwest Academy of Management Conference Presentation Reviewer (2008)

## PUBLICATIONS

### BOOKS AND CHAPTERS

**Hanvey, C.M.,** & Sady, K. (Eds.) (2015). *Practitioner's Guide to Legal Issues in Organizations*. New York, NY: Springer.

**Hanvey, C.M.,** & Banks, C.G. (2015). Wage and Hour Litigation. In C.M. Hanvey and K. Sady (Eds.), *Practitioner's Guide to Legal Issues in Organizations*. New York, NY: Springer.

### ARTICLES

**Hanvey, C.M.,** & Arnold, E.B. (2016). *Evaluating Employee Exempt Status According to Revised FLSA Exemption Criteria* [white paper]. Washington, DC: Berkeley Research Group.

Banks, C.G., & **Hanvey, C.M.** (2016). Wage and Hour Litigation Developments and Trends. *The Industrial-Organizational Psychologist*, 53 (3), 80-87.

Dubin, D.F., & **Hanvey, C.M.** (2015). Criterion-Related Validity: Strategies for Addressing Supervisor Rating Errors. *Quarterly: A publication of the Personnel Testing Council of Metropolitan Washington, X (2)*, 5-8.

**Hanvey, C.M.,** & Arnold, E.B. (2012). Nature of the Work: On-Duty Meal Periods. *HR Advisor: Legal and Practical Guidance,* (January/February), 20-28.

**Hanvey, C.M.** (2012). Job Analyses to Study FLSA Exemption Misclassification. *Quarterly: A publication of the Personnel Testing Council of Metropolitan Washington, VIII* (1), 6-9.

### OTHER PUBLICATIONS

Arnold, E.B., & **Hanvey, C. M.** (2016, April 29). Tools for Studying Your Employees' Duties. *Five on Friday.* [Web log post]. Seyfarth Shaw LLP.



## CONFERENCE PROCEEDINGS

**Hanvey, C.M.** (2016, April) Panelist, *Implications of Revisions to FLSA Exemptions for Organizations and Employees.* Panel Discussion presented at the annual meeting of the Society for Industrial and Organizational Psychology (SIOP), Anaheim, CA.

**Hanvey, C.M.** (2016, April) Application of Bayesian Statistics to Wage and Hour Litigation. In K. Sady (Chair), *Beyond Frequentist Paradigms in Legal Scenarios: Consideration of Bayesian Approaches.* Symposium presented at the annual meeting of the Society for Industrial and Organizational Psychology (SIOP), Anaheim, CA.

**Hanvey, C.M.** (2016, April) Panelist, *Do's and Don'ts of Graduate School: Surviving and Thriving 2.0.* Panel Discussion presented at the annual meeting of the Society for Industrial and Organizational Psychology (SIOP), Anaheim, CA.

**Hanvey, C.M.** (2015, April) Panelist, *Performance Appraisal: Balancing Business Needs and Legal Defensibility.* Panel Discussion presented at the annual meeting of the Society for Industrial and Organizational Psychology (SIOP), Philadelphia, PA.

Dubin, D.F., & **Hanvey, C.M.** (2015, April). Analyzing Nested Data in Criterion-Related Validation. In K. Sady & D. Dubin (Co-Chairs), *Faces in a Crowd: Data Aggregation Issues in Legal Scenarios.* Symposium presented at the annual meeting of the Society for Industrial and Organizational Psychology (SIOP), Philadelphia, PA.

**Hanvey, C.M.** (2015, April) Panelist, *Do's and Don'ts of Graduate School: Surviving and Thriving.* Panel Discussion presented at the annual meeting of the Society for Industrial and Organizational Psychology (SIOP), Philadelphia, PA.

**Hanvey, C.M.** (2014, May). Evaluating "Statistically Significant" Within-Title Variability. In C. Hanvey (Chair), *Within-Group Variability: Methodological and Statistical Advancements in the Legal Context.* Symposium presented at the annual meeting of the Society for Industrial and Organizational Psychology (SIOP), Honolulu, HI.

**Hanvey, C.M.** (2014, May). Chair, *Within-Group Variability: Methodological and Statistical Advancements in the Legal Context.* Symposium presented at the annual meeting of the Society for Industrial and Organizational Psychology (SIOP), Honolulu, HI.



**Hanvey, C.M.**, Banks, C. G. & Arnold, E. B. (2013, April). Appropriate Analyses at Different Stages of a Class Action Lawsuit.  In C. Hanvey & K. Sady (Co-Chairs), *I-O in the Legal Context: Inconsistencies in Understanding and Application.* Symposium presented at the annual meeting of the Society for Industrial and Organizational Psychology (SIOP), Houston, TX.

**Hanvey, C.M.** & Sady, K. (2013, April). Co-Chairs, *I-O in the Legal Context: Inconsistencies in Understanding and Application.* Symposium presented at the annual meeting of the Society for Industrial and Organizational Psychology (SIOP), Houston, TX.

**Hanvey, C.M.**, Arnold, E. B. (2012, August). Nature of the Work: On-Duty Meal Periods. In C. Hanvey (Chair), *Innovation in Job Analysis: Creative Solutions to Unique Challenges*. Symposium presented at the annual meeting of the American Psychological Association (APA), Orlando, FL.

**Hanvey, C.M.,** (2012, August). Chair, *Innovation in Job Analysis: Creative Solutions to Unique Challenges*. Symposium presented at the annual meeting of the American Psychological Association (APA), Orlando, FL.

**Hanvey, C.M.**  (2012, April) Chair, *Job Analysis in a Legal Environment.*  Panel Discussion conducted at the annual meeting of the Society for Industrial and Organizational Psychology (SIOP), San Diego, CA.

**Hanvey, C.M.**, Campion, J. E., Sady, K. (2009, April). *Juror Decisions in Wrongful Termination Cases: A Multi-Level Justice Perspective*. Interactive Poster presented at the annual meeting of the Society for Industrial and Organizational Psychology (SIOP), New Orleans, LA.

--
7/1/16