ARTHUR A. HARTINGER (SBN 121521)
ahartinger@publiclawgroup.com
LINDA M. ROSS (SBN 133874)
lross@publiclawgroup.com
JENNIFER L. NOCK (SBN 160663)
jnock@publiclawgroup.com
RENNE SLOAN HOLTZMAN SAKAI LLP
1220 Seventh Street, Suite 300
Berkeley, California 94710
Telephone: (510) 995-5800
Facsimile: (415) 678-3838

Attorneys for Defendant
CITY AND COUNTY OF SAN FRANCISCO

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARRYL A. STITT, TONY GRANDBERRY, and HEDY GRIFFIN, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>THE SAN FRANCISCO MUNICIPAL TRANSPORTATION AGENCY; CITY AND COUNTY OF SAN FRANCISCO; and DOES 1-20,<br><br>    Defendants. | Case No. 12-cv-03704-YGR<br><br>**NOTICE OF MOTION AND MOTION OF DEFENDANT TO EXCLUDE REPORTS AND TESTIMONY OF PLAINTIFFS' EXPERTS DROGIN AND LOVELL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT (*DAUBERT*; FRE 702)**<br><br>Date:    September 6, 2016<br>Time:    2:00 p.m.<br>Judge: Hon. Yvonne Gonzalez Rogers<br>Ctrm.: 1, 4th Floor<br>    1301 Clay Street<br>    Oakland, CA  94612<br><br>Action Filed:   July 16, 2012<br>Trial Date:     November 29, 2016 |

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

# TABLE OF CONTENTS

Page(s)

I.    STATEMENT OF ISSUES TO BE DECIDED ...................................................1

II.   STATEMENT OF RELEVANT FACTS ..........................................................2

    A.    Richard Drogin, Ph.D. ...........................................................................3

        1.    Drogin's Report ...........................................................................3

        2.    305 Affidavits / Declarations ......................................................7

        3.    City's Expert Rebuttal Reports ...................................................9

    B.    John Lovell, Ph.D. ................................................................................12

        1.    Observational Study of Operators at SFMTA ...........................12

        2.    Lovell's Rebuttal Report ...........................................................12

III.  LEGAL ARGUMENT ....................................................................................14

    A.    The Trial Court's Gatekeeping Responsibility Under Rule 702 and *Daubert* ..................14

    B.    Drogin's Evidence is Neither Reliable Nor Relevant to Determining Any Issue of Liability or Damages in This Case ..........................................14

        1.    Drogin's Evidence is Not Reliable Because It is Based on Affidavits and Other Data Gathered by Plaintiffs' Counsel, and Drogin Makes No Pretense of Any Attempt to Assure The Data's Accuracy or Validity ..................15

        2.    Rather Than Assisting the Trier of Fact, Drogin Places the Burden of Validating His Data Squarely on the Trier of Fact ................18

        3.    Drogin Did Not Rely on a Random Sample ......................20

        4.    Failure to Fully Disclose Drogin's Underlying Data Precludes the City's Experts From Fully Assessing His Methodology and Results ...........................22

        5.    Drogin's Calculations Encompass Time Not Alleged In The Complaint And Are Not Relevant to Plaintiffs' Claims ..........................23

    C.    Lovell Lacks the Foundation to Opine Upon or Criticize the BRG Time and Motion Study and So His Offered Evidence is Neither Reliable Nor Relevant ...............24

IV.   CONCLUSION ..............................................................................................25

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*24/7 Records, Inc. v. Sony Music Entertainment, Inc.*,
    514 F. Supp. 2d 571 (S.D.N.Y. 2007) .................................................................................. 22

*Akaosugi v. Benihana Nat. Corp.*,
    No. C 11–01272 WHA, 2012 WL 1029546 (N.D. Cal. March 26, 2012) ..................... 24, 25

*Amos v. Johnson Controls*,
    No. 3:15-CV-226 JD, 2016 WL 3662263 (N.D. Ind. July 11, 2016) ........................... 18, 22

*Estate of Barabin v. AstenJohnson, Inc.*,
    740 F.3d 457 (9th Cir. 2014) ........................................................................................... 14

*Comcast Corp. v. Behrend*,
    __ U.S. __, 133 S. Ct. 1426 (2013) .................................................................................. 24

*Dailey v. Sears, Roebuck and Co.*,
    214 Cal. App. 4th 974 (2013) ........................................................................................... 24

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    43 F.3d 1311 (9th Cir. 1995) ............................................................................... 14, 23, 25

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ................................................................................................. *passim*

*Duran v. U.S. Bank Nat'l Ass'n*,
    59 Cal. 4th 1 (2014) ............................................................................... 19, 20, 21, 22, 24

*G. v. Hawaii Dept. of Human Services*,
    703 F. Supp. 2d 1112 (D. Hawai'i March 19, 2010) ...................................................... 16

*Gibson v. County of Riverside*,
    181 F. Supp. 2d 1057 (C.D. Cal. 2002) .......................................................................... 15

*Hurt v. Commerce Energy, Inc.*,
    No. 1:12–CV–00758, 2015 WL 410703 (N.D. Ohio Jan. 29, 2015) ......................... 16, 17, 22

*Krouch v. Wal-Mart Stores, Inc.*,
    No. 12–cv–02217–YGR, 2014 WL 5463333 (N.D. Cal. Oct. 28, 2014) ......................... 14

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) ......................................................................................................... 23

*Lou v. Ma Laboratories*,
    No. C 12–05409 WHA, 2014 WL 68605 (N.D. Cal. Jan 8, 2014) .................................. 24

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

**TABLE OF AUTHORITIES:** (continued)                                      **Page(s)**

*Marlo v. United Parcel Service, Inc.*,
  251 F.R.D. 476 (C.D. Cal. 2008) ..........................................................................22

*O2 Micro Intern. Ltd. v. Monolithic Power Sys., Inc.*,
  20 F. Supp. 2d 1070 (N.D. Cal.2006) ....................................................................15

*Senne v. Kansas City Royals Baseball Corp.*,
  No. 14-cv-00608-JCS, 2016 WL 3940761 (N.D. Cal. July 21, 2016)..........................17, 18

*Sirko v. Int'l Bus. Machines Corp.*,
  No. CV 13–03192 DMG, 2014 WL 4452699 (C.D. Cal. Sept. 3, 2014)..................16, 17, 18

*In re TMI Litig.*,
  193 F.3d 613 (3rd Cir. 1999) ...............................................................................16

*Tunnell v. Ford Motor Co.*,
  330 F. Supp. 2d 707 (W.D. Va 2004) ................................................................16, 18

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)...........................................................................................24

*York v. Starbucks Corp.*,
  No. CV-08-07919 GAF, 2011 WL 8199987 (C.D. Cal. Nov. 23, 2011)..................15, 20, 24

**Other Authorities**

Federal Rules of Evidence
  Rule 702 ...............................................................................................*passim*
  Rule 703 ...............................................................................................15

Allen, M.A., Hall, R.E. and Lazear, V.A., Fed. Judicial Ctr., *Reference Guide to
  Estimation of Economic Damages, in* Reference Manual on Scientific Evidence (3d
  ed. 2011) ....................................................................................................15

Diamond, S. S., Fed. Judicial Ctr., *Reference Guide on Survey Research, in* Reference
  Manual on Scientific Evidence (3d ed. 2011).............................................................17, 22

Kaye & Freedman, *Reference Guide on Statistics, in* Reference Manual on Scientific
  Evidence (3d ed. 2011) .....................................................................................21

Freedman, D., Pisani, R., Purves, R., W.W. Norton & Co., *Statistics* (4th ed. 2007) ...............21

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

1

2

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on Tuesday, September 6, 2016, at 2:00 p.m., or as soon thereafter as counsel may be heard, before the Honorable Yvonne Gonzalez Rogers, United States District Court, Courtroom No. 1, Fourth Floor, 1301 Clay Street, Oakland, California, Defendant City and County of San Francisco ("City") will and hereby does move the Court for an order to strike and exclude the reports and testimony of plaintiffs' experts Richard Drogin, Ph.D. and John Lovell, Ph.D.  This motion is brought on the grounds that Drogin's opinions and proffered testimony are neither reliable nor relevant to determining any issue of liability or damages, that Lovell is not qualified to offer an opinion on defendant's expert's observational study, and their reports and testimony should thus be excluded pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993).  This motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities below, the declarations of Arthur Hartinger and Geoff Spellberg, and the Request for Judicial Notice, filed herewith, pleadings and papers on file herein, and on such other matters that may be presented to the Court at the time of the hearing.

## RELIEF SOUGHT

The City seeks to strike and exclude the testimony and May 10, 2016, report of Richard Drogin, Ph.D. ("Drogin") from consideration on summary judgment and at trial.  The City also moves to strike and exclude the testimony and June 13, 2016, rebuttal report of John Lovell, Ph.D. ("Lovell") from consideration on summary judgment and at trial.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     STATEMENT OF ISSUES TO BE DECIDED

1.     Whether Drogin's report fails to meet the standard for expert testimony outlined by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993) because his methodology in obtaining or analyzing data in this case was fundamentally flawed, he did not provide data in a format capable of access and validation by the City's experts, and his findings are not relevant to any issue of liability or damages in this case.

2.     Whether Lovell's report fails to meet the standard for expert testimony under Rule 702 and *Daubert* because he is not qualified to give an expert opinion on observational job analysis studies.

## II.    STATEMENT OF RELEVANT FACTS

Plaintiff bus and train operators who have worked for the San Francisco Metropolitan Transportation Agency ("SFMTA") at any time since July 16, 2009, contend that SFMTA has policies and practices of not compensating them for start-end travel time, turn-in time, and late runs, and that those policies and practices violate federal, state, and local wage and hour laws. (Second Amended Complaint ("SAC" or "Complaint") [Dkt. No. 69].)[1]  When the Court certified the Rule 23 class and conditionally certified the FLSA collective action on May 2, 2014, it found: "The expert declaration of Dr. Drogin demonstrates specifically how the class members' claims can be proven on a class-wide basis." (Dkt. No. 189 at 8:24-28, 18:12-14, citing Declaration of Dr. Richard Drogin, Ph.D. ("Drogin Decl."), ¶¶ 4-34 [Dkt. No. 157].) Drogin had described in his declaration that he could compute damages in part by "random sampling for a survey and/or selecting Operators for deposition or court testimony," and then discussed his recommendations for random sampling, including a pilot sample and an agreed-upon or court-set margin of error. (Drogin Decl., ¶¶ 14, 30-33 [Dkt. No. 157 at 4-5, 9-10.)

On May 10, 2016, the parties exchanged their expert witness reports. Plaintiffs produced Drogin's Report, and the City produced the Observational Study of Operators by Elizabeth Arnold ("Arnold") of the Berkeley Research Group ("BRG").  (Declaration of Linda M. Ross in Support of Motion to Decertify Collective Action and Class Action ("Ross Decl."), Exh. 1 [Drogin Report] [Dkt. No. 350-1 at 2-83]; Declaration of Elizabeth Arnold in Support of Motion to Decertify Collective Action and Class Action ("Arnold Decl."), Exh. C [BRG Report] [Dkt. No. 347-3].) On June 13, 2006, Plaintiffs produced the report of John Lovell, Ph.D. to rebut BRG's observational study, and the City produced reports of experts Arnold, statistician Chester Hanvey, Ph.D., forensic accountant Mary Furst, and economist Mark Cohen to rebut Drogin's analysis.  (Declaration of Geoffrey Spellberg in Support of Defendant's Motion to Exclude Testimony of Plaintiffs' Experts ("Spellberg Decl."), ¶ 2, Exh. A  [Lovell Report], filed herewith; Arnold Decl., Exh. 5 [BRG Rebuttal Report] [Dkt. No. 347-4]; Declaration of Chester Hanvey, Ph.D. in Support of Motion to Decertify Collective Action and Class Action ("Hanvey Decl.") [Dkt. No.

---

[1] Plaintiffs had included "meeting time" in the SAC, but are no longer pursuing that claim, nor are they pursuing their "End Travel Time" claim under the FLSA or California law, their Start-End Travel or Turn-In Time claims for runs out of the Cable Car Division, or "a claim for time spent turning in a 'miscellaneous' report." (Dkt. No. 357.)

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

345]; Declaration of Mary Furst in Support of Motion to Decertify Collective Action and Class Action ("Furst Decl."), ¶¶ 16-33 [Dkt No. 348]; Declaration of Mark Cohen in Support of Motion for Summary Judgment or, In the Alternative, Partial Summary Judgment ("Cohen Decl."), ¶¶ 4, 9, Exhs. B, C, filed herewith.)  On July 29, 2016, the City served Mary Furst's Amended Rebuttal Report to Expert Report of Richard Drogin, Ph.D ("Amended Furst Report").  (Declaration of Mary Furst in Support of Motion for Summary Judgment ("Furst Decl. II"), attaching report, filed herewith.)

On July 1, 2016, Plaintiffs filed their Trial Plan, in which they stated they "intend to prove their claims at trial on a representative and classwide basis," and they "will call Dr. Drogin to testify at trial." (Dkt. No. 335 at 4:2-5.) They urge the Court to try the case "based on representative proof," where their primary representative proof is Drogin's report and testimony. (*Id.* at 6:15-22.)

## A.   Richard Drogin, Ph.D.

### 1.   Drogin's Report

Drogin's assignment was "to act as a statistical consultant to make calculations regarding the number of occurrences and amount of time spent on various tasks outlined [in the report], estimate aggregate class wide damages, and to provide advice and counsel on sampling issues."  (Drogin Report at p. 1, ¶ 2 [Dkt. No. 350-1, p. 2].)  In his report, Drogin listed and defined three categories of time at issue: Start-End Travel Time, Turn-In Time, and Routinely Late Time.  (*Id.* at pp. 3-4, ¶ 4 [Dkt. No. 350-1 at 4-5].)  There is no indication that Drogin based these definitions on, or read, the Second Amended Complaint. (*Id.* at 2, fn 1, and Appendix 2 [Dkt. No. 350-1 at 3, 45-46]; Declaration of Arthur A. Hartinger ("Hartinger. Decl."), ¶ 3, Exh. A [Deposition of Richard Drogin ("Depo.") at 93:7-8, 93:15-16 (Drogin testified, "Number 15, I don't know if I read that. I may have reviewed 15," in reference to the SAC, which is listed as Number 15 on Appendix 2 of his Report)].)

For his definitions, Drogin split Start-End Travel Time into: (1) "Start Travel," which he defined as the "time required for Operators to travel from a division to the relief location to start their run," based on the assumption that "Operators whose run assignments begin at a relief location must first go to the division," and "the waiting time spent for the vehicle the Operator was set to relieve (referred to as 'Start Travel Wait');" and (2) "End Travel," which he defined as the time "Operators whose run assignments begin at a division and end at a relief location travel back to their personal vehicle" to start their commute

DEFENDANT'S MOTION TO EXCLUDE PLAINTIFFS' EXPERTS - 12-cv-03704-YGR

1    home, assuming all such Operators drive and park at the division.  (Drogin Report at p 3, ¶ 4(b), p. 10, ¶

2    7(a)(i)(1) [Dkt. No. 350-1 at 4, 11].)  (Compare SAC, ¶ 10 [defined as the time for Operators to get to or

3    from their own vehicles when their runs "start and end at different geographical points," at either the

4    beginning or end of their shifts; does not allege relief Operators must start shifts at division or include

5    Start Wait Travel Time].)  Drogin defined Turn-In Time as the time to "perform various tasks after

6    pulling into the division gate, including parking the vehicle, performing a walk-through inspection of the

7    vehicle, completing a defect card, and/or returning the defect card and transfers to a specific location at

8    the division."  (*Id*. at p 3, ¶ 4(c) [Dkt. No. 350-1, p. 4].)  (Compare SAC, ¶ 19 [defined as "turn in various

9    documents at the end of their day's assignment"].)  Drogin defined Routinely Late Time as the late time

10   when "transit vehicles routinely arrive at an end point of the daily runs later than the scheduled arrival

11   time," and he split this category into "Late to Relief" and "Late to Division."  (*Id*. at p. 4, ¶ 4(d), p. 14 fn.

12   13 [Dkt. No. 350-1 at 5, 15].)

13          To estimate the travel time portion of Start-End Travel Time, Drogin relied on Plaintiffs' counsel

14   to obtain information from "511 Trip Planner" from www.511.org. (*Id*. at 8, 9-10, ¶¶ 5(a)(vi), 7(a)(i)(1)

15   [Dkt. No. 350-1 at 9-11].)  He compiled a list of the start and end locations for specific runs, gave that list

16   to Plaintiffs' counsel, who provided information to Drogin from the 511 Trip Planner inquiries.  (*Id*. at

17   10, ¶ 7(a)(i)(1) and fn. 8; Depo. at 203:2-4, 203:22-204:3, 39:17-25 [Drogin "initially" looked at the

18   511.org website, but "primarily relied on counsel's producing that data travel time information"], 195:17-

19   24, Exh. 11 [511 spreadsheet].)  For the Trip Planner inquiries, the assumption was that Operators would

20   walk if travel was less than 1.05, 1.03, or one mile, and would take public transportation if it was greater

21   than 1, 1.03, or 1.05 miles "in all instances," which he testified was "an arbitrary assumption."  (Drogin

22   Report at 10, ¶ 7(a)(i)(1) [Dkt. No. 350-1 at 11]; Depo. at 189:11-21, 290:16-25.)  Drogin listed the

23   travel times he calculated in Appendix 4 of his Report, which he "derived from the spreadsheet that

24   counsel provided that summarized the 511." (Depo. at 194:17-24, 204:3-4, 204:18-21, Exh. 11.) Relying

25   on Plaintiffs' counsel to ensure accuracy, Drogin "also asked counsel to check it again and find any

26   errors and redo the whole thing independently," which they did, "[a]nd then a month later [he] asked

27   them to do it again," [a]nd they redid the whole thing again."  (*Id*. at 204:3-21.)  Drogin "didn't verify the

28   accuracy of 511."  (*Id*. at 192:9-11, 279:11-3.)

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

DEFENDANT'S MOTION TO EXCLUDE PLAINTIFFS' EXPERTS - 12-cv-03704-YGR

To estimate the time Operators spent in Start Travel Wait Time[2], Turn-in Time, and Routinely Late Time, Drogin concluded it was "necessary to take a random sample of class members." (Drogin Report at pp. 10-11, ¶ 7(a)(ii)(1) [Dkt. No. 350-1 at 11-12].) Drogin "provided Plaintiffs' counsel with a random sample of class members drawn from the class list, and they obtained affidavits from persons in the sample describing the time they spent engaging in Start Travel Wait Time, Turn-In Time, and Routinely Late Time." (*Id.* at 12, ¶ 7(a)(ii)(4) [Dkt. No. 350-1 at 13]; Depo. at 105:14-106:9 [used class list of 3,108 per Plaintiffs' counsel instructions].) Drogin recommended a sample size of 300 to 400, Plaintiffs' counsel decided on 400, and Plaintiffs' counsel ultimately obtained 305 affidavits from class members in the sample. (Drogin Report at p. 13, ¶ 7(a)(iii)(2) [Dkt. No. 350-1 at 14].) The defense was not involved in randomizing the list or selecting the sample. (Depo. at 107:10-12, 117:20-118:2, 118:14.) Because he had a sample of over 300, Drogin determined that "he didn't need to validate" that he had a representative sample of operators across all eight divisions. (*Id.* at 305:6-306:6 ["I didn't need to validate that"].)

Drogin played no role in creating, obtaining or ensuring the accuracy and validity of the affidavits: He testified that he did not know how the declarations were drafted, the process for obtaining the declarants' signatures, whether it was voluntary, the circumstances under which handwritten time estimates were inserted, whether the declarations were completed before being provided to the selected Operators, whether any of the Operators had questions about the meaning of the terms in the declarations, whether they were coached, whether any efforts were made to help Operators remember accurately, or whether they signed their declarations in the presence of counsel or other declarants. (*Id.* at 144:21-145:11, 151:9-152:9, 154:6-24, 166:6-15, 168:15-24, 169:3-10, 169:14-170:8, 183:13-184:7.) He did not know how to answer the question whether attorneys coached the declarants because "they are clients of the attorneys." (*Id.* at 169:14-24.)

Drogin denied that it was his role to ensure that the data in the affidavits was accurate and not exaggerated, that the Operators were not manipulated or subject to leading questions, or that the

---

[2] As discussed above, "Start Travel Wait Time" is not in the operative complaint, but Drogin uses it as a component for his Start-End Travel Time calculations. (Compare SAC, ¶ 10 [Dkt. No. 69] and Drogin Report at pp. 9-10, ¶ 7(a)(i)(1) [Dkt. No. 350-1 at 10-11].)

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

1    Operators understood what they were signing. (Depo. at 144:13-14, 156:2-13, 161:21-162:21, 173:17-

2    174:2, 174:14-21, 177:19-178:4, 179:1-14.)  He stated:

3           "I did not design a survey. This is not a survey. These are affidavits. These
            are different than a survey where you write a questionnaire up and then
4           have interviewers go interview people. This is not what this is."

5    (*Id.* at 161:7-11.)

6           Instead, Drogin took the numbers in the declarations "at face value" for his calculations because

7    the declarations were signed under penalty of perjury, and he reasoned it was up to the Court or the trier

8    of fact to determine the veracity of the information.  (Depo. at 155:23-156:10; *see also Id.* at 138:2-10,

9    138:17-19, 155:8-9, 160:1-8, 160:22-25, 161:21-162:21, 173:14-174:18, 175:17-176:3, 177:19-178:25,

10   179:10-18, 181:5-10, 184:8-16, 211:1-5.)  He had no concerns, for example, about the accuracy of

11   reported information where an Operator is being asked to give time estimates occurring over a long

12   period of time because "this is what they're testifying to, [a]nd that will …be the concern of the Court."

13   (*Id.* at 182:3-12).

14          Drogin used the data from these affidavits, compiled in Appendix 5 to the Report, "to estimate the

15   average time spent engaging in Start Travel Wait Time, Turn-In Time, and Routinely Late Time." (*Id.* at

16   pp. 13-14, ¶¶ 7(a)(iii)(2), 7(a)(iv)(1), Appx. 5 [Dkt. No. 350-1 at 14-15, 66-78]; *see* Depo. at 304:5-12 ["I

17   used the average that was testified to in the affidavits. That's how I got the turn-in time"].)[3]  He used the

18   data from these affidavits for "Plaintiffs' Sample Estimates of Unpaid Time" in Table 1 of his Report,

19   stating the time was "derived from the results of the random sample, as testified to in the affidavits

20   collected."  (*Id.* at p. 15, ¶ 7(a)(iv)(2), Table 1 [Dkt. No. 350-1 at 16].)  Drogin then combined Table 1

21   with Plaintiffs' counsel's 511.org data for Start-End Travel Time, to "compute[] the total unpaid time for

22   each run."  (*Id.*, pp. 15-18, ¶ 7(a)(v), (specifically, ¶ 7(a)(v)(5)), and p. 18, fns. 21, 22 [Dkt. No. 350-1 at

23   16-19].) This is the data on which Drogin relied to calculate unpaid hours to estimate damages under the

24

25   [3] Appendix 5 also lists the 95 remaining Operators, and the reasons their data was not collected, as
     "compiled by counsel."  (Drogin Report, Appx. 5, pp. 13-17 [Dkt. No. 305-1 at 79-83]; Depo. at 123:18-
26   124:4.) Plaintiffs' counsel listed those they could not contact and those that were incomplete and thus not
     included in the sample. (Depo. at 124:10-20, 128:22-129:2, 132:2-5, 133:9-24.)  Drogin did not verify
27   that they actually were incomplete, but "count[ed] it as a nonresponse." (*Id.* at 133:22-24, 138:11-15,
     139:13-21, 141:11-18.) For those listed as "Could not be contacted," Drogin did not know the method
28   Plaintiffs' counsel used to try to contact them or how many attempts they made; he simply "was
     informed" that [t]hey could not be contacted." (*Id.* at 130:2-131:3.)

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

FLSA, California's Wage Order 9-2001, and the San Francisco Minimum Wage Ordinance.  (*Id.* at pp. 20-22, ¶ 8(a)(i)(1)(a) [FLSA damages computed "by first determining the paid hours in a week, and then determining the unpaid hours"], ¶¶ 8(a)(i)(3), (4) [damages for violation of Wage Order 9-2001 and SFMWO "are computed for all unpaid hours worked"] [Dkt. No. 350-1 at 16, 21-23].)

On July 15, 2016, Drogin amended his report "to recalculate the damages with the addition of Darryl Stitt included for the list of damages," per Plaintiffs' counsel's request, apparently adding representative plaintiff Stitt to his random sample. (Depo. at 235:1-16.)

### 2.  305 Affidavits / Declarations

At the City's request, Plaintiffs produced the 305 affidavits on which Drogin relied in his Report. (*See* Declaration of Alessandra Moore ("Moore Decl.")], ¶¶ 3, 5, Exh. A [Dkt. Nos. 349, 349-1 through 349-11].)  Each affidavit is titled, "DECLARATION OF …," and is on pleading paper, with only Plaintiffs' counsel's information in the caption.  (*Id.*, Exh. A.)  According to the signature pages, the declarations appear to have been collected between December 2015 and February 2016, covering a period from "July 16, 2009 to the present."  (*See, e.g.*, *Id.*, Exh. A, Aisha Adams Decl. (dated December 1, 2015), ¶ 2 and Alberto Montoya Decl. (dated February 7, 2016), ¶ 2 [Dkt. No. 349-1 at 6-13].)

The introductory paragraphs are identical, describe "the covered period of the lawsuit," and include the statement, "Because of Defendant's policies and practices regarding compensation of Operators, I have routinely worked time for which Defendant paid (a) no compensation, and/or (b) no federally mandated overtime premium when my work time exceeded forty (40) hours per week ("Overtime")."  (*Id.*, ¶¶ 2, 3 of each declaration in Exh. A [Dkt. Nos. 349-1 through 349-11.)  The subsequent paragraphs, to the extent a particular time component applies to each declarant, include identical language for Start-End Travel Time, Turn-In Time, and Routinely Late Time – with the exception of the time estimates that were handwritten or typed in. (Moore Decl.*,* ¶ 4, Exh. A [Dkt. Nos. 349 to 349-11.)  Thus, the declarations that do not have an "NA" in Drogin's Appendix 5 are identical except for the numbers inserted for the four components of time, while those that have one or more "NAs" in Appendix 5 are missing the text related to one or more components of time but are otherwise identical to the other declarations.  (Compare *Id.*, Exh. A with Drogin Report, Appx. 5, pp. 1-12 [Dkt. No. 350-1 at 67-78].)

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

To illustrate, the Declaration of Aris Chan ("Chan Decl.") contains all three categories of time, with someone handwriting in "30" for the space left blank in Start-End Travel Time, "10" for the space left blank in Turn-In time, and "10" for each space left black in "Routinely Late Time." (Chan Decl., ¶¶ 5, 10, 17 [Dkt. No. 349-2 at 21-24].)  Each of these numbers is reflected in Drogin's chart, line 3, Random No. 6.  (Drogin Report, Appx. 5, p. 1 [Dkt. No. 350-1 at 67].)  In comparison, the Declaration of Cassandra Griffin ("Griffin Decl.") includes only a section on Routinely Late Time, which states, in part, "the average amount of my 'routinely late' time for which Defendant has not paid me is approximately 6 minutes per day that I have operated run that ends at a relief location and 9 minutes per day that I have operated a run that end at a division." (Griffin Decl., ¶ 7 [Dkt. No. 349-3 at 40-42].)  This is reflected in Drogin's Appendix 5, line 4, Random No. 8, as "NA" for Start Travel Wait Time and Turn-In Time, "6" for Late Time at Relief, and "9" for Late Time at Division.  (Drogin Report, Appx. 5, p. 1 [Dkt. No. 350-1 at 67].) Other than the time difference, the text for "Routinely Late Time" is identical in both declarations, including the statement, "My understanding has been that if I were to submit Transit Operator Vehicle Logs routinely, I would be investigated and possibly subject to discipline, but that if I did not, I would not be subject to discipline." (Compare Chan Decl., ¶ 17 [Dkt. No. 349-2 at 24] with Griffin Decl., ¶ 7 [Dkt. No. 349-3 at 41].)

Similarly, for each declaration that includes "Start-End Travel Time," the declaration provides, "The average amount of time that I have spent reviewing the bulletin board and/or any bulletins is at least five (5) minutes per day," and "each day that I have worked a run that begins at a relief location, I have arrived at the relief location an average of ___ minutes before the scheduled time of the relief."  (*See*, *e.g.*, Chan Decl., ¶ 5 [Dkt. No. 349-2 at 22].)  For those that include "Turn-In Time," each identical declaration states, "The average number of minutes that I have spent between pulling in to the gate at the division and completing the tasks listed above ("Turn-In Time") is ___ minutes per day that I have worked a run that ends at a division," where those tasks "include parking the vehicle, performing a walk-through inspection of the vehicle, completing a defect card, and/or returning the defect card and transfers to a specific location at the division." (*Id.*, ¶¶ 9-10 [Dkt. No. 349-2 at 23].) The declarations all say that the City has paid neither straight time nor overtime for each category of time.  (*See*, *e.g.*, *Id.*, ¶¶ 7, 12, 17 [Dkt. No. 349-2 at 22-24.)

Drogin assumed the Operators understood the terms in the form declarations – such as "turn-in time" and "late at division" -- because they signed under penalty of perjury, even though he did not know if anyone described the consequences of testifying under penalty of perjury to them before they signed their declarations.  (Depo. at 177:19-178:25, 184:21-185:1.)  He testified that it was "not my role" to "ensure that all the terms were accurately defined so that everybody had a common understanding as to what they meant."  (*Id*. at 179:10-14.)  In addition, Drogin took no steps to ensure that the operators excluded non-compensable activities from their estimates, testifying, "Well, it's up to them because they stated they did, and they testified under penalty of perjury that they did not include time for which they were paid."  (*Id*. at 181:5-10.)

### 3.    City's Expert Rebuttal Reports

The City's experts addressed Drogin's methodology, finding that he had relied on flawed data, failed to ensure an unbiased representative sample, made inaccurate assumptions, and lacked transparency in his calculations. (*See, e.g.*, Amended Furst Report, ¶ 65 ["Given the many serious shortcomings in his approach, because the sample does not represent the population, his methodology will give biased, inaccurate and incorrect estimates," which cannot be extrapolated to the population as a whole].)

**Non-reliable Data.**  First, Hanvey noted, "Dr. Drogin provides no evidence supporting the validity of the self-report data or the travel time data and does not describe any actions taken to ensure that the data are valid" or reliable. (Hanvey Decl., ¶¶ 3, 11 [Dkt. No. 345 at 2-3, 6].)  "The failure to report the adequacy of the data is a direct violation of the American Statistical Association's *Ethical Guidelines for Statistical Practice* which state that it is a statistician's responsibility to 'report the sources and assessed adequacy of the data.'" (*Id*., ¶ 11 [Dkt. No. 345 at 6], citing American Statistical Ass'n (2016), Section B.4.) Failure to provide "any evaluation of the quality or the validity of the underlying self-report or travel time data …also violates professional guidelines in statistical analysis." (*Id*., ¶ 3 [Dkt. No. 345 at 3].) Hanvey noted that Drogin did not appear to follow *any* of the "best practices for collecting valid and reliable self-report data" outlined in the *Reference Guide on Survey Research*.  (*Id*., ¶ 13, citing Diamond (2003) [Dkt. No. 345 at 6-7].)

Second, Hanvey observed that Drogin's insufficient description of data collection nevertheless

Renne Sloan Holtzman Sakai LLP
Attorneys at Law

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

"indicates that the plaintiffs' attorneys were directly involved in the data collection," which "is a significant violation of professional standards," "creates the possibility of biased results," and "alone undermines the credibility of all the self-report data Dr. Drogin relied upon." (*Id.*, ¶¶ 3, 13 [Dkt. No. 345 at 3, 6-7.)

Third, the City's experts observed that Drogin did not try to eliminate potential bias or identify inaccurate responses in the self-report data, even though the following factors could lead to an upward bias, i.e., over-estimating unpaid time: (1) the declarations "do not allow for varying estimates of time or alternatives to being late (such as being on-time or early)," (2) people tend "to over-report the amount of time they spend performing work tasks," (3) "83% of the Operators' self-reports were given in 5-minute increments," meaning that most Operators likely rounded their estimates to the nearest five minutes, which "can have a large proportional impact on the results" because "many of the activities at issue are only a few minutes in duration (e.g., 'turn-in time')," (4) each space in the declarations "requires an estimate be made that covers a large amount of time and which may incentivize exaggeration," (5) by requiring one estimate for each category over a large period of time, the declarations gave "no option to separately describe the different runs and schedules they worked during the class period, even though Operator schedules routinely change and are re-bid approximately four times per year;" and (6) the declarations were "taken from individuals who have an incentive to maximize their estimates of allegedly unpaid time." (Hanvey Decl., ¶¶ 15-17 [Dkt. No. 345 at 8-9]; Cohen Decl., Exh. B, ¶¶ 14, 17; Furst Decl., ¶ 25 [Dkt. No. 348 at 7-8]; Amended Furst Report, ¶¶ 20-25, 32, 40.) Overestimates applied to "around 2.5 million Operator runs in his database" will likely result in "millions of dollars of overestimated damages." (Hanvey Decl, ¶ 16 [Dkt. No. 345 at 8-9].) In sum, "due to the lack of reliability and accuracy of the Operator responses in the biased and poorly designed declarations, we do not believe those declarations can be used to support any kind of statistically-reliable sampling." (Furst Decl., ¶ 30 [Dkt. No. 348 at 9].)

Fourth, Furst opined that Drogin's travel time calculations were "unsupportable" because Drogin made "no attempt to account for the different ways in which Operators travel to relief points," and instead just assumed "all Operators are following an identical pattern of travel." (Furst Decl., ¶¶ 29, 32 [Dkt. No. 348 at 8-10].) He did not refer to Operator deposition testimony about the way they traveled

between divisions and relief points or how long it took, and the declarations on which he did rely had no such information. (*Id.*) She also stated that they could not confirm the 511.org information on which he purports to rely.  (*Id.*, ¶ 28 [Dkt. No. 348 at 8].)

**Non-representative Sample**. The City's experts found that "the sample of Operators who provided self-report data is susceptible to non-response bias" because Drogin did not evaluate the extent to which the group of 95 non-responders differed in meaningful ways from the group of 305 responders "to determine the extent to which non-responders biased the results" – contrary to professional practice. (Hanvey Decl., ¶¶ 5, 26-28 [Dkt. No. 345 at 2-3, 6].)  Hanvey explained, "If, for example, Operators from a particular division were more likely to respond, the sample cannot be considered random and the results from the sample would be biased toward the experiences from Operators in the division."  (*Id.*, ¶ 26.) Moreover, where 95 out of 400 – or 23% -- did not provide a declaration, "[t]his is not considered a high response rate." (*Id.*, ¶ 27, citing Diamond (2003), p. 384 ["A 'high response rate' has been defined as 80% or higher"].)  For those 27 Operators listed in Appendix 5 of Drogin's Report as "Could not be contacted" or "Did not provide complete declaration," Hanvey opined those descriptions "suggest that some Operators 'self-selected' out of the sample."  (*Id.*, ¶ 27.)  If "Operators who do not believe they have any unpaid time … may not have the same motivation to participate," and are more likely to have self-selected out of this sample, their removal "from the sample will cause averages from the remaining Operators in the sample to be inflated."  (*Id.*, ¶ 27; Furst Decl., ¶ 26 [Dkt. No. 348 at 8] [Omitting 95 operators from the random sample of 400 "is a clear demonstration of self-selection and response bias in the procurement of these declarations"].)

In addition, where there was no time included in a particular declaration for a category of unpaid time, Drogin simply counted that as "NA" rather than "zero," without investigating why a particular declaration left out a particular category of time.  (Amended Furst Report, ¶ 53.)  By excluding those in the sample who might have "zero" time, the sample is not representative, and the calculations have an upward bias.  (*Id.*, ¶ 53-58.)  In addition, "Drogin made no apparent attempts to adjust for the incorrect and upward bias in the responses" in Furst's examples.  (*Id.*, ¶ 64.)

**Non-transparent Data**.  The City's experts have been unable to analyze or reconcile Drogin's calculations supporting his conclusions because (1) Drogin did not include his calculations with his

DEFENDANT'S MOTION TO EXCLUDE PLAINTIFFS' EXPERTS - 12-cv-03704-YGR

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

1    report; and (2) not all of the electronic files that Plaintiffs' counsel subsequently provided are accessible.

2    The City and its experts have been working to access Drogin's files, but there are still files the City's

3    experts cannot read, which has at best resulted in delay in evaluating Drogin's calculations and findings,

4    and at worst an inability to evaluate some of his calculations.  (Furst Decl., ¶¶ 17-20 [Dkt. No. 348 at 5-

5    6]; Furst Decl. II, ¶¶ 5-7; Cohen Decl., ¶ 8, Exh. B, p. 3, fn. 4.)

6        **B.    John Lovell, Ph.D.**

7            **1.    Observational Study of Operators at SFMTA**

8            Elizabeth Arnold is Director in the Labor and Employment practice at Berkeley Research Group

9    ("BRG"), was vice president of Lamorinda Consulting before joining BRG, and has conducted more than

10   150 wage and hour job analysis studies as well as hundreds of employee observations in the context of

11   wage and hour litigation.  (Arnold Decl., ¶¶ 2-3, Exh. A [Dkt. Nos. 347 at 2 of 21, 347-1 at 1-15].)

12   Retained by the City, Arnold and her team performed a "job analysis study" of SFMTA operators at each

13   of the eight Municipal Railway transit divisions.  (Arnold Decl., ¶¶ 5-6, 10, 17, Exh. C [BRG's

14   Observational Study of Operators] [Dkt. Nos. 347 at 3-4, 6; 347-3 at 2-97].)  Job analysis techniques are

15   based on volumes of empirical research and academic literature.  (*See, e.g.*, *Id.*, Exh. C at p. 2, ¶ 6, fn. 4

16   [Dkt. No. 347 at 3].)  There are various methods to collect job analysis data.  BRG conducted a "time and

17   motion study" which involved observing 275 Operators across all of the divisions and at several different

18   "Relief Points" (i.e., designated stops along routes where new Operators take over vehicles for their

19   runs.)  (*Id.*, at ¶¶ 6-8, 17 [Dkt. No. 347 at 3-4, 6].)  There were over 65 hours of such observation which

20   resulted in identifying and documenting more than 4,000 individual tasks performed by these

21   Operators.  (*Id.*, at ¶ 7, [Dkt. No. 347 at 3].)  All tasks performed by each Operator and the duration of

22   each task were recorded by observers, generating an individual record of tasks performed for each

23   Operator. (*Id.*)  The data from each individual observation record was then analyzed to determine how

24   each Operator spent his or her time, and from the aggregate of those individual analyses BRG was able to

25   draw meaningful conclusions regarding the actual time used by observed Operators for pre-shift

26   activities, bulletin review and turn-in time.  (*Id.*, at ¶¶ 7, 40 [Dkt. No. 347 at 3, 15].)

27           **2.    Lovell's Rebuttal Report**

28           Plaintiffs designated John Lovell, Ph.D. as the rebuttal expert for BRG's Report, but he is not

-12-

DEFENDANT'S MOTION TO EXCLUDE PLAINTIFFS' EXPERTS - 12-cv-03704-YGR

qualified to opine on BRG's work.  (Spellberg Decl., ¶ 2, Exh. A [Lovell Report].)  Deposition

questioning not only confirmed the lack of substance to his report,[4] but shows that Lovell lacks the

professional expertise to provide opinions about or criticisms of the BRG report.  (*Id.*, ¶ 3, Exh. B

[Lovell Depo. Excerpts].)

At the outset, Lovell admitted that he had never conducted a time and motion study experiment in

the workplace or in any other venue:

> Q.    Have you ever conducted a time and motion study experiment in the workplace?
>
> A.    I have not.
>
> Q.    Have you ever conducted a time and motion study in some other venue besides the
>
> workplace?
>
> A.    No.

(Lovell Depo. at 15:9-14].)  He testified that his "impression" was that a "job analysis is part of an

organizational study done by sociologists," and when asked if he had experience performing a job

analysis study, Lovell admitted "No, I am a psychologist."  (*Id.* at 21:8-15.)  When asked if the BRG

study was a job analysis study, Lovell did not feel qualified to answer: "I don't know. I would have to

think about that. I don't feel like I am a sociologist and that feels like a question for sociologist

expertise."  (*Id.* at 21:16-22.)  The first page of BRG's report shows it is a job analysis. (Arnold Decl.,

Exh. C [BRG's Study, p. 1, ¶¶ 2, 3] [Dkt. No. 347-3 at 4].)  Lovell testified that he is an "experimental

psychologist," and admitted that virtually all of his experimental psychology research has been

conducted in an academic setting, not in the workplace.  (Lovell Depo at 10:11-13, 11:17-13:24, 16:6-10,

18:9-22, 20:6-10 [last study where he observed people, outside academia, was 1980].)  Lovell has never

been an expert in any legal matter, nor has he consulted on any other legal matter. (*Id.* at

---

[4] Dr. Lovell's lack of familiarity with job analyses is illustrated by his bizarre criticisms of BRG's work. For example, Lovell opined that this simple observational study of Muni drivers in the workplace had breached ethical standards similar to the ethical violations in the Tuskegee Syphilis study where afflicted African American subjects were not medically treated and was similar to the ethical violations of Nazi physicians who conducted horrifying "medical experiments" on concentration camp inmates. (Lovell Depo. at 25:23-28:7].)  Lovell also opined that when the BRG observers conducted their observations of the Muni Operators, they should have worn right angle eye glasses that researchers who study gorilla behavior use to avoid eye contact with the gorillas. (*Id.* at 75:2-7; Lovell Report at p. 10, ¶ 5(g)].)  He bases that remarkable conclusion in part on his observation that the deer who wander into his yard at home tend to become more spooked when he looks them directly in the eyes. (Lovell Depo. at 71:7-17.)

DEFENDANT'S MOTION TO EXCLUDE PLAINTIFFS' EXPERTS - 12-cv-03704-YGR

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

10:18-23.)

## III.    LEGAL ARGUMENT

### A.    The Trial Court's Gatekeeping Responsibility Under Rule 702 and *Daubert*

"Trial judges are charged with the responsibility of acting as 'gatekeepers' to ensure that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Krouch v. Wal-Mart Stores, Inc.*, No. 12–cv–02217–YGR, 2014 WL 5463333, at *6, 7 (N.D. Cal. Oct. 28, 2014) (expert's report that was "based on unfounded and contradicted assumptions" was neither admissible at trial nor considered on summary judgment), citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). [5] "'Expert testimony should not be admitted when it is speculative, it is not supported by sufficient facts, or the facts of the case contradict or otherwise render the opinion unreasonable.'" *Id.* (quoting *U.S. v. Rushing*, 388 F.3d 1153, 1156 (8th Cir. 2004).)  *See Estate of Barabin v. AstenJohnson, Inc.,* 740 F.3d 457, 466-67 (9th Cir. 2014) (*Daubert* requires "that the proponent of expert testimony lay a proper foundation" by establishing "relevancy and reliability," and that the district court must make findings of relevancy and reliability before admitting expert testimony into evidence).

Where the Court is "presented with only the experts' qualifications, their conclusions and their assurances of reliability," "that's not enough." *Daubert v. Merrell Dow Pharmaceuticals, Inc. (Daubert II)*, 43 F.3d 1311, 1315-1316, 1319 (9th Cir. 1995) ("something doesn't become 'scientific knowledge' just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were 'derived by the scientific method' be deemed conclusive").

### B.    Drogin's Evidence is Neither Reliable Nor Relevant to Determining Any Issue of Liability or Damages in This Case

The self-report and travel time data Drogin obtained from Plaintiffs' counsel and used for his calculations of unpaid time is not reliable, and thus cannot support his conclusions regarding any

---

[5] Federal Rule of Evidence 702 provides: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

1  category of time at issue.  Because the sample of operators chosen to sign the affidavits was not random,

2  Drogin's calculations of unpaid time based on that data – even if reliable -- cannot be reliably

3  extrapolated to the class.  Because Drogin based his calculations for each category of time as defined in

4  the declarations rather than in the Second Amended Complaint, his calculations do not "fit" the liability

5  or damages claims at issue.  As a result, Drogin's calculations for liability and damages, for each

6  category of time, will *not* help the trier of fact understand the evidence or determine a fact in issue, are

7  *not* based on sufficient data, are *not* "the product of reliable principles and methods," and Drogin has *not*

8  "reliably applied the principles and methods to the facts of the case."  *See* Fed. R. Evid. 702.  Drogin's

9  opinion, report, and testimony should be stricken and excluded under Rule 702 and *Daubert*.

> **1.    Drogin's Evidence is Not Reliable Because It is Based on Affidavits and Other Data Gathered by Plaintiffs' Counsel, and Drogin Makes No Pretense of Any Attempt to Assure The Data's Accuracy or Validity**

12      "Case law plainly holds that an expert cannot adopt another's data without verifying its validity

13  and reliability."  *York v. Starbucks Corp*., No. CV-08-07919 GAF, 2011 WL 8199987, at *13-14,16

14  (C.D. Cal. Nov. 23, 2011) (striking expert declaration and opinions based on "irrelevant and potentially

15  incorrect data," especially where "the content of that data is material to the issue on which [the expert]

16  opined"), citing *O2 Micro Intern. Ltd. v. Monolithic Power Sys., Inc.*, 420 F. Supp. 2d 1070, 1088 (N.D.

17  Cal. 2006); *see also* Fed. R. Evid. 703 (experts can base opinions on inadmissible evidence "[i]f of a type

18  reasonably relied upon by experts in the particular field in forming opinions or inferences upon the

19  subject").  "Validation of any dataset is critical."  (Hartinger Decl., Exh. B [Allen, M.A., Hall, R.E. and

20  Lazear, V.A., Fed. Judicial Ctr., *Reference Guide to Estimation of Economic Damages, in* Reference

21  Manual on Scientific Evidence 483-484 (3d ed. 2011).)

22      Put simply, Drogin used data gathered by Plaintiffs' counsel as the basis for all of his opinions

23  and did nothing at all to ensure its accuracy.[6]  (Depo. at 39:17-25 ["primarily relied on counsel's

24  producing that data travel time information"], 136:2-4 ["counsel" collected information and signatures

25  for affidavits], 138:17-19 ["So I took the declarations, and I took the numbers that were in the

_____

[6] Drogin assumed the data in the declarations was accurate because they were signed under penalty of perjury, but obtaining data through affidavits signed under penalty of perjury does not remedy "substantial deficiencies" in collecting that data. *Gibson v. County of Riverside*, 181 F. Supp. 2d 1057, 1065-69 (C.D. Cal. 2002).  (*See, e.g.*, Drogin Depo. at 160:22-25, 178:18-25, 184:21-185:1.)

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

1  declarations, and used those in the calculations that I reported in my report"].)  He freely admits, "I did

2  not design a survey."  (*Id*. 161:7-11.)

3      That renders his opinion, report, and testimony so flawed that they are inadmissible.  *See, e.g.*,

4  *Sirko v. Int'l Bus. Machines Corp*., No. CV 13–03192 DMG (SSx), 2014 WL 4452699, at *4-6 (C.D.

5  Cal. Sept. 3, 2014) ("the Court strikes those portions of the experts' reports that are based on the results

6  of Plaintiffs' counsel's survey"); *Hurt v. Commerce Energy, Inc.*, No. 1:12–CV–00758, 2015 WL

7  410703, at *1-2, 4 (N.D. Ohio Jan. 29, 2015) (where plaintiffs' experts' classwide damages estimate of

8  unpaid wages and overtime relied "on a survey distributed by Plaintiffs' counsel to class members," the

9  court found that neither "Plaintiffs' survey results" nor the expert's "methodology in using those survey

10  results were reliable," and granted the motion to exclude the expert's report); *G. v. Hawaii Dept. of

11  Human Services*, 703 F. Supp. 2d 1112, 1124-26 (D. Hawai'i March 19, 2010) (survey not conducted in

12  accordance with "generally accepted principals" where it was  "designed and overseen" by "a law partner

13  of Plaintiffs' counsel," the interviewers were aware "of the connection between the survey and the

14  litigation," and respondents were aware the survey was part of "an advocacy effort"); *In re TMI Litig*.,

15  193 F.3d 613, 698 (3rd Cir. 1999) (expert testimony properly excluded where expert relied on

16  "summaries … made by employees of Trial Plaintiffs' counsel," that were based on patients' "self-report

17  of symptoms"); *Tunnell v. Ford Motor Co*., 330 F. Supp. 2d 707, 710-711 (W.D. Va 2004) (survey with

18  an introductory "Information Piece" written by plaintiffs' counsel was "unfairly skewed in favor of

19  Plaintiff," and was inadmissible because "[w]hile cross examination may reveal the unfairness of the

20  survey to the jury, it will not provide the answers that survey respondents would have given had the

21  questions not been worded in a manner that was biased").  Drogin acknowledged that he could not

22  remember any other sampling cases where he obtained information by having plaintiffs' counsel prepare

23  and send out affidavits, noting "I generally propose depositions."  (Depo. at 238:20-25, 239:11-23.)

24      The major problem with attorney-created surveys is bias.  In *Sirko*, the plaintiffs' attorney created

25  a survey questionnaire as foundational evidence to support class certification, and "both the cover letter

26  and the survey itself informed recipients that the purpose of the survey was to support a class action

27  seeking overtime wages for employees who had been misclassified as exempt."  *Sirko*, 2014 WL

28  4452699, at *4. Because "[t]he survey recipients had to have been aware they would be potential

Renne Sloan Holtzman Sakai LLP
Attorneys at Law

beneficiaries of such a lawsuit," "[t]his undermines any possible inference that the survey responses were objective." *Id*. The Court found the survey inadmissible because it "lacks basic indicators of reliability," and therefore also struck "those portions of the experts' reports that are based on the results of Plaintiffs' counsel's survey." *Id*. at *4-6. Here, all portions of Drogin's report are based on the results of Plaintiffs' counsel's data collection.

In *Hurt*, "Rather than have an independent expert design and conduct the survey, Plaintiffs' counsel did it themselves." *Hurt*, 2015 WL 410703, *4. "Although 'some attorney involvement in the survey design is necessary to ensure that relevant questions are directed to a relevant population, the attorneys 'should have no part in carrying out the survey.'" *Id*. (quoting Diamond, S. S., Fed. Judicial Ctr., *Reference Guide on Survey Research, in* Reference Manual on Scientific Evidence 237-38 (3d ed. 2011).) Discussing "the risks of faulty memory and 'insincere responses' (i.e., giving untrue answers to produce favorable results) by the respondents," and the "enhanced … likelihood that the respondents would inflate the hours they worked in order to increase the damages they would recover" when they knew their responses would be used in a lawsuit for unpaid wages and overtime, the court found that "the obvious problems inherent in having attorneys conduct the survey call into doubt the reliability of the survey." *Id*.

Here, the declarations have the same issues of "self-interest bias" and faulty memory that renders data "fundamentally flawed." *Senne v. Kansas City Royals Baseball Corp.*, No. 14-cv-00608-JCS, 2016 WL 3940761, at *56-59 (N.D. Cal. July 21, 2016) (granting motion to exclude expert's declaration and testimony, based on "problems … as to its failure to adequately ensure objectivity and its reliance on the players' ability to recall details of activities and events that occurred many months (and often years) ago"). First, where all of the declarants were class members, they "all …had a vested interest in the results of the survey… and the outcome of this action." *Id*. at *57. Indeed, Drogin testified that he didn't "know about coaching" in the collection of the affidavits because the declarants "are clients of the attorneys." (Drogin Depo. at 169:14-24.) Given that the declarants included the case caption with only Plaintiffs' counsel information as well as Plaintiffs' densely worded view of the case, with just four small spaces for declarants to write in extra time and nothing else, these declarations served only to educate the declarants about how they could benefit from this case, and could not produce objectively reliable data.

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

(*See, e.g.*, Chan Decl. [Dkt. No. 349-2 at 21-24].)  *See Sirko*, 2014 WL 4452699, at *4; *Tunnel*, 330 F. Supp. 2d at 710-711.

Second, the data from the declarations that Drogin used for his calculations was the declarants' estimates of the average amount of time they spent on a variety of activities "per day" that they worked particular shifts, over a period of up to six and a half years. (*See, e.g.*, Chan Decl., ¶¶ 5, 10, 17 [Dkt. No. 349-2 at 21-24].))  *Senne*, 2016 WL 3940761, at *56 ("the reliability of any survey used to determine the amounts of time the players spent engaging in particular activities is questionable").  Drogin's *complete* reliance on declarants' "ability … to remember the type of mundane events necessary to come up with reliable answers to questions about the amount of time they spent on various types of activities" and "to recall events that occurred, for many, years before they completed the survey" rendered both his methodology and results "unreliable."  *Id.*, 2016 WL 3940761, at *56, 58-9.

Rather than employing statistical expertise, Drogin simply accepted the self-report and 511.org data at face value and input it into his calculations, making no attempts to check its validity, veracity, or potential bias. (Drogin Depo at 162:17-21, 211:1-5; 279:1-13.) *See Amos v. Johnson Controls*, No. 3:15-CV-226 JD, 2016 WL 3662263, at *13 (N.D. Ind. July 11, 2016) (granting motion to strike where "it is altogether unclear what statistical expertise Dr. Cohen brought to bear on this analysis other than plugging the numbers 153 (the number of survey respondents) and 117 (the number of Indiana citizens among those respondents) into a formula to calculate confidence intervals").  Drogin's report is thus unreliable and should be excluded. *Senne*, 2016 WL 3940761, at *54.

### 2.  Rather Than Assisting the Trier of Fact, Drogin Places the Burden of Validating His Data Squarely on the Trier of Fact

"Rule 702 further requires that the evidence or testimony 'assist the trier of fact to understand the evidence or to determine a fact in issue,'" but Drogin places the onus for determining the accuracy of his underlying data squarely *on* the trier of fact.  *Daubert*, 509 U.S. at 591-92 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility").  (Drogin Depo. at 155:8-9 ["it would be up to the trier of fact to evaluate the affidavits"], 156:8-10, 161:22-162:16 ["ultimately it's up to the trier of fact to determine whether these results are leading,…misleading, …incorrect, whether they're people that were forced to write these numbers down,

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

whether they knew what they were doing"], 174:2-18 ["the trier of fact could then evaluate whether the person had exaggerated"], 179:10-18 ["it's up to the – ultimately the finder of fact, the Court or the jury, to determine whether people understood [the terms in the declarations they signed], whether the data is meaningful, whether the data is accurate or what the proper values should be"], 182:3-12 [accuracy of time estimates occurring over a long period of time "will be the concern of the Court"]; 210:14-25 [not concerned with significant disparities in times Operators reported for turn-in time because "the Court will evaluate whether it's true or false"].)

Drogin reasoned that the data in the declarations "isn't valid insofar as the Court will determine the veracity of this information. And the Court's determination is valid by definition." (Depo. at 155:16-156:13.) He thus stated repeatedly that he would change his calculations depending on the Court's findings. (*Id.* at 143:25-144:7 [if Court found "data was manipulated" or "some sort of other problem" with the data in the declarations, "either it would be thrown out or there would be some revised modifications which would be relevant to making a calculation"]; 162:21-24 ["if the numbers are too high or too low, the Court could suggest other – other numbers and we could redo the damage calculation using the same formulas and get a new number"]; 179:18-23 ["If the Court finds there should be some other value inserted or taken in as values to be used in the formula, then you could repeat the formula that I've devised and developed to break down all of the different runs to see what the damages would be under that different scenario"]; 207:12-17 [would adjust damages model if Court identified reasonable mitigating factors].)

The California Supreme Court has rejected Drogin's "methodology" of delegating his obligations as a statistical expert to the trial court and of accepting without question data for calculating liability and damages in a wage and hour class action. The California Court of Appeal and later the California Supreme Court both found the results unreliable and reversed the trial court's decision in *Duran v. U.S.*

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

*Bank National Association*.[7]  *Duran v. U.S. Bank Nat'l Ass'n* ("*Duran*"), 59 Cal. 4th 1, 42-47, 49-50 (2014); *Duran I*, 137 Cal.Rptr.3d at 437-38. In *Duran*, even though there were "serious flaws in the sampling plan" developed by the trial court, Drogin testified that "the trial court's methodology in phase one was statistically sound," he relied on the court's "sampling plan" for his estimate that 100 percent of the class was misclassified, and he used the trial court's findings to determine the average weekly hours of unpaid overtime for the sample, which he opined could be extrapolated to the class.  *Duran*, 59 Cal. 4th at 19-22, 24, 48.  In reversing the trial court's decision, the court of appeal, whose opinion was affirmed, was incredulous when explaining that Drogin "remarkably concluded" that results from the trial court's unscientific selection of a random sample "'can be reliably projected to the class as a whole.'"  *Duran I*, 137 Cal. Rptr. 3d at 401.  Also, like here, Drogin assumed "no measurement error" when "the data he used was derived from the court's statement of decision."  *Id.*, 137 Cal.Rptr.3d at 415. This assumption was wrong; the California Supreme Court reversed the trial court's finding on liability and damages based, in significant part, "on faulty statistical methodology." *Duran,* 59 Cal. 4th at 49-50 ("Sampling errors require reversal").

Because even Drogin is unsure of the validity of his underlying data, and will change his calculations based on whatever the Court finds, his damages estimates are not useful to anyone – let alone the trier or fact.  *See York v. Starbucks*, 2011 WL 8199987, at *14, 16 (where expert testified data he used "'might not be accurate,'" court found his "admissions remarkable," particularly where "the content of that data is material to the issue on which [the expert] opined," and granted motion to strike his declaration).

### 3.    Drogin Did Not Rely on a Random Sample

Even assuming Drogin relied on reliable data to calculate unpaid hours worked in the time categories at issue, whether he can support an inference that this data applies class wide "depends on how

---

[7] Drogin listed the superior court decision in *Duran* in his December 31, 2013, declaration as an example of a case that used sampling and in which he was involved.  (Drogin Decl., ¶¶ 19, 20 [Dkt. No. 157 at p. 6].)  He stated only that the "case is now on appeal," but neglected to state that the court of appeal had *reversed the decision almost two years earlier* or that the case had been pending review before the California Supreme Court for a year and a half.  (*Id.*, ¶ 20.)  *See Duran v. U.S. Bank Nat'l Ass'n* ("*Duran I*"), 137 Cal.Rptr.3d 391 (Feb. 6, 2012), review granted, 275 P.3d 1266, 140 Cal.Rptr.3d 79 (May 16, 2012), affirmed, 59 Cal. 4th, (2014) attached as Exh. A to Request for Judicial Notice, filed herewith.

representative the sample is." *Duran*, 59 Cal. 4th at 38, citing Kaye & Freedman, *Reference Guide on Statistics, in* Reference Manual on Scientific Evidence 211, 216-217 (3d ed. 2011). "A sample that includes even a small number of interested parties can produce biased results." *Id*. at 43. "The impact of this error is magnified when the biased results are extrapolated to the entire population." *Id*. "Selection bias cannot be cured simply by increasing the size of the sample." *Id*., citing Freedman et al., *Statistics* 335 (4th ed. 2007). ("When a selection procedure is biased, taking a large sample does not help. This just repeats the basic mistake on a larger scale"). In *Duran*, the court found sampling had "failed" where the sample size did not account for the variability among class members, some members dropped out of or were removed from the sample, and two named plaintiffs were included in the "random" sample. *Id*. at 41-45. The same issues are present here.

Drogin proposed a sampling methodology at the class certification stage, but failed to implement it. (Drogin Decl., ¶¶ 14, 30-33 [Dkt. No. 157 at 4-5, 9-10].) Although he told the Court he could compute damages in part by "random sampling for a survey and/or selecting Operators for deposition or court testimony," he did neither: He did not design a survey, and he "selected Operators" not for deposition or court testimony but to be declarants for Plaintiffs' counsel. (Drogin Decl., ¶ 14 [Dkt. No. 157 at 4-5]; Drogin Depo. at 161:7-11; Drogin Report at 12, ¶ 7(a)(ii)(4) [Dkt. No. 350-1 at 13].) Although he recommended an agreed-upon or court-ordered margin of error and a pilot sample to determine variation in the sample population to see if a larger sample is needed to achieve the required margin of error, these were not done. (Drogin Decl., ¶¶ 30-33 [Dkt. No. 157 at 9-10]; Drogin Report at 12-13, ¶¶ 7(a)(ii)(4) and 7(a)(iii)(2) [Dkt. No. 350-1 at 13-14].) Drogin even testified that "he didn't need to validate" that he had a representative sample of operators across all eight divisions simply because "over 300 is a fairly decent size, and you would expect to get a representative [sample]." (Drogin Depo. at 305:6-306:6.)

Instead, without any testing of the variation in the population or consultation with defendants, Drogin simply "suggested" that a sample size of between 300 and 400 "would *probably* be sufficient to obtain reliable estimates." (Drogin Report at 13, ¶ 7(a)(iii)(2) [Dkt. No. 350-1 at 14], emphasis added; Drogin, Decl., ¶ 34 [Dkt. No. 157 at 10].) In addition, without any involvement from the City's experts or counsel, Drogin randomized the list, provided the identities of the first 400 on the list for Plaintiffs' counsel, and Plaintiffs' counsel obtained affidavits from 305. (Drogin Report at 12-13, ¶¶ 7(a)(ii)(4) and

7(a)(iii)(2) [Dkt. No. 350-1 at 13-14].)  Drogin relied on Plaintiffs' counsel to decide those who "Could not be contacted" or "Did not provide a completed declaration," and did no testing to determine non-response bias, even though the response rate was 76%.  (*See* Hanvey Decl., ¶ 27 [Dkt. No. 345 at 13-14]; Furst Decl., ¶ 26 [Dkt. No. 348 at 8].)  According to a treatise on which Drogin said he relied, it was "incumbent on" him "to analyze the level and sources of nonresponse, and to assess how that nonresponse is likely to have affected the results." (Depo. at 34:4-35:12, Exh. 4 [excerpt from Diamond, S.S., Fed. Judicial Ctr., *Reference Guide on Survey Research, in* Reference Manual on Scientific Evidence 383-384 and n. 110 (3d ed. 2011) ["Plan for a nonresponse bias analysis if the expected unit response rate is below 80%"].)  He did not do so. In addition, adding class representative Stitt to the damages calculation further compromised the sample. (Depo. at 235:1-16.)  These are the same flaws identified in *Duran*.  *Duran*, 59 Cal. 4th at 41-45.

Drogin's lack of any methodology for ensuring he used a representative sample is another fundamental flaw necessitating exclusion under Rule 702 and *Daubert*.  *See Hurt*, 2015 WL 410703, *5-6 (excluding expert's conclusions on additional grounds that "there was no serious testing to determine whether the respondents were representative of the entire class," and expert "did nothing to determine whether there may have been non-response bias"); *Amos v. Johnson Controls*, No. 3:15-CV-226 JD, 2016 WL 3662263, at *13 (N.D. Ind. July 11, 2016) (granting motion to strike where expert extrapolated survey results to the whole class, "having assumed away or neglected each of those critical steps" of determining whether sample was representative or whether non-response rate affected the validity of the results); *Marlo v. United Parcel Service, Inc.*, 251 F.R.D. 476, 485 (C.D. Cal. 2008) (survey did not meet *Daubert* reliability standard where expert "did not analyze the reasons for nonresponse," and "Plaintiffs' counsel …appears to have designed the questions").

### 4. Failure to Fully Disclose Drogin's Underlying Data Precludes the City's Experts From Fully Assessing His Methodology and Results

Drogin's findings based on calculations and data that the City's experts have been unable to access and evaluate should be stricken.  At this point, this encompasses all of Drogin's conclusions because it is not known what is in the inaccessible files.  *See 24/7 Records, Inc. v. Sony Music Entertainment, Inc.,* 514 F. Supp. 571, 575-576 (S.D.N.Y. 2007) (excluding expert testimony where

"method of valuation cannot be evaluated").

     5.      **Drogin's Calculations Encompass Time Not Alleged In The Complaint And Are Not Relevant to Plaintiffs' Claims**

The "gatekeeping inquiry must be 'tied to the facts' of a particular 'case.'" *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) (quoting *Daubert*, 509 U.S. at 591); *see Daubert II*, 43 F.3d at 1320 (stressing "the importance of the 'fit' between the testimony and an issue in the case"). The consideration of whether expert testimony satisfies the relevance prong of Rule 702 is "Would plaintiffs' proffered scientific evidence "assist the trier of fact to ... determine a fact in issue?" *Daubert II*, 43 F.3d at 1320.

As discussed above, Drogin's flawed methodology – including assigning the trier of fact the task of discerning the validity of his underlying data – in no way assists the trier of fact to determine anything and thus fails the relevance prong of Rule 702. Moreover, Drogin relied on the definitions of the categories of time from the declarations and his conversations with Plaintiffs' counsel, rather than reviewing and relying on the narrower definitions in the operative complaint for Start-End Travel Time and Turn-In Time. (*See, e.g.*, Drogin Depo. at 93:7-8, 93:15-16 [did not know if he read SAC], 187:12-189:4 [assumptions based on conversations with Plaintiffs' attorneys], 266:3-7 [considered "start travel wait time because that was one of the components that was testified to in the affidavits"].)

The Complaint defines Start-End Travel as the time Operators spend getting to or from their own vehicles when their runs "start and end at different geographical points," at either the beginning or end of their shifts. (SAC, ¶ 10) But Drogin's calculations add (1) "time required for Operators to travel from a division to the relief location to start their run," based on the assumption that "Operators whose run assignments begin at a relief location must first go to the division," and (2) Start Travel Wait time. (Drogin Report at p 3, ¶ 4(b), p. 10, ¶ 7(a)(i)(1) [Dkt. No. 350-1, pp. 4, 11].) The Complaint defines Turn-In Time as the time to "turn in various documents at the end of their day's assignment." SAC, ¶ 19.) But Drogin's calculations add time for "parking the vehicle, performing a walk-through inspection of the vehicle." (Drogin Report at p 3, ¶ 4(c) [Dkt. No. 350-1, p. 4].) Because these theories of liability go beyond Plaintiffs' theory as plead in the Complaint, Drogin's calculations are not "tethered to plaintiffs' theory of liability," are overbroad, and should be stricken and excluded from consideration on

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

1  summary judgment and at trial.  *See Lou v. Ma Laboratories*, No. C 12–05409 WHA, 2014 WL 68605, at

2  *4 (N.D. Cal. Jan 8, 2014); *Comcast Corp. v. Behrend,* __ U.S. __, 133 S. Ct. 1426, 1433 (2013); *York v.*

3  *Starbucks*, 2011 WL 8199987, at *14.

4      In sum, Drogin's report, conclusions, and testimony fail to meet the reliability and relevance

5  standards of Rule 702 and *Daubert* and should be excluded.[8]

6    **C.    Lovell Lacks the Foundation to Opine Upon or Criticize the BRG Time and Motion Study and So His Offered Evidence is Neither Reliable Nor Relevant**

7

8      Lovell admits that he has no experience of any kind with time and motion studies or job analysis

9  studies.  (Lovell Depo. at 15:9-14, 21:8-22.)  Without that experience, there is no foundation upon which

10 Lovell can criticize the means and methods of the BRG study and conclusions. *Akaosugi v. Benihana*

11 *Nat. Corp.*, No. C 11–01272 WHA, 2012 WL 1029546, at *2 (N.D. Cal. March 26, 2012) (striking

12 plaintiffs' expert's "reply declaration on the grounds that he is not qualified to give an opinion on the

13 reliability of" defendant's expert's report). In *Akaosugi*, like here, the defendant had retained an

14 experienced expert consultant to perform a time and motion observational study, and the plaintiffs

15 submitted an expert declaration critiquing it.  *Id*. at *1 (experts in both cases each had work experience

16 with the same consulting firm - Lamorinda Consulting).  While the plaintiffs' expert in that case was a

17 professor and had participated in various dissertation committees, some of which involved observational

18 studies, he had not actually performed a time and motion observational study.  *Id*. at *2.   The court

19 concluded, "There is no indication in the record that Dr. Johanson has specific qualifications related to

20 time and motion studies, having never conducted one himself," and thus granted the defendant's motion

21 to strike.  *Id*. "Though Dr. Johanson may well be qualified in other fields, his résumé does not bear out

22 that he is qualified to critique a time and motion study, which is specifically what is at issue here."  *Id*.;

23

24  _____
[8] In addition to *Duran*, discussed above, the Supreme Court and a number of other courts have rejected
25 Drogin's analysis and methodology in similar cases.  *See, e.g.*, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S.
338, 356 (2011) (finding plaintiff's statistical evidence fell "well short," where plaintiffs' experts'
26 studies, including Drogin's, were "insufficient to establish that respondents' theory can be proved on a
classwide basis" because of a "failure of inference"); *Lou v. Ma Laboratories*, 2014 WL 68605, at *4
27 (finding Drogin's methodology "problematic" because he did not account for "individualized variances,"
based his findings on misplaced assumptions on employees are doing compensable work, and relied on a
28 subset "which may not be representative of the class," and concluding "Dr. Richard Drogin's report fails
to save the day"); *Dailey v. Sears, Roebuck and Co*., 214 Cal. App. 4th 974, 997-999 (2013) (affirming
trial court's rejection of Drogin's sampling methodology for both liability and damages).

DEFENDANT'S MOTION TO EXCLUDE PLAINTIFFS' EXPERTS - 12-cv-03704-YGR

RENNE SLOAN HOLTZMAN SAKAI LLP
Attorneys at Law

1   *Daubert II*, 43 F.3d at 1315-1316, 1319

2       Likewise, Lovell's testimony shows that he is not qualified to opine on or criticize the job

3   analysis using the time and motion study approach performed by BRG.  Like the unqualified expert in

4   *Akaosugi*, while possibly well-qualified as an experimental psychologist, Lovell has never conducted any

5   type of study that is remotely similar to the BRG observational study here.  Moreover, he did not feel he

6   was qualified to determine whether BRG's study was a job analysis study.  (Lovell Depo. at 21:16-22 ["I

7   don't feel like I am a sociologist and that feels like a question for sociologist expertise"].)  To allow him

8   to challenge the BRG Report would be akin to permitting an orthopedic surgeon to criticize the medical

9   care provided by a cardiologist.   Both are medical professionals, with some overlapping background, but

10  each has a distinct specialty.   Here, Lovell freely admits that he has never conducted at any time or

11  anywhere a time and motion study.   With that total lack of experience, he does not have sufficient

12  foundation to opine about BRG's time and motion study and resulting analysis.

13  **IV.    CONCLUSION**

14      The reports and expected testimony of Drogin are not based on any acceptable scientific

15  methodology nor relevant and thus fail to meet the reliability and relevance standards of *Daubert* and

16  Federal Rule of Evidence 702.  Lovell is not qualified to opine on BRG's observational study, and his

17  testimony and report should also be excluded.  Accordingly, the City respectfully requests that the Court

18  strike and exclude the testimony and evidence of Plaintiffs' experts Drogin and Lovell.

19

20   Dated:  August 2, 2016                          RENNE SLOAN HOLTZMAN SAKAI LLP

21

22                                                   By: */s/ Arthur A. Hartinger*

23                                                        Jennifer L. Nock
                                                          Arthur A. Hartinger
24

25                                                   Attorneys for Defendant
                                                     CITY AND COUNTY OF SAN FRANCISCO
26

27

28

DEFENDANT'S MOTION TO EXCLUDE PLAINTIFFS' EXPERTS - 12-cv-03704-YGR