1   THE TIDRICK LAW FIRM
    STEVEN G. TIDRICK, SBN 224760
2   JOEL B. YOUNG, SBN 236662
    2039 Shattuck Avenue, Suite 308
3   Berkeley, California 94704
    Telephone: (510) 788-5100
4   Facsimile: (510) 291-3226
    E-mail:    sgt@tidricklaw.com
5   E-mail:    jby@tidricklaw.com

6   Attorneys for Individual and Representative
    Plaintiffs DARRYL A. STITT, TONY
7   GRANDBERRY, and HEDY GRIFFIN,
    and for the CERTIFIED CLASS

8
                    IN THE UNITED STATES DISTRICT COURT
9
              FOR THE NORTHERN DISTRICT OF CALIFORNIA
10

11  DARRYL A. STITT *et al.*,              Civil Case Number: 4:12-cv-03704-YGR

12                  Plaintiffs,            **PLAINTIFFS' NOTICE OF MOTION
         v.                               AND MOTION TO EXCLUDE EXPERT
13                                        TESTIMONY**
    THE SAN FRANCISCO MUNICIPAL
14  TRANSPORTATION AGENCY *et al.*,        The Honorable Yvonne Gonzalez Rogers

                    Defendants.           Hearing Date: September 6, 2016
15                                        Time:         2:00 p.m.
                                          Judge:        Hon. Yvonne Gonzalez Rogers
16                                        Courtroom:    1, Fourth Floor
                                                        1301 Clay Street
17                                                      Oakland, CA 94612

18                                        Action Filed: July 16, 2012
                                          Trial Date:   November 29, 2016
19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ........................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................ 1

I.     INTRODUCTION .............................................................................................. 1

II.    ARGUMENT ..................................................................................................... 1

    A.  The Legal Standards for Admissibility of Expert Testimony ....................... 1

    B.  Arnold Initial Report and Arnold Rebuttal Report ....................................... 2

        1.  The Arnold Initial Report and Arnold Rebuttal Report Should Be
        Stricken .................................................................................................. 5

           a.  The Findings in Arnold's Reports Are Not Relevant to
           Plaintiffs' Unpaid Wage Claims ............................................ 5

           b.  Arnold's Observation Results Include Individuals Who Are Not
           in the Class ............................................................................. 6

           c.  Arnold's Observations Are Not Subject to Retesting ........... 7

    C.  Hanvey Rebuttal Report ................................................................................. 8

        1.  Portions of the Hanvey Rebuttal Report Should Be Stricken ............ 10

    D.  Furst Initial Report ........................................................................................ 11

        1.  The Furst Initial Report Should Be Stricken ..................................... 13

    E.  Furst-Fleissig Rebuttal Report ...................................................................... 14

        1.  The Furst-Fleissig Report Should Be Stricken .................................. 16

    F.  Cohen Rebuttal Report ................................................................................... 18

        1.  The Cohen Rebuttal Report Should Be Stricken ............................... 19

           a.  Cohen Used Improper Pay Codes to Offset Unpaid Time ..... 19

           b.  Cohen Improperly Applied Offsets On An Aggregate Basis. 20

               1)  Numerous Courts Have Required that Offsets Be
               Applied Only in the *Workweek* When They Accrued   20

i

2) The DOL Regulations Require that Offsets Are

Allowed in Only the Workweek When They Accrued  21

3) The Ninth Circuit Holds that Offsets Are To Be

Applied on a Weekly Basis.....................................  22

c. The California Minimum Wage and SFMWO Apply to Each

Hour Worked ............................................................  22

1) California Courts Have Rejected the FLSA's Rule  23

d. SFMWO Applies to Each Hour Worked ..............................  24

III.  CONCLUSION.................................................................................  25

ii

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY
Stitt v. The San Francisco Municipal Transportation Agency et al., Civil Case No. C-12-03704-YGR

**TABLE OF AUTHORITIES**

**CASES**                                                                    **PAGE(S)**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
738 F.3d 960 (9th Cir. 2013) ...................................................................... 2

*Arizona v. United States*,
132 S. Ct. 2492 (2012) ............................................................................. 24

*Armenta v. Osmose, Inc.*,
135 Cal. App. 4th 314 (2005)……………………………………………… 23, 24, 25

*Avila v. Willits Envtl. Remediation Trust*,
633 F.3d 828 (9th Cir. 2011) .................................................................... 13

*Biggs v. Joshua Hendy Corp.*,
183 F.2d 515 (9th Cir. 1950) .................................................................... 22

*Biggs v. Wilson*,
1 F.3d 1537 (9th Cir. 1993) ...................................................................... 21

*Brock v. Wilamowsky*,
833 F.2d 11 (2d Cir. 1987) ........................................................................ 20

*Calhoun v. Yamaha Motor Corp.*,
350 F.3d 316 (3d Cir. 2003) ....................................................................... 5

*Christopher v. SmithKline Beecham Corp.*,
635 F.3d 383 (9th Cir. 2011) .................................................................... 22

*Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City*,
383 F.3d 110 (3d Cir. 2004) ....................................................................... 6

*City of Pomona v. SOM N. Am. Corp.*,
750 F.3d 1036 (9th Cir. 2014) .................................................................... 2

*Conzo v. City of NY*,
667 F. Supp. 2d 279 (S.D.N.Y. 2009) ....................................................... 21

*Dale K. Barker Co., P.C. v. Plaza*,
541 Fed. Appx. 810 (10th Cir. 2013) ........................................................ 17

*Daubert v. Merrell Dow Pharms.*,
509 U.S. 579 (1993) .......................................................................... *passim*

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
43 F.3d 1311 (9th Cir. 1995) ...................................................................... 2

*Gilmer v. Alameda-Contra Costa Transit Dist.*,
2011 U.S. Dist. LEXIS 126845 (N.D. Cal. Nov. 2, 2011) ......................... 20

*Gonzalez v. Downtown LA Motors*, LP,
215 Cal. App. 4th 36 (2013) ...................................................................... 25

*Herman v. Fabri-Center of Am., Inc.*,
308 F.3d 580 (6th Cir. 2002) ......................................................................... 21

*Huong Que, Inc. v. Luu*,
150 Cal. App. 4th 400 (2007) ......................................................................... 24

*Innis Arden Golf Club v. Pitney Bowes, Inc.*,
257 F.R.D. 334 (D. Conn. 2009) ...................................................................... 7

*J & J Snack Foods Corp. v. Earthgrains Co.*,
220 F. Supp. 2d 358 (D.N.J. 2002) .................................................................. 6

*Khoury v. Philips Med. Sys.*,
614 F.3d 888 (8th Cir. 2010) ......................................................................... 13

*Maxwell v. Angel-Etts of Cal.*,
2001 U.S. Dist. LEXIS 25418 (C.D. Cal. July 9, 2001) ..................................... 8

*Nolan v. City of Chicago*,
125 F. Supp. 2d 324 (N.D. Ill. 2000) ............................................................. 21

*Paul Revere Life Ins. Co. v. Jafari*,
2002 U.S. Dist. LEXIS 28224 (D. Md. Sept. 19, 2002) ...................................... 7

*Primiano v. Cook*,
598 F.3d 558 (9th Cir. 2010) ................................................................. *passim*

*Regents of Univ. of California v. Public Employment Relations Bd.*,
41 Cal. 3d 601 (1986). ................................................................................. 24

*Rudy v. City of Lowell*,
777 F. Supp. 2d 255 (D. Mass. Mar. 14, 2011) .......................................... 20, 21

*Schneider v. Fried*,
320 F.3d 396 (3d Cir. 2003) ........................................................................ 5, 6

*Scott v. City of NY*,
592 F. Supp. 2d 475 (S.D.N.Y. 2008). ....................................................... 21, 22

*Vigil v. Whirlpool Corp.*,
2001 U.S. Dist. LEXIS 26269 (D.N.M. Nov. 16, 2001) ................................. 8, 18

*Westfield Ins. Co. v. Bridgestone Ams. Tire Operations, LLC*,
2014 U.S. Dist. LEXIS 182960 (N.D. W. Va. Dec. 18, 2014) ............................. 8

STATUTES AND REGULATIONS

29 U.S.C. § 203(m) ..................................................................................... 25

Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 206 *et seq.* ........................... 19

29 U.S.C §207……………………………………………………………………… 19, 20, 21, 22

29 C.F.R. § 531.50. ............................................................................................... 25

29 C.F.R. §778.104 .............................................................................................. 20

29 C.F.R. §778.106 .............................................................................................. 21

29 C.F.R. §778.202(c) .......................................................................................... 22

California Labor Code §§ 221-223 ....................................................................... 24

DLSE Opinion Letter of January 29, 2002…………………………………… 23, 24, 25

SF Admin. Code §12R (SFMWO) ..................................................................... 24, 25

RULES

FRE Rule 702 ....................................................................................................... *passim*

# NOTICE OF MOTION AND MOTION

TO DEFENDANT AND ITS ATTORNEYS OF RECORD:

NOTICE IS HEREBY GIVEN that on September 6, 2016, at 2:00 pm, or as soon thereafter as the matter may be heard in the above-entitled Court, located at 1301 Clay Street, Oakland, California, Courtroom 5, the Honorable Yvonne Gonzalez Rogers presiding, Plaintiffs Darryl Stitt, Hedy Griffin, and Tony Grandberry (collectively "Plaintiffs"), on behalf of the certified class, will and hereby do move the Court for an order striking in its entirety, or in part, Defendant San Francisco Municipal Transportation Agency ("SFMTA" or "Defendant")'s expert reports of Mary Furst ("Furst Initial Report"), Elizabeth Arnold ("Arnold Initial Report") and rebuttal expert reports of Mary Furst and Adrian Fleissig ("Furst-Fleissig Rebuttal Report"), Elizabeth Arnold ("Arnold Rebuttal Report"), and Mark Cohen ("Cohen Rebuttal Report") as well as parts of the rebuttal report of Chester Hanvey ("Hanvey Rebuttal Report"). Plaintiffs' motion is made pursuant to FRE Rule 702 and *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) ("*Daubert*").

DATED: August 2, 2016

THE TIDRICK LAW FIRM
By:    /s/ Steven G. Tidrick

_____

STEVEN G. TIDRICK, SBN 224760

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Plaintiffs seek relief for Defendant's failure to pay bus and train operators ("Operators") for Start-End Travel Time, Turn-In Time, and Routinely Late Time. Pursuant to FRE Rule 702 and *Daubert*, 509 U.S. 579 (1993), Plaintiffs seek to exclude the Furst Initial Report, the Arnold Initial Report, the Furst-Fleissig Rebuttal Report, the Arnold Rebuttal Report, the Cohen Rebuttal Report, and parts of the the Hanvey Rebuttal Report.

## II.    ARGUMENT

### A.    The Legal Standards for Admissibility of Expert Testimony

Federal Rule of Evidence 702 provides:

1

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY
*Stitt v. The San Francisco Municipal Transportation Agency*, Civil Case No. C-12-03704-YGR

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
    (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
    (b) the testimony is based on sufficient facts or data;
    (c) the testimony is the product of reliable principles and methods; and
    (d) the expert has reliably applied the principles and methods to the facts of the case.

The Ninth Circuit has expressed its view under *Daubert*, 509 U.S. 579 (1993), and its progeny, including *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311 (9th Cir. 1995) ("*Daubert II*"), that the district court's inquiry into admissibility of expert testimony under Rule 702 is a flexible one. *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043-1044 (9th Cir. 2014) (citing *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). In evaluating proffered expert testimony, the trial court is "a gatekeeper, not a fact finder." *Id.* (citing *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010). "[T]he trial court must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Id.* (citing *Primiano*, 598 F.3d at 564 (quoting *Daubert*, 509 U.S. at 597). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id.* (citing *Primiano*, 598 F.3d at 565.

**B.    Arnold Initial Report and Arnold Rebuttal Report**

Elizabeth Arnold was retained as an expert to conduct a job analysis of SFMTA Operators. *See* Arnold Report ¶ 2. The job analysis was performed from December 14, 2015 to April 22, 2016. *Id.* ¶ 38. In connection with that job analysis, Arnold attempted to measure the amount of time that Operators spent performing certain pre and post shift activities. *Id.* ¶ 8. Arnold used observers to view the Operators performing job duties and record the tasks as well as the amount of time to perform the tasks. *Id.* ¶¶ 3, 4. No observations were video recorded. *See* Tidrick Decl. Ex C (transcript of deposition of Elizabeth Arnold) ("Arnold Depo") at 59:14-60:2.

To conduct this analysis, Arnold created observation protocols that observers were instructed to follow while making observations. *See* Arnold Report ¶ 3. These protocols were

revised during the course of the observations. *See* Arnold Depo. at 74:25-78:1. Arnold's team willfully destroyed all but the most recent version of the protocol, and therefore was unable to produce copies of the earlier versions. *Id*. *See also* Tidrick Decl. Ex. HH (June 9, 2016 e-mail from Defendant's counsel stating "there is no separate document from the final").

According to the last (and only existing) version protocol, the start of shift observations began as soon "as the operator picks up the outfit" after entering into the division. *See* Tidrick Decl. Ex. Z (Arnold Depo. Ex. 118), pg. 2. Therefore, observers would start recording the activities the Operator performed only after the Operator picked up the outfit. *See* Arnold Depo. at 80:14-18. However, if an Operator performed activities prior to picking up the outfit such activities were not recorded by the observer. *See* Arnold Depo. at 80:24-81:3. Observations of end of shift activities began as "soon as the operator drives the bus onto the property." *See* Tidrick Decl. Ex Z (Arnold Depo. Ex. 118), pg. 2.

Although Arnold created a sampling plan for the job analysis, Arnold determined that it was not "possible to identify individual Operators in advance and observe them at the division using a random sampling approach." Arnold Initial Report ¶ 37 n.11. In making observations, Arnold's team made no determination of whether the operator was a class member, therefore Arnold's report included data for Operators who are not part of the suit.[1]

After issuing her initial report, Arnold's team conducted additional observations because Arnold recognized that the initial report did not capture whether: (1) Operators starting their day by making a relief go to the division first and review the bulletin board before making a relief; and (2) all Operators whose runs ends at a relief point return to the division at the end of their shifts to retrieve their personal vehicles. *See* Arnold Rebuttal Report ¶ 2. These observations were conducted from June 1, 2016 to June 9, 2016, and incorporated these observations into her rebuttal report. *See* Arnold Rebuttal Report, Table 1.

Despite Arnold's stated desire to determine whether Operators starting their day by

---

[1] Defendant has not produced contact information for Operators after July 2014, therefore recently hired Operators have not received notice and are not members of the class. *See* Tidrick Decl. ¶¶ 34, 45 & Ex. GG (March 27, 2016 email). Defendant has hired numerous Operators since then. *See* Tidrick Decl. Ex. R (Declaration of Eric Williams) ("Williams Decl.") ¶ 21.

making a relief go to the division first and review the bulletin board before making a relief, Arnold (1) failed to record Operators at all of the locations where bulletins are posted at the divisions (*e.g.*, (a) at the Kirkland Division and Woods Divisions Arnold's team failed to record Operators looking at the binders directly adjacent to the bulletin boards where bulletins are placed, (b) at the Presideo Division Arnold's team failed to record Operators looking at the bulletins that are posted next to the receivers window and did not record Operators looking at a certain bulletin board because allegedly no bulletins were posted on such board, *see* Arnold Depo. at 202:19-22, 204:8-20; Arnold Rebuttal Report Ex. 3); (2) did not account for the fact that on or about January 15, 2016, SFMTA ended the requirement for light rail Operators to go to the division to review the bulletin board before operating a vehicle, *see* Arnold Depo. at 205:22-206:23; Williams Decl. ¶ 13, Exs. A, B; and (3) did not record Operators reviewing bulletins prior to picking up their outfit. *See* Arnold Depo. at 80:24-90:2; Williams Decl. ¶ 10.

Arnold only performed approximately 40 of the 231 observations for the Arnold Initial Report and did not perform many of these additional observations for the Arnold Rebuttal Report. *See* Arnold Depo. at 25:18-26:4, 27:22-25. When asked to provide detail for observations she did not perform, Arnold admitted that she would have to speculate as to the facts surrounding what the observer actual observed and/or why the observer described a certain activity in the manner in which it was described. For example, when asked about the observation specified in her observation results entitled "PRE_WKY_0137.0_END" Arnold responded that: (a) the observer could have recorded this observation differently than how it was originally recorded; and (b) she did not know and/or would have to speculate: (1) where the observer was located when making the observation; (2) why the Operator was unobservable for a portion of the observation; (3) where the Operator parked the bus; and (4) where the bike was located on the bus. *See* Arnold Depo at 155:23-164:9; Tidrick Decl. at Ex. AA. Arnold further admitted that she did not know how it would be possible to determine whether an observer missed an activity that was performed by an Operator. *See* Arnold Depo. at 122:11-24.

Arnold opined that the "distance between the Operators and the observers and the lack of interaction between them and reduces the likelihood that any Operators significantly changed their behavior as a result of the observation study," Arnold Initial Report ¶ 44. However, Arnold did not specify a certain amount of distance that the observer should maintain, the observers did not record their distance from the Operators, and Arnold did not actually study whether the distance between Operators and observers impacted Operators' behaviors. *See* Arnold Depo. at 156:16-159:6, 178:3-7, 181:2-7.

Arnold also opined: "To the extent any Operators' activities were influenced by the observations, the result would likely be to increase time spent on specific activities of interest." Arnold Initial Report ¶ 44. Arnold admitted that she conducted no study to reach that conclusion; it was simply "logical." *See* Arnold Depo. at 181:14-182:14.

Regarding the findings of the Arnold Initial Report and the Arnold Rebuttal Report, Arnold attested that the "findings *are not* intended to be statistically extrapolated to the population or any other time period." *See* Arnold Decl. (Docket No. 347) ("Arnold Decl.") ¶ 15 (emphasis added). *See also* Arnold Depo. at 199:2-200:19. Arnold also attested that the Arnold Initial Report and the Arnold Rebuttal Report "collected data to determine the amount of time Operators *in [her] sample* spent on the stated activities of interest." Arnold Decl. ¶ 47 (emphasis added). *See also* Arnold Depo. at 183:1-6, 199:2-200:19. Arnold also attested that the Arnold Initial Report and the Arnold Rebuttal Report *did not* attempt to "determine the amount of time it takes Operators to complete each of the activities of interest." Arnold Decl. ¶ 47; Arnold Depo. at 183:1-6, 199:2-200:19.

1.     **The Arnold Initial Report and Arnold Rebuttal Report Should Be Stricken**

a)     **The Findings in Arnold's Reports Are Not Relevant to Plaintiffs' Unpaid Wage Claims**

In applying Federal Rule of Evidence 702, trial judges are required to ensure that the expert's testimony must "be relevant for the purposes of the case and must assist the trier of fact." *Calhoun v. Yamaha Motor Corp.*, 350 F.3d 316, 321 (3d Cir. 2003) (quoting *Schneider*

*v. Fried*, 320 F.3d 396, 405 (3d Cir. 2003)).

As noted above, Arnold admits that the findings in the Arnold Initial Report and the Arnold Rebuttal Report are: (1) limited to the Operators who were observed; and (2) should not be extrapolated to the class of Operators or any other time period. *See supra*. Arnold further admits that observations she conducted did not begin until December 14, 2015. Here, however, Plaintiffs are making claims for unpaid wages for the time period of July 16, 2009 to November 15, 2015, which is clearly prior to the time period that Arnold's observations were performed. *See supra*. Therefore, based on Arnold's admissions regarding the limitations of her observations, there is no basis for her conclusions to be relevant to resolving Plaintiffs' unpaid wage claims which were prior to Arnolds Study.[2]  If Defendant were to present Arnold's findings at trial, there is the likelihood that the jury would apply her findings to Plaintiffs' unpaid wage claims in a manner inconsistent with Arnold's admissions.

### b) Arnold's Observation Results Include Individuals Who Are Not in the Class

In performing the observations, Arnold's observers took no steps to determine whether the Operators being observed were actually in the class. As a result, approximately 31% of Arnold's observations for the Arnold Initial Report were made of Operators that are not in the class. *See* Tidrick Decl. Ex. S (Declaration of Richard Drogin, Ph.D.) ("Drogin Decl.") ¶ 32. Therefore, the conclusions reached in Arnold's reports are in large part based upon data from the wrong target population. *See id.* Courts reviewing expert reports based on data from the wrong target population have excluded such expert reports. *See e.g., Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City*, 383 F.3d 110 (3d Cir. 2004), (upholding the district court's exclusion of a survey that studied the wrong population); *J & J Snack Foods Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 371-72 (D.N.J. 2002) (excluding a survey where the

---

[2] Despite Arnold's admission regarding the relevancy of her findings, Defendant is attempting to extrapolate Arnold's findings to Plaintiffs' unpaid wage claims which occurred prior to Arnolds' study. *See, e.g.*, Defendant's Letter Requesting Pre-Summary Judgment Motion Conference (Docket No. 334), page 3 ("MTA performed an ***observational study*** in response to this litigation, which demonstrates that the amount of time spent on the post-shift tasks identified by Plaintiffs is *de minimus* [sic] . . .").

expert studied an "improper sampling universe" in a trademark infringement case).

### c) Arnold's Observations Are Not Subject to Retesting

*Daubert* identifies certain factors to help determine reliability, including "whether a theory or technique is scientific knowledge that will assist the trier of fact . . . can be (and has been) tested." *Daubert*, 509 U.S. at 593-94.

As discussed above, observers made observations in person without making video recordings. *See supra*. Arnold admitted that based on the use of these observation techniques it is impossible for her, Plaintiffs, or the trier-of-fact to retest and determine what any particular Operator actually did while being observed or whether any of the observers failed to observer a particular activity and/or incorrectly observed a particular activity. *See* supra. She admitted that it would have been possible to video record, but that it did not occur for cost reasons. *See supra*. Given that Arnold's opinions are being offered as evidence of whether certain activities were performed and how long it takes to perform certain activities, the lack of ability to retest the observations prevents Plaintiffs from being able to fully evaluate Arnold's data and conclusions.  Furthermore, because Arnold herself performed an insignificant number of observations, she cannot assist the trier-of-fact in determining what actually happened and would have to speculate about what was observed during the observation and why certain activities were recorded in the ways that they were.  *See supra*. Also, because all versions of the observation protocol were destroyed other than the most recent version, Plaintiffs and their experts are unable to evaluate what exactly the observers were instructed to do.  In similar situations, courts have excluded the expert testimony. *See e.g.*, *Innis Arden Golf Club v. Pitney Bowes, Inc.*, 257 F.R.D. 334, 342-343 (D. Conn. 2009) (precluding expert testimony based on spoliation of evidence); *Paul Revere Life Ins. Co. v. Jafari*, 2002 U.S. Dist. LEXIS 28224, at *13-18 (D. Md. Sept. 19, 2002) ("Paul Revere may not introduce any evidence from Dr. Lewis due to his spoliation of the evidence. . . . [E]ven if not excluded on spoliation grounds, the proferred testimony of Dr. Lewis would be held inadmissable under Daubert.").

If the Court does not grant Plaintiffs' request to strike the entire report, then in the

7

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY
*Stitt v. The San Francisco Municipal Transportation Agency*, Civil Case No. C-12-03704-YGR

alternative Plaintiffs request the following.

First, Plaintiffs request that the Court instruct the jury that the findings in the Arnold Initial Report and Rebuttal Report are limited to the time period studied, *i.e.*, December 15, 2015 to June 9, 2016, and that Arnold is only opining as to that time period. *See Westfield Ins. Co. v. Bridgestone Ams. Tire Operations, LLC*, 2014 U.S. Dist. LEXIS 182960, at *13-14 (N.D. W. Va. Dec. 18, 2014) ("In *Daubert*, the Supreme Court noted that cross-examination, presentation of evidence, and jury instructions 'are the traditional and appropriate means of attacking shaky but admissible evidence.'") (quoting *Daubert*, 509 U.S. at 596); *Maxwell v. Angel-Etts of Cal.*, 2001 U.S. Dist. LEXIS 25418, at *19 (C.D. Cal. July 9, 2001) ("This Court properly denied ACI's request to strike the testimony, instead instructing the jury that Sherwood's opinion could only be used to show a 'preference in general to loop systems over an intrusive method.'").

Second, the findings and opinions regarding whether Operators review the bulletin board before operating their vehicles contained in Paragraphs 70-71, Graph 8, and Paragraphs 78, 82, and 84 of the Arnold Initial Report and Paragraphs 7-12, Table 1, and Paragraphs 26-27 of the Arnold Rebuttal Report should be stricken. Arnold's observational techniques failed to accurately capture whether Operators actually perform this activity. *See supra*. Therefore, Arnold's conclusions on this issue are erroneous and unreliable.

Third, the opinions referenced in Paragraph 44 should be stricken as Arnold admitted that she did not study either of the issues specified in that paragraph, and that she based the second sentence only on logic. *See supra*. Therefore, Arnold has no basis to support her conclusions reached in that paragraph. *See Vigil v. Whirlpool Corp.*, 2001 U.S. Dist. LEXIS 26269, at *5 (D.N.M. Nov. 16, 2001) (excluding proffered expert opinion under *Daubert* because the opinion was within the realm of "common knowledge").

**C.     Hanvey Rebuttal Report**

The Hanvey Rebuttal Report opines that: (1) Drogin's calculations used flawed data because no evidence was presented by Dr. Drogin to show that any steps were taken to ensure that the self-report data were reliable or valid and the travel time database appears to have

8

been calculated manually and contains numerous errors; (2) Dr. Drogin analysis embedded assumptions that are shown to be false by other data; and (3) the sample of Operators who provided so-called "self-report data" are susceptible to non-response bias. *See* Hanvey Rebuttal Report ¶¶ 2, 3, and 4.

Despite Hanvey's opinion that no evidence was presented by Dr. Drogin to show that any steps were taken to ensure that the self-report data was reliable or valid, Hanvey admitted that (1) he had never actually reviewed any of the so-called self-report data (*i.e.*, the Operator declarations) prior to rendering his opinion, *see* Tidrick Decl. Ex G (Deposition of Chester Hanvey) ("Hanvey Depo") at 48:21-49:5, and (2) he could not determine the extent to which any of the response in an Operator declaration was biased or inaccurate. *See* Hanvey Depo. at 51:20-52:4, 52:15-54:6. Moreover, Hanvey's evaluation is predicated on techniques used to gather data for surveys. *See* Hanvey Rebuttal Report ¶ 12 & n. 9, 13 & n.13.

Hanvey relied upon "logic" and the opinions in the Arnold Rebuttal Report to opine that Drogin used numerous "false" travel time assumptions. Hanvey Rebuttal Report ¶¶ 22, 23; Hanvey Depo. at 61:4-62:2. Hanvey admitted to not studying: (1) whether Operators traveled from divisions to relief points prior to shifts or from relief points to divisions after shifts; and (2) the amount of time Operators spent traveling from divisions to relief points prior to shifts or from relief points to divisions after shifts. *See* Hanvey Depo. at 61:4 – 63:8.

Hanvey concluded that Drogin's sample did not have a high response rate because "[o]f the 400 Operators who were randomly selected to participate in this exercise, 95 (23%) did not provide a declaration."[3] *See* Hanvey Rebuttal Report ¶ 25. Hanvey rendered this opinion despite not knowing whether it was appropriate to exclude from the sample: (1) Operators who were in Drogin's sample but not in the work assignment data provided by SFMTA; or (2) Operators who were in the work assignment data but whose runs could not be

---

[3] Hanvey defined a "high response rate" as a response rate of 80% or higher. *See* Hanvey Rebuttal Report ¶ 25; Hanvey Depo. at 64:9-11.

9

FFS' NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY
*he San Francisco Municipal Transportation Agency*, Civil Case No. C-12-03704-YGR

matched to a range report. *See* Hanvey Depo. at 67:23-69:9.[4]

Hanvey opined: "Another form of self-report bias that is particularly relevant to this case is the tendency of people to over-report the amount of time they spend performing work tasks. This is compounded by the possibility that Operators have financial motivation to provide higher estimates." Hanvey Rebuttal Report ¶ 14 & n.14. Hanvey admitted, however, that any purported financial incentive was speculative. *See* Hanvey Depo. at 77:15-23. Hanvey also admitted that none of the three studies he cited involved statements under penalty of perjury, such as affidavits or declarations. *See* Hanvey Depo. at 78:19-21, 80:23-81:4. Hanvey did not deny that all three studies that he cited involved workers' estimates of their total hours worked, as opposed to time estimates of discrete work tasks. *See* Hanvey Depo. at 79:19-80:4, 80:10-22. He admitted that he had no opinion as to whether information provided under penalty of perjury would tend to be more accurate. *See* Hanvey Depo. at 81:6-12. He was unaware of a scholarly publication that found: "Although some segments of the population had a tendency to overstate their hours, others had a tendency to understate their hours, so there was no bias in the aggregate." Hanvey Depo. at 81:22-82:13. He was unable to offer any opinion as to whether some segments of the population have a tendency to overstate their hours, and others have a tendency to understate their hours. *Id.* at 83:7-20, 83:22-84:2. He admitted that he did nothing to assess whether the population in the class in this case has a tendency to either overstate or understate their hours. *Id.* at 84:4-8.

### 1. Portions of the Hanvey Rebuttal Report Should be Stricken

The following paragraphs of the Hanvey Rebuttal Report should be stricken for the reasons outlined below.

First, Hanvey's opinions regarding whether the Operator declarations are biased (specifically, Paragraphs 2, 10, 11, 12, 14, and16) should be stricken. Hanvey proffers

---

[4] Drogin determined that for 25 of the operators in his sample, no work assignment data was provided by Defendant, and for 37 operators in his sample their run, block, and piece values appearing in the work assignment data did not match any runs in the range report. Thus, Drogin excluded such operators from the sample results because his damage model was based upon only those operators that had runs listed in the work assignment data and could be matched to a range report. *See* Drogin Supplemental Declaration ¶ 23-28.

10

opinions regarding the Operator declarations despite admitting that he never reviewed any of the Operator declarations. *See supra.* Hanvey's failure to review the Operator declarations shows that Hanvey's opinion is not based upon sufficient facts or data. *See Primiano*, 598 F.3d 558, 563-564 (providing that an expert witness "may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data…").

Second, Hanvey's opinions regarding Drogin's travel time assumptions (specifically, Paragraphs 21, 22, 23, and 24) should be stricken for the following reasons. First, the only basis for Hanvey's opinion is the Arnold Initial Report, the Arnold Rebuttal Report, and "logic." *See supra.* Despite Arnold's admonition that her conclusions cannot be extrapolated to a period prior to when such observations were conducted, Hanvey does exactly that in rendering his opinions regarding Drogin's travel time assumptions (*i.e.*, applies Arnold's conclusions to assumptions that Drogin used for Plaintiffs' wages claims, which cover a time period prior to Arnold's observations). *See supra.* Hanvey admitted his opinion was based upon "logic" and that he did not study: (1) whether Operators traveled from divisions to relief points prior to shifts or from relief points to divisions after shifts; and (2) the amount of time Operators spent traveling from divisions to relief points prior to shifts or from relief points to divisions after shifts. *See supra.* Hanvey's opinions on this issue do not rest upon sufficient facts, data, or expertise, and should be stricken. *See Primiano*, 598 F.3d at 563-564.

Third, Hanvey's opinion as to whether self-report data is "susceptible to non-response bias" in Paragraph 25 should be stricken. Hanvey's analysis is based upon the fact that Operators were excluded from Drogin's sample whose runs were not in the work assignment data or whose runs could not be matched to a range report. *See supra.* Hanvey admitted that he did not know whether it was appropriate to exclude these Operators. Hanvey Depo. at 67:23-69:9. Hanvey's opinion is therefore not based on a sound foundation.

Fourth, Hanvey's opinions in paragraph 14 of his report should be stricken. Hanvey's opinions were speculative and have no sound basis. He did nothing to assess whether the three published studies he reviewed had any valid application to this case. *See supra.*

**D. Furst Initial Report**

The Furst Initial Report concluded that (1) "In aggregate, for Operators' runs that end at a division[5], they are early and on-time the majority of the time"; (2) "selected Operators that end at a division are early and on-time more often than late"; (3) "in aggregate, Operators submit overtime slips for unscheduled overtime"; and (4) "selected Operators have submitted overtime slips." *See* Furst Initial Report pg. 5 section V (Summary Opinion(s)). [6]

In rendering her opinion with respect to on-time performance for runs that ended at a division, Furst used processed automatic passenger counter ("APC") data[7] maintained by SFMTA. *See* Furst Initial Report pg. 8 section VI. (Detailed Statement of Opinion(s)) A.1. Furst admitted that she: (1) had no expertise with respect the transportation industry, performing on-time performance reports, APC Technology, how APC data was generated, issues with APC data, transit route construction, and/or transit run construction, *see* Tidrick Decl. at Ex B (Deposition of Mary Furst) ("Furst Depo.") at 16:18-17:13, 37:5-7; and (2) did nothing to validate the APC data that she was provided or the APC technology generally. S*ee* Furst Depo at 42:15-44:1. Furst used a definition of "late" that considered vehicles to be on-time if they arrived between one minute early and four minutes late, despite not knowing whether this definition was applicable to Plaintiffs' Routinely Late Time claims. *See* Furst Depo at 30:13-31:14. Moreover, the APC data used by Furst (1) is limited to only motor coaches and trolley vehicles, and therefore, there is no data for light rail and cable car Operators, *see* Furst Initial Report pg. 7 section VI. (Detailed Statement of Opinion(s)) A; and (2) is limited to the 30% of the motor coaches and trolley vehicles that have APC systems, and therefore, is not available for each day an Operator pulled into the division. *See* Furst Initial Report pg. 7 section VI. (Detailed Statement of Opinion(s)) A.

With respect to the findings Furst's findings that Operators submit overtime slips for unscheduled overtime ("Overtime Card"), Furst used the eMerge payroll data only from

---

[5] Furst did not study on-time performance for runs that ended at relief points.

[6] The Furst Initial Report did not include paragraph numbering. Therefore, in this brief, when citing to the Furst Initial Report, Plaintiffs cite the page number and section.

[7] Unlike raw APC data, processed APC data is the output of a proprietary algorithm of SFMTA's APC Technology manufacturer. *See* Tidrick Decl. (Deposition of Jason Lee dated July 14, 2016) ("Lee Depo.") at 22:22-25:12.

August 27, 2012 to March 25, 2016.[8] Furst considered an Overtime Card to have been submitted by an Operator when the payroll data reflected a code of "OSU" or "OUT." *See* Furst Initial Report Ex. B1 pg. 5. Furst did not review any actual Overtime Cards submitted by Operators, and did not confirm the reason why an operator may have submitted an Overtime Card, even though the San Francisco Office of the Controller's own audit concluded that 44% of Operators' unscheduled overtime entries in SFMTA's payroll data was not supported by an Overtime Card. *See* Furst Depo at 69:3-18, Ex. 35 (pg. 12-13). SFMTA decided she should not review the unscheduled overtime cards submitted by Operators because such records were too "voluminous." Furst Depo. at 25:3-13.

### 1.     The Furst Initial Report Should Be Stricken

The Furst Initial Report should be stricken in its entirety for the following reasons.

<u>First</u>, Defendant's expert Mary Furst, is a certified public account, fraud examiner, and certified in financial forensics. *See* Furst Initial Report pg. 5 Section III (Qualifications). Ms. Furst admitted that she had never performed an on-time performance report for a transportation company, has no relevant work experience in transportation industry, and is not an expert in APC data. *See supra*. Furst simply does not have the expertise to give valid opinions about whether SFMTA's vehicles are on-time when pulling back into the division, and therefore, the Furst Initial Report should be stricken. *See Avila v. Willits Envtl. Remediation Trust*, 633 F.3d 828, 893 (9th Cir. 2011) (excluding the opinions of expert witness because the witness did not have any knowledge or special training concerning metal working); *Khoury v. Philips Med. Sys.*, 614 F.3d 888, 893 (8th Cir. 2010) (in a product liability action, an ergonomist was not qualified to provide an expert opinion because he had no training, education or experience in the design of the equipment).

<u>Second</u>, Furst used processed APC data which does not record the exact location of the vehicle at the time the vehicle door opens, and thus, Furst cannot be certain where the vehicle

---

[8] Furst did not analyze payroll data from December 11, 2009 to August 17, 2012 for her report because the "overtime in the GEAC data does not differentiate between scheduled and unscheduled overtime." *See* Furst Initial Report pg. 9 section VI. (Detailed Statement of Opinion(s)) B.

13

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY
*Stitt v. The San Francisco Municipal Transportation Agency*, Civil Case No. C-12-03704-YGR

was when its door opened. *See supra*. The APC data that Furst used is also significantly

incomplete. *See supra*. Therefore, Furst's conclusions regarding vehicle on-time performance

at a division are unreliable. *See Primiano v. Cook*, 598 F.3d 558, 565 ("the trial court must

assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task

at hand'").

Third, Furst used an improper and irrelevant definition on-time performance to

evaluate Plaintiffs' Routinely Late Time claims. *See supra*; *Primiano*, 598 F.3d at 565. If

Furst is allowed to present these findings to a jury it would mislead and/or confuse the jury.

Fourth, Furst failed to review a single Overtime Card. She also failed to reconcile

SFMTA's inaccurate payroll records. She examined SFMTA's payroll records only for the

time period of August 27, 2012 to March 25, 2016. *See supra*. Furst's opinions regarding

Operator's submission of Overtime Cards are unreliable. *Primiano*, 598 F.3d at 565.

Fifth, Furst failed to number the paragraphs of her report as required by the Court.

If the Court does not strike the Furst Initial Report in its entirety, then it should strike

all references to vehicle on-time performance and unscheduled overtime cards.[9]

**E.    Furst-Fleissig Rebuttal Report**

The Furst-Fleissig Rebuttal Report was a joint report issued by Mary Furst and Adrian

Fleissig. *See* Furst-Fleissig Rebuttal Report ¶ 1. Although Furst and Fleissig co-authored the

report, both admitted that they did not have knowledge and/or expertise regarding all of its

contents. *See* Furst Depo. at 85:16-22; 86:7-12, 96:23-97:3, 101:6-12, 102:17-25, 104:9-21,

101:5-15, 119:18-22; Tidrick Decl. Ex H (transcript of deposition of Adrian Fleissig at 49:10-

13, 55:23-56:17, 83:7-13, 84:16-85:14, 86:13-16, 87:1-22, 89:16-24, 93:5-11, 100:11-101:23,

102:24-105:7, 114:16-115:9, 116:4-118:6, 118:25-119:10, 127:5-17).

The Furst-Fleissig Rebuttal Report opines that "a well designed survey, instead of a

declaration, would have provided better estimates of Operator early, on-time and alleged late

time." *See* Furst-Fleissig Rebuttal Report ¶ 26. However, Furst and Fleissig admitted that

they had no expertise with respect to creating, administering, or performing surveys. *See*

---

[9] Paragraph numbers are not referenced because the Furst Initial Report does not have them.

Furst Depo. at 86:13-24-87:22, 96:23-97:10; Fleissig Depo. at 23:21-24; 25:12-14.

The Furst-Fleissig Rebuttal Report opines that a stratified sample should have been used rather than a simple random sample. *See* Furst-Fleissig Rebuttal Report ¶¶ 36-38. However, Furst testified that she had no expertise to support this statement. *See* Furst Depo. at 99:6-100:20. Moreover, Fleissig testified that he did not perform any analysis to determine whether performing a stratified sample would produce more reliable results than a simple random sample, because it was "not part of my assignment." *See* Fleissig Depo. at 84:7-85:13.

The Furst-Fleissig Rebuttal Report opines regarding the subject: "Average Arrival Time at Division – Dr. Drogin v. APC Data." *See* Furst-Fleissig Rebuttal Report ¶ 43- 46. In this section, APC data was compared to responses from Operators regarding routinely late time at a division. However, in each of the Operator examples, the report relies upon only a sample of the APC data for each Operator studied rather than all of the APC data during the class period for that Operator. *See* Furst-Fleissig Rebuttal Report ¶ 43-46. Although only a portion of the APC data was used to perform a comparison of Operator responses, the report concludes that certain Operator's average minutes late at a division estimates are not feasible. *See* Furst-Fleissig Rebuttal Report ¶ 44. Furst testified that she did not know why they did not use all of the APC data for each Operator when making such comparison. *See* Furst Depo. at 104:5-106:2; Fleissig Depo. at 87:1-8.

The Furst-Fleissig Rebuttal Report opines regarding the subject "Average Start-Travel-Wait Time – Dr. Drogin v. OWA Data." *See* Furst-Fleissig Rebuttal Report ¶¶ 53-58. In this section Furst and Fleissig allegedly used Operator Work Assignment ("OWA") data to determine the locations of where Operator's run assignments began or ended. However, the information in the work assignment data does not provide the locations of where Operator Cortez's run assignments began or ended. *See* Furst Depo. at 56:11-59:18, Ex. 103.[10] Also, Furst and Fleissig suggest that when an operator did not provide a time estimate for a certain

[10] In order to determine the ending location or beginning location for a run, a run number would need to be matched to a range report. Furst and Fleissig were given a range report only for Spring 2013 and not the entire class period. *See* Furst Initial Report Attachment 4; Furst-Fleissig Rebuttal Report Attachment 5.

category of time such non-response should be treated as a zero for purposes of determining the weighted average time for a category of time. *See* Furst-Fleissig Rebuttal Report ¶ 48-52. Furst and Fleissig both testified, however, that they did not know why non-responses should be treated as a zero. *See* Furst Depo. at 110:25-111:5-15; Fleissig Depo. at 89:19.

The Furst-Fleissig Rebuttal Report opines that Dr. Drogin's sample has a problematic non-response rate. *See* Furst-Fleissig Rebuttal Report ¶ 62- 63. However, neither Furst nor Fleissig could provide an opinion whether it was appropriate to exclude any of the following from the sample: (1) Operators who were in Drogin's sample but not in SFMTA's work assignment data; or (2) Operators that who in the work assignment data but whose runs could not be matched to a range report. *See* Furst Depo. at 118:3-15; Fleissig Depo. at 117:11-118:15, 119:5-9.

The Furst-Fleissig Rebuttal Report opines that Dr. Drogin "wrongfully assumes" that Operators arrive at relief locations 20 minutes before starting their run, but Furst testified that she did not study whether Operators arrive at relief locations 20 minutes before starting their run, and that she had no basis for asserting otherwise other than "common sense." Furst Depo. at 121:4-122:6.

The Furst-Fleissig Rebuttal Report opines that the numbers of minutes in the Operator declaration regarding Turn-In Time "81% are in increments of 5 minutes which is unlikely to match actual data." *See* Furst-Fleissig Rebuttal Report ¶ 96. Furst and Fleissig testified that they did not have actual data regarding the amount of time Operators spent performing Turn-In Time and that they did not perform any analysis to confirm if that statement was in fact true.[11] *See* Furst Depo. at 123:25-124:11; Fleissig Depo. at 89:20-90:9, 123:25-124:11.

### 1.     The Furst-Fleissig Rebuttal Report Should Be Stricken

The Furst-Fleissig Report should be stricken in its entirety as Furst and Fleissig cannot opine to the report's complete contents as admitted during their depositions. *See supra*. Moreover, neither Furst nor Fleissig delineate which opinion belongs to which expert or

---

[11] Defendant admitted that it has not maintained records memorializing the actual amount of time Operators spent performing Turn-In Time.

16

examined all of the documents/data used to support the report's conclusions. *See Dale K.*

*Barker Co., P.C. v. Plaza*, 541 Fed. Appx. 810, 815-816 (10th Cir. 2013) (cautioning that joint

reports could prove problematic if it is not clear whether both experts adhere to all of the

opinions in the report and they do not delineate which opinions belong to which expert).

In the alternative, the following paragraphs of the Furst-Fleissig Rebuttal Report

should be stricken for the reasons outlined below.

First, paragraph 26 of the report regarding implementation of a survey should be

stricken because Furst and Fleissig opined that they had no expertise with respect to creating,

administering, and/or performing surveys. *See supra.*

Second, paragraphs 36 through 38 of the report referencing the use of stratification

should be stricken because Furst testified that she had no expertise to support the statements

contained on those paragraphs and Fleissig testified that he did not perform any analysis to

determine whether performing a stratified sample would produce more reliable results than a

simple random sample. *See supra.*

Third, paragraphs 43 through 46 of the report should be stricken as the report uses a

sample of the APC data for each operator rather than all of the APC data for such operator

when analyzing declaration responses to APC data. *See supra.* Furst testified that she did not

know why they did not use all of the APC data for each Operator when making such

comparison and Fleissig testified that he was not involved in the preparation of these sections.

*See supra.*

Fourth, paragraphs 53 through 58 of the report should be stricken because the

information contained in the work assignment data does not provide the locations of where

run assignments begin or end. *See supra.* Also, Furst and Fleissig both testified that they did

not know why Operator non-responses contained in declarations should be treated as a zero

for purposes of determining the amount of time spent on a particular activity. *See supra.* As

such, there is no basis for their conclusions reached in these paragraphs.

Fifth, paragraphs 62 through 63 regarding the appropriate sample non-response rate

should be stricken as Furst and Fleissig could not provide an opinion whether Operators that

1    met certain criterion should be included or not included in the sample. *See supra*.

2    Sixth, paragraphs 86 through 91 of the report should be stricken as Furst testified that

3    she did not study whether Operators arrive at relief locations 20 minutes before starting their

4    run, and that she had no basis for asserting otherwise other than "common sense." *See supra*.

5    *See Vigil v. Whirlpool Corp.*, 2001 U.S. Dist. LEXIS 26269, at *5 (D.N.M. Nov. 16, 2001)

6    (excluding proffered expert opinion under *Daubert* because the opinion was within the realm

7    of "common knowledge").

8    Seventh, paragraph 96 of the report should be stricken as Furst and Fleissig testified

9    that they did not have actual data regarding the amount of time Operators spent performing

10   Turn-In Time and did not perform any analysis to confirm if that statement was in fact true.

11   *See supra*.

12            **F.    Cohen Rebuttal Report**

13           For the Cohen Rebuttal Report, Cohen used the pay codes contained in the payroll

14   data, created a "Preliminary Offset Key" in conjunction with Defendant's counsel and then

15   tallied the offsetting income on a classwide basis against Drogin's unpaid time from the pay

16   code information. *See* Cohen Rebuttal Report pg. 4.[12] Cohen found that offsetting income was

17   "significantly greater than the estimates of unpaid time provided by Dr. Drogin" and "no

18   economic loss has been suffered by plaintiffs." *Id.* In making these findings Cohen calculated

19   economic losses on an aggregate basis (*i.e.*, adding all of the weeks worked in which an

20   Operator suffered a loss under the FLSA and all of the weeks worked in which an Operators'

21   offsetting income was greater than the loss under the FLSA). *See* Tidrick Decl. Ex. D

22   (Deposition of Mark Cohen) ("Cohen Depo.") at 32:7-33:12, 35:14-36:24. Furthermore,

23   Cohen concluded that Plaintiffs' minimum wage claims are "unwarranted." *See* Cohen

24   Rebuttal Report, page 2. In reaching this conclusion, Cohen found that "[p]er the Department

25   of Labor, minimum wage violations are based on dividing total pay by total hours worked."

26   *See* Cohen Rebuttal Report pg. 2-3, Footnote 2.

27   _____
     [12] The Cohen Rebuttal Report did not include paragraph numbering. Therefore, when citing to the

28   Cohen Initial Report or Cohen Rebuttal Report, Plaintiffs will only provide the page number of
     the report being cited.

**1. The Cohen Rebuttal Report Should Be Stricken**

For the reasons outlined below, Cohen's Rebuttal Report should be stricken as the proffered testimony does not "rests on a reliable foundation" *Daubert*, 509 U.S. at 597.

**a) Cohen Used Improper Pay Codes to Offset Unpaid Time**

Pursuant to the Fair Labor Standards Act ("FLSA"), an employer may apply three specified types of compensation paid to an employee as a credit against the unpaid overtime it owes. Specifically, 29 U.S.C §207(h)(2) provides: "Extra compensation paid as described in paragraphs (5), (6), and (7) of subsection (e) of this section shall be creditable towards overtime compensation payable." Thus, included within the FLSA subsection that provides the regular rate of pay compensation exceptions (§207(e)), and are also the only three types of compensation that may be credited or offset against overtime wages due. Thus, any type of compensation that must be included in the regular rate of pay, *necessarily* cannot be used as a credit against unpaid wages due.

Defendant instructed Cohen to credit payments made to Operators that had been tagged with the following codes in the Trapeze system: "STR," "STB," and various codes reflecting lunch allowances when they were greater than 30 minutes. *See* Cohen Depo. at 29:8-32:4, Ex. 127. Trapeze code "STR" represents payment for Operator travel from a relief point away from the home division to the home division, or the opposite. This time is considered work time by the SFMTA. Trapeze code "STB" represents payment for standby time. Operators are placed on standby at the division or at a relief point. While Operators are on standby, they remain subject to orders from SFMTA and are expected to perform work during that time. This time is considered work time by the SFMTA. Trapeze Code for Lunch Allowances greater than 30 minutes: There are various Trapeze Codes that are used to represent the lunch allowance that SFMTA pays Operators as straight time pay. SFMTA has a policy and practice of including payment for travel time to Operators in the lunch allowance. This happens when payment for a lunch allowance is greater than 20 minutes. Thus, when the Trapeze Codes that represent the payment for a lunch allowance are greater than 20 minutes it

19

represents payment for travel time. This time is considered work time by the SFMTA.[13] *See* Williams Dec. ¶ 17-20; Tidrick Decl. Ex. A (transcript of deposition of Susana Beaumont-Lopez) at 33:19-25, Ex. 36.

Payments pursuant to these codes do not fall within any of the compensation premiums identified in sub-subsections (5), (6), or (7) of §207(e). They are not paid because Operators worked "in excess of eight [hours] in a day or in excess of the maximum workweek applicable to such employee." 29 U.S.C. § 207(e)(5). It is not paid because Operators worked on "Saturdays, Sunday, holidays, or regular days of rest." *Id* § 207(e)(6). And it is not paid "for work outside of . . . the basic, normal, or regular workday (not exceeding 8 hours) or workweek. *Id.,* § 207(e)7).[14]  Cohen's use of these codes to "offset" pay is incorrect.

**b)      Cohen Improperly Applied Offsets On An Aggregate Basis**

The Cohen Rebuttal Report applied offsets on an "aggregate" basis, where all creditable payments to an individual are used to offset all damages owed to that individual for the entire class period. This "aggregate offset" method is prohibited by: (1) numerous cases discussing the purpose and legislative history of the FLSA; (2) Department of Labor regulations; and (3) the Ninth Circuit's approved method of calculating offsets.

**(1)      Numerous Courts Have Required that Offsets Be Applied Only in the *Workweek* When They Accrued.**

It is well established that the FLSA "takes a single workweek as its standard and does not permit averaging of hours over 2 or more weeks" in determining overtime payments owed. 29 C.F.R. §778.104; *Rudy v. City of Lowell*, 777 F. Supp. 2d 255, 260-61 (D. Mass. Mar. 14, 2011); *Gilmer v. Alameda-Contra Costa Transit Dist.*, 2011 U.S. Dist. LEXIS 126845, at *40 (N.D. Cal. Nov. 2, 2011).  It is similarly well-established that payments required by the FLSA must be computed and timely paid during the pay period associated

---

[13] Defendants have not yet stipulated to the meanings of the Trapeze pay codes. Therefore, Plaintiffs reserve their rights to amend and revise the meanings of the codes discussed herein.
[14] This is referred to as "clock pattern" premium pay (29 C.F.R. § 778.204), which is limited to premium pay "payable solely on the basis of the time of day in which the work is performed, independent of the number of hours worked." *Brock v. Wilamowsky,* 833 F.2d 11, 16 (2d Cir. 1987).

with the week when the work was performed. 29 C.F.R. §778.106 ("overtime compensation earned in a particular workweek must be paid on the regular pay day for the period in which such workweek ends"); *Biggs v. Wilson*, 1 F.3d 1537 (9th Cir. 1993) (holding wages due pursuant to the FLSA must be promptly paid, and the workweek is the FLSA standard period for payments); *Herman v. Fabri-Center of Am., Inc.*, 308 F.3d 580, 590-591 (6th Cir. 2002) (citing cases).

Allowing employers to apply offsets to weeks other than the week when the work was performed undermines the protections afforded by the FLSA and would have the effect of "requir[ing] employees to work large blocks of overtime without premium compensation." *Rudy*, 777 F. Supp. 2d art 262. As held by the court in *Scott*,

> The [overtime] requirement protects workers from the imposition of excessive hours by placing an immediate cost on the employer. If employers were allowed to bank credit for contractual overtime against future obligations to pay statutory overtime, it would place workers in the employer's debt[.]

*Scott v. City of NY,* 592 F. Supp. 2d 475, 484 (S.D.N.Y. 2008). *See also Nolan v. City of Chicago*, 125 F. Supp. 2d 324, 332 (N.D. Ill. 2000) ("[t]o permit the [employer] to obtain a credit against a period where no credit was otherwise due, would harm the [employees] and confer a benefit upon the [employer], which is clearly not intended by the FLSA."); *Conzo v. City of NY*, 667 F. Supp. 2d 279, 291 (S.D.N.Y. 2009) (similar).

Additionally, a review of the legislative history of section 207(h)(2) supports a finding that the Act should be interpreted to include a workweek restriction, as discussed in *Herman*, 308 F.3d at 586-589. *Herman* noted that section 207(h)(2) originally provided credits "toward *any* premium compensation due" (emphasis added), and that clause was later revised to enact the current provision: "toward overtime compensation payable." *Id.* at 586. Courts have found that "[l]ogically this excision [of the word *any*] restricts the application of credit to the standard calculations conducted under the FLSA-calculations made on a workweek or work period basis." *Scott*, 592 at 484-485; *see also Herman*, 308 F.3d at 586-589.

**(2)     The DOL Regulations Require that Offsets Are Allowed in Only the Workweek When They Accrued**

21

The DOL regulation discussing damage offsets provides that an employer may credit extra payments "made for daily overtime hours against the overtime compensation which is due under the statute for hours in excess of 40 in that workweek." 29 C.F.R. §778.202(c) (emphasis added). While section 778.202 pertains to premium pay for hours in excess of the daily or weekly standard found in section 207(e)(5) of the FLSA, this regulation is a clear indication that DOL has interpreted the 29 U.S.C. §207(h)(2) offset provision to require crediting on only a weekly basis. *See Scott v. City of NY*, 592 F.Supp.2d 475, 482 (S.D.N.Y 2008) (holding that the regulations promulgated by the DOL at 29 C.F.R. §778.202(c) "resolve this ambiguity" in the text of the Act). "A proper interpretation of the FLSA is necessarily guided by the regulations issued by the Secretary of Labor." *Christopher v. SmithKline Beecham Corp.*, 635 F.3d 383, 389 (9th Cir. 2011).

### (3) The Ninth Circuit Holds that Offsets Are To Be Applied on a Weekly Basis

In *Biggs v. Joshua Hendy Corp.*, 183 F.2d 515 (9th Cir. 1950), the Ninth Circuit provided numerical calculations to exemplify how to determine the amount of overtime payments due to employees bringing a claim for missed meal breaks. Although the Ninth Circuit did not directly opine on the question of whether the credits were to be applied on a weekly or aggregate basis, the court applied the offsets on a weekly basis ("subtracting ["the amount of the excess overtime premium"47] from ["the gross amount due"] leaves 2 times the regular hourly rate as the net amount due appellants for each week in which they worked through lunch . . ."). *Id.* at 518. The Ninth Circuit's practical application of offsets on a weekly basis demonstrates the proper method under the Act. *Id.* at 518-519.

### c) The California Minimum Wage and SFMWO Apply to Each Hour Worked

The Cohen Rebuttal Report used the "Department of Labor" guidelines to calculate minimum wage violations by dividing total pay by total hours worked. This method has been rejected under California law and should be rejected under the SFMWO.

### (1) California Courts Have Rejected the FLSA's Rule

In *Armenta v. Osmose, Inc.*, 135 Cal. App. 4th 314, 321 (2005), the Court of Appeal rejected the FLSA rule that calculates minimum wage compliance by dividing all compensation during a pay period by the total hours worked to arrive at an average rate of pay. *Armenta v. Osmose, Inc.*, 135 Cal. App. 4th 314, 324 (2005). *Armenta* held that employers must pay the minimum wage for each hour worked, and that it is irrelevant if an employee's total compensation for a pay period far exceeds the minimum wage. *Id*.[15] The *Armenta* court adopted the reasoning of the January 29, 2002 opinion letter of the Department of Labor Standards Enforcement (DLSE) (the "DLSE Opinion Letter") (Tidrick Decl. Ex. QQ). *Id*. In that letter, the DLSE analyzed whether the Sacramento Regional Transit District ("RTD") (a government entity like SFMTA) could average "all wages paid under a CBA or other contract, within a particular pay period, in order to determine whether the employer complied with its minimum wage obligations." *See* DLSE Opinion Letter at pg. 7-11 & n.5. The DLSE Opinion Letter concluded that California Labor Code sections 221-223:

> "prevented the RTD, or any other employer that might be covered by a CBA or other contract that expressly pays employees less than the minimum wage for certain activities that constitute "hours worked" within the meaning of state law, from using any part of the wage payments that are required under that CBA or other contract for activities that are compensated in an amount that equals or exceeds the minimum wage, as a credit for satisfying minimum wage obligations for those activities that are compensated at less than the minimum wage under the CBA or contract. Instead, all hours for which the employees are entitled to an amount equal or greater than the minimum wage pursuant to the provisions of the CBA or other contract must be compensated precisely in accordance with the provisions of the CBA or contract; and all other hours (or parts of hours) which the CBA or contract explicitly states will be paid at less than the minimum wage, but which constitute "hours worked" under state law, must be compensated at the minimum wage. Averaging of all wages paid under a CBA or other contract, within a particular pay period, in order to determine whether the employer complied with its minimum wage obligations is not permitted under these circumstances, for to do so would result in the employer paying the employees less than the contract rate for those activities which the CBA or contract requires payment of a specified amount equal to or greater than the minimum wage, in violation of Labor Code sections 221-223."

DLSE Letter page 11 (emphasis added).

### d) SFMWO Applies to Each Hour Worked

[15] The holding in *Armenta* has been subsequently adopted by numerous other federal and state courts. *See e.g.*, *Cardenas v. McLane Foodservices, Inc.*, 796 F. Supp. 2d 1246, 1252-53 (C.D. Cal. 2011); *Gonzalez v. Downtown LA Motors, LP*, 215 Cal. App. 4th 36, 49 (2013); *Quezada v. Con-Way Freight, Inc.*, 2014 U.S. Dist. LEXIS 5922, at *6-7 (N.D. Cal. Jan. 16, 2014).

The FLSA's rule for calculating a minimum wage violation does not apply to SFMWO for the following reasons. First, in contrast to the FLSA, the plain language of the SFMWO makes clear that the San Francisco minimum wage applies to each hour worked.[16] *Compare* SF Admin. Code §12R.4.(a) ("Employers shall pay Employees no less than the Minimum Wage for **_each_** hour worked within the geographic boundaries of the City.") (emphasis added); *with* 29 USCS § 206 (a) ("Every employer shall pay to each of his employees who in any workweek is engaged in commerce…wages at the following rates…"). The FLSA addresses payment of the minimum wage to employees who "in any work week" are engaged in commerce, whereas the SFMWO addresses payment of the minimum wage for "each hour." The reference to "each hour" displays a clear intention that the SFMWO applies to each hour worked. *See Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 411 (2007) (holding that "the maxim expressio unius exclusio alterius est, i.e., 'mention of one matter implies the exclusion of all others,'" is an aid to interpretation); *Arizona v. United States*, 132 S. Ct. 2492, 2520 (2012) (same). A similar comparison was made in *Armenta*, where the court found:

> "the minimum wage provisions of the FLSA differ significantly from California's minimum wage law. FLSA requires payment of minimum wage to employees who "in any work week" are engaged in commerce…Wage Order No. 4, section 4(B) provides: "Every employer shall pay to each employee, on the established payday for the period involved, not less than the applicable minimum wage for all hours worked in the payroll period, whether the remuneration is measured by time, piece, commission, or otherwise." This language expresses the intent to ensure that employees be compensated at the minimum wage for each hour worked. The averaging method utilized by the federal courts for assessing a violation of the federal minimum wage law does not apply here."

*Armenta*, 135 Cal. App. 4th 314, 323. (emphasis added).

Second, as noted above, California Labor Code §§ 221-223 prevents employers, including SFMTA,[17] that are covered by a CBA from using any part of the wage payments that are required under that CBA as a credit for satisfying minimum wage obligations for

---

[16] When attempting to ascertain the meaning of a statute, the rules of statutory construction suggest that the words of the statute itself should first be consulted. *See Regents of Univ. of California v. Public Employment Relations Bd.*, 41 Cal. 3d 601, 607 (1986).

[17] The DLSE has stated that Labor Code sections 221-223 apply to all employers, including public employers. *See* DLSE Letter pg. 11 footnote 5.

24

PLAINTIFFS' NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY
*Stitt v. The San Francisco Municipal Transportation Agency*, Civil Case No. C-12-03704-YGR

those activities that are compensated at less than the minimum wage. *See* DLSE Letter pg. 11; *Gonzalez v. Downtown LA Motors*, LP, 215 Cal. App. 4th 36, 50-51 (2013).

*Third*, the SFMWO incorporates various elements of California law, including the Labor Code, and does not incorporate the FLSA. *See e.g.*, SF Admin. Code §§ 12R.2, 12R.3.(b), 12R.7.(b), 12R.7.(d), 12R.23.(a). The lack of incorporation of the FLSA or federal law within the SFMWO portends to a conclusion that authorities concerning the FLSA should not be used to construe the SFMWO. *Armenta*, 135 Cal. App. 4th 314, 322-323.

*Fourth*, the Office of Labor Standards Enforcement, which enforces the SFMWO, has taken the position that calculating unpaid wages under the SFMWO is done by multiplying the hours worked by the minimum wage. *See* Tidrick Decl. Ex. DD, page CCSF 097719, Footnote 5 (calculating back wages for Ms. Alpoe by "multiplying the hours worked by the hourly minimum wage").

*Fifth*, the SFMWO reflects a clear intent to protect the rights of workers in San Francisco to greater extent than the FLSA. For example: (1) San Francisco employees are allowed a higher minimum wage than federal statutes allow; and (2) the FLSA gives employers a tip credit for employees earning tips, *see* (29 U.S.C. § 203(m); 29 C.F.R. § 531.50.), whereas the SFMWO does not contain such a provision. These examples demonstrate that the SFWMO provides greater protections to employees, and therefore, authorities regarding the FLSA are of no utility in interpreting the SFMWO. *See Armenta*, 135 Cal. App. 4th 314, 323 ("The federal authorities are of little assistance, if any, in construing state laws and regulations that provide greater protection to workers.").

**III.    CONCLUSION**

Plaintiffs respectfully request that the Court grant their motion.

DATED: August 2, 2016                    THE TIDRICK LAW FIRM

                                         By:    /s/ Steven G. Tidrick
                                         _____
                                         STEVEN G. TIDRICK, SBN 224760
                                         JOEL B. YOUNG, SBN 236662