Exhibit A

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | NORTHERN DISTRICT OF CALIFORNIA |
| 3 | ---oOo--- |
| 4 | DARRYL A. STITT, et al.,          Case Number |
| 5 |          Plaintiffs,             12-cv-03704-YGR (EDL) |
| 6 | vs |
| 7 | THE SAN FRANCISCO MUNICIPAL |
| 8 | TRANSPORTATION AGENCY, et al., |
| 9 |          Defendants. |
| 10 | _____ |
| 11 | |
| 12 | |
| 13 | |
| 14 | DEPOSITION OF SUSANA BEAUMONT-LOPEZ |
| 15 | San Francisco, California |
| 16 | Wednesday, April 27, 2016 |
| 17 | Volume I |
| 18 | |
| 19 | |
| 20 | |
| 21 | Reported by: THOMAS J. FRASIK |
| 22 | RPR, CSR No. 6961 |
| 23 | Job No:  2298404 |
| 24 | |
| 25 | Pages:  1 - 46 |

Veritext Legal Solutions
866 299-5127

| 1 | UNITED STATES DISTRICT COURT |
| 2 | NORTHERN DISTRICT OF CALIFORNIA |
| 3 | ---oOo--- |
| 4 | DARRYL A. STITT, et al.,      Case Number |
| 5 |     Plaintiffs,        12-cv-03704-YGR (EDL) |
| 6 | vs |
| 7 | THE SAN FRANCISCO MUNICIPAL |
| 8 | TRANSPORTATION AGENCY, et al., |
| 9 |     Defendants. |
| 10 | _____ |
| 11 | |
| 12 |     Deposition of SUSANA BEAUMONT-LOPEZ, |
| 13 | VOLUME I, at 1390 Market Street, Seventh Floor, |
| 14 | San Francisco, California, beginning at 9:55 a.m., |
| 15 | and ending at 11:13 a.m., on Wednesday, April 27, |
| 16 | 2016, before Thomas J. Frasik, Registered Professional |
| 17 | Reporter, Certified Shorthand Reporter No. 6961. |

Page 2

Appearances of Counsel:

For the Plaintiffs:

    THE TIDRICK LAW FIRM
    BY:  STEVEN G. TIDRICK
        Attorney At Law
    2039 Shattuck Avenue, Suite 308
    Berkeley, California  94704
    510-788-5100
    sgt@tidricklaw.com

For the Defendants:

    RENNE SLOAN HOLTZMAN SAKAI
    PUBLIC LAW GROUP
    BY:  KEVIN P. McLAUGHLIN
        Attorney At Law
    1220 Seventh Street, Suite 300
    Berkeley, California  94710
    510-995-5806
    kmclaughlin@publiclawgroup.com

Also Present:

    JOHN DUDLEY

Page 3

I N D E X

SUSANA BEAUMONT-LOPEZ, VOLUME I    EXAMINATION

    BY MR. TIDRICK    6

INSTRUCTIONS NOT TO ANSWER/REFUSALS TO ANSWER:

    Page  Line
     (None)

Page 4

E X H I B I T S

SUSANA BEAUMONT-LOPEZ DEPOSITION

| NUMBER | INTRODUCED |
|---|---|
| Previous Exhibit 36 | 20 |

Page 5

| | |
|---|---|
| 1      San Francisco, California | 1   senior operations planning, was there another job title |
| 2      Wednesday, April 27, 2016 | 2   that you held? |
| 3      9:55 a.m. | 3     A. Yes, but it was out of state, in the Regional |
| 4 | 4   Transportation Agency of Southern Nevada, and I was also |
| 5      SUSANA BEAUMONT-LOPEZ, | 5   a senior planner there for five years. |
| 6   having been administered an oath, was examined and | 6     Q. You first started with SFMTA in March 2012; |
| 7   testified as follows: | 7   correct? |
| 8      ---o0o--- | 8     A. Correct. |
| 9      EXAMINATION | 9     Q. What were your job functions in the position of |
| 10   BY MR. TIDRICK: | 10   senior operations planning? |
| 11     Q. Good morning. | 11     A. At RTC or here at SFMTA? Both? |
| 12     A. Good morning. | 12     Q. At the SFMTA. |
| 13     Q. Would you please state your full name for the | 13     A. At SFMTA, I oversaw five planners ranging from |
| 14   record? | 14   Planner 1, 2 and 3 classifications, and we basically |
| 15     A. Yes. My name is Susana Beaumont-Lopez. | 15   dealt with everything to do with all seven divisions, |
| 16     Q. Can you spell all that, please? | 16   related to operator issues with turns, with route |
| 17     A. Yes. Susana is S-u-s-a-n-a, Beaumont is | 17   alignments, bus stop coordination. We attended the |
| 18   B-e-a-u-m-o-n-t, hyphen L-o-p-e-z. | 18   safety meetings to receive input from the operators on |
| 19     Q. Have you ever been deposed before? | 19   issues that they were facing in the field. We worked |
| 20     A. I have not. | 20   with the transportation group to establish when they |
| 21     Q. Do you understand generally how a deposition | 21   were putting in different pedestrian projects or bicycle |
| 22   works? | 22   projects. We were basically the liaison to make sure |
| 23     A. Yes. | 23   how the impact of the projects were going to affect the |
| 24     Q. You understand that I'll be asking questions | 24   transit service. |
| 25   today and your obligation is to answer them accurately | 25     Q. Was one of the things you said run alignments |
| <div align="center">Page 6</div> | <div align="center">Page 8</div> |
| 1   and truthfully, you understand that? | 1   or was that run assignments? |
| 2     A. Yes. | 2     A. Route alignment, sorry. |
| 3     Q. Are you on any medications that would affect | 3     Q. Route alignments? |
| 4   your ability to testify accurately today? | 4     A. Right. |
| 5     A. No. | 5     Q. What does "route alignments" refer to? |
| 6     Q. Are you currently employed by SFMTA? | 6     A. The routing that the buses are going to take, |
| 7     A. Yes. | 7   the routing that a specific -- the routing that a line |
| 8     Q. What is your job title? | 8   will take, and most of it is based on ridership and |
| 9     A. Senior operations manager of schedules. | 9   passenger demands. A lot of the lines are historical, |
| 10     Q. How long have you had that job title? | 10   and we perhaps make Tweets based on demand or special |
| 11     A. Two and a half years. | 11   events, construction. |
| 12     Q. So you started that position in 2014? | 12     Q. For the route alignments job function, were |
| 13     A. Correct. | 13   there some written procedures that you followed? |
| 14     Q. Do you recall what month? | 14     A. Actually, there's a study that was done prior |
| 15     A. January. | 15   to me starting in the agency, which is called the TEP, |
| 16     Q. Immediately before becoming senior operations | 16   Transit Effectiveness Project, and that basically laid |
| 17   manager of schedules, did you hold another job title? | 17   out what the plans for the agency were for the next few |
| 18     A. Yes. I was a senior operations planning. | 18   years. |
| 19     Q. For SFMTA? | 19     Q. What was the approximate date of that study? |
| 20     A. For SFMTA. | 20     A. I don't know. |
| 21     Q. What period of time did you serve in the | 21     Q. Who was that study owned by? |
| 22   position senior operations planning? | 22     MR. McLAUGHLIN: Objection. Speculation. |
| 23     A. From March of 2012 till I got the new position | 23     THE WITNESS: Can I answer? |
| 24   with the schedules. | 24     MR. McLAUGHLIN: Yes. |
| 25     Q. Immediately prior to serving in the position of | 25     THE WITNESS: I believe it was done by a |
| <div align="center">Page 7</div> | <div align="center">Page 9</div> |

<div align="right">3 (Pages 6 - 9)</div>

1 consultant in coordination with SFMTA planning group --
2 with the SFMTA planning group.
3 BY MR. TIDRICK:
4    Q.  With respect to the route alignments, the
5 routing that a bus or train will take -- strike that.
6       Do I understand correctly one of the aspects of
7 route alignments is determining the routing that a
8 transit vehicle will take?
9    A.  Yes.
10   Q.  Is there a reason that that -- strike that.
11      Many of SFMTA's runs are scheduled to start and
12 stop in different geographic locations; correct?
13   A.  Yes.
14   Q.  Is there a reason that runs are scheduled to
15 start and end in different geographic locations?
16      MR. McLAUGHLIN:  I'm just going to note for
17 the record this is not a topic on which the witness has
18 been designated, so she's testifying in her personal
19 capacity in response to this line of questioning.  She
20 can go forward and answer.  I will object based on
21 speculation.
22      THE WITNESS:  Can you repeat the question?
23      (Record read by the reporter
24      as follows):
25      "QUESTION:  Is there a reason that

1    A.  If it's a route that is going in a loop, of
2 course it's going to start and end in the same location,
3 but if it's a route that descends from downtown out to
4 the beach, it may not end and start in the same
5 geographic location.
6    Q.  There's a difference between a route and a run;
7 correct?
8      MR. McLAUGHLIN:  Objection.  Vague.
9      THE WITNESS:  Yes.
10 BY MR. TIDRICK:
11   Q.  Many of SFMTA's runs are scheduled to start and
12 end in different geographic locations; correct?
13   A.  Yes.
14   Q.  Many of SFMTA's runs start and end in the same
15 geographic location; correct?
16   A.  Some, yes.
17   Q.  Is there a reason that SFMTA does not schedule
18 all runs to start and end in the same geographic
19 location?
20      MR. McLAUGHLIN:  Objection.  Vague.  Incomplete
21 hypothetical.
22      THE WITNESS:  There's several reasons why it
23 may not end and start in the same geographical location.
24 BY MR. TIDRICK:
25   Q.  What are those reasons?

1    runs are scheduled to start and end
2    in different geographic locations?"
3      THE WITNESS:  The reason is because MUNI
4 provides service to San Francisco and the service is
5 designed based on the travel patterns of where
6 individuals may start and end their trips, that's why
7 runs start and end in different geographical locations.
8 BY MR. TIDRICK:
9    Q.  When you say "individuals," you're referring to
10 the riders; correct?
11   A.  The patrons, correct.
12   Q.  Not the operators; correct?
13   A.  No.
14   Q.  Correct?
15   A.  Correct.
16   Q.  As a technical matter, it would be possible to
17 schedule runs to start and end at the same geographic
18 location; correct?
19      MR. McLAUGHLIN:  Objection.  Vague.  Incomplete
20 hypothetical.
21      Go ahead, you can answer the question.
22      THE WITNESS:  It depends on the route
23 alignment.
24 BY MR. TIDRICK:
25   Q.  How does it depend on the route alignment?

1    A.  Operator availability, vehicle availability,
2 efficiency.
3    Q.  Any other reasons?
4    A.  No, not that I can think of.
5    Q.  What do you mean by "efficiency"?
6    A.  If a bus is scheduled to start in downtown,
7 per se, and at the end of that run for that operator the
8 schedule ends, let's say, at the beach, for instance,
9 pulling that vehicle back to downtown may cause issues
10 with the amount of time that the operator has been on
11 the platform.
12   Q.  When you say "issues," is the concern that it
13 would mean that the operator is on the clock for a
14 longer period of time?
15   A.  There's certain limitations per the contract of
16 how long an operator can be on the platform.
17      So let's say that run now ends at the beach.
18 Having the operator come back to downtown may cause
19 potential issues with the amount of time that operator
20 has been on the platform.
21   Q.  In that situation, isn't it possible for SFMTA
22 to adjust the route to be shorter?
23   A.  No.
24      MR. McLAUGHLIN:  Objection.  Vague.  Incomplete
25 hypothetical.

1  As a running notation for the record, this is
2  going on Ms. Lopez's personal testimony and not 30(b)(6)
3  testimony.
4  BY MR. TIDRICK:
5  Q.  Why is it impossible to adjust the route?
6  MR. McLAUGHLIN:  Objection.  Incomplete
7  hypothetical.  Vague.
8  THE WITNESS:  There's certain routes -- the
9  routes are laid out for a reason; right?  The public is
10 expecting for a route to complete in what location we
11 have published.  If a route all of a sudden ends before
12 the point where we have placed that the route is
13 designed to do, then those individuals that are on the
14 bus will have to fully exit the bus and have to wait for
15 the following run or route to come through to pick them
16 up.  So it's not -- the system can't be based on what's
17 happening with a given operator; the system -- we're
18 here to provide a public service, we're not here to
19 provide a service for that individual operator.
20 BY MR. TIDRICK:
21 Q.  Approximately how often does SFMTA make
22 adjustments to routes?
23 MR. McLAUGHLIN:  Objection.  Vague.
24 THE WITNESS:  Adjustments to routes ...
25 Like I mentioned earlier, the TEP has it laid out, what

Page 14

1  the plans are for what realignments are going to take
2  place.  In the last year, the board approved a certain
3  percentage of service increases that could come into
4  play, and the service planning group is in charge of
5  determining what route changes or alignments are done,
6  and a lot of it is based on mandate.
7  BY MR. TIDRICK:
8  Q.  The question I'm asking is different, and
9  that is --
10 A.  It varies.
11 Q.  I'm looking for a number.  Approximately how
12 often in the last year has SFMTA made changes to routes?
13 MR. McLAUGHLIN:  Do you want to -- it's vague.
14 Changes to routes, like a formal change, or based on a
15 given day something happens; what are you referring to?
16 I'm sorry for speaking in my objection but it's really
17 vague.
18 BY MR. TIDRICK:
19 Q.  Changes with respect to start or end locations.
20 MR. McLAUGHLIN:  Same objection.
21 THE WITNESS:  Yes.
22 MR. McLAUGHLIN:  That's not a clarification.
23 BY MR. TIDRICK:
24 Q.  How often are formal changes made to routes?
25 A.  Speaking in regards to schedules, we have

Page 15

1  sign-ups per the MOU at least two times a year when it's
2  a year that is a DSU, which is a general sign-up.  And a
3  sign-up could be routing changes, could be scheduling
4  changes.
5  But does the same thing happen in every given
6  sign-up?  No.  So I can't put a number or a time frame
7  to that question.
8  BY MR. TIDRICK:
9  Q.  What I'm trying to understand is when you say
10 that the public expects routes to end at a certain
11 place, the public's expectations change routinely
12 when SFMTA makes changes to routes; correct?
13 MR. McLAUGHLIN:  Objection.  Vague.
14 Speculation.  Nonsensical.
15 THE WITNESS:  Changes to -- I really
16 don't -- do you understand how SFMTA -- their routing
17 structure and how it works, and all the different
18 construction projects and special events that happen
19 in the city may have an impact on what a route may
20 potentially do.  Route changes are not done frequently.
21 BY MR. TIDRICK:
22 Q.  When you say that efficiency is one of the
23 reasons why runs are scheduled to start and end in
24 different locations, you identified the point that it
25 may be that an operator has worked a certain amount of

Page 16

1  hours and, therefore, SFMTA would not be able to change
2  the route to end at the same geographic location that it
3  starts.  Do I understand that correctly?
4  A.  Correct.
5  Q.  And is that number of hours -- do you know what
6  that number of hours is?
7  MR. McLAUGHLIN:  Objection.  Vague.
8  THE WITNESS:  Per the MOU, the number of
9  hours -- the max number of hours that an operator can be
10 behind the wheel is ten hours.
11 BY MR. TIDRICK:
12 Q.  There are numerous routes that start and end in
13 different geographic locations that are either at eight
14 hours or slightly above eight hours; is that correct?
15 A.  Some are, yes.
16 Q.  In those instances, is there a reason that
17 SFMTA does not adjust the route to have the run end at
18 the same geographic location where it started?
19 MR. McLAUGHLIN:  Objection.  Vague.  Incomplete
20 hypothetical.
21 I'm going to note you have not asked the
22 witness one question about the topic on which she was
23 produced, which was a very discrete topic, which,
24 frankly, I don't think we even had to produce a witness
25 on because it wasn't encompassed within the actual

Page 17

1 30(b)(6) topic. You're wasting our time and it's an
2 abuse of the 30(b)(6) deposition process.
3     I understand the Detoy case and that you can
4 ask a 30(b)(6) witness about other things, but to
5 conduct the whole deposition based on other topics is
6 completely improper. So, I've noted that objection and
7 I hope we can move toward the topic on which the witness
8 is designated to testify soon.
9 BY MR. TIDRICK:
10    Q. Do you still have the question in mind?
11    A. No.
12    Q. If we could please read it back?
13        (Record read by the reporter
14        as follows):
15        "QUESTION: In those instances, is
16        there a reason that SFMTA does not
17        adjust the route to have the run end
18        at the same geographic location
19        where it started?"
20        MR. McLAUGHLIN: Do you have my objection as
21 far as the incomplete hypothetical and vague?
22        THE REPORTER: Yes.
23        THE WITNESS: Routes cannot be adjusted on the
24 fly. The route designation is there for a reason and
25 they cannot be adjusted on the fly.

Page 18

1 BY MR. TIDRICK:
2    Q. Does SFMTA -- actually, let me ask you a
3 different question.
4     In your current position, senior operations
5 manager of schedules, what are your job functions?
6    A. I oversee the scheduling team and we create the
7 run assignments for -- we create the schedules and the
8 run assignments for the operators, we do the run cuts,
9 we do the operator bids, we create the operator paddles,
10 and we work along with service planning to create
11 schedule changes during sign-up periods.
12    Q. You work with range reports in your current
13 position?
14    A. Correct.
15    Q. You're familiar with SFMTA's range reports?
16    A. Yes.
17    Q. And how to read them?
18    A. Yes.
19    Q. You're familiar with the range reports for all
20 of SFMTA's divisions?
21    A. Yes.
22    Q. And what they mean?
23    A. Yes.
24    Q. Are there any other job functions that you
25 perform as senior operations manager of schedules?

Page 19

1    A. No.
2    Q. I'm showing you the document previously marked
3 as Exhibit 36. The document says Exhibit 36, Cobean,
4 C-o-b-e-a-n.
5        (Previously marked Exhibit 36
6        was shown to the witness and
7        is annexed hereto.)
8 BY MR. TIDRICK:
9    Q. Exhibit 36 is numbered CCSF 032074 through
10 CCSF 032082.
11        Exhibit 36 is a range report; correct?
12    A. Yes.
13    Q. You understand and know how to read this range
14 report; correct?
15    A. Yes.
16    Q. Starting in the left-most column of Exhibit 36,
17 where it says "Run" at the top, what does the
18 information in that column refer to?
19    A. "Run" is the assignment for an operator that
20 signs to that run, it's the work assignment.
21    Q. What does the information in the column
22 entitled "On" refer to?
23    A. The start time.
24    Q. The scheduled start time; correct?
25    A. Yes.

Page 20

1    Q. What does the information in the column
2 entitled "Train" refer to?
3    A. "Train" refers to the operator assignment and
4 the vehicle assignment.
5    Q. What does the information in the column
6 entitled "Off" refer to?
7    A. The time the operator is off from work.
8    Q. The time that the operator is scheduled to be
9 off from work; correct?
10    A. Yes.
11    Q. What does the information in the column
12 entitled "Range" refer to?
13    A. The amount of time the operator is -- the
14 amount of time the operator is scheduled to be on the
15 platform -- not on the platform, sorry. The range is
16 the scheduled amount of time the operator is working for
17 the SFMTA.
18    Q. Skipping to the right-most column, what does
19 the "Days Off" column refer to?
20    A. The days that the operator is scheduled to be
21 off from work.
22    Q. And, for example, where in the Days Off column
23 it says "S-S," what does that mean?
24    A. Saturday, Sunday.
25    Q. And where in the Days Off column it says "T-F,"

Page 21

6 (Pages 18 - 21)

1 what does that mean?
2    A. Thursday, Friday.
3    Q. Where the Days Off column says "F-S," what
4 that mean?
5    A. Friday, Saturday.
6    Q. Where the Days Off column says "T-W," what does
7 that refer to?
8    A. Tuesday or Wednesday.
9    Q. Where the Days Off column says "S-M," what does
10 that refer to?
11    A. Sunday, Monday.
12    Q. What does the column entitled "P$" refer to?
13    A. Is the amount of pay for that run.
14    Q. The column entitled "O.T. Night Diff.," what
15 does that column refer to?
16    A. It's overtime, night differential.
17    Q. What does that refer to?
18    A. Any overtime that's accumulated during a
19 different time. There's different times, there's day
20 shift, there's swing shift, so any time beyond their
21 regular time, which I believe is six p.m.
22    Q. The column entitled "O.T. Reg.," what does that
23 refer to?
24    A. It's the overtime during the regular hours.
25    Q. The column entitled -- can you elaborate on

Page 22

1 hours and minutes; correct?
2    A. Correct.
3    Q. So, for instance, if that column says 0:07 in
4 the T-r-a-v A-l-l. column, what does that mean?
5    A. That's seven minutes.
6    Q. And how do you explain to a layperson what that
7 seven-minute travel allowance means?
8    A. You have a run in particular you want me
9 to ...
10       Let's say, for instance, run number two, okay?
11 That operator is scheduled to come into work at 5:25
12 in the morning and he or she is assigned to train 6101.
13 That operator then relieves run 28 at one p.m., so from
14 one p.m. to 1:07, that operator is paid travel to
15 standby at the division until 1:10. Again, that
16 operator gets paid turn-in time from 1:10 to 1:30. So
17 the seven minutes that you see on the Travel Allowance
18 column is for the seven minutes between one o'clock to
19 1:07.
20    Q. If you could, please, turn to CCSF 032078.
21 Looking at run 27, as an example, in the Exhibit 36
22 report, in the On column where it says
23 "RP 1131," "1131" refers to 11:31 a.m.; correct?
24    A. Correct.
25    Q. "RP" stands for report to the division;

Page 24

1 that, please?
2    A. On the O.T. Regular?
3    Q. Yes.
4    A. Any time beyond the -- any time beyond eight
5 hours that is past six p.m.
6    Q. The column entitled "Stra Night Diff," what
7 does the information in that column refer to?
8    A. It's time that is paid as straight time, but it
9 may be past six p.m. or whenever that night differential
10 time kicks in.
11    Q. The column entitled "S-t-r-a Reg," what does
12 that refer to?
13    A. It's straight pay regular, at the regular time.
14    Q. The column entitled "L-u-n A-l-l," what does
15 that refer to?
16    A. It's a lunch allowance.
17    Q. What does that mean?
18    A. 20 minutes are allocated for operators that
19 work past four hours straight.
20    Q. The column entitled "T-r-a-v A-l-l.," what
21 that refer to?
22    A. It's travel allowance.
23    Q. What does that mean?
24    A. Travel allocated between places of work.
25    Q. The information in that column is designated in

Page 23

1 correct?
2    A. Correct.
3    Q. So "RP 1131" indicates that the operator is to
4 report at the division at 11:31 a.m.; correct?
5    A. Correct.
6    Q. Do I understand correctly the operator is to
7 report at the division at 11:31 a.m. and then travel to
8 the relief point by 11:36 a.m.?
9    A. So this operator is asked to come into the
10 division at 11:31 a.m. to pick out their outfits and
11 their radio and then relieve operator number six at
12 11:43.
13    Q. Still looking at run 27 as an example, the
14 relief point is not at the division; correct?
15    A. It's not.
16    Q. Correct?
17    A. Correct.
18    Q. Do I understand correctly the operator is to
19 report at the division at 11:31 a.m. and travel to the
20 relief point by 11:36 a.m.?
21    A. No. The operator reports to the division at
22 11:31 a.m., picks up their outfits and their radio to
23 11:36, then he or she is relieving operator in run six
24 at 11:43 a.m.
25    Q. Where is the relief occurring?

Page 25

7 (Pages 22 - 25)

Page 26:

1    A. Oh, I don't know.
2    Q. You've already said that the relief is not
3 occurring at the division; correct?
4    A. It's not, it's not.
5    Q. How is it that you know that?
6    A. I actually have the relief. One second.
7    (Witness consults a smartphone.)
8    THE WITNESS: The relief is at California and
9 Powell. I have a listing of all the different relief
10 points that are not here (indicating).
11 BY MR. TIDRICK:
12    Q. Help me understand. When I ask you whether the
13 operator is to report at the division at 11:31, that's
14 correct; yes?
15    A. Yes.
16    Q. The operator is expected to travel to the
17 relief point by 11:36 a.m.; correct?
18    A. By 11:43. He's standing by at the relief from
19 11:36 to 11:43.
20    If you go all the way across to the area where
21 there's a column that says "SD" and "SR," SD stands for
22 standby at the division, SR means standby at the relief.
23 So those seven minutes between 11:36 and 11:43 are
24 reflected in the standby at the relief time.
25    Q. Did I hear you right, SR stands for standby at

Page 27:

1 the relief point; correct?
2    A. Correct.
3    Q. "1136 SR" means that the operator is to
4 wait --
5    A. It's the report time. So there's five minutes
6 there. The five minutes -- the five minutes between
7 11:31 and 11:36 are included in the report time. The
8 "RC" column, RC time, that stands for report time, okay?
9 So the five minutes are included in there.
10    You see a total of 25 minutes currently, but
11 if you go to the end, when that operator is scheduled to
12 get off work at 7:15 and 7:35, that's 20 minutes; right?
13 So 20 minutes, plus the five minutes from when they
14 reported, is under the RC time which equals 25 minutes.
15 So it's report time and turn-in time.
16    Q. Now, I heard you say that the operator is to
17 be on standby at the relief from 11:36 to 11:43.
18    A. Correct.
19    Q. So the operator -- here's where I'm trying to
20 understand what you've said previously. If the operator
21 is to be standing by at the relief from 11:36 until
22 11:43, the operator is expected to be arriving at the
23 relief by 11:36; correct?
24    A. By 11:43.
25    Q. What does -- "11:36 SR," the 11:36 refers to

Page 28:

1 11:36 a.m.; correct?
2    A. Correct.
3    Q. "SR" stands for standby at relief; correct?
4    A. Correct.
5    Q. "11:36 SR" means that the operator is to be
6 waiting at the relief location from 11:36 until the
7 vehicle is scheduled to arrive at 11:43 a.m.; correct?
8    MR. McLAUGHLIN: Objection. Asked and
9 answered. Misstates testimony.
10    THE WITNESS: "SR" stands for standby at the
11 relief, yes. So that's the time the operator is
12 expected to be at the relief.
13 BY MR. TIDRICK:
14    Q. From 11:36 until 11:43; correct?
15    A. Correct.
16    Q. There's a period of time between 11:31 and
17 11:43 when the operator is traveling from the division
18 to the relief point; correct? Actually, strike that.
19    There's a period of time between 11:31 and
20 11:36 when the operator is scheduled to be traveling
21 from the division to the relief; correct?
22    A. Can you express it -- I'm not sure I understand
23 your question.
24    Q. You've already said that the relief point is at
25 a geographic point different from the division. So what

Page 29:

1 I'm trying to understand -- maybe it's just too
2 obvious -- if the operator is at the division at 11:31
3 and at the relief point at 11:36, there's some period of
4 time between 11:31 and 11:36 --
5    A. Correct.
6    Q. -- when the operator is traveling from the
7 division to the relief point; correct?
8    A. Correct.
9    Q. In the run 27, there's a place that says
10 "TI 7:35."
11    A. Um-hum.
12    Q. "TI" stands for turn-in time; correct?
13    A. Correct.
14    Q. Do I understand that only runs that have a TI
15 listed in the range report is being paid turn-in time?
16    A. Correct.
17    Q. Is there a period of time that -- let me ask
18 you a different question.
19    SFMTA includes turn-in time in the range
20 reports in order to ensure that operators are being paid
21 for performing the turn-in time activity; correct?
22    A. Correct.
23    Q. The two asterisks refers to the fact that the
24 run is pulling into a division; correct?
25    A. Correct.

8 (Pages 26 - 29)

1  MR. McLAUGHLIN: If you've completed that line
2  of questioning, I'd like to take a break to confer with
3  the witness.
4  MR. TIDRICK: I think we're almost done. Could
5  we attempt to finish it up?
6  MR. McLAUGHLIN: No, I'd like to confer with
7  the witness before you finish.
8  MR. TIDRICK: Let's take a short break.
9  MR. McLAUGHLIN: Thank you.
10  (Recess held.)
11  MR. McLAUGHLIN: We can go back on the record.
12  The witness would like to make a clarification
13  of her earlier testimony.
14  MR. TIDRICK: There is no question pending.
15  What time did we go off the record?
16  THE REPORTER: 10:39.
17  MR. TIDRICK: Let the record reflect we went
18  off the record at defendant counsel's request at 10:39.
19  Defendant's counsel and the witness left the room and
20  returned at 10:47.
21  Without getting into the substance of any
22  conversation that you had with your lawyer, were you
23  speaking with your lawyer during the time of this break
24  from 10:39 to 10:47?
25  THE WITNESS: Correct.
Page 30

1 BY MR. TIDRICK:
2  Q. Do I understand correctly that -- strike that.
3  Has something prompted you to want to change
4 any of your testimony?
5  A. Yes. I provided some inconsistent information
6 earlier. I got a bit confused.
7  MR. TIDRICK: I'm just about done with my
8 questioning and you're welcome to ask questions on
9 cross.
10  MR. McLAUGHLIN: I would just ask that she
11 be allowed to make the clarification. You can't
12 foreclose her from doing that.
13 BY MR. TIDRICK:
14  Q. Do you supervise Judy Bowers?
15  MR. McLAUGHLIN: Pardon me. I'm going to ask
16 that the witness make the clarification on the record,
17 then you can pick up the questioning where you'd like.
18  So, with that, please make the clarification
19 that you intended to make, please.
20  THE WITNESS: Yes.
21  MR. TIDRICK: Objection. Leading and improper.
22 And because the direct examination is not finished, it's
23 not time for cross-examination. Those are my
24 objections.
25  THE WITNESS: Okay. So to clarify, I said
Page 31

1  two different versions earlier with run 27. The correct
2  version is the operator is expected to report at the
3  division at 11:31 and be at the relief point by 11:43.
4  From 11:31 to 11:36, that report time is
5  reflected under the RC column, that additional five
6  minutes to report under the RC column. From 11:36 to
7  11:43, that's seven minutes, and that is reflected in
8  the standby at the relief time, but the operator is
9  expected to be there by 11:43, not 11:36.
10  The additional 20 minutes under the RC time is
11  from when the operator pulls in the vehicle to when the
12  operator turns in -- does a turn-in -- the turn-in time
13  to do the turn-in of the materials, that's 20 minutes,
14  plus the five minutes of the report time equals the
15  25 minutes.
16 BY MR. TIDRICK:
17  Q. Are there any documents that you consulted
18  during the break that lead you to change your testimony?
19  A. Documents, no.
20  MR. McLAUGHLIN: Objection as to "change your
21  testimony." She gave two different answers to the same
22  question and I would think you would want to clarify and
23  understand the correct answer.
24 BY MR. TIDRICK:
25  Q. Other than counsel, did you speak with anyone
Page 32

1  during the break?
2  A. Yes.
3  Q. Other than counsel, you spoke with someone else
4  during the break?
5  A. Yes.
6  Q. Who did you speak with during the break?
7  A. My predecessor, who was the previous scheduling
8  manager who was here in 2011. I was not in charge of
9  schedules in 2011.
10  Q. Who is that predecessor?
11  A. Edmund Wong.
12  Q. Did you have a phone call during the break with
13  Edmund Wong?
14  A. Yes.
15  Q. Do I understand for run 27, SFMTA is paying the
16  operator for a total of seven minutes for standby at the
17  relief?
18  A. Correct.
19  Q. At the top of the range reports, where it says
20  "All Runs With Standby Time Are Subject to Orders
21  Including Revenue Work," what does that mean?
22  A. So standby time is -- basically, that means
23  you're on the clock and you're getting paid by the
24  SFMTA. You may potentially be asked to do other work,
25  revenue work, meaning being on the platform.
Page 33

1 Q. Have you ever worked with Judy Bowers?
2 A. Yes.
3 Q. During what period of time have you worked with
4 Judy Bowers?
5 A. Since I started at the SFMTA in 2012.
6 Q. In the SFMTA hierarchy, have you been
7 Judy Bowers' supervisor?
8 A. Since I moved to schedules, yes, in the last
9 two and a half years.
10 Q. Do I understand correctly from January 2014 to
11 the present you have been Judy Bowers' supervisor?
12 A. Correct.
13 Q. During the time period March 2012 up until
14 January 2014, what was your relationship with
15 Judy Bowers in the SFMTA hierarchy?
16 A. Well, schedule and service planning works
17 hand in hand when implementing sign-ups, so a work
18 relationship of providing information on different plans
19 or different information received during safety
20 meetings, just basically information exchange.
21 Q. During the time period when you were senior
22 operations planning, March 2012 up until January 2014,
23 what was Judy Bowers' position?
24 A. The same as it is now, she's a scheduler.
25 Q. So during the time period March 2012 to

1 A. Every day.
2 Q. What have been Judy Bowers' job functions
3 during the time period of January 2014 to the present?
4 A. Judy is the scheduler for Presidio division.
5 Q. In that capacity, what are her
6 responsibilities?
7 A. Creating the runs, creating the blocks, vehicle
8 assignments, conducting the sign-ups.
9 Q. Any other responsibilities?
10 A. No.
11 Q. During the time period that you have directly
12 supervised Judy Bowers, January 2014 to the present,
13 have you found her work to be accurate and reliable?
14 A. No.
15 Q. Do you believe Judy Bowers to be trustworthy,
16 based on your experience with her?
17 A. At times.
18 Q. When you say "at times," I take it that you
19 believe that at times Judy Bowers is not trustworthy?
20 A. Correct.
21 Q. When specifically have you found Judy Bowers to
22 not be trustworthy?
23 A. When it comes to her work quality.
24 Q. What specifically do you mean by that?
25 A. Judy has been in the schedules group for over

1 January 2014, is it fair to say you worked regularly
2 with Judy Bowers?
3 A. I wouldn't say regularly, but maybe once or
4 twice in a year.
5 Q. And what kind of projects did you work on with
6 Judy Bowers once or twice a year in the time frame
7 March 2012 to January 2014?
8 A. They weren't projects specifically. They
9 were -- for instance, Judy was in charge of updating the
10 route sheets, which provides directions to the operator,
11 the turn-by-turn, the relief point locations, the
12 restroom location, et cetera. During that time, I would
13 provide updates to Judy Bowers so she could update the
14 route sheets for the operators, primarily. Other than
15 that, not much interaction.
16 Q. Do I understand your interaction with
17 Judy Bowers increased once you became senior operations
18 manager of schedules in January 2014; correct?
19 A. Yes.
20 Q. At that point, she started reporting directly
21 to you; correct?
22 A. Correct.
23 Q. During the time period January 2014 to the
24 present, approximately how often do you interact with
25 Judy Bowers?

1 five to six years and is the least competent scheduler
2 in the group, even after training has been provided.
3 Q. How long has that been your observation?
4 A. Since I became the manager of the schedules
5 group.
6 Q. When you say "the least competent," is there
7 some way that you measure competence of the schedulers?
8 A. Yes, by their work product. Judy is not
9 able to, even though it's part of her responsibility, as
10 I mentioned before, to complete her work. There are
11 areas where Judy cannot do the work and other schedulers
12 are assigned from other divisions to complete that work
13 for her.
14 Q. Have you ever discussed -- strike that.
15 Who preceded you in the position of senior
16 operations manager of schedules?
17 A. There was a person in my position in the
18 interim, I'm not sure how long he was there, but his
19 name was Michael Wong.
20 Q. Do you know approximately how long he was in
21 the position?
22 A. I don't know.
23 Q. Do you know who was in the position before
24 Michael Wong?
25 A. It was Edmund Wong.

1    Q. Can you spell his last name?
2    A. Edmund Wong, W-o-n-g.
3    Q. Do you know approximately the time frame that
4 Edmund Wong was in your current position?
5    A. I don't know.
6    Q. Do you know who was in the position prior to
7 Edmund Wong?
8    A. There's two individuals, but I don't know
9 what -- who came first or after the other. One was
10 Paco, and I don't remember his last name, and then
11 another person was Angelo Figoni.
12    Q. Do you have any understanding whether
13 Judy Bowers ever reported to any of the four individuals
14 you just mentioned?
15    A. I believe she reported to all of them except
16 Angelo.
17    MR. McLAUGHLIN: I'll just note for the
18 record -- I think it's apparent -- this is not 30(b)(6)
19 testimony but Ms. Beaumont Lopez's personal views on
20 this individual, obviously not the topic on which she
21 was designated.
22 BY MR. TIDRICK:
23    Q. Have you ever had conversations with any of the
24 individuals you've just mentioned who preceded you in
25 your current position, specifically Michael Wong,

1 Edmund Wong, or Paco, whose last name you're not
2 remembering at this time, conversations with any of them
3 about Judy Bowers?
4    A. No.
5    Q. Have you ever discussed any issues about
6 Judy Bowers' job performance or trustworthiness with
7 anyone?
8    A. Well, it's obvious in the scheduling group that
9 they're having to do her work, so yes, I have discussed
10 her work performance with others within the group, yes.
11    Q. Other schedulers?
12    A. Other schedulers.
13    Q. Besides other schedulers, is there anyone else
14 that you've discussed --
15    A. My manager.
16    Q. Who is that?
17    A. Julie Kirchbaum, K-i-r-c-h-b-a-u-m. She's the
18 service planning and scheduling manager.
19    Q. Approximately how many times have you discussed
20 any issues about Judy Bowers' job performance or
21 trustworthiness with Julie Kirchbaum?
22    A. Oh, several occasions, I would say at least
23 five. We do performance evaluations every year, so
24 every time the issue comes up, it's discussed with
25 Julie.

1    Q. Do I understand correctly over the period of
2 time from March -- strike that.
3    Do I understand correctly during the time
4 period of January 2014 to the present, you've discussed
5 Judy Bowers' job performance or trustworthiness with
6 Julie Kirchbaum on several occasions, at least five
7 times?
8    A. At least, yes.
9    Q. What was that?
10    A. At least five times, yes.
11    Q. Do you recall approximately how long after
12 you became senior operations manager of schedules
13 that you first discussed any issues of Judy Bowers'
14 trustworthiness or job performance with Julie Kirchbaum?
15    A. I don't remember, no.
16    Q. I realize I've been lumping these two things
17 together in some of these recent questions, job
18 performance and trustworthiness. Let me ask you a
19 different, more specific question. Have you ever
20 discussed any issues about Judy Bowers' trustworthiness
21 with anyone?
22    A. No.
23    Q. Earlier you described one of your job functions
24 in senior operations planning as involving taking input
25 from operators on issues in the field?

1    A. Um-hum.
2    Q. During the time period March 2012 to
3 January 2014, approximately how many times did you take
4 input from operators on issues in the field?
5    MR. McLAUGHLIN: I'm just going to state,
6 again, this is personal testimony, not 30(b)(6)
7 testimony, but you can answer.
8    THE WITNESS: I'm going to say, like, ten
9 times or so.
10 BY MR. TIDRICK:
11    Q. Was there a particular mechanism, or how
12 exactly did you take input from the operators?
13    A. Yes. Input from the operators, like if there
14 was a special event that was happening, we created
15 additional trips or additional runs to provide service
16 to this area, specifically in the Marina, that typically
17 does not have transit service. We'd meet with the
18 operators in the field and get questions from them,
19 "Hey, this weekend's America's Cup, how was the line
20 performed, did you have a lot of people, did you not
21 have enough people, what times did you have too many
22 people, were you in conflict with other runs, were you
23 in conflict with the taxi services, enough directions,
24 was the signage correct, do you know what signage to put
25 on your head sign?" It's very informal conversations

that we used in service planning to provide a better service for not only the operator but also for the public.

At safety meetings, the planners will intake information from the operators regarding, oh, "I can't make a turn on Market and Third because folks are not respecting -- or the pedestrians are not respecting the light signal." So we will work with the inspectors to assign somebody during the peak times. So very informal conversations about issues that the operators were facing in the field.

Oh, or we jump on a bus and we ask the operator "How you doin', are there any issues you're facing on the line," and they'll provide their input and we'll move on from there to see what areas we could help improve with what the operators are facing.

Q. In your position of senior operations planning, is it fair to say that you were generally familiar with any adjustments that were being made to runs based on operator complaints?

A. No, no.

Q. Was there someone else who was charged with that?

A. So the way it works is that we receive -- if it's related to runs, et cetera, from service planning,

that information was then provided to schedules, and then a schedule modification was made. So, basically, we were intaking the information and providing it to the schedules department when I was in the capacity of service planner. We never looked back with the operator or gave them what the solution was, no; it was simply intaking the information and passing it on to certain groups.

Q. I want to make sure I understand. You referred to service planning?

A. Service planning is the group, it's called service planning. So service planning is absolutely the same umbrella under Julie Kirchbaum, it's two different groups under the same umbrella.

Q. When you say you were in the position of senior operations planning from March 2012 to January 2014, is that the same as service planning?

A. It's the same as service planning, yes.

Q. So in the time period March 2012 to January 2014, your position was senior operations planning. That is, in effect, top level in the service planning group?

A. No. There was a manager over me and then there's Julie. So I was a planner, I wasn't called a Planner 4, it was a Planner 5, and there was Julie. So

I wouldn't consider that I was top in the planning department, no.

Q. Was there someone else in service planning -- during the time that you were in the role of senior operations planning, was there someone else who had responsibility for taking input from operators about issues in the field?

A. Yes, there was two, so it was Julie Kirchbaum and Jeff Flynn.

Q. So just the three of you, Julie Kirchbaum, you, and Jeff Flynn?

A. Correct.

Q. Did you ever have conversations with either Julie Kirchbaum or Jeff Flynn about operator complaints that transit vehicles were ending at the end points of their runs after the scheduled ending time?

A. No.

Q. I understand there were various times when your lawyer was making statements about whether you were testifying in your personal capacity or on behalf of the agency. Putting that aside, you understand that you were designated to testify on behalf of SFMTA today; correct?

A. Correct.

MR. McLAUGHLIN: Vague. Object that it's

vague.

MR. TIDRICK: Thank you for your time. At this time, we're concluding our questioning of you, Ms. Beaumont-Lopez.

THE WITNESS: Okay. Thank you.

MR. McLAUGHLIN: Thank you.

(TIME NOTED: 11:13 a.m.)

```
 1        DEPOSITION REPORTER'S CERTIFICATION
 2
 3        I, the undersigned, a California Certified
 4  Shorthand Reporter, do hereby certify:
 5        That the foregoing proceedings were taken
 6  before me at the time and place herein set forth, at
 7  which time the witness was administered the oath; that
 8  the testimony of the witness and all objections made by
 9  counsel at the time of the proceedings were recorded
10  stenographically by me, and were thereafter transcribed
11  under my direction; that the foregoing transcript
12  contains a full, true, and accurate record of all
13  proceedings.
14        I further certify that I am neither financially
15  interested in the action nor a relative or employee of
16  any attorney or party to this action.
17        IN WITNESS WHEREOF, I have this date subscribed
18  my name.
19  Dated:  5/5/16
20
21
22
23        Thomas J. Frasik
          THOMAS J. FRASIK, CSR No. 6961
24
25
                                              Page 46
```

Veritext Legal Solutions
866 299-5127

**0**

032074   20:9
032078   24:20
032082   20:10
03704   1:5 2:5
0:07   24:3

**1**

1   1:25 8:14
10:39   30:16,18,24
10:47   30:20,24
1131   24:23,23 25:3
1136   27:3
11:13   2:15 45:7
11:36   25:8,20,23
   26:17,19,23 27:7,17
   27:21,23,25,25 28:1
   28:5,6,14,20 29:3,4
   32:4,6,9
11:43   25:12,24
   26:18,19,23 27:17
   27:22,24 28:7,14,17
   32:3,7,9
12   1:5 2:5
1220   3:19
1390   2:13
1:07   24:14,19
1:10   24:15,16
1:30   24:16

**2**

2   8:14
20   5:5 23:18 27:12
   27:13 32:10,13
2011   33:8,9
2012   7:23 8:6 34:5
   34:13,22,25 35:7
   41:2 43:16,19
2014   7:12 34:10,14
   34:22 35:1,7,18,23
   36:3,12 40:4 41:3
   43:16,20
2016   1:16 2:16 6:2
2039   3:8

**2298404**   1:23
25   27:10,14 32:15
27   1:16 2:15 6:2
   24:21 25:13 29:9
   32:1 33:15
28   24:13

**3**

3   8:14
30   14:2 18:1,2,4
   38:18 41:6
300   3:19
308   3:8
36   5:5 20:3,3,5,9,11
   20:16 24:21

**4**

4   43:25
46   1:25

**5**

5   43:25
5/5/16   46:19
510-788-5100   3:10
510-995-5806   3:21

**6**

6   4:4 14:2 18:1,2,4
   38:18 41:6
6101   24:12
6961   1:22 2:17
   46:23

**7**

7:15   27:12
7:35   27:12 29:10

**9**

94704   3:9
94710   3:20
9:55   2:14 6:3

**a**

a.m.   2:14,15 6:3
   24:23 25:4,7,8,10
   25:19,20,22,24
   26:17 28:1,7 45:7
ability   7:4

able   17:1 37:9
absolutely   43:12
abuse   18:2
accumulated   22:18
accurate   36:13
   46:12
accurately   6:25 7:4
action   46:15,16
activity   29:21
actual   17:25
additional   32:5,10
   41:15,15
adjust   13:22 14:5
   17:17 18:17
adjusted   18:23,25
adjustments   14:22
   14:24 42:19
administered   6:6
   46:7
affect   7:3 8:23
agency   1:8 2:8 8:4
   9:15,17 44:21
ahead   11:21
al   1:4,8 2:4,8
alignment   9:2 11:23
   11:25
alignments   8:17,25
   9:3,5,12 10:4,7 15:5
allocated   23:18,24
allowance   23:16,22
   24:7,17
allowed   31:11
america's   41:19
amount   13:10,19
   21:13,14,16 22:13
angelo   38:11,16
annexed   20:7
answer   4:10,10 6:25
   9:23 10:20 11:21
   32:23 41:7
answered   28:9
answers   32:21
apparent   38:18
appearances   3:1

approved   15:2
approximate   9:19
approximately
   14:21 15:11 35:24
   37:20 38:3 39:19
   40:11 41:3
april   1:16 2:15 6:2
area   26:20 41:16
areas   37:11 42:15
arrive   28:7
arriving   27:22
aside   44:21
asked   17:21 25:9
   28:8 33:24
asking   6:24 15:8
aspects   10:6
assign   42:9
assigned   24:12
   37:12
assignment   20:19
   20:20 21:3,4
assignments   9:1
   19:7,8 36:8
asterisks   29:23
attempt   30:5
attended   8:17
attorney   3:7,18
   46:16
availability   13:1,1
avenue   3:8

**b**

b   5:1 6:18 14:2 18:1
   18:2,4 20:4 38:18
   39:17 41:6
back   13:9,18 18:12
   30:11 43:5
based   9:8,10 10:20
   11:5 14:16 15:6,14
   18:5 36:16 42:19
basically   8:14,22
   9:16 33:22 34:20
   43:2
beach   12:4 13:8,17

**beaumont** 1:14 2:12
4:2 5:2 6:5,15,17
38:19 45:4
**becoming** 7:16
**beginning** 2:14
**behalf** 44:20,22
**believe** 9:25 22:21
36:15,19 38:15
**berkeley** 3:9,20
**better** 42:1
**beyond** 22:20 23:4,4
**bicycle** 8:21
**bids** 19:9
**bit** 31:6
**blocks** 36:7
**board** 15:2
**bowers** 31:14 34:1,4
34:7,11,15,23 35:2
35:6,13,17,25 36:2
36:12,15,19,21
38:13 39:3,6,20
40:5,13,20
**break** 30:2,8,23
32:18 33:1,4,6,12
**bus** 8:17 10:5 13:6
14:14,14 42:12
**buses** 9:6

**c**

**c** 20:4 39:17
**california** 1:2,15 2:2
2:14 3:9,20 6:1 26:8
46:3
**call** 33:12
**called** 9:15 43:11,24
**capacity** 10:19 36:5
43:4 44:20
**case** 1:4 2:4 18:3
**cause** 13:9,18
**ccsf** 20:9,10 24:20
**certain** 13:15 14:8
15:2 16:10,25 43:7
**certification** 46:1
**certified** 2:17 46:3

**certify** 46:4,14
**cetera** 35:12 42:25
**change** 15:14 16:11
17:1 31:3 32:18,20
**changes** 15:5,12,14
15:19,24 16:3,4,12
16:15,20 19:11
**charge** 15:4 33:8
35:9
**charged** 42:22
**city** 16:19
**clarification** 15:22
30:12 31:11,16,18
**clarify** 31:25 32:22
**classifications** 8:14
**clock** 13:13 33:23
**cobean** 20:3
**column** 20:16,18,21
21:1,5,11,18,19,22
21:25 22:3,6,9,12
22:14,15,22,25 23:6
23:7,11,14,20,25
24:3,4,18,22 26:21
27:8 32:5,6
**come** 13:18 14:15
15:3 24:11 25:9
**comes** 36:23 39:24
**competence** 37:7
**competent** 37:1,6
**complaints** 42:20
44:14
**complete** 14:10
37:10,12
**completed** 30:1
**completely** 18:6
**concern** 13:12
**concluding** 45:3
**conduct** 18:5
**conducting** 36:8
**confer** 30:2,6
**conflict** 41:22,23
**confused** 31:6
**consider** 44:1
**construction** 9:11
16:18

**consultant** 10:1
**consulted** 32:17
**consults** 26:7
**contains** 46:12
**contract** 13:15
**conversation** 30:22
**conversations** 38:23
39:2 41:25 42:10
44:13
**coordination** 8:17
10:1
**correct** 7:13 8:7,8
10:12 11:10,11,12
11:14,15,18 12:7,12
12:15 16:12 17:4,14
19:14 20:11,14,24
21:9 24:1,2,23,24
25:1,2,4,5,14,16,17
26:3,14,17 27:1,2
27:18,23 28:1,2,3,4
28:7,14,15,18,21
29:5,7,8,12,13,16,21
29:22,24,25 30:25
32:1,23 33:18 34:12
35:18,21,22 36:20
41:24 44:12,23,24
**correctly** 10:6 17:3
25:6,18 31:2 34:10
40:1,3
**counsel** 3:1 30:19
32:25 33:3 46:9
**counsel's** 30:18
**course** 12:2
**court** 1:1 2:1
**create** 19:6,7,9,10
**created** 41:14
**creating** 36:7,7
**cross** 31:9,23
**csr** 1:22 46:23
**cup** 41:19
**current** 19:4,12 38:4
38:25
**currently** 7:6 27:10
**cuts** 19:8

**cv** 1:5 2:5

**d**

**d** 4:1
**darryl** 1:4 2:4
**date** 9:19 46:17
**dated** 46:19
**day** 15:15 22:19
36:1
**days** 21:19,20,22,25
22:3,6,9
**dealt** 8:15
**defendant** 30:18
**defendant's** 30:19
**defendants** 1:9 2:9
3:14
**demand** 9:10
**demands** 9:9
**department** 43:4
44:2
**depend** 11:25
**depends** 11:22
**deposed** 6:19
**deposition** 1:14 2:12
5:2 6:21 18:2,5 46:1
**descends** 12:3
**described** 40:23
**designated** 10:18
18:8 23:25 38:21
44:22
**designation** 18:24
**designed** 11:5 14:13
**determining** 10:7
15:5
**detoy** 18:3
**diff** 22:14 23:6
**difference** 12:6
**different** 8:21 10:12
10:15 11:2,7 12:12
15:8 16:17,24 17:13
19:3 22:19,19 26:9
28:25 29:18 32:1,21
34:18,19 40:19
43:13

Veritext Legal Solutions
866 299-5127

**differential** 22:16 23:9
**direct** 31:22
**direction** 46:11
**directions** 35:10 41:23
**directly** 35:20 36:11
**discrete** 17:23
**discussed** 37:14 39:5,9,14,19,24 40:4,13,20
**district** 1:1,2 2:1,2
**division** 24:15,25 25:4,7,10,14,19,21 26:3,13,22 28:17,21 28:25 29:2,7,24 32:3 36:4
**divisions** 8:15 19:20 37:12
**document** 20:2,3
**documents** 32:17,19
**doin** 42:13
**doing** 31:12
**downtown** 12:3 13:6 13:9,18
**dsu** 16:2
**dudley** 3:25

**e**

**e** 4:1 5:1 6:18,18 20:4
**earlier** 14:25 30:13 31:6 32:1 40:23
**edl** 1:5 2:5
**edmund** 33:11,13 37:25 38:2,4,7 39:1
**effect** 43:21
**effectiveness** 9:16
**efficiency** 13:2,5 16:22
**eight** 17:13,14 23:4
**either** 17:13 44:13
**elaborate** 22:25
**employed** 7:6

**employee** 46:15
**encompassed** 17:25
**ends** 13:8,17 14:11
**ensure** 29:20
**entitled** 20:22 21:2,6 21:12 22:12,14,22 22:25 23:6,11,14,20
**equals** 27:14 32:14
**establish** 8:20
**et** 1:4,8 2:4,8 35:12 42:25
**evaluations** 39:23
**event** 41:14
**events** 9:11 16:18
**exactly** 41:12
**examination** 4:2 6:9 31:22,23
**examined** 6:6
**example** 21:22 24:21 25:13
**exchange** 34:20
**exhibit** 5:5 20:3,3,5 20:9,11,16 24:21
**exit** 14:14
**expectations** 16:11
**expected** 26:16 27:22 28:12 32:2,9
**expecting** 14:10
**expects** 16:10
**experience** 36:16
**explain** 24:6
**express** 28:22

**f**

**f** 21:25 22:3
**facing** 8:19 42:11,13 42:16
**fact** 29:23
**fair** 35:1 42:18
**familiar** 19:15,19 42:18
**far** 18:21
**field** 8:19 40:25 41:4 41:18 42:11 44:7

**figoni** 38:11
**financially** 46:14
**finish** 30:5,7
**finished** 31:22
**firm** 3:5
**first** 8:6 38:9 40:13
**five** 8:5,13 27:5,6,6 27:9,13 32:5,14 37:1 39:23 40:6,10
**floor** 2:13
**fly** 18:24,25
**flynn** 44:9,11,14
**folks** 42:6
**followed** 9:13
**following** 14:15
**follows** 6:7 10:24 18:14
**foreclose** 31:12
**foregoing** 46:5,11
**formal** 15:14,24
**forth** 46:6
**forward** 10:20
**found** 36:13,21
**four** 23:19 38:13
**frame** 16:6 35:6 38:3
**francisco** 1:7,15 2:7 2:14 6:1 11:4
**frankly** 17:24
**frasik** 1:21 2:16 46:23
**frequently** 16:20
**friday** 22:2,5
**full** 6:13 46:12
**fully** 14:14
**function** 9:12
**functions** 8:9 19:5 19:24 36:2 40:23
**further** 46:14

**g**

**g** 3:6 38:2
**general** 16:2
**generally** 6:21 42:18

**geographic** 10:12,15 11:2,17 12:5,12,15 12:18 17:2,13,18 18:18 28:25
**geographical** 11:7 12:23
**getting** 30:21 33:23
**given** 14:17 15:15 16:5
**go** 10:20 11:21 26:20 27:11 30:11 30:15
**going** 8:23 9:6 10:16 12:1,2 14:2 15:1 17:21 31:15 41:5,8
**good** 6:11,12
**group** 3:16 8:20 10:1,2 15:4 36:25 37:2,5 39:8,10 43:11,22
**groups** 43:8,14

**h**

**h** 5:1 39:17
**half** 7:11 34:9
**hand** 34:17,17
**happen** 16:5,18
**happening** 14:17 41:14
**happens** 15:15
**head** 41:25
**hear** 26:25
**heard** 27:16
**held** 8:2 30:10
**help** 26:12 42:15
**hereto** 20:7
**hey** 41:19
**hierarchy** 34:6,15
**historical** 9:9
**hold** 7:17
**holtzman** 3:15
**hope** 18:7
**hours** 17:1,5,6,9,9 17:10,14,14 22:24 23:5,19 24:1

Veritext Legal Solutions
866 299-5127

**hum** 29:11 41:1
**hyphen** 6:18
**hypothetical** 11:20
  12:21 13:25 14:7
  17:20 18:21

**i**

**identified** 16:24
**immediately** 7:16,25
**impact** 8:23 16:19
**implementing** 34:17
**impossible** 14:5
**improper** 18:6
  31:21
**improve** 42:16
**included** 27:7,9
**includes** 29:19
**including** 33:21
**incomplete** 11:19
  12:20 13:24 14:6
  17:19 18:21
**inconsistent** 31:5
**increased** 35:17
**increases** 15:3
**indicates** 25:3
**indicating** 26:10
**individual** 14:19
  38:20
**individuals** 11:6,9
  14:13 38:8,13,24
**informal** 41:25 42:9
**information** 20:18
  20:21 21:1,5,11
  23:7,25 31:5 34:18
  34:19,20 42:5 43:1
  43:3,7
**input** 8:18 40:24
  41:4,12,13 42:14
  44:6
**inspectors** 42:8
**instance** 13:8 24:3
  24:10 35:9
**instances** 17:16
  18:15

**instructions** 4:10
**intake** 42:4
**intaking** 43:3,7
**intended** 31:19
**interact** 35:24
**interaction** 35:15,16
**interested** 46:15
**interim** 37:18
**introduced** 5:3
**involving** 40:24
**issue** 39:24
**issues** 8:16,19 13:9
  13:12,19 39:5,20
  40:13,20,25 41:4
  42:10,13 44:7

**j**

**j** 1:21 2:16 46:23
**january** 7:15 34:10
  34:14,22 35:1,7,18
  35:23 36:3,12 40:4
  41:3 43:16,20
**jeff** 44:9,11,14
**job** 1:23 7:8,10,17
  8:1,9 9:12 19:5,24
  36:2 39:6,20 40:5
  40:14,17,23
**john** 3:25
**judy** 31:14 34:1,4,7
  34:11,15,23 35:2,6
  35:9,13,17,25 36:2
  36:4,12,15,19,21,25
  37:8,11 38:13 39:3
  39:6,20 40:5,13,20
**julie** 39:17,21,25
  40:6,14 43:13,24,25
  44:8,10,14
**jump** 42:12

**k**

**k** 39:17
**kevin** 3:17
**kicks** 23:10
**kind** 35:5
**kirchbaum** 39:17,21
  40:6,14 43:13 44:8

**instructions** 44:10,14
**kmclaughlin** 3:22
**know** 9:20 17:5
  20:13 26:1,5 37:20
  37:22,23 38:3,5,6,8
  41:24

**l**

**l** 6:18 23:14,14,14
  23:20,20 24:4,4
**laid** 9:16 14:9,25
**law** 3:5,7,16,18
**lawyer** 30:22,23
  44:19
**layperson** 24:6
**lead** 32:18
**leading** 31:21
**left** 20:16 30:19
**level** 43:21
**liaison** 8:22
**light** 42:8
**limitations** 13:15
**line** 4:12 9:7 10:19
  30:1 41:19 42:14
**lines** 9:9
**listed** 29:15
**listing** 26:9
**location** 11:18 12:2
  12:5,15,19,23 14:10
  17:2,18 18:18 28:6
  35:12
**locations** 10:12,15
  11:2,7 12:12 15:19
  16:24 17:13 35:11
**long** 7:10 13:16 37:3
  37:18,20 40:11
**longer** 13:14
**looked** 43:5
**looking** 15:11 24:21
  25:13
**loop** 12:1
**lopez** 1:14 2:12 4:2
  5:2 6:5,15 45:4
**lopez's** 14:2 38:19

**lot** 9:9 15:6 41:20
**lumping** 40:16
**lunch** 23:16

**m**

**m** 6:18 22:9 39:17
**making** 44:19
**manager** 7:9,17
  19:5,25 33:8 35:18
  37:4,16 39:15,18
  40:12 43:23
**mandate** 15:6
**march** 7:23 8:6
  34:13,22,25 35:7
  40:2 41:2 43:16,19
**marina** 41:16
**marked** 20:2,5
**market** 2:13 42:6
**materials** 32:13
**matter** 11:16
**max** 17:9
**mclaughlin** 3:17
  9:22,24 10:16 11:19
  12:8,20 13:24 14:6
  14:23 15:13,20,22
  16:13 17:7,19 18:20
  28:8 30:1,6,9,11
  31:10,15 32:20
  38:17 41:5 44:25
  45:6
**mean** 13:5,13 19:22
  21:23 22:1,4 23:17
  23:23 24:4 33:21
  36:24
**meaning** 33:25
**means** 24:7 26:22
  27:3 28:5 33:22
**measure** 37:7
**mechanism** 41:11
**medications** 7:3
**meet** 41:17
**meetings** 8:18 34:20
  42:4
**mentioned** 14:25
  37:10 38:14,24

Veritext Legal Solutions
866 299-5127

**michael** 37:19,24
  38:25
**mind** 18:10
**minute** 24:7
**minutes** 23:18 24:1
  24:5,17,18 26:23
  27:5,6,6,9,10,12,13
  27:13,14 32:6,7,10
  32:13,14,15 33:16
**misstates** 28:9
**modification** 43:2
**monday** 22:11
**month** 7:14
**morning** 6:11,12
  24:12
**mou** 16:1 17:8
**move** 18:7 42:15
**moved** 34:8
**muni** 11:3
**municipal** 1:7 2:7

**n**

**n** 4:1 6:17,18 20:4
  23:14 38:2
**name** 6:13,15 37:19
  38:1,10 39:1 46:18
**neither** 46:14
**nevada** 8:4
**never** 43:5
**new** 7:23
**night** 22:14,16 23:6
  23:9
**nonsensical** 16:14
**northern** 1:2 2:2
**notation** 14:1
**note** 10:16 17:21
  38:17
**noted** 18:6 45:7
**number** 1:4 2:4 5:3
  15:11 16:6,25 17:5
  17:6,8,9 24:10
  25:11
**numbered** 20:9
**numerous** 17:12

**o**

**o** 6:18,18 20:4 38:2
**o'clock** 24:18
**o.t.** 22:14,22 23:2
**o0o** 6:8
**oath** 6:6 46:7
**object** 10:20 44:25
**objection** 9:22 11:19
  12:8,20 13:24 14:6
  14:23 15:16,20
  16:13 17:7,19 18:6
  18:20 28:8 31:21
  32:20
**objections** 31:24
  46:8
**obligation** 6:25
**observation** 37:3
**obvious** 29:2 39:8
**obviously** 38:20
**occasions** 39:22
  40:6
**occurring** 25:25
  26:3
**oh** 26:1 39:22 42:5
  42:12
**okay** 24:10 27:8
  31:25 45:5
**once** 35:3,6,17
**ooo** 1:3 2:3
**operations** 7:9,16,18
  7:22 8:1,10 19:4,25
  34:22 35:17 37:16
  40:12,24 42:17
  43:16,20 44:5
**operator** 8:16 13:1,7
  13:10,13,16,18,19
  14:17,19 16:25 17:9
  19:9,9 20:19 21:3,7
  21:8,13,14,16,20
  24:11,13,14,16 25:3
  25:6,9,11,18,21,23
  26:13,16 27:3,11,16
  27:19,20,22 28:5,11
  28:17,20 29:2,6

  32:2,8,11,12 33:16
  35:10 42:2,12,20
  43:5 44:14
**operators** 8:18
  11:12 19:8 23:18
  29:20 35:14 40:25
  41:4,12,13,18 42:5
  42:10,16 44:6
**order** 29:20
**orders** 33:20
**outfits** 25:10,22
**oversaw** 8:13
**oversee** 19:6
**overtime** 22:16,18
  22:24
**owned** 9:21

**p**

**p** 3:17 6:18 22:12
**p.m.** 22:21 23:5,9
  24:13,14
**paco** 38:10 39:1
**paddles** 19:9
**page** 4:12
**pages** 1:25
**paid** 23:8 24:14,16
  29:15,20 33:23
**pardon** 31:15
**part** 37:9
**particular** 24:8
  41:11
**party** 46:16
**passenger** 9:9
**passing** 43:7
**patrons** 11:11
**patterns** 11:5
**pay** 22:13 23:13
**paying** 33:15
**peak** 42:9
**pedestrian** 8:21
**pedestrians** 42:7
**pending** 30:14
**people** 41:20,21,22
**percentage** 15:3

**perform** 19:25
**performance** 39:6
  39:10,20,23 40:5,14
  40:18
**performed** 41:20
**performing** 29:21
**period** 7:21 13:14
  28:16,19 29:3,17
  34:3,13,21,25 35:23
  36:3,11 40:1,4 41:2
  43:19
**periods** 19:11
**person** 37:17 38:11
**personal** 10:18 14:2
  38:19 41:6 44:20
**phone** 33:12
**pick** 14:15 25:10
  31:17
**picks** 25:22
**place** 15:2 16:11
  29:9 46:6
**placed** 14:12
**places** 23:24
**plaintiffs** 1:5 2:5 3:4
**planner** 8:5,14 43:5
  43:24,25,25
**planners** 8:13 42:4
**planning** 7:18,22
  8:1,10 10:1,2 15:4
  19:10 34:16,22
  39:18 40:24 42:1,17
  42:25 43:10,11,12
  43:12,16,17,18,21
  43:22 44:1,3,5
**plans** 9:17 15:1
  34:18
**platform** 13:11,16
  13:20 21:15,15
  33:25
**play** 15:4
**please** 6:13,16 18:12
  23:1 24:20 31:18,19
**plus** 27:13 32:14
**point** 14:12 16:24
  25:8,14,20 26:17

Veritext Legal Solutions
866 299-5127

27:1 28:18,24,25
29:3,7 32:3 35:11
35:20
**points** 26:10 44:15
**position** 7:12,22,23
7:25 8:9 19:4,13
34:23 37:15,17,21
37:23 38:4,6,25
42:17 43:15,20
**possible** 11:16 13:21
**potential** 13:19
**potentially** 16:20
33:24
**powell** 26:9
**preceded** 37:15
38:24
**predecessor** 33:7,10
**present** 3:24 34:11
35:24 36:3,12 40:4
**presidio** 36:4
**previous** 5:5 33:7
**previously** 20:2,5
27:20
**primarily** 35:14
**prior** 7:25 9:14 38:6
**procedures** 9:13
**proceedings** 46:5,9
46:13
**process** 18:2
**produce** 17:24
**produced** 17:23
**product** 37:8
**professional** 2:16
**project** 9:16
**projects** 8:21,22,23
16:18 35:5,8
**prompted** 31:3
**provide** 14:18,19
35:13 41:15 42:1,14
**provided** 31:5 37:2
43:1
**provides** 11:4 35:10
**providing** 34:18
43:3

**public** 3:16 14:9,18
16:10 42:3
**public's** 16:11
**publiclawgroup.c...**
3:22
**published** 14:11
**pulling** 13:9 29:24
**pulls** 32:11
**put** 16:6 41:24
**putting** 8:21 44:21

**q**

**quality** 36:23
**question** 10:22,25
11:21 15:8 16:7
17:22 18:10,15 19:3
28:23 29:18 30:14
32:22 40:19
**questioning** 10:19
30:2 31:8,17 45:3
**questions** 6:24 31:8
40:17 41:18

**r**

**r** 23:11,20 24:4
39:17
**radio** 25:11,22
**range** 19:12,15,19
20:11,13 21:12,15
29:15,19 33:19
**ranging** 8:13
**rc** 27:8,8,14 32:5,6
32:10
**read** 10:23 18:12,13
19:17 20:13
**realignments** 15:1
**realize** 40:16
**really** 15:16 16:15
**reason** 10:10,14,25
11:3 12:17 14:9
17:16 18:16,24
**reasons** 12:22,25
13:3 16:23
**recall** 7:14 40:11
**receive** 8:18 42:24

**received** 34:19
**recess** 30:10
**record** 6:14 10:17
10:23 14:1 18:13
30:11,15,17,18
31:16 38:18 46:12
**recorded** 46:9
**refer** 9:5 20:18,22
21:2,6,12,19 22:7
22:10,12,15,17,23
23:7,12,15,21
**referred** 43:9
**referring** 11:9 15:15
**refers** 21:3 24:23
27:25 29:23
**reflect** 30:17
**reflected** 26:24 32:5
32:7
**refusals** 4:10
**reg** 22:22 23:11
**regarding** 42:5
**regards** 15:25
**regional** 8:3
**registered** 2:16
**regular** 22:21,24
23:2,13,13
**regularly** 35:1,3
**related** 8:16 42:25
**relationship** 34:14
34:18
**relative** 46:15
**reliable** 36:13
**relief** 25:8,14,20,25
26:2,6,8,9,17,18,22
26:24 27:1,17,21,23
28:3,6,11,12,18,21
28:24 29:3,7 32:3,8
33:17 35:11
**relieve** 25:11
**relieves** 24:13
**relieving** 25:23
**remember** 38:10
40:15
**remembering** 39:2

**renne** 3:15
**repeat** 10:22
**report** 20:11,14
24:22,25 25:4,7,19
26:13 27:5,7,8,15
29:15 32:2,4,6,14
**reported** 1:21 27:14
38:13,15
**reporter** 2:17,17
10:23 18:13,22
30:16 46:4
**reporter's** 46:1
**reporting** 35:20
**reports** 19:12,15,19
25:21 29:20 33:19
**request** 30:18
**respect** 10:4 15:19
**respecting** 42:7,7
**response** 10:19
**responsibilities** 36:6
36:9
**responsibility** 37:9
44:6
**restroom** 35:12
**returned** 30:20
**revenue** 33:21,25
**riders** 11:10
**ridership** 9:8
**right** 9:4 14:9 21:18
26:25 27:12
**role** 44:4
**room** 30:19
**route** 8:16 9:2,3,5
9:12 10:4,7 11:22
11:25 12:1,3,6
13:22 14:5,10,11,12
14:15 15:5 16:19,20
17:2,17 18:17,24
35:10,14
**routes** 14:8,9,22,24
15:12,14,24 16:10
16:12 17:12 18:23
**routinely** 16:11
**routing** 9:6,7,7 10:5
10:7 16:3,16

Veritext Legal Solutions
866 299-5127

**rp** 24:23,25 25:3
**rpr** 1:22
**rtc** 8:11
**run** 8:25 9:1 12:6
  13:7,17 14:15 17:17
  18:17 19:7,8,8
  20:17,19,20 22:13
  24:8,10,13,21 25:13
  25:23 29:9,24 32:1
  33:15
**running** 14:1
**runs** 10:11,14 11:1,7
  11:17 12:11,14,18
  16:23 29:14 33:20
  36:7 41:15,22 42:19
  42:25 44:16

**s**

**s** 5:1 6:17,17 21:23
  21:23 22:3,9 23:11
**safety** 8:18 34:19
  42:4
**sakai** 3:15
**san** 1:7,15 2:7,14
  6:1 11:4
**saturday** 21:24 22:5
**says** 20:3,17 21:23
  21:25 22:3,6,9 24:3
  24:22 26:21 29:9
  33:19
**schedule** 11:17
  12:17 13:8 19:11
  34:16 43:2
**scheduled** 10:11,14
  11:1 12:11 13:6
  16:23 20:24 21:8,14
  21:16,20 24:11
  27:11 28:7,20 44:16
**scheduler** 34:24
  36:4 37:1
**schedulers** 37:7,11
  39:11,12,13
**schedules** 7:9,17,24
  15:25 19:5,7,25
  33:9 34:8 35:18

**scheduling** 36:25 37:4,16 40:12
  43:1,4
**scheduling** 16:3
  19:6 33:7 39:8,18
**sd** 26:21,21
**se** 13:7
**second** 26:6
**see** 24:17 27:10
  42:15
**senior** 7:9,16,18,22
  8:1,5,10 19:4,25
  34:21 35:17 37:15
  40:12,24 42:17
  43:15,20 44:4
**serve** 7:21
**service** 8:24 11:4,4
  14:18,19 15:3,4
  19:10 34:16 39:18
  41:15,17 42:1,2,25
  43:5,10,11,12,12,17
  43:18,21 44:3
**services** 41:23
**serving** 7:25
**set** 46:6
**seven** 8:15 24:5,7,17
  24:18 26:23 32:7
  33:16
**seventh** 2:13 3:19
**sfmta** 7:6,19,20 8:6
  8:11,12,13 10:1,2
  12:17 13:21 14:21
  15:12 16:12,16 17:1
  17:17 18:16 19:2
  21:17 29:19 33:15
  33:24 34:5,6,15
  44:22
**sfmta's** 10:11 12:11
  12:14 19:15,20
**sgt** 3:11
**shattuck** 3:8
**sheets** 35:10,14
**shift** 22:20,20
**short** 30:8
**shorter** 13:22

**shorthand** 2:17 46:4
**showing** 20:2
**shown** 20:6
**sign** 16:1,2,3,6
  19:11 34:17 36:8
  41:25
**signage** 41:24,24
**signal** 42:8
**signature** 46:23
**signs** 20:20
**simply** 43:6
**situation** 13:21
**six** 22:21 23:5,9
  25:11,23 37:1
**skipping** 21:18
**slightly** 17:14
**sloan** 3:15
**smartphone** 26:7
**solution** 43:6
**somebody** 42:9
**soon** 8:17 10:12
**sorry** 9:2 15:16
  21:15
**southern** 8:4
**speak** 32:25 33:6
**speaking** 15:16,25
  30:23
**special** 9:10 16:18
  41:14
**specific** 9:7 40:19
**specifically** 35:8
  36:21,24 38:25
  41:16
**speculation** 9:22
  10:21 16:14
**spell** 6:16 38:1
**spoke** 33:3
**sr** 26:21,22,25 27:3
  27:25 28:3,5,10
**standby** 24:15 26:22
  26:22,24,25 27:17
  28:3,10 32:8 33:16
  33:20,22
**standing** 26:18
  27:21

**stands** 24:25 26:21
  26:25 27:8 28:3,10
  29:12
**start** 10:11,15 11:1
  11:6,7,17 12:2,4,11
  12:14,18,23 13:6
  15:19 16:23 17:12
  20:23,24
**started** 7:12 8:6
  17:18 18:19 34:5
  35:20
**starting** 9:15 20:16
**starts** 17:3
**state** 6:13 8:3 41:5
**statements** 44:19
**states** 1:1 2:1
**stenographically** 46:10
**steven** 3:6
**stitt** 1:4 2:4
**stop** 8:17 10:12
**stra** 23:6
**straight** 23:8,13,19
**street** 2:13 3:19
**strike** 10:5,10 28:18
  31:2 37:14 40:2
**structure** 16:17
**study** 9:14,19,21
**subject** 33:20
**subscribed** 46:17
**substance** 30:21
**sudden** 14:11
**suite** 3:8,19
**sunday** 21:24 22:11
**supervise** 31:14
**supervised** 36:12
**supervisor** 34:7,11
**sure** 8:22 28:22
  37:18 43:9
**susana** 1:14 2:12 4:2
  5:2 6:5,15,17
**swing** 22:20
**system** 14:16,17

**t**

**t** 5:1 6:18 21:25 22:6
23:11,20 24:4
**take** 9:6,8 10:5,8
15:1 30:2,8 36:18
41:3,12
**taken** 46:5
**taxi** 41:23
**team** 19:6
**technical** 11:16
**ten** 17:10 41:8
**tep** 9:15 14:25
**testified** 6:7
**testify** 7:4 18:8
44:22
**testifying** 10:18
44:20
**testimony** 14:2,3
28:9 30:13 31:4
32:18,21 38:19 41:6
41:7 46:8
**thank** 30:9 45:2,5,6
**thing** 16:5
**things** 8:25 18:4
40:16
**think** 13:4 17:24
30:4 32:22 38:18
**third** 42:6
**thomas** 1:21 2:16
46:23
**three** 44:10
**thursday** 22:2
**ti** 29:10,12,14
**tidrick** 3:5,6 4:4
6:10 10:3 11:8,24
12:10,24 14:4,20
15:7,18,23 16:8,21
17:11 18:9 19:1
20:8 26:11 28:13
30:4,8,14,17 31:1,7
31:13,21 32:16,24
38:22 41:10 45:2
**tidricklaw.com** 3:11

**till** 7:23
**time** 7:21 13:10,14
13:19 16:6 18:1
20:23,24 21:7,8,13
21:14,16 22:19,20
22:21 23:4,4,8,8,10
23:13 24:16 26:24
27:5,7,8,8,14,15,15
28:11,16,19 29:4,12
29:15,17,19,21
30:15,23 31:23 32:4
32:8,10,12,14 33:20
33:22 34:3,13,21,25
35:6,12,23 36:3,11
38:3 39:2,24 40:2,3
41:2 43:19 44:4,16
45:2,3,7 46:6,7,9
**times** 16:1 22:19
36:17,18,19 39:19
40:7,10 41:3,9,21
42:9 44:18
**title** 7:8,10,17 8:1
**today** 6:25 7:4 44:22
**top** 20:17 33:19
43:21 44:1
**topic** 10:17 17:22,23
18:1,7 38:20
**topics** 18:5
**total** 27:10 33:16
**train** 10:5 21:2,3
24:12
**training** 37:2
**transcribed** 46:10
**transcript** 46:11
**transit** 8:24 9:16
10:8 41:17 44:15
**transportation** 1:8
2:8 8:4,20
**travel** 11:5 23:22,24
24:7,14,17 25:7,19
26:16
**traveling** 28:17,20
29:6
**trips** 11:6 41:15

**true** 46:12
**trustworthiness**
39:6,21 40:5,14,18
40:20
**trustworthy** 36:15
36:19,22
**truthfully** 7:1
**trying** 16:9 27:19
29:1
**tuesday** 22:8
**turn** 24:16,20 27:15
29:12,15,19,21
32:12,12,13 35:11
35:11 42:6
**turns** 8:16 32:12
**tweets** 9:10
**twice** 35:4,6
**two** 7:11 16:1 24:10
29:23 32:1,21 34:9
38:8 40:16 43:13
44:8
**typically** 41:16

**u**

**u** 6:17,18 23:14
39:17
**um** 29:11 41:1
**umbrella** 43:13,14
**undersigned** 46:3
**understand** 6:21,24
7:1 10:6 16:9,16
17:3 18:3 20:13
25:6,18 26:12 27:20
28:22 29:1,14 31:2
32:23 33:15 34:10
35:16 40:1,3 43:9
44:18,21
**understanding**
38:12
**united** 1:1 2:1
**update** 35:13
**updates** 35:13
**updating** 35:9
**ups** 16:1 34:17 36:8

**v**

**v** 23:20 24:4
**vague** 11:19 12:8,20
13:24 14:7,23 15:13
15:17 16:13 17:7,19
18:21 44:25 45:1
**varies** 15:10
**various** 44:18
**vehicle** 10:8 13:1,9
21:4 28:7 32:11
36:7
**vehicles** 44:15
**version** 32:2
**versions** 32:1
**views** 38:19
**volume** 1:17 2:13
4:2
**vs** 1:6 2:6

**w**

**w** 22:6 38:2
**wait** 14:14 27:4
**waiting** 28:6
**want** 15:13 24:8
31:3 32:22 43:9
**wasting** 18:1
**way** 26:20 37:7
42:24
**wednesday** 1:16
2:15 6:2 22:8
**weekend's** 41:19
**welcome** 31:8
**went** 30:17
**wheel** 17:10
**whereof** 46:17
**witness** 9:23,25
10:17,22 11:3,22
12:9,22 14:8,24
15:21 16:15 17:8,22
17:24 18:4,7,23
20:6 26:7,8 28:10
30:3,7,12,19,25
31:16,20,25 41:8
45:5 46:7,8,17

Veritext Legal Solutions
866 299-5127

**wong**  33:11,13
  37:19,24,25 38:2,4
  38:7,25 39:1
**work**  19:10,12
  20:20 21:7,9,21
  23:19,24 24:11
  27:12 33:21,24,25
  34:17 35:5 36:13,23
  37:8,10,11,12 39:9
  39:10 42:8
**worked**  8:19 16:25
  34:1,3 35:1
**working**  21:16
**works**  6:22 16:17
  34:16 42:24
**written**  9:13

**x**

**x**  4:1 5:1

**y**

**year**  15:2,12 16:1,2
  35:4,6 39:23
**years**  7:11 8:5 9:18
  34:9 37:1
**ygr**  1:5 2:5

**z**

**z**  6:18

# Federal Rules of Civil Procedure

## Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2014. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Exhibit B

1          IN THE UNITED STATES DISTRICT COURT
2            FOR THE NORTHERN DISTRICT OF CALIFORNIA
3    DARRYL A. STITT, TONY
     GRANDBERRY, and HEDY GRIFFIN,
4    on behalf of themselves and
     all others similarly situated,
5
          Plaintiffs,
6
               vs.                    Case No. C-12-03704-YGR
7
     THE SAN FRANCISCO MUNICIPAL
8    TRANSPORTATION AGENCY;
     CITY AND COUNTY OF SAN
9    FRANCISCO; and DOES 1-20,
10        Defendants.
     _____
11
12
13
14
15
16        VIDEO DEPOSITION OF MARY E. FURST
17               Berkeley, California
18               Friday, July 8, 2016
19                    Volume I
20
21
22   REPORTED BY:
23   REBECCA L. ROMANO, RPR, CSR No. 12546
24   JOB NO. 2342044
25   PAGES 1 - 132

                                              Page 1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE NORTHERN DISTRICT OF CALIFORNIA
3  DARRYL A. STITT, TONY
   GRANDBERRY, and HEDY GRIFFIN,
4  on behalf of themselves and
   all others similarly situated,
5
     Plaintiffs,
6
         vs.       Case No. C-12-03704-YGR
7
   THE SAN FRANCISCO MUNICIPAL
8  TRANSPORTATION AGENCY;
   CITY AND COUNTY OF SAN
9  FRANCISCO; and DOES 1-20,
10   Defendants.
   _____
11
12
13
14
15
16      DEPOSITION OF MARY FURST, taken on behalf of
17 the Plaintiffs, at Renne Sloan Holtzman Sakai,
18 1220 7th Street, Suite 300, Berkeley, California,
19 commencing at 8:18 a.m., Friday, July 8, 2016 before
20 Rebecca L. Romano, Certified Shorthand Reporter
21 No. 12546
22
23
24
25

---

1             INDEX
2  DEPONENT                    EXAMINATION
3  MARY FURST                      PAGE
   VOLUME I
4
5          BY MR. TIDRICK          8
6
7
8
9
10        EXHIBITS
11 NUMBER                         PAGE
12        DESCRIPTION
13 Exhibit 100   Plaintiffs' Notice of
14        Depositions of Defendant's
15        Experts and Demand for
16        Production at Depositions,
17        5 Pages;              6
18
19 Exhibit 101   Expert Report, 5/10/2016;    6
20
21 Exhibit 102   Rebuttal Report to Expert
22        Report of Richard Drogin,
23        Ph.D., 6/13/2016;          6
24
25 /////

---

1        APPEARANCES OF COUNSEL
2  For the Plaintiffs:
3    THE TIDRICK LAW FIRM
4    BY: STEVEN G. TIDRICK
5    BY: JOEL B. YOUNG
6    Attorneys at Law
7    2039 Shattuck Avenue
8    Suite 308
9    Berkeley, California 94704
10   (510) 788-5100
11   sgt@tidricklaw.com
12   jby@tidricklaw.com
13
14 For the Defendants:
15   RENNE SLOAN HOLTZMAN SAKAI
16   BY: GEOFF SPELLBERG
17   Attorney at Law
18   350 Sansome Street
19   Suite 300
20   San Francisco, California 94104
21   (415) 678-3800
22   gspellberg@publiclawgroup.com
23
24 ALSO PRESENT:
25   Soseh Kevorkian, Videographer

---

1        EXHIBITS (cont'd)
2  NUMBER                         PAGE
3        DESCRIPTION
4  Exhibit 103    Report, 25 Pages;        56
5
6  Exhibit 104    Declaration of Rochelle
7        Larry, 2 Pages;          80
8
9  Exhibit 105    Declaration of Mary Furst
10       in Support of Motion to
11       Decertify Collective Action
12       and Class Action, 5 Pages.     127
13
14
15       PREVIOUSLY MARKED EXHIBITS
16 NUMBER                         PAGE
17 Antonio 11                      64
18
19 Exhibit 35                      69
20
21
22
23
24
25 /////

Page 6

1    Berkeley, California, Friday, July 8, 2016
2         8:18 a.m.
3         ---oOo---
4
5    (Exhibits 100, Exhibit 101, and Exhibit 102
6    were marked for identification by the court reporter
7    and are attached hereto.)
8
9         THE VIDEOGRAPHER: Good morning. We're
10   on the record at 8:18 a.m. on July 8th, 2016. This    08:18:50
11   is the video-recorded deposition of Mary Furst.
12        My name is Soseh Kevorkian, here with our
13   court reporter, Rebecca Romano. We're here from
14   Veritext Legal Solutions.
15        This deposition is being held at    08:19:10
16   1220 7th Street in Berkeley, California. The
17   caption of this case is Darryl A. Stitt, et al.,
18   versus The San Francisco Municipal Transportation
19   Agency, at al. Case No. C-12-03704-YGR.
20        Please note that audio and video recording    08:19:40
21   will take place unless all parties agree to go off the
22   record. Microphones are sensitive. They pick up
23   whispers, private conversations, and all cellular
24   interference.
25        At this time, will counsel and all    08:19:37

Page 7

1    present please identify themselves for the record.    08:19:37
2         MR. TIDRICK: Steven Tidrick for
3    plaintiffs and the certificated class.
4         MR. YOUNG: Joel Young for plaintiffs.
5         MR. SPELLBERG: Geoff Spellberg    08:20:04
6    representing defendants.
7         THE REPORTER: If you could raise your right
8    hand for me, please.
9         THE DEPONENT: (Complies.)
10        THE REPORTER: You do solemnly state,    08:20:21
11   under penalty of perjury, that the testimony you
12   are about to give in this deposition, shall be the
13   truth, the whole truth and nothing but the truth?
14        THE DEPONENT: I do.
15
16
17
18
19
20
21
22
23
24
25   /////

Page 8

1         MARY FURST,    08:20:19
2    having been administered an oath, was examined and
3    testified as follows:
4
5         EXAMINATION    08:20:19
6    MR. TIDRICK:
7    Q.   Good morning.
8    A.   Good morning.
9    Q.   Would you please state your full name for
10   the record.    08:20:24
11   A.   Mary Elizabeth Furst.
12   Q.   Have you ever been deposed before?
13   A.   Yes.
14   Q.   Approximately how many times?
15   A.   Fifty or 60.    08:20:34
16   Q.   Have you ever testified at trial before?
17   A.   Yes.
18   Q.   Approximately how many times?
19   A.   Four or five.
20   Q.   Do you understand generally how a    08:20:49
21   deposition works?
22   A.   Yes.
23   Q.   You understand that you're testifying
24   under penalty of perjury?
25   A.   Yes.    08:20:56

Page 9

1    Q.   What did you do to prepare for today's    08:20:59
2    deposition?
3    A.   I reread the reports that I prepared. I
4    read Dr. Drogin's report. Reviewed the charts that
5    are contained in the reports and also reviewed my    08:21:12
6    declaration.
7    Q.   When you say your "declaration," are you
8    referring to the declaration that you signed in
9    support of defendants' motion to decertify the
10   class?    08:21:42
11   A.   I believe so. I know -- I believe it was
12   dated July 5th.
13   Q.   When you say the reports you prepared,
14   that you reread them, are you referring to the
15   documents that have been marked as Exhibit 101 and    08:22:08
16   Exhibit 102?
17   A.   Yes.
18   Q.   I'm showing you the document that's been
19   marked as Exhibit 100 entitled "Plaintiffs' Notice
20   of Depositions of Defendants' Experts and Demand    08:22:44
21   for Production at Depositions," dated
22   June 21st, 2016.
23        Have you seen Exhibit 100 before?
24   A.   Yes.
25   Q.   You understand that you're testifying    08:23:05

3 (Pages 6 - 9)

1 today pursuant to the Exhibit 100 deposition 08:23:07
2 notice?
3    A.  Yes.
4    Q.  Are you producing any documents or data
5 today?                              08:23:24
6    A.  I have with me one additional piece of
7 information and it's my billings, I think, through
8 May of 2016.
9    Q.  Are you producing those today pursuant to
10 the deposition notice?              08:23:48
11    A.  I'm prepared to do that.
12    Q.  Other than that, are there any other
13 documents or data that you are producing today?
14    A.  No.
15    Q.  If you could, please, in the Exhibit 101 08:24:24
16 document turn to attachment 1, your resume or CV.
17    A.  Okay.
18    Q.  Attachment 1 to Exhibit 101 is a
19 three-page document, correct?
20    A.  Yes.                         08:25:11
21    Q.  That three-page document is your current
22 CV?
23    A.  Yes.
24    Q.  When, approximately, did you last update
25 it?                                 08:25:25

Page 10

1    A.  Probably within the last six months.  08:25:30
2    Q.  Is there any further experience or
3 qualification that you have acquired within the
4 last six months that is not reflected in the
5 resume?                             08:25:54
6    A.  Nothing that I -- would cause me to
7 change the resume.
8    Q.  At page 5 of your initial expert report,
9 Exhibit 101, section III describes your
10 qualifications, correct?            08:26:49
11    A.  Yes.
12    Q.  There's a reference in the qualifications
13 you list for yourself in Exhibit 101 to -- and I
14 quote -- "numerous wage and hour" matters.
15        How many wage and hour matters have you  08:27:12
16 conducted damage analyses for?
17    A.  Probably about 12 to 15.
18    Q.  During what approximate span of years
19 have you conducted damage analyses for wage and
20 hour cases?                         08:27:47
21        In other words, when was the first time
22 you did?
23    A.  The first one was 20 or 25 years ago
24 about.
25    Q.  Of the approximately 12 to 15 wage and  08:28:16

Page 11

1 hour cases for which you have conducted damage  08:28:20
2 analyses, in any of those cases were you doing the
3 analyses for the plaintiffs, the workers in the
4 case?
5        MR. SPELLBERG:  Well, that's compound.  08:28:39
6        But you may answer.
7    Q.  (By Mr. Tidrick)  Do you understand the
8 question?
9    A.  I do.  If I'm working for the plaintiff
10 or the defense is your question?    08:28:49
11    Q.  Yes.
12    A.  I believe there is one of the cases that
13 I worked on that was plaintiffs.
14    Q.  Do I understand correctly of the -- of
15 all of the wage and hour cases in which you have  08:29:18
16 conducted damage analyses, only one of them was a
17 case in which you were retained by the plaintiffs?
18    A.  That's correct.  The majority is retained
19 by the defense.
20    Q.  The one wage and hour case in which you  08:29:53
21 were retained by the plaintiffs, who was the
22 defendant in that case?
23    A.  I can't recall.
24    Q.  Do you recall approximately how many
25 years ago was that case?            08:30:04

Page 12

1    A.  The case settled early on.  And it was  08:30:05
2 probably about six years ago, so there was little
3 work that I did on that case.
4    Q.  The one wage and hour case in which you
5 were retained by the plaintiffs, was that a class  08:30:29
6 action or individual action?
7    A.  I think it was an individual action.
8    Q.  You have never performed an analyses in a
9 wage and hour class action on the side of the
10 plaintiffs, correct?               08:31:07
11        MR. SPELLBERG:  Object to the form of the
12 question.  I think this was just answered about her
13 plaintiffs experience.
14        You -- you may respond again.
15        THE DEPONENT:  Yes.  Since the case was  08:31:20
16 resolved early on, I think that's a fair statement,
17 that I haven't performed work on behalf of the
18 plaintiff in any substantial capacity.
19    Q.  (By Mr. Tidrick)  Have you ever failed to
20 qualify as an expert in any case?   08:31:48
21    A.  No.
22    Q.  The one case in your career in which you
23 were performing a damage analysis for the
24 plaintiff, do you recall what state that case was
25 in?                                 08:32:14

Page 13

4 (Pages 10 - 13)

Page 14

```
1    A.  Well, just to clarify, the one that I'm      08:32:17
2  talking about was wage and hour, because I have
3  performed damage analysis for plaintiffs.  It was
4  in the state in the California.
5    Q.  I don't quite understand the          08:32:44
6  clarification or explanation you just gave.
7         Is your point that in the one case in
8  which you did work for a plaintiff in a wage and
9  hour case, it wasn't plaintiffs, plural, it was
10  only a single plaintiff?                  08:33:04
11         Is that what you're saying?
12    A.  No.  I believe the question you asked me
13  did not reference wage and hour cases.  You said
14  damage analysis on behalf of the plaintiff.  I've
15  done damage analysis on behalf of the plaintiff.  08:33:20
16  It wasn't a wage and hour case, per se.
17         So I was just clarifying my response to
18  what I believe your question really was.
19    Q.  The one case that you are referring to,
20  what generally was that case about?          08:34:00
21    A.  I can't recall.
22    Q.  It was or was not a wage and hour case?
23    A.  It was a wage and hour case that was
24  settled early on.  Because it was settled early on,
25  I had -- and it was about six years ago, I cannot
```
Page 14

Page 15

```
1  recall what it was about.                  08:34:24
2    Q.  I see.
3         And your point is that because it settled
4  early on, the case didn't get to the point of you
5  either qualifying or not qualifying as an expert;  08:34:29
6  is that correct?
7    A.  That part's correct as well.
8    Q.  Have you ever done any work for a transit
9  service?
10    A.  Yes.                          08:34:49
11    Q.  Approximately how many transit services
12  have you done work for?
13    A.  I believe -- well, two, including this
14  one.
15    Q.  Besides SFMTA, what other transit service  08:35:24
16  have you done work for?
17    A.  VTA, Santa Clara County.
18    Q.  And when you say that you've done work
19  for a transit service, you're referring to your
20  work as an expert in litigation, exclusively,    08:35:52
21  correct?
22    A.  I believe I was an expert the entire
23  time.  I'm not quite sure if I was in the capacity
24  of a consultant.
25    Q.  All of your work for transit agencies has  08:36:09
```
Page 15

Page 16

```
1  been litigation-related, correct?          08:36:11
2    A.  I'm not sure if that's correct.  I'll say
3  all my wage and hour cases have been -- which is
4  two -- litigation.
5    Q.  Besides wage and hour cases, what other    08:36:48
6  transit agencies have you done work for?
7    A.  If -- if I did and I -- I don't know if I
8  have, I can't think of anything offhand.  But for
9  the last 35-plus years, I've done damage
10  calculations on a variety of entities, and I      08:37:18
11  suspect I've done one for transit agencies over the
12  course of my career.
13    Q.  Besides SFMTA and VTA, can you recall
14  what other transit agency you have done work for?
15    A.  No.                          08:37:44
16    Q.  Other than the work that you've done
17  relating to litigation, do you have any experience
18  in the transportation industry?
19    A.  Not specifically.
20    Q.  Do you have any experience in          08:38:22
21  transportation planning?
22    A.  No.
23    Q.  Have you ever created a vehicle on-time
24  performance report for a transit service?
25    A.  No.                          08:38:33
```
Page 16

Page 17

```
1    Q.  Have you ever created a vehicle on-time    08:38:34
2  performance report -- strike that.
3         Have you ever had any formal training
4  relating to route scheduling for any transit
5  service?                          08:38:56
6    A.  No.
7    Q.  Have you ever had any formal training
8  relating to route scheduling, generally?
9    A.  No.
10    Q.  Have you ever had any training or        08:39:03
11  experience relating to route construction for a
12  transit service?
13    A.  No.
14    Q.  Referring to your initial report, marked
15  as Exhibit 101 -- and when I refer to "initial    08:39:24
16  report," I'll be referring to Exhibit 101.
17         Do you understand that?
18    A.  Yes.
19    Q.  If you could, please, turn to page 5 of
20  Exhibit 101.                          08:39:36
21         In Exhibit 101, page 5, section II, you
22  state, and I quote, "We have been asked to opine on
23  Plaintiffs' assertions that operator runs are
24  routinely late and that operators do not put in for
25  unscheduled overtime."                  08:40:05
```
Page 17

5 (Pages 14 - 17)

1        Is that all that you were asked to opine        08:40:17
2 on?
3        MR. SPELLBERG:  Vague and ambiguous, as
4 to time.
5        You mean her entire assignment or        08:40:28
6 initially?
7     Q.  (By Mr. Tidrick)  In connection with your
8 initial report.
9     A.  I believe this initial report addresses
10 those issues exclusively.  Meaning, that's all I        08:40:50
11 was asked to opine on at the time that this report
12 was created.
13     Q.  And I understand that your rebuttal
14 report, Exhibit 102, addresses and presents some
15 additional opinions.        08:41:22
16        Do you intend to offer at trial any
17 opinions that are not stated in either Exhibit 101
18 or 102?
19        MR. SPELLBERG:  Well, let me -- before
20 she answers, let me make the objection that the        08:41:40
21 witness will offer the opinions that we request of
22 her.  Some of that will be driven by how plaintiff
23 presents their case.
24        But having said that, you may answer, to
25 the best of your understanding, as to the opinions        08:41:54
                                        Page 18

1 you would offer at trial.        08:41:56
2        THE DEPONENT:  And I'm sorry.  What was
3 your question?
4        MR. TIDRICK:  Madam Court Reporter, could
5 you read it back, please.        08:42:05
6        (Record read as follows:
7        "QUESTION:  Do you intend to offer at
8        trial any opinions that are not
9        stated in either Exhibit 101 or
10        102?")        08:42:06
11        THE DEPONENT:  Not at this time.
12     Q.  (By Mr. Tidrick)  Have you performed any
13 specific calculation regarding the total number of
14 instances in which operators were late at
15 divisions?        08:42:44
16     A.  Not that I recall.
17     Q.  Have you performed any specific
18 calculation regarding the total number of instances
19 in which operators were late at relief points?
20     A.  No.        08:43:25
21     Q.  Have you performed any specific
22 calculation regarding the total number of instances
23 in which operators submitted overtime cards?
24     A.  I'll -- I believe we did, but it was not
25 overtime cards, per se.  It's overtime entries in        08:43:43
                                        Page 19

1 the payroll reports.        08:43:46
2     Q.  Where, in either of your reports, do you
3 make any statement about that calculation?
4        If I could refer you to page 9 of your
5 expert report, Exhibit 101, under section B,        08:46:18
6 bullet point 3, is that what you're referring to?
7     A.  It would be, yes.
8     Q.  Do I understand correctly from that
9 bullet point that during the time period for which
10 the GEAC payroll system was in effect from        08:47:40
11 September 11, 2009 to August 17, 2012, it was not
12 possible for you to make any calculation about the
13 total number of instances in which operators had
14 overtime entries in the payroll reports?
15        MR. SPELLBERG:  Vague and ambiguous.        08:48:12
16        You may answer.
17        THE DEPONENT:  Well, that's not exactly
18 correct.
19        Well, no, I think that's -- that actually
20 probably is fair to say, that using the GEAC data        08:48:25
21 we were unable to determine the number of instances
22 that employees put in for overtime, unscheduled
23 overtime.
24     Q.  (By Mr. Tidrick)  So the only time period
25 for which you were able to make a calculation about        08:48:49
                                        Page 20

1 the number of overtime entries for operators, that        08:49:01
2 time period is only from August 27, 2012, onwards?
3     A.  Up to March 25, 2016.  That's the period
4 that we had data -- eMerge data from.
5     Q.  A few questions ago I asked whether you        08:49:49
6 had performed any specific calculation about the
7 total number of instances in which operators
8 submitted overtime cards, and in your answer I
9 understand you indicated not overtime cards,
10 per se.        08:50:06
11        Do I understand correctly that your
12 calculation of submission of overtime did not look
13 at -- at actual overtime cards submitted, but
14 rather what SFMTA's electronic systems reflected;
15 is that correct?        08:50:37
16        MR. SPELLBERG:  I'm going to object.
17 Vague and ambiguous.
18        You may answer, if you understand the
19 question.
20        THE DEPONENT:  Our analysis was based on        08:50:46
21 the eMerge data and the number of instances of
22 overtime recorded in that document, and it was
23 solely based on that document, or calculations at
24 least.
25     Q.  (By Mr. Tidrick)  Did you take any steps        08:51:11
                                        Page 21

6 (Pages 18 - 21)

1 to assess whether the entries in the GEAC data were 08:51:13
2 a reliable indicator of overtime cards submitted?
3     A.  We did not do any additional testing.
4 But given that employees were paid overtime, based
5 on those entries, we found them to be reliable for 08:51:36
6 the purposes that we were using the information
7 for.
8     Q.  Why is the fact that employees were paid
9 overtime indicative that the GEAC data that you
10 looked at was reliable -- not GEAC, eMerge. 08:51:59
11     Do you understand the question?
12     A.  You're asking me why I relied on eMerge
13 data and found that to be acceptable entries
14 because people were paid; is that your question?
15     Q.  I'm really trying to understand your 08:52:25
16 answer to the prior question.
17     Why did you believe that the eMerge data
18 was reliable?
19     A.  We -- I will say we relied on the eMerge
20 data for the unscheduled overtime entries, knowing 08:52:54
21 that operators were paid for the entries that were
22 listed within the eMerge data.
23     Q.  Is it possible, in your opinion, that
24 operators submitted overtime cards that are not
25 reflected in the eMerge data? 08:53:26

Page 22

1     A.  As -- I suppose it's possible, but I 08:53:32
2 don't know of any situations.
3     Q.  Is there any reason that you didn't take
4 any steps to assess whether the eMerge data
5 accurately reflected overtime cards actually 08:53:58
6 submitted?
7     A.  At the time that we prepared the report,
8 I know that the payroll slips themselves -- it's
9 just a voluminous amount of information to go
10 through to -- to validate whether or not an 08:54:25
11 overtime split matches up with the eMerge data.  So
12 it was a function of the amount of work that it
13 would have taken to -- to validate a number on the
14 eMerge data that was paid.
15     Q.  Did you ever consider taking that step, 08:55:10
16 to validate the data in that manner?
17     A.  At some point it was discussed earlier on
18 in my assignment, during settlement discussion time
19 frame.
20     Q.  Have you ever performed any specific 08:56:28
21 calculation regarding the total number of instances
22 in which operators drive their transit vehicle
23 after the scheduled ending time and did not submit
24 overtime cards?
25     MR. SPELLBERG:  I'm going to object to 08:56:52

Page 23

1 the form of the question.  I'm not sure I 08:56:55
2 understand it.
3     You may answer, if you do.
4     THE DEPONENT:  I'm sorry.  Can -- could
5 you repeat that question.  I want to make sure I 08:57:04
6 answer it correctly.
7     MR. TIDRICK:  Madam Court Reporter, could
8 you please read it back.
9     (Record read as follows:
10     "QUESTION:  Have you ever performed 08:57:11
11     any specific calculation regarding
12     the total number of instances in
13     which operators drive their transit
14     vehicle after the scheduled ending
15     time and did not submit overtime 08:57:11
16     cards?")
17     THE DEPONENT:  So your question is, did
18 we do it in total.  No, we did it -- we did some.
19 It wasn't calculations, per se, but analysis of the
20 data.  And it's referred to in exhibits in -- I 08:57:46
21 think both reports, where there's a comparison
22 between the APC data and a driver's route and
23 whether or not if they were early or late, and on
24 that same day whether or not they put in for
25 overtime. 08:58:14

Page 24

1     So we didn't do it in total, we did it on 08:58:15
2 a spot basis for compar- -- well, for exhibit
3 purposes.
4     Q.  (By Mr. Tidrick)  Is there any reason
5 that you did not do a calculation of the total 08:58:32
6 number of instances?
7     A.  We weren't asked to do that.
8     Q.  Have you performed any specific
9 calculation offsetting the total number of minutes
10 when operators drove their vehicles after the 08:59:05
11 scheduled ending time versus the total number of
12 minutes in which an operator arrived early to their
13 scheduled ending location?
14     A.  Again, I'm not sure I understand your
15 question. 08:59:32
16     Are you asking me whether or not we used
17 minutes that operators arrived early as an offset
18 for when they arrived late?
19     Q.  Rather than getting hung up on the word
20 "offset," let me ask the question this way. 08:59:51
21     Have you performed any calculation that
22 would allow you to compare the total number of
23 minutes that operators operated their vehicle,
24 after the scheduled ending time, to the total
25 number of minutes that operators arrived early to 09:00:15

Page 25

7 (Pages 22 - 25)

1 their scheduled ending locations?          09:00:26
2          MR. SPELLBERG: Vague and ambiguous.
3          You may answer, if you can.
4          THE DEPONENT: I -- I -- again, I'm not
5 sure I understand your question.          09:00:33
6     Q.  (By Mr. Tidrick) Have you done any
7 calculation of the total number of minutes that
8 operators arrived early at scheduled ending
9 locations?
10    A.  Well, again, when you say "total," we may     09:00:55
11 have done some calculations in that regard during
12 the settlement process. Subsequent to the
13 settlement process, we did sample analysis for
14 specific operators.
15         And it wasn't for the total, but it was     09:01:20
16 for the incidents where we had matching data, APC
17 data, versus an -- an operator's scheduled arrival
18 time. So we did it on a spot check basis or a
19 sample basis, if you will, but have not done a
20 calculation in totality for the total population.     09:01:45
21    Q.  Do you believe that the spot check that
22 you did constituted a representative sample?
23         MR. SPELLBERG: Vague and ambiguous.
24         You may answer.
25         THE DEPONENT: It may. I did not review     09:02:13

Page 26

1 it from a statistical standpoint, but I think the     09:02:16
2 results that were derived from the samples were
3 consistent, if I was to extrapolate to the
4 population, perhaps.
5         But, again, I didn't exactly do that, and     09:02:31
6 it was earlier on for settlement purposes when such
7 a calculation estimate was prepared.
8     Q.  (By Mr. Tidrick) Is it fair to say the
9 possibility that it's a representative sample is
10 really speculative; it -- it also may not be a     09:02:52
11 representative sample, correct?
12         MR. SPELLBERG: Objection.
13 Argumentative.
14         THE DEPONENT: I can't say I know if it's
15 speculative. I -- I simply didn't do a statistical     09:03:00
16 analysis to determine it one way or the other.
17    Q.  (By Mr. Tidrick) With respect to the
18 spot check you did, is there a reason that you
19 limited it just to inci- -- incidents in which
20 there was APC data that you could match against     09:03:24
21 operators' schedules?
22    A.  Well, that was the only black-and-white
23 information that was available to determine whether
24 or not an operator was early or late.
25    Q.  So for purpose of your analysis, you     09:03:50

Page 27

1 thought it was reasonable to not include incidents     09:03:52
2 in which you didn't have APC data that you could
3 match against schedules; is that fair?
4         MR. SPELLBERG: Objection. It's almost
5 incomprehensible. Vague and ambiguous.     09:04:05
6         You may answer.
7         THE DEPONENT: It wouldn't make any
8 sense. I'm -- I'm looking at available
9 documentation.
10    Q.  (By Mr. Tidrick) When you say that the     09:04:34
11 spot check you did may be a representative sample,
12 is it fair to say that you are assuming that those
13 instances in which there is not data -- that you
14 are assuming that you can extrapolate from the
15 instances in which you have data to those in which     09:05:05
16 you don't?
17    A.  I might be able to, yes. I would work
18 with our statistician to come up with such a
19 conclusion.
20    Q.  If you could, please, turn to     09:05:49
21 attachment 4 of Exhibit 101.
22         The items that are listed in
23 attachment 4, those are the documents and data that
24 you relied upon in forming your opinions?
25    A.  For this report, yes.     09:06:36

Page 28

1     Q.  For the initial report, correct?     09:06:39
2     A.  Yes.
3     Q.  The Exhibit 101 report?
4     A.  Yes.
5     Q.  Was there anything else that you relied     09:06:50
6 upon in forming your opinions for the initial
7 report?
8     A.  This is the dataset that was relied on.
9     Q.  Other than the dataset, was there
10 anything else that you relied upon?     09:07:03
11    A.  I assume I relied on my general knowledge
12 working on the case for several years, but this is
13 the dataset that was used to generate the specific
14 charts and analysis contained in this report.
15    Q.  Who provided you with the documents and     09:07:25
16 data that are listed in the attachment 4?
17    A.  SFMTA.
18    Q.  If you could turn, please, to page 6 of
19 Exhibit 101, your initial report.
20         In section V of your initial report,     09:08:01
21 sub-point A of your "Summary Opinion(s)," do I
22 understand correctly that it is your opinion, and I
23 quote, "In aggregate, for operators' runs that end
24 at a division, they are early and on-time the
25 majority of the time."     09:08:31

Page 29

8 (Pages 26 - 29)

1    A.  Do I understand that correctly -- you    09:08:37
2 read that correctly, yes.
3    Q.  That is your opinion, correct?
4    A.  Yes.
5    Q.  When you say "in aggregate," what do you    09:08:59
6 mean by that?
7    A.  In total.
8    Q.  When you say "early" in your reports, how
9 do you define "early"?
10    A.  I'll define early as being -- I believe    09:09:23
11 this is two minutes before the scheduled time or
12 before two minutes.
13    Q.  In your reports, when you say "on time,"
14 how do you define that?
15    A.  One minute early and four minutes late,    09:09:59
16 compared to the scheduled time.
17    Q.  Why do you use that definition of
18 "on time"?
19    A.  Because SFMTA uses that definition.
20    Q.  Any other reason?    09:10:25
21    A.  It seemed to be consistent with the
22 transit agencies and the little bit of research
23 that I did.
24        So that's displayed on footnote 2,
25 page 8 of the initial report.    09:10:40

1    Q.  Did SFMTA instruct you to use that    09:10:59
2 definition?
3    A.  No.
4    Q.  Did anyone instruct you to use that
5 definition?    09:11:13
6    A.  Counsel did.
7    Q.  Do you believe that that definition of
8 on time is appropriate in evaluating plaintiffs'
9 routinely late time claims?
10    A.  Well, appropriate, I'm not sure -- it is    09:11:41
11 what it is.  I -- it's -- I'm not suggesting it's
12 appropriate or inappropriate.  It is the time frame
13 that was used to do the analysis contained in the
14 report.
15    Q.  A few questions ago when I asked how you    09:12:29
16 define on time and -- part of your definition is up
17 to 4 minutes late.
18        Does 4 minutes late go just up to
19 4 minutes and zero seconds, or does 4 minutes late
20 go all the way up to 4 minutes and 59 seconds?    09:13:06
21    A.  I believe our computations would be
22 4 minutes after the scheduled arrival -- or
23 scheduled time per the run schedule.  So it should
24 be 4 minutes exactly.
25    Q.  Four minutes and zero seconds?    09:13:30

1    A.  I believe that's correct.    09:13:32
2    Q.  Are you certain of that?
3    A.  No.
4    Q.  The other part of the definition of on --
5 on time, beginning at 1 minute early, does that go    09:13:51
6 all the way to 1 minute and 59 seconds before the
7 scheduled time, or like 4 minutes -- is it your
8 understanding that it's 1 minute and zero seconds?
9    A.  I believe it's 1 minute and zero seconds,
10 but I would have to ask the individual that did the    09:14:20
11 actual analysis on the time frame that he
12 specifically asked the computer or, you know, used
13 to segregate the data.
14    Q.  Who was that?
15    A.  Stephen Cole.    09:14:41
16    Q.  Is that someone who works for you?
17    A.  Yes.
18    Q.  Did you perform any calculations of
19 on-time performance in which you did not use that
20 definition?    09:15:32
21    A.  Yes.
22    Q.  Are those calculations reflected in
23 either of your reports?
24    A.  No.
25    Q.  Is there a reason that you didn't include    09:15:55

1 those calculations in your reports?    09:15:58
2    A.  It was at counsel's instructions.
3    Q.  The alternative calculations that you did
4 of on-time performance, how did you define on time
5 performance, other than using the 1 minute early    09:16:27
6 and 4 minute late definition?
7    A.  The actual scheduled arrival time.
8    Q.  In other words, treating any time after
9 the actual scheduled arrival time as being late,
10 correct?    09:17:04
11    A.  Correct.
12    Q.  Do you have any understanding -- even a
13 general understanding -- of how your results or
14 opinions would be different if you used that
15 alternative definition of on time?    09:17:33
16    A.  Yes.
17    Q.  How would they be different?
18    A.  More runs would be late, about
19 40 percent, and 60 would be on time or early.  So
20 still a majority of the runs are on time or early.    09:17:55
21    Q.  And approximately 40 percent are late,
22 correct?
23    A.  After the scheduled arrival time.
24    Q.  At page 7 of your initial report,
25 Exhibit 101, one of the conclusions that you assert    09:19:26

Page 34

1 is that operators are regularly early and on time, 09:19:42
2 correct?
3    A.  Yes.
4    Q.  Your analysis of on-time performance is
5 based on automatic passenger counter data, correct? 09:20:16
6    A.  Yes.
7    Q.  Also known as APC data, correct?
8    A.  Yes.
9    Q.  You understand that there is certain
10 technology that SFMTA uses to generate the APC 09:20:47
11 data?
12    A.  Generally, yes.
13    Q.  Do you have any knowledge who the
14 manufacturer or manufacturers are of that
15 technology? 09:21:09
16    A.  Not off the top of my head.  I think I've
17 read a memo of who manufactures the equipment.
18    Q.  Do you have any knowledge, one way or the
19 other, whether the APC data that you looked at came
20 from only one manufacturer or more than one 09:21:37
21 manufacturer?
22    A.  I don't know.  The APC data, per se, I --
23 the -- the document that we were provided, as far
24 as I know, came from a single source.
25    Q.  Do you know that or are you assuming 09:22:06

Page 35

1 that? 09:22:07
2    A.  The document that we were provided was a
3 document.  We didn't get multiple documents
4 suggesting different sources.  So if -- I -- I know
5 there's multiple transponders.  I assume they're 09:22:20
6 all recording information into one system.  We
7 relied on the information contained in the report
8 produced out of that system.
9    Q.  What is a transponder?
10    A.  I don't know exactly, but it's the 09:22:42
11 hardware that is recording time stamps.
12    Q.  Hardware on the transit vehicles?
13    A.  I believe so, yes.
14    Q.  Do you have any understanding how the
15 automatic passenger counters work? 09:23:17
16    A.  Not specifically, but I understand they
17 record the time -- a time stamp when the door is
18 opened of the transit vehicle.
19    Q.  The front door or the back door?
20    A.  The door.  I don't know which door.  And 09:23:37
21 I assume the front door.
22    Q.  Do you know one way or the other, or is
23 that an assumption?
24    A.  As I said, I assume the front door.
25    Q.  Do you have any understanding whether the 09:24:17

Page 36

1 automatic passenger counter system tracks 09:24:20
2 passengers getting on the bus or off the bus?
3       MR. SPELLBERG:  Or something else.
4 Objection.  Vague and ambiguous.
5    Q.  (By Mr. Tidrick) Or something else? 09:24:34
6    A.  As I stated, I understand that the APC
7 data does a time stamp when the door is open.  I
8 have no other knowledge, nor did I inquire of any
9 other data that may be recorded using that system.
10    Q.  So it's fair to say that you do not know 09:25:11
11 whether the APC counters track how many passengers
12 get on the bus or off the bus; is that correct?
13       MR. SPELLBERG:  Or something -- or
14 something else.  Vague and ambiguous.
15       You may answer. 09:25:27
16       THE DEPONENT:  I don't know if the APC
17 counts the number of passengers that get on or off
18 a vehicle.
19    Q.  (By Mr. Tidrick) Do you have any
20 understanding what the APC systems were designed to 09:25:43
21 do; what functions they were designed to perform?
22    A.  Not specifically.
23    Q.  Do you know generally?
24    A.  I know what they do, or at least one
25 component, which is time stamp when the door opens. 09:26:10

Page 37

1 I know that they're an approved system by the FTA. 09:26:15
2 I think they're used for federal funding purposes
3 as well.  That's really the -- the extent of my
4 knowledge.
5    Q.  You don't claim to be an expert with 09:26:40
6 respect to APC technology, correct?
7    A.  That's correct.
8    Q.  At page 7 of your initial report,
9 Exhibit 101, in section A, the second bullet point,
10 there's a statement "In addition to providing 09:27:07
11 passenger count information."
12       Why did you include that statement, if
13 you don't know whether the technology provides
14 passenger count information?
15    A.  I don't know.  I must have been referring 09:27:27
16 to a memo that I was reading when I prepared the
17 report.
18    Q.  Focusing on the second part of that
19 sentence where you say, "the APC data records when
20 a vehicle's door opens at each stop, and when the 09:27:45
21 vehicle's door opens at a division," do you have
22 any recollection where you got that information?
23    A.  That was through conversation with SFMTA.
24    Q.  Who specifically?
25    A.  I believe it was Jason Lee. 09:28:05

10 (Pages 34 - 37)

Q. Is there anyone or anything that you 09:28:23
consulted, other than talking with Jason Lee, to
understand the APC data?

A. Well, we received a memo. I know I had
conversations with Jason Lee. I've talked to 09:28:38
counsel, who, I believe, reached out to SFMTA, in
understanding their systems as well. So I spoke
with counsel about this. And based on that
information, I used the APC data as the time stamp
for vehicles arriving at a division. 09:29:08

Q. The memo that you're referring to that
you reviewed, is that listed in attachment 4 to
your initial report, Plaintiffs' Exhibit 101?

A. It's not.

Q. Is there a reason you didn't list that? 09:29:32

A. This -- likely an oversight. We relied
on the data, the APC data itself.

Q. Do you have any recollection who authored
the memo that you reviewed?

A. I don't know specifically, but I believe 09:30:03
the memo was provided to me through Jason Lee.

Q. Do you still have a copy of that memo
anywhere in your files?

A. I probably do.

MR. TIDRICK: For the record, we are 09:30:34

---

making a request that that memo be produced. 09:30:35

MR. SPELLBERG: I'm sorry. Were you
talking to me?

MR. TIDRICK: I think the record speaks
for itself. 09:30:52

MR. SPELLBERG: I know I missed -- were
you asking for something to be produced? I --

MR. TIDRICK: Yes.

Q. (By Mr. Tidrick) Do you have any
understanding whether the memo was authored by 09:31:02
someone at SFMTA?

A. I assume so.

Q. Do you have any recollection
approximately how long the memo is?

A. Three pages. Three or four pages. 09:31:23

Q. Do you have any recollection whether the
memo has any attachments?

A. Can you define what an attachment is?
Like an example of APC? It was just a memo.

Q. Well, an attachment, like your expert 09:31:47
report, has things that are labeled as attachments.

A. No, I do not recall any attachments that
I was provided.

Q. Do you recall approximately what the date
of the memo was? 09:31:58

---

A. I believe I received it October 2015, or 09:32:00
thereabouts, so it was during the settlement
period.

Q. Do you have any understanding or
recollection whether the memo was prepared for this 09:32:17
litigation?

A. I don't know.

Q. To the best of your recollection, what
does the memo describe?

A. The substance of what the memo describes 09:32:35
is contained in my report that I used to rely on.
So it describes the APC data itself, the purpose of
it.

Frankly, I don't even know if it
discusses the vehicle door being open at each stop 09:32:56
and -- and when the data -- the APC data is
recorded. I can't recall if the memo describes
that or not, or if that was provided to me
verbally.

Q. Do you have any understanding where on 09:33:19
the transit vehicles the automatic passenger
counters are located?

A. No.

Q. Are you able to tell me generally what
automatic passenger counter data is? 09:33:40

---

A. Well, as I've stated, it's -- what we 09:33:45
used it for was a time stamp for when the vehicle
door opens. It's my understanding it's on about
20 percent of the vehicles at this time. I think
historically it was on fewer vehicles. But I 09:33:59
understand currently it's on about 30 percent of
the vehicles and the motor coaches and trolleys
only.

So it does not include -- it's all
stated in -- on page 7 of my report in the bullets 09:34:18
for A. I mean, that -- that is, essentially, my
knowledge of the APC data. And we were advised
that SFMTA found that data to be the most accurate
in recording time stamp at a division for on-time
performance matrix. 09:34:50

Q. More accurate than what the operators
recall?

A. Well, I would say the most accurate data.

Q. Why do you believe it's more accurate
than what the operators recall? 09:35:08

A. Because it's a black-and-white time
stamp. It -- it's unbiased source of information.

Q. Why do you believe that what the
operators recall is biased?

MR. SPELLBERG: Objection. Misstates her 09:35:35

---

1 testimony.                                    09:35:37
2    Q.   (By Mr. Tidrick)  Do you believe that
3 what the operators recall is biased?
4        MR. SPELLBERG:  Lack of foundation.
5        You may answer.                          09:35:43
6        THE DEPONENT:  Yes.  And that's addressed
7 in the rebuttal report.
8    Q.   (By Mr. Tidrick)  Did you take any steps
9 to assess the reliability or the validity of the
10 APC data?                                      09:36:07
11   A.   No.
12   Q.   Have you ever ridden a transit vehicle
13 and tracked the openings of the doors?
14   A.   No.
15   Q.   Is there any reason that you wouldn't    09:36:48
16 have been able to take steps to assess whether the
17 time stamps generated by the APC technology
18 accurately reflects the times when vehicles arrive
19 at divisions?
20   A.   I wasn't asked to do that.              09:37:11
21   Q.   Is there any reason that you couldn't do
22 that?
23       MR. SPELLBERG:  Vague and ambiguous.
24       You may answer.
25       THE DEPONENT:  I don't think I could have  09:37:29

Page 42

1 validated the information that we use because it    09:37:33
2 spans back to 2009.  So sitting here today, I'd be
3 unable to validate information from 2009 forward.
4 I mean -- so I -- I wouldn't be able to validate
5 history, to -- to my knowledge.                  09:37:46
6    Q.   (By Mr. Tidrick)  You are relying on the
7 information going back to 2009, correct?
8    A.   I'm using that information to prepare my
9 analysis.
10   Q.   Is there any reason, at the present time,  09:38:03
11 you couldn't take steps to assess whether the APC
12 technology is accurately recording the time when
13 the transit vehicle pulls into the division?
14   A.   Again, I have not been asked to do that.
15   Q.   Is there any reason that you couldn't do   09:38:21
16 that?
17       MR. SPELLBERG:  Lack of foundation.
18 Vague and ambiguous.
19       THE DEPONENT:  Well, the client may not
20 want me to do that.                              09:38:30
21   Q.   (By Mr. Tidrick)  Any other reason?
22   A.   They may not pay for me to do that.  I
23 might not have the access to be able to do that.
24   Q.   Any other reasons?
25   A.   Not that I know of that are within        09:38:39

Page 43

1 reason.                                         09:38:44
2    Q.   Do you know specifically what the
3 automatic passenger counters measure?
4    A.   We discussed what I know about the APC
5 data, and what I used was the time stamp associated  09:39:16
6 with that information.
7    Q.   Do you have any understanding whether --
8 when a transit vehicle has a door open before it
9 pulls into the division, how that door opening is
10 recorded?                                       09:39:56
11       MR. SPELLBERG:  I'm going to object.
12 It's vague and ambiguous about a door open.
13       Only answer if you understand what's
14 being requested.
15       THE DEPONENT:  And I'm sorry, I do not     09:40:06
16 understand what you're asking me.
17   Q.   (By Mr. Tidrick)  Well, let's go back to
18 page 7 of Exhibit 101, your initial report.
19       You make the statement "the APC data
20 records when a vehicle's door opens at each stop,   09:40:20
21 and when the vehicle's door opens at a division."
22       Do you have any understanding, one way or
23 the other, what the APC counter does if the door
24 opens sometime between the last stop and the
25 division?                                       09:40:58

Page 44

1        MR. SPELLBERG:  That's an incomplete       09:41:03
2 hypothetical.  You -- I'm not sure the witness has
3 the foundation.
4        But you may answer, if you're able.
5        THE DEPONENT:  I don't specifically know.   09:41:14
6 We were provided with a dataset that indicated the
7 date -- or the time stamp that was to believe -- or
8 was -- was indicated to be when a vehicle's door
9 opened at a division.
10   Q.   (By Mr. Tidrick)  Would it surprise you    09:41:37
11 to learn that there is some geographic area, beyond
12 the divisions, where if the transit vehicle door
13 opens that door opening is registered as being at
14 the division?
15       MR. SPELLBERG:  Objection.  Facts not in    09:42:02
16 evidence.  Lack of foundation.
17       You may answer.
18       THE DEPONENT:  I don't know if it would
19 be surprising one way or the other.  Again, we were
20 provided with a dataset that indicated the date --   09:42:14
21 or the time stamp for a vehicle door opening that
22 was believed to be at the division.
23   Q.   (By Mr. Tidrick)  Do you have any
24 understanding, one way or the other, whether when
25 the transit vehicle door opens, at some point       09:42:45

Page 45

12 (Pages 42 - 45)

1 between the last stop and the division, whether 09:42:49
2 that door opening is recorded as being at the
3 division?
4 MR. SPELLBERG: Objection. Facts not in
5 evidence. Incomplete hypothetical. Lack of 09:42:59
6 foundation.
7 You may answer, if you're able.
8 THE DEPONENT: I don't know if it would
9 be recorded as being open at the division, one way
10 or the other. 09:43:12
11 Q. (By Mr. Tidrick) Let me give you a
12 hypothetical.
13 Assume that there is some geographic
14 radius around the divisions, where if the transit
15 vehicle's door opens, that door opening and the 09:43:36
16 time of that door opening, registers as being at
17 the division.
18 How would that impact your conclusions?
19 MR. SPELLBERG: It's an incomplete
20 hypothetical. 09:43:53
21 THE DEPONENT: I don't know if it would,
22 one way or the other.
23 Q. (By Mr. Tidrick) What I don't understand
24 about your last answer is, if there's some
25 geographic radius beyond the division where the 09:44:36

---

1 door opening and the time of the door opening 09:44:40
2 registers as being at the division, it would seem
3 obvious that the time that you're assuming is the
4 time at the division is -- and would be biased in
5 only one direction and -- that is indicating that 09:45:18
6 the buses and trains are arriving at the divisions
7 earlier than they actually do; isn't that correct?
8 MR. SPELLBERG: Well, I'm going to
9 object. I mean, that's the whole reason that we
10 objected that it's an incomplete hypothetical. You 09:45:34
11 didn't include in your hypothetical that the door
12 failed to open at the division and wasn't recorded
13 at the division.
14 So the way you've asked the question,
15 it's ambiguous. And the witness has properly 09:45:44
16 answered.
17 You may answer again, but you're -- you
18 just -- all you're doing now is arguing with the
19 witness over a hypothetical that you provided
20 that's incomplete. 09:45:55
21 MR. TIDRICK: For the record, I would
22 request that there be no speaking objections that
23 lead the witness.
24 Q. (By Mr. Tidrick) Do you understand the
25 question? 09:46:10

---

1 MR. SPELLBERG: If you do, you may 09:46:14
2 answer. But please pay attention to my objection
3 as well.
4 THE DEPONENT: Well, what I heard you ask
5 is if a door opens somewhere around the division 09:46:24
6 and is recorded as being at the division -- and I
7 don't know whether or not that would be the case --
8 and you're suggesting that it's before somehow they
9 are at the division.
10 What I didn't hear you ask -- and -- and 09:46:48
11 you suggested that if that was the case, then the
12 on-time performance or the APC data would be biased
13 as being early.
14 What I didn't hear you say is if a
15 vehicle arrives at a division and somehow doesn't 09:47:05
16 open its door until the vehicle is parked or -- or
17 something else, and then the door opens, that part
18 of the hypothetical was excluded by you. And in
19 that case, the time stamp could be later than when
20 a vehicle arrives at a division. 09:47:31
21 So the time stamp at the division is what
22 we relied on. When the door opened, I'm unsure.
23 But all I can state is that the time stamp, that
24 dataset that we were provided is what we relied on.
25 MR. SPELLBERG: Can we take a break 09:48:04

---

1 whenever you have a -- when you get to a convenient 09:48:06
2 spot.
3 MR. TIDRICK: Yes, within the next couple
4 minutes.
5 MR. SPELLBERG: Yeah, no hurry. 09:48:12
6 Q. (By Mr. Tidrick) With respect to the
7 statement in your initial report, Exhibit 101, that
8 "the APC data records when a vehicle's door opens
9 at each stop, and when the vehicle's door opens at
10 a division," if, in fact, that statement is 09:48:46
11 inaccurate, do you believe that presents problems
12 for your analysis?
13 MR. SPELLBERG: Vague and ambiguous.
14 Incomplete hypothetical.
15 You may answer, if you're able. 09:48:56
16 THE DEPONENT: The description may be
17 simplified. The -- again, the data that we were
18 provided -- the dataset that we were provided
19 indicates when a vehicle has arrived at a division.
20 That's what we used to rely on for our APC and 09:49:23
21 on-time performance analysis.
22 Q. (By Mr. Tidrick) Do you have any
23 understanding that it's possible to ascertain the
24 exact location where a transit vehicle was when the
25 door opens? 09:49:40

---

| | |
|---|---|
| 1    A.  I don't know.                     09:49:41 | 1        THE VIDEOGRAPHER:  We're going off the     09:52:38 |
| 2    Q.  If you could, please, turn to | 2    record at 9:52 a.m.  This is the end of Media 1. |
| 3  Exhibit A2.2 to your report -- your initial report, | 3        (Recess taken.) |
| 4  Exhibit 101. | 4        THE VIDEOGRAPHER:  We're on the record at |
| 5        MR. SPELLBERG:  A2.2?              09:50:23 | 5    9:59 a.m.  This is the beginning of Media 2 in the    09:59:10 |
| 6        MR. TIDRICK:  A2.2.  Page 2 of 4. | 6    deposition of Mary Furst. |
| 7    Q.  (By Mr. Tidrick)  Near the top it should | 7    Q.  (By Mr. Tidrick)  In your initial report, |
| 8  indicate "From August 27, 2012 to October 27, 2015 | 8    Exhibit 101, page 6, section V -- Roman |
| 9  - Mumtaz Ahmad." | 9    numeral V -- capital letter B, you express the |
| 10       Page 2 of 4.  Are you on the same page?    09:50:45 | 10   opinion, and I quote, "Selected operators that end    09:59:41 |
| 11   A.  Yes. | 11   at a division are early and on-time more often than |
| 12   Q.  Looking at the row that reflects the date | 12   late." |
| 13 8/20/2013, the very first row on this page, do you | 13       That is your opinion, correct? |
| 14 have any understanding where Mr. Ahmad's bus was | 14   A.  Yes. |
| 15 when the door opened?                    09:51:08 | 15   Q.  The selected operators refers to the        10:00:02 |
| 16       MR. SPELLBERG:  Vague and ambiguous as to | 16   19 operators whose names appear at Exhibit A2; is |
| 17 which door opening. | 17   that correct? |
| 18       You may answer. | 18   A.  It was not limited to -- the list was not |
| 19       THE DEPONENT:  Are you asking for the | 19   limited to this, but the information or the opinion |
| 20 exact location?  It's my understanding that it's    09:51:19 | 20   is based on this set.  As you can see in note (A),    10:01:05 |
| 21 the Kirkland Garage. | 21   there were 20 operators in total that we did not |
| 22   Q.  (By Mr. Tidrick)  Other than saying | 22   have matching APC data for. |
| 23 somewhere at the Kirkland Garage, are you able to | 23   Q.  Did you do anything to account for the |
| 24 say with any more precision than that? | 24   individuals for whom there was no matching APC |
| 25   A.  No.                               09:51:31 | 25   data?                                  10:01:44 |
|                                      Page 50 |                                      Page 52 |
| 1    Q.  If I were to show you a map of the     09:51:36 | 1    A.  No.                              10:01:53 |
| 2  Kirkland division and the surrounding area, would | 2    Q.  So you did not include operators for whom |
| 3  you be able to tell me the specific geographic area | 3    there was no APC data, correct? |
| 4  where a door opening would register as being at the | 4    A.  No, because the information is strictly |
| 5  division?                               09:51:49 | 5    based on AC -- APC data.  So if there is none,    10:02:16 |
| 6    A.  No. | 6    there's nothing to include. |
| 7    Q.  Your opinion with respect to on-time | 7    Q.  When you say the "information," do I |
| 8  performance of defendants' vehicles is limited only | 8    understand you to say your opinions are based on |
| 9  to vehicles that are equipped with automatic | 9    the APC data, correct? |
| 10 passenger counters, correct?             09:52:05 | 10   A.  It's based on a comparison of the APC       10:02:32 |
| 11   A.  That's what our analysis is, yes. | 11   data and the payroll data.  So we combined those |
| 12   Q.  Which is about 20 percent of the fleet | 12   records, along with range reports, to determine |
| 13 currently, correct? | 13   whether or not operators arrived early, on time or |
| 14       MR. SPELLBERG:  Objection.  Misstates her | 14   late.  So it was a combination of -- of various |
| 15 testimony.                              09:52:19 | 15   sources of data that was used to create           10:02:59 |
| 16       THE DEPONENT:  I understand it to be | 16   Exhibit 2 -- A2. |
| 17 30 percent of the fleet, but I don't know for sure. | 17   Q.  The 20 operators that you based your |
| 18   Q.  (By Mr. Tidrick)  Your opinion with | 18   analysis on, how were those 20 operators selected? |
| 19 respect to on-time performance of defendants' | 19   A.  All right.  I think it was 19 that show |
| 20 vehicle is limited only to instances in which    09:52:25 | 20   up on Exhibit A2, if I counted correctly.          10:03:55 |
| 21 vehicles are pulling into a division; is that | 21       The operators were the deposed operators |
| 22 correct? | 22   and named plaintiffs. |
| 23   A.  That's correct. | 23   Q.  I asked about 20 operators because I |
| 24       MR. TIDRICK:  We can take a short break | 24   understood from one of your prior answers that you |
| 25 now.                                    09:52:36 | 25   actually had come up with a set of 20, but one of    10:04:29 |
|                                      Page 51 |                                      Page 53 |

Veritext Legal Solutions
866 299-5127

1 them there was no APC data.                    10:04:32
2       Did I understand that incorrectly?
3    A.  You understood that incorrectly, yes.
4    Q.  How many individuals did you exclude from
5 your analysis because there was no APC data for   10:04:49
6 them?
7    A.  Twenty.
8    Q.  Do I understand correctly there were
9 20 operators for whom there was no APC data and
10 19 operators for whom there was APC data?        10:05:13
11   A.  Correct.  So it was matching APC data
12 with the other data sources that we were comparing
13 it to.
14   Q.  Did you take any steps to ascertain
15 whether the 20 operators for whom there was no APC  10:05:36
16 data could fairly be represented by the 19 for
17 which there was APC data?
18   A.  We didn't make that representation one
19 way or the other.
20   Q.  Your analysis only covered the time frame  10:06:07
21 of August 27th, 2012 through October 27th, 2015,
22 correct?
23   A.  That's correct.
24   Q.  Why is that?
25   A.  Because of eMerge data.  So this analysis  10:06:20

Page 54

1 is extended to also look at unscheduled overtime   10:06:28
2 entries that are reflected on Exhibits A2-1
3 through, I think, 19.  So because we included a
4 comparison of whether or not when someone arrived
5 early, on time or late, if they also had          10:07:05
6 unscheduled overtime entries.
7    Q.  Did you match the scheduled times listed
8 in the GPS data to the scheduled ending times in
9 the range reports?
10   A.  What's the GPS data?                       10:07:20
11   Q.  Let -- let me restate that.
12       Did you match the scheduled times listed
13 in the APC data to the scheduled ending times in
14 the range reports?
15   A.  Yes.                                        10:07:33
16   Q.  How did you do that, if you weren't
17 provided range reports for the entire class period?
18   A.  We used the spring 2013 range report as a
19 proxy and that provided us with run numbers, and
20 then we compared that with the on time -- operator  10:08:17
21 work assignments to get, I think, the block
22 numbers, and the run numbers, and then the APC
23 data.
24   Q.  When you say that you used the spring
25 2013 range reports as a proxy, do I understand     10:08:38

Page 55

1 correctly one of your assumptions is that the      10:08:41
2 scheduled ending times in the time periods, before
3 and after spring 2013, are the same as what they
4 are in the spring 2013?
5    A.  Yes.                                        10:08:55
6    Q.  Do you have any understanding one way or
7 the other -- I'm showing you a document marked as
8 Plaintiff's Exhibit 103.
9        (Exhibit 103 was marked for identification by
10 the court reporter and is attached hereto.)        10:09:57
11   Q.  (By Mr. Tidrick)  I will represent to you
12 that Exhibit 103 is a printout of the work
13 assignment data that you produced sorted for one of
14 the operators, Joseph Cortez.
15       Do you recognize the format and columns     10:10:38
16 reflected in the Exhibit 103 document?
17   A.  I'm familiar with most of them.
18   Q.  Do you understand -- and I'm just going
19 to quickly go through the columns, what the column
20 that says "Date" reflects.                         10:11:06
21   A.  I assume that's the -- I'm not sure
22 what -- is this the operator work assignment
23 information?  So I assume it's the date that that
24 operator worked.
25   Q.  Do you understand what the column          10:11:22

Page 56

1 entitled, "Cap" reflects?                          10:11:25
2    A.  That, I don't know.
3    Q.  Do you understand what the column
4 entitled "Name" reflects?
5    A.  An operator name.                           10:11:36
6    Q.  Do you understand what the column
7 entitled "Assign Type" reflects?
8    A.  That would be the -- I'm not 100 percent
9 sure, because when I see absence, I'm -- I would
10 have thought that this was the operator work       10:12:01
11 assignment because there's some absences listed
12 here.  I'm not sure.
13   Q.  Do you understand what the column
14 entitled "History" represents?
15   A.  No.                                         10:12:14
16   Q.  Do you understand what the column
17 entitled "Piece" represents?
18   A.  The number of pieces on a run.
19   Q.  Do you understand what the column
20 entitled "Block" represents?                       10:12:24
21   A.  A vehicle reference.
22   Q.  Do you understand what the column
23 entitled "From" represents?
24   A.  I'm not sure.
25   Q.  Do you understand what the column          10:12:40

Page 57

15 (Pages 54 - 57)

1 entitled "To" represents?                          10:12:41
2     A.   I'm not sure.
3     Q.   Do you understand what the column
4 entitled "HRS" represents?
5     A.   In this situation, I'm not sure.          10:12:59
6     Q.   When you say "in this situation," are
7 there other situations where you would understand
8 what the column entitled "HRS" represents?
9     A.   Well, I think it's the -- if I look at
10 this just very quickly, it looks like the -- the    10:13:15
11 math between the from and to.  So it's the time in
12 between from and to.
13    Q.   Do you know what the column entitled
14 "Division" represents?
15    A.   Of the division that the run -- it should  10:13:28
16 have been the run was operated under.
17    Q.   Do you know what the column entitled
18 "DSW" represents?
19    A.   No.
20    Q.   Do you know what the column entitled "Run  10:13:42
21 Only" represents?
22    A.   I assume that's the run number of the
23 particular run on that particular day.
24    Q.   What fields in the operator work
25 assignment data were used to match to the automatic 10:13:59

1 passenger counter data?                             10:14:03
2     A.   I don't know exactly.  Stephen Cole did
3 that work.
4     Q.   What fields in the work assignment data
5 allow you to know what the starting location or the 10:14:34
6 ending location of a run is?
7     A.   I'm sorry.  What was your question?
8 In -- in what report?
9         MR. SPELLBERG:  Madam Court Reporter,
10 could you please read it back.                      10:14:51
11        (Record read as follows:
12        "QUESTION:  What fields in the work
13        assignment data allow you to know
14        what the starting location or the
15        ending location of a run is?")         10:14:53
16        THE DEPONENT:  It's going to be based on
17 the run number, which you have to refer back to the
18 range report.
19    Q.   (By Mr. Tidrick)  Turning back, please,
20 to Exhibit A2.2 of your initial report,             10:15:32
21 Exhibit 101, page 2 of 4.
22        MR. SPELLBERG:  Sorry.  A1.1?
23        MR. TIDRICK:  A2.2 --
24        MR. SPELLBERG:  A2.2.
25        MR. TIDRICK:  -- of Exhibit 101,            10:16:01

1 page 2 of 4.                                        10:16:02
2         MR. SPELLBERG:  Thank you.
3     Q.   (By Mr. Tidrick)  Referring to the column
4 entitled "Min (Early) or Date."
5         Do you see the column I'm referring to?    10:16:34
6     A.   Yes.
7     Q.   This data reflects that Mr. Ahmad arrived
8 at the division after the scheduled ending time of
9 the run on a number of dates from -- at least
10 August 20th, 2013, which is the first row, to a row 10:17:12
11 that's five from the bottom, January 30th, 2014.
12        Is that correct?
13    A.   Yes.
14    Q.   This Exhibit A2.2 document shows that APC
15 data indicates whether an operator worked beyond    10:17:52
16 his or her scheduled ending time; is that correct?
17    A.   I'm sorry.  What was your question again?
18        MR. TIDRICK:  Could you read it back,
19 please.
20        (Record read as follows:                   10:18:27
21        "QUESTION:  This Exhibit A2.2
22        document shows that APC data
23        indicates whether an operator worked
24        beyond his or her scheduled ending
25        time; is that correct?")               10:18:27

1         MR. SPELLBERG:  Vague and ambiguous.        10:18:28
2         You may answer.
3         THE DEPONENT:  The document compares the
4 scheduled time with the actual time and the
5 difference therein, along with the unscheduled      10:18:37
6 overtime entries.
7     Q.   (By Mr. Tidrick)  All of the instances
8 where the APC data reflects a positive number, that
9 indicates late, correct?
10    A.   That's correct.                            10:18:59
11    Q.   And it reflects a certain number of
12 minutes after the scheduled arrival time, correct?
13    A.   Yes.
14    Q.   It reflects that the operator's vehicle
15 pulled into the division some number of minutes     10:19:21
16 after the scheduled arrival time, correct?
17    A.   That's correct.  And it's based on the
18 actual minutes.
19    Q.   It's based on the what?
20    A.   The actual minute difference.              10:19:39
21    Q.   When you say the "actual minute
22 difference," what do you mean by "actual"?
23    A.   Well, we previously talked about this
24 concept of on time.  So this is not a minus 4 to
25 plus -- or minus one minute to plus four.  This is  10:19:52

16 (Pages 58 - 61)

1 the actual minutes late or the -- the actual 10:19:56
2 difference between the scheduled time and the
3 actual time.
4   Q. Understood.
5     Without treating certain number of 10:20:08
6 minutes early or late as being on time, correct?
7   A. Correct.
8   Q. Do you believe that APC data can provide
9 knowledge that an operator worked beyond his or her
10 scheduled ending time? 10:20:32
11   A. APC data as a time stamp, that's all we
12 relied on. Whether or not it provides any other
13 information, I don't know. I didn't rely on it for
14 anything but a time stamp.
15   Q. During the range of dates that I 10:20:54
16 mentioned from August 20th, 2013 to
17 January 30th, 2014, do I understand correctly, from
18 looking at your Exhibit A2.2 document, that there
19 was only one date for which Mumtaz Ahmad has a
20 unscheduled overtime entry? 10:21:24
21   A. That's correct.
22   Q. Do I understand correctly from your
23 Exhibit A.2 -- strike that.
24     Do I understand correctly from your
25 Exhibit A2.2 document that during the time frame 10:21:43

1 August 20th, 2013 to January 30th, 2014, there were 10:21:47
2 approximately 33 days in which Mumtaz Ahmad arrived
3 at his division after the scheduled ending time and
4 did not get paid for that extra driving time?
5   A. I didn't count, but 33 incidents of that, 10:22:19
6 there was an entry -- one entry for unscheduled
7 overtime between the scheduled time and the actual
8 time, per the documents that we reviewed.
9     In that particular instance, the
10 unscheduled overtime was in excess of the time that 10:22:41
11 is indicated as being late. So it's 9 minutes
12 late, 23 minutes of overtime.
13   Q. And the data reflects that the 33 days in
14 that time frame were days in which Mumtaz Ahmad
15 arrived late at the division and did not get paid 10:23:11
16 for that late time, correct?
17   A. Well, separate counting the 33 days to
18 validate that, I don't know. Assuming that's
19 correct, the number of incidents that -- and I
20 don't know if it's 32, really, because he did get 10:23:31
21 paid for one. So I don't know if you're counting
22 all of them.
23     But as far as I know, that's correct. He
24 was -- did not receive unscheduled overtime for
25 those instances where the actual time is greater 10:23:41

1 than the scheduled time. 10:23:48
2   Q. Turning back to page 6 of your initial
3 report, Exhibit 101, Roman numeral V, your
4 opinions, sub-point C, specifically, your
5 conclusion, and I quote, "In aggregate, operators 10:24:26
6 submit overtime slips for unscheduled overtime."
7     In rendering that opinion, how do you
8 define the phrase "in aggregate"?
9   A. I would define that as the total count of
10 unscheduled overtime entries that operators put in 10:25:17
11 for, as referred to and displayed on Exhibit B1.
12     And this is in response to what we
13 understand to be the allegations as operators don't
14 put in for unscheduled overtime. But we see
15 thousands of unscheduled overtime entries reflected 10:25:46
16 on Exhibit B1.
17   Q. I'm showing you a document previously
18 marked as Exhibit 11 to the Antonio deposition.
19     Are you familiar with this document?
20   A. No. 10:26:12
21   Q. Do you have any understanding what the
22 Antonio Exhibit 11 document is?
23   A. Well, it looks to be a "Transit Operator
24 Vehicle Log."
25   Q. Have you ever seen a document that looks 10:26:34

1 like the Exhibit 11 document from the Antonio 10:26:36
2 deposition?
3   A. No.
4   Q. There are various places in your report
5 where you refer to overtime slips. 10:27:01
6     Have you reviewed any overtime slips?
7   A. No.
8   Q. Is there any reason that you did not
9 review any overtime slips?
10   A. We relied on the overtime entries in the 10:27:22
11 payroll records. And I think we previously talked
12 about due -- it's really due to the voluminous
13 stacks and stacks of overtime slips, as we were
14 told.
15   Q. You never asked SFMTA to provide you with 10:27:55
16 any overtime slips; is that correct?
17   A. We had discussion about the overtime
18 slips during the settlement process. It was
19 essentially agreed at that time that we would not
20 look at overtime slips due to the voluminous nature 10:28:15
21 of them.
22   Q. When you say it was "agreed," who was
23 that agreement with?
24   A. It was a general -- I -- I don't know.
25 It was with counsel, essentially, which would be 10:28:24

1 Jon Rolnick.                          10:28:28
2    Q.  SFMTA's counsel?
3    A.  Yes.
4    Q.  If I could, please, refer you back to
5 Exhibit A2.2, page 2 of 4.  And as an example,     10:28:40
6 drawing your attention to the one day we were
7 discussing earlier where there's an entry for
8 unscheduled overtime, October 21st, 2013.
9       Do you see the row I'm referring to?
10   A.  Yes.                          10:29:24
11   Q.  I don't mean to be repetitive, but based
12 on what you said a few minutes ago, that you did
13 not look at any overtime slips, do I understand
14 correctly that for this date, October 21st, 2013,
15 that reflects that Mumtaz Ahmad has an entry of     10:29:49
16 unscheduled overtime for 23 minutes, you did not
17 look at the overtime slip that Mumtaz Ahmad
18 submitted that day; is that correct?
19   A.  That's correct.
20   Q.  Do you know, one way or the other, if     10:30:20
21 Mr. Ahmad actually submitted an overtime slip on
22 that date, or is it possible that there are entries
23 in the unscheduled overtime that do not correspond
24 with overtime slips?
25   A.  I don't know.                   10:30:40
                                        Page 66

1    Q.  Is it fair to say that if Mumtaz Ahmad     10:30:51
2 submitted an overtime slip on October 21st, 2013,
3 you don't know the reason why Mumtaz Ahmad
4 submitted the overtime slip, correct?
5    A.  That's correct.                 10:31:11
6    Q.  Do you understand that on
7 October 21st, 2013, Mumtaz Ahmad could have
8 submitted an overtime slip for some work activity,
9 other than arriving late at a division?
10   A.  Generally, yes.                 10:31:34
11   Q.  Your Exhibit A2.2 is designed to suggest
12 that when operators arrive late at their divisions
13 that they are submitting overtime cards sometimes
14 for arriving late at the divisions, correct?
15      MR. SPELLBERG:  Vague and ambiguous.     10:32:27
16 You may answer.
17      THE DEPONENT:  What was your question?
18 If --
19      MR. TIDRICK:  Madam Court Reporter.
20      (Record read as follows:          10:32:34
21      "QUESTION:  Your Exhibit A2.2 is
22      designed to suggest that when
23      operators arrive late at their
24      divisions that they are submitting
25      overtime cards sometimes for arriving     10:32:34
                                        Page 67

1       late at the divisions, correct?")     10:32:34
2       THE DEPONENT:  The schedule is designed
3 to simply compare the scheduled time to the actual
4 time, determine whether or not a vehicle arrived
5 early or late.  And then it also compares whether     10:33:07
6 or not there is an unscheduled overtime entry on
7 that date and indicates the number of minutes for
8 that date.  That's what it's designed to do, just
9 set forth the actual facts.
10   Q.  (By Mr. Tidrick)  What I'm trying to get     10:33:28
11 at is what the facts reflect.  Let me ask the
12 question this way.
13      You acknowledge that the column entitled
14 "Unscheduled OT Entered" can reflect an entry of
15 unscheduled overtime for work activities, other     10:33:45
16 than time that the operator is driving past their
17 scheduled arrival time, correct?
18   A.  Well, that's not the only thing it
19 reflects.  It's when the operator has an
20 unscheduled overtime entry.              10:34:12
21   Q.  For any reason, correct?
22   A.  That's correct.
23   Q.  So, for instance, if Mumtaz Ahmad spent
24 time in a meeting that day, the unscheduled
25 overtime entry could be reflecting that, for     10:34:32
                                        Page 68

1 October 21st, 2013, correct?             10:34:35
2    A.  Yes.
3    Q.  I'm showing you a document that was
4 previously marked as Exhibit 35, entitled
5 "San Francisco Municipal Transportation Agency,     10:35:13
6 SFMTA, Lacks Effective Controls Over Its Payroll
7 Process and Timekeeping System for Transit
8 Operators."
9       Have you ever seen this document before?
10   A.  I don't believe so.              10:35:31
11   Q.  Were you aware that the Office of the
12 Controller had conducted an audit regarding SFMTA's
13 payroll process and timekeeping system for transit
14 operators?
15   A.  I was -- I'm aware that a study was done.     10:36:00
16 I didn't know who it was done by.  I didn't know
17 when it was done.  But, yes, I -- I was aware that
18 a study was done for the controls over timekeeping.
19   Q.  And I understand that you haven't seen
20 the Exhibit 35 document before.  I'm going to refer     10:36:16
21 you to a couple pages in it simply to understand
22 what understanding you may or may not have about
23 some of the facts stated in it.
24      If you could, please, turn to page 12 of
25 the Exhibit 35 document.                 10:36:33
                                        Page 69

18 (Pages 66 - 69)

| | |
|---|---|
| 1  Near the bottom of page 12 of the          10:36:53 | 1  would that have caused you to believe that your          10:40:05 |
| 2  Exhibit 35 document, there's a statement, and it's | 2  analysis needed to look at the actual overtime |
| 3  below and to the right of the text that says, | 3  slips in order to be accurate? |
| 4  "Finding 1.3." | 4          MR. SPELLBERG:  Same objections. |
| 5          Specifically, the statement          10:37:05 | 5          You may answer.          10:40:21 |
| 6  "Forty-four percent of transit operators' | 6          THE DEPONENT:  I don't know because |
| 7  unscheduled overtime was not supported by overtime | 7  that -- your point assumes that the overtime slips |
| 8  slips.  The audit reviewed all unscheduled overtime | 8  are accurate and that the overtime is recorded |
| 9  at three of SFMTA's seven transit divisions for the | 9  appropriately, based on whatever an employee may |
| 10  pay period ending July 6, 2012, and could not          10:37:24 | 10  be entitled to, or an operator may be entitled to.          10:40:40 |
| 11  verify over 1,000 instances in unscheduled | 11  So I think it would be a far more detailed analysis |
| 12  overtime." | 12  than simply looking at an overtime slip and |
| 13          Is -- were you aware of any finding that | 13  comparing it to Trapeze. |
| 14  44 percent of transit operators' unscheduled | 14      Q.  But looking at the |
| 15  overtime was not supported by overtime slips?          10:37:59 | 15  overtime slips would be part of that analysis,          10:40:55 |
| 16      A.  No. | 16  correct? |
| 17      Q.  If you had known that, would that lead | 17      A.  It could be.  And so it's a far greater |
| 18  you to believe that it would be important to review | 18  analysis. |
| 19  the overtime slips in order to confirm that the | 19      Q.  At page 20 of the Office of the |
| 20  records in the Trapeze system actually matched the          10:38:24 | 20  Controller's audit, Exhibit 35, near the top of          10:41:07 |
| 21  content of the overtime slips? | 21  page 20, the Office of the Controller of the |
| 22          MR. SPELLBERG:  Objection.  Vague and | 22  City and County of San Francisco made the finding, |
| 23  ambiguous.  And it's also an incomplete | 23  and I quote, "Trapeze shows 1.23 million more hours |
| 24  hypothetical as the -- that one sentence has not | 24  than PPSD's payroll system." |
| 25  been explained or -- or explained what -- what the          10:38:41 | 25          Is that a fact that you were aware of?          10:41:31 |
| Page 70 | Page 72 |

| | |
|---|---|
| 1  finding actually is.          10:38:50 | 1      A.  No.          10:41:34 |
| 2          You may answer. | 2      Q.  Does the fact that -- strike that. |
| 3          THE DEPONENT:  All right.  Sorry.  The | 3          If you had been aware that the |
| 4  question again. | 4  City and County of San Francisco's Office of the |
| 5          (Record read as follows:          10:38:57 | 5  Controller had found that the Trapeze system showed          10:41:50 |
| 6          "QUESTION:  If you had known that, | 6  1.23 million more hours than PPSD's payroll system, |
| 7          would that lead you to believe that | 7  would that have caused you to believe that your |
| 8          it would be important to review the | 8  analysis needed to do more than look at the data |
| 9          overtime slips in order to confirm | 9  that you did? |
| 10          that the records in the Trapeze          10:38:57 | 10      A.  Well, if I continue reading on -- and,          10:42:07 |
| 11          system actually matched the content | 11  you know, your question is so narrow, I -- I |
| 12          of the overtime slips?") | 12  continue to read on.  It says, "According to SFMTA |
| 13          THE DEPONENT:  I'll have to say, not | 13  management, numerous factors could explain the |
| 14  necessarily, and for what purpose. | 14  variances" for the reporting. |
| 15      Q.  (By Mr. Tidrick)  If I could, please,          10:39:30 | 15          So there's -- there's much more          10:42:26 |
| 16  refer you to page 15 of the Exhibit 35 audit | 16  information that I would need than simply saying |
| 17  report.  There's four bullet points on that page, | 17  yes to your question.  I -- I would want to further |
| 18  and the third I will read. | 18  understand what could potentially be driving the |
| 19          It says, "A slip indicated 2 hours and | 19  differences between the two systems. |
| 20  3 minutes of overtime worked, but the Trapeze          10:39:44 | 20      Q.  What steps do you believe would be          10:42:45 |
| 21  report showed 1 hour and 22 minutes of overtime | 21  necessary to understand the differences between |
| 22  recorded." | 22  what the Trapeze system shows as far as hours |
| 23          That's a finding of the City and County | 23  worked and the payroll system? |
| 24  of San Francisco's Office of the Controller. | 24      A.  First, the conversation with the |
| 25          If that's a fact that you were aware of,          10:40:03 | 25  appropriate people in both departments, most          10:43:02 |
| Page 71 | Page 73 |

19 (Pages 70 - 73)

1 likely, both at SFMTA and also the Controller's    10:43:07
2 Office. Understand what Trapeze is showing and
3 what the payroll system is showing. Understand any
4 timing differences. Any kind of rec- --
5 reconciliation issues.    10:43:20
6      I -- to develop an audit program for you
7 at this point is -- is far more than I can really
8 articulate, as we sit here.
9      Q.  I understand that, before today, SFMTA
10 did not provide you with a copy of the Exhibit 35    10:43:38
11 report by the Office of the Controller.
12      But based on the findings that I've
13 brought to your attention today in that audit
14 report, do you believe that it is necessary to
15 compare overtime slips actually submitted by the    10:43:54
16 operators with the unscheduled overtime entries in
17 Trapeze, in order to ascertain whether operators
18 have actually submitted overtime slips?
19      MR. SPELLBERG:  Objection.  I think she
20 just answered that.    10:44:10
21 You may answer again.
22      THE DEPONENT:  And I'll say, I don't
23 know, because if -- if there's differences between
24 the documents and it -- earlier I think we looked
25 at that there are not always a overtime slip    10:44:25

Page 74

1 anyway.  Doing that comparison would still    10:44:28
2 potentially provide inaccurate conclusions.
3      Q.  (By Mr. Tidrick)  If I could, please,
4 refer you to your rebuttal report, which has been
5 marked as Exhibit 102, and specifically    10:44:47
6 attachment 5 to Exhibit 102.
7      Does that attachment 5 document identify
8 the documents and the data that you relied upon in
9 forming your opinions set forth in the rebuttal
10 report?    10:45:10
11      MR. SPELLBERG:  Wait a minute.  I'm going
12 to ask you to repeat it or read it back, once I've
13 got to attachment 5.
14      THE DEPONENT:  That is -- that should be
15 a listing of the data that we relied on to prepare    10:45:32
16 our analysis and opinions.
17      Q.  (By Mr. Tidrick)  Are there any other
18 documents or data that you reviewed, in forming
19 your opinions that are not listed in attachment 5?
20      A.  Not that I can think of.    10:45:56
21      Q.  If I could, please, turn to page 6 of
22 your rebuttal report, Exhibit 102.
23      Do I understand correctly that your
24 assignment was, and I quote, "Specifically, we have
25 been asked to provide rebuttal comments regarding    10:46:22

Page 75

1 Dr. Drogin's May 10, 2016 report.  We have been    10:46:27
2 asked to opine on Plaintiffs' and Dr. Drogin's
3 simple random sample and computations developed
4 therefore."
5      A.  Yes.    10:46:44
6      Q.  In connection with your rebuttal report,
7 did you perform any specific calculation regarding
8 the total number of instances in which operators
9 were late at divisions or relief points?
10      A.  No, just the -- I -- did I say that?    10:47:01
11      The total -- no, I don't have the total.
12 I only have the sample sets that we reported on.
13      Q.  Why did you not do a calculation of the
14 total?
15      A.  We weren't asked to.    10:47:19
16      Q.  In connection with your rebuttal report,
17 did you perform any specific calculation regarding
18 the total number of instances in which operators
19 submitted overtime slips?
20      A.  I do not believe so.    10:48:49
21      Q.  And why not?
22      A.  We may have -- it wasn't specific to our
23 assignment on the rebuttal report, I don't believe.
24 And we may have addressed it in the initial report.
25      I think we talked about this earlier in    10:49:13

Page 76

1 the deposition.    10:49:15
2      Q.  Other than what you've described earlier
3 today, is there any other calculation you've done
4 regarding that issue?
5      A.  Probably.  I did a lot of analysis during    10:49:33
6 the settlement process.
7      Q.  Is there any other analysis that you did,
8 that you can recall, on that issue?
9      A.  On the number of incidents that operators
10 put in unscheduled overtime?  To -- for the total,    10:49:55
11 it was limited to the eMerge dataset, and it would
12 be the count and the amount of overtime that was
13 submitted as unscheduled overtime for the operators
14 that are party to this class.  So we have a count
15 and an amount in total that was in eMerge.    10:50:20
16      Q.  You took no steps to assess whether any
17 of the unscheduled overtime reflected in the data
18 had any connection with time that operators spend
19 driving their vehicles after the scheduled ending
20 time, correct?    10:50:40
21      MR. SPELLBERG:  Objection.  Vague and
22 ambiguous.
23      You may answer, if you understand.
24      THE DEPONENT:  There is not a direct
25 correlation between the unscheduled overtime    10:50:56

Page 77

1 entries and the difference between the scheduled 10:50:58
2 and actual time that operators ended at a division.
3    Q.  (By Mr. Tidrick)  Have you performed any
4 specific calculation comparing the total number of
5 minutes in which operators operated their vehicle, 10:51:21
6 after the scheduled ending time, as compared with
7 the total number of minutes in which an operator
8 arrived early to the scheduled ending location?
9        THE DEPONENT:  I'm sorry.  I need that
10 one repeated as well.                10:51:39
11      (Record read as follows:
12      "QUESTION:  Have you performed any
13       specific calculation comparing the
14       total number of minutes in which
15       operators operated their vehicle,   10:51:40
16       after the scheduled ending time, as
17       compared with the total number of
18       minutes in which an operator arrived
19       early to the scheduled ending
20       location?")                  10:51:40
21      THE DEPONENT:  I'm sorry.  Can you
22 repeat -- can you restate that.  I'm not quite sure
23 what your question is.
24    Q.  (By Mr. Tidrick)  Let me ask you a
25 different question.                  10:52:16

Page 78

1        In your rebuttal report, when you discuss  10:52:19
2 on-time performance, are you using the same
3 definitions of early and on time that you used in
4 your initial report?
5    A.  Yes.  It's -- it's noted in the report.  10:52:31
6    Q.  At page 11 of your rebuttal report,
7 Exhibit 102, there's a statement about -- and I
8 quote -- "the actual population of 4,018 Operators
9 from July 2009 to the present."
10       Do I understand your -- your critique is  10:53:08
11 that you believe the class size is actually 4,018?
12    A.  I believe there's 4,018 operators that
13 were employed during that period, yes.
14    Q.  And do I understand you're making a
15 critique that the actual class size is 4,018?  10:53:26
16    A.  It's just a statement.  It's not a
17 critique.
18    Q.  Do I understand correctly your analysis
19 assumes that the class size is 4,018 operators?
20    A.  If the 4,018 operators is incorrect, I  10:54:10
21 guess we are assuming that.  I don't know where
22 that 4,018 comes from.  I assume it's a count of
23 all the operators.  I think it's all the unique
24 operator ID numbers that we had in our dataset.
25    Q.  If I could, please, I'd like to refer you  10:54:40

Page 79

1 to one of the declarations, the declaration of  10:54:41
2 Rochelle Larry.
3        (Exhibit 104 was marked for identification by
4 the court reporter and is attached hereto.)
5    Q.  (By Mr. Tidrick)  Your opinion is that  10:55:17
6 the declarations that operators signed, that
7 Dr. Drogin used in his analysis, are unreliable; is
8 that fair?
9    A.  They seemed to be, yes.
10    Q.  You believe they are biased?    10:55:31
11    A.  Yes.
12    Q.  If I could, please, refer you to your
13 rebuttal report at paragraph 21.
14       Do I understand correctly it's your
15 opinion that the sections of the operators'  10:56:21
16 declarations discussing start and travel time are
17 somehow biased?
18    A.  Are we referring to paragraph 21, because
19 that's "Start-Travel-Wait Time."
20       So are you just asking me a question  10:56:46
21 after you reference paragraph 21, just so I'm
22 clear?
23    Q.  Let me try to clarify.  And to do so, I'm
24 going to refer you to the declaration of
25 Rochelle Larry, Exhibit 104, paragraph 5.  And  10:57:01

Page 80

1 specifically, it's at page 2 of that declaration  10:57:13
2 from lines 19 through 21, I'd like to refer you to.
3        Do you understand that Rochelle Larry has
4 attested, under penalty of perjury, and I quote,
5 "Furthermore, each day that I have worked a run  10:57:27
6 that begins at a relief location, I have arrived at
7 the relief location an average of 30 minutes before
8 the scheduled time of the relief"?
9        You understand that Rochelle Larry is
10 attesting to that under penalty of perjury?  10:57:42
11    A.  Yes.
12    Q.  Let me give you a hypothetical.  Let's
13 say that an operator has worked only two days, and
14 on one day the operator arrived 6 minutes early and
15 on the other day the operator arrived 2 minutes  10:58:14
16 late.
17       Are you able to tell me what the average
18 of those two is?
19    A.  Sure.
20    Q.  What is the average?          10:58:25
21    A.  Without my calculator, I can't do math.
22 It's something slightly over one.
23    Q.  Let's work through the math.  Six minutes
24 early one day, let's call that negative 6.  And 2
25 minutes late on the second day, that's positive 2.  10:58:49

Page 81

1  A. I'm sorry. That was your example?          10:58:56
2  Q. Yes.
3  A. I don't even know what I had in my head.
4 Okay.
5  Q. So --                                       10:59:01
6  A. So I apologize for that.
7      MR. SPELLBERG: I'm still trying to
8 figure out where her one came from.
9      THE DEPONENT: Yeah, I don't know where
10 one came from.                                 10:59:04
11     MR. TIDRICK: It's all right.
12     THE DEPONENT: I'm -- I'm trying to focus
13 too hard.
14     MR. SPELLBERG: You really need your
15 calculator.                                    10:59:12
16     THE DEPONENT: I really need my
17 calculator.
18  Q. (By Mr. Tidrick) It's -- not to waste
19 time. You know, if you -- if you want a
20 calculator, you're welcome to use one, or feel free   10:59:16
21 to use scratch paper to write it out.
22     Six minutes early one day, 2 minutes late
23 the other day. So let's call 6 minutes early
24 negative 6 and 2 minutes late is positive 2.
25     Is it fair to say that the way you do the   10:59:40
Page 82

1 average is you add those two numbers together. So   10:59:42
2 it's negative 6, plus 2, is negative 4, correct?
3  A. Yes.
4  Q. And negative 4 divided by 2 is
5 negative 2, correct?                            10:59:58
6  A. Yes.
7  Q. And so the average of 6 minutes early one
8 day and 2 minutes late the other day, is negative
9 2, or in other words, 2 minutes early, correct?
10  A. I believe that's correct.                  11:00:15
11  Q. So is it fair to say that, in
12 mathematical terms, an average accounts for both
13 time that is early as well as time that is late?
14  A. Sure.
15  Q. Now, if I could please refer you to the   11:00:29
16 section of Rochelle Larry's declaration at
17 paragraph 17. It's the last page, page 4, at lines
18 13 through 17. And I'll read it out loud.
19     Rochelle Larry attests, and I quote, "As
20 a result, during the Covered Period, the average   11:01:05
21 amount of my 'routinely late' time for which
22 defendant has not paid me is approximately
23 45 minutes per day that I have operated a run that
24 ends at a relief location and 45 minutes per day
25 that I have operated a run that ends at a       11:01:26
Page 83

1 division."                                      11:01:28
2      You understand that Rochelle Larry has
3 attested to that, under penalty of perjury?
4  A. Yes.
5  Q. And you understand that Rochelle Larry   11:01:38
6 has provided the information that, specifically,
7 the average amount of Rochelle Larry's routinely
8 late time for which defendant has not paid
9 Rochelle Larry is approximately 45 minutes per day
10 that Rochelle Larry operated a run that ends at a   11:02:11
11 relief location and 45 minutes per day that
12 Rochelle Larry operated a run that ends at a
13 division.
14     You understand that?
15  A. That's what the statement says.           11:02:26
16  Q. Let me give you another mathematical
17 hypothetical.
18     Let's say that there are two days that
19 Rochelle Larry has driven, and on one of those days
20 Rochelle Larry arrived 2 minutes early and the   11:03:03
21 other day Rochelle Larry arrived 10 minutes late.
22     Is it possible for you to provide me what
23 the average of those two days is?
24     And, again, just mathematically,
25 2 minutes early, negative 2, 10 minutes late,   11:03:24
Page 84

1 positive 10.                                    11:03:30
2      Is it fair to say that the average of
3 that is you add those two numbers together,
4 negative 2 plus 10 is 8, positive 8, and you divide
5 8 by 2, to come up with an average of 4 minutes.   11:03:48
6      Is that correct?
7  A. I think so.
8  Q. Paragraph 25 of your rebuttal report,
9 which is at page 13 of Exhibit 102 -- the last
10 sentence of paragraph 25 says, "Proper           11:04:32
11 administration by a neutral party is necessary to
12 further eliminate biases."
13     What -- what is the basis for your belief
14 that proper administration by a neutral party is
15 necessary to eliminate biases?                  11:04:56
16  A. That statement is from Adrian Fleissig,
17 the coauthor of this report. He's administered a
18 variety of surveys and that is his opinion.
19  Q. Do I understand correctly from your last
20 answer, are there certain statements in this report   11:05:20
21 that you are not prepared to testify to?
22     That's one of them, correct?
23  A. I can tell you --
24     MR. SPELLBERG: Well, she -- she didn't
25 testify -- she didn't say she wouldn't testify to   11:05:32
Page 85

22 (Pages 82 - 85)

1  it.                                                11:05:35

2    Q.  (By Mr. Tidrick)  Other than this

3  statement in your rebuttal report that I just read,

4  in paragraph 25, are there other statements in this

5  report that you are not -- let -- let me ask the      11:05:55

6  question differently.

7        Plaintiffs' Exhibit 102 is a rebuttal

8  report that you have authored, correct?

9    A.  Coauthored with Adrian Fleissig, but yes.

10    Q.  Do you have expertise with respect to      11:06:33

11  everything that's in this report?

12    A.  No.

13    Q.  So is it fair to say that the statement,

14  "Proper administration by a neutral party is

15  necessary to further eliminate biases" -- you do     11:06:55

16  not have a basis for that statement, correct?

17    A.  I would say I have kind of general

18  comments regarding that.  Adrian being the -- the

19  statistician and the expert in statistical portions

20  of this report, I -- I would turn to him to address  11:07:28

21  the comments that specifically discuss the basis

22  for appropriate stratification of sample size or

23  expertise, as far as administering surveys and

24  obtaining statistically accurate information.

25    Q.  Do you have any understanding, either    11:08:15

Page 86

1  from conversations with Adrian Fleissig or -- or    11:08:18

2  otherwise, whether the statement "proper

3  administration" is referring to the collection of

4  declarations from class members?

5    A.  I don't think it's so much the collection  11:08:41

6  of information.  I think it's the format of

7  questions.  It's how you administer those

8  questions.  It's who administers those questions.

9        I think some of those comments are

10  brought out in paragraph 28, you know.  It's the    11:08:58

11  words that you ask.  It's how you ask them.  It's

12  who's asking those questions to make sure that you

13  get a complete and unbiased response.

14    Q.  You personally don't have the expertise

15  to assess that, correct?                    11:09:22

16    A.  I would turn to Adrian for additional

17  expertise in that regard.

18    Q.  Do you have some expertise to assess

19  that?

20    A.  I -- I do not administer surveys.  I      11:09:39

21  would say I -- I don't have the expertise.  I have

22  more general knowledge.

23    Q.  Do you have any general understanding

24  whether declarations can be used as evidence to

25  support damage calculations?              11:10:01

Page 87

1      MR. SPELLBERG:  Objection.  Overbroad.    11:10:03

2  Vague and ambiguous.  Incomplete hypothetical.

3      You may answer, if you're able.

4      THE DEPONENT:  I would think that if

5  they're done properly, they may be.  But it's a    11:10:14

6  very broad statement that you're making and so I --

7  I don't know.

8      The declarations that I've reviewed

9  certainly appear biased and don't provide the

10  responding party to accurately indicate comments   11:10:32

11  over a long period of time.

12    Q.  (By Mr. Tidrick)  Your critique that the

13  declarations are biased assumes that operators

14  didn't have the option of stating, for example,

15  that their vehicles were, on average, early; is     11:10:51

16  that correct?

17    A.  There's no indication that there's a

18  question asking whether or not they're early.  The

19  questions all appear to be leading.  When we

20  compare the results of the survey with the APC     11:11:11

21  data, they're so different that it would cause me

22  to question the accuracy of the responses, which is

23  set forth in the report, the rebuttal report.

24    Q.  Your critique that the survey -- strike

25  that.                                         11:11:37

Page 88

1      Your critique that the declarations are    11:11:39

2  biased assumes that operators are lying, correct?

3      MR. SPELLBERG:  Objection.

4  Argumentative.  Vague and ambiguous.

5      You may answer.                  11:11:54

6      THE DEPONENT:  It appears the responses

7  are not consistent with the actual data that we

8  have.

9    Q.  (By Mr. Tidrick)  Your statement that the

10  declarations are biased is incorrect if, in fact,   11:12:14

11  the operators are all telling the truth, correct?

12      MR. SPELLBERG:  Objection.

13  Argumentative.  Vague and ambiguous.

14      You may answer.

15      THE DEPONENT:  I -- I would just state     11:12:36

16  that the -- the information that we have -- the

17  actual arrival times at divisions compared to the

18  responses provided by the declarations are

19  inconsistent.

20    Q.  (By Mr. Tidrick)  So your analysis of     11:13:02

21  bias is limited to situations in which operators

22  are arriving at a division; is that correct?

23    A.  The comparison that we were able to do to

24  date at this point is arriving at a division,

25  that's correct.                           11:13:14

Page 89

23 (Pages 86 - 89)

1    Q.  And not for arrivals at relief points,      11:13:18
2  correct?
3    A.  That's correct.
4    Q.  And not with respect to the amount of
5  time that operators spend performing turning time      11:13:35
6  activities, correct?
7    A.  That's correct.  It's arriving at a
8  division, compared -- the schedule versus the
9  actual time arriving at a division.
10   Q.  And really, your evidence of bias is      11:13:55
11 limited to that particular circumstance, correct?
12       MR. SPELLBERG:  Object to the form of the
13 question --
14       THE DEPONENT:  What's your question?
15       MR. SPELLBERG:  -- "evidence of bias."      11:14:08
16       THE DEPONENT:  Evidence of bias.
17       MR. SPELLBERG:  Yeah, it's your opinion.
18   Q.  (By Mr. Tidrick)  Do you have any basis
19 for opining that the information in paragraph 5 of
20 Rochelle Larry's declaration is false?      11:14:51
21   A.  I have no evidence, but I think there's
22 still an indication of bias in the way that the
23 statement is set forth, and it -- it's because --
24 it says, "I have arrived at a relief location an
25 average of" -- fill in the blanks -- 30 minutes.      11:15:43

1  And it says before the scheduled time at the      11:15:45
2  relief.
3        So because the statement itself says
4  "before," there -- there's nothing that says,
5  you know, X percent of the time I arrive before.      11:15:58
6  X percent, I'm on time.  X percent, I'm late.
7        There's nothing in the question that
8  allows that option, and that's why we find these
9  questions to be biased, upwardly biased.
10   Q.  Do you have any reason to believe that an      11:16:24
11 operator couldn't strike out the word "before" and
12 write "after," or put a negative number in the line
13 before the word "minutes"?
14   A.  We didn't see one instance of that, even
15 though we saw instances of that in the actual data.      11:16:50
16 So whether or not an operator could have or would
17 have, we didn't see any evidence of that.
18   Q.  Isn't it possible that one explanation
19 for why you didn't see an instance of that is that
20 in all instances the average was, in fact, a      11:17:09
21 positive number?
22       MR. SPELLBERG:  Calls for speculation.
23       THE DEPONENT:  That could be.  But,
24 again, based on the evidence that we do have, it
25 suggests something different.      11:17:26

1    Q.  (By Mr. Tidrick)  So your opinion is that      11:17:33
2  some or all of the operators are lying in their
3  declarations that are signed under penalty of
4  perjury?
5    A.  Once again --      11:17:42
6        MR. SPELLBERG:  Objection.
7        THE DEPONENT:  Once again, it's a simple
8  comparison between actual APC data and the
9  scheduled arrival time versus the actual arrival
10 time and the -- the bias nature of the questions      11:17:58
11 and the responses that we've observed are
12 inconsistent.
13   Q.  (By Mr. Tidrick)  In Rochelle Larry's
14 declaration, Exhibit 104, paragraph 4, do you have
15 any reason to believe that any information in      11:18:15
16 paragraph 4 is false?
17   A.  I don't know one way or the other.  I
18 don't know if she was deposed or not.  I don't know
19 if she had to commute by her vehicle.  I -- and I
20 don't -- I don't know.  I don't have any evidence      11:18:49
21 one way or the other.
22   Q.  You do have the evidence of what
23 Rochelle Larry has attested to under penalty of
24 perjury, correct?
25   A.  I have her handwritten estimates of time.      11:19:11

1    Q.  With respect to paragraph 4, do you have      11:19:31
2  any reason to believe that any of the information
3  in paragraph 4 is false?
4        MR. SPELLBERG:  Didn't you just ask that?
5        Objection.  Asked and answered.      11:19:52
6        THE DEPONENT:  I thought -- I thought I
7  did answer that.
8    Q.  (By Mr. Tidrick)  I'm confused by your
9  statement about filling in minutes.
10        My impression from your answer to the      11:20:00
11 last question was that you didn't understand the
12 question.
13   A.  You asked a further question.  You asked
14 a second question, after I gave you my response.
15        And you said, doesn't the fact that      11:20:14
16 filling in minutes provide you with evidence about
17 paragraph 4.
18   Q.  Do you have any reason to believe that
19 any of the information in paragraph 6 is false?
20        MR. SPELLBERG:  Same objections.      11:21:02
21 Speculation.  Vague and ambiguous.
22        THE DEPONENT:  I don't have one comment
23 one way or the other.
24   Q.  (By Mr. Tidrick)  Do you have any reason
25 to believe that any of the information in      11:21:11

1 paragraph 7 is false?                    11:21:16
2         MR. SPELLBERG:  Same objection.
3         THE DEPONENT:  I believe that there is
4 indications that Rochelle Larry was paid overtime.
5 And what it's for and when it's for, I -- I don't    11:21:58
6 know.
7         I -- I would have to do a full analysis
8 of the payments that she received to confirm that
9 statement one way or the other.
10     Q.  (By Mr. Tidrick)  Have you done that    11:22:15
11 analysis?
12     A.  Not for Rochelle Larry, specifically.
13     Q.  With regard to any of the declarations
14 that have been provided by -- by operators, have
15 you done any analysis to assess the truthfulness of    11:22:35
16 the declarations?
17         MR. SPELLBERG:  Vague and ambiguous.
18         You may answer.
19         THE DEPONENT:  The analysis that we did
20 was comparing the times that are recorded in the    11:22:46
21 declarations that we received to the APC data that
22 we have.
23         So the other allegations or the other --
24 turn-in time, for instance -- I think the only
25 thing that we -- we can really have evidence for is    11:23:08

Page 94

1 the routinely late.  So the other allegations, we    11:23:14
2 have done analysis that suggest bias that are set
3 forth in the report in detail where we indicate
4 that the average minutes are typically in 5-minute
5 intervals and so forth.                    11:23:42
6     Q.  (By Mr. Tidrick)  The analysis that
7 you've done that you're referring to is limited to
8 the samples that you've previously identified,
9 correct?
10     A.  Which ones are you referring -- what    11:23:56
11 previously identified examples?
12         The -- the examples that are contained in
13 my rebuttal report and the initial report.
14     Q.  Are you aware of any evidence that any
15 operator signed his or her declaration under    11:24:14
16 duress?
17     A.  I don't know.
18     Q.  Are you aware of any evidence that any
19 operator was coerced into signing a declaration?
20     A.  I don't know.                    11:24:28
21     Q.  Are you aware of any evidence that the
22 operator did not understand what he or she was
23 signing?
24     A.  I don't know.
25     Q.  Do you have any evidence that any    11:24:35

Page 95

1 operator did not understand what penalty of perjury    11:24:37
2 means?
3     A.  I don't know.
4     Q.  Do you know what penalty of perjury
5 means?                    11:24:45
6     A.  Probably not.
7         MR. SPELLBERG:  I didn't expect that
8 answer.
9         THE DEPONENT:  Well, you know, I --
10 roughly, it's, you know, don't perjure yourself,    11:24:52
11 don't lie.  I don't know what the penalty is
12 exactly.  I've never perjured myself.
13     Q.  (By Mr. Tidrick)  I take it from your
14 answer that none of the lawyers had to explain that
15 to you, correct?                    11:25:06
16         MR. SPELLBERG:  Well, don't answer the
17 question.  My discussion with her is protected.
18         THE DEPONENT:  I'll just say, no comment.
19     Q.  (By Mr. Tidrick)  Do you recall how you
20 first learned what penalty of perjury means?    11:25:36
21     A.  Probably on Law and Order, or something
22 like that.
23     Q.  In paragraph 26 of your rebuttal report,
24 there's a discussion of surveys and a reference to
25 "A well-designed survey."                    11:25:57

Page 96

1         How do you define what a survey is?    11:26:05
2     A.  I need to refer back to Dr. Fleissig
3 again for an appropriate definition of the survey.
4     Q.  That's not a definition you're prepared
5 to provide today, correct?                    11:26:27
6     A.  That's correct.
7     Q.  Are you aware of any instances in which
8 affidavits submitted under penalty of perjury were
9 considered to be a survey?
10     A.  I don't know.                    11:26:50
11     Q.  Are you aware that the City and County of
12 San Francisco prosecutes employers whom it accuses
13 of wage theft?
14     A.  What --
15         MR. SPELLBERG:  Objection -- objection.    11:27:13
16 Lack of foundations.  Beyond the scope of this
17 witness's designation.
18     Q.  (By Mr. Tidrick)  Have you heard the
19 phrase "wage theft" before?
20     A.  Sure.                    11:27:23
21     Q.  Do you understand that there's an agency
22 within the City that prosecutes wage theft
23 occurring within the City and County of
24 San Francisco?
25     A.  No.                    11:27:36

Page 97

1      MR. SPELLBERG: Same -- same objections.    11:27:36
2      THE DEPONENT: No. Generally, that makes
3 sense, but I'm not aware of it.
4    Q. (By Mr. Tidrick) Do you have any
5 understanding whether declarations by workers is    11:27:46
6 ever used in connection with showing that employers
7 have submitted wage theft?
8      MR. SPELLBERG: Objection. She
9 doesn't even -- isn't even aware of the agency. So
10 there's no foundation.    11:28:06
11      You may answer.
12      THE DEPONENT: No.
13    Q. (By Mr. Tidrick) At page 16 of your
14 rebuttal report -- and you understand when I refer
15 to your rebuttal report, I'm referring to    11:28:19
16 Exhibit 102, correct?
17    A. Yes.
18    Q. At paragraphs 33 through 42, there's
19 discussion of stratified samples and, generally
20 speaking, a discussion about stratified samples    11:28:31
21 being necessary in this case.
22      Do you have any understanding for why a
23 stratified sample is necessary in this case?
24    A. Generally.
25    Q. What is that?    11:28:44

Page 98

1    A. There's very different situations and    11:28:47
2 circumstances, along with different divisions, that
3 probably treat operators differently. So to
4 extrapolate the most accurately stratified sample
5 is probably a route to take.    11:29:11
6    Q. You believe the class should be
7 stratified according to division?
8    A. I would turn to Dr. Fleissig to come up
9 with appropriate stratification of samples.
10    Q. Fair to say that that's not something    11:29:30
11 you're prepared to testify to today?
12    A. That's correct.
13    Q. Do you have any basis for believing that
14 stratification would be helpful for all of
15 plaintiffs' claims?    11:29:44
16    A. I just have a general opinion it probably
17 would be.
18    Q. Probably would be, but you're not
19 prepared to testify definitively one way or the
20 other, correct?    11:30:01
21    A. That's correct. We didn't go through the
22 process of stratifying to have any kind of data to
23 make that judgment.
24    Q. Do you believe that factors such as day
25 of the week, time of day, run assignment,    11:30:22

Page 99

1 seasonality are -- are all axes according to which    11:30:27
2 you would stratify the class?
3    A. They could be considerations for
4 stratification.
5    Q. Do you understand that one problem with    11:30:44
6 stratifying along multiple axes like that is that
7 individuals would then belong to multiple strata?
8    A. Understood.
9    Q. Is that a problem?
10    A. I don't know.    11:30:57
11    Q. Do you have an opinion as to whether
12 stratified samples always produce a more precise
13 estimate than a simple random sample?
14    A. I don't have an opinion one way or the
15 other.    11:31:15
16    Q. Do you have an opinion one way or the
17 other whether a simple random sample can produce a
18 more precise estimate than a stratified sample?
19    A. A more precise. I don't have an opinion
20 one way or the other.    11:31:25
21    Q. At -- do you have any reason to believe,
22 one way or another, whether statisticians generally
23 recommend for or against the use of a simple random
24 approach?
25      MR. SPELLBERG: It's -- I'm going to    11:31:53

Page 100

1 object. Vague and ambiguous as to -- it's an    11:31:54
2 incomplete hypothetical.
3      You may answer, if you're able.
4      THE DEPONENT: Do I have any opinion    11:32:03
5 regarding that? I'm sorry. I --
6      MR. TIDRICK: Madam Court Reporter.
7      THE DEPONENT: Yeah.
8      (Record read as follows:
9      "QUESTION: At -- do you have any
10      reason to believe one way or another    11:32:06
11      whether statisticians generally
12      recommend for or against the use of a
13      simple random approach?")
14      THE DEPONENT: Well, per my discussions
15 with Dr. Fleissig, he advised me that statisticians    11:32:25
16 prefer not to use simple random samples, but I
17 don't know for certain. I -- I would defer to him.
18    Q. (By Mr. Tidrick) Do you have any basis
19 for opining that Dr. Drogin's sample does not
20 represent the class in this case?    11:32:51
21    A. Do I have any opinions whether or not it
22 does?
23      Yes. That's what's set forth in the
24 rebuttal report.
25    Q. Other than what's in the rebuttal report,    11:33:12

Page 101

26 (Pages 98 - 101)

1 do you have any basis for saying that Dr. Drogin's  11:33:14
2 sample does not represent the class?
3      A.  Hopefully, we were exhaustive enough in
4 the rebuttal report that we touched upon the key
5 elements that we believe form the basis for why the  11:33:27
6 random sample is -- is not appropriate, and the
7 results of that sample as well.
8      Q.  Has any damage estimate been prepared by
9 anyone for the defendants, that you're aware of,
10 using a stratified sample?  11:33:52
11      A.  Is that the end of your question?
12      Q.  Uh-huh.
13      A.  Sorry.
14         No.
15      Q.  Why not?  11:34:07
16      A.  I don't know.
17      Q.  How can you make a recommendation that a
18 stratified sample should be used without performing
19 any testing to see if the results of a stratified
20 sample would be any different from a simple random  11:34:19
21 sample?
22      A.  I think those opinions and comments are
23 set forth in the report.  Again, they're
24 Dr. Fleissig's comments, and his opinions and
25 rationale for that.  11:34:33

Page 102

1      Q.  Are there any reasons you're aware of  11:34:34
2 that are not set forth in your reports?
3      A.  No.
4      Q.  Generally speaking, you would expect any
5 well-conducted sample to provide details concerning  11:34:46
6 confidence intervals and margins of error?
7      A.  Would I consider any samples to include
8 that?
9      Q.  Generally speaking, would you expect any
10 well-conducted sample to provide details regarding  11:35:06
11 confidence intervals and margins of errors?
12      A.  Yes.
13      Q.  Why is that?
14      A.  I don't know exactly.  I -- again, I turn
15 to Dr. Fleissig for the specifics in that regard.  11:35:16
16      Q.  If confidence intervals and margins of
17 error results are not provided for, for a
18 particular sample, do you believe that it is
19 appropriate to extrapolate the sample results to
20 the population?  11:35:45
21      A.  I don't know.
22      Q.  At page 19 of your rebuttal report,
23 there's a discussion of average arrival times at
24 divisions.
25         How did you match the APC data to the  11:36:00

Page 103

1 work assignment data?  11:36:03
2      A.  I think we discussed that already.  We
3 used the range report, the operator work
4 assignment, and the APC data.
5      Q.  In -- why did you compare the APC data  11:36:18
6 for selected periods of the operators to their
7 response, rather than all of the APC data for a
8 particular operator?
9      A.  I'm not sure why we did the analysis the
10 way we did.  We -- I guess I'm not 100 percent  11:36:45
11 clear on what you're asking.
12         I think for demonstration purposes the
13 sample that we used was appropriate.
14      Q.  Let me try to rephrase.
15         For any given operator that you did  11:37:08
16 examine data for, is there a reason that you looked
17 only for certain grades of time rather than for all
18 of the time for which there is APC data for that
19 operator?
20      A.  There's no specific reason for that.  11:37:24
21      Q.  You could have, correct?
22      A.  I believe we could have, yes.
23      Q.  One example -- Rochelle Larry, who -- who
24 you discuss at page 19 of your rebuttal report --
25 you state at page 19 of your rebuttal report that  11:37:38

Page 104

1 she had 1,063 run assignments from July 16th, 2009  11:37:42
2 to September 29th, 2014; is that correct?
3      A.  Yes.
4      Q.  However, when you performed a comparative
5 analysis of her responses in her declaration, you  11:37:58
6 looked only at APC data from the time period
7 April 3rd, 2013 to November 21st, 2013, correct?
8      A.  Correct.
9      Q.  Why did you look only at the APC data for
10 that time period?  11:38:18
11      A.  Because we were -- I think we were using
12 the spring -- well, it had to be beyond the spring
13 report.  I'm not sure.
14      Q.  Is that the --
15      A.  I'm not sure.  There was no specific  11:38:28
16 reason we didn't look at all the data.  It's just
17 time-consuming.  So for demonstration purposes, we
18 used the period that is being described.
19      Q.  Do you think it would have been more
20 accurate to use all of the APC data that exists for  11:38:44
21 Ms. Larry, in order to perform the comparative
22 analysis that you did?
23      A.  I don't know.
24      Q.  It's fair to say that you can't really
25 know that one way or the other, unless you did the  11:39:01

Page 105

27 (Pages 102 - 105)

1 full analysis, correct? 11:39:05
2 A. Correct.
3 Q. At page 21 of your rebuttal report, at
4 paragraph 44, you make a statement, and I quote,
5 "These Operator average minutes late estimates are 11:39:13
6 not even feasible as it is impossible for an
7 average to be larger than the maximum late time."
8 I just want to make sure I understand,
9 the basis for that statement is the analysis of the
10 APC data that you performed? 11:39:34
11 A. That's correct.
12 Q. The analysis of the APC data that you
13 performed that's described in your rebuttal report,
14 correct?
15 A. For each of the individuals listed, yes. 11:39:43
16 Q. At page 22 of your report, at your
17 table 2 -- actually, further down the page -- let
18 me ask a different question.
19 In table 2, is there a reason that you
20 didn't analyze the total number of minutes that 11:40:36
21 operators were late and didn't get paid for that
22 time?
23 A. That wasn't the purpose of the chart.
24 Q. What was the purpose of the chart?
25 A. The purpose of the chart is to display an 11:41:10

Page 106

1 example of Dr. Drogin's weighted average versus the 11:41:14
2 APC weighted average time that we had from the
3 sample that we developed that's described in the
4 report.
5 Q. Would it have been possible for you to 11:41:44
6 perform an analysis that looks specifically to the
7 number of the minutes that operators were late and
8 were not paid for that time?
9 A. We could have done a different analysis
10 and listed the assumptions used to develop that 11:42:10
11 analysis.
12 Q. Is there a reason that you didn't?
13 A. We weren't asked to do that. And the
14 information that is displayed in the rebuttal
15 report is specific to the elements that are 11:42:28
16 described in the report. We didn't come up with a
17 damage calculation. We didn't do that.
18 Q. Why did you not come up with a damage
19 calculation?
20 A. Because there's -- we are rebutting 11:42:44
21 Drogin's report and, specifically, the elements
22 that were used to -- that he used to calculate
23 damages, and we found the information to be biased,
24 upwardly biased, overstated. It's kind of garbage
25 in/garbage out, so we didn't go through the process 11:43:11

Page 107

1 of recalculating any amounts. 11:43:16
2 We discussed the issues with the
3 responses from the declarations received. And
4 that's what the report states, the rebuttal report
5 purpose, and that's what we describe in the report. 11:43:29
6 Q. Have you ever done an analysis of the
7 amount of damages that operators have suffered in
8 this case?
9 A. We've done some calculations in the --
10 during the settlement process of potential damages. 11:43:45
11 Q. What is your estimate of the potential
12 damage that the operators have suffered?
13 A. I don't know.
14 Q. Do you have any understanding of that?
15 A. No. We never refined those numbers. 11:44:04
16 They were for settlement purposes.
17 Q. Can you recall approximately what
18 conclusions you've reached about the total amount
19 of damages that operators have suffered?
20 MR. SPELLBERG: Well, I'm going to 11:44:20
21 instruct her not to answer. That was done as part
22 of the settlement process, so it's protected from
23 any discovery under Federal Rule of Evidence 408.
24 So I'm instructing the witness not to answer.
25 Q. (By Mr. Tidrick) Outside of the 11:44:41

Page 108

1 settlement process, have you ever done any analysis 11:44:42
2 of that?
3 MR. SPELLBERG: I'm going to instruct the
4 witness again not to answer. She's been designated
5 to testify about the items in her two reports. 11:44:48
6 Feel free to question about those at length, but
7 anything outside of that, and that certainly anything
8 that would impinge upon the settlement effort, is
9 protected. So I'm instructing her not to answer
10 again. 11:45:05
11 Q. (By Mr. Tidrick) Why do you believe that
12 cable car operators should be included in the
13 calculation for start-travel-wait time?
14 A. Okay. I don't know, specifically. But
15 if there's -- 11:45:26
16 MR. SPELLBERG: Do you know what he's
17 referring to because I don't. And you shouldn't
18 answer unless --
19 MR. YOUNG: Page 25 of your report.
20 THE DEPONENT: Yup. I'll -- I'll state 11:45:33
21 that why should there be some inclusion of them --
22 and I'll refer to page 25, paragraph 53, point B --
23 that we saw runs that cable car operators worked
24 had relief points. So there's 1,259 runs where
25 cable car operates started at relief points. 11:46:21

Page 109

1    Q. (By Mr. Tidrick)  Do you understand that,    11:46:23
2  in this case, cable car operators are not making
3  claims for start travel time?
4    A.  I'm not sure if I know that.
5        MR. SPELLBERG:  We --    11:46:38
6    Q. (By Mr. Tidrick)  I'll --
7        MR. SPELLBERG:  We object to facts not in
8  evidence.
9    Q. (By Mr. Tidrick)  Assume -- assume that
10  cable car operators are not making claims for start    11:46:44
11  travel time.
12        Making that assumption, you agree that an
13  N/A response should not be treated as a zero,
14  correct?
15        MR. SPELLBERG:  Objection.  Incomplete    11:47:03
16  hypothetical about what's being proved.
17        You may answer, if you're able.
18        THE DEPONENT:  I'm going to say, in the
19  instances of the 1,259 runs, I would want to
20  double-check to confirm that those runs were for    11:47:21
21  cable car runs, and that those operators somehow
22  didn't work on other vehicles, so I -- I'm not
23  certain.  I understand your point, but I'm not
24  certain.
25    Q. (By Mr. Tidrick)  For an operator who's    11:47:52

Page 110

1  not making a claim for start travel time, you would    11:47:54
2  agree that an N/A response should not be treated as
3  a zero, correct?
4    A.  I don't know.
5    Q.  Are you aware of any kind of statistical    11:48:08
6  practice of taking an N/A response and treating
7  that as a numerical zero response?
8        MR. SPELLBERG:  Vague and ambiguous.
9  Overbroad.
10        THE DEPONENT:  I don't know.  And, in    11:48:33
11  part, I would defer to Dr. Fleissig in this.  So
12  when there's nonresponses, they must be addressed.
13  And how they are addressed, I would have to take a
14  look at the responses and confirm that they should
15  be included in in-- or excluded.    11:48:59
16    Q. (By Mr. Tidrick)  You did not take any
17  steps to analyze for those operators who gave N/A
18  responses to assess whether those N/A responses
19  should be treated as zeros or not, based on actual
20  data?    11:49:25
21        You didn't do any kind of analysis like
22  that, correct?
23    A.  Well, that's not true.  We did look at
24  the fact that the runs started at relief locations.
25    Q.  Anything else?    11:49:43

Page 111

1    A.  I don't know.  I would have to defer to    11:49:44
2  Stephen Cole, who is looking at the details.
3    Q.  Did Stephen Cole perform the calculations
4  for the reports?
5    A.  For the most part, yes, under my    11:50:06
6  supervision.
7    Q.  Is Stephen Cole planning to testify at
8  trial?
9    A.  I'll say that's up to counsel.  I don't
10  know.    11:50:22
11    Q.  Is it your intention to get further
12  information for Stephen Cole before testifying at
13  trial?
14        MR. SPELLBERG:  I'm sorry.  The question
15  is incomprehensible as asked.  I think you    11:50:41
16  misspoke.
17        THE DEPONENT:  I'm not sure what your
18  question is.
19    Q. (By Mr. Tidrick)  Is there any
20  information that you don't already have that you    11:50:56
21  intend to ask Stephen Cole for in order to be able
22  to testify at trial?
23    A.  Any further analysis that we might do?
24  Possibly, yes.  And -- and what is it, I don't
25  know.  It depends on discussions with counsel.    11:51:14

Page 112

1    Q.  At pages 57 to 58 of your rebuttal    11:51:19
2  report --
3    A.  I'm sorry.  My --
4    Q.  I apologize.  I mean paragraphs 57 to
5  58 --    11:51:32
6    A.  Oh, okay.
7    Q.  -- refer to the analysis you did in those
8  paragraphs.
9        Is there a reason that you didn't perform
10  your analysis across the responses from all of the    11:51:45
11  operators in the sample?
12    A.  No.  There is for illustration purposes.
13  This isn't a hard-and-fast number.
14    Q.  You could have performed that analysis,
15  correct?    11:52:09
16    A.  I believe so, yes.
17    Q.  At paragraph 59 to 60, there's a
18  discussion of the distribution of the sample versus
19  the total population.
20        Why do you use the number 4,018 as the    11:52:39
21  number of operators for performing your analysis?
22    A.  Again, that was, I believe, the count of
23  all the operators that were working runs during the
24  class period.
25    Q.  At page 27, paragraph 61, discussion of    11:53:04

Page 113

29 (Pages 110 - 113)

1 operators putting in for unscheduled overtime, do    11:53:08
2 you have any basis for believing that operators
3 submit overtime cards for being late to a division?
4     A.  I'm sorry.  Do I have any -- I missed
5 that first part.                                      11:53:38
6     Q.  Let me ask the question differently.
7     A.  Okay.
8     Q.  Do you have any reason to believe that
9 operators submit overtime cards for time that they
10 spend operating transit vehicles after the           11:53:53
11 scheduled arrival time?
12     A.  Do I have a belief that they submit
13 overtime?
14     Q.  Do you have a reason for that belief?
15     Well, let's start with, do you believe         11:54:03
16 that operators submit overtime cards for time that
17 they spend driving vehicles after the scheduled
18 arrival time?
19     A.  Yes.
20     Q.  What is the basis for your belief?          11:54:14
21     A.  The entries within the payroll system for
22 unscheduled overtime.
23     Q.  You understand, though, that the entries
24 that you have reviewed have no indication of the
25 reason that the overtime was claimed, correct?       11:54:28

---

1     A.  That's correct.  When we look at certain     11:54:32
2 operators, I think it is fair to say that they're
3 putting in for working beyond the scheduled time.
4 And when we see 10 minutes per -- per day for
5 certain operators, it seems to indicate that it's    11:54:53
6 likely for a time worked beyond the scheduled time.
7     Q.  That is an assumption that you're making,
8 though, correct?
9     A.  That's correct.
10     Q.  At paragraph 61, you make the statement      11:55:08
11 that if an operator had some late times on the APC
12 records, but was paid overtime for all of those
13 minutes, then the operator was compensated.
14     You agree that based on your model in
15 Exhibit 6, that if there is no overtime paid on       11:55:31
16 instances in which an operator had some late times,
17 then that operator was not compensated for that
18 time?
19     A.  I'm sorry.  When you talked about
20 schedule 6, I got distracted and missed part of       11:55:48
21 your question.  So I need to understand what the
22 question is again.
23     Q.  And you just said schedule 6.  I'm
24 referring to what you've labeled Exhibit 6.
25     A.  Okay.  Which -- yeah, I understand that.      11:56:04

---

1     MR. TIDRICK:  And, again, just for a             11:56:06
2 clear record, we're talking about Exhibit 6 of
3 Exhibit 102 -- I apologize.  I -- I mean
4 Exhibit 4 of Exhibit 102.  There's so many exhibit
5 numbers -- and, actually, we're near the end of the   11:56:23
6 tape so let's -- if you could, just for the sake of
7 time, find Exhibit 4.  We'll go off the record
8 briefly so the tape can be changed.
9     THE DEPONENT:  Okay.  I have it.
10     THE VIDEOGRAPHER:  We're going off the          11:56:36
11 record at 11:56 a.m.  This is the end of Media 2.
12     (Recess taken.)
13     THE VIDEOGRAPHER:  We're on the record at
14 11:59 a.m.  This is the beginning of Media 3 in the
15 deposition of Mary Furst.                            12:00:03
16     Q.  (By Mr. Tidrick)  Actually, if you could
17 flip ahead, please, to page 28 of your rebuttal
18 report, Exhibit 102.
19     MR. SPELLBERG:  To where?  I'm sorry.
20 What page?                                           12:00:16
21     MR. TIDRICK:  Page 28, at paragraph 62 to
22 63, there's a discussion of the sample nonresponse
23 rate.
24     Q.  (By Mr. Tidrick)  Do you have an opinion
25 as to what an adequate nonresponse rate for a         12:00:32

---

1 sample is?                                           12:00:35
2     A.  I don't.
3     Q.  And specifically in this case, do you
4 believe what an adequate nonresponse rate for the
5 sample would be?                                      12:00:48
6     A.  I don't.
7     Q.  Do you have any reason to believe, one
8 way or another, whether an 80 percent nonresponse
9 rate would be adequate for the sample in this case?
10     A.  I don't.                                     12:01:00
11     Q.  Do you understand that Dr. Drogin
12 calculated damages based upon individuals who were
13 in the work assignment data, annual payroll data
14 and whose work assignment data could be matched to
15 a range report?                                       12:01:22
16     A.  Along with them providing a response to
17 the declaration, yes, complete response to the
18 declaration.  So he eliminated those that did not
19 provide complete responses, I understand.
20     Q.  If an operator does not fit the criteria     12:01:42
21 just described, specifically for individuals for
22 whom there is no work assignment data or payroll
23 data, or for whom the work assignment data could
24 not be matched to a range report, you understand
25 that those individuals are not included in           12:02:06

---

Veritext Legal Solutions
866 299-5127

1 Dr. Drogin's damages calculations? 12:02:11
2    A. I understand that, yes.
3    Q. Do you have an opinion, one way or the
4 other, whether operators for whom there is not work
5 assignment data should have been included in the 12:02:23
6 sample results?
7    A. I don't have an opinion. I mean, it
8 seems appropriate that they're not included, since
9 there is no information for them.
10    Q. Do you believe that operators whose run 12:02:39
11 numbers are in the work assignment data, but who
12 could not be matched to runs in the range reports,
13 should be included in the sample results?
14    A. That, I don't know. I want to inquire
15 about why we could not find those files. 12:02:53
16    Q. Assuming that, based on the data that
17 exists, that it is not possible to match the
18 operators whose run numbers are in the work
19 assignment data to runs in the range reports, you
20 agree that assuming that it's not possible, that 12:03:27
21 they should be excluded from the sample results?
22    A. No, I don't -- I don't agree with that.
23    Q. Why is that?
24    A. Because I don't know why they would not
25 be able to be matched. But if they've got 12:03:43

1 responses to the declaration, that should be 12:03:49
2 incorporated somehow for some anomaly of runs, I
3 think there needs to be some consideration for
4 those particular operators and those responses.
5    Q. Do you have a definitive opinion as to 12:04:10
6 those situations in which -- specifically which
7 operators should have been included that were not
8 included?
9    A. No.
10    Q. Assuming that these groups of people -- 12:04:21
11 and by "these groups" I'm referring to people
12 who -- for whom there is no work assignment data or
13 whose work assignment data could not be matched to
14 a range report -- assuming that those groups were
15 properly excluded, would you agree that the 12:04:40
16 nonresponse rate would be adequate?
17    A. I don't know.
18    Q. Do you have an opinion, one way or the
19 other, whether a nonresponse rate of 10 percent or
20 less would be acceptable? 12:04:59
21    A. I don't know. I would refer to
22 Dr. Fleissig for his opinion.
23    Q. With respect to page 31 of your rebuttal
24 report, at paragraphs 72 to 76, there's a
25 discussion of examples of time added by Dr. Drogin 12:05:25

1 to these runs. 12:05:29
2    Do you have any understanding, one way or
3 the other, why Dr. Drogin added travel time between
4 the first piece and the second piece of a two-part
5 run? 12:05:43
6    A. Subsequent to this report, I know that
7 Stephen Cole sat in Dr. Drogin's recent deposition
8 and learned that there is impact, not travel time,
9 being added in those instance -- instances. So the
10 report -- the comments on page 31 are incorrect, 12:06:03
11 and they misunderstood what Dr. Drogin did in his
12 computations.
13    Q. And when you say the comments at page 31,
14 you're referring to paragraphs 72 through 76?
15    A. I -- I believe that's correct. I didn't 12:06:35
16 necessarily identify the -- the paragraphs that
17 were -- incorrectly at -- stated Dr. Drogin's
18 computations, but they certainly had to do with the
19 travel time in between the end of piece one and the
20 start of piece two. So they're inaccurate 12:06:53
21 statements and are inaccurate assumptions by us.
22    Q. At paragraph 72 through 76?
23    A. Again, without fully reading those
24 paragraphs, I can't say for certain. But it seems
25 to be within that heading. And that would 12:07:10

1 include -- I guess 77 isn't an opinion one way or 12:07:14
2 the other. It's just an identifier.
3    Q. In order to perform the analysis that you
4 did perform, you were able to analyze some details
5 of Dr. Drogin's computations; is that correct? 12:07:31
6    A. Yes.
7    Q. You reviewed Dr. Drogin's report,
8 correct?
9    A. Yes.
10    Q. You're aware that Dr. Drogin specifically 12:07:43
11 did not include travel time between the first piece
12 and the second of a two-part run?
13    A. I'm aware of that now.
14    Q. At page 35 of your rebuttal report, if I
15 could, please, draw your attention to paragraph 86. 12:08:03
16 It's at page 36 of your rebuttal report.
17    You state, and I quote, "It seems
18 unlikely that an operator would wait 20+ minutes at
19 a relief location that is no more than a four
20 minute walk from the division." 12:08:22
21    Did you study whether it was, in fact,
22 "unlikely"?
23    A. No.
24    Q. At paragraph 91, you state, and I quote,
25 "Dr. Drogin has wrongfully assumed that on average 12:08:52

1 Operator's arrive 20 minutes before starting their          12:08:58
2 run from a relief location that was two blocks or
3 less from a division."
4          Did you study whether that assumption
5 that you're describing is correct or incorrect?          12:09:19
6      A.   No.  It's common sense.
7      Q.   At page 38, paragraph 93, footnote 14,
8 when you set on time to be zero -- and when I say
9 that, I'm referring to the phrase if on time is set
10 to zero -- when you set on time to zero, how did          12:10:12
11 you calculate on time?
12      A.   If they arrived when their scheduled
13 arrival time was indicated.  So if they were to
14 arrive at 2:00 o'clock and they arrived at
15 2:00 o'clock, we measured that as being on time.          12:10:32
16      Q.   In other words, not using a definition
17 where there's some buffer plus or minus the amount,
18 but actually anything -- treating anything that's,
19 in fact, some amount of time after the scheduled
20 time to be not on time, correct?          12:10:52
21          MR. SPELLBERG:  Do you understand the
22 question?
23          THE DEPONENT:  I lost -- I lost the
24 on times.
25      Q.   (By Mr. Tidrick)  Can you explain the          12:11:07
                                                   Page 122

1 example -- for example, if an operator arrives          12:11:08
2 59 seconds after his or her scheduled ending time,
3 would that count as being on time or late?
4      A.   I believe that would be counted as late.
5      Q.   Referring to paragraph 94 --          12:11:32
6      A.   One second.  I just want to make sure
7 that I've given you a correct response.  So I'm
8 referring to footnote 14 and the second half of
9 that footnote.
10      Q.   Understood.          12:11:54
11      A.   Okay.  Yeah.
12      Q.   The part of the discussion where you say
13 if on time is set to zero.
14      A.   Yes.  Yeah.  I just want to make sure
15 that's clear.          12:12:06
16      Q.   At paragraph 94 -- do you have any
17 understanding, if you were to review and analyze
18 the overtime slips, what you could do to assess
19 whether an operator has submitted an overtime slip
20 for turn-in time?          12:12:31
21          MR. SPELLBERG:  Vague and ambiguous.
22 Incomplete hypothetical.
23          THE DEPONENT:  I -- I don't know.  I have
24 not reviewed those slips.
25      Q.   (By Mr. Tidrick)  At paragraph 96, you          12:12:44
                                                   Page 123

1 make the statement that 81% are in increments of          12:12:46
2 5 minutes which is unlikely to match actual data."
3          Did you have actual data to perform any
4 analysis to confirm whether that statement is
5 correct or not?          12:13:10
6      A.   Yes.  We didn't do that, but we have the
7 information that's set forth in charts, and it
8 could easily be done.
9      Q.   But you, in fact, did not do that
10 analysis, correct?          12:13:25
11      A.   Correct.
12      Q.   At page 39, paragraphs -- well,
13 specifically, paragraph 101 and footnote 15 that is
14 on the following page -- there's a reference in
15 footnote 15 to a "snapshot of sample data."          12:13:50
16          Specifically, what data was provided to
17 you that you're referring to there?
18      A.   It was a chart that Jason Lee provided to
19 us, which was also part of the explanation for the
20 APC data.          12:14:13
21      Q.   Is there a reason that that data is not
22 listed in the list of documents that you reviewed?
23      A.   Not specifically.
24      Q.   Is that a document that you still have?
25      A.   Yes.  And we talked about the same          12:14:34
                                                   Page 124

1 document earlier today.          12:14:37
2      Q.   This is the memo -- the approximately
3 three- or four-page memo?
4      A.   Yes.
5      Q.   So that memo makes some reference to          12:14:54
6 data; is that correct?
7      A.   It makes a reference to a snapshot of
8 relief point data.
9      Q.   And did you actually look at the
10 underlying data that memo that Jason Lee          12:15:18
11 provided to you refers to?
12      A.   We looked at some of that information and
13 we have not completed our review of APC data at
14 relief points.
15      Q.   Is there anything that's set -- that's          12:15:41
16 not set forth in your reports that you've formed
17 opinions about, based on further review of the APC
18 data?
19      A.   I'm not sure what you're asking me.
20          Did -- did we do other work on the APC          12:16:02
21 data that we haven't stated opinion --
22      Q.   Well --
23      A.   -- for?  I mean, what are you asking me?
24      Q.   When you say "We have not completed our
25 review of APC data relief points," are you planning          12:16:10
                                                   Page 125

1 to do further review of APC data relief points? 12:16:14
2 A. Sure. If instructed by counsel, yes.
3 Q. At this point, you've not done such a
4 review, correct?
5 A. That's correct. It -- it's incomplete. 12:16:24
6 Q. At this point in time, you're not
7 planning to do such a review, correct?
8 A. That's correct, unless we're instructed.
9 Q. At page 40, paragraph 104, there's a
10 discussion of "Offsets Not Addressed by 12:16:40
11 Dr. Drogin." That's how you titled that paragraph,
12 that section.
13 With respect to paragraph 104, is it fair
14 to say that you did not perform any calculations of
15 potential offsets? 12:16:58
16 A. Yes, we have not -- we have not done a
17 calculation of damages.
18 Q. Nor of offsets, correct?
19 A. Of offsetting time, that's correct.
20 Q. Are there any other offsets that you have 12:17:23
21 identified or that you're aware of, other than what
22 is listed in paragraph 104?
23 A. Not as I sit here right now.
24 Q. The --
25 /////
Page 126

1 (Exhibit 105 was marked for identification by 12:17:52
2 the court reporter and is attached hereto.)
3 Q. (By Mr. Tidrick) The paragraph -- sorry,
4 strike that.
5 The document marked as Plaintiffs' 12:18:03
6 Exhibit 105, you signed this declaration, correct?
7 A. Yes.
8 Q. Did you draft this declaration?
9 A. I definitely wrote a fair amount of it,
10 yes. 12:18:21
11 Q. Other parts of it was drafted for you,
12 correct?
13 MR. SPELLBERG: Kind of misstates --
14 misstates facts.
15 THE DEPONENT: Counsel drafted part of 12:18:38
16 this declaration.
17 Q. (By Mr. Tidrick) Were you concerned that
18 parts that counsel drafted were biased?
19 MR. SPELLBERG: Vague and ambiguous.
20 You may answer. 12:18:53
21 THE DEPONENT: No, I -- I confirm that
22 the information that was stated is accurate.
23 Q. (By Mr. Tidrick) Are you concerned that
24 any of the information you've received from SFMTA
25 is biased? 12:19:12
Page 127

1 A. No. 12:19:17
2 Q. Why not?
3 A. Because of the -- last couple years
4 of -- of dealing with SFMTA and getting an
5 understanding of the different information and 12:19:33
6 documents that were available. Based on the
7 discussions with the individuals that I had, I -- I
8 had no sense that there was a bias that was
9 conveyed to me.
10 Q. Have you ever interviewed any of the 12:19:54
11 operators?
12 A. No.
13 Q. Do you believe that interviewing the
14 operators would have put you in a better position
15 to assess whether they are truthful or biased? 12:20:15
16 MR. SPELLBERG: Calls for speculation.
17 THE DEPONENT: I -- yeah, I don't know.
18 It would certainly give me a better sense of their
19 comments -- and how they match up with the
20 documents that I've been provided. 12:20:36
21 Q. (By Mr. Tidrick) Paragraph 19 of
22 Exhibit 105, you make a statement that you believe
23 "that Dr. Drogin used Fortran software to compute
24 damages," and that "Fortran is not one of the
25 current common file types or extensions that 12:20:53
Page 128

1 experts use to transmit data." 12:20:54
2 That's what you believe, correct?
3 A. Yes.
4 Q. Are you aware that the files that
5 Dr. Drogin produced to you actually are text files? 12:21:08
6 MR. SPELLBERG: Objection. Lack of
7 foundation.
8 You may answer.
9 THE DEPONENT: I think, eventually, yes.
10 There are text files that are in a form that is 12:21:22
11 simply different than what we typically receive
12 these days.
13 Q. (By Mr. Tidrick) And text files --
14 that's also referred to as .txt, correct?
15 That's how you refer to text files in 12:21:41
16 paragraph 19 of your declaration?
17 A. That's my understanding, yes.
18 Q. And if I understand your paragraph 19
19 accurately, you -- you believe that text files is
20 one of the common file types that experts use to 12:21:51
21 transmit data, correct?
22 A. Well, none of the file types that we were
23 provided had the .txt extension. And when we tried
24 to pull data into various types of software -- and
25 I reached out to our IT expert and others -- the -- 12:22:12
Page 129

33 (Pages 126 - 129)

| 1 | the information that we were given was such that it | 12:22:21 |

1 the information that we were given was such that it 12:22:21
2 did not come through in any typical manner that was
3 up-loadable in a regular fashion.
4     So these days files are just set up
5 differently -- or most files that we received. And 12:22:45
6 the files we received from Dr. Drogin were
7 certainly in a format that was challenging to
8 upload into systems that we typically use.
9     Q.  You understand now, though, that they are
10 text files, correct? 12:23:01
11     A.  I think so.  I -- I'll have to say --
12     MR. SPELLBERG:  Well, objection.  Lack of
13 foundation.
14     THE DEPONENT:  Yeah.
15     MR. SPELLBERG:  If -- if you know, you 12:23:11
16 can say.
17     THE DEPONENT:  I'm not exactly sure.
18 I've -- I've relied on my IT people to work with
19 the files.
20     Q.  (By Mr. Tidrick)  Have you confirmed with 12:23:27
21 your IT people -- people that the files Dr. Drogin
22 produced were, in fact, text files?
23     A.  I have not.
24     MR. TIDRICK:  At this point in time,
25 we'll suspend the deposition to be reconvened at a 12:24:31

1 mutually convenient time. 12:24:36
2     THE VIDEOGRAPHER:  Okay.  We're going off
3 the record at 12:24 p.m., and this concludes
4 today's testimony given by Mary Furst.  The total
5 number of media used was three and will be retained 12:24:45
6 by Veritext, LLC.
7     (TIME NOTED:  12:24 p.m.)
8
9
10
11
12         ---o0o---
13
14
15
16
17
18
19
20
21
22
23
24
25

1     I, Rebecca L. Romano, a Certified Shorthand
2 Reporter of the State of California, do hereby certify:
3     That the foregoing proceedings were taken before me
4 at the time and place herein set forth; that any
5 witnesses in the foregoing proceedings, prior to
6 testifying, were administered an oath; that a record of
7 the proceedings was made by me using machine shorthand
8 which was thereafter transcribed under my direction;
9 that the foregoing transcript is true record of the
10 testimony given.
11     Further, that if the foregoing pertains to the
12 original transcript of a deposition in a Federal Case,
13 before completion of the proceedings, review of the
14 transcript [ ] was [ ] was not requested.
15     I further certify I am neither financially
16 interested in the action nor a relative or employee of
17 any attorney or any party to this action.
18     IN WITNESS WHEREOF, I have this date subscribed my
19 name.
20
21 Dated: July 19, 2016
22
23
24         Rebecca L. Romano, RPR,
25         CSR. No 12546

34 (Pages 130 - 132)

**1**

**1** 1:25 10:16,18 32:5
32:6,8,9 33:5 52:2
71:21
**1,000** 70:11
**1,063** 105:1
**1,259** 109:24 110:19
**1-20** 1:9 2:9
**1.23** 72:23 73:6
**1.3.** 70:4
**10** 76:1 84:21,25
85:1,4 115:4 119:19
**100** 4:13 6:5 9:19,23
10:1 57:8 104:10
**101** 4:19 6:5 9:15
10:15,18 11:9,13
17:15,16,20,21
18:17 19:9 20:5
28:21 29:3,19 33:25
37:9 38:13 44:18
49:7 50:4 52:8
59:21,25 64:3
124:13
**102** 4:21 6:5 9:16
18:14,18 19:10 75:5
75:6,22 79:7 85:9
86:7 98:16 116:3,4
116:18
**103** 5:4 56:8,9,12,16
**104** 5:6 80:3,25
92:14 126:9,13,22
**105** 5:9 127:1,6
128:22
**11** 5:17 20:11 64:18
64:22 65:1 79:6
**11:56** 116:11
**11:59** 116:14
**12** 11:17,25 69:24
70:1
**12-03704** 1:6 2:6
6:19
**1220** 2:18 6:16
**12546** 1:23 2:21
132:25

**127** 5:12
**12:24** 131:3,7
**13** 83:18 85:9
**132** 1:25
**14** 122:7 123:8
**15** 11:17,25 71:16
124:13,15
**16** 98:13
**16th** 105:1
**17** 20:11 83:17,18
**19** 52:16 53:19
54:10,16 55:3 81:2
103:22 104:24,25
128:21 129:16,18
132:21

**2**

**2** 5:7 30:24 50:6,10
52:5 53:16 59:21
60:1 66:5 71:19
81:1,15,24,25 82:22
82:24,24 83:2,4,5,8
83:9,9 84:20,25,25
85:4,5 106:17,19
116:11
**20** 11:23 41:4 51:12
52:21 53:17,18,23
53:25 54:9,15 72:19
72:21 121:18 122:1
**2009** 20:11 43:2,3,7
79:9 105:1
**2012** 20:11 21:2
50:8 54:21 70:10
**2013** 55:18,25 56:3
56:4 60:10 62:16
63:1 66:8,14 67:2,7
69:1 105:7,7
**2014** 60:11 62:17
63:1 105:2
**2015** 40:1 50:8
54:21
**2016** 1:18 2:19 6:1
6:10 9:22 10:8 21:3
76:1 132:21

**2039** 3:7
**20th** 60:10 62:16
63:1
**21** 80:13,18,21 81:2
106:3
**21st** 9:22 66:8,14
67:2,7 69:1 105:7
**22** 71:21 106:16
**23** 63:12 66:16
**2342044** 1:24
**25** 5:4 11:23 21:3
85:8,10 86:4 109:19
109:22
**26** 96:23
**27** 21:2 50:8,8
113:25
**27th** 54:21,21
**28** 87:10 116:17,21
**29th** 105:2
**2:00** 122:14,15

**3**

**3** 20:6 71:20 116:14
**30** 46:6 51:17 81:7
90:25
**300** 2:18 3:19
**308** 3:8
**30th** 60:11 62:17
63:1
**31** 119:23 120:10,13
**32** 63:20
**33** 63:2,5,13,17
98:18
**35** 5:19 16:9 69:4,20
69:25 70:2 71:16
72:20 74:10 121:14
**350** 3:18
**36** 121:16
**38** 122:7
**39** 124:12
**3rd** 105:7

**4**

**4** 28:21,23 29:16
31:17,18,19,19,20
31:22,24 32:7 33:6

**38:12** 50:6,10 59:21
60:1 61:24 66:5
83:2,4,17 85:5
92:14,16 93:1,3,17
116:4,7
**4,018** 79:8,11,12,15
79:19,20,22 113:20
**40** 33:19,21 126:9
**408** 108:23
**415** 3:21
**42** 98:18
**44** 70:14 106:4
**45** 83:23,24 84:9,11

**5**

**5** 4:17 5:12 11:8
17:19,21 75:6,7,13
75:19 80:25 90:19
95:4 124:2
**5/10/2016** 4:19
**510** 3:10
**53** 109:22
**56** 5:4
**57** 113:1,4
**58** 113:1,5
**59** 31:20 32:6
113:17 123:2
**5th** 9:12

**6**

**6** 4:17,19,23 29:18
52:8 64:2 70:10
75:21 81:14,24
82:23,24 83:2,7
93:19 115:15,20,23
115:24 116:2
**6/13/2016** 4:23
**60** 8:15 33:19
113:17
**61** 113:25 115:10
**62** 116:21
**63** 116:22
**64** 5:17
**678-3800** 3:21
**69** 5:19

| 7 |
| --- |
| **7**   33:24 37:8 41:10 44:18 94:1 |
| **72**   119:24 120:14,22 |
| **76**   119:24 120:14,22 |
| **77**   121:1 |
| **788-5100**   3:10 |
| **7th**   2:18 6:16 |

| 8 |
| --- |
| **8**   1:18 2:19 4:5 6:1 30:25 85:4,4,5 |
| **8/20/2013**   50:13 |
| **80**   5:7 117:8 |
| **81**   124:1 |
| **86**   121:15 |
| **8:18**   2:19 6:2,10 |
| **8th**   6:10 |

| 9 |
| --- |
| **9**   20:4 63:11 |
| **91**   121:24 |
| **93**   122:7 |
| **94**   123:5,16 |
| **94104**   3:20 |
| **94704**   3:9 |
| **96**   123:25 |
| **9:52**   52:2 |
| **9:59**   52:5 |

| a |
| --- |
| **a.2**   62:23 |
| **a.m.**   2:19 6:2,10 52:2,5 116:11,14 |
| **a1.1**   59:22 |
| **a2**   52:16 53:16,20 |
| **a2-1**   55:2 |
| **a2.2**   50:3,5 59:20,23 60:14,21 62:18,25 66:5 67:11,21 |
| **a2.2.**   50:6 59:24 |
| **able**   20:25 28:17 40:24 42:16 43:4,23 45:4 46:7 49:15 50:23 51:3 81:17 88:3 89:23 101:3 |

110:17 112:21
118:25 121:4
**absence**   57:9
**absences**   57:11
**ac**   53:5
**acceptable**   22:13
119:20
**access**   43:23
**account**   52:23
**accounts**   83:12
**accuracy**   88:22
**accurate**   41:13,16
41:18,19 72:3,8
86:24 105:20
127:22
**accurately**   23:5
42:18 43:12 88:10
99:4 129:19
**accuses**   97:12
**acknowledge**   68:13
**acquired**   11:3
**action**   5:11,12 13:6
13:6,7,9 132:16,17
**activities**   68:15 90:6
**activity**   67:8
**actual**   21:13 32:11
33:7,9 61:4,18,20
61:21,22 62:1,1,3
63:7,25 68:3,9 72:2
78:2 79:8,15 89:7
89:17 90:9 91:15
92:8,9 111:19 124:2
124:3
**add**   83:1 85:3
**added**   119:25 120:3
120:9
**addition**   37:10
**additional**   10:6
18:15 22:3 87:16
**address**   86:20
**addressed**   42:6
76:24 111:12,13
126:10
**addresses**   18:9,14

**adequate**   116:25
117:4,9 119:16
**administer**   87:7,20
**administered**   8:2
85:17 132:6
**administering**   86:23
**administers**   87:8
**administration**
85:11,14 86:14 87:3
**adrian**   85:16 86:9
86:18 87:1,16
**advised**   41:12
101:15
**affidavits**   97:8
**agencies**   15:25 16:6
16:11 30:22
**agency**   1:8 2:8 6:19
16:14 69:5 97:21
98:9
**aggregate**   29:23
30:5 64:5,8
**ago**   11:23 12:25
13:2 14:25 21:5
31:15 66:12
**agree**   6:21 110:12
111:2 115:14
118:20,22 119:15
**agreed**   65:19,22
**agreement**   65:23
**ahead**   116:17
**ahmad**   59:9 60:7
62:19 63:2,14 66:15
66:17,21 67:1,3,7
68:23
**ahmad's**   50:14
**al**   6:17,19
**allegations**   64:13
94:23 95:1
**allow**   25:22 59:5,13
**allows**   91:8
**alternative**   33:3,15
**ambiguous**   18:3
20:15 21:17 26:2,23
28:5 36:4,14 42:23
43:18 44:12 47:15

49:13 50:16 61:1
67:15 70:23 77:22
88:2 89:4,13 93:21
94:17 101:1 111:8
123:21 127:19
**amount**   23:9,12
77:12,15 83:21 84:7
90:4 108:7,18
122:17,19 127:9
**amounts**   108:1
**analyses**   11:16,19
12:2,3,16 13:8
**analysis**   13:23 14:3
14:14,15 21:20
24:19 26:13 27:16
27:25 29:14 31:13
32:11 34:4 43:9
49:12,21 51:11
53:18 54:5,20,25
72:2,11,15,18 73:8
75:16 77:5,7 79:18
80:7 89:20 94:7,11
94:15,19 95:2,6
104:9 105:5,22
106:1,9,12 107:6,9
107:11 108:6 109:1
111:21 112:23
113:7,10,14,21
121:3 124:4,10
**analyze**   106:20
111:17 121:4
123:17
**annual**   117:13
**anomaly**   119:2
**answer**   12:6 18:24
20:16 21:8,18 22:16
24:3,6 26:3,24 28:6
36:15 42:5,24 44:13
45:4,17 46:7,24
47:17 48:2 49:15
50:18 61:2 67:16
71:2 72:5 74:21
77:23 85:20 88:3
89:5,14 93:7,10
94:18 96:8,14,16

98:11 101:3 108:21
108:24 109:4,9,18
110:17 127:20
129:8
**answered** 13:12
47:16 74:20 93:5
**answers** 18:20 53:24
**antonio** 5:17 64:18
64:22 65:1
**anyway** 75:1
**apc** 24:22 26:16
27:20 28:2 34:7,10
34:19,22 36:6,11,16
36:20 37:6,19 38:3
38:9,17 39:19 40:12
40:16 41:12 42:10
42:17 43:11 44:4,19
44:23 48:12 49:8,20
52:22,24 53:3,5,9
53:10 54:1,5,9,10
54:11,15,17 55:13
55:22 60:14,22 61:8
62:8,11 88:20 92:8
94:21 103:25 104:4
104:5,7,18 105:6,9
105:20 106:10,12
107:2 115:11
124:20 125:13,17
125:20,25 126:1
**apologize** 82:6
113:4 116:3
**appear** 52:16 88:9
88:19
**appearances** 3:1
**appears** 89:6
**approach** 100:24
101:13
**appropriate** 31:8,10
31:12 73:25 86:22
97:3 99:9 102:6
103:19 104:13
118:8
**appropriately** 72:9
**approved** 37:1

**approximate** 11:18
**approximately** 8:14
8:18 10:24 11:25
12:24 15:11 33:21
39:14,24 63:2 83:22
84:9 108:17 125:2
**april** 105:7
**area** 45:11 51:2,3
**arguing** 47:18
**argumentative**
27:13 89:4,13
**arrival** 26:17 31:22
33:7,9,23 61:12,16
68:17 89:17 92:9,9
103:23 114:11,18
122:13
**arrivals** 90:1
**arrive** 42:18 67:12
67:23 91:5 122:1,14
**arrived** 25:12,17,18
25:25 26:8 49:19
53:13 55:4 60:7
63:2,15 68:4 78:8
78:18 81:6,14,15
84:20,21 90:24
122:12,14
**arrives** 48:15,20
123:1
**arriving** 38:10 47:6
67:9,14,25 89:22,24
90:7,9
**articulate** 74:8
**ascertain** 49:23
54:14 74:17
**asked** 14:12 17:22
18:1,11 21:5 25:7
31:15 32:12 42:20
43:14 47:14 53:23
65:15 75:25 76:2,15
93:5,13,13 107:13
112:15
**asking** 22:12 25:16
39:7 44:16 50:19
80:20 87:12 88:18
104:11 125:19,23

**assert** 33:25
**assertions** 17:23
**assess** 22:1 23:4
42:9,16 43:11 77:16
87:15,18 94:15
111:18 123:18
128:15
**assign** 57:7
**assignment** 18:5
23:18 56:13,22
57:11 58:25 59:4,13
75:24 76:23 99:25
104:1,4 117:13,14
117:22,23 118:5,11
118:19 119:12,13
**assignments** 55:21
105:1
**associated** 44:5
**assume** 29:11 35:5
35:21,24 39:12
46:13 56:21,23
58:22 79:22 110:9,9
**assumed** 121:25
**assumes** 72:7 79:19
88:13 89:2
**assuming** 28:12,14
34:25 47:3 63:18
79:21 118:16,20
119:10,14
**assumption** 35:23
110:12 115:7 122:4
**assumptions** 56:1
107:10 120:21
**attached** 6:7 56:10
80:4 127:2
**attachment** 10:16
10:18 28:21,23
29:16 38:12 39:18
39:20 75:6,7,13,19
**attachments** 39:17
39:21,22
**attention** 48:2 66:6
74:13 121:15
**attested** 81:4 84:3
92:23

**attesting** 81:10
**attests** 83:19
**attorney** 3:17
132:17
**attorneys** 3:6
**audio** 6:20
**audit** 69:12 70:8
71:16 72:20 74:6,13
**august** 20:11 21:2
50:8 54:21 60:10
62:16 63:1
**authored** 38:18
39:10 86:8
**automatic** 34:5
35:15 36:1 40:21,25
44:3 51:9 58:25
**available** 27:23 28:8
128:6
**avenue** 3:7
**average** 81:7,17,20
83:1,7,12,20 84:7
84:23 85:2,5 88:15
90:25 91:20 95:4
103:23 106:5,7
107:1,2 121:25
**aware** 69:11,15,17
70:13 71:25 72:25
73:3 95:14,18,21
97:7,11 98:3,9
102:9 103:1 111:5
121:10,13 126:21
129:4
**axes** 100:1,6

| b |
| --- |

**b** 3:5 20:5 52:9
109:22
**b1** 64:11,16
**back** 19:5 24:8
35:19 43:2,7 44:17
59:10,17,19 60:18
64:2 66:4 75:12
97:2
**based** 21:20,23 22:4
34:5 38:8 52:20

53:5,8,10,17 59:16
61:17,19 66:11 72:9
74:12 91:24 111:19
115:14 117:12
118:16 125:17
128:6
**basis** 25:2 26:18,19
85:13 86:16,21
90:18 99:13 101:18
102:1,5 106:9 114:2
114:20
**beginning** 32:5 52:5
116:14
**begins** 81:6
**behalf** 1:4 2:4,16
13:17 14:11,15
**belief** 85:13 114:12
114:14,20
**believe** 9:11,11
12:12 14:12,18
15:13,22 18:9 19:24
22:17 26:21 30:10
31:7,21 32:1,9
35:13 37:25 38:6,20
40:1 41:19,23 42:2
45:7 49:11 62:8
69:10 70:18 71:7
72:1 73:7,20 74:14
76:20,23 79:11,12
80:10 83:10 91:10
92:15 93:2,18,25
94:3 99:6,24 100:21
101:10 102:5
103:18 104:22
109:11 113:16,22
114:8,15 117:4,7
118:10 120:15
123:4 128:13,22
129:2,19
**believed** 45:22
**believing** 99:13
114:2
**belong** 100:7
**berkeley** 1:17 2:18
3:9 6:1,16

**best** 18:25 40:8
**better** 128:14,18
**beyond** 45:11 46:25
60:15,24 62:9 97:16
105:12 115:3,6
**bias** 89:21 90:10,15
90:16,22 92:10 95:2
128:8
**biased** 41:24 42:3
47:4 48:12 80:10,17
88:9,13 89:2,10
91:9,9 107:23,24
127:18,25 128:15
**biases** 85:12,15
86:15
**billings** 10:7
**bit** 30:22
**black** 27:22 41:21
**blanks** 90:25
**block** 55:21 57:20
**blocks** 122:2
**bottom** 60:11 70:1
**break** 48:25 51:24
**briefly** 116:8
**broad** 88:6
**brought** 74:13 87:10
**buffer** 122:17
**bullet** 20:6,9 37:9
71:17
**bullets** 41:10
**bus** 36:2,2,12,12
50:14
**buses** 47:6

**c**

**c** 1:6 2:6 6:19 64:4
**cable** 109:12,23,25
110:2,10,21
**calculate** 107:22
122:11
**calculated** 117:12
**calculation** 19:13,18
19:22 20:3,12,25
21:6,12 23:21 24:11
25:5,9,21 26:7,20

27:7 76:7,13,17
77:3 78:4,13 107:17
107:19 109:13
126:17
**calculations** 16:10
21:23 24:19 26:11
32:18,22 33:1,3
87:25 108:9 112:3
118:1 126:14
**calculator** 81:21
82:15,17,20
**california** 1:2,17 2:2
2:18 3:9,20 6:1,16
14:4 132:2
**call** 81:24 82:23
**calls** 91:22 128:16
**cap** 57:1
**capacity** 13:18
15:23
**capital** 52:9
**caption** 6:17
**car** 109:12,23,25
110:2,10,21
**cards** 19:23,25 21:8
21:9,13 22:2,24
23:5,24 24:16 67:13
67:25 114:3,9,16
**career** 13:22 16:12
**case** 1:6 2:6 6:17,19
12:4,17,20,22,25
13:1,3,4,15,20,22,24
14:7,9,16,19,20,22
14:23 15:4 18:23
29:12 48:7,11,19
98:21,23 101:20
108:8 110:2 117:3,9
132:12
**cases** 11:20 12:1,2
12:12,15 14:13 16:3
16:5
**cause** 11:6 88:21
**caused** 72:1 73:7
**cellular** 6:23
**certain** 32:2 34:9
61:11 62:5 85:20

101:17 104:17
110:23,24 115:1,5
120:24
**certainly** 88:9 109:7
120:18 128:18
130:7
**certificated** 7:3
**certified** 2:20 132:1
**certify** 132:2,15
**challenging** 130:7
**change** 11:7
**changed** 116:8
**chart** 106:23,24,25
124:18
**charts** 9:4 29:14
124:7
**check** 26:18,21
27:18 28:11 110:20
**circumstance** 90:11
**circumstances** 99:2
**city** 1:8 2:8 71:23
72:22 73:4 97:11,22
97:23
**claim** 37:5 111:1
**claimed** 114:25
**claims** 31:9 99:15
110:3,10
**clara** 15:17
**clarification** 14:6
**clarify** 14:1 80:23
**clarifying** 14:17
**class** 5:12 7:3 9:10
13:5,9 55:17 77:14
79:11,15,19 87:4
99:6 100:2 101:20
102:2 113:24
**clear** 80:22 104:11
116:2 123:15
**client** 43:19
**coaches** 41:7
**coauthor** 85:17
**coauthored** 86:9
**coerced** 95:19
**cole** 32:15 59:2
112:2,3,7,12,21

120:7
**collection** 87:3,5
**collective** 5:11
**column** 56:19,25
57:3,6,13,16,19,22
57:25 58:3,8,13,17
58:20 60:3,5 68:13
**columns** 56:15,19
**combination** 53:14
**combined** 53:11
**come** 28:18 53:25
85:5 99:8 107:16,18
130:2
**comes** 79:22
**commencing** 2:19
**comment** 93:22
96:18
**comments** 75:25
86:18,21 87:9 88:10
102:22,24 120:10
120:13 128:19
**common** 122:6
128:25 129:20
**commute** 92:19
**compar** 25:2
**comparative** 105:4
105:21
**compare** 25:22 68:3
74:15 88:20 104:5
**compared** 30:16
55:20 78:6,17 89:17
90:8
**compares** 61:3 68:5
**comparing** 54:12
72:13 78:4,13 94:20
**comparison** 24:21
53:10 55:4 75:1
89:23 92:8
**compensated**
115:13,17
**complete** 87:13
117:17,19
**completed** 125:13
125:24

**completion** 132:13
**complies** 7:9
**component** 36:25
**compound** 12:5
**computations** 31:21
76:3 120:12,18
121:5
**compute** 128:23
**computer** 32:12
**concept** 61:24
**concerned** 127:17
127:23
**concerning** 103:5
**concludes** 131:3
**conclusion** 28:19
64:5
**conclusions** 33:25
46:18 75:2 108:18
**conducted** 11:16,19
12:1,16 69:12 103:5
103:10
**confidence** 103:6,11
103:16
**confirm** 70:19 71:9
94:8 110:20 111:14
124:4 127:21
**confirmed** 130:20
**confused** 93:8
**connection** 18:7
76:6,16 77:18 98:6
**consider** 23:15
103:7
**consideration** 119:3
**considerations**
100:3
**considered** 97:9
**consistent** 27:3
30:21 89:7
**constituted** 26:22
**construction** 17:11
**consultant** 15:24
**consulted** 38:2
**consuming** 105:17
**cont'd** 5:1

**contained** 9:5 29:14
31:13 35:7 40:11
95:12
**content** 70:21 71:11
**continue** 73:10,12
**controller** 69:12
71:24 72:21 73:5
74:11
**controller's** 72:20
74:1
**controls** 69:6,18
**convenient** 49:1
131:1
**conversation** 37:23
73:24
**conversations** 6:23
38:5 87:1
**conveyed** 128:9
**copy** 38:22 74:10
**correct** 10:19 11:10
12:18 13:10 15:6,7
15:21 16:1,2 20:18
21:15 27:11 29:1
30:3 32:1 33:10,11
33:22 34:2,5,7
36:12 37:6,7 43:7
47:7 51:10,13,22,23
52:13,17 53:3,9
54:11,22,23 60:12
60:16,25 61:9,10,12
61:16,17 62:6,7,21
63:16,19,23 65:16
66:18,19 67:4,5,14
68:1,17,21,22 69:1
72:16 77:20 83:2,5
83:9,10 85:6,22
86:8,16 87:15 88:16
89:2,11,22,25 90:2
90:3,6,7,11 92:24
95:9 96:15 97:5,6
98:16 99:12,20,21
104:21 105:2,7,8
106:1,2,11,14
110:14 111:3,22
113:15 114:25

115:1,8,9 120:15
121:5,8 122:5,20
123:7 124:5,10,11
125:6 126:4,5,7,8
126:18,19 127:6,12
129:2,14,21 130:10
**correctly** 12:14 20:8
21:11 24:6 29:22
30:1,2 53:20 54:8
56:1 62:17,22,24
66:14 75:23 79:18
80:14 85:19
**correlation** 77:25
**correspond** 66:23
**cortez** 56:14
**counsel** 3:1 6:25
31:6 38:6,8 65:25
66:2 112:9,25 126:2
127:15,18
**counsel's** 33:2
**count** 37:11,14 63:5
64:9 77:12,14 79:22
113:22 123:3
**counted** 53:20 123:4
**counter** 34:5 36:1
40:25 44:23 59:1
**counters** 35:15
36:11 40:22 44:3
51:10
**counting** 63:17,21
**counts** 36:17
**county** 1:8 2:8 15:17
71:23 72:22 73:4
97:11,23
**couple** 49:3 69:21
128:3
**course** 16:12
**court** 1:1 2:1 6:6,13
19:4 24:7 56:10
59:9 67:19 80:4
101:6 127:2
**covered** 54:20 83:20
**create** 53:15
**created** 16:23 17:1
18:12

Veritext Legal Solutions
866 299-5127

criteria 117:20
critique 79:10,15,17
88:12,24 89:1
csr 1:23 132:25
current 10:21
128:25
currently 41:6
51:13
cv 10:16,22

**d**

damage 11:16,19
12:1,16 13:23 14:3
14:14,15 16:9 87:25
102:8 107:17,18
108:12
damages 107:23
108:7,10,19 117:12
118:1 126:17
128:24
darryl 1:3 2:3 6:17
data 10:4,13 20:20
21:4,4,21 22:1,9,13
22:17,20,22,25 23:4
23:11,14,16 24:20
24:22 26:16,17
27:20 28:2,13,15,23
29:16 32:13 34:5,7
34:11,19,22 36:7,9
37:19 38:3,9,17,17
40:12,16,16,25
41:12,13,18 42:10
44:5,19 48:12 49:8
49:17 52:22,25 53:3
53:5,9,11,11,15
54:1,5,9,10,11,12,16
54:17,25 55:8,10,13
55:23 56:13 58:25
59:1,4,13 60:7,15
60:22 61:8 62:8,11
63:13 73:8 75:8,15
75:18 77:17 88:21
89:7 91:15 92:8
94:21 99:22 103:25
104:1,4,5,7,16,18

105:6,9,16,20
106:10,12 111:20
117:13,13,14,22,23
117:23 118:5,11,16
118:19 119:12,13
124:2,3,15,16,20,21
125:6,8,10,13,18,21
125:25 126:1 129:1
129:21,24
dataset 29:8,9,13
45:6,20 48:24 49:18
77:11 79:24
date 39:24 45:7,20
50:12 56:20,23 60:4
62:19 66:14,22 68:7
68:8 89:24 132:18
dated 9:12,21
132:21
dates 60:9 62:15
day 24:24 58:23
66:6,18 68:24 81:5
81:14,15,24,25
82:22,23 83:8,8,23
83:24 84:9,11,21
99:24,25 115:4
days 63:2,13,14,17
81:13 84:18,19,23
129:12 130:4
dealing 128:4
decertify 5:11 9:9
declaration 5:6,9
9:6,7,8 80:1,24 81:1
83:16 90:20 92:14
95:15,19 105:5
117:17,18 119:1
127:6,8,16 129:16
declarations 80:1,6
80:16 87:4,24 88:8
88:13 89:1,10,18
92:3 94:13,16,21
98:5 108:3
defendant 12:22
83:22 84:8
defendant's 4:14

defendants 1:10
2:10 3:14 7:6 9:9,20
51:8,19 102:9
defense 12:10,19
defer 101:17 111:11
112:1
define 30:9,10,14
31:16 33:4 39:18
64:8,9 97:1
definitely 127:9
definition 30:17,19
31:2,5,7,16 32:4,20
33:6,15 97:3,4
122:16
definitions 79:3
definitive 119:5
definitively 99:19
demand 4:15 9:20
demonstration
104:12 105:17
departments 73:25
depends 112:25
deponent 4:2 7:9,14
13:15 19:2,11 20:17
21:20 24:4,17 26:4
26:25 27:14 28:7
36:16 42:6,25 43:19
44:15 45:5,18 46:8
46:21 48:4 49:16
50:19 51:16 59:16
61:3 67:17 68:2
71:3,13 72:6 74:22
75:14 77:24 78:9,21
82:9,12,16 88:4
89:6,15 90:14,16
91:23 92:7 93:6,22
94:3,19 96:9,18
98:2,12 101:4,7,14
109:20 110:18
111:10 112:17
116:9 122:23
123:23 127:15,21
128:17 129:9
130:14,17

deposed 8:12 53:21
92:18
deposition 1:16 2:16
6:11,15 7:12 8:21
9:2 10:1,10 52:6
64:18 65:2 77:1
116:15 120:7
130:25 132:12
depositions 4:14,16
9:20,21
derived 27:2
describe 40:9 108:5
described 77:2
105:18 106:13
107:3,16 117:21
describes 11:9 40:10
40:12,17
describing 122:5
description 4:12 5:3
49:16
designated 109:4
designation 97:17
designed 36:20,21
67:11,22 68:2,8
96:25
detail 95:3
detailed 72:11
details 103:5,10
112:2 121:4
determine 20:21
27:16,23 53:12 68:4
develop 74:6 107:10
developed 76:3
107:3
difference 61:5,20
61:22 62:2 78:1
differences 73:19,21
74:4,23
different 33:14,17
35:4 78:25 88:21
91:25 99:1,2 102:20
106:18 107:9 128:5
129:11
differently 86:6
99:3 114:6 130:5

Veritext Legal Solutions
866 299-5127

direct 77:24
direction 47:5 132:8
discovery 108:23
discuss 79:1 86:21
  104:24
discussed 23:17
  44:4 104:2 108:2
discusses 40:15
discussing 66:7
  80:16
discussion 23:18
  65:17 96:17,24
  98:19,20 103:23
  113:18,25 116:22
  119:25 123:12
  126:10
discussions 101:14
  112:25 128:7
display 106:25
displayed 30:24
  64:11 107:14
distracted 115:20
distribution 113:18
district 1:1,2 2:1,2
divide 85:4
divided 83:4
division 29:24 37:21
  38:10 41:14 43:13
  44:9,21,25 45:9,14
  45:22 46:1,3,9,17
  46:25 47:2,4,12,13
  48:5,6,9,15,20,21
  49:10,19 51:2,5,21
  52:11 58:14,15 60:8
  61:15 63:3,15 67:9
  78:2 84:1,13 89:22
  89:24 90:8,9 99:7
  114:3 121:20 122:3
divisions 19:15
  42:19 45:12 46:14
  47:6 67:12,14,24
  68:1 70:9 76:9
  89:17 99:2 103:24
document 9:18
  10:16,19,21 21:22

21:23 34:23 35:2,3
  56:7,16 60:14,22
  61:3 62:18,25 64:17
  64:19,22,25 65:1
  69:3,9,20,25 70:2
  75:7 124:24 125:1
  127:5
documentation 28:9
documents 9:15
  10:4,13 28:23 29:15
  35:3 63:8 74:24
  75:8,18 124:22
  128:6,20
doing 12:2 47:18
  75:1
door 35:17,19,19,20
  35:20,21,24 36:7,25
  37:20,21 40:15 41:3
  44:8,9,12,20,21,23
  45:8,12,13,21,25
  46:2,15,15,16 47:1
  47:1,11 48:5,16,17
  48:22 49:8,9,25
  50:15,17 51:4
doors 42:13
double 110:20
dr 9:4 76:1,2 80:7
  97:2 99:8 101:15,19
  102:1,24 103:15
  107:1 111:11
  117:11 118:1
  119:22,25 120:3,7
  120:11,17 121:5,7
  121:10,25 126:11
  128:23 129:5 130:6
  130:21
draft 127:8
drafted 127:11,15
  127:18
draw 121:15
drawing 66:6
drive 23:22 24:13
driven 18:22 84:19
driver's 24:22

driving 63:4 68:16
  73:18 77:19 114:17
drogin 4:22 80:7
  117:11 119:25
  120:3,11 121:10,25
  126:11 128:23
  129:5 130:6,21
drogin's 9:4 76:1,2
  101:19 102:1 107:1
  107:21 118:1 120:7
  120:17 121:5,7
drove 25:10
dsw 58:18
due 65:12,12,20
duress 95:16

### e

e 1:16
earlier 23:17 27:6
  47:7 66:7 74:24
  76:25 77:2 125:1
early 13:1,16 14:24
  14:24 15:4 24:23
  25:12,17,25 26:8
  27:24 29:24 30:8,9
  30:10,15 32:5 33:5
  33:19,20 34:1 48:13
  52:11 53:13 55:5
  60:4 62:6 68:5 78:8
  78:19 79:3 81:14,24
  82:22,23 83:7,9,13
  84:20,25 88:15,18
easily 124:8
effect 20:10
effective 69:6
effort 109:8
either 15:5 18:17
  19:9 20:2 32:23
  86:25
electronic 21:14
elements 102:5
  107:15,21
eliminate 85:12,15
  86:15

eliminated 117:18
elizabeth 8:11
emerge 21:4,21
  22:10,12,17,19,22
  22:25 23:4,11,14
  54:25 77:11,15
employed 79:13
employee 72:9
  132:16
employees 20:22
  22:4,8
employers 97:12
  98:6
ended 78:2
ends 83:24,25 84:10
  84:12
entered 68:14
entire 15:22 18:5
  55:17
entities 16:10
entitled 9:19 57:1,4
  57:7,14,17,20,23
  58:1,4,8,13,17,20
  60:4 68:13 69:4
  72:10,10
entries 19:25 20:14
  21:1 22:1,5,13,20
  22:21 55:2,6 61:6
  64:10,15 65:10
  66:22 74:16 78:1
  114:21,23
entry 62:20 63:6,6
  66:7,15 68:6,14,20
  68:25
equipment 34:17
equipped 51:9
error 103:6,17
errors 103:11
essentially 41:11
  65:19,25
estimate 27:7
  100:13,18 102:8
  108:11
estimates 92:25
  106:5

**et** 6:17
**evaluating** 31:8
**eventually** 129:9
**evidence** 45:16 46:5
  87:24 90:10,15,16
  90:21 91:17,24
  92:20,22 93:16
  94:25 95:14,18,21
  95:25 108:23 110:8
**exact** 49:24 50:20
**exactly** 20:17 27:5
  31:24 35:10 59:2
  96:12 103:14
  130:17
**examination** 4:2 8:5
**examine** 104:16
**examined** 8:2
**example** 39:19 66:5
  82:1 88:14 104:23
  107:1 123:1,1
**examples** 95:11,12
  119:25
**excess** 63:10
**exclude** 54:4
**excluded** 48:18
  111:15 118:21
  119:15
**exclusively** 15:20
  18:10
**exhaustive** 102:3
**exhibit** 4:13,19,21
  5:4,6,9,19 6:5,5
  9:15,16,19,23 10:1
  10:15,18 11:9,13
  17:15,16,20,21
  18:14,17 19:9 20:5
  25:2 28:21 29:3,19
  33:25 37:9 38:13
  44:18 49:7 50:3,4
  52:8,16 53:16,20
  56:8,9,12,16 59:20
  59:21,25 60:14,21
  62:18,23,25 64:3,11
  64:16,18,22 65:1
  66:5 67:11,21 69:4

69:20,25 70:2 71:16
  72:20 74:10 75:5,6
  75:22 79:7 80:3,25
  85:9 86:7 92:14
  98:16 115:15,24
  116:2,3,4,4,4,7,18
  127:1,6 128:22
**exhibits** 4:10 5:1,15
  6:5 24:20 55:2
**exists** 105:20 118:17
**expect** 96:7 103:4,9
**experience** 11:2
  13:13 16:17,20
  17:11
**expert** 4:19,21 11:8
  13:20 15:5,20,22
  20:5 37:5 39:20
  86:19 129:25
**expertise** 86:10,23
  87:14,17,18,21
**experts** 4:15 9:20
  129:1,20
**explain** 73:13 96:14
  122:25
**explained** 70:25,25
**explanation** 14:6
  91:18 124:19
**express** 52:9
**extended** 55:1
**extension** 129:23
**extensions** 128:25
**extent** 37:3
**extra** 63:4
**extrapolate** 27:3
  28:14 99:4 103:19

**f**

**fact** 22:8 49:10
  71:25 72:25 73:2
  89:10 91:20 93:15
  111:24 121:21
  122:19 124:9
  130:22
**factors** 73:13 99:24

**facts** 45:15 46:4
  68:9,11 69:23 110:7
  127:14
**failed** 13:19 47:12
**fair** 13:16 20:20
  27:8 28:3,12 36:10
  67:1 80:8 82:25
  83:11 85:2 86:13
  99:10 105:24 115:2
  126:13 127:9
**fairly** 54:16
**false** 90:20 92:16
  93:3,19 94:1
**familiar** 56:17 64:19
**far** 34:23 63:23
  72:11,17 73:22 74:7
  86:23
**fashion** 130:3
**fast** 113:13
**feasible** 106:6
**federal** 37:2 108:23
  132:12
**feel** 82:20 109:6
**fewer** 41:5
**fields** 58:24 59:4,12
**fifty** 8:15
**figure** 82:8
**file** 128:25 129:20
  129:22
**files** 38:23 118:15
  129:4,5,10,13,15,19
  130:4,5,6,10,19,21
  130:22
**fill** 90:25
**filling** 93:9,16
**financially** 132:15
**find** 91:8 116:7
  118:15
**finding** 70:4,13 71:1
  71:23 72:22
**findings** 74:12
**firm** 3:3
**first** 11:21,23 50:13
  60:10 73:24 96:20
  114:5 120:4 121:11

**fit** 117:20
**five** 8:19 60:11
**fleet** 51:12,17
**fleissig** 85:16 86:9
  87:1 97:2 99:8
  101:15 103:15
  111:11 119:22
**fleissig's** 102:24
**flip** 116:17
**focus** 82:12
**focusing** 37:18
**following** 124:14
**follows** 8:3 19:6
  24:9 59:11 60:20
  67:20 71:5 78:11
  101:8
**footnote** 30:24
  122:7 123:8,9
  124:13,15
**foregoing** 132:3,5,9
  132:11
**form** 13:11 24:1
  90:12 102:5 129:10
**formal** 17:3,7
**format** 56:15 87:6
  130:7
**formed** 125:16
**forming** 28:24 29:6
  75:9,18
**forth** 68:9 75:9
  88:23 90:23 95:3,5
  101:23 102:23
  103:2 124:7 125:16
  132:4
**fortran** 128:23,24
**forty** 70:6
**forward** 43:3
**found** 22:5,13 41:13
  73:5 107:23
**foundation** 42:4
  43:17 45:3,16 46:6
  98:10 129:7 130:13
**foundations** 97:16
**four** 8:19 30:15
  31:25 39:15 61:25

Veritext Legal Solutions
866 299-5127

70:6 71:17 121:19 125:3
**frame** 23:19 31:12 32:11 54:20 62:25 63:14
**francisco** 1:7,9 2:7,9 3:20 6:18 69:5 72:22 97:12,24
**francisco's** 71:24 73:4
**frankly** 40:14
**free** 82:20 109:6
**friday** 1:18 2:19 6:1
**front** 35:19,21,24
**fta** 37:1
**full** 8:9 94:7 106:1
**fully** 120:23
**function** 23:12
**functions** 36:21
**funding** 37:2
**furst** 1:16 2:16 4:3 5:9 6:11 8:1,11 52:6 116:15 131:4
**further** 11:2 73:17 85:12 86:15 93:13 106:17 112:11,23 125:17 126:1 132:11,15
**furthermore** 81:5

**g**

**g** 3:4
**garage** 50:21,23
**garbage** 107:24,25
**geac** 20:10,20 22:1,9 22:10
**general** 29:11 33:13 65:24 86:17 87:22 87:23 99:16
**generally** 8:20 14:20 17:8 34:12 36:23 40:24 67:10 98:2,19 98:24 100:22 101:11 103:4,9

**generate** 29:13 34:10
**generated** 42:17
**geoff** 3:16 7:5
**geographic** 45:11 46:13,25 51:3
**getting** 25:19 36:2 128:4
**give** 7:12 46:11 81:12 84:16 128:18
**given** 22:4 104:15 123:7 130:1 131:4 132:10
**go** 6:21 23:9 31:18 31:20 32:5 44:17 56:19 99:21 107:25 116:7
**going** 21:16 23:25 43:7 44:11 47:8 52:1 56:18 59:16 69:20 75:11 80:24 100:25 108:20 109:3 110:18 116:10 131:2
**good** 6:9 8:7,8
**gps** 55:8,10
**grades** 104:17
**grandberry** 1:3 2:3
**greater** 63:25 72:17
**griffin** 1:3 2:3
**groups** 119:10,11,14
**gspellberg** 3:22
**guess** 79:21 104:10 121:1

**h**

**half** 123:8
**hand** 7:8
**handwritten** 92:25
**hard** 82:13 113:13
**hardware** 35:11,12
**head** 34:16 82:3
**heading** 120:25
**hear** 48:10,14

**heard** 48:4 97:18
**hedy** 1:3 2:3
**held** 6:15
**helpful** 99:14
**hereto** 6:7 56:10 80:4 127:2
**historically** 41:5
**history** 43:5 57:14
**holtzman** 2:17 3:15
**hopefully** 102:3
**hour** 11:14,15,20 12:1,15,20 13:4,9 14:2,9,13,16,22,23 16:3,5 71:21
**hours** 71:19 72:23 73:6,22
**hrs** 58:4,8
**huh** 102:12
**hung** 25:19
**hurry** 49:5
**hypothetical** 45:2 46:5,12,20 47:10,11 47:19 48:18 49:14 70:24 81:12 84:17 88:2 101:2 110:16 123:22

**i**

**identification** 6:6 56:9 80:3 127:1
**identified** 95:8,11 126:21
**identifier** 121:2
**identify** 7:1 75:7 120:16
**ii** 17:21
**iii** 11:9
**illustration** 113:12
**impact** 46:18 120:8
**impinge** 109:8
**important** 70:18 71:8
**impossible** 106:6
**impression** 93:10

**inaccurate** 49:11 75:2 120:20,21
**inappropriate** 31:12
**inci** 27:19
**incidents** 26:16 27:19 28:1 63:5,19 77:9
**include** 28:1 32:25 37:12 41:9 47:11 53:2,6 103:7 121:1 121:11
**included** 55:3 109:12 111:15 117:25 118:5,8,13 119:7,8
**including** 15:13
**inclusion** 109:21
**incomplete** 45:1 46:5,19 47:10,20 49:14 70:23 88:2 101:2 110:15 123:22 126:5
**incomprehensible** 28:5 112:15
**inconsistent** 89:19 92:12
**incorporated** 119:2
**incorrect** 79:20 89:10 120:10 122:5
**incorrectly** 54:2,3 120:17
**increments** 124:1
**index** 4:1
**indicate** 50:8 88:10 95:3 115:5
**indicated** 21:9 45:6 45:8,20 63:11 71:19 122:13
**indicates** 49:19 60:15,23 61:9 68:7
**indicating** 47:5
**indication** 88:17 90:22 114:24
**indications** 94:4

Veritext Legal Solutions
866 299-5127

**indicative** 22:9
**indicator** 22:2
**individual** 13:6,7
  32:10
**individuals** 52:24
  54:4 100:7 106:15
  117:12,21,25 128:7
**industry** 16:18
**information** 10:7
  22:6 23:9 27:23
  35:6,7 37:11,14,22
  38:9 41:22 43:1,3,7
  43:8 44:6 52:19
  53:4,7 56:23 62:13
  73:16 84:6 86:24
  87:6 89:16 90:19
  92:15 93:2,19,25
  107:14,23 112:12
  112:20 118:9 124:7
  125:12 127:22,24
  128:5 130:1
**initial** 11:8 17:14,15
  18:8,9 29:1,6,19,20
  30:25 33:24 37:8
  38:13 44:18 49:7
  50:3 52:7 59:20
  64:2 76:24 79:4
  95:13
**initially** 18:6
**inquire** 36:8 118:14
**instance** 63:9 68:23
  91:14,19 94:24
  120:9
**instances** 19:14,18
  19:22 20:13,21 21:7
  21:21 23:21 24:12
  25:6 28:13,15 51:20
  61:7 63:25 70:11
  76:8,18 91:15,20
  97:7 110:19 115:16
  120:9
**instruct** 31:1,4
  108:21 109:3
**instructed** 126:2,8

**instructing** 108:24
  109:9
**instructions** 33:2
**intend** 18:16 19:7
  112:21
**intention** 112:11
**interested** 132:16
**interference** 6:24
**intervals** 95:5 103:6
  103:11,16
**interviewed** 128:10
**interviewing** 128:13
**issue** 77:4,8
**issues** 18:10 74:5
  108:2
**items** 28:22 109:5

**j**

**january** 60:11 62:17
  63:1
**jason** 37:25 38:2,5
  38:21 124:18
  125:10
**jby** 3:12
**job** 1:24
**joel** 3:5 7:4
**jon** 66:1
**joseph** 56:14
**judgment** 99:23
**july** 1:18 2:19 6:1,10
  9:12 70:10 79:9
  105:1 132:21
**june** 9:22

**k**

**kevorkian** 3:25 6:12
**key** 102:4
**kind** 74:4 86:17
  99:22 107:24 111:5
  111:21 127:13
**kirkland** 50:21,23
  51:2
**know** 9:11 16:7 23:2
  23:8 27:14 32:12
  34:22,24,25 35:4,10
  35:20,22 36:10,16

  36:23,24 37:1,13,15
  38:4,20 39:6 40:7
  40:14 43:25 44:2,4
  45:5,18 46:8,21
  48:7 50:1 51:17
  57:2 58:13,17,20
  59:2,5,13 62:13
  63:18,20,21,23
  65:24 66:20,25 67:3
  69:16,16 72:6 73:11
  74:23 79:21 82:3,9
  82:19 87:10 88:7
  91:5 92:17,18,20
  94:6 95:17,20,24
  96:3,4,9,10,11
  97:10 100:10
  101:17 102:16
  103:14,21 105:23
  105:25 108:13
  109:14,16 110:4
  111:4,10 112:1,10
  112:25 118:14,24
  119:17,21 120:6
  123:23 128:17
  130:15
**knowing** 22:20
**knowledge** 29:11
  34:13,18 36:8 37:4
  41:12 43:5 62:9
  87:22
**known** 34:7 70:17
  71:6

**l**

**l** 1:23 2:20 132:1,24
**labeled** 39:21
  115:24
**lack** 42:4 43:17
  45:16 46:5 97:16
  129:6 130:12
**lacks** 69:6
**larger** 106:7
**larry** 5:7 80:2,25
  81:3,9 83:19 84:2,5
  84:9,10,12,19,20,21

  92:23 94:4,12
  104:23 105:21
**larry's** 83:16 84:7
  90:20 92:13
**late** 17:24 19:14,19
  24:23 25:18 27:24
  30:15 31:9,17,18,19
  33:6,9,18,21 52:12
  53:14 55:5 61:9
  62:1,6 63:11,12,15
  63:16 67:9,12,14,23
  68:1,5 76:9 81:16
  81:25 82:22,24 83:8
  83:13,21 84:8,21,25
  91:6 95:1 106:5,7
  106:21 107:7 114:3
  115:11,16 123:3,4
**law** 3:3,6,17 96:21
**lawyers** 96:14
**lead** 47:23 70:17
  71:7
**leading** 88:19
**learn** 45:11
**learned** 96:20 120:8
**lee** 37:25 38:2,5,21
  124:18 125:10
**legal** 6:14
**length** 109:6
**letter** 52:9
**lie** 96:11
**limited** 27:19 51:8
  51:20 52:18,19
  77:11 89:21 90:11
  95:7
**line** 91:12
**lines** 81:2 83:17
**list** 11:13 38:15
  52:18 124:22
**listed** 22:22 28:22
  29:16 38:12 55:7,12
  57:11 75:19 106:15
  107:10 124:22
  126:22
**listing** 75:15

Veritext Legal Solutions
866 299-5127

**litigation** 15:20 16:1
16:4,17 40:6
**little** 13:2 30:22
**llc** 131:6
**loadable** 130:3
**located** 40:22
**location** 25:13 49:24
50:20 59:5,6,14,15
78:8,20 81:6,7
83:24 84:11 90:24
121:19 122:2
**locations** 26:1,9
111:24
**log** 64:24
**long** 39:14 88:11
**look** 21:12 55:1 58:9
65:20 66:13,17 72:2
73:8 105:9,16
111:14,23 115:1
125:9
**looked** 22:10 34:19
74:24 104:16 105:6
125:12
**looking** 28:8 50:12
62:18 72:12,14
112:2
**looks** 58:10 64:23
64:25 107:6
**lost** 122:23,23
**lot** 77:5
**loud** 83:18
**lying** 89:2 92:2

**m**

**machine** 132:7
**madam** 19:4 24:7
59:9 67:19 101:6
**majority** 12:18
29:25 33:20
**making** 39:1 79:14
88:6 110:2,10,12
111:1 115:7
**management** 73:13
**manner** 23:16 130:2

**manufacturer** 34:14
34:20,21
**manufacturers**
34:14
**manufactures** 34:17
**map** 51:1
**march** 21:3
**margins** 103:6,11,16
**marked** 5:15 6:6
9:15,19 17:14 56:7
56:9 64:18 69:4
75:5 80:3 127:1,5
**mary** 1:16 2:16 4:3
5:9 6:11 8:1,11 52:6
116:15 131:4
**match** 27:20 28:3
55:7,12 58:25
103:25 118:17
124:2 128:19
**matched** 70:20
71:11 117:14,24
118:12,25 119:13
**matches** 23:11
**matching** 26:16
52:22,24 54:11
**math** 58:11 81:21,23
**mathematical** 83:12
84:16
**mathematically**
84:24
**matrix** 41:15
**matters** 11:14,15
**maximum** 106:7
**mean** 18:5 30:6
41:11 43:4 47:9
61:22 66:11 113:4
116:3 118:7 125:23
**meaning** 18:10
**means** 96:2,5,20
**measure** 44:3
**measured** 122:15
**media** 52:2,5 116:11
116:14 131:5
**meeting** 68:24

**members** 87:4
**memo** 34:17 37:16
38:4,11,19,21,22
39:1,10,14,17,19,25
40:5,9,10,17 125:2
125:3,5,10
**mentioned** 62:16
**microphones** 6:22
**million** 72:23 73:6
**min** 60:4
**minus** 61:24,25
122:17
**minute** 30:15 32:5,6
32:8,9 33:5,6 61:20
61:21,25 75:11 95:4
121:20
**minutes** 25:9,12,17
25:23,25 26:7 30:11
30:12,15 31:17,18
31:19,19,20,22,24
31:25 32:7 49:4
61:12,15,18 62:1,6
63:11,12 66:12,16
68:7 71:20,21 78:5
78:7,14,18 81:7,14
81:15,23,25 82:22
82:22,23,24 83:7,8
83:9,23,24 84:9,11
84:20,21,25,25 85:5
90:25 91:13 93:9,16
95:4 106:5,20 107:7
115:4,13 121:18
122:1 124:2
**missed** 39:6 114:4
115:20
**misspoke** 112:16
**misstates** 41:25
51:14 127:13,14
**misunderstood**
120:11
**model** 115:14
**months** 11:1,4
**morning** 6:9 8:7,8
**motion** 5:10 9:9

**motor** 41:7
**multiple** 35:3,5
100:6,7
**mumtaz** 50:9 62:19
63:2,14 66:15,17
67:1,3,7 68:23
**municipal** 1:7 2:7
6:18 69:5
**mutually** 131:1

**n**

**n** 110:13 111:2,6,17
111:18
**name** 6:12 8:9 57:4
57:5 132:19
**named** 53:22
**names** 52:16
**narrow** 73:11
**nature** 65:20 92:10
**near** 50:7 70:1 72:20
116:5
**necessarily** 71:14
120:16
**necessary** 73:21
74:14 85:11,15
86:15 98:21,23
**need** 73:16 78:9
82:14,16 97:2
115:21
**needed** 72:2 73:8
**needs** 119:3
**negative** 81:24
82:24 83:2,2,4,5,8
84:25 85:4 91:12
**neither** 132:15
**neutral** 85:11,14
86:14
**never** 13:8 65:15
96:12 108:15
**nonresponse** 116:22
116:25 117:4,8
119:16,19
**nonresponses**
111:12

Veritext Legal Solutions
866 299-5127

**northern** 1:2 2:2
**note** 6:20 52:20
**noted** 79:5 131:7
**notice** 4:13 9:19
  10:2,10
**november** 105:7
**number** 4:11 5:2,16
  19:13,18,22 20:13
  20:21 21:1,7,21
  23:13,21 24:12 25:6
  25:9,11,22,25 26:7
  36:17 57:18 58:22
  59:17 60:9 61:8,11
  61:15 62:5 63:19
  68:7 76:8,18 77:9
  78:4,7,14,17 91:12
  91:21 106:20 107:7
  113:13,20,21 131:5
**numbers** 55:19,22
  55:22 79:24 83:1
  85:3 108:15 116:5
  118:11,18
**numeral** 52:9 64:3
**numerical** 111:7
**numerous** 11:14
  73:13

**o**

**o'clock** 122:14,15
**o0o** 6:3 131:12
**oath** 8:2 132:6
**object** 13:11 21:16
  23:25 44:11 47:9
  90:12 101:1 110:7
**objected** 47:10
**objection** 18:20
  27:12 28:4 36:4
  41:25 45:15 46:4
  48:2 51:14 70:22
  74:19 77:21 88:1
  89:3,12 92:6 93:5
  94:2 97:15,15 98:8
  110:15 129:6
  130:12

**objections** 47:22
  72:4 93:20 98:1
**observed** 92:11
**obtaining** 86:24
**obvious** 47:3
**occurring** 97:23
**october** 40:1 50:8
  54:21 66:8,14 67:2
  67:7 69:1
**offer** 18:16,21 19:1
  19:7
**offhand** 16:8
**office** 69:11 71:24
  72:19,21 73:4 74:2
  74:11
**offset** 25:17,20
**offsets** 126:10,15,18
  126:20
**offsetting** 25:9
  126:19
**oh** 113:6
**okay** 10:17 82:4
  109:14 113:6 114:7
  115:25 116:9
  123:11 131:2
**once** 75:12 92:5,7
**ones** 95:10
**onwards** 21:2
**open** 36:7 40:15
  44:8,12 46:9 47:12
  48:16
**opened** 35:18 45:9
  48:22 50:15
**opening** 44:9 45:13
  45:21 46:2,15,16
  47:1,1 50:17 51:4
**openings** 42:13
**opens** 36:25 37:20
  37:21 41:3 44:20,21
  44:24 45:13,25
  46:15 48:5,17 49:8
  49:9,25
**operated** 25:23
  58:16 78:5,15 83:23
  83:25 84:10,12

**operates** 109:25
**operating** 114:10
**operator** 17:23
  25:12 27:24 55:20
  56:22,24 57:5,10
  58:24 60:15,23 62:9
  64:23 68:16,19
  72:10 78:7,18 79:24
  81:13,14,15 91:11
  91:16 95:15,19,22
  96:1 104:3,8,15,19
  106:5 110:25
  115:11,13,16,17
  117:20 121:18
  123:1,19
**operator's** 26:17
  61:14 122:1
**operators** 17:24
  19:14,19,23 20:13
  21:1,7 22:21,24
  23:22 24:13 25:10
  25:17,23,25 26:8,14
  27:21 29:23 34:1
  41:16,20,24 42:3
  52:10,15,16,21 53:2
  53:13,17,18,21,21
  53:23 54:9,10,15
  56:14 64:5,10,13
  67:12,23 69:8,14
  70:6,14 74:16,17
  76:8,18 77:9,13,18
  78:2,5,15 79:8,12
  79:19,20,23 80:6,15
  88:13 89:2,11,21
  90:5 92:2 94:14
  99:3 104:6 106:21
  107:7 108:7,12,19
  109:12,23 110:2,10
  110:21 111:17
  113:11,21,23 114:1
  114:2,9,16 115:2,5
  118:4,10,18 119:4,7
  128:11,14
**opine** 17:22 18:1,11
  76:2

**opining** 90:19
  101:19
**opinion** 22:23 29:21
  29:22 30:3 51:7,18
  52:10,13,19 64:7
  80:5,15 85:18 90:17
  92:1 99:16 100:11
  100:14,16,19 101:4
  116:24 118:3,7
  119:5,18,22 121:1
  125:21
**opinions** 18:15,17
  18:21,25 19:8 28:24
  29:6 33:14 53:8
  64:4 75:9,16,19
  101:21 102:22,24
  125:17
**option** 88:14 91:8
**order** 70:19 71:9
  72:3 74:17 96:21
  105:21 112:21
  121:3
**original** 132:12
**ot** 68:14
**outside** 108:25
  109:7
**overbroad** 88:1
  111:9
**oversight** 38:16
**overstated** 107:24
**overtime** 17:25
  19:23,25,25 20:14
  20:22,23 21:1,8,9
  21:12,13,22 22:2,4
  22:9,20,24 23:5,11
  23:24 24:15,25 55:1
  55:6 61:6 62:20
  63:7,10,12,24 64:6
  64:6,10,14,15 65:5
  65:6,9,10,13,16,17
  65:20 66:8,13,16,17
  66:21,23,24 67:2,4
  67:8,13,25 68:6,15
  68:20,25 70:7,7,8
  70:12,15,15,19,21

Veritext Legal Solutions
866 299-5127

71:9,12,20,21 72:2
72:7,8,12,15 74:15
74:16,18,25 76:19
77:10,12,13,17,25
94:4 114:1,3,9,13
114:16,22,25
115:12,15 123:18
123:19

**p**

**p.m.** 131:3,7
**page** 4:3,11 5:2,16
10:19,21 11:8 17:19
17:21 20:4 29:18
30:25 33:24 37:8
41:10 44:18 50:6,10
50:10,13 52:8 59:21
60:1 64:2 66:5
69:24 70:1 71:16,17
72:19,21 75:21 79:6
81:1 83:17,17 85:9
98:13 103:22
104:24,25 106:3,16
106:17 109:19,22
113:25 116:17,20
116:21 119:23
120:10,13 121:14
121:16 122:7
124:12,14 125:3
126:9
**pages** 1:25 4:17 5:4
5:7,12 39:15,15
69:21 113:1
**paid** 22:4,8,14,21
23:14 63:4,15,21
83:22 84:8 94:4
106:21 107:8
115:12,15
**paper** 82:21
**paragraph** 80:13,18
80:21,25 83:17 85:8
85:10 86:4 87:10
90:19 92:14,16 93:1
93:3,17,19 94:1
96:23 106:4 109:22

113:17,25 115:10
116:21 120:22
121:15,24 122:7
123:5,16,25 124:13
126:9,11,13,22
127:3 128:21
129:16,18
**paragraphs** 98:18
113:4,8 119:24
120:14,16,24
124:12
**parked** 48:16
**part** 31:16 32:4
37:18 48:17 72:15
108:21 111:11
112:5 114:5 115:20
120:4 121:12
123:12 124:19
127:15
**part's** 15:7
**particular** 58:23,23
63:9 90:11 103:18
104:8 119:4
**parties** 6:21
**parts** 127:11,18
**party** 77:14 85:11
85:14 86:14 88:10
132:17
**passenger** 34:5
35:15 36:1 37:11,14
40:21,25 44:3 51:10
59:1
**passengers** 36:2,11
36:17
**pay** 43:22 48:2
70:10
**payments** 94:8
**payroll** 20:1,10,14
23:8 53:11 65:11
69:6,13 72:24 73:6
73:23 74:3 114:21
117:13,22
**penalty** 7:11 8:24
81:4,10 84:3 92:3
92:23 96:1,4,11,20

97:8
**people** 22:14 73:25
119:10,11 130:18
130:21,21
**percent** 33:19,21
41:4,6 51:12,17
57:8 70:6,14 91:5,6
91:6 104:10 117:8
119:19
**perform** 32:18
36:21 76:7,17
105:21 107:6 112:3
113:9 121:3,4 124:3
126:14
**performance** 16:24
17:2 32:19 33:4,5
34:4 41:15 48:12
49:21 51:8,19 79:2
**performed** 13:8,17
14:3 19:12,17,21
21:6 23:20 24:10
25:8,21 78:3,12
105:4 106:10,13
113:14
**performing** 13:23
90:5 102:18 113:21
**period** 20:9,24 21:2
21:3 40:3 55:17
70:10 79:13 83:20
88:11 105:6,10,18
113:24
**periods** 56:2 104:6
**perjure** 96:10
**perjured** 96:12
**perjury** 7:11 8:24
81:4,10 84:3 92:4
92:24 96:1,4,20
97:8
**personally** 87:14
**pertains** 132:11
**ph.d.** 4:23
**phrase** 64:8 97:19
122:9
**pick** 6:22

**piece** 10:6 57:17
120:4,4,19,20
121:11
**pieces** 57:18
**place** 6:21 132:4
**places** 65:4
**plaintiff** 12:9 13:18
13:24 14:8,10,14,15
18:22
**plaintiff's** 56:8
**plaintiffs** 1:5 2:5,17
3:2 4:13 7:3,4 9:19
12:3,13,17,21 13:5
13:10,13 14:3,9
17:23 31:8 38:13
53:22 76:2 86:7
99:15 127:5
**planning** 16:21
112:7 125:25 126:7
**please** 6:20 7:1,8 8:9
10:15 17:19 19:5
24:8 28:20 29:18
48:2 50:2 59:10,19
60:19 66:4 69:24
71:15 75:3,21 79:25
80:12 83:15 116:17
121:15
**plural** 14:9
**plus** 16:9 61:25,25
83:2 85:4 122:17
**point** 14:7 15:3,4
20:6,9 23:17 29:21
37:9 45:25 64:4
72:7 74:7 89:24
109:22 110:23
125:8 126:3,6
130:24
**points** 19:19 71:17
76:9 90:1 109:24,25
125:14,25 126:1
**population** 26:20
27:4 79:8 103:20
113:19
**portions** 86:19

position   128:14
positive   61:8 81:25
 82:24 85:1,4 91:21
possibility   27:9
possible   20:12 22:23
 23:1 49:23 66:22
 84:22 91:18 107:5
 118:17,20
possibly   112:24
potential   108:10,11
 126:15
potentially   73:18
 75:2
ppsd's   72:24 73:6
practice   111:6
precise   100:12,18,19
precision   50:24
prefer   101:16
prepare   9:1 43:8
 75:15
prepared   9:3,13
 10:11 23:7 27:7
 37:16 40:5 85:21
 97:4 99:11,19 102:8
present   3:24 7:1
 43:10 79:9
presents   18:14,23
 49:11
previously   5:15
 61:23 64:17 65:11
 69:4 95:8,11
printout   56:12
prior   22:16 53:24
 132:5
private   6:23
probably   11:1,17
 13:2 20:20 38:24
 77:5 96:6,21 99:3,5
 99:16,18
problem   100:5,9
problems   49:11
proceedings   132:3,5
 132:7,13
process   26:12,13
 65:18 69:7,13 77:6

99:22 107:25
 108:10,22 109:1
produce   100:12,17
produced   35:8 39:1
 39:7 56:13 129:5
 130:22
producing   10:4,9,13
production   4:16
 9:21
program   74:6
proper   85:10,14
 86:14 87:2
properly   47:15 88:5
 119:15
prosecutes   97:12,22
protected   96:17
 108:22 109:9
proved   110:16
provide   62:8 65:15
 74:10 75:2,25 84:22
 88:9 93:16 97:5
 103:5,10 117:19
provided   29:15
 34:23 35:2 38:21
 39:23 40:18 45:6,20
 47:19 48:24 49:18
 49:18 55:17,19 84:6
 89:18 94:14 103:17
 124:16,18 125:11
 128:20 129:23
provides   37:13
 62:12
providing   37:10
 117:16
proxy   55:19,25
publiclawgroup.c...
 3:22
pull   129:24
pulled   61:15
pulling   51:21
pulls   43:13 44:9
purpose   27:25 40:12
 71:14 106:23,24,25
 108:5

purposes   22:6 25:3
 27:6 37:2 104:12
 105:17 108:16
 113:12
pursuant   10:1,9
put   17:24 20:22
 24:24 64:10,14
 77:10 91:12 128:14
putting   114:1 115:3

q

qualification   11:3
qualifications   11:10
 11:12
qualify   13:20
qualifying   15:5,5
question   12:8,10
 13:12 14:12,18 19:3
 19:7 21:19 22:11,14
 22:16 24:1,5,10,17
 25:15,20 26:5 47:14
 47:25 59:7,12 60:17
 60:21 67:17,21
 68:12 71:4,6 73:11
 73:17 78:12,23,25
 80:20 86:6 88:18,22
 90:13,14 91:7 93:11
 93:12,13,14 96:17
 101:9 102:11
 106:18 109:6
 112:14,18 114:6
 115:21,22 122:22
questions   21:5
 31:15 87:7,8,8,12
 88:19 91:9 92:10
quickly   56:19 58:10
quite   14:5 15:23
 78:22
quote   11:14 17:22
 29:23 52:10 64:5
 72:23 75:24 79:8
 81:4 83:19 106:4
 121:17,24

r

radius   46:14,25
raise   7:7
random   76:3 100:13
 100:17,23 101:13
 101:16 102:6,20
range   53:12 55:9,14
 55:17,18,25 59:18
 62:15 104:3 117:15
 117:24 118:12,19
 119:14
rate   116:23,25 117:4
 117:9 119:16,19
rationale   102:25
reached   38:6 108:18
 129:25
read   9:4 19:5,6 24:8
 24:9 30:2 34:17
 59:10,11 60:18,20
 67:20 71:5,18 73:12
 75:12 78:11 83:18
 86:3 101:8
reading   37:16 73:10
 120:23
really   14:18 22:15
 27:10 37:3 63:20
 65:12 74:7 82:14,16
 90:10 94:25 105:24
reason   23:3 25:4
 27:18 30:20 32:25
 38:15 42:15,21
 43:10,15,21 44:1
 47:9 65:8 67:3
 68:21 91:10 92:15
 93:2,18,24 100:21
 101:10 104:16,20
 105:16 106:19
 107:12 113:9 114:8
 114:14,25 117:7
 124:21
reasonable   28:1
reasons   43:24 103:1
rebecca   1:23 2:20
 6:13 132:1,24

**[rebuttal - represents]**

rebuttal 4:21 18:13
42:7 75:4,9,22,25
76:6,16,23 79:1,6
80:13 85:8 86:3,7
88:23 95:13 96:23
98:14,15 101:24,25
102:4 103:22
104:24,25 106:3,13
107:14 108:4 113:1
116:17 119:23
121:14,16
rebutting 107:20
rec 74:4
recalculating 108:1
recall 12:23,24
13:24 14:21 15:1
16:13 19:16 39:22
39:24 40:17 41:17
41:20,24 42:3 77:8
96:19 108:17
receive 63:24
129:11
received 38:4 40:1
94:8,21 108:3
127:24 130:5,6
recess 52:3 116:12
recognize 56:15
recollection 37:22
38:18 39:13,16 40:5
40:8
recommend 100:23
101:12
recommendation
102:17
reconciliation 74:5
reconvened 130:25
record 6:10,22 7:1
8:10 19:6 24:9
35:17 38:25 39:4
47:21 52:2,4 59:11
60:20 67:20 71:5
78:11 101:8 116:2,7
116:11,13 131:3
132:6,9

recorded 6:11 21:22
36:9 40:17 44:10
46:2,9 47:12 48:6
71:22 72:8 94:20
recording 6:20 35:6
35:11 41:14 43:12
records 37:19 44:20
49:8 53:12 65:11
70:20 71:10 115:12
refer 17:15 20:4
59:17 65:5 66:4
69:20 71:16 75:4
79:25 80:12,24 81:2
83:15 97:2 98:14
109:22 113:7
119:21 129:15
reference 11:12
14:13 57:21 80:21
96:24 124:14 125:5
125:7
referred 24:20
64:11 129:14
referring 9:8,14
14:19 15:19 17:14
17:16 20:6 37:15
38:11 60:3,5 66:9
80:18 87:3 95:7,10
98:15 109:17
115:24 119:11
120:14 122:9 123:5
123:8 124:17
refers 52:15 125:11
refined 108:15
reflect 68:11,14
reflected 11:4 21:14
22:25 23:5 32:22
55:2 56:16 64:15
77:17
reflecting 68:25
reflects 42:18 50:12
56:20 57:1,4,7 60:7
61:8,11,14 63:13
66:15 68:19
regard 26:11 87:17
94:13 103:15

regarding 19:13,18
19:22 23:21 24:11
69:12 75:25 76:7,17
77:4 86:18 101:5
103:10
register 51:4
registered 45:13
registers 46:16 47:2
regular 130:3
regularly 34:1
related 16:1
relating 16:17 17:4
17:8,11
relative 132:16
reliability 42:9
reliable 22:2,5,10,18
relied 22:12,19
28:24 29:5,8,10,11
35:7 38:16 48:22,24
62:12 65:10 75:8,15
130:18
relief 19:19 76:9
81:6,7,8 83:24
84:11 90:1,24 91:2
109:24,25 111:24
121:19 122:2 125:8
125:14,25 126:1
rely 40:11 49:20
62:13
relying 43:6
rendering 64:7
renne 2:17 3:15
repeat 24:5 75:12
78:22
repeated 78:10
repetitive 66:11
rephrase 104:14
report 4:19,21,22
5:4 9:4 11:8 16:24
17:2,14,16 18:8,9
18:11,14 20:5 23:7
28:25 29:1,3,7,14
29:19,20 30:25
31:14 33:24 35:7
37:8,17 38:13 39:21

40:11 41:10 42:7
44:18 49:7 50:3,3
52:7 55:18 59:8,18
59:20 64:3 65:4
71:17,21 74:11,14
75:4,10,22 76:1,6
76:16,23,24 79:1,4
79:5,6 80:13 85:8
85:17,20 86:3,5,8
86:11,20 88:23,23
95:3,13,13 96:23
98:14,15 101:24,25
102:4,23 103:22
104:3,24,25 105:13
106:3,13,16 107:4
107:15,16,21 108:4
108:4,5 109:19
113:2 116:18
117:15,24 119:14
119:24 120:6,10
121:7,14,16
reported 1:22 76:12
reporter 2:20 6:6,13
7:7,10 19:4 24:7
56:10 59:9 67:19
80:4 101:6 127:2
132:2
reporting 73:14
reports 9:3,5,13
20:1,2,14 24:21
30:8,13 32:23 33:1
53:12 55:9,14,17,25
103:2 109:5 112:4
118:12,19 125:16
represent 56:11
101:20 102:2
representation
54:18
representative
26:22 27:9,11 28:11
represented 54:16
representing 7:6
represents 57:14,17
57:20,23 58:1,4,8
58:14,18,21

Page 15

**request** 18:21 39:1
47:22
**requested** 44:14
132:14
**reread** 9:3,14
**research** 30:22
**resolved** 13:16
**respect** 27:17 37:6
49:6 51:7,19 86:10
90:4 93:1 119:23
126:13
**respond** 13:14
**responding** 88:10
**response** 14:17
64:12 87:13 93:14
104:7 110:13 111:2
111:6,7 117:16,17
123:7
**responses** 88:22
89:6,18 92:11 105:5
108:3 111:14,18,18
113:10 117:19
119:1,4
**restate** 55:11 78:22
**result** 83:20
**results** 27:2 33:13
88:20 102:7,19
103:17,19 118:6,13
118:21
**resume** 10:16 11:5,7
**retained** 12:17,18
12:21 13:5 131:5
**review** 26:25 65:9
70:18 71:8 123:17
125:13,17,25 126:1
126:4,7 132:13
**reviewed** 9:4,5
38:12,19 63:8 65:6
70:8 75:18 88:8
114:24 121:7
123:24 124:22
**richard** 4:22
**ridden** 42:12
**right** 7:7 53:19 70:3
71:3 82:11 126:23

**rochelle** 5:6 80:2,25
81:3,9 83:16,19
84:2,5,7,9,10,12,19
84:20,21 90:20
92:13,23 94:4,12
104:23
**rolnick** 66:1
**roman** 52:8 64:3
**romano** 1:23 2:20
6:13 132:1,24
**roughly** 96:10
**route** 17:4,8,11
24:22 99:5
**routinely** 17:24 31:9
83:21 84:7 95:1
**row** 50:12,13 60:10
60:10 66:9
**rpr** 1:23 132:24
**rule** 108:23
**run** 31:23 55:19,22
57:18 58:15,16,20
58:22,23 59:6,15,17
60:9 81:5 83:23,25
84:10,12 99:25
105:1 118:10,18
120:5 121:12 122:2
**runs** 17:23 29:23
33:18,20 109:23,24
110:19,20,21
111:24 113:23
118:12,19 119:2
120:1

**s**

**s** 29:21
**sakai** 2:17 3:15
**sake** 116:6
**sample** 26:13,19,22
27:9,11 28:11 76:3
76:12 86:22 98:23
99:4 100:13,17,18
101:19 102:2,6,7,10
102:18,20,21 103:5
103:10,18,19
104:13 107:3

113:11,18 116:22
117:1,5,9 118:6,13
118:21 124:15
**samples** 27:2 95:8
98:19,20 99:9
100:12 101:16
103:7
**san** 1:7,8 2:7,8 3:20
6:18 69:5 71:24
72:22 73:4 97:12,24
**sansome** 3:18
**santa** 15:17
**sat** 120:7
**saw** 91:15 109:23
**saying** 14:11 50:22
73:16 102:1
**says** 56:20 70:3
71:19 73:12 84:15
85:10 90:24 91:1,3
91:4
**schedule** 31:23 68:2
90:8 115:20,23
**scheduled** 23:23
24:14 25:11,13,24
26:1,8,17 30:11,16
31:22,23 32:7 33:7
33:9,23 55:7,8,12
55:13 56:2 60:8,16
60:24 61:4,12,16
62:2,10 63:3,7 64:1
68:3,17 77:19 78:1
78:6,8,16,19 81:8
91:1 92:9 114:11,17
115:3,6 122:12,19
123:2
**schedules** 27:21
28:3
**scheduling** 17:4,8
**scope** 97:16
**scratch** 82:21
**se** 14:16 19:25 21:10
24:19 34:22
**seasonality** 100:1
**second** 37:9,18
81:25 93:14 120:4

121:12 123:6,8
**seconds** 31:19,20,25
32:6,8,9 123:2
**section** 11:9 17:21
20:5 29:20 37:9
52:8 83:16 126:12
**sections** 80:15
**see** 15:2 52:20 57:9
60:5 64:14 66:9
91:14,17,19 102:19
115:4
**seen** 9:23 64:25 69:9
69:19
**segregate** 32:13
**selected** 52:10,15
53:18 104:6
**sense** 28:8 98:3
122:6 128:8,18
**sensitive** 6:22
**sentence** 37:19
70:24 85:10
**separate** 63:17
**september** 20:11
105:2
**service** 15:9,15,19
16:24 17:5,12
**services** 15:11
**set** 52:20 53:25 68:9
75:9 88:23 90:23
95:2 101:23 102:23
103:2 122:8,9,10
123:13 124:7
125:15,16 130:4
132:4
**sets** 76:12
**settled** 13:1 14:24
14:24 15:3
**settlement** 23:18
26:12,13 27:6 40:2
65:18 77:6 108:10
108:16,22 109:1,8
**seven** 70:9
**sfmta** 15:15 16:13
29:17 30:19 31:1
34:10 37:23 38:6

Veritext Legal Solutions
866 299-5127

39:11 41:13 65:15
69:6 73:12 74:1,9
127:24 128:4
**sfmta's** 21:14 66:2
69:12 70:9
**sgt** 3:11
**shattuck** 3:7
**short** 51:24
**shorthand** 2:20
132:1,7
**show** 51:1 53:19
**showed** 71:21 73:5
**showing** 9:18 56:7
64:17 69:3 74:2,3
98:6
**shows** 60:14,22
72:23 73:22
**side** 13:9
**signature** 132:23
**signed** 9:8 80:6 92:3
95:15 127:6
**signing** 95:19,23
**similarly** 1:4 2:4
**simple** 76:3 92:7
100:13,17,23
101:13,16 102:20
**simplified** 49:17
**simply** 27:15 68:3
69:21 72:12 73:16
129:11
**single** 14:10 34:24
**sit** 74:8 126:23
**sitting** 43:2
**situated** 1:4 2:4
**situation** 58:5,6
**situations** 23:2 58:7
89:21 99:1 119:6
**six** 11:1,4 13:2 14:25
81:23 82:22
**size** 79:11,15,19
86:22
**slightly** 81:22
**slip** 66:17,21 67:2,4
67:8 71:19 72:12
74:25 123:19

**slips** 23:8 64:6 65:5
65:6,9,13,16,18,20
66:13,24 70:8,15,19
70:21 71:9,12 72:3
72:7,15 74:15,18
76:19 123:18,24
**sloan** 2:17 3:15
**snapshot** 124:15
125:7
**software** 128:23
129:24
**solely** 21:23
**solemnly** 7:10
**solutions** 6:14
**sorry** 19:2 24:4 39:2
44:15 59:7,22 60:17
71:3 78:9,21 82:1
101:5 102:13
112:14 113:3 114:4
115:19 116:19
127:3
**sorted** 56:13
**soseh** 3:25 6:12
**source** 34:24 41:22
**sources** 35:4 53:15
54:12
**span** 11:18
**spans** 43:2
**speaking** 47:22
98:20 103:4,9
**speaks** 39:4
**specific** 19:13,17,21
21:6 23:20 24:11
25:8 26:14 29:13
51:3 76:7,17,22
78:4,13 104:20
105:15 107:15
**specifically** 16:19
32:12 35:16 36:22
37:24 38:20 44:2
45:5 64:4 70:5 75:5
75:24 81:1 84:6
86:21 94:12 107:6
107:21 109:14
117:3,21 119:6

121:10 124:13,16
124:23
**specifics** 103:15
**speculation** 91:22
93:21 128:16
**speculative** 27:10,15
**spellberg** 3:16 7:5,5
12:5 13:11 18:3,19
20:15 21:16 23:25
26:2,23 27:12 28:4
36:3,13 39:2,6
41:25 42:4,23 43:17
44:11 45:1,15 46:4
46:19 47:8 48:1,25
49:5,13 50:5,16
51:14 59:9,22,24
60:2 61:1 67:15
70:22 72:4 74:19
75:11 77:21 82:7,14
85:24 88:1 89:3,12
90:12,15,17 91:22
92:6 93:4,20 94:2
94:17 96:7,16 97:15
98:1,8 100:25
108:20 109:3,16
110:5,7,15 111:8
112:14 116:19
122:21 123:21
127:13,19 128:16
129:6 130:12,15
**spend** 77:18 90:5
114:10,17
**spent** 68:23
**split** 23:11
**spoke** 38:7
**spot** 25:2 26:18,21
27:18 28:11 49:2
**spring** 55:18,24
56:3,4 105:12,12
**stacks** 65:13,13
**stamp** 35:17 36:7,25
38:9 41:2,14,22
44:5 45:7,21 48:19
48:21,23 62:11,14

**stamps** 35:11 42:17
**standpoint** 27:1
**start** 80:16,19
109:13 110:3,10
111:1 114:15
120:20
**started** 109:25
111:24
**starting** 59:5,14
122:1
**state** 7:10 8:9 13:24
14:4 17:22 48:23
89:15 104:25
109:20 121:17,24
132:2
**stated** 18:17 19:9
36:6 41:1,10 69:23
120:17 125:21
127:22
**statement** 13:16
20:3 37:10,12 44:19
49:7,10 70:2,5 79:7
79:16 84:15 85:16
86:3,13,16 87:2
88:6 89:9 90:23
91:3 93:9 94:9
106:4,9 115:10
124:1,4 128:22
**statements** 85:20
86:4 120:21
**states** 1:1 2:1 108:4
**stating** 88:14
**statistical** 27:1,15
86:19 111:5
**statistically** 86:24
**statistician** 28:18
86:19
**statisticians** 100:22
101:11,15
**step** 23:15
**stephen** 32:15 59:2
112:2,3,7,12,21
120:7
**steps** 21:25 23:4
42:8,16 43:11 54:14

Veritext Legal Solutions
866 299-5127

73:20 77:16 111:17
**steven** 3:4 7:2
**stitt** 1:3 2:3 6:17
**stop** 37:20 40:15
  44:20,24 46:1 49:9
**strata** 100:7
**stratification** 86:22
  99:9,14 100:4
**stratified** 98:19,20
  98:23 99:4,7 100:12
  100:18 102:10,18
  102:19
**stratify** 100:2
**stratifying** 99:22
  100:6
**street** 2:18 3:18 6:16
**strictly** 53:4
**strike** 17:2 62:23
  73:2 88:24 91:11
  127:4
**study** 69:15,18
  121:21 122:4
**sub** 29:21 64:4
**submission** 21:12
**submit** 23:23 24:15
  64:6 114:3,9,12,16
**submitted** 19:23
  21:8,13 22:2,24
  23:6 66:18,21 67:2
  67:4,8 74:15,18
  76:19 77:13 97:8
  98:7 123:19
**submitting** 67:13,24
**subscribed** 132:18
**subsequent** 26:12
  120:6
**substance** 40:10
**substantial** 13:18
**suffered** 108:7,12
  108:19
**suggest** 67:11,22
  95:2
**suggested** 48:11
**suggesting** 31:11
  35:4 48:8

**suggests** 91:25
**suite** 2:18 3:8,19
**summary** 29:21
**supervision** 112:6
**support** 5:10 9:9
  87:25
**supported** 70:7,15
**suppose** 23:1
**sure** 15:23 16:2 24:1
  24:5 25:14 26:5
  31:10 45:2 51:17
  56:21 57:9,12,24
  58:2,5 78:22 81:19
  83:14 87:12 97:20
  104:9 105:13,15
  106:8 110:4 112:17
  123:6,14 125:19
  126:2 130:17
**surprise** 45:10
**surprising** 45:19
**surrounding** 51:2
**survey** 88:20,24
  96:25 97:1,3,9
**surveys** 85:18 86:23
  87:20 96:24
**suspect** 16:11
**suspend** 130:25
**system** 20:10 35:6,8
  36:1,9 37:1 69:7,13
  70:20 71:11 72:24
  73:5,6,22,23 74:3
  114:21
**systems** 21:14 36:20
  38:7 73:19 130:8

**t**

**table** 106:17,19
**take** 6:21 21:25 23:3
  42:8,16 43:11 48:25
  51:24 54:14 96:13
  99:5 111:13,16
**taken** 2:16 23:13
  52:3 116:12 132:3
**talked** 38:5 61:23
  65:11 76:25 115:19

**124:25
talking** 14:2 38:2
  39:3 116:2
**tape** 116:6,8
**technology** 34:10,15
  37:6,13 42:17 43:12
**tell** 40:24 51:3 81:17
  85:23
**telling** 89:11
**terms** 83:12
**testified** 8:3,16
**testify** 85:21,25,25
  99:11,19 109:5
  112:7,22
**testifying** 8:23 9:25
  112:12 132:6
**testimony** 7:11 42:1
  51:15 131:4 132:10
**testing** 22:3 102:19
**text** 70:3 129:5,10
  129:13,15,19
  130:10,22
**thank** 60:2
**theft** 97:13,19,22
  98:7
**thereabouts** 40:2
**thing** 68:18 94:25
**things** 39:21
**think** 10:7 13:7,12
  13:16 16:8 20:19
  24:21 27:1 34:16
  37:2 39:4 41:4
  42:25 53:19 55:3,21
  58:9 65:11 72:11
  74:19,24 75:20
  76:25 79:23 85:7
  87:5,6,9 88:4 90:21
  94:24 102:22 104:2
  104:12 105:11,19
  112:15 115:2 119:3
  129:9 130:11
**third** 71:18
**thought** 28:1 57:10
  93:6,6

**thousands** 64:15
**three** 10:19,21 39:15
  39:15 70:9 125:3
  131:5
**tidrick** 3:3,4 4:5 7:2
  7:2 8:6 12:7 13:19
  18:7 19:4,12 20:24
  21:25 24:7 25:4
  26:6 27:8,17 28:10
  36:5,19 38:25 39:4
  39:8,9 42:2,8 43:6
  43:21 44:17 45:10
  45:23 46:11,23
  47:21,24 49:3,6,22
  50:6,7,22 51:18,24
  52:7 56:11 59:19,23
  59:25 60:3,18 61:7
  67:19 68:10 71:15
  72:14 75:3,17 78:3
  78:24 80:5 82:11,18
  86:2 88:12 89:9,20
  90:18 92:1,13 93:8
  93:24 94:10 95:6
  96:13,19 97:18 98:4
  98:13 101:6,18
  108:25 109:11
  110:1,6,9,25 111:16
  112:19 116:1,16,21
  116:24 122:25
  123:25 127:3,17,23
  128:21 129:13
  130:20,24
**tidricklaw.com** 3:11
  3:12
**time** 6:25 11:21
  15:23 16:23 17:1
  18:4,11 19:11 20:9
  20:24 21:2 23:7,18
  23:23 24:15 25:11
  25:24 26:18 29:24
  29:25 30:11,13,16
  30:18 31:8,9,12,16
  31:23 32:5,7,11,19
  33:4,4,7,8,9,15,19
  33:20,23 34:1,4

35:11,17,17 36:7,25
38:9 41:2,4,14,14
41:21 42:17 43:10
43:12 44:5 45:7,21
46:16 47:1,3,4
48:12,19,21,23
49:21 51:7,19 52:11
53:13 54:20 55:5,20
56:2 58:11 60:8,16
60:25 61:4,4,12,16
61:24 62:2,3,6,10
62:11,14,25 63:3,4
63:7,8,10,14,16,25
64:1 65:19 68:3,4
68:16,17,24 77:18
77:20 78:2,6,16
79:2,3 80:16,19
81:8 82:19 83:13,13
83:21 84:8 88:11
90:5,5,9 91:1,5,6
92:9,10,25 94:24
99:25 104:17,18
105:6,10,17 106:7
106:22 107:2,8
109:13 110:3,11
111:1 114:9,11,16
114:18 115:3,6,6,18
116:7 119:25 120:3
120:8,19 121:11
122:8,9,10,11,13,15
122:19,20,20 123:2
123:3,13,20 126:6
126:19 130:24
131:1,7 132:4
**timekeeping** 69:7,13
69:18
**times** 8:14,18 42:18
55:7,8,12,13 56:2
89:17 94:20 103:23
115:11,16 122:24
**timing** 74:4
**titled** 126:11
**today** 10:1,5,9,13
43:2 74:9,13 77:3
97:5 99:11 125:1

**today's** 9:1 131:4
**told** 65:14
**tony** 1:3 2:3
**top** 34:16 50:7 72:20
**total** 19:13,18,22
20:13 21:7 23:21
24:12,18 25:1,5,9
25:11,22,24 26:7,10
26:15,20 30:7 52:21
64:9 76:8,11,11,14
76:18 77:10,15 78:4
78:7,14,17 106:20
108:18 113:19
131:4
**totality** 26:20
**touched** 102:4
**track** 36:11
**tracked** 42:13
**tracks** 36:1
**training** 17:3,7,10
**trains** 47:6
**transcribed** 132:8
**transcript** 132:9,12
132:14
**transit** 15:8,11,15
15:19,25 16:6,11,14
16:24 17:4,12 23:22
24:13 30:22 35:12
35:18 40:21 42:12
43:13 44:8 45:12,25
46:14 49:24 64:23
69:7,13 70:6,9,14
114:10
**transmit** 129:1,21
**transponder** 35:9
**transponders** 35:5
**transportation** 1:8
2:8 6:18 16:18,21
69:5
**trapeze** 70:20 71:10
71:20 72:13,23 73:5
73:22 74:2,17
**travel** 80:16,19
109:13 110:3,11
111:1 120:3,8,19

121:11
**treat** 99:3
**treated** 110:13
111:2,19
**treating** 33:8 62:5
111:6 122:18
**trial** 8:16 18:16 19:1
19:8 112:8,13,22
**tried** 129:23
**trolleys** 41:7
**true** 111:23 132:9
**truth** 7:13,13,13
89:11
**truthful** 128:15
**truthfulness** 94:15
**try** 80:23 104:14
**trying** 22:15 68:10
82:7,12
**turn** 10:16 17:19
28:20 29:18 50:2
69:24 75:21 86:20
87:16 94:24 99:8
103:14 123:20
**turning** 59:19 64:2
90:5
**twenty** 54:7
**two** 15:13 16:4
30:11,12 73:19
81:13,18 83:1 84:18
84:23 85:3 109:5
120:4,20 121:12
122:2
**txt** 129:14,23
**type** 57:7
**types** 128:25 129:20
129:22,24
**typical** 130:2
**typically** 95:4
129:11 130:8

**u**

**uh** 102:12
**unable** 20:21 43:3
**unbiased** 41:22
87:13

**underlying** 125:10
**understand** 8:20,23
9:25 12:7,14 14:5
17:17 18:13 20:8
21:9,11,18 22:11,15
24:2 25:14 26:5
29:22 30:1 34:9
35:16 36:6 38:3
41:6 44:13,16 46:23
47:24 51:16 53:8
54:2,8 55:25 56:18
56:25 57:3,6,13,16
57:19,22,25 58:3,7
62:17,22,24 64:13
66:13 67:6 69:19,21
73:18,21 74:2,3,9
75:23 77:23 79:10
79:14,18 80:14 81:3
81:9 84:2,5,14
85:19 93:11 95:22
96:1 97:21 98:14
100:5 106:8 110:1
110:23 114:23
115:21,25 117:11
117:19,24 118:2
122:21 129:18
130:9
**understanded** 54:3
**understanding**
18:25 32:8 33:12,13
35:14,25 36:20 38:7
39:10 40:4,20 41:3
44:7,22 45:24 49:23
50:14,20 56:6 64:21
69:22 86:25 87:23
98:5,22 108:14
120:2 123:17 128:5
129:17
**understood** 53:24
62:4 100:8 123:10
**unique** 79:23
**united** 1:1 2:1
**unreliable** 80:7
**unscheduled** 17:25
20:22 22:20 55:1,6

Veritext Legal Solutions
866 299-5127

61:5 62:20 63:6,10
63:24 64:6,10,14,15
66:8,16,23 68:6,14
68:15,20,24 70:7,8
70:11,14 74:16
77:10,13,17,25
114:1,22
**unsure** 48:22
**update** 10:24
**upload** 130:8
**upwardly** 91:9
107:24
**use** 30:17 31:1,4
32:19 43:1 82:20,21
100:23 101:12,16
105:20 113:20
129:1,20 130:8
**uses** 30:19 34:10

**v**

**v** 29:20 52:8,9 64:3
**vague** 18:3 20:15
21:17 26:2,23 28:5
36:4,14 42:23 43:18
44:12 49:13 50:16
61:1 67:15 70:22
77:21 88:2 89:4,13
93:21 94:17 101:1
111:8 123:21
127:19
**validate** 23:10,13,16
43:3,4 63:18
**validated** 43:1
**validity** 42:9
**variances** 73:14
**variety** 16:10 85:18
**various** 53:14 65:4
129:24
**vehicle** 16:23 17:1
23:22 24:14 25:23
35:18 36:18 40:15
41:2 42:12 43:13
44:8 45:12,21,25
48:15,16,20 49:19
49:24 51:20 57:21

61:14 64:24 68:4
78:5,15 92:19
**vehicle's** 37:20,21
44:20,21 45:8 46:15
49:8,9
**vehicles** 25:10 35:12
38:10 40:21 41:4,5
41:7 42:18 51:8,9
51:21 77:19 88:15
110:22 114:10,17
**verbally** 40:19
**verify** 70:11
**veritext** 6:14 131:6
**versus** 6:18 25:11
26:17 90:8 92:9
107:1 113:18
**video** 1:16 6:11,20
**videographer** 3:25
6:9 52:1,4 116:10
116:13 131:2
**volume** 1:19 4:3
**voluminous** 23:9
65:12,20
**vs** 1:6 2:6
**vta** 15:17 16:13

**w**

**wage** 11:14,15,19,25
12:15,20 13:4,9
14:2,8,13,16,22,23
16:3,5 97:13,19,22
98:7
**wait** 75:11 80:19
109:13 121:18
**walk** 121:20
**want** 24:5 43:20
73:17 82:19 106:8
110:19 118:14
123:6,14
**waste** 82:18
**way** 25:20 27:16
31:20 32:6 34:18
35:22 44:22 45:19
45:24 46:9,22 47:14
54:19 56:6 66:20

68:12 82:25 90:22
92:17,21 93:23 94:9
99:19 100:14,16,20
100:22 101:10
104:10 105:25
117:8 118:3 119:18
120:2 121:1
**we've** 92:11 108:9
**week** 99:25
**weighted** 107:1,2
**welcome** 82:20
**whereof** 132:18
**whispers** 6:23
**white** 27:22 41:21
**witness** 18:21 45:2
47:15,19,23 108:24
109:4 132:18
**witness's** 97:17
**witnesses** 132:5
**word** 25:19 91:11
91:13
**words** 11:21 33:8
83:9 87:11 122:16
**work** 13:3,17 14:8
15:8,12,16,18,20,25
16:6,14,16 23:12
28:17 35:15 55:21
56:12,22 57:10
58:24 59:3,4,12
67:8 68:15 81:23
104:1,3 110:22
117:13,14,22,23
118:4,11,18 119:12
119:13 125:20
130:18
**worked** 12:13 56:24
60:15,23 62:9 71:20
73:23 81:5,13
109:23 115:6
**workers** 12:3 98:5
**working** 12:9 29:12
113:23 115:3
**works** 8:21 32:16
**write** 82:21 91:12

**wrongfully** 121:25
**wrote** 127:9

**x**

**x** 91:5,6,6

**y**

**yeah** 49:5 82:9
90:17 101:7 115:25
123:11,14 128:17
130:14
**years** 11:18,23
12:25 13:2 14:25
16:9 29:12 128:3
**ygr** 1:6 2:6 6:19
**young** 3:5 7:4,4
109:19
**yup** 109:20

**z**

**zero** 31:19,25 32:8,9
110:13 111:3,7
122:8,10,10 123:13
**zeros** 111:19

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2014. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Exhibit C

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                FOR THE DISTRICT OF CALIFORNIA
 3
 4   DARRYL A. STITT, TONY        )
     GRANDBERRY, and HEDY         )
 5   GRIFFIN, on behalf of        )
     themselves and all others    )
 6   similarly situated,          )
                                  )
 7              Plaintiffs,       )
                                  )
 8        vs.                     )        No. C-12-03704-YGR
                                  )
 9   THE SAN FRANCISCO MUNICIPAL)
     TRANSPORTATION AGENCY;       )
10   CITY AND COUNTY OF SAN       )
     FRANCISCO; and DOES 1-20,    )
11                                )
                Defendants.       )
12   _____)
13
14
15        VIDEOTAPED DEPOSITION OF ELIZABETH ARNOLD
16                        VOLUME I
17                 Emeryville, California
18                Wednesday, July 13, 2016
19
20
21
22
23

     Reported by:
24   KATHLEEN BACA
     CSR No. 10267
25   JOB No. 2342047
```

Veritext Legal Solutions
866 299-5127

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CALIFORNIA

DARRYL A. STITT, TONY         )
GRANDBERRY, and HEDY          )
GRIFFIN, on behalf of         )
themselves and all others     )
similarly situated,           )
                              )
            Plaintiffs,       )
                              )
    vs.                       )   No. C-12-03704-YGR
                              )
THE SAN FRANCISCO MUNICIPAL)
TRANSPORTATION AGENCY;    )
CITY AND COUNTY OF SAN    )
FRANCISCO; and DOES 1-20, )
                          )
            Defendants.   )
_____)

        Videotaped deposition of ELIZABETH
ARNOLD, Volume I, taken on behalf of
Plaintiffs, at Berkeley Research Group,
2200 Powell Street, Suite 1200,
Emeryville, California, beginning at
12:16 p.m. and ending at 8:10 p.m. on
Wednesday, July 13, 2016, before
KATHLEEN BACA, Certified Shorthand
Reporter No. 10267.

Page 2

APPEARANCES:

For the Plaintiffs:
    THE TIDRICK LAW FIRM
    BY:  STEVEN G. TIDRICK
    BY:  JOEL B. YOUNG
    Attorneys at Law
    2039 Shattuck Avenue
    Suite 308
    Berkeley, California 94704
    510.788.5100
    sgt@tidricklaw.com
    jby@tidricklaw.com

For Defendants:
    RENNE SLOAN HOLTZMAN SAKAI
    BY:  GEOFF SPELLBERG
    Attorney at Law
    350 Sansome Street
    Suite 300
    San Francisco, California 94104
    415.678.3800
    gspellberg@publiclawgroup.com

Also Present:
    AMANDA McCAFFREY

Video Operator:

    CASSIA LEET
    Veritext Legal Solutions
    415.274.9977

Page 3

            I N D E X
                                    PAGE
EXAMINATION BY MR. TIDRICK            7


          E X H I B I T S

NUMBER          DESCRIPTION          PAGE

Exhibit 105  Observational Study of Operators    6
             at The San Francisco Municipal
             Transportation Agency -

Exhibit 106  Rebuttal Report for The             6
             San Francisco Municipal
             Transportation Agency

Exhibit 107  Declaration of Elizabeth Arnold     6

Exhibit 108  Work and Detail Abbreviations       6

Exhibit 109  Muni Operator Time Study            6
             11/13/15

Exhibit 110  Muni Operator Time Study            6
             11/13/15

Exhibit 111  Muni Operator Time Study            6
             11/13/15

Exhibit 112  Muni Operator Time Study            6
             11/16/15

Exhibit 113  Muni Operator Time Study            6
             11/16/15

Exhibit 114  Muni Operator Time Study            6
             Draft: 11/13/15

Exhibit 115  Muni Operator Time Study            6
             11/16/15

Page 4

NUMBER          DESCRIPTION          PAGE
Exhibit 116  Muni Operator Time Study            6
             11/13/15

Exhibit 117  Curriculum Vitae of Elizabeth       6
             Arnold

Exhibit 118  Muni Operator Study - Observation   64
             Protocol

Exhibit 119  Exhibit J - Master List Of          72
             Observations

Exhibit 120  Master List Of Observations         72

Exhibit 121  Muni Operator Study - Detailed     109
             Coding Guide

Exhibit 122  Muni Observation Records - Raw     123

Exhibit 123  Plaintiffs' Third Supplemental     191
             Disclosure Pursuant to Rule
             26(a)(1)(A)

Exhibit 124  Rail Rule Book                     205

        C E R T I F I E D   Q U E S T I O N S
                                    Page Line
Q   When you say that every division is        35  24
    completely different, are you
    exaggerating?

Page 5

2 (Pages 2 - 5)

1   Emeryville, California, Wednesday, July 13, 2016
2          12:16 p.m.
3
4       (Exhibits 105 - 117 marked for identification
5        by the court reporter and attached hereto.)
6                12:15
7       VIDEO OPERATOR:  Good afternoon.  We're on the   12:16
8   record at 12:16 p.m. on July 13th, 2016.  This is the   12:16
9   video recorded deposition of Elizabeth Arnold.   12:16
10      My name is Cassia Leet, here with our court   12:16
11  reporter, Kathleen Baca.  We're here from Veritext   12:16
12  Legal Solutions at the request of counsel for   12:16
13  plaintiffs.                12:16
14      This deposition is being held at 2200 Powell   12:16
15  Street, Suite 1200, Emeryville, California 94608.   12:16
16      The caption of this case is Darryl A. Stitt,   12:16
17  et al. versus the San Francisco Municipal   12:16
18  Transportation Agency, et al., in the United States   12:16
19  District Court for the Northern District of California.   12:16
20  Case No. C-12-03704-YGR.            12:17
21      Please note that the audio and video recording   12:17
22  will take place unless all parties agree to go off the   12:17
23  record.  Microphones are sensitive and may pick up   12:17
24  whispers and private conversations.        12:17
25      I am not related to any party in this action   12:17

1   nor am I financially interested in the outcome in any   12:17
2   way.                12:17
3       If there are any objections to the proceeding,   12:17
4   please state them at the time of your appearance   12:17
5   beginning with the noticing attorney.        12:17
6       If you could just introduce yourselves for the   12:17
7   record.                12:17
8       MR. TIDRICK:  Steven Tidrick for plaintiffs in   12:17
9   the certified class.            12:17
10      My partner Joel Young is here as well, and our   12:17
11  paralegal Amanda McCaffrey.  Our firm represents   12:17
12  plaintiffs in the certified class.        12:17
13      MR. SPELLBERG:  I'm Geoff Spellberg.  I   12:17
14  represent defendants.            12:17
15      MR. TIDRICK:  Thank you.        12:17
16      The witness will be sworn in and counsel may   12:17
17  begin the examination.            12:18
18
19      ELIZABETH ARNOLD,
20  having been first duly sworn, was examined and
21      testified as follows:        12:18
22      EXAMINATION BY MR. TIDRICK
23      MR. TIDRICK:  Q  Good afternoon.      12:18
24  A  Good afternoon.            12:18
25  Q  Would you please state your full name for the   12:18

1   record?                12:18
2   A  Elizabeth Barbara Arnold.        12:18
3   Q  Is it Dr. Arnold?            12:18
4   A  No.                12:18
5   Q  Ms. Arnold, have you ever been deposed before?   12:18
6   A  I have.                12:18
7   Q  Approximately how many times?        12:18
8   A  Twice.                12:18
9   Q  You understand then generally what a        12:18
10  deposition is?                12:18
11  A  Yes.                12:18
12  Q  You understand that you're testifying under   12:18
13  penalty of perjury today?            12:18
14  A  Yes.                12:18
15  Q  You understand that the oath that has been   12:18
16  administered to you is the same as is administered in a   12:18
17  court of law?                12:18
18  A  Yes.                12:18
19  Q  The two times you've been deposed before,   12:19
20  approximately when did those depositions occur?   12:19
21  A  A year or two ago.  And then the other one was   12:19
22  a few years before that.            12:19
23  Q  The case a year or two ago, what did that   12:19
24  involve?                12:19
25  A  They were both wage and hour cases.      12:19

1   Q  Both of the cases in which you've been deposed   12:19
2   before were wage and hour cases?        12:19
3   A  Correct.                12:19
4   Q  Were they both class actions?        12:19
5   A  Yes.                12:19
6   Q  In those two cases, did you testify on behalf   12:19
7   of the plaintiffs or the defendant?        12:19
8   A  Defendant.                12:19
9   Q  Who were the defendants in the two cases that   12:19
10  you've testified in before?            12:19
11  A  I'm not sure if that's public.        12:19
12  Q  You can still answer.            12:20
13      MR. SPELLBERG:  Was it a lawsuit that had been   12:20
14  filed?                12:20
15      THE WITNESS:  Yes.            12:20
16      MR. SPELLBERG:  You can go ahead.      12:20
17      THE WITNESS:  Oh, okay.        12:20
18      MR. SPELLBERG:  Was there a court settlement   12:20
19  that has a confidentiality provision?        12:20
20      THE WITNESS:  Well, one of them is still   12:20
21  active.  It's been going on for many years obviously.   12:20
22      MR. SPELLBERG:  It will be a public record   12:20
23  then that's okay.  Unless you have a concern you want   12:20
24  to talk about.  There is no --        12:20
25      THE WITNESS:  Yeah.  Maybe we should talk   12:20

3 (Pages 6 - 9)

1 about it.                                    12:20
2       MR. SPELLBERG: Okay.                    12:20
3       THE WITNESS: Okay.                      12:20
4       MR. SPELLBERG: Off the record.          12:20
5       VIDEO OPERATOR: Is that okay with you?  12:20
6       MR. TIDRICK: We can go off the record.  12:20
7       VIDEO OPERATOR: Going off the record. The 12:20
8 time is 12:20.                                12:20
9       (Recess taken 12:20 p.m. - 12:22 p.m.)  12:22
10      VIDEO OPERATOR: Back on the record. The time 12:22
11 is 12:22.                                    12:22
12      MR. TIDRICK: Madam court reporter, could you 12:22
13 please read back the last pending question.  12:23
14      (Pending question read.)                12:23
15      THE WITNESS: Savemart Supermarkets and H & R 12:23
16 Block.                                       12:23
17      MR. TIDRICK: Q The second one. That's H & R 12:23
18 Block?                                       12:23
19   A   Yes. H & R Block.                      12:23
20   Q   The tax preparation company?           12:23
21   A   Correct.                               12:23
22   Q   You were retained by the employer defendants 12:23
23 in both of those cases?                      12:23
24   A   Correct.                               12:23
25   Q   Do you have any knowledge where in the country 12:23
                                          Page 10

1 those lawsuits were filed?                    12:23
2   A   I believe those were both California cases. 12:23
3   Q   State or federal court, do you know?    12:24
4   A   State, I believe.                       12:24
5   Q   I'm showing you a document that's been  12:24
6 previously marked as Plaintiffs' Exhibit 100, the 12:24
7 deposition notice.                            12:24
8       Have you seen that document before?     12:24
9   A   I have seen it, yes.                     12:24
10   Q   You understand that you're testifying here 12:24
11 today pursuant to that deposition notice?    12:24
12   A   Yes.                                    12:24
13   Q   You understand that that deposition notice 12:24
14 called for you to produce certain documents?  12:24
15   A   Yes. I believe that -- well, we do have some 12:24
16 materials to hand over to you today. But it's my 12:24
17 understanding that there was a dispute regarding some 12:24
18 of these materials and that it's still a bit up in the 12:24
19 air in terms of what's being -- what is being 12:25
20 identified as responsive to this particular notice. 12:25
21   Q   Are you able to hand me whatever documents 12:25
22 you're producing today?                      12:25
23      MR. SPELLBERG: Yeah. Let me say, I believe, 12:25
24 most of what you've asked for has previously been 12:25
25 produced.                                    12:25
                                          Page 11

1       There are some additional materials on this 12:25
2 thumb drive which we're handing over to you today. 12:25
3       MR. TIDRICK: Q Ms. Arnold, do you have any 12:25
4 understanding of what documents are on the thumb drive 12:25
5 that you're producing today?                  12:25
6   A   Yes.                                     12:25
7   Q   What are they?                           12:25
8   A   They are invoices, a copy -- copies of   12:25
9 invoices that were submitted for the project. And then 12:25
10 there is an updated version of the master raw task 12:26
11 database which includes the more recent coding that we 12:26
12 conducted, specifically related to walking time and 12:26
13 work time. And that is in Excel format as requested. 12:26
14   Q   Other than the materials you just described is 12:26
15 there anything else on the thumb drive that you have 12:26
16 produced today?                              12:26
17   A   No.                                     12:26
18   Q   You mentioned a minute or two ago that there 12:26
19 are some materials that are, quote, "a bit still up in 12:26
20 the air as to whether they are being produced." 12:26
21      What documents are those?                12:27
22      MR. SPELLBERG: Well, I'm going to instruct 12:27
23 the witness not to answer that. I think that's a 12:27
24 dispute between the attorneys.               12:27
25      Whatever we've discussed with her on that, I 12:27
                                          Page 12

1 don't believe you're entitled to discover. I'm happy 12:27
2 to talk with you about it off the record.     12:27
3       MR. TIDRICK: Sitting right now I don't  12:27
4 recall documents that have been identified that there 12:27
5 was any dispute about production.            12:27
6       MR. SPELLBERG: Yeah. I would have to go off 12:27
7 the record. I'm not sure what's referred to either. I 12:27
8 presume -- you know, and Kevin had gone back and forth 12:27
9 on things. I've seen so much e-mail traffic over the 12:27
10 last few weeks.                              12:27
11      MR. TIDRICK: Q I'm showing you a document 12:28
12 that's been marked as Plaintiffs' Exhibit 108. 12:28
13      What is this document?                   12:28
14   A   I don't recall seeing this before. I would -- 12:28
15 I can speculate.                             12:28
16      MR. SPELLBERG: Don't do that.           12:29
17      MR. TIDRICK: Q I'll represent to you that 12:29
18 Plaintiffs' Exhibit 108 is a document that was provided 12:29
19 by defendants' counsel as part of a document production 12:29
20 from you.                                    12:29
21      MR. SPELLBERG: There is no question pending. 12:29
22      MR. TIDRICK: Q With that information, does 12:29
23 it refresh your recollection whether you've seen the 12:29
24 Plaintiffs' Exhibit 108 before?              12:29
25      MR. SPELLBERG: I'll object that fact is not 12:29
                                          Page 13

4 (Pages 10 - 13)

1 in evidence. We don't agree with it.                12:29
2     You may answer if you recognize the document.   12:29
3     THE WITNESS: I don't recognize the document.    12:29
4     MR. TIDRICK: Q Do you have any familiarity       12:30
5 with any of the information that's contained in the  12:30
6 Plaintiffs' Exhibit 108 document?                    12:30
7     MR. SPELLBERG: I'm sorry. Don't -- I don't       12:30
8 want you to speculate. If you recognize any of it, you 12:30
9 can testify to it. But, otherwise, you're not to       12:30
10 answer.                                              12:30
11     THE WITNESS: No. I mean there appears to be     12:30
12 a list of abbreviations. Owl, I believe that's an    12:30
13 overnight run, but that's about it.                  12:30
14     MR. TIDRICK: Q When you say "that's about       12:30
15 it," is there anything more in the Exhibit 108 document 12:31
16 that you're familiar with?                           12:31
17     A Well, I recognize the term "cable car. Light  12:31
18 rail vehicle. Conductor. Grip men. Grip man."        12:31
19     Q Anything else?                                 12:31
20     A I'm looking through. I don't think so, no.    12:31
21     Q The second to last item you mentioned, was    12:31
22 that grip man, the abbreviation MOT.                 12:32
23     A Well, I've never seen motor man. But I        12:32
24 believe grip man is the grip role that one of the     12:32
25 operators plays on the cable car. But I haven't seen 12:32

                                                    Page 14

1 it written quite like that before. And I haven't seen 12:32
2 motor man. That I --                                  12:32
3     Q Sorry. I didn't mean to cut you off.           12:32
4     A That's okay. I just said that I remember.      12:32
5     Q You're saying that motor man is a term that    12:32
6 you may or may not remember?                          12:32
7     A I don't recall seeing the term "motor man"     12:32
8 previously.                                           12:32
9     Q I'm showing you a document that was marked as  12:32
10 Plaintiffs' Exhibit 105.                             12:33
11     A Yes.                                           12:33
12     Q Is this a report that you created?            12:33
13     A Yes.                                           12:33
14     Q For ease of reference I'll refer to that in   12:33
15 this deposition as your initial report.              12:33
16     A Okay.                                          12:33
17     Q Do you understand that?                        12:33
18     A Yes.                                           12:33
19     Q That was your initial report in this case.    12:33
20 Correct?                                             12:33
21     A Correct.                                       12:33
22     MR. TIDRICK: If you could please turn to        12:33
23 Exhibit B --                                         12:33
24     (Chester Hanvey enters deposition room.)        12:33
25     MR. TIDRICK: Q -- of Plaintiffs' Exhibit 105.   12:33

                                                    Page 15

1     A Mm-hmm.                                         12:33
2     MR. SPELLBERG: So Mr. Hanvey, for the record,    12:33
3 has entered the deposition.                           12:34
4     MR. TIDRICK: What is the basis for               12:34
5 Mr. Hanvey's presence in the deposition?             12:34
6     MR. SPELLBERG: He's an expert consultant         12:34
7 retained in this case.                               12:34
8     MR. TIDRICK: And he's the next to testify        12:34
9 today. Correct?                                       12:34
10     MR. SPELLBERG: Right.                            12:34
11     You have two BRG people today -- both are       12:34
12 here.                                               12:34
13     MR. TIDRICK: Because he's not a party to the    12:34
14 case, plaintiffs' position is that he's not entitled to 12:34
15 be here. And also given that he is about to testify,  12:34
16 the typical rules of court would provide that someone 12:35
17 who's going to testify is not to be present at the    12:35
18 deposition for a number of reasons that underlie the  12:35
19 rule, including that they are not to be influenced by  12:35
20 other's deposition testimony.                         12:35
21     So we would ask that he leave the room,         12:35
22 please.                                             12:35
23     MR. SPELLBERG: Do you have authority that       12:35
24 supports that? Because clearly experts are entitled to 12:35
25 sit in to see other expert's testify.                12:35

                                                    Page 16

1     MR. YOUNG: Do you have authority?                12:35
2     MR. SPELLBERG: I think I just asked you.         12:35
3 You're the one who just identified that legally he     12:35
4 shouldn't be staying.                                12:35
5     MR. YOUNG: Do you want to go off the record?    12:35
6     Can we go off the record, please.               12:35
7     VIDEO OPERATOR: Going off the record. The        12:35
8 time is 12:35.                                        12:38
9     (Recess taken 12:35 a.m. - 12:54 p.m.)          12:54
10     VIDEO OPERATOR: Back on the record. The time    12:54
11 is 12:54.                                            12:54
12     MR. SPELLBERG: So at the break defendant has    12:54
13 agreed that Mr. Hanvey will be excused from the       12:54
14 deposition and is not present now. He's left the      12:54
15 deposition room.                                     12:54
16     My request to plaintiffs was that once they     12:54
17 are past a point where they think there is any overlap 12:54
18 or possible prejudice, Mr. Hanvey attending the       12:54
19 deposition, they will let me know and he can return to 12:54
20 the deposition.                                       12:54
21     MR. TIDRICK: That is what we're planning.       12:54
22     Madam court reporter, please read back the      12:54
23 last question that was pending.                       12:55
24     (Pending question read.)                        12:55
25     MR. TIDRICK: Q If you could please turn to      12:55

                                                    Page 17

5 (Pages 14 - 17)

**Page 18**

1 Page 3 of 3 of that. Fourth from the bottom there is a 12:55
2 document entitled Abrdvs.pdf. And I'll represent to 12:55
3 you that the Plaintiffs' Exhibit 108 document is a 12:55
4 printout of that document. 12:55
5 A Okay. 12:55
6 Q Assuming what I just said is correct and that 12:56
7 Plaintiffs' Exhibit 108 is a printout of the Abrdvs.pdf 12:56
8 document, assuming that to be true, is Plaintiffs' 12:56
9 Exhibit 108 a document that you received from SFMTA? 12:56
10 A Received? Yes. 12:56
11 Q Who specifically did you receive it from? 12:57
12     MR. SPELLBERG: You may testify if you know. 12:57
13     THE WITNESS: Different materials arrived at 12:57
14 different points. I don't remember specifically which 12:57
15 documents came from who. 12:57
16     MR. TIDRICK: Q So is the answer that you 12:57
17 don't know? 12:57
18 A We received materials from John Rollnick and 12:57
19 his staff. Who specifically from his staff, I don't 12:57
20 recall. 12:57
21 Q But it was either from Jonathan Rollnick or 12:57
22 his staff. Correct? 12:57
23 A I believe so. 12:57
24 Q The initial report, which is marked as 12:58
25 Plaintiffs' Exhibit 105. 12:58

**Page 19**

1     Did anyone other than you draft the report? 12:58
2 A What do you mean by "draft"? 12:58
3 Q Do you ever use the word "draft" yourself? 12:58
4     MR. SPELLBERG: I'm going to object to the 12:58
5 form of the question. I don't understand it. 12:58
6     If you don't understand it, let him know. 12:58
7     THE WITNESS: I'm not sure what you mean by 12:58
8 "draft." 12:58
9     MR. TIDRICK: Q Did anyone besides you play 12:59
10 any part in writing the report? 12:59
11 A I wrote the report. 12:59
12 Q When you wrote the initial report Plaintiffs' 12:59
13 Exhibit 105, did you personally type out every word of 12:59
14 the report? 12:59
15 A I typed out -- 12:59
16     MR. SPELLBERG: I'm going to object. Vague 12:59
17 and ambiguous. Typing as opposed to writing are two 12:59
18 different things. 12:59
19     You may answer that question. 12:59
20     THE WITNESS: I typed the report. I believe 13:00
21 my colleague Chester Hanvey may have reviewed the 13:00
22 report. But I typed it. 13:00
23     MR. TIDRICK: Q Do I understand you correctly 13:00
24 there were no sections or parts of the report that 13:00
25 someone else wrote and that you then copied and pasted 13:00

**Page 20**

1 into the report? 13:00
2 A No. 13:00
3 Q "No" meaning that did not happen. Correct? 13:00
4 A Right. 13:00
5 Q In your work you use the term "time and motion 13:01
6 study"? 13:01
7 A We've used that term, yes. 13:01
8 Q Do you consider what you did for SFMTA to be a 13:01
9 time and motion study? 13:01
10 A The study that we did for SFMTA was a job 13:01
11 analysis using observational time and motion 13:01
12 methodology. 13:01
13 Q Have you ever done analyses using a time and 13:01
14 motion methodology prior to this one? 13:01
15 A Yes. 13:01
16 Q Approximately how many times? 13:01
17 A I've conducted over 150 job analyses using a 13:02
18 variety of methods. One of which is observational time 13:02
19 and motion methodology. 13:02
20 Q Of the approximately 150 job analyses that 13:02
21 you've done, approximately how many used a time and 13:02
22 motion methodology? 13:02
23 A I don't have the exact number, but I would say 13:02
24 a third to a half. 13:02
25 Q A total of roughly 50 to 75. Is that 13:02

**Page 21**

1 approximately correct? 13:03
2 A Sounds about right. 13:03
3 Q Of the job analyses that you've done -- strike 13:03
4 that. 13:03
5     Of the approximately 50 to 75 job analyses 13:03
6 that you've done using a time and motion methodology, 13:03
7 how many of those have been for court cases? 13:03
8 A I would have to look at the list, but probably 13:03
9 three-fourths, maybe 75 percent. 13:04
10 Q Now I understand these are just 13:04
11 approximations, but based on the numbers you've 13:04
12 provided, just running the math, do I understand 13:04
13 correctly you've done approximately 37 to 56 job 13:04
14 analyses using time and motion methodology for court 13:04
15 cases? 13:04
16 A When you say "court cases," you mean active 13:05
17 litigation? 13:05
18 Q Yes. 13:05
19 A Sounds a bit high, but we can go with those 13:05
20 numbers. 13:05
21 Q Of the time and motion -- strike that. 13:05
22     Of the job analyses that you've done for court 13:05
23 cases in which you used a time and motion methodology, 13:05
24 approximately what percentage of those were you 13:05
25 retained by the side representing the workers? 13:05

6 (Pages 18 - 21)

| | |
|---|---|
| 1   A   The plaintiffs?    13:05 | 1   marked as Plaintiffs' Exhibit 106.    13:10 |
| 2   Q   Yes.    13:05 | 2   A   Okay.    13:10 |
| 3   A   Time and motion studies are almost exclusively   13:05 | 3   Q   Plaintiffs' Exhibit 106 is your rebuttal   13:10 |
| 4   conducted for the defense, simply because the    13:05 | 4   report. Correct?    13:10 |
| 5   methodology requires that we have access to employees.   13:06 | 5   A   Correct.    13:10 |
| 6   And typically it's the company that is able to give   13:06 | 6   Q   You drafted that?    13:10 |
| 7   that access.    13:06 | 7   A   Correct.    13:10 |
| 8   Q   So when you say "almost exclusively for the   13:06 | 8   Q   Did anyone else draft it besides you?    13:10 |
| 9   defendant," is there a handful of cases in which you   13:06 | 9   A   No. I wrote it.    13:10 |
| 10   did job analyses using a time and motion methodology   13:06 | 10   Q   For any of the analyses that you've done in   13:10 |
| 11   where you were retained by the workers, the plaintiffs?   13:06 | 11   this case, are there any assumptions that you used that   13:11 |
| 12   A   I have done work for the plaintiffs, but I   13:06 | 12   you were provided by counsel?    13:11 |
| 13   can't think of actually a time and motion observation   13:06 | 13   A   What do you mean by "assumptions we used"?   13:11 |
| 14   study that was for the plaintiffs.    13:06 | 14   Q   Is the word "assumption" a word that you use   13:11 |
| 15   Q   Have you physically been to each of SFMTAs   13:06 | 15   in your work?    13:11 |
| 16   divisions?    13:07 | 16    MR. SPELLBERG: Vague and ambiguous.    13:11 |
| 17   A   Yes.    13:07 | 17    THE WITNESS: Is the word "assumption"? I   13:11 |
| 18   Q   Turning back again to the Exhibit 105    13:07 | 18   know what the word assumption means, but I'm not sure   13:11 |
| 19   document, and specifically Exhibit B to the 105    13:07 | 19   how it applies here.    13:11 |
| 20   document.    13:07 | 20    MR. TIDRICK: Q   Were you told to assume   13:11 |
| 21    Exhibit B to Plaintiffs' Exhibit 105, your   13:07 | 21   anything for your analysis?    13:11 |
| 22   initial report, is a list of all the documents that you   13:07 | 22   A   No.    13:11 |
| 23   received.    13:07 | 23   Q   For your initial report, Plaintiffs'    13:12 |
| 24    Is that correct?    13:07 | 24   Exhibit 105, did you personally perform all the   13:12 |
| 25   A   That we received, yes.    13:07 | 25   observations for that report?    13:12 |
|                    Page 22 |                    Page 24 |
| 1   Q   Did you personally review all of the documents   13:07 | 1   A   Did I personally perform all of the    13:12 |
| 2   that you received?    13:07 | 2   observations? No.    13:13 |
| 3   A   No.    13:07 | 3   Q   For your rebuttal report, Plaintiffs'    13:13 |
| 4   Q   Are you able to identify on Exhibit B list   13:07 | 4   Exhibit 106, did you personally perform all of the   13:13 |
| 5   which documents that you received that you did not   13:07 | 5   observations for that report?    13:13 |
| 6   review?    13:07 | 6   A   No.    13:13 |
| 7   A   No. I would have to really look through and   13:07 | 7   Q   For the initial report, are you able to   13:13 |
| 8   open the file. Sometimes the name isn't descriptive   13:07 | 8   provide me even an approximation of what percentage of   13:13 |
| 9   enough. But, you know, this is intended to be a list   13:08 | 9   the observations that you relied upon were observations   13:13 |
| 10   of files received. Not all of them were particularly   13:08 | 10   that you personally made?    13:13 |
| 11   relevant or useful.    13:08 | 11   A   I would have to look, but I believe it was   13:13 |
| 12   Q   Would it be easier for you to identify on the   13:08 | 12   close to 40. 37, something like that.    13:13 |
| 13   Exhibit B list the documents that you did actually   13:08 | 13   Q   For the rebuttal report -- when you say "37 to   13:14 |
| 14   review?    13:08 | 14   40," are you saying that's the number of observations   13:14 |
| 15   A   You know, it's been a little while. We review   13:08 | 15   you did? Or is that the percentage of the observations   13:14 |
| 16   the documents for background purposes.    13:08 | 16   you did?    13:14 |
| 17    Do you want me to point out ones that I   13:08 | 17   A   Oh. That would be the count.    13:14 |
| 18   recognize?    13:08 | 18   Q   Do I understand correctly for the initial   13:14 |
| 19   Q   Yes, please.    13:08 | 19   report the total number of observations that you   13:14 |
| 20   A   So some of the legal documents. Certainly the   13:09 | 20   personally did in connection with that report was   13:14 |
| 21   defect cards. The divisions -- the locations of the   13:09 | 21   approximately 37 to 40?    13:14 |
| 22   divisions and the superintendents of the divisions.   13:09 | 22   A   Yes. Although I would have to check the   13:14 |
| 23   The division chart. Those are the ones that stand out   13:10 | 23   actual list to verify that number.    13:14 |
| 24   to me right now.    13:10 | 24   Q   Are you able to tell me approximately what the   13:14 |
| 25   Q   I'm showing you the document that has been   13:10 | 25   total number of observations were made that you used in   13:15 |
|                    Page 23 |                    Page 25 |

1 connection with your initial report?          13:15
2   A   With the initial report there was, I believe,   13:15
3 231. But I can double check. 231 for the initial   13:16
4 report.          13:16
5   Q   For the rebuttal report, marked as plaintiffs'   13:16
6 106, what was the total number of observations that you   13:16
7 relied upon for that report?          13:16
8   A   So for the rebuttal report, we conducted an   13:16
9 additional 44 relief point observations. We also   13:16
10 conducted additional observations that were focused   13:16
11 exclusively on the bulletin boards at seven of the   13:16
12 different divisions.          13:16
13   Q   How many observations were made focused on the   13:17
14 bulletin boards?          13:17
15   A   Well, the bulletin boards were structured   13:17
16 differently. So they were for a duration of time. And   13:17
17 we tallied the number of operators who actually came   13:17
18 and read the bulletin board. So I'm not sure how to   13:17
19 answer that question.          13:17
20   Q   Let's break it down.          13:17
21       First, with respect to the 44 relief point   13:17
22 observations that were made that you relied upon for   13:17
23 the rebuttal report, of those 44 relief point   13:17
24 observations, how many did you personally make?   13:17
25   A   I did not conduct any of the relief point   13:17

Page 26

1 observations.          13:17
2   Q   With respect to the observations that were   13:17
3 focused on the bulletin boards for the rebuttal report,   13:18
4 are you able to tell me approximately the total number   13:18
5 of hours that was spent making those observations?   13:18
6   A   Well, there is a table included in the report,   13:18
7 Table 1 in the rebuttal, that lists the duration of   13:18
8 each of the observations at each of the seven   13:18
9 divisions. So I would need to do the math on adding   13:18
10 all of those hours up.          13:18
11   Q   Are you able to tell me of the time that was   13:18
12 spent doing observations at the bulletin boards for   13:18
13 your rebuttal report, approximately how many hours did   13:18
14 you personally spend making those observations?   13:18
15   A   My team conducted the bulletin observations.   13:18
16   Q   So is the answer zero?          13:18
17   A   Zero.          13:19
18   Q   You spent zero hours making those   13:19
19 observations. Correct?          13:19
20   A   I did not do any of the bulletin board   13:19
21 observations, correct.          13:19
22   Q   Is there a reason that you did not personally   13:19
23 do any of the observations in connection with rebuttal   13:19
24 report?          13:19
25   A   Scheduling.          13:19

Page 27

1   Q   With respect to the time period covered by the   13:19
2 initial report and the rebuttal report, do I understand   13:19
3 correctly that the time period for which your team did   13:20
4 observations was limited to the time period of   13:20
5 December 14th, 2015 through June 9th, 2016?   13:20
6   A   I know the June date is correct. I would have   13:20
7 to just double check the last -- which date did you   13:20
8 say, June 9th?          13:20
9   Q   From December 14th, 2015 through June 9th,   13:20
10 2016.          13:20
11   A   Correct.          13:20
12   Q   Is there a reason that your observations --   13:20
13 strike that.          13:20
14       Is there a reason that the observations of   13:21
15 your team was limited to the time period of   13:21
16 December 14th, 2015 through June 9th, 2016?   13:21
17       MR. SPELLBERG: I'm going to object to the   13:21
18 form of the question. Use of the word "limited."   13:21
19       You may answer.          13:21
20       THE WITNESS: Well, that's a period of nearly   13:21
21 six months. That seems like a pretty lengthy period   13:21
22 for an observation study like this, based on my   13:21
23 experience.          13:21
24       MR. TIDRICK: Madam court reporter, could you   13:21
25 read back the question.          13:21

Page 28

1       (Previous question read.)          13:22
2       MR. TIDRICK: Q   Do you understand that   13:22
3 question?          13:22
4   A   I'm not sure what you're getting at. Is there   13:22
5 a reason?          13:22
6   Q   Let's start with this.          13:22
7       How did you pick the starting date of   13:22
8 December 14th, 2015 as the first date to do   13:22
9 observational study?          13:22
10   A   Well, there is a process for the methodology   13:22
11 which includes background research, study design. We   13:22
12 started collecting data when we were ready to collect   13:22
13 data.          13:22
14   Q   When did you first start doing any work in   13:23
15 connection with this case?          13:23
16   A   I believe it says in the report we were   13:23
17 retained in October 2015.          13:23
18   Q   Is it fair to say that the only reason you   13:23
19 didn't do observational work prior to December 14th,   13:24
20 2015 is simply based on when your firm was retained and   13:24
21 the amount of time it took to get ready to do the   13:24
22 study?          13:24
23   A   When the firm was retained and the amount of   13:24
24 time it took us to complete our background and planning   13:24
25 activities so that we would be ready to collect data.   13:24

Page 29

8 (Pages 26 - 29)

Page 30

1  Q  I'm handing you documents that have been    13:25
2  marked as Plaintiffs' Exhibit 109 through 116.    13:25
3  A  Okay.    13:25
4  Q  What are the documents that have been marked    13:25
5  Exhibits 109 through 116?    13:26
6  A  These are our notes from the site visits we    13:26
7  conducted at the divisions.    13:26
8  Q  Who created these documents?  And if you need    13:26
9  to, you can go through them one by one if they were    13:26
10  created by different people.    13:26
11  A  When you say "created," do you mean the    13:26
12  template itself?  Or do you mean who wrote notes?    13:26
13  Q  Let's start with the template itself.    13:26
14  A  I believe that I did -- Chester and I did.  I    13:27
15  don't recall exactly who -- probably both contributed    13:27
16  to it.    13:27
17  Q  With respect to the handwritten notes on the    13:27
18  Exhibit 109 through 116 documents, are you able to tell    13:27
19  me for each of these documents who made those    13:27
20  handwritten notes?    13:27
21  A  Yes.  I believe so.    13:27
22  Q  Let's take them in order.  Plaintiffs'    13:27
23  Exhibit 109.    13:27
24  A  There is also a -- there is a table that has    13:27
25  this in it.  Here we go.  So in order --    13:28

Page 31

1       MR. SPELLBERG:  Which exhibit is that?    13:28
2       THE WITNESS:  This is Exhibit 109.    13:28
3       MR. SPELLBERG:  No.  No.  This one. 105.    13:28
4       THE WITNESS:  Okay.    13:28
5       MR. TIDRICK:  Q  So starting with Exhibit 109.    13:28
6  A  109 was conducted by Kirk DeStiger.    13:28
7  Q  Exhibit 110, who created that?    13:28
8  A  That was mine.    13:28
9  Q  Exhibit 111, who created that?    13:28
10  A  That was also mine.    13:28
11  Q  Exhibit 112, who created that?    13:28
12  A  That was Chester Hanvey.    13:28
13  Q  Exhibit 113, who created that?    13:28
14  A  That was Chester Hanvey.    13:28
15  Q  Exhibit 114, who created that?    13:29
16  A  I believe this was also Kirk DeStiger.    13:29
17  Q  Exhibit 115, who created that?    13:29
18  A  That was mine.    13:29
19  Q  Exhibit 116, who created that?    13:29
20  A  Christina Banks.    13:29
21  Q  The template that was used for the Exhibit 109    13:29
22  through Exhibit 116, interview notes, when did you    13:29
23  finalize that template?    13:29
24  A  Well, I think we may have done some    13:29
25  reformatting.  Clearly there is slight differences in    13:30

Page 32

1  the formatting, but the information is the same.    13:30
2       I can't give you an exact date as to when the    13:30
3  template was finalized.    13:30
4  Q  Can you tell me approximately when?    13:30
5  A  When it was finalized?  The content is all the    13:30
6  same.  It's just formatting.  So it looks like - looks    13:30
7  like we had a couple different versions going but it's    13:30
8  all the same content.    13:30
9  Q  The first version of the template that was    13:30
10  used for the Exhibit 109 through 116 documents.    13:30
11  A  Mm-hmm.    13:30
12  Q  Can you tell me approximately when that    13:30
13  template was finalized?    13:30
14  A  Well, clearly it went through a series of    13:31
15  revisions so I don't know what you mean by finalized.    13:31
16       The last version -- mine was 115 -- was    13:31
17  conducted last.  So if you want to call that the final    13:31
18  version.    13:31
19  Q  Of the Exhibit 109 through 116 documents,    13:31
20  which one was conducted first?    13:31
21  A  Well, there were three of them conducted on    13:31
22  the same day.  Kirkland, Potrero and Green were all    13:31
23  conducted on November 17, based on this table, Page 5    13:31
24  in the report.    13:31
25  Q  The template that was used for the interviews    13:31

Page 33

1  that were conducted on November 17, 2015, can you tell    13:32
2  me approximately when that template was finalized?    13:32
3  A  So we -- it looks like we used slightly    13:32
4  different formatted versions.  So, again, I'm not sure    13:32
5  what you mean.    13:32
6  Q  Different versions for the --    13:32
7  A  They are formatted slightly different.  So we    13:32
8  tried to just add a little table at the top, for    13:32
9  example, to just put the names.    13:32
10  Q  You're saying the three that were    13:32
11  conducted on November 17th, 2015 are different    13:32
12  templates?    13:32
13  A  Not different templates.  The content is all    13:32
14  the same.  They are just formatted slightly different.    13:32
15  Q  For the Plaintiffs' Exhibit 109 document.    13:32
16  A  Okay.    13:32
17  Q  The template that was used for those interview    13:33
18  notes, Plaintiffs' Exhibit 109, when did you create    13:33
19  that template?    13:33
20  A  I don't recall the specific dates of when this    13:33
21  template was created.    13:33
22  Q  Can you tell me approximately?    13:33
23  A  Well, before it was conducted.  Before it was    13:33
24  printed and used.  It says "Draft 11/13."    13:33
25  Q  Do you believe that the draft was created on    13:33

9 (Pages 30 - 33)

1 November 13th, 2015? 13:33
2 A Well, it's likely somewhere between the 13th 13:33
3 and the 17th. 13:33
4 Q What steps did you go through to develop the 13:34
5 template that you used for the Plaintiffs' Exhibit 109 13:34
6 interview? 13:34
7 A We reviewed a variety of documents, document 13:34
8 review, to familiarize yourself with some of the 13:34
9 relevant issues. To familiarize ourselves with the 13:34
10 division. Some division terminology, et cetera. And 13:34
11 put together a list of questions that we thought would 13:34
12 be helpful for us to know. 13:34
13 Q Were you provided any assumptions by counsel 13:35
14 to prepare the interview template? 13:35
15 A Not that I recall. 13:35
16 Q Why did you conduct interviews with the seven 13:35
17 division superintendents? 13:35
18 A The superintendents served in the subject 13:36
19 matter expert capacity, SMEs. It is general practice 13:36
20 within the field of job analysis to interview subject 13:36
21 matter experts to learn about the jobs that you're 13:36
22 studying. 13:36
23 We felt that the superintendents would also 13:36
24 have the -- were in the best position to provide us 13:36
25 with broad information about the operations of the 13:36

Page 34

1 division, to give us tour, to point out different areas 13:36
2 in the division and describe general practices. 13:36
3 Q Do you have any reason to believe that -- 13:36
4 strike that. 13:37
5 The handwritten notes on the Exhibit 109 13:37
6 through 116 documents -- 13:37
7 A Mm-hmm. 13:37
8 Q -- did you rely on that handwritten 13:37
9 information for the analysis that you did in connection 13:37
10 with either your initial report or your rebuttal 13:37
11 report? 13:37
12 A The site visits were conducted as part of our 13:37
13 background research only. We used them to inform the 13:37
14 design of our actual data collection. 13:37
15 Again, they were -- the purpose was to learn 13:37
16 about the general operations of each of the divisions. 13:38
17 We needed to go to each one because every division is 13:38
18 completely different. 13:38
19 We went to each division to learn about the 13:38
20 specifics of that particular division in terms of 13:38
21 vehicle type, practices. They were used for that 13:38
22 purpose and were not relied upon for the ultimate 13:38
23 numeric data analysis or findings. 13:38
24 Q When you say that every division is completely 13:38
25 different, are you exaggerating? 13:38

Page 35

1 MR. SPELLBERG: Objection. That's a 13:38
2 pejorative question. 13:38
3 Don't answer the question. 13:38
4 MR. TIDRICK: Counsel, are you instructing the 13:38
5 witness not to answer that question? 13:38
6 MR. SPELLBERG: Right. You can answer the 13:38
7 basis -- you can ask her the basis for her comment. 13:39
8 But to ask it in that way is insulting and not proper. 13:39
9 So I've instructed. 13:39
10 MR. TIDRICK: It's a proper question and I ask 13:39
11 that the court reporter mark that point in the 13:39
12 transcript, please. 13:39
13 Q What is your basis for saying that every 13:39
14 division is completely different? 13:39
15 A I have personally spent time at each of the 13:39
16 divisions, and I can tell you that the physical layouts 13:39
17 of each of the divisions are completely different. The 13:39
18 vehicle types are different. The procedures at each 13:39
19 division is different. 13:39
20 In terms of -- well, a variety of procedures. 13:39
21 The way things are executed is different at each of the 13:39
22 divisions. 13:40
23 Q Do you believe that there are similarities 13:40
24 between the divisions? 13:40
25 A Similarities in the sense that they all 13:40

Page 36

1 operate Muni vehicles. 13:40
2 Q Did you observe any similarities between the 13:40
3 divisions with respect to procedures? 13:40
4 A Well, I would say there are some similarities. 13:40
5 Q Based on the interview notes that were 13:41
6 collected and written up by your team, do you believe 13:41
7 that there are significant similarities with respect to 13:41
8 procedures at the divisions? 13:41
9 MR. SPELLBERG: Vague and ambiguous. 13:41
10 Overbroad. 13:41
11 You may answer if you're able. 13:41
12 THE WITNESS: Typically when we talk to SMEs 13:41
13 that are at a more senior level, they are able to 13:41
14 provide broad information about the way operations work 13:41
15 at the facilities. So because of that and because of 13:41
16 the fact it's quite broad, I suspect that looking at 13:42
17 their responses to some of the questions will probably 13:42
18 be similar. 13:42
19 MR. TIDRICK: Q Do you have any reason to 13:42
20 believe that any of the handwritten information in the 13:42
21 notes written up by your team, as reflected in the 13:42
22 Exhibits 109 through Exhibit 116 documents, is 13:42
23 inaccurate? 13:42
24 A I have no reason to believe that the 13:42
25 superintendents intentionally provided false 13:42

Page 37

10 (Pages 34 - 37)

1  information, if that's what you mean.  But I think that   13:42
2  they answered questions from their perspective as a   13:42
3  leader, as a senior leader at the facility.   13:42
4       Again, when talking to subject matter experts   13:43
5  who are more senior, sometimes they are not as in touch   13:43
6  with the daily operations of some of their lower level   13:43
7  employees.  This is common, which is why we don't rely   13:43
8  entirely on information collected from subject matter   13:43
9  experts in senior leadership roles.   13:43
10  Q   The handwritten information on the Exhibit 109   13:43
11  through Exhibit 116 documents, is it fair to say that   13:43
12  those handwritten notes reflects what the   13:43
13  superintendents said in response to the questions that   13:43
14  are posed in the template?   13:43
15  A   So the site visits are intended to be a   13:44
16  combination of observation of what the consultants see   13:44
17  at the division.  And then there are responses to   13:44
18  questions.  So you'll find some of both of that in   13:44
19  these documents.   13:44
20  Q   Focusing just on the part of the interview   13:44
21  template that starts "Superintendent interview   13:44
22  questions."   13:44
23  A   Mm-hmm.   13:44
24  Q   With respect to that part of the templates   13:45
25  that were used for the Exhibit 109 through Exhibit 116   13:45

Page 38

1  documents --   13:45
2  A   Mm-hmm.   13:45
3  Q   -- is it fair to say that the handwritten   13:45
4  notes in those parts of these documents reflects what   13:45
5  the superintendents said in response to the questions   13:45
6  that are posed in the template?   13:45
7  A   I believe so.  I haven't looked at these notes   13:45
8  in a little while.  But it's possible that during the   13:45
9  interview they didn't hit every question, and it's   13:45
10  possible that one question led to a different question.   13:45
11       These are not -- these kind of site visits are   13:45
12  a little bit more fluid than they are structured.   13:45
13  Again, because the intent is to really figure out   13:45
14  background information and not to collect data that   13:46
15  will ultimately be used in the analysis.   13:46
16  Q   Is it the intent and practice of your team   13:46
17  conducting the interviews to record in the templates in   13:46
18  the interview question sections for Exhibits 109   13:46
19  through 116 information collected during those   13:46
20  interviews as accurately as possible?   13:46
21  A   So, do we record information in these sheets   13:46
22  as accurately as possible?   13:46
23  Q   Yes.   13:46
24  A   Yes.  We record information in the site visit   13:46
25  sheets that is as accurate as possible.   13:46

Page 39

1  Q   And is it fair to say as a general matter for   13:47
2  the Exhibit 109 through 116 interview notes, that the   13:47
3  first part of the template reflects observations made   13:47
4  by the person on your team, and the latter part of the   13:47
5  template reflects information you gleaned from the   13:47
6  interviews with the superintendents?   13:47
7  A   I wouldn't necessarily say that these were --   13:47
8  the data was collected consecutively.  So the way site   13:47
9  visits work is a little more informal than that.  Some   13:47
10  of them you go in.  You're looking at things.  You're   13:47
11  jotting down notes.  So you may be talking to the   13:47
12  superintendent while you're walking, for example.  And   13:47
13  you might write down things that you see as you're   13:47
14  walking that may not be in a direct response to a   13:47
15  question to the superintendent.   13:47
16       So it's more fluid than that.  It's not a   13:47
17  structured process where you first go through Page 1   13:48
18  and then go through question by question.  It's   13:48
19  It's more interactive.   13:48
20       So because of that, it's -- I know, for   13:48
21  example -- so I might write down things kind of   13:48
22  sporadically throughout on the sheet because I've seen   13:48
23  something that I think is notable or something that I   13:48
24  want to come back to, for example.   13:48
25  Q   I think what you're describing is the order in   13:48

Page 40

1  which things occur.   13:48
2       What I'm getting at is slightly different in   13:48
3  that focusing just on the sections of the templates   13:48
4  that are described as superintendent interview   13:48
5  questions.   13:48
6       Is it fair to say that that part of the   13:48
7  templates, the handwritten information reflects   13:48
8  information gleaned from the superintendents, things   13:49
9  that the superintendents said during the interviews?   13:49
10  A   So what I'm telling you is not necessarily.   13:49
11  Because as you're walking -- because these are not   13:49
12  necessarily sit-down interviews.  We're walking around   13:49
13  the facility.   13:49
14       So I might write down something in a different   13:49
15  space off to the side.  Because these are intended for   13:49
16  our own review.  So I might put something off to the   13:49
17  side that looks like it's next to a question from the   13:49
18  superintendent, just because that's the page I have   13:49
19  open and I'll write it down.  That's something that I   13:49
20  saw and not necessarily about something the   13:49
21  superintendent responded to.  That's what I'm trying to   13:49
22  explain to you.   13:49
23  Q   Does your team have any practice to   13:49
24  differentiate between information that's gleaned from   13:49
25  their own observation versus what the superintendent   13:49

Page 41

1 says?                                    13:49
2    A   Well, the important piece of the site visit is    13:49
3 to gather background information about the divisions.    13:49
4 So for us it's an all encompassing site visit.  That's    13:50
5 why it's called a site visit.              13:50
6        So it's a mix of information that we've    13:50
7 observed and information that we're told.  It's a    13:50
8 combination of both.  Again, for background information    13:50
9 to help us set up the studies.             13:50
10       This was our first visit to each of the    13:50
11 facilities.  So we were still learning about where    13:50
12 things were.  Where things are located.  What happens    13:50
13 where.  That's the purpose of this information.    13:50
14   Q   My question was going to whether there is any    13:50
15 record of which is which.                  13:50
16       Is there any record that you have    13:50
17 indicating -- of the information in the interview    13:50
18 question section of the templates for Exhibit 109    13:50
19 through Exhibit 116, which information was gleaned from    13:50
20 interviews and which information was gleaned from    13:50
21 observations?                              13:50
22   A   I would have to look through -- I would have    13:50
23 to look through the notes to answer that.    13:51
24   Q   When you said "look through the notes," you    13:51
25 mean the Exhibit 109 through Exhibit 116 documents?    13:51

1    A   If you would like me to specifically    13:51
2 differentiate between what was observed and what was a    13:51
3 direct response from a superintendent, I would need to    13:51
4 go back through.                           13:51
5    Q   What I'm trying to get at is when you say "the    13:51
6 notes," you're referring to the Exhibit 109 through 116    13:51
7 documents.  Correct?                       13:51
8    A   Correct.                             13:51
9    Q   In other words, apart from the Exhibit 109    13:51
10 through 116 documents, you don't have some separate    13:51
11 record that differentiates between what materials in    13:51
12 those documents was gleaned from interviews versus    13:51
13 observations.                             13:51
14       Is that fair?                        13:51
15   A   We don't have a separate document that says    13:51
16 "Here's the observations and here's what we saw."    13:51
17   Q   Let's turn to the Exhibit 111 document.  The    13:52
18 Exhibit 111 document reflects -- it is notes that you    13:52
19 took personally.  Correct?                 13:52
20   A   Correct.                             13:52
21   Q   You conducted an interview with the    13:52
22 superintendents of the Flynn division in connection    13:52
23 with the notes that you took in the Exhibit 111    13:52
24 document.  Correct?                        13:52
25   A   Actually this was the assistant    13:52

1 superintendent.  The superintendent was out ill.  I    13:52
2 think she's seriously ill.  So we were unable to speak    13:52
3 with her as noted in the table.            13:52
4    Q   The interview notes reflected in the    13:53
5 Exhibit 111 document are notes that you took based on    13:53
6 an interview with the Flynn division assistant    13:53
7 superintendent.  Correct?                  13:53
8    A   Correct.                             13:53
9    Q   Do you have any basis for knowing how long    13:53
10 that assistant superintendent that you interviewed had    13:53
11 been working at the Flynn division?        13:53
12   A   I would have to read through the questions    13:53
13 again to see if we asked that.             13:53
14   Q   If it's not in the interview notes, do you    13:53
15 have any other basis for knowing how long that person    13:53
16 had been working at the Flynn division?    13:53
17   A   We might have heard -- we might have gotten    13:53
18 that information from -- I'm not sure.  But my    13:53
19 impression -- I think she's been there awhile.  I don't    13:54
20 think she was brand new.                   13:54
21   Q   If you could please turn to Page 7 of the    13:54
22 exhibit.                                  13:54
23   A   Oh, she's been there two years she said.    13:54
24   Q   Yes.                                 13:54
25       MR. SPELLBERG:  Page 7?               13:54

1        THE WITNESS:  Yeah.  "Been here two years."    13:54
2        MR. TIDRICK:  Q  If you could please turn to    13:54
3 Question 15, which is at Page 5 of Exhibit 111.    13:55
4    A   Okay.                                13:55
5    Q   Do I understand correctly that one of the    13:55
6 questions that you asked of the assistant    13:55
7 superintendent at the Flynn division was "Are operators    13:55
8 expected to read the postings on any of these bulletin    13:55
9 boards every day?"                         13:55
10       Is that a question you asked?         13:55
11   A   I believe so.                        13:55
12   Q   And do I understand correctly the answer that    13:55
13 the Flynn superintendent -- assistant superintendent    13:55
14 provided in response to that was yes?      13:55
15   A   That's what it says.  "Yes."           13:55
16   Q   That's what you understood that person's    13:55
17 answer to be.  Correct?                    13:55
18   A   Yes.                                 13:55
19       MR. SPELLBERG:  Can we go off the record a    13:55
20 minute?                                    13:56
21       VIDEO OPERATOR:  Is that all right with you?    13:56
22       (Short pause.)                        13:56
23       MR. TIDRICK:  Q  Do I understand that you also    13:56
24 asked the question "If so, which bulletin boards are    13:56
25 they expected to read?"                    13:56

| | |
|---|---|
| 1   A   Mm-hmm.                                    13:56 | 1        THE WITNESS:  I think that the difference      14:01 |
| 2   Q   Is that a yes?                              13:56 | 2   might be in the word "expected."  So there might be a    14:01 |
| 3   A   Sorry.  Could you say that again.           13:56 | 3   difference between what they are expected to do and     14:01 |
| 4   Q   After you asked the Flynn assistant         13:56 | 4   what they actually do.  But I'm sure this was fresh in    14:01 |
| 5   superintendent the question "Are operators expected to   13:56 | 5   my memory after the interview.                14:01 |
| 6   read the postings on any of these bulletin boards every   13:56 | 6        I also recall that there was a little bit        14:01 |
| 7   day?"                                          13:56 | 7   after language -- little bit of a language barrier with    14:01 |
| 8   A   Mm-hmm.                                    13:56 | 8   this particular interview.                     14:01 |
| 9   Q   And that person responded "yes."  You then   13:57 | 9        MR. TIDRICK:  Q  With respect to the first      14:01 |
| 10  asked "If so, which bulletin boards are they expected   13:57 | 10  question "Are operators expected to read the postings    14:02 |
| 11  to read?"  Correct?                            13:57 | 11  on any of these bulletin boards every day?"  Are you     14:02 |
| 12  A   Correct.                                   13:57 | 12  saying that the response received, "yes," may not be     14:02 |
| 13  Q   And do I understand correctly the response   13:57 | 13  accurate?  Are you saying that?                14:02 |
| 14  that you received to that was "The main one, plus the   13:57 | 14  A   I'm -- I don't recall specifically.  But I'm     14:02 |
| 15  safety side ones.  Not every day, but read it once."   13:57 | 15  looking at this now and thinking that the word         14:02 |
| 16  A   That's what it says.                        13:57 | 16  "expected" is the difference.  So are they expected to    14:02 |
| 17  Q   The written text "Plus safety side ones.  Not   13:58 | 17  read the postings every day?  Yes.              14:02 |
| 18  every day but read it once" is additional information   13:58 | 18       But when you ask "If so, which bulletin boards    14:02 |
| 19  about a bulletin board that posts bulletins regarding   13:58 | 19  are they expected to read?"  Then she might have said,    14:02 |
| 20  safety.                                        13:58 | 20  "The main one, plus the safety one.  But not really      14:02 |
| 21       Is that correct?                          13:58 | 21  every day.  They read it once."                 14:02 |
| 22  A   Looking at this now, I'm not quite sure what   13:58 | 22       So there is a difference between the second      14:02 |
| 23  she's referring to.  I would need to think about that.   13:58 | 23  response and the first response.  But I don't remember    14:02 |
| 24  Q   So you don't know what "read it once" refers   13:58 | 24  specifically, so I would have to think back about that    14:02 |
| 25  to?                                            13:58 | 25  one.                                          14:02 |
| Page 46 | Page 48 |

| | |
|---|---|
| 1   A   Well, I think she's saying that they don't    13:58 | 1   Q   When you say that there is some aspect that     14:03 |
| 2   read it every day.  They read it once.            13:59 | 2   you would have to reflect on, are you referring to the    14:03 |
| 3   Q   Referring to the safety side ones?          13:59 | 3   answer to 15A, the question, "If so, which bulletin      14:03 |
| 4   A   I can't be certain if she's referring to the   13:59 | 4   boards are they expected to read?"              14:03 |
| 5   safety side ones only, or if she's including the main   13:59 | 5   A   These site visits were conducted six, seven     14:03 |
| 6   one in that statement.                          13:59 | 6   months ago.  I haven't looked at this document in       14:03 |
| 7   Q   What I'm trying to understand is that if the   13:59 | 7   awhile.  I have some memories of the interview, but I    14:03 |
| 8   response to the first question "Are operators expected   14:00 | 8   think that if I was to read through it, maybe more of    14:03 |
| 9   to read the postings on any of these bulletin boards   14:00 | 9   the context would come back to me in terms of the       14:03 |
| 10  every day?" is yes, then it must be that either the   14:00 | 10  subtleties of the different responses to questions.      14:04 |
| 11  main one or the safety side ones were every day.   14:00 | 11  Q   Is there something else that you would refer     14:04 |
| 12       Is that logical?                          14:00 | 12  to besides the Exhibit 111 document to refresh your     14:04 |
| 13       MR. SPELLBERG:  It says "Not every day."   14:00 | 13  memory on what was said?                       14:04 |
| 14       MR. TIDRICK:  Let me ask it a different way.   14:00 | 14  A   I think that these are my notes, so I would     14:04 |
| 15  Q   In light of the fact that the answer to the   14:00 | 15  review the notes as they were taken to help refresh my    14:04 |
| 16  question "Are operators expected to read the postings   14:00 | 16  memory.                                       14:04 |
| 17  on any of these bulletin boards every day?" was yes, do   14:00 | 17  Q   Did you review this document to prepare for     14:04 |
| 18  you believe that the response to the subsequent   14:00 | 18  your deposition today?                         14:04 |
| 19  question "If so, which bulletin boards are they   14:00 | 19  A   No.                                       14:04 |
| 20  expected to read?"  That "the main one" refers to the   14:00 | 20  Q   Did you review any documents to prepare for     14:05 |
| 21  one that operators are expected to read every day?   14:01 | 21  your deposition today?                         14:05 |
| 22  A   I suspect --                               14:01 | 22  A   I reviewed the reports and the declaration.      14:05 |
| 23       MR. SPELLBERG:  I'm going to object.  That's   14:01 | 23  Q   You're referring to the initial report        14:05 |
| 24  vague and ambiguous the way it's phrased.         14:01 | 24  Exhibit 105, the rebuttal report Exhibit 106.  And when    14:05 |
| 25       You may answer.                           14:01 | 25  you say "the declaration," are you referring to         14:05 |
| Page 47 | Page 49 |

Veritext Legal Solutions
866 299-5127

1 Exhibit 107? 14:05
2 A Yes. 14:05
3 Q Those three documents are the only documents 14:05
4 you reviewed to prepare for your deposition today? 14:05
5 A I also reviewed -- put the files for 14:05
6 production on the flash drive. 14:05
7 Q The flash drive that you produced today? 14:06
8 A Correct. 14:06
9 Q What I'm trying to get at is with respect to 14:06
10 what the assistant superintendent at Flynn said in 14:06
11 response to the questions at No. 15, Page 5, of 14:06
12 Exhibit 111. 14:06
13     If you were to testify at trial, is there 14:06
14 anything else you would to do to refresh your 14:06
15 recollection, other than reading the notes in 14:06
16 Exhibit 111? 14:06
17     MR. SPELLBERG: I'm going to object to the 14:06
18 form of the question. She could look at anything to 14:06
19 refresh her recollection. A lot might depend on what 14:06
20 the attorneys ask of the witness at trial. So I don't 14:06
21 see how she can possibly know what she could -- 14:06
22     MR. YOUNG: Wait a minute. Please stop with 14:07
23 the speaking objections, please. 14:07
24     MR. SPELLBERG: Well, actually, it's improper 14:07
25 for you to be commenting since your colleague is taking 14:07
Page 50

1 the deposition. 14:07
2     MR. YOUNG: Well, we just hope you'd would 14:07
3 stop with the speaking objections. And I'll stop 14:07
4 asking questions. 14:07
5     MR. SPELLBERG: You can say what you like, but 14:07
6 I can object in any way I deem appropriate. That's my 14:07
7 objection. I don't think it's a proper question. 14:07
8     MR. TIDRICK: If that's the case, please just 14:07
9 state an objection without leading the witness, please. 14:07
10     MR. YOUNG: It may be not proper of me to ask 14:07
11 questions of the witness. But it's certainly proper 14:07
12 for me make statements to you. 14:07
13     MR. SPELLBERG: No, actually, I don't think 14:07
14 that's correct. 14:07
15     MR. YOUNG: I -- 14:07
16     MR. SPELLBERG: You have one person taking the 14:07
17 deposition. That person is controlling the mode and 14:07
18 the manner of the deposition. 14:07
19     MR. YOUNG: We disagree on that. 14:07
20     MR. SPELLBERG: Right. 14:07
21     MR. YOUNG: If you can cite some authority, I 14:07
22 would appreciate it. 14:08
23     MR. TIDRICK: Q Are there any documents that 14:08
24 exist that you believe would allow you to refresh your 14:08
25 recollection about what was said during your interview 14:08
Page 51

1 of the assistant superintendent of the Flynn division? 14:08
2     MR. SPELLBERG: Vague and ambiguous. 14:08
3     You may answer. 14:08
4     THE WITNESS: I would review my notes from the 14:08
5 interview. 14:08
6     MR. TIDRICK: Q You're referring to the 14:08
7 Exhibit 111 document. Correct? 14:08
8 A Yes. I seem to -- 14:08
9     Did I give this to you? I don't know where it 14:08
10 went, but the one we were just looking at, yes. 14:08
11     Did I put them over here? 14:08
12     MR. SPELLBERG: I think that one is mine. 14:08
13     THE WITNESS: Oh. 14:08
14     MR. TIDRICK: Q Do you still have the 14:08
15 Exhibit 111 document? 14:09
16 A I don't know where it -- how it could have 14:09
17 walked away. I'm sitting right here. So I must have 14:09
18 put it down here. No. 14:09
19     Anyway, the one we were just looking at, yes. 14:09
20     MR. SPELLBERG: Look at mine. 14:09
21     THE WITNESS: Thanks. 14:09
22     So the best source to review what was said 14:09
23 during that interview would be the notes from the 14:09
24 interview. 14:09
25     MR. TIDRICK: Q Does anything else exist that 14:09
Page 52

1 you would use to refresh your recollection of that 14:09
2 interview? 14:09
3 A Maybe the schedule of site visits. 14:09
4 Q Anything else? 14:10
5 A I'm not sure what you're getting at. I would 14:10
6 look at the notes from the interview. 14:10
7 Q Okay. If you could please turn to 14:10
8 Question 20, which is at Page 6 of Exhibit 111. 14:10
9     Do I understand correctly that one of the 14:10
10 questions you asked the assistant superintendent of 14:10
11 Flynn division was "What is a typical end of shift 14:10
12 process for operators when they drive onto the yard 14:10
13 until they leave the division?" 14:10
14 A Yes. 14:10
15 Q And you also asked "Does this process vary by 14:11
16 the type of vehicle? If so, how?" Correct? 14:11
17 A Correct. 14:11
18 Q Do I understand that in response to 14:11
19 Question 20 the words "Pull in, leave bus, drop off 14:11
20 defect card," was a response to Question 20? 14:11
21 A It appears to be a response to Question 20. 14:12
22 Q The statement "If relief point is end of 14:12
23 shift, they just leave from there. If they drive, many 14:12
24 have to come back." 14:12
25     Is something else that the assistant 14:12
Page 53

14 (Pages 50 - 53)

1 superintendent said? 14:12
2 A Yes. That's something she said based on these 14:12
3 notes. 14:12
4 Q Is it fair to say that the superintendent -- 14:12
5 the assistant superintendent was saying that when an 14:12
6 operator ends a shift at a relief point, the operator 14:12
7 has to come back to the division if they drove. 14:12
8 Is that correct? 14:12
9 MR. SPELLBERG: Objection. Misstates the 14:12
10 document and calls for speculation. 14:12
11 You can answer. 14:13
12 THE WITNESS: I think the statement says "If 14:13
13 the relief point ends" -- wait. "If relief point 14:13
14 ends, end of shift, they just leave from there. If 14:13
15 they drive, may have to come back." 14:13
16 MR. TIDRICK: Q Did you understand that the 14:13
17 assistant superintendent was saying that when an 14:13
18 operator's run ends at a relief point, that the 14:13
19 operator comes back to the division, if they drove? 14:13
20 MR. SPELLBERG: Objection. Misstates the 14:13
21 document. Misstates her testimony. 14:13
22 You may answer it one more time. 14:13
23 And it calls for speculation. 14:13
24 THE WITNESS: According to these notes her 14:13
25 response says, "If the relief point" -- and it's end of 14:13

1 shift" -- "If relief point end of shift, they just 14:14
2 leave from there. If they drive, they may come back." 14:14
3 MR. TIDRICK: Q Does that say "If they drive 14:14
4 many have to come back"? 14:14
5 MR. SPELLBERG: May. 14:14
6 THE WITNESS: If they drive may have to come 14:14
7 back. 14:14
8 MR. SPELLBERG: You're asking if the 14:14
9 handwriting says "many" instead of "may." Right? 14:14
10 THE WITNESS: I think it says "may." 14:14
11 MR. TIDRICK: Yes. 14:14
12 THE WITNESS: "May have to come back." 14:14
13 MR. TIDRICK: Counsel, I heard you say "may" 14:15
14 to the witness while the question was pending, and I 14:15
15 repeat my request that you not make statements that are 14:15
16 leading to the witness. 14:15
17 MR. SPELLBERG: She answered it about three or 14:15
18 four times, and you didn't like it and so you continued 14:15
19 to ask the same question. 14:15
20 MR. TIDRICK: And you stated "may" and I 14:15
21 wasn't asking you the question. 14:15
22 Q This is your handwriting. Correct? 14:16
23 A Yes. 14:16
24 Q Do you believe there is any ambiguity whether 14:16
25 you wrote "may" or "many" on Page 6 where it says "If 14:16

1 they drive," fill in the blank, "have to come back"? 14:16
2 MR. SPELLBERG: Objection. Asked and 14:16
3 answered. You're -- this is about the fifth time 14:16
4 you've asked it. It's the last time I'll let her 14:16
5 answer. 14:16
6 You may answer. 14:16
7 THE WITNESS: It looks like "may." 14:16
8 MR. TIDRICK: Q Do you have any understanding 14:16
9 why it is that operators who drive would have to come 14:16
10 back to the division? 14:16
11 MR. SPELLBERG: Objection. Misstates the 14:16
12 document. Calls for speculation. 14:16
13 You may answer it if you're able. 14:16
14 THE WITNESS: Do I have an understanding of 14:16
15 why operators who drive would have to come back to the 14:17
16 division? 14:17
17 MR. TIDRICK: Q Yes. 14:17
18 A They -- if they drive to the division, then 14:17
19 they would probably want to leave from the division. 14:17
20 Q If you could please turn to questions -- 14:17
21 Question 27, which is at Page 7 of Exhibit 111. 14:17
22 A Okay. 14:17
23 Q And, actually, let's try to find the original 14:17
24 marked exhibit because there are some points where I 14:17
25 may need to actually have the witness mark something on 14:17

1 the exhibit. 14:18
2 And I see, Counsel, that you're 14:18
3 highlighting -- 14:18
4 MR. SPELLBERG: Yeah. I highlight what you 14:18
5 ask. Right. 14:18
6 THE WITNESS: So I must have -- did I put them 14:18
7 down over here? 14:18
8 MR. TIDRICK: Do you mind if I reach and look 14:18
9 through. 14:18
10 THE WITNESS: Please. I don't know how 14:18
11 they... 14:18
12 MR. TIDRICK: Is it possible they got into 14:18
13 this stack? 14:18
14 THE WITNESS: That's what I'm thinking. 14:18
15 MR. SPELLBERG: It's completely possible. 14:18
16 THE WITNESS: Oh. Never mind. 14:18
17 MR. TIDRICK: Q There is a stack of a bunch 14:18
18 of them. So is that 111 at the top? 14:18
19 A 9, 10. 14:18
20 Q There it is. It's right there. 14:18
21 A Okay. 12. 14:18
22 Q So if you could please turn to Page 7 of 14:18
23 Exhibit 111. 14:18
24 A Okay. 14:18
25 Q And go down the page to No. 27. 14:18

15 (Pages 54 - 57)

Page 58:

1 A Okay. 14:18
2 Q Do I understand correctly that the responses 14:18
3 to Questions 27 and 28 were "no."
4 Is that correct? 14:19
5 A It looks like she specified that she'd only 14:19
6 been there two years. But within -- presumably within 14:19
7 those two years she answered no. Correct.
8 Q Did you do any other investigation with 14:19
9 respect to the Flynn division to ascertain whether the 14:19
10 answer to Questions 27 and 28 was anything other than 14:19
11 "no" for the period of time before two years earlier? 14:19
12 A No. 14:19
13 Q Why not? 14:20
14 A Well, for our time and motion observation 14:20
15 study you're clearly studying what the operators are 14:20
16 doing now. 14:20
17 Q And when you say "now," obviously you mean 14:20
18 during the time of the study. Correct? 14:20
19 A During the time of the study. Correct. 14:20
20 Q For each of the interviews that are reflected 14:21
21 in the Exhibit 109 through 116 interview notes, is it 14:21
22 fair to say that in instances where the person being 14:21
23 interviewed had not been at the division for the entire 14:21
24 class period July 2009 up until the time that you 14:21
25 interviewed them at least, that you did not have your 14:21

Page 58

Page 59:

1 team do follow-up to see whether there was any 14:22
2 difference prior to the time that the person was at the 14:22
3 division? 14:22
4 A Correct. We did not study -- we didn't 14:22
5 collect retrospective data. Time and motion 14:22
6 observation study is collecting data based on current 14:22
7 circumstances. 14:22
8 Q If you could please turn to the page after 14:22
9 Page 7 in the Exhibit 111 document. It's not numbered, 14:22
10 but the very first page after Page 7 where there is a 14:22
11 little star and then a handwritten statement. 14:23
12 This is still your handwriting. Correct? 14:23
13 A Correct. 14:23
14 Q And you wrote "Entire property under video 14:23
15 camera. Contract individuals before/after paddle 14:23
16 pickup and watch to gilly room." 14:23
17 Why did you write that? 14:23
18 A At one point we were looking into -- we were 14:23
19 trying to figure out what the situation was with video 14:23
20 camera coverage at the divisions. The video cameras 14:23
21 that existed. And so we were collecting that as part 14:23
22 of our initial, like I said, background. 14:24
23 It turned out that the video cameras were 14:24
24 completely inadequate for any sort of meaningful data 14:24
25 collection. They were sketch -- they were slow, 14:24

Page 59

Page 60:

1 choppy. Lacked coverage of the divisions. 14:24
2 Inconsistent. So we were unable to use them for any 14:24
3 data collection. 14:24
4 Q I understand these interview notes reflected 14:24
5 in Exhibit 111 is for the Flynn division. 14:24
6 But do I understand correctly the statement 14:24
7 you just made about why you did not rely on video 14:25
8 camera coverage, are you speaking with respect to all 14:25
9 the divisions at SFMTA? 14:25
10 A I'm speaking generally. The specifics is, 14:25
11 again, different for every division. 14:25
12 I think that this was based on what a 14:25
13 particular camera that I saw. However, I did not 14:25
14 review footage at the facility. So this was probably a 14:25
15 note to self, "Kind of looks like X, Y, Z." 14:25
16 Q And when you say "the note to self," you're 14:25
17 referring now to the Page 8 of Exhibit 111 document. 14:25
18 Correct? 14:25
19 A Page 8, yeah, with no Page number on it. 14:25
20 Yeah. 14:25
21 Q It's not numbered, but the page after Page 7. 14:25
22 A Yeah. 14:25
23 Q Putting that aside, I'm trying to understand 14:25
24 with respect to the statement you made about -- well, 14:26
25 let me put it this way. 14:26

Page 60

Page 61:

1 You considered the possibility of using video 14:26
2 camera coverage for your collection of data at the 14:26
3 divisions. 14:26
4 Is that correct? 14:26
5 A We were told that there were video cameras at 14:26
6 the divisions. So being thorough in our background 14:26
7 research, we wanted to understand what those videos -- 14:26
8 where they were, what they would cover. So we looked 14:26
9 into that. 14:26
10 And like I said, the coverage was 14:26
11 inconsistent. Choppy. Not helpful and was not going 14:26
12 to work for the level of detail and accuracy we needed 14:27
13 for our data collection. 14:27
14 Q Did you consider the possibility of installing 14:27
15 your own cameras at the divisions, cameras that were 14:27
16 higher quality and would provide the necessary 14:27
17 coverage? 14:27
18 A So we looked at that -- thought about that. 14:27
19 And the divisions, while they vary, some of them are 14:27
20 huge in terms of just square footage, they are massive 14:27
21 and they have lots of -- some of them have lots of 14:27
22 nooks and crannies and it would be very difficult to 14:27
23 ensure complete coverage that would be required to 14:27
24 accurately track individuals. 14:27
25 It would be -- there were blind spots and it 14:27

Page 61

Veritext Legal Solutions
866 299-5127

Page 62:

1 would be really hard to track them from one camera to 14:28
2 the next to the next to the next. 14:28
3 We decided that actually following them, 14:28
4 again, was going to give us the best data, the most 14:28
5 accurate data. Installing video cameras was going to 14:28
6 be problematic. 14:28
7 Q Just to be clear. When you say that it would 14:28
8 be difficult to have complete coverage and that they 14:28
9 are -- there are potential blind spots -- 14:28
10 A Mm-hmm. 14:28
11 Q -- do I understand that there is no technical 14:28
12 barrier to having complete coverage through cameras? 14:28
13 It's simply a matter that it would have required a 14:28
14 large number of cameras. 14:28
15 Is that fair to say? 14:28
16 A Well, I'm not a video camera expert. But the 14:28
17 number of video cameras you would need to install for 14:29
18 Woods division, for example, the yard is massive. 14:29
19 We also recognized that there were visual 14:29
20 impediments to cameras. Operators, depending on the 14:29
21 number of vehicles in the yard, will duck in and out of 14:29
22 busses, vehicles. And a camera would not be able to 14:29
23 capture that. 14:29
24 They also, when they pull in, will potentially 14:29
25 sit in the bus for a while, or sit in the vehicle. And 14:29
Page 62

Page 63:

1 a camera would not be able to capture that. 14:29
2 The other issue we have with cameras and this 14:29
3 comes up with a lot of studies, you miss the 14:29
4 interaction of who they are interacting with. The 14:29
5 content of that interaction. 14:29
6 So again, we decided that live observations 14:30
7 would give us the best data. 14:30
8 Q Do I understand correctly that the observers 14:30
9 moved around as they were observing? 14:30
10 A The observers had posts, kind of post areas 14:30
11 where they were positioned around the division. And 14:30
12 they moved within that post area. 14:30
13 Q That was true for all the observers? 14:30
14 A What was true of all the observers? 14:30
15 Q Well, that they were posted within an area and 14:30
16 that they would move within that area to make their 14:30
17 observations? 14:30
18 A Yes. 14:30
19 Q Did the observers make any kind of record of 14:30
20 where exactly they were when they made their 14:31
21 observations? 14:31
22 A No. 14:31
23 Q Do you generally have a preference for using 14:31
24 cameras for time and motion studies? 14:31
25 A For the reasons I just described, the issues 14:31
Page 63

Page 64:

1 with video being problematic, it depends on the study. 14:31
2 But generally our preference is to have live reporters 14:31
3 because, again, we find that that's the best way to get 14:31
4 accurate data. 14:31
5 Q Are there advantages to using cameras over 14:31
6 live observers? 14:31
7 A Are there advantages? I think it depends on 14:31
8 what you're studying. So for a job analysis, context 14:32
9 is very important. And one of the challenges of video 14:32
10 is that you lose a lot of that context. 14:32
11 It also depends on the physical layout of 14:32
12 where people are working. Work environment. How much 14:32
13 are they moving. So if somebody is in one room, 14:32
14 potentially a video could be -- you might consider it. 14:32
15 But if somebody is moving around an entire property, 14:32
16 that's a very different scenario. 14:32
17 MR. TIDRICK: The video operator needs to 14:32
18 change the tape so we'll go off the record. 14:32
19 VIDEO OPERATOR: This marks the end of 14:32
20 Volume 1, Media No. 1 of the deposition of Elizabeth 14:32
21 Arnold. 14:32
22 The time is 2:32 p.m. We are off the record. 14:44
23 (Recess taken 2:32 p.m. - 2:45 p.m.) 14:44
24 (Exhibit 118 marked for identification by 14:44
25 the court reporter and is attached hereto.) 14:45
Page 64

Page 65:

1 VIDEO OPERATOR: We are back on the record at 14:45
2 2:45 p.m. 14:45
3 This marks the beginning of Volume 1, Media 14:46
4 No. 2 of the deposition of Elizabeth Arnold. 14:46
5 MR. TIDRICK: Q Do I understand correctly 14:46
6 Exhibit 117 is your current CV? 14:46
7 A Is this the one I just gave to you? Yes. 14:46
8 Q Do I understand correctly you received your 14:46
9 bachelor's degree in 2000? 14:46
10 A Correct. 14:46
11 Q And you received your master's in 2008? 14:46
12 A Correct. 14:46
13 Q And you've been the director of the Berkeley 14:46
14 Research Group from 2014 to the present? 14:46
15 A Correct. 14:46
16 Q I'm showing you a document that's been marked 14:46
17 as Exhibit 118. 14:46
18 A Okay. 14:46
19 Q This is the observation protocol that you 14:47
20 created for this case? 14:47
21 A Yes. 14:47
22 Q When did you create this document 14:47
23 approximately? 14:47
24 A Early on in the study. 14:47
25 Q Can you tell me approximately? 14:47
Page 65

17 (Pages 62 - 65)

Veritext Legal Solutions
866 299-5127

Page 66:

1   A  Well, we would have created it and then    14:47
2 probably made some revisions. So December, January.  14:47
3   Q  Your firm was retained by SFMTA in October    14:47
4 2015. Correct?    14:47
5   A  Correct.    14:47
6   Q  The observation started in December of 2015.    14:48
7 Correct?    14:48
8   A  Correct.    14:48
9   Q  So at least the initial version of the    14:48
10 Observation Protocol document, plaintiffs' 118, was    14:48
11 created sometime between October 2015 and December    14:48
12 2015?    14:48
13   A  Correct.    14:48
14   Q  Were there multiple versions of the 118    14:48
15 document?    14:48
16   A  I wouldn't say there were versions. We added    14:48
17 to it.    14:49
18   Q  Does Plaintiffs' Exhibit 118 reflect the final    14:49
19 version of the Observation Protocol?    14:49
20   A  I believe so.    14:49
21   Q  Anywhere in your files do you have some other    14:49
22 version of the Exhibit 118 document that is shorter?    14:49
23   A  No. Not that I recall.    14:49
24   Q  When you say that at some point in time you    14:49
25 added to the Observation Protocol, what do you mean by    14:49

Page 66

Page 67:

1 that?    14:49
2   A  Well, at a certain point we -- as you know    14:49
3 from the report -- conducted relieve point    14:50
4 observations. So a.k.a. terminals. So we added some    14:50
5 language into the protocol to reflect the relief point    14:50
6 observations as well.    14:50
7   Q  Can you tell me approximately when the    14:50
8 language about the relief point was added?    14:50
9   A  I don't remember to be honest.    14:50
10   Q  Is the Observation Protocol a document that    14:50
11 was provided to all the various observers that were    14:50
12 making the observations?    14:50
13   A  Yes.    14:51
14   Q  After you added language to the Observation    14:51
15 Protocol reflecting the relief point observations, did    14:51
16 you then provide that revised version to the observers?    14:51
17   A  Yes.    14:51
18   Q  Do you still have any copies of the original    14:51
19 version of the Observation Protocol that had been    14:51
20 provided to the observers?    14:51
21   A  Like I said, we revise it as we go. We don't    14:51
22 retain drafts.    14:51
23   Q  So do I understand correctly that there was a    14:51
24 period of time for which there were observations being    14:51
25 made using some other version of the Exhibit 118    14:51

Page 67

Page 68:

1 document and you no longer have any copies of that.    14:51
2   Is that correct?    14:51
3   A  Well, there are a couple of pieces here that    14:51
4 are just added specifically for the relief point    14:51
5 observations. So those would be the only points    14:52
6 that -- that were added to clarify and add guidance for    14:52
7 specifically the relief point observations.    14:52
8   Q  How many observers total did you use to do the    14:52
9 observations before you added language for the relief    14:52
10 point observations?    14:52
11   A  I don't recall.    14:52
12   Q  Can you tell me approximately how many    14:52
13 observers you had working on this?    14:52
14   A  Well, if you look at the briefing -- so, as    14:52
15 described in the report there were extensive    14:53
16 three-hours briefing sessions that were conducted with    14:53
17 all of the observers. There were two agendas for those    14:53
18 briefing meetings that were produced as part of the    14:53
19 files. There is a copy listed of the observer names.    14:53
20   Q  Are you able to tell me approximately how many    14:53
21 observers there were and who conducted the observations    14:53
22 before you added language about relief point    14:53
23 observations?    14:53
24   A  Maybe six or seven. But I would need to look    14:53
25 at the list.    14:53

Page 68

Page 69:

1   Q  Those individuals all received a copy of an    14:53
2 Observation Protocol document?    14:53
3   A  Yes. As part of the briefing.    14:53
4   Q  When you say that the original Observation    14:54
5 Protocol document that was distributed to the observers    14:54
6 and it was used before you added in language about    14:54
7 relief point observations, are you confident that none    14:54
8 of those observers still have a copy of the original    14:54
9 Observation Protocol?    14:54
10   A  Well, we have document retention policies in    14:54
11 place that once data collection is completed, documents    14:54
12 that are no longer relevant are no longer retained. So    14:54
13 I wouldn't know.    14:54
14   Q  Do I understand correctly that it is your    14:54
15 firm's practice not to retain Observation Protocols    14:55
16 that were used for observations?    14:55
17   MR. SPELLBERG: Objection. Overbroad.    14:55
18 Misstates her testimony.    14:55
19   THE WITNESS: We've produced the Observation    14:55
20 Protocol that is part of the project file.    14:55
21   MR. TIDRICK: Q I'm asking a different    14:55
22 question, which is: The Observation Protocol that was    14:55
23 used for the observations before you added language    14:55
24 about relief point observations, that version of the    14:55
25 document that was used for observations, it's your    14:55

Page 69

1 practice not to retain Observation Protocols that are     14:55
2 actually used in connection with observations?     14:55
3         MR. SPELLBERG: I'm going to object to the     14:55
4 form of the question. Those are two different things.     14:56
5 That's an incomprehensible question.     14:56
6         Only answer if you understand what he asked.     14:56
7         THE WITNESS: I think I already answered that     14:56
8 the Observation Protocol has been produced. This is     14:56
9 the Observation Protocol.     14:56
10        MR. TIDRICK: Q You acknowledge that the     14:56
11 Plaintiffs' Exhibit 118 document, the Observation     14:56
12 Protocol, this version of the document did not exist     14:56
13 when your observers made their observations that were     14:56
14 reflected in your first version of your report, the     14:56
15 Plaintiffs' Exhibit 105 document. Correct?     14:56
16    A  I said that I didn't recall the exact date     14:56
17 that the relief point information was incorporated into     14:56
18 the protocol.     14:56
19    Q  At some point in time there was a version of     14:57
20 the Observation Protocol document that did not include     14:57
21 content about the relief point observations. Correct?     14:57
22    A  That was not a final protocol.     14:57
23    Q  When you say "that was not a final     14:57
24 protocol" --     14:57
25    A  This is the final protocol (indicating).     14:57
                                                    Page 70

1    Q  "This" meaning the Plaintiffs' 118 document?     14:57
2    A  Right.     14:57
3    Q  The earlier version of the Observation     14:58
4 Protocol was used by observers. Correct?     14:58
5    A  I don't recall the exact date of when we     14:58
6 incorporated the notes regarding the relief points     14:58
7 observation specifically. So I'm not sure. But it's     14:58
8 the same. Just take away the bits that were added to     14:58
9 the relief point.     14:58
10    Q  How do you know that it's the same except for     14:58
11 those additions?     14:58
12    A  Because I added it.     14:58
13    Q  What did you do with the original version of     14:58
14 the document?     14:58
15    A  I just saved over it. So this is the final     14:59
16 version of the protocol.     14:59
17    Q  When your observers started doing observations     14:59
18 in December of 2015, were they making observations at     14:59
19 the relief points?     14:59
20    A  No. I think -- no. Those started later.     14:59
21    Q  Are you able to tell me approximately when     14:59
22 observers started doing observations at the relief     14:59
23 points?     14:59
24    A  Possibly in -- looks like April. No. Never     15:00
25 mind. It's not in order -- date order. I would have     15:00
                                                    Page 71

1 to check. It was earlier than that.     15:01
2    Q  What would you have to check in order to tell     15:01
3 me the period of time during which the observers were     15:01
4 doing observations at relief points?     15:01
5    A  The master list of observations sorted by     15:01
6 date or filtered.     15:01
7         (Exhibit 119 marked for identification by
8         the court reporter and is attached hereto.)
9         MR. TIDRICK: The Exhibit 119 document, is     15:01
10 that the document that you're referring to?     15:02
11    A  No. This doesn't appear to be sorted by date.     15:03
12    Q  In the Exhibit 119 document, I would refer you     15:03
13 to Row No. 179.     15:03
14    A  Okay.     15:03
15    Q  Strike that.     15:04
16        In the Exhibit 119 document, I would refer you     15:04
17 to Row 135.     15:04
18    A  Okay.     15:04
19    Q  Do you understand that the Row 135 data in     15:04
20 Exhibit 119 reflects the first day when observers     15:04
21 started making observations at relief points?     15:04
22    A  No. Row 135 reflects an observation conducted     15:04
23 at the Presidio division.     15:05
24        (Exhibit 120 marked for identification by
25         the court reporter and is attached hereto.)     15:05
                                                    Page 72

1         MR. TIDRICK: Q What is the Exhibit 119     15:05
2 document?     15:05
3    A  It's a -- well, you gave it to me.     15:05
4    Q  I'll represent to you it's a document that you     15:05
5 produced.     15:05
6         Are you able to tell me what it is?     15:05
7    A  It looks like it's Exhibit J, master list of     15:06
8 observations.     15:06
9    Q  Exhibit J to your initial report?     15:06
10    A  I don't know which exhibit -- which report     15:06
11 it's an exhibit to. There have been several.     15:06
12    Q  Now, I'm showing you a document that's been     15:06
13 marked as Exhibit 120.     15:06
14    A  Okay.     15:06
15    Q  I'll refer you to Line 135 in Exhibit 120.     15:06
16        Does Line 135 of Exhibit 120 reflect the first     15:07
17 date when your team of observers was making     15:07
18 observations at relief points?     15:07
19    A  I would have to double check the list.     15:07
20    Q  How exactly would you do that?     15:07
21    A  Well, I'd have to go through line by line and     15:07
22 look at -- to make sure every one before that was a     15:07
23 division.     15:07
24        Do you want me to do that?     15:07
25    Q  Yes, please.     15:08
                                                    Page 73

19 (Pages 70 - 73)

**Page 74**

1    A    Excuse me.  It looks like Row 135 is the first    15:08
2 relief point observation.    15:09
3    Q    So there were no relief point observations    15:09
4 made prior to February 21st, 2016.    15:09
5    Is that correct?    15:09
6    A    Based on this list, that looks to be correct.    15:09
7    MR. YOUNG:  Don't mark on that.    15:09
8    THE WITNESS:  Oh, I was just marking because    15:09
9 it's hard to see.  I just wrote a line on 135.    15:09
10    MR. TIDRICK:  Q  And do I understand correctly    15:09
11 the lines you've drawn on Page 2 of Exhibit 120 in dark    15:09
12 blue ink reflects the -- for lack of a better word --    15:09
13 the cutoff between when observations started at the    15:09
14 relief points.    15:09
15    Is that correct?    15:10
16    A    You were asking about Line 135, so I put a    15:10
17 line next to Line 135.    15:10
18    Q    Who created the Exhibit 120 document?    15:10
19    A    The document -- well, it's a spreadsheet.  I    15:10
20 certainly contributed to it as did other members of the    15:10
21 team.    15:10
22    Q    Why was the document created?    15:10
23    A    It was a tracking sheet to track our    15:10
24 observations.    15:11
25    Q    Referring to the Exhibit 118 document.    15:11

**Page 75**

1    A    18?    15:11
2    Q    118.    15:11
3    A    Wait.  Which one is 18?    15:11
4    Q    118.    15:11
5    MR. SPELLBERG:  The Observation Protocol.    15:11
6    THE WITNESS:  Oh, okay.    15:11
7    MR. TIDRICK:  Q  who created the Exhibit 118    15:11
8 document?    15:11
9    A    I worked on it.  Other team members worked on    15:11
10 it as well.    15:11
11    Q    Why was the Exhibit 118 document created?    15:11
12    A    It's important when conducting a study to    15:11
13 create a protocol to ensure that observation procedures    15:11
14 are clear, articulated, and followed by observers.  We    15:12
15 always create protocol for our studies.    15:12
16    Q    Why is it important for the observation    15:12
17 procedures to be clear, articulated and followed?    15:12
18    A    To ensure accurate data collection.  It's    15:12
19 important that all of your observers are familiar with    15:12
20 the protocol, follow the protocol for consistency and    15:12
21 accuracy in data collection.    15:12
22    Q    If you had not had an observational protocol,    15:12
23 what would be the impact on your report?    15:13
24    MR. SPELLBERG:  I'm going to object.  It's an    15:13
25 incomplete hypothetical.  It calls for speculation.    15:13

**Page 76**

1    You may answer if you're able.    15:13
2    THE WITNESS:  That's a -- not really a -- that    15:13
3 question doesn't make a lot of sense because we    15:13
4 wouldn't do a study without a protocol document to,    15:13
5 again, ensure consistent and appropriate data    15:13
6 collection, techniques and methods were followed.    15:13
7    MR. TIDRICK:  Q  Are you able to tell me    15:13
8 specifically and exactly what changed in the    15:13
9 Exhibit 118 document after initial observations were    15:13
10 made?    15:14
11    A    Well, like I said, when we added the relief    15:14
12 point observations, we added content that related to    15:14
13 the relief point observations.    15:14
14    Q    Can you tell me exactly what you added?    15:14
15    A    Do you want me to go through the protocol?  I    15:14
16 mean, it's an evolving document that we use to guide    15:14
17 the observationists.    15:14
18    Q    Did it evolve more than once?    15:15
19    A    I don't know.  I can't tell you.  I don't    15:15
20 remember.    15:15
21    Q    Is it fair to say that each time that the    15:15
22 document changed you provided a new version of the    15:15
23 document to the observers?    15:15
24    A    The observers all had the protocol.  So do you    15:15
25 want me to point out the term -- relief point material?    15:15

**Page 77**

1    MR. TIDRICK:  Madam court reporter, could you    15:15
2 read back my last question.    15:15
3    (Previous question read.)    15:15
4    MR. TIDRICK:  Q  Do you understand that    15:15
5 question?    15:15
6    A    Yeah.    15:15
7    So the observers all had the current version    15:15
8 of the protocol.    15:15
9    Q    How was the protocol distributed to the    15:15
10 observers?  Was it distributed in hard copy?    15:16
11    A    That would have been electronically.    15:16
12    Q    Were the observers e-mailed a copy of the    15:16
13 protocol?    15:16
14    A    I think that would have been e-mailed, yeah.    15:16
15    Q    Each time that the protocol changed, did you    15:16
16 e-mail the latest version to the observers?    15:16
17    A    It sounds like you're describing that there    15:16
18 was lots and lots of changes.  And I don't think that    15:16
19 there were like multiple versions going out.    15:16
20    Q    You testified that it was an evolving    15:16
21 document.    15:16
22    My only question is:  Each time it evolved,    15:16
23 did you e-mail the latest version to the observers?    15:16
24    A    So if there were any significant changes to    15:17
25 the protocol, scheduling, anything like that, observers    15:17

1 were notified and communicated to.                15:17
2    Q    At the second page, Page 2 of 9 of the      15:17
3 Exhibit 118 document, the section discussing start of  15:17
4 shift observations?                              15:17
5    A    Yes.                                    15:17
6    Q    What divisions at SFMTA were start of shift  15:17
7 activities observed at?                          15:17
8    A    All of them.                            15:18
9    Q    How were operators beginning their shifts  15:18
10 selected to be observed?                        15:18
11    A    So for our sampling plan we looked at the  15:18
12 variety of features and factors that we needed to  15:18
13 cover.  We covered all of the divisions.  All hours of  15:18
14 the day almost, with a few hour exceptions.  All  15:18
15 different vehicle types.  Different run types.  To  15:18
16 ensure that we had the broad range of features covered  15:19
17 in the sample.                                  15:19
18    Q    So did someone identify a particular operator,  15:19
19 for example, by badge number or by name to be observed?  15:19
20    A    We would -- the team would arrive at a  15:19
21 particular division at a designated time.  The team  15:19
22 would meet, as described in this protocol, to review  15:19
23 basics, and how they were going to execute the study  15:19
24 for that particular day, posts, et cetera.  We would  15:19
25 each take posts.                                15:19

1    And for start of shift observations, the lead  15:19
2 person would typically be the one in the dispatch  15:19
3 office.  And the next -- we would try to start at a  15:19
4 time when we knew operators were coming in.  And we  15:20
5 would pick the next person to come in that we could see  15:20
6 a run number for.                               15:20
7    So as they came in and pick up a run number,  15:20
8 we could see the run number, we would observe them.  15:20
9    Q    On the first page of Exhibit 118 there is a  15:20
10 section entitled "Overview."  Five paragraphs down  15:21
11 there is a paragraph that starts "We are observing."  15:21
12 The second sentence says "For starter shift  15:21
13 observations at the division, you should start  15:21
14 observing the first operator you see pick up an outfit  15:21
15 with the run number."                           15:21
16    Do you see that?                            15:21
17    A    Yes.                                   15:21
18    Q    Is that the protocol that your observers  15:21
19 followed throughout your study?                  15:21
20    A    So the start of shift observations were  15:21
21 structured slightly differently than the end of shift.  15:21
22 I believe that that sentence is consistent with what I  15:21
23 just described in terms of the start of shift  15:21
24 observations.                                   15:21
25    Q    On the second page of the Exhibit 118 document  15:22

1 in the section entitled "Beginning observations at the  15:22
2 division."?                                      15:22
3    A    Yes.                                   15:22
4    Q    There is a bullet point, and then beneath that  15:22
5 three sub points.                               15:22
6    And do you see where it says "For start of  15:22
7 shift operations at the division, you should start  15:22
8 observing the first operator" -- sorry.  Strike that.  15:23
9    Do you see the underlined text in the bullet  15:23
10 that says "If you're observer No. 1, you'll start  15:23
11 recording activities as soon as the operator picks up  15:23
12 the outfit"?                                    15:23
13    A    Yes.  I see that.                       15:23
14    Q    Do I understand correctly based on that  15:23
15 instruction, observations started only when someone  15:23
16 picked up an outfit with a run number.          15:23
17    Is that correct?                            15:23
18    A    For the start of shift observations, correct.  15:23
19    Q    Do I understand correctly that operators at  15:23
20 the division who did not pick up an outfit were not  15:23
21 observed for start of shift activities.         15:24
22    Is that correct?                            15:24
23    A    Correct.                               15:24
24    Q    Do I also understand correctly that if an  15:24
25 operator performed an activity before picking up the  15:24

1 outfit, that activity was not recorded.             15:24
2    Is that correct?                            15:24
3    A    Correct.                               15:24
4    Q    With respect to observations in the division  15:24
5 gilly rooms for start of shift activities, those were  15:24
6 conducted in the mornings.                       15:24
7    Is that correct?                            15:24
8    A    Sorry.  Say that again.                  15:24
9    Q    Observations in the division gilly rooms for  15:24
10 start of shift activities were conducted only in the  15:24
11 mornings.                                       15:24
12    Is that correct?                            15:24
13    A    No.  No.  Operators went into the gilly rooms  15:24
14 both the starting -- start and end of shift.  I'm not  15:24
15 sure where you're getting that.                  15:24
16    Q    With respect to observation of start of shift  15:25
17 activities, observation of start of shift activities at  15:25
18 the division gilly rooms were conducted only in the  15:25
19 mornings.                                       15:25
20    Is that correct?                            15:25
21    MR. SPELLBERG:  Do you understand the       15:25
22 question?                                       15:25
23    THE WITNESS:  No, I don't understand the    15:25
24 question.                                       15:25
25    MR. SPELLBERG:  Vague and ambiguous.  I'm not  15:25

1 sure I do.                                    15:25
2       MR. TIDRICK:  Q  For start of shift      15:25
3 activities --                                  15:25
4     A   Okay.                                  15:25
5     Q   -- your observers observed in the division  15:25
6 gilly rooms only in the mornings.              15:25
7       Is that correct?                         15:25
8     A   So start of shift observations ranged.  When  15:25
9 you say "morning," you know, they can range up until  15:25
10 the afternoon.  But I'm not sure what you mean by gilly  15:25
11 room.                                         15:25
12      Do you know what a gilly -- are you familiar  15:25
13 with the gilly rooms?                          15:26
14    Q   For your initial report, Plaintiffs'   15:26
15 Exhibit 105, do I understand correctly that the  15:26
16 analysis of start of shift activities was based on --  15:26
17 in part, on observations that occurred in the division  15:26
18 gilly rooms.                                   15:26
19      Is that fair?                            15:26
20    A   So we tracked observer activities after they  15:26
21 picked up an outfit with a run number that was visible.  15:26
22 Some operators, after performing that activity, may  15:26
23 have gone into the gilly room.  And that activity was  15:26
24 tracked.  Some did not.                        15:27
25      Is that what you're asking?              15:27
                                              Page 82

1    Q   Those observations in the gilly rooms occurred  15:27
2 only in the mornings.                          15:27
3      Is that correct?                          15:27
4    A   No.  Operators go into the gilly room  15:27
5 throughout both in the morning -- start of shift and  15:27
6 end of shift.                                  15:27
7    Q   The observations with respect to picking up  15:27
8 outfits for the initial report occurred only in the  15:27
9 mornings.                                      15:27
10      Is that correct?                         15:27
11    A   No.  We did end of shift observations for the  15:27
12 initial report.                               15:27
13    Q   For the start of shift activities observed for  15:27
14 the initial report, were the observations regarding  15:28
15 picking up the outfits conducted only in the mornings?  15:28
16    A   Are you asking if anyone picked up an outfit  15:28
17 in the afternoon?                             15:28
18    Q   Yes.                                   15:28
19    A   So we -- like I said, we tried to cover all  15:28
20 times of day.  And I would have to double check it to  15:28
21 when the last pickups were.  But as I recall, there  15:28
22 were some in the early afternoon.             15:28
23      So by saying morning, that's not really  15:28
24 accurate.  The start of shifts run for quite awhile.  15:28
25 There are clusters throughout the day, but they run  15:28
                                              Page 83

1 into the afternoon.                            15:28
2    Q   For the initial report, did you have observers  15:28
3 looking at start of shift activities that occurred in  15:28
4 the early afternoon?                           15:28
5    A   I would have to double check the times, but I  15:29
6 I'm pretty sure that we did.  I seem to recall myself  15:29
7 actually being in the afternoon in a division for a  15:29
8 start of shift.  They are less frequent.       15:29
9    Q   For start of shift observations, the operators  15:29
10 that you observed were not selected randomly.  15:29
11      Is that correct?                         15:29
12      MR. SPELLBERG:  Objection.  Vague and    15:29
13 ambiguous as to the use of the word "randomly."  15:29
14      You may answer.                          15:29
15      THE WITNESS:  They were selected on a next  15:29
16 available basis.  So the next operator to come into the  15:29
17 room -- as I described, the next operator to come into  15:29
18 the room with a visible outfit was selected for  15:29
19 observation.                                  15:29
20      MR. TIDRICK:  Q  Did that depend on the  15:29
21 availability of the observer?                  15:29
22    A   No.  Like I said, the -- we specifically  15:29
23 targeted defined periods of time when the observation  15:30
24 team would be in place.                       15:30
25    Q   What happens when there were more operators  15:30
                                              Page 84

1 than observers for any particular point in time?  15:30
2    A   Well, we would pick the next available and  15:30
3 observe that individual.  And so we would be observing  15:30
4 that individual until they left on the vehicle.  15:30
5    Q   In your professional opinion, do you believe  15:30
6 that there could have been a random selection of  15:30
7 operators to be chosen to be observed for starter shift  15:30
8 activities?                                   15:30
9    A   Describe what you mean by "random."  I think  15:30
10 that our selection process was random in the sense  15:30
11 there were no biases and no one was more less likely to  15:30
12 be selected.                                  15:30
13    Q   In the Exhibit 118 document, at Page 2 of 9  15:30
14 near the bottom, there is a discussion of end of shift  15:31
15 observations.                                 15:31
16    A   Okay.                                  15:31
17    Q   Now, referring back to Page 1 of Exhibit 118,  15:31
18 in the overview section, the fifth paragraph down,  15:31
19 there is a statement "For end of shift division  15:31
20 observations you should start recording the first  15:31
21 vehicle you see pull in."                     15:31
22      Is that correct?                         15:31
23    A   It says that in Paragraph 5, yes.       15:31
24    Q   That instruction was provided to all of the  15:31
25 observers to follow.                          15:31
                                              Page 85

1        Is that correct?                    15:31
2   A    All of the observers received the protocol.    15:31
3   Yes.                                      15:31
4   Q    To your knowledge, did any observer not follow    15:32
5   that instruction?                          15:32
6   A    Well, I think that describes later on that the    15:32
7   caveat to that is that you can see the vehicle, that    15:32
8   you can see the run number.  So there are some kind    15:32
9   of -- it's not quite that straightforward.  But, yes,    15:32
10  to my knowledge, the protocol was followed.    15:32
11  Q    Do I understand correctly that observations    15:32
12  started only when transit vehicles pulled into the    15:32
13  division gate?                             15:32
14  A    For the end of shift observations -- for the    15:32
15  end of shift division observations, correct.    15:32
16  Q    With respect to the end of shift observations,    15:32
17  operators were not picked randomly for observations.    15:32
18       Is that correct?                     15:32
19  A    No, that's not correct.  We picked up vehicles    15:32
20  as they pulled in.                         15:32
21  Q    Did you follow the same next available process    15:33
22  that you were describing earlier with respect to start    15:33
23  of shift activities?                       15:33
24  A    Yes.  So we targeted -- again, targeted    15:33
25  specific time periods so that we would have a variety    15:33

Page 86

1   of times of day for the end of shift.  And during those    15:33
2   defined periods, we picked up the next vehicle that    15:33
3   came in.                                   15:33
4   Q    And do I understand when there were instances    15:33
5   of more vehicles pulling than you had observers, your    15:33
6   process was for the observer to start observing    15:33
7   whatever the next vehicle was when that observer became    15:33
8   available.                                 15:33
9        Is that correct?                     15:33
10  A    Right.                                15:33
11       So as the -- so we picked the next vehicle and    15:33
12  observed that particular operator of that vehicle.    15:33
13  Q    If you could, please, in the initial report,    15:34
14  Exhibit 105.                               15:34
15  A    Mm-hmm.                               15:34
16  Q    Turn to Page 13, Footnote 11.         15:34
17       MR. SPELLBERG:  Is that 105?          15:34
18       THE WITNESS:  105, yeah.              15:34
19       MR. SPELLBERG:  Footnote 11?          15:34
20       THE WITNESS:  Yeah.                   15:34
21       MR. TIDRICK:  Q  That footnote reads, "It was    15:34
22  not possible to identify individual operators in    15:34
23  advance and observe them at the division using a random    15:34
24  sampling approach."                        15:34
25       What did you mean by that?            15:34

Page 87

1   A    So what we meant by that was the realities of    15:34
2   the division, the number of operators coming -- moving,    15:34
3   it wasn't possible to identify them in advance and    15:35
4   select them in advance and target them for observation.    15:35
5   It just wasn't feasible in the environment that we were    15:35
6   in.                                        15:35
7        So we felt that using the next available    15:35
8   approach would give us more data.  More accurate and    15:35
9   more efficient data for the study.         15:35
10  Q    Why wasn't it feasible?               15:35
11  A    Because there was no way to identify who was    15:35
12  who.  So people are constantly coming into the    15:35
13  divisions with jackets and hats and they are all    15:35
14  wearing brown, their uniforms, and there was no way to    15:35
15  identify who was who.  Reliably, I should say.    15:35
16  Q    And the statement you just made, you believe    15:36
17  that's true both with respect to start of shift    15:36
18  activities as well as end of shift activities?    15:36
19  A    When you're on the ground in the division and    15:36
20  things are happening real time, there -- it was not    15:36
21  feasible.  Again, it was not feasible to identify the    15:36
22  people in advance.  So we would have to use the next    15:36
23  available approach to capture the volume of data that    15:36
24  we wanted.                                 15:36
25  Q    And what you're saying is with respect to both    15:36

Page 88

1   start of shift activities as well as end of shift    15:36
2   activities?                                15:36
3   A    Yes.  Because, again, as the busses are    15:36
4   pulling in, we're picking up the busses, next available    15:36
5   bus coming in.  I said busses.  It should be vehicles.    15:36
6   Q    Did your observers do anything to confirm    15:36
7   whether the driver of a vehicle was an operator as    15:36
8   opposed to serving in some other position at SFMTA?    15:36
9   A    Well, as the vehicles pull in, you can see    15:37
10  them get out.  The operators wear uniforms.    15:37
11  Q    Was that something that was specified in the    15:37
12  protocol that you distributed?             15:37
13       MR. SPELLBERG:  Wait.  I don't think she was    15:37
14  done with her answer.                      15:37
15       Go ahead.                            15:37
16       THE WITNESS:  The operators wear uniforms.    15:37
17  They are obviously driving the busses.  They get out.    15:37
18  There are some pretty telltale signs as to the fact    15:37
19  that they are in fact the operators.       15:37
20       MR. TIDRICK:  Q  What are the telltale signs?    15:37
21  Other than the fact they are wearing uniforms.    15:37
22  A    Well, the one that comes to mind is the    15:37
23  uniforms.  The uniforms.  They would perform the end of    15:37
24  run activities that we've discussed that, of course,    15:38
25  vary by division.  But some of them would pull in and    15:38

Page 89

23 (Pages 86 - 89)

1 stop and have the revenue folks empty the cash box, for 15:38
2 example. And perhaps pick up their unused transfers 15:38
3 and their defect cards. They would get out. Walk 15:38
4 away. 15:38
5      And other divisions, they would pull in to the 15:38
6 meet and greet station. Get out of the vehicle and 15:38
7 have a yard starter come up and park the vehicle. 15:38
8      So, of course, as I described in the report, 15:38
9 the specifics around the pull-in varied by division. 15:38
10 But all of those factors would suggest that they were, 15:38
11 in fact, operators. 15:38
12      Q   Are you aware that there are positions other 15:38
13 than operators at SFMTA that drive the transit 15:38
14 vehicles? 15:38
15      MR. SPELLBERG: Objection. Vague and 15:38
16 ambiguous. Incomplete hypothetical. 15:39
17      You may answer. 15:39
18      THE WITNESS: Our job analysis was of the 15:39
19 operators. 15:39
20      MR. TIDRICK: Q   Do you understand my prior 15:39
21 question? 15:39
22      MR. SPELLBERG: If she doesn't understand it, 15:39
23 then it's your responsibility to re-ask it. So 15:39
24 pejorative question. 15:39
25      MR. TIDRICK: Q   Do you know whether or not a 15:39

Page 90

1 yard starter drives transit vehicles? 15:39
2      A   So as I described the yard starters, from what 15:39
3 I've seen, the yard starters are involved in parking, 15:39
4 parking of the vehicle. 15:39
5      So in the scenario I just described where the 15:39
6 operator gets out at the meet and greet, for example, a 15:39
7 yard starter may step in and park the vehicle. So you 15:39
8 can see the operator get out and the yard starter get 15:40
9 in. Converse -- sorry are you still... 15:40
10      Q   Mm-hmm. 15:40
11      A   Conversely, the yard starters will get in the 15:40
12 vehicles, sometimes at the start of shift, and pull up 15:40
13 to meet and greet, so the operator can walk over and 15:40
14 get into the vehicle. 15:40
15      So in that sense, I'm aware that yard starters 15:40
16 operate vehicles within the yard. 15:40
17      Q   Are you aware that yard starters have runs 15:40
18 assigned to them? 15:40
19      MR. SPELLBERG: Objection. Fact not in 15:40
20 evidence. Incomplete hypothetical. 15:40
21      You may answer. 15:40
22      Vague and ambiguous as well. 15:40
23      THE WITNESS: Based on some of the documents 15:40
24 I've read, I believe that yard starters are technically 15:40
25 operators in a different role. 15:40

Page 91

1      So to the extent that they are operating in 15:40
2 the role of operator, I could see that they would be 15:41
3 operating vehicles, perhaps, on a run. But when they 15:41
4 are in the yard in the yard starter role, that would be 15:41
5 different. 15:41
6      MR. TIDRIcK: Q   Did your observers record the 15:41
7 identities of any of the operators who were studied? 15:41
8      A   To the extent possible our observers recorded 15:41
9 the run number and the vehicle number of the vehicles. 15:41
10      Q   Did you explain to your observers that yard 15:41
11 starters could also be assigned runs and perform 15:41
12 revenue service? 15:41
13      A   So, again -- so it's a little confusing 15:41
14 because yard starters, as I described in my first 15:42
15 report, there are several different roles that 15:42
16 operators fill. And I believe that yard starter is one 15:42
17 of the roles that operators can fill. So I don't know 15:42
18 if they are technically an operator if they are driving 15:42
19 a route, or if they are still a yard starter. I think 15:42
20 they bid into those different roles. 15:42
21      I would have to read back in my first report 15:42
22 where I described the background of Muni and the 15:42
23 different roles that operators play. But -- so I'm not 15:42
24 sure how to address your question. 15:42
25      Q   Do you recall one way or the other what 15:42

Page 92

1 instruction, if any, you gave to your observers about 15:42
2 that? 15:42
3      MR. SPELLBERG: Vague and ambiguous as to 15:42
4 "that." 15:42
5      THE WITNESS: About what? So -- 15:42
6      MR. SPELLBERG: Wait a minute. Why don't we 15:42
7 get an understanding what "that" is. 15:42
8      MR. TIDRICK: Would you read back the 15:42
9 question, please. 15:43
10      (Pending question read.) 15:43
11      MR. SPELLBERG: I'm going to instruct the 15:43
12 witness. Unless you really understand what counsel 15:43
13 means when he uses the word "that," that you shouldn't 15:43
14 answer the question. 15:43
15      THE WITNESS: I don't. I'm not sure what you 15:43
16 mean. 15:43
17      MR. TIDRICK: Q   Were your observers given any 15:43
18 instructions with respect to observation of yard 15:43
19 starters? 15:43
20      A   So, again, looking at the report there are a 15:43
21 variety of positions that -- alternative roles that 15:43
22 operators hold. It's called extra signable work. And 15:43
23 they can be temporary or permanent roles. 15:43
24      And I understand parkers, yard starters, 702 15:44
25 operators, these are all temporary roles that operators 15:44

Page 93

24 (Pages 90 - 93)

1 may fill.                                    15:44
2    Q   Do you have any recollection of what      15:44
3 instruction, if any, your observers received about yard   15:44
4 starters?                                  15:44
5        MR. SPELLBERG: Objection. Asked and      15:44
6 answered.                                 15:44
7        You may answer again if you're able.     15:44
8        THE WITNESS: Observers were aware of the fact   15:44
9 that since they conducted observations at the different   15:44
10 divisions, they were aware of the fact that operators   15:44
11 would get out of the vehicles and that a yard starter   15:44
12 would get in and park the vehicle in the yard.    15:44
13       MR. TIDRICK: Q  Is that an instruction that   15:45
14 you or someone from your staff gave the observers?   15:45
15    A   That wasn't an instruction. That's an     15:45
16 observation. So they would have seen. If you observe   15:45
17 at the divisions, you can see this happen.       15:45
18    Q   How did your observers know how to       15:45
19 differentiate between the yard starters versus the   15:45
20 other operators?                           15:45
21    A   Well, the operators are in uniform and they   15:45
22 get out of the vehicle. And the yard starters walk up   15:45
23 and get in. And the yard starters drive and park the   15:45
24 vehicle.                                  15:45
25    Q   Is that information that you communicated to   15:45

Page 94

1 your observers?                            15:45
2    A   Well, they observed it because they conducted   15:46
3 observations at these divisions.              15:46
4    Q   How did they know how to differentiate between   15:46
5 a yard starter and operator?                  15:46
6    A   Well, they were observing the operator. So   15:46
7 they would focus on the operator.             15:46
8    Q   How did they know which one was which?     15:46
9    A   Because the operator was the one that just got   15:46
10 out of the bus.                           15:46
11    Q   Who told them that?                   15:46
12    A   They could see the operator just drove in the   15:46
13 bus and got out in a uniform.                15:46
14    Q   Who instructed the observers that the       15:46
15 individuals in uniform coming out of the bus were the   15:46
16 operators to be observed?                   15:46
17    A   Well, it's in the protocol we're observing   15:46
18 operators. And operators are the individuals operating   15:46
19 the vehicles.                             15:46
20    Q   Where are you referring to in the protocol?   15:46
21    A   The first sentence. "The purpose of the     15:46
22 project is to track the amount of time Muni operators   15:46
23 spend performing different tasks before and after their   15:46
24 run."                                    15:47
25    Q   Is it possible that any of the individuals   15:47

Page 95

1 whom your observers tracked were, in fact, yard   15:47
2 starters and not operators?                  15:47
3        MR. SPELLBERG: Calls for speculation.     15:47
4        You may do the best you can with it.     15:47
5        THE WITNESS: So as I described before, the   15:47
6 yard starters are, in fact, operators.         15:47
7    So do you mean when they are in the operator   15:47
8 role driving a run as an operator? What do you mean   15:48
9 exactly?                                  15:48
10       MR. TIDRICK: Q  Is it possible that any of   15:48
11 the individuals for whom your team recorded     15:48
12 observations were, in fact, yard starters at the time   15:48
13 that the observations were made, and not operators at   15:48
14 the time that the observations were made?       15:48
15    A   So are you saying that yard starters actually   15:48
16 as yard starters are driving runs or operating runs?   15:48
17    Q   Yes.                              15:48
18    A   So yard starters who are actually operators   15:48
19 are driving runs. And in this hypothetical, they   15:48
20 pulled into the division at the end of a run and we   15:48
21 tracked them?                            15:48
22    Q   Yes. Is that possible?                15:48
23    A   Well, aren't they still operators, though?   15:48
24 Because yard starters are operators, right? So they   15:49
25 would still be operators.                   15:49

Page 96

1    Q   So they would have been tracked. Is that   15:49
2 correct?                                  15:49
3    A   As an operator.                     15:49
4    A   As an operator.                     15:49
5    A   So operators are all part of the study. So in   15:49
6 that sense we are still tracking an operator.    15:49
7    Q   So do I understand correctly that a yard   15:49
8 starter acting as an operator would have been tracked   15:49
9 as an operator?                           15:49
10    A   Well, I don't think it's an operator -- it's a   15:49
11 yard starter acting as an operator. I think it's an   15:49
12 operator who may at times fill a yard starter role.   15:49
13 It's still an operator.                    15:49
14    Q   And, therefore, tracked by your observers.   15:49
15 Correct?                                  15:49
16    A   We're studying the operator position. So if   15:49
17 operators pull in -- pulled into vehicles at the end of   15:50
18 a run, we would track them.                 15:50
19    Q   Are there -- strike that.             15:50
20       Did end of shift observations occur at one of   15:50
21 the divisions?                            15:50
22       MR. SPELLBERG: It's an incomplete question.   15:50
23 Vague and ambiguous.                      15:50
24       MR. TIDRICK: Strike that.             15:50
25    Q   Do I understand correctly that cable car   15:51

Page 97

25 (Pages 94 - 97)

Page 98:

1  turn-in time was included in your calculations?    15:51
2  A  Yes.    15:51
3  Q  Are you aware that cable car operators are    15:51
4  compensated for turn-in time?    15:51
5  A  The specifics around compensated and    15:51
6  uncompensated time weren't a focus of our study.    15:51
7  Q  Assuming that cable car operators are not    15:51
8  making a claim for turn-in time, would you agree that    15:51
9  observations with respect to their turn-in time should    15:51
10 not be included in the calculations?    15:51
11     MR. SPELLBERG:  Objection.  Calls for a legal    15:51
12 conclusion.  Lack of foundation to respond to that.    15:52
13     The observations were directed by Counsel, not    15:52
14 by what BRG was independently doing.    15:52
15     You may answer the question.    15:52
16     MR. TIDRICK:  Q  Do you agree with what your    15:52
17 counsel just said?    15:52
18 A  We were conducting a job analysis of    15:52
19 operators.  And operators work at eight different    15:52
20 divisions.  So we studied operators in the different    15:52
21 divisions that they work.    15:52
22     MR. TIDRICK:  Counsel, I would repeat my    15:52
23 previous request that you not answer the questions.    15:52
24 The deponent is here to answer the questions.  And your    15:52
25 last statement was clearly leading, if not an actual    15:52

Page 98

Page 99:

1  answer to the question.    15:52
2     MR. SPELLBERG:  But it was really an improper    15:52
3  question because she's -- it's very clear BRG was not    15:53
4  tasked with determining what's compensable and what's    15:53
5  not compensable.    15:53
6     It's clear that the studies were designed to    15:53
7  look at what activities operators engaged in and how    15:53
8  much time was involved with those particular    15:53
9  activities.    15:53
10     So you might ask her about whether something    15:53
11 is compensated or uncompensated or should be in the    15:53
12 study or not.  It's a completely improper question, as    15:53
13 you're well aware.    15:53
14     MR. TIDRICK:  Was BRG tasked with anything    15:53
15 else?    15:53
16     MR. SPELLBERG:  You can ask the witness what    15:53
17 their mandate was and what they did.  What you've been    15:53
18 doing all day.    15:53
19     MR. TIDRICK:  I'm asking you.    15:53
20     MR. SPELLBERG:  I'm not being deposed today,    15:53
21 actually.    15:53
22     MR. TIDRICK:  Is there anything else, Counsel,    15:54
23 that you want to say about what BRG was tasked with?    15:54
24     MR. SPELLBERG:  I was just responding to your    15:54
25 comment that you felt my objection was improper.  I was    15:54

Page 99

Page 100:

1  explaining to you why I made the objection because I    15:54
2  felt your question was improper.    15:54
3     MR. TIDRICK:  Q  If you could please turn to    15:54
4  Page 3 -- strike that.    15:54
5     With respect to observations of end of shift    15:54
6  activities, when did those stop?    15:54
7     MR. SPELLBERG:  Vague and ambiguous.    15:54
8     MR. TIDRICK:  Q  Specifically what time of day    15:54
9  did end of shift activities stop?    15:54
10 A  I would have to check the records, but as I    15:54
11 said in the report, we observed, I want to say,    15:55
12 22 hours out of a 24 hour day.  So I think there was --    15:55
13 it was like from 2:00 in the morning and 3:00 in the    15:55
14 morning that we didn't observe.  The shifts start back    15:55
15 up at 4:00.  So I think the last end of shifts were    15:55
16 midnight, 1:00 a.m.    15:55
17 Q  Was there a particular activity that your    15:55
18 observers considered to be the last activity to    15:55
19 observe?    15:55
20 A  Last activity to observe?    15:55
21 Q  For end of shift activity.    15:55
22 A  Meaning like when did they conclude each    15:55
23 observation?    15:55
24 Q  Yes.    15:55
25 A  Oh.  That would be exiting the premises for    15:55

Page 100

Page 101:

1  the division observations.    15:55
2  Q  For the relief observations, what was the last    15:55
3  activity observed?    15:55
4  A  So are you referring to the end of shift    15:56
5  relief point observations?    15:56
6  Q  Yes.    15:56
7  A  So end of shift relief point observations    15:56
8  were conducted as operators ended their runs at the    15:56
9  relief points.  Observers tracked their activities    15:56
10 until they either got back to the division, returned to    15:56
11 the division, or for a period of 45 minutes.  Or if it    15:56
12 was evident that they had arrived at their destination.    15:56
13 Q  Were observers given any standards to evaluate    15:56
14 when any of those things occurred?    15:56
15 A  We used 45 minutes as a general cutoff.  But,    15:57
16 for instance, the individual who got on BART, it was    15:57
17 the last stop out of the city.  The individual did not    15:57
18 get off, so the observer got off.    15:57
19 Q  In the instance you're referring to the    15:57
20 observer was on a BART train with the operator?    15:57
21 A  Correct.    15:57
22 Q  And the observer left the BART train at the    15:57
23 Embarcadero station?    15:57
24 A  I would have to review my BART schedule, BART    15:57
25 map, but I think that's the last one.    15:57

Page 101

26 (Pages 98 - 101)

| | | |
|---|---|---|
| 1 He was headed -- the operator was headed to 15:57 | 1 VIDEO OPERATOR: Going off the record. The 16:01 |
| 2 the East Bay. He watched him stay on the train and the 15:58 | 2 time is 4:01. 16:01 |
| 3 operator -- observer got out. And he -- the operator 15:58 | 3 (Recess taken 4:01 - 4:16 p.m.) 16:16 |
| 4 took off to the East Bay. 15:58 | 4 VIDEO OPERATOR: Back on the record. The time 16:16 |
| 5 Q What was the name of the observer who made 15:58 | 5 is 4:16. 16:16 |
| 6 that observation? 15:58 | 6 MR. TIDRICK: Q If you could please turn 16:16 |
| 7 A I would have to check the records. I don't 15:58 | 7 to -- strike that. 16:16 |
| 8 recall offhand. | 8 If you could, please, in Exhibit 105, your 16:16 |
| 9 Q Was it you? 15:58 | 9 initial report turn to Paragraph 83, which is at 16:16 |
| 10 A No. 15:58 | 10 Page 32. 16:16 |
| 11 Q At Page 3 of 9 of Exhibit 118 document. The 15:58 | 11 A Paragraph 83? 16:16 |
| 12 discussion of observations at relief points. 15:58 | 12 Q Yes. 16:16 |
| 13 Do I understand correctly that observations at 15:58 | 13 A Okay. 16:16 |
| 14 relief locations began when an operator arrived at the 15:58 | 14 Q There is a statement in that paragraph I would 16:16 |
| 15 relief location? 15:58 | 15 like to ask you about. 16:16 |
| 16 A For the start of shift observations at relief 15:58 | 16 A Okay. 16:17 |
| 17 points we started tracking operators when they became 15:59 | 17 Q You state, and I quote, "We observed operators 16:17 |
| 18 visible to the observer. 15:59 | 18 using a variety of methods to get to the relief point, 16:17 |
| 19 Q That was based on an operator being in a 15:59 | 19 including walking, being dropped off by another driver, 16:17 |
| 20 uniform. 15:59 | 20 driving their own personal vehicle, riding a bike, and 16:17 |
| 21 Is that correct? 15:59 | 21 taking another bus. It's unknown where the operators 16:17 |
| 22 A Being in a uniform, correct. 15:59 | 22 who were observed walking were coming from. But it is 16:17 |
| 23 Q What time of day were observations performed 15:59 | 23 possible that some of these operators were walking from 16:17 |
| 24 at relief points? 15:59 | 24 a division, which in some instances, is only a few 16:17 |
| 25 A They were scattered throughout the day. But 15:59 | 25 blocks away from the relief point." 16:17 |
| Page 102 | Page 104 |

| | | |
|---|---|---|
| 1 we targeted -- we targeted mostly the busy points 15:59 | 1 Sitting here today, you believe that those 16:18 |
| 2 because we wanted to get as much data as possible and 15:59 | 2 statements are correct? 16:18 |
| 3 not have the operator -- excuse me -- the observer sit 15:59 | 3 A Yes. 16:18 |
| 4 there for hours and hours when only one bus was coming. 15:59 | 4 Q Observers making observations at relief points 16:18 |
| 5 But then later on we did some sampling to 15:59 | 5 did not record where the operators were traveling from. 16:18 |
| 6 ensure that relief points that were further out away 16:00 | 6 Is that correct? 16:18 |
| 7 from the divisions were also included. 16:00 | 7 A Where they were traveling from? Correct. 16:18 |
| 8 Q Observers were instructed to arrive at a 16:00 | 8 That was not visible. If that's what you're asking. 16:18 |
| 9 relief location 45 minutes before the provided 16:00 | 9 The method of transport was what was recorded. 16:18 |
| 10 departure time of the run that they would be observing. 16:00 | 10 Q Where the operators were traveling from was 16:18 |
| 11 Is that correct? 16:00 | 11 not recorded. 16:18 |
| 12 A Right. 16:00 | 12 Is that correct? 16:18 |
| 13 Q Why was it necessary to arrive 45 minutes 16:00 | 13 A Well, we couldn't see exactly where they were 16:18 |
| 14 beforehand? 16:00 | 14 traveling from. We could only see from the relief 16:18 |
| 15 A We had been told -- we had been -- weren't 16:00 | 15 point. 16:18 |
| 16 sure exactly when operators were going to arrive. Some 16:00 | 16 Q I think you're trying to provide a reason for 16:19 |
| 17 of them, I think, arrived awhile before. And some of 16:00 | 17 something, but there is an intermediate question I'm 16:19 |
| 18 them -- so we wanted to make sure we were there before 16:00 | 18 trying to ask. And I can get to the reason. 16:19 |
| 19 they got there. 16:00 | 19 A Sure. 16:19 |
| 20 So we always -- with all of our observations, 16:00 | 20 Q I understand correctly -- do I understand 16:19 |
| 21 we always allow lead time to make sure that we're there 16:00 | 21 correctly that observers who were making observations 16:19 |
| 22 at the appropriate time. 16:01 | 22 at the relief points did not record where the operators 16:19 |
| 23 Would it be possible to run to the -- take a 16:01 | 23 were traveling from. 16:19 |
| 24 break. 16:01 | 24 Is that correct? 16:19 |
| 25 MR. TIDRICK: Sure. 16:01 | 25 A Did not record or did not know where they were 16:19 |
| Page 103 | Page 105 |

Veritext Legal Solutions
866 299-5127

1 traveling from. 16:19
2 Q Correct? 16:19
3 A Correct. 16:19
4 Q How did you form the belief that operators 16:19
5 were coming from a division? 16:19
6 A We -- it just says it's possible. It's 16:19
7 possible that they were walking from a division because 16:20
8 some of the divisions were close. 16:20
9 Q Was there any basis other than that for your 16:20
10 belief that operators were coming from a division? 16:20
11 A Was there any basis for the belief -- well, I 16:20
12 know on a map that they are quite close. So if they 16:20
13 are going to walk, it seems possible they were walking 16:20
14 from a division. 16:20
15 Exhibit O has a map of the divisions and the 16:20
16 relief points. So if you look at the Exhibit O, it's 16:20
17 the last page, you can see that the divisions are here 16:21
18 and the relief point is there (indicating). So it 16:21
19 would seem like they could walk. 16:21
20 Q At Page 3 of 9 of the Observation Protocol. 16:21
21 Going back to Exhibit 118. In the section entitled 16:21
22 "Start of shift observations at relief points." Second 16:21
23 bullet point. 16:21
24 There is a sentence that starts "Find a 16:21
25 location where you can clearly see what the operator is 16:22

1 doing before and after he/she boards the vehicle." 16:22
2 For your initial report, Exhibit 105, do I 16:22
3 understand correctly that at relief locations observers 16:22
4 were observing operators only before their shift 16:22
5 through the time the operator boarded the vehicle that 16:22
6 he or she was set to relieve? 16:22
7 A So the relief point -- the starter shift 16:23
8 relief point observation started when the operator 16:23
9 became visible to the observer, and ended when the 16:23
10 vehicle that the operator was driving pulled away. 16:23
11 Q Operators whose runs ended at a relief 16:23
12 location were not observed after they transferred the 16:23
13 vehicle to the operator who was relieving them. 16:23
14 Is that correct? 16:23
15 A Sorry. Say that again. Operators who -- 16:23
16 Q Operators whose runs ended at a relief 16:23
17 location were not observed after they transferred the 16:23
18 vehicle to the operator who was relieving them. 16:23
19 Is that correct? 16:23
20 A No, that's not correct. 16:24
21 For the end of shift relief point observation, 16:24
22 we observed them after they got out of the vehicle. 16:24
23 Q I'm talking about for the initial report. For 16:24
24 your initial report the -- 16:24
25 A Oh. 16:24

1 Q -- Exhibit 105 -- 16:24
2 A Right. Right. 16:24
3 Q -- the observational study. 16:24
4 A So the initial report, we only observed relief 16:24
5 points start of shifts. 16:24
6 Q Do I understand correctly then for the initial 16:24
7 report, operators whose runs ended at a relief location 16:24
8 were not observed after they transferred the vehicle to 16:24
9 the operator relieving them. 16:24
10 Is that correct? 16:24
11 A Correct. They were only observers starting 16:24
12 their shifts. 16:24
13 Q How many observations were made of operators 16:24
14 traveling -- strike that. 16:24
15 For the initial report, how many observations 16:25
16 were made of operators traveling to a relief point by 16:25
17 being dropped off by another driver? 16:25
18 A How many start of shift relief point operators 16:25
19 were dropped off by another driver? 16:25
20 Q Yes. 16:25
21 A I would have to look at the actual -- it's in 16:25
22 the data -- in the raw database. But I think it was 16:25
23 only one or two. It should be in the -- one of the 16:25
24 files. 16:25
25 Q How many observations were made of operators 16:25

1 traveling to a relief point by driving their only 16:25
2 personal vehicle? 16:25
3 A Again, I don't remember the exact number, but 16:25
4 it was only a few. And I should specify that we only 16:25
5 saw them arrive in the vehicle. 16:26
6 So we can only talk about the vicinity in 16:26
7 which was visible to the observer. So I don't know 16:26
8 where they were driving from. 16:26
9 Q How many observations were made of operators 16:26
10 traveling to a relief point by riding a bicycle? 16:26
11 A Again, I would have to look at the actual 16:26
12 data. 16:26
13 Q Can you recall approximately? 16:26
14 A It was only a couple. I think it was one or 16:26
15 two. 16:26
16 Q How did you determine whether an operator 16:26
17 traveling to a relief point was starting their day by 16:26
18 making a relief or performing a split run? 16:26
19 A We didn't know. We would just record the 16:27
20 operator -- starting their shift. Starting their runs. 16:27
21 (Exhibit 121 marked for identification by
22 the court reporter and is attached hereto.
23 MR. TIDRICK: Q I'm showing you a document 16:27
24 marked Exhibit 121. 16:27
25 A Mm-hmm. 16:27

**Page 110**

1  Q   What is that document?                16:27
2  A   This is a detailed coding guide that we   16:27
3  created to help guide and calibrate coding among   16:27
4  observers.
5  Q   The document is dated May 1st, 2016.  Correct?   16:27
6  A   It is.                16:27
7  Q   Is that when the document was created?   16:27
8  A   When it was created?  I don't know.  If   16:28
9  that's the -- that appears to be the final date, but I   16:28
10  don't know whether that's when it was created.  That's   16:28
11  the date on here.  But, you know, sometimes we -- the   16:28
12  dates aren't always accurate.                16:28
13  Q   Are you able to tell me approximately when the   16:28
14  Exhibit 121 document was created?                16:28
15  A   I don't recall.                16:28
16  Q   Do you recall approximately when the   16:28
17  Exhibit 121 document was circulated to your observers   16:28
18  or rather to your coders?  Strike that.
19      You circulated the Exhibit 121 document to   16:28
20  whom?                16:28
21  A   The detailed coding guide would have been   16:28
22  given to the observers.  I don't recall when it was   16:28
23  circulated.                16:28
24  Q   Do you recall approximately?                16:28
25  A   I don't.                16:28

Page 110

**Page 111**

1  Q   Who created the Exhibit 121 document?   16:29
2  A   The team.                16:29
3  Q   Who specifically?                16:29
4  A   It was a collaborative effort.                16:29
5  Q   Did you participate in it?                16:29
6  A   I did.                16:29
7  Q   Why was the Exhibit 121 document created?   16:29
8  A   You always want to give coders as much   16:29
9  information as you can to help with the accuracy and   16:29
10  consistency in coding.                16:30
11  Q   This document Exhibit 121 provides a list of   16:29
12  activities that if observed, should be coded.                16:29
13      Is that correct?                16:29
14  A   Correct.                16:29
15  Q   How was that list of activities created?   16:29
16  A   Well, as it describes in the report, we   16:29
17  initially started the study and identified that there   16:29
18  were a number of activities of interest that were   16:29
19  relevant -- that were relevant to the study.  And so   16:29
20  these were the -- these were the issues that were   16:30
21  relevant at the time.                16:30
22      So we created a coding scheme to code that   16:30
23  information from the task statements that were   16:30
24  documented in the observation records.                16:30
25  Q   Do I understand correctly that based on the   16:30

Page 111

**Page 112**

1  activity that had been recorded, the coder would   16:30
2  provide a numerical number to that activity?   16:30
3  A   Correct.                16:30
4      For -- so, it's a coding process.  You create   16:30
5  a coding scheme.  This is methodology used with   16:30
6  qualitative data.  You develop a coding scheme.  The   16:30
7  data is coded using those numeric representation for   16:30
8  the different themes.                16:30
9  Q   The number that was assigned by the coder for   16:30
10  an activity was based on whether -- strike that.   16:30
11      The number that the coder assigned to any   16:31
12  given activity was based on whether they felt that the   16:31
13  activity was within one of the categories listed on the   16:31
14  detailed coding guide, Exhibit 121 document.  Correct?   16:31
15  A   Correct.                16:31
16  Q   An activity that did not fall within one of   16:31
17  the categories listed in the Exhibit 121 detailed   16:31
18  coding guide did not receive a code number.   16:31
19      Is that correct?                16:31
20  A   Well, I should clarify that this is the   16:31
21  detailed coding guide that was created for the initial   16:31
22  coding scheme that we used.  And so only activities   16:31
23  that are listed on this sheet received a code.  Later   16:31
24  we added some additional activities that we coded.   16:31
25      But to be more specific, all of the activities   16:31

Page 112

**Page 113**

1  that the operators performed were certainly recorded.   16:31
2  But only the activities -- specifically activity of   16:32
3  interest that were represented by these codes received   16:32
4  a numeric code.                16:32
5  Q   As far as the calculations of the amounts of   16:32
6  time taken to perform particular activities, only   16:32
7  activities that received codes were counted towards   16:32
8  that time.  Correct?                16:32
9  A   Only activities that received codes were   16:32
10  analyzed and calculated and included as part of that   16:32
11  activity of interest.  Correct.                16:32
12  Q   Your initial report relies upon what the   16:32
13  observer saw while conducting the observations.                16:32
14      Is that correct?                16:32
15  A   In what sense?  The activities recorded?   16:32
16  Q   Let's try it this way.                16:33
17      The observers made observations, and based on   16:33
18  those observations they made notations.  Correct?   16:33
19  A   They made notations?  They provided codes.   16:33
20  They coded the activities.  Is that what you're saying?   16:33
21  Q   Does your report account for anything that   16:33
22  observers did not see?                16:33
23      MR. SPELLBERG:  I'm going to object to the   16:33
24  form of the question.  It's incomprehensible.   16:33
25      THE WITNESS:  I don't know what that means.   16:33

Page 113

1 Does the report reflect anything the observers didn't 16:34
2 see? 16:34
3     MR. TIDRICK: Q Maybe the question is too 16:34
4 obvious. 16:34
5 A Oh. 16:34
6     MR. SPELLBERG: Or maybe the other way. 16:34
7     MR. TIDRICK: Q You've already testified that 16:34
8 your calculation of amounts of time spent on various 16:34
9 activities was based on measurements that were made by 16:34
10 the observers that included times that were then coded 16:34
11 with numbers. Correct? 16:34
12 A Measurements that were -- measurements. What 16:34
13 do you mean by "measurements"? 16:34
14 Q Let me try something else. How did your 16:35
15 observers record times? 16:35
16 A They recorded activities and recorded times. 16:35
17 So if that's what you mean by "measurements," then, 16:35
18 yeah, they recorded times. 16:35
19 Q How exactly did they record them? 16:35
20 A They would record the activity that was 16:35
21 performed and the end time of that particular activity. 16:35
22 Q How did they do that? 16:35
23 A They have a clipboard with a digital 16:35
24 continuous clock and they document the tasks performed 16:35
25 and the end time for each of those activities. 16:35

1 Q Is there a computer program that they use? 16:36
2 A We use Excel to calculate the times. 16:36
3 Q Does the observer need to manually input the 16:36
4 time? Or do you have an automated process for that in 16:36
5 the program that the observers use? 16:36
6 A The observers manually enter into the Excel 16:36
7 template. 16:36
8 Q What are they using to keep track of what time 16:36
9 of day it is? 16:36
10 A What time of day it is? They are writing. 16:36
11 Q Do they look at a watch? 16:36
12 A No. There is a digital -- we use a particular 16:36
13 type of clipboard that has a digital clock on it. So 16:36
14 it's set up so that you record the end times of each 16:36
15 activity. 16:36
16 Q Maybe what I'm trying to understand is too 16:37
17 obvious, so if you could please. 16:37
18 How would you explain to a layperson whether 16:37
19 your analysis of the amounts of time spent on 16:37
20 activities includes anything beyond what the observers 16:37
21 were able to physically see? 16:38
22     MR. SPELLBERG: I'm going to object. Vague 16:38
23 and ambiguous. I don't understand it. 16:38
24 Unless you understand, don't answer. 16:38
25 THE WITNESS: Beyond what the observer -- what 16:38

1 the observers physically see? So like are we -- it's 16:38
2 an observation study, so it's what they observe. 16:38
3     MR. TIDRICK: Q Did the observers ever talk 16:38
4 with the operators? 16:38
5 A As part of the protocol, the observers were 16:38
6 instructed not to initiate any conversations with the 16:38
7 operators. And that was reviewed in our briefing 16:38
8 session. 16:38
9 However, I know from reviewing the records 16:38
10 that there were a few instances where particularly 16:39
11 aggressive operators did come up and interact with the 16:39
12 observers. There were only a few instances of that. 16:39
13 And it's noted in the record. 16:39
14 Q Were the observers allowed to record any 16:39
15 amounts of times that they did not observe? 16:39
16 A So as I described earlier, there were various 16:39
17 visual impediments to the observations at different 16:39
18 points. And when we could not reasonably determine 16:39
19 what an observer was -- excuse me -- what an operator 16:39
20 was doing or whether they were going we noted that as 16:39
21 unobservable. 16:39
22 That time was treated slightly differently 16:39
23 depending on context. So, for example, during the bus 16:40
24 inspections, if we observed an operator stepping out of 16:40
25 the bus and doing some -- what clearly appeared to be 16:40

1 inspection, completing the defect card, and then got 16:40
2 back on the bus, we would actually include that 16:40
3 unobservable time -- because we couldn't see what they 16:40
4 were doing in the bus specifically, but we wanted to 16:40
5 give them the benefit of the doubt. 16:40
6 So we were over inclusive and we included that 16:40
7 unobservable time in the bus as part of the bus 16:40
8 inspection time. So we felt it was reasonable to 16:40
9 assume that they were completing some sort of 16:40
10 inspection or completing their defect card or something 16:40
11 to that effect. So we actually included that as part 16:40
12 of Code 1, which was inspect vehicle. 16:40
13 So, you know, generally speaking, we tried to 16:40
14 be really overly inclusive in the coding because it was 16:40
15 difficult to determine all the time precisely what 16:41
16 documents they were reviewing, for example. So we had 16:41
17 to include everything. Every document they reviewed in 16:41
18 the code. 16:41
19 Q Were there any other times that you designated 16:41
20 as unobservable that you treated as time spent on a 16:41
21 work activity? 16:41
22 A Were there any other times that there was an 16:41
23 unobservable time that was treated as a work activity? 16:41
24     MR. SPELLBERG: I'm going to object there is a 16:41
25 fact not in evidence. Improper assumption in that 16:41

30 (Pages 114 - 117)

**Page 118**

```
 1  question.  It's also vague and ambiguous.              16:41
 2        MR. TIDRICK:  Q  You can answer.                 16:41
 3    A   I would have to look at the data to answer       16:41
 4  that accurately.  But, again, I would repeat that we   16:41
 5  were really over inclusive in our coding and gave the  16:42
 6  operators the benefit when we weren't sure what they   16:42
 7  were doing.                                            16:42
 8    Q   Your reports rely on what the observers          16:42
 9  recorded.                                              16:42
10        Is that correct?                                 16:42
11    A   The data is what the observers recorded, yes.    16:42
12    Q   You personally did not perform all of the        16:42
13  observations.  Correct?                                16:42
14    A   Correct.                                         16:42
15    Q   The observations were not recorded on a          16:42
16  camera.                                                16:42
17        Is that correct?                                 16:42
18    A   Correct.                                         16:42
19    Q   There is no way to go back to see if an          16:42
20  observer failed to record a particular activity.       16:42
21        Is that correct?                                 16:42
22    A   Well, I would say that we took a number of       16:43
23  steps to ensure the accuracy and validity of the data 16:43
24  that we collected.  As we've reviewed, there is a      16:43
25  detailed protocol.                                     16:43
```

Page 118

**Page 119**

```
 1        All of the observers participated in an          16:43
 2  extensive three-hour briefing where we reviewed all of 16:43
 3  the protocols and the materials.  They were also tested 16:43
 4  on their knowledge of that -- of the materials.  They  16:43
 5  are all -- they all have particular expertise in the   16:43
 6  area of social science research.                       16:43
 7        So I focused on the individual's skill as a      16:43
 8  basis for the validity of the data.                    16:43
 9        MR. TIDRICK:  Move to strike as nonresponsive.   16:44
10        Madam court reporter, can you read back the      16:44
11  question, please.                                      16:44
12        MR. SPELLBERG:  I object to the motion to        16:44
13  strike.                                                16:44
14        (Previous question read.)                        16:44
15        MR. TIDRICK:  Q  Do you understand that          16:44
16  question?                                              16:44
17    A   There is no way to go back?  Back in time?       16:44
18        MR. SPELLBERG:  If you don't understand, it's    16:44
19  his job to ask you a clear question.                   16:44
20        MR. TIDRICK:  Q  Do you have any method of       16:44
21  determining whether an observer failed to record a     16:44
22  particular activity?                                   16:44
23    A   Well, we did actually take an extra step to      16:44
24  validate the data where we compared the observation    16:44
25  record with external data collected from Muni,         16:45
```

Page 119

**Page 120**

```
 1  specifically the overtime records.  We were able to    16:45
 2  validate our observations with that external data,     16:45
 3  which is a very powerful evidence in the validity of   16:45
 4  the data.                                              16:45
 5    Q   If an observer, in fact, failed to record an     16:45
 6  activity, do you have any mechanism for going back and 16:45
 7  confirming that the activity occurred or did not occur? 16:45
 8        MR. SPELLBERG:  Vague and ambiguous.             16:45
 9  Incomplete hypothetical.  Fact not in evidence.        16:45
10        You may answer.                                  16:45
11        THE WITNESS:  I have no reason to believe that   16:46
12  there were any excluded tasks.                         16:46
13        MR. TIDRICK:  Q  I'm asking a different          16:46
14  question and -- in response to my prior questions,     16:46
15  you're describing what I believe you think are steps   16:46
16  that you think were adequate beforehand.               16:46
17        I'm asking about what can be done after the      16:46
18  fact to assess whether or not the observations made by 16:46
19  the observers were complete.                           16:46
20        MR. SPELLBERG:  I think she's answered that      16:46
21  already.  Asked and answered.                          16:46
22        MR. TIDRICK:  She hasn't answered it.            16:46
23        MR. SPELLBERG:  Well, you don't like the         16:46
24  answer, but to me she's answered it several times.     16:46
25  I'll let her do it one more time.                      16:46
```

Page 120

**Page 121**

```
 1        MR. TIDRICK:  She's described something          16:46
 2  completely different, Counsel.  She's been describing  16:46
 3  what she believes were steps taken in advance.         16:46
 4        MR. SPELLBERG:  Well, that's not true in the     16:46
 5  least.  She testified about how they validated it      16:46
 6  against Muni records on one occasion.  So that's not   16:47
 7  accurate.                                              16:47
 8        I'll let her answer it again, but I'm going to   16:47
 9  start instructing if you ask the same question again   16:47
10  and again.                                             16:47
11        You may answer again.                            16:47
12        Why don't you re-ask it.                         16:47
13        MR. TIDRICK:  Q  Are you saying that you went    16:47
14  back and reviewed overtime records to make sure that   16:47
15  there was nothing accounted for in the overtime that   16:47
16  had not been observed by the observers?                16:47
17    A   No.  What I'm saying is that we validated the    16:47
18  content of the observations when there were statements 16:47
19  in the records that specifically stated that the       16:47
20  operator turned in an overtime slip.  We validated     16:47
21  that with Muni data.                                   16:47
22    Q   I understand you're saying you have no reason    16:47
23  to believe that an observer missed anything.  You have 16:47
24  full confidence in your observers that they recorded   16:48
25  everything that was visible.  You believe that.        16:48
```

Page 121

| | |
|---|---|
| 1 Is that correct? 16:48 | 1 raw file which you now have the third version of. 17:02 |
| 2 A Correct. 16:48 | 2 Q That's what's on the flash drive that you 17:03 |
| 3 Q Do you believe it's possible that the 16:48 | 3 provided today? 17:03 |
| 4 observers missed any activities that they were supposed 16:48 | 4 A Correct. 17:03 |
| 5 to be recording? 16:48 | 5 Q The documents on the flash drive, does it 17:03 |
| 6 MR. SPELLBERG: She just answered that. Asked 16:48 | 6 subtract anything from the Exhibit 122 document or does 17:03 |
| 7 and answered. 16:48 | 7 it just add to it? 17:03 |
| 8 You may answer again. 16:48 | 8 A If this document is from the -- this document 17:03 |
| 9 THE WITNESS: I have no reason to believe that 16:48 | 9 looks like it might be pre-rebuttal. So there is -- 17:03 |
| 10 they missed anything. 16:48 | 10 it's not comprehensive. It doesn't include all of the 17:03 |
| 11 MR. TIDRICK: Q Do you have any way at this 16:48 | 11 observations that were conducted for the rebuttal. 17:03 |
| 12 point in time of ascertaining whether the observers 16:48 | 12 Q Do I understand that there are, essentially, 17:04 |
| 13 missed anything? 16:48 | 13 three versions of this Exhibit 122 document? There is 17:04 |
| 14 A I reviewed all of the records personally and 16:48 | 14 this, and then there is a subsequent version that 17:04 |
| 15 reviewed all of the data for accuracy. But in terms of 16:48 | 15 includes additional observations for the rebuttal. And 17:04 |
| 16 coding, timing, task statements, and I have no reason 16:48 | 16 then there is an additional version that you provided 17:04 |
| 17 to believe there are any tasks missing. 16:48 | 17 today on the flash drive? 17:04 |
| 18 Q Do you have any way of making that 16:49 | 18 A These aren't exhibits, though, just to be 17:04 |
| 19 determination other than reviewing the recorded data? 16:49 | 19 clear. These are -- these are -- this is the 17:04 |
| 20 A What would -- what would be another way of 16:49 | 20 underlying data from the study. And we are producing 17:04 |
| 21 making that determination? 16:49 | 21 them -- one for each production request, for each of 17:04 |
| 22 Q Exactly. That's what I'm asking. 16:49 | 22 the three reports. 17:04 |
| 23 Is there another way? 16:49 | 23 Q What I'm trying to get at when I ask you if 17:04 |
| 24 A I don't know. 16:49 | 24 anything was subtracted is, of these three versions -- 17:05 |
| 25 MR. TIDRICK: We need to change the tape. So 16:49 | 25 and we'll call them one, two, and three, in 17:05 |
| Page 122 | Page 124 |

| | |
|---|---|
| 1 we'll take a short break. 16:49 | 1 chronological order. 17:05 |
| 2 VIDEO OPERATOR: This marks the end of 16:49 | 2 Do versions two and three reflect any changes 17:05 |
| 3 Volume 1, Media No. 2 of the deposition of Elizabeth 16:49 | 3 other than additional observations? 17:05 |
| 4 Arnold. | 4 A Any changes other than additional 17:05 |
| 5 The time is 4:49 p.m. We're off the record. 16:49 | 5 observations? I don't think so. We may have changed a 17:05 |
| 6 (Recess taken 4:49 p.m. - 5:01 p.m.) 16:56 | 6 word here or there to clarify a task on the right 17:05 |
| 7 (Exhibit 122 marked for identification by 17:01 | 7 column. Nothing that would impact the results. So 17:05 |
| 8 the court reporter and is attached hereto.) 17:01 | 8 none of the coding was changed, for example. 17:05 |
| 9 VIDEO OPERATOR: We're back on the record at 17:01 | 9 Q None of the numerical coding changed? Do I 17:06 |
| 10 5:01 p.m. 17:01 | 10 understand that correctly? 17:06 |
| 11 This marks the beginning of Volume 1, Media 17:01 | 11 A As I recall. I don't think any of the 17:06 |
| 12 No. 3 of the deposition of Elizabeth Arnold. 17:01 | 12 numeric -- well, except for the fact that, of course, 17:06 |
| 13 MR. TIDRICK: Q I'm showing you a document 17:02 | 13 we added -- we added sets of codes for each version. 17:06 |
| 14 that's been marked as Exhibit 122. There are a few 17:02 | 14 So, you know, second version has the work time, and 17:06 |
| 15 flags on the document that I'll use just for ease of 17:02 | 15 then the third version has the work time and the walk 17:06 |
| 16 reference because there aren't page numbers on this. 17:02 | 16 time, I believe. It's just because the project has 17:06 |
| 17 A Okay. 17:02 | 17 evolved as we keep filing reports. 17:06 |
| 18 MR. SPELLBERG: What was the number of this 17:02 | 18 Q Have any edits been made to any of the 17:06 |
| 19 one? 17:02 | 19 descriptions of tasks that appear in the column 17:06 |
| 20 MR. TIDRICK: Exhibit 122. It's a document 17:02 | 20 entitled "Task_final" in the data set? 17:07 |
| 21 that says at the top of the first page "Muni 17:02 | 21 A Like I said, it's possible that one or two 17:07 |
| 22 Observation Records - Raw." 17:02 | 22 words but nothing significant. Again, nothing that 17:07 |
| 23 Q Ms. Arnold, what is the Exhibit 122 document? 17:02 | 23 would change the results or opinions in any of the 17:07 |
| 24 A It looks like it is one of the early 17:02 | 24 reports. 17:07 |
| 25 production documents -- early versions of the records 17:02 | 25 Q So when you say one or two words, do you mean 17:07 |
| Page 123 | Page 125 |

1 one or two entries?                          17:07
2    A   It's possible that one or two words were    17:07
3 edited to clarify, for example.              17:07
4    Q   Do you have something specific in mind that    17:07
5 was edited?                                  17:07
6    A   No. I just -- you know this database has been    17:07
7 active so we've been adding to it and improving it.    17:07
8    Q   The observers write the material that appears    17:08
9 in the task_final column contemporaneously with the    17:08
10 observation?                                17:08
11   A   No. So this probably isn't the right version    17:08
12 to be looking at. The version that is going to be most    17:08
13 relevant to this discussion is the version that has the    17:08
14 original task statement on the left and the final task    17:08
15 statement on the right.                     17:08
16       You should have -- you've received versions of    17:08
17 the document with that. So that will show the original    17:08
18 task statement on the left and the final task statement    17:08
19 on the right.                               17:08
20   Q   For any given entry does the same individual    17:09
21 observer write both the original task statement and the    17:09
22 final task statement?                       17:09
23   A   So the team -- for most of the observations    17:09
24 the team did the entry together. So one member of the    17:09
25 team would enter the data into the template immediately    17:09

Page 126

1 after the observation so that we would have the benefit    17:09
2 of all three observers there reading and reviewing the    17:09
3 records as they are entered into the template.    17:09
4       Do you have handy the version with the    17:09
5 original task to the left? I think that would really    17:09
6 help. It was certainly produced. It's quite wide. It    17:10
7 might be on legal size. I know there are multiple    17:10
8 versions but...                             17:10
9    Q   On Page 3 of Exhibit 122, and, again, I    17:10
10 recognize there are not page numbers.        17:10
11   A   Right.                               17:10
12   Q   But --                              17:10
13   A   This is an Excel database.           17:10
14   Q   If you could, please, flip to the third    17:10
15 printed page. What you're looking is double sided. So    17:10
16 I mean the third printed page.               17:10
17   A   One, two, three.                     17:10
18   Q   Yes.                               17:10
19       On that page, if could you, please -- about    17:11
20 two-thirds of the way down there is a darker horizontal    17:11
21 line.                                      17:11
22   A   Mm-hmm.                             17:11
23   Q   And just to ensure we're looking at the same    17:11
24 one, above that line there is a time stamp of 0:00:00.    17:11
25   A   Mm-hmm.                             17:11

Page 127

1    Q   Beneath it there is a time that says 20:43:02.    17:11
2       Do you see that?                     17:11
3       MR. SPELLBERG: I don't see that.      17:11
4       THE WITNESS: Sorry. Which -- sorry. Just    17:11
5 below -- can you say that again.             17:11
6       MR. TIDRICK: Q  Well, let me try to point it    17:11
7 to you this way.                           17:11
8    A   Okay.                              17:11
9    Q   It's indicated as being one of the cable car    17:11
10 runs.                                      17:11
11   A   Yes.                               17:11
12   Q   And a weekday run.                   17:11
13   A   Yes.                               17:11
14   Q   And then there is a column that says 28.    17:11
15   A   Yes.                               17:11
16   Q   And then end.                       17:11
17   A   Yes.                               17:11
18   Q   And then 1.                         17:11
19   A   Yes.                               17:11
20   Q   And then there is a time stamp of 20:43:02.    17:12
21   A   Right.                             17:12
22   Q   And immediately to the right of that time    17:12
23 stamp there is another time stamp that says 28:43:40.    17:12
24   A   Mm-hmm.                             17:12
25   Q   Do you see that?                     17:12

Page 128

1    A   Mm-hmm.                             17:12
2    Q   And then immediately to the right of that is    17:12
3 something that says 0:00:20.                 17:12
4    A   Mm-hmm.                             17:12
5    Q   What I'm trying to understand with respect to    17:12
6 this entry, can you explain what the 28:43:02    17:12
7 represents? Is that a time of day?           17:12
8    A   Yes.                               17:12
9    Q   And to the right of that where it says    17:12
10 28:43:40, is that a time of day?             17:12
11   A   Yes.                               17:12
12   Q   And to the right of that where it says    17:13
13 0:00:20, what does that number reflect?      17:13
14   A   20 seconds.                         17:13
15   Q   And what is the 20 seconds intended to    17:13
16 represent?                                 17:13
17   A   So the 20 seconds is the period of time    17:13
18 between those two numbers.                   17:13
19   Q   But the amount of time between those two    17:13
20 numbers is actually 28 seconds, isn't it?    17:13
21   A   Yeah. I think that that might -- that's    17:13
22 supposed to be 20 seconds.                   17:13
23   Q   It's supposed to 20 seconds?           17:13
24   A   Instead of 02.                      17:13
25   Q   If I make may take a look at the exhibit,    17:13

Page 129

33 (Pages 126 - 129)

Page 130

1 please.
2      Well, since you have written on it -- just so   17:13
3 the record is clear, on the third page of 122 there is   17:13
4 an entry of time 28:43:02.  And you've drawn a little   17:14
5 arrow from the 2 to the 0.  And you've drawn that   17:14
6 indicating that you believe that that time stamp should   17:14
7 actually be 28:43:20.   17:14
8      Is that correct?   17:14
9 A   Mm-hmm.   17:14
10 Q   Yes?   17:14
11 A   Yes.   17:14
12 Q   How do you know that?   17:14
13 A   I think that -- without getting too   17:14
14 technical -- the -- when it exported from SAS, the way   17:14
15 the time was represented in this particular column in   17:14
16 some -- in a few instances flipped.  But the actual   17:14
17 calculations are correct, so...   17:15
18 Q   How is it --   17:15
19 A   That's how I know that.   17:15
20 Q   How is it that when the data is exported from   17:15
21 SAS that the time flipped?   17:15
22 A   I'm actually going to turn to Chester to   17:15
23 answer that question.  It's to do with the coding   17:15
24 program and the way that SAS talks to Excel.  But   17:15
25 again, the data is accurate and the findings are   17:15

Page 131

1 accurate.   17:15
2 Q   Which data are accurate?   17:15
3 A   So the data in the findings.  So you'll notice   17:15
4 that that particular -- that particular task is not   17:15
5 coded.  So in this particular version it has no bearing   17:15
6 on this findings of this study.   17:16
7 Q   This particular row you mean?   17:16
8 A   Mm-hmm.   17:16
9 Q   How can you know that the 28:43:02 is   17:16
10 inaccurate, as opposed to the 28:43:40 being inaccurate   17:16
11 or the 0:00:20 being inaccurate?   17:16
12 A   Because they came from different calculations.   17:16
13 Again, I'm going to have to point you to Chester on   17:16
14 that one.   17:16
15 Q   One thing I'm also trying to understand is on   17:16
16 the row immediately beneath that there is another task.   17:16
17 But just to be clear, the task we were just talking   17:16
18 about, it's indicated as being 20 seconds is drive into   17:16
19 yard.   17:16
20      The row beneath that, the description is park   17:17
21 cable car.  And the beginning time stamp for that is   17:17
22 28:43:04?   17:17
23 A   Mm-hmm.   17:17
24 Q   How can it be that 28:43:04 is 36 seconds   17:17
25 before --   17:17

Page 132

1 A   Right.   17:17
2 Q   -- the ending time on the prior row.   17:17
3 A   Which is how I know that it flipped.   17:17
4 Q   But how do you know that the 28:43:02 flipped   17:17
5 as opposed to the 28:43:40 being flipped?   17:17
6 A   Because the observers are recording end times   17:17
7 so that they only record end times.  So it's a start   17:17
8 time and then they record the end times.   17:17
9 Q   I see.   17:17
10      So do you believe that the next row down where   17:17
11 the start time is recorded as 28:43:04, you believe   17:17
12 that that's inaccurate as well?  In other words, that   17:17
13 should be 28:43:40?   17:17
14 A   Right.   17:18
15 Q   And do you believe that inaccuracy appears in   17:18
16 all of the data in that row?   17:18
17 A   I would have to look at each individual row.   17:18
18 Q   Do you have any basis for believing that that   17:18
19 inaccuracy would appear only in those rows but not in   17:18
20 others?   17:18
21 A   It's possible, but I've -- I believe it was   17:18
22 only -- it's only in a couple of them.  And we became   17:18
23 aware of the issue and it doesn't impact any of the   17:18
24 results.   17:18
25 Q   Going down a few rows to the row where the end   17:18

Page 133

1 time is 28:44:30.  And then the row beneath that, the   17:18
2 start time is 28:44:03.   17:18
3 A   Mm-hmm.   17:18
4 Q   Is that, again, the same error?   17:19
5 A   Mm-hmm.   17:19
6 Q   Yes.  Is that the same error or is that   17:19
7 something else?   17:19
8 A   Like I said, it's an issue with the way that   17:19
9 SAS talks to Excel.   17:19
10 Q   Is the information in the column that's   17:19
11 entitled "Period" -- and, again, going back to the   17:19
12 first example I was asking you about, the one where the   17:19
13 period time is reflected as 20 seconds.   17:19
14 A   Mm-hmm.   17:19
15 Q   Does your computer program calculate the   17:19
16 20 seconds based on the difference between the start   17:19
17 row and the end row?   17:19
18 A   So in each of the individual records, yes.   17:20
19 But then they are all up loaded into SAS, pulled   17:20
20 together, and spit back out.  And I -- so that's not --   17:20
21 that is how the individual records are calculated but   17:20
22 that's not what's happening right here.  So these are   17:20
23 just numbers, there are no formulas in it.   17:20
24 Q   Does the observer manually record the   17:20
25 20 second period of time?  Or does the recorder only   17:20

1 the start time and the end time?　　17:20
2 　A　So the observer records one start time and　17:20
3 then everything after that is end time.  So they are　17:20
4 only recording one time.　　17:20
5 　Q　I see.　　17:20
6 　　So for any given task the recorder only　17:20
7 records the start time, not the end time.　17:20
8 　　Is that correct?　　17:20
9 　A　No.  They record one start time and then　17:20
10 everything after that is an end time.  So it's -- from　17:21
11 then on it's the duration between the two.  The end　17:21
12 time of the prior task and the end time of the next　17:21
13 task.　　17:21
14 　　It's a little more complicated than that.　17:21
15 There are also concurrent and ultimate tasks in there.　17:21
16 But generally speaking that would be the best way to　17:21
17 explain it.　　17:21
18 　Q　Well, explain to me in the example that we're　17:21
19 discussing on Page 3 of Exhibit 122.  The task "Drive　17:21
20 into yard."  The observer recorded the start time as　17:21
21 being 28:43:22.　　17:21
22 　　MR. SPELLBERG:  Misstates the testimony.　17:21
23 　　MR. TIDRICK:  I apologize.  You've already　17:21
24 said that that is inaccurate in the exhibit.　17:21
25 　Q　The observer for the drive into yard activity　17:21

1 on Page 3 of Exhibit 122.  The observer hand wrote　17:22
2 28:43:20.　　17:22
3 　　Is that correct?　　17:22
4 　A　Mm-hmm.　　17:22
5 　Q　Yes?　　17:22
6 　A　Yes.　　17:22
7 　Q　And did the observer handwrite 28:43:40 as　17:22
8 the end time?　　17:22
9 　A　Yes.　　17:22
10 　Q　And the recorder did not handwrite the 20　17:22
11 second interval.　　17:22
12 　　Is that correct?　　17:22
13 　A　No.　　17:22
14 　Q　The observer records only the start time and　17:22
15 the end time for any given activity.　17:22
16 　　Is that correct?　　17:22
17 　A　There is only one start time for the start of　17:22
18 the observation and then everything after that is an　17:22
19 end time.　　17:22
20 　Q　Help me understand that.　17:22
21 　　So, for example, in the drive into yard　17:22
22 activity, the observer has recorded 28:43:20, even　17:23
23 though it says 02 in the document.  The observer has　17:23
24 recorded that as the start time?　17:23
25 　A　Mm-hmm.　　17:23

1 　Q　The observer has recorded 28:43.40 as the end　17:23
2 time?　　17:23
3 　A　Right.　　17:23
4 　Q　And then for the next task listed in the row　17:23
5 immediately beneath that "Park cable car."　17:23
6 　　What has the observer recorded in handwriting?　17:23
7 　A　20:43:50.　　17:23
8 　Q　I see.　　17:23
9 　　And so the recording of the start time for　17:23
10 that activity is simply assumed to be the ending time　17:23
11 for the prior activity.　　17:23
12 　　Is that correct?　　17:23
13 　A　Correct.　　17:23
14 　Q　And that's true for all of observations by all　17:23
15 of the observers.　　17:23
16 　　Is that correct?　　17:23
17 　A　Correct.　　17:23
18 　Q　And so moving to the next row down, "Retrieve　17:23
19 radio."  The recorder -- sorry, I meant to say the　17:24
20 observer didn't write down 28:43:05 and instead wrote　17:24
21 down only the end time of 28:44:00.　17:24
22 　A　Correct.　　17:24
23 　Q　Is that correct?　　17:24
24 　　Now the numbers in the end column, have those　17:24
25 numbers been incorrectly exported from SAS or is the　17:24

1 numbers in that column correct?　17:24
2 　A　I believe that the end times are correct.　17:24
3 　　Oh, that's my phone.　　17:24
4 　　MR. TIDRICK:  We don't have to go off the　17:24
5 record.  He can come in and hand that to you.　17:24
6 　Q　The calculation of the amount of time for any　17:25
7 given task, that's reflected in the period column.　17:25
8 　　Is that correct?　　17:25
9 　A　Right.　　17:25
10 　Q　And -- was there something else you wanted to　17:25
11 say?　　17:25
12 　A　Yeah.  With the exception -- so I just wanted　17:25
13 to explain the -- there is a sub activity column as　17:25
14 well.  You can see that where it's indented a little　17:25
15 bit.　　17:25
16 　　So on the first page, if you see the 4 and the　17:25
17 210, sub activity.  Do you see that?　17:26
18 　Q　Okay.　　17:26
19 　A　So those are actually concurrent activities.　17:26
20 So that's where we record concurrent and alternative　17:26
21 activities.　　17:26
22 　　A concurrent activity is when more than one　17:26
23 thing is being done at once.  We recognize that people　17:26
24 can multitask and so our methodology accounts for that.　17:26
25 　　So we record a concurrent activity, and you　17:26

Page 138

1 can see that in the task statement itself. It actually 17:26
2 says "concurrent activity." So that is -- you'll 17:26
3 notice there is no period time there, but there is a 17:26
4 sub activity time there of four minutes. 17:26
5     The following column one over is called tot 17:26
6 time. And the reason that I want to mention that is 17:27
7 because you'll see that there is distinction between 17:27
8 tot time and total time allocated. 17:27
9 Q   Understood. 17:27
10 A   So if you look at the concurrent activity in 17:27
11 tot time, the data is based on what's in the tot time 17:27
12 column and not the total allocated column. Because if 17:27
13 a concurrent activity is happening at the same time, we 17:27
14 can't count it in both and have the time add up to the 17:27
15 total observation time. 17:27
16     So we count it -- we split it. We count it in 17:27
17 the total time under both. You get credit for both, 17:27
18 the concurrent time and the dominant time. So I want 17:27
19 to explain why there is a difference between total time 17:27
20 and time allocated. 17:27
21 Q   The time in the period column, is that 17:27
22 calculated by the computer program? 17:27
23 A   The time in the period column is calculated by 17:28
24 a computer program, yes. 17:28
25 Q   If you could please turn to Page 6 of 17:28

Page 139

1 Exhibit 122. 17:28
2 A   Sorry. Exhibit 6? 17:28
3 Q   Page 6 of Exhibit 122. 17:28
4 A   I think it's this one. No. This one? 17:28
5 Q   It's showing for the Flynn weekday 465.0. 17:28
6 A   Mm-hmm. 17:28
7 Q   Do you see in -- 17:28
8     MR. SPELLBERG: Wait. What does it say on the 17:28
9 far right? It's the walk-through column and exit 17:28
10 building. That page? 17:28
11     MR. TIDRICK: Yes. On the top right of the 17:28
12 page it says "Walk through hall and exit building." 17:28
13     MR. SPELLBERG: Okay. 17:28
14     MR. TIDRICK: Q   So there is a row that has a 17:28
15 time stamp of 18:28:01. 17:29
16     Do you see that? 17:29
17 A   Sorry. "Walk through hall and exit building." 17:29
18 That's what you're talking about? 17:29
19 Q   That's at the far right of that page. I just 17:29
20 want to make sure you're on the same page. 17:29
21 A   Okay. 17:29
22 Q   Go down to the row that starts 18:28:01. 17:29
23 A   18:28:01. 17:29
24 Q   Yes. Do you see that? 17:29
25 A   Yeah. 17:29

Page 140

1 Q   And to the right of that is the time stamp 17:29
2 18:28:20. And to the right of that is an indication of 17:29
3 10 seconds on an activity? 17:29
4 A   Mm-hmm. 17:29
5 Q   Now, again, the difference between the start 17:29
6 time and the end time appears to be 19 seconds, but 17:29
7 it's recording a difference of 10 seconds. 17:29
8     Is this, again, due to some error in the SAS 17:29
9 export? 17:29
10 A   Mm-hmm. 17:29
11 Q   If you could please turn to Page 8. So turn 17:30
12 ahead two more pages. 17:30
13     MR. SPELLBERG: One page or -- 17:30
14     MR. TIDRICK: Q   In the top right column it 17:30
15 says "Walk and exit premises through driveway." 17:30
16     Do you see that? 17:30
17 A   Yeah. 17:30
18 Q   In the column with the task final description, 17:30
19 four lines down from the top, the description is 17:30
20 "Talked to employees in kiosk." 17:30
21     Do you see that? 17:30
22 A   Yes. 17:30
23 Q   And the row beneath that says "Get off bus." 17:30
24     Do you see that? 17:30
25 A   Mm-hmm. 17:30

Page 141

1 Q   At what point in time did this operator park 17:30
2 the bus. 17:31
3 A   "Talked to employees in kiosk. Get off bus. 17:31
4 Pulled up in yard. Hand defect card. Employees in 17:31
5 kiosk." So get off the bus. 17:31
6     So I think they must have included -- well, 17:31
7 let me see. Hold on. Let me keep reading. So I think 17:31
8 they must have included parking the bus and getting off 17:31
9 the bus. So stopping and getting off the bus. 17:31
10 Q   Was that what your protocol told the observers 17:31
11 to do? 17:31
12 A   What the protocol told the observers to do? 17:32
13 To describe what they saw? 17:32
14 Q   Well, every time there is an entry that says 17:32
15 "Get off the bus," does that include the parking? 17:32
16 A   Depends on the context. 17:32
17 Q   How does it depend? 17:32
18 A   Well, if there is a task before that that says 17:32
19 "Park the bus," or "Stop bus" or a variety of other 17:32
20 things, then it wouldn't include parking the bus. 17:32
21 Q   Your belief is that the time spent parking is 17:32
22 included in the row that says "Get off bus." 17:32
23     Is that correct? 17:32
24 A   So let me look. This is Flynn. So this is 17:32
25 Flynn yard. And the way that the process works at 17:33

36 (Pages 138 - 141)

Page 142

1 Flynn is they pull in the yard. They stop at the 17:33
2 kiosk. They hand the defect card to the employees in 17:33
3 the kiosk. They talk to employees in the kiosk. And 17:33
4 they probably got off the bus because they didn't park 17:33
5 it. That's why it's not there. 17:33
6 So I -- you have to look at the context. So 17:33
7 you have to know, for example, that the process for 17:33
8 Flynn is different than the other divisions. And that 17:33
9 they have procedures in Flynn where sometimes there are 17:33
10 yard starters that will park the bus. 17:33
11 So I would have to read through this more 17:33
12 carefully. But looking at it as Flynn, he got off on 17:33
13 the kiosk and somebody else parked the bus. 17:34
14 Q If you could please in your rebuttal report 17:34
15 Exhibit 106 -- please keep the Exhibit 122 open to that 17:34
16 page so we can come back to it. 17:34
17 A Okay. 17:34
18 Q But if you could, please, in Exhibit 106 your 17:34
19 rebuttal report, turn to Page 8. 17:34
20 A Oh, 8 not 18. 17:34
21 MR. SPELLBERG: Page 8. 17:34
22 MR. TIDRICK: Yes. Page 8. 17:34
23 Q Near the bottom of the page there is a 17:34
24 description of the Flynn division. 17:34
25 Do you see that? Specifically -- at Page 8 -- 17:34

Page 143

1 A Yep. 17:34
2 Q -- there is a statement "At Flynn operators 17:34
3 pull in, stop at the kiosk, and possibly interact with 17:35
4 yard starters for maintenance employees depending on 17:35
5 the time of day. Then drop off their defect cards in 17:35
6 the drop box before or after driving the bus farther 17:35
7 into the yard and parking it." 17:35
8 A Mm-hmm. 17:35
9 Q So a moment ago when you said that the 17:35
10 operators at Flynn do not park their vehicles, do you 17:35
11 believe that that testimony was incorrect? 17:35
12 A No. I think that there is a variety. I think 17:35
13 that these are the typical procedures. But you'll 17:35
14 notice that there is a footnote that says the daily 17:35
15 process for each division can vary depending on a 17:35
16 variety of factors. So it is possible that a yard 17:35
17 starter at Flynn parked a bus. 17:35
18 Q I see. 17:35
19 So earlier when you said what the process was 17:35
20 at Flynn you weren't -- you're not actually describing 17:36
21 what the process is at Flynn. 17:36
22 Is that correct? 17:36
23 A No. I mean these processes are dependent on a 17:36
24 variety of factors. And time of day is one of them. 17:36
25 Whether a yard starter is present is one of them. I'll 17:36

Page 144

1 state that what's in the report here is the typical 17:36
2 process, but there is variation. 17:36
3 So it is possible that for this particular 17:36
4 observation a yard starter or a maintenance employee 17:36
5 took over the bus and parked it. 17:36
6 Q And for this observation that we're discussing 17:36
7 at Page 8 of Exhibit 122, it's also possible that when 17:36
8 the observer wrote "Get off the bus" -- excuse me. 17:36
9 There was no "the" in there. It says "Get off bus." 17:36
10 MR. SPELLBERG: Which line are we on again? I 17:36
11 sort of lost track here. 17:36
12 THE WITNESS: I think he's back on this one 17:37
13 (indicating). 17:37
14 MR. SPELLBERG: On "Get off bus." 17:37
15 THE WITNESS: "Get off bus." 17:37
16 MR. SPELLBERG: Okay. I'm sorry. 17:37
17 MR. TIDRICK: Q Ms. Arnold, do you see where 17:37
18 we are? 17:37
19 A Yes. 17:37
20 Q Is it possible that the observer who wrote 17:37
21 "Get off bus" was including the time parking the 17:37
22 vehicle for the entry in that row? 17:37
23 MR. SPELLBERG: Calls for speculation. 17:37
24 THE WITNESS: Is it possible? 17:37
25 MR. SPELLBERG: Calls for speculation. 17:37

Page 145

1 THE WITNESS: I don't think I can speculate on 17:37
2 that. 17:37
3 MR. TIDRICK: Q If you could please turn 17:38
4 ahead 10 pages -- there is a purple colored flag. And 17:38
5 actually I think it might be the page immediately after 17:38
6 that. 17:38
7 It's the page that in the top right, the 17:38
8 activity recorded is "Stay in building (activity 17:38
9 unobservable.)" 17:38
10 A Mm-hmm. 17:38
11 Q If you could go down please a little farther 17:38
12 than halfway down the page, there is an activity 17:38
13 recorded "Walk to lunchroom." 17:38
14 Do you see that? 17:38
15 It's for the green division, weekday 44. With 17:39
16 a starting time recorded of 5:27:00. 17:39
17 Do you see that? 17:39
18 A One second. 17:39
19 MR. SPELLBERG: The start 5:27:00? 17:39
20 MR. TIDRICK: Right. 17:39
21 MR. SPELLBERG: This one (indicating). 17:39
22 THE WITNESS: Am I looking at the wrong -- 17:39
23 yeah. I have the wrong page. Oh, okay. 17:39
24 MR. TIDRICK: Q Green -- 17:39
25 A Got it. 17:39

37 (Pages 142 - 145)

Q Do you see the activity described as "Walk to 17:39
lunchroom"? 17:39
A Yes. 17:39
Q The row beneath below that says "Stay in 17:39
lunchroom. Activity unobservable." 17:39
A Right. 17:39
Q "Enter stairwell." 17:39
A Mm-hmm. 17:39
Q Where does the observer include time spent 17:39
getting from the lunchroom to the stairwell? 17:39
A That would be part of "Enter stairwell." 17:40
Q How do you know that? 17:40
A Because they stayed in the lunchroom until 17:40
5:30. And then they exit and entered the stairwell. 17:40
Q But, in fact, the observer records only the 17:40
end time for any activity. Right? 17:40
A The end time, yes. 17:41
Q So we really don't know when exactly the 17:41
operator entered the stairwell. Correct? 17:41
A They entered the stairwell -- the activity of 17:41
entering the stairwell and then it ended at 5:30:40. 17:41
Q But we don't know when the operator entered 17:41
the stairwell. Correct? 17:41
A So it's a 10-second duration. So the operator 17:41
must have left the lunchroom, walked to the stairwell, 17:41

entered it. And the observer wrote "Enter stairwell." 17:41
Q Is there a reason that the observer doesn't 17:41
record the activity of walking from the lunchroom to 17:41
the stairwell? 17:41
A Because it was less than 10 seconds. So it 17:41
was included in the "Enter stairwell" activity. 17:42
Q Why did the observer choose to include it in 17:42
the "Enter stairwell" activity, as opposed to the "Stay 17:42
in lunchroom" activity? 17:42
A The walking? 17:42
Q Right. 17:42
A Oh, because walking is under 10 seconds is 17:42
incorporated into the task immediately after it. 17:42
Q Is that consistently what the observers did? 17:42
A Yes. That's what the protocol dictates. 17:42
Q All right. If you could turn ahead, please, 17:42
to the blue flagged page. And I believe in your 17:42
double-sided printout it will be the next page after. 17:42
The far right column at the top, the 17:42
description of the task final at the top of the page is 17:42
"Exit yard. End observer 3." 17:43
Are you looking at the same page? 17:43
A No. 17:43
MR. SPELLBERG: I'm sorry. Which page are we 17:43
again? Is it the blue tab? 17:43

MR. TIDRICK: It's the blue flag. It's 17:43
possibly the page immediately after the blue flag. 17:43
MR. SPELLBERG: What does it say on the top? 17:43
Concurrent or -- 17:43
MR. TIDRICK: "Kirkland Sunday 724.0." 17:43
MR. SPELLBERG: "Sort documents" on the upper 17:43
right? 17:43
MR. TIDRICK: Right now I'm referring to the 17:43
far left column in the middle. 17:43
MR. SPELLBERG: There are a lot of Kirklands. 17:43
THE WITNESS: How are you on Kirkland? Mine 17:43
says "Presidio." 17:43
MR. SPELLBERG: The easier one is what is on 17:43
the far right top. Is it "Sort documents" or 17:43
"Concurrent activity"? 17:43
MR. TIDRICK: "Exit yard. End observer 3" is 17:43
at the top of the page. 17:43
Let me take a look at -- 17:43
THE WITNESS: I'm on Presidio. 17:43
MR. SPELLBERG: Oh, it's the one after it. 17:44
THE WITNESS: Maybe it's in a different order, 17:44
I think. 17:44
MR. TIDRICK: Q All right. I'm showing the 17:44
page that in the top right column says "Exit yard. End 17:44
observer 3." 17:44

A Yes. 17:44
Q Now referring to the far left column, just to 17:44
make sure we're looking at the row. There is a column 17:44
that says "Kirkland Sunday 0724.0. end." And then 17:44
there is a start time of 19:18:03. 17:44
Do you see that? 17:44
A Mm-hmm. 17:44
MR. SPELLBERG: Is it this one? 17:45
THE WITNESS: Yeah. Yep. 17:45
MR. SPELLBERG: Okay. 17:45
MR. TIDRICK: Q Do you see in that row the 17:45
end time is recorded as 19:18:40? 17:45
A Mm-hmm.
Q And the amount of time recorded is 10 seconds? 17:45
A Mm-hmm. 17:45
Q Now, has the same error occurred in this row 17:45
with respect to the start time? In other words -- 17:45
A It looks like the digits are flipped. Yep. 17:45
But, again, clearly that doesn't impact the 17:45
analysis or the findings -- the total times listed in 17:45
the other columns, which is what is actually being 17:45
pulled to calculate the codes. 17:45
Q How can you be sure that the error isn't in 17:45
the period column? 17:45
A Because the issue happened in SAS. So when it 17:45

Page 150

1  pulls all of those individual records into SAS, there   17:46
2  was an issue talking about the time, the way the digits   17:46
3  appeared in the time measurement.  And when it spit it   17:46
4  back out, this is what happened.   17:46
5      Q   But the period column is a time measurement   17:46
6  too.  Correct?   17:46
7      A   Period column is time measurement too, yes.   17:46
8      Q   So how is SAS immune from an error in the   17:46
9  period column?   17:46
10     A   You should ask Chester about that.  He has   17:46
11 more information on the specifics of exactly what that   17:46
12 was related to.   17:46
13     Q   In the Exhibit 122 document, is this the   17:46
14 document that you reviewed in order to verify that   17:46
15 observers had not left out activities?   17:47
16     A   I reviewed the database 122.  I believe --   17:47
17 obviously, there are several versions going around.   17:47
18 But this looks like the one that was reviewed for   17:47
19 coding and for task statements.   17:47
20     Q   And so earlier today when you testified that   17:47
21 you reviewed something to verify accuracy, this is the   17:47
22 document you're referring to or some version of the   17:47
23 Exhibit 122 document?   17:47
24     A   Some version, yes.  Whether or not that issue   17:47
25 with the flipped digits appeared, I can't certain.   17:47

Page 151

1  But, yeah.   17:48
2      Q   On this page, the activity that says "Pull   17:48
3  into yard.  Start observer 1."   17:48
4      A   Oh, I flipped back to the beginning.  Okay.   17:48
5      MR. SPELLBERG:  Which --   17:48
6      MR. TIDRICK:  It's Kirkland Sunday 724.0.   17:48
7      MR. SPELLBERG:  There are a lot of those.   17:48
8  What's on the right corner?  The "Pull into yard"?   17:48
9      MR. TIDRICK:  Right.  It says "Pull into   17:48
10 yard."   17:48
11     MR. SPELLBERG:  "Start observer 1."   17:48
12     MR. TIDRICK:  Why don't I take the exhibit.   17:48
13     THE WITNESS:  Sorry.   17:48
14     MR. TIDRICK:  It's this page (indicating.)   17:48
15     MR. SPELLBERG:  Let me get on it.   17:48
16     MR. TIDRICK:  Q  So this is the page we were   17:48
17 just looking at in Exhibit 122 with the start time of   17:48
18 19:18:03.   17:48
19     A   Mm-hmm.   17:48
20     Q   Although, I understand from your testimony, it   17:48
21 should be 19:18:30.   17:48
22     A   Mm-hmm.   17:48
23     Q   The activity "Pull into yard.  Start observer   17:49
24 1."   17:49
25     A   Mm-hmm.   17:49

Page 152

1      Q   The next activity recorded after that is "Exit   17:49
2  bus.  End observer 1."   17:49
3      A   Mm-hmm.   17:49
4      Q   For this particular operator where has the   17:49
5  observer recorded time spent driving the bus to the   17:49
6  parking location?   17:49
7      A   So "Pull into yard" and then "Exit bus."  So I   17:49
8  think "Pull into yard" would include driving.   17:49
9          But, again, I did want to point out that --   17:49
10 you'll notice that in our coding scheme that driving   17:49
11 the bus inside the gate was not one of the things that   17:49
12 we coded for.  And that was because it wasn't part of   17:49
13 our original data collection activities and interests.   17:49
14         So had that been a particular area of   17:50
15 interest, we would have documented parking -- driving   17:50
16 and parking and coded it.   17:50
17     Q   A few lines down there is a row that says "Go   17:50
18 back in car to grab something."   17:50
19     A   Mm-hmm.   17:50
20     Q   Was that an activity of interest?   17:50
21     A   Let's see.  This is at Kirkland.  So I'm not   17:50
22 sure if the car that's being referred to -- I suspect   17:51
23 it actually might be a personal vehicle because the way   17:51
24 Kirkland is laid out, the yard is fairly small.  And   17:51
25 personal vehicles park in the yard, the same yard that   17:51

Page 153

1  the busses park in.   17:51
2          So after the individual exited the bus, the   17:51
3  individual probably walked over to his or her car --   17:51
4  because it says "Different parking spot."  So went to a   17:51
5  different parking spot.  Picked up something personal   17:51
6  from their car and went back to car.  It's possible.   17:51
7      Q   When you say it's possible -- or I think you   17:51
8  said probably.  The reality is you don't know what   17:51
9  exactly that person was doing.  Correct?   17:51
10     A   Out of context like this it's very difficult   17:51
11 to piece together.  So I would need to talk to the   17:52
12 observer.   17:52
13     Q   Also a car is not necessarily a personal   17:52
14 vehicle.  Correct?   17:52
15     A   True.   17:52
16         But it seems unlikely that they would use the   17:52
17 term "bus" and then follow it by "car."   17:52
18     Q   Why is that unlikely?   17:52
19     A   Because if you're referring to a bus you're   17:52
20 probably not going to then turn around and say "Drive   17:52
21 car."   17:52
22     Q   But that is exactly what happened here.  There   17:52
23 is a line that says "Exit bus" and then it says "Drive   17:52
24 car to a different parking spot."   17:52
25         Do you have any understanding what that refers   17:52

1  to? If it was a personal activity, why would there be  17:52
2  a line here that says "Drive car to a different parking  17:52
3  spot"?  17:52
4     A  So there is also an issue in the Kirkland yard  17:52
5  where as the busses start pulling back in, the yard  17:52
6  gets filled up with busses, and so there is less  17:53
7  parking for people. So it's possible that they had to  17:53
8  move their personal vehicle to make room for busses  17:53
9  pulling in.  17:53
10    Q  When you say it's possible, you really are  17:53
11  speculating, though. Correct?  17:53
12    A  I'm speculating looking at this -- looking at  17:53
13  the circumstances of this particular observation.  17:53
14    Q  If you could, please, turn ahead to the green  17:53
15  flag.  17:53
16    A  Green? I don't have a green. This one?  17:53
17  Yellow.  17:53
18    Q  Yes. Actually, turn to the next page, please.  17:53
19    A  Okay.  17:53
20    Q  And I believe near the top of that page is a  17:53
21  line that says "Leave premises by crosswalk or cross  17:53
22  street."  17:53
23    A  Yes.  17:53
24    Q  If you could, please, go to the entry that  17:53
25  says "137.0_end."  17:54

Page 154

1    A  Let's see 137.0_end. Okay.  17:54
2    Q  There is a series of activities listed that  17:54
3  starts "Enter yard. Start observer 1."  17:54
4    Do you see that?  17:54
5    A  Mm-hmm.  17:54
6    Q  The next line says "Wait for attendant to  17:54
7  remove cash drawer from bus."  17:54
8    Do you see that?  17:54
9    A  Mm-hmm.  17:54
10    Q  And then it says "Park bus in yard." Correct?  17:54
11    A  Mm-hmm.  17:54
12    Q  The next line says "Wait in bus. Activity  17:54
13  unobservable." Correct?  17:54
14    A  Mm-hmm.  17:54
15    Q  The next line says "Ride bike towards  17:54
16  building." Correct?  17:54
17    A  Mm-hmm.  17:54
18    Q  Can you explain to me how did you perform this  17:54
19  observation?  17:54
20    A  What do you mean how did --  17:54
21    MR. SPELLBERG: You mean how did the observer  17:54
22  do it?  17:54
23    MR. TIDRICK: Q Did you perform this  17:54
24  observation or was it one of your observers?  17:54
25    A  I would have to look it up. I don't remember  17:54

Page 155

1  ever seeing -- have you already checked it? It's one  17:54
2  that I did?  17:54
3    Q  I don't know.  17:54
4    A  Okay. I can check against the list, but it's  17:55
5  going to take a little while.  17:55
6    So what is your question?  17:55
7    Q  Are you able to tell me where the observer was  17:55
8  stationed when making that observation?  17:55
9    A  Let's see. This is Presidio. Does it matter?  17:55
10  Why are you asking that?  17:55
11    Q  Do you know where the observer was stationed?  17:55
12    A  Do I know where the observer was stationed? I  17:55
13  can speculate but --  17:55
14    MR. SPELLBERG: No. Don't speculate.  17:55
15    THE WITNESS: -- I can't be certain.  17:55
16    MR. TIDRICK: Q How far was the observer from  17:55
17  the bus driver?  17:55
18    A  Close enough to determine that he was -- he or  17:56
19  she was parking the bus. That he or she rode a bike  17:56
20  towards the building. That he dropped his paperwork in  17:56
21  the mailbox beneath the stairwell. That he entered and  17:56
22  exited the meet and greet.  17:56
23    Q  When you say "close enough," do you have any  17:56
24  idea in distance how far away the observer was?  17:56
25    A  Do I have an exact --  17:56

Page 156

1    Q  Do you have even an approximation?  17:56
2    A  Do I have an exact measurement how far the  17:56
3  observer was? No. However, clearly they were close  17:56
4  enough to record all of these tasks and see them  17:56
5  visually.  17:56
6    Q  Are you able to tell me approximately how far  17:56
7  away was the observer?  17:56
8    A  Am I able to tell you approximately? Within  17:56
9  visual distance to observe and document all of these  17:57
10  things, which is what's required as the protocol.  17:57
11    Q  Other than saying that it was within visual  17:57
12  distance, do you have any idea how far away was the  17:57
13  observer?  17:57
14    A  For Presidio, I suspect I know, but I couldn't  17:57
15  say for certain without talking to the observer.  17:57
16    Q  Will the observer have any kind of a written  17:57
17  record of that?  17:57
18    A  The observer's recording the tasks that he or  17:57
19  she sees. And that's the data and that's the important  17:57
20  part.  17:57
21    Q  So there is no --  17:57
22    A  That's the important piece. So the spot, the  17:57
23  distance, is not relevant as long as they can  17:57
24  accurately record the data.  17:57
25    Q  Why do you say it's not relevant?  17:57

Page 157

Veritext Legal Solutions
866 299-5127

1    A    Because it's not relevant because they are    17:57
2  recording the data accurately from where they were. I    17:58
3  guess I'm not understanding.    17:58
4    Q    Well, we're in a court of law, and one of the    17:58
5  things that the jury will be doing is assessing    17:58
6  credibility and the credibility of the observers.    17:58
7    A    Correct.    17:58
8    Q    It's not unusual in a court case to ask how    17:58
9  far away were you when you observed something. Because    17:58
10  that goes directly to the credibility of the    17:58
11  observation.    17:58
12    So that I'm asking you -- and I'll ask it    17:58
13  again is, are you able to tell me whether there is any    17:58
14  written record of how far away the observer was from    17:58
15  the bus driver when making that observation?    17:58
16    MR. SPELLBERG: I'm going to object. She's    17:58
17  answered that question and she's not -- since doesn't    17:58
18  know if she's the person that did it, she's speculating    17:58
19  or estimating best she can.    17:58
20    You may answer.    17:58
21    Same objections.    17:58
22    THE WITNESS: So I see that the observer    17:58
23  couldn't see what was happening in the bus. So there    17:59
24  was some distance. They couldn't visually see what was    17:59
25  happening in the bus.    17:59

Page 158

1    However, they did code that has a 1, which is    17:59
2  inspect bus. So they gave them that credit for    17:59
3  inspecting the bus.    17:59
4    MR. TIDRICK: Q    As far as the exact distance,    17:59
5  you would be speculating. Correct?    17:59
6    A    Correct.    17:59
7    Q    Would you or the recorder -- the observer have    17:59
8  any idea what the operator looked like?    17:59
9    MR. SPELLBERG: Wait. Objection. Calls for    17:59
10  speculation. It's vague and ambiguous.    17:59
11    You can do the best you can with it.    17:59
12    THE WITNESS: I don't know.    17:59
13    MR. TIDRICK: Q    Are you able to tell me with    17:59
14  any level of approximation where the observer was    17:59
15  positioned while making the observation?    17:59
16    MR. SPELLBERG: Asked and answered.    18:00
17    THE WITNESS: I already answered that    18:00
18  question.    18:00
19    MR. TIDRICK: Q    What is the answer?    18:00
20    MR. SPELLBERG: You can answer one more time,    18:00
21  Elizabeth, then I'm going to instruct.    18:00
22    THE WITNESS: Okay. Sorry. Do I have any --    18:00
23  could you repeat it again?    18:00
24    MR. TIDRICK: Madam court reporter, could you    18:00
25  please read back the question.    18:00

Page 159

1    (Pending question read.)    18:00
2    MR. TIDRICK: Q    Do you understand how that    18:00
3  question is different from the earlier questions?    18:00
4  Before I was asking you distance. Now I'm asking you    18:00
5  geographically where was the observer.    18:00
6    Are you able to tell me with any level of    18:00
7  precision where the observer was positioned?    18:01
8    MR. SPELLBERG: This has been asked and    18:01
9  answered.    18:01
10    You may answer one more time as best you can.    18:01
11    THE WITNESS: Okay. So this was an under    18:01
12  shift observation in Presidio. So it's --    18:01
13    Should I speculate?    18:01
14    MR. SPELLBERG: Don't speculate. If you can't    18:01
15  speculate then -- you've answered the question. Are    18:01
16  you able to add to your earlier answer?    18:01
17    THE WITNESS: It would be speculation.    18:01
18    MR. SPELLBERG: Then I'll instruct the witness    18:01
19  not to speculate.    18:01
20    MR. TIDRICK: Q    So is it true that with    18:02
21  regard to where the observer was positioned while    18:02
22  making the observation, you would only be able to    18:02
23  speculate as to what that location was.    18:02
24    Is that correct?    18:02
25    A    Well, each observer at each division had    18:02

Page 160

1  particular areas where they were stationed. I would    18:02
2  have to think about the individual division. I don't    18:02
3  know where the operator was, per se, so it's difficult    18:02
4  for me to identify where the observer was.    18:02
5    Q    The line that says "Park bus in yard." Are    18:02
6  you able to tell me where in the yard the operator    18:02
7  parked the bus?    18:02
8    A    No.    18:02
9    Q    Is there any recording of that location in any    18:02
10  document?    18:02
11    A    Other than the fact that it's the yard, no.    18:02
12    Q    The line that says "Wait in bus. Activity    18:02
13  unobservable."    18:02
14    A    Mm-hmm.    18:03
15    Q    Are you able to tell me where in the bus the    18:03
16  operator was waiting?    18:03
17    A    No. They were unobservable. They were in the    18:03
18  bus.    18:03
19    Again, we coded that as a Code 1, which is    18:03
20  inspect vehicle because we wanted to give them the    18:03
21  benefit of the doubt and assume that they were    18:03
22  completing some sort of end of shift inspection or    18:03
23  completing a defect card.    18:03
24    Q    Why was the activity unobservable?    18:03
25    A    Because when the operators are in the bus it's    18:03

Page 161

41 (Pages 158 - 161)

Page 162:

1 very difficult to see exactly what they are doing.    18:03
2 Sometimes you can see if they are moving in the bus.    18:03
3 But oftentimes they are sitting in the seat, in the    18:03
4 driver's seat. And the way the bus is situated you    18:03
5 can't see in exactly what they are doing.    18:03
6      As we've also discussed -- should I keep    18:03
7 talking?    18:03
8      MR. SPELLBERG: Why don't you wait.    18:03
9      MR. TIDRICK: Q If you're done with your    18:03
10 answer, you can stop.    18:03
11 A No, I'm not.    18:04
12      Okay. So as I discussed, we -- there was a    18:04
13 distance between the observer and the operator. And so    18:04
14 as a function of that distance --    18:04
15      Did somebody just hit -- did you just hit    18:04
16 that?    18:04
17      MR. YOUNG: He did.    18:04
18      MR. SPELLBERG: No, I didn't.    18:04
19      MR. YOUNG: Yeah.    18:04
20      THE WITNESS: So there is a distance between    18:04
21 the observer and the operator. And so as a function of    18:04
22 that distance, one of the things that we weren't able    18:04
23 to do is always capture exactly what the operators were    18:04
24 doing in the bus. And that's just an omission of the    18:04
25 distance we kept from the operators.    18:05

Page 162

Page 163:

1      MR. TIDRICK: Q There is a line that says    18:05
2 "Ride bike toward building."    18:05
3 A Mm-hmm.    18:05
4 Q Are you able to tell me who was riding the    18:05
5 bike?    18:05
6 A The operator.    18:05
7 Q Are you able to tell me where the bike was    18:05
8 located?    18:05
9 A Well, I suspect that it was on the -- it was    18:05
10 on the bus.    18:05
11 Q You say suspect, but that's speculation.    18:05
12 Correct?    18:05
13 A Correct. But "Wait in bus" goes immediately    18:05
14 to "ride bike" so...    18:05
15 Q Where would the observer have included time    18:05
16 between leaving the bus and getting to be able to ride    18:05
17 the bike?    18:05
18 A With the ride the bike task.    18:05
19 Q Do you know that for a fact or is that    18:05
20 speculation?    18:05
21 A That's the protocol.    18:05
22 Q How does the protocol indicate the time spent    18:06
23 getting to the bike should be included in riding the    18:06
24 bike?    18:06
25 A How does the protocol include -- sorry. Say    18:06

Page 163

Page 164:

1 that again.    18:06
2 Q You say that's in the protocol. Where exactly    18:06
3 in the protocol is that?    18:06
4 A Well, so the task of getting the bike -- I    18:06
5 mean, I suppose they could have described it    18:06
6 differently. They could have said "Pull down bike."    18:06
7 "Get on bike." "Ride bike towards building." But they    18:06
8 simply wrote "Ride bike towards building" and included    18:06
9 that time.    18:06
10 Q If you could please turn to the first page of    18:06
11 this Exhibit 122 document.    18:06
12      Can you tell me the column that says "Obs" at    18:07
13 the top. What does that refer to?    18:07
14 A Observation.    18:07
15 Q And so the information in that column reflects    18:07
16 what?    18:07
17 A It's the right at the top.    18:07
18      MR. SPELLBERG: Thank you.    18:07
19      THE WITNESS: So "Bry" is -- it says    18:07
20 "division" but it's also a relief point. So it's just    18:07
21 an abbreviation for the division or the relief point.    18:07
22      MR. TIDRICK: Q But now you're talking about    18:07
23 the column that says "Division."    18:07
24 A No. I'm explaining what "Obs" column means.    18:07
25 Q Oh, okay. Keep going then.    18:07

Page 164

Page 165:

1 A So it's -- you'll see it's Bry_key. Yes?    18:07
2 Q Yes.    18:07
3 A So that's the abbreviation for the    18:07
4 division/relief point. The service is a weekday. The    18:08
5 run is 53. The time we broadened to include relief    18:08
6 point so "Rlf" stands for relief point. So that's the    18:08
7 observation.    18:08
8 Q The column that says "Division" what does that    18:08
9 refer to?    18:08
10 A So division originally meant division. So as    18:08
11 you can see by looking at other observations they were    18:08
12 abbreviations for the division, Kirkland, MME. But    18:08
13 then we added relief points into the data set.    18:08
14 Q So that column identifies either the division    18:08
15 or the relief point where the observation occurred?    18:08
16 A Correct.    18:08
17 Q The column that says "Service," what does that    18:08
18 refer to?    18:08
19 A Weekday. So the way service is categorized at    18:08
20 Muni. "Wky" is weekday and that's Monday through    18:08
21 Friday. Saturday is a separate day and Sunday is a    18:09
22 separate day.    18:09
23 Q The column that says "Run" what does that    18:09
24 refer to?    18:09
25 A Run number.    18:09

Page 165

42 (Pages 162 - 165)

**Page 166**

1   Q   The column that says "Time," what does that   18:09
2  refer to?   18:09
3   A   So originally that was "Sta" for start and end   18:09
4  for start of shift and end of shift. But then we added   18:09
5  relief observations and the abbreviations for that is   18:09
6  "Rlf."   18:09
7   Q   The column that says "N," what does that refer   18:09
8  to?   18:09
9   A   That's the consecutive count of the task for   18:09
10  that particular record.   18:09
11   Q   The column that says "Start" that refers to   18:09
12  the start time of the task.   18:09
13      Is that correct?   18:09
14   A   Correct.   18:09
15   Q   And, again, as you've testified earlier, that   18:09
16  information is assumed to be the same as the end time   18:09
17  for the prior tax.   18:09
18      Is that correct?   18:09
19   A   Correct.   18:09
20   Q   The next column "End" refers to the end time   18:10
21  that was recorded by the observer.   18:10
22      Is that correct?   18:10
23   A   Correct.   18:10
24   Q   The next column "Period" refers to the period   18:10
25  of time as calculated by your computer program.   18:10

**Page 167**

1      Is that correct?   18:10
2   A   Correct.   18:10
3   Q   The next column "Sub_ act" refers to a period   18:10
4  of time for sub activity as you were describing   18:10
5  earlier.   18:10
6      Is that correct?   18:10
7   A   Concurrent and alternate time.   18:10
8   Q   The next column "Time_tot," what does that   18:10
9  refer to?   18:10
10   A   So tot time is -- tot time is what the   18:10
11  analysis is really based on. So it's the amount of   18:10
12  time allocated to that particular activity.   18:10
13   Q   By your observers. Correct?   18:10
14   A   Well, the difference between the start and   18:10
15  end. So the duration.   18:10
16   Q   Again, so that number is calculated by the   18:11
17  computer based on the data in the other columns.   18:11
18  Correct?   18:11
19   A   Correct.   18:11
20   Q   And then the next column "Time_allocated,"   18:11
21  what does that refer to?   18:11
22   A   So time allocated is used to calculate the   18:11
23  total time of the observations. So you see in this   18:11
24  example how there was a concurrent activity of two   18:11
25  minutes and 10 seconds.   18:11

**Page 168**

1      So if we included that time in the observation   18:11
2  it would be inflated by two minutes and 10 seconds   18:11
3  because it was a concurrent task, it was happening at   18:11
4  the same time as another task. So we want to give   18:11
5  credit -- as much credit as possible to activities.   18:11
6      So we will count -- this example -- these   18:11
7  tasks aren't coded, so it's not really good example.   18:11
8  But if we were -- if we allowed that concurrent time to   18:11
9  count for both in the total time allocated, it wouldn't   18:11
10  add up. It would be overcounted, the time -- the   18:12
11  duration of the observation.   18:12
12      Do you follow? No?   18:12
13   Q   The time allocated column, the number is   18:12
14  almost always the same at the time_tot column.   18:12
15  Correct?   18:12
16   A   Unless there is a concurrent or alternate   18:12
17  activity.   18:12
18   Q   Understood.   18:12
19      And so the time allocated simply reflects a   18:12
20  judgment about whether the sub activity counts to the   18:12
21  other activity or not. Correct?   18:12
22   A   No. It's not a judgment. It's just not --   18:12
23  the concurrent time is not included because we want --   18:12
24  because that's intended to measure the entire duration   18:12
25  of the alteration.   18:12

**Page 169**

1   Q   The next column "Coder 1," what does that   18:12
2  reflect?   18:12
3   A   Oh. So we use a coding process for the codes   18:12
4  and Coder 1 is the first coder.   18:12
5   Q   Does that represent one individual or multiple   18:12
6  individuals?   18:12
7   A   One individual.   18:13
8   Q   The next column "Coder 2," does that represent   18:13
9  one individual or multiple individuals?   18:13
10   A   One individual.   18:13
11   Q   The next column, "Coder 3," does that   18:13
12  represent one individual or multiple individuals?   18:13
13   A   One individual.   18:13
14   Q   Were Coders 1, 2, and 3 also observers?   18:13
15   A   Yes.   18:13
16   Q   The next column "Code_final," what does that   18:13
17  represent?   18:13
18   A   That's the final code that was used.   18:13
19   Q   The next column "Task_final" that's the   18:13
20  description written by the observer. Correct?   18:13
21   A   That's the final code. So as I was referring   18:13
22  to earlier, if you had the database that has the   18:13
23  original task statement you would see that there are   18:13
24  just some kind of cleanup to the task statements so   18:13
25  that they will be in final form.   18:13

Q The next -- 18:13
A So this is the final form. 18:13
Q The next column over that says "Observer," 18:13
what does that reflect? 18:14
A That's Observer 1 -- sorry. It's the number 18:14
of the observer who recorded it so -- 18:14
Q The observer who actually observed the 18:14
activity? 18:14
A Right. 18:14
So you'll notice up into -- like -- so 18:14
starting on the next -- starting on the second page 18:14
there is Observer 2. So in the observer column it will 18:14
say "2." 18:14
Q Understood. 18:14
And the number in the observer column, does 18:14
that correspond with the identification of Coder 1, 18:14
Coder 2, Coder 3? In other words, if it says 18:14
"Observer" and the number in that column is "1" does 18:14
that mean that -- 18:14
A No. 18:14
Q -- the person who is Coder 1 --
A No.
Q -- was also the observer? No?
A No.
(Reporter requests recess.)

VIDEO OPERATOR: Going off the record. The 18:14
time is 6:14. 18:30
(Recess taken 6:14 p.m. - 6:31 p.m.) 18:31
VIDEO OPERATOR: Back on the record. The time 18:31
is 6:31. 18:31
MR. TIDRICK: Q If you could please look at 18:31
Exhibit 105, your initial report. Page 16, 18:31
Paragraph 46. 18:32
A Okay. 18:32
MR. SPELLBERG: Wait a minute. 105? 18:32
THE WITNESS: No. Page 16, I think, 18:32
Paragraph 45. 18:32
MR. SPELLBERG: Oh, I was in the wrong 18:32
section. Thanks. 18:32
MR. TIDRICK: Q Paragraph 46 states, quote, 18:32
"To validate the accuracy of the observation data, we 18:32
reviewed the SFMTA overtime log for the dates of the 18:32
observations and were able to corroborate the 18:32
completion and turn-in of overtime slips recorded by 18:32
the observers for several records across divisions. 18:32
This comparison to an independent source provides 18:32
strong validity evidence supporting the accuracy and 18:32
comprehensiveness of the observation data." 18:32
A Yes. 18:32
Q Sitting here today, do you stand by those 18:32

statements? 18:32
A Yes. 18:32
Q The validity testing described in Paragraph 46 18:33
is the only validity testing that you performed. 18:33
Is that correct? 18:33
A Well, validity testing isn't really a term. 18:33
There are a variety of ways to demonstrate validity -- 18:33
validity of the data. And I think we already talked 18:33
about some of them, but -- 18:33
Q Anything other than what you described today? 18:33
A Well, just to review, the training and testing 18:33
of the observers. 18:33
Q It's not necessary for you to repeat things 18:33
you've already said. 18:33
A Okay. 18:33
Q Is there anything other than what you've 18:33
described today that you did to test the validity of 18:33
any of the data? 18:33
A So there is one other thing that I would add 18:33
in that the data that we collected was logical in the 18:33
sense that activities were performed that would be 18:34
expected, that would be expected at different times of 18:34
the day. So there is just a face full of the element 18:34
to the data. 18:34
Q Did you personally review all of the data to 18:34

see if you believed it was logical? 18:34
A I personally reviewed all of the data, yes. 18:34
Q With respect to the validity evidence that you 18:34
refer to in Paragraph 46 of your initial report -- 18:34
A Mm-hmm. 18:34
Q -- Exhibit 105. 18:34
Are you suggesting that because observers 18:34
correctly observed operators turning in overtime cards 18:34
that you believe that all of the observations made by 18:34
the observers for the entire study were valid? 18:34
A Well, I think that -- as I said, there are a 18:34
variety of ways to demonstrate validity. But one 18:34
important -- or one considered strong validity evidence 18:35
is to corroborate with external sources from an 18:35
independent source. So to validate information from an 18:35
external source. So that is strong validity evidence. 18:35
Q How does the comparison of overtime slips 18:35
validate the accuracy of whether an observer observed 18:35
any other activity accurately? 18:35
A Well, if they -- if they accurately collected 18:35
data regarding overtime slips and were able to 18:35
corroborate that with an external source, that in 18:35
itself is validity evidence of the accuracy of the 18:35
data. 18:35
Q Is it possible that the turning in of an 18:35

Page 174:

1 overtime slip is a more discrete activity than other 18:35
2 activities observed by the observers? 18:35
3     MR. SPELLBERG: Objection. Vague and 18:35
4 ambiguous as to "discrete." 18:35
5     THE WITNESS: A more discrete? I'm not sure 18:36
6 what you mean by "discrete activity." 18:36
7     MR. TIDRICK: Q Did you, for the initial part 18:36
8 of your study, instruct the observers not to record 18:36
9 time spent parking the bus? 18:36
10     A Did I instruct them not to record parking the 18:36
11 bus? No. 18:36
12     Q Is it surprising to you there weren't more 18:37
13 instances recorded of parking the bus? 18:37
14     A Well, as I described in my report, when it 18:37
15 comes to describing the activity of parking, it's 18:37
16 actually a much more, shall we say, varied procedure, 18:37
17 depending on the division. 18:37
18     You may have seen -- I think it's in either 18:37
19 rebuttal or the final declaration. But parking isn't 18:37
20 the same thing across the different divisions. And, in 18:37
21 fact, in some divisions, the operators don't even park 18:37
22 their own vehicles. So the fact it wasn't described 18:37
23 that way is not surprising to me because it doesn't 18:37
24 happen in some divisions. 18:37
25     As we've already also discussed, in some of 18:37

Page 175:

1 the divisions yard starters and mechanics park the 18:38
2 busses. I shouldn't say busses, vehicles. Depending 18:38
3 on the vehicle type. So I don't think parking -- you 18:38
4 might -- I have to look at the specific paragraphs, but 18:38
5 there is a whole paragraph on complexity of parking and 18:38
6 how it differs by division. 18:38
7     Q In Paragraph 46 of Exhibit 105, where you 18:38
8 refer to several records. 18:38
9     A Where do you -- 46. Several records. Mm-hmm. 18:38
10     Q How many records did you use to make that 18:38
11 corroboration? 18:38
12     A 12. It's in Footnote 17. 18:39
13     Q Turning back to the Observation Protocol, 18:39
14 Exhibit 118 at Page 3. There is a statement near the 18:39
15 bottom. It's three bullet points from the bottom. "It 18:39
16 is important to avoid making employees uncomfortable 18:39
17 with your presence." 18:39
18     Why is that important? 18:39
19     A Well, generally, it's always a good idea to 18:39
20 try avoid making people uncomfortable. 18:40
21     Q What would the effect be of operators being 18:40
22 uncomfortable? 18:40
23     A Well, generally, people don't like being 18:40
24 uncomfortable. And as we conduct observation studies 18:40
25 we do what we can to minimize any discomfort that 18:40

Page 176:

1 employees may have from the study. 18:40
2     Q Do you have any concern the discomfort would 18:40
3 affect the analysis? 18:40
4     A Would affect the analysis? In terms of the -- 18:40
5     Q Your findings. 18:40
6     A In terms of the findings? So if you're 18:40
7 getting at -- I am getting tired. 18:40
8     Okay. If you're getting at the impact of the 18:41
9 observations on operators, we took a number of steps to 18:41
10 try to prevent and minimize our impact on operators. 18:41
11     Q That's not what I'm asking. I'm not asking 18:41
12 about steps that you took to try to prevent discomfort. 18:41
13     What I'm asking is -- let me try asking the 18:41
14 question this way. 18:41
15     Are you aware of studies that find that people 18:41
16 who are under stress move more quickly than people who 18:41
17 don't? 18:41
18     MR. SPELLBERG: Vague and ambiguous. 18:41
19     You may answer. 18:41
20     THE WITNESS: Am I aware of studies that 18:41
21 people who are under stress? I believe that LaValle 18:42
22 made that claim and has some citations for that. 18:42
23     MR. TIDRICK: Q So you are aware of those 18:42
24 studies? 18:42
25     A I didn't read the studies. 18:42

Page 177:

1     Q Are you aware of any studies that say the 18:42
2 opposite? 18:42
3     A That say that people who are under stress move 18:42
4 slower? 18:42
5     Q Yes. 18:42
6     A Well, he didn't cite any. 18:42
7     Q That's not my question. 18:42
8     Are you aware of any studies that show that? 18:42
9     A That people who are under stress move slower. 18:42
10 I'm not aware of any study. 18:42
11     Q Paragraph 44 of your initial report, if we can 18:42
12 turn back to that, please. It's at Page 16 of 18:42
13 Exhibit 105. 18:42
14     A Page 16? 18:42
15     MR. SPELLBERG: 44? 18:42
16     THE WITNESS: 44? 18:43
17     MR. TIDRICK: Q It reads, quote, "The 18:43
18 distance between the operators and the observers and 18:43
19 the lack of interaction between them and reduces the 18:43
20 likelihood that any operators significantly changed 18:43
21 their behavior as a result of the observation study." 18:43
22     Do you stand by that statement? 18:43
23     A That the distance between operators and 18:43
24 observers and the lack of the interaction between them 18:43
25 reduced the likelihood that operators significantly 18:43

45 (Pages 174 - 177)

1 changed their behavior as a result of the observations 18:43
2 study? Yes. 18:43
3 Q Did you specify a certain amount of distance 18:43
4 that the observer should maintain between themselves 18:43
5 and the operators? 18:43
6 A No. There was no specific distance 18:43
7 requirement. 18:43
8 Q Did you do anything to study whether operators 18:44
9 changed their behavior as a result of the observation 18:44
10 techniques? 18:44
11 A Well, as I've described here, you know, we 18:44
12 took a number of steps to try to -- to try to minimize 18:44
13 any impact that we might have on operator's behavior. 18:44
14 We kept as much distance as possible. 18:44
15 Q I apologize -- 18:44
16 MR. SPELLBERG: Don't cut her off. 18:44
17 MR. TIDRICK: Q You're saying something 18:44
18 that's nonresponsive. 18:44
19 A No. I'm describing -- 18:44
20 MR. SPELLBERG: She's answering the question. 18:44
21 THE WITNESS: I'm describing the steps that 18:44
22 we took specifically to try -- 18:44
23 MR. YOUNG: That's not the question. 18:44
24 THE WITNESS: He's asking about -- 18:44
25 MR. YOUNG: Did you study it? 18:44

Page 178

1 MR. SPELLBERG: You know, and you really 18:44
2 shouldn't be jumping in. It's not your deposition. 18:44
3 Go ahead and finish your answer. 18:44
4 THE WITNESS: Okay. We took a number of steps 18:44
5 to specifically avoid or minimize our interactions on 18:44
6 operators. One of which is the distance that I've 18:44
7 described here. 18:44
8 Another one is a bulletin that we worked with 18:45
9 Muni operations on that was distributed to all the 18:45
10 operators to notify them about the study. To assure 18:45
11 them that our study was not measuring their performance 18:45
12 in any way. To go about their job duties as normal. 18:45
13 In addition, we instructed observers to try to 18:45
14 avoid interaction and certainly not initiate 18:45
15 interaction with operators. All of these activities 18:45
16 were done to try to minimize -- minimize any impact. 18:45
17 And also I should say that the distance you're 18:45
18 asking about earlier, because of the distance, we were 18:45
19 often out of sight of operators, and certainly not 18:45
20 right up on them to where they would be directly aware 18:46
21 of our presence. 18:46
22 MR. TIDRICK: Q If you were often out of 18:46
23 sight of operators, do you have any concern that there 18:46
24 were activities performed that you were not able to 18:46
25 capture? 18:46

Page 179

1 A I think that their reality of implementing 18:46
2 this study, the challenges of, as I've described 18:46
3 before, of physical obstructions, such as busses moving 18:46
4 and tight yards, yes, there were some periods where we 18:46
5 were not able to observe the operators. And that is 18:46
6 reflected in the record as unobservable activity. 18:46
7 That's just a function of, again, the 18:46
8 divisions and circumstances in which we were observing. 18:46
9 That's a reality of conducting this kind of job 18:46
10 analysis in the workplace. 18:46
11 Q The next question is a yes or no question. 18:46
12 Did you study whether operators changed their 18:46
13 behavior as a result of your observation techniques? 18:46
14 A I can say that I personally spent many, many 18:47
15 hours observing these operators across the divisions. 18:47
16 I observed them performing lots of non-work 18:47
17 activities -- smoking, eating, chatting. A variety of 18:47
18 activities that would suggest to me that they are 18:47
19 performing their work as normal and spending time as 18:47
20 normal. 18:47
21 I would also add to that that I -- as we've 18:47
22 reviewed and conducted hundreds of observations across 18:47
23 organizations. And I can generally say that most 18:47
24 employees when they are being observed realize they 18:47
25 have a job to do, they have tasks to perform, and they 18:47

Page 180

1 focus on those tasks and getting them done. 18:47
2 Q Other than anecdotally watching operators 18:48
3 yourself performing non-work activities, did you do 18:48
4 anything to study whether operators changed their 18:48
5 behavior based on the observation techniques? 18:48
6 A Did we do anything specifically to study 18:48
7 whether they changed their behavior? No. 18:48
8 Q In Paragraph 44 of your initial report -- 18:48
9 THE WITNESS: Do you mind if we close the 18:48
10 door? I feel like we're echoing down the hall. 18:48
11 MR. TIDRICK: That's fine. We don't have to 18:48
12 go off the record though. 18:48
13 THE WITNESS: Paragraph 44. 18:48
14 MR. TIDRICK: Q Paragraph 44 of your initial 18:48
15 study, Plaintiffs' 105, includes the following 18:48
16 statement. Quote, "To the extent any operators' 18:49
17 activities were influenced by the observations, the 18:49
18 result would likely be to increase time spent on 18:49
19 specific activities of interest." 18:49
20 A Yes. 18:49
21 Q Did you do anything in the way of a study to 18:49
22 reach that conclusion? 18:49
23 A Well, I know that -- I believe that there is a 18:49
24 general awareness of the litigation and the issues 18:49
25 involved in the litigation. And I think that it's 18:49

Page 181

46 (Pages 178 - 181)

Page 182:

```
 1  logical that given that there is financial gain for    18:49
 2  these operators at the outcome of this litigation, that  18:49
 3  if they were going to go change their behavior, it      18:49
 4  would be to -- for their own benefit. And that would    18:49
 5  be increasing the amount of time they spent on the      18:49
 6  activities of interest, so...                           18:49
 7      Q   Are you aware of any studies that show that?    18:49
 8  Or is that really just a layperson opinion?             18:50
 9      A   That's a logical conclusion. I wouldn't say     18:50
10  layperson, but --                                       18:50
11      Q   It's a logical conclusion. Correct?             18:50
12      A   Logical conclusion given there is a known       18:50
13  awareness among the population and that there is        18:50
14  financial gain.                                         18:50
15      Q   In Paragraph 47 of your declaration, which has  18:50
16  been marked as Plaintiffs' Exhibit 107.                 18:50
17          MR. SPELLBERG: I'm sorry. Which paragraph?      18:50
18          THE WITNESS: Yeah. I missed the paragraph.      18:50
19          MR. TIDRICK: Q Paragraph 47.                    18:50
20      A   Oh, okay.                                       18:50
21      Q   Paragraph 47 of your declaration, Plaintiffs'   18:50
22  Exhibit 107 discusses zero time data. Correct?          18:51
23      A   Correct.                                        18:51
24      Q   Your report included zero time data. Correct?   18:51
25      A   Correct.                                        18:51
                                             Page 182
```

Page 183:

```
 1      Q   At Lines 15 to 16 you include the statement,    18:51
 2  "Our study collected data to determine the amount of    18:51
 3  time operators in our sample spent on the stated        18:51
 4  activities of interest."                                18:51
 5          Your study, in fact, did that. Correct?         18:51
 6      A   Correct.                                        18:51
 7      Q   You also state in Paragraph 47. "We recorded    18:51
 8  the amount of time, or lack thereof, represented by      18:51
 9  zero score, operators spent on these activities and ran  18:51
10  calculations across all of those data points to         18:51
11  determine the average time spent on each activity."     18:51
12          You, in fact, did that. Correct?                18:51
13      A   Correct.                                        18:51
14      Q   Referring back up to Paragraph 46 of the same   18:52
15  declaration, Plaintiffs' Exhibit 107.                   18:52
16          Do I understand correctly that you included     18:52
17  the zero time point data in calculating the average of  18:52
18  five minutes and 42 seconds that's reflected in         18:52
19  Paragraph 46?                                           18:52
20      A   So I'm trying to think through your question.   18:52
21          So we coded the walking time and summed it all  18:52
22  up and averaged it. So this is a --                     18:53
23      Q   You said "walking time," but you didn't mean    18:53
24  that. Right?                                            18:53
25      A   Oh, sorry.                                      18:53
                                             Page 183
```

Page 184:

```
 1      Q   Let me start over with a slightly different     18:53
 2  question. Might be clearer.                             18:53
 3          Paragraph 46 of Exhibit 107 includes an         18:53
 4  average that you calculated of five minutes and         18:53
 5  42 seconds. Correct?                                    18:53
 6      A   Of the total work time. Is that what you're     18:53
 7  referring to? Five minutes, 42 seconds. This is our     18:53
 8  all inclusive kind of total work time.                  18:53
 9      Q   The average of five minutes and 42 seconds      18:53
10  that's reflected in Paragraph 46, that's an average.    18:53
11  Correct?                                                18:53
12      A   Right.                                          18:53
13      Q   All that I'm asking is that in computing that   18:54
14  average, did you add together only positive sums of     18:54
15  time observed or did you also include the zero time     18:54
16  point data?                                             18:54
17          Do you understand what I'm asking?              18:54
18      A   I think so.                                     18:54
19      Q   Let me put it a different way. Let's say that   18:54
20  had you three observations.                             18:54
21      A   Yeah. I don't know that it's applicable         18:54
22  because everybody -- I think that everybody had some    18:54
23  work time.                                              18:54
24      Q   Let me try it this way.                         18:54
25      A   So it doesn't --                                18:54
                                             Page 184
```

Page 185:

```
 1      Q   Let's say you have three observations. For      18:54
 2  one observation it was zero minutes. For another        18:55
 3  observation it was zero minutes. For another            18:55
 4  observation it was three minutes.                       18:55
 5          In computing the average reflected in           18:55
 6  Paragraph 46, did you add together zero plus zero plus  18:55
 7  three and divide by three to get an average of one?     18:55
 8  Did you do that?                                        18:55
 9      A   So my response is that I don't think that       18:55
10  hypothetical makes sense because I think that -- I      18:55
11  would have to look at the data, but I'm fairly certain  18:55
12  that everybody spent some time on work time, so there   18:55
13  was no zero.                                            18:55
14          So something that every operator did would be   18:55
15  work. So they would all be included. There is no        18:55
16  zero.                                                   18:55
17      Q   If an observer was not in a position to         18:55
18  observe an operator performing a certain activity, and, 18:56
19  therefore, that activity was not noted among the        18:56
20  observations, for purposes of this calculation was that 18:56
21  treated as zero?                                        18:56
22      A   Let me try to -- if -- so this graph            18:56
23  represents what we coded as work time. And that's a     18:56
24  different amount for each operator. But unlike -- I     18:56
25  think the distinction -- the zero time issue comes into 18:56
                                             Page 185
```

Page 186:

1  play because some operators did not perform the          18:56
2  activities of interest, right?  So there are zero        18:56
3  points that are factored into that average.              18:56
4       However, this calculation, I believe, is            18:56
5  different because I don't think that there were          18:56
6  records.  And, again, I would have to double check the   18:56
7  data.  But I don't think that there were records that    18:57
8  had no work time.                                        18:57
9       So there is no -- you're talking about the          18:57
10 end.  Did we divide by 118 for the average.  So this is  18:57
11 a different scenario.                                     18:57
12      Q  For the average that's reflected in              18:57
13 Paragraph 46, did you do anything to account for the     18:57
14 possibility that an observer may not have been in a      18:57
15 position to observe an operator performing an activity?  18:57
16      A  Again, there were no -- I don't think there       18:57
17 were any zero points.  So I don't understand what --      18:57
18 what you're saying.                                       18:57
19         MR. SPELLBERG:  Yeah.  I'm going to object.        18:57
20 Vague and ambiguous.  I think I understand what you're    18:57
21 asking, and I think I understand what she's answering     18:57
22 and I don't think you two are thinking the same way.      18:57
23         THE WITNESS:  Oh.                                 18:57
24         MR. SPELLBERG:  Is my view.  I could be wrong.    18:57
25         MR. TIDRICK:  Q  I believe what you're saying      18:58
                                                      Page 186

Page 187:

1  is that for an observer's observation of a particular     18:58
2  operator --                                               18:58
3       A  Mm-hmm.                                           18:58
4       Q  -- that there was no instance where the           18:58
5  operator did not perform some amount of work time.        18:58
6  Correct?                                                  18:58
7       A  Right.  Right.                                    18:58
8       Q  What I'm asking is different.  And that is I'm    18:58
9  honing in on particular components of the work time.      18:58
10      A  Okay.                                             18:58
11      Q  So, for instance, let's say an observer was       18:58
12 able to observe the operator performing turn-in time.     18:58
13      A  Okay.                                             18:58
14      Q  But wasn't in a position to observe the           18:58
15 operator performing some other activity.                  18:58
16      A  Okay.                                             18:58
17      Q  What I'm wondering is in that scenario, the        18:59
18 unobserved activity, does that count as zero?              18:59
19      A  Oh.  The unobserved activity -- I think I          18:59
20 mentioned this earlier.  It depended on context.  So       18:59
21 the unobserved activity -- so specifically in the box      18:59
22 is the one that keeps coming to mind.  Then it would be    18:59
23 counted as work.                                          18:59
24      Q  What I'm getting at is different though.           18:59
25      I understand what you're talking now is where         18:59
                                                      Page 187

Page 188:

1  there is actually a recorded activity of something        18:59
2  being unobservable?                                        18:59
3       A  Yes.                                              18:59
4       Q  What I'm talking about is instances in which       18:59
5  the observer was not in a position to know whether an      18:59
6  operator was performing an activity at all.  In other      18:59
7  words, it doesn't even show up as unobservable in the      18:59
8  log.                                                       18:59
9       A  Oh.  No.  I don't think that that happened.       18:59
10 That wouldn't -- that would not be a violation from the    18:59
11 protocol.                                                  18:59
12      So these are continuous observation records.          19:00
13 And if the operator was out of sight or the observer       19:00
14 could not tell -- could not see what the operator was      19:00
15 doing, they recorded unobservable activity.                19:00
16      Q  At Paragraph 46, are you able to tell me           19:00
17 mathematically how you calculated that average of five     19:00
18 minutes and 42 seconds?                                    19:00
19      A  Excuse me.  Added up the work time across the      19:01
20 118.                                                       19:01
21      Q  Keeping it really simple.                          19:01
22      What was the numerator?  What was denominator?        19:01
23      A  118.                                              19:01
24      Q  118 was the numerator?                             19:01
25      A  There are 118 observations.                        19:01
                                                      Page 188

Page 189:

1       Q  All right.  So 118 was the denominator?           19:01
2       A  Mm-hmm.                                           19:01
3       Q  And how did you calculate what the numerator      19:01
4  was?                                                       19:01
5       A  So there are 118 -- I would have to look at        19:01
6  the actual records to see the work time that's for each    19:01
7  individual observation.  I'm not understanding what        19:01
8  you're...                                                  19:01
9       So we added up the work time for each                 19:01
10 observation.  So you can -- if you look at the file I       19:01
11 just gave you.  You can see where it's coded as work        19:01
12 time, work time, work time.  So you add it up for each      19:01
13 individual operator and you divide it by the total          19:02
14 number of operators, which is 118.                          19:02
15      Does that answer your question?                        19:02
16      Q  I think it does.  Let me make sure that I'm         19:02
17 following you right.                                        19:02
18      A  Okay.                                               19:02
19      Q  In the Plaintiffs' Exhibit --                       19:02
20      A  It's also in one of the other files.  But it's      19:02
21 probably easiest if you look at what I just gave you.       19:02
22 It's not in this one.                                       19:02
23      Q  In what you produced today on the flash             19:02
24 drive --                                                    19:02
25      A  Yes.                                               19:02
                                                      Page 189

1 Q -- it includes something that is an updated 19:02
2 version of Plaintiffs' Exhibit 122. Correct? 19:02
3 A 122? It's an updated version, yes. 19:02
4 So I think we talked about there are three 19:02
5 different versions because of -- this was the original 19:02
6 and then there is a rebuttal and then this is a 19:02
7 declaration. 19:02
8 Q Okay. Do I understand correctly that the 19:02
9 average of five minutes and 42 seconds that's reflected 19:03
10 in Paragraph 46, the way that you reached that average 19:03
11 mathematically, the denominator was 118. And the 19:03
12 numerator was the sum total of the work time amounts 19:03
13 that were coded as work activities in the file on the 19:03
14 flash drive that you produced today. 19:03
15 Is that correct? 19:03
16 A Correct. 19:03
17 Q Okay. Do I understand correctly that when you 19:03
18 did your initial report, Plaintiffs' Exhibit 105, you 19:04
19 were not aware that time that operators spend parking 19:04
20 the vehicle was part of the claim for unpaid time? Did 19:04
21 I understand correctly? 19:04
22 A It's my understanding that the definite -- 19:04
23 that it's how areas of interest have sort of evolved 19:04
24 over time. And we were basing it on the original, 19:04
25 which did not include, did not specify parking. So 19:04

Page 190

1 parking was not identified. 19:04
2 I think I -- that's in the report. Parking 19:04
3 was not identified as one of the areas of interest 19:04
4 specifically because it was not included in the 19:04
5 original filing. 19:05
6 (Exhibit 123 marked for identification by 19:05
7 the court reporter and is attached hereto.) 19:05
8 MR. TIDRICK: Q I'm showing you a document 19:05
9 marked as Plaintiffs' Exhibit 123. 19:05
10 I'll represent to you this is not a document 19:05
11 that was listed in the list that you prepared of 19:05
12 documents that you reviewed. So I don't believe you've 19:05
13 reviewed this. 19:05
14 A No, I have not seen this. 19:05
15 Q So today is the first time you've seen this 19:05
16 document marked as Plaintiffs' Exhibit 123. 19:05
17 Is that correct? 19:05
18 A As far as I can recall, yes. 19:06
19 Q If you could please turn to Page 8. Toward 19:06
20 the bottom of the page that starts at Line 25. And 19:06
21 I'll read it out loud. Quote, "Turn-in time: 19:06
22 Plaintiffs proposed to prove those claims using class 19:06
23 wide evidence including but not limited to Range 19:06
24 Reports, Operator Rule Books, bulletins, and 19:06
25 information from and/or testimony of representative 19:06

Page 191

1 sample of operators to establish, for operators is 19:06
2 assigned to runs that end at a division, the daily 19:06
3 average of unpaid minutes that elapse between pulling 19:07
4 in to division and the completion of the following 19:07
5 tasks: Parking the vehicle. Performing a walk-through 19:07
6 inspection of the vehicle. Completing a defect card, 19:07
7 and/or returning the defect cards, transfers, and/or 19:07
8 miscellaneous reports in the required locations." 19:07
9 Looking at that statement today -- and I 19:07
10 understand you can only answer this hypothetically, but 19:07
11 let me present the hypothetical. 19:07
12 In designing the study and your process of 19:07
13 identifying activities of interest -- I think that's 19:08
14 your phrase. Right? 19:08
15 A Yeah. That's the phrase that I use. 19:08
16 Q Does the sentence that I just read, at least 19:08
17 in your professional work as a person who does the work 19:08
18 that you do -- 19:08
19 A Mm-hmm. 19:08
20 Q -- does that statement present to you time 19:08
21 spent on parking the vehicle as an activity of 19:08
22 interest? 19:08
23 MR. SPELLBERG: I'm going to object to the 19:08
24 question as vague and ambiguous. May call for a legal 19:08
25 conclusion. 19:08

Page 192

1 You may answer. 19:08
2 THE WITNESS: I don't actually know what this 19:08
3 document is or how it fits into the case or when or 19:08
4 where or -- you know. We've already established I've 19:08
5 never seen this document. So I would need to know more 19:08
6 about it before I could speculate about how it would 19:08
7 impact the study scope. 19:08
8 MR. TIDRICK: Q All right. Well, I'll tell 19:08
9 you when it fits in. 19:09
10 A It's got Tom Amioto in here? 19:09
11 Q You'll that see it's dated November 20th, 19:09
12 2015. 19:09
13 What I'm wondering is the process that you use 19:09
14 in designing your analyses of work activities, 19:09
15 including time and motion type analysis, is the 19:09
16 information reflected in the statement that I just read 19:09
17 from Plaintiffs' Exhibit 123 something that, in 19:09
18 your view, identifies the parking of the vehicle as an 19:09
19 activity of interest? 19:10
20 MR. SPELLBERG: I'm going to object -- same 19:10
21 objections. She just answered the question. 19:10
22 If you have anything different to add you may. 19:10
23 THE WITNESS: No, I don't. 19:10
24 MR. TIDRICK: Q In designing your study and 19:10
25 identifying activities of interest, you relied on 19:10

Page 193

49 (Pages 190 - 193)

1 documents. Correct?                                    19:10
2        MR. SPELLBERG: Vague and ambiguous.              19:10
3        You may answer.                                  19:10
4        THE WITNESS: We looked at documents. We          19:10
5 talked to the client. We reviewed a variety of          19:10
6 materials.                                               19:10
7        You know, there are some issues in the case      19:10
8 that we may or may not include in the study. So, you     19:10
9 know, I don't know how this would fit in. I would have   19:10
10 to -- I don't have enough information.                  19:10
11       MR. TIDRICK: Q In designing the study, did       19:11
12 you make an assumption that time spent parking the      19:11
13 vehicle was not part of the claim for turn-in time?     19:11
14    A  I didn't design -- did I make an assumption?      19:11
15 No, I didn't make an assumption.                        19:11
16    Q  What did you not design?                          19:11
17    A  I'm sorry. I'm getting confused.                  19:11
18       Could you repeat the question?                    19:11
19    Q  Well, you were starting to say you didn't         19:11
20 design something and I'm wondering what it is that you   19:11
21 didn't design?                                          19:11
22       MR. SPELLBERG: She asked you to repeat the        19:11
23 question, please.                                       19:11
24       MR. TIDRICK: Q Right. What was it that you        19:11
25 didn't design?                                          19:11
                                              Page 194

1        MR. SPELLBERG: She was confused. I'm going        19:11
2 to instruct her not to answer.                           19:11
3        Repeat the question, please.                      19:11
4        MR. TIDRICK: Q What did you not design?           19:11
5        MR. SPELLBERG: I just instructed her on that.     19:11
6        MR. TIDRICK: What is the basis for that           19:11
7 instruction.                                             19:11
8        MR. SPELLBERG: Because she was confused with      19:11
9 your question, and she started to say something and      19:11
10 then she corrected it. And so it was just a fragment     19:11
11 of a sentence and you're jumping on it as if it's some   19:12
12 great piece of evidence.                                 19:12
13       If you want to ask a clear question, she can       19:12
14 give you a clear answer, that's fine. But you're          19:12
15 basically trying to argue with her that there is          19:12
16 something there. So, anyway, I've instructed.            19:12
17       THE WITNESS: I don't know. I've never seen         19:12
18 this document before. You're giving it to me and          19:12
19 asking if I would re-scope the study or if I would        19:12
20 modify any of the specifics of the study. And I don't     19:12
21 know enough about this document, how it fits into the     19:12
22 case. Where or why it was filed. Why I haven't seen       19:12
23 it. Like, I don't know any of those factors. So I         19:12
24 really can't speculate about how the study may or may     19:12
25 not have been designed differently because of this       19:12
                                              Page 195

1 particular document.                                     19:12
2        MR. TIDRICK: Q How did you make decisions         19:12
3 about what to include as activities of interest?         19:12
4    A  We reviewed materials. We talked to the           19:12
5 client. We conducted our site visits as we've            19:12
6 discussed to determine, you know, what is feasible.       19:13
7 What can we study. What areas of interest.                19:13
8    Q  Did you review any depositions taken of            19:13
9 operators?                                                19:13
10    A  I believe that we were sent some depositions      19:13
11 of operators later. But I don't recall specifically      19:13
12 whether I reviewed any of them. I think they are on      19:13
13 our list.                                                19:13
14    Q  Do I understand correctly you do not recall       19:13
15 reviewing deposition transcripts of operators'           19:13
16 depositions.                                             19:13
17       Is that correct?                                  19:13
18    A  I may have reviewed one or two. I didn't          19:13
19 spend lot of time on them -- on reviewing the            19:13
20 transcripts. I think that Chester may have reviewed      19:13
21 more of them than I did.                                 19:13
22    Q  What do you recall, if anything, about the        19:14
23 deposition transcripts of operators that you reviewed?   19:14
24    A  It's kind of blurry. That wasn't our main --      19:14
25 clearly that wasn't our main source of data, so it       19:14
                                              Page 196

1 wasn't --                                                19:14
2        Are we running out of tape again?                19:14
3    Q  Yes.                                               19:14
4    A  Oh.                                                19:14
5    Q  You can finish your answer.                        19:14
6    A  Oh, sorry. I wasn't sure if we were literally     19:14
7 out of tape.                                              19:14
8        I think I was finished.                           19:14
9        MR. TIDRICK: Okay. We can go off the record.     19:14
10       VIDEO OPERATOR: This marks the end of            19:14
11 Volume 1, Media No. 3 of the deposition of Elizabeth    19:14
12 Arnold.                                                  19:14
13       The time is 7:14 p.m. We're off the record.      19:15
14       (Recess taken 7:14 p.m. - 7:29 p.m.)             19:14
15       VIDEO OPERATOR: We are back on the record at     19:29
16 7:29 p.m.                                                19:29
17       This marks the beginning of Volume 1, Media      19:29
18 No. 4 of the deposition of Elizabeth Arnold.            19:29
19       MR. TIDRICK: Q If you could please refer to      19:29
20 your declaration, Plaintiffs' Exhibit 107. And          19:29
21 specifically Paragraph 31 which is at Page 9.            19:29
22       MR. SPELLBERG: I'm sorry. What paragraph?        19:29
23 47?                                                      19:29
24       MR. TIDRICK: Paragraph 31, which is at Page 9    19:29
25 of Exhibit 107.                                          19:29
                                              Page 197

50 (Pages 194 - 197)

1  Q  You include a statement, and I quote,  19:29
2  "Sometimes bulletins are not included in the outfit but  19:30
3  are posted on boards." That's at Line 9.  19:30
4  Do you see that?  19:30
5  A  Mm-hmm.  19:30
6  Q  Sitting here today, you believe that that's  19:30
7  accurate?  19:30
8  A  Well, I think that statement needs to be in  19:30
9  context. So, you know, the beginning of the sentence  19:30
10 says "Receiver stated that sometimes bulletins are  19:30
11 included in the outfit but not posted on the board.  19:30
12 Sometimes they are on the boards, but not the outfits.  19:30
13 And sometimes bulletins are on both."  19:30
14 So, you know, the point of that statement is  19:30
15 really to say there is a lot of variation in how and  19:30
16 where bulletins are shared with operators.  19:30
17 Q  Is it true that sometimes bulletins are not  19:30
18 included in the outfit but are posted on boards?  19:30
19 A  According to this receiver, yes.  19:30
20 Q  If could you please turn to -- well, and do  19:30
21 you have any reason to believe that that receiver that  19:31
22 you spoke with was being untruthful?  19:31
23 A  I do not have any reason to think that, no.  19:31
24 Q  If you could please turn to Paragraph 15 of  19:31
25 your declaration, Plaintiffs' Exhibit 107,  19:31

1  Paragraph 15, which is at Page 5.  19:31
2  Starting at Line 6 you make the following  19:31
3  statement. Quote, "The findings are not intended to be  19:31
4  statistically extrapolated to the population or any  19:31
5  other time period, rather our study was designed to  19:31
6  provide descriptive insight into the variety of tasks  19:31
7  operators perform at the beginnings and ends of their  19:31
8  shifts."  19:31
9  Sitting here today do you stand by that  19:31
10 statement?  19:31
11 A  Yes.  19:31
12 Q  You also make the statement in Paragraph 15,  19:32
13 "It," referring to your study, "was intended to capture  19:32
14 a 'snapshot' of the thousands of runs that operators  19:32
15 drive throughout the day and night over the course of a  19:32
16 week." Do I understand that to be correct?  19:32
17 Do I understand that to be correct?  19:32
18 A  Correct.  19:32
19 Q  That is a true statement you stand by.  19:32
20 Correct?  19:32
21 A  Correct.  19:32
22 Q  Why is it that the findings cannot be  19:32
23 statistically extrapolated to the population for any  19:32
24 other time period?  19:32
25 A  Because this is a descriptive study.  19:32

1  Q  What do you mean by that. You mean  19:33
2  descriptive of a particular time period and particular  19:33
3  operators that you observed?  19:33
4  A  This is intended to be a descriptive study of  19:33
5  the operators that we observed. So there is a  19:33
6  difference between a descriptive study and a different  19:33
7  type study.  19:33
8  So this study was specifically intended to  19:33
9  provide information and details around how a group of  19:33
10 operators were spending their time across the different  19:33
11 divisions, across the time -- days of the -- times of  19:33
12 the day, days of the week. It's really to give some  19:33
13 informative hard data to inform questions about how  19:33
14 these operators are spending their time.  19:33
15 Q  And specifically how the operators that you  19:34
16 observed were spending their time during the snapshot  19:34
17 of time that you observed.  19:34
18 Is that correct?  19:34
19 A  Correct.  19:34
20 Q  Now, if you could please -- all right. If you  19:34
21 could please turn to the Interview Notes that were  19:34
22 marked as Plaintiffs' Exhibit 109.  19:35
23 A  Okay.  19:35
24 Q  Actually setting that document aside for a  19:35
25 moment.  19:35

1  With respect to the Woods division were you  19:35
2  aware of the fact that daily bulletins that are posted  19:35
3  on the bulletin board are also placed in a binder next  19:35
4  to the bulletin board?  19:35
5  A  Well, I think as I described in the original  19:36
6  report, bulletins -- the placement of bulletins varies  19:36
7  by division. And there are some duplicates.  19:36
8  So I know that in some of the divisions there  19:36
9  are -- well, like I said, there are some in the  19:36
10 outfits. There are some on the boards. In multiple  19:36
11 places.  19:36
12 Q  Assume for a moment that at the Woods division  19:36
13 that there was a binder that contained the bulletins --  19:36
14 the same bulletins that are posted on the bulletin  19:36
15 board.  19:36
16 A  Mm-hmm.  19:36
17 Q  Assuming that to be the case, do you believe  19:36
18 that could explain in your rebuttal report,  19:36
19 Exhibit 106 --  19:36
20 A  Sorry. Which number are we on?  19:36
21 Q  Exhibit 106.  19:36
22 A  Exhibit 106. Which page?  19:37
23 Q  Page 5.  19:37
24 A  Page 5. Woods.  19:37
25 Q  Table 1.  19:37

| | |
|---|---|
| 1 A Okay. 19:37 | 1 MR. SPELLBERG: Objection. Calls for 19:40 |
| 2 Q Woods. The far right column, the number of 19:37 | 2 speculation. Lack of foundation. 19:40 |
| 3 operators who viewed bulletin board is listed as zero. 19:37 | 3 You may answer. 19:40 |
| 4 A Right. 19:37 | 4 THE WITNESS: That's what the notes say. 19:40 |
| 5 Q And my question for you is: Assume that the 19:37 | 5 MR. TIDRICK: Q Do you have any reason to 19:40 |
| 6 bulletins on the bulletin board are also placed in a 19:37 | 6 believe that that is false? 19:40 |
| 7 binder. Do you believe that that could explain why it 19:37 | 7 A No. 19:40 |
| 8 is that your observers observed zero operators viewing 19:37 | 8 Q Do you have any understanding of where the 19:40 |
| 9 the bulletin board at Woods? 19:37 | 9 receiving area is at the Presidio division? 19:41 |
| 10 MR. SPELLBERG: Objection. Incomplete 19:37 | 10 A Let me think. I think he means the -- where 19:41 |
| 11 hypothetical. Calls for speculation. Probably lack of 19:37 | 11 the receiver is. Sign-in. Okay. 19:41 |
| 12 foundation. 19:37 | 12 Q Did your observers observe at that location to 19:41 |
| 13 You may answer. 19:37 | 13 determine if operators were looking at bulletins. 19:41 |
| 14 THE WITNESS: I don't know if that binder that 19:37 | 14 A You're referring specifically to the bulletin 19:41 |
| 15 you're referring to -- I don't recall seeing it 19:37 | 15 board observations in the rebuttal? 19:41 |
| 16 specifically, and I don't know how often it's updated. 19:38 | 16 Q Yes. 19:41 |
| 17 I don't know if it has exactly the same bulletins that 19:38 | 17 Did you post individuals at the receiving 19:41 |
| 18 are on the board, so... 19:38 | 18 area? 19:41 |
| 19 MR. TIDRICK: Q Did your observers also 19:38 | 19 A No. 19:41 |
| 20 review this location to determine if operators were 19:38 | 20 Q Why not? 19:41 |
| 21 looking at bulletins in the binders? 19:38 | 21 A Well, it says "Sometimes leave extra copies." 19:41 |
| 22 A We -- at Woods we did not look at -- we were 19:38 | 22 That's hardly -- "Sometimes leave extra copies," first 19:41 |
| 23 not tracking binders. 19:38 | 23 of all, extra copies seems to imply that they still 19:42 |
| 24 Q Why not? 19:38 | 24 would be posted on the board. But sometimes -- we 19:42 |
| 25 A Well, the observer can only see so much when 19:38 | 25 focused on the boards where we understood there to be 19:42 |
| Page 202 | Page 204 |

| | |
|---|---|
| 1 he or she is standing at the bulletin board. 19:38 | 1 the most likely majority of them posted. 19:42 |
| 2 Q If I could please refer you to Exhibit 3. The 19:38 | 2 Q Is that what you did at all of the divisions? 19:42 |
| 3 Presidio interview notes. 19:38 | 3 A Yes. 19:42 |
| 4 A Now we are on Presidio? We were just talking 19:39 | 4 MR. TIDRICK: If you could please mark this as 19:42 |
| 5 about Woods. Right? 19:39 | 5 the next exhibit. 19:42 |
| 6 Q Right. We're switching to -- if you could 19:39 | 6 (Exhibit 124 marked for identification by 19:43 |
| 7 please look at Plaintiffs' Exhibit 114. 19:39 | 7 the court reporter and is attached hereto.) 19:43 |
| 8 A Okay. 19:39 | 8 MR. TIDRICK: Q Exhibit 124, is that a 19:43 |
| 9 MR. SPELLBERG: Wait. Wait. I'm not there 19:39 | 9 document you've seen before? 19:43 |
| 10 yet. Okay. 19:39 | 10 A It doesn't look familiar. 19:43 |
| 11 MR. TIDRICK: Q The response to Question No. 19:39 | 11 Q Fair to say then this is not a document you 19:43 |
| 12 17, if could you please turn to that. 19:39 | 12 consulted in the course of your observations or 19:43 |
| 13 A Oh, are you looking at -- Question 17 is: 19:39 | 13 research for your report? 19:43 |
| 14 "Where do operators pick up their paddles?" Or "How 19:39 | 14 A We had other Muni procedural books that are in 19:44 |
| 15 are the other communications distributed to operators?" 19:39 | 15 the production list, but I don't recognize this as one 19:44 |
| 16 Q What I'm looking at is the handwritten 19:39 | 16 of them. I don't know why -- where this comes from or 19:44 |
| 17 responses for Question No. 17. In the Presidio 19:40 | 17 why we didn't have it. It -- perhaps it's old or 19:44 |
| 18 interview notes, Plaintiffs' Exhibit 114. 19:40 | 18 outdated. 19:44 |
| 19 Do you see where the information is 19:40 | 19 Q I'll refer to you Page 6 of the document where 19:44 |
| 20 handwritten "Sometimes leave extra copies of bulletins 19:40 | 20 it says "Revised August 2015." 19:44 |
| 21 in the receiving area (sign-in and posted)." 19:40 | 21 A Okay. 19:44 |
| 22 Do you see that. Correct? 19:40 | 22 Q And if I could, please, refer you to Page 37 19:45 |
| 23 A Mm-hmm. 19:40 | 23 of the document, Rule 2.2.2. And I'll read it. Quote, 19:45 |
| 24 Q Do you understand that to be an accurate 19:40 | 24 "Employees reporting to a rail division shall check the 19:45 |
| 25 statement? 19:40 | 25 division bulletin board daily for new general 19:45 |
| Page 203 | Page 205 |

52 (Pages 202 - 205)

Veritext Legal Solutions
866 299-5127

1 bulletins, division bulletins, and notices prior to 19:45
2 operating a rail vehicle." 19:45
3 Were you aware that SFMTA changed its old rule 19:45
4 regarding reviewing bulletin boards prior to a shift 19:45
5 and adopted the new rule that's reflected at 2.2.2 of 19:45
6 Exhibit 124? 19:45
7 MR. SPELLBERG: Objection. There is no 19:45
8 foundation for that. Facts not in evidence. 19:46
9 I'm not sure how you can answer it since you 19:46
10 don't know whether it's accurate or not. But you may 19:46
11 do the best you can. 19:46
12 THE WITNESS: I said that I haven't seen this 19:46
13 document before. 19:46
14 MR. TIDRICK: Q Were you aware of what I just 19:46
15 asked? 19:46
16 A Aware of a change in policy about reading the 19:46
17 bulletins? No. I'm not -- was I aware that -- no. 19:46
18 Q So there was no change in the rules that you 19:46
19 factored into your analysis. 19:46
20 Is that correct? 19:46
21 A No. We weren't studying the rules. We were 19:46
22 studying what people were actually doing. So it's 19:46
23 irrelevant what the policy and procedure. 19:46
24 MR. TIDRICK: We'll take a short break. Off 19:46
25 the record. 19:46
Page 206

1 VIDEO OPERATOR: Going off the record. The 19:46
2 time is 7:46. 19:46
3 (Recess taken 7:46 p.m. - 7:52 p.m.) 19:52
4 VIDEO OPERATOR: Back on the record. The time 19:52
5 is 7:52. 19:52
6 MR. TIDRICK: Q With respect to observations 19:52
7 that -- strike that. 19:52
8 With respect to observations that you 19:52
9 personally did not make, would you agree that the 19:52
10 observer who made the observation is in a better 19:52
11 position than you are to testify as to what was 19:52
12 actually observed? 19:53
13 MR. SPELLBERG: Vague and ambiguous. 19:53
14 You may answer. 19:53
15 THE WITNESS: Well, I can review the record 19:53
16 and I can talk about the tasks that are documented. 19:53
17 And, you know, based on the protocol of the task 19:53
18 statements, it should be evidenced what was documented 19:53
19 and what occurred. So I can certainly review and talk 19:53
20 about that. 19:53
21 MR. TIDRICK: Q Do you believe that there are 19:53
22 instances in which you are able to testify better than 19:54
23 the observer as to what the observer actually observed? 19:54
24 MR. SPELLBERG: Vague and ambiguous. 19:54
25 THE WITNESS: Well, as I said previously, I've 19:54
Page 207

1 conducted hundreds of observations. So I have a lot of 19:54
2 experience in conducting observational studies. So I 19:54
3 can certainly testify about observational records and 19:54
4 studies. 19:54
5 MR. TIDRICK: Q As a general matter, you are 19:54
6 unable to provide more detail about an observed 19:55
7 activity than what is recorded in the database, for 19:55
8 which there are three versions, Plaintiffs' Exhibit 122 19:55
9 is the first version. I understand there are two more 19:55
10 versions. 19:55
11 Is that correct? 19:55
12 MR. SPELLBERG: Same objection. 19:55
13 THE WITNESS: Sorry. Could you repeat the 19:55
14 actual question part? 19:55
15 MR. TIDRICK: Q For observations that you 19:55
16 personally did not make, the only amount of detail that 19:55
17 you personally can communicate is whatever level of 19:55
18 detail is laid out in the electronic database, the 19:55
19 first version of which is Plaintiffs' Exhibit 122. 19:55
20 Correct? 19:55
21 MR. SPELLBERG: Same objections. Vague and 19:55
22 ambiguous. 19:55
23 You may answer. 19:55
24 THE WITNESS: I can speak to the data 19:55
25 that's -- that was analyzed and recorded in the 19:55
Page 208

1 database. 19:56
2 MR. TIDRICK: Q And you can't provide more 19:56
3 detail than that. Correct? 19:56
4 MR. SPELLBERG: Two different things. That's 19:56
5 vague and ambiguous. It's incomprehensible. 19:56
6 You may answer. 19:56
7 THE WITNESS: What do you mean by "more 19:56
8 detail"? 19:56
9 MR. TIDRICK: Q For instance, when an 19:56
10 observer writes that they observed an operator walking 19:56
11 to and entering a restaurant, the only person that can 19:56
12 really tell us how far away that restaurant was, what 19:56
13 the restaurant was, what the operator looked like is 19:56
14 whoever made the observation. Correct? 19:56
15 A Those details are really not relevant to the 19:56
16 job analysis. The task statement that's documented is 19:56
17 sufficient to make a determination as to how the 19:56
18 operator is spending his or her time. 19:57
19 Q It's not relevant according to whom? 19:57
20 A It's not relevant to job analysis which 19:57
21 restaurant they went into or how far the restaurant -- 19:57
22 what restaurant chain they went into really isn't 19:57
23 relevant to the data we collected or relevant to the 19:57
24 job analysis. 19:57
25 Q But it is relevant to the credibility of the 19:57
Page 209

53 (Pages 206 - 209)

1 observation, wouldn't you agree? 19:57
2 MR. SPELLBERG: That's vague and ambiguous. 19:57
3 THE WITNESS: I wouldn't agree that the name 19:57
4 of a particular restaurant chain is relevant to the 19:57
5 credibility of the observation. 19:57
6 MR. TIDRICK: Q You're asking -- Plaintiffs' 19:57
7 Exhibit 122, the first page, half way down the page. 19:57
8 This is the first page of Plaintiffs' Exhibit 122. 19:58
9 There is an activity recorded "Walked to and entered 19:58
10 restaurant." 19:58
11 Are you able to tell me what restaurant the 19:58
12 operator was observed walking into and entering? 19:58
13 A What relevance does that have to anything? 19:58
14 This is a job analysis. We were writing down tasks. 19:58
15 The name of the restaurant is completely irrelevant. 19:58
16 Q Well, the jury might consider it relevant to 19:58
17 the credibility of the observation. I'm not asking you 19:58
18 right now to comment on the relevance of the question. 19:58
19 I'm just asking you to answer the question. 19:58
20 Are you able to tell me what restaurant the 19:58
21 operator was observed walking to? 19:58
22 A Do I know what restaurant? No. It says 19:59
23 "restaurant." 19:59
24 Q After you received Dr. Drogin's report, and 19:59
25 specifically after you did the Plaintiffs' Exhibit 102, 19:59
Page 210

1 observational study, you obtained Dr. Drogin's report. 19:59
2 Correct? 19:59
3 A Sorry. 102, you said? 19:59
4 Q Your observational study, your initial 19:59
5 observational study, which has been marked as 19:59
6 Exhibit 105? 19:59
7 A 105. Sorry. Hold on. 19:59
8 Q After you did the observational study, the 20:00
9 initial observational study that's been marked as 20:00
10 Plaintiffs' Exhibit 105. After you did that study you 20:00
11 obtained a report from Dr. Drogin. Correct? 20:00
12 A You would have to be more specific. I think 20:00
13 there were multiple reports by Drogin. Right? So 20:00
14 there was a declaration and then there was another 20:00
15 declaration and then -- so I don't remember the exact 20:00
16 dates. 20:00
17 Q Do you recall that after you did your initial 20:00
18 observational study you received a report by Dr. Drogin 20:00
19 that prompted you to do additional observations? 20:00
20 MR. SPELLBERG: Objection. Fact not in 20:00
21 evidence. 20:00
22 You may answer. 20:00
23 THE WITNESS: So -- sorry. What was the 20:00
24 question? 20:00
25 MR. TIDRICK: Would you read it back, please. 20:01
Page 211

1 (Pending question read.) 20:01
2 THE WITNESS: After we did the initial report, 20:01
3 yes, I was asked to address specific claims made by 20:01
4 plaintiffs' counsel and Drogin. 20:01
5 MR. TIDRICK: Q In connection with your 20:01
6 rebuttal report why did you not perform observations 20:01
7 observing amounts of time that operators spend parking 20:01
8 transit vehicles? 20:01
9 A At that point -- 20:01
10 MR. SPELLBERG: I'm going to object. It's 20:01
11 incomprehensible. Assumes a fact not in evidence. 20:01
12 You can do your best with it. 20:01
13 THE WITNESS: Why didn't we do additional? We 20:01
14 had already completed our study at the divisions. 20:02
15 MR. TIDRICK: Q Why have you never done any 20:02
16 analysis of the amounts of time that operators spend 20:02
17 parking the transit vehicles? 20:02
18 MR. SPELLBERG: Misstates the facts. It's 20:02
19 been done. 20:02
20 You may answer. 20:02
21 THE WITNESS: So if you look on Page 22. 20:02
22 MR. SPELLBERG: Which exhibit? 20:02
23 THE WITNESS: Exhibit 106, Paragraph 22. 20:02
24 As described in my previous report, the 20:02
25 activities Dr. Drogin labels as turn-in-time varies 20:02
Page 212

1 significantly. Parking the vehicle, for example, is 20:02
2 not a discrete task in the context of operations. 20:02
3 Rather the process of returning the vehicle to the 20:02
4 division involves different procedures depending on the 20:02
5 division, vehicle type, and time of day. For example 20:02
6 -- I go on to describe the specific parking procedures 20:03
7 at each of the divisions, A, B, C, D, E, F, G and H. 20:03
8 Paragraph 23 states: "Given the differing and 20:03
9 unique sequence of events of each division it is 20:03
10 unclear whether parking vehicle includes some, all or 20:03
11 none of the activities and processes listed above. It 20:03
12 is also notable that at some divisions operators do not 20:03
13 even park their own vehicles." 20:03
14 MR. TIDRICK: Q Can you identify any 20:03
15 divisions where operators do not park the transit 20:03
16 vehicles? 20:03
17 A Yes. Let me -- so at Green division, the 20:03
18 operators pull into the yard. Drive through the 20:03
19 revenue loop, where they drop off the money box with 20:03
20 all the money they have collected for the day. They 20:03
21 then drive to the meet and greet. Get out of the 20:03
22 vehicle. And a yard starter or maintenance employee 20:04
23 may or may not, depending on the time of day, park the 20:04
24 train. 20:04
25 At MME operators pull in, exit the train to 20:04
Page 213

| | |
|---|---|
| 1 make adjustments to the track. Drive forward to the 20:04 | 1 would like to work how -- let's put on the record how 20:07 |
| 2 meet and greet. And then stop and exit the vehicle so 20:04 | 2 we're going to work out the payment of the witness. 20:07 |
| 3 that a yard starter can park the train. 20:04 | 3 I presume that she will send you a bill for -- 20:07 |
| 4 Q So at those two divisions, operators do not 20:04 | 4 it's about eight hours -- eight hours 15 minutes, and 20:07 |
| 5 park the transit vehicles? 20:04 | 5 then you guys are going to pay directly? Is that 20:07 |
| 6 A I would say with the caveat that there are -- 20:04 | 6 acceptable? 20:07 |
| 7 there may be specific scenarios where there are 20:04 | 7 MR. TIDRICK: Let's discuss that in the 20:07 |
| 8 changes, but generally speaking. 20:04 | 8 context of -- 20:07 |
| 9 Then at cable car, operations are very 20:04 | 9 MR. SPELLBERG: No. No. No. We're putting 20:07 |
| 10 different. So at cable car, when the cars pull in, 20:04 | 10 it on the record, or otherwise you're going to pay in 20:07 |
| 11 there are two operators working on the vehicle. They 20:04 | 11 advance for these. 20:07 |
| 12 pull into the barn and the conductor and the grip both 20:05 | 12 I mean, I'm willing to do that with your 20:07 |
| 13 get off of the vehicle, where a maintenance person 20:05 | 13 witnesses. I think that's the fair way to do it. And 20:07 |
| 14 takes over. Handles the vehicle and then pulls it into 20:05 | 14 I would appreciate you putting it on the record that 20:07 |
| 15 a very specific parking place. 20:05 | 15 she will send the bill directly to you for whatever the 20:07 |
| 16 The barn at cable car is very different than 20:05 | 16 time is. I think it's eight hours and 15 minutes 20:07 |
| 17 the yards in the other divisions. It's very tight so 20:05 | 17 tonight. And then you guys will make the payment 20:07 |
| 18 it's very -- it's very difficult to park the vehicles. 20:05 | 18 directly. 20:07 |
| 19 Q Why are you telling me that when the question 20:05 | 19 MR. TIDRICK: And where are you getting eight 20:07 |
| 20 was which divisions are you aware of where the 20:05 | 20 hours and 15 minutes? 20:07 |
| 21 operators do not park the vehicles. 20:05 | 21 MR. SPELLBERG: Didn't we start at noon? 20:07 |
| 22 What's the relevance of that? 20:05 | 22 It's 8:10 right now. 20:07 |
| 23 A Because I just said cable car they don't park 20:05 | 23 MR. TIDRICK: 8:07. 20:07 |
| 24 their vehicles. I was describing the steps that go 20:05 | 24 MR. SPELLBERG: Oh. No, it's 8:10. I have 20:07 |
| 25 into cable car where they don't park their vehicles. 20:05 | 25 8:10. 20:07 |
| Page 214 | Page 216 |

| | |
|---|---|
| 1 That's what you asked me, right? 20:05 | 1 MR. TIDRICK: Regardless, we've suspended the 20:07 |
| 2 Q What I asked was what divisions are you aware 20:05 | 2 deposition and you're keeping her here longer. 20:07 |
| 3 of where you believe operators do not park the 20:05 | 3 THE WITNESS: I thought we only had seven 20:07 |
| 4 vehicles? 20:05 | 4 hours or eight hours. 20:07 |
| 5 And I understand you've testified now that a 20:06 | 5 MR. SPELLBERG: Yeah. We haven't used the 20:07 |
| 6 cable car it's very difficult to park the vehicles. 20:06 | 6 whole seven hours yet. 20:07 |
| 7 It's a different question, but that's all right. 20:06 | 7 Anyway, I'm objecting to that. Oh, yeah. No, 20:08 |
| 8 Let me ask a different question. 20:06 | 8 but you have to pay for the time. You don't just pay 20:08 |
| 9 We'll suspend the deposition at this time. 20:06 | 9 for the testimony time. You pay for the time she's 20:08 |
| 10 The court reporter and videographer are scheduled to 20:06 | 10 here. And you pay for the break time and so on. 20:08 |
| 11 leave at this time. 20:06 | 11 That's the way it's done. 20:08 |
| 12 VIDEO OPERATOR: Okay. This concludes today's 20:06 | 12 MR. TIDRICK: I didn't say anything about 20:08 |
| 13 deposition of Elizabeth Arnold. 20:06 | 13 that. Your witness just did. 20:08 |
| 14 The time is 8:06 p.m. We're off the record. 20:06 | 14 MR. SPELLBERG: No. No. You asked me why it 20:08 |
| 15 MR. TIDRICK: We're suspending it. 20:06 | 15 was 8:10. And I said that's why, because we've been 20:08 |
| 16 MR. SPELLBERG: Not off the record. 20:06 | 16 here eight hours and 10 minutes. So you owe her eight 20:08 |
| 17 MR. TIDRICK: We're suspending it, not 20:06 | 17 hours and 10 minutes. 20:08 |
| 18 concluding. 20:06 | 18 I just want to put on the record that you guys 20:08 |
| 19 THE WITNESS: Why are we suspending it? 20:06 | 19 are going to pay it directly. 20:08 |
| 20 MR. SPELLBERG: We're not off the record. 20:06 | 20 MR. TIDRICK: As opposed to what? 20:08 |
| 21 We're objecting to suspending it. We're here. 20:06 | 21 MR. SPELLBERG: As opposed to anything else. 20:08 |
| 22 We're ready to continue. I understand you have issues 20:06 | 22 I would like this confirmed on the record. Because if 20:08 |
| 23 with the reporting staff. 20:06 | 23 you don't pay it then I'm going to go to court. 20:08 |
| 24 We're going to object to continuing and -- 20:06 | 24 MR. TIDRICK: I've just never heard about 20:08 |
| 25 No. 1, that's my objection for the record. No. 2, I 20:06 | 25 anybody making a statement about that on the record. 20:08 |
| Page 215 | Page 217 |

1    MR. SPELLBERG: Well, now you have. So you're    20:08
2  agreeing to pay it?    20:08
3    MR. TIDRICK: Send us the invoice. Our normal    20:08
4  practice is to pay the invoice.    20:08
5    MR. SPELLBERG: Okay.    20:08
6    MR. TIDRICK: I don't understand. I think you    20:08
7  might be up to something tricky because it's very    20:08
8  strange and odd you would make a statement like that.    20:08
9    MR. SPELLBERG: So she'll send the invoice to    20:08
10  you and your office will pay her directly.    20:09
11    MR. TIDRICK: I see. You just don't want to    20:09
12  be an intermediary. You want her to send it to us    20:09
13  directly.    20:09
14    MR. SPELLBERG: Correct. And then you pay it.    20:09
15  And I would like it on the record because we've had    20:09
16  problems in the past with lawyers not paying. And then    20:09
17  I have to run to court.    20:09
18    MR. TIDRICK: Not with us.    20:09
19    MR. SPELLBERG: I'm not saying it's you.    20:09
20    MR. TIDRICK: Thank you. Thank you.    20:09
21    THE WITNESS: It's just some -- we've had    20:09
22  instances where they don't pay.    20:09
23    MR. SPELLBERG: And we have an agreement on    20:09
24  that, right? And I'll do the same with your witnesses.    20:09
25  I think that's the right way to do it.    20:09

1    MR. TIDRICK: I haven't heard anything that    20:09
2  sounds controversial. I would like to see the invoice.    20:09
3  It surprises me you're raising this --    20:09
4    THE WITNESS: No. No. No. It's just because    20:09
5  we have had some depositions where we never got paid.    20:09
6  So we had a conversation and so he's putting it on the    20:09
7  record.    20:09
8    MR. SPELLBERG: If I have to go to court on an    20:09
9  administrative motion to get paid. I just want to put    20:09
10  it on the record that you guys agreed to --    20:09
11    THE WITNESS: If it's nothing -- yeah.    20:09
12    MR. SPELLBERG: Okay.    20:09
13    MR. TIDRICK: Are you agreeing to pay all of    20:10
14  our expert witnesses in exactly the same way that    20:10
15  you're requesting?    20:10
16    MR. SPELLBERG: Of course. Of course. That    20:10
17  would be unfair if I didn't agree to that.    20:10
18    MR. TIDRICK: All right.    20:10
19    MR. SPELLBERG: And so you agree?    20:10
20    MR. TIDRICK: Yes.    20:10
21    MR. SPELLBERG: Thank you.    20:10
22  Now we can go off the record.    20:10
23    VIDEO OPERATOR: This concludes today's    20:10
24  deposition of Elizabeth Arnold. The number of media    20:10
25  used was four and will be retained by Veritext Legal    20:10

1  Solutions.
2    The time is 8:10 p.m. We're off the record.    20:10
3    MS. REPORTER: Do you want a copy?    20:10
4    MR. SPELLBERG: Yeah, please.    20:10
5    MR. TIDRICK: For the record, we're holding    20:11
6  onto the exhibits so that they can be used at the    20:11
7  deposition tomorrow morning.    20:11
8
9    (Deposition suspended at 8:10 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1            DECLARATION
2
3
4
5    I hereby declare I am the deponent in the
6  within matter; that I have read the foregoing
7  deposition and know the contents thereof, and I declare
8  that the same is true of my knowledge except as to the
9  matters which are therein stated upon my information or
10  belief, and as to those matters, I believe it to be
11  true.
12    I declare under the penalties of perjury of
13  the State of California that the foregoing is true and
14  correct.
15    Executed on the _____ day of
16  _____ 2016, at _____,
17  California.
18
19
20
21
                    _____
22            ELIZABETH ARNOLD
23
24
25

1          CERTIFICATE
2          I, the undersigned, a Certified Shorthand
3     Reporter of the State of California, do hereby certify:
4          That the foregoing proceedings were taken
5     before me at the time and place herein set forth; that
6     any witnesses in the foregoing proceedings, prior to
7     testifying, were duly sworn; that a record of the
8     proceedings was made by me using machine shorthand
9     which was thereafter transcribed under my direction;
10    that the foregoing transcript is a true record of the
11    testimony given.
12          Further, that if the foregoing pertains to the
13    original transcript of a deposition in a Federal Case,
14    before completion of the proceedings, review of the
15    transcript [ ] was [ ] was not requested.
16          I further certify I am neither financially
17    interested in the action nor a relative or employee of
18    any attorney or party to this action.
19          IN WITNESS WHEREOF, I have this date
20    subscribed my name.
21
22    Dated: July 22, 2016
23
24
                KATHLEEN BACA, CSR #10267
25
Veritext Legal Solutions
866 299-5127

**&**

**&** 10:15,17,19

**0**

**0** 130:5
**02** 129:24 135:23
**0724.0.** 149:4
**0:00:00** 127:24
**0:00:20** 129:3,13
131:11

**1**

**1** 5:12 27:7 40:17
64:20,20 65:3 80:10
85:17 117:12 123:3
123:11 128:18
151:3,11,24 152:2
155:3 159:1 161:19
169:1,4,14 170:5,16
170:18,21 197:11
197:17 201:25
215:25
**1-20** 1:10 2:11
**10** 57:19 140:3,7
145:4 146:24 147:5
147:12 149:14
167:25 168:2
217:16,17
**100** 11:6
**102** 210:25 211:3
**10267** 1:24 2:23
222:24
**105** 4:9 6:4 15:10,25
18:25 19:13 22:18
22:19,21 24:24 31:3
49:24 70:15 82:15
87:14,17,18 104:8
107:2 108:1 171:7
171:10 173:6 175:7
177:13 181:15
190:18 211:6,7,10
**106** 4:11 24:1,3 25:4
26:6 49:24 142:15
142:18 201:19,21
201:22 212:23

**107** 4:13 50:1
182:16,22 183:15
184:3 197:20,25
198:25
**108** 4:14 13:12,18
13:24 14:6,15 18:3
18:7,9
**109** 4:15 5:9 30:2,5
30:18,23 31:2,5,6
31:21 32:10,19
33:15,18 34:5 35:5
37:22 38:10,25
39:18 40:2 42:18,25
43:6,9 58:21 200:22
**11** 87:16,19
**11/13** 33:24
**11/13/15** 4:16,17,19
4:23 5:2
**11/16/15** 4:20,22,25
**110** 4:17 31:7
**111** 4:18 31:9 43:17
43:18,23 44:5 45:3
49:12 50:12,16 52:7
52:15 53:8 56:21
57:18,23 59:9 60:5
60:17
**112** 4:20 31:11
**113** 4:21 31:13
**114** 4:23 31:15
203:7,18
**115** 4:24 31:17
32:16
**116** 5:2 30:2,5,18
31:19,22 32:10,19
35:6 37:22 38:11,25
39:19 40:2 42:19,25
43:6,10 58:21
**117** 5:3 6:4 65:6
**118** 5:5 64:24 65:17
66:10,14,18,22
67:25 70:11 71:1
74:25 75:2,4,7,11
76:9 78:3 79:9,25
85:13,17 102:11
106:21 175:14

**186:**10 188:20,23
188:24,25 189:1,5
189:14 190:11
**119** 5:6 72:7,9,12,16
72:20 73:1
**12** 57:21 175:12
**12-03704** 1:8 2:8
6:20
**120** 5:8 72:24 73:13
73:15,16 74:11,18
**1200** 2:18 6:15
**121** 5:9 109:21,24
110:14,17,19 111:1
111:7,11 112:14,17
**122** 5:10 123:7,14
123:20,23 124:6,13
127:9 130:3 134:19
135:1 139:1,3
142:15 144:7
150:13,16,23
151:17 164:11
190:2,3 208:8,19
210:7,8
**123** 5:10,11 191:6,9
191:16 193:17
**124** 5:13 205:6,8
206:6
**13** 1:18 2:21 6:1
87:16
**135** 72:17,19,22
73:15,16 74:1,9,16
74:17
**137.0** 154:25 155:1
**13th** 6:8 34:1,2
**14th** 28:5,9,16 29:8
29:19
**15** 45:3 50:11 183:1
198:24 199:1,12
216:4,16,20
**150** 20:17,20
**15a** 49:3
**16** 171:7,11 177:12
177:14 183:1
**17** 32:23 33:1
175:12 203:12,13

203:17
**179** 72:13
**17th** 33:11 34:3
**18** 75:1,3 142:20
**18:28:01** 139:15,22
139:23
**18:28:20** 140:2
**19** 140:6
**191** 5:11
**19:18:03** 149:5
151:18
**19:18:30** 151:21
**19:18:40** 149:12
**1:00** 100:16
**1st** 110:5

**2**

**2** 65:4 74:11 78:2
85:13 123:3 130:5
169:8,14 170:12,13
170:17 215:25
**2.2.2** 206:5
**2.2.2.** 205:23
**20** 53:8,19,20,21
129:14,15,17,22,23
131:18 133:13,16
133:25 135:10
**2000** 65:9
**2008** 65:11
**2009** 58:24
**2014** 65:14
**2015** 28:5,9,16 29:8
29:17,20 33:1,11
34:1 66:4,6,11,12
71:18 193:12
205:20
**2016** 1:18 2:21 6:1,8
28:5,10,16 74:4
110:5 221:16
222:22
**2039** 3:6
**205** 5:13
**20:43:02** 128:1,20
**20:43:50** 136:7

**20th** 193:11
**210** 137:17
**21st** 74:4
**22** 100:12 212:21,23 222:22
**2200** 2:18 6:14
**23** 213:8
**231** 26:3,3
**2342047** 1:25
**24** 5:20 100:12
**25** 191:20
**26** 5:12
**27** 56:21 57:25 58:3 58:10
**28** 58:3,10 128:14 129:20
**28:43.40** 136:1
**28:43:02** 129:6 130:4 131:9 132:4
**28:43:04** 131:22,24 132:11
**28:43:05** 136:20
**28:43:20** 130:7 135:2,22
**28:43:22** 134:21
**28:43:40** 128:23 129:10 131:10 132:5,13 135:7
**28:44:00** 136:21
**28:44:03** 133:2
**28:44:30** 133:1
**2:00** 100:13
**2:32** 64:22,23
**2:45** 64:23 65:2

**3**

**3** 18:1,1 100:4 102:11 106:20 123:12 127:9 134:19 135:1 147:21 148:16,25 169:11,14 170:17 175:14 197:11 203:2

**300** 3:13
**308** 3:6
**31** 197:21,24
**32** 104:10
**35** 5:20
**350** 3:12
**36** 131:24
**37** 21:13 25:12,13 25:21 205:22
**3:00** 100:13

**4**

**4** 137:16 197:18
**40** 25:12,14,21
**415.274.9977** 3:20
**415.678.3800** 3:14
**42** 183:18 184:5,7,9 188:18 190:9
**44** 26:9,21,23 145:15 177:11,15 177:16 181:8,13,14
**45** 101:11,15 103:9 103:13 171:12
**46** 171:8,15 172:3 173:4 175:7,9 183:14,19 184:3,10 185:6 186:13 188:16 190:10
**465.0.** 139:5
**47** 182:15,19,21 183:7 197:23
**4:00** 100:15
**4:01** 104:2,3
**4:16** 104:3,5
**4:49** 123:5,6

**5**

**5** 32:23 45:3 50:11 85:23 199:1 201:23 201:24
**50** 20:25 21:5
**510.788.5100** 3:7
**53** 165:5
**56** 21:13
**5:01** 123:6,10

**5:27:00** 145:16,19
**5:30** 146:14
**5:30:40** 146:21

**6**

**6** 4:9,11,13,14,15,17 4:18,20,21,23,24 5:2,3 53:8 55:25 138:25 139:2,3 199:2 205:19
**64** 5:5
**6:14** 171:2,3
**6:31** 171:3,5

**7**

**7** 4:3 44:21,25 56:21 57:22 59:9,10 60:21
**702** 93:24
**72** 5:6,8
**724.0.** 148:5 151:6
**75** 20:25 21:5,9
**7:14** 197:13,14
**7:29** 197:14,16
**7:46** 207:2,3
**7:52** 207:3,5

**8**

**8** 60:17,19 140:11 142:19,20,21,22,25 144:7 191:19
**83** 104:9,11
**8:06** 215:14
**8:07** 216:23
**8:10** 2:20 216:22,24 216:25 217:15 220:2,9

**9**

**9** 57:19 78:2 85:13 102:11 106:20 197:21,24 198:3
**94104** 3:13
**94608** 6:15
**94704** 3:7
**9th** 28:5,8,9,16

**a**

**a.k.a.** 67:4
**a.m.** 17:9 100:16
**abbreviation** 14:22 164:21 165:3
**abbreviations** 4:14 14:12 165:12 166:5
**able** 11:21 22:6 23:4 25:7,24 27:4,11 30:18 37:11,13 56:13 62:22 63:1 68:20 71:21 73:6 76:1,7 94:7 110:13 115:21 120:1 156:7 157:6,8 158:13 159:13 160:6,16,22 161:6,15 162:22 163:4,7,16 171:18 173:21 179:24 180:5 187:12 188:16 207:22 210:11,20
**abrdvs.pdf** 18:7
**abrdvs.pdf.** 18:2
**acceptable** 216:6
**access** 22:5,7
**account** 113:21 186:13
**accounted** 121:15
**accounts** 137:24
**accuracy** 61:12 75:21 111:9 118:23 122:15 150:21 171:16,22 173:18 173:23
**accurate** 39:25 48:13 62:5 64:4 75:18 83:24 88:8 110:12 121:7 130:25 131:1,2 198:7 203:24 206:10
**accurately** 39:20,22 61:24 118:4 157:24

158:2 173:19,20
**acknowledge** 70:10
**act** 167:3
**acting** 97:8,11
**action** 6:25 222:17
222:18
**actions** 9:4
**active** 9:21 21:16
126:7
**activities** 29:25 78:7
80:11,21 81:5,10,17
81:17 82:3,16,20
83:13 84:3 85:8
86:23 88:18,18 89:1
89:2,24 99:7,9
100:6,9 101:9
111:12,15,18
112:22,24,25 113:2
113:6,7,9,15,20
114:9,16,25 115:20
122:4 137:19,21
150:15 152:13
155:2 168:5 172:21
174:2 179:15,24
180:17,18 181:3,17
181:19 182:6 183:4
183:9 186:2 190:13
192:13 193:14,25
196:3 212:25
213:11
**activity** 80:25 81:1
82:22,23 100:17,18
100:20,21 101:3
112:1,2,10,12,13,16
113:2,11 114:20,21
115:15 117:21,23
118:20 119:22
120:6,7 134:25
135:15,22 136:10
136:11 137:13,17
137:22,25 138:2,4
138:10,13 140:3
145:8,8,12 146:1,5
146:16,20 147:3,6,8
147:9 148:15 151:2

151:23 152:1,20
154:1 155:12
161:12,24 167:4,12
167:24 168:17,20
168:21 170:8
173:19 174:1,6,15
180:6 183:11
185:18,19 186:15
187:15,18,19,21
188:1,6,15 192:21
193:19 208:7 210:9
**actual** 25:23 35:14
98:25 108:21
109:11 130:16
189:6 208:14
**add** 33:8 68:6 124:7
138:14 160:16
168:10 172:19
180:21 184:14
185:6 189:12
193:22
**added** 66:16,25 67:4
67:8,14 68:4,6,9,22
69:6,23 71:8,12
76:11,12,14 112:24
125:13,13 165:13
166:4 188:19 189:9
**adding** 27:9 126:7
**addition** 179:13
**additional** 12:1 26:9
26:10 46:18 112:24
124:15,16 125:3,4
211:19 212:13
**additions** 71:11
**address** 92:24 212:3
**adequate** 120:16
**adjustments** 214:1
**administered** 8:16
8:16
**administrative**
219:9
**adopted** 206:5
**advance** 87:23 88:3
88:4,22 121:3
216:11

**advantages** 64:5,7
**affect** 176:3,4
**afternoon** 6:7 7:23
7:24 82:10 83:17,22
84:1,4,7
**agency** 1:9 2:10 4:10
4:12 6:18
**agendas** 68:17
**aggressive** 116:11
**ago** 8:21,23 12:18
49:6 143:9
**agree** 6:22 14:1 98:8
98:16 207:9 210:1,3
219:17,19
**agreed** 17:13 219:10
**agreeing** 218:2
219:13
**agreement** 218:23
**ahead** 9:16 89:15
140:12 145:4
147:16 154:14
179:3
**air** 11:19 12:20
**al** 6:17,18
**allocated** 138:8,12
138:20 167:12,20
167:22 168:9,13,19
**allow** 51:24 103:21
**allowed** 116:14
168:8
**alteration** 168:25
**alternate** 167:7
168:16
**alternative** 93:21
137:20
**amanda** 3:17 7:11
**ambiguity** 55:24
**ambiguous** 19:17
24:16 37:9 47:24
52:2 81:25 84:13
90:16 91:22 93:3
97:23 100:7 115:23
118:1 120:8 159:10
174:4 176:18
186:20 192:24

194:2 207:13,24
208:22 209:5 210:2
**amioto** 193:10
**amount** 29:21,23
95:22 129:19 137:6
149:14 167:11
178:3 182:5 183:2,8
185:24 187:5
208:16
**amounts** 113:5
114:8 115:19
116:15 190:12
212:7,16
**analyses** 20:13,17
20:20 21:3,5,14,22
22:10 24:10 193:14
**analysis** 20:11 24:21
34:20 35:9,23 39:15
64:8 82:16 90:18
98:18 115:19
149:20 167:11
176:3,4 180:10
193:15 206:19
209:16,20,24
210:14 212:16
**analyzed** 113:10
208:25
**anecdotally** 181:2
**answer** 9:12 12:23
14:2,10 18:16 19:19
26:19 27:16 28:19
36:3,5,6 37:11
42:23 45:12,17
47:15,25 49:3 52:3
54:11,22 56:5,6,13
58:10 70:6 76:1
84:14 89:14 90:17
91:21 93:14 94:7
98:15,23,24 99:1
115:24 118:2,3
120:10,24 121:8,11
122:8 130:23
158:20 159:19,20
160:10,16 162:10
176:19 179:3

Veritext Legal Solutions
866 299-5127

189:15 192:10
193:1 194:3 195:2
195:14 197:5
202:13 204:3 206:9
207:14 208:23
209:6 210:19
211:22 212:20
**answered** 38:2
55:17 56:3 58:7
70:7 94:6 120:20,21
120:22,24 122:6,7
158:17 159:16,17
160:9,15 193:21
**answering** 178:20
186:21
**anybody** 217:25
**anyway** 52:19
195:16 217:7
**apart** 43:9
**apologize** 134:23
178:15
**appear** 72:11
125:19 132:19
**appearance** 7:4
**appearances** 3:1
**appeared** 116:25
150:3,25
**appears** 14:11 53:21
110:9 126:8 132:15
140:6
**applicable** 184:21
**applies** 24:19
**appreciate** 51:22
216:14
**approach** 87:24
88:8,23
**appropriate** 51:6
76:5 103:22
**approximately** 8:7
8:20 20:16,20,21
21:1,5,13,24 25:21
25:24 27:4,13 32:4
32:12 33:2,22 65:23
65:25 67:7 68:12,20
71:21 109:13

110:13,16,24 157:6
157:8
**approximation** 25:8
157:1 159:14
**approximations**
21:11
**april** 71:24
**area** 63:12,15,16
119:6 152:14
203:21 204:9,18
**areas** 35:1 63:10
161:1 190:23 191:3
196:7
**argue** 195:15
**arnold** 1:15 2:16
4:13 5:4 6:9 7:19
8:2,3,5 12:3 64:21
65:4 123:4,12,23
144:17 197:12,18
215:13 219:24
221:22
**arrive** 78:20 103:8
103:13,16 109:5
**arrived** 18:13
101:12 102:14
103:17
**arrow** 130:5
**articulated** 75:14,17
**ascertain** 58:9
**ascertaining** 122:12
**aside** 60:23 200:24
**asked** 11:24 17:2
44:13 45:6,10,24
46:4,10 53:10,15
56:2,4 70:6 94:5
120:21 122:6
159:16 160:8
194:22 206:15
212:3 215:1,2
217:14
**asking** 51:4 55:8,21
69:21 74:16 82:25
83:16 99:19 105:8
120:13,17 122:22
133:12 156:10

158:12 160:4,4
176:11,11,13,13
178:24 179:18
184:13,17 186:21
187:8 195:19 210:6
210:17,19
**aspect** 49:1
**assess** 120:18
**assessing** 158:5
**assigned** 91:18
92:11 112:9,11
192:2
**assistant** 43:25 44:6
44:10 45:6,13 46:4
50:10 52:1 53:10,25
54:5,17
**assume** 24:20 117:9
161:21 201:12
202:5
**assumed** 136:10
166:16
**assumes** 212:11
**assuming** 18:6,8
98:7 201:17
**assumption** 24:14
24:17,18 117:25
194:12,14,15
**assumptions** 24:11
24:13 34:13
**assure** 179:10
**attached** 6:5 64:25
72:8,25 109:22
123:8 191:7 205:7
**attendant** 155:6
**attending** 17:18
**attorney** 3:12 7:5
222:18
**attorneys** 3:5 12:24
50:20
**audio** 6:21
**august** 205:20
**authority** 16:23
17:1 51:21
**automated** 115:4

**availability** 84:21
**available** 84:16 85:2
86:21 87:8 88:7,23
89:4
**avenue** 3:6
**average** 183:11,17
184:4,9,10,14 185:5
185:7 186:3,10,12
188:17 190:9,10
192:3
**averaged** 183:22
**avoid** 175:16,20
179:5,14
**aware** 90:12 91:15
91:17 94:8,10 98:3
99:13 132:23
176:15,20,23 177:1
177:8,10 179:20
182:7 190:19 201:2
206:3,14,16,17
214:20 215:2
**awareness** 181:24
182:13
**awhile** 44:19 49:7
83:24 103:17

**b**

**b** 3:5 4:7 15:23
22:19,21 23:4,13
213:7
**baca** 1:24 2:22 6:11
222:24
**bachelor's** 65:9
**back** 10:10,13 13:8
17:10,22 22:18
28:25 40:24 43:4
48:24 49:9 53:24
54:7,15,19 55:2,4,7
55:12 56:1,10,15
65:1 77:2 85:17
92:21 93:8 100:14
101:10 104:4
106:21 117:2
118:19 119:10,17
119:17 120:6

121:14 123:9
133:11,20 142:16
144:12 150:4 151:4
152:18 153:6 154:5
159:25 171:4
175:13 177:12
183:14 197:15
207:4 211:25
**background** 23:16
29:11,24 35:13
39:14 42:3,8 59:22
61:6 92:22
**badge** 78:19
**banks** 31:20
**barbara** 8:2
**barn** 214:12,16
**barrier** 48:7 62:12
**bart** 101:16,20,22
101:24,24
**based** 21:11 28:22
29:20 32:23 37:5
44:5 54:2 59:6
60:12 74:6 80:14
82:16 91:23 102:19
111:25 112:10,12
113:17 114:9
133:16 138:11
167:11,17 181:5
207:17
**basically** 195:15
**basics** 78:23
**basing** 190:24
**basis** 16:4 36:7,7,13
44:9,15 84:16 106:9
106:11 119:8
132:18 195:6
**bay** 102:2,4
**bearing** 131:5
**began** 102:14
**beginning** 2:19 7:5
65:3 78:9 80:1
123:11 131:21
151:4 197:17 198:9
**beginnings** 199:7

**behalf** 1:5 2:5,16 9:6
**behavior** 177:21
178:1,9,13 180:13
181:5,7 182:3
**belief** 106:4,10,11
141:21 221:10
**believe** 11:2,4,15,23
13:1 14:12,24 18:23
19:20 25:11 26:2
29:16 30:14,21
31:16 33:25 35:3
36:23 37:6,20,24
39:7 45:11 47:18
51:24 55:24 66:20
79:22 85:5 88:16
91:24 92:16 105:1
120:11,15 121:23
121:25 122:3,9,17
125:16 130:6
132:10,11,15,21
137:2 143:11
147:17 150:16
154:20 173:9
176:21 181:23
186:4,25 191:12
196:10 198:6,21
201:17 202:7 204:6
207:21 215:3
221:10
**believed** 173:1
**believes** 121:3
**believing** 132:18
**beneath** 80:4 128:1
131:16,20 133:1
136:5 140:23 146:4
156:21
**benefit** 117:5 118:6
127:1 161:21 182:4
**berkeley** 2:17 3:7
65:13
**best** 34:24 52:22
62:4 63:7 64:3 96:4
134:16 158:19
159:11 160:10
206:11 212:12

**better** 74:12 207:10
207:22
**beyond** 115:20,25
**biases** 85:11
**bicycle** 109:10
**bid** 92:20
**bike** 104:20 155:15
156:19 163:2,5,7,14
163:17,18,23,24
164:4,6,7,7,8
**bill** 216:3,15
**binder** 201:3,13
202:7,14
**binders** 202:21,23
**bit** 11:18 12:19
21:19 39:12 48:6,7
137:15
**bits** 71:8
**blank** 56:1
**blind** 61:25 62:9
**block** 10:16,18,19
**blocks** 104:25
**blue** 74:12 147:17
147:25 148:1,2
**blurry** 196:24
**board** 26:18 27:20
46:19 198:11 201:3
201:4,15 202:3,6,9
202:18 203:1
204:15,24 205:25
**boarded** 107:5
**boards** 26:11,14,15
27:3,12 45:9,24
46:6,10 47:9,17,19
48:11,18 49:4 107:1
198:3,12,18 201:10
204:25 206:4
**book** 5:13
**books** 191:24
205:14
**bottom** 18:1 85:14
142:23 175:15,15
191:20
**box** 90:1 143:6
187:21 213:19

**brand** 44:20
**break** 17:12 26:20
103:24 123:1
206:24 217:10
**brg** 16:11 98:14
99:3,14,23
**briefing** 68:14,16,18
69:3 116:7 119:2
**broad** 34:25 37:14
37:16 78:16
**broadened** 165:5
**brown** 88:14
**bry** 164:19 165:1
**building** 139:10,12
139:17 145:8
155:16 156:20
163:2 164:7,8
**bullet** 80:4,9 106:23
175:15
**bulletin** 26:11,14,15
26:18 27:3,12,15,20
45:8,24 46:6,10,19
47:9,17,19 48:11,18
49:3 179:8 201:3,4
201:14 202:3,6,9
203:1 204:14
205:25 206:4
**bulletins** 46:19
191:24 198:2,10,13
198:16,17 201:2,6,6
201:13,14 202:6,17
202:21 203:20
204:13 206:1,1,17
**bunch** 57:17
**bus** 53:19 62:25
89:5 95:10,13,15
103:4 104:21
116:23,25 117:2,4,7
117:7 140:23 141:2
141:3,5,8,9,9,15,19
141:19,20,22 142:4
142:10,13 143:6,17
144:5,8,9,14,15,21
152:2,5,7,11 153:2
153:17,19,23 155:7

Veritext Legal Solutions
866 299-5127

155:10,12 156:17
156:19 158:15,23
158:25 159:2,3
161:5,7,12,15,18,25
162:2,4,24 163:10
163:13,16 174:9,11
174:13
**busses** 62:22 89:3,4
89:5,17 153:1 154:5
154:6,8 175:2,2
180:3
**busy** 103:1

**c**

**c** 1:8 2:8 5:18 6:20
213:7
**cable** 14:17,25 97:25
98:3,7 128:9 131:21
136:5 214:9,10,16
214:23,25 215:6
**calculate** 115:2
133:15 149:22
167:22 189:3
**calculated** 113:10
133:21 138:22,23
166:25 167:16
184:4 188:17
**calculating** 183:17
**calculation** 114:8
137:6 185:20 186:4
**calculations** 98:1,10
113:5 130:17
131:12 183:10
**calibrate** 110:3
**california** 1:2,17 2:2
2:19 3:7,13 6:1,15
6:19 11:2 221:13,17
222:3
**call** 32:17 124:25
192:24
**called** 11:14 42:5
93:22 138:5
**calls** 54:10,23 56:12
75:25 96:3 98:11
144:23,25 159:9

202:11 204:1
**camera** 59:15,20
60:8,13 61:2 62:1
62:16,22 63:1
118:16
**cameras** 59:20,23
61:5,15,15 62:5,12
62:14,17,20 63:2,24
64:5
**capacity** 34:19
**caption** 6:16
**capture** 62:23 63:1
88:23 162:23
179:25 199:13
**car** 14:17,25 97:25
98:3,7 128:9 131:21
136:5 152:18,22
153:3,6,6,13,17,21
153:24 154:2 214:9
214:10,16,23,25
215:6
**card** 53:20 117:1,10
141:4 142:2 161:23
192:6
**cards** 23:21 90:3
143:5 173:8 192:7
**carefully** 142:12
**cars** 214:10
**case** 6:16,20 8:23
15:19 16:7,14 24:11
29:15 51:8 65:20
158:8 193:3 194:7
195:22 201:17
222:13
**cases** 8:25 9:1,2,6,9
10:23 11:2 21:7,15
21:16,23 22:9
**cash** 90:1 155:7
**cassia** 3:19 6:10
**categories** 112:13
112:17
**categorized** 165:19
**caveat** 86:7 214:6
**certain** 11:14 47:4
67:2 150:25 156:15

157:15 178:3
185:11,18
**certainly** 23:20
51:11 74:20 113:1
127:6 179:14,19
207:19 208:3
**certificate** 222:1
**certified** 2:22 7:9,12
222:2
**certify** 222:3,16
**cetera** 34:10 78:24
**chain** 209:22 210:4
**challenges** 64:9
180:2
**change** 64:18
122:25 125:23
182:3 206:16,18
**changed** 76:8,22
77:15 125:5,8,9
177:20 178:1,9
180:12 181:4,7
206:3
**changes** 77:18,24
125:2,4 214:8
**chart** 23:23
**chatting** 180:17
**check** 25:22 26:3
28:7 72:1,2 73:19
83:20 84:5 100:10
102:7 156:4 186:6
205:24
**checked** 156:1
**chester** 15:24 19:21
30:14 31:12,14
130:22 131:13
150:10 196:20
**choose** 147:7
**choppy** 60:1 61:11
**chosen** 85:7
**christina** 31:20
**chronological** 125:1
**circulated** 110:17
110:19,23
**circumstances** 59:7
154:13 180:8

**citations** 176:22
**cite** 51:21 177:6
**city** 1:10 2:10
101:17
**claim** 98:8 176:22
190:20 194:13
**claims** 191:22 212:3
**clarify** 68:6 112:20
125:6 126:3
**class** 7:9,12 9:4
58:24 191:22
**cleanup** 169:24
**clear** 62:7 75:14,17
99:3,6 119:19
124:19 130:3
131:17 195:13,14
**clearer** 184:2
**clearly** 16:24 31:25
32:14 58:15 98:25
106:25 116:25
149:19 157:3
196:25
**client** 194:5 196:5
**clipboard** 114:23
115:13
**clock** 114:24 115:13
**close** 25:12 106:8,12
156:18,23 157:3
181:9
**clusters** 83:25
**code** 111:22 112:18
112:23 113:4
117:12,18 159:1
161:19 169:16,18
169:21
**coded** 111:12 112:7
112:24 113:20
114:10 131:5
152:12,16 161:19
168:7 183:21
185:23 189:11
190:13
**coder** 112:1,9,11
169:1,4,4,8,11
170:16,17,17,21

Veritext Legal Solutions
866 299-5127

**coders** 110:18 111:8
169:14
**codes** 113:3,7,9,19
125:13 149:22
169:3
**coding** 5:9 12:11
110:2,3,21 111:10
111:22 112:4,5,6,14
112:18,21,22
117:14 118:5
122:16 125:8,9
130:23 150:19
152:10 169:3
**collaborative** 111:4
**colleague** 19:21
50:25
**collect** 29:12,25
39:14 59:5
**collected** 37:6 38:8
39:19 40:8 118:24
119:25 172:20
173:20 183:2
209:23 213:20
**collecting** 29:12
59:6,21
**collection** 35:14
59:25 60:3 61:2,13
69:11 75:18,21 76:6
152:13
**colored** 145:4
**column** 125:7,19
126:9 128:14
130:15 133:10
136:24 137:1,7,13
138:5,12,12,21,23
139:9 140:14,18
147:19 148:9,24
149:2,3,24 150:5,7
150:9 164:12,15,23
164:24 165:8,14,17
165:23 166:1,7,11
166:20,24 167:3,8
167:20 168:13,14
169:1,8,11,16,19
170:3,12,15,18

202:2
**columns** 149:21
167:17
**combination** 38:16
42:8
**come** 40:24 49:9
53:24 54:7,15 55:2
55:4,6,12 56:1,9,15
79:5 84:16,17 90:7
116:11 137:5
142:16
**comes** 54:19 63:3
89:22 174:15
185:25 205:16
**coming** 79:4 88:2,12
89:5 95:15 103:4
104:22 106:5,10
187:22
**comment** 36:7 99:25
210:18
**commenting** 50:25
**common** 38:7
**communicate**
208:17
**communicated** 78:1
94:25
**communications**
203:15
**company** 10:20 22:6
**compared** 119:24
**comparison** 171:21
173:17
**compensable** 99:4,5
**compensated** 98:4,5
99:11
**complete** 29:24
61:23 62:8,12
120:19
**completed** 69:11
212:14
**completely** 5:20
35:18,24 36:14,17
57:15 59:24 99:12
121:2 210:15

**completing** 117:1,9
117:10 161:22,23
192:6
**completion** 171:19
192:4 222:14
**complexity** 175:5
**complicated** 134:14
**components** 187:9
**comprehensive**
124:10
**comprehensiveness**
171:23
**computer** 115:1
133:15 138:22,24
166:25 167:17
**computing** 184:13
185:5
**concern** 9:23 176:2
179:23
**conclude** 100:22
**concludes** 215:12
219:23
**concluding** 215:18
**conclusion** 98:12
181:22 182:9,11,12
192:25
**concurrent** 134:15
137:19,20,22,25
138:2,10,13,18
148:4,15 167:7,24
168:3,8,16,23
**conduct** 26:25 34:16
175:24
**conducted** 12:12
20:17 22:4 26:8,10
27:15 30:7 31:6
32:17,20,21,23 33:1
33:11,23 35:12
43:21 49:5 67:3
68:16,21 72:22 81:6
81:10,18 83:15 94:9
95:2 101:8 124:11
180:22 196:5 208:1
**conducting** 39:17
75:12 98:18 113:13

180:9 208:2
**conductor** 14:18
214:12
**confidence** 121:24
**confident** 69:7
**confidentiality** 9:19
**confirm** 89:6
**confirmed** 217:22
**confirming** 120:7
**confused** 194:17
195:1,8
**confusing** 92:13
**connection** 25:20
26:1 27:23 29:15
35:9 43:22 70:2
212:5
**consecutive** 166:9
**consecutively** 40:8
**consider** 20:8 61:14
64:14 210:16
**considered** 61:1
100:18 173:13
**consistency** 75:20
111:10
**consistent** 76:5
79:22
**consistently** 147:14
**constantly** 88:12
**consultant** 16:6
**consultants** 38:16
**consulted** 205:12
**contained** 14:5
201:13
**contemporaneously**
126:9
**content** 32:5,8 33:13
63:5 70:21 76:12
121:18
**contents** 221:7
**context** 49:9 64:8,10
116:23 141:16
142:6 153:10
187:20 198:9 213:2
216:8

| | | | |
|---|---|---|---|
| **continue** 215:22 | 106:2,3 107:14,19 | 196:14 | **created** 15:12 30:8 |
| **continued** 55:18 | 107:20 108:10,11 | **correspond** 170:16 | 30:10,11 31:7,9,11 |
| **continuing** 215:24 | 110:5 111:13,14 | **corroborate** 171:18 | 31:13,15,17,19 |
| **continuous** 114:24 | 112:3,14,15,19 | 173:14,22 | 33:21,25 65:20 66:1 |
| 188:12 | 113:8,11,14,18 | **corroboration** | 66:11 74:18,22 75:7 |
| **contract** 59:15 | 114:11 118:10,13 | 175:11 | 75:11 110:3,7,8,10 |
| **contributed** 30:15 | 118:14,17,18,21 | **counsel** 6:12 7:16 | 110:14 111:1,7,15 |
| 74:20 | 122:1,2 124:4 130:8 | 13:19 24:12 34:13 | 111:22 112:21 |
| **controlling** 51:17 | 130:17 134:8 135:3 | 36:4 55:13 57:2 | **credibility** 158:6,6 |
| **controversial** 219:2 | 135:12,16 136:12 | 93:12 98:13,17,22 | 158:10 209:25 |
| **conversation** 219:6 | 136:13,16,17,22,23 | 99:22 121:2 212:4 | 210:5,17 |
| **conversations** 6:24 | 137:1,2,8 141:23 | **count** 25:17 138:14 | **credit** 138:17 159:2 |
| 116:6 | 143:22 146:19,23 | 138:16,16 166:9 | 168:5,5 |
| **converse** 91:9 | 150:6 153:9,14 | 168:6,9 187:18 | **cross** 154:21 |
| **conversely** 91:11 | 154:11 155:10,13 | **counted** 113:7 | **crosswalk** 154:21 |
| **copied** 19:25 | 155:16 158:7 159:5 | 187:23 | **csr** 1:24 222:24 |
| **copies** 12:8 67:18 | 159:6 160:24 | **country** 10:25 | **current** 59:6 65:6 |
| 68:1 203:20 204:21 | 163:12,13 165:16 | **counts** 168:20 | 77:7 |
| 204:22,23 | 166:13,14,18,19,22 | **county** 1:10 2:10 | **curriculum** 5:3 |
| **copy** 12:8 68:19 | 166:23 167:1,2,6,7 | **couple** 32:7 68:3 | **cut** 15:3 178:16 |
| 69:1,8 77:10,12 | 167:13,18,19 | 109:14 132:22 | **cutoff** 74:13 101:15 |
| 220:3 | 168:15,21 169:20 | **course** 89:24 90:8 | **cv** 65:6 |
| **corner** 151:8 | 172:5 182:11,22,23 | 125:12 199:15 | |
| **correct** 9:3 10:21,24 | 182:24,25 183:5,6 | 205:12 219:16,16 | **d** |
| 15:20,21 16:9 18:6 | 183:12,13 184:5,11 | **court** 1:1 2:1 6:5,10 | **d** 4:1 5:18 213:7 |
| 18:22 20:3 21:1 | 187:6 190:2,15,16 | 6:19 8:17 9:18 | **daily** 38:6 143:14 |
| 22:24 24:4,5,7 | 191:17 194:1 | 10:12 11:3 16:16 | 192:2 201:2 205:25 |
| 27:19,21 28:6,11 | 196:17 199:17,18 | 17:22 21:7,14,16,22 | **dark** 74:11 |
| 43:7,8,19,20,24 | 199:20,21 200:18 | 28:24 36:11 64:25 | **darker** 127:20 |
| 44:7,8 45:17 46:11 | 200:19 203:22 | 72:8,25 77:1 109:22 | **darryl** 1:4 2:4 6:16 |
| 46:12,21 50:8 51:14 | 206:20 208:11,20 | 119:10 123:8 158:4 | **data** 29:12,13,25 |
| 52:7 53:16,17 54:8 | 209:3,14 211:2,11 | 158:8 159:24 191:7 | 35:14,23 39:14 40:8 |
| 55:22 58:4,7,18,19 | 218:14 221:14 | 205:7 215:10 | 59:5,6,24 60:3 61:2 |
| 59:4,12,13 60:18 | **corrected** 195:10 | 217:23 218:17 | 61:13 62:4,5 63:7 |
| 61:4 65:10,12,15 | **correctly** 19:23 | 219:8 | 64:4 69:11 72:19 |
| 66:4,5,7,8,13 68:2 | 21:13 25:18 28:3 | **cover** 61:8 78:13 | 75:18,21 76:5 88:8 |
| 70:15,21 71:4 74:5 | 45:5,12 46:13 53:9 | 83:19 | 88:9,23 103:2 |
| 74:6,15 80:17,18,22 | 58:2 60:6 63:8 65:5 | **coverage** 59:20 60:1 | 108:22 109:12 |
| 80:23 81:2,3,7,12 | 65:8 67:23 69:14 | 60:8 61:2,10,17,23 | 112:6,7 118:3,11,23 |
| 81:20 82:7 83:3,10 | 74:10 80:14,19,24 | 62:8,12 | 119:8,24,25 120:2,4 |
| 84:11 85:22 86:1,15 | 82:15 86:11 97:7,25 | **covered** 28:1 78:13 | 121:21 122:15,19 |
| 86:18,19 87:9 97:2 | 102:13 105:20,21 | 78:16 | 124:20 125:20 |
| 97:15 101:21 | 107:3 108:6 111:25 | **crannies** 61:22 | 126:25 130:20,25 |
| 102:21,22 103:11 | 125:10 173:8 | **create** 33:18 65:22 | 131:2,3 132:16 |
| 105:2,6,7,12,24 | 183:16 190:8,17,21 | 75:13,15 112:4 | 138:11 152:13 |

Veritext Legal Solutions
866 299-5127

157:19,24 158:2
165:13 167:17
171:16,23 172:8,18
172:20,24,25 173:2
173:21,24 182:22
182:24 183:2,10,17
184:16 185:11
186:7 196:25
200:13 208:24
209:23
**database**  12:11
108:22 126:6
127:13 150:16
169:22 208:7,18
209:1
**date**  28:6,7 29:7,8
32:2 70:16 71:5,25
72:6,11 73:17 110:9
110:11 222:19
**dated**  110:5 193:11
222:22
**dates**  33:20 110:12
171:17 211:16
**day**  32:22 45:9 46:7
46:15,18 47:2,10,11
47:13,17,21 48:11
48:17,21 72:20
78:14,24 83:20,25
87:1 99:18 100:8,12
102:23,25 109:17
115:9,10 129:7,10
143:5,24 165:21,22
172:23 199:15
200:12 213:5,20,23
221:15
**days**  200:11,12
**december**  28:5,9,16
29:8,19 66:2,6,11
71:18
**decided**  62:3 63:6
**decisions**  196:2
**declaration**  4:13
49:22,25 174:19
182:15,21 183:15
190:7 197:20

198:25 211:14,15
221:1
**declare**  221:5,7,12
**deem**  51:6
**defect**  23:21 53:20
90:3 117:1,10 141:4
142:2 143:5 161:23
192:6,7
**defendant**  9:7,8
17:12 22:9
**defendants**  1:11
2:12 3:10 7:14 9:9
10:22 13:19
**defense**  22:4
**defined**  84:23 87:2
**definite**  190:22
**degree**  65:9
**demonstrate**  172:7
173:12
**denominator**  188:22
189:1 190:11
**departure**  103:10
**depend**  50:19 84:20
141:17
**depended**  187:20
**dependent**  143:23
**depending**  62:20
116:23 143:4,15
174:17 175:2 213:4
213:23
**depends**  64:1,7,11
141:16
**deponent**  98:24
221:5
**deposed**  8:5,19 9:1
99:20
**deposition**  1:15 2:15
6:9,14 8:10 11:7,11
11:13 15:15,24 16:3
16:5,18,20 17:14,15
17:19,20 49:18,21
50:4 51:1,17,18
64:20 65:4 123:3,12
179:2 196:15,23
197:11,18 215:9,13

217:2 219:24 220:7
220:9 221:7 222:13
**depositions**  8:20
196:8,10,16 219:5
**describe**  35:2 85:9
141:13 213:6
**described**  12:14
41:4 63:25 68:15
78:22 79:23 84:17
90:8 91:2,5 92:14
92:22 96:5 116:16
121:1 146:1 164:5
172:3,10,17 174:14
174:22 178:11
179:7 180:2 201:5
212:24
**describes**  86:6
111:16
**describing**  40:25
77:17 86:22 120:15
121:2 143:20 167:4
174:15 178:19,21
214:24
**description**  4:8 5:1
131:20 140:18,19
142:24 147:20
169:20
**descriptions**  125:19
**descriptive**  23:8
199:6,25 200:2,4,6
**design**  29:11 35:14
194:14,16,20,21,25
195:4
**designated**  78:21
117:19
**designed**  99:6
195:25 199:5
**designing**  192:12
193:14,24 194:11
**destiger**  31:6,16
**destination**  101:12
**detail**  4:14 61:12
208:6,16,18 209:3,8
**detailed**  5:9 110:2
110:21 112:14,17

112:21 118:25
**details**  200:9 209:15
**determination**
122:19,21 209:17
**determine**  109:16
116:18 117:15
156:18 183:2,11
196:6 202:20
204:13
**determining**  99:4
119:21
**develop**  34:4 112:6
**dictates**  147:15
**difference**  48:1,3,16
48:22 59:2 133:16
138:19 140:5,7
167:14 200:6
**differences**  31:25
**different**  5:20 18:13
18:14 19:18 26:12
30:10 32:7 33:4,6,7
33:11,13,14 35:1,18
35:25 36:14,17,18
36:19,21 39:10 41:2
41:14 47:14 49:10
60:11 64:16 69:21
70:4 78:15,15 91:25
92:5,15,20,23 94:9
95:23 98:19,20
112:8 116:17
120:13 121:2
131:12 142:8
148:21 153:4,5,24
154:2 160:3 172:22
174:20 184:1,19
185:24 186:5,11
187:8,24 190:5
193:22 200:6,10
209:4 213:4 214:10
214:16 215:7,8
**differentiate**  41:24
43:2 94:19 95:4
**differentiates**  43:11
**differently**  26:16
79:21 116:22 164:6

Veritext Legal Solutions
866 299-5127

195:25
**differing** 213:8
**differs** 175:6
**difficult** 61:22 62:8
  117:15 153:10
  161:3 162:1 214:18
  215:6
**digital** 114:23
  115:12,13
**digits** 149:18 150:2
  150:25
**direct** 40:14 43:3
**directed** 98:13
**direction** 222:9
**directly** 158:10
  179:20 216:5,15,18
  217:19 218:10,13
**director** 65:13
**disagree** 51:19
**disclosure** 5:12
**discomfort** 175:25
  176:2,12
**discover** 13:1
**discrete** 174:1,4,5,6
  213:2
**discuss** 216:7
**discussed** 12:25
  89:24 162:6,12
  174:25 196:6
**discusses** 182:22
**discussing** 78:3
  134:19 144:6
**discussion** 85:14
  102:12 126:13
**dispatch** 79:2
**dispute** 11:17 12:24
  13:5
**distance** 156:24
  157:9,12,23 158:24
  159:4 160:4 162:13
  162:14,20,22,25
  177:18,23 178:3,6
  178:14 179:6,17,18
**distinction** 138:7
  185:25

**distributed** 69:5
  77:9,10 89:12 179:9
  203:15
**district** 1:1,2 2:1,2
  6:19,19
**divide** 185:7 186:10
  189:13
**division** 5:20 23:23
  34:10,10,17 35:1,2
  35:17,19,20,24
  36:14,19 38:17
  43:22 44:6,11,16
  45:7 52:1 53:11,13
  54:7,19 56:10,16,18
  56:19 58:9,23 59:3
  60:5,11 62:18 63:11
  72:23 73:23 78:21
  79:13 80:2,7,20
  81:4,9,18 82:5,17
  84:7 85:19 86:13,15
  87:23 88:2,19 89:25
  90:9 96:20 101:1,10
  101:11 104:24
  106:5,7,10,14
  142:24 143:15
  145:15 160:25
  161:2 164:20,21,23
  165:4,8,10,10,12,14
  174:17 175:6 192:2
  192:4 201:1,7,12
  204:9 205:24,25
  206:1 213:4,5,9,17
**divisions** 22:16
  23:21,22,22 26:12
  27:9 30:7 35:16
  36:16,17,22,24 37:3
  37:8 42:3 59:20
  60:1,9 61:3,6,15,19
  78:6,13 88:13 90:5
  94:10,17 95:3 97:21
  98:20,21 103:7
  106:8,15,17 142:8
  171:20 174:20,21
  174:24 175:1 180:8
  180:15 200:11

201:8 205:2 212:14
  213:7,12,15 214:4
  214:17,20 215:2
**document** 11:5,8
  13:11,13,18,19 14:2
  14:3,6,15 15:9 18:2
  18:3,4,8,9 22:19,20
  23:25 33:15 34:7
  43:15,17,18,24 44:5
  49:6,12,17 52:7,15
  54:10,21 56:12 59:9
  60:17 65:16,22
  66:10,15,22 67:10
  68:1 69:2,5,10,25
  70:11,12,15,20 71:1
  71:14 72:9,10,12,16
  73:2,4,12 74:18,19
  74:22,25 75:8,11
  76:4,9,16,22,23
  77:21 78:3 79:25
  85:13 102:11
  109:23 110:1,5,7,14
  110:17,19 111:1,7
  111:11 112:14
  114:24 117:17
  123:13,15,20,23
  124:6,8,8,13 126:17
  135:23 150:13,14
  150:22,23 157:9
  161:10 164:11
  191:8,10,16 193:3,5
  195:18,21 196:1
  200:24 205:9,11,19
  205:23 206:13
**documented** 111:24
  152:15 207:16,18
  209:16
**documents** 11:14,21
  12:4,21 13:4 18:15
  22:22 23:1,5,13,16
  23:20 30:1,4,8,18
  30:19 32:10,19 34:7
  35:6 37:22 38:11,19
  39:1,4 42:25 43:7
  43:10,12 49:20 50:3

50:3 51:23 69:11
  91:23 117:16
  123:25 124:5 148:6
  148:14 191:12
  194:1,4
**doing** 27:12 29:14
  58:16 71:17,22 72:4
  98:14 99:18 107:1
  116:20,25 117:4
  118:7 153:9 158:5
  162:1,5,24 188:15
  206:22
**dominant** 138:18
**door** 181:10
**double** 26:3 28:7
  73:19 83:20 84:5
  127:15 147:18
  186:6
**doubt** 117:5 161:21
**dr** 8:3 210:24 211:1
  211:11,18 212:25
**draft** 4:23 19:1,2,3,8
  24:8 33:24,25
**drafted** 24:6
**drafts** 67:22
**drawer** 155:7
**drawn** 74:11 130:4
  130:5
**drive** 12:2,4,15 50:6
  50:7 53:12,23 54:15
  55:2,3,6 56:1,9,15
  56:18 90:13 94:23
  124:2,5,17 131:18
  134:19,25 135:21
  153:20,23 154:2
  189:24 190:14
  199:15 213:18,21
  214:1
**driver** 89:7 104:19
  108:17,19 156:17
  158:15
**driver's** 162:4
**drives** 91:1
**driveway** 140:15

**driving** 89:17 92:18 96:8,16,19 104:20 107:10 109:1,8 143:6 152:5,8,10,15
**drogin** 211:11,13,18 212:4,25
**drogin's** 210:24 211:1
**drop** 53:19 143:5,6 213:19
**dropped** 104:19 108:17,19 156:20
**drove** 54:7,19 95:12
**duck** 62:21
**due** 140:8
**duly** 7:20 222:7
**duplicates** 201:7
**duration** 26:16 27:7 134:11 146:24 167:15 168:11,24
**duties** 179:12

### e

**e** 4:1,7 5:18,18,18 13:9 77:12,14,16,23 213:7
**earlier** 58:11 71:3 72:1 86:22 116:16 143:19 150:20 160:3,16 166:15 167:5 169:22 179:18 187:20
**early** 65:24 83:22 84:4 123:24,25
**ease** 15:14 123:15
**easier** 23:12 148:13
**easiest** 189:21
**east** 102:2,4
**eating** 180:17
**echoing** 181:10
**edited** 126:3,5
**edits** 125:18
**effect** 117:11 175:21
**efficient** 88:9

**effort** 111:4
**eight** 98:19 216:4,4 216:16,19 217:4,16 217:16
**either** 13:7 18:21 35:10 47:10 101:10 165:14 174:18
**elapse** 192:3
**electronic** 208:18
**electronically** 77:11
**element** 172:23
**elizabeth** 1:15 2:15 4:13 5:3 6:9 7:19 8:2 64:20 65:4 123:3,12 159:21 197:11,18 215:13 219:24 221:22
**embarcadero** 101:23
**emeryville** 1:17 2:19 6:1,15
**employee** 144:4 213:22 222:17
**employees** 22:5 38:7 140:20 141:3,4 142:2,3 143:4 175:16 176:1 180:24 205:24
**employer** 10:22
**empty** 90:1
**encompassing** 42:4
**ended** 101:8 107:9 107:11,16 108:7 146:21
**ends** 54:6,13,14,18 199:7
**engaged** 99:7
**ensure** 61:23 75:13 75:18 76:5 78:16 103:6 118:23 127:23
**enter** 115:6 126:25 146:7,11 147:1,6,8 155:3

**entered** 16:3 127:3 146:14,19,20,22 147:1 156:21 210:9
**entering** 146:21 209:11 210:12
**enters** 15:24
**entire** 58:23 59:14 64:15 168:24 173:10
**entirely** 38:8
**entitled** 13:1 16:14 16:24 18:2 79:10 80:1 106:21 125:20 133:11
**entries** 126:1
**entry** 126:20,24 129:6 130:4 141:14 144:22 154:24
**environment** 64:12 88:5
**error** 133:4,6 140:8 149:16,23 150:8
**essentially** 124:12
**establish** 192:1
**established** 193:4
**estimating** 158:19
**et** 6:17,18 34:10 78:24
**evaluate** 101:13
**events** 213:9
**everybody** 184:22 184:22 185:12
**evidence** 14:1 91:20 117:25 120:3,9 171:22 173:3,13,16 173:23 191:23 195:12 206:8 211:21 212:11
**evidenced** 207:18
**evident** 101:12
**evolve** 76:18
**evolved** 77:22 125:17 190:23
**evolving** 76:16 77:20

**exact** 20:23 32:2 70:16 71:5 109:3 156:25 157:2 159:4 211:15
**exactly** 30:15 63:20 73:20 76:8,14 96:9 103:16 105:13 114:19 122:22 146:18 150:11 153:9,22 162:1,5,23 164:2 202:17 219:14
**exaggerating** 5:21 35:25
**examination** 4:3 7:17,22
**examined** 7:20
**example** 33:9 40:12 40:21,24 62:18 78:19 90:2 91:6 116:23 117:16 125:8 126:3 133:12 134:18 135:21 142:7 167:24 168:6 168:7 213:1,5
**excel** 12:13 115:2,6 127:13 130:24 133:9
**exception** 137:12
**exceptions** 78:14
**excluded** 120:12
**exclusively** 22:3,8 26:11
**excuse** 74:1 103:3 116:19 144:8 188:19
**excused** 17:13
**execute** 78:23
**executed** 36:21 221:15
**exhibit** 4:9,11,13,14 4:15,17,18,20,21,23 4:24 5:2,3,5,6,6,8,9 5:10,11,13 11:6 13:12,18,24 14:6,15

15:10,23,25 18:3,7
18:9,25 19:13 22:18
22:19,21,21 23:4,13
24:1,3,24 25:4 30:2
30:18,23 31:1,2,5,7
31:9,11,13,15,17,19
31:21,22 32:10,19
33:15,18 34:5 35:5
37:22 38:10,11,25
38:25 40:2 42:18,19
42:25,25 43:6,9,17
43:18,23 44:5,22
45:3 49:12,24,24
50:1,12,16 52:7,15
53:8 56:21,24 57:1
57:23 58:21 59:9
60:5,17 64:24 65:6
65:17 66:18,22
67:25 70:11,15 72:7
72:9,12,16,20,24
73:1,7,9,10,11,13,15
73:16 74:11,18,25
75:7,11 76:9 78:3
79:9,25 82:15 85:13
85:17 87:14 102:11
104:8 106:15,16,21
107:2 108:1 109:21
109:24 110:14,17
110:19 111:1,7,11
112:14,17 123:7,14
123:20,23 124:6,13
127:9 129:25
134:19,24 135:1
139:1,2,3 142:15,15
142:18 144:7
150:13,23 151:12
151:17 164:11
171:7 173:6 175:7
175:14 177:13
182:16,22 183:15
184:3 189:19 190:2
190:18 191:6,9,16
193:17 197:20,25
198:25 200:22
201:19,21,22 203:2

203:7,18 205:5,6,8
206:6 208:8,19
210:7,8,25 211:6,10
212:22,23
**exhibits** 6:4 30:5
37:22 39:18 124:18
220:6
**exist** 51:24 52:25
70:12
**existed** 59:21
**exit** 139:9,12,17
140:15 146:14
147:21 148:16,24
152:1,7 153:23
213:25 214:2
**exited** 153:2 156:22
**exiting** 100:25
**expected** 45:8,25
46:5,10 47:8,16,20
47:21 48:2,3,10,16
48:16,19 49:4
172:22,22
**experience** 28:23
208:2
**expert** 16:6 34:19
62:16 219:14
**expert's** 16:25
**expertise** 119:5
**experts** 16:24 34:21
38:4,9
**explain** 41:22 92:10
115:18 129:6
134:17,18 137:13
138:19 155:18
201:18 202:7
**explaining** 100:1
164:24
**export** 140:9
**exported** 130:14,20
136:25
**extensive** 68:15
119:2
**extent** 92:1,8 181:16
**external** 119:25
120:2 173:14,16,22

**extra** 93:22 119:23
203:20 204:21,22
204:23
**extrapolated** 199:4
199:23

**f**

**f** 5:18 213:7
**face** 172:23
**facilities** 37:15
42:11
**facility** 38:3 41:13
60:14
**fact** 13:25 37:16
47:15 89:18,19,21
90:11 91:19 94:8,10
96:1,6,12 117:25
120:5,9,18 125:12
146:15 161:11
163:19 174:21,22
183:5,12 201:2
211:20 212:11
**factored** 186:3
206:19
**factors** 78:12 90:10
143:16,24 195:23
**facts** 206:8 212:18
**failed** 118:20 119:21
120:5
**fair** 29:18 38:11
39:3 40:1 41:6
43:14 54:4 58:22
62:15 76:21 82:19
205:11 216:13
**fairly** 152:24 185:11
**fall** 112:16
**false** 37:25 204:6
**familiar** 14:16 75:19
82:12 205:10
**familiarity** 14:4
**familiarize** 34:8,9
**far** 113:5 139:9,19
147:19 148:9,14
149:2 156:16,24
157:2,6,12 158:9,14

159:4 191:18 202:2
209:12,21
**farther** 143:6
145:11
**feasible** 88:5,10,21
88:21 196:6
**features** 78:12,16
**february** 74:4
**federal** 11:3 222:13
**feel** 181:10
**felt** 34:23 88:7 99:25
100:2 112:12 117:8
**field** 34:20
**fifth** 56:3 85:18
**figure** 39:13 59:19
**file** 23:8 69:20 124:1
189:10 190:13
**filed** 9:14 11:1
195:22
**files** 23:10 50:5
66:21 68:19 108:24
189:20
**filing** 125:17 191:5
**fill** 56:1 92:16,17
94:1 97:12
**filled** 154:6
**filtered** 72:6
**final** 32:17 66:18
70:22,23,25 71:15
110:9 125:20 126:9
126:14,18,22
140:18 147:20
169:16,18,19,21,25
170:2 174:19
**finalize** 31:23
**finalized** 32:3,5,13
32:15 33:2
**financial** 182:1,14
**financially** 7:1
222:16
**find** 38:18 56:23
64:3 106:24 176:15
**findings** 35:23
130:25 131:3,6
149:20 176:5,6

Veritext Legal Solutions
866 299-5127

199:3,22
**fine** 181:11 195:14
**finish** 179:3 197:5
**finished** 197:8
**firm** 3:4 7:11 29:20
29:23 66:3
**firm's** 69:15
**first** 7:20 26:21 29:8
29:14 32:9,20 40:3
40:17 42:10 47:8
48:9,23 59:10 70:14
72:20 73:16 74:1
79:9,14 80:8 85:20
92:14,21 95:21
123:21 133:12
137:16 164:10
169:4 191:15
204:22 208:9,19
210:7,8
**fit** 194:9
**fits** 193:3,9 195:21
**five** 79:10 183:18
184:4,7,9 188:17
190:9
**flag** 145:4 148:1,2
154:15
**flagged** 147:17
**flags** 123:15
**flash** 50:6,7 124:2,5
124:17 189:23
190:14
**flip** 127:14
**flipped** 130:16,21
132:3,4,5 149:18
150:25 151:4
**fluid** 39:12 40:16
**flynn** 43:22 44:6,11
44:16 45:7,13 46:4
50:10 52:1 53:11
58:9 60:5 139:5
141:24,25 142:1,8,9
142:12,24 143:2,10
143:17,20,21
**focus** 95:7 98:6
181:1

**focused** 26:10,13
27:3 204:25
**focusing** 38:20 41:3
**folks** 90:1
**follow** 59:1 75:20
85:25 86:4,21
153:17 168:12
**followed** 75:14,17
76:6 79:19 86:10
**following** 62:3 138:5
181:15 189:17
192:4 199:2
**follows** 7:21
**footage** 60:14 61:20
**footnote** 87:16,19,21
143:14 175:12
**foregoing** 221:6,13
222:4,6,10,12
**form** 19:5 28:18
50:18 70:4 106:4
113:24 169:25
170:2
**format** 12:13
**formatted** 33:4,7,14
**formatting** 32:1,6
**formulas** 133:23
**forth** 13:8 222:5
**forward** 214:1
**foundation** 98:12
202:12 204:2 206:8
**four** 55:18 138:4
140:19 219:25
**fourth** 18:1
**fourths** 21:9
**fragment** 195:10
**francisco** 1:9,10 2:9
2:11 3:13 4:10,12
6:17
**frequent** 84:8
**fresh** 48:4
**friday** 165:21
**full** 7:25 121:24
172:23
**function** 162:14,21
180:7

**further** 103:6
222:12,16

**g**

**g** 3:4 213:7
**gain** 182:1,14
**gate** 86:13 152:11
**gather** 42:3
**general** 34:19 35:2
35:16 40:1 101:15
181:24 205:25
208:5
**generally** 8:9 60:10
63:23 64:2 117:13
134:16 175:19,23
180:23 214:8
**geoff** 3:11 7:13
**geographically**
160:5
**getting** 29:4 41:2
53:5 81:15 130:13
141:8,9 146:10
163:16,23 164:4
176:7,7,8 181:1
187:24 194:17
216:19
**gilly** 59:16 81:5,9,13
81:18 82:6,10,12,13
82:18,23 83:1,4
**give** 22:6 32:2 35:1
52:9 62:4 63:7 88:8
111:8 117:5 161:20
168:4 195:14
200:12
**given** 16:15 93:17
101:13 110:22
112:12 126:20
134:6 135:15 137:7
182:1,12 213:8
222:11
**giving** 195:18
**gleaned** 40:5 41:8
41:24 42:19,20
43:12

**go** 6:22 9:16 10:6
13:6 17:5,6 21:19
30:9,25 34:4 35:17
40:10,17,18 43:4
45:19 57:25 64:18
67:21 73:21 76:15
83:4 89:15 118:19
119:17 137:4
139:22 145:11
152:17 154:24
179:3,12 181:12
182:3 197:9 213:6
214:24 217:23
219:8,22
**goes** 158:10 163:13
**going** 9:21 10:7
12:22 16:17 17:7
19:4,16 28:17 32:7
42:14 47:23 50:17
61:11 62:4,5 70:3
75:24 77:19 78:23
93:11 103:16 104:1
106:13,21 113:23
115:22 116:20
117:24 120:6 121:8
126:12 130:22
131:13 132:25
133:11 150:17
153:20 156:5
158:16 159:21
164:25 171:1 182:3
186:19 192:23
193:20 195:1 207:1
212:10 215:24
216:2,5,10 217:19
217:23
**good** 6:7 7:23,24
168:7 175:19
**gotten** 44:17
**grab** 152:18
**grandberry** 1:4 2:5
**graph** 185:22
**great** 195:12
**green** 32:22 145:15
145:24 154:14,16

154:16 213:17
**greet** 90:6 91:6,13
156:22 213:21
214:2
**griffin** 1:5 2:5
**grip** 14:18,18,22,24
14:24 214:12
**ground** 88:19
**group** 2:17 65:14
200:9
**gspellberg** 3:14
**guess** 158:3
**guidance** 68:6
**guide** 5:9 76:16
110:2,3,21 112:14
112:18,21
**guys** 216:5,17
217:18 219:10

**h**

**h** 4:7 10:15,17,19
213:7
**half** 20:24 210:7
**halfway** 145:12
**hall** 139:12,17
181:10
**hand** 11:16,21 135:1
137:5 141:4 142:2
**handful** 22:9
**handing** 12:2 30:1
**handles** 214:14
**handwrite** 135:7,10
**handwriting** 55:9
55:22 59:12 136:6
**handwritten** 30:17
30:20 35:5,8 37:20
38:10,12 39:3 41:7
59:11 203:16,20
**handy** 127:4
**hanvey** 15:24 16:2
17:13,18 19:21
31:12,14
**hanvey's** 16:5
**happen** 20:3 94:17
174:24

**happened** 149:25
150:4 153:22 188:9
**happening** 88:20
133:22 138:13
158:23,25 168:3
**happens** 42:12
84:25
**happy** 13:1
**hard** 62:1 74:9
77:10 200:13
**hats** 88:13
**headed** 102:1,1
**heard** 44:17 55:13
217:24 219:1
**hedy** 1:4 2:5
**held** 6:14
**help** 42:9 49:15
110:3 111:9 127:6
135:20
**helpful** 34:12 61:11
**hereto** 6:5 64:25
72:8,25 109:22
123:8 191:7 205:7
**high** 21:19
**higher** 61:16
**highlight** 57:4
**highlighting** 57:3
**hit** 39:9 162:15,15
**hmm** 16:1 32:11
35:7 38:23 39:2
46:1,8 62:10 87:15
91:10 109:25
127:22,25 128:24
129:1,4 130:9 131:8
131:23 133:3,5,14
135:4,25 139:6
140:4,10,25 143:8
145:10 146:8 149:7
149:13,15 151:19
151:22,25 152:3,19
155:5,9,11,14,17
161:14 163:3 173:5
175:9 187:3 189:2
192:19 198:5
201:16 203:23

**hold** 93:22 141:7
211:7
**holding** 220:5
**holtzman** 3:11
**honest** 67:9
**honing** 187:9
**hope** 51:2
**horizontal** 127:20
**hour** 8:25 9:2 78:14
100:12 119:2
**hours** 27:5,10,13,18
68:16 78:13 100:12
103:4,4 180:15
216:4,4,16,20 217:4
217:4,6,16,17
**huge** 61:20
**hundreds** 180:22
208:1
**hypothetical** 75:25
90:16 91:20 96:19
120:9 185:10
192:11 202:11
**hypothetically**
192:10

**i**

**idea** 156:24 157:12
159:8 175:19
**identification** 6:4
64:24 72:7,24
109:21 123:7
170:16 191:6 205:6
**identified** 11:20
13:4 17:3 111:17
191:1,3
**identifies** 165:14
193:18
**identify** 23:4,12
78:18 87:22 88:3,11
88:15,21 161:4
213:14
**identifying** 192:13
193:25
**identities** 92:7

**immediately** 126:25
128:22 129:2
131:16 136:5 145:5
147:13 148:2
163:13
**immune** 150:8
**impact** 75:23 125:7
132:23 149:19
176:8,10 178:13
179:16 193:7
**impediments** 62:20
116:17
**implementing** 180:1
**imply** 204:23
**important** 42:2 64:9
75:12,16,19 157:19
157:22 173:13
175:16,18
**impression** 44:19
**improper** 50:24
99:2,12,25 100:2
117:25
**improving** 126:7
**inaccuracy** 132:15
132:19
**inaccurate** 37:23
131:10,10,11
132:12 134:24
**inadequate** 59:24
**include** 70:20 117:2
117:17 124:10
141:15,20 146:9
147:7 152:8 163:25
165:5 183:1 184:15
190:25 194:8 196:3
198:1
**included** 27:6 98:1
98:10 103:7 113:10
114:10 117:6,11
141:6,8,22 147:6
163:15,23 164:8
168:1,23 182:24
183:16 185:15
191:4 198:2,11,18

Veritext Legal Solutions
866 299-5127

| | | | |
|---|---|---|---|
| **includes** 12:11 29:11 115:20 124:15 181:15 184:3 190:1 213:10 | **individuals** 59:15 61:24 69:1 95:15,18 95:25 96:11 169:6,9 169:12 204:17 | **insight** 199:6 **inspect** 117:12 159:2 161:20 **inspecting** 159:3 | **interest** 111:18 113:3,11 152:15,20 181:19 182:6 183:4 186:2 190:23 191:3 |

**includes** 12:11
29:11 115:20
124:15 181:15
184:3 190:1 213:10
**including** 16:19
47:5 104:19 144:21
191:23 193:15
**inclusive** 117:6,14
118:5 184:8
**incomplete** 75:25
90:16 91:20 97:22
120:9 202:10
**incomprehensible**
70:5 113:24 209:5
212:11
**inconsistent** 60:2
61:11
**incorporated** 70:17
71:6 147:13
**incorrect** 143:11
**incorrectly** 136:25
**increase** 181:18
**increasing** 182:5
**indented** 137:14
**independent** 171:21
173:15
**independently**
98:14
**indicate** 163:22
**indicated** 128:9
131:18
**indicating** 42:17
70:25 106:18 130:6
144:13 145:21
151:14
**indication** 140:2
**individual** 85:3,4
87:22 101:16,17
126:20 132:17
133:18,21 150:1
153:2,3 161:2 169:5
169:7,9,10,12,13
189:7,13
**individual's** 119:7

**individuals** 59:15
61:24 69:1 95:15,18
95:25 96:11 169:6,9
169:12 204:17
**inflated** 168:2
**influenced** 16:19
181:17
**inform** 35:13 200:13
**informal** 40:9
**information** 13:22
14:5 32:1 34:25
35:9 37:14,20 38:1
38:8,10 39:14,19,21
39:24 40:5 41:7,8
41:24 42:3,6,7,8,13
42:17,19,20 44:18
46:18 70:17 94:25
111:9,23 133:10
150:11 164:15
166:16 173:15
191:25 193:16
194:10 200:9
203:19 221:9
**informative** 200:13
**initial** 15:15,19
18:24 19:12 22:22
24:23 25:7,18 26:1
26:2,3 28:2 35:10
49:23 59:22 66:9
73:9 76:9 82:14
83:8,12,14 84:2
87:13 104:9 107:2
107:23,24 108:4,6
108:15 112:21
113:12 171:7 173:4
174:7 177:11 181:8
181:14 190:18
211:4,9,17 212:2
**initially** 111:17
**initiate** 116:6
179:14
**ink** 74:12
**input** 115:3
**inside** 152:11

**insight** 199:6
**inspect** 117:12
159:2 161:20
**inspecting** 159:3
**inspection** 117:1,8
117:10 161:22
192:6
**inspections** 116:24
**install** 62:17
**installing** 61:14 62:5
**instance** 101:16,19
187:4,11 209:9
**instances** 58:22 87:4
104:24 116:10,12
130:16 174:13
188:4 207:22
218:22
**instruct** 12:22 93:11
159:21 160:18
174:8,10 195:2
**instructed** 36:9
95:14 103:8 116:6
179:13 195:5,16
**instructing** 36:4
121:9
**instruction** 80:15
85:24 86:5 93:1
94:3,13,15 195:7
**instructions** 93:18
**insulting** 36:8
**intended** 23:9 38:15
41:15 129:15
168:24 199:3,13
200:4,8
**intent** 39:13,16
**intentionally** 37:25
**interact** 116:11
143:3
**interacting** 63:4
**interaction** 63:4,5
177:19,24 179:14
179:15
**interactions** 179:5
**interactive** 40:19

**interest** 111:18
113:3,11 152:15,20
181:19 182:6 183:4
186:2 190:23 191:3
192:13,22 193:19
193:25 196:3,7
**interested** 7:1
222:17
**interests** 152:13
**intermediary**
218:12
**intermediate** 105:17
**interval** 135:11
**interview** 31:22
33:17 34:6,14,20
37:5 38:20,21 39:9
39:18 40:2 41:4
42:17 43:21 44:4,6
44:14 48:5,8 49:7
51:25 52:5,23,24
53:2,6 58:21 60:4
200:21 203:3,18
**interviewed** 44:10
58:23,25
**interviews** 32:25
34:16 39:17,20 40:6
41:9,12 42:20 43:12
58:20
**introduce** 7:6
**investigation** 58:8
**invoice** 218:3,4,9
219:2
**invoices** 12:8,9
**involve** 8:24
**involved** 91:3 99:8
181:25
**involves** 213:4
**irrelevant** 206:23
210:15
**issue** 63:2 132:23
133:8 149:25 150:2
150:24 154:4
185:25
**issues** 34:9 63:25
111:20 181:24

Veritext Legal Solutions
866 299-5127

194:7 215:22
**item** 14:21

## j

**j** 5:6 73:7,9
**jackets** 88:13
**january** 66:2
**jby** 3:8
**job** 1:25 20:10,17,20
21:3,5,13,22 22:10
34:20 64:8 90:18
98:18 119:19
179:12 180:9,25
209:16,20,24
210:14
**jobs** 34:21
**joel** 3:5 7:10
**john** 18:18
**jonathan** 18:21
**jotting** 40:11
**judgment** 168:20,22
**july** 1:18 2:21 6:1,8
58:24 222:22
**jumping** 179:2
195:11
**june** 28:5,6,8,9,16
**jury** 158:5 210:16

## k

**kathleen** 1:24 2:22
6:11 222:24
**keep** 115:8 125:17
141:7 142:15 162:6
164:25
**keeping** 188:21
217:2
**keeps** 187:22
**kept** 162:25 178:14
**kevin** 13:8
**key** 165:1
**kind** 39:11 40:21
60:15 63:10,19 86:8
157:16 169:24
180:9 184:8 196:24
**kiosk** 140:20 141:3
141:5 142:2,3,3,13

143:3
**kirk** 31:6,16
**kirkland** 32:22
148:5,11 149:4
151:6 152:21,24
154:4 165:12
**kirklands** 148:10
**knew** 79:4
**know** 11:3 13:8
17:19 18:12,17 19:6
23:9,15 24:18 28:6
32:15 34:12 40:20
46:24 50:21 52:9,16
57:10 67:2 69:13
71:10 73:10 76:19
82:9,12 90:25 92:17
94:18 95:4,8 105:25
106:12 109:7,19
110:8,10,11 113:25
116:9 117:13
122:24 125:14
126:6 127:7 130:12
130:19 131:9 132:3
132:4 142:7 146:12
146:18,22 153:8
156:3,11,12 157:14
158:18 159:12
161:3 163:19
178:11 179:1
181:23 184:21
188:5 193:2,4,5
194:7,9,9 195:17,21
195:23 196:6 198:9
198:14 201:8
202:14,16,17
205:16 206:10
207:17 210:22
221:7
**knowing** 44:9,15
**knowledge** 10:25
86:4,10 119:4 221:8
**known** 182:12

## l

**labels** 212:25
**lack** 74:12 98:12
177:19,24 183:8
202:11 204:2
**lacked** 60:1
**laid** 152:24 208:18
**language** 48:7,7
67:5,8,14 68:9,22
69:6,23
**large** 62:14
**latest** 77:16,23
**lavalle** 176:21
**law** 3:4,5,12 8:17
158:4
**lawsuit** 9:13
**lawsuits** 11:1
**lawyers** 218:16
**layout** 64:11
**layouts** 36:16
**layperson** 115:18
182:8,10
**lead** 79:1 103:21
**leader** 38:3,3
**leadership** 38:9
**leading** 51:9 55:16
98:25
**learn** 34:21 35:15,19
**learning** 42:11
**leave** 16:21 53:13,19
53:23 54:14 55:2
56:19 154:21
203:20 204:21,22
215:11
**leaving** 163:16
**led** 39:10
**leet** 3:19 6:10
**left** 17:14 85:4
101:22 126:14,18
127:5 146:25 148:9
149:2 150:15
**legal** 3:20 6:12
23:20 98:11 127:7
192:24 219:25

**legally** 17:3
**lengthy** 28:21
**level** 37:13 38:6
61:12 159:14 160:6
208:17
**light** 14:17 47:15
**likelihood** 177:20,25
**limited** 28:4,15,18
191:23
**line** 5:19 73:15,16
73:21,21 74:9,16,17
74:17 127:21,24
144:10 153:23
154:2,21 155:6,12
155:15 161:5,12
163:1 191:20 198:3
199:2
**lines** 74:11 140:19
152:17 183:1
**list** 5:6,8 14:12 21:8
22:22 23:4,9,13
25:23 34:11 68:25
72:5 73:7,19 74:6
111:11,15 156:4
191:11 196:13
205:15
**listed** 68:19 112:13
112:17,23 136:4
149:20 155:2
191:11 202:3
213:11
**lists** 27:7
**literally** 197:6
**litigation** 21:17
181:24,25 182:2
**little** 23:15 33:8 39:8
39:12 40:9 48:6,7
59:11 92:13 130:4
134:14 137:14
145:11 156:5
**live** 63:6 64:2,6
**loaded** 133:19
**located** 42:12 163:8
**location** 102:15
103:9 106:25

107:12,17 108:7
152:6 160:23 161:9
202:20 204:12
**locations** 23:21
102:14 107:3 192:8
**log** 171:17 188:8
**logical** 47:12 172:20
173:1 182:1,9,11,12
**long** 44:9,15 157:23
**longer** 68:1 69:12,12
217:2
**look** 21:8 23:7 25:11
42:22,23,24 50:18
52:20 53:6 57:8
68:14,24 73:22 99:7
106:16 108:21
109:11 115:11
118:3 129:25
132:17 138:10
141:24 142:6
148:18 155:25
171:6 175:4 185:11
189:5,10,21 202:22
203:7 205:10
212:21
**looked** 39:7 49:6
61:8,18 78:11 159:8
194:4 209:13
**looking** 14:20 37:16
40:10 46:22 48:15
52:10,19 59:18 84:3
93:20 126:12
127:15,23 142:12
145:22 147:22
149:3 151:17
154:12,12 165:11
192:9 202:21
203:13,16 204:13
**looks** 32:6,6 33:3
41:17 56:7 58:5
60:15 71:24 73:7
74:1,6 123:24 124:9
149:18 150:18
**loop** 213:19

**lose** 64:10
**lost** 144:11
**lot** 50:19 63:3 64:10
76:3 148:10 151:7
196:19 198:15
208:1
**lots** 61:21,21 77:18
77:18 180:16
**loud** 191:21
**lower** 38:6
**lunchroom** 145:13
146:2,5,10,13,25
147:3,9

## m

**machine** 222:8
**madam** 10:12 17:22
28:24 77:1 119:10
159:24
**mail** 13:9 77:16,23
**mailbox** 156:21
**mailed** 77:12,14
**main** 46:14 47:5,11
47:20 48:20 196:24
196:25
**maintain** 178:4
**maintenance** 143:4
144:4 213:22
214:13
**majority** 205:1
**making** 27:5,14,18
67:12 71:18 72:21
73:17 98:8 105:4,21
109:18 122:18,21
156:8 158:15
159:15 160:22
175:16,20 217:25
**man** 14:18,22,23,24
15:2,5,7
**mandate** 99:17
**manner** 51:18
**manually** 115:3,6
133:24
**map** 101:25 106:12
106:15

**mark** 36:11 56:25
74:7 205:4
**marked** 6:4 11:6
13:12 15:9 18:24
24:1 26:5 30:2,4
56:24 64:24 65:16
72:7,24 73:13
109:21,24 123:7,14
182:16 191:6,9,16
200:22 205:6 211:5
211:9
**marking** 74:8
**marks** 64:19 65:3
123:2,11 197:10,17
**massive** 61:20 62:18
**master** 5:6,8 12:10
72:5 73:7
**master's** 65:11
**material** 76:25
126:8
**materials** 11:16,18
12:1,14,19 18:13,18
43:11 119:3,4 194:6
196:4
**math** 21:12 27:9
**mathematically**
188:17 190:11
**matter** 34:19,21
38:4,8 40:1 62:13
156:9 208:5 221:6
**matters** 221:9,10
**mccaffrey** 3:17 7:11
**mean** 14:11 15:3
19:2,7 21:16 24:13
30:11,12 32:15 33:5
38:1 42:25 58:17
66:25 76:16 82:10
85:9 87:25 93:16
96:7,8 114:13,17
125:25 127:16
131:7 143:23
155:20,21 164:5
170:19 174:6
183:23 200:1,1
209:7 216:12

**meaning** 20:3 71:1
100:22
**meaningful** 59:24
**means** 24:18 93:13
113:25 164:24
204:10
**meant** 88:1 136:19
165:10
**measure** 168:24
**measurement** 150:3
150:5,7 157:2
**measurements**
114:9,12,12,13,17
**measuring** 179:11
**mechanics** 175:1
**mechanism** 120:6
**media** 64:20 65:3
123:3,11 197:11,17
219:24
**meet** 78:22 90:6
91:6,13 156:22
213:21 214:2
**meetings** 68:18
**member** 126:24
**members** 74:20 75:9
**memories** 49:7
**memory** 48:5 49:13
49:16
**men** 14:18
**mention** 138:6
**mentioned** 12:18
14:21 187:20
**method** 105:9
119:20
**methodology** 20:12
20:14,19,22 21:6,14
21:23 22:5,10 29:10
112:5 137:24
**methods** 20:18 76:6
104:18
**microphones** 6:23
**middle** 148:9
**midnight** 100:16
**mind** 57:8,16 71:25
89:22 126:4 181:9

187:22

**mine** 31:8,10,18
32:16 52:12,20
148:11

**minimize** 175:25
176:10 178:12
179:5,16,16

**minute** 12:18 45:20
50:22 93:6 171:10

**minutes** 101:11,15
103:9,13 138:4
167:25 168:2
183:18 184:4,7,9
185:2,3,4 188:18
190:9 192:3 216:4
216:16,20 217:16
217:17

**miscellaneous** 192:8

**missed** 121:23 122:4
122:10,13 182:18

**missing** 122:17

**misstates** 54:9,20,21
56:11 69:18 134:22
212:18

**mix** 42:6

**mm** 16:1 32:11 35:7
38:23 39:2 46:1,8
62:10 87:15 91:10
109:25 127:22,25
128:24 129:1,4
130:9 131:8,23
133:3,5,14 135:4,25
139:6 140:4,10,25
143:8 145:10 146:8
149:7,13,15 151:19
151:22,25 152:3,19
155:5,9,11,14,17
161:14 163:3 173:5
175:9 187:3 189:2
192:19 198:5
201:16 203:23

**mme** 165:12 213:25

**mode** 51:17

**modify** 195:20

**moment** 143:9
200:25 201:12

**monday** 165:20

**money** 213:19,20

**months** 28:21 49:6

**morning** 82:9 83:5
83:23 100:13,14
220:7

**mornings** 81:6,11
81:19 82:6 83:2,9
83:15

**mot** 14:22

**motion** 20:5,9,11,14
20:19,22 21:6,14,21
21:23 22:3,10,13
58:14 59:5 63:24
119:12 193:15
219:9

**motor** 14:23 15:2,5
15:7

**move** 63:16 119:9
154:8 176:16 177:3
177:9

**moved** 63:9,12

**moving** 64:13,15
88:2 136:18 162:2
180:3

**multiple** 66:14
77:19 127:7 169:5,9
169:12 201:10
211:13

**multitask** 137:24

**muni** 4:15,17,18,20
4:21,23,24 5:2,5,9
5:10 37:1 92:22
95:22 119:25 121:6
121:21 123:21
165:20 179:9
205:14

**municipal** 1:9 2:9
4:10,12 6:17

---

**n**

**n** 4:1 5:18 166:7

**name** 6:10 7:25 23:8
78:19 102:5 210:3
210:15 222:20

**names** 33:9 68:19

**near** 85:14 142:23
154:20 175:14

**nearly** 28:20

**necessarily** 40:7
41:10,14,20 153:13

**necessary** 61:16
103:13 172:13

**need** 27:9 30:8 43:3
46:23 56:25 62:17
68:24 115:3 122:25
153:11 193:5

**needed** 35:17 61:12
78:12

**needs** 64:17 198:8

**neither** 222:16

**never** 14:23 57:16
71:24 193:5 195:17
212:15 217:24
219:5

**new** 44:20 76:22
205:25 206:5

**night** 199:15

**non** 180:16 181:3

**nonresponsive**
119:9 178:18

**nooks** 61:22

**noon** 216:21

**normal** 179:12
180:19,20 218:3

**northern** 6:19

**notable** 40:23
213:12

**notations** 113:18,19

**note** 6:21 60:15,16

**noted** 44:3 116:13
116:20 185:19

**notes** 30:6,12,17,20
31:22 33:18 35:5
37:5,21 38:12 39:4
39:7 40:2,11 42:23
42:24 43:6,18,23

44:4,5,14 49:14,15
50:15 52:4,23 53:6
54:3,24 58:21 60:4
71:6 200:21 203:3
203:18 204:4

**notice** 11:7,11,13,20
131:3 138:3 143:14
152:10 170:10

**notices** 206:1

**noticing** 7:5

**notified** 78:1

**notify** 179:10

**november** 32:23
33:1,11 34:1 193:11

**number** 4:8 5:1
16:18 20:23 25:14
25:19,23,25 26:6,17
27:4 60:19 62:14,17
62:21 78:19 79:6,7
79:8,15 80:16 82:21
86:8 88:2 92:9,9
90:3 111:18 112:2
112:9,11,18 118:22
123:18 129:13
165:25 167:16
168:13 170:5,15,18
176:9 178:12 179:4
189:14 201:20
202:2 219:24

**numbered** 59:9
60:21

**numbers** 21:11,20
114:11 123:16
127:10 129:18,20
133:23 136:24,25
137:1

**numerator** 188:22
188:24 189:3
190:12

**numeric** 35:23
112:7 113:4 125:12

**numerical** 112:2
125:9

**o**

**o** 5:18 106:15,16
**oath** 8:15
**object** 13:25 19:4,16
28:17 47:23 50:17
51:6 70:3 75:24
113:23 115:22
117:24 119:12
158:16 186:19
192:23 193:20
212:10 215:24
**objecting** 215:21
217:7
**objection** 36:1 51:7
51:9 54:9,20 56:2
56:11 69:17 84:12
90:15 91:19 94:5
98:11 99:25 100:1
159:9 174:3 202:10
204:1 206:7 208:12
211:20 215:25
**objections** 7:3 50:23
51:3 158:21 193:21
208:21
**obs** 164:12,24
**observation** 5:5,10
22:13 28:22 38:16
41:25 58:14 59:6
65:19 66:6,10,19,25
67:10,14,19 69:2,4
69:9,15,19,22 70:1
70:8,9,11,20 71:3,7
72:22 74:2 75:5,13
75:16 81:16,17
84:19,23 88:4 93:18
94:16 100:23 102:6
106:20 107:8,21
111:24 116:2
119:24 123:22
126:10 127:1
135:18 138:15
144:4,6 154:13
155:19,24 156:8
158:11,15 159:15

160:12,22 164:14
165:7,15 168:1,11
171:16,23 175:13
175:24 177:21
178:9 180:13 181:5
185:2,3,4 187:1
188:12 189:7,10
207:10 209:14
210:1,5,17
**observational** 4:9
20:11,18 29:9,19
75:22 108:3 208:2,3
211:1,4,5,8,9,18
**observationists**
76:17
**observations** 5:7,8
24:25 25:2,5,9,9,14
25:15,19,25 26:6,9
26:10,13,22,24 27:1
27:2,5,8,12,14,15,19
27:21,23 28:4,12,14
40:3 42:21 43:13,16
63:6,17,21 67:4,6
67:12,15,24 68:5,7
68:9,10,21,23 69:7
69:16,23,24,25 70:2
70:13,21 71:17,18
71:22 72:4,5,21
73:8,18 74:3,13,24
76:9,12,13 78:4
79:1,13,20,24 80:1
80:15,18 81:4,9
82:8,17 83:1,7,11
83:14 84:9 85:15,20
86:11,14,15,16,17
94:9 95:3 96:12,13
96:14 97:20 98:9,13
100:5 101:1,2,5,7
102:12,13,16,23
103:20 105:4,21
106:22 108:13,15
108:25 109:9
113:13,17,18
116:17 118:13,15
120:2,18 121:18

124:11,15 125:3,5
126:23 136:14
165:11 166:5
167:23 171:18
173:9 176:9 178:1
180:22 181:17
184:20 185:1,20
188:25 204:15
205:12 207:6,8
208:1,15 211:19
212:6
**observe** 37:2 79:8
85:3 87:23 94:16
100:14,19,20 116:2
116:15 157:9 180:5
185:18 186:15
187:12,14 204:12
**observed** 42:7 43:2
78:7,10,19 80:21
82:5 83:13 84:10
85:7 87:12 95:2,16
100:11 101:3
104:17,22 107:12
107:17,22 108:4,8
111:12 116:24
121:16 158:9 170:7
173:8,18 174:2
180:16,24 184:15
200:3,5,16,17 202:8
207:12,23 208:6
209:10 210:12,21
**observer** 68:19
80:10 82:20 84:21
86:4 87:6,7 101:18
101:20,22 102:3,5
102:18 103:3 107:9
109:7 113:13 115:3
115:25 116:19
118:20 119:21
120:5 121:23
126:21 133:24
134:2,20,25 135:1,7
135:14,22,23 136:1
136:6,20 144:8,20
146:9,15 147:1,2,7

147:21 148:16,25
151:3,11,23 152:2,5
153:12 155:3,21
156:7,11,12,16,24
157:3,7,13,15,16
158:14,22 159:7,14
160:5,7,21,25 161:4
162:13,21 163:15
166:21 169:20
170:3,5,6,7,12,12,15
170:18,23 173:18
178:4 185:17
186:14 187:11
188:5,13 202:25
207:10,23,23
209:10
**observer's** 157:18
187:1
**observers** 63:8,10
63:13,14,19 64:6
67:11,16,20 68:8,13
68:17,21 69:5,8
70:13 71:4,17,22
72:3,20 73:17 75:14
75:19 76:23,24 77:7
77:10,12,16,23,25
79:18 82:5 84:2
85:1,25 86:2 87:5
89:6 92:6,8,10 93:1
93:17 94:3,8,14,18
95:1,14 96:1 97:14
100:18 101:9,13
103:8 105:4,21
107:3 108:11 110:4
110:17,22 113:17
113:22 114:1,10,15
115:5,6,20 116:1,3
116:5,12,14 118:8
118:11 119:1
120:19 121:16,24
122:4,12 126:8
127:2 132:6 136:15
141:10,12 147:14
150:15 155:24
158:6 167:13

Veritext Legal Solutions
866 299-5127

169:14 171:20
172:12 173:7,10
174:2,8 177:18,24
179:13 202:8,19
204:12
**observing** 63:9
79:11,14 80:8 85:3
87:6 95:6,17 103:10
107:4 180:8,15
212:7
**obstructions** 180:3
**obtained** 211:1,11
**obvious** 114:4
115:17
**obviously** 9:21
58:17 89:17 150:17
**occasion** 121:6
**occur** 8:20 41:1
97:20 120:7
**occurred** 82:17 83:1
83:8 84:3 101:14
120:7 149:16
165:15 207:19
**october** 29:17 66:3
66:11
**odd** 218:8
**offhand** 102:8
**office** 79:3 218:10
**oftentimes** 162:3
**oh** 9:17 25:17 44:23
52:13 57:16 74:8
75:6 100:25 107:25
114:5 137:3 142:20
145:23 147:12
148:20 151:4
164:25 169:3
171:13 182:20
183:25 186:23
187:19 188:9 197:4
197:6 203:13
216:24 217:7
**okay** 9:17,23 10:2,3
10:5 15:4,16 18:5
24:2 30:3 31:4
33:16 45:4 53:7

56:22 57:21,24 58:1
65:18 72:14,18
73:14 75:6 82:4
85:16 104:13,16
123:17 128:8
137:18 139:13,21
142:17 144:16
145:23 149:10
151:4 154:19 155:1
156:4 159:22
160:11 162:12
164:25 171:9
172:15 176:8 179:4
182:20 187:10,13
187:16 189:18
190:8,17 197:9
200:23 202:1 203:8
203:10 204:11
205:21 215:12
218:5 219:12
**old** 205:17 206:3
**omission** 162:24
**once** 17:16 46:15,18
46:24 47:2 48:21
69:11 76:18 137:23
**ones** 23:17,23 46:15
46:17 47:3,5,11
**open** 23:8 41:19
142:15
**operate** 37:1 91:16
**operating** 92:1,3
95:18 96:16 206:2
**operations** 34:25
35:16 37:14 38:6
80:7 179:9 213:2
214:9
**operator** 3:18 4:15
4:17,18,20,21,23,24
5:2,5,9 6:7 10:5,7
10:10 17:7,10 45:21
54:6,6,19 64:17,19
65:1 78:18 79:14
80:8,11,25 84:16,17
87:12 89:7 91:6,8
91:13 92:2,18 95:5

95:6,7,9,12 96:7,8
97:3,4,6,8,9,10,11
97:12,13,16 101:20
102:1,3,3,14,19
103:3 104:1,4
106:25 107:5,8,10
107:13,18 108:9
109:16,20 116:19
116:24 121:20
123:2,9 141:1
146:19,22,24 152:4
159:8 161:3,6,16
162:13,21 163:6
171:1,4 185:14,18
185:24 186:15
187:2,5,12,15 188:6
188:13,14 189:13
191:24 197:10,15
207:1,4 209:10,13
209:18 210:12,21
215:12 219:23
**operator's** 54:18
178:13
**operators** 4:9 14:25
26:17 45:7 46:5
47:8,16,21 48:10
53:12 56:9,15 58:15
62:20 78:9 79:4
80:19 81:13 82:22
83:4 84:9,25 85:7
86:17 87:22 88:2
89:10,16,19 90:11
90:13,19 91:25 92:7
92:16,17,23 93:22
93:25,25 94:10,20
94:21 95:16,18,18
95:22 96:2,6,13,18
96:23,24,25 97:5,17
98:3,7,19,19,20
99:7 101:8 102:17
103:16 104:17,21
104:23 105:5,10,22
106:4,10 107:4,11
107:15,16 108:7,13
108:16,18,25 109:9

113:1 116:4,7,11
118:6 143:2,10
161:25 162:23,25
173:8 174:21
175:21 176:9,10
177:18,20,23,25
178:5,8 179:6,10,15
179:19,23 180:5,12
180:15 181:2,4,16
182:2 183:3,9 186:1
189:14 190:19
192:1,1 196:9,11,15
196:23 198:16
199:7,14 200:3,5,10
200:14,15 202:3,8
202:20 203:14,15
204:13 212:7,16
213:12,15,18,25
214:4,11,21 215:3
**opinion** 85:5 182:8
**opinions** 125:23
**opposed** 19:17 89:8
131:10 132:5 147:8
217:20,21
**opposite** 177:2
**order** 30:22,25
40:25 71:25,25 72:2
125:1 148:21
150:14
**organizations**
180:23
**original** 56:23 67:18
69:4,8 71:13 126:14
126:17,21 127:5
152:13 169:23
190:5,24 191:5
201:5 222:13
**originally** 165:10
166:3
**outcome** 7:1 182:2
**outdated** 205:18
**outfit** 79:14 80:12
80:16,20 81:1 82:21
83:16 84:18 198:2
198:11,18

**outfits** 83:8,15
198:12 201:10
**overbroad** 37:10
69:17
**overcounted** 168:10
**overlap** 17:17
**overly** 117:14
**overnight** 14:13
**overtime** 120:1
121:14,15,20
171:17,19 173:8,17
173:21 174:1
**overview** 79:10
85:18
**owe** 217:16
**owl** 14:12

**p**

**p.m.** 2:20,20 6:2,8
10:9,9 17:9 64:22
64:23,23 65:2 104:3
123:5,6,6,10 171:3
171:3 197:13,14,14
197:16 207:3,3
215:14 220:2,9
**paddle** 59:15
**paddles** 203:14
**page** 4:2,8 5:1,19
18:1 32:23 40:17
41:18 44:21,25 45:3
50:11 53:8 55:25
56:21 57:22,25 59:8
59:9,10,10 60:17,19
60:19,21,21 74:11
78:2,2 79:9,25
85:13,17 87:16
100:4 102:11
104:10 106:17,20
123:16,21 127:9,10
127:15,16,19 130:3
134:19 135:1
137:16 138:25
139:3,10,12,19,20
140:11,13 142:16
142:19,21,22,23,25

144:7 145:5,7,12,23
147:17,18,20,22,24
148:2,17,24 151:2
151:14,16 154:18
154:20 164:10
170:11 171:7,11
175:14 177:12,14
191:19,20 197:21
197:24 199:1
201:22,23,24
205:19,22 210:7,7,8
212:21
**pages** 140:12 145:4
**paid** 219:5,9
**paperwork** 156:20
**paragraph** 79:11
85:18,23 104:9,11
104:14 171:8,12,15
172:3 173:4 175:5,7
177:11 181:8,13,14
182:15,17,18,19,21
183:7,14,19 184:3
184:10 185:6
186:13 188:16
190:10 197:21,22
197:24 198:24
199:1,12 212:23
213:8
**paragraphs** 79:10
175:4
**paralegal** 7:11
**park** 90:7 91:7
94:12,23 131:20
136:5 141:1,19
142:4,10 143:10
152:25 153:1
155:10 161:5
174:21 175:1
213:13,15,23 214:3
214:5,18,21,23,25
215:3,6
**parked** 142:13
143:17 144:5 161:7
**parkers** 93:24

**parking** 91:3,4
141:8,15,20,21
143:7 144:21 152:6
152:15,16 153:4,5
153:24 154:2,7
156:19 174:9,10,13
174:15,19 175:3,5
190:19,25 191:1,2
192:5,21 193:18
194:12 212:7,17
213:1,6,10 214:15
**part** 13:19 19:10
35:12 38:20,24 40:3
40:4 41:6 59:21
68:18 69:3,20 82:17
97:5 113:10 116:5
117:7,11 146:11
152:12 157:20
174:7 190:20
194:13 208:14
**participate** 111:5
**participated** 119:1
**particular** 11:20
35:20 48:8 60:13
78:18,21,24 85:1
87:12 99:8 100:17
113:6 114:21
115:12 118:20
119:5,22 130:15
131:4,4,5,7 144:3
152:4,14 154:13
161:1 166:10
167:12 187:1,9
196:1 200:2,2 210:4
**particularly** 23:10
116:10
**parties** 6:22
**partner** 7:10
**parts** 19:24 39:4
**party** 6:25 16:13
222:18
**pasted** 19:25
**pause** 45:22
**pay** 216:5,10 217:8
217:8,9,10,19,23

218:2,4,10,14,22
219:13
**paying** 218:16
**payment** 216:2,17
**pejorative** 36:2
90:24
**penalties** 221:12
**penalty** 8:13
**pending** 10:13,14
13:21 17:23,24
55:14 93:10 160:1
212:1
**people** 16:11 30:10
64:12 88:12,22
137:23 154:7
175:20,23 176:15
176:16,21 177:3,9
206:22
**percent** 21:9
**percentage** 21:24
25:8,15
**perform** 24:24 25:1
25:4 89:23 92:11
113:6 118:12
155:18,23 180:25
186:1 187:5 199:7
212:6
**performance** 179:11
**performed** 80:25
102:23 113:1
114:21,24 172:4,21
179:24
**performing** 82:22
95:23 109:18
180:16,19 181:3
185:18 186:15
187:12,15 188:6
192:5
**period** 28:1,3,4,15
28:20,21 58:11,24
67:24 72:3 101:11
129:17 133:11,13
133:25 137:7 138:3
138:21,23 149:24
150:5,7,9 166:24,24

Veritext Legal Solutions
866 299-5127

167:3 199:5,24
200:2
**periods** 84:23 86:25
87:2 180:4
**perjury** 8:13 221:12
**permanent** 93:23
**person** 40:4 44:15
46:9 51:16,17 58:22
59:2 79:2,5 153:9
158:18 170:21
192:17 209:11
214:13
**person's** 45:16
**personal** 104:20
109:2 152:23,25
153:5,13 154:1,8
**personally** 19:13
23:1 24:24 25:1,4
25:10,20 26:24
27:14,22 36:15
43:19 118:12
122:14 172:25
173:2 180:14 207:9
208:16,17
**perspective** 38:2
**pertains** 222:12
**phone** 137:3
**phrase** 192:14,15
**phrased** 47:24
**physical** 36:16
64:11 180:3
**physically** 22:15
115:21 116:1
**pick** 6:23 29:7 79:5
79:7,14 80:20 85:2
90:2 203:14
**picked** 80:16 82:21
83:16 86:17,19 87:2
87:11 153:5
**picking** 80:25 83:7
83:15 89:4
**picks** 80:11
**pickup** 59:16
**pickups** 83:21

**piece** 42:2 153:11
157:22 195:12
**pieces** 68:3
**place** 6:22 69:11
84:24 214:15 222:5
**placed** 201:3 202:6
**placement** 201:6
**places** 201:11
**plaintiffs** 1:7 2:7,17
3:3 5:11 6:13 7:8,12
9:7 11:6 13:12,18
13:24 14:6 15:10,25
16:14 17:16 18:3,7
18:8,25 19:12 22:1
22:11,12,14,21 24:1
24:3,23 25:3 26:5
30:2,22 33:15,18
34:5 66:10,18 70:11
70:15 71:1 82:14
181:15 182:16,21
183:15 189:19
190:2,18 191:9,16
191:22 193:17
197:20 198:25
200:22 203:7,18
208:8,19 210:6,8,25
211:10 212:4
**plan** 78:11
**planning** 17:21
29:24
**play** 19:9 92:23
186:1
**plays** 14:25
**please** 6:21 7:4,25
10:13 15:22 16:22
17:6,22,25 23:19
36:12 44:21 45:2
50:22,23 51:8,9
53:7 56:20 57:10,22
59:8 73:25 87:13
93:9 100:3 104:6,8
115:17 119:11
127:14,19 130:1
138:25 140:11
142:14,15,18 145:3

145:11 147:16
154:14,18,24
159:25 164:10
171:6 177:12
191:19 194:23
195:3 197:19
198:20,24 200:20
200:21 203:2,7,12
205:4,22 211:25
220:4
**plus** 46:14,17 48:20
185:6,6
**point** 17:17 23:17
26:9,21,23,25 35:1
36:11 53:22 54:6,13
54:13,18,25 55:1
59:18 66:24 67:2,3
67:5,8,15 68:4,7,10
68:22 69:7,24 70:17
70:19,21 71:9 74:2
74:3 76:12,13,25,25
80:4 85:1 101:5,7
104:18,25 105:15
106:18,23 107:7,8
107:21 108:16,18
109:1,10,17 122:12
128:6 131:13 141:1
152:9 164:20,21
165:4,6,6,15 183:17
184:16 198:14
212:9
**points** 18:14 56:24
68:5 71:6,19,23
72:4,21 73:18 74:14
80:5 101:9 102:12
102:17,24 103:1,6
105:4,22 106:16,22
108:5 116:18
165:13 175:15
183:10 186:3,17
**policies** 69:10
**policy** 206:16,23
**population** 182:13
199:4,23

**posed** 38:14 39:6
**position** 16:14 34:24
89:8 97:16 185:17
186:15 187:14
188:5 207:11
**positioned** 63:11
159:15 160:7,21
**positions** 90:12
93:21
**positive** 184:14
**possibility** 61:1,14
186:14
**possible** 17:18 39:8
39:10,20,22,25
57:12,15 87:22 88:3
92:8 95:25 96:10,22
103:2,23 104:23
106:6,7,13 122:3
125:21 126:2
132:21 143:16
144:3,7,20,24 153:6
153:7 154:7,10
168:5 173:25
178:14
**possibly** 50:21 71:24
143:3 148:2
**post** 63:10,12
204:17
**posted** 63:15 198:3
198:11,18 201:2,14
203:21 204:24
205:1
**postings** 45:8 46:6
47:9,16 48:10,17
**posts** 46:19 63:10
78:24,25
**potential** 62:9
**potentially** 62:24
64:14
**potrero** 32:22
**powell** 2:18 6:14
**powerful** 120:3
**practice** 34:19 39:16
41:23 69:15 70:1
218:4

practices 35:2,21
pre 124:9
precisely 117:15
precision 160:7
preference 63:23
64:2
prejudice 17:18
premises 100:25
140:15 154:21
preparation 10:20
prepare 34:14 49:17
49:20 50:4
prepared 191:11
presence 16:5
175:17 179:21
present 3:16 16:17
17:14 65:14 143:25
192:11,20
presidio 72:23
148:12,19 156:9
157:14 160:12
203:3,4,17 204:9
presumably 58:6
presume 13:8 216:3
pretty 28:21 84:6
89:18
prevent 176:10,12
previous 29:1 77:3
98:23 119:14
212:24
previously 11:6,24
15:8 207:25
printed 33:24
127:15,16
printout 18:4,7
147:18
prior 20:14 29:19
59:2 74:4 90:20
120:14 132:2
134:12 136:11
166:17 206:1,4
222:6
private 6:24
probably 21:8 30:15
37:17 56:19 60:14

66:2 126:11 142:4
153:3,8,20 189:21
202:11
problematic 62:6
64:1
problems 218:16
procedural 205:14
procedure 174:12
206:23
procedures 36:18
36:20 37:3,8 75:13
75:17 142:9 143:13
213:4,6
proceeding 7:3
proceedings 222:4,6
222:8,14
process 29:10 40:17
53:12,15 85:10
86:21 87:6 112:4
115:4 141:25 142:7
143:15,19,21 144:2
169:3 192:12
193:13 213:3
processes 143:23
213:11
produce 11:14
produced 11:25
12:16,20 50:7 68:18
69:19 70:8 73:5
127:6 189:23
190:14
producing 11:22
12:5 124:20
production 13:5,19
50:6 123:25 124:21
205:15
professional 85:5
192:17
program 115:1,5
130:24 133:15
138:22,24 166:25
project 12:9 69:20
95:22 125:16
prompted 211:19

proper 36:8,10 51:7
51:10,11
property 59:14
64:15
proposed 191:22
protocol 5:5 65:19
66:10,19,25 67:5,10
67:15,19 69:2,5,9
69:20,22 70:8,9,12
70:18,20,22,24,25
71:4,16 75:5,13,15
75:20,20,22 76:4,15
76:24 77:8,9,13,15
77:25 78:22 79:18
86:2,10 89:12 95:17
95:20 106:20 116:5
118:25 141:10,12
147:15 157:10
163:21,22,25 164:2
164:3 175:13
188:11 207:17
protocols 69:15 70:1
119:3
prove 191:22
provide 16:16 25:8
34:24 37:14 61:16
67:16 105:16 112:2
199:6 200:9 208:6
209:2
provided 13:18
21:12 24:12 34:13
37:25 45:14 67:11
67:20 76:22 85:24
103:9 113:19 124:3
124:16
provides 111:11
171:21
provision 9:19
public 9:11,22
publiclawgroup.c...
3:14
pull 53:19 62:24
85:21 89:9,25 90:5
90:9 91:12 97:17
142:1 143:3 151:2,8

151:9,23 152:7,8
164:6 213:18,25
214:10,12
pulled 86:12,20
96:20 97:17 107:10
133:19 141:4
149:22
pulling 87:5 89:4
154:5,9 192:3
pulls 150:1 214:14
purple 145:4
purpose 35:15,22
42:13 95:21
purposes 23:16
185:20
pursuant 5:12 11:11
put 33:9 34:11
41:16 50:5 52:11,18
57:6 60:25 74:16
184:19 216:1
217:18 219:9
putting 60:23 216:9
216:14 219:6

| q |
| --- |

qualitative 112:6
quality 61:16
question 10:13,14
13:21 17:23,24 19:5
19:19 26:19 28:18
28:25 29:1,3 36:2,3
36:5,10 39:9,10,10
39:18 40:15,18,18
40:18 41:17 42:14
42:18 45:3,10,24
46:5 47:8,16,19
48:10 49:3 50:18
51:7 53:8,19,20,21
55:14,19,21 56:21
69:22 70:4,5 76:3
77:2,3,5,22 81:22
81:24 90:21,24
92:24 93:9,10,14
97:22 98:15 99:1,3
99:12 100:2 105:17

113:24 114:3 118:1
119:11,14,16,19
120:14 121:9
130:23 156:6
158:17 159:18,25
160:1,3,15 176:14
177:7 178:20,23
180:11,11 183:20
184:2 189:15
192:24 193:21
194:18,23 195:3,9
195:13 202:5
203:11,13,17
208:14 210:18,19
211:24 212:1
214:19 215:7,8
**questions** 34:11
37:17 38:2,13,18,22
39:5 41:5 44:12
45:6 49:10 50:11
51:4,11 53:10 56:20
58:3,10 98:23,24
120:14 160:3
200:13
**quickly** 176:16
**quite** 15:1 37:16
46:22 83:24 86:9
106:12 127:6
**quote** 12:19 104:17
171:15 177:17
181:16 191:21
198:1 199:3 205:23

**r**

**r** 5:18 10:15,17,19
**radio** 136:19
**rail** 5:13 14:18
205:24 206:2
**raising** 219:3
**ran** 183:9
**random** 85:6,9,10
87:23
**randomly** 84:10,13
86:17

**range** 78:16 82:9
191:23
**ranged** 82:8
**raw** 5:10 12:10
108:22 123:22
124:1
**reach** 57:8 181:22
**reached** 190:10
**read** 10:13,14 17:22
17:24 26:18 28:25
29:1 44:12 45:8,25
46:6,11,15,18,24
47:2,2,9,16,20,21
48:10,17,19,21 49:4
49:8 77:2,3 91:24
92:21 93:8,10
119:10,14 142:11
159:25 160:1
176:25 191:21
192:16 193:16
205:23 211:25
212:1 221:6
**reading** 50:15 127:2
141:7 206:16
**reads** 87:21 177:17
**ready** 29:12,21,25
215:22
**real** 88:20
**realities** 88:1
**reality** 153:8 180:1
180:9
**realize** 180:24
**really** 23:7 39:13
48:20 62:1 76:2
83:23 93:12 99:2
117:14 118:5 127:5
146:18 154:10
167:11 168:7 172:6
179:1 182:8 188:21
195:24 198:15
200:12 209:12,15
209:22
**reason** 27:22 28:12
28:14 29:5,18 35:3
37:19,24 105:16,18

120:11 121:22
122:9,16 138:6
147:2 198:21,23
204:5
**reasonable** 117:8
**reasonably** 116:18
**reasons** 16:18 63:25
**rebuttal** 4:11 24:3
25:3,13 26:5,8,23
27:3,7,13,23 28:2
35:10 49:24 124:9
124:11,15 142:14
142:19 174:19
190:6 201:18
204:15 212:6
**recall** 13:4,14 15:7
18:20 30:15 33:20
34:15 48:6,14 66:23
68:11 70:16 71:5
83:21 84:6 92:25
102:8 109:13
110:15,16,22,24
125:11 191:18
196:11,14,22
202:15 211:17
**receive** 18:11
112:18
**received** 18:9,10,18
22:23,25 23:2,5,10
46:14 48:12 65:8,11
69:1 86:2 94:3
112:23 113:3,7,9
126:16 210:24
211:18
**receiver** 198:10,19
198:21 204:11
**receiving** 203:21
204:9,17
**recess** 10:9 17:9
64:23 104:3 123:6
170:25 171:3
197:14 207:3
**recognize** 14:2,3,8
14:17 23:18 127:10
137:23 205:15

**recognized** 62:19
**recollection** 13:23
50:15,19 51:25 53:1
94:2
**record** 6:8,23 7:7
8:1 9:22 10:4,6,7,10
13:2,7 16:2 17:5,6,7
17:10 39:17,21,24
42:15,16 43:11
45:19 63:19 64:18
64:22 65:1 92:6
104:1,4 105:5,22,25
109:19 114:15,19
114:20 115:14
116:13,14 118:20
119:21,25 120:5
123:5,9 130:3 132:7
132:8 133:24 134:9
137:5,20,25 147:3
157:4,17,24 158:14
166:10 171:1,4
174:8,10 180:6
181:12 197:9,13,15
206:25 207:1,4,15
215:14,16,20,25
216:1,10,14 217:18
217:22,25 218:15
219:7,10,22 220:2,5
222:7,10
**recorded** 6:9 81:1
92:8 96:11 105:9,11
112:1 113:1,15
114:16,16,18 118:9
118:11,15 121:24
122:19 132:11
134:20 135:22,24
136:1,6 145:8,13,16
149:12,14 152:1,5
166:21 170:6
171:19 174:13
183:7 188:1,15
208:7,25 210:9
**recorder** 133:25
134:6 135:10
136:19 159:7

Veritext Legal Solutions
866 299-5127

recording 6:21
80:11 85:20 122:5
132:6 134:4 136:9
140:7 157:18 158:2
161:9
records 5:10 100:10
102:7 111:24 116:9
120:1 121:6,14,19
122:14 123:22,25
127:3 133:18,21
134:2,7 135:14
146:15 150:1
171:20 175:8,9,10
186:6,7 188:12
189:6 208:3
reduced 177:25
reduces 177:19
refer 15:14 49:11
72:12,16 73:15
164:13 165:9,18,24
166:2,7 167:9,21
173:4 175:8 197:19
203:2 205:19,22
reference 15:14
123:16
referred 13:7
152:22
referring 43:6 46:23
47:3,4 49:2,23,25
52:6 60:17 72:10
74:25 85:17 95:20
101:4,19 148:8
149:2 150:22
153:19 169:21
183:14 184:7
199:13 202:15
204:14
refers 46:24 47:20
153:25 166:11,20
166:24 167:3
reflect 49:2 66:18
67:5 73:16 114:1
125:2 129:13 169:2
170:4

reflected 37:21 44:4
58:20 60:4 70:14
133:13 137:7 180:6
183:18 184:10
185:5 186:12 190:9
193:16 206:5
reflecting 67:15
reflects 38:12 39:4
40:3,5 41:7 43:18
72:20,22 74:12
164:15 168:19
reformatting 31:25
refresh 13:23 49:12
49:15 50:14,19
51:24 53:1
regard 160:21
regarding 11:17
46:19 71:6 83:14
173:21 206:4
regardless 217:1
related 6:25 12:12
76:12 150:12
relative 222:17
relevance 210:13,18
214:22
relevant 23:11 34:9
69:12 111:19,19,21
126:13 157:23,25
158:1 209:15,19,20
209:23,23,25 210:4
210:16
reliably 88:15
relied 25:9 26:7,22
35:22 193:25
relief 26:9,21,23,25
53:22 54:6,13,13,18
54:25 55:1 67:5,8
67:15 68:4,7,9,22
69:7,24 70:17,21
71:6,9,19,22 72:4
72:21 73:18 74:2,3
74:14 76:11,13,25
101:2,5,7,9 102:12
102:14,15,16,24
103:6,9 104:18,25

105:4,14,22 106:16
106:18,22 107:3,7,8
107:11,16,21 108:4
108:7,16,18 109:1
109:10,17,18
164:20,21 165:4,5,6
165:13,15 166:5
relies 113:12
relieve 67:3 107:6
relieving 107:13,18
108:9
rely 35:8 38:7 60:7
118:8 119:7
remember 15:4,6
18:14 48:23 67:9
76:20 109:3 155:25
211:15
remove 155:7
renne 3:11
repeat 55:15 98:22
118:4 159:23
172:13 194:18,22
195:3 208:13
report 4:11 15:12,15
15:19 18:24 19:1,10
19:11,12,14,20,22
19:24 20:1 22:22
24:4,23,25 25:3,5,7
25:13,19,20 26:1,2
26:4,5,7,8,23 27:3,6
27:13,24 28:2,2
29:16 32:24 35:10
35:11 49:23,24 67:3
68:15 70:14 73:9,10
75:23 82:14 83:8,12
83:14 84:2 87:13
90:8 92:15,21 93:20
100:11 104:9 107:2
107:23,24 108:4,7
108:15 111:16
113:12,21 114:1
142:14,19 144:1
171:7 173:4 174:14
177:11 181:8
182:24 190:18

191:2 201:6,18
205:13 210:24
211:1,11,18 212:2,6
212:24
reported 1:23
reporter 2:23 6:5,11
10:12 17:22 28:24
36:11 64:25 72:8,25
77:1 109:22 119:10
123:8 159:24
170:25 191:7 205:7
215:10 220:3 222:3
reporters 64:2
reporting 205:24
215:23
reports 49:22 118:8
124:22 125:17,24
191:24 192:8
211:13
represent 7:14
13:17 18:2 73:4
129:16 169:5,8,12
169:17 191:10
representation
112:7
representative
191:25
represented 113:3
130:15 183:8
representing 21:25
represents 7:11
129:7 185:23
request 6:12 17:16
55:15 98:23 124:21
requested 12:13
222:15
requesting 219:15
requests 170:25
required 61:23
62:13 157:10 192:8
requirement 178:7
requires 22:5
research 2:17 29:11
35:13 61:7 65:14
119:6 205:13

Veritext Legal Solutions
866 299-5127

**respect** 26:21 27:2
28:1 30:17 37:3,7
38:24 48:9 50:9
58:9 60:8,24 81:4
81:16 83:7 86:16,22
88:17,25 93:18 98:9
100:5 129:5 149:17
173:3 201:1 207:6,8
**respond** 98:12
**responded** 41:21
46:9
**responding** 99:24
**response** 38:13 39:5
40:14 43:3 45:14
46:13 47:8,18 48:12
48:23,23 50:11
53:18,20,21 54:25
120:14 185:9
203:11
**responses** 37:17
38:17 49:10 58:2
203:17
**responsibility** 90:23
**responsive** 11:20
**restaurant** 209:11
209:12,13,21,21,22
210:4,10,11,15,20
210:22,23
**result** 177:21 178:1
178:9 180:13
181:18
**results** 125:7,23
132:24
**retain** 67:22 69:15
70:1
**retained** 10:22 16:7
21:25 22:11 29:17
29:20,23 66:3 69:12
219:25
**retention** 69:10
**retrieve** 136:18
**retrospective** 59:5
**return** 17:19
**returned** 101:10

**returning** 192:7
213:3
**revenue** 90:1 92:12
213:19
**review** 23:1,6,14,15
34:8 41:16 49:15,17
49:20 52:4,22 60:14
78:22 101:24
172:11,25 196:8
202:20 207:15,19
222:14
**reviewed** 19:21 34:7
49:22 50:4,5 116:7
117:17 118:24
119:2 121:14
122:14,15 150:14
150:16,18,21
171:17 173:2
180:22 191:12,13
194:5 196:4,12,18
196:20,23
**reviewing** 116:9
117:16 122:19
127:2 196:15,19
206:4
**revise** 67:21
**revised** 67:16
205:20
**revisions** 32:15 66:2
**ride** 155:15 163:2,14
163:16,18 164:7,8
**riding** 104:20
109:10 163:4,23
**right** 13:3 16:10
20:4 21:2 23:24
36:6 45:21 51:20
52:17 55:9 57:5,20
71:2 87:10 96:24
103:12 108:2,2
125:6 126:11,15,19
127:11 128:21,22
129:2,9,12 132:1,14
133:22 136:3 137:9
139:9,11,19 140:1,2
140:14 145:7,20

146:6,16 147:11,16
147:19 148:7,8,14
148:23,24 151:8,9
164:17 170:9
179:20 183:24
184:12 186:2 187:7
187:7 189:1,17
192:14 193:8
194:24 200:20
202:2,4 203:5,6
210:18 211:13
215:1,7 216:22
218:24,25 219:18
**rlf** 165:6 166:6
**rode** 156:19
**role** 14:24 91:25
92:2,4 96:8 97:12
**roles** 38:9 92:15,17
92:20,23 93:21,23
93:25
**rollnick** 18:18,21
**room** 15:24 16:21
17:15 59:16 64:13
82:11,23 83:4 84:17
84:18 154:8
**rooms** 81:5,9,13,18
82:6,13,18 83:1
**roughly** 20:25
**route** 92:19
**row** 72:13,17,19,22
74:1 131:7,16,20
132:2,10,16,17,25
133:1,17,17 136:4
136:18 139:14,22
140:23 141:22
144:22 146:4 149:3
149:11,16 152:17
**rows** 132:19,25
**rule** 5:12,13 16:19
191:24 205:23
206:3,5
**rules** 16:16 206:18
206:21
**run** 14:13 54:18
78:15 79:6,7,8,15

80:16 82:21 83:24
83:25 86:8 89:24
92:3,9 95:24 96:8
96:20 97:18 103:10
103:23 109:18
128:12 165:5,23,25
218:17
**running** 21:12 197:2
**runs** 91:17 92:11
96:16,16,19 101:8
107:11,16 108:7
109:20 128:10
192:2 199:14

---

**s**

**s** 4:7 5:18,18
**safety** 46:15,17,20
47:3,5,11 48:20
**sakai** 3:11
**sample** 78:17 183:3
192:1
**sampling** 78:11
87:24 103:5
**san** 1:9,10 2:9,10
3:13 4:10,12 6:17
**sansome** 3:12
**sas** 130:14,21,24
133:9,19 136:25
140:8 149:25 150:1
150:8
**saturday** 165:21
**saved** 71:15
**savemart** 10:15
**saw** 41:20 43:16
60:13 109:5 113:13
141:13
**saying** 15:5 25:14
33:10 36:13 47:1
48:12,13 54:5,17
83:23 88:25 96:15
113:20 121:13,17
121:22 157:11
178:17 186:18,25
218:19

Veritext Legal Solutions
866 299-5127

**says** 29:16 33:24
42:1 43:15 45:15
46:16 47:13 54:12
54:25 55:9,10,25
79:12 80:6,10 85:23
106:6 123:21 128:1
128:14,23 129:3,9
129:12 135:23
138:2 139:12
140:15,23 141:14
141:18,22 143:14
144:9 146:4 148:12
148:24 149:4 151:2
151:9 152:17 153:4
153:23,23 154:2,21
154:25 155:6,10,12
155:15 161:5,12
163:1 164:12,19,23
165:8,17,23 166:1,7
166:11 170:3,17
198:10 204:21
205:20 210:22

**scattered** 102:25

**scenario** 64:16 91:5
186:11 187:17

**scenarios** 214:7

**schedule** 53:3
101:24

**scheduled** 215:10

**scheduling** 27:25
77:25

**scheme** 111:22
112:5,6,22 152:10

**science** 119:6

**scope** 193:7 195:19

**score** 183:9

**se** 161:3

**seat** 162:3,4

**second** 10:17 14:21
48:22 78:2 79:12,25
106:22 125:14
133:25 135:11
145:18 146:24
170:11

**seconds** 129:14,15
129:17,20,22,23
131:18,24 133:13
133:16 140:3,6,7
147:5,12 149:14
167:25 168:2
183:18 184:5,7,9
188:18 190:9

**section** 42:18 78:3
79:10 80:1 85:18
106:21 171:14

**sections** 19:24 39:18
41:3

**see** 16:25 38:16
40:13 44:13 50:21
57:2 59:1 74:9 79:5
79:8,14,16 80:6,9
80:13 85:21 86:7,8
89:9 91:8 92:2
94:17 95:12 105:13
105:14 106:17,25
113:22 114:2
115:21 116:1 117:3
118:19 128:2,3,25
132:9 134:5 136:8
137:14,16,17 138:1
138:7 139:7,16,24
140:16,21,24 141:7
142:25 143:18
144:17 145:14,17
146:1 149:6,11
152:21 155:1,4,8
156:9 157:4 158:22
158:23,24 162:1,2,5
165:1,11 167:23
169:23 173:1
188:14 189:6,11
193:11 198:4
202:25 203:19,22
218:11 219:2

**seeing** 13:14 15:7
156:1 202:15

**seen** 11:8,9 13:9,23
14:23,25 15:1 40:22
91:3 94:16 174:18

**seconds** 191:14,15 193:5
195:17,22 205:9
206:12

**sees** 157:19

**select** 88:4

**selected** 78:10 84:10
84:15,18 85:12

**selection** 85:6,10

**self** 60:15,16

**send** 216:3,15 218:3
218:9,12

**senior** 37:13 38:3,5
38:9

**sense** 36:25 76:3
85:10 91:15 97:6
113:15 172:21
185:10

**sensitive** 6:23

**sent** 196:10

**sentence** 79:12,22
95:21 106:24
192:16 195:11
198:9

**separate** 43:10,15
165:21,22

**sequence** 213:9

**series** 32:14 155:2

**seriously** 44:2

**served** 34:18

**service** 92:12 165:4
165:17,19

**serving** 89:8

**session** 116:8

**sessions** 68:16

**set** 42:9 107:6
115:14 125:20
165:13 222:5

**sets** 125:13

**setting** 200:24

**settlement** 9:18

**seven** 26:11 27:8
34:16 49:5 68:24
217:3,6

**sfmta** 18:9 20:8,10
60:9 66:3 78:6 89:8

**seconds** 90:13 171:17 206:3

**sfmtas** 22:15

**sgt** 3:8

**shared** 198:16

**shattuck** 3:6

**she'd** 58:5

**she'll** 218:9

**sheet** 40:22 74:23
112:23

**sheets** 39:21,25

**shift** 53:11,23 54:6
54:14 55:1,1 78:4,6
79:1,12,20,21,23
80:7,18,21 81:5,10
81:14,16,17 82:2,8
82:16 83:5,6,11,13
84:3,8,9 85:7,14,19
86:14,15,16,23 87:1
88:17,18 89:1,1
91:12 97:20 100:5,9
100:21 101:4,7
102:16 106:22
107:4,7,21 108:18
109:20 160:12
161:22 166:4,4
206:4

**shifts** 78:9 83:24
100:14,15 108:5,12
199:8

**short** 45:22 123:1
206:24

**shorter** 66:22

**shorthand** 2:22
222:2,8

**show** 126:17 177:8
182:7 188:7

**showing** 11:5 13:11
15:9 23:25 65:16
73:12 109:23
123:13 139:5
148:23 191:8

**side** 21:25 41:15,17
46:15,17 47:3,5,11

**sided** 127:15 147:18

**sight** 179:19,23
188:13
**sign** 203:21 204:11
**signable** 93:22
**significant** 37:7
77:24 125:22
**significantly** 177:20
177:25 213:1
**signs** 89:18,20
**similar** 37:18
**similarities** 36:23,25
37:2,4,7
**similarly** 1:6 2:6
**simply** 22:4 29:20
62:13 136:10 164:8
168:19 188:21
**sit** 16:25 41:12
62:25,25 103:3
**site** 30:6 35:12 38:15
39:11,24 40:8 42:2
42:4,5 49:5 53:3
196:5
**sitting** 13:3 52:17
105:1 162:3 171:25
198:6 199:9
**situated** 1:6 2:6
162:4
**situation** 59:19
**six** 28:21 49:5 68:24
**size** 127:7
**sketch** 59:25
**skill** 119:7
**slight** 31:25
**slightly** 33:3,7,14
41:2 79:21 116:22
184:1
**slip** 121:20 174:1
**slips** 171:19 173:17
173:21
**sloan** 3:11
**slow** 59:25
**slower** 177:4,9
**small** 152:24
**smes** 34:19 37:12

**smoking** 180:17
**snapshot** 199:14
200:16
**social** 119:6
**solutions** 3:20 6:12
220:1
**somebody** 64:13,15
142:13 162:15
**soon** 80:11
**sorry** 14:7 15:3 46:3
80:8 81:8 91:9
107:15 128:4,4
136:19 139:2,17
144:16 147:24
151:13 159:22
163:25 170:5
182:17 183:25
194:17 197:6,22
201:20 208:13
211:3,7,23
**sort** 59:24 117:9
144:11 148:6,14
161:22 190:23
**sorted** 72:5,11
**sounds** 21:2,19
77:17 219:2
**source** 52:22 171:21
173:15,16,22
196:25
**sources** 173:14
**space** 41:15
**speak** 44:2 208:24
**speaking** 50:23 51:3
60:8,10 117:13
134:16 214:8
**specific** 33:20 86:25
112:25 126:4 175:4
178:6 181:19
211:12 212:3 213:6
214:7,15
**specifically** 12:12
18:11,14,19 22:19
43:1 48:14,24 68:4
68:7 71:7 76:8
84:22 100:8 111:3

113:2 117:4 120:1
121:19 142:25
178:22 179:5 181:6
187:21 191:4
196:11 197:21
200:8,15 202:16
204:14 210:25
**specifics** 35:20
60:10 90:9 98:5
150:11 195:20
**specified** 58:5 89:11
**specify** 109:4 178:3
190:25
**speculate** 13:15 14:8
145:1 156:13,14
160:13,14,15,19,23
193:6 195:24
**speculating** 154:11
154:12 158:18
159:5
**speculation** 54:10
54:23 56:12 75:25
96:3 144:23,25
159:10 160:17
163:11,20 202:11
204:2
**spellberg** 3:11 7:13
7:13 9:13,16,18,22
10:2,4 11:23 12:22
13:6,16,21,25 14:7
16:2,6,10,23 17:2
17:12 18:12 19:4,16
24:16 28:17 31:1,3
36:1,6 37:9 44:25
45:19 47:13,23
50:17,24 51:5,13,16
51:20 52:2,12,20
54:9,20 55:5,8,17
56:2,11 57:4,15
69:17 70:3 75:5,24
81:21,25 84:12
87:17,19 89:13
90:15,22 91:19 93:3
93:6,11 94:5 96:3
97:22 98:11 99:2,16

99:20,24 100:7
113:23 114:6
115:22 117:24
119:12,18 120:8,20
120:23 121:4 122:6
123:18 128:3
134:22 139:8,13
140:13 142:21
144:10,14,16,23,25
145:19,21 147:24
148:3,6,10,13,20
149:8,10 151:5,7,11
151:15 155:21
156:14 158:16
159:9,16,20 160:8
160:14,18 162:8,18
164:18 171:10,13
174:3 176:18
177:15 178:16,20
179:1 182:17
186:19,24 192:23
193:20 194:2,22
195:1,5,8 197:22
202:10 203:9 204:1
206:7 207:13,24
208:12,21 209:4
210:2 211:20
212:10,18,22
215:16,20 216:9,21
216:24 217:5,14,21
218:1,5,9,14,19,23
219:8,12,16,19,21
220:4
**spend** 27:14 95:23
190:19 196:19
212:7,16
**spending** 180:19
200:10,14,16
209:18
**spent** 27:5,12,18
36:15 114:8 115:19
117:20 141:21
146:9 152:5 163:22
174:9 180:14
181:18 182:5 183:3

Veritext Legal Solutions
866 299-5127

183:9,11 185:12
192:21 194:12
**spit** 133:20 150:3
**split** 109:18 138:16
**spoke** 198:22
**sporadically** 40:22
**spot** 153:4,5,24
154:3 157:22
**spots** 61:25 62:9
**spreadsheet** 74:19
**square** 61:20
**sta** 166:3
**stack** 57:13,17
**staff** 18:19,19,22
94:14 215:23
**stairwell** 146:7,10
146:11,14,19,20,21
146:23,25 147:1,4,6
147:8 156:21
**stamp** 127:24
128:20,23,23 130:6
131:21 139:15
140:1
**stand** 23:23 171:25
177:22 199:9,19
**standards** 101:13
**standing** 203:1
**stands** 165:6
**star** 59:11
**start** 29:6,14 30:13
78:3,6 79:1,3,13,20
79:23 80:6,7,10,18
80:21 81:5,10,14,16
81:17 82:2,8,16
83:5,13,24 84:3,8,9
85:20 86:22 87:6
88:17 89:1 91:12
100:14 102:16
106:22 108:5,18
121:9 132:7,11
133:2,16 134:1,2,7
134:9,20 135:14,17
135:17,24 136:9
140:5 145:19 149:5
149:17 151:3,11,17

151:23 154:5 155:3
166:3,4,11,12
167:14 184:1
216:21
**started** 29:12 66:6
71:17,20,22 72:21
74:13 80:15 86:12
102:17 107:8
111:17 195:9
**starter** 79:12 85:7
90:7 91:1,7,8 92:4
92:16,19 94:11 95:5
97:8,11,12 107:7
143:17,25 144:4
213:22 214:3
**starters** 91:2,3,11
91:15,17,24 92:11
92:14 93:19,24 94:4
94:19,22,23 96:2,6
96:12,15,16,18,24
142:10 143:4 175:1
**starting** 29:7 31:5
81:14 108:11
109:17,20,20
145:16 170:11,11
194:19 199:2
**starts** 38:21 79:11
106:24 139:22
155:3 191:20
**state** 7:4,25 11:3,4
51:9 104:17 144:1
183:7 221:13 222:3
**stated** 55:20 121:19
183:3 198:10 221:9
**statement** 47:6
53:22 54:12 59:11
60:6,24 85:19 88:16
98:25 104:14
126:14,15,18,18,21
126:22 138:1 143:2
169:23 175:14
177:22 181:16
183:1 192:9,20
193:16 198:1,8,14
199:3,10,12,19

203:25 209:16
217:25 218:8
**statements** 51:12
55:15 105:2 111:23
121:18 122:16
150:19 169:24
172:1 207:18
**states** 1:1 2:1 6:18
171:15 213:8
**station** 90:6 101:23
**stationed** 156:8,11
156:12 161:1
**statistically** 199:4
199:23
**stay** 102:2 145:8
146:4 147:8
**stayed** 146:13
**staying** 17:4
**step** 91:7 119:23
**stepping** 116:24
**steps** 34:4 118:23
120:15 121:3 176:9
176:12 178:12,21
179:4 214:24
**steven** 3:4 7:8
**stitt** 1:4 2:4 6:16
**stop** 50:22 51:3,3
90:1 100:6,9 101:17
141:19 142:1 143:3
162:10 214:2
**stopping** 141:9
**straightforward**
86:9
**strange** 218:8
**street** 2:18 3:12 6:15
154:22
**stress** 176:16,21
177:3,9
**strike** 21:3,21 28:13
35:4 72:15 80:8
97:19,24 100:4
104:7 108:14
110:18 112:10
119:9,13 207:7

**strong** 171:22
173:13,16
**structured** 26:15
39:12 40:17 79:21
**studied** 92:7 98:20
**studies** 22:3 42:9
63:3,24 75:15 99:6
175:24 176:15,20
176:24,25 177:1,8
182:7 208:2,4
**study** 4:9,15,17,18
4:20,21,23,24 5:2,5
5:9 20:6,9,10 22:14
28:22 29:9,11,22
58:15,18,19 59:4,6
64:1 65:24 75:12
76:4 78:23 79:19
88:9 97:5 98:6
99:12 108:3 111:17
111:19 116:2
124:20 131:6
173:10 174:8 176:1
177:10,21 178:2,8
178:25 179:10,11
180:2,12 181:4,6,15
181:21 183:2,5
192:12 193:7,24
194:8,11 195:19,20
195:24 196:7 199:5
199:13,25 200:4,6,7
200:8 211:1,4,5,8,9
211:10,18 212:14
**studying** 34:22
58:15 64:8 97:16
206:21,22
**sub** 80:5 137:13,17
138:4 167:3,4
168:20
**subject** 34:18,20
38:4,8
**submitted** 12:9
**subscribed** 222:20
**subsequent** 47:18
124:14

Veritext Legal Solutions
866 299-5127

subtleties 49:10
subtract 124:6
subtracted 124:24
sufficient 209:17
suggest 90:10
  180:18
suggesting 173:7
suite 2:18 3:6,13
  6:15
sum 190:12
summed 183:21
sums 184:14
sunday 148:5 149:4
  151:6 165:21
superintendent
  38:21 40:12,15 41:4
  41:18,21,25 43:3
  44:1,1,7,10 45:7,13
  45:13 46:5 50:10
  52:1 53:10 54:1,4,5
  54:17
superintendents
  23:22 34:17,18,23
  37:25 38:13 39:5
  40:6 41:8,9 43:22
supermarkets 10:15
supplemental 5:11
supporting 171:22
supports 16:24
suppose 164:5
supposed 122:4
  129:22,23
sure 9:11 13:7 19:7
  24:18 26:18 29:4
  33:4 44:18 46:22
  48:4 53:5 71:7
  73:22 81:15 82:1,10
  84:6 92:24 93:15
  103:16,18,21,25
  105:19 118:6
  121:14 139:20
  149:3,23 152:22
  174:5 189:16 197:6
  206:9

surprises 219:3
surprising 174:12
  174:23
suspect 37:16 47:22
  152:22 157:14
  163:9,11
suspend 215:9
suspended 217:1
  220:9
suspending 215:15
  215:17,19,21
switching 203:6
sworn 7:16,20 222:7

t

t 4:7 5:18,18
tab 147:25
table 27:6,7 30:24
  32:23 33:8 44:3
  201:25
take 6:22 30:22 71:8
  78:25 103:23
  119:23 123:1
  129:25 148:18
  151:12 156:5
  206:24
taken 2:16 10:9 17:9
  49:15 64:23 104:3
  113:6 121:3 123:6
  171:3 196:8 197:14
  207:3 222:4
takes 214:14
talk 9:24,25 13:2
  37:12 109:6 116:3
  142:3 153:11
  207:16,19
talked 140:20 141:3
  172:8 190:4 194:5
  196:4
talking 38:4 40:11
  107:23 131:17
  139:18 150:2
  157:15 162:7
  164:22 186:9
  187:25 188:4 203:4

talks 130:24 133:9
tallied 26:17
tape 64:18 122:25
  197:2,7
target 88:4
targeted 84:23
  86:24,24 103:1,1
task 12:10 111:23
  122:16 125:6,20
  126:9,14,14,18,18
  126:21,22 127:5
  131:4,16,17 134:6
  134:12,13,19 136:4
  137:7 138:1 140:18
  141:18 147:13,20
  150:19 163:18
  164:4 166:9,12
  168:3,4 169:19,23
  169:24 207:17
  209:16 213:2
tasked 99:4,14,23
tasks 95:23 114:24
  120:12 122:17
  125:19 134:15
  157:4,18 168:7
  180:25 181:1 192:5
  199:6 207:16
  210:14
tax 10:20 166:17
team 27:15 28:3,15
  37:6,21 39:16 40:4
  41:23 59:1 73:17
  74:21 75:9 78:20,21
  84:24 96:11 111:2
  126:23,24,25
technical 62:11
  130:14
technically 91:24
  92:18
techniques 76:6
  178:10 180:13
  181:5
tell 25:24 27:4,11
  30:18 32:4,12 33:1
  33:22 36:16 65:25

67:7 68:12,20 71:21
  72:2 73:6 76:7,14
  76:19 110:13 156:7
  157:6,8 158:13
  159:13 160:6 161:6
  161:15 163:4,7
  164:12 188:14,16
  193:8 209:12
  210:11,20
telling 41:10 214:19
telltale 89:18,20
template 30:12,13
  31:21,23 32:3,9,13
  32:25 33:2,17,19,21
  34:5,14 38:14,21
  39:6 40:3,5 115:7
  126:25 127:3
templates 33:12,13
  38:24 39:17 41:3,7
  42:18
temporary 93:23,25
term 14:17 15:5,7
  20:5,7 76:25 153:17
  172:6
terminals 67:4
terminology 34:10
terms 11:19 35:20
  36:20 49:9 61:20
  79:23 122:15 176:4
  176:6
test 172:17
tested 119:3
testified 7:21 9:10
  77:20 114:7 121:5
  150:20 166:15
  215:5
testify 9:6 14:9 16:8
  16:15,17,25 18:12
  50:13 207:11,22
  208:3
testifying 8:12 11:10
  222:7
testimony 16:20
  54:21 69:18 134:22
  143:11 151:20

Veritext Legal Solutions
866 299-5127

191:25 217:9
222:11
**testing** 172:3,4,6,11
**text** 46:17 80:9
**thank** 7:15 164:18
218:20,20 219:21
**thanks** 52:21 171:14
**themes** 112:8
**thereof** 183:8 221:7
**thing** 131:15 137:23
172:19 174:20
**things** 13:9 19:18
36:21 40:10,13,21
41:1,8 42:12,12
70:4 88:20 101:14
141:20 152:11
157:10 158:5
162:22 172:13
209:4
**think** 12:23 14:20
17:2,17 22:13 31:24
38:1 40:23,25 44:2
44:19,20 46:23 47:1
48:1,24 49:8,14
51:7,13 52:12 54:12
55:10 60:12 64:7
70:7 71:20 77:14,18
85:9 86:6 89:13
92:19 97:10,11
100:12,15 101:25
103:17 105:16
108:22 109:14
120:15,16,20 125:5
125:11 127:5
129:21 130:13
139:4 141:6,7
143:12,12 144:12
145:1,5 148:22
152:8 153:7 161:2
171:11 172:8
173:11 174:18
175:3 180:1 181:25
183:20 184:18,22
185:9,10,25 186:5,7
186:16,20,21,22

187:19 188:9
189:16 190:4 191:2
192:13 196:12,20
197:8 198:8,23
201:5 204:10,10
211:12 216:13,16
218:6,25
**thinking** 48:15
57:14 186:22
**third** 5:11 20:24
124:1 125:15
127:14,16 130:3
**thirds** 127:20
**thorough** 61:6
**thought** 34:11 61:18
217:3
**thousands** 199:14
**three** 21:9 32:21
33:10 50:3 55:17
68:16 80:5 119:2
124:13,22,24,25
125:2 127:2,17
175:15 184:20
185:1,4,7,7 190:4
208:8
**thumb** 12:2,4,15
**tidrick** 3:4,4 4:3 7:8
7:8,15,22,23 10:6
10:12,17 12:3 13:3
13:11,17,22 14:4,14
15:22,25 16:4,8,13
17:21,25 18:16 19:9
19:23 24:20 28:24
29:2 31:5 36:4,10
37:19 45:2,23 47:14
48:9 51:8,23 52:6
52:14,25 54:16 55:3
55:11,13,20 56:8,17
57:8,12,17 64:17
65:5 69:21 70:10
72:9 73:1 74:10
75:7 76:7 77:1,4
82:2 84:20 87:21
89:20 90:20,25 92:6
93:8,17 94:13 96:10

97:24 98:16,22
99:14,19,22 100:3,8
103:25 104:6
109:23 114:3,7
116:3 118:2 119:9
119:15,20 120:13
120:22 121:1,13
122:11,25 123:13
123:20 128:6
134:23 137:4
139:11,14 140:14
142:22 144:17
145:3,20,24 148:1,5
148:8,16,23 149:11
151:6,9,12,14,16
155:23 156:16
159:4,13,19,24
160:2,20 162:9
163:1 164:22 171:6
171:15 174:7
176:23 177:17
178:17 179:22
181:11,14 182:19
186:25 191:8 193:8
193:24 194:11,24
195:4,6 196:2 197:9
197:19,24 202:19
203:11 204:5 205:4
205:8 206:14,24
207:6,21 208:5,15
209:2,9 210:6
211:25 212:5,15
213:14 215:15,17
216:7,19,23 217:1
217:12,20,24 218:3
218:6,11,18,20
219:1,13,18,20
220:5
**tidricklaw.com** 3:8
3:8
**tight** 180:4 214:17
**time** 4:15,17,18,20
4:21,23,24 5:2 7:4
10:8,10 12:12,13
17:8,10 20:5,9,11

20:13,18,21 21:6,14
21:21,23 22:3,10,13
26:16 27:11 28:1,3
28:4,15 29:21,24
36:15 54:22 56:3,4
58:11,14,18,19,24
59:2,5 63:24 64:22
66:24 67:24 70:19
72:3 76:21 77:15,22
78:21 79:4 84:23
85:1 86:25 88:20
95:22 96:12,14 98:1
98:4,6,8,9 99:8
100:8 102:23
103:10,21,22 104:2
104:4 107:5 111:21
113:6,8 114:8,21,25
115:4,8,10,19
116:22 117:3,7,8,15
117:20,23 119:17
120:25 122:12
123:5 125:14,15,16
127:24 128:1,20,22
128:23 129:7,10,17
129:19 130:4,6,15
130:21 131:21
132:2,8,11 133:1,2
133:13,25 134:1,1,2
134:3,4,7,7,9,10,12
134:12,20 135:8,14
135:15,17,19,24
136:2,9,10,21 137:6
138:3,4,6,8,8,11,11
138:13,14,15,17,18
138:18,19,20,21,23
139:15 140:1,6,6
141:1,14,21 143:5
143:24 144:21
145:16 146:9,16,17
149:5,12,14,17
150:2,3,5,7 151:17
152:5 159:20
160:10 163:15,22
164:9 165:5 166:1
166:12,16,20,25

Veritext Legal Solutions
866 299-5127

167:4,7,8,10,10,12
167:20,22,23 168:1
168:4,8,9,10,13,14
168:19,23 171:2,4
174:9 180:19
181:18 182:5,22,24
183:3,8,11,17,21,23
184:6,8,15,15,23
185:12,12,23,25
186:8 187:5,9,12
188:19 189:6,9,12
189:12,12 190:12
190:19,20,24
191:15,21 192:20
193:15 194:12,13
196:19 197:13
199:5,24 200:2,10
200:11,14,16,17
207:2,4 209:18
212:7,16,25 213:5
213:23 215:9,11,14
216:16 217:8,9,9,10
220:2 222:5

**times** 8:7,19 20:16
55:18 83:20 84:5
87:1 97:12 114:10
114:15,16,18 115:2
115:14 116:15
117:19,22 120:24
132:6,7,8 137:2
149:20 172:22
200:11

**timing** 122:16

**tired** 176:7

**today** 8:13 11:11,16
11:22 12:2,5,16
16:9,11 49:18,21
50:4,7 99:20 105:1
124:3,17 150:20
171:25 172:10,17
189:23 190:14
191:15 192:9 198:6
199:9

**today's** 215:12
219:23

**told** 24:20 42:7 61:5
95:11 103:15
141:10,12

**tom** 193:10

**tomorrow** 220:7

**tonight** 216:17

**tony** 1:4 2:4

**top** 33:8 57:18
123:21 139:11
140:14,19 145:7
147:19,20 148:3,14
148:17,24 154:20
164:13,17

**tot** 138:5,8,11,11
167:8,10,10 168:14

**total** 20:25 25:19,25
26:6 27:4 68:8
138:8,12,15,17,19
149:20 167:23
168:9 184:6,8
189:13 190:12

**touch** 38:5

**tour** 35:1

**track** 61:24 62:1
74:23 95:22 97:18
115:8 144:11 214:1

**tracked** 82:20,24
96:1,21 97:1,8,14
101:9

**tracking** 74:23 97:6
102:17 202:23

**traffic** 13:9

**train** 101:20,22
102:2 213:24,25
214:3

**training** 172:11

**transcribed** 222:9

**transcript** 36:12
222:10,13,15

**transcripts** 196:15
196:20,23

**transferred** 107:12
107:17 108:8

**transfers** 90:2 192:7

**transit** 86:12 90:13
91:1 212:8,17
213:15 214:5

**transport** 105:9

**transportation** 1:9
2:10 4:10,12 6:18

**traveling** 105:5,7,10
105:14,23 106:1
108:14,16 109:1,10
109:17

**treated** 116:22
117:20,23 185:21

**trial** 50:13,20

**tricky** 218:7

**tried** 33:8 83:19
117:13

**true** 18:8 63:13,14
88:17 121:4 136:14
153:15 160:20
198:17 199:19
221:8,11,13 222:10

**try** 56:23 79:3
113:16 114:14
128:6 175:20
176:10,12,13
178:12,12,22
179:13,16 184:24
185:22

**trying** 41:21 43:5
47:7 50:9 59:19
60:23 105:16,18
115:16 124:23
129:5 131:15
183:20 195:15

**turn** 15:22 17:25
43:17 44:21 45:2
53:7 56:20 57:22
59:8 87:16 98:1,4,8
98:9 100:3 104:6,9
130:22 138:25
140:11,11 142:19
145:3 147:16
153:20 154:14,18
164:10 171:19
177:12 187:12

191:19,21 194:13
198:20,24 200:21
203:12 212:25

**turned** 59:23 121:20

**turning** 22:18 173:8
173:25 175:13

**twice** 8:8

**two** 8:19,21,23 9:6,9
12:18 16:11 19:17
44:23 45:1 58:6,7
58:11 68:17 70:4
108:23 109:15
124:25 125:2,21,25
126:1,2 127:17,20
129:18,19 134:11
140:12 167:24
168:2 186:22
196:18 208:9 209:4
214:4,11

**type** 19:13 35:21
53:16 115:13 175:3
193:15 200:7 213:5

**typed** 19:15,20,22

**types** 36:18 78:15,15

**typical** 16:16 53:11
143:13 144:1

**typically** 22:6 37:12
79:2

**typing** 19:17

| u |
|---|

**u** 5:18

**ultimate** 35:22
134:15

**ultimately** 39:15

**unable** 44:2 60:2
208:6

**unclear** 213:10

**uncomfortable**
175:16,20,22,24

**uncompensated**
98:6 99:11

**underlie** 16:18

**underlined** 80:9

Veritext Legal Solutions
866 299-5127

**underlying** 124:20
**undersigned** 222:2
**understand** 8:9,12
8:15 11:10,13 15:17
19:5,6,23 21:10,12
25:18 28:2 29:2
45:5,12,23 46:13
47:7 53:9,18 54:16
58:2 60:4,6,23 61:7
62:11 63:8 65:5,8
67:23 69:14 70:6
72:19 74:10 77:4
80:14,19,24 81:21
81:23 82:15 86:11
87:4 90:20,22 93:12
93:24 97:7,25
102:13 105:20,20
107:3 108:6 111:25
115:16,23,24
119:15,18 121:22
124:12 125:10
129:5 131:15
135:20 151:20
160:2 183:16
184:17 186:17,20
186:21 187:25
190:8,17,21 192:10
196:14 199:17
203:24 208:9 215:5
215:22 218:6
**understanding**
11:17 12:4 56:8,14
93:7 153:25 158:3
189:7 190:22 204:8
**understood** 45:16
138:9 168:18
170:14 204:25
**unfair** 219:17
**uniform** 94:21
95:13,15 102:20,22
**uniforms** 88:14
89:10,16,21,23,23
**unique** 213:9
**united** 1:1 2:1 6:18

**unknown** 104:21
**unobservable**
116:21 117:3,7,20
117:23 145:9 146:5
155:13 161:13,17
161:24 180:6 188:2
188:7,15
**unobserved** 187:18
187:19,21
**unpaid** 190:20
192:3
**untruthful** 198:22
**unused** 90:2
**unusual** 158:8
**updated** 12:10
190:1,3 202:16
**upper** 148:6
**use** 19:3 20:5 24:14
28:18 53:1 60:2
68:8 76:16 84:13
88:22 115:1,2,5,12
123:15 153:16
169:3 175:10
192:15 193:13
**useful** 23:11
**uses** 93:13

**v**

**vague** 19:16 24:16
37:9 47:24 52:2
81:25 84:12 90:15
91:22 93:3 97:23
100:7 115:22 118:1
120:8 159:10 174:3
176:18 186:20
192:24 194:2
207:13,24 208:21
209:5 210:2
**valid** 173:10
**validate** 119:24
120:2 171:16
173:15,18
**validated** 121:5,17
121:20

**validity** 118:23
119:8 120:3 171:22
172:3,4,6,7,8,17
173:3,12,13,16,23
**variation** 144:2
198:15
**varied** 90:9 174:16
**varies** 201:6 212:25
**variety** 20:18 34:7
36:20 78:12 86:25
93:21 104:18
141:19 143:12,16
143:24 172:7
173:12 180:17
194:5 199:6
**various** 67:11 114:8
116:16
**vary** 53:15 61:19
89:25 143:15
**vehicle** 14:18 35:21
36:18 53:16 62:25
78:15 85:4,21 86:7
87:2,7,11,12 89:7
90:6,7 91:4,7,14
92:9 94:12,22,24
104:20 107:1,5,10
107:13,18,22 108:8
109:2,5 117:12
144:22 152:23
153:14 154:8
161:20 175:3
190:20 192:5,6,21
193:18 194:13
206:2 213:1,3,5,10
213:22 214:2,11,13
214:14
**vehicles** 37:1 62:21
62:22 86:12,19 87:5
89:5,9 90:14 91:1
91:12,16 92:3,9
94:11 95:19 97:17
143:10 152:25
174:22 175:2 212:8
212:17 213:13,16
214:5,18,21,24,25

215:4,6
**verify** 25:23 150:14
150:21
**veritext** 3:20 6:11
219:25
**version** 12:10 32:9
32:16,18 66:9,19,22
67:16,19,25 69:24
70:12,14,19 71:3,13
71:16 76:22 77:7,16
77:23 124:1,14,16
125:13,14,15
126:11,12,13 127:4
131:5 150:22,24
190:2,3 208:9,19
**versions** 32:7 33:4,6
66:14,16 77:19
123:25 124:13,24
125:2 126:16 127:8
150:17 190:5 208:8
208:10
**versus** 6:17 41:25
43:12 94:19
**vicinity** 109:6
**video** 3:18 6:7,9,21
10:5,7,10 17:7,10
45:21 59:14,19,20
59:23 60:7 61:1,5
62:5,16,17 64:1,9
64:14,17,19 65:1
104:1,4 123:2,9
171:1,4 197:10,15
207:1,4 215:12
219:23
**videographer**
215:10
**videos** 61:7
**videotaped** 1:15
2:15
**view** 186:24 193:18
**viewed** 202:3
**viewing** 202:8
**violation** 188:10
**visible** 82:21 84:18
102:18 105:8 107:9

Veritext Legal Solutions
866 299-5127

| | | | |
|---|---|---|---|
| 109:7 121:25 | 217:18 218:11,12 | **whereof** 222:19 | 222:6 |
| **visit** 39:24 42:2,4,5 | 219:9 220:3 | **whispers** 6:24 | **wky** 165:20 |
| 42:10 | **wanted** 61:7 88:24 | **wide** 127:6 191:23 | **wondering** 187:17 |
| **visits** 30:6 35:12 | 103:2,18 117:4 | **willing** 216:12 | 193:13 194:20 |
| 38:15 39:11 40:9 | 137:10,12 161:20 | **witness** 7:16 9:15,17 | **woods** 62:18 201:1 |
| 49:5 53:3 196:5 | **watch** 59:16 115:11 | 9:20,25 10:3,15 | 201:12,24 202:2,9 |
| **visual** 62:19 116:17 | **watched** 102:2 | 12:23 14:3,11 18:13 | 202:22 203:5 |
| 157:9,11 | **watching** 181:2 | 19:7,20 24:17 28:20 | **word** 19:3,13 24:14 |
| **visually** 157:5 | **way** 7:2 36:8,21 | 31:2,4 36:5 37:12 | 24:14,17,18 28:18 |
| 158:24 | 37:14 40:8 47:14,24 | 45:1 48:1 50:20 | 48:2,15 74:12 84:13 |
| **vitae** 5:3 | 51:6 60:25 64:3 | 51:9,11 52:4,13,21 | 93:13 125:6 |
| **volume** 1:16 2:16 | 88:11,14 92:25 | 54:12,24 55:6,10,12 | **words** 43:9 53:19 |
| 64:20 65:3 88:23 | 113:16 114:6 | 55:14,16 56:7,14,25 | 125:22,25 126:2 |
| 123:3,11 197:11,17 | 118:19 119:17 | 57:6,10,14,16 69:19 | 132:12 149:17 |
| **vs** 1:8 2:8 | 122:11,18,20,23 | 70:7 74:8 75:6 76:2 | 170:17 188:7 |
| | 127:20 128:7 | 81:23 84:15 87:18 | **work** 4:14 12:13 |
| **w** | 130:14,24 133:8 | 87:20 89:16 90:18 | 20:5 22:12 24:15 |
| | 134:16 141:25 | 91:23 93:5,12,15 | 29:14,19 37:14 40:9 |
| **wage** 8:25 9:2 | 150:2 152:23 162:4 | 94:8 96:5 99:16 | 61:12 64:12 93:22 |
| **wait** 50:22 54:13 | 165:19 174:23 | 113:25 115:25 | 98:19,21 117:21,23 |
| 75:3 89:13 93:6 | 176:14 179:12 | 120:11 122:9 128:4 | 125:14,15 180:16 |
| 139:8 155:6,12 | 181:21 184:19,24 | 144:12,15,24 145:1 | 180:19 181:3 184:6 |
| 159:9 161:12 162:8 | 186:22 190:10 | 145:22 148:11,19 | 184:8,23 185:12,15 |
| 163:13 171:10 | 210:7 216:13 | 148:21 149:9 | 185:23 186:8 187:5 |
| 203:9,9 | 217:11 218:25 | 151:13 156:15 | 187:9,23 188:19 |
| **waiting** 161:16 | 219:14 | 158:22 159:12,17 | 189:6,9,11,12,12 |
| **walk** 90:3 91:13 | **ways** 172:7 173:12 | 159:22 160:11,17 | 190:12,13 192:17 |
| 94:22 106:13,19 | **we've** 12:25 20:7 | 160:18 162:20 | 192:17 193:14 |
| 125:15 139:9,12,17 | 42:6 69:19 89:24 | 164:19 171:11 | 216:1,2 |
| 140:15 145:13 | 118:24 126:7 162:6 | 174:5 176:20 | **worked** 75:9,9 |
| 146:1 192:5 | 174:25 180:21 | 177:16 178:21,24 | 179:8 |
| **walked** 52:17 | 193:4 196:5 217:1 | 179:4 181:9,13 | **workers** 21:25 |
| 146:25 153:3 210:9 | 217:15 218:15,21 | 182:18 186:23 | 22:11 |
| **walking** 12:12 40:12 | **wear** 89:10,16 | 193:2,23 194:4 | **working** 44:11,16 |
| 40:14 41:11,12 | **wearing** 88:14 89:21 | 195:17 202:14 | 64:12 68:13 214:11 |
| 104:19,22,23 106:7 | **wednesday** 1:18 | 204:4 206:12 | **workplace** 180:10 |
| 106:13 147:3,10,12 | 2:21 6:1 | 207:15,25 208:13 | **works** 141:25 |
| 183:21,23 209:10 | **week** 199:16 200:12 | 208:24 209:7 210:3 | **write** 40:13,21 41:14 |
| 210:12,21 | **weekday** 128:12 | 211:23 212:2,13,21 | 41:19 59:17 126:8 |
| **want** 9:23 14:8 17:5 | 139:5 145:15 165:4 | 212:23 215:19 | 126:21 136:20 |
| 23:17 32:17 40:24 | 165:19,20 | 216:2 217:3,3 | **writes** 209:10 |
| 56:19 73:24 76:15 | **weeks** 13:10 | 218:21 219:4,11 | **writing** 19:10,17 |
| 76:25 99:23 100:11 | **went** 32:14 35:19 | 222:19 | 115:10 210:14 |
| 111:8 138:6,18 | 52:10 81:13 121:13 | **witnesses** 216:13 | **written** 15:1 37:6,21 |
| 139:20 152:9 168:4 | 153:4,6 209:21,22 | 218:24 219:14 | 46:17 130:2 157:16 |
| 168:23 195:13 | | | |

Veritext Legal Solutions
866 299-5127

158:14 169:20
**wrong** 145:22,23
171:13 186:24
**wrote** 19:11,12,25
24:9 30:12 55:25
59:14 74:9 135:1
136:20 144:8,20
147:1 164:8

## x

**x** 4:1,7 60:15

## y

**y** 60:15
**yard** 53:12 62:18,21
90:7 91:1,2,3,7,8,11
91:15,16,17,24 92:4
92:4,10,14,16,19
93:18,24 94:3,11,12
94:19,22,23 95:5
96:1,6,12,15,16,18
96:24 97:7,11,12
131:19 134:20,25
135:21 141:4,25
142:1,10 143:4,7,16
143:25 144:4
147:21 148:16,24
151:3,8,10,23 152:7
152:8,24,25,25
154:4,5 155:3,10
161:5,6,11 175:1
213:18,22 214:3
**yards** 180:4 214:17
**yeah** 9:25 11:23
13:6 45:1 57:4
60:19,20,22 77:6,14
87:18,20 114:18
129:21 137:12
139:25 140:17
145:23 149:9 151:1
162:19 182:18
184:21 186:19
192:15 217:5,7
219:11 220:4
**year** 8:21,23

**years** 8:22 9:21
44:23 45:1 58:6,7
58:11
**yellow** 154:17
**yep** 143:1 149:9,18
**ygr** 1:8 2:8 6:20
**young** 3:5 7:10 17:1
17:5 50:22 51:2,10
51:15,19,21 74:7
162:17,19 178:23
178:25

## z

**z** 60:15
**zero** 27:16,17,18
182:22,24 183:9,17
184:15 185:2,3,6,6
185:13,16,21,25
186:2,17 187:18
202:3,8

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2014. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Exhibit D

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3
 4    DARRYL A. STITT, TONY GRANDBERRY,
      and HEDY GRIFFIN, on behalf of
 5    themselves and all others
      similarly situated,
 6
                      Plaintiffs,
 7
                      vs.                Case No: C-12-03704-YGR
 8
      THE SAN FRANCISCO MUNICIPAL
 9    TRANSPORTATION AGENCY; CITY AND
      COUNTY OF SAN FRANCISCO; and
10    DOES 1-20,
11                    Defendants.
      _____ /
12
13
14                   DEPOSITION OF MARK COHEN
15                    Berkeley, California
16                   Thursday, July 14, 2016
17                        Volume I
18
19
20
21
22    Reported by:
23    DEBBIE RAZAVI, RPR, CSR NO. 9989
24    Job No. 2342054
25    PAGES 1 - 73
```

Page 1

**Page 2**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2       FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3
 4   DARRYL A. STITT, TONY GRANDBERRY,
     and HEDY GRIFFIN, on behalf of
 5   themselves and all others
     similarly situated,
 6
 7            Plaintiffs,
 8        vs.        Case No: C-12-03704-YGR
 9   THE SAN FRANCISCO MUNICIPAL
     TRANSPORTATION AGENCY; CITY AND
     COUNTY OF SAN FRANCISCO; and
10   DOES 1-20,
11            Defendants.
     _____/
12
13
14
15        Deposition of MARK COHEN, Volume I, taken
16   on behalf of Plaintiffs, at Renne, Sloan, Holtzman,
17   Sakai, 1220 Seventh Street, Suite 300, Berkeley,
18   California, beginning at 8:05 a.m. and ending at
19   10:40 a.m. on Thursday, July 14, 2016, before
20   DEBBIE RAZAVI, Certified Shorthand Reporter No. 9989.
21
22
23
24
25
```

**Page 3**

```
 1   APPEARANCES
 2   For Plaintiffs:
 3     THE TIDRICK LAW FIRM
 4     BY:  STEVEN G. TIDRICK, ESQUIRE
 5          JOEL B. YOUNG, ESQUIRE
 6     2039 Shattuck Avenue, Suite 308
 7     Berkeley, California 94704
 8     (510) 788-5100
 9     sgt@tidricklaw.com
10     jby@tidricklaw.com
11   For Defendants:
12     RENNE, SLOAN, HOLTZMAN, SAKAI
13     BY:  GEOFF SPELLBERG, ESQUIRE
14     1220 Seventh Street, Suite 300
15     Berkeley, California 94710
16     (415) 837-0456
17     gspellberg@publiclawgroup.com
18   Also present:  Christine Hulsizer
19
20
21
22
23
24
25
```

**Page 4**

```
 1                   INDEX
 2   WITNESS                    EXAMINATION
 3   MARK COHEN
 4   Volume I
 5         BY MR. TIDRICK       5
 6         EXHIBITS
 7   NUMBER      DESCRIPTION          PAGES
 8   Exhibit 125  May 10, 2016 Letter      8
 9   Exhibit 126  June 10, 2016 Letter     9
10   Exhibit 127  Subset of Rows in Preliminary   29
11       Offset Key
12   Exhibit 128  Declaration of Mark Cohen     10
13   Exhibit 129  July 13, 2016 Letter       12
14   Exhibit 130  Draft for Discussion Purposes   23
15   Exhibit 131  Consent to Become Party Plaintiff 42
16   Exhibit 132  Hedy Griffin 2-Year FSLA Damages 45
17   Exhibit 133  Computations Identifying Offsets 46
18   Exhibit 134  Combination of Dr. Drogin's and  49
19       Mark Cohen's Work Product
20   Exhibit 135  Declaration of Jonathan-Dat Lam  59
21   Exhibit 136  Pay Code Descriptions       69
22       QUESTION INSTRUCTED NOT TO ANSWER
23         PAGE      LINE
24          13        16
25
```

**Page 5**

```
 1     Berkeley, California, Thursday, July 14, 2016
 2           8:05 a.m.
 3          MARK COHEN,
 4   having been administered an oath, was examined and
 5   testified as follows:
 6          EXAMINATION
 7   BY MR. TIDRICK:
 8     Q.  Good morning.  Would you please state your
 9   full name for the record.
10     A.  Mark Cohen.
11     Q.  Have you ever been deposed before?
12     A.  Yes.
13     Q.  Approximately how many times?
14     A.  600.
15     Q.  You understand generally how a deposition
16   works then?
17     A.  Yes.
18     Q.  I'm showing you a document previously marked
19   as Plaintiffs' Exhibit 100.  This is the deposition
20   notice.
21         Have you seen that document before?
22     A.  Yes.
23     Q.  You understand that you're testifying today
24   pursuant to that deposition notice?
25     A.  Yes.
```

Q.  You understand that that deposition notice calls for you to produce documents?

A.  Yes.

Q.  Are you producing any documents in response to that deposition notice?

A.  Yes.

Q.  Are you giving them to me now?

A.  Yes, if you would like them.  I brought them here.  They are right in front of me.

Q.  We have requested them.

A.  Well, they are right here.

Q.  All of these?

A.  Well, that's part of it, and then you received a disk yesterday, I believe, with the electronic items that --

MR. YOUNG:  Is that what you are going to be relying on to testify with?

THE WITNESS:  Yes.  Now you have my file.

MR. YOUNG:  Are you producing something separate from this?

THE WITNESS:  I provided yesterday some electronic documentation for you that I hope you have because I sent it to the law firm.

MR. YOUNG:  What I'm really getting at is I understand you're using this to testify with; correct?

THE WITNESS:  Yes.

MR. YOUNG:  So I don't want to take your documents if you are going to be using these to testify with.

MR. SPELLBERG:  These are his originals.  You can look through them, you can have them, part of them, whatever you want.

BY MR. TIDRICK:

Q.  If at any point you need any of the documents that you've produced today to respond to any questions just let us know.

A.  Okay.

MR. SPELLBERG:  So we will have to work out an arrangement.  Those are Mark's originals, that's his original file, so have to get a copy back to him.

BY MR. TIDRICK:

Q.  For the record, you've provided just now a binder approximately two inches thick with papers in a red weld and says "SFMTA" also about two-inches thick.

Do you have any understanding whether the materials in the binder and the red weld that you have provided us just a couple of minutes ago are documents that have already been provided to us?

A.  Many of -- I would say -- I can pull out the documents that you don't have if that makes it easier

for you.

A.  Yes, please.

A.  You may have some of this already, I'm not sure, but these are the items I believe you do not have.

Q.  For the record, you're now handing us a stack of papers about half an inch thick, and I understand the documents I'm now holding about half an inch thick you believe are the documents that have not previously been produced to us; is that correct?

A.  Yes.

Q.  I'm showing you a document that's been marked as Plaintiffs' Exhibit 125.  At the top of Plaintiffs' 125 is your firm's name Cohen, Volk and it's dated May 10, 2016.

Is this your initial report?

A.  Yes.

(Plaintiffs' Exhibit 125 was marked for identification.)

Q.  I'm showing you a document marked as Plaintiffs' Exhibit 126.  It's a document that says "Cohen, Volk" at the top.  It's dated June 10, 2016.

Is this Plaintiffs' Exhibit 126 your rebuttal report?

A.  I don't know how you want to characterize it.  You've characterized it as a rebuttal report.  I don't

know if that's the best characterization.  It's an update, and I did in this report have an opportunity at least to review the report of Dr. Drogin, but I didn't have his deposition at that time.  So I guess it would be partially rebuttal.

(Plaintiffs' Exhibit 126 was marked for identification.)

Q.  Plaintiffs' Exhibit 126 is a supplemental report that you prepared?

A.  Yes.

Q.  Earlier you mentioned that you understand that a disk was provided to our law firm yesterday?

A.  Yes.

Q.  What was on that disk?

A.  Essentially all the code and the output that was generated from that to provide the analysis of the work that went into my declaration on July 1 as well as the additional calculations that are in my July 13 report, and I believe that's all.

Q.  I'm showing you a document that's marked as Plaintiffs' Exhibit 128.  It's a declaration by you that has a file stamp date of July 5, 2016.

That's a declaration that you signed?

A.  I'm sorry.  Can you repeat the date.

////

1      (Plaintiffs' Exhibit 128 was marked for
2      identification.)
3      Q.   It has a file stamp date at the top of July 5,
4  2016.
5           Is that a declaration that you signed?
6      A.   Yes.
7      Q.   What is the date when you signed that?
8      A.   July 1.
9      Q.   A moment ago when you were describing the
10 materials on the disk that was produced yesterday and
11 you mentioned that it included code and output that was
12 used to generate the analysis that went into the
13 declaration of July 1, is Plaintiffs' Exhibit 128 the
14 declaration that you're referring to?
15     A.   Yes.
16     Q.   A moment ago you testified that materials on
17 the disk that you produced yesterday was also including
18 code and output that was generated to provide analysis
19 that went into a July 13 report.  July 13 obviously was
20 yesterday.
21          Is there a report that you have done dated
22 July 13?
23     A.   Yes.
24     Q.   Is that among the stack of documents that you
25 provided this morning?

1      Q.   And we are calling them "attachments."  They
2  are not physically attached, but do I understand
3  correctly these two documents are referred to in the
4  July 13, 2016 report?
5      A.   Correct.
6      Q.   For ease of reference I have marked the
7  July 13, 2016 report that you just described which is a
8  three-page document as well as the two attachments that
9  you just described as a single exhibit labeled as
10 Plaintiffs' Exhibit 129.
11          Exhibit 129 is a report that you prepared?
12     A.   Yes.
13          (Plaintiffs' Exhibit 129 was marked for
14          identification.)
15     Q.   Referring back to the Plaintiffs' Exhibit 125
16 document, you created this Plaintiffs' Exhibit 125
17 document; correct?
18     A.   Yes.
19     Q.   Did anyone assist you?
20     A.   Well, throughout this process I have had
21 assistance.
22     Q.   From whom?
23     A.   From Eric Drabkin, Tom Stephenson, Linda Liz
24 Fehrm, F-e-h-r-m.  Stephenson is with a p-h and s-o-n.
25     Q.   When you say those individuals assisted you,

1      A.   Yes.
2           Now, just so you know, the attachments to the
3  report were provided yesterday which was the actual work
4  product in terms of the quantitative analysis that I
5  performed.
6      Q.   When you say "the attachments," attachments to
7  what?
8      A.   To that report.
9      Q.   The July 13, 2016 report?
10     A.   Yes.
11          So just to help you out a little bit, these
12 would be the attachments and these came to you
13 yesterday.
14     Q.   And you're referring to two documents you're
15 handing to me right now, one of which at the top says
16 "Response to Drogin Analysis - Damages by Person FLSA
17 Two-Year Statute of Limitations 7-12-16 Calculation,"
18 and a document that at the top says "Response to Drogin
19 Analysis Damages By Person All Class Members FLSA
20 Two-Year Statute of Limitations 7-12-16 Calculations";
21 is that correct?
22     A.   Yes.
23     Q.   Do I understand correctly these two documents
24 are attachments to the July 13, 2016 report?
25     A.   Yes.

1  is it fair to say they assisted you in connection with
2  preparing the Plaintiffs' Exhibit 125 report, the
3  Plaintiffs' Exhibit 126 report and the Plaintiffs'
4  Exhibit 129 report?
5      A.   Yes.
6      Q.   The Plaintiffs' Exhibit 125 report, when did
7  you create that document?
8      A.   Well, the analysis and work product was
9  developed shortly before May 10, 2016.
10     Q.   Why did you create the Plaintiffs' Exhibit 125
11 document?
12     A.   Well, I was told that a report was due and I
13 had to provide my opinions at that point based on the
14 information available.
15     Q.   Did plaintiffs' -- strike that.
16          Did defendants' counsel assist you in writing
17 the Plaintiffs' Exhibit 125 document?
18          MR. SPELLBERG:  I'm going to object and
19 instruct him not to answer.  I believe that
20 communications between attorneys and their experts are
21 not discoverable.  I think you can go about it in a
22 different way, but anything that implicates
23 communications that I have had or any other attorney had
24 with Mr. Cohen and his office is not discoverable so
25 I'm going to instruct him not to answer that question as

Page 14

1  phrased.
2  BY MR. TIDRICK:
3      Q.  Did defendants' counsel provide you any
4  assumptions that you used in connection with the
5  Plaintiffs' 125 report?
6      A.  They had indicated to me with respect to the
7  claims with respect to start and travel time, return in
8  time, routinely late time, meeting time and bulletin
9  time that those claims as a matter of law may not be
10  compensable.
11      Q.  That was an assumption that you used in your
12  analysis?
13      A.  Yes, that's correct.  Although I didn't
14  provide an analysis per se at that point in time, it was
15  quantitative in nature.
16      Q.  Were there any other assumptions that
17  defendants' counsel provided to you that you used in
18  connection with your May 10, 2016 report marked as
19  Plaintiffs' Exhibit 125?
20      A.  Yes.  I understood from the law office that
21  certain components of pay were subject to an offset
22  against any of the potential pay violations under the
23  FLSA and I was provided with information, items A
24  through G, in that regard.
25      Q.  Referring to the Plaintiffs' Exhibit 126

Page 15

1  document, you created the Plaintiffs' Exhibit 126
2  document?
3      A.  I did.
4      Q.  When did you create the Plaintiffs' Exhibit
5  126 document?
6      A.  Well, in the month between May 10 and June 10.
7      Q.  2016?
8      A.  Correct.
9      Q.  Did defendants' counsel provide you with any
10  assumptions that you used in connection with your
11  Plaintiffs' Exhibit 126 report other than the
12  assumptions that you've already mentioned with respect
13  to the Plaintiffs' Exhibit 125 report?
14      A.  Well, I would say that in terms of
15  assumptions, I had a conversation between myself,
16  Mr. McLaughlin and Mr. Keohane at the City and County of
17  San Francisco, and we went through the different earn
18  codes and identified which of those codes would be
19  subject to offsets, and to that extent I suppose one
20  could say that these were assumptions that were provided
21  to me, but they were developed, you know, as part of my
22  discussion with Mr. Keohane.  I could spell that for you
23  too if I could find it here.  Actually, I think they
24  have the note with them.
25      Q.  K-e-o-h-a-n-e?

Page 16

1      A.  That sounds correct.
2      Q.  Do you understand that Judge Gonzalez Rogers
3  has a standing order that requires all expert reports to
4  include paragraphs to facilitate any motion practice
5  challenge to the specifics of any opinions?
6      A.  No.
7          MR. SPELLBERG:  I wasn't aware either.
8  BY MR. TIDRICK:
9      Q.  In the Plaintiffs' Exhibit 125 report you list
10  various documents that you reviewed.  They are listed on
11  the first page numbered 1 through 5.
12          Are those all of the documents that you relied
13  upon to complete your May 10, 2016 report?
14      A.  Yes.
15      Q.  Regarding the Plaintiffs' Exhibit 126 report,
16  your report dated June 10, 2016, the first page lists
17  four additional documents and the second page lists five
18  additional documents described as prior documents.
19          Do I understand correctly the documents
20  identified on those two pages are all of the documents
21  you relied upon to complete your June 10, 2016 report?
22      A.  Well, those were the documents that were sent
23  to me.  I did pull out the San Francisco Minimum Wage
24  Ordinance from the Internet and had pulled out the FLSA
25  from the Internet as well, looked at that.

Page 17

1          I'm thinking, if you give me one more second
2  to see if there was any more documentation that I relied
3  on or looked at aside from what was sent.
4          I know that there were the MOU's that had been
5  at some point looked at that I downloaded from the
6  Internet as well.  I'm trying to recall if I utilized
7  those specifically.
8          Well, while I have them, I don't know that
9  they were of any real use.
10      Q.  Anything else?
11      A.  No.
12      Q.  In the June 10, 2016 report marked as
13  Plaintiffs' Exhibit 126 there's a discussion of minimum
14  wage violations at Pages 2 and 3 of the report, and
15  specifically if I could refer you to footnote two at
16  Page 3 of 7 of your June 10, 2016 report marked as
17  Plaintiffs' Exhibit 126, do I understand correctly that
18  per the Department of Labor minimum wage violations are
19  based on dividing total pay by total hours worked?
20      A.  Yes.
21      Q.  That's what you did?
22      A.  Right.
23      Q.  Do you believe that it is appropriate to use
24  the Department of Labor's standards for calculating
25  minimum wage violations under the San Francisco Minimum

5 (Pages 14 - 17)

Page 18

    1    Wage Ordinance?
    2        A.  Well, in my records there's a note.  I had my
    3    assistant contact what I understood to be the individual
    4    regarding the minimum wage ordinance.  And my
    5    understanding is that you take the total pay, you divide
    6    it by the hours worked, that identifies your effective
    7    hourly rate.  To the extent it was under San
    8    Francisco minimum wage, there would be a pay violation;
    9    to the extent that your earnings were higher than the
   10    minimum wage there would not be.
   11        Q.  Who is the assistant that you mentioned
   12    contacted someone regarding the minimum wage ordinance?
   13        A.  Tom Stephenson.
   14        Q.  Tom Stephenson works for you?
   15        A.  Yes.
   16        Q.  He contacted someone with the City and County
   17    of San Francisco?
   18        A.  Actually, I think he has a note.  If I can
   19    look at the notes that I turned over to you.  I think
   20    there's more than that.  If you can give me the whole
   21    stack, I probably could find it easier.
   22        MR. YOUNG:  Is this yours too?
   23        THE WITNESS:  Yes.
   24        He contacted Richard Gage, the Deputy Labor
   25    Commissioner of the California Department of Industrial

Page 19

    1    Relations, Division of Labor Standards Enforcement, and
    2    then I had him pull down the minimum wage from the
    3    Internet with respect to San Francisco for different
    4    periods of time.
    5    BY MR. TIDRICK:
    6        Q.  The specific papers you referred to just now
    7    in order to identify the contact with Richard Gage as
    8    well as the minimum wage from the City and County of San
    9    Francisco, can you tell me specifically which pages
   10    those are and pull them out.
   11        A.  Yes.
   12        MR. TIDRICK:  Geoff, do you mind if we mark
   13    these both as exhibits or do you have someone who can
   14    make a photocopy?
   15        MR. SPELLBERG:  I can do it right now.  I can
   16    give it to somebody.
   17        MR. TIDRICK:  Off the record.
   18        (Recess taken.)
   19        THE WITNESS:  Just for a complete list, while
   20    I haven't pulled it down from the Internet and printed
   21    it out, I did look at the San Francisco Minimum Wage
   22    Ordinance in and of itself.
   23    BY MR. TIDRICK:
   24        Q.  When did you do that?
   25        A.  This was prior to the report preparation of

Page 20

    1    June 10.
    2        Q.  Approximately what month?
    3        A.  In June, it was probably the 9th or 10th I
    4    looked at it.
    5        Q.  You looked at the current version of the San
    6    Francisco Minimum Wage Ordinance?
    7        A.  It was the one on the Internet.  I don't know.
    8        Q.  It was whatever version was on the Internet?
    9        A.  Yes.
   10        Q.  In approximately June 2016; correct?
   11        A.  Correct.
   12        Q.  If I could refer you, please, to your May 10,
   13    2016 report, Plaintiffs' Exhibit 125.
   14        If I could please refer you to your June 10,
   15    2016 report marked as Plaintiffs' Exhibit 126.
   16        If you could please turn to the exhibit of
   17    this report that's labeled as the Preliminary Offset
   18    Key.  The Preliminary Offset Key is a one-page document
   19    that's part of your June 10, 2016 report; correct?
   20        A.  No.  It goes on for several pages.  It's one,
   21    two, three, four pages.
   22        Q.  The four-page Preliminary Offset Key that's
   23    attached to your June 10, 2016 report marked as
   24    Plaintiffs' Exhibit 126 is a document that is a subset
   25    of the pay codes on your offset key list sorted by

Page 21

    1    PeopleSoft Earn Code and subject offset; is that
    2    correct?
    3        A.  Well, I don't know if I would call it a
    4    subset, but it's been generated from the list of all the
    5    different earn codes.
    6        Q.  Who created the four-page Preliminary Offset
    7    Key that's attached to Plaintiffs' Exhibit 126?
    8        A.  I did.
    9        Q.  When did you create it?
   10        A.  Shortly before the June 10 report was
   11    completed.
   12        Q.  Why did you create it?
   13        A.  Well, in order to determine the economic loss
   14    based on the allegations, one would compute the losses
   15    from the items but also the offsets that would be
   16    appropriate given that these individuals were paid in
   17    different ways from what the FLSA rules are, and to the
   18    extent that they were paid more than they otherwise
   19    would have been paid under the FLSA, there would be an
   20    offset to consider.  So these pay codes provide us with
   21    the types of pay and the key provides a mechanism to
   22    identify which pay would be subject to offset and which
   23    pay would not.
   24        Q.  Did anyone assist you in preparing the
   25    Preliminary Offset Key, the four-page document that's

6 (Pages 18 - 21)

1 within your June 10, 2016 report?
2   A. Yes.
3   Q. Who?
4   A. Well, this was developed in conversation with
5 Mr. Keohane and Mr. McLaughlin.
6   Q. Did you take any notes during those
7 conversations with Mr. Keohane and Mr. McLaughlin?
8   A. Well, these are essentially the notes.
9     So how the mechanism worked was I was provided
10 a document by the law office which I understood to be a
11 document that your office and Mr. McLaughlin's office
12 were utilizing together to get an understanding of all
13 the different pay codes that would be at issue in this
14 case, and I printed that out, and essentially I just
15 took that item, his file, in other words, had it on the
16 screen during the conversation with Mr. Keohane and
17 Mr. McLaughlin and developed whether those pay codes
18 were subject to offset during the call. So those are my
19 notes of the call as part of the preliminary pay code
20 key.
21   Q. The document that you described just now that
22 you said you understood to be provided by defense
23 counsel's law office to get an understanding of all the
24 different pay codes, how many pages is the document
25 you're referring to?

1   A. Six pages. And that document has already been
2 produced to you, but I just printed it out because I
3 thought it might be convenient at the deposition.
4   Q. For the record, the six-page document that you
5 just described is the document marked as Plaintiffs'
6 Exhibit 130; correct?
7   A. Yes.
8     (Plaintiffs' Exhibit 130 was marked for
9     identification.)
10   Q. Referring again to the Preliminary Offset Key
11 in your June 10, 2016 report, please help me understand
12 what the various columns refer to starting with the
13 first column Trapeze Code. What does that refer to?
14   A. So there's different ways that time was
15 captured and measured by function. The Trapeze Code is
16 one of those ways because the defendant was using
17 Trapeze as a tool in order to measure and record time.
18   Q. The next column Trapeze Description, what does
19 that refer to?
20   A. That describes what the code refers to.
21   Q. The next column Old GEAC Codes, what does that
22 refer to?
23   A. There was a payroll system that had been in
24 place, I think it was prior to 2012 sometime, and that
25 payroll system had its own sets of codes that pertained

1 to the items associated with the Trapeze and Trapeze
2 Description columns.
3   Q. Do I understand correctly in any given row in
4 the Preliminary Offset Key whatever is identified as the
5 Trapeze Code and the Old GEAC Code is an indication that
6 those codes are functionally equivalent?
7   A. Yes.
8   Q. The next column in the Preliminary Offset Key
9 which is labeled PeopleSoft Earn Code, do I understand
10 correctly that information in that column indicates
11 whatever the PeopleSoft Earn Code was that was
12 equivalent to the Old GEAC Code and Trapeze listed in
13 the same row in the Preliminary Offset Key?
14   A. Yes.
15   Q. Do I understand correctly that the information
16 in the column labeled PeopleSoft Earn Code description
17 indicates a description of what the PeopleSoft Earn Code
18 listed is in a given row in the Preliminary Offset Key?
19   A. Yes.
20   Q. Do I understand correctly that in the column
21 of the Preliminary Offset Key labeled Add to Gross
22 that the information in that column indicates -- well,
23 please tell me, what does it indicate?
24   A. My understanding is that it was a part of the
25 gross earnings.

1   Q. What do you mean by that?
2   A. When you receive a paycheck there's a gross
3 earnings column that would be separate and aside from,
4 let's say, reimbursement, for example, or a benefit for
5 health or retirement, and then if it's added to gross
6 this would be part of those earnings or income as part
7 of the gross earning amount.
8     MR. SPELLBERG: Hold on a second.
9     Joel, do you have those documents that Mark
10 gave you earlier? I would like to look at them.
11     MR. YOUNG: Which ones?
12     MR. SPELLBERG: You had -- he handed them to
13 you. He had a set of them.
14     MR. YOUNG: Hold on.
15     MR. SPELLBERG: Because I think I'm going to
16 have to make copies. I want to look at those.
17     MR. YOUNG: You are thinking about those?
18     MR. SPELLBERG: Probably.
19     MR. YOUNG: That's the only thing I have left
20 other than the copies you gave me.
21     MR. SPELLBERG: Okay. Yes, it's the one I
22 want.
23     MR. TIDRICK: Is there any in that stack that
24 you don't want us marking as exhibits?
25     MR. SPELLBERG: You can mark anything you

| | |
|---|---|
| 1   want. Some of this I want myself. | 1   If I remember correctly, I think he is a payroll |
| 2       Let me go have a set made of this for myself. | 2   manager. |
| 3   Let me get a set of these made. | 3     Q.  Is it your understanding that the information |
| 4       MR. TIDRICK:  Off the record. | 4   reflected in the Subject to Offset column in the |
| 5       (Recess taken.) | 5   Preliminary Offset Key in your June 10, 2016 report |
| 6   BY MR. TIDRICK: | 6   marked as Plaintiffs' Exhibit 126 accurately reflects |
| 7     Q.  In the Preliminary Offset Key that's part of | 7   what Mr. Keohane's understanding is of what pay codes |
| 8   your June 10, 2016 report marked as Plaintiffs' Exhibit | 8   are subject to offset? |
| 9   126, the column entitled Multifactor, what does that | 9     A.  Well, I don't know that he has the legal |
| 10   refer to? | 10   understanding of what is subject to offset, but he has |
| 11     A.  My understanding is that is a compensation | 11   the understanding of what those pay codes represent. |
| 12   category that is paid at a normalized rate or at some | 12     Q.  Do I understand you correctly that when you |
| 13   other rate. So, for example, some overtime would be | 13   created the Subject to Offset column in the Preliminary |
| 14   paid at time and-a-half, and so to the extent that | 14   Offset Key in your June 10, 2016 report, you based your |
| 15   that's the case the multifactor for that item would be | 15   decision on what to put in the Subject to Offset column |
| 16   1.5. | 16   on your discussions with Mr. Keohane? |
| 17     Q.  So do I understand correctly that any number | 17     A.  And Mr. McLaughlin. |
| 18   that appears in the Multifactor column is a multiplier | 18     Q.  Mr. McLaughlin being one of defendants' |
| 19   against the wage rate? | 19   lawyers; correct? |
| 20     A.  I suppose you could characterize it that way. | 20     A.  Right. |
| 21     Q.  With respect to the zeros in the column, are | 21     As I understood, part of the process is really |
| 22   you indicating that -- obviously, zero times anything is | 22   to identify those offsets that are appropriate to |
| 23   zero. | 23   consider from a legal basis in the case, and |
| 24     Is that accurate with respect to the zeros in | 24   Mr. McLaughlin is the legal authority that I had access |
| 25   the Multifactor column as well? | 25   to while speaking with Mr. Keohane. |
| <div align="right">Page 26</div> | <div align="right">Page 28</div> |
| 1     A.  Yes. So those would be unpaid categories. | 1     Q.  So if I understand the process correctly, you |
| 2     Q.  Anything with a zero in the Multifactor | 2   received information from Mr. Keohane with respect to |
| 3   column? | 3   what each of the payroll codes meant and you received |
| 4     A.  That's my understanding as I looked at it. | 4   information about the legal implication from |
| 5     Q.  With respect to the column entitled Subject to | 5   Mr. McLaughlin and using that information you developed |
| 6   24-Hour Rule in the Preliminary Offset Key, what does | 6   the information listed in the Subject to Offset column? |
| 7   that refer to? | 7     A.  Correct. |
| 8     A.  I don't know. That was part of the document | 8     Q.  I'm showing you a document that's been marked |
| 9   that was provided that you marked as Plaintiffs' 130. | 9   as Plaintiffs' Exhibit 127. I will represent to you |
| 10     Q.  With respect to the column in the Preliminary | 10   that Plaintiffs' Exhibit 127 is a subset of the rows in |
| 11   Offset Key in your June 10, 2016 report marked as | 11   your Preliminary Offset Key in the June 10, 2016 report |
| 12   Plaintiffs' Exhibit 126, the column entitled Subject to | 12   that has been sorted by PeopleSoft Earn Code and Subject |
| 13   Offset, what does that indicate? | 13   to Offset. |
| 14     A.  So this is the component that I generated from | 14     Looking at the top five rows in the |
| 15   the Exhibit 130 in discussion with Mr. McLaughlin and | 15   Plaintiffs' Exhibit 127 document, do I understand |
| 16   Mr. Keohane as to whether this item would be subject to | 16   correctly that these five rows are pay codes that you |
| 17   offsets in this matter. | 17   understood to be subject to offset? |
| 18     Q.  What do you mean by that "subject to offsets"? | 18     A.  Yes. |
| 19     A.  What I mean is this would be a reduction in | 19     (Plaintiffs' Exhibit 127 was marked for |
| 20   any claimed FLSA loss or in any of the losses as I | 20   identification.) |
| 21   understand the plaintiffs are making in this case. | 21     Q.  Why are those five rows subject to offset? |
| 22     Q.  Do you have any understanding of what | 22     A.  Well, part of that requires a legal analysis |
| 23   Mr. Keohane's position is with the City and County of | 23   in my mind, but to give you an idea of my understanding, |
| 24   San Francisco? | 24   if the plaintiffs are claiming that they haven't been |
| 25     A.  I wrote it down. It's in the notes you have. | 25   paid because they have further standby time but there is |
| <div align="right">Page 27</div> | <div align="right">Page 29</div> |

<div align="right">8 (Pages 26 - 29)</div>

1  a pay for their standby time, that would reduce their
2  loss, and "STB" is the pay code for the standby time.
3        To the extent that there's travel time that
4  they are compensated for and they are claiming a loss
5  from travel time, then to the extent they were paid for
6  travel time that would be an offset to their loss.
7        With respect to the military leave, they
8  didn't work but they received compensation and as I
9  understand that would be an offset to the loss. Same
10  with jury duty.
11     Q.  Why did you understand that jury duty would be
12  an offset to the loss?
13     A.  Because they get compensated for time they are
14  not working and my understanding is that that's not
15  required under the FLSA.
16     Q.  The row with the Trapeze Description From
17  Expired MOU, why is that subject to offset?
18     MR. SPELLBERG: I'm going to object to the
19  extent you're asking for a legal conclusion. Mark can
20  testify to his understanding.
21  BY MR. TIDRICK:
22     Q.  What information did you receive that led you
23  to conclude that the From Expired MOU category was
24  subject to offset?
25     A.  Well, my understanding is that it's not just
Page 30

1  From Expired MOU, it's the Trapeze Code for that is
2  MPO-L which came from the Expired MOU but it referred to
3  military leave, and, again, military leave was something
4  that was paid for or paid to the employee for time that
5  they did actually not work in their job.
6     Q.  I see. So the Trapeze Code MPO-L refers to
7  the description in the Trapeze Description column "bid
8  run for performing military leave overseas, oil rail
9  premium from expired MOU"?
10    A.  That's my understanding, yes.
11    Q.  Is there any other information that you
12  received that led you to believe that the MPO-L category
13  was subject to offset?
14    A.  Other than what we have discussed, my
15  conversations with Mr. McLaughlin who is the legal
16  source for that, no, that and, of course, Mr. Keohane
17  who provided an explanation for what that pay was.
18    Q.  As far as the specifics of what you heard,
19  nothing beyond what you have described during your
20  deposition here today?
21    A.  Right.
22    Q.  With respect to the lunch period row, what
23  does the LNCH code refer to?
24    A.  To the lunch period and in instances they were
25  paid, but it wouldn't represent an offset unless it was
Page 31

1  over 30 minutes.
2     Q.  Why is that?
3     A.  That's my understanding of what Mr. McLaughlin
4  said that the legal measure is.
5     Q.  If I could, please, refer you to your June 10,
6  2016 report, Page 4 of 7.
7        Do I understand correctly that the paragraph
8  at Page 4 of 7 that starts "I have tallied the
9  offsetting income" refers to three-year and two-year
10  offset lists that are also part of this same report?
11    A.  Well, as well as the entire period from
12  July 1, 2009 to November 14, 2015.
13    Q.  Referring to the table in the June 10, 2016
14  report, Plaintiffs' Exhibit 126 that's labeled
15  Three-year FLSA Offsets, that's two pages within this
16  document; correct?
17    A.  That's correct.
18    Q.  This two-page Three-year FLSA Offsets document
19  that's within your June 10, 2016 report, what is this
20  Three-year FLSA Offsets document?
21    A.  So what I did is I took the pay over the
22  three-year FLSA periods as indicated in Dr. Drogin's
23  work product and tallied up those pay codes payout by
24  pay code that were subject to an offset after the
25  adjustment as to the amounts of the offset. Some items,
Page 32

1  for example, overtime, wouldn't be subject to a complete
2  offset, it would only be subject to half of the time
3  and-a-half that was paid, so, in other words, a third of
4  the total pay. And then I computed all those offsets
5  over the Drogin three-year FLSA period to come up with
6  the $57 million figure.
7     Q.  What does the $57 million figure refer to?
8     A.  The offsets for the class over the three-year
9  period as identified by Dr. Drogin.
10    Q.  The $57 million figure is the offset that you
11  calculated for the entire class for the three-year
12  period identified by Dr. Drogin; is that correct?
13    A.  Right.
14    Q.  Who created the Three-year FLSA Offsets
15  document?
16    A.  I did.
17    Q.  When did you create it?
18    A.  Shortly before June 10, 2016.
19    Q.  In the Three-year FLSA Offset document what
20  does the column "ERN Code" refer to?
21    A.  That's the earned code. Generally, it's
22  really the PeopleSoft code.
23    Q.  Why do certain codes listed in this column
24  have a (1) after the code?
25    A.  Because in the Trapeze Code there may be a
Page 33

1 further breakdown of the PeopleSoft code. So, for
2 example, with respect to birthday, there's the two items
3 listed "BDP." Now, that is an item under the Earned
4 Code category that pertains to someone being paid on
5 their birthday, but it doesn't further break down
6 between whether they worked on that birthday or they
7 didn't work on the birthday. So in those instances
8 where there's more than one potential category of pay
9 under the Earned Code I split them out and separated
10 them.
11    Q. And you did that for the entire class; is that
12 correct?
13    A. Right.
14    Q. And you did that for the entire three-year
15 FLSA time period identified in Dr. Drogin's report?
16    A. Right.
17    Q. In the column of the Three-year FLSA Offset
18 document labeled "Adjustment," what does the adjustment
19 number refer to?
20    A. To the amount of the total pay that would be
21 subject to offset.
22        So as I indicated earlier, an example would be
23 for overtime, I would take one-third of the total amount
24 as the offset so the adjustment would be .33 in that
25 column.

Page 34

1    Q. How did you determine in the adjustment column
2 which of the codes you listed as 1.00 and which ones you
3 listed as 0.33?
4    A. Well, generally speaking, if they didn't work
5 and were compensated at a straight-time basis the
6 adjustment would be 1. If it was overtime pay and they
7 were paid at time-and-a-half the adjustment would be
8 .33.
9    Q. Why did you use the .33 figure for that?
10    A. Because this is above and beyond a normal
11 straight-time pay for the hours worked so the offset
12 would be that premium, if you will, for the hours worked
13 over an eight-hour day.
14    Q. Referring to the very last row of the
15 Three-year FLSA Offset document that is in your June 10,
16 2016 report, Plaintiffs' Exhibit 126, the total you list
17 of $57,120,070 is your conclusion of the aggregate
18 offsetting income for the entire class for the
19 three-year statute of limitations period identified by
20 Dr. Drogin; is that correct?
21    A. Right, for those people that he measured.
22    Q. How did you calculate that total amount?
23    A. So he provides information in his work product
24 as to the period for each of the individuals, and when
25 you merge the pay data and the Trapeze data you get

Page 35

1 information that allows you to compute what the total
2 pay was over the periods in question. Then you get --
3 once you get the total pay for everything then I sorted
4 away all the pay codes that were not subject to an
5 offset leaving only the pay codes that were subject to
6 an offset, and then I further refined the calculation to
7 make an adjustment as to whether or not the entire
8 amount would be subject to the offset or just a portion.
9    Q. Referring to the two-page document in your
10 June 10, 2016 report marked as Plaintiffs' Exhibit 126
11 that is labeled Two-Year FLSA Offsets, is it fair to say
12 that what you have described with respect to the
13 Three-year FLSA Offsets and the methodology you used to
14 create and reach a total in that document is the same
15 with respect to the Two-year FLSA Offset document, the
16 only difference being that in the Two-year FLSA Offset
17 document you limited the calculation to the two-year
18 FLSA statute of limitations period; is that correct?
19    A. Yes.
20    Q. And your total calculation of the offset on an
21 aggregate basis for the entire class for the two-year
22 FLSA statute of limitations period, am I reading this
23 right, is $45,888,107; is that correct?
24    A. Yes.
25    Q. If you can turn, please, to Page 6 of your

Page 36

1 June 10, 2016 report marked as Plaintiffs' Exhibit 126,
2 there's a statement that you make on this page in the
3 last paragraph, the very last sentence of that page, and
4 I quote "No losses occur in a significant majority of
5 weeks when offsets are considered." That's a conclusion
6 that you reached; is that correct?
7    A. Yes.
8        MR. SPELLBERG: Sorry. Where is that
9 sentence?
10        MR. YOUNG: Bottom of the page. You're on the
11 wrong page.
12        MR. SPELLBERG: Sorry.
13 BY MR. TIDRICK:
14    Q. In reaching that conclusion how many work
15 weeks did you observe where losses occurred after
16 applying the offsets?
17    A. I'm sorry. Would you mind repeating the
18 question.
19        MR. TIDRICK: Could you read it back.
20        (Record read.)
21        THE WITNESS: Well, it was dependent on which
22 measures I was taking. So I had the entire period, I
23 had the FLSA two-year period data and I have the FLSA
24 three-year period data. So I could refer to each period
25 and each period I observed that.

Page 37

10 (Pages 34 - 37)

BY MR. TIDRICK:

Q. Just to make sure I understand correctly, that's something that you can provide for me for the FLSA three-year statute of limitations period, the FLSA two-year statue of limitations period, and did you say for another period of time as well?

A. Right, for the entire period.

And you have that data. It's part of what was provided to you.

Q. Is that part of what was provided in the CD yesterday?

A. No. It was provided, I think, when was it, like June 28 or so.

Q. Are you able to tell me approximately for any of those time periods how many work weeks there were where you observed losses after applying the offsets, or is that something you can tell me with information you have here today?

A. It would be a guess right now because I don't have all the analysis in front of me, but I could say that the analysis is there, it identifies losses by week, and it was clear upon observation that in most weeks there was no loss.

Q. When you say "in most weeks," you're saying a majority, more than 50 percent?

A. Yes.

Q. In some number of weeks for each of those three time periods that you analyzed there were a certain number of weeks where you computed there was a loss even after applying the offset; is that correct?

A. Well, using Dr. Drogin's methodology, yes. I mean, I do have concerns with his methodology, but in use of his methodology there were weeks in which there were losses even after considering the offsets.

Q. And I understand that you don't have the electronic files in front of you right now.

Can you just describe for me if you did have the electronic files in front of you how specifically would you be able to identify for each of those time periods the number of weeks for which you concluded that there were losses even after applying the offsets. What's the methodology you would use to be able to tell me the number of weeks?

A. Sure.

Well, Dr. Drogin made a calculation by week by person of the losses. Now, separately I computed using the payroll data in the Trapeze data after I merge them together offsets per week per person and apply those next to each other and then took the difference.

Q. Are you able to tell me without having the

files in front of you what was the aggregate value of the work weeks where the losses were occurred after applying the offsets?

A. Yes. And this is part of the most recent work that I've performed, and I performed it based on the 289 people -- well, actually, the 345 people per in my declaration. I did it for the 289 people who were a subset of the 345 in that not everyone signed a consent form, and then I also did it for the class in total for those people who signed consent forms.

And to answer your question, for the two-year FLSA period for the entire class who signed consent forms which were over 2,000 people, the economic loss after considering the offsets was a negative $14,535,525.44.

For the subset of those who were deposed or provided declarations but who also signed consent forms, for the two-year FLSA period the aggregate loss after considering the offsets was negative $2,142,158.84.

Q. I'm asking something different which is looking just at the work weeks where losses occurred, are you able to tell me what was the aggregate value of the loss after applying offsets?

MR. SPELLBERG: I'm going to object. It's incomprehensible then.

THE WITNESS: So you're saying ignore the weeks where there was a negative loss?

BY MR. TIDRICK:

Q. Correct.

A. I can't tell you that number right now right here. You have the data to make the calculation on your own because I provided it to you, you can make that calculation, but I haven't endeavored to make the calculation because I don't think it's relevant at all.

Q. Aside from your own belief about the relevance, can you just describe for me briefly how exactly the files that you produced could be analyzed in order to identify the aggregate value of the loss in the work weeks where losses occurred after applying the offsets, what methodology you would use.

MR. SPELLBERG: It's still incomprehensible the way the question is asked.

THE WITNESS: Well, like I said, in the evaluation I used Dr. Drogin's analysis in which he computes the loss by week by person. And in some weeks after considering the offset there was positive and some were negative, so you just sort out the positive ones and you can count them up.

BY MR. TIDRICK:

Q. Did you perform any kind of analysis based on

the work weeks where losses occurred after applying
offsets?
    MR. SPELLBERG: Same objection.
    THE WITNESS: No, I did not do that.
BY MR. TIDRICK:
  Q. If I could refer you, please -- strike that.
    The numbers that you provided within the last
few minutes about a negative $14 million loss and a
negative $2 million loss, do I understand correctly that
those are calculations that you made accounting for both
weeks in which there was an economic loss as well as
weeks in which there was not; in other words, it's an
aggregate of all of the weeks; is that correct?
  A. During the periods in question which is to say
during the FLSA periods for each person as they sign,
you know, given the date in which they signed the
consent form and so forth.
  Q. I'm showing you a document marked as
Plaintiffs' Exhibit 131.
    Is this a document that you have seen before?
  A. You know, there were quite a few documents
produced in this case. I believe it's included in the
documents that I received.
    (Plaintiffs' Exhibit 131 was marked for
    identification.)

  Q. Do you understand that the Plaintiffs' Exhibit
131 document is an FLSA consent form signed by Darryl
Stitt?
  A. Yes.
  Q. You've expressed the opinion that Mr. Stitt
did not sign a consent form; is that correct?
  A. Well, that's what Dr. Drogin had indicated.
  Q. Other than your belief that Dr. Drogin
indicated that, do you have any basis for saying that
Mr. Stitt did not sign a consent form?
  A. No.
  Q. With respect to a statement on Page 6 of your
June 10, 2016 report marked as Plaintiffs' Exhibit
126 --
    MR. SPELLBERG: Sorry. What page?
    MR. TIDRICK: 6 of 7.
    THE WITNESS: I have to say I would have to go
back to the class list provided to see if there was --
whether it was indicated that he signed the consent form
or not. That might be another piece of information that
would provide an answer to your question, but I can't
say what it says right now.
BY MR. TIDRICK:
  Q. Turning to Page 6 of 7 of your June 10, 2016
report, Plaintiffs' Exhibit 126, there's a paragraph

that starts "Ms. Griffin."
  A. Yes.
  Q. Do I understand correctly that that paragraph
describes the analysis that you did to reach the
conclusion that Ms. Griffin had a loss of $22,182 --
strike that.
    Do I understand correctly that you reached the
conclusion that under the FLSA two-year statute of
limitations period Ms. Griffin's losses were $30,756?
  A. According to Dr. Drogin.
  Q. And your analysis after doing your offsetting
analysis was that Ms. Griffin's economic loss was
negative $295?
  A. Yes, at that point that was my assessment.
  Q. Your opinion is that offsetting income equaled
$31,051. Do I understand correctly you reached that
number by adding up the offsetting amounts for each of
Ms. Griffin's work weeks; is that correct?
  A. Right.
  Q. Including both weeks in which there was a
positive loss as well as weeks in which there was a
negative loss; is that correct?
  A. Right.
  Q. And similarly, with respect to the
calculations that you've made for Mr. Grandberry, do I

understand that the analysis you did includes both weeks
in which you determined that there was both positive
loss and negative loss?
  A. Yes.
  Q. I'm showing you a document that's been marked
as Plaintiffs' Exhibit 132. At the top it says Hedy
Griffin Two-year FLSA Damages.
    This is a document that you prepared; correct?
  A. Yes.
    (Plaintiffs' Exhibit 132 was marked for
    identification.)
  Q. Turning to the right-most column in the
Plaintiffs' Exhibit 132 document, the column entitled
Difference Between Drogin Damages Under FLSA Two-year
and Cohen Offset.
  A. Yes.
  Q. When the number in that column is positive,
what does that signify?
  A. That the damages are positive after
consideration of the offsets.
  Q. When a value in that column is negative, what
does that signify?
  A. That the damages are negative, that the
offsets are greater than the losses.
  Q. And each of the rows in the Plaintiffs'

1 Exhibit 132 document represents a separate work week;
2 correct?
3    A.   That's right.
4    Q.   The methodology that you used to perform the
5 calculations set forth in the Plaintiffs' Exhibit 132
6 document, is that a methodology that you would be able
7 to perform for each member of the class?
8    A.   Yes.
9    Q.   I'm showing you a document marked
10 Plaintiffs' Exhibit 133.  Is Plaintiffs' Exhibit 133 a
11 document that you created?
12    A.   Yes.
13       (Plaintiffs' Exhibit 133 was marked for
14       identification.)
15    Q.   What is the Plaintiffs' Exhibit 133 document?
16    A.   This is part of the computation that I
17 identified the offsets by day for her, and when I say
18 "her" for Ms. Griffin.  And this is pertaining again to
19 my work product that was generated in creation of
20 Exhibit 132.
21       And just so you know, this work product has
22 been refined since this time, but in any event, that's
23 how I did it.
24    Q.   What refinements have you made to the
25 Plaintiffs' Exhibit 133 document?

1    A.   Well, since that time I discovered that
2 Dr. Drogin wasn't including all the weeks during the
3 FLSA periods.  So for weeks, for example, when they
4 didn't work but were paid and maybe subject to an
5 offset, he didn't include those in some instances.  So I
6 went back and took all the weeks specifically within the
7 period of the FLSA claim whether in the two-year period.
8 So I refined it in that regard.
9       And then also not with respect to her, but
10 with respect to everyone else, there were some
11 discrepancies between the class list that Dr. Drogin
12 used and the class list that was furnished.  Now, that
13 may be part of the reason that Dr. Drogin did not
14 consider Mr. Stitt to have signed the consent form.
15 After this June 10 information was provided to you I
16 continued to try and understand his work product, and I
17 found that he wasn't using the same class list.
18    Q.   The same class list that you were provided?
19    A.   Well, that he was provided as well.  I mean, I
20 used the same list that he was provided, but somehow he
21 didn't necessarily apply it to his calculations.
22       So after applying his methodologies and
23 including everybody in the class list who signed the
24 consent form I generated new figures, and after
25 including those weeks that he had eliminated during that

1 FLSA period, including that data, I obtained new
2 results.
3    Q.   And you did that for all individuals that you
4 understood to be members of the class?
5    A.   Correct.
6       So, for example, in my most recent document,
7 while you were talking I looked up Hedy Griffin, and I
8 had a different number for her in my most recent product
9 compared to the figure that I had calculated initially
10 as of June 10, 2016.
11    Q.   Focusing on the Plaintiffs' Exhibit 133
12 document, can you explain to a layperson what is the
13 Plaintiffs' Exhibit 133 document, what is it intended to
14 do?
15    A.   Well, it's intended to take the periods of
16 time that we had information for and calculate up the
17 offsets based on the offset key that we discussed
18 earlier.
19    Q.   For?
20    A.   Ms. Griffin.
21    Q.   And you did it for all days that Ms. Griffin
22 worked?
23    A.   Or didn't work but was compensated for.
24    Q.   The analysis that you did for Ms. Griffin as
25 reflected in the Plaintiffs' Exhibit 133 document, is it

1 possible for you to do the same analysis for each member
2 of the class?
3    A.   Yes.
4    Q.   The next exhibit will be Plaintiffs' 134.
5       I'm showing you a document marked Plaintiffs'
6 Exhibit 134.
7       Focusing just on the Plaintiffs' Exhibit 134
8 document, can you explain as you would to a layperson
9 what does the Plaintiffs' Exhibit 134 document
10 represent?
11    A.   So this is a combination of Dr. Drogin's work
12 product and my work product pertaining to the offsets.
13 The work product in this matter is only with respect to Ms. Griffin, and it
14 instance is only with respect to Ms. Griffin, and it
15 pertains to her on a daily basis summarized ultimately
16 on a weekly basis.
17       (Plaintiffs' Exhibit 134 was marked for
18       identification.)
19    Q.   The analysis you did for Ms. Griffin reflected
20 in Plaintiffs' Exhibit 134 document that you created,
21 would it be possible for you to do the same analysis for
22 each class member?
23    A.   You know, excuse me, it's not summarized on a
24 weekly basis, it's all on a daily basis.
25       But in answer to your question, yes, I suppose

1 I could do this for each person separately. I mean, it
2 would be a lot of paper.
3 Q. It would be a lot of paper. I'm not asking if
4 you have done it. It's something you could do; correct?
5 A. Yes, it would take quite a bit of time to do
6 it this way, but, yes.
7 Q. Are you familiar with the GEAC data produced
8 by SFMTA?
9 A. I know of its existence and that it was the
10 data that was generated with respect to payroll prior to
11 the 2012 period, I believe.
12 Q. Separate from the GEAC data, let me ask you
13 something different.
14 For the analysis you did for Ms. Griffin, did
15 you perform a regular rate calculation?
16 MR. SPELLBERG: Objection. Calls for legal
17 conclusion.
18 You may answer if you understand.
19 THE WITNESS: You mean the regular rate on an
20 hourly basis? I'm not quite understanding what you
21 mean.
22 BY MR. TIDRICK:
23 Q. Yes.
24 A. So, yes, this analysis is based on the same
25 regular rates that Dr. Drogin used.

1 Q. In doing that calculation what pay codes did
2 you -- strike that.
3 The GEAC data, did you actually review any of
4 the GEAC data?
5 A. I'm not remembering at this point whether I
6 looked at the actual GEAC data or whether I used the
7 other data for making my calculations. I just can't
8 remember at this point.
9 Q. Were you aware of an audit conducted by the
10 Office of the Controller of the City and County of San
11 Francisco regarding SFMTA's payroll process and
12 timekeeping system for transit operators?
13 A. I heard there was an audit, but that's about
14 all.
15 Q. I'm showing you a document that has been
16 previously marked as Plaintiffs' Exhibit 35.
17 If you could, please tell me, having the
18 Exhibit 35 document in front of you, do you recognize
19 it?
20 A. No.
21 Q. I'll represent to you that Exhibit 35 is the
22 City and County of San Francisco Office of Controller
23 audit I was just asking about. And I understand you
24 haven't seen this, but for reference, could you please
25 turn to Page 3 of the Exhibit 35 document, the audit.

1 A. Yes.
2 Q. There's a statement at Page 3 that reads, and
3 I quote, "Every other week SFMTA's payroll division
4 interfaces and transmits the transit operator's time
5 records from Trapeze to the controller's Payroll and
6 Personnel Services Division, PPSD, for payroll
7 processing. During the audit period PPSD processed
8 payroll and personnel data using the GEAC 2 payroll
9 system (GEAC) for employees of all city departments
10 ensuring compliance with city, state and federal tax
11 wage and hour regulations. Using data from Trapeze,
12 GEAC calculated pay based on the hours worked and
13 applicable tax and payroll deductions. Once payroll was
14 processed, GEAC uploaded the payroll data to the labor
15 distribution system part of the Financial Accounting and
16 Management Information System (FAMIS), the State's
17 financial system."
18 The process described in the statement that I
19 just read to you, is that a process that you were aware
20 of?
21 A. Well, I wasn't aware that once the GEAC data
22 was processed it was uploaded to the FAMIS system,
23 didn't know that.
24 Q. Other than that is the process that is laid
25 out in the statement I just read a process that you were

1 familiar with?
2 A. Yes, but at some point, again, this changed
3 and they migrated from the GEAC system to the PeopleSoft
4 system.
5 Q. Your understanding is that the GEAC data
6 presents what is actually paid to the operators; is that
7 correct?
8 A. Yes, that's right.
9 Q. Do you have any reason to believe that that is
10 not accurate?
11 A. Well, you know, I haven't investigated it. I
12 don't know whether that's the case or not.
13 Q. So is it fair to say you have no reason either
14 to believe or disbelieve that the GEAC data presents
15 what is actually paid to the operators?
16 A. Right.
17 Q. Do you understand that the GEAC data is
18 summarized by pay period?
19 A. That's my understanding.
20 Q. You understand that GEAC data was provided to
21 you for the time period of December 11, 2009 through
22 August 17, 2012?
23 A. I mean, I'm not recollecting right now.
24 Q. Do you recall approximately whether that's the
25 time period?

**Page 54**

A. As I said, I recall that they stopped using the system in 2012 so it sounds generally correct, but as I'm sitting here now I can't be sure.

Q. You understand that the GEAC data did not contain any of the actual GEAC pay codes; is that correct?

A. Again, I would have to go back and look.

Q. Sitting here today you don't recall one way or the other; is that correct?

A. Yes.

Q. For the time period for which you had GEAC data, how did you determine which GEAC codes to offset?

A. Well, there were Trapeze codes that were provided.

Q. Based on the Trapeze codes that were provided, how did you assess which GEAC codes to offset?

A. Well, we had table -- not table, but Exhibit 130 and it provides the Trapeze code, the old GEAC code and the PeopleSoft code, and so this document provided the basis for the different pay codes to select those which were subject to offset or not which we talked about already. So I didn't particularly need the old GEAC codes necessarily to pick and choose which ones were subject to offset because we had not only the old GEAC code associated with that earning amount or wage

**Page 55**

amount or compensation amount and its cross reference with the Trapeze code and the PeopleSoft code.

Q. In the audit document that's been marked as Exhibit 35, if I could please refer you to Page 20 of that document.

Do you see Page 20 of the Trapeze audit, Exhibit 35, there's a statement that Trapeze shows 1.23 million more hours than PPSD's payroll system? You see that statement?

A. Yes.

Q. Again, I understand the audit document is not something you have seen before the deposition today. All that I'm interested in knowing is, is the fact that Trapeze shows 1.23 million more hours than PPSD pay control system a fact that you were aware of before the deposition today?

A. No.

MR. SPELLBERG: I'm going to object to the form of the question. It's a fact not in evidence.

THE WITNESS: I don't know what it pertains to either because you could have an hour of unpaid leave that's in Trapeze that doesn't show up on the payroll. So I don't know that it means anything by itself.

BY MR. TIDRICK:

Q. In your analysis, in any of the analysis that

**Page 56**

you have constructed for this case, do you do anything to account for any discrepancy between the number of hours reflected in the Trapeze system and the number of hours reflected in the payroll system?

MR. SPELLBERG: Objection. Fact not in evidence.

THE WITNESS: In this particular instance I don't know that there is a difference. I'm responding to the analysis of Dr. Drogin and the periods that he selected based on the class list data in terms of the loss and I'm tallying up all the offsets as indicated in the payroll system.

BY MR. TIDRICK:

Q. I'm asking a somewhat different question, and I understand your lawyer is making an objection. I'm asking about a fact not in evidence.

I'm asking you to assume that the finding by the City and County of San Francisco's auditor, internal auditor, as reflected as Page 20 of the audit report, Exhibit 35, assuming that to be true, the auditor is finding that Trapeze shows 1.23 million more hours than PPSD's payroll system, assuming hypothetically that the City and County of San Francisco's internal audit department was correct, is there any manner in which you accounted for that discrepancy in any of the analysis

**Page 57**

that you have done for this case?

MR. SPELLBERG: Objection. It's vague and ambiguous, incomprehensible. One, since he didn't know it existed, it's impossible for him to have accounted for it in advance; and, two, it's an incomplete hypothetical because you have just taken one sentence out of context out of an entire audit.

So you may answer, of course, if you're able.

THE WITNESS: Well, I don't know how one would even evaluate such a discrepancy based on the information provided.

Like I said, I think one easy explanation could be that in Trapeze they may show a person is away on leave without pay and ultimately in payroll those hours aren't picked up because they aren't paid. Does that mean that the person was improperly paid? No. Does it mean that there's a discrepancy in how they tally time? No.

So just because you can tally up time on -- tally up time on one method using Trapeze and then get different hours of what was actually paid in the payroll system to me is something that would have to be investigated with respect to the merits of that discrepancy.

I don't know that the people were paid

1 improperly which is what your question is suggesting.
2 BY MR. TIDRICK:
3    Q.   You understand that the GEAC data represents
4 what operators were actually paid?
5    A.   Well, according to this document you said that
6 it was then uploaded to another system before they were
7 ultimately cut their checks, so I can't say for sure
8 now.
9        My understanding was that the GEAC system was
10 a payroll system and it was utilized to develop what the
11 pay would be.
12    Q.   Assuming that the GEAC data does represent
13 what operators were actually paid, why did you use
14 Trapeze codes for calculating offsets and not the codes
15 contained in the GEAC data?
16    A.   Well, what I did is utilize the same methods
17 that Dr. Drogin used in terms of generating historical
18 pay.  The Trapeze codes were codes that could be
19 utilized throughout the periods because the GEAC codes
20 discontinued in 2012, so GEAC at some point in time was
21 not a source that was utilized in computing the losses.
22    Q.   When you stated just now that the Trapeze
23 codes could be used throughout the periods, you're
24 referring to the three time periods of analysis you
25 described earlier in this deposition -- correct --

1 specifically the three-year FSLA statute of limitations
2 period, the two-year FSLA statute of limitations period
3 and the entire class period; is that correct?
4    A.   Right.
5        Do you mind if we take a break?  We have been
6 going for a couple of hours now.
7        (Recess taken.)
8        (Plaintiffs' Exhibit 135 was marked for
9        identification.)
10 BY MR. TIDRICK:
11    Q.   I'm showing you a document marked as
12 Plaintiffs' Exhibit 135, the Declaration of Jonathan-Dat
13 Lam.  I'll represent to you that this document,
14 Exhibit 135, is one of the Declarations By Operators
15 that was used in conjunction with the analysis by
16 Dr. Drogin and was part of the sample.
17        Do you recall seeing any of those
18 declarations?
19    A.   Yes.
20    Q.   I don't expect you to recall every one of the
21 declarations you reviewed, but in looking at the
22 Exhibit 135 document, do you recognize it to be
23 essentially the same form that you've seen for the
24 declarations I'm referring to?
25    A.   Yes.

1    Q.   Did you ever contact any of the operators who
2 signed the declarations?
3    A.   No.
4    Q.   Do you have any reason to believe that any of
5 the operators' declarations are not truthful?
6    A.   Well, they may be trying to recollect as best
7 they can and perhaps they are truthful, perhaps they are
8 not, I don't know, but regardless, recollections don't
9 make this process an accurate one.
10    Q.   Do you have any reason to believe that SFMTA
11 or the City and County of San Francisco have retained
12 any records that reflect more accurately any of the
13 amounts of time specified by the operators in their
14 declarations?
15    A.   I don't know exactly what they have in that
16 regard.
17    Q.   Do you have any reason to believe that the
18 amounts of time would be any different than what a
19 third-party observer watching the operators would
20 observe?
21        MR. SPELLBERG:  Objection.  Lack of
22 foundation, incomplete hypothetical.
23        THE WITNESS:  It's hard for me to answer that
24 question.
25 ////

1 BY MR. TIDRICK:
2    Q.   Why is that?
3    A.   Well, because it wasn't done.  I can say,
4 generally speaking, when there's a third party that's
5 disinterested there's better measures in place to
6 measure these types of things than the interested party
7 and their recollection.
8    Q.   Do you have any understanding whether there
9 has been any third-party observation done of the
10 operators for the period of time for which the operators
11 are claiming to have been underpaid?
12    A.   I don't know.  You know, I can't -- I can say
13 that in responding to Dr. Drogin, it doesn't appear that
14 the plaintiffs had made tallies themselves or that there
15 were third parties making tallies on their behalf.
16    Q.   Are you aware of any evidence that any
17 operator signed his or her declaration under duress?
18        MR. SPELLBERG:  Objection.  Lack of
19 foundation.  Witness isn't designated as an expert on
20 that topic.
21        You may answer.
22        THE WITNESS:  I have no idea.
23 BY MR. TIDRICK:
24    Q.   Are you aware of any evidence that any
25 operator was coerced into signing his or her

1 declaration?
2     MR. SPELLBERG: Same objections.
3     THE WITNESS: I have no idea one way or the
4 other.
5 BY MR. TIDRICK:
6   Q. Are you aware of any evidence that any
7 operator did not understand what he or she was signing?
8     MR. SPELLBERG: Same objections.
9     THE WITNESS: I have no idea.
10 BY MR. TIDRICK:
11   Q. Do you have any reason to believe that any
12 operator did not understand what penalty of perjury
13 means?
14     MR. SPELLBERG: Same objections.
15     THE WITNESS: I don't know.
16 BY MR. TIDRICK:
17   Q. Do you know what penalty of perjury means?
18   A. Yes.
19   Q. Did someone have to explain that to you for
20 this case?
21   A. No.
22   Q. Do you recall how you first learned what
23 penalty of perjury means?
24   A. When I got involved in the area of forensic
25 economics.

1   Q. How many surveys have you prepared yourself?
2   A. Hundreds, I would say.
3   Q. In your professional capacity do you have any
4 kind of a working definition of what a "survey" is?
5   A. Yes.
6   Q. What is that?
7   A. It's where you inquire to individuals about
8 certain information and then you compile those answers.
9   Q. In the hundreds of surveys that you have
10 prepared, have you ever included language in the survey
11 that specifies that the individual is providing the
12 responses under penalty of perjury?
13   A. No, I don't think so. I can't remember a time
14 I did that.
15   Q. The definition that you've provided of a
16 survey just now, is that a definition that you learned
17 at school or in some other professional training?
18   A. Yes.
19   Q. Where did you get that definition of a survey
20 that you provided a moment ago?
21   A. It's commonly used in statistics and in market
22 research.
23   Q. Have you ever performed a survey in connection
24 with any wage and hour class action lawsuits?
25   A. No.

1   Q. When approximately was that?
2   A. About 32 years ago.
3   Q. Prior to that you didn't know what penalty of
4 perjury meant?
5     MR. SPELLBERG: Objection. Misstates his
6 testimony.
7     THE WITNESS: I didn't have a real keen
8 understanding of it. Coinciding about the time I
9 started filing my tax returns, I think there's a penalty
10 of perjury item on your tax returns.
11 BY MR. TIDRICK:
12   Q. Understood.
13   Fair to say -- I understand this was 32 years
14 ago. Best of your recollection is when you're filing
15 your tax return for the first time you see it says
16 "penalty of perjury" and you had some understanding of
17 what that meant; is that right?
18   A. Right.
19   Q. Do you have expertise with respect to the
20 design of surveys?
21   A. I do have some, yes.
22   Q. What is your expertise with respect to the
23 design of surveys?
24   A. Well, I have studied it in school and prepared
25 surveys myself over the years.

1   Q. Are you able to provide me with any examples
2 of affidavits being provided under penalty of perjury
3 being referred to as a survey?
4     MR. SPELLBERG: I'm going to object to the
5 form of the question. I don't understand it. Vague and
6 ambiguous.
7     THE WITNESS: I don't know.
8 BY MR. TIDRICK:
9   Q. Are you familiar with 511.org?
10   A. Somewhat, yes.
11   Q. What do you understand 511.org is?
12   A. It's a service that allows you to try and
13 estimate the time it takes you to get from one place to
14 another using different forms of transportation.
15   Q. Here in the bay area; correct?
16   A. Yes.
17   Q. Do you have any general understanding about
18 the accuracy of the time estimates provided by 511.org?
19   A. No.
20   Q. Do you have any reason to believe that time
21 estimates provided by 511.org are not accurate?
22   A. Well, depends.
23   Q. What does it depend on?
24   A. Depends on if you have different forms of
25 transportation you actually take rather than utilizing

**Page 66**

1 the methods that are identified in 511.org.

2 Q. Have you undertaken any steps to ascertain how

3 exactly operators travel to or from relief points?

4 A. Well, I read the depositions of the three

5 individuals who are named here, Mr. Stitt,

6 Mr. Grandberry and Ms. Griffin, and they testified about

7 those issues.

8 Q. Other than what you read about in the

9 deposition testimony of the three named plaintiffs, have

10 you done anything else to ascertain how operators travel

11 to or from relief points?

12 A. No, not at this point anyway.

13 Q. You haven't done anything to study whether the

14 travel time estimates generated from the 511.org data

15 are different from the actual travel time incurred by

16 operators; is that correct?

17 A. Well, the testimony of the three isn't

18 necessarily consistent with the assumptions that

19 Dr. Drogin uses in that he is utilizing the 511.org data

20 for everyone, and we know, for example, that

21 Mr. Grandberry and Ms. Griffin maintain their car at the

22 place in which they started their run.

23 Q. Have you done anything to ascertain whether

24 the travel time estimates, the amounts of time estimated

25 by 511.org, are different than their actual travel time?

**Page 67**

1 A. Yes. That's what I just said. It seems to me

2 it wouldn't be applicable given that there would be no

3 travel time if they are keeping their car at the place

4 at which they start their run.

5 Q. Is that -- strike that.

6 Is that simply a logical conclusion you have

7 drawn or do you have any other basis for that

8 conclusion?

9 A. Well, to the extent that they started their

10 shift at the start point of their run there would be no

11 travel time.

12 Let's say as another alternative they actually

13 started at the division and drove their car to the

14 starting point. Driving a car versus taking public

15 transportation and walking generally saves you time and

16 that's a statistical fact, particularly if you have

17 early morning shifts. So I would suggest that utilizing

18 511 data only doesn't necessarily paint an accurate

19 picture of the travel time.

20 Q. Do you have any understanding one way or the

21 other whether Mr. Grandberry and Ms. Griffin parked

22 their car at one location and then have to take public

23 transit and walk back from another location to the

24 location of their car? Do you have any understanding of

25 whether that's true one way or the other?

**Page 68**

1 A. I would have to go back to their run data to

2 see if they actually had to travel back to their car

3 after the day's end or whether their run finished at the

4 place it started from, but, of course, if they had to

5 travel back, they had to travel back. How they did so,

6 I don't know the mechanism by which they did that.

7 Q. And the records that you're referring to are

8 the Range reports?

9 A. I believe so. And then there's also their

10 deposition transcripts that I could refer to, might

11 provide me some information as well. There may be some

12 other data.

13 Q. Other than the deposition testimony of any

14 operator, is it fair to say you have no information

15 about how exactly any given operator travels to or from

16 relief points; is that fair?

17 A. Yes.

18 Q. I'm showing you a document marked as

19 Plaintiffs' 136.

20 MR. SPELLBERG: Is this our last document?

21 MR. TIDRICK: We need to wrap up shortly.

22 MR. SPELLBERG: Yes.

23 MR. TIDRICK: Understood.

24 Q. Plaintiffs' Exhibit 136, do you recognize this

25 document?

**Page 69**

1 A. Yes, I have seen this document.

2 (Plaintiffs' Exhibit 136 was marked for

3 identification.)

4 Q. What is this document?

5 A. This is a document that identifies pay codes

6 and a description for those pay codes.

7 Q. If you could please turn to the third page of

8 the Exhibit 136 document, row number 95, OTVTT, there's

9 a description of that pay code that says "Overtime VTT."

10 Are you able to tell me what that code means?

11 And I understand you're flipping through your binder

12 right now. We can get to that, but without referring to

13 any other document, are you able to tell me what that

14 code means "OT VTT"?

15 A. Not offhand. I would have to refer to other

16 documents.

17 Q. Before we do that for the sake of efficiency

18 let me ask you about a few others so we can do them as a

19 group.

20 There's also a code "ETR." Are you seeing the

21 "ETR" code?

22 A. Yes.

23 Q. What row?

24 A. 148.

25 Q. Without referring to any other documents are

Page 70

1  you able to tell me what the ETR code refers to?
2    A.  Well, its description is "FX End Travel Time."
3    Q.  Do you know what that means without referring
4  to any other documents?
5    A.  At this point I would be somewhat speculating
6  because I would be going off what the description says
7  and that says it pertains to travel time and I would
8  think it would be pertaining to the travel time at the
9  end of a run.
10   Q.  That would be speculation though; correct?
11   A.  Well, you're having me do a memory test here.
12  I'm not allowed to look at any other documents, so,
13  yeah, sure.  But, you know, to the extent that that's my
14  best guess, you can call it speculation, you could call
15  it an educated estimate.
16   Q.  At row 182 there's a pay code "SVT-M" for
17  which there's a description "Service Trade - Meal Time."
18       Without referring to any other documents are
19  you able to tell me what that code refers to?
20   A.  I'm sorry.  What line is it?
21   Q.  182.  It's on the page Bates numbered CCSF
22  095708.
23   A.  No, I can't say offhand.
24   Q.  On the next page, 095709, at row 216 there's a
25  code "WKPBR" for which there's a description "Guarantee

Page 72

1  two individuals?
2    A.  Well, I haven't evaluated all the potential
3  resources that were available to get an answer to that
4  so I can't tell you right now, but certainly I could
5  research other options.
6      MR. TIDRICK:  At this point we will suspend
7  the deposition and we can cooperate to reconvene at a
8  mutually-agreeable time.
9      THE REPORTER:  Mr. Spellberg, would you like a
10  copy of the transcript?
11      MR. SPELLBERG:  Yes, a copy and a disk.
12      (Time noted:  10:40 a.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 71

1  EXB Regular."
2       Without referring to any other documents are
3  you able to tell me what that code means?
4    A.  Again, just providing you with an educated
5  guess or estimate I would say that this pertains to a
6  guaranteed payment for time that wasn't necessarily
7  worked but should be paid at regular pay.
8    Q.  Now, I understand you were starting to flip
9  through your binder.  Are there certain documents you
10  would like to try to identify the various meanings of
11  various codes in the Exhibit 136 document?
12   A.  Well, there was the Exhibit 130 that was the
13  basis from which I made calculations of the offsets as
14  it was utilized in the discussion with Mr. Keohane and
15  Mr. McLaughlin.
16   Q.  Do I understand correctly in order to
17  ascertain what the meanings of the codes are in the
18  Exhibit 136 document it was necessary for you to consult
19  with Mr. Keohane and Mr. McLaughlin; is that correct?
20   A.  Well, I would think that that would have
21  been -- that was the most sensible thing to do so as to
22  avoid making mistakes and characterizing whether it be
23  appropriate for offsets or not.
24   Q.  Are there any other sources that you're aware
25  of that you could consult other than speaking with those

Page 73

1       I, the undersigned, a Certified Shorthand
2  Reporter of the State of California, do hereby certify:
3       That the foregoing proceedings were taken before
4  me at the time and place herein set forth; that any
5  witnesses in the foregoing proceedings, prior to
6  testifying, were placed under oath; that a verbatim
7  record of the proceedings was made by me using machine
8  shorthand which was thereafter transcribed under my
9  direction; further, that the foregoing is an accurate
10  transcription thereof.
11       Further, that if the foregoing pertains to the
12  original transcript of a deposition in a Federal case,
13  before completion of the proceedings review of the
14  transcript [ ] was [ ] was not required.
15       I further certify that I am neither financially
16  interested in the action nor a relative or employee of
17  any attorney or any of the parties.
18       IN WITNESS WHEREOF, I have this date subscribed
19  my name.
20  Dated:  July 18, 2016
21
22
23       *Debbie Razavi*
24       DEBBIE RAZAVI, RPR
25       CSR No. 9989

19 (Pages 70 - 73)

Veritext Legal Solutions
866 299-5127

| 0 |
|---|
| **0.33** 35:3 |
| **095708** 70:22 |
| **095709** 70:24 |

| 1 |
|---|
| **1** 1:25 9:17 10:8,13 16:11 32:12 33:24 35:6 |
| **1-20** 1:10 2:10 |
| **1.00** 35:2 |
| **1.23** 55:7,14 56:21 |
| **1.5.** 26:16 |
| **10** 4:8,9,12 8:14,21 13:9 14:18 15:6,6 16:13,16,21 17:12 17:16 20:1,12,14,19 20:23 21:10 22:1 23:11 26:8 27:11 28:5,14 29:11 32:5 32:13,19 33:18 35:15 36:10 37:1 43:13,24 47:15 48:10 |
| **100** 5:19 |
| **10:40** 2:19 72:12 |
| **10th** 20:3 |
| **11** 53:21 |
| **12** 4:13 |
| **12-03704** 1:7 2:7 |
| **1220** 2:17 3:14 |
| **125** 4:8 8:12,13,17 12:15,16 13:2,6,10 13:17 14:5,19 15:13 16:9 20:13 |
| **126** 4:9 8:20,22 9:6 9:8 13:3 14:25 15:1 15:5,11 16:15 17:13 17:17 20:15,24 21:7 26:9 27:12 28:6 32:14 35:16 36:10 37:1 43:14,25 |
| **127** 4:10 29:9,10,15 29:19 |

| 2 |
|---|
| **128** 4:12 9:21 10:1 10:13 |
| **129** 4:13 12:10,11 12:13 13:4 |
| **13** 4:13,24 9:18 10:19,19,22 11:9,24 12:4,7 |
| **130** 4:14 23:6,8 27:9 27:15 54:18 71:12 |
| **131** 4:15 42:19,24 43:2 |
| **132** 4:16 45:6,10,13 46:1,5,20 |
| **133** 4:17 46:10,10 46:13,15,25 48:11 48:13,25 |
| **134** 4:18 49:4,6,7,9 49:17,20 |
| **135** 4:20 59:8,12,14 59:22 |
| **136** 4:21 68:19,24 69:2,8 71:11,18 |
| **14** 1:16 2:19 5:1 32:12 42:8 |
| **14,535,525.44.** 40:15 |
| **148** 69:24 |
| **16** 4:24 |
| **17** 53:22 |
| **18** 73:20 |
| **182** 70:16,21 |

| 2 |
|---|
| **2** 4:16 17:14 42:9 52:8 |
| **2,000** 40:13 |
| **2,142,158.84.** 40:19 |
| **20** 55:4,6 56:19 |
| **2009** 32:12 53:21 |
| **2012** 23:24 50:11 53:22 54:2 58:20 |
| **2015** 32:12 |
| **2016** 1:16 2:19 4:8,9 4:13 5:1 8:14,21 9:22 10:4 11:9,24 12:4,7 13:9 14:18 |

| |
|---|
| 15:7 16:13,16,21 17:12,16 20:10,13 20:15,19,23 22:1 23:11 26:8 27:11 28:5,14 29:11 32:6 32:13,19 33:18 35:16 36:10 37:1 43:13,24 48:10 73:20 |
| **2039** 3:6 |
| **216** 70:24 |
| **22,182** 44:5 |
| **23** 4:14 |
| **2342054** 1:24 |
| **24** 27:6 |
| **28** 38:13 |
| **289** 40:5,7 |
| **29** 4:10 |
| **295** 44:13 |

| 3 |
|---|
| **3** 17:14,16 51:25 52:2 |
| **30** 32:1 |
| **30,756** 44:9 |
| **300** 2:17 3:14 |
| **308** 3:6 |
| **31,051** 44:16 |
| **32** 63:2,13 |
| **33** 34:24 35:8,9 |
| **345** 40:6,8 |
| **35** 51:16,18,21,25 55:4,7 56:20 |

| 4 |
|---|
| **4** 32:6,8 |
| **415** 3:16 |
| **42** 4:15 |
| **45** 4:16 |
| **45,888,107** 36:23 |
| **46** 4:17 |
| **49** 4:18 |

| 5 |
|---|
| **5** 4:5 9:22 10:3 16:11 |

| |
|---|
| **50** 38:25 |
| **510** 3:8 |
| **511** 67:18 |
| **511.org** 65:9,11,18 65:21 66:14,19,25 |
| **511.org.** 66:1 |
| **57** 33:6,7,10 |
| **57,120,070** 35:17 |
| **59** 4:20 |

| 6 |
|---|
| **6** 36:25 43:12,16,24 |
| **600** 5:14 |
| **69** 4:21 |

| 7 |
|---|
| **7** 17:16 32:6,8 43:16 43:24 |
| **7-12-16** 11:17,20 |
| **73** 1:25 |
| **788-5100** 3:8 |

| 8 |
|---|
| **8** 4:8 |
| **837-0456** 3:16 |
| **8:05** 2:18 5:2 |

| 9 |
|---|
| **9** 4:9 |
| **94704** 3:7 |
| **94710** 3:15 |
| **95** 69:8 |
| **9989** 1:23 2:20 73:25 |
| **9th** 20:3 |

| a |
|---|
| **a.m.** 2:18,19 5:2 72:12 |
| **able** 38:14 39:14,17 39:25 40:22 46:6 57:8 65:1 69:10,13 70:1,19 71:3 |
| **access** 28:24 |
| **account** 56:2 |
| **accounted** 56:25 57:4 |

**accounting** 42:10 52:15
**accuracy** 65:18
**accurate** 26:24 53:10 60:9 65:21 67:18 73:9
**accurately** 28:6 60:12
**action** 64:24 73:16
**actual** 11:3 51:6 54:5 66:15,25
**add** 24:21
**added** 25:5
**adding** 44:17
**additional** 9:18 16:17,18
**adjustment** 32:25 34:18,18,24 35:1,6 35:7 36:7
**administered** 5:4
**advance** 57:5
**affidavits** 65:2
**agency** 1:9 2:9
**aggregate** 35:17 36:21 40:1,18,22 41:13 42:13
**ago** 7:22 10:9,16 63:2,14 64:20
**agreeable** 72:8
**allegations** 21:14
**allowed** 70:12
**allows** 36:1 65:12
**alternative** 67:12
**ambiguous** 57:3 65:6
**amount** 25:7 34:20 34:23 35:22 36:8 54:25 55:1,1
**amounts** 32:25 44:17 60:13,18 66:24
**analysis** 9:16 10:12 10:18 11:4,16,19 13:8 14:12,14 29:22 38:20,21 41:19,25

44:4,11,12 45:1 48:24 49:1,19,21 50:14,24 55:25,25 56:9,25 58:24 59:15
**analyzed** 39:3 41:12
**answer** 4:22 13:19 13:25 40:11 43:21 49:25 50:18 57:8 60:23 61:21 72:3
**answers** 64:8
**anyway** 66:12
**appear** 61:13
**appearances** 3:1
**appears** 26:18
**applicable** 52:13 67:2
**apply** 39:23 47:21
**applying** 37:16 38:16 39:5,16 40:3 40:23 41:14 42:1 47:22
**appropriate** 17:23 21:16 28:22 71:23
**approximately** 5:13 7:18 20:2,10 38:14 53:24 63:1
**area** 62:24 65:15
**arrangement** 7:14
**ascertain** 66:2,10,23 71:17
**aside** 17:3 25:3 41:10
**asked** 41:17
**asking** 30:19 40:20 50:3 51:23 56:14,16 56:17
**assess** 54:16
**assessment** 44:14
**assist** 12:19 13:16 21:24
**assistance** 12:21
**assistant** 18:3,11
**assisted** 12:25 13:1
**associated** 24:1 54:25

**assume** 56:17
**assuming** 56:20,22 58:12
**assumption** 14:11
**assumptions** 14:4 14:16 15:10,12,15 15:20 66:18
**attached** 12:2 20:23 21:7
**attachments** 11:2,6 11:6,12,24 12:1,8
**attorney** 13:23 73:17
**attorneys** 13:20
**audit** 51:9,13,23,25 52:7 55:3,6,11 56:19,23 57:7
**auditor** 56:18,19,20
**august** 53:22
**authority** 28:24
**available** 13:14 72:3
**avenue** 3:6
**avoid** 71:22
**aware** 16:7 51:9 52:19,21 55:15 61:16,24 62:6 71:24

**b**

**b** 3:5
**back** 7:15 12:15 37:19 43:18 47:6 54:7 67:23 68:1,2,5 68:5
**based** 13:13 17:19 21:14 28:14 40:5 41:25 48:17 50:24 52:12 54:15 56:10 57:10
**basis** 28:23 35:5 36:21 43:9 49:15,16 49:24,24 50:20 54:20 67:7 71:13
**bates** 70:21
**bay** 65:15

**bdp** 34:3
**beginning** 2:18
**behalf** 1:4 2:4,16 61:15
**belief** 41:10 43:8
**believe** 6:14 8:4,8 9:19 13:19 17:23 31:12 42:22 50:11 53:9,14 60:4,10,17 62:11 65:20 68:9
**benefit** 25:4
**berkeley** 1:15 2:17 3:7,15 5:1
**best** 9:1 60:6 63:14 70:14
**better** 61:5
**beyond** 31:19 35:10
**bid** 31:7
**binder** 7:18,21 69:11 71:9
**birthday** 34:2,5,6,7
**bit** 11:11 50:5
**bottom** 37:10
**break** 34:5 59:5
**breakdown** 34:1
**briefly** 41:11
**brought** 6:8
**bulletin** 14:8

**c**

**c** 1:7 2:7
**calculate** 35:22 48:16
**calculated** 33:11 48:9 52:12
**calculating** 17:24 58:14
**calculation** 11:17 36:6,17,20 39:20 41:6,8,9 50:15 51:1
**calculations** 9:18 11:20 42:10 44:25 46:5 47:21 51:7 71:13

**california** 1:2,15 2:2 2:18 3:7,15 5:1 18:25 73:2
**call** 21:3 22:18,19 70:14,14
**calling** 12:1
**calls** 6:2 50:16
**capacity** 64:3
**captured** 23:15
**car** 66:21 67:3,13,14 67:22,24 68:2
**case** 1:7 2:7 22:14 26:15 27:21 28:23 42:22 53:12 56:1 57:1 62:20 73:12
**categories** 27:1
**category** 26:12 30:23 31:12 34:4,8
**ccsf** 70:21
**cd** 38:10
**certain** 14:21 33:23 39:4 64:8 71:9
**certainly** 72:4
**certified** 2:20 73:1
**certify** 73:2,15
**challenge** 16:5
**changed** 53:2
**characterization** 9:1
**characterize** 8:24 26:20
**characterized** 8:25
**characterizing** 71:22
**checks** 58:7
**choose** 54:23
**christine** 3:18
**city** 1:9 2:9 15:16 18:16 19:8 27:23 51:10,22 52:9,10 56:18,23 60:11
**claim** 47:7
**claimed** 27:20
**claiming** 29:24 30:4 61:11

**claims** 14:7,9
**class** 11:19 33:8,11 34:11 35:18 36:21 40:9,12 43:18 46:7 47:11,12,17,18,23 48:4 49:2,22 56:10 59:3 64:24
**clear** 38:22
**code** 4:21 9:15 10:11 10:18 21:1 22:19 23:13,15,20 24:5,5 24:9,11,12,16,17 29:12 30:2 31:1,6 31:23 32:24 33:20 33:21,22,24,25 34:1 34:4,9 54:18,19,19 54:25 55:2,2 69:9 69:10,14,20,21 70:1 70:16,19,25 71:3
**codes** 15:18,18 20:25 21:5,20 22:13 22:17,24 23:21,25 24:6 28:7,11 29:3 29:16 32:23 33:23 35:2 36:4,5 51:1 54:5,12,13,15,16,20 54:23 58:14,14,18 58:18,19,23 69:5,6 71:11,17
**coerced** 61:25
**cohen** 1:14 2:15 4:3 4:12 5:3,10 8:13,21 13:24 45:15
**cohen's** 4:19
**coinciding** 63:8
**column** 23:13,18,21 24:8,10,16,20,22 25:3 26:9,18,21,25 27:3,5,10,12 28:4 28:13,15 29:6 31:7 33:20,23 34:17,25 35:1 45:12,13,17,21
**columns** 23:12 24:2
**combination** 4:18 49:11

**come** 33:5
**commissioner** 18:25
**commonly** 64:21
**communications** 13:20,23
**compared** 48:9
**compensable** 14:10
**compensated** 30:4 30:13 35:5 48:23
**compensation** 26:11 30:8 55:1
**compile** 64:8
**complete** 16:13,21 19:19 33:1
**completed** 21:11
**completion** 73:13
**compliance** 52:10
**component** 27:14
**components** 14:21
**computation** 46:16
**computations** 4:17
**compute** 21:14 36:1
**computed** 33:4 39:4 39:21
**computes** 41:20
**computing** 58:21
**concerns** 39:7
**conclude** 30:23
**concluded** 39:15
**conclusion** 30:19 35:17 37:5,14 44:5 44:8 50:17 67:6,8
**conducted** 51:9
**conjunction** 59:15
**connection** 13:1 14:4,18 15:10 64:23
**consent** 4:15 40:8,10 40:12,17 42:17 43:2 43:6,10,19 47:14,24
**consider** 21:20 28:23 47:14
**consideration** 45:20
**considered** 37:5
**considering** 39:9 40:14,19 41:21

**consistent** 66:18
**constructed** 56:1
**consult** 71:18,25
**contact** 18:3 19:7 60:1
**contacted** 18:12,16 18:24
**contain** 54:5
**contained** 58:15
**context** 57:7
**continued** 47:16
**control** 55:15
**controller** 51:10,22
**controller's** 52:5
**convenient** 23:3
**conversation** 15:15 22:4,16
**conversations** 22:7 31:15
**cooperate** 72:7
**copies** 25:16,20
**copy** 7:15 72:10,11
**correct** 6:25 8:9 11:21 12:5,17 14:13 15:8 16:1 20:10,11 20:19 21:2 23:6 28:19 29:7 32:16,17 33:12 34:12 35:20 36:18,23 37:6 39:5 41:4 42:13 43:6 44:18,22 45:8 46:2 48:5 50:4 53:7 54:2 54:6,9 56:24 58:25 59:3 65:15 66:16 70:10 71:19
**correctly** 11:23 12:3 16:19 17:17 24:3,10 24:15,20 26:17 28:1 28:12 29:1,16 32:7 38:2 42:9 44:3,7,16 71:16
**counsel** 13:16 14:3 14:17 15:9
**counsel's** 22:23

Veritext Legal Solutions
866 299-5127

count 41:23
county 1:9 2:9 15:16
  18:16 19:8 27:23
  51:10,22 56:18,23
  60:11
couple 7:22 59:6
course 31:16 57:8
  68:4
court 1:1 2:1
create 13:7,10 15:4
  21:9,12 33:17 36:14
created 12:16 15:1
  21:6 28:13 33:14
  46:11 49:20
creation 46:19
cross 55:1
csr 1:23 73:25
current 20:5
cut 58:7

**d**

daily 49:15,24
damages 4:16 11:16
  11:19 45:7,14,19,23
darryl 1:4 2:4 43:2
dat 4:20 59:12
data 35:25,25 37:23
  37:24 38:8 39:22,22
  41:6 48:1 50:7,10
  50:12 51:3,4,6,7
  52:8,11,14,21 53:5
  53:14,17,20 54:4,12
  56:10 58:3,12,15
  66:14,19 67:18 68:1
  68:12
date 9:22,24 10:3,7
  42:16 73:18
dated 8:13,21 10:21
  16:16 73:20
day 35:13 46:17
day's 68:3
days 48:21
debbie 1:23 2:20
  73:24

december 53:21
decision 28:15
declaration 4:12,20
  9:17,21,23 10:5,13
  10:14 40:7 59:12
  61:17 62:1
declarations 40:17
  59:14,18,21,24 60:2
  60:5,14
deductions 52:13
defendant 23:16
defendants 1:11
  2:11 3:11 13:16
  14:3,17 15:9 28:18
defense 22:22
definition 64:4,15
  64:16,19
department 17:18
  17:24 18:25 56:24
departments 52:9
depend 65:23
dependent 37:21
depends 65:22,24
deposed 5:11 40:16
deposition 1:14 2:15
  5:15,19,24 6:1,5 9:4
  23:3 31:20 55:12,16
  58:25 66:9 68:10,13
  72:7 73:12
depositions 66:4
deputy 18:24
describe 39:12
  41:11
described 12:7,9
  16:18 22:21 23:5
  31:19 36:12 52:18
  58:25
describes 23:20 44:4
describing 10:9
description 4:7
  23:18 24:2,16,17
  30:16 31:7,7 69:6,9
  70:2,6,17,25
descriptions 4:21

design 63:20,23
designated 61:19
determine 21:13
  35:1 54:12
determined 45:2
develop 58:10
developed 13:9
  15:21 22:4,17 29:5
difference 36:16
  39:24 45:14 56:8
different 13:22
  15:17 19:3 21:5,17
  22:13,24 23:14
  40:20 48:8 50:13
  54:20 56:14 57:21
  60:18 65:14,24
  66:15,25
direction 73:9
disbelieve 53:14
discontinued 58:20
discoverable 13:21
  13:24
discovered 47:1
discrepancies 47:11
discrepancy 56:2,25
  57:10,17,24
discussed 31:14
  48:17
discussion 4:14
  15:22 17:13 27:15
  71:14
discussions 28:16
disinterested 61:5
disk 6:14 9:12,14
  10:10,17 72:11
distribution 52:15
district 1:1,2 2:1,2
divide 18:5
dividing 17:19
division 19:1 52:3,6
  67:13
document 5:18,21
  8:11,19,20 9:20
  11:18 12:8,16,17
  13:7,11,17 15:1,2,5

20:18,24 21:25
  22:10,11,21,24 23:1
  23:4,5 27:8 29:8,15
  32:16,18,20 33:15
  33:19 34:18 35:15
  36:9,14,15,17 42:18
  42:20 43:2 45:5,8
  45:13 46:1,6,9,11
  46:15,25 48:6,12,13
  48:25 49:5,8,9,20
  51:15,18,25 54:19
  55:3,5,11 58:5
  59:11,13,22 68:18
  68:20,25 69:1,4,5,8
  69:13 71:11,18
documentation 6:22
  17:2
documents 6:2,4 7:3
  7:9,22,25 8:7,8
  10:24 11:14,23 12:3
  16:10,12,17,18,18
  16:19,20,22 25:9
  42:21,23 69:16,25
  70:4,12,18 71:2,9
doing 44:11 51:1
downloaded 17:5
dr 4:18 9:3 32:22
  33:9,12 34:15 35:20
  39:6,20 41:19 43:7
  43:8 44:10 47:2,11
  47:13 49:11 50:25
  56:9 58:17 59:16
  61:13 66:19
drabkin 12:23
draft 4:14
drawn 67:7
driving 67:14
drogin 9:3 11:16,18
  33:5,9,12 35:20
  39:20 43:7,8 44:10
  45:14 47:2,11,13
  50:25 56:9 58:17
  59:16 61:13 66:19
drogin's 4:18 32:22
  34:15 39:6 41:19

Veritext Legal Solutions
866 299-5127

49:11
**drove** 67:13
**due** 13:12
**duress** 61:17
**duty** 30:10,11

**e**

**e** 12:24 15:25,25
**earlier** 9:11 25:10
  34:22 48:18 58:25
**early** 67:17
**earn** 15:17 21:1,5
  24:9,11,16,17 29:12
**earned** 33:21 34:3,9
**earning** 25:7 54:25
**earnings** 18:9 24:25
  25:3,6
**ease** 12:6
**easier** 7:25 18:21
**easy** 57:12
**economic** 21:13
  40:13 42:11 44:12
**economics** 62:25
**educated** 70:15 71:4
**effective** 18:6
**efficiency** 69:17
**eight** 35:13
**either** 16:7 53:13
  55:21
**electronic** 6:14,22
  39:11,13
**eliminated** 47:25
**employee** 31:4
  73:16
**employees** 52:9
**endeavored** 41:8
**enforcement** 19:1
**ensuring** 52:10
**entire** 32:11 33:11
  34:11,14 35:18 36:7
  36:21 37:22 38:7
  40:12 57:7 59:3
**entitled** 26:9 27:5,12
  45:13

**equaled** 44:15
**equivalent** 24:6,12
**eric** 12:23
**ern** 33:20
**esquire** 3:4,5,13
**essentially** 9:15 22:8
  22:14 59:23
**estimate** 65:13
  70:15 71:5
**estimated** 66:24
**estimates** 65:18,21
  66:14,24
**etr** 69:20,21 70:1
**evaluate** 57:10
**evaluated** 72:2
**evaluation** 41:19
**event** 46:22
**everybody** 47:23
**evidence** 55:19 56:6
  56:16 61:16,24 62:6
**exactly** 41:12 60:15
  66:3 68:15
**examination** 4:2 5:6
**examined** 5:4
**example** 25:4 26:13
  33:1 34:2,22 47:3
  48:6 66:20
**examples** 65:1
**exb** 71:1
**excuse** 49:23
**exhibit** 4:8,9,10,12
  4:13,14,15,16,17,18
  4:20,21 5:19 8:12
  8:17,20,22 9:6,8,21
  10:1,13 12:9,10,11
  12:13,15,16 13:2,3
  13:4,6,10,17 14:19
  14:25 15:1,4,11,13
  16:9,15 17:13,17
  20:13,15,16,24 21:7
  23:6,8 26:8 27:12
  27:15 28:6 29:9,10
  29:15,19 32:14
  35:16 36:10 37:1
  42:19,24 43:1,13,25

45:6,10,13 46:1,5
  46:10,10,13,15,20
  46:25 48:11,13,25
  49:4,6,7,9,17,20
  51:16,18,21,25
  54:18 55:4,7 56:20
  59:8,12,14,22 68:24
  69:2,8 71:11,12,18
**exhibits** 4:6 19:13
  25:24
**existed** 57:4
**existence** 50:9
**expect** 59:20
**expert** 16:3 61:19
**expertise** 63:19,22
**experts** 13:20
**expired** 30:17,23
  31:1,2,9
**explain** 48:12 49:8
  62:19
**explanation** 31:17
  57:12
**expressed** 43:5
**extent** 15:19 18:7,9
  21:18 26:14 30:3,5
  30:19 67:9 70:13

**f**

**f** 12:24
**facilitate** 16:4
**fact** 55:13,15,19
  56:5,16 67:16
**fair** 13:1 36:11
  53:13 63:13 68:14
  68:16
**familiar** 50:7 53:1
  65:9
**famis** 52:16,22
**far** 31:18
**federal** 52:10 73:12
**fehrm** 12:24
**figure** 33:6,7,10
  35:9 48:9
**figures** 47:24

**file** 6:18 7:15 9:22
  10:3 22:15
**files** 39:11,13 40:1
  41:12
**filing** 63:9,14
**financial** 52:15,17
**financially** 73:15
**find** 15:23 18:21
**finding** 56:17,21
**finished** 68:3
**firm** 3:3 6:23 9:12
**firm's** 8:13
**first** 16:11,16 23:13
  62:22 63:15
**five** 16:17 29:14,16
  29:21
**flip** 71:8
**flipping** 69:11
**flsa** 11:16,19 14:23
  16:24 21:17,19
  27:20 30:15 32:15
  32:18,20,22 33:5,14
  33:19 34:15,17
  35:15 36:11,13,15
  36:16,18,22 37:23
  37:23 38:4,4 40:12
  40:18 42:15 43:2
  44:8 45:7,14 47:3,7
  48:1
**focusing** 48:11 49:7
**follows** 5:5
**footnote** 17:15
**foregoing** 73:3,5,9
  73:11
**forensic** 62:24
**form** 40:9 42:17
  43:2,6,10,19 47:14
  47:24 55:19 59:23
  65:5
**forms** 40:10,13,17
  65:14,24
**forth** 42:17 46:5
  73:4
**found** 47:17

Veritext Legal Solutions
866 299-5127

**foundation** 60:22 61:19

**four** 16:17 20:21,22 21:6,25

**francisco** 1:8,9 2:8,9 15:17 16:23 17:25 18:8,17 19:3,9,21 20:6 27:24 51:11,22 60:11

**francisco's** 56:18,23

**front** 6:9 38:20 39:11,13 40:1 51:18

**fsla** 4:16 59:1,2

**full** 5:9

**function** 23:15

**functionally** 24:6

**furnished** 47:12

**further** 29:25 34:1,5 36:6 73:9,11,15

**fx** 70:2

**g**

**g** 3:4 14:24

**gage** 18:24 19:7

**geac** 23:21 24:5,12 50:7,12 51:3,4,6 52:8,9,12,14,21 53:3,5,14,17,20 54:4,5,11,12,16,19 54:23,25 58:3,9,12 58:15,19,20

**general** 65:17

**generally** 5:15 33:21 35:4 54:2 61:4 67:15

**generate** 10:12

**generated** 9:16 10:18 21:4 27:14 46:19 47:24 50:10 66:14

**generating** 58:17

**geoff** 3:13 19:12

**getting** 6:24

**give** 17:1 18:20 19:16 29:23

**given** 21:16 24:3,18 42:16 67:2 68:15

**giving** 6:7

**go** 13:21 26:2 43:17 54:7 68:1

**goes** 20:20

**going** 6:16 7:3 13:18 13:25 25:15 30:18 40:24 55:18 59:6 65:4 70:6

**gonzalez** 16:2

**good** 5:8

**grandberry** 1:4 2:4 44:25 66:6,21 67:21

**greater** 45:24

**griffin** 1:4 2:4 4:16 44:1,5 45:7 46:18 48:7,20,21,24 49:14 49:19 50:14 66:6,21 67:21

**griffin's** 44:9,12,18

**gross** 24:21,25 25:2 25:5,7

**group** 69:19

**gspellberg** 3:17

**guarantee** 70:25

**guaranteed** 71:6

**guess** 9:4 38:19 70:14 71:5

**h**

**h** 12:24,24 15:25

**half** 8:6,7 26:14 33:2 33:3 35:7

**handed** 25:12

**handing** 8:5 11:15

**hard** 60:23

**health** 25:5

**heard** 31:18 51:13

**hedy** 1:4 2:4 4:16 45:6 48:7

**help** 11:11 23:11

**higher** 18:9

**historical** 58:17

**hold** 25:8,14

**holding** 8:7

**holtzman** 2:16 3:12

**hope** 6:22

**hour** 27:6 35:13 52:11 55:21 64:24

**hourly** 18:7 50:20

**hours** 17:19 18:6 35:11,12 52:12 55:8 55:14 56:3,4,21 57:15,21 59:6

**hulsizer** 3:18

**hundreds** 64:2,9

**hypothetical** 57:6 60:22

**hypothetically** 56:22

**i**

**idea** 29:23 61:22 62:3,9

**identification** 8:18 9:7 10:2 12:14 23:9 29:20 42:25 45:11 46:14 49:18 59:9 69:3

**identified** 15:18 16:20 24:4 33:9,12 34:15 35:19 46:17 66:1

**identifies** 18:6 38:21 69:5

**identify** 19:7 21:22 28:22 39:14 41:13 71:10

**identifying** 4:17

**ignore** 41:1

**implicates** 13:22

**implication** 29:4

**impossible** 57:4

**improperly** 57:16 58:1

**inch** 8:6,7

**inches** 7:18,19

**include** 16:4 47:5

**included** 10:11 42:22 64:10

**includes** 45:1

**including** 10:17 44:20 47:2,23,25 48:1

**income** 25:6 32:9 35:18 44:15

**incomplete** 57:5 60:22

**incomprehensible** 40:25 41:16 57:3

**incurred** 66:15

**index** 4:1

**indicate** 24:23 27:13

**indicated** 14:6 32:22 34:22 43:7,9,19 56:11

**indicates** 24:10,17 24:22

**indicating** 26:22

**indication** 24:5

**individual** 18:3 64:11

**individuals** 12:25 21:16 35:24 48:3 64:7 66:5 72:1

**industrial** 18:25

**information** 13:14 14:23 24:10,15,22 28:3 29:2,4,5,6 30:22 31:11 35:23 36:1 38:17 43:20 47:15 48:16 52:16 57:11 64:8 68:11,14

**initial** 8:15

**initially** 48:9

**inquire** 64:7

**instance** 49:14 56:7

**instances** 31:24 34:7 47:5

**instruct** 13:19,25

**instructed** 4:22

**intended** 48:13,15
**interested** 55:13
 61:6 73:16
**interfaces** 52:4
**internal** 56:18,23
**internet** 16:24,25
 17:6 19:3,20 20:7,8
**investigated** 53:11
 57:23
**involved** 62:24
**issue** 22:13
**issues** 66:7
**item** 22:15 26:15
 27:16 34:3 63:10
**items** 6:14 8:4 14:23
 21:15 24:1 32:25
 34:2

**j**

**jby** 3:10
**job** 1:24 31:5
**joel** 3:5 25:9
**jonathan** 4:20 59:12
**judge** 16:2
**july** 1:16 2:19 4:13
 5:1 9:17,18,22 10:3
 10:8,13,19,19,22
 11:9,24 12:4,7
 32:12 73:20
**june** 4:9 8:21 15:6
 16:16,21 17:12,16
 20:1,3,10,14,19,23
 21:10 22:1 23:11
 26:8 27:11 28:5,14
 29:11 32:5,13,19
 33:18 35:15 36:10
 37:1 38:13 43:13,24
 47:15 48:10
**jury** 30:10,11

**k**

**k** 15:25
**keen** 63:7
**keeping** 67:3
**keohane** 15:16,22
 22:5,7,16 27:16

28:16,25 29:2 31:16
 71:14,19
**keohane's** 27:23
 28:7
**key** 4:11 20:18,18
 20:22,25 21:7,21,25
 22:20 23:10 24:4,8
 24:13,18,21 26:7
 27:6,11 28:5,14
 29:11 48:17
**kind** 41:25 64:4
**know** 7:11 8:24 9:1
 11:2 15:21 17:4,8
 20:7 21:3 27:8 28:9
 42:16,21 46:21
 49:23 50:9 52:23
 53:11,12 55:20,23
 56:8 57:3,9,25 60:8
 60:15 61:12,12
 62:15,17 63:3 65:7
 66:20 68:6 70:3,13
**knowing** 55:13

**l**

**l** 31:2,6,12
**labeled** 12:9 20:17
 24:9,16,21 32:14
 34:18 36:11
**labor** 17:18 18:24
 19:1 52:14
**labor's** 17:24
**lack** 60:21 61:18
**laid** 52:24
**lam** 4:20 59:13
**language** 64:10
**late** 14:8
**law** 3:3 6:23 9:12
 14:9,20 22:10,23
**lawsuits** 64:24
**lawyer** 56:15
**lawyers** 28:19
**layperson** 48:12
 49:8
**learned** 62:22 64:16

**leave** 30:7 31:3,3,8
 55:21 57:14
**leaving** 36:5
**led** 30:22 31:24
**left** 25:19
**legal** 28:9,23,24
 29:4,22 30:19 31:15
 32:4 50:16
**letter** 4:8,9,13
**limitations** 11:17,20
 35:19 36:18,22 38:4
 38:5 44:9 59:1,2
**limited** 36:17
**linda** 12:23
**line** 4:23 70:20
**list** 16:9 19:19 20:25
 21:4 35:16 43:18
 47:11,12,17,18,20
 47:23 56:10
**listed** 16:10 24:12
 24:18 29:6 33:23
 34:3 35:2,3
**lists** 16:16,17 32:10
**little** 11:11
**liz** 12:23
**lnch** 31:23
**location** 67:22,23,24
**logical** 67:6
**look** 7:6 18:19 19:21
 25:10,16 54:7 70:12
**looked** 16:25 17:3,5
 20:4,5 27:4 48:7
 51:6
**looking** 29:14 40:21
 59:21
**loss** 21:13 27:20
 30:2,4,6,9,12 38:23
 39:5 40:13,18,23
 41:2,13,20 42:8,9
 42:11 44:5,12,21,22
 45:3,3 56:11
**losses** 21:14 27:20
 37:4,15 38:16,21
 39:9,16,21 40:2,21
 41:14 42:1 44:9

45:24 58:21
**lot** 50:2,3
**lunch** 31:22,24

**m**

**m** 12:24 70:16
**machine** 73:7
**maintain** 66:21
**majority** 37:4 38:25
**making** 27:21 51:7
 56:15 61:15 71:22
**management** 52:16
**manager** 28:2
**manner** 56:24
**mark** 1:14 2:15 4:3
 4:12,19 5:3,10
 19:12 25:9,25 30:19
**mark's** 7:14
**marked** 5:18 8:11
 8:17,19 9:6,20 10:1
 12:6,13 14:18 17:12
 17:16 20:15,23 23:5
 23:8 26:8 27:9,11
 28:6 29:8,19 36:10
 37:1 42:18,24 43:13
 45:5,10 46:9,13
 49:5,17 51:16 55:3
 59:8,11 68:18 69:2
**market** 64:21
**marking** 25:24
**materials** 7:21
 10:10,16
**matter** 14:9 27:17
 49:13
**mclaughlin** 15:16
 22:5,7,17 27:15
 28:17,18,24 29:5
 31:15 32:3 71:15,19
**mclaughlin's** 22:11
**meal** 70:17
**mean** 25:1 27:18,19
 39:7 47:19 50:1,19
 50:21 53:23 57:16
 57:17

Veritext Legal Solutions
866 299-5127

**meanings** 71:10,17
**means** 55:23 62:13
  62:17,23 69:10,14
  70:3 71:3
**meant** 29:3 63:4,17
**measure** 23:17 32:4
  61:6
**measured** 23:15
  35:21
**measures** 37:22
  61:5
**mechanism** 21:21
  22:9 68:6
**meeting** 14:8
**member** 46:7 49:1
  49:22
**members** 11:19 48:4
**memory** 70:11
**mentioned** 9:11
  10:11 15:12 18:11
**merge** 35:25 39:22
**merits** 57:23
**method** 57:20
**methodologies**
  47:22
**methodology** 36:13
  39:6,7,8,17 41:15
  46:4,6
**methods** 58:16 66:1
**migrated** 53:3
**military** 30:7 31:3,3
  31:8
**million** 33:6,7,10
  42:8,9 55:8,14
  56:21
**mind** 19:12 29:23
  37:17 59:5
**minimum** 16:23
  17:13,18,25,25 18:4
  18:8,10,12 19:2,8
  19:21 20:6
**minutes** 7:22 32:1
  42:8
**misstates** 63:5

**mistakes** 71:22
**moment** 10:9,16
  64:20
**month** 15:6 20:2
**morning** 5:8 10:25
  67:17
**motion** 16:4
**mou** 30:17,23 31:1,2
  31:9
**mou's** 17:4
**mpo** 31:2,6,12
**multifactor** 26:9,15
  26:18,25 27:2
**multiplier** 26:18
**municipal** 1:8 2:8
**mutually** 72:8

**n**

**n** 12:24 15:25
**name** 5:9 8:13 73:19
**named** 66:5,9
**nature** 14:15
**necessarily** 47:21
  54:23 66:18 67:18
  71:6
**necessary** 71:18
**need** 7:9 54:22
  68:21
**negative** 40:14,19
  41:2,22 42:8,9
  44:13,22 45:3,21,23
**neither** 73:15
**new** 47:24 48:1
**normal** 35:10
**normalized** 26:12
**northern** 1:2 2:2
**note** 15:24 18:2,18
**noted** 72:12
**notes** 18:19 22:6,8
  22:19 27:25
**notice** 5:20,24 6:1,5
**november** 32:12
**number** 4:7 26:17
  34:19 39:2,4,15,18
  41:5 44:17 45:17

  48:8 56:2,3 69:8
**numbered** 16:11
  70:21
**numbers** 42:7

**o**

**o** 12:24 15:25
**oath** 5:4 73:6
**object** 13:18 30:18
  40:24 55:18 65:4
**objection** 42:3 50:16
  56:5,15 57:2 60:21
  61:18 63:5
**objections** 62:2,8,14
**observation** 38:22
  61:9
**observe** 37:15 60:20
**observed** 37:25
  38:16
**observer** 60:19
**obtained** 48:1
**obviously** 10:19
  26:22
**occur** 37:4
**occurred** 37:15 40:2
  40:21 41:14 42:1
**offhand** 69:15 70:23
**office** 13:24 14:20
  22:10,11,11,23
  51:10,22
**offset** 4:11 14:21
  20:17,18,22,25 21:1
  21:6,20,22,25 22:18
  23:10 24:4,8,13,18
  24:21 26:7 27:6,11
  27:13 28:4,5,8,10
  28:13,14,15 29:6,11
  29:13,17,21 30:6,9
  30:12,17,24 31:13
  31:25 32:10,24,25
  33:2,10,19 34:17,21
  34:24 35:11,15 36:5
  36:6,8,15,16,20
  39:5 41:21 45:15
  47:5 48:17 54:12,16

  54:21,24
**offsets** 4:17 15:19
  21:15 27:17,18
  28:22 32:15,18,20
  33:4,8,14 36:11,13
  37:5,16 38:16 39:9
  39:16,23 40:3,14,19
  40:23 41:15 42:2
  45:20,24 46:17
  48:17 49:12 56:11
  58:14 71:13,23
**offsetting** 32:9
  35:18 44:11,15,17
**oil** 31:8
**okay** 7:12 25:21
**old** 23:21 24:5,12
  54:18,23,24
**once** 36:3 52:13,21
**ones** 25:11 35:2
  41:22 54:23
**operator** 61:17,25
  62:7,12 68:14,15
**operator's** 52:4
**operators** 51:12
  53:6,15 58:4,13
  59:14 60:1,5,13,19
  61:10,10 66:3,10,16
**opinion** 43:5 44:15
**opinions** 13:13 16:5
**opportunity** 9:2
**options** 72:5
**order** 16:3 19:7
  21:13 23:17 41:13
  71:16
**ordinance** 16:24
  18:1,4,12 19:22
  20:6
**original** 7:15 73:12
**originals** 7:5,14
**ot** 69:14
**otvtt** 69:8
**output** 9:15 10:11
  10:18
**overseas** 31:8

Veritext Legal Solutions
866 299-5127

**overtime** 26:13 33:1
34:23 35:6 69:9

**p**

**p** 12:24
**page** 4:23 12:8
16:11,16,17 17:16
20:18,22 21:6,25
23:4 32:6,8,18 36:9
36:25 37:2,3,10,11
43:12,15,24 51:25
52:2 55:4,6 56:19
69:7 70:21,24
**pages** 1:25 4:7 16:20
17:14 19:9 20:20,21
22:24 23:1 32:15
**paid** 21:16,18,19
26:12,14 29:25 30:5
31:4,4,25 33:3 34:4
35:7 47:4 53:6,15
57:15,16,21,25 58:4
58:13 71:7
**paint** 67:18
**paper** 50:2,3
**papers** 7:18 8:6 19:6
**paragraph** 32:7
37:3 43:25 44:3
**paragraphs** 16:4
**parked** 67:21
**part** 6:13 7:6 15:21
20:19 22:19 24:24
25:6,6 26:7 27:8
28:21 29:22 32:10
38:8,10 40:4 46:16
47:13 52:15 59:16
**partially** 9:5
**particular** 49:13
56:7
**particularly** 54:22
67:16
**parties** 61:15 73:17
**party** 4:15 60:19
61:4,6,9
**pay** 4:21 14:21,22
17:19 18:5,8 20:25

21:20,21,22,23
22:13,17,19,24 28:7
28:11 29:16 30:1,2
31:17 32:21,23,24
33:4 34:8,20 35:6
35:11,25 36:2,3,4,5
51:1 52:12 53:18
54:5,20 55:14 57:14
58:11,18 69:5,6,9
70:16 71:7
**paycheck** 25:2
**payment** 71:6
**payout** 32:23
**payroll** 23:23,25
28:1 29:3 39:22
50:10 51:11 52:3,5
52:6,8,8,13,13,14
55:8,22 56:4,12,22
57:14,21 58:10
**penalty** 62:12,17,23
63:3,9,16 64:12
65:2
**people** 35:21 40:6,6
40:7,10,13 57:25
**peoplesoft** 21:1 24:9
24:11,16,17 29:12
33:22 34:1 53:3
54:19 55:2
**percent** 38:25
**perform** 41:25 46:4
46:7 50:15
**performed** 11:5
40:5,5 64:23
**performing** 31:8
**period** 31:22,24
32:11 33:5,9,12
34:15 35:19,24
36:18,22 37:22,23
37:24,24,25 38:4,5
38:6,7 40:12,18
44:9 47:7,7 48:1
50:11 52:7 53:18,21
53:25 54:11 59:2,2
59:3 61:10

**periods** 19:4 32:22
36:2 38:15 39:3,15
42:14,15 47:3 48:15
56:9 58:19,23,24
**perjury** 62:12,17,23
63:4,10,16 64:12
65:2
**person** 11:16,19
39:21,23 41:20
42:15 50:1 57:13,16
**personnel** 52:6,8
**pertained** 23:25
**pertaining** 46:18
49:12 70:8
**pertains** 34:4 49:15
55:20 70:7 71:5
73:11
**photocopy** 19:14
**phrased** 14:1
**physically** 12:2
**pick** 54:23
**picked** 57:15
**picture** 67:19
**piece** 43:20
**place** 23:24 61:5
65:13 66:22 67:3
68:4 73:4
**placed** 73:6
**plaintiff** 4:15
**plaintiffs** 1:6 2:6,16
3:2 5:19 8:12,12,17
8:20,22 9:6,8,21
10:1,13 12:10,13,15
12:16 13:2,3,3,6,10
13:15,17 14:5,19,25
15:1,4,11,13 16:9
16:15 17:13,17
20:13,15,24 21:7
23:5,8 26:8 27:9,12
27:21 28:6 29:9,10
29:15,19,24 32:14
35:16 36:10 37:1
42:19,24 43:1,13,25
45:6,10,13,25 46:5
46:10,10,13,15,25

48:11,13,25 49:4,5
49:7,9,17,20 51:16
59:8,12 61:14 66:9
68:19,24 69:2
**please** 5:8 8:2 20:12
20:14,16 23:11
24:23 32:5 36:25
42:6 51:17,24 55:4
69:7
**point** 7:9 13:13
14:14 17:5 44:14
51:5,8 53:2 58:20
66:12 67:10,14 70:5
72:6
**points** 66:3,11 68:16
**portion** 36:8
**position** 27:23
**positive** 41:21,22
44:21 45:2,17,19
**possible** 49:1,21
**potential** 14:22 34:8
72:2
**ppsd** 52:6,7 55:14
**ppsd's** 55:8 56:22
**practice** 16:4
**preliminary** 4:10
20:17,18,22 21:6,25
22:19 23:10 24:4,8
24:13,18,21 26:7
27:6,10 28:5,13
29:11
**premium** 31:9 35:12
**preparation** 19:25
**prepared** 9:9 12:11
45:8 63:24 64:1,10
**preparing** 13:2
21:24
**present** 3:18
**presents** 53:6,14
**previously** 5:18 8:8
51:16
**printed** 19:20 22:14
23:2
**prior** 16:18 19:25
23:24 50:10 63:3

Veritext Legal Solutions
866 299-5127

73:5
**probably** 18:21 20:3
25:18
**proceedings** 73:3,5
73:7,13
**process** 12:20 28:21
29:1 51:11 52:18,19
52:24,25 60:9
**processed** 52:7,14
52:22
**processing** 52:7
**produce** 6:2
**produced** 7:10 8:9
10:10,17 23:2 41:12
42:22 50:7
**producing** 6:4,19
**product** 4:19 11:4
13:8 32:23 35:23
46:19,21 47:16 48:8
49:12,12,13
**professional** 64:3,17
**provide** 9:16 10:18
13:13 14:3,14 15:9
21:20 38:3 43:21
65:1 68:11
**provided** 6:21 7:17
7:22,23 9:12 10:25
11:3 14:17,23 15:20
22:9,22 27:9 31:17
38:9,10,12 40:17
41:7 42:7 43:18
47:15,18,19,20
53:20 54:14,15,20
57:11 64:15,20 65:2
65:18,21
**provides** 21:21
35:23 54:18
**providing** 64:11
71:4
**public** 67:14,22
**publiclawgroup.c...**
3:17
**pull** 7:24 16:23 19:2
19:10

**pulled** 16:24 19:20
**purposes** 4:14
**pursuant** 5:24
**put** 28:15

**q**

**quantitative** 11:4
14:15
**question** 4:22 13:25
36:2 37:18 40:11
41:17 42:14 43:21
49:25 55:19 56:14
58:1 60:24 65:5
**questions** 7:10
**quite** 42:21 50:5,20
**quote** 37:4 52:3

**r**

**r** 12:24
**rail** 31:8
**range** 68:8
**rate** 26:12,13,19
50:15,19
**rates** 50:25
**razavi** 1:23 2:20
73:24
**reach** 36:14 44:4
**reached** 37:6 44:7
44:16
**reaching** 37:14
**read** 37:19,20 52:19
52:25 66:4,8
**reading** 36:22
**reads** 52:2
**real** 17:9 63:7
**really** 6:24 28:21
33:22
**reason** 47:13 53:9
53:13 60:4,10,17
62:11 65:20
**rebuttal** 8:22,25 9:5
**recall** 17:6 53:24
54:1,8 59:17,20
62:22
**receive** 25:2 30:22

**received** 6:13 29:2,3
30:8 31:12 42:23
**recess** 19:18 26:5
59:7
**recognize** 51:18
59:22 68:24
**recollect** 60:6
**recollecting** 53:23
**recollection** 61:7
63:14
**recollections** 60:8
**reconvene** 72:7
**record** 5:9 7:17 8:5
19:17 23:4,17 26:4
37:20 73:7
**records** 18:2 52:5
60:12 68:7
**red** 7:19,21
**reduce** 30:1
**reduction** 27:19
**refer** 17:15 20:12,14
23:12,13,19,22
26:10 27:7 31:23
32:5 33:7,20 34:19
37:24 42:6 55:4
68:10 69:15
**reference** 12:6
51:24 55:1
**referred** 12:3 19:6
31:2 65:3
**referring** 10:14
11:14 12:15 14:25
22:25 23:10 32:13
35:14 36:9 58:24
59:24 68:7 69:12,25
70:3,18 71:2
**refers** 23:20 31:6
32:9 70:1,19
**refined** 36:6 46:22
47:8
**refinements** 46:24
**reflect** 60:12
**reflected** 28:4 48:25
49:19 56:3,4,19

**reflects** 28:6
**regard** 14:24 47:8
60:16
**regarding** 16:15
18:4,12 51:11
**regardless** 60:8
**regular** 50:15,19,25
71:1,7
**regulations** 52:11
**reimbursement**
25:4
**relations** 19:1
**relative** 73:16
**relevance** 41:11
**relevant** 41:9
**relied** 16:12,21 17:2
**relief** 66:3,11 68:16
**relying** 6:17
**remember** 28:1 51:8
64:13
**remembering** 51:5
**renne** 2:16 3:12
**repeat** 9:24
**repeating** 37:17
**report** 8:15,23,25
9:2,3,9,19 10:19,21
11:3,8,9,24 12:4,7
12:11 13:2,3,4,6,12
14:5,18 15:11,13
16:9,13,15,16,21
17:12,14,16 19:25
20:13,15,17,19,23
21:10 22:1 23:11
26:8 27:11 28:5,14
29:11 32:6,10,14,19
34:15 35:16 36:10
37:1 43:13,25 56:19
**reported** 1:22
**reporter** 2:20 72:9
73:2
**reports** 16:3 68:8
**represent** 28:11
29:9 31:25 49:10
51:21 58:12 59:13

Veritext Legal Solutions
866 299-5127

**represents** 46:1 58:3
**requested** 6:10
**required** 30:15
73:14
**requires** 16:3 29:22
**research** 64:22 72:5
**resources** 72:3
**respect** 14:6,7 15:12
19:3 26:21,24 27:5
27:10 29:2 30:7
31:22 34:2 36:12,15
43:12 44:24 47:9,10
49:14 50:10 57:23
63:19,22
**respond** 7:10
**responding** 56:8
61:13
**response** 6:4 11:16
11:18
**responses** 64:12
**results** 48:2
**retained** 60:11
**retirement** 25:5
**return** 14:7 63:15
**returns** 63:9,10
**review** 9:3 51:3
73:13
**reviewed** 16:10
59:21
**richard** 18:24 19:7
**right** 6:9,11 11:15
17:22 19:15 28:20
31:21 33:13 34:13
34:16 35:21 36:23
38:7,19 39:11 41:5
41:5 43:22 44:19,23
45:12 46:3 53:8,16
53:23 59:4 63:17,18
69:12 72:4
**rogers** 16:2
**routinely** 14:8
**row** 24:3,13,18
30:16 31:22 35:14
69:8,23 70:16,24

**rows** 4:10 29:10,14
29:16,21 45:25
**rpr** 1:23 73:24
**rule** 27:6
**rules** 21:17
**run** 31:8 66:22 67:4
67:10 68:1,3 70:9

**s**

**s** 12:24
**sakai** 2:17 3:12
**sake** 69:17
**sample** 59:16
**san** 1:8,9 2:8,9
15:17 16:23 17:25
18:7,17 19:3,8,21
20:5 27:24 51:10,22
56:18,23 60:11
**saves** 67:15
**saying** 38:24 41:1
43:9
**says** 7:19 8:20 11:15
11:18 43:22 45:6
63:15 69:9 70:6,7
**school** 63:24 64:17
**screen** 22:16
**se** 14:14
**second** 16:17 17:1
25:8
**see** 17:2 31:6 43:18
55:6,8 63:15 68:2
**seeing** 59:17 69:20
**seen** 5:21 42:20
51:24 55:12 59:23
69:1
**select** 54:20
**selected** 56:10
**sensible** 71:21
**sent** 6:23 16:22 17:3
**sentence** 37:3,9 57:6
**separate** 6:20 25:3
46:1 50:12
**separated** 34:9
**separately** 39:21
50:1

**service** 65:12 70:17
**services** 52:6
**set** 25:13 26:2,3 46:5
73:4
**sets** 23:25
**seventh** 2:17 3:14
**sfmta** 7:19 50:8
60:10
**sfmta's** 51:11 52:3
**sgt** 3:9
**shattuck** 3:6
**shift** 67:10
**shifts** 67:17
**shorthand** 2:20 73:1
73:8
**shortly** 13:9 21:10
33:18 68:21
**show** 55:22 57:13
**showing** 5:18 8:11
8:19 9:20 29:8
42:18 45:5 46:9
49:5 51:15 59:11
68:18
**shows** 55:7,14 56:21
**sign** 42:15 43:6,10
**signature** 73:23
**signed** 9:23 10:5,7
40:8,10,12,17 42:16
43:2,19 47:14,23
60:2 61:17
**significant** 37:4
**signify** 45:18,22
**signing** 61:25 62:7
**similarly** 1:5 2:5
44:24
**simply** 67:6
**single** 12:9
**sitting** 54:3,8
**situated** 1:5 2:5
**six** 23:1,4
**sloan** 2:16 3:12
**somebody** 19:16
**somewhat** 56:14
65:10 70:5

**sorry** 9:24 37:8,12
37:17 43:15 70:20
**sort** 41:22
**sorted** 20:25 29:12
36:3
**sounds** 16:1 54:2
**source** 31:16 58:21
**sources** 71:24
**speaking** 28:25 35:4
61:4 71:25
**specific** 19:6
**specifically** 17:7,15
19:9 39:13 47:6
59:1
**specifics** 16:5 31:18
**specified** 60:13
**specifies** 64:11
**speculating** 70:5
**speculation** 70:10
70:14
**spell** 15:22
**spellberg** 3:13 7:5
7:13 13:18 16:7
19:15 25:8,12,15,18
25:21,25 30:18 37:8
37:12 40:24 41:16
42:3 43:15 50:16
55:18 56:5 57:2
60:21 61:18 62:2,8
62:14 63:5 65:4
68:20,22 72:9,11
**split** 34:9
**stack** 8:5 10:24
18:21 25:23
**stamp** 9:22 10:3
**standards** 17:24
19:1
**standby** 29:25 30:1
30:2
**standing** 16:3
**start** 14:7 67:4,10
**started** 63:9 66:22
67:9,13 68:4
**starting** 23:12 67:14
71:8

Veritext Legal Solutions
866 299-5127

**starts** 32:8 44:1
**state** 5:8 52:10 73:2
**state's** 52:16
**stated** 58:22
**statement** 37:2
43:12 52:2,18,25
55:7,9
**states** 1:1 2:1
**statistical** 67:16
**statistics** 64:21
**statue** 38:5
**statute** 11:17,20
35:19 36:18,22 38:4
44:8 59:1,2
**stb** 30:2
**stephenson** 12:23,24
18:13,14
**steps** 66:2
**steven** 3:4
**stitt** 1:4 2:4 43:3,5
43:10 47:14 66:5
**stopped** 54:1
**straight** 35:5,11
**street** 2:17 3:14
**strike** 13:15 42:6
44:6 51:2 67:5
**studied** 63:24
**study** 66:13
**subject** 14:21 15:19
21:1,22 22:18 27:5
27:12,16,18 28:4,8
28:10,13,15 29:6,12
29:17,21 30:17,24
31:13 32:24 33:1,2
34:21 36:4,5,8 47:4
54:21,24
**subscribed** 73:18
**subset** 4:10 20:24
21:4 29:10 40:8,16
**suggest** 67:17
**suggesting** 58:1
**suite** 2:17 3:6,14
**summarized** 49:15
49:23 53:18

**supplemental** 9:8
**suppose** 15:19 26:20
49:25
**sure** 8:4 38:2 39:19
54:3 58:7 70:13
**survey** 64:4,10,16
64:19,23 65:3
**surveys** 63:20,23,25
64:1,9
**suspend** 72:6
**svt** 70:16
**system** 23:23,25
51:12 52:9,15,16,17
52:22 53:3,4 54:2
55:8,15 56:3,4,12
56:22 57:22 58:6,9
58:10

### t

**table** 32:13 54:17,17
**take** 7:2 18:5 22:6
34:23 48:15 50:5
59:5 65:25 67:22
**taken** 2:15 19:18
26:5 57:6 59:7 73:3
**takes** 65:13
**talked** 54:22
**talking** 48:7
**tallied** 32:8,23
**tallies** 61:14,15
**tally** 57:18,19,20
**tallying** 56:11
**tax** 52:10,13 63:9,10
63:15
**tell** 19:9 24:23 38:14
38:17 39:17,25
40:22 41:5 51:17
69:10,13 70:1,19
71:3 72:4
**terms** 11:4 15:14
56:10 58:17
**test** 70:11
**testified** 5:5 10:16
66:6

**testify** 6:17,25 7:3
30:20
**testifying** 5:23 73:6
**testimony** 63:6 66:9
66:17 68:13
**thereof** 73:10
**thick** 7:18,19 8:6,7
**thing** 25:19 71:21
**things** 61:6
**think** 13:21 15:23
18:18,19 23:24
25:15 28:1 38:12
41:9 57:12 63:9
64:13 70:8 71:20
**thinking** 17:1 25:17
**third** 33:3 34:23
60:19 61:4,9,15
69:7
**thought** 23:3
**three** 12:8 20:21
32:9,15,18,20,22
33:5,8,11,14,19
34:14,17 35:15,19
36:13 37:24 38:4
39:3 58:24 59:1
66:4,9,17
**thursday** 1:16 2:19
5:1
**tidrick** 3:3,4 4:5 5:7
7:8,16 14:2 16:8
19:5,12,17,23 25:23
26:4,6 30:21 37:13
37:19 38:1 41:3,24
42:5 43:16,23 50:22
55:24 56:13 58:2
59:10 61:1,23 62:5
62:10,16 63:11 65:8
68:21,23 72:6
**tidricklaw.com** 3:9
3:10
**time** 9:4 14:7,8,8,9
14:14 19:4 23:14,17
26:14 29:25 30:1,2
30:3,5,6,13 31:4
33:2 34:15 35:5,7

35:11 38:6,15 39:3
39:14 46:22 47:1
48:16 50:5 52:4
53:21,25 54:11
57:18,19,20 58:20
58:24 60:13,18
61:10 63:8,15 64:13
65:13,18,20 66:14
66:15,24,24,25 67:3
67:11,15,19 70:2,7
70:8,17 71:6 72:8
72:12 73:4
**timekeeping** 51:12
**times** 5:13 26:22
**today** 5:23 7:10
31:20 38:18 54:8
55:12,16
**told** 13:12
**tom** 12:23 18:13,14
**tony** 1:4 2:4
**tool** 23:17
**top** 8:12,21 10:3
11:15,18 29:14 45:6
**topic** 61:20
**total** 17:19,19 18:5
33:4 34:20,23 35:16
35:22 36:1,3,14,20
40:9
**trade** 70:17
**training** 64:17
**transcribed** 73:8
**transcript** 72:10
73:12,14
**transcription** 73:10
**transcripts** 68:10
**transit** 51:12 52:4
67:23
**transmits** 52:4
**transportation** 1:9
2:9 65:14,25 67:15
**trapeze** 23:13,15,17
23:18 24:1,1,5,12
30:16 31:1,6,7
33:25 35:25 39:22
52:5,11 54:13,15,18

Veritext Legal Solutions
866 299-5127

55:2,6,7,14,22 56:3
56:21 57:13,20
58:14,18,22
**travel** 14:7 30:3,5,6
66:3,10,14,15,24,25
67:3,11,19 68:2,5,5
70:2,7,8
**travels** 68:15
**true** 56:20 67:25
**truthful** 60:5,7
**try** 47:16 65:12
71:10
**trying** 17:6 60:6
**turn** 20:16 36:25
51:25 69:7
**turned** 18:19
**turning** 43:24 45:12
**two** 7:18,19 11:14
11:17,20,23 12:3,8
16:20 17:15 20:21
32:9,15,18 34:2
36:9,11,15,16,17,21
37:23 38:5 40:11,18
44:8 45:7,14 47:7
57:5 59:2 72:1
**types** 21:21 61:6

**u**

**ultimately** 49:15
57:14 58:7
**underpaid** 61:11
**undersigned** 73:1
**understand** 5:15,23
6:1,25 8:6 9:11
11:23 12:2 16:2,19
17:17 23:11 24:3,9
24:15,20 26:17
27:21 28:12 29:1,15
30:9,11 32:7 38:2
39:10 42:9 43:1
44:3,7,16 45:1
47:16 50:18 51:23
53:17,20 54:4 55:11
56:15 58:3 62:7,12
63:13 65:5,11 69:11

71:8,16
**understanding** 7:20
18:5 22:12,23 24:24
26:11 27:4,22 28:3
28:7,10,11 29:23
30:14,20,25 31:10
32:3 50:20 53:5,19
58:9 61:8 63:8,16
65:17 67:20,24
**understood** 14:20
18:3 22:10,22 28:21
29:17 48:4 63:12
68:23
**undertaken** 66:2
**united** 1:1 2:1
**unpaid** 27:1 55:21
**update** 9:2
**uploaded** 52:14,22
58:6
**use** 17:9,23 35:9
39:8,17 41:15 58:13
**uses** 66:19
**utilize** 58:16
**utilized** 17:6 58:10
58:19,21 71:14
**utilizing** 22:12
65:25 66:19 67:17

**v**

**vague** 57:2 65:5
**value** 40:1,22 41:13
45:21
**various** 16:10 23:12
71:10,11
**verbatim** 73:6
**version** 20:5,8
**versus** 67:14
**violation** 18:8
**violations** 14:22
17:14,18,25
**volk** 8:13,21
**volume** 1:17 2:15
4:4
**vs** 1:7 2:7

**vtt** 69:9,14

**w**

**wage** 16:23 17:14,18
17:25 18:1,4,7,8,10
18:12 19:2,8,21
20:6 26:19 52:11
54:25 64:24
**walk** 67:23
**walking** 67:15
**want** 7:2,7 8:24
25:16,22,24 26:1,1
**watching** 60:19
**way** 13:22 26:20
41:17 50:6 54:8
62:3 67:20,25
**ways** 21:17 23:14,16
**week** 38:22 39:20,23
41:20 46:1 52:3
**weekly** 49:16,24
**weeks** 37:5,15 38:15
38:23,24 39:2,4,8
39:15,18 40:2,21
41:2,14,20 42:1,11
42:12,13 44:18,20
44:21 45:1 47:2,3,6
47:25
**weld** 7:19,21
**went** 9:17 10:12,19
15:17 47:6
**whereof** 73:18
**witness** 4:2 6:18,21
7:1 18:23 19:19
37:21 41:1,18 42:4
43:17 50:19 55:20
56:7 57:9 60:23
61:19,22 62:3,9,15
63:7 65:7 73:18
**witnesses** 73:5
**wkpbr** 70:25
**words** 22:15 33:3
42:12
**work** 4:19 7:13 9:17
11:3 13:8 30:8 31:5
32:23 34:7 35:4,23

37:14 38:15 40:2,4
40:21 41:14 42:1
44:18 46:1,19,21
47:4,16 48:23 49:11
49:12,13
**worked** 17:19 18:6
22:9 34:6 35:11,12
48:22 52:12 71:7
**working** 30:14 64:4
**works** 5:16 18:14
**wrap** 68:21
**writing** 13:16
**wrong** 37:11
**wrote** 27:25

**y**

**yeah** 70:13
**year** 4:16 11:17,20
32:9,9,15,18,20,22
33:5,8,11,14,19
34:14,17 35:15,19
36:11,13,15,16,17
36:21 37:23,24 38:4
38:5 40:11,18 44:8
45:7,14 47:7 59:1,2
**years** 63:2,13,25
**yesterday** 6:14,21
9:12 10:10,17,20
11:3,13 38:11
**ygr** 1:7 2:7
**young** 3:5 6:16,19
6:24 7:2 18:22
25:11,14,17,19
37:10

**z**

**zero** 26:22,23 27:2
**zeros** 26:21,24

Page 13

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2014. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Exhibit E

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4  _____
                                         )
5  DARRYL A. STITT, TONY GRANDBERRY,     )
   and HEDY GRIFFIN, on behalf of        )
6  themselves and all others             )
   similarly situated,                   )
7                                         )
             Plaintiffs,                  )
8                                         )
   vs.                                    ) No. C-12-03704-YGR
9                                         )
   THE SAN FRANCISCO MUNICIPAL           )
10 TRANSPORTATION AGENCY; CITY AND        )
   COUNTY OF SAN FRANCISCO, and          )
11 DOES 1-20,                             )
                                         )
12          Defendants.                   )
                                         )
13 _____)

14

15          DEPOSITION OF JASON ROBERT LEE

16            San Francisco, California

17            Wednesday, April 6, 2016

18                 Volume I

19

20

21 Reported by:
   CATHERINE A. RYAN
22 CSR No. 8239
23 Job No. 2284904

24

25 PAGES 1 - 71

                                        Page 1

1     IN THE UNITED STATES DISTRICT COURT
2     FOR THE NORTHERN DISTRICT OF CALIFORNIA
3
4  _____
                    )
5  DARRYL A. STITT, TONY GRANDBERRY,  )
    and HEDY GRIFFIN, on behalf of    )
6  themselves and all others        )
    similarly situated,          )
7                      )
         Plaintiffs,     )
8                      )
    vs.            ) No. C-12-03704-YGR
9                      )
    THE SAN FRANCISCO MUNICIPAL       )
10  TRANSPORTATION AGENCY; CITY AND  )
    COUNTY OF SAN FRANCISCO, and     )
11  DOES 1-20,             )
                      )
12       Defendants.      )
                      )
13  _____)
14
15
16
17     Deposition of JASON ROBERT LEE, Volume I,
18  taken on behalf of Plaintiffs, at 1390 Market Street,
19  Fox Plaza, Seventh Floor, San Francisco, California,
20  beginning at 8:57 a.m. and ending at 11:36 a.m., on
21  Wednesday, April 6, 2016, before CATHERINE A. RYAN,
22  Certified Shorthand Reporter No. 8239.
23
24
25

---

1  APPEARANCES:
2  For Plaintiffs:
3    THE TIDRICK LAW FIRM
      BY:  STEVEN G. TIDRICK
4      JOEL B. YOUNG
      Attorneys at Law
5    2039 Shattuck Avenue, Suite 308
    Berkeley, California  94704
6    (510) 788-5100
    (510) 291-3226 Fax
7    sgt@tidricklaw.com
    jby@tidricklaw.com
8
9
10  For Defendants:
11    RENNE SLOAN HOLTZMAN SAKAI
      BY:  KEVIN P. McLAUGHLIN
12    Attorney at Law
    1220 Seventh Street, Suite 300
13    Berkeley, California  94710
    (510) 995-5806
14    (415) 678-3838 Fax
    kmclaughlin@publiclawgroup.com
15
16
17  Also Present:
18  AMANDA McCAFFREY, The Tidrick Law Firm
19  JOHN DUBLEY, Plaintiff
20  (Mr. Dubley was not present at the commencement of the
21  deposition proceedings.)
22
23
24
25

---

1             INDEX
2  WITNESS                 EXAMINATION
3  JASON ROBERT LEE
    Volume I
4     BY MR. TIDRICK         6
5
6        EXHIBITS
7  NUMBER      DESCRIPTION       PAGES
8  Exhibit 29  "Plaintiffs' Fifth Notice of Rule     6
9     30(b)(6) Deposition of Defendant City
10    and County of San Francisco and Demand
11    for Production at the Deposition" and
12    "Proof of Service"; 14 pages
13
14  Exhibit 30  "Order Regarding Motion to Compel    6
15    Following February 23, 2016 Hearing";
16    4 pages
17
18  Exhibit 31  "NextBus Real-Time Transit Management  28
19    System Users Guide, NextBus, Inc.,
20    Version 4.0"; Bates CCSF 095573 - CCSF
21    095669
22
23  Exhibit 32  Agency map; 1 page        28
24
25  //

---

1  INDEX (Continued)
2        EXHIBITS
3  NUMBER      DESCRIPTION       PAGES
4
5  Exhibit 33  Email series, "Subject:  Fw: Stitt"; 3  59
6    pages
7
8  Exhibit 34  "SFMTA Proposal to Utilize [sic]    60
9    Automatic Passenger Counters for NTD
10    Passenger Boarding and Passenger Mile
11    Data"; Bates CCSF 095551 - CCSF 095560
12
13
14
15
16
17
18
19
20
21
22
23
24
25

2 (Pages 2 - 5)

| | |
|---|---|
| 1   San Francisco, California; Wednesday, April 6, 2016 | 1   a project manager in May 2015, what was your job title? |
| 2          8:57 a.m. | 2     A   I was a performance manager. |
| 3     (Exhibit 29 and Exhibit 30 were marked for | 3     Q   During what period of time was your job title |
| 4     identification by the court reporter.) | 4   performance manager? |
| 5 | 5     A   From May of 2012 through May of 2015. |
| 6        JASON ROBERT LEE, | 6     Q   Did someone replace you in the position of |
| 7   having been administered an oath, was examined and | 7   performance manager? |
| 8   testified as follows: | 8     A   There was a reorganization. |
| 9 | 9     Q   What job functions did you perform in the |
| 10        EXAMINATION | 10   position of performance manager in the time period May |
| 11   BY MR. TIDRICK: | 11   2012 through May 2015? |
| 12     Q   Good morning. | 12     A   I was responsible for report -- for delivering |
| 13     Will you please state your full name for the | 13   our strategic plan performance reports.  In our |
| 14   record. | 14   strategic plan we have objectives that we need to make, |
| 15     A   Jason Lee. | 15   and our responsibility -- the responsibility of the |
| 16     Q   Do you have a middle name? | 16   group was to report on our progress towards meeting |
| 17     A   Yes. | 17   those goals. |
| 18     Q   What is that? | 18     Q   A reorganization occurred in approximately May |
| 19     A   Robert. | 19   2015? |
| 20     Q   What is your job title? | 20     A   Correct. |
| 21     A   I'm a project manager in the technology | 21     Q   As a result of that reorganization, did the |
| 22   division of San Francisco Municipal Transportation | 22   job functions that you previously performed as |
| 23   Agency. | 23   performance manager become assigned to a different |
| 24     Q   The acronym for that is SFMTA, correct? | 24   position? |
| 25     A   Correct. | 25     A   They continued within the performance group. |
| <div align="right">Page 6</div> | <div align="right">Page 8</div> |
| 1     Q   Are you currently employed by SFMTA? | 1     Q   From May 2015 to the present who has performed |
| 2     A   I am. | 2   the functions that you used to perform in the position |
| 3     Q   When did you start at SFMTA? | 3   of performance manager? |
| 4     A   March 2008. | 4     A   There is a chief performance officer. |
| 5     Q   What are your job functions in your current | 5     Q   Anyone else? |
| 6   job title? | 6     A   That person is responsible for that group. |
| 7     A   I'm responsible for delivering various | 7     Q   Who is the chief performance officer? |
| 8   technology projects to fruition. | 8     A   Travis Fox. |
| 9     Q   Do you supervise anyone? | 9     Q   Is that T-r-a-v-i-s? |
| 10     A   Currently, no. | 10     A   Correct. |
| 11     Q   Have you previously at SFMTA? | 11     Q   Fox, F-o-x? |
| 12     A   Yes. | 12     A   Uh-huh. |
| 13     Q   During what time period? | 13     THE REPORTER:  Is that a "Yes"? |
| 14     A   From 2012 through 2015. | 14     THE WITNESS:  Yes. |
| 15     Q   What month in 2015 did you stop supervising | 15   BY MR. TIDRICK: |
| 16   people? | 16     Q   Travis Fox has served as chief performance |
| 17     A   May 2015. | 17   officer from May 2015 to the present? |
| 18     Q   Did your job functions change in approximately | 18     A   Correct. |
| 19   May 2015? | 19     Q   Do you have an understanding, approximately, |
| 20     A   Yes, I transitioned. | 20   how many people serve in Travis Fox's group? |
| 21     Q   What transition did you make in approximately | 21     A   I don't know that number offhand. |
| 22   May 2015? | 22     Q   When you first started at SFMTA in March 2008, |
| 23     A   I transitioned to become a project manager | 23   what was your position? |
| 24   within the technology division. | 24     A   I was the manager of fare systems development. |
| 25     Q   Immediately prior to transitioning to becoming | 25     Q   Can you repeat that again more slowly, please. |
| <div align="right">Page 7</div> | <div align="right">Page 9</div> |

<div align="right">3 (Pages 6 - 9)</div>

1   A   Manager of fare systems development.
2   Q   Manager of fare systems development?
3   A   Of fare systems development.
4       (Mr. Dubley joined the deposition
5       proceedings.)
6 BY MR. TIDRICK:
7   Q   During what period of time did you serve in
8 the position manager of fare systems development?
9   A   From March of 2008 through May of 2012.
10   Q   May of 2012 is when you --
11   A   Transitioned over to performance manager.
12   Q   What were your job functions in the position
13 of manager of fare systems development?
14   A   To investigate fare policy and to support the
15 delivery of fare technology projects.
16   Q   You are generally familiar with the NextBus
17 system?
18   A   Yes.
19   Q   When did you first have occasion to work with
20 the NextBus system?
21   A   In my role as the performance manager.
22   Q   So beginning in approximately May 2012?
23   A   Correct.
24   Q   Do you continue to work with the NextBus
25 system today?

1 just said, I'm not asking you to testify with respect to
2 the content of communications you've had with any
3 lawyer. You understand that?
4   A   Yes.
5   Q   Again, keeping in mind that I'm not asking you
6 to disclose the substance of any communications that
7 you've had with any lawyer, can you tell me
8 approximately how many times you've met with any lawyer
9 to prepare for the deposition?
10   A   I think twice.
11   Q   Again, without getting into the substance of
12 anything that you discussed with any lawyer, can you
13 tell me approximately when those two discussions with
14 lawyers occurred?
15   A   Within the past two weeks.
16   Q   Do you have any recollection of the names of
17 the lawyers that you met with to prepare for today's
18 deposition?
19   A   We -- Kevin McLaughlin, Linda Ross, and
20 Jonathan Rolnick.
21   Q   Anyone else?
22   A   Not to my knowledge, no.
23   Q   Did you also have communications with Boris
24 Reznikov?
25   A   Not to prepare for this.

1   A   Yes.
2   Q   Is it fair to say that you've worked with
3 NextBus system, generally speaking, on a day-to-day
4 basis from May 2012 to the present?
5   A   I would say on a regular basis, not
6 necessarily day to day.
7   Q   The document that has been marked as Exhibit
8 29 -- have you seen that document before?
9   A   No.
10   Q   If you could, please, turn to page 3 of
11 Exhibit 29. Referring to both pages 3 and 4 of Exhibit
12 29, do you have any understanding that you've been
13 designated to testify on behalf of SFMTA today with
14 respect to topics 5 and 6 of Exhibit 29?
15   A   Yes.
16   Q   What did you do to prepare to testify today
17 regarding topic 5 and 6?
18       MR. McLAUGHLIN: I would just caution the
19 witness: Don't testify as to any attorney
20 communications that you may have had. You can describe
21 the fact that they occurred, if you'd like.
22       THE WITNESS: I had discussions with our
23 attorneys.
24 BY MR. TIDRICK:
25   Q   Just to reiterate a point that Mr. McLaughlin

1   Q   Again, without getting into the substance of
2 any communications you've had with any lawyer, can you
3 tell me when, approximately, you've had conversations
4 with Boris Reznikov?
5   A   I don't recall offhand.
6   Q   Do you recall approximately how many times
7 you've had communications with Boris Reznikov?
8   A   I don't have any recollection of the specific
9 number of times.
10   Q   Are you able to approximate it?
11   A   Not really.
12   Q   Are you able to say with any degree of
13 certainty whether you've had more than five
14 communications with Boris Reznikov?
15       MR. McLAUGHLIN: You're talking about in the
16 course of this litigation?
17       MR. TIDRICK: Yes. Let's start with that.
18       THE WITNESS: In the course of the entire
19 case?
20 BY MR. TIDRICK:
21   Q   Yes.
22   A   I have forgotten how many times I've spoken
23 with him.
24   Q   Would you say it's been more than ten times?
25   A   Perhaps.

| | |
|---|---|
| 1   Q   More than five times? | 1   the company NextBus, Inc.? |
| 2   A   Probably more than five times. | 2   A   Yes. |
| 3   Q   Did you look at any documents to prepare for | 3   Q   Who specifically at NextBus, Inc. have you |
| 4   today's deposition? | 4   interacted with? |
| 5   A   No. | 5   A   The project manager on their side:  Russell |
| 6   Q   I'm showing you a document that's been marked | 6   Chun.  I don't know -- I don't know if that's his |
| 7   as Exhibit 31. | 7   official title, but he's the working project manager |
| 8       For the record, Exhibit 31 has Bates numbers | 8   there.  Blair Brown, who I believe is the -- he's one of |
| 9   CCSF095573 through CCSF095669, entitled "NextBus" -- | 9   the senior executives there.  And Olivier Terrien -- I |
| 10  that's capital N, capital B, all one word -- "Real-time" | 10  think that's his name -- who's also a senior executive |
| 11  with a dash "Transit Management System Users Guide, | 11  there. |
| 12  NextBus, Inc., Version 4.0." | 12  Q   Anyone else? |
| 13       Is Exhibit 31 a document that you are familiar | 13  A   There are other staff members who are -- who |
| 14  with? | 14  just joined. |
| 15  A   I am familiar of the document. | 15  Q   Do you know any of their first names? |
| 16  Q   What is the Exhibit 31 document? | 16  A   Hugh Stevenson. |
| 17  A   It appears to be the user's guide -- user | 17  Q   Anyone else? |
| 18  guide for the NextBus system. | 18  A   No, not that I recall.  No. |
| 19  Q   Is the Exhibit 31 document a document that | 19  Q   Russell Chun -- can you spell his name? |
| 20  you've used before? | 20  A   R-u-s-s-e-l-l C-h-u-n. |
| 21  A   I have seen the document.  I have used the | 21  Q   Blair Brown -- can you spell Blair Brown's |
| 22  NextBus system but not gone through every page of the | 22  name, please? |
| 23  document. | 23  A   B-l-a-i-r.  Last name B-r-o-w-n. |
| 24  Q   Sitting here today, do you have some | 24  Q   Olivier Terrien -- can you spell that person's |
| 25  recollection of what has caused you to look at the | 25  name, please? |
| Page 14 | Page 16 |

| | |
|---|---|
| 1   Exhibit 31 document before? | 1   A   O-l-i-v-i-e-r.  And then I think it's |
| 2   A   In using NextBus, you need to be familiar with | 2   T-e-r-r-i-e-n. |
| 3   the various features of the program.  Sometimes you | 3   Q   Was that i-e-n? |
| 4   reference user's guide.  Oftentimes you just play around | 4   A   Yes. |
| 5   with the system to figure out how to use it. | 5   Q   Is it fair to say prior to May 2012 you |
| 6   Q   And you've done both of those things in the | 6   personally did not have any interactions with anyone at |
| 7   course of working with the NextBus system, correct? | 7   NextBus?  Is that correct? |
| 8   A   Yes. | 8   A   Yes. |
| 9   Q   Do you have any understanding who created the | 9   Q   Of the individuals you've mentioned -- Russell |
| 10  Exhibit 31 document? | 10  Chun, Blair Brown, Olivier Terrien -- with respect to |
| 11  A   No.  I -- no. | 11  those three, do you have any understanding the time |
| 12  Q   I see that on the first page of the Exhibit 31 | 12  period when any of them have been at NextBus? |
| 13  document it says "NextBus, Inc., Version 4.0."  Beneath | 13  A   Russell Chun has been there for years.  The |
| 14  that it has an address in Alameda, California, and a | 14  others are fairly recent within the past year or less. |
| 15  couple lines -- a few lines below that there's a | 15  Q   So just to be clear, Blair Brown and Olivier |
| 16  copyright date of "2009, NextBus, Inc." | 16  Terrien have been there only relatively recently within |
| 17       I'm just drawing attention to that to ask | 17  the -- |
| 18  whether any of that refreshes your recollection | 18  A   Correct. |
| 19  whether -- for example, have you ever heard anyone say | 19  Q   -- past year or less, correct? |
| 20  that the Exhibit 31 document was created by NextBus? | 20       Correct? |
| 21  A   I would assume, based on what's on the title | 21  A   Correct. |
| 22  page, that NextBus had created it. | 22  Q   Russell Chun, in contrast, has been there at |
| 23  Q   Did SFMTA create the Exhibit 31 document? | 23  least since May 2012? |
| 24  A   No. | 24  A   At least. |
| 25  Q   Have you ever interacted with personnel from | 25  Q   How many times would you say that you've |
| Page 15 | Page 17 |

1 interacted with Russell Chun from May 2012 to the
2 present?
3    A   I don't recall.
4    Q   Is it fair to say that Russell Chun is someone
5 who you've been regularly in contact with?
6    A   Yes.
7    Q   Do you typically communicate with Russell Chun
8 by email or phone or both?
9    A   We usually -- we often have face-to-face
10 meetings.
11    Q   Are those face-to-face meetings typically at
12 NextBus's offices in Alameda or here in San Francisco?
13    A   San Francisco.
14    Q   Do you have any understanding when,
15 approximately, the Exhibit 31 document was created?
16    A   It says 2009.
17    Q   Do you have any reason to think that that's
18 not accurate?
19    A   No reason.
20    Q   Do you have any understanding who has access
21 to the Exhibit 31 document?
22    MR. McLAUGHLIN: Objection. Speculation. You
23 mean within San Francisco?
24 BY MR. TIDRICK:
25    Q   Let's start with that.

1    A   I do not know who has access to it. I assume
2 it's on -- available to any of NextBus's clients.
3    Q   Do you have any understanding who at SFMTA
4 uses the Exhibit 31 document?
5    A   I -- people who use the NextBus system may use
6 the document or may just know how to use NextBus through
7 playing around with it.
8    Q   My next question -- you may be able to answer
9 by specific names or it might more be job functions, job
10 titles, groups.
11    My question is who at SFMTA uses the NextBus
12 system?
13    A   Our operations people, scheduling people,
14 information technology people.
15    Q   To your knowledge, have any SFMTA staff ever
16 gone through tutorials about the NextBus system?
17    A   I -- I don't know what other SFMTA staff have
18 gone through related to using the NextBus system.
19    Q   You know who Ed Reiskin is?
20    A   He's our director of transportation.
21    Q   Have you ever interacted with Ed Reiskin?
22    A   Yes.
23    Q   From May 2012 to the present, how frequently
24 have you interacted with Ed Reiskin?
25    A   I've been in meetings with him related to

1 performance. I've provided updates to him on projects,
2 but I do not regularly meet with him.
3    Q   When you say meetings related to performance,
4 what do you mean by that?
5    A   So when I was the performance manager, we
6 would have our regular performance meetings on
7 approximately a monthly basis in which we would go over
8 numbers with Ed and our transit operations folks.
9    Q   What was that time period?
10    A   From May 2012 through May 2015.
11    Q   When you say "go over numbers," what numbers
12 are you referring to?
13    A   Numbers related to how the agency was doing
14 relative to its strategic planning goals -- strategic
15 plan, goals, and objectives.
16    Q   And specifically what numbers does that
17 include?
18    A   We have --
19    MR. McLAUGHLIN: Just object that it's
20 overbroad.
21    You can answer.
22    THE WITNESS: We have dozens of strategic plan
23 goals and objectives, and so numbers related to any of
24 those metrics would be included.
25 //

1 BY MR. TIDRICK:
2    Q   During the monthly performance meetings you're
3 referring to -- well, is that what they were called?
4 Performance meetings?
5    A   We had an internal term, Tran-stat meetings,
6 but they were performance meetings.
7    Q   Tran-stat? How do you spell that?
8    A   T-r-a-n-s-t-a-t.
9    Q   Is that an acronym?
10    A   Transit statistics.
11    Q   So it's capital T-r-a-n capital S-t-a-t?
12    A   No, lower case S.
13    Q   So just Tran-stat?
14    A   Correct.
15    Q   And the idea is it's the combination of
16 transportation and statistics?
17    A   Correct.
18    Q   Is that an industry term or is that just
19 something that --
20    A   It was an internal term used at SFMTA.
21    Q   The numbers that were covered in the Tran-stat
22 meetings, were those in some kind of a written report
23 that was circulated at those meetings?
24    A   They were on dashboards that were shown
25 electronically.

| | |
|---|---|
| 1    Q    On a projector? | 1    Q    SFMTA employs both bus and train operators, |
| 2    A    Correct. | 2   correct? |
| 3    Q    PowerPoint presentations? | 3    A    Correct. |
| 4    A    No, not a PowerPoint presentation. | 4    Q    That's been true throughout the time -- well, |
| 5    Q    What file format, as far as you know? | 5   at least from 2009 to the present, correct? |
| 6    A    So -- so we have -- we have software that we | 6    A    Correct. |
| 7   use called Tableau, and Tableau allows us to portray | 7    Q    Is there a physical location known as central |
| 8   statistics in graphical format. | 8   command -- central control? Strike that. |
| 9    Q    Fair to say that during the monthly Tran-stat | 9      Is there a physical location known as central |
| 10   meetings the various statistics that were covered in the | 10   control? |
| 11   meetings were projected on a screen using the Tableau | 11    A    There is. |
| 12   software? | 12    Q    What is that? |
| 13    A    Correct. | 13      MR. McLAUGHLIN: Objection. Vague. |
| 14    Q    Do you have any understanding whether those | 14      You can answer as best ... |
| 15   Tran-stat meetings occurred prior to May 2012? | 15      THE WITNESS: Operations is not my area of |
| 16    A    They did not occur. | 16   expertise. I understand there is a transit management |
| 17    Q    They started in May 2012? | 17   center where operational decisions are made. |
| 18    A    They started in approximately September of | 18   BY MR. TIDRICK: |
| 19   2012 after a few months that I was managing the | 19    Q    Do you have any understanding where in the |
| 20   performance unit. | 20   city that is, geographically, I mean, the address? |
| 21    Q    Is it fair to say the Tran-stat meetings was | 21    A    1455 Market Street. |
| 22   one of your initiatives? | 22    Q    Has central control been located at 1455 |
| 23    A    That is fair to say. | 23   Market Street at least from 2009 to the present? |
| 24    Q    Do those continue today? | 24    A    I think they have moved there in the past few |
| 25    A    They do. | 25   years. |
| <div align="right">Page 22</div> | <div align="right">Page 24</div> |
| 1    Q    Do you have any recollection -- well, strike | 1    Q    It is your understanding that there has been a |
| 2   that. | 2   location known as central control at least from 2009 to |
| 3      The numbers that were covered in these | 3   the present, correct? |
| 4   Tran-stat meetings from September 2012 to the present -- | 4    A    Correct. |
| 5   did they include on-time performance statistics? | 5    Q    Have you ever visited central control? |
| 6    A    Yes. | 6    A    No. |
| 7    Q    For all divisions of SFMTA? | 7    Q    And I don't mean to get hung up on the word |
| 8    A    Clarify what you mean by "all divisions," | 8   "visited." |
| 9   please. | 9      How is it that you know where central control |
| 10    Q    How many divisions are there in SFMTA? | 10   is? |
| 11    A    I think there's something like nine divisions, | 11    A    As part of working at SFMTA in my functions, |
| 12   approximately. You mean garages, right, or depots? | 12   you pick up on things. |
| 13    Q    That's what I'm referring to. | 13    Q    Do you have any understanding what the |
| 14    A    Okay. | 14   functions of central control are? |
| 15    Q    Is it fair to say that during the monthly | 15    A    Again, I'm not an operations expert, but I |
| 16   Tran-stat meetings from September of 2012 to the present | 16   believe they are responsible for day-to-day real-time |
| 17   the numbers covered included on-time performance | 17   management of the transportation system. |
| 18   statistics for the entire fleet of SFMTA's vehicles? | 18    Q    Have you ever spoken with anyone at central |
| 19    A    Yes. | 19   control? |
| 20    Q    The term "operator" or classification 9163 -- | 20      MR. McLAUGHLIN: Objection. Vague. |
| 21   that includes both bus and train operators, correct? | 21      MR. TIDRICK: Let me try something else. |
| 22    A    Correct. | 22    Q    You understand that there are certain |
| 23    Q    When we refer to operators, you understand | 23   personnel that work in central control, correct? |
| 24   we're referring to both, correct? | 24    A    Uh-huh. |
| 25    A    Correct. | 25      THE REPORTER: I'm sorry. Is that a "Yes"? |
| <div align="right">Page 23</div> | <div align="right">Page 25</div> |

<div align="right">7 (Pages 22 - 25)</div>

1       THE WITNESS: Yes.
2 BY MR. TIDRICK:
3       Q    Have you ever communicated by phone or by
4 email with anyone who works for central control?
5       A    No.
6       Q    Do you have any understanding that central
7 control uses the NextBus system?
8       A    I am aware that they do, yes.
9       Q    Do you have any understanding how central
10 control uses the NextBus system?
11      A    They can determine where vehicles are in
12 real-time and make operational decisions on how to deal
13 with service-related operational issues.
14      Q    If you could, please, in the Exhibit 31
15 document turn to page 5. At page 5 there is a section
16 header "Terminology Used in this Guide."
17           Do you see that?
18      A    Uh-huh. Yes.
19      Q    Beneath that it says: "You should be familiar
20 with the following terms."
21           Do you see that?
22      A    Yes.
23      Q    Immediately beneath that it says "Agency Map."
24      A    Yes.
25      Q    Do you see that?
Page 26

1       "Yes"?
2       A    Yes.
3       Q    Exhibit 31, page 5 defines agency map as "a
4 real-time map display of route and vehicle activity.
5 This is accessed from a secure web page unique to the
6 transit agency and not visible to the public."
7           Do you see that?
8       A    Yes.
9       Q    Is that your understanding of what the agency
10 map is?
11      A    Yes.
12      Q    When you say that central control knows where
13 the transit vehicles are in real-time, is the agency map
14 one of the NextBus technologies that central control
15 uses to monitor the locations of the transit vehicles?
16           MR. McLAUGHLIN: Objection. Speculation.
17           You can answer.
18           THE WITNESS: They can use the map. I don't
19 know if they do use the map.
20 BY MR. TIDRICK:
21      Q    I'm just trying to understand the distinction
22 that you're drawing.
23           Do I understand correctly that the NextBus
24 technology that central control has access to includes
25 the agency map function --
Page 27

1       A    Yes.
2       Q    -- correct?
3           Central control can use the agency map to
4 monitor the locations of all transit vehicles in
5 real-time, correct?
6       A    Correct.
7       Q    Have you ever personally seen the agency map?
8       A    Yes.
9           (Exhibit 31 was marked for identification by
10          the court reporter.)
11 BY MR. TIDRICK:
12      Q    If you could, please, turn to page 22 of
13 Exhibit 31.
14           On page 22 of Exhibit 31 you see that there's
15 a screenshot below the header "Viewing of Schedule
16 Adherence"?
17      A    Yes.
18      Q    Is that an example of an agency map?
19      A    Yes.
20      Q    That's typical of what an agency map looks
21 like?
22      A    Yes.
23           (Exhibit 32 was marked for identification by
24          the court reporter.)
25 //
Page 28

1 BY MR. TIDRICK:
2       Q    I'm showing you a document marked as Exhibit
3 32.
4           Is Exhibit 32 also an example of what a
5 typical agency map looks like?
6       A    Yes, filtered down to a route.
7       Q    When you say "filtered down to a route," what
8 do you mean by that?
9       A    You select one route that you're focusing on,
10 and only the vehicles associated with that route will
11 show up.
12      Q    The NextBus technology allows the user to
13 filter down to any given route in the SFMTA transit
14 system, correct?
15      A    Correct.
16      Q    And to give real-time information on the exact
17 location of transit vehicles at any given time, correct?
18      A    Correct.
19      Q    Has the agency map function that you've
20 described existed at least from 2009 to the present?
21      A    Yes. Well, I don't know about 2009. Since
22 I've been there, yes, it has.
23      Q    So personally you know that the agency map
24 function that you have described has existed from
25 mid-2012 to the present, correct?
Page 29

8 (Pages 26 - 29)

## Page 30

1    A    Correct.

2    Q    Do you have any reason to believe that it did

3 not exist from 2009 to the present?

4    A    No reason to believe that.

5    Q    Do you have reason to believe that it did

6 exist from 2009 to the present?

7    A    Yes, it probably did exist if it's here in

8 this document published in 2009. I would assume it was

9 around since 2009.

10    Q    The agency map function in NextBus -- is it

11 your understanding that the various departments within

12 SFMTA that you previously mentioned today, specifically

13 operations people, scheduling people, IT people, all

14 have access to the agency map function?

15    A    Yes.

16    Q    And that's been true at least from mid-2012 to

17 the present, correct?

18    A    Yes.

19    Q    And you have no reason to believe that they

20 didn't from 2009 to 2012, correct?

21    A    That's correct.

22    Q    NextBus tracks vehicles that arrive at the

23 endpoints of runs after the scheduled arrival time,

24 correct?

25        MR. McLAUGHLIN: Objection. Vague.

## Page 31

1        MR. YOUNG: You can answer the question.

2        THE WITNESS: Can you repeat the question,

3 please?

4        MR. YOUNG: Madam Court Reporter, can you

5 please repeat the question.

6    (Record read by the reporter as follows:

7        "QUESTION: NextBus tracks vehicles

8        that arrive at the endpoints of runs after

9        the scheduled arrival time, correct?")

10        THE WITNESS: Correct.

11 BY MR. TIDRICK:

12    Q    That's been true at least from mid-2012 to the

13 present, correct?

14    A    Correct.

15    Q    And you have no reason to believe that that

16 was not true from the time period 2009 to 2012, correct?

17    A    Correct.

18        MR. McLAUGHLIN: I'm going to object again.

19 It's vague.

20 BY MR. TIDRICK:

21    Q    Can you please describe for me what are the

22 purposes that you have in using the NextBus system? And

23 I'm referring to you specifically.

24        MR. McLAUGHLIN: Objection. Vague as to time.

25 //

## Page 32

1 BY MR. TIDRICK:

2    Q    And let me also be more focused.

3        With respect to the system map function -- let

4 me restate the question.

5        Approximately how many times have you looked

6 at the agency map function in NextBus?

7    A    Over the time I've worked at SFMTA, many

8 times.

9    Q    What are the reasons that you, Mr. Lee, look

10 at the agency map function in NextBus?

11    A    I would want to track where a specific vehicle

12 was at a certain time.

13    Q    Any other reasons?

14    A    That would be the primary reason.

15    Q    When you say "track where a specific vehicle

16 was at a certain time," is that in real-time or after

17 the fact or both?

18    A    Primarily after the fact.

19    Q    When you say "Primarily after the fact," do I

20 understand you've had occasion to use the agency map

21 function to look at where a specific vehicle was at a

22 certain time, sometimes in real-time, sometimes after

23 the fact, but primarily after the fact?

24    A    Correct.

25    Q    Again, just talking about the instances when

## Page 33

1 you, Mr. Lee, have looked at the agency map function,

2 what are the reasons that you have been looking up,

3 after the fact, where a specific vehicle was at a

4 certain time?

5    A    If I was involved or if I had witnessed

6 something on the vehicle and we needed to pull the

7 videotape from that vehicle, I needed to know what

8 vehicle number that was. So I could rewind and find out

9 which vehicle that was and then make a request for a

10 videotape for that vehicle.

11    Q    Are there any other reasons that you have used

12 the agency map function to look up where a specific

13 vehicle was at a certain time after the fact?

14    A    If there were service disruption and I was

15 curious about what had happened, I would look that up

16 after the fact.

17    Q    Any other reasons?

18    A    I would say that's -- those are the primary

19 reasons.

20    Q    Now, with respect to the times that you've

21 used the agency map function to see where a specific

22 vehicle was in real-time, what are the reasons you've

23 done that?

24    A    So we've had test hardware installed on

25 vehicles before and only on specific vehicles, and we

1 needed to find out where that vehicle was.
2 Q Any other reasons that you've had reason to
3 use that function in real-time?
4 A If I needed to catch a certain bus to go
5 somewhere.
6 Q Any other reasons?
7 A I'd say those would be the primary reasons.
8 Q Why is it you sometimes use the agency map
9 function to look up the location of a vehicle if you
10 needed to catch a bus to go somewhere?
11 A Because I wanted to see when the bus would
12 arrive, how close it was physically to my stop, and the
13 map would show that.
14 Q Is there a reason that you don't just consult
15 what the schedule is?
16 A When you mean -- what do you mean by "the
17 schedule"? The published schedule?
18 Q Yes.
19 A Well, oftentimes real-time information would
20 provide a more accurate representation of what's
21 happening out there. If there were a missing bus, for
22 example, it might appear in the schedule, but the
23 NextBus would show that -- would not have a time for
24 that.
25 Q Would not have a time for what?

1 A So NextBus would reflect -- if a bus were not
2 -- were missing, then NextBus wouldn't show that that
3 bus was on there from the agency map. So I would know
4 not to wait for it even if it were in the published
5 schedule.
6 Q When you say that the NextBus real-time data
7 is oftentimes more accurate than the published schedule,
8 are there other reasons why that's the case?
9 MR. McLAUGHLIN: Objection. Vague.
10 BY MR. TIDRICK:
11 Q Just reasons that you're aware of?
12 A Well, NextBus has GPS -- GPS -- or vehicle --
13 our buses or vehicles have GPS trackers on them. So,
14 theoretically, NextBus uses that data to tell you when
15 the vehicles are supposed to arrive, and that's in
16 real-time. A schedule is static. That's prepared
17 months in advance. So NextBus would theoretically
18 provide a more up-to-date prediction of when the bus
19 would arrive.
20 Q Is that why you typically look at the agency
21 map function rather than the published schedule when
22 you're needing to catch a bus?
23 A Well, I actually typically use my smartphone,
24 which doesn't have the agency map on it. It just tells
25 you when the vehicle is supposed to arrive.

1 Published schedules do give a general idea of
2 when -- what the service is supposed to be. So
3 sometimes if I have to plan in advance, I will use a
4 schedule to get a general idea of the service that is
5 provided when I want to travel.
6 Q When you use your smartphone, is that telling
7 you what the published schedule is?
8 A It is telling me the prediction.
9 Q The prediction based on the real-time data?
10 A Correct.
11 Q What's the name of the app that you use on
12 your smartphone for that?
13 A I just go to NextBus.com.
14 Q The term "AMDT" -- what does that refer to?
15 A I don't know what that refers to.
16 MR. McLAUGHLIN: Objection. Vague.
17 BY MR. TIDRICK:
18 Q Are you familiar with the term "Advanced
19 Mobile Data Terminal"?
20 A I -- I am not familiar with that term.
21 Q Are there radios on the transit vehicles that
22 connect with the NextBus server?
23 A I believe so.
24 Q Do you have any understanding what the
25 function is of the radio that connects with the NextBus

1 server?
2 A So I'm not an expert on the hardware side of
3 how NextBus works, but I believe there is a GPS tracker
4 that communicates where the location of the bus is, and
5 there is an association that's made between the bus and
6 the -- the schedule block.
7 Q When you say "schedule block," what are you
8 referring to?
9 A So a block is the vehicle assignment within a
10 schedule. So a specific block number throughout the day
11 in a schedule would be a -- associated with a vehicle.
12 Q When you say GPS tracker, have you also heard
13 the term GPS antenna?
14 A I have heard that term before.
15 Q As far as you know, are those the same thing?
16 A I -- I can't say either way.
17 Q Your understanding is that there is some sort
18 of GPS device on every transit vehicle --
19 A Correct.
20 Q -- in the fleet, correct?
21 And that device communicates the location of
22 each and every transit vehicle to the NextBus system,
23 correct?
24 A Correct.
25 Q And it does that in real-time, correct?

1    A    Correct.
2    Q    And you know that to be a fact from mid-2012
3  to the present, correct?
4    A    Correct.
5    Q    And you have no reason to believe that it's
6  not the case from 2009 to 2012, correct?
7    A    That's correct.
8    Q    Do you have any understanding whether there is
9  any kind of device on the transit vehicle that the
10 operator needs to log into or activate in some manner in
11 order for the GPS tracking to operate?
12   A    So the GPS tracking -- it is my understanding
13 that the GPS tracking operates regardless of operator
14 intervention.  However, operators should log on so that
15 there is an association made between the vehicle and the
16 schedule block.
17        MR. YOUNG:  Did you say "log" or "block"?
18        THE WITNESS:  Log on.
19 BY MR. TIDRICK:
20   Q    What happens if the operator does not log on?
21   A    If the operator does not log on, there are a
22 couple other ways that NextBus can associate a vehicle
23 with a schedule block.  One is if the yard starter who
24 assigned the vehicle to the operator enters the
25 information into Trapeze.

Page 38

1        Two, NextBus has a feature called auto jobber,
2  which attempts to associate the vehicle with the
3  schedule block.
4    Q    So do I understand correctly there are three
5  different ways that the GPS tracking device can be
6  associated with a schedule block -- the three different
7  ways you've described?
8    A    Correct.
9    Q    Are there any others?
10   A    Not to my knowledge.
11   Q    What happens if none of those three ways of
12 making the association occur?
13   A    Then NextBus is unable to identify what the
14 vehicle is -- the schedule block that the vehicle is
15 associated with.
16   Q    Are you aware of that ever happening?
17   A    It may occur from time to time.
18   Q    Is there ever any radio frequency interference
19 that disrupts the GPS tracking?
20        MR. McLAUGHLIN:  Objection.  Vague.
21 Speculation.
22        THE WITNESS:  Technology is never a hundred
23 percent.
24 BY MR. TIDRICK:
25   Q    So as a general matter, it's fair to say that

Page 39

1  even though the GPS system attempts to identify the
2  exact location of each and every transit vehicle at any
3  given point in time, it's not 100 percent accurate,
4  correct?
5    A    Just like on your phone.  There are dropped
6  calls.  Technology is never a hundred percent.
7    Q    Who maintains the GPS devices on the transit
8  vehicles?
9    A    I don't know.
10   Q    Do you have any understanding who within SFMTA
11 would know that?
12   A    We have maintenance people who do that.  We
13 also can track when -- if a GPS unit isn't reporting, we
14 can track that as well, but I don't know who the
15 specific party is.
16   Q    I understand you may not know the engineering
17 side of this, but, as a general matter, the GPS unit not
18 reporting -- how is it that SFMTA is able to track that?
19   A    Well, if a vehicle hasn't reported for days,
20 you know, there's a hole of data, and then we can tell
21 that something needs to be fixed.
22   Q    When that happens, as a general matter, what
23 steps occur to fix it?  For example, is there a
24 particular unit within SFMTA that goes and checks on the
25 vehicle?

Page 40

1    A    I don't know the answer.  I think it is a
2  partnership, though, with NextBus to try to figure out
3  what to do.
4    Q    Have you heard about GPS devices on the
5  transit vehicles having mechanical failures?
6    A    I particularly don't follow that.  I'm sure,
7  as with any technology, there are failures.
8    Q    Is it fair to say that what you're not sure of
9  is who exactly goes and fixes those failures?
10   A    Correct.  I don't know exactly the process of
11 how that works.
12   Q    Of fixing those, correct?
13   A    Correct.
14   Q    Do you have any knowledge of poor signal
15 strength being an issue that affects the reliability of
16 the GPS data?
17   A    I don't think it's a major issue.
18   Q    Do you know that for a fact or is that
19 something you've just heard from someone?
20   A    When we look at the data, it is fairly
21 complete.  Of course, as I mentioned before, nothing is
22 a hundred percent accurate, but -- I couldn't give you a
23 specific number, but it's probably in the high 90s in
24 terms of reliability.
25   Q    Has anyone ever actually assessed or assigned

Page 41

11 (Pages 38 - 41)

1 a number to the reliability or is that more of a
2 guesstimate?
3      A   It's a guesstimate.
4      Q   Do missed trips impact the GPS data?
5          MR. McLAUGHLIN: Objection. Vague.
6          THE WITNESS: If a vehicle does not go out,
7 then no real-time data is associated with that vehicle.
8 So it will not show up in the data.
9 BY MR. TIDRICK:
10     Q   Are you familiar with the term "missing
11 leader"?
12     A   Yes.
13     Q   In general lay person's terms, can you
14 describe what that is?
15     A   Missing leader is when the vehicle -- transit
16 vehicle that's scheduled to be ahead of you is not
17 there.
18     Q   When that occurs, oftentimes there's an
19 attempt to essentially plug in another vehicle for that
20 missing leader, correct?
21     A   It depends on the transit agency or the policy
22 or the -- and the resource availability.
23     Q   In those instances where a transit vehicle is
24 inserted for the missing leader, is it fair to say that
25 that vehicle is having less of a headway before the

1 vehicle behind it than the missing leader would have
2 had?
3          MR. McLAUGHLIN: Objection. Vague.
4 Incomplete hypothetical.
5          THE WITNESS: I think it would depend on a
6 case-by-case basis.
7 BY MR. TIDRICK:
8      Q   Is there a terminology that you have for a
9 vehicle that's inserted to replace a missing leader?
10     A   The operations folks may have a terminology
11 for it. I -- I don't know offhand.
12     Q   When a transit vehicle is inserted to replace
13 a missing leader, how does the NextBus GPS system
14 account for that?
15     A   As I mentioned before, there are multiple ways
16 that NextBus can associate a vehicle with the schedule
17 block. There is the auto jobber function, which would
18 probably try to associate that vehicle with a schedule
19 block.
20     Q   Is it fair to say that essentially a computer
21 -- the auto jobber function attempts to associate the
22 transit vehicle with a schedule block?
23     A   Yes.
24     Q   Do you understand that when there is a missing
25 leader, that the vehicle behind the missing leader will

1 be moved up so that it is less than a full headway
2 behind where the missing leader would have been?
3          MR. McLAUGHLIN: Objection. Incomplete
4 hypothetical.
5          THE WITNESS: Again, I think it depends on the
6 policy of the transit agency.
7 BY MR. TIDRICK:
8      Q   Do you know what the policy is?
9      A   I -- I do not know what the policy is.
10     Q   Do you have any understanding how the auto
11 jobber associates a vehicle that is replacing a missing
12 leader?
13     A   The auto jobber looks at the -- the position
14 of the vehicle and how it's traversing down the street
15 to associate it with a route and a schedule block.
16     Q   Based on the way you've described it, it
17 sounds as though the auto jobber function will look to
18 what the real-time location of the vehicle is relative
19 to what the scheduled runs are and associates the
20 vehicle, whichever one is -- it's closest to on the
21 schedule. Is that fair to say?
22     A   Yes.
23         I would also add with regards to your previous
24 question that the SFMTA is hitting about 98.5 percent of
25 its scheduled service delivered. So these are very rare

1 cases you're talking about.
2      Q   What does the 98.5 percent figure refer to?
3      A   The percentage of scheduled service that's
4 delivered.
5      Q   Understood.
6         So the 98.5 percent simply refers to the fact
7 that the missing leader issue pops up 1.5 percent of the
8 time, correct?
9      A   Or less.
10     Q   Are you saying that 98.5 percent of the runs
11 go out every day?
12     A   I believe we are achieving that as an agency
13 right now. I don't know -- that varies from month to
14 month, but, as a whole, I think we are now achieving
15 that.
16     Q   How long has SFMTA been achieving the 98.5
17 percent --
18     A   I don't recall offhand.
19     Q   Is that a statistic that you were monitoring?
20     A   Currently in my current position I do not
21 monitor that any longer. Other people, maybe.
22     Q   During the time period when you were having
23 the Tran-stat meetings, is that a statistic that you
24 monitored?
25     A   Yes.

| | |
|---|---|
| 1   Q  Do you have any recollection whether the 98.5 | 1   Q  What about with respect to bridges? |
| 2  percent figure that you're referring to today was | 2   A  I -- I have not. |

Page 46

1   Q   Do you have any recollection whether the 98.5
2   percent figure that you're referring to today was
3   typical of the numbers during the --
4   A   You know, I think --
5   Q   -- 2012 to 2015 time frame?
6   A   I don't have the specific numbers, but it was
7   increasing.
8   Q   Fair to say that the number used to be lower
9   than that, and it increased over time?
10   A   Yeah.
11   Q   Do you have any recollection approximately how
12   low that number was at the beginning of the 2012 period
13   when you were monitoring it?
14   A   It's -- it's always been at least around 95
15   percent or above. It may have dipped a little bit, but,
16   again, in terms of the missing leader issue, it's --
17   yeah, it's a very small percentage of trips.
18   MR. McLAUGHLIN: I don't know if this is a
19   small break in your line of questioning, but I just
20   wanted to make clear Mr. Lee needs to leave at 11:45. I
21   think that was communicated before.
22   And also just make clear on the record he's
23   here on topics 5 and 6. I think that was our -- our
24   understanding. Just making that clear.
25   MR. YOUNG: What's your availability for the

Page 46

1   rest of the day after?
2   THE WITNESS: I am booked the rest of the day.
3   MR. YOUNG: Okay. What about the rest of the
4   week? Assuming we don't get -- assuming we don't finish
5   today, we might have to bring you back.
6   THE WITNESS: I'd have to check my schedule.
7   MR. McLAUGHLIN: Yeah, that's something that
8   -- I can confer with Mr. Lee, and I can figure that out.
9   I mean, I think a lot of this stuff today has not been
10   addressed really to these topics, but we can confer.
11   BY MR. TIDRICK:
12   Q   Do you have any knowledge one way or the other
13   whether there is ever geographic blocking of GPS
14   satellites by urban buildings?
15   A   You know, I'm not a technical expert in that,
16   but certainly when you look at the data, it's a pretty
17   complete data set for all routes.
18   Q   What I'm asking about is not how complete it
19   is, but whether you have any knowledge one way or the
20   other --
21   A   I'm not an expert in the way that that
22   functions.
23   Q   Have you ever heard from anyone at NextBus
24   that there is less accuracy around tall urban buildings?
25   A   I have not.

Page 47

1   Q   What about with respect to bridges?
2   A   I -- I have not.
3   Q   What about with respect to steep geography,
4   like hills?
5   A   I have not either.
6   Q   Does NextBus operate for each route?
7   A   Yes.
8   Q   That's been true from 2009 to present?
9   A   Since I was performance manager and, I assume,
10   prior to that time.
11   Q   You have every reason to think that has been
12   the case from 2009 to the present, correct?
13   A   That is correct.
14   Q   Does SFMTA adjust the GPS data when a vehicle
15   is running off the scheduled route?
16   A   We do not adjust any data.
17   Q   Has SFMTA ever become aware of any limitations
18   of the CAD ADL system's inability to send location
19   information?
20   MR. McLAUGHLIN: I'd just object as vague.
21   THE WITNESS: I -- the CAD ADL system where --
22   you know, there's always technology improvements that
23   occur, and so nothing, again, is ever a hundred percent.
24   BY MR. TIDRICK:
25   Q   Are there any specific technical limitations

Page 48

1   that you can identify that have existed at any time from
2   2009 to the present?
3   A   No.
4   Q   Is it fair to say there may be someone else
5   who has more knowledge about that?
6   A   I'm not sure whether there is within the
7   agency.
8   Q   Have you ever heard NextBus give any caveats
9   about the reliability of the GPS data?
10   A   No.
11   Q   On the Exhibit 32 document, if you could help
12   me identify and explain what the materials in the boxes
13   refer to ... And just as an example, you'll see I'm
14   pointing to one -- it's the one that's on the furthest
15   right on the page, the box that extends to the furthest
16   right on the page of Exhibit --
17   A   This one here? Exhibit 32?
18   Q   Yes.
19   MR. McLAUGHLIN: I'll just note for the record
20   that this exhibit doesn't have a Bates stamp. So we're
21   assuming that it represents data from the City's system.
22   I don't know if that's true or not.
23   BY MR. TIDRICK:
24   Q   Looking at the box on Exhibit 32 that's the
25   furthest to the right in the box that says

Page 49

1 "1-California:5611 -3:21 late," can you please tell me
2 what the various information in that box refers to?
3    A    Sure.  So 1 California is the route.  Then
4 5611 is the vehicle number, and then 3 minutes and 21
5 seconds is how much it's late by.  That -- that -- that
6 NextBus is estimating.
7    Q    And is it fair to say that the 3 minutes and
8 21 seconds late refers to how far behind the schedule
9 the transit vehicle is?
10    A    Correct.
11    Q    And the description you've just given of the
12 information in the box on Exhibit 32 -- is it fair to
13 say that what you've just described is true for any
14 other box on the agency maps?
15    A    Yes.
16    Q    If you could, please, in the Exhibit 31
17 document turn to page 22.  Again, for ease of reference,
18 let's just refer to the box that's closest to the top of
19 the page, the box that says "31:5555 -18:46 late."
20       Can you please review for me what the various
21 material in that box refers to?
22    A    So the 30 --
23       MR. McLAUGHLIN:  Object -- I'll just object
24 that this is not an MTA document.  So it calls for
25 speculation.  I mean, it doesn't look like the ones on

1 the other -- on Exhibit 32.  So that's all.
2       THE WITNESS:  So, I mean, based on what this
3 is -- as my attorney has advised, this is not an MTA
4 document -- it appears that this could be the route
5 number and then the vehicle number and then the time
6 it's late versus scheduled.
7 BY MR. TIDRICK:
8    Q    Is that your understanding of what that is?
9    A    That's -- that's what I would guess it would
10 be, yep.
11    Q    Do you have any reason to think that that's
12 incorrect?
13    A    No.
14    Q    In the Exhibit 31 document could you please
15 turn to page 6.
16    A    Oh, page 6.
17    Q    I apologize.  Page 7, the next page, please.
18 At the bottom of the page you'll see there's a
19 definition of stale vehicle:  "A vehicle that has not
20 reported its position in six minutes."
21       Is that a definition you're familiar with?
22    A    I'm not in operations; so I don't typically
23 use that terminology.
24    Q    Have you ever heard anyone in operations use
25 that terminology?

1    A    No.
2    Q    Is there some other term that SFMTA uses to
3 refer to a vehicle that has not been reporting its
4 position?
5    A    I -- I wouldn't know.
6    Q    On page 6 of Exhibit 31 the terminology
7 "hidden stop," referring to "A stop that is not a
8 passenger service stop and does not appear on the public
9 map, hidden stops are generally used for time points
10 that the system uses to generate predictions for a
11 vehicle and are reported on the schedule adherence
12 reports."
13       Is "hidden stop" a term that SFMTA uses?
14    A    Not regularly, to -- to my knowledge, no.
15    Q    Has SFMTA ever established time points in the
16 NextBus system to identify the locations of the division
17 gates?
18    A    No.
19    Q    Is there a reason why SFMTA has never done
20 that?
21       MR. McLAUGHLIN:  Objection.  Speculation.
22       THE WITNESS:  NextBus is used to provide
23 predictions at revenue stops.  That is the purpose of
24 the software for our customers primarily, first.
25       Divisions or depots or garages are not revenue

1 stops.
2 BY MR. TIDRICK:
3    Q    Is there any reason that SFMTA would not be
4 able to set up time points at the division gates?
5    A    I do not believe that NextBus has that
6 capability.
7    Q    What's the basis for that belief?
8    A    I believe that NextBus has told us that that
9 is not feasible.
10    Q    Do you have any reason -- do you have any
11 understanding why that would not be feasible?
12    A    So when we develop a route, it is based on the
13 revenue -- the revenue service of that route.  A garage
14 or depot or division is not in revenue service -- is not
15 a revenue service stop.  NextBus looks at those revenue
16 stops only.
17    Q    Is there any technical reason why the NextBus
18 system cannot look at a non-revenue stop?
19       MR. McLAUGHLIN:  Objection.  Speculation.
20       THE WITNESS:  I don't ever believe the NextBus
21 system as a prediction software system for customers was
22 ever designed to do that.
23 BY MR. TIDRICK:
24    Q    Isn't that exactly what the terminology
25 "hidden stop" is referring to at page 6 of Exhibit 31?

1    A    So "hidden stop" -- I mean, we don't use this
2  term, but sometimes -- let's say the portal entrance at
3  Duboce and Church, which actually is not a revenue stop
4  for customers to get on -- it's a stop that could be
5  used as a time point for keeping track of where the
6  vehicle is, but it is not a -- an actual stop.  It is,
7  however, on the route of the train.
8    Q    Pulling in at the division gate is part of
9  numerous SFMTA runs, correct?
10       MR. McLAUGHLIN:  Objection.  Vague.
11       THE WITNESS:  Clearly when a vehicle finishes
12  up, they have to go back to the garage for the -- the
13  vehicle to be stored there, but it is not part of the
14  revenue service --
15  BY MR. TIDRICK: --
16    Q    The G- --
17    A    -- of that -- of that trip.
18    Q    The GPS is still operating when the vehicles
19  pull into the division gates, correct?
20       MR. McLAUGHLIN:  Objection.  Vague.
21  Speculation.
22       THE WITNESS:  The GPS, unless it's turned off,
23  would probably be running at that point, yes.
24  BY MR. TIDRICK:
25    Q    Are the GPS devices regularly turned off?

1    A    If the vehicle is turned off.
2    Q    As long as the vehicle is running, the GPS
3  system is running, correct?
4    A    It probably should be.
5    Q    Has SFMTA ever asked NextBus whether it would
6  be feasible to establish a time point at the division
7  gates?
8    A    We have inquired, and they have said that it
9  is not feasible.
10    Q    Who made that inquiry to NextBus?
11    A    I did.
12    Q    When?
13    A    I don't -- I wouldn't be able to say.
14    Q    Within the last year?
15    A    I -- I wouldn't be able to say.
16    Q    Can you tell me even approximately when you
17  made that inquiry?
18    A    You know, since I've been the performance
19  manager or even in my current role.
20    Q    So it was sometime from September 2012 to the
21  present?
22    A    Correct.
23    Q    Why did you make that inquiry to NextBus?
24    A    Because I was curious about whether we could
25  track vehicles at different locations.

1    Q    Why were you curious about that?
2    A    As --
3       MR. McLAUGHLIN:  Objection.  Argumentative.
4       THE WITNESS:  It's part of my responsibility.
5  BY MR. TIDRICK:
6    Q    Why were you interested in knowing if a time
7  point could be established at the division gates?
8    A    Because --
9       MR. McLAUGHLIN:  Objection.  Asked and
10  answered.
11       You can answer.
12       THE WITNESS:  -- it's part of my
13  responsibility as -- in my role in the technology
14  division.
15  BY MR. TIDRICK:
16    Q    Did anyone ask you to make that inquiry?
17    A    No.
18    Q    Who at NextBus told you that that was not
19  feasible?
20    A    I believe it was Russell Chun.
21    Q    Was this a phone conversation?
22    A    I believe it was in a face-to-face meeting
23  with him.
24    Q    Did you ever put anything in writing about
25  that?

1    A    No.
2    Q    When you asked Russell Chun whether it's
3  possible to establish a time point at the division gate,
4  did you ask him about establishing time points anywhere
5  else?
6    A    We had -- you know, I don't recall the exact
7  details of the conversation.  I don't even know when it
8  occurred.
9    Q    Did Russell know at the time that you asked
10  him that it was not feasible or did he have to go and
11  check and get back to you?
12    A    No, I believe he told me it was not feasible.
13    Q    To the best of your recollection, what exactly
14  did he say about why it is not feasible?
15    A    It is not part of the revenue service on a
16  route.  A route is designed -- as shown in Exhibit 32,
17  this is a route.  The location of where the division
18  is is not part of that because it is not a revenue stop on
19  the route.
20    Q    SFMTA occasionally changes the geography of
21  routes, correct?
22    A    Correct.
23    Q    And when it does, is NextBus capable of
24  setting up time points at new locations that show up on
25  a route?

1    A    For the revenue service portion of the route,
2 yes.
3    Q    So what's the technical reason why, for
4 internal purposes, SFMTA couldn't identify the division
5 gate as being part of the route?
6        MR. McLAUGHLIN:  Objection.  Vague.  Calls for
7 speculation.
8 BY MR. TIDRICK:
9    Q    Do you understand the question?
10        MR. McLAUGHLIN:  "Internal purposes."
11        THE WITNESS:  "Internal purposes."  We have
12 route patterns that are based on revenue service of a
13 route -- the revenue service of the route, and
14 everything in Trapeze and NextBus is built into that
15 revenue service of the route, not the garage.  That's
16 not what NextBus was designed to do.
17 BY MR. TIDRICK:
18    Q    If you established a passenger stop at the
19 division gate, NextBus would be able to track that,
20 correct?
21    A    There's -- there's --
22        MR. McLAUGHLIN:  Objection.  Speculation.
23 Incomplete hypothetical.
24        THE WITNESS:  And there may be multiple ways
25 that a bus gets back to the yard.  There's no fixed

Page 58

1 route -- way that the bus gets back to the yard.
2 BY MR. TIDRICK:
3    Q    That's not true with respect to trains and
4 trolleys, correct?
5    A    There can be multiple ways.  A train or a
6 trolley doesn't necessarily end at the same time point
7 in every -- on every trip; so there could be multiple
8 combinations of ways to get back to the yard.
9    Q    The actual geographical path doesn't change,
10 though, correct?
11    A    You know, I'm not in scheduling; so I don't
12 know the exact details there.  But if something is not
13 on a -- within the revenue service portion of the route,
14 we do not keep that information in NextBus, and NextBus
15 does not track that information.
16        Can I use the restroom?
17        MR. YOUNG:  You need to use the restroom?
18        THE WITNESS:  Yes.
19        MR. YOUNG:  Yeah, yeah, yeah.
20        MR. TIDRICK:  Off the record.
21        (Recess.)
22        (Exhibit 33 was marked for identification by
23        the court reporter.)
24        MR. TIDRICK:  Back on the record.
25    Q    I'm showing you a document that's been marked

Page 59

1 as Exhibit 33.  I'll represent this is an email from
2 Defendants' counsel, Boris Reznikov, sent on Thursday,
3 September 10th, 2015, at 1:48 p.m.  And I'm going to
4 refer to the second paragraph near the first page of
5 Exhibit 33, the paragraph that reads:  "Also, the vendor
6 for NextBus has confirmed that its database does not
7 provide the information you are seeking (i.e., on-time
8 performance for relief events).  The vendor has also
9 provided that it is not able to manipulate the database
10 to obtain this information."
11        My question for you, Mr. Lee, is whether any
12 of the information that I have just read is consistent
13 with anything that you have ever heard in NextBus.
14        MR. McLAUGHLIN:  Objection.  Vague.  Compound.
15        THE WITNESS:  This second paragraph is
16 consistent with my understanding of the NextBus data
17 set.
18        (Exhibit 34 was marked for identification by
19        the court reporter.)
20 BY MR. TIDRICK:
21    Q    I'm showing you a document that's been marked
22 as Exhibit 34, which is Bates-numbered CCSF095551
23 through 095560, the first page of which says at the top
24 "SFMTA San Francisco Municipal Transportation Agency
25 Proposal to Utilize Automatic Passenger Counters for NTD

Page 60

1 Passenger Boarding and Passenger Mile Data" with a date
2 near the bottom of April 19th, 2010.
3    Q    Mr. Lee, is Exhibit 34 a document that you are
4 familiar with?
5    A    Yes.
6    Q    What is the Exhibit 34 document?
7    A    It is -- so the Federal Transit Administration
8 requires recipients of federal funds to submit ridership
9 data to them, and each transit agency has to come up
10 with the methodology that's approved by the Federal
11 Transit Administration to determine the ridership of the
12 system.
13        This document describes the methodology that
14 the SFMTA uses to estimate ridership.
15    Q    The methodology that Exhibit 34 describes --
16 what's the time period when SFMTA has been using the
17 methodology?
18    A    Presumably from the date of this document
19 through the present.
20    Q    In other words, from April --
21        MR. McLAUGHLIN:  I don't want you to assume.
22        THE WITNESS:  Okay.
23        MR. McLAUGHLIN:  Just what -- if you know or
24 your best estimate.
25 //

Page 61

16 (Pages 58 - 61)

**Page 62**

BY MR. TIDRICK:
Q   In other words, from approximately April 19th, 2010, to the present, correct?
A   Since I have been in the performance manager position, it had -- I am certain that they have used this methodology through the present.
Q   That's the time period of roughly May 2012 to the present?
A   Correct.
Q   You have no reason to think that it wasn't being used during the time frame April 2010 through May 2012; correct?
A   Correct.
Q   SFMTA created the Exhibit 34 document?
A   Yes, it did.
Q   The Exhibit 34 document was created on April 19th, 2010?
        MR. McLAUGHLIN: Objection. Speculation.
        MR. TIDRICK: Let me ask a different question.
Q   Do you have any reason to believe that the Exhibit 34 document was not created on April 19th, 2010?
A   No.
        MR. McLAUGHLIN: Same objection.
BY MR. TIDRICK:
Q   Who at SFMTA uses the Exhibit 34 document?

**Page 63**

        MR. McLAUGHLIN: Objection. Speculation. Vague.
        THE WITNESS: Our transit operations people who calculate ridership follow this methodology.
BY MR. TIDRICK:
Q   You're familiar with the term "Automatic Passenger Counter data," correct?
A   Yes.
Q   The acronym APC data refers to the same thing, correct?
A   Correct.
Q   You're personally familiar with APC data from the time period of mid-2012 to the present, correct?
A   Correct.
Q   During that period of time, has there been any change with respect to geographic areas that are covered by APC data?
A   Our APCs, as described in this document, are distributed around the system so that all routes are sampled. All routes are sampled as described in this methodology.
Q   Who at SFMTA makes decisions about how exactly to do the sampling?
A   I do not know who the specific people were who developed this White Paper on the sampling in which

**Page 64**

those decisions were made.
Q   Does APC data exist for the division locations?
A   So APC data is ridership data. Division locations, the garage depots are non-revenue stops. So we use the -- this data to measure ridership at revenue stops.
Q   Do I understand correctly a division is not a revenue stop? Is that correct?
A   That's correct.
Q   And that's true at least from 2012 to the present, correct?
A   Correct.
Q   And you have no reason to believe that it would be different in the period 2009 to 2012, correct?
A   That's correct.
Q   Do you know who identifies which transit vehicles will be identified for collecting the APC data?
A   So approximately 30 percent of our vehicles are APC equipped -- of our rubber tire fleet is APC equipped. They are distributed based on the methodology that's outlined in this White Paper, and on a daily basis Yard Star -- there's -- are able to use the calendar as shown in the example to distribute the vehicles so that routes are sampled appropriately.

**Page 65**

Q   You said approximately 30 percent of the rubber tire vehicles?
A   Yeah.
Q   Is that only diesel buses?
A   Motor coaches and trolley coaches. It's described on the first page.
Q   But where specifically on the first page? Are you referring to the --
A   On the --
Q   -- bottom section, "Automatic --"
A   Exactly.
Q   "-- Passenger Counters"?
        Which vehicles in SFMTA's fleet are not covered by the APC data?
A   Our historic -- historics, our cable cars, our light rail vehicles.
Q   What you've just described has been true at least from 2012 to the present, correct?
A   Correct.
Q   You have no reason to believe that it was any different during the period 2009 to 2012, correct?
A   Correct.
Q   Limited to -- strike that.
        APC data is collected only for motor coach and trolley coach routes, correct?

| | |
|---|---|
| 1  A  Correct. | 1  These reports can show the total ridership on each line, |
| 2  Q  And only for approximately 30 percent of those | 2  boardings, alightings by stop, segment running time, |
| 3  vehicles, correct? | 3  on-time performance, and many other reports." |
| 4  A  Correct. | 4  Is that statement accurate? |
| 5  Q  Page 3 of the Exhibit 34 document -- near the | 5  A  I have no reason to believe it's not accurate. |
| 6  top of page 3 of Exhibit 34, four and five lines down | 6  Q  Have you ever seen reports generated |
| 7  from the top refers to installation of the 110 APCs | 7  reflecting -- |
| 8  being completed between early August and mid-September | 8  A  Yes. |
| 9  2006. | 9  Q  -- each of the items listed there? |
| 10  Do you see that? | 10  A  I've seen reports that are reflected by |
| 11  A  Uh-huh. | 11  boardings, alightings by stop, primarily. |
| 12  Q  Do you have any reason to think that as of | 12  Q  Have you ever seen a report generated from the |
| 13  2006 the number of transit vehicles for which APC data | 13  APC data with respect to segment running time? |
| 14  was being collected was 110? | 14  A  No. |
| 15  A  You know, I wasn't here at the agency at that | 15  Q  Have you ever seen one generated with respect |
| 16  time.  I assume what's written here -- I don't have any | 16  to on-time performance? |
| 17  reason to believe that what's written here is incorrect. | 17  A  No. |
| 18  Q  Do you have a general understanding that over | 18  Q  Are SFMTA's reports on on-time performance |
| 19  time the number of vehicles in SFMTA's fleet that have | 19  ever generated from APC data? |
| 20  been covered by APC has increased over time, correct? | 20  A  No. |
| 21  A  That's correct. | 21  Q  Why not? |
| 22  Q  And the 30 percent figure refers to the | 22  A  Our NextBus data covers all vehicles.  APC |
| 23  current time period, correct? | 23  data covers a subset of vehicles and a portion of the |
| 24  A  Mm-hmm. | 24  fleet.  We have used NextBus data for our on-time |
| 25  Q  "Yes"? | 25  performance analysis. |
| <div align="right">Page 66</div> | <div align="right">Page 68</div> |
| 1  A  Yes. | 1  Q  Have -- strike that. |
| 2  Q  And referring to page 4 of Exhibit 34, the | 2  Has SFMTA ever considered using the APC data |
| 3  second full paragraph begins:  "Approximately 30 percent | 3  as a cross check on the accuracy of the on-time |
| 4  of the fleet is equipped with APCs." | 4  performance measured by the NextBus data? |
| 5  A  Uh-huh. | 5  MR. McLAUGHLIN:  Objection.  Speculation. |
| 6  Q  "Yes"? | 6  THE WITNESS:  We use APC data for ridership |
| 7  A  Uh-huh.  Yes. | 7  analysis. |
| 8  Q  And as far as you know, that's an accurate | 8  MR. TIDRICK:  Madam Court Reporter, could you |
| 9  statement as of April 2010? | 9  read back the question, please. |
| 10  A  Yes. | 10  (Record read by the reporter as follows: |
| 11  Q  The number of vehicles -- strike that. | 11  "QUESTION:  Has SFMTA ever considered |
| 12  The number of motor coach and trolley coach | 12  using the APC data as a cross check on the |
| 13  vehicles for which APC data has been collected has never | 13  accuracy of the on-time performance |
| 14  been more than 30 percent, correct? | 14  measured by the NextBus data?") |
| 15  A  I don't know that answer. | 15  MR. TIDRICK:  I might want to rephrase that. |
| 16  Q  Do you have any reason to think that at some | 16  Can we take a short break? |
| 17  point in time SFMTA has reduced the percentage of the | 17  MR. McLAUGHLIN:  All right. |
| 18  fleet for which APC data is being collected? | 18  (Recess.) |
| 19  A  I don't believe SFMTA has reduced the | 19  MR. TIDRICK:  Back on the record.  At this |
| 20  percentage. | 20  point in time, in light of the amount of remaining |
| 21  Q  Page 2 of Exhibit 34, the first paragraph on | 21  material that Plaintiffs anticipate need to be covered |
| 22  the page, beginning four lines from the bottom of that | 22  with this witness with respect to the topics that he's |
| 23  paragraph says:  "These data are input into a | 23  been designated to testify on, which we anticipate is |
| 24  statistical analysis program, which can show the data in | 24  less than half a day left, in light of the fact that the |
| 25  various ways through automatically generated reports. | 25  witness is unavailable starting nine minutes from now, |
| <div align="right">Page 67</div> | <div align="right">Page 69</div> |

1  11:45, at this point in time we're simply suspending the
2  deposition, and we'll meet and confer with Defendants'
3  counsel to reschedule the remainder of Mr. Lee's
4  testimony for a future date.
5       MR. McLAUGHLIN:  And that's confirmed on my
6  end, and we will confer about setting some limitations,
7  potentially, on the further deposition.  So it's not
8  just continued outright, but we will certainly confer
9  about that and resume the deposition later.
10      Thank you.
11      MR. TIDRICK:  Thank you.
12      (TIME NOTED:  11:36 A.M.)
13
14
15
16
17
18
19
20
21
22
23
24
25
                                              Page 70

1       I, the undersigned, a Certified Shorthand Reporter
2  of the State of California, do hereby certify:
3       That the foregoing proceedings were taken before
4  me at the time and place herein set forth; that any
5  witnesses in the foregoing proceedings, prior to
6  testifying, were administered an oath; that a record of
7  the proceedings was made by me using machine shorthand
8  which was thereafter transcribed under my direction;
   that the foregoing is a true record of the testimony
9  given.
10      Further, that if the foregoing pertains to the
   original transcript of a deposition in a Federal Case,
11 before completion of the proceedings, review of the
12 transcript [  ] was [  ] was not requested.
13      I further certify that I am neither
14 financially interested in the action nor a relative or
15 employee of any attorney or any party to this action.
16      IN WITNESS WHEREOF, I have this date subscribed my
17 name.
18 Dated:  4/19/16
19
20      Catherine A. Ryan
21      Catherine A. Ryan, RMR, CRR
22      CSR No. 8239
23
24
25
                                              Page 71

| **0** |
|---|
| **095551** 5:11 |
| **095560** 5:11 60:23 |
| **095573** 4:20 |
| **095669** 4:21 |

| **1** |
|---|
| **1** 1:25 4:23 50:1,3 |
| **1-20** 1:11 2:11 |
| **1.5** 45:7 |
| **100** 40:3 |
| **10th** 60:3 |
| **110** 66:7,14 |
| **11:36** 2:20 70:12 |
| **11:45** 46:20 70:1 |
| **12-03704** 1:8 2:8 |
| **1220** 3:12 |
| **1390** 2:18 |
| **14** 4:12 |
| **1455** 24:21,22 |
| **18:46** 50:19 |
| **19th** 61:2 62:2,17,21 |
| **1:48** 60:3 |

| **2** |
|---|
| **2** 67:21 |
| **2006** 66:9,13 |
| **2008** 7:4 9:22 10:9 |
| **2009** 15:16 18:16 |
| 24:5,23 25:2 29:20 |
| 29:21 30:3,6,8,9,20 |
| 31:16 38:6 48:8,12 |
| 49:2 64:15 65:21 |
| **2010** 61:2 62:3,11 |
| 62:17,21 67:9 |
| **2012** 7:14 8:5,11 |
| 10:9,10,22 11:4 |
| 17:5,23 18:1 19:23 |
| 20:10 22:15,17,19 |
| 23:4,16 29:25 30:16 |
| 30:20 31:12,16 38:2 |
| 38:6 46:5,12 55:20 |
| 62:7,12 63:13 64:11 |
| 64:15 65:18,21 |

| **2015** 7:14,15,17,19 |
|---|
| 7:22 8:1,5,11,19 9:1 |
| 9:17 20:10 46:5 |
| 60:3 |
| **2016** 1:17 2:21 4:15 |
| 6:1 |
| **2039** 3:5 |
| **21** 50:4,8 |
| **22** 28:12,14 50:17 |
| **2284904** 1:23 |
| **23** 4:15 |
| **28** 4:18,23 |
| **29** 4:8 6:3 11:8,11 |
| 11:12,14 |
| **291-3226** 3:6 |

| **3** |
|---|
| **3** 5:5 11:10,11 50:4 |
| 50:7 66:5,6 |
| **30** 4:9,14 6:3 50:22 |
| 64:19 65:1 66:2,22 |
| 67:3,14 |
| **300** 3:12 |
| **308** 3:5 |
| **31** 4:18 14:7,8,13,16 |
| 14:19 15:1,10,12,20 |
| 15:23 18:15,21 19:4 |
| 26:14 27:3 28:9,13 |
| 28:14 50:16 51:14 |
| 52:6 53:25 |
| **31:5555** 50:19 |
| **32** 4:23 28:23 29:3,4 |
| 49:11,17,24 50:12 |
| 51:1 57:16 |
| **33** 5:5 59:22 60:1,5 |
| **34** 5:8 60:18,22 61:3 |
| 61:6,15 62:14,16,21 |
| 62:25 66:5,6 67:2 |
| 67:21 |
| **3:21** 50:1 |

| **4** |
|---|
| **4** 4:16 11:11 67:2 |
| **4.0** 4:20 |
| **4.0.** 14:12 15:13 |

| **4/19/16** 71:18 |
|---|
| **415** 3:14 |

| **5** |
|---|
| **5** 11:14,17 26:15,15 |
| 27:3 46:23 |
| **510** 3:6,6,13 |
| **5611** 50:1,4 |
| **59** 5:5 |

| **6** |
|---|
| **6** 1:17 2:21 4:4,8,9 |
| 4:14 6:1 11:14,17 |
| 46:23 51:15,16 52:6 |
| 53:25 |
| **60** 5:8 |
| **678-3838** 3:14 |

| **7** |
|---|
| **7** 51:17 |
| **71** 1:25 |
| **788-5100** 3:6 |

| **8** |
|---|
| **8239** 1:22 2:22 |
| 71:22 |
| **8:57** 2:20 6:2 |

| **9** |
|---|
| **90s** 41:23 |
| **9163** 23:20 |
| **94704** 3:5 |
| **94710** 3:13 |
| **95** 46:14 |
| **98.5** 44:24 45:2,6,10 |
| 45:16 46:1 |
| **995-5806** 3:13 |

| **a** |
|---|
| **a.m.** 2:20,20 6:2 |
| 70:12 |
| **able** 13:10,12 19:8 |
| 40:18 53:4 55:13,15 |
| 58:19 60:9 64:23 |
| **access** 18:20 19:1 |
| 27:24 30:14 |
| **accessed** 27:5 |

| **account** 43:14 |
|---|
| **accuracy** 47:24 69:3 |
| 69:13 |
| **accurate** 18:18 |
| 34:20 35:7 40:3 |
| 41:22 67:8 68:4,5 |
| **achieving** 45:12,14 |
| 45:16 |
| **acronym** 6:24 21:9 |
| 63:9 |
| **action** 71:14,15 |
| **activate** 38:10 |
| **activity** 27:4 |
| **actual** 54:6 59:9 |
| **add** 44:23 |
| **address** 15:14 24:20 |
| **addressed** 47:10 |
| **adherence** 28:16 |
| 52:11 |
| **adjust** 48:14,16 |
| **adl** 48:18,21 |
| **administered** 6:7 |
| 71:6 |
| **administration** 61:7 |
| 61:11 |
| **advance** 35:17 36:3 |
| **advanced** 36:18 |
| **advised** 51:3 |
| **agency** 1:10 2:10 |
| 4:23 6:23 20:13 |
| 26:23 27:3,6,9,13 |
| 27:25 28:3,7,18,20 |
| 29:5,19,23 30:10,14 |
| 32:6,10,20 33:1,12 |
| 33:21 34:8 35:3,20 |
| 35:24 42:21 44:6 |
| 45:12 49:7 50:14 |
| 60:24 61:9 66:15 |
| **ahead** 42:16 |
| **alameda** 15:14 |
| 18:12 |
| **alightings** 68:2,11 |
| **allows** 22:7 29:12 |
| **amanda** 3:18 |

amdt 36:14
amount 69:20
analysis 67:24 68:25 69:7
answer 19:8 20:21 24:14 27:17 31:1 41:1 56:11 67:15
answered 56:10
antenna 37:13
anticipate 69:21,23
apc 63:9,12,17 64:2 64:4,18,20,20 65:14 65:24 66:13,20 67:13,18 68:13,19 68:22 69:2,6,12
apcs 63:18 66:7 67:4
apologize 51:17
app 36:11
appear 34:22 52:8
appearances 3:1
appears 14:17 51:4
appropriately 64:25
approved 61:10
approximate 13:10
approximately 7:18 7:21 8:18 9:19 10:22 12:8,13 13:3 13:6 18:15 20:7 22:18 23:12 32:5 46:11 55:16 62:2 64:19 65:1 66:2 67:3
april 1:17 2:21 6:1 61:2,20 62:2,11,16 62:21 67:9
area 24:15
areas 63:16
argumentative 56:3
arrival 30:23 31:9
arrive 30:22 31:8 34:12 35:15,19,25
asked 55:5 56:9 57:2,9
asking 12:1,5 47:18

assessed 41:25
assigned 8:23 38:24 41:25
assignment 37:9
associate 38:22 39:2 43:16,18,21 44:15
associated 29:10 37:11 39:6,15 42:7
associates 44:11,19
association 37:5 38:15 39:12
assume 15:21 19:1 30:8 48:9 61:21 66:16
assuming 47:4,4 49:21
attempt 42:19
attempts 39:2 40:1 43:21
attention 15:17
attorney 3:12 11:19 51:3 71:15
attorneys 3:4 11:23
august 66:8
auto 39:1 43:17,21 44:10,13,17
automatic 5:9 60:25 63:6 65:10
automatically 67:25
availability 42:22 46:25
available 19:2
avenue 3:5
aware 26:8 35:11 39:16 48:17

**b**

b 3:4 4:9 14:10 16:23,23
back 47:5 54:12 57:11 58:25 59:1,8 59:24 69:9,19
based 15:21 36:9 44:16 51:2 53:12 58:12 64:21

basis 11:4,5 20:7 43:6 53:7 64:23
bates 4:20 5:11 14:8 49:20 60:22
becoming 7:25
beginning 2:20 10:22 46:12 67:22
begins 67:3
behalf 1:5 2:5,18 11:13
belief 53:7
believe 16:8 25:16 30:2,4,5,19 31:15 36:23 37:3 38:5 45:12 53:5,8,20 56:20,22 57:12 62:20 64:14 65:20 66:17 67:19 68:5
beneath 15:13 26:19 26:23
berkeley 3:5,13
best 24:14 57:13 61:24
bit 46:15
blair 16:8,21,21 17:10,15
block 37:6,7,9,10 38:16,17,23 39:3,6 39:14 43:17,19,22 44:15
blocking 47:13
boarding 5:10 61:1
boardings 68:2,11
booked 47:2
boris 12:23 13:4,7 13:14 60:2
bottom 51:18 61:2 65:10 67:22
box 49:15,24,25 50:2,12,14,18,19,21
boxes 49:12
break 46:19 69:16
bridges 48:1
bring 47:5

brown 16:8,21 17:10,15
brown's 16:21
buildings 47:14,24
built 58:14
bus 23:21 24:1 34:4 34:10,11,21 35:1,3 35:18,22 37:4,5 58:25 59:1
buses 35:13 65:4

**c**

c 1:8 2:8 16:20
cable 65:15
cad 48:18,21
calculate 63:4
calendar 64:24
california 1:2,16 2:2 2:19 3:5,13 6:1 15:14 50:1,3 71:2
called 21:3 22:7 39:1
calls 40:6 50:24 58:6
capability 53:6
capable 57:23
capital 14:10,10 21:11,11
cars 65:15
case 13:19 21:12 35:8 38:6 43:6,6 48:12 71:10
cases 45:1
catch 34:4,10 35:22
catherine 1:21 2:21 71:21
caused 14:25
caution 11:18
caveats 49:8
ccsf 4:20,20 5:11,11
ccsf095551 60:22
ccsf095573 14:9
ccsf095669 14:9
center 24:17
central 24:7,8,9,22 25:2,5,9,14,18,23

Veritext Legal Solutions
866 299-5127

26:4,6,9 27:12,14
27:24 28:3
**certain** 25:22 32:12
32:16,22 33:4,13
34:4 62:5
**certainly** 47:16 70:8
**certainty** 13:13
**certified** 2:22 71:1
**certify** 71:2,13
**change** 7:18 59:9
63:16
**changes** 57:20
**check** 47:6 57:11
69:3,12
**checks** 40:24
**chief** 9:4,7,16
**chun** 16:6,19 17:10
17:13,22 18:1,4,7
56:20 57:2
**church** 54:3
**circulated** 21:23
**city** 1:10 2:10 4:9
24:20
**city's** 49:21
**clarify** 23:8
**classification** 23:20
**clear** 17:15 46:20,22
46:24
**clearly** 54:11
**clients** 19:2
**close** 34:12
**closest** 44:20 50:18
**coach** 65:24,25
67:12,12
**coaches** 65:5,5
**collected** 65:24
66:14 67:13,18
**collecting** 64:18
**combination** 21:15
**combinations** 59:8
**come** 61:9
**command** 24:8
**commencement**
3:20

**communicate** 18:7
**communicated** 26:3
46:21
**communicates** 37:4
37:21
**communications**
11:20 12:2,6,23
13:2,7,14
**company** 16:1
**compel** 4:14
**complete** 41:21
47:17,18
**completed** 66:8
**completion** 71:11
**compound** 60:14
**computer** 43:20
**confer** 47:8,10 70:2
70:6,8
**confirmed** 60:6 70:5
**connect** 36:22
**connects** 36:25
**considered** 69:2,11
**consistent** 60:12,16
**consult** 34:14
**contact** 18:5
**content** 12:2
**continue** 10:24
22:24
**continued** 5:1 8:25
70:8
**contrast** 17:22
**control** 24:8,10,22
25:2,5,9,14,19,23
26:4,7,10 27:12,14
27:24 28:3
**conversation** 56:21
57:7
**conversations** 13:3
**copyright** 15:16
**correct** 6:24,25 8:20
9:10,18 10:23 15:7
17:7,18,19,20,21
21:14,17 22:2,13
23:21,22,24,25 24:2
24:3,5,6 25:3,4,23

28:2,5,6 29:14,15
29:17,18,25 30:1,17
30:20,21,24 31:9,10
31:13,14,16,17
32:24 36:10 37:19
37:20,23,24,25 38:1
38:3,4,6,7 39:8 40:4
41:10,12,13 42:20
45:8 48:12,13 50:10
54:9,19 55:3,22
57:21,22 58:20 59:4
59:10 62:3,9,12,13
63:7,10,11,13,14
64:9,10,12,13,15,16
65:18,19,21,22,25
66:1,3,4,20,21,23
67:14
**correctly** 27:23 39:4
64:8
**counsel** 60:2 70:3
**counter** 63:7
**counters** 5:9 60:25
65:12
**county** 1:10 2:10
4:10
**couple** 15:15 38:22
**course** 13:16,18
15:7 41:21
**court** 1:1 2:1 6:4
28:10,24 31:4 59:23
60:19 69:8
**covered** 21:21 22:10
23:3,17 63:16 65:14
66:20 69:21
**covers** 68:22,23
**create** 15:23
**created** 15:9,20,22
18:15 62:14,16,21
**cross** 69:3,12
**crr** 71:21
**csr** 1:22 71:22
**curious** 33:15 55:24
56:1
**current** 7:5 45:20
55:19 66:23

**currently** 7:1,10
45:20
**customers** 52:24
53:21 54:4

**d**

**daily** 64:22
**darryl** 1:5 2:5
**dash** 14:11
**dashboards** 21:24
**data** 5:11 35:6,14
36:9,19 40:20 41:16
41:20 42:4,7,8
47:16,17 48:14,16
49:9,21 60:16 61:1
61:9 63:7,9,12,17
64:2,4,4,6,18 65:14
65:24 66:13 67:13
67:18,23,24 68:13
68:19,22,23,24 69:2
69:4,6,12,14
**database** 60:6,9
**date** 15:16 35:18
61:1,18 70:4 71:16
**dated** 71:18
**day** 11:3,3,6,6 25:16
25:16 37:10 45:11
47:1,2 69:24
**days** 40:19
**deal** 26:12
**decisions** 24:17
26:12 63:22 64:1
**defendant** 4:9
**defendants** 1:12
2:12 3:10 60:2 70:2
**defines** 27:3
**definition** 51:19,21
**degree** 13:12
**delivered** 44:25 45:4
**delivering** 7:7 8:12
**delivery** 10:15
**demand** 4:10
**departments** 30:11
**depend** 43:5

**depends** 42:21 44:5
**deposition** 1:15 2:17
  3:21 4:9,11 10:4
  12:9,18 14:4 70:2,7
  70:9 71:10
**depot** 53:14
**depots** 23:12 52:25
  64:5
**describe** 11:20
  31:21 42:14
**described** 29:20,24
  39:7 44:16 50:13
  63:18,20 65:6,17
**describes** 61:13,15
**description** 4:7 5:3
  50:11
**designated** 11:13
  69:23
**designed** 53:22
  57:16 58:16
**details** 57:7 59:12
**determine** 26:11
  61:11
**develop** 53:12
**developed** 63:25
**development** 9:24
  10:1,2,3,8,13
**device** 37:18,21 38:9
  39:5
**devices** 40:7 41:4
  54:25
**diesel** 65:4
**different** 8:23 39:5
  39:6 55:25 62:19
  64:15 65:21
**dipped** 46:15
**direction** 71:8
**director** 19:20
**disclose** 12:6
**discussed** 12:12
**discussions** 11:22
  12:13
**display** 27:4
**disruption** 33:14

**disrupts** 39:19
**distinction** 27:21
**distribute** 64:24
**distributed** 63:19
  64:21
**district** 1:1,2 2:1,2
**division** 6:22 7:24
  52:16 53:4,14 54:8
  54:19 55:6 56:7,14
  57:3,17 58:4,19
  64:2,4,8
**divisions** 23:7,8,10
  23:11 52:25
**document** 11:7,8
  14:6,13,15,16,19,19
  14:21,23 15:1,10,13
  15:20,23 18:15,21
  19:4,6 26:15 29:2
  30:8 49:11 50:17,24
  51:4,14 59:25 60:21
  61:3,6,13,18 62:14
  62:16,21,25 63:18
  66:5
**documents** 14:3
**doing** 20:13
**dozens** 20:22
**drawing** 15:17
  27:22
**dropped** 40:5
**dubley** 3:19,20 10:4
**duboce** 54:3

**e**

**e** 16:20 17:1,2,2,3
**early** 66:8
**ease** 50:17
**ed** 19:19,21,24 20:8
**either** 37:16 48:5
**electronically** 21:25
**email** 5:5 18:8 26:4
  60:1
**employed** 7:1
**employee** 71:15
**employs** 24:1

**endpoints** 30:23
  31:8
**engineering** 40:16
**enters** 38:24
**entire** 13:18 23:18
**entitled** 14:9
**entrance** 54:2
**equipped** 64:20,21
  67:4
**essentially** 42:19
  43:20
**establish** 55:6 57:3
**established** 52:15
  56:7 58:18
**establishing** 57:4
**estimate** 61:14,24
**estimating** 50:6
**events** 60:8
**exact** 29:16 40:2
  57:6 59:12
**exactly** 41:9,10
  53:24 57:13 63:22
  65:11
**examination** 4:2
  6:10
**examined** 6:7
**example** 15:19
  28:18 29:4 34:22
  40:23 49:13 64:24
**executive** 16:10
**executives** 16:9
**exhibit** 4:8,14,18,23
  5:5,8 6:3,3 11:7,11
  11:11,14 14:7,8,13
  14:16,19 15:1,10,12
  15:20,23 18:15,21
  19:4 26:14 27:3
  28:9,13,14,23 29:2
  29:4 49:11,16,17,20
  49:24 50:12,16 51:1
  51:14 52:6 53:25
  57:16 59:22 60:1,5
  60:18,22 61:3,6,15
  62:14,16,21,25 66:5
  66:6 67:2,21

**exhibits** 4:6 5:2
**exist** 30:3,6,7 64:2
**existed** 29:20,24
  49:1
**expert** 25:15 37:2
  47:15,21
**expertise** 24:16
**explain** 49:12
**extends** 49:15

**f**

**f** 9:11
**face** 18:9,9,11,11
  56:22,22
**fact** 11:21 32:17,18
  32:19,23,23 33:3,13
  33:16 38:2 41:18
  45:6 69:24
**failures** 41:5,7,9
**fair** 11:2 17:5 18:4
  22:9,21,23 23:15
  39:25 41:8 42:24
  43:20 44:21 46:8
  49:4 50:7,12
**fairly** 17:14 41:20
**familiar** 10:16 14:13
  14:15 15:2 26:19
  36:18,20 42:10
  51:21 61:4 63:6,12
**far** 22:5 37:15 50:8
  67:8
**fare** 9:24 10:1,2,3,8
  10:13,14,15
**fax** 3:6,14
**feasible** 53:9,11
  55:6,9 56:19 57:10
  57:12,14
**feature** 39:1
**features** 15:3
**february** 4:15
**federal** 61:7,8,10
  71:10
**fifth** 4:8
**figure** 15:5 41:2
  45:2 46:2 47:8

66:22
**file** 22:5
**filter** 29:13
**filtered** 29:6,7
**financially** 71:14
**find** 33:8 34:1
**finish** 47:4
**finishes** 54:11
**firm** 3:3,18
**first** 9:22 10:19
15:12 16:15 52:24
60:4,23 65:6,7
67:21
**five** 13:13 14:1,2
66:6
**fix** 40:23
**fixed** 40:21 58:25
**fixes** 41:9
**fixing** 41:12
**fleet** 23:18 37:20
64:20 65:13 66:19
67:4,18 68:24
**floor** 2:19
**focused** 32:2
**focusing** 29:9
**folks** 20:8 43:10
**follow** 41:6 63:4
**following** 4:15 26:20
**follows** 6:8 31:6
69:10
**foregoing** 71:3,5,8
71:10
**forgotten** 13:22
**format** 22:5,8
**forth** 71:4
**four** 66:6 67:22
**fox** 2:19 9:8,11,16
**fox's** 9:20
**frame** 46:5 62:11
**francisco** 1:9,10,16
2:9,10,19 4:10 6:1
6:22 18:12,13,23
60:24
**frequency** 39:18

**frequently** 19:23
**fruition** 7:8
**full** 6:13 44:1 67:3
**function** 27:25
29:19,24 30:10,14
32:3,6,10,21 33:1
33:12,21 34:3,9
35:21 36:25 43:17
43:21 44:17
**functions** 7:5,18 8:9
8:22 9:2 10:12 19:9
25:11,14 47:22
**funds** 61:8
**further** 70:7 71:10
71:13
**furthest** 49:14,15,25
**future** 70:4
**fw** 5:5

**g**

**g** 3:3 54:16
**garage** 53:13 54:12
58:15 64:5
**garages** 23:12 52:25
**gate** 54:8 57:3 58:5
58:19
**gates** 52:17 53:4
54:19 55:7 56:7
**general** 36:1,4 39:25
40:17,22 42:13
66:18
**generally** 10:16 11:3
52:9
**generate** 52:10
**generated** 67:25
68:6,12,15,19
**geographic** 47:13
63:16
**geographical** 59:9
**geographically**
24:20
**geography** 48:3
57:20
**getting** 12:11 13:1

**give** 29:16 36:1
41:22 49:8
**given** 29:13,17 40:3
50:11 71:9
**go** 20:7,11 34:4,10
36:13 42:6 45:11
54:12 57:10
**goals** 8:17 20:14,15
20:23
**goes** 40:24 41:9
**going** 31:18 60:3
**good** 6:12
**gps** 35:12,12,13 37:3
37:12,13,18 38:11
38:12,13 39:5,19
40:1,7,13,17 41:4
41:16 42:4 43:13
47:13 48:14 49:9
54:18,22,25 55:2
**grandberry** 1:5 2:5
**graphical** 22:8
**griffin** 1:5 2:5
**group** 8:16,25 9:6
9:20
**groups** 19:10
**guess** 51:9
**guesstimate** 42:2,3
**guide** 4:19 14:11,17
14:18 15:4 26:16

**h**

**h** 16:20
**half** 69:24
**happened** 33:15
**happening** 34:21
39:16
**happens** 38:20
39:11 40:22
**hardware** 33:24
37:2
**header** 26:16 28:15
**headway** 42:25 44:1
**heard** 15:19 37:12
37:14 41:4,19 47:23
49:8 51:24 60:13

**hearing** 4:15
**hedy** 1:5 2:5
**help** 49:11
**hidden** 52:7,9,13
53:25 54:1
**high** 41:23
**hills** 48:4
**historic** 65:15
**historics** 65:15
**hitting** 44:24
**hmm** 66:24
**hole** 40:20
**holtzman** 3:11
**hugh** 16:16
**huh** 9:12 25:24
26:18 66:11 67:5,7
**hundred** 39:22 40:6
41:22 48:23
**hung** 25:7
**hypothetical** 43:4
44:4 58:23

**i**

**i.e.** 60:7
**idea** 21:15 36:1,4
**identification** 6:4
28:9,23 59:22 60:18
**identified** 64:18
**identifies** 64:17
**identify** 39:13 40:1
49:1,12 52:16 58:4
**immediately** 7:25
26:23
**impact** 42:4
**improvements**
48:22
**inability** 48:18
**include** 20:17 23:5
**included** 20:24
23:17
**includes** 23:21
27:24
**incomplete** 43:4
44:3 58:23

**incorrect** 51:12 66:17
**increased** 46:9 66:20
**increasing** 46:7
**index** 4:1 5:1
**individuals** 17:9
**industry** 21:18
**information** 19:14 29:16 34:19 38:25 48:19 50:2,12 59:14 59:15 60:7,10,12
**initiatives** 22:22
**input** 67:23
**inquired** 55:8
**inquiry** 55:10,17,23 56:16
**inserted** 42:24 43:9 43:12
**installation** 66:7
**installed** 33:24
**instances** 32:25 42:23
**interacted** 15:25 16:4 18:1 19:21,24
**interactions** 17:6
**interested** 56:6 71:14
**interference** 39:18
**internal** 21:5,20 58:4,10,11
**intervention** 38:14
**investigate** 10:14
**involved** 33:5
**issue** 41:15,17 45:7 46:16
**issues** 26:13
**items** 68:9

**j**

**jason** 1:15 2:17 4:3 6:6,15
**jby** 3:7
**job** 1:23 6:20 7:5,6 7:18 8:1,3,9,22

10:12 19:9,9
**jobber** 39:1 43:17 43:21 44:11,13,17
**joel** 3:4
**john** 3:19
**joined** 10:4 16:14
**jonathan** 12:20

**k**

**keep** 59:14
**keeping** 12:5 54:5
**kevin** 3:11 12:19
**kind** 21:22 38:9
**kmclaughlin** 3:14
**know** 9:21 16:6,6,15 19:1,6,17,19 22:5 25:9 27:19 29:21,23 33:7 35:3 36:15 37:15 38:2 40:9,11 40:14,16,20 41:1,10 41:18 43:11 44:8,9 45:13 46:4,18 47:15 48:22 49:22 52:5 55:18 57:6,7,9 59:11,12 61:23 63:24 64:17 66:15 67:8,15
**knowing** 56:6
**knowledge** 12:22 19:15 39:10 41:14 47:12,19 49:5 52:14
**known** 24:7,9 25:2
**knows** 27:12

**l**

**l** 16:20,20,23 17:1
**late** 50:1,5,8,19 51:6
**law** 3:3,4,12,18
**lawyer** 12:3,7,8,12 13:2
**lawyers** 12:14,17
**lay** 42:13
**leader** 42:11,15,20 42:24 43:1,9,13,25 43:25 44:2,12 45:7 46:16

**leave** 46:20
**lee** 1:15 2:17 4:3 6:6 6:15 32:9 33:1 46:20 47:8 60:11 61:3
**lee's** 70:3
**left** 69:24
**light** 65:16 69:20,24
**limitations** 48:17,25 70:6
**limited** 65:23
**linda** 12:19
**line** 46:19 68:1
**lines** 15:15,15 66:6 67:22
**listed** 68:9
**litigation** 13:16
**little** 46:15
**located** 24:22
**location** 24:7,9 25:2 29:17 34:9 37:4,21 40:2 44:18 48:18 57:17
**locations** 27:15 28:4 52:16 55:25 57:24 64:3,5
**log** 38:10,14,17,18 38:20,21
**long** 45:16 55:2
**longer** 45:21
**look** 14:3,25 32:9,21 33:12,15 34:9 35:20 41:20 44:17 47:16 50:25 53:18
**looked** 32:5 33:1
**looking** 33:2 49:24
**looks** 28:20 29:5 44:13 53:15
**lot** 47:9
**low** 46:12
**lower** 21:12 46:8

**m**

**machine** 71:7

**madam** 31:4 69:8
**maintains** 40:7
**maintenance** 40:12
**major** 41:17
**making** 39:12 46:24
**management** 4:18 14:11 24:16 25:17
**manager** 6:21 7:23 8:1,2,4,7,10,23 9:3 9:24 10:1,2,8,11,13 10:21 16:5,7 20:5 48:9 55:19 62:4
**managing** 22:19
**manipulate** 60:9
**manner** 38:10
**map** 4:23 26:23 27:3 27:4,10,13,18,19,25 28:3,7,18,20 29:5 29:19,23 30:10,14 32:3,6,10,20 33:1 33:12,21 34:8,13 35:3,21,24 52:9
**maps** 50:14
**march** 7:4 9:22 10:9
**marked** 6:3 11:7 14:6 28:9,23 29:2 59:22,25 60:18,21
**market** 2:18 24:21 24:23
**material** 50:21 69:21
**materials** 49:12
**matter** 39:25 40:17 40:22
**mccaffrey** 3:18
**mclaughlin** 3:11 11:18,25 12:19 13:15 18:22 20:19 24:13 25:20 27:16 30:25 31:18,24 35:9 36:16 39:20 42:5 43:3 44:3 46:18 47:7 48:20 49:19 50:23 52:21 53:19 54:10,20 56:3,9

Veritext Legal Solutions
866 299-5127

58:6,10,22 60:14
61:21,23 62:18,23
63:1 69:5,17 70:5
**mean** 18:23 20:4
23:8,12 24:20 25:7
29:8 34:16,16 47:9
50:25 51:2 54:1
**measure** 64:6
**measured** 69:4,14
**mechanical** 41:5
**meet** 20:2 70:2
**meeting** 8:16 56:22
**meetings** 18:10,11
19:25 20:3,6 21:2,4
21:5,6,22,23 22:10
22:11,15,21 23:4,16
45:23
**members** 16:13
**mentioned** 17:9
30:12 41:21 43:15
**met** 12:8,17
**methodology** 61:10
61:13,15,17 62:6
63:4,21 64:21
**metrics** 20:24
**mid** 29:25 30:16
31:12 38:2 63:13
66:8
**middle** 6:16
**mile** 5:10 61:1
**mind** 12:5
**minutes** 50:4,7
51:20 69:25
**missed** 42:4
**missing** 34:21 35:2
42:10,15,20,24 43:1
43:9,13,24,25 44:2
44:11 45:7 46:16
**mm** 66:24
**mobile** 36:19
**monitor** 27:15 28:4
45:21
**monitored** 45:24
**monitoring** 45:19
46:13

**month** 7:15 45:13
45:14
**monthly** 20:7 21:2
22:9 23:15
**months** 22:19 35:17
**morning** 6:12
**motion** 4:14
**motor** 65:5,24 67:12
**moved** 24:24 44:1
**mta** 50:24 51:3
**multiple** 43:15
58:24 59:5,7
**municipal** 1:9 2:9
6:22 60:24

**n**

**n** 14:10 16:20,23
17:2,3 21:8,11
**name** 6:13,16 16:10
16:19,22,23,25
36:11 71:17
**names** 12:16 16:15
19:9
**near** 60:4 61:2 66:5
**necessarily** 11:6
59:6
**need** 8:14 15:2
59:17 69:21
**needed** 33:6,7 34:1
34:4,10
**needing** 35:22
**needs** 38:10 40:21
46:20
**neither** 71:13
**never** 39:22 40:6
52:19 67:13
**new** 57:24
**nextbus** 4:18,19
10:16,20,24 11:3
14:9,12,18,22 15:2
15:7,13,16,20,22
16:1,3 17:7,12 19:5
19:6,11,16,18 26:7
26:10 27:14,23
29:12 30:10,22 31:7

31:22 32:6,10 34:23
35:1,2,6,12,14,17
36:22,25 37:3,22
38:22 39:1,13 41:2
43:13,16 47:23 48:6
49:8 50:6 52:16,22
53:5,8,15,17,20
55:5,10,23 56:18
57:23 58:14,16,19
59:14,14 60:6,13,16
68:22,24 69:4,14
**nextbus's** 18:12
19:2
**nextbus.com.** 36:13
**nine** 23:11 69:25
**non** 53:18 64:5
**northern** 1:2 2:2
**note** 49:19
**noted** 70:12
**notice** 4:8
**ntd** 5:9 60:25
**number** 4:7 5:3 9:21
13:9 33:8 37:10
41:23 42:1 46:8,12
50:4 51:5,5 66:13
66:19 67:11,12
**numbered** 60:22
**numbers** 14:8 20:8
20:11,11,13,16,23
21:21 23:3,17 46:3
46:6
**numerous** 54:9

**o**

**o** 9:11 16:23 17:1
**oath** 6:7 71:6
**object** 20:19 31:18
48:20 50:23,23
**objection** 18:22
24:13 25:20 27:16
30:25 31:24 35:9
36:16 39:20 42:5
43:3 44:3 52:21
53:19 54:10,20 56:3
56:9 58:6,22 60:14

62:18,23 63:1 69:5
**objectives** 8:14
20:15,23
**obtain** 60:10
**occasion** 10:19
32:20
**occasionally** 57:20
**occur** 22:16 39:12
39:17 40:23 48:23
**occurred** 8:18 11:21
12:14 22:15 57:8
**occurs** 42:18
**offhand** 9:21 13:5
43:11 45:18
**officer** 9:4,7,17
**offices** 18:12
**official** 16:7
**oftentimes** 15:4
34:19 35:7 42:18
**oh** 51:16
**okay** 23:14 47:3
61:22
**olivier** 16:9,24 17:10
17:15
**ones** 50:25
**operate** 38:11 48:6
**operates** 38:13
**operating** 54:18
**operational** 24:17
26:12,13
**operations** 19:13
20:8 24:15 25:15
30:13 43:10 51:22
51:24 63:3
**operator** 23:20
38:10,13,20,21,24
**operators** 23:21,23
24:1 38:14
**order** 4:14 38:11
**original** 71:10
**outlined** 64:22
**outright** 70:8
**overbroad** 20:20

Veritext Legal Solutions
866 299-5127

| p | | | |
|---|---|---|---|
| **p** 3:11 | 20:1,3,5,6 21:2,4,6 | **pointing** 49:14 | **prior** 7:25 17:5 |
| **p.m.** 60:3 | 22:20 23:5,17 48:9 | **points** 52:9,15 53:4 | 22:15 48:10 71:5 |
| **page** 4:23 11:10 | 55:18 60:8 62:4 | 57:4,24 | **probably** 14:2 30:7 |
| 14:22 15:12,22 | 68:3,16,18,25 69:4 | **policy** 10:14 42:21 | 41:23 43:18 54:23 |
| 26:15,15 27:3,5 | 69:13 | 44:6,8,9 | 55:4 |
| 28:12,14 49:15,16 | **performed** 8:22 9:1 | **poor** 41:14 | **proceedings** 3:21 |
| 50:17,19 51:15,16 | **period** 7:13 8:3,10 | **pops** 45:7 | 10:5 71:3,5,7,11 |
| 51:17,17,18 52:6 | 10:7 17:12 20:9 | **portal** 54:2 | **process** 41:10 |
| 53:25 60:4,23 65:6 | 31:16 45:22 46:12 | **portion** 58:1 59:13 | **production** 4:11 |
| 65:7 66:5,6 67:2,21 | 61:16 62:7 63:13,15 | 68:23 | **program** 15:3 67:24 |
| 67:22 | 64:15 65:21 66:23 | **portray** 22:7 | **progress** 8:16 |
| **pages** 1:25 4:7,12,16 | **person** 9:6 | **position** 8:6,10,24 | **project** 6:21 7:23 |
| 5:3,6 11:11 | **person's** 16:24 | 9:2,23 10:8,12 | 8:1 16:5,7 |
| **paper** 63:25 64:22 | 42:13 | 44:13 45:20 51:20 | **projected** 22:11 |
| **paragraph** 60:4,5 | **personally** 17:6 28:7 | 52:4 62:5 | **projector** 22:1 |
| 60:15 67:3,21,23 | 29:23 63:12 | **possible** 57:3 | **projects** 7:8 10:15 |
| **part** 25:11 54:8,13 | **personnel** 15:25 | **potentially** 70:7 | 20:1 |
| 56:4,12 57:15,18 | 25:23 | **powerpoint** 22:3,4 | **proof** 4:12 |
| 58:5 | **pertains** 71:10 | **prediction** 35:18 | **proposal** 5:8 60:25 |
| **particular** 40:24 | **phone** 18:8 26:3 | 36:8,9 53:21 | **provide** 34:20 35:18 |
| **particularly** 41:6 | 40:5 56:21 | **predictions** 52:10 | 52:22 60:7 |
| **partnership** 41:2 | **physical** 24:7,9 | 52:23 | **provided** 20:1 36:5 |
| **party** 40:15 71:15 | **physically** 34:12 | **prepare** 11:16 12:9 | 60:9 |
| **passenger** 5:9,10,10 | **pick** 25:12 | 12:17,25 14:3 | **public** 27:6 52:8 |
| 52:8 58:18 60:25 | **place** 71:4 | **prepared** 35:16 | **publiclawgroup.c...** |
| 61:1,1 63:7 65:12 | **plaintiff** 3:19 | **present** 3:17,20 9:1 | 3:14 |
| **path** 59:9 | **plaintiffs** 1:7 2:7,18 | 9:17 11:4 18:2 | **published** 30:8 |
| **patterns** 58:12 | 3:2 4:8 69:21 | 19:23 23:4,16 24:5 | 34:17 35:4,7,21 |
| **people** 7:16 9:20 | **plan** 8:13,14 20:15 | 24:23 25:3 29:20,25 | 36:1,7 |
| 19:5,13,13,14 30:13 | 20:22 36:3 | 30:3,6,17 31:13 | **pull** 33:6 54:19 |
| 30:13,13 40:12 | **planning** 20:14 | 38:3 48:8,12 49:2 | **pulling** 54:8 |
| 45:21 63:3,24 | **play** 15:4 | 55:21 61:19 62:3,6 | **purpose** 52:23 |
| **percent** 39:23 40:3,6 | **playing** 19:7 | 62:8 63:13 64:12 | **purposes** 31:22 58:4 |
| 41:22 44:24 45:2,6 | **plaza** 2:19 | 65:18 | 58:10,11 |
| 45:7,10,17 46:2,15 | **please** 6:13 9:25 | **presentation** 22:4 | **put** 56:24 |
| 48:23 64:19 65:1 | 11:10 16:22,25 23:9 | **presentations** 22:3 | |
| 66:2,22 67:3,14 | 26:14 28:12 31:3,5 | **presumably** 61:18 | q |
| **percentage** 45:3 | 31:21 50:1,16,20 | **pretty** 47:16 | **question** 19:8,11 |
| 46:17 67:17,20 | 51:14,17 69:9 | **previous** 44:23 | 31:1,2,5,7 32:4 |
| **perform** 8:9 9:2 | **plug** 42:19 | **previously** 7:11 8:22 | 44:24 58:9 60:11 |
| **performance** 8:2,4,7 | **point** 11:25 40:3 | 30:12 | 62:19 69:9,11 |
| 8:10,13,23,25 9:3,4 | 54:5,23 55:6 56:7 | **primarily** 32:18,19 | **questioning** 46:19 |
| 9:7,16 10:11,21 | 57:3 59:6 67:17 | 32:23 52:24 68:11 | |
| | 69:20 70:1 | **primary** 32:14 | |
| | | 33:18 34:7 | |

| r | | | |
|---|---|---|---|
| **r** 9:9 16:20,23,23 17:1,2,2 21:8,11 | **reference** 15:4 50:17 | **reporter** 2:22 6:4 9:13 25:25 28:10,24 31:4,6 59:23 60:19 69:8,10 71:1 | **rmr** 71:21 |
| **radio** 36:25 39:18 | **referring** 11:11 20:12 21:3 23:13,24 31:23 37:8 46:2 52:7 53:25 65:8 67:2 | | **robert** 1:15 2:17 4:3 6:6,19 |
| **radios** 36:21 | | | **role** 10:21 55:19 56:13 |
| **rail** 65:16 | | **reporting** 40:13,18 52:3 | **rolnick** 12:20 |
| **rare** 44:25 | | **reports** 8:13 52:12 67:25 68:1,3,6,10 68:18 | **ross** 12:19 |
| **read** 31:6 60:12 69:9 69:10 | **refers** 36:15 45:6 50:2,8,21 63:9 66:7 66:22 | | **roughly** 62:7 |
| **reads** 60:5 | | **represent** 60:1 | **route** 27:4 29:6,7,9 29:10,13 44:15 48:6 48:15 50:3 51:4 53:12,13 54:7 57:16 57:16,17,19,25 58:1 58:5,12,13,13,15 59:1,13 |
| **real** 4:18 14:10 25:16 26:12 27:4,13 28:5 29:16 32:16,22 33:22 34:3,19 35:6 35:16 36:9 37:25 42:7 44:18 | **reflect** 35:1 | **representation** 34:20 | |
| | **reflected** 68:10 | **represents** 49:21 | |
| | **reflecting** 68:7 | **request** 33:9 | |
| | **refreshes** 15:18 | **requested** 71:12 | |
| | **regarding** 4:14 11:17 | **requires** 61:8 | |
| | | **reschedule** 70:3 | |
| **really** 13:11 47:10 | **regardless** 38:13 | **resource** 42:22 | **routes** 47:17 57:21 63:19,20 64:25 65:25 |
| **reason** 18:17,19 30:2,4,5,19 31:15 32:14 34:2,14 38:5 48:11 51:11 52:19 53:3,10,17 58:3 62:10,20 64:14 65:20 66:12,17 67:16 68:5 | **regards** 44:23 | **respect** 11:14 12:1 17:10 32:3 33:20 48:1,3 59:3 63:16 68:13,15 69:22 | |
| | **regular** 11:5 20:6 | | **rubber** 64:20 65:2 |
| | **regularly** 18:5 20:2 52:14 54:25 | | **rule** 4:8 |
| | **reiskin** 19:19,21,24 | **responsibility** 8:15 8:15 56:4,13 | **running** 48:15 54:23 55:2,3 68:2,13 |
| | **reiterate** 11:25 | | **runs** 30:23 31:8 44:19 45:10 54:9 |
| | **related** 19:18,25 20:3,13,23 26:13 | **responsible** 7:7 8:12 9:6 25:16 | |
| **reasons** 32:9,13 33:2 33:11,17,19,22 34:2 34:6,7 35:8,11 | **relative** 20:14 44:18 71:14 | **rest** 47:1,2,3 | **russell** 16:5,19 17:9 17:13,22 18:1,4,7 56:20 57:2,9 |
| | | **restate** 32:4 | |
| **recall** 13:5,6 16:18 18:3 45:18 57:6 | **relatively** 17:16 | **restroom** 59:16,17 | **ryan** 1:21 2:21 71:21 |
| | **reliability** 41:15,24 42:1 49:9 | **result** 8:21 | |
| **recess** 59:21 69:18 | | **resume** 70:9 | |
| **recipients** 61:8 | **relief** 60:8 | **revenue** 52:23,25 53:13,13,14,15,15 53:18 54:3,14 57:15 57:18 58:1,12,13,15 59:13 64:5,6,9 | s |
| **recollection** 12:16 13:8 14:25 15:18 23:1 46:1,11 57:13 | **remainder** 70:3 | | **s** 9:9 16:20,20 21:8 21:11,12 |
| | **remaining** 69:20 | | **sakai** 3:11 |
| | **renne** 3:11 | | **sampled** 63:20,20 64:25 |
| | **reorganization** 8:8 8:18,21 | | |
| **record** 6:14 14:8 31:6 46:22 49:19 59:20,24 69:10,19 71:6,8 | **repeat** 9:25 31:2,5 | **review** 50:20 71:11 | **sampling** 63:23,25 |
| | **rephrase** 69:15 | **rewind** 33:8 | **san** 1:9,10,16 2:9,10 2:19 4:10 6:1,22 18:12,13,23 60:24 |
| | **replace** 8:6 43:9,12 | **reznikov** 12:24 13:4 13:7,14 60:2 | |
| | **replacing** 44:11 | | **satellites** 47:14 |
| **reduced** 67:17,19 | **report** 8:12,16 21:22 68:12 | **ridership** 61:8,11,14 63:4 64:4,6 68:1 69:6 | **saying** 45:10 |
| **refer** 23:23 36:14 45:2 49:13 50:18 52:3 60:4 | | | **says** 15:13 18:16 26:19,23 49:25 50:19 60:23 67:23 |
| | **reported** 1:21 40:19 51:20 52:11 | **right** 23:12 45:13 49:15,16,25 69:17 | |

schedule 28:15
34:15,17,17,22 35:5
35:7,16,21 36:4,7
37:6,7,10,11 38:16
38:23 39:3,6,14
43:16,18,22 44:15
44:21 47:6 50:8
52:11
scheduled 30:23
31:9 42:16 44:19,25
45:3 48:15 51:6
schedules 36:1
scheduling 19:13
30:13 59:11
screen 22:11
screenshot 28:15
second 60:4,15 67:3
seconds 50:5,8
section 26:15 65:10
secure 27:5
see 15:12 26:17,21
26:25 27:7 28:14
33:21 34:11 49:13
51:18 66:10
seeking 60:7
seen 11:8 14:21 28:7
68:6,10,12,15
segment 68:2,13
select 29:9
send 48:18
senior 16:9,10
sent 60:2
september 22:18
23:4,16 55:20 60:3
66:8
series 5:5
serve 9:20 10:7
served 9:16
server 36:22 37:1
service 4:12 26:13
33:14 36:2,4 44:25
45:3 52:8 53:13,14
53:15 54:14 57:15
58:1,12,13,15 59:13

set 47:17 53:4 60:17
71:4
setting 57:24 70:6
seventh 2:19 3:12
sfmta 5:8 6:24 7:1,3
7:11 9:22 11:13
15:23 19:3,11,15,17
21:20 23:7,10 24:1
25:11 29:13 30:12
32:7 40:10,18,24
44:24 45:16 48:14
48:17 52:2,13,15,19
53:3 54:9 55:5
57:20 58:4 60:24
61:14,16 62:14,25
63:22 67:17,19 69:2
69:11
sfmta's 23:18 65:13
66:19 68:18
sgt 3:7
shattuck 3:5
short 69:16
shorthand 2:22 71:1
71:7
show 29:11 34:13,23
35:2 42:8 57:24
67:24 68:1
showing 14:6 29:2
59:25 60:21
shown 21:24 57:16
64:24
sic 5:8
side 16:5 37:2 40:17
signal 41:14
signature 71:20
similarly 1:6 2:6
simply 45:6 70:1
sitting 14:24
situated 1:6 2:6
six 51:20
sloan 3:11
slowly 9:25
small 46:17,19
smartphone 35:23
36:6,12

software 22:6,12
52:24 53:21
sorry 25:25
sort 37:17
sounds 44:17
speaking 11:3
specific 13:8 19:9
32:11,15,21 33:3,12
33:21,25 37:10
40:15 41:23 46:6
48:25 63:24
specifically 16:3
20:16 30:12 31:23
65:7
speculation 18:22
27:16 39:21 50:25
52:21 53:19 54:21
58:7,22 62:18 63:1
69:5
spell 16:19,21,24
21:7
spoken 13:22 25:18
staff 16:13 19:15,17
stale 51:19
stamp 49:20
star 64:23
start 7:3 13:17
18:25
started 9:22 22:17
22:18
starter 38:23
starting 69:25
stat 21:5,7,13,21
22:9,15,21 23:4,16
45:23
state 6:13 71:2
statement 67:9 68:4
states 1:1 2:1
static 35:16
statistic 45:19,23
statistical 67:24
statistics 21:10,16
22:8,10 23:5,18
steep 48:3

steps 40:23
steven 3:3
stevenson 16:16
stitt 1:5 2:5 5:5
stop 7:15 34:12 52:7
52:7,8,13 53:15,18
53:25 54:1,3,4,6
57:18 58:18 64:9
68:2,11
stops 52:9,23 53:1
53:16 64:5,7
stored 54:13
strategic 8:13,14
20:14,14,22
street 2:18 3:12
24:21,23 44:14
strength 41:15
strike 23:1 24:8
65:23 67:11 69:1
stuff 47:9
subject 5:5
submit 61:8
subscribed 71:16
subset 68:23
substance 12:6,11
13:1
suite 3:5,12
supervise 7:9
supervising 7:15
support 10:14
supposed 35:15,25
36:2
sure 41:6,8 49:6
50:3
suspending 70:1
system 4:19 10:17
10:20,25 11:3 14:11
14:18,22 15:5,7
19:5,12,16,18 25:17
26:7,10 29:14 31:22
32:3 37:22 40:1
43:13 48:21 49:21
52:10,16 53:18,21
53:21 55:3 61:12
63:19

Veritext Legal Solutions
866 299-5127

**system's** 48:18
**systems** 9:24 10:1,2
  10:3,8,13

**t**

**t** 9:9 17:2 21:8,8,8
  21:11,11,11
**tableau** 22:7,7,11
**take** 69:16
**taken** 2:18 71:3
**talking** 13:15 32:25
  45:1
**tall** 47:24
**technical** 47:15
  48:25 53:17 58:3
**technologies** 27:14
**technology** 6:21 7:8
  7:24 10:15 19:14
  27:24 29:12 39:22
  40:6 41:7 48:22
  56:13
**tell** 12:7,13 13:3
  35:14 40:20 50:1
  55:16
**telling** 36:6,8
**tells** 35:24
**ten** 13:24
**term** 21:5,18,20
  23:20 36:14,18,20
  37:13,14 42:10 52:2
  52:13 54:2 63:6
**terminal** 36:19
**terminology** 26:16
  43:8,10 51:23,25
  52:6 53:24
**terms** 26:20 41:24
  42:13 46:16
**terrien** 16:9,24
  17:10,16
**test** 33:24
**testified** 6:8
**testify** 11:13,16,19
  12:1 69:23
**testifying** 71:6

**testimony** 70:4 71:8
**thank** 70:10,11
**theoretically** 35:14
  35:17
**thing** 37:15 63:9
**things** 15:6 25:12
**think** 12:10 16:10
  17:1 18:17 23:11
  24:24 41:1,17 43:5
  44:5 45:14 46:4,21
  46:23 47:9 48:11
  51:11 62:10 66:12
  67:16
**three** 17:11 39:4,6
  39:11
**thursday** 60:2
**tidrick** 3:3,3,18 4:4
  6:11 9:15 10:6
  11:24 13:17,20
  18:24 21:1 24:18
  25:21 26:2 27:20
  28:11 29:1 31:11,20
  32:1 35:10 36:17
  38:19 39:24 42:9
  43:7 44:7 47:11
  48:24 49:23 51:7
  53:2,23 54:15,24
  56:5,15 58:8,17
  59:2,20,24 60:20
  62:1,19,24 63:5
  69:8,15,19 70:11
**tidricklaw.com** 3:7
  3:7
**time** 4:18 7:13 8:3
  8:10 10:7 14:10
  17:11 20:9 23:5,17
  24:4 25:16 26:12
  27:4,13 28:5 29:16
  29:17 30:23 31:9,16
  31:24 32:7,12,16,16
  32:22,22 33:4,13,22
  34:3,19,23,25 35:6
  35:16 36:9 37:25
  39:17,17 40:3 42:7
  44:18 45:8,22 46:5

46:9 48:10 49:1
  51:5 52:9,15 53:4
  54:5 55:6 56:6 57:3
  57:4,9,24 59:6 60:7
  61:16 62:7,11 63:13
  63:15 66:16,19,20
  66:23 67:17 68:2,3
  68:13,16,18,24 69:3
  69:13,20 70:1,12
  71:4
**times** 12:8 13:6,9,22
  13:24 14:1,2 17:25
  32:5,8 33:20
**tire** 64:20 65:2
**title** 6:20 7:6 8:1,3
  15:21 16:7
**titles** 19:10
**today** 10:25 11:13
  11:16 14:24 22:24
  30:12 46:2 47:5,9
**today's** 12:17 14:4
**told** 53:8 56:18
  57:12
**tony** 1:5 2:5
**top** 50:18 60:23 66:6
  66:7
**topic** 11:17
**topics** 11:14 46:23
  47:10 69:22
**total** 68:1
**track** 32:11,15
  40:13,14,18 54:5
  55:25 58:19 59:15
**tracker** 37:3,12
**trackers** 35:13
**tracking** 38:11,12
  38:13 39:5,19
**tracks** 30:22 31:7
**train** 23:21 24:1
  54:7 59:5
**trains** 59:3
**tran** 21:5,7,13,21
  22:9,15,21 23:4,16
  45:23

**transcribed** 71:8
**transcript** 71:10,12
**transit** 4:18 14:11
  20:8 21:10 24:16
  27:6,13,15 28:4
  29:13,17 36:21
  37:18,22 38:9 40:2
  40:7 41:5 42:15,21
  42:23 43:12,22 44:6
  50:9 61:7,9,11 63:3
  64:17 66:13
**transition** 7:21
**transitioned** 7:20,23
  10:11
**transitioning** 7:25
**transportation** 1:10
  2:10 6:22 19:20
  21:16 25:17 60:24
**trapeze** 38:25 58:14
**travel** 36:5
**traversing** 44:14
**travis** 9:8,16,20
**trip** 54:17 59:7
**trips** 42:4 46:17
**trolley** 59:6 65:5,25
  67:12
**trolleys** 59:4
**true** 24:4 30:16
  31:12,16 48:8 49:22
  50:13 59:3 64:11
  65:17 71:8
**try** 25:21 41:2 43:18
**trying** 27:21
**turn** 11:10 26:15
  28:12 50:17 51:15
**turned** 54:22,25
  55:1
**tutorials** 19:16
**twice** 12:10
**two** 12:13,15 39:1
**typical** 28:20 29:5
  46:3
**typically** 18:7,11
  35:20,23 51:22

Veritext Legal Solutions
866 299-5127

| u | v | vs 1:8 2:8 | writing 56:24 |
|---|---|---|---|

**writing** 56:24
**written** 21:22 66:16
66:17

| | | w | |

**u** 16:20,20
**uh** 9:12 25:24 26:18
66:11 67:5,7
**unable** 39:13
**unavailable** 69:25
**undersigned** 71:1
**understand** 12:3
23:23 24:16 25:22
27:21,23 32:20 39:4
40:16 43:24 58:9
64:8
**understanding** 9:19
11:12 15:9 17:11
18:14,20 19:3 22:14
24:19 25:1,13 26:6
26:9 27:9 30:11
36:24 37:17 38:8,12
40:10 44:10 46:24
51:8 53:11 60:16
66:18
**understood** 45:5
**unique** 27:5
**unit** 22:20 40:13,17
40:24
**united** 1:1 2:1
**updates** 20:1
**urban** 47:14,24
**use** 15:5 19:5,5,6
22:7 27:18,19 28:3
32:20 34:3,8 35:23
36:3,6,11 51:23,24
54:1 59:16,17 64:6
64:23 69:6
**user** 14:17 29:12
**user's** 14:17 15:4
**users** 4:19 14:11
**uses** 19:4,11 26:7,10
27:15 35:14 52:2,10
52:13 61:14 62:25
**usually** 18:9
**utilize** 60:25
**utlilize** 5:8

**v** 9:9 17:1
**vague** 24:13 25:20
30:25 31:19,24 35:9
36:16 39:20 42:5
43:3 48:20 54:10,20
58:6 60:14 63:2
**varies** 45:13
**various** 7:7 15:3
22:10 30:11 50:2,20
67:25
**vehicle** 27:4 32:11
32:15,21 33:3,6,7,8
33:9,10,13,22 34:1
34:9 35:12,25 37:9
37:11,18,22 38:9,15
38:22,24 39:2,14,14
40:2,19,25 42:6,7
42:15,16,19,23,25
43:1,9,12,16,18,22
43:25 44:11,14,18
44:20 48:14 50:4,9
51:5,19,19 52:3,11
54:6,11,13 55:1,2
**vehicles** 23:18 26:11
27:13,15 28:4 29:10
29:17 30:22 31:7
33:25,25 35:13,15
36:21 40:8 41:5
54:18 55:25 64:18
64:19,25 65:2,13,16
66:3,13,19 67:11,13
68:22,23
**vendor** 60:5,8
**version** 4:20 14:12
15:13
**versus** 51:6
**videotape** 33:7,10
**viewing** 28:15
**visible** 27:6
**visited** 25:5,8
**volume** 1:18 2:17
4:3

**w** 16:23
**wait** 35:4
**want** 32:11 36:5
61:21 69:15
**wanted** 34:11 46:20
**way** 37:16 44:16
47:12,19,21 59:1
**ways** 38:22 39:5,7
39:11 43:15 58:24
59:5,8 67:25
**we've** 33:24
**web** 27:5
**wednesday** 1:17
2:21 6:1
**week** 47:4
**weeks** 12:15
**whereof** 71:16
**whichever** 44:20
**white** 63:25 64:22
**witness** 4:2 9:14
11:19,22 13:18
20:22 24:15 26:1
27:18 31:2,10 38:18
39:22 42:6 43:5
44:5 47:2,6 48:21
51:2 52:22 53:20
54:11,22 56:4,12
58:11,24 59:18
60:15 61:22 63:3
69:6,22,25 71:16
**witnessed** 33:5
**witnesses** 71:5
**word** 14:10 25:7
**words** 61:20 62:2
**work** 10:19,24
25:23
**worked** 11:2 32:7
**working** 15:7 16:7
25:11
**works** 26:4 37:3
41:11

| x |
|---|

**x** 9:11

| y |
|---|

**yard** 38:23 58:25
59:1,8 64:23
**yeah** 46:10,17 47:7
59:19,19,19 65:3
**year** 17:14,19 55:14
**years** 17:13 24:25
**yep** 51:10
**ygr** 1:8 2:8
**young** 3:4 31:1,4
38:17 46:25 47:3
59:17,19

Page 12

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2014. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Exhibit F

```
 1           IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3

 4   DARRYL A. STITT, TONY GRANDBERRY,
     and HEDY GRIFFIN, on behalf of
 5   themselves and all others
     similarly situated,
 6
                     Plaintiffs,
 7
                 vs.                Case No: C-12-03704-YGR
 8
     THE SAN FRANCISCO MUNICIPAL
 9   TRANSPORTATION AGENCY; CITY AND
     COUNTY OF SAN FRANCISCO; and
10   DOES 1-20,
11                   Defendants.
     _____ /
12
13
14              DEPOSITION OF JASON LEE
15              San Francisco, California
16              Thursday, July 14, 2016
17                     Volume I
18
19
20
21
22   Reported by:
23   DEBBIE RAZAVI, RPR, CSR NO. 9989
24   Job No. 2342057
25   PAGES 1 - 73
```

Veritext Legal Solutions
866 299-5127

```
 1        IN THE UNITED STATES DISTRICT COURT
 2      FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3
 4  DARRYL A. STITT, TONY GRANDBERRY,
    and HEDY GRIFFIN, on behalf of
 5  themselves and all others
    similarly situated,
 6
 7          Plaintiffs,
 8      vs.        Case No: C-12-03704-YGR
 9  THE SAN FRANCISCO MUNICIPAL
    TRANSPORTATION AGENCY; CITY AND
    COUNTY OF SAN FRANCISCO; and
10  DOES 1-20,
11          Defendants.
    _____/
12
13
14
15
16
17      Deposition of JASON LEE, Volume I, taken
18  on behalf of Plaintiffs, at County of San Francisco,
19  City Attorney's Office, 1390 Market Street, Room 7-04,
20  San Francisco, California, beginning at 1:25 p.m. and
21  ending at 4:30 p.m. on Thursday, July 14, 2016, before
22  DEBBIE RAZAVI, Certified Shorthand Reporter No. 9989.
23
24
25
```

```
 1                INDEX
 2  WITNESS                    EXAMINATION
 3  JASON LEE
 4  Volume I
 5          BY MR. TIDRICK        5
 6          EXHIBITS
 7  NUMBER        DESCRIPTION        PAGES
 8  Exhibit 137  Printout of Excel File      32
 9  Exhibit 138  Declaration of Jason Lee      49
10  Exhibit 139  Methodology for Estimating      50
11          On-Time Performance At Relief
12          Points and Division Pull-Ins
13  Exhibit 140  Aerial photograph      54
14  Exhibit 141  Aerial photograph      54
15  Exhibit 142  Aerial photograph      54
16  Exhibit 143  Aerial photograph      54
17  Exhibit 144  Aerial photograph      54
18  Exhibit 145  Aerial photograph      54
19  Exhibit 146  Aerial photograph      54
20  Exhibit 147  Aerial photograph      54
21  Exhibit 148  Map              58
22
23
24
25
```

```
 1  APPEARANCES
 2  For Plaintiffs:
 3  THE TIDRICK LAW FIRM
 4     BY:  STEVEN G. TIDRICK, ESQUIRE
 5         JOEL B. YOUNG, ESQUIRE
 6     2039 Shattuck Avenue, Suite 308
 7     Berkeley, California 94704
 8     (510) 788-5100
 9     sgt@tidricklaw.com
10     jby@tidricklaw.com
11
12  For Defendants:
13     RENNE, SLOAN, HOLTZMAN, SAKAI
14     BY:  KEVIN P. McLAUGHLIN, ESQUIRE
15     1220 Seventh Street, Suite 300
16     Berkeley, California 94710
17     (510) 995-5806
18     kmclaughlin@publiclawgroup.com
19
20
21
22
23
24
25
```

```
 1      San Francisco, California, Thursday, July 14, 2016
 2          1:25 p.m.
 3
 4          JASON LEE,
 5  having been administered an oath, was examined and
 6  testified as follows:
 7          EXAMINATION
 8  BY MR. TIDRICK:
 9      Q.  Good afternoon, Mr. Lee.
10      A.  Good afternoon.
11      Q.  I'm showing you a document that's been marked
12  as Plaintiffs' Exhibit 100.  It's a document entitled
13  Plaintiffs' Notice of Depositions of Defendants' Experts
14  and Demand For Production At Deposition.  As you can
15  see, you are listed at Page 2 of this document.
16      You understand that you're testifying today
17  pursuant to this deposition notice?
18      A.  Yes.
19      Q.  Are you producing any documents today in
20  response to this deposition notice?
21      A.  No.
22      Q.  Do you understand that you have been disclosed
23  by the defendants in this case as a person who is
24  anticipated to testify at trial regarding certain
25  subjects?  You understand that?
```

1    A.  Yes.
2    Q.  Do you understand that you have been
3  designated by the defendants to testify at trial
4  regarding defendants' use of NextBus and Automatic
5  Passenger Counter, "APC," systems and the capabilities
6  of those systems to track vehicle and operator location
7  including at the end of runs?
8    A.  Yes.
9    Q.  You understand that you have been designated
10  by defendants to testify to assist the trier of fact in
11  understanding defendants' capabilities to track vehicle
12  and operator location including at the end of runs?
13    A.  Yes.
14    Q.  I understand that you have been designated to
15  testify as to those subject areas.  Sitting here today
16  are there specific opinions that you intend to offer at
17  trial?
18    A.  No.
19    Q.  Is it fair to say at this point in time --
20  strike that.
21        At this point in time you're not prepared to
22  identify any specific opinions that you intend to offer
23  at trial; is that correct?
24    A.  At this point in time, no.
25    Q.  At this point in time it's correct?

1    A.  It's correct.
2    Q.  And I apologize, but it's important just to
3  have a clear record for the court reporter, let me
4  finish the question.  I know you know where I'm going
5  with it.
6        Let me state it this way, is it fair to say
7  that at this point in time you cannot identify any
8  specific opinions that you intend to offer at trial?
9    A.  That is correct.
10    Q.  With respect to Automatic Passenger Counter,
11  that is also abbreviated "APC"; correct?
12    A.  Correct.
13    Q.  SFMTA uses APC systems on its transit
14  vehicles; is that correct?
15    A.  On 30 percent of its rubber tire fleet.
16    Q.  Is it fair to say SFMTA only uses APC systems
17  on 30 percent of its rubber tire fleet?
18    A.  Yes.
19    Q.  Of that 30 percent are you able to tell me
20  what proportion goes out each day into revenue service?
21    A.  That number would vary from day to day.  I do
22  not know what that number is.
23    Q.  Are you able to tell me approximately the
24  range that it varies within day to day?
25    A.  I would not be able to tell you.

1    Q.  Is it fair to say that the percentage of
2  the -- strike that.
3        At prior points in time during the time frame
4  July 2009 to the present the percentage of SFMTA's
5  transit vehicles with APC systems has been lower than 30
6  percent; correct?
7        MR. McLAUGHLIN:  Objection.  Vague.
8        THE WITNESS:  Could you please repeat the
9  question.
10  BY MR. TIDRICK:
11    Q.  Are you able to tell me as of July 2009
12  approximately what percentage of SFMTA's transit
13  vehicles had APC systems?
14    A.  Approximately 30 percent of the rubber tire
15  fleet.
16    Q.  As of July 2009?
17    A.  As of July 2009 I believe that is the case
18  approximately.
19    Q.  So it's been approximately 30 percent of the
20  rubber tire fleet continually from July 2009 to the
21  present?
22    A.  Correct.
23    Q.  During the time frame July 2009 to the present
24  the APC counters that SFMTA has had on its transit
25  vehicles, have they all been made by the same

1  manufacturer?
2    A.  The same manufacturer has produced the APC's
3  on all of our vehicles up until the most recent batch of
4  New Flyer articulated motor coach and trolly coaches.
5  There is a different system on that, but that has not
6  yet been activated.
7    Q.  Say again.  The name of the vehicles with the
8  different systems are called what?
9    A.  New Flyer.  We also have New Flyers with the
10  existing system.
11    Q.  When you say "existing," you mean the prior
12  system?
13    A.  The prior system.
14    Q.  At this point in time approximately how many
15  New Flyer vehicles with the new system does SFMTA have
16  in its fleet?
17    A.  Perhaps around 200 as they are currently being
18  delivered, but I do not know that specific number
19  offhand.
20    Q.  It's an approximation; correct?
21    A.  It's an approximation.
22    Q.  The manufacturer of the APC's on New Flyer
23  buses with the new system, what is the name of that
24  manufacturer?
25    A.  IRIS.

3 (Pages 6 - 9)

**Page 10**

1  Q.  Is that spelled I-R-I-S?
2  A.  Yes, all capital letters.
3  Q.  The manufacturer of the other APC systems that
4  SFMTA has on its transit vehicles is?
5  A.  Urban Transportation Associates or UTA.
6  Q.  So it's fair to say that during the time
7  period July 2009 to the present SFMTA has used APC
8  counters manufactured by only two manufacturers, IRIS
9  and UTA; is that correct?
10  A.  From 2009 to the present those have been the
11  two manufacturers; however, they do not overlap.
12  Q.  When you say "they do not overlap," what you
13  mean is that purchasing from IRIS stopped at a certain
14  point in time and then purchasing from UTA began; is
15  that correct?
16  A.  The flip, purchasing from UTA took place and
17  then that stopped and then purchasing the IRIS took
18  place.
19  Q.  When you say that "they do not overlap," what
20  you mean to say is that SFMTA wasn't simultaneously
21  purchasing them from both manufacturers?
22  A.  Correct.
23  Q.  However, it is fair to say that the use of the
24  APC counters by those two manufacturers does overlap;
25  correct?

**Page 11**

1  A.  Correct.
2  Q.  Have you ever spoken with anyone at UTA?
3  MR. McLAUGHLIN:  Objection.  Vague.
4  You can go ahead.
5  THE WITNESS:  I'm sure in the course I have
6  spoken with them, but I did not manage the contract with
7  UTA.
8  BY MR. TIDRICK:
9  Q.  Are you able to tell me approximately when was
10  the last time you have ever spoken with anyone at UTA?
11  A.  Three or four years ago.
12  Q.  Who specifically manages the contract with
13  UTA?
14  A.  It's under probably Julie Kirschbaum.
15  Q.  Spell her name.
16  A.  J-u-l-i-e, last name K-i-r-s-c-h-b-a-u-m.
17  Q.  Do you have any understanding was there
18  someone who managed the contract with UTA prior to Julie
19  Kirschbaum?
20  A.  No, I don't think there was anyone else.
21  Q.  Who manages the contract with IRIS?
22  A.  We do not have a contract with IRIS.  Those
23  APC equipment were purchased with the New Flyer
24  contract, under the New Flyer contract.
25  Q.  I want to make sure I have the order right.

**Page 12**

1  At this point in time the only manufacturer
2  that you're obtaining counters from is IRIS or UTA?
3  A.  At this point we are purchasing IRIS
4  equipment.
5  Q.  And you're no longer purchasing UTA equipment?
6  A.  That is correct.
7  Q.  The UTA equipment SFMTA purchased directly
8  from UTA?
9  A.  Correct.
10  Q.  And Julie Kirschbaum managed that contract?
11  A.  I believe that is the case.
12  Q.  But there is currently no contract with UTA;
13  correct?
14  A.  There may still be a maintenance contract with
15  UTA, but we are not purchasing new equipment from UTA.
16  Q.  And if I understand correctly, the
17  IRIS-manufactured counters, SFMTA does not purchase
18  those from IRIS, rather, they are purchased from some
19  other company?
20  A.  They are purchased along with the bus which is
21  manufactured by New Flyer and we have a contract with
22  New Flyer.
23  Q.  Who manages the contract with New Flyer?
24  A.  I don't know the specific person who manages
25  that contract.

**Page 13**

1  Q.  Is there a particular department that manages
2  that contract?
3  A.  The transit division.
4  Q.  Even if you don't know who manages the
5  contract with New Flyer, do you know anyone at SFMTA who
6  has responsibility for interacting with New Flyer with
7  respect to the IRIS APC counters?
8  A.  There are people within the transit division
9  who interact with New Flyer, not specifically with
10  regards to the APC's but with regards to on-boarding of
11  those vehicles.
12  Q.  Have you ever spoken with anyone at New Flyer
13  or any other company about the IRIS technology?
14  A.  I have not spoken with anyone from New Flyer
15  with regards to the APC procurement.
16  Q.  Have you ever spoken with anyone else about
17  the APC technology from IRIS?
18  A.  I have.
19  Q.  You have not?
20  A.  I have.
21  Q.  You have?
22  A.  Yes.
23  Q.  Who have you spoken with?
24  A.  Nguvi Kahiha.
25  Q.  Can you spell that?

| | |
|---|---|
| 1   A.  N-g-u-v-i, K-a-h-i-h-a. | 1  our vehicles for almost 10 years, maybe 10 years or |
| 2   Q.  Can you spell the last name again. | 2  approximately 10 years, and when equipment is that old |
| 3   A.  K-a-h-i-h-a. | 3  then you look for more modern technology. |
| 4   Q.  Approximately how long ago did you speak with | 4   Q.  Are there specific ways in which the IRIS |
| 5  that individual? | 5  technology is more advanced than UTA technology?  For |
| 6   A.  I have spoken with him regularly for probably | 6  instance, is it more precise? |
| 7  at least two years. | 7      MR. McLAUGHLIN:  Objection.  Vague. |
| 8   Q.  What have you regularly spoken with him about? | 8      THE WITNESS:  With regards to passenger |
| 9   A.  The technology and the arrival of the | 9  counting, it is mounted in a different location and so |
| 10  equipment on the vehicles. | 10  it may be more accurate in certain conditions where a |
| 11   Q.  What company does that individual work for? | 11  vehicle is very crowded. |
| 12   A.  IRIS. | 12  BY MR. TIDRICK: |
| 13   Q.  Do you have any understanding what Nguvi | 13   Q.  Where is the IRIS technology located? |
| 14  Kahiha's position is at IRIS? | 14   A.  The IRIS technology, the IRIS sensor is |
| 15   A.  He is the sales rep. | 15  mounted atop the doorways of the bus. |
| 16   Q.  Is there anyone you're aware of by name -- | 16   Q.  All of the doorways? |
| 17  strike that. | 17   A.  All of the doorways. |
| 18      Do you know the names of anyone who has | 18   Q.  Where are the UTA sensors mounted? |
| 19  understanding of the IRIS technology? | 19   A.  The UTA sensors are primarily mounted on the |
| 20      MR. McLAUGHLIN:  Objection.  Vague. | 20  side of the doorways. |
| 21      THE WITNESS:  I have a basic understanding of | 21   Q.  All of the doorways? |
| 22  the IRIS technology.  Nguvi, obviously as a salesperson, | 22   A.  All of the doorways. |
| 23  would have understanding of the IRIS technology. | 23   Q.  When you say "the sides," can you just try to |
| 24  BY MR. TIDRICK: | 24  describe what you mean by that. |
| 25   Q.  Basic understanding? | 25   A.  When you're passing through a doorway they are |
| <div align="right">Page 14</div> | <div align="right">Page 16</div> |
| 1   A.  Correct. | 1  either to the left or right of where you are passing |
| 2   Q.  You mentioned that you spoke with someone at | 2  through. |
| 3  UTA approximately three or four years ago.  What was | 3   Q.  That's the UTA sensors? |
| 4  that about? | 4   A.  That's the UTA sensors. |
| 5   A.  I have no idea.  I just recall that I spoke | 5   Q.  With respect to the IRIS sensors, they are |
| 6  with that person.  It may have been at a conference | 6  located above the passenger's head; correct? |
| 7  where he was trying to sell his product. | 7   A.  That's correct. |
| 8   Q.  Has SFMTA ever had any concerns or issues with | 8   Q.  Or rather, they are located above at the top |
| 9  the UTA technology that caused SFMTA to want to switch | 9  of the doorway? |
| 10  to the IRIS technology instead? | 10   A.  Correct. |
| 11      MR. McLAUGHLIN:  Objection.  Speculation, | 11   Q.  That passengers pass through; correct? |
| 12  vague. | 12   A.  Correct. |
| 13      THE WITNESS:  As with all technology there are | 13   Q.  How have you come to learn how the APC |
| 14  advancements.  As an agency we are always looking for | 14  technology works? |
| 15  the latest technology. | 15      MR. McLAUGHLIN:  Objection.  Vague. |
| 16  BY MR. TIDRICK: | 16      Go ahead. |
| 17   Q.  Do you consider the IRIS technology to be more | 17      THE WITNESS:  I was involved in the decision |
| 18  advanced than the UTA technology? | 18  to go with new technology. |
| 19      MR. McLAUGHLIN:  Objection.  Vague. | 19  BY MR. TIDRICK: |
| 20      THE WITNESS:  It is more modern and more | 20   Q.  To go with the IRIS technology? |
| 21  reliable. | 21   A.  Correct. |
| 22  BY MR. TIDRICK: | 22   Q.  Rather than the UTA technology? |
| 23   Q.  In what way is the IRIS technology more | 23   A.  Correct. |
| 24  reliable than the UTA technology? | 24   Q.  Who else was involved in that decision? |
| 25   A.  Well, currently the UTA equipment has been on | 25   A.  There were people from the transit division |
| <div align="right">Page 15</div> | <div align="right">Page 17</div> |

<div align="right">5 (Pages 14 - 17)</div>

**Page 18**

1  that took the recommendations from the technology group,
2  the Technology and Performance Group, which I was a part
3  of.
4      Q.  Who else is in the Technology and Performance
5  Group?
6      A.  I was the primary person who was responsible
7  for that from the Technology and Performance Group.
8      Q.  Was there anyone else in the Technology and
9  Performance Group who played a role in the decision to
10  switch from UTA to IRIS technology?
11      A.  There were people involved in the testing of
12  that technology, but in terms of making the
13  recommendation from the Technology and Performance, I
14  was the person.
15      Q.  What are the names of the people involved in
16  the testing?
17      A.  David Papas, P-a-p-a-s, that was the primary
18  person.
19      Q.  Can you recall approximately how many people
20  total were involved in the testing?
21      A.  One other person, Andrew Harrison.  Both of
22  them are no longer with the agency.
23      Q.  Do you know where either of them works now?
24      A.  David is at a law firm, I believe, and Andrew
25  is with the airport.

**Page 19**

1      Q.  SFO?
2      A.  Correct.
3      Q.  Are there any individuals you're aware of who
4  have more knowledge than you do about how the UTA
5  technology works?
6          MR. McLAUGHLIN:  Objection.  Vague.
7          Within MTA?
8  BY MR. TIDRICK:
9      Q.  Anywhere in the world.
10      A.  I'm sure the UTA representatives would know
11  more about that.
12      Q.  What I mean to say is I'm not saying there is,
13  but if there was some technological question about the
14  UTA technology that you did not know the answer to, who
15  would you call?
16      A.  UTA.
17      Q.  Anyone in particular at UTA?
18      A.  I wouldn't -- I wouldn't know.  I did not deal
19  with that contract.
20      Q.  Again, assuming that there was some
21  technological question about the IRIS technology that
22  you did not know the answer to, is there anyone in
23  particular that you would call to obtain the answer?
24      A.  I would call Nguvi Kahiha from IRIS.
25      Q.  Do you have a basic understanding of how the

**Page 20**

1  UTA technology works?
2      A.  Yes.
3      Q.  Do you have a basic understanding of how the
4  IRIS technology works?
5      A.  Yes.
6      Q.  I would like to ask you some questions about
7  APC technology generally, and what I would ask is that
8  if there are any differences between the IRIS and the
9  UTA if you could please explain that as I ask you
10  questions about the technology.
11      A.  Okay.
12      Q.  What does APC data measure?
13      A.  APC data measures the ridership of people
14  going in and out of vehicles at individual stops.
15      Q.  Is that what SFMTA uses APC data for?
16      A.  Yes.
17      Q.  How does APC work?
18          MR. McLAUGHLIN:  Objection.  Vague, overbroad.
19          THE WITNESS:  APC uses either in the case of
20  UTA a beam that's transmitted between the two sensors on
21  either side of the door and as a person enters or exits
22  it counts the person entering or leaving.
23          In the case of IRIS, there's an infrared
24  sensor overhead that uses infrared technology to form an
25  image of the person, person's head, and when the

**Page 21**

1  person's head enters or leaves a threshold it counts the
2  person entering or exiting.
3  BY MR. TIDRICK:
4      Q.  With respect to the UTA technology, the beam
5  that you're describing between the two sensors, that's
6  on the left and the right side of the door; correct?
7      A.  Correct.
8      Q.  Is that essentially like, for example, a
9  garage door will sometimes have a beam that runs from
10  one end to the other just to sense whether there's an
11  object in between?
12      A.  That's correct.
13          MR. McLAUGHLIN:  Objection.  Vague.
14  BY MR. TIDRICK:
15      Q.  Same concept; correct?
16      A.  That's the same concept.
17      Q.  Do I understand correctly SFMTA uses data
18  generated from the APC counters to keep track of the
19  number of passengers who get on and off at various
20  stops; is that correct?
21      A.  That is correct.
22      Q.  Do I understand correctly the device on the
23  transit vehicle that detects the number of passengers,
24  that's called a sensor or something else?
25      A.  I don't know what the technical term is.  We

1  call it a sensor.
2  Q.  SFMTA refers to the device on the transit
3  vehicles, whether it's UTA or IRIS, you refer to it as a
4  sensor; correct?
5  A.  An APC sensor, yes.
6  Q.  How does SFMTA know for any given data that's
7  generated about passengers getting on or off which stop
8  it was where that data was collected?
9  A.  There is a GPS tracker on board and when the
10  door opens the GPS coordinates are recorded along with
11  the time and the passengers on and off.
12  Q.  SFMTA has some type of automated system that
13  takes the raw data and tracks that data to particular
14  stops?
15  MR. McLAUGHLIN:  Objection.  Vague.
16  THE WITNESS:  The raw data is used and is
17  processed on the back end by software provided by UTA to
18  determine the route and location of the stop.
19  BY MR. TIDRICK:
20  Q.  Is that the case with the IRIS data as well,
21  or is there back-end software provided by IRIS that
22  performs that function for the IRIS counters?
23  A.  The IRIS counters record the geo locations of
24  the openings and closings of the door and that is
25  matched also through a back-end process with the
Page 22

1  location of where the vehicle is on the route and stop
2  to determine the ridership at that stop.
3  Q.  When you say "IRIS records the geo locations
4  of the openings and closings," is that through some kind
5  of software that's provided by IRIS?
6  A.  I don't know the specifics of how it's able to
7  determine the geo location.
8  Q.  Are you able to tell me generally how IRIS is
9  able to determine the geo location?
10  A.  Well, I believe there's something embedded in
11  the sensor that detects the geo location, just like on a
12  cell phone you have an antenna or something inside the
13  cell phone that's able to tell you where the location of
14  the cell phone is.  It's the same technology.
15  Q.  One thing that's important is that because you
16  are testifying under oath we don't want any speculation.
17  So let me just clarify with you, when you say
18  you believe, do you know for a fact that that's how it
19  works or are you speculating?
20  A.  I'm reasonably confident that within the
21  sensor, within the IRIS sensor, there is an ability to
22  track geo location.
23  Q.  Is that geo location data from the IRIS sensor
24  transmitted in some manner to SFMTA?
25  A.  Well, currently the IRIS sensors are not yet
Page 23

1  active so we are not currently receiving data from the
2  IRIS sensors.
3  Q.  Is it fair to say that data that has been used
4  in this court case is data exclusively from the UTA
5  sensors?
6  A.  Yes.
7  Q.  With respect to the raw data from the UTA APC
8  sensors, I believe you said that it's processed on the
9  back end by software provided by UTA to determine the
10  route and location of the stop; is that correct?
11  A.  Correct.
12  Q.  When you say "on the back end," what are you
13  referring to?
14  A.  That means that the raw data is received by
15  the SFMTA, that raw data is processed not on the
16  vehicle, and that data once it's been processed is
17  converted into files that we can use to determine the
18  ridership at each stop.
19  Q.  With respect to the raw data received from the
20  UTA sensors, do you have any knowledge of the format in
21  which SFMTA receives that data?
22  A.  That raw data is provided in text files.
23  Q.  Are you able to tell me specifically the
24  various categories of data that are transmitted from the
25  UTA APC sensors to SFMTA?
Page 24

1  A.  From the UTA sensors there's information about
2  the latitude, longitude, time on and off at each stop.
3  Q.  Is there any other category of data that is
4  transmitted from the UTA APC sensors to SFMTA?
5  A.  There might be, but those are the main ones.
6  Q.  Do you know one way or another whether there
7  are any other categories of data or would you be
8  speculating?
9  A.  Without seeing the data in front of me I
10  wouldn't be able to recall every single column that's in
11  the data, so I'm going on what my knowledge of the data
12  that we receive from those files would be.
13  Q.  Is there a technical term you use to describe
14  a packet of data that arrives from any given stop?  Do
15  you use the term "packet" or --
16  A.  A record.
17  Q.  There's a various grouping of data from each
18  stop?
19  A.  A record.  A record is the data that's
20  collected from each door-opening event.
21  Q.  Each time that a door opens a record is
22  generated; is that correct?
23  A.  That's correct.
24  Q.  For any given record of UTA data does the
25  latitude and longitude information that is transmitted
Page 25

7 (Pages 22 - 25)

Page 26

1  to SFMTA reflect the exact longitude and latitude where
2  the door opened or is it the latitude and longitude of a
3  particular stop?  Do you understand the difference?
4       A.  Not really.
5       Q.  Let's say that on Monday the bus stops at a
6  particular stop, pulls up here, and I'm indicating this
7  side of the wall in the room.  The next day because
8  there's an ambulance sitting right there the bus pulls
9  up and stops about 15 feet back, and I'm indicating the
10  other side of the room.
11       What I'm wondering is the record that's
12  generated on Monday when the bus stops over here versus
13  the record that's generated on Tuesday when the bus
14  stops about 15 feet away, are the records that are
15  generated reflecting GPS coordinates that are actually
16  10 or 15 feet away from each other or, rather, is there
17  some designated GPS coordinate for that stop that is
18  reflected in both of those records?
19       A.  The individual records of raw data are where
20  the GPS tracker indicates where the latitude and
21  longitude are, not a specific stop.
22       MR. YOUNG:  Madam court reporter, can you read
23  that answer back.
24       (Record read.)
25  ////

Page 27

1  BY MR. TIDRICK:
2       Q.  For the UTA APC sensors, are you able to tell
3  me even approximately the level of granularity of the
4  latitude and longitude data, and by that I mean is it
5  accurate to within a certain number of feet?
6       A.  I can't answer that question.  I do not know.
7       Q.  When raw data is transmitted from the UTA APC
8  sensors to SFMTA, is there a computer program or some
9  kind of automated software that will connect the GPS
10  data to a particular revenue stop?
11       A.  UTA provides that software.
12       Q.  Does that software have a name?
13       A.  I don't believe it does.  It's part of the UTA
14  package.
15       Q.  Do I understand correctly that the raw data
16  that is transmitted from the UTA APC sensors that every
17  record is connected by the UTA package software to
18  either a revenue stop or the division?
19       A.  Correct.
20       Q.  I'm trying to get my head around the
21  following.  Let's say you have a bus stop at point A and
22  you have a bus stop at point B and for whatever reason
23  about halfway in between bus stop A and B for whatever
24  reason the operator opens the door, let's say a
25  passenger, member of the public outside that's calling

Page 28

1  with a question or any other reason.  If the door on the
2  transit vehicle opens somewhere between bus stop A and
3  bus stop B, in light of the fact that I understand from
4  what you've described that every record is tied to
5  either a particular stop or the division, do I
6  understand correctly in that scenario that the opening
7  of the door somewhere in between stop A and stop B will
8  be connected to either stop A or stop B?
9       A.  That is my understanding.  It's a proprietary
10  software so I don't know the exact algorithm that UTA
11  uses to determine the stop in that case.
12       Q.  And I understand it's a proprietary software,
13  you don't know the exact algorithm, and I'm not asking
14  you to testify at a level of detail you don't know, but
15  what you do know is that when the bus stops somewhere
16  between bus stop A and bus stop B, the software performs
17  some kind of algorithm to connect that door opening to
18  stop A or stop B; correct?
19       A.  Correct.
20       Q.  And, likewise, if the door opens at some point
21  between the last revenue stop and the division, again,
22  I'm not asking you to speculate, I understand it's
23  proprietary software, you don't know the exact
24  algorithm, but the opening of the door between the last
25  revenue stop and the division, the software is going to

Page 29

1  connect that door opening to either the last revenue
2  stop or the division; correct?
3       A.  I don't know about that particular situation.
4       Q.  Do you know anything about what occurs in that
5  situation?
6       A.  I do not know about that situation.  I do know
7  that if it's in revenue service along a route it will
8  attempt to assign a stop location.  I do not know the
9  situation where it's traveling between the last revenue
10  stop and the depot.
11       Q.  Again, I understand that the software that
12  connects a door opening between the last revenue stop
13  and the division, that technology is proprietary, you
14  don't know the specifics of it.
15       Is there someone that you would call or
16  contact to be able to understand what happens in that
17  situation?
18       A.  No, I wouldn't call anyone.  We don't use
19  APC's for that specific situation that you're talking
20  about.  We use APC's to determine ridership.
21       Q.  Just to be clear, so SFMTA does not use APC
22  data to determine vehicle location; is that correct?
23       MR. McLAUGHLIN:  Objection.  Vague, misstates
24  the testimony.
25       THE WITNESS:  SFMTA uses APC software to track

1  ridership.  That's what we purchased the product to do.
2  BY MR. TIDRICK:
3     Q.  Not to track vehicle location; correct?
4     A.  That is not its primary purpose.
5     Q.  Has anyone ever indicated to SFMTA that
6  tracking a vehicle location is a purpose that APC is
7  able to perform?
8        MR. McLAUGHLIN:  Objection.  Speculation.
9        THE WITNESS:  APC --
10 BY MR. TIDRICK:
11    Q.  Never mind.  Strike the question.
12       What I mean to ask with respect to who you
13 would call is not whether this is a question that you
14 would normally call someone about.
15       What I mean to say is there someone out there
16 that you're aware of who would be able to describe to me
17 with accuracy and with direct knowledge what the
18 software does to connect a door-opening event that
19 occurs between the last revenue stop and the division,
20 is there anyone in the world that you're aware of that
21 has knowledge about that?
22    A.  Who has knowledge about connecting the last
23 revenue stop to the division?
24    Q.  No.  The question I posed earlier which is how
25 exactly does this proprietary software handle a
                                                   Page 30

1  situation in which a door opens somewhere between the
2  last revenue stop and the division, how exactly does the
3  software handle that and track it and specifically
4  whether it tracks and under what circumstances it tracks
5  that door opening to either the last revenue stop or to
6  the division, who in the world has knowledge of that?
7     A.  Probably the people who wrote the software
8  which would be someone within UTA.
9     Q.  Did you write the software?
10    A.  No.
11    Q.  With the UTA APC sensors, what happens at a
12 revenue stop if the door opens, people get on and off,
13 the door closes, the bus doesn't move and then the door
14 opens again and individuals get on and off again, does
15 that generate one record or two records?
16    A.  I do not know how the raw data is capsulated
17 if a door re-opens.  However, when we are looking at
18 stop-by-stop ridership, when we are looking at
19 stop-by-stop ridership the customer activity at that
20 stop will be aggregated up.
21    Q.  Again, a scenario where a transit vehicle is
22 not moving, the door opens, individuals get on and off,
23 the door closes, the vehicle does not move, the door
24 opens again, individuals get on and off, do I understand
25 correctly that the number of passengers who get on and
                                                   Page 31

1  off are aggregated?
2     A.  Correct.
3     Q.  Do I understand correctly that the aggregate
4  number is transmitted from the APC sensor to SFMTA as a
5  single record?
6     A.  I do not know how it's represented at the raw
7  data level.  I do know when we get the processed report
8  it is aggregated up.
9     Q.  The processed report that SFMTA receives, does
10 that include the time of day?
11       MR. YOUNG:  Mr. Lee, is there something you're
12 reading?
13       THE WITNESS:  I'm just looking at my phone
14 right now.  I'm sorry.
15       MR. YOUNG:  We would appreciate it if you not
16 look at your phone during this deposition.
17       MR. TIDRICK:  Do you need to take a break?
18       THE WITNESS:  I do need to take a break,
19 actually.
20       MR. TIDRICK:  That's fine.  We can take a
21 break.
22       (Recess taken.)
23       (Plaintiffs' Exhibit 137 was marked for
24       identification.)
25 ////
                                                   Page 32

1  BY MR. TIDRICK:
2     Q.  We have marked a document as Plaintiffs'
3  Exhibit 137.
4        Before we get to that, let me ask you a
5  general question.
6        With respect to the APC data, filters are
7  applied to the data to remove inappropriate or anomalous
8  data; is that correct?
9        MR. McLAUGHLIN:  Objection.  Vague.
10       THE WITNESS:  It's a vague question.  I don't
11 know what you mean there.
12 BY MR. TIDRICK:
13    Q.  Are you aware of any filtering that occurs of
14 the APC data?
15    A.  As with any technological system that collects
16 data there might be erroneous data, you know, if there's
17 something clearly off or there's a missing field within
18 the record, perhaps that data is removed; however, the
19 processed data that we receive has been processed and we
20 take that at -- we understand that there's a proprietary
21 algorithm that is used by UTA and then we take whatever
22 data is given to us.
23    Q.  Help me understand physically where the
24 processing happens.  And specifically my question is the
25 transit vehicles have APC filters on them; correct?
                                                   Page 33

9 (Pages 30 - 33)

1    A. Transit vehicles have APC sensors on them.

2    Q. Sorry. I misspoke.

3       Transit vehicles have APC sensors; correct?

4    A. Correct.

5    Q. Data is transmitted from the APC sensors to

6 where?

7    A. So when the vehicle pulls in to the yard there

8 is a wireless bulk data process that occurs. That raw

9 data is then fed through or the UTA software then

10 processes that raw data and provides us with reports and

11 ensures that data has been refined through the

12 proprietary algorithm that they have.

13    Q. The wireless bulk data transfer that occurs

14 when a vehicle pulls into the division, the data is

15 transmitted wirelessly from the transit vehicle to

16 where?

17    A. So we have a server and that data is then

18 processed at that time.

19    Q. When you say "we have a server" -- strike

20 that.

21       When you say "we have a server," you're saying

22 SFMTA has a server?

23    A. Correct.

24    Q. Where physically is that server located?

25    A. I don't know physically where that is. We

1 have many computer hardware throughout our entire

2 agency.

3    Q. The server is located somewhere in the City

4 and County of San Francisco; correct?

5    A. Yes.

6    Q. When a transit vehicle pulls into the division

7 there's a wireless bulk data transfer that occurs

8 whereby raw data for that day is transmitted from the

9 transit vehicle to a server owned and operated by SFMTA

10 somewhere in San Francisco?

11    A. Yes.

12    Q. The UTA software that processes that data is

13 located at SFMTA's server; correct?

14    A. Yes, the software resides somewhere in SFMTA's

15 computer system.

16    Q. In other words, it's not the case that the

17 data is transmitted to some other city or state?

18    A. That's correct.

19    Q. Correct?

20    A. Correct.

21    Q. Does SFMTA have access to the raw data

22 collected by the UTA APC sensors or only the data after

23 it's processed by UTA's proprietary software?

24    MR. McLAUGHLIN: Objection. Vague.

25    THE WITNESS: As a matter of course we look at

1 the processed data. It may be possible to retrieve

2 individual files with the raw data, but we do not as a

3 matter of course look at those files because they are

4 basically files of different columns, there's CSV,

5 Common Separated Value files, where you can't make sense

6 of them just looking at them, so we always go with the

7 processed data in terms of our analysis.

8    Q. For the analysis that's been done for this

9 lawsuit has SFMTA looked at any of the raw data or only

10 the processed data?

11    MR. McLAUGHLIN: Objection. Speculation.

12    You can answer.

13    THE WITNESS: We have used the data that's

14 come out of their system, the processed data.

15 BY MR. TIDRICK:

16    Q. Is there something that prompts the wireless

17 bulk data transfer to occur when the transit vehicle

18 pulls into a division?

19    A. I'm not an expert on wi-fi communication

20 systems, but my understanding is that that upload

21 happens automatically when a vehicle pulls in.

22    Q. When you say that it happens automatically

23 when a vehicle pulls in, do I understand correctly that

24 there's nothing that the operator has to do or that the

25 bus has to do other than just pulling into the division

1 gate; is that correct?

2    A. That's correct.

3    Q. Somehow the fact that the vehicle is pulling

4 into the division gate prompts that wireless bulk data

5 transfer to occur?

6    A. That's correct.

7    Q. And that's been true from July 2009 all the

8 way to the present; is that correct?

9    A. That's correct.

10    Q. What happens out in the field, the transit

11 vehicle is at a revenue stop, let's say for some reason

12 the operator turns off the vehicle, I don't know why,

13 there could be a number of vehicle reasons why that

14 happens, does the turning off of the bus stop the APC

15 sensor from working?

16    MR. McLAUGHLIN: Objection. Vague.

17    THE WITNESS: So the turning off of a bus will

18 stop all the systems on the vehicle in general. There

19 may be other things that just go on automatically that

20 are battery powered. I don't know all the systems that

21 are on the vehicles.

22    It's also important to remember that

23 several -- there's a portion of our vehicle fleet that

24 are also electrically powered trolly buses and they're

25 connected up. So just because a vehicle stops doesn't

1  mean that the power is off.

2    Q. Is that analogous, for example, to a car you

3  can turn off the engine but you can still turn on the

4  headlights?

5      MR. McLAUGHLIN: Objection. Vague.

6      THE WITNESS: You know, I'm not an expert at

7  the mechanics of the electrical engineering of a transit

8  vehicle.

9  BY MR. TIDRICK:

10    Q. Again, I don't want you to speculate.

11    Do you know one way or the other when a bus is

12  turned off, do you know one way or the other whether the

13  APC sensor is collecting data for anyone getting on or

14  off the bus when the bus is powered off? Do you know

15  one way or the other?

16    A. I don't think it is collecting data at that

17  point.

18    Q. Exhibit 137 is an example of processed APC

19  data; is that correct?

20      MR. McLAUGHLIN: Objection. Vague.

21      THE WITNESS: It appears to be an example of

22  processed APC data.

23  BY MR. TIDRICK:

24    Q. I will represent to you that Exhibit 137 is a

25  printout of the first approximately 10 pages of an Excel

1  file that was produced to us in this lawsuit sorted by

2  ending at a division.

3    With that background about how this printout

4  was generated, are you able to tell me, for example,

5  what the meanings of the various columns are?

6    A. Sure.

7    Q. All right. Let's go through them one by one.

8    In the Exhibit 137 document as an example of

9  processed APC data, what is the left-most column, the

10  one with the heading "APC_PKEY"?

11    A. That appears to be the APC primary key which

12  is a unique number that's assigned to the record.

13    Q. What does the column titled

14  "Effective_Date_Key" indicate?

15    A. I believe that's a unique number that's

16  associated with a day.

17    Q. Would I understand correctly then that in that

18  column -- any number in that column could be decoded, so

19  to speak, to refer to a specific date such as August 10,

20  2015?

21    A. Yes.

22    Q. And every date between July 2009 to the

23  present would have its own unique number; is that

24  correct?

25    A. Yes.

1    Q. The next column headed "Stop_Name," what does

2  that indicate?

3    A. The location of the stop that the processed

4  data has been associated with.

5    Q. The next column that is headed with the word

6  "Block," what does that indicate?

7    A. That's the block number that the vehicle has

8  been assigned to on that particular day.

9    Q. The next column that is headed "SCH_Time,"

10  what does that indicate?

11    A. The scheduled time that it was supposed to be

12  at that particular stop name.

13    Q. The next column entitled "Bus," what does that

14  indicate?

15    A. The vehicle number.

16    Q. Each vehicle at SFMTA's fleet has a unique

17  number?

18    A. Correct.

19    Q. The next column entitled "ACT_Stop_Time," do I

20  understand correctly, does that reflect the actual time

21  that the bus was associated with being at the location

22  indicated in the "Stop_Name" column?

23    A. Yes.

24    Q. The next column entitled

25  "DIFF_Actual_SCHED_Time," do I understand correctly that

1  that's simply a calculation of the difference between

2  the value in the column entitled "SCH_Time" and the

3  value indicated in the column entitled "ACT_Stop_Time"?

4    A. Correct, in seconds.

5    Q. The column entitled "Line," what does that

6  indicate?

7    A. Should be the route, like the 38 Geary, the 22

8  Fillmore.

9    Q. The next column entitled "Direction" --

10    A. In this case because it appears to be at the

11  garage there's no line associated with that.

12    Q. The next column entitled "Direction," what

13  does that indicate?

14    A. Direction typically here is either inbound or

15  outbound.

16    Q. Does a certain number indicate inbound?

17    A. I wouldn't know that unless I were able to see

18  other pieces of data.

19    Q. Is it your understanding that there's a

20  certain number that indicates inbound and another that

21  indicates outbound?

22    A. I believe so.

23    Q. Fair to say that seven reflects either inbound

24  or outbound, you're not sure which; is that correct?

25    A. Or it might be that the bus is pulling into

1 the division at that point. But without seeing further
2 data, I wouldn't be able to conclude that definitely.
3 Q. Next column entitled "Run_Number," what does
4 that column reflect?
5 A. That refers to the run number associated with
6 that particular vehicle at that time.
7 Q. In this data it appears the run number is
8 always reflected as a zero. Do you know what that
9 indicates?
10 A. It may just be, again, these records pertain
11 to people pulling in to the end of the line, the
12 division, and it might be garage zero.
13 Q. The next column entitled "Pattern," what does
14 that indicate?
15 A. So individual lines or individual routes may
16 have different patterns. In this case "DH" appears to
17 be "deadhead" meaning not in service.
18 Q. The next column entitled "Reference Key," what
19 does that represent?
20 A. I believe that's a unique number associated
21 with the record.
22 Q. I understand you have also indicated that the
23 left-most column entitled "APC_PKEY" is also a unique
24 number assigned to the record. Do you have any
25 understanding as to why or why there are two unique

1 numbers associated with any given record?
2 A. No.
3 Q. You do not know why there are two different --
4 A. No, I do not.
5 Q. I apologize. We can't talk over each other.
6 That's why I'm having to repeat it so we have a clear
7 record.
8 Is it fair to say that you understand that the
9 "Reference Key" column and the "APC_PKEY" column both
10 indicate some kind of unique number assigned to the
11 record, but you are not sure why there are two such
12 numbers for any given record; is that fair?
13 A. That's correct.
14 Q. The next column -- strike that.
15 The next column entitled "Stop_ID," what does
16 that column indicate?
17 A. So each revenue stop has a unique ID number so
18 that you can associate it with a specific stop name. In
19 this case the stop ID at garage appears to be 9999.
20 Q. The right-most column on the Exhibit 137
21 document, the column entitled "Pullin," P-u-l-l-i-n, one
22 word, what does column represent?
23 A. That represents whether -- the record
24 represents a pull-in to the vehicle -- of the vehicle to
25 a yard or not. So "1" would indicate if it was a

1 pull-in. A zero would indicate it was not a pull-in.
2 Q. Has anyone to your knowledge performed any
3 kind of analysis to validate whether the processed APC
4 data indicating -- strike that.
5 For this lawsuit SFMTA has assembled data to
6 analyze times of day when transit vehicles are at the
7 divisions; is that correct?
8 MR. McLAUGHLIN: Objection. Vague.
9 THE WITNESS: Could you repeat the question,
10 please.
11 BY MR. TIDRICK:
12 Q. Are you familiar with a report or more than
13 one report prepared by Mary Furst for this lawsuit?
14 A. I understand that Mary Furst has been a part
15 of the lawsuit. I'm not sure what specific report you
16 are referencing.
17 Q. I'm showing you a document that was previously
18 marked as Plaintiffs' Exhibit 101 which on the cover
19 page says "Expert Report by Mary E. Furst, May 10,
20 2016."
21 Is that a document that you have seen before?
22 A. Yes.
23 Q. I'm now showing you a document that's been
24 marked Plaintiffs' Exhibit 102 which on the front cover
25 says "Rebuttal Report to Expert Report of Richard Drogin

1 by Mary E. Furst," various letters and then Adrian
2 Fleissig dated June 13, 2016.
3 Have you seen the Exhibit 102 report before?
4 A. Yes.
5 Q. I have some questions for you about both of
6 the reports, and if it's necessary to discuss them
7 separately to answer the questions accurately, please
8 do.
9 Did you play some role in the preparation of
10 the Exhibit 101 and 102 reports?
11 A. No.
12 Q. Did you have any communications with Mary
13 Furst in which you provided information that you
14 understood she would be using to prepare either the
15 Exhibit 101 or 102 reports?
16 A. I have prepared data for her and submitted it
17 to our counsel.
18 Q. The data that you prepared, was that
19 essentially you compiled various of the processed data
20 that had been generated by the UTA proprietary software?
21 A. Correct.
22 Q. And you understand that that data was provided
23 to Mary Furst for her to conduct her analysis?
24 A. Correct.
25 Q. Have you had any conversations with Ms. Furst

1 about the APC data?
2 A. Yes.
3 Q. Approximately how many conversations?
4 A. I have no idea, a couple, two, three, I don't
5 know.
6 Q. Do you have any recollection of what you
7 communicated to Ms. Furst in those conversations?
8 A. I explained to her what the data meant.
9 Q. When you explained to Ms. Furst what the data
10 meant, to the best of your knowledge did you provide any
11 level of detail above and beyond what you have provided
12 to me today in response to the questions I've asked
13 about the APC data?
14 MR. McLAUGHLIN: Objection. Vague.
15 THE WITNESS: I don't recall the specific
16 conversations I had with Ms. Furst.
17 BY MR. TIDRICK:
18 Q. Can you recall generally what you discussed
19 with Ms. Furst?
20 A. I discussed with her what the data meant.
21 Q. You did that so that she would have the
22 information she needed to conduct her analysis; correct?
23 A. Correct. As I don't recall the specific
24 conversations, I'm sure she asked questions, just as you
25 have asked me questions, and I answered those questions.

1 Q. All that I'm asking now is that -- obviously,
2 when you were communicating with Ms. Furst it wasn't a
3 deposition, it wasn't as formal as this. In that kind
4 of conversation the information would be a little more
5 free flowing.
6 All that I'm asking is sitting here today can
7 you recall any information that you provided to
8 Ms. Furst about how the data works above and beyond the
9 information that you have provided here today?
10 A. You know, I described what APC data produces,
11 described what the different columns meant, stop
12 location, time stamps, went through each column,
13 described what run numbers meant, what block numbers
14 meant much in the same way that I have answered your
15 questions here.
16 Q. To the best of your knowledge, is there any
17 information that you provided here today that you
18 believe you did not provide to Ms. Furst?
19 MR. McLAUGHLIN: Objection. Overly broad.
20 MR. YOUNG: You can answer the question.
21 THE WITNESS: I think I have explained to both
22 you and Ms. Furst what the columns have meant and how to
23 interpret how to use the APC data.
24 BY MR. TIDRICK:
25 Q. All that I'm asking, there's nothing in your

1 mind that's substantively different about the
2 information you provided today about the APC data
3 different from what you provided to Ms. Furst; is that
4 fair?
5 MR. McLAUGHLIN: Objection. Vague.
6 THE WITNESS: I think that's probably fair. I
7 do not recall the exact conversations I had with
8 Ms. Furst.
9 BY MR. TIDRICK:
10 Q. Have you or anyone else at SFMTA to your
11 knowledge ever prepared any kind of merging of work
12 assignment data with APC data?
13 MR. McLAUGHLIN: Objection. Vague.
14 THE WITNESS: I have only looked at the --
15 work assignment, just for clarification, you mean the
16 operators and what pieces of work they were assigned? I
17 do not deal with that. I only looked at the NextBus
18 data and the APC data.
19 BY MR. TIDRICK:
20 Q. What I'm asking is, is there anyone to your
21 knowledge who has merged any APC data with work
22 assignment data?
23 A. I don't believe that anyone within MTA has
24 done that.
25 Q. Do you have any reason to believe anyone

1 outside of SFMTA has done that?
2 A. Well, perhaps Ms. Furst did, but I wasn't
3 involved in that process.
4 Q. I'm showing you a document that's been marked
5 as Plaintiffs' Exhibit 138 entitled Declaration of Jason
6 Lee in Support of Motion to Decertify Collective Action
7 and Class Action.
8 Is this a document that you signed?
9 A. Yes.
10 (Plaintiffs' Exhibit 138 was marked for
11 identification.)
12 Q. Did you review this document carefully before
13 you signed it?
14 A. Yes.
15 Q. Yes or no question, do you have any knowledge
16 who drafted the Exhibit 138 document?
17 A. I do not know the specific person who drafted
18 it; however, I was very careful in making additions to
19 clarify and be precise about what was conveyed in the
20 document.
21 Q. Showing you a document that's been marked as
22 Plaintiffs' Exhibit 139. It is a three-page document
23 entitled Methodology for Estimating On-Time Performance
24 at Relief Points and Division Pull-Ins.
25 Is this a document that you drafted?

| | |
|---|---|
| 1    A.  Uh-huh. | 1    you that allows you to know that you prepared the |
| 2    Q.  Yes? | 2    Plaintiffs' Exhibit 139 document at some point before |
| 3    A.  Yes. | 3    May 2015; correct? |
| 4        (Plaintiffs' Exhibit 139 was marked for | 4    A.  Correct. |
| 5        identification.) | 5    Q.  And given that it includes sample data from |
| 6    Q.  Did someone other than you prepare an initial | 6    November 2014 it allows you to pin down that you |
| 7    draft of this? | 7    prepared it sometime between November 2014 and May 2015; |
| 8    A.  No. | 8    correct? |
| 9    Q.  Is it fair to say that you, Mr. Lee, prepared | 9    A.  Yeah, that's probably correct. |
| 10   the initial draft of the Plaintiffs' Exhibit 139 | 10   Q.  Is there any reason you're doubting that time |
| 11   document? | 11   frame now? |
| 12   A.  Yes. | 12   A.  Without the specific date stamp on the file I |
| 13   Q.  And over time you revised it and Plaintiffs' | 13   wouldn't know, so I don't want to be putting down |
| 14   Exhibit 139 is the final version of your memo? | 14   something and saying something with definite certainty |
| 15   A.  Yes. | 15   unless I see specific documentation about that. |
| 16   Q.  Do you recall approximately when you first | 16   Q.  I'm not asking you to speculate. |
| 17   started drafting the Exhibit 139 document? | 17       It's fair to say that the document was |
| 18   A.  No. | 18   prepared approximately in the time frame of |
| 19   Q.  Do you know approximately when you finalized | 19   November 2014 to May 2015; correct? |
| 20   the Exhibit 139 document? | 20   A.  Correct. |
| 21   A.  No. | 21   Q.  Did anyone participate with you in the |
| 22   Q.  Are you able to tell me even approximately | 22   drafting of the Plaintiffs' Exhibit 139 document? |
| 23   when you started or finished drafting the Exhibit 139 | 23   A.  No. |
| 24   document? | 24   Q.  Why did you create the Plaintiffs' Exhibit 139 |
| 25   A.  Well, given that there's sample data from | 25   document? |
| Page 50 | Page 52 |

| | |
|---|---|
| 1    November 2014, January 15, 2015 data, I would assume it | 1    A.  Because I wanted to answer the question. |
| 2    got started sometime in 2014. | 2    Q.  What question? |
| 3    Q.  I'm curious why you would assume you started | 3    A.  Which is estimating on-time performance at |
| 4    it in November 2014.  And the only reason I say that, at | 4    relief points in division pull-ins. |
| 5    least to a layperson it would seem, again, just speaking | 5    Q.  Did someone ask you to answer that question? |
| 6    hypothetically, you could have started drafting it | 6    A.  No one specifically asked me to answer that |
| 7    sometime three months ago, let's say, April 2016, and | 7    question. |
| 8    obviously, the information in the document includes, as | 8    Q.  What prompted you to want an answer to that |
| 9    you say, sample data from one week in November 2014 and | 9    question? |
| 10   a table that says processed January 8, 2015, but at | 10   A.  Well, I think there were general questions |
| 11   least to a layperson it would seem all those things | 11   about -- in connection with this litigation about where |
| 12   indicate is that you prepared it at some point after | 12   the operation -- where the operators were. |
| 13   that. | 13   Q.  The questions that you were attempting to |
| 14   A.  Okay.  Sure.  However, I certainly don't | 14   answer were prompted by this lawsuit; correct? |
| 15   know -- I certainly know that I did not start in this | 15   A.  Correct. |
| 16   year, even through last year, because in the middle of | 16   Q.  If you could please turn to the second page of |
| 17   last year I changed positions and this was the work that | 17   Plaintiffs' Exhibit 139.  There's a section entitled |
| 18   I had done as the performance manager prior to May 2015. | 18   "Methodology."  If you can, please, given that SFMTA has |
| 19   Q.  It was May 2015 when you changed positions? | 19   designated you as an expert in this case, I would ask |
| 20   A.  That's correct. | 20   that you explain as you would to a layperson what the |
| 21   Q.  And I apologize, just to have a clear record | 21   methodology is that's described in paragraph one.  What |
| 22   it's important you let me finish asking the question | 22   is that first step of the methodology? |
| 23   before you answer. | 23       MR. McLAUGHLIN:  Objection.  The document |
| 24       Given that you changed positions at SFMTA in | 24   speaks for itself. |
| 25   May 2015, that point in time is a mental reference for | 25       THE WITNESS:  So as I explained from Exhibit |
| Page 51 | Page 53 |

1 137, there's an indication from the APC records that if
2 a run number is zero and the stop ID is 9999 that that
3 would indicate that it would be -- that record is a
4 pull-in to a division.
5        MR. TIDRICK:  Let's take just a five-minute
6 break, please.
7        (Recess taken.)
8 BY MR. TIDRICK:
9    Q.   Mr. Lee, if you could look first at
10 Exhibit 140.  Do you recognize Exhibit 140 to be an
11 aerial view of the Kirkland division?
12    A.   It is.
13        (Plaintiffs' Exhibits 140 through 147 were
14 marked for identification.)
15    Q.   Exhibit 141 do you recognize to be an aerial
16 view of the Potrero division?
17    A.   It is.
18    Q.   Exhibit 142 do you recognize to be an aerial
19 view of the Presidio division?
20    A.   It is.
21    Q.   Exhibit 143 do you recognize to be an aerial
22 view of the Presidio division?
23    A.   Not Presidio, the Woods, I believe.
24    Q.   143?
25    A.   143 is Woods.

1    Q.   Exhibit 143 you recognize to be an aerial view
2 of the Woods division?
3    A.   Correct.
4    Q.   Do you recognize Exhibit 144 to be an aerial
5 view of the Green division?
6    A.   Yes.
7    Q.   Do you recognize Exhibit 145 to be an aerial
8 view of the Flynn division?
9    A.   Yes.
10    Q.   Do you recognize Exhibit 146 to be an aerial
11 view of the Cable Car division?
12    A.   Yes.
13    Q.   Do you recognize Exhibit 147 to be an aerial
14 view of the Muni Metro East division?
15    A.   Yes.
16    Q.   If you could please look at the very first
17 initial report, Exhibit 101.  If you could please turn
18 to the page of the Exhibit 101 of Mary Furst's report
19 which is labeled as Exhibit A 2.2.
20    A.   Okay.
21    Q.   If you could please specifically turn to
22 Page 2 of 4 of Exhibit A 2.2.  Do you see at the bottom
23 it's labeled Page 1 of 4, Page 2 of 4, Page 3 of 4?
24    A.   Yes.
25    Q.   If you could please turn to Page 2 of 4 of

1 Exhibit A 2.2 of Mary Furst's initial report, I want to
2 bring your attention to the first row on that page which
3 I understand to be a record for the date August 20,
4 2013.  Do you see that?
5    A.   Yes.
6    Q.   Is it your understanding that the record
7 reflected in that line of Exhibit A 2.2 reflects the
8 opening of a door on Mr. Ahmad's transit vehicle?
9    A.   Yes.
10    Q.   Specifically the data in that row indicates
11 that a door of Mr. Ahmad's transit vehicle opened at its
12 military time 18:26:35; is that correct?
13    A.   Yes.
14    Q.   Looking back at the Exhibit 140 document, the
15 aerial view of the Kirkland division, are you able to
16 tell me where at the Kirkland division Mr. Ahmad's bus
17 was on August 20, 2013 at the time 18:26:35?
18    A.   Based on the record here it appears that he
19 entered the Kirkland garage and then opened his doors at
20 18:26:35 on August 20, 2013 somewhere within the
21 boundaries of the Kirkland garage.
22    Q.   Are you able to tell me at any level of detail
23 more specific than that where the door opened?
24    A.   Based on this data, no.
25    Q.   Obviously, I presented and asked you about one

1 row as an example of the APC data.
2        Is it fair to say that what you have just
3 described about the level of detail that you can provide
4 would be the same for any of the APC data?
5    A.   Based on the records contained in this
6 document here, the APC data indicates where the vehicle
7 stopped, at which division it stopped.
8    Q.   When you say "this document," you're referring
9 to the Exhibit A 2.2 of Ms. Furst's report?
10    A.   Correct.
11    Q.   Is it fair to say that the statement you just
12 made would be the same with respect to any of the APC
13 data Ms. Furst used for any of the divisions; is that
14 correct?
15        MR. McLAUGHLIN:  Objection.  Speculation,
16 vague.
17        THE WITNESS:  Based on this information,
18 that's what it appears to be.
19 BY MR. TIDRICK:
20    Q.   If you could please open up the map that has
21 been marked as Plaintiffs' Exhibit 148.  The map has two
22 sides and the side that I would ask you to open up is
23 the side that has the legend in the right side between
24 rows five and seven.
25        I'll represent to you that on the Exhibit 148

1 map on the sides that you're looking at there are
2 turquoise colored dots at the locations of each of the
3 SFMTA divisions.
4     You see that?
5 A. Yes.
6     (Plaintiffs' Exhibit 148 was marked for
7     identification.)
8 Q. Looking at the dot that is located at the
9 location of the Kirkland division on the map, it's just
10 to the right of Ripley's Believe It Or Not, do you see
11 that?
12 A. Yes.
13 Q. I'll give you a pen.
14     The question I have for you is, and this may
15 or may not be possible so you can tell me one way or the
16 other, but you may recall earlier I asked you if the
17 operator opens the door of the bus at some point between
18 the last revenue stop and the division, in that
19 circumstance would it geo locate it as being at the last
20 revenue stop or the division, and my understanding is
21 you're not sure, it depends exactly how the proprietary
22 software processes the raw data; correct?
23 A. Correct.
24 Q. The question I have for you is, is it possible
25 for you to identify the specific geographic area around

Page 58

1 the Kirkland division where the opening of the door by
2 the bus operator would geo locate as being at the
3 Kirkland division?
4 A. It is not possible.
5 Q. And is that simply because you don't know
6 exactly how the proprietary software translates the raw
7 data; is that correct?
8 A. That's correct.
9 Q. If I were to ask you that same question for
10 any of SFMTA divisions, your answer would be the same;
11 is that correct?
12 A. I don't know exactly the geo fence that's used
13 for them to determine that.
14 Q. To determine the geo location of being the
15 division; correct?
16 A. Correct. However, if the vehicle pulls in to
17 the division and the doors open there it would record it
18 as having arrived at a division.
19 Q. And there's a certain, as you say, geo fence,
20 a geographic area within which the opening of the door
21 would record as being at the division; is that correct?
22 A. Correct.
23 Q. And it's not possible for you to draw with a
24 pen to indicate where exactly that geo fence is?
25 A. I would not know what that is.

Page 59

1 Q. The term "geo fence" is a term that describes
2 some certain geographic area within which the opening of
3 the door geo locates as being within that geo fence;
4 right?
5 A. Right.
6 Q. You can put the map away. It takes up a lot
7 of space on the table.
8 A. I would add that typically, at least from my
9 experience, I have not seen operators open the doors
10 outside the garage, they open the doors as they get in
11 and they get off the vehicles.
12 Q. If you could please turn to the three-page
13 memo, Exhibit 139.
14     On the first page of Exhibit 139 under the
15 section "Definitions" there's a sentence that starts
16 "Run numbers and block numbers are not identical and may
17 not necessarily have a one-to-one correspondence with
18 each other." And it goes on to provide an example.
19     The question I have for you is in order to
20 match work assignment data with the APC data is it
21 necessary to use both the run number and the block
22 number in order to match it accurately or is it possible
23 to use just one or the other?
24     MR. McLAUGHLIN: Objection. Vague,
25 speculation.

Page 60

1     THE WITNESS: So run numbers correspond to a
2 specific operator. Block numbers correspond to a
3 vehicle. A specific vehicle may be assigned to a
4 different block number on a day-to-day basis. Typically
5 you're not going to necessarily operate a vehicle, the
6 same vehicle, on the same block number every single day.
7 So the run number and the block number are used together
8 to help identify the vehicle and the operator to match
9 them up.
10 BY MR. TIDRICK:
11 Q. Do I understand you correctly then in order to
12 match an operator ID number to the APC data you would
13 recommend using both the run number and the block
14 number; correct?
15 A. Well, if you have a run number and you have
16 the assignment of the operator to that run number then
17 you would know -- let me take that back.
18     If you have a run number and you know the
19 operator assigned to that run number and you have the
20 vehicle associated with that run number you would then
21 be able to tell when the vehicle -- if it reaches a
22 certain location like a division and you have the run
23 number associated with it and you have the operator
24 associated with it then you would know when the operator
25 pulled into that division.

Page 61

16 (Pages 58 - 61)

Page 62

1    Q.  Do I understand correctly in your view it
2  would not be sufficient to have only the run number and
3  the operator number, you would need additional
4  information; is that correct?
5        MR. McLAUGHLIN:  Objection.  Vague.
6        THE WITNESS:  If you just had a run number and
7  an operator number without the vehicle you wouldn't be
8  able to match when the operator arrived at the division.
9  BY MR. TIDRICK:
10   Q.  What is the demarcation for the vehicle, what
11  is that?
12   A.  A vehicle, each individual vehicle within
13  SFMTA has a unique number.  That's a fixed number
14  assigned -- a fixed number painted on the side of that
15  vehicle.
16   Q.  Going back to the page of the Mary Furst
17  report, Exhibit 101, and specifically the page within
18  there that's labeled A 2.2, Page 2 of 4, are you able to
19  tell me on that page where the vehicle ID number is?
20   A.  So with that particular example you have the
21  run number and you have the block number.  You also
22  know, and it's not printed here, but you also know what
23  block number was associated with what vehicle on that
24  particular day.  So from that you can determine when the
25  vehicle pulled in, who was on it and where it was when

Page 63

1  it pulled in which is in this case the Kirkland garage.
2  So you have the pieces of information you need to know
3  to put that together.
4    Q.  In order to evaluate the actual times that an
5  operator pulled a transit vehicle into a division using
6  APC data for any given time period, would you recommend
7  using all of the APC data for that operator during that
8  time period?
9        MR. McLAUGHLIN:  Objection.  Vague, incomplete
10  hypothetical.
11        THE WITNESS:  Could you please define what you
12  mean by "time period."
13  BY MR. TIDRICK:
14   Q.  Let's say that you were attempting to assess
15  the actual times when an operator pulled in to a
16  division for the entire period July 2009 through let's
17  say August of 2015.  Would you recommend using all of
18  the APC data that exists for that entire time period?
19        MR. McLAUGHLIN:  Same objections.
20        THE WITNESS:  I would look at the APC data
21  that we have keeping in mind that APC is available in 30
22  percent of the vehicles and those vehicles are cycled
23  around different routes per the sample plan that was
24  developed by the SFMTA in conjunction with the Federal
25  Transit Administration.

Page 64

1  BY MR. TIDRICK:
2    Q.  Is there any reason that you would prefer to
3  look at some specific time period as opposed to
4  obtaining and reviewing the data for the entire July
5  2009 through August 2015 time period?
6        MR. McLAUGHLIN:  Objection.  Vague.
7        THE WITNESS:  I have no opinion on that.
8  BY MR. TIDRICK:
9    Q.  Turning back again to this document.  It's
10  been marked as Plaintiffs' Exhibit 137.  In the column
11  entitled "Stop name" there are some records that have
12  the letters "EOL," some, but not all, of them have the
13  letters "EOL."  Are you able to tell me what the "EOL"
14  refers to?
15   A.  "EOL," I believe, means End of Line.
16   Q.  So just as an example, let's look at the very
17  first instance which the letters "EOL" appears on the
18  first page of Plaintiffs' Exhibit 137.  It's nine lines
19  down from the top not counting the header, the APC_PKEY,
20  unique ID number associated with it is 8692121.  So that
21  row includes the stop name "Kirkland_Garage-EOL."  The
22  row immediately above it says "Kirkland_Garage" but
23  doesn't say "EOL."
24        Are you able to tell me anything about why the
25  row above it doesn't say "EOL" but that row does say

Page 65

1  "EOL"?
2    A.  I don't think it makes any difference.  They
3  both represent pulling in to the garage based on having
4  the stop ID of 9999 and a run number of zero.
5    Q.  And I'm using that instance of EOL just as an
6  example.
7        Is it your opinion that at any point in the
8  APC data where it says "EOL" that it has no significant
9  difference between an entry that doesn't say "EOL"?
10   A.  Correct.
11   Q.  The column entitled "SCH_Time," I understand
12  you have already described what the data in that column
13  means.
14        The question I have for you now is, is the
15  information in that row derived from the scheduled
16  pull-in times in Range reports?
17   A.  That is correct.
18   Q.  I'm giving you a hypothetical.  If for some
19  reason the time listed in the column titled "SCH_time"
20  did not correspond with the pull-in times in the Range
21  reports, would you have any explanation for why they are
22  different?
23        MR. McLAUGHLIN:  Objection.  Incomplete
24  hypothetical, vague.
25        THE WITNESS:  As far as I'm aware, this APC

1  data uses the Trapeze schedule data and whatever data is
2  there is whatever it is.
3  BY MR. TIDRICK:
4    Q.  In other words, it should be the same;
5  correct?
6    A.  It should be.
7    Q.  Fair to say if for some reason it's different
8  for any given instance you don't have an explanation for
9  that; correct?
10   A.  I would need to investigate the specific
11 instance.
12   Q.  Understood.
13     Earlier you were describing in layperson's
14 terms the methodology laid out in the Plaintiffs'
15 Exhibit 139 document.  You already described for Page 2
16 of 3 the methodology described in the first paragraph of
17 the methodology section number one.
18     Are you able to describe for me in layperson's
19 terms what the methodology is described in the second
20 paragraph, number two?
21     MR. McLAUGHLIN:  Objection.  Document speaks
22 for itself, vague.
23     THE WITNESS:  So the purpose of .2 of the
24 methodology is to get all of the records associated with
25 a last revenue stop and determine whether that last

---

1  revenue stop might be just prior to a pull-in to a
2  division or to a relief point.
3  BY MR. TIDRICK:
4    Q.  Similarly, can you describe in layperson's
5  terms what the purpose of the methodology described in
6  step number three is.
7     MR. McLAUGHLIN:  Same objections.
8     THE WITNESS:  So for step number three it
9  would be taking those candidate points and then applying
10 an evaluation criteria to determine whether it's a
11 relief point or the last revenue stop prior to a
12 pull-in.
13 BY MR. TIDRICK:
14   Q.  Similarly, can you explain what the purpose of
15 the methodology described in point number four is?
16    MR. McLAUGHLIN:  Same objections.
17    THE WITNESS:  So that is to then classify or
18 group all the relief points together and the pull-in
19 times together so you don't mix and match.
20 BY MR. TIDRICK:
21   Q.  Earlier you mentioned an individual by the
22 name of Ngui Kahiha.
23   A.  Nguvi Kahiha.
24   Q.  Do you know geographically where he works?
25   A.  He lives in Atlanta.  He lives and works in

---

1  Atlanta.
2    Q.  His company has an office there?
3    A.  Correct.
4    Q.  Do you have a phone number for him?
5    A.  Not offhand.
6     MR. TIDRICK:  Can we take just a five-minute
7  break, please.
8     MR. McLAUGHLIN:  Okay.
9     (Recess taken.)
10 BY MR. TIDRICK:
11   Q.  The processed APC data that you understand was
12 provided to Mary Furst, to your knowledge has anyone
13 performed any study attempting to validate the accuracy
14 of that data?
15    MR. McLAUGHLIN:  Objection.  Vague.
16    THE WITNESS:  Well, as regards to the timing
17 of when the doors open and close, I believe that's -- is
18 that what you are referencing in terms of the accuracy
19 of the data?
20 BY MR. TIDRICK:
21   Q.  Let's start with that.
22   A.  Okay.  So when, as I mentioned earlier, we
23 were testing the different types of APC's when we were
24 looking at the new technology, we were on a bus and we
25 were watching the doors open and close and we were

---

1  recording the times and then we were matching it up with
2  the times that were reported by the APC system and they
3  were a match.  So, yes, we were pretty confident that
4  the data was accurate.
5    Q.  Approximately how many times did you ride
6  buses and make that comparison?
7    A.  We rode for hours.
8    Q.  On one particular day or how many days?
9    A.  Multiple days.
10   Q.  Approximately how many days?
11   A.  I don't recall at this point.  I think it was
12 over at least a two-week period.
13   Q.  Were you doing that with the UTA technology or
14 IRIS technology?
15   A.  With the UTA technology, with both the UTA
16 technology and the IRIS technology.
17   Q.  When approximately did you do that testing?
18   A.  That testing was done at approximately
19 early -- late 2013, early 2014.
20   Q.  What was the purpose of that testing?
21   A.  The purpose of that testing was to evaluate
22 new technology as at that point our UTA equipment was
23 about seven years old.
24   Q.  From what you have described before, I
25 understand that the functional purpose of the APC data

---

1 for SFMTA is keeping track of the number of passengers
2 that get on and off the bus; correct?
3    A.   Correct.
4    Q.   When you were doing the tests that you just
5 described over approximately a two-week period --
6    A.   At least two-month period.
7    Q.   Let me ask it.  Let me start over with the
8 question.
9         During the approximately two-month period when
10 you rode buses in late 2013 and early 2014 what
11 specifically did you do to validate the accuracy?  In
12 other words, did you take notes on the actual time that
13 you were at the revenue stops and then compare that with
14 what the APC system was generating?
15    A.   Yes.
16    Q.   Did you do anything else as part of that
17 testing that you can recall or as what you just
18 described what you did?
19    A.   The purpose of the testing was to evaluate the
20 accuracy of different -- the ridership counting accuracy
21 of different systems, namely, the UTA and the IRIS
22 systems.
23    Q.   As part of the testing that you did in late
24 2013, early 2014, did you take any steps to validate the
25 accuracy of what the processed APC data was reporting as

---

1         Actually, setting aside Exhibit 137 document,
2 let me ask you a general question.
3         To your knowledge has anyone ever conducted a
4 study as to whether operators whose runs are pulling
5 into divisions at SFMTA ever open the door of the
6 transit vehicle at points between the last revenue stop
7 and pulling into the division?
8         MR. McLAUGHLIN:  Objection.  Vague.
9         THE WITNESS:  The SFMTA has not conducted a
10 study on that specific issue.
11 BY MR. TIDRICK:
12    Q.   To your knowledge has anyone conducted a study
13 on that issue for SFMTA?
14    A.   To my knowledge nobody has conducted such a
15 study; however, it is not general practice for operators
16 to open their doors prior to arriving -- prior to --
17 between the last revenue stop and arriving at the
18 division.
19         MR. TIDRICK:  This concludes the deposition.
20 Thank you.
21         THE WITNESS:  Thank you.
22         (Time noted:  4:30 p.m.)
23
24
25

---

1 far as location?
2    A.   Yes, we did.  We looked at the reports that
3 were being generated from the UTA APC system, we were
4 riding the vehicles and we knew which stops the doors
5 opened and closed and we were able to match it up that
6 way.
7    Q.   Do you have any kind of written records of
8 that testing?
9    A.   Somewhere I might have them.  I don't have
10 them with me.
11    Q.   Did anyone participate in that testing with
12 you?
13    A.   David Pappas and Andrew Harrison as I
14 mentioned several hours ago.
15    Q.   As part of that testing that you did in
16 approximately a two-month period in late 2013 and early
17 2014, did you do anything other than validate the
18 accuracy of the locations and the times of when and
19 where the bus doors were opening at the revenue stops?
20    A.   That was -- that along with ensuring that we
21 got ridership counts at those stops were the output of
22 that exercise.
23    Q.   That's all; correct?
24    A.   As far as I can remember at this point.
25    Q.   If you could please refer to Exhibit 137.

---

1         I, the undersigned, a Certified Shorthand
2 Reporter of the State of California, do hereby certify:
3         That the foregoing proceedings were taken before
4 me at the time and place herein set forth; that any
5 witnesses in the foregoing proceedings, prior to
6 testifying, were placed under oath; that a verbatim
7 record of the proceedings was made by me using machine
8 shorthand which was thereafter transcribed under my
9 direction; further, that the foregoing is an accurate
10 transcription thereof.
11         Further, that if the foregoing pertains to the
12 original transcript of a deposition in a Federal case,
13 before completion of the proceedings review of the
14 transcript [ ] was [ ] was not required.
15         I further certify that I am neither financially
16 interested in the action nor a relative or employee of
17 any attorney or any of the parties.
18         IN WITNESS WHEREOF, I have this date subscribed
19 my name.
20 Dated:  July 18, 2016
21
22
23         _Debbie Razavi_
24         DEBBIE RAZAVI, RPR
25         CSR No. 9989

---

19 (Pages 70 - 73)

| 1 | 2 |
|---|---|
| **1** 1:25 43:25 55:23 | **2** 5:15 55:22,23,25 |
| **1-20** 1:10 2:10 | 62:18 66:15,23 |
| **10** 16:1,1,2 26:16 | **2.2** 56:1,7 57:9 |
| 38:25 39:19 44:19 | 62:18 |
| **100** 5:12 | **2.2.** 55:19,22 |
| **101** 44:18 45:10,15 | **20** 56:3,17,20 |
| 55:17,18 62:17 | **200** 9:17 |
| **102** 44:24 45:3,10 | **2009** 8:4,11,16,17,20 |
| 45:15 | 8:23 10:7,10 37:7 |
| **12-03704** 1:7 2:7 | 39:22 63:16 64:5 |
| **1220** 3:15 | **2013** 56:4,17,20 |
| **13** 45:2 | 69:19 70:10,24 |
| **137** 4:8 32:23 33:3 | 71:16 |
| 38:18,24 39:8 43:20 | **2014** 51:1,2,4,9 52:6 |
| 54:1 64:10,18 71:25 | 52:7,19 69:19 70:10 |
| 72:1 | 70:24 71:17 |
| **138** 4:9 49:5,10,16 | **2015** 39:20 51:1,10 |
| **139** 4:10 49:22 50:4 | 51:18,19,25 52:3,7 |
| 50:10,14,17,20,23 | 52:19 63:17 64:5 |
| 52:2,22,24 53:17 | **2016** 1:16 2:21 5:1 |
| 60:13,14 66:15 | 44:20 45:2 51:7 |
| **1390** 2:19 | 73:20 |
| **14** 1:16 2:21 5:1 | **2039** 3:6 |
| **140** 4:13 54:10,10 | **22** 41:7 |
| 54:13 56:14 | **2342057** 1:24 |
| **141** 4:14 54:15 | |
| **142** 4:15 54:18 | **3** |
| **143** 4:16 54:21,24 | **3** 55:23 66:16 |
| 54:25 55:1 | **30** 7:15,17,19 8:5,14 |
| **144** 4:17 55:4 | 8:19 63:21 |
| **145** 4:18 55:7 | **300** 3:15 |
| **146** 4:19 55:10 | **308** 3:6 |
| **147** 4:20 54:13 | **32** 4:8 |
| 55:13 | **38** 41:7 |
| **148** 4:21 57:21,25 | |
| 58:6 | **4** |
| **15** 26:9,14,16 51:1 | **4** 55:22,23,23,24,25 |
| **18** 73:20 | 62:18 |
| **18:26:35** 56:12,17 | **49** 4:9 |
| 56:20 | **4:30** 2:21 72:22 |
| **1:25** 2:20 5:2 | |
| | **5** |
| | **5** 4:5 |
| | **50** 4:10 |

| | |
|---|---|
| **510** 3:8,17 | **activity** 31:19 |
| **54** 4:13,14,15,16,17 | **actual** 40:20,25 63:4 |
| 4:18,19,20 | 63:15 70:12 |
| **58** 4:21 | **add** 60:8 |
| | **additional** 62:3 |
| **7** | **additions** 49:18 |
| **7-04** 2:19 | **administered** 5:5 |
| **73** 1:25 | **administration** |
| **788-5100** 3:8 | 63:25 |
| | **adrian** 45:1 |
| **8** | **advanced** 15:18 |
| **8** 51:10 | 16:5 |
| **8692121** 64:20 | **advancements** |
| | 15:14 |
| **9** | **aerial** 4:13,14,15,16 |
| **94704** 3:7 | 4:17,18,19,20 54:11 |
| **94710** 3:16 | 54:15,18,21 55:1,4 |
| **995-5806** 3:17 | 55:7,10,13 56:15 |
| **9989** 1:23 2:22 | **afternoon** 5:9,10 |
| 73:25 | **agency** 1:9 2:9 15:14 |
| **9999** 43:19 54:2 | 18:22 35:2 |
| 65:4 | **aggregate** 32:3 |
| | **aggregated** 31:20 |
| **a** | 32:1,8 |
| **abbreviated** 7:11 | **ago** 11:11 14:4 15:3 |
| **ability** 23:21 | 51:7 71:14 |
| **able** 7:19,23,25 8:11 | **ahead** 11:4 17:16 |
| 11:9 23:6,8,9,13 | **ahmad's** 56:8,11,16 |
| 24:23 25:10 27:2 | **airport** 18:25 |
| 29:16 30:7,16 39:4 | **algorithm** 28:10,13 |
| 41:17 42:2 50:22 | 28:17,24 33:21 |
| 56:15,22 61:21 62:8 | 34:12 |
| 62:18 64:13,24 | **allows** 52:1,6 |
| 66:18 71:5 | **ambulance** 26:8 |
| **access** 35:21 | **analogous** 38:2 |
| **accuracy** 30:17 | **analysis** 36:7,8 44:3 |
| 68:13,18 70:11,20 | 45:23 46:22 |
| 70:20,25 71:18 | **analyze** 44:6 |
| **accurate** 16:10 27:5 | **andrew** 18:21,24 |
| 69:4 73:9 | 71:13 |
| **accurately** 45:7 | **anomalous** 33:7 |
| 60:22 | **answer** 19:14,22,23 |
| **act** 40:19 41:3 | 26:23 27:6 36:12 |
| **action** 49:6,7 73:16 | 45:7 47:20 51:23 |
| **activated** 9:6 | 53:1,5,6,8,14 59:10 |
| **active** 24:1 | |

**answered** 46:25 47:14
**antenna** 23:12
**anticipated** 5:24
**apc** 6:5 7:11,13,16 8:5,13,24 10:3,7,24 11:23 13:7,15,17 17:13 20:7,12,13,15 20:17,19 21:18 22:5 24:7,25 25:4 27:2,7 27:16 29:21,25 30:6 30:9 31:11 32:4 33:6,14,25 34:1,3,5 35:22 37:14 38:13 38:18,22 39:9,10,11 42:23 43:9 44:3 46:1,13 47:10,23 48:2,12,18,21 54:1 57:1,4,6,12 60:20 61:12 63:6,7,18,20 63:21 64:19 65:8,25 68:11 69:2,25 70:14 70:25 71:3
**apc's** 9:2,22 13:10 29:19,20 68:23
**apologize** 7:2 43:5 51:21
**appearances** 3:1
**appears** 38:21 39:11 41:10 42:7,16 43:19 56:18 57:18 64:17
**applied** 33:7
**applying** 67:9
**appreciate** 32:15
**approximately** 7:23 8:12,14,18,19 9:14 11:9 14:4 15:3 16:2 18:19 27:3 38:25 46:3 50:16,19,22 52:18 69:5,10,17,18 70:5,9 71:16
**approximation** 9:20 9:21
**april** 51:7

**area** 58:25 59:20 60:2
**areas** 6:15
**arrival** 14:9
**arrived** 59:18 62:8
**arrives** 25:14
**arriving** 72:16,17
**articulated** 9:4
**aside** 72:1
**asked** 46:12,24,25 53:6 56:25 58:16
**asking** 28:13,22 47:1,6,25 48:20 51:22 52:16
**assembled** 44:5
**assess** 63:14
**assign** 29:8
**assigned** 39:12 40:8 42:24 43:10 48:16 61:3,19 62:14
**assignment** 48:12 48:15,22 60:20 61:16
**assist** 6:10
**associate** 43:18
**associated** 39:16 40:4,21 41:11 42:5 42:20 43:1 61:20,23 61:24 62:23 64:20 66:24
**associates** 10:5
**assume** 51:1,3
**assuming** 19:20
**atlanta** 67:25 68:1
**atop** 16:15
**attempt** 29:8
**attempting** 53:13 63:14 68:13
**attention** 56:2
**attorney** 73:17
**attorney's** 2:19
**august** 39:19 56:3 56:17,20 63:17 64:5
**automated** 22:12 27:9

**automatic** 6:4 7:10
**automatically** 36:21 36:22 37:19
**available** 63:21
**avenue** 3:6
**aware** 14:16 19:3 30:16,20 33:13 65:25

## b

**b** 3:5 11:16 27:22,23 28:3,7,8,16,18
**back** 22:17,21,25 24:9,12 26:9,23 56:14 61:17 62:16 64:9
**background** 39:3
**based** 56:18,24 57:5 57:17 65:3
**basic** 14:21,25 19:25 20:3
**basically** 36:4
**basis** 61:4
**batch** 9:3
**battery** 37:20
**beam** 20:20 21:4,9
**began** 10:14
**beginning** 2:20
**behalf** 1:4 2:4,18
**believe** 8:17 12:11 18:24 23:10,18 24:8 27:13 39:15 41:22 42:20 47:18 48:23 48:25 54:23 58:10 64:15 68:17
**berkeley** 3:7,16
**best** 46:10 47:16
**beyond** 46:11 47:8
**block** 40:6,7 47:13 60:16,21 61:2,4,6,7 61:13 62:21,23
**board** 22:9
**boarding** 13:10
**bottom** 55:22

**boundaries** 56:21
**break** 32:17,18,21 54:6 68:7
**bring** 56:2
**broad** 47:19
**bulk** 34:8,13 35:7 36:17 37:4
**bus** 12:20 16:15 26:5,8,12,13 27:21 27:22,23 28:2,3,15 28:16,16 31:13 36:25 37:14,17 38:11,14,14 40:13 40:21 41:25 56:16 58:17 59:2 68:24 70:2 71:19
**buses** 9:23 37:24 69:6 70:10

## c

**c** 1:7 2:7 11:16
**cable** 55:11
**calculation** 41:1
**california** 1:2,15 2:2 2:20 3:7,16 5:1 73:2
**call** 19:15,23,24 22:1 29:15,18 30:13 30:14
**called** 9:8 21:24
**calling** 27:25
**candidate** 67:9
**capabilities** 6:5,11
**capital** 10:2
**capsulated** 31:16
**car** 38:2 55:11
**careful** 49:18
**carefully** 49:12
**case** 1:7 2:7 5:23 8:17 12:11 20:19,23 22:20 24:4 28:11 35:16 41:10 42:16 43:19 53:19 63:1 73:12
**categories** 24:24 25:7

Veritext Legal Solutions
866 299-5127

category 25:3
caused 15:9
cell 23:12,13,14
certain 5:24 10:13 16:10 27:5 41:16,20 59:19 60:2 61:22
certainly 51:14,15
certainty 52:14
certified 2:22 73:1
certify 73:2,15
changed 51:17,19 51:24
circumstance 58:19
circumstances 31:4
city 1:9 2:9,19 35:3 35:17
clarification 48:15
clarify 23:17 49:19
class 49:7
classify 67:17
clear 7:3 29:21 43:6 51:21
clearly 33:17
close 68:17,25
closed 71:5
closes 31:13,23
closings 22:24 23:4
coach 9:4
coaches 9:4
collected 22:8 25:20 35:22
collecting 38:13,16
collective 49:6
collects 33:15
colored 58:2
column 25:10 39:9 39:13,18,18 40:1,5 40:9,13,19,22,24 41:2,3,5,9,12 42:3,4 42:13,18,23 43:9,9 43:14,15,16,20,21 43:22 47:12 64:10 65:11,12,19
columns 36:4 39:5 47:11,22

come 17:13 36:14
common 36:5
communicated 46:7
communicating 47:2
communication 36:19
communications 45:12
company 12:19 13:13 14:11 68:2
compare 70:13
comparison 69:6
compiled 45:19
completion 73:13
computer 27:8 35:1 35:15
concept 21:15,16
concerns 15:8
conclude 42:2
concludes 72:19
conditions 16:10
conduct 45:23 46:22
conducted 72:3,9,12 72:14
conference 15:6
confident 23:20 69:3
conjunction 63:24
connect 27:9 28:17 29:1 30:18
connected 27:17 28:8 37:25
connecting 30:22
connection 53:11
connects 29:12
consider 15:17
contact 29:16
contained 57:5
continually 8:20
contract 11:6,12,18 11:21,22,24,24 12:10,12,14,21,23 12:25 13:2,5 19:19

conversation 47:4
conversations 45:25 46:3,7,16,24 48:7
converted 24:17
conveyed 49:19
coordinate 26:17
coordinates 22:10 26:15
correct 6:23,25 7:1 7:9,11,12,14 8:6,22 9:20 10:9,15,22,25 11:1 12:6,9,13 15:1 17:6,7,10,11,12,21 17:23 19:2 21:6,7 21:12,15,20,21 22:4 24:10,11 25:22,23 27:19 28:18,19 29:2 29:22 30:3 32:2 33:8,25 34:3,4,23 35:4,13,18,19,20 37:1,2,6,8,9 38:19 39:24 40:18 41:4,24 43:13 44:7 45:21,24 46:22,23 51:20 52:3 52:4,8,9,19,20 53:14,15 55:3 56:12 57:10,14 58:22,23 59:7,8,11,15,16,21 59:22 61:14 62:4 65:10,17 66:5,9 68:3 70:2,3 71:23
correctly 12:16 21:17,22 27:15 28:6 31:25 32:3 36:23 39:17 40:20,25 61:11 62:1
correspond 61:1,2 65:20
correspondence 60:17
counsel 45:17
counter 6:5 7:10
counters 8:24 10:8 10:24 12:2,17 13:7 21:18 22:22,23

counting 16:9 64:19 70:20
counts 20:22 21:1 71:21
county 1:9 2:9,18 35:4
couple 46:4
course 11:5 35:25 36:3
court 1:1 2:1 7:3 24:4 26:22
cover 44:18,24
create 52:24
criteria 67:10
crowded 16:11
csr 1:23 73:25
csv 36:4
curious 51:3
currently 9:17 12:12 15:25 23:25 24:1
customer 31:19
cycled 63:22

**d**

darryl 1:4 2:4
data 20:12,13,15 21:17 22:6,8,13,13 22:16,20 23:23 24:1 24:3,4,7,14,15,16,19 24:21,22,24 25:3,7 25:9,11,11,14,17,19 25:24 26:19 27:4,7 27:10,15 29:22 31:16 32:7 33:6,7,8 33:14,16,16,18,19 33:22 34:5,8,9,10 34:11,13,14,17 35:7 35:8,12,17,21,22 36:1,2,7,9,10,13,14 36:17 37:4 38:13,16 38:19,22 39:9 40:4 41:18 42:2,7 44:4,5 45:16,18,19,22 46:1 46:8,9,13,20 47:8

Veritext Legal Solutions
866 299-5127

47:10,23 48:2,12,12
48:18,18,21,22
50:25 51:1,9 52:5
56:10,24 57:1,4,6
57:13 58:22 59:7
60:20,20 61:12 63:6
63:7,18,20 64:4
65:8,12 66:1,1,1
68:11,14,19 69:4,25
70:25
**date** 39:14,19,22
52:12 56:3 73:18
**dated** 45:2 73:20
**david** 18:17,24
71:13
**day** 7:20,21,21,24
7:24 26:7 32:10
35:8 39:16 40:8
44:6 61:4,4,6 62:24
69:8
**days** 69:8,9,10
**deadhead** 42:17
**deal** 19:18 48:17
**debbie** 1:23 2:22
73:24
**decertify** 49:6
**decision** 17:17,24
18:9
**declaration** 4:9 49:5
**decoded** 39:18
**defendants** 1:11
2:11 3:12 5:13,23
6:3,4,10,11
**define** 63:11
**definite** 52:14
**definitely** 42:2
**definitions** 60:15
**delivered** 9:18
**demand** 5:14
**demarcation** 62:10
**department** 13:1
**depends** 58:21
**deposition** 1:14 2:17
5:14,17,20 32:16
47:3 72:19 73:12

**depositions** 5:13
**depot** 29:10
**derived** 65:15
**describe** 16:24
25:13 30:16 66:18
67:4
**described** 28:4
47:10,11,13 53:21
57:3 65:12 66:15,16
66:19 67:5,15 69:24
70:5,18
**describes** 60:1
**describing** 21:5
66:13
**description** 4:7
**designated** 6:3,9,14
26:17 53:19
**detail** 28:14 46:11
56:22 57:3
**detects** 21:23 23:11
**determine** 22:18
23:2,7,9 24:9,17
28:11 29:20,22
59:13,14 62:24
66:25 67:10
**developed** 63:24
**device** 21:22 22:2
**dh** 42:16
**diff** 40:25
**difference** 26:3 41:1
65:2,9
**differences** 20:8
**different** 9:5,8 16:9
36:4 42:16 43:3
47:11 48:1,3 61:4
63:23 65:22 66:7
68:23 70:20,21
**direct** 30:17
**direction** 41:9,12,14
73:9
**directly** 12:7
**disclosed** 5:22
**discuss** 45:6
**discussed** 46:18,20

**district** 1:1,2 2:1,2
**division** 4:12 13:3,8
17:25 27:18 28:5,21
28:25 29:2,13 30:19
30:23 31:2,6 34:14
35:6 36:18,25 37:4
39:2 42:1,12 49:24
53:4 54:4,11,16,19
54:22 55:2,5,8,11
55:14 56:15,16 57:7
58:9,18,20 59:1,3
59:15,17,18,21
61:22,25 62:8 63:5
63:16 67:2 72:7,18
**divisions** 44:7 57:13
58:3 59:10 72:5
**document** 5:11,12
5:15 33:2 39:8
43:21 44:17,21,23
49:4,8,12,16,20,21
49:22,25 50:11,17
50:20,24 51:8 52:2
52:17,22,25 53:23
56:14 57:6,8 64:9
66:15,21 72:1
**documentation**
52:15
**documents** 5:19
**doing** 69:13 70:4
**door** 20:21 21:6,9
22:10,24 25:20,21
26:2 27:24 28:1,7
28:17,20,24 29:1,12
30:18 31:1,5,12,13
31:13,17,22,23,23
56:8,11,23 58:17
59:1,20 60:3 72:5
**doors** 56:19 59:17
60:9,10 68:17,25
71:4,19 72:16
**doorway** 16:25 17:9
**doorways** 16:15,16
16:17,20,21,22
**dot** 58:8

**dots** 58:2
**doubting** 52:10
**draft** 50:7,10
**drafted** 49:16,17,25
**drafting** 50:17,23
51:6 52:22
**draw** 59:23
**drogin** 44:25

**e** 11:16 44:19 45:1
**earlier** 30:24 58:16
66:13 67:21 68:22
**early** 69:19,19 70:10
70:24 71:16
**east** 55:14
**effective** 39:14
**either** 17:1 18:23
20:19,21 27:18 28:5
28:8 29:1 31:5
41:14,23 45:14
**electrical** 38:7
**electrically** 37:24
**embedded** 23:10
**employee** 73:16
**engine** 38:3
**engineering** 38:7
**ensures** 34:11
**ensuring** 71:20
**entered** 56:19
**entering** 20:22 21:2
**enters** 20:21 21:1
**entire** 35:1 63:16,18
64:4
**entitled** 5:12 40:13
40:19,24 41:2,3,5,9
41:12 42:3,13,18,23
43:15,21 49:5,23
53:17 64:11 65:11
**entry** 65:9
**eol** 64:12,13,13,15
64:17,21,23,25 65:1
65:5,8,9
**equipment** 11:23
12:4,5,7,15 14:10

15:25 16:2 69:22
**erroneous** 33:16
**esquire** 3:4,5,14
**essentially** 21:8
45:19
**estimating** 4:10
49:23 53:3
**evaluate** 63:4 69:21
70:19
**evaluation** 67:10
**event** 25:20 30:18
**exact** 26:1 28:10,13
28:23 48:7
**exactly** 30:25 31:2
58:21 59:6,12,24
**examination** 4:2 5:7
**examined** 5:5
**example** 21:8 38:2
38:18,21 39:4,8
57:1 60:18 62:20
64:16 65:6
**excel** 4:8 38:25
**exclusively** 24:4
**exercise** 71:22
**exhibit** 4:8,9,10,13
4:14,15,16,17,18,19
4:20,21 5:12 32:23
33:3 38:18,24 39:8
43:20 44:18,24 45:3
45:10,15 49:5,10,16
49:22 50:4,10,14,17
50:20,23 52:2,22,24
53:17,25 54:10,10
54:15,18,21 55:1,4
55:7,10,13,17,18,19
55:22 56:1,7,14
57:9,21,25 58:6
60:13,14 62:17
64:10,18 66:15
71:25 72:1
**exhibits** 4:6 54:13
**existing** 9:10,11
**exists** 63:18
**exiting** 21:2

**exits** 20:21
**experience** 60:9
**expert** 36:19 38:6
44:19,25 53:19
**experts** 5:13
**explain** 20:9 53:20
67:14
**explained** 46:8,9
47:21 53:25
**explanation** 65:21
66:8

## f

**fact** 6:10 23:18 28:3
37:3
**fair** 6:19 7:6,16 8:1
10:6,23 24:3 41:23
43:8,12 48:4,6 50:9
52:17 57:2,11 66:7
**familiar** 44:12
**far** 65:25 71:1,24
**fed** 34:9
**federal** 63:24 73:12
**feet** 26:9,14,16 27:5
**fence** 59:12,19,24
60:1,3
**fi** 36:19
**field** 33:17 37:10
**file** 4:8 39:1 52:12
**files** 24:17,22 25:12
36:2,3,4,5
**fillmore** 41:8
**filtering** 33:13
**filters** 33:6,25
**final** 50:14
**finalized** 50:19
**financially** 73:15
**fine** 32:20
**finish** 7:4 51:22
**finished** 50:23
**firm** 3:3 18:24
**first** 38:25 50:16
53:22 54:9 55:16
56:2 60:14 64:17,18
66:16

**five** 54:5 57:24 68:6
**fixed** 62:13,14
**fleet** 7:15,17 8:15,20
9:16 37:23 40:16
**fleissig** 45:2
**flip** 10:16
**flowing** 47:5
**flyer** 9:4,9,15,22
11:23,24 12:21,22
12:23 13:5,6,9,12
13:14
**flyers** 9:9
**flynn** 55:8
**following** 27:21
**follows** 5:6
**foregoing** 73:3,5,9
73:11
**form** 20:24
**formal** 47:3
**format** 24:20
**forth** 73:4
**four** 11:11 15:3
67:15
**frame** 8:3,23 52:11
52:18
**francisco** 1:8,9,15
2:8,9,18,20 5:1 35:4
35:10
**free** 47:5
**front** 25:9 44:24
**function** 22:22
**functional** 69:25
**furst** 44:13,14,19
45:1,13,23,25 46:7
46:9,16,19 47:2,8
47:18,22 48:3,8
49:2 57:13 62:16
68:12
**furst's** 55:18 56:1
57:9
**further** 42:1 73:9,11
73:15

## g

**g** 3:4 14:1
**garage** 21:9 41:11
42:12 43:19 56:19
56:21 60:10 63:1
64:21,22 65:3
**gate** 37:1,4
**geary** 41:7
**general** 33:5 37:18
53:10 72:2,15
**generally** 20:7 23:8
46:18
**generate** 31:15
**generated** 21:18
22:7 25:22 26:12,13
26:15 39:4 45:20
71:3
**generating** 70:14
**geo** 22:23 23:3,7,9
23:11,22,23 58:19
59:2,12,14,19,24
60:1,3,3
**geographic** 58:25
59:20 60:2
**geographically**
67:24
**getting** 22:7 38:13
**give** 58:13
**given** 22:6 25:14,24
33:22 43:1,12 50:25
51:24 52:5 53:18
63:6 66:8
**giving** 65:18
**go** 11:4 17:16,18,20
36:6 37:19 39:7
**goes** 7:20 60:18
**going** 7:4 20:14
25:11 28:25 61:5
62:16
**good** 5:9,10
**gps** 22:9,10 26:15,17
26:20 27:9
**grandberry** 1:4 2:4

Veritext Legal Solutions
866 299-5127

**granularity** 27:3
**green** 55:5
**griffin** 1:4 2:4
**group** 18:1,2,5,7,9
  67:18
**grouping** 25:17

**h**

**h** 11:16 14:1,1,3,3
**halfway** 27:23
**handle** 30:25 31:3
**happens** 29:16
  31:11 33:24 36:21
  36:22 37:10,14
**hardware** 35:1
**harrison** 18:21
  71:13
**head** 17:6 20:25
  21:1 27:20
**headed** 40:1,5,9
**header** 64:19
**heading** 39:10
**headlights** 38:4
**hedy** 1:4 2:4
**help** 33:23 61:8
**holtzman** 3:13
**hours** 69:7 71:14
**huh** 50:1
**hypothetical** 63:10
  65:18,24
**hypothetically** 51:6

**i**

**idea** 15:5 46:4
**identical** 60:16
**identification** 32:24
  49:11 50:5 54:14
  58:7
**identify** 6:22 7:7
  58:25 61:8
**image** 20:25
**immediately** 64:22
**important** 7:2 23:15
  37:22 51:22
**inappropriate** 33:7

**inbound** 41:14,16
  41:20,23
**include** 32:10
**includes** 51:8 52:5
  64:21
**including** 6:7,12
**incomplete** 63:9
  65:23
**index** 4:1
**indicate** 39:14 40:2
  40:6,10,14 41:6,13
  41:16 42:14 43:10
  43:16,25 44:1 51:12
  54:3 59:24
**indicated** 30:5 40:22
  41:3 42:22
**indicates** 26:20
  41:20,21 42:9 56:10
  57:6
**indicating** 26:6,9
  44:4
**indication** 54:1
**individual** 14:5,11
  20:14 26:19 36:2
  42:15,15 62:12
  67:21
**individuals** 19:3
  31:14,22,24
**information** 25:1,25
  45:13 46:22 47:4,7
  47:9,17 48:2 51:8
  57:17 62:4 63:2
  65:15
**infrared** 20:23,24
**initial** 50:6,10 55:17
  56:1
**ins** 4:12 49:24 53:4
**inside** 23:12
**instance** 16:6 64:17
  65:5 66:8,11
**intend** 6:16,22 7:8
**interact** 13:9
**interacting** 13:6
**interested** 73:16

**interpret** 47:23
**investigate** 66:10
**involved** 17:17,24
  18:11,15,20 49:3
**iris** 9:25 10:8,13,17
  11:21,22 12:2,3,17
  12:18 13:7,13,17
  14:12,14,19,22,23
  15:10,17,23 16:4,13
  16:14,14 17:5,20
  18:10 19:21,24 20:4
  20:8,23 22:3,20,21
  22:22,23 23:3,5,8
  23:21,23,25 24:2
  69:14,16 70:21
**issue** 72:10,13
**issues** 15:8

**j**

**j** 11:16
**january** 51:1,10
**jason** 1:14 2:17 4:3
  4:9 5:4 49:5
**jby** 3:10
**job** 1:24
**joel** 3:5
**julie** 11:14,18 12:10
**july** 1:16 2:21 5:1
  8:4,11,16,17,20,23
  10:7 37:7 39:22
  63:16 64:4 73:20
**june** 45:2

**k**

**k** 11:16 14:1,3
**kahiha** 13:24 19:24
  67:22,23
**kahiha's** 14:14
**keep** 21:18
**keeping** 63:21 70:1
**kevin** 3:14
**key** 39:11,14 42:18
  43:9
**kind** 23:4 27:9
  28:17 43:10 44:3
  47:3 48:11 71:7

**kirkland** 54:11
  56:15,16,19,21 58:9
  59:1,3 63:1 64:21
  64:22
**kirschbaum** 11:14
  11:19 12:10
**kmclaughlin** 3:18
**knew** 71:4
**know** 7:4,4,22 9:18
  12:24 13:4,5 14:18
  18:23 19:10,14,18
  19:22 21:25 22:6
  23:6,18 25:6 27:6
  28:10,13,14,15,23
  29:3,4,6,6,8,14
  31:16 32:6,7 33:11
  33:16 34:25 37:12
  37:20 38:6,11,12,14
  41:17 42:8 43:3
  46:5 47:10 49:17
  50:19 51:15,15 52:1
  52:13 59:5,12,25
  61:17,18,24 62:22
  62:22 63:2 67:24
**knowledge** 19:4
  24:20 25:11 30:17
  30:21,22 31:6 44:2
  46:10 47:16 48:11
  48:21 49:15 68:12
  72:3,12,14

**l**

**l** 11:16 43:21,21
**labeled** 55:19,23
  62:18
**laid** 66:14
**late** 69:19 70:10,23
  71:16
**latest** 15:15
**latitude** 25:2,25
  26:1,2,20 27:4
**law** 3:3 18:24
**lawsuit** 36:9 39:1
  44:5,13,15 53:14

**layperson** 51:5,11
53:20
**layperson's** 66:13
66:18 67:4
**learn** 17:13
**leaves** 21:1
**leaving** 20:22
**lee** 1:14 2:17 4:3,9
5:4,9 32:11 49:6
50:9 54:9
**left** 17:1 21:6 39:9
42:23
**legend** 57:23
**letters** 10:2 45:1
64:12,13,17
**level** 27:3 28:14 32:7
46:11 56:22 57:3
**light** 28:3
**likewise** 28:20
**line** 41:5,11 42:11
56:7 64:15
**lines** 42:15 64:18
**listed** 5:15 65:19
**litigation** 53:11
**little** 47:4
**lives** 67:25,25
**locate** 58:19 59:2
**located** 16:13 17:6,8
34:24 35:3,13 58:8
**locates** 60:3
**location** 6:6,12 16:9
22:18 23:1,7,9,11
23:13,22,23 24:10
29:8,22 30:3,6 40:3
40:21 47:12 58:9
59:14 61:22 71:1
**locations** 22:23 23:3
58:2 71:18
**long** 14:4
**longer** 12:5 18:22
**longitude** 25:2,25
26:1,2,21 27:4
**look** 16:3 32:16
35:25 36:3 54:9
55:16 63:20 64:3,16

**looked** 36:9 48:14
48:17 71:2
**looking** 15:14 31:17
31:18 32:13 36:6
56:14 58:1,8 68:24
**lot** 60:6
**lower** 8:5

## m

**m** 11:16
**machine** 73:7
**madam** 26:22
**main** 25:5
**maintenance** 12:14
**making** 18:12 49:18
**manage** 11:6
**managed** 11:18
12:10
**manager** 51:18
**manages** 11:12,21
12:23,24 13:1,4
**manner** 23:24
**manufactured** 10:8
12:17,21
**manufacturer** 9:1,2
9:22,24 10:3 12:1
**manufacturers** 10:8
10:11,21,24
**map** 4:21 57:20,21
58:1,9 60:6
**marked** 5:11 32:23
33:2 44:18,24 49:4
49:10,21 50:4 54:14
57:21 58:6 64:10
**market** 2:19
**mary** 44:13,14,19
45:1,12,23 55:18
56:1 62:16 68:12
**match** 60:20,22 61:8
61:12 62:8 67:19
69:3 71:5
**matched** 22:25
**matching** 69:1
**matter** 35:25 36:3

**mclaughlin** 3:14 8:7
11:3 14:20 15:11,19
16:7 17:15 19:6
20:18 21:13 22:15
29:23 30:8 33:9
35:24 36:11 37:16
38:5,20 44:8 46:14
47:19 48:5,13 53:23
57:15 60:24 62:5
63:9,19 64:6 65:23
66:21 67:7,16 68:8
68:15 72:8
**mean** 9:11 10:13,20
16:24 19:12 27:4
30:12,15 33:11 38:1
48:15 63:12
**meaning** 42:17
**meanings** 39:5
**means** 24:14 64:15
65:13
**meant** 46:8,10,20
47:11,13,14,22
**measure** 20:12
**measures** 20:13
**mechanics** 38:7
**member** 27:25
**memo** 50:14 60:13
**mental** 51:25
**mentioned** 15:2
67:21 68:22 71:14
**merged** 48:21
**merging** 48:11
**methodology** 4:10
49:23 53:18,21,22
66:14,16,17,19,24
67:5,15
**metro** 55:14
**middle** 51:16
**military** 56:12
**mind** 30:11 48:1
63:21
**minute** 54:5 68:6
**missing** 33:17
**misspoke** 34:2

**misstates** 29:23
**mix** 67:19
**modern** 15:20 16:3
**monday** 26:5,12
**month** 70:6,9 71:16
**months** 51:7
**motion** 49:6
**motor** 9:4
**mounted** 16:9,15,18
16:19
**move** 31:13,23
**moving** 31:22
**mta** 19:7 48:23
**multiple** 69:9
**muni** 55:14
**municipal** 1:8 2:8

## n

**n** 14:1 43:21
**name** 9:7,23 11:15
11:16 14:2,16 27:12
40:1,12,22 43:18
64:11,21 67:22
73:19
**names** 14:18 18:15
**necessarily** 60:17
61:5
**necessary** 45:6
60:21
**need** 32:17,18 62:3
63:2 66:10
**needed** 46:22
**neither** 73:15
**never** 30:11
**new** 9:4,9,9,15,15,22
9:23 11:23,24 12:15
12:21,22,23 13:5,6
13:9,12,14 17:18
68:24 69:22
**nextbus** 6:4 48:17
**nguvi** 13:24 14:13
14:22 19:24 67:22
67:23
**nine** 64:18

Veritext Legal Solutions
866 299-5127

**normally** 30:14
**northern** 1:2 2:2
**noted** 72:22
**notes** 70:12
**notice** 5:13,17,20
**november** 51:1,4,9
52:6,7,19
**number** 4:7 7:21,22
9:18 21:19,23 27:5
31:25 32:4 37:13
39:12,15,18,23 40:7
40:15,17 41:16,20
42:3,5,7,20,24
43:10,17 54:2 60:21
60:22 61:4,6,7,7,12
61:13,14,15,16,18
61:19,20,23 62:2,3
62:6,7,13,13,14,19
62:21,21,23 64:20
65:4 66:17,20 67:6
67:8,15 68:4 70:1
**numbers** 43:1,12
47:13,13 60:16,16
61:1,2

**o**

**oath** 5:5 23:16 73:6
**object** 21:11
**objection** 8:7 11:3
14:20 15:11,19 16:7
17:15 19:6 20:18
21:13 22:15 29:23
30:8 33:9 35:24
36:11 37:16 38:5,20
44:8 46:14 47:19
48:5,13 53:23 57:15
60:24 62:5 63:9
64:6 65:23 66:21
68:15 72:8
**objections** 63:19
67:7,16
**obtain** 19:23
**obtaining** 12:2 64:4
**obviously** 14:22
47:1 51:8 56:25

**occur** 36:17 37:5
**occurs** 29:4 30:19
33:13 34:8,13 35:7
**offer** 6:16,22 7:8
**offhand** 9:19 68:5
**office** 2:19 68:2
**okay** 20:11 51:14
55:20 68:8,22
**old** 16:2 69:23
**once** 24:16
**ones** 25:5
**open** 57:20,22 59:17
60:9,10 68:17,25
72:5,16
**opened** 26:2 56:11
56:19,23 71:5
**opening** 25:20 28:6
28:17,24 29:1,12
30:18 31:5 56:8
59:1,20 60:2 71:19
**openings** 22:24 23:4
**opens** 22:10 25:21
27:24 28:2,20 31:1
31:12,14,17,22,24
58:17
**operate** 61:5
**operated** 35:9
**operation** 53:12
**operator** 6:6,12
27:24 36:24 37:12
58:17 59:2 61:2,8
61:12,16,19,23,24
62:3,7,8 63:5,7,15
**operators** 48:16
53:12 60:9 72:4,15
**opinion** 64:7 65:7
**opinions** 6:16,22 7:8
**opposed** 64:3
**order** 11:25 60:19
60:22 61:11 63:4
**original** 73:12
**outbound** 41:15,21
41:24
**output** 71:21

**outside** 27:25 49:1
60:10
**overbroad** 20:18
**overhead** 20:24
**overlap** 10:11,12,19
10:24
**overly** 47:19
**owned** 35:9

**p**

**p** 3:14 18:17,17
43:21
**p.m.** 2:20,21 5:2
72:22
**package** 27:14,17
**packet** 25:14,15
**page** 5:15 44:19
49:22 53:16 55:18
55:22,23,23,23,25
56:2 60:12,14 62:16
62:17,18,19 64:18
66:15
**pages** 1:25 4:7 38:25
**painted** 62:14
**papas** 18:17
**pappas** 71:13
**paragraph** 53:21
66:16,20
**part** 18:2 27:13
44:14 70:16,23
71:15
**participate** 52:21
71:11
**particular** 13:1
19:17,23 22:13 26:3
26:6 27:10 28:5
29:3 40:8,12 42:6
62:20,24 69:8
**parties** 73:17
**pass** 17:11
**passenger** 6:5 7:10
16:8 27:25
**passenger's** 17:6
**passengers** 17:11
21:19,23 22:7,11

31:25 70:1
**passing** 16:25 17:1
**pattern** 42:13
**patterns** 42:16
**pen** 58:13 59:24
**people** 13:8 17:25
18:11,15,19 20:13
31:7,12 42:11
**percent** 7:15,17,19
8:6,14,19 63:22
**percentage** 8:1,4,12
**perform** 30:7
**performance** 4:11
18:2,4,7,9,13 49:23
51:18 53:3
**performed** 44:2
68:13
**performs** 22:22
28:16
**period** 10:7 63:6,8
63:12,16,18 64:3,5
69:12 70:5,6,9
71:16
**person** 5:23 12:24
15:6 18:6,14,18,21
20:21,22,25 21:2
49:17
**person's** 20:25 21:1
**pertain** 42:10
**pertains** 73:11
**phone** 23:12,13,14
32:13,16 68:4
**photograph** 4:13,14
4:15,16,17,18,19,20
**physically** 33:23
34:24,25
**pieces** 41:18 48:16
63:2
**pin** 52:6
**pkey** 39:10 42:23
43:9 64:19
**place** 10:16,18 73:4
**placed** 73:6
**plaintiffs** 1:6 2:6,18
3:2 5:12,13 32:23

33:2 44:18,24 49:5
49:10,22 50:4,10,13
52:2,22,24 53:17
54:13 57:21 58:6
64:10,18 66:14
**plan** 63:23
**play** 45:9
**played** 18:9
**please** 8:8 20:9
44:10 45:7 53:16,18
54:6 55:16,17,21,25
57:20 60:12 63:11
68:7 71:25
**point** 6:19,21,24,25
7:7 9:14 10:14 12:1
12:3 27:21,22 28:20
38:17 42:1 51:12,25
52:2 58:17 65:7
67:2,11,15 69:11,22
71:24
**points** 4:12 8:3
49:24 53:4 67:9,18
72:6
**portion** 37:23
**posed** 30:24
**position** 14:14
**positions** 51:17,19
51:24
**possible** 36:1 58:15
58:24 59:4,23 60:22
**potrero** 54:16
**power** 38:1
**powered** 37:20,24
38:14
**practice** 72:15
**precise** 16:6 49:19
**prefer** 64:2
**preparation** 45:9
**prepare** 45:14 50:6
**prepared** 6:21 44:13
45:16,18 48:11 50:9
51:12 52:1,7,18
**present** 8:4,21,23
10:7,10 37:8 39:23

**presented** 56:25
**presidio** 54:19,22,23
**pretty** 69:3
**previously** 44:17
**primarily** 16:19
**primary** 18:6,17
30:4 39:11
**printed** 62:22
**printout** 4:8 38:25
39:3
**prior** 8:3 9:11,13
11:18 51:18 67:1,11
72:16,16 73:5
**probably** 11:14 14:6
31:7 48:6 52:9
**proceedings** 73:3,5
73:7,13
**process** 22:25 34:8
49:3
**processed** 22:17
24:8,15,16 32:7,9
33:19,19 34:18
35:23 36:1,7,10,14
38:18,22 39:9 40:3
44:3 45:19 51:10
68:11 70:25
**processes** 34:10
35:12 58:22
**processing** 33:24
**procurement** 13:15
**produced** 9:2 39:1
**produces** 47:10
**producing** 5:19
**product** 15:7 30:1
**production** 5:14
**program** 27:8
**prompted** 53:8,14
**prompts** 36:16 37:4
**proportion** 7:20
**proprietary** 28:9,12
28:23 29:13 30:25
33:20 34:12 35:23
45:20 58:21 59:6
**provide** 46:10 47:18
57:3 60:18

**provided** 22:17,21
23:5 24:9,22 45:13
45:22 46:11 47:7,9
47:17 48:2,3 68:12
**provides** 27:11
34:10
**public** 27:25
**publiclawgroup.c...**
3:18
**pull** 4:12 43:24 44:1
44:1 49:24 53:4
54:4 65:16,20 67:1
67:12,18
**pulled** 61:25 62:25
63:1,5,15
**pullin** 43:21
**pulling** 36:25 37:3
41:25 42:11 65:3
72:4,7
**pulls** 26:6,8 34:7,14
35:6 36:18,21,23
59:16
**purchase** 12:17
**purchased** 11:23
12:7,18,20 30:1
**purchasing** 10:13
10:14,16,17,21 12:3
12:5,15
**purpose** 30:4,6
66:23 67:5,14 69:20
69:21,25 70:19
**pursuant** 5:17
**put** 60:6 63:3
**putting** 52:13

**q**

**question** 7:4 8:9
19:13,21 27:6 28:1
30:11,13,24 33:5,10
33:24 44:9 47:20
49:15 51:22 53:1,2
53:5,7,9 58:14,24
59:9 60:19 65:14
70:8 72:2

**questions** 20:6,10
45:5,7 46:12,24,25
46:25 47:15 53:10
53:13

**r**

**r** 10:1 11:16
**range** 7:24 65:16,20
**raw** 22:13,16 24:7
24:14,15,19,22
26:19 27:7,15 31:16
32:6 34:8,10 35:8
35:21 36:2,9 58:22
59:6
**razavi** 1:23 2:22
73:24
**reaches** 61:21
**read** 26:22,24
**reading** 32:12
**really** 26:4
**reason** 27:22,24
28:1 37:11 48:25
51:4 52:10 64:2
65:19 66:7
**reasonably** 23:20
**reasons** 37:13
**rebuttal** 44:25
**recall** 15:5 18:19
25:10 46:15,18,23
47:7 48:7 50:16
58:16 69:11 70:17
**receive** 25:12 33:19
**received** 24:14,19
**receives** 24:21 32:9
**receiving** 24:1
**recess** 32:22 54:7
68:9
**recognize** 54:10,15
54:18,21 55:1,4,7
55:10,13
**recollection** 46:6
**recommend** 61:13
63:6,17
**recommendation**
18:13

Veritext Legal Solutions
866 299-5127

**recommendations** 18:1
**record** 7:3 22:23 25:16,19,19,21,24 26:11,13,24 27:17 28:4 31:15 32:5 33:18 39:12 42:21 42:24 43:1,7,11,12 43:23 51:21 54:3 56:3,6,18 59:17,21 73:7
**recorded** 22:10
**recording** 69:1
**records** 23:3 26:14 26:18,19 31:15 42:10 54:1 57:5 64:11 66:24 71:7
**refer** 22:3 39:19 71:25
**reference** 42:18 43:9 51:25
**referencing** 44:16 68:18
**referring** 24:13 57:8
**refers** 22:2 42:5 64:14
**refined** 34:11
**reflect** 26:1 40:20 42:4
**reflected** 26:18 42:8 56:7
**reflecting** 26:15
**reflects** 41:23 56:7
**regarding** 5:24 6:4
**regards** 13:10,10,15 16:8 68:16
**regularly** 14:6,8
**relative** 73:16
**reliable** 15:21,24
**relief** 4:11 49:24 53:4 67:2,11,18
**remember** 37:22 71:24
**remove** 33:7

**removed** 33:18
**renne** 3:13
**rep** 14:15
**repeat** 8:8 43:6 44:9
**report** 32:7,9 44:12 44:13,15,19,25,25 45:3 55:17,18 56:1 57:9 62:17
**reported** 1:22 69:2
**reporter** 2:22 7:3 26:22 73:2
**reporting** 70:25
**reports** 34:10 45:6 45:10,15 65:16,21 71:2
**represent** 38:24 42:19 43:22 57:25 65:3
**representatives** 19:10
**represented** 32:6
**represents** 43:23,24
**required** 73:14
**resides** 35:14
**respect** 7:10 13:7 17:5 21:4 24:7,19 30:12 33:6 57:12
**response** 5:20 46:12
**responsibility** 13:6
**responsible** 18:6
**retrieve** 36:1
**revenue** 7:20 27:10 27:18 28:21,25 29:1 29:7,9,12 30:19,23 31:2,5,12 37:11 43:17 58:18,20 66:25 67:1,11 70:13 71:19 72:6,17
**review** 49:12 73:13
**reviewing** 64:4
**revised** 50:13
**richard** 44:25
**ride** 69:5
**ridership** 20:13 23:2 24:18 29:20 30:1

31:18,19 70:20 71:21
**riding** 71:4
**right** 11:25 17:1 21:6 26:8 32:14 39:7 43:20 57:23 58:10 60:4,5
**ripley's** 58:10
**rode** 69:7 70:10
**role** 18:9 45:9
**room** 2:19 26:7,10
**route** 22:18 23:1 24:10 29:7 41:7
**routes** 42:15 63:23
**row** 56:2,10 57:1 64:21,22,25,25 65:15
**rows** 57:24
**rpr** 1:23 73:24
**rubber** 7:15,17 8:14 8:20
**run** 42:3,5,7 47:13 54:2 60:16,21 61:1 61:7,13,15,16,18,19 61:20,22 62:2,6,21 65:4
**runs** 6:7,12 21:9 72:4

**s**

**s** 10:1 11:16 18:17
**sakai** 3:13
**sales** 14:15
**salesperson** 14:22
**sample** 50:25 51:9 52:5 63:23
**san** 1:8,9,15 2:8,9,18 2:20 5:1 35:4,10
**saying** 19:12 34:21 52:14
**says** 44:19,25 51:10 64:22 65:8
**scenario** 28:6 31:21
**sch** 40:9 41:2 65:11 65:19

**sched** 40:25
**schedule** 66:1
**scheduled** 40:11 65:15
**second** 53:16 66:19
**seconds** 41:4
**section** 53:17 60:15 66:17
**see** 5:15 41:17 52:15 55:22 56:4 58:4,10
**seeing** 25:9 42:1
**seen** 44:21 45:3 60:9
**sell** 15:7
**sense** 21:10 36:5
**sensor** 16:14 20:24 21:24 22:1,4,5 23:11,21,21,23 32:4 37:15 38:13
**sensors** 16:18,19 17:3,4,5 20:20 21:5 23:25 24:2,5,8,20 24:25 25:1,4 27:2,8 27:16 31:11 34:1,3 34:5 35:22
**sentence** 60:15
**separated** 36:5
**separately** 45:7
**server** 34:17,19,21 34:22,24 35:3,9,13
**service** 7:20 29:7 42:17
**set** 73:4
**setting** 72:1
**seven** 41:23 57:24 69:23
**seventh** 3:15
**sfmta** 7:13,16 8:24 9:15 10:4,7,20 12:7 12:17 13:5 15:8,9 20:15 21:17 22:2,6 22:12 23:24 24:15 24:21,25 25:4 26:1 27:8 29:21,25 30:5 32:4,9 34:22 35:9 35:21 36:9 44:5

Veritext Legal Solutions
866 299-5127

48:10 49:1 51:24
53:18 58:3 59:10
62:13 63:24 70:1
72:5,9,13
**sfmta's** 8:4,12 35:13
35:14 40:16
**sfo** 19:1
**sgt** 3:9
**shattuck** 3:6
**shorthand** 2:22 73:1
73:8
**showing** 5:11 44:17
44:23 49:4,21
**side** 16:20 20:21
21:6 26:7,10 57:22
57:23,23 62:14
**sides** 16:23 57:22
58:1
**signature** 73:23
**signed** 49:8,13
**significant** 65:8
**similarly** 1:5 2:5
67:4,14
**simply** 41:1 59:5
**simultaneously**
10:20
**single** 25:10 32:5
61:6
**sitting** 6:15 26:8
47:6
**situated** 1:5 2:5
**situation** 29:3,5,6,9
29:17,19 31:1
**sloan** 3:13
**software** 22:17,21
23:5 24:9 27:9,11
27:12,17 28:10,12
28:16,23,25 29:11
29:25 30:18,25 31:3
31:7,9 34:9 35:12
35:14,23 45:20
58:22 59:6
**sorry** 32:14 34:2
**sorted** 39:1

**space** 60:7
**speak** 14:4 39:19
**speaking** 51:5
**speaks** 53:24 66:21
**specific** 6:16,22 7:8
9:18 12:24 16:4
26:21 29:19 39:19
43:18 44:15 46:15
46:23 49:17 52:12
52:15 56:23 58:25
61:2,3 64:3 66:10
72:10
**specifically** 11:12
13:9 24:23 31:3
33:24 53:6 55:21
56:10 62:17 70:11
**specifics** 23:6 29:14
**speculate** 28:22
38:10 52:16
**speculating** 23:19
25:8
**speculation** 15:11
23:16 30:8 36:11
57:15 60:25
**spell** 11:15 13:25
14:2
**spelled** 10:1
**spoke** 15:2,5
**spoken** 11:2,6,10
13:12,14,16,23 14:6
14:8
**stamp** 52:12
**stamps** 47:12
**start** 51:15 68:21
70:7
**started** 50:17,23
51:2,3,6
**starts** 60:15
**state** 7:6 35:17 73:2
**statement** 57:11
**states** 1:1 2:1
**step** 53:22 67:6,8
**steps** 70:24
**steven** 3:4

**stitt** 1:4 2:4
**stop** 22:7,18 23:1,2
24:10,18 25:2,14,18
26:3,6,17,21 27:10
27:18,21,22,23 28:2
28:3,5,7,7,8,8,11,16
28:16,18,18,21,25
29:2,8,10,12 30:19
30:23 31:2,5,12,18
31:18,19,19,20
37:11,14,18 40:1,3
40:12,19,22 41:3
43:15,17,18,19
47:11 54:2 58:18,20
64:11,21 65:4 66:25
67:1,11 72:6,17
**stopped** 10:13,17
57:7,7
**stops** 20:14 21:20
22:14 26:5,9,12,14
28:15 37:25 70:13
71:4,19,21
**street** 2:19 3:15
**strike** 6:20 8:2 14:17
30:11 34:19 43:14
44:4
**study** 68:13 72:4,10
72:12,15
**subject** 6:15
**subjects** 5:25
**submitted** 45:16
**subscribed** 73:18
**substantively** 48:1
**sufficient** 62:2
**suite** 3:6,15
**support** 49:6
**supposed** 40:11
**sure** 11:5,25 19:10
39:6 41:24 43:11
44:15 46:24 51:14
58:21
**switch** 15:9 18:10
**system** 9:5,10,12,13
9:15,23 22:12 33:15
35:15 36:14 69:2

70:14 71:3
**systems** 6:5,6 7:13
7:16 8:5,13 9:8 10:3
36:20 37:18,20
70:21,22

**t**

**table** 51:10 60:7
**take** 32:17,18,20
33:20,21 54:5 61:17
68:6 70:12,24
**taken** 2:17 32:22
54:7 68:9 73:3
**takes** 22:13 60:6
**talk** 43:5
**talking** 29:19
**technical** 21:25
25:13
**technological** 19:13
19:21 33:15
**technology** 13:13,17
14:9,19,22,23 15:9
15:10,13,15,17,18
15:23,24 16:3,5,5
16:13,14 17:14,18
17:20,22 18:1,2,4,7
18:8,10,12,13 19:5
19:14,21 20:1,4,7
20:10,24 21:4 23:14
29:13 68:24 69:13
69:14,15,16,16,22
**tell** 7:19,23,25 8:11
11:9 23:8,13 24:23
27:2 39:4 50:22
56:16,22 58:15
61:21 62:19 64:13
64:24
**term** 21:25 25:13,15
60:1,1
**terms** 18:12 36:7
66:14,19 67:5 68:18
**testified** 5:6
**testify** 5:24 6:3,10
6:15 28:14

Veritext Legal Solutions
866 299-5127

**testifying** 5:16 23:16
  73:6
**testimony** 29:24
**testing** 18:11,16,20
  68:23 69:17,18,20
  69:21 70:17,19,23
  71:8,11,15
**tests** 70:4
**text** 24:22
**thank** 72:20,21
**thereof** 73:10
**thing** 23:15
**things** 37:19 51:11
**think** 11:20 38:16
  47:21 48:6 53:10
  65:2 69:11
**three** 11:11 15:3
  46:4 49:22 51:7
  60:12 67:6,8
**threshold** 21:1
**thursday** 1:16 2:21
  5:1
**tidrick** 3:3,4 4:5 5:8
  8:10 11:8 14:24
  15:16,22 16:12
  17:19 19:8 21:3,14
  22:19 27:1 30:2,10
  32:17,20 33:1,12
  36:15 38:9,23 44:11
  46:17 47:24 48:9,19
  54:5,8 57:19 61:10
  62:9 63:13 64:1,8
  66:3 67:3,13,20
  68:6,10,20 72:11,19
**tidricklaw.com** 3:9
  3:10
**tied** 28:4
**time** 4:11 6:19,21,24
  6:25 7:7 8:3,3,23
  9:14 10:6,14 11:10
  12:1 22:11 25:2,21
  32:10 34:18 40:9,11
  40:19,20,25 41:2,3
  42:6 47:12 49:23
  50:13 51:25 52:10

52:18 53:3 56:12,17
  63:6,8,12,18 64:3,5
  65:11,19,19 70:12
  72:22 73:4
**times** 44:6 63:4,15
  65:16,20 67:19 69:1
  69:2,5 71:18
**timing** 68:16
**tire** 7:15,17 8:14,20
**titled** 39:13 65:19
**today** 5:16,19 6:15
  46:12 47:6,9,17
  48:2
**tony** 1:4 2:4
**top** 17:8 64:19
**total** 18:20
**track** 6:6,11 21:18
  23:22 29:25 30:3
  31:3 70:1
**tracker** 22:9 26:20
**tracking** 30:6
**tracks** 22:13 31:4,4
**transcribed** 73:8
**transcript** 73:12,14
**transcription** 73:10
**transfer** 34:13 35:7
  36:17 37:5
**transit** 7:13 8:5,12
  8:24 10:4 13:3,8
  17:25 21:23 22:2
  28:2 31:21 33:25
  34:1,3,15 35:6,9
  36:17 37:10 38:7
  44:6 56:8,11 63:5
  63:25 72:6
**translates** 59:6
**transmitted** 20:20
  23:24 24:24 25:4,25
  27:7,16 32:4 34:5
  34:15 35:8,17
**transportation** 1:9
  2:9 10:5
**trapeze** 66:1
**traveling** 29:9

**trial** 5:24 6:3,17,23
  7:8
**trier** 6:10
**trolly** 9:4 37:24
**true** 37:7
**try** 16:23
**trying** 15:7 27:20
**tuesday** 26:13
**turn** 38:3,3 53:16
  55:17,21,25 60:12
**turned** 38:12
**turning** 37:14,17
  64:9
**turns** 37:12
**turquoise** 58:2
**two** 10:8,11,24 14:7
  20:20 21:5 31:15
  42:25 43:3,11 46:4
  57:21 66:20 69:12
  70:5,6,9 71:16
**type** 22:12
**types** 68:23
**typically** 41:14 60:8
  61:4

| u |
| --- |

**u** 11:16,16 14:1
  43:21
**uh** 50:1
**undersigned** 73:1
**understand** 5:16,22
  5:25 6:2,9,14 12:16
  21:17,22 26:3 27:15
  28:3,6,12,22 29:11
  29:16 31:24 32:3
  33:20,23 36:23
  39:17 40:20,25
  42:22 43:8 44:14
  45:22 56:3 61:11
  62:1 65:11 68:11
  69:25
**understanding** 6:11
  11:17 14:13,19,21
  14:23,25 19:25 20:3
  28:9 36:20 41:19

42:25 56:6 58:20
**understood** 45:14
  66:12
**unique** 39:12,15,23
  40:16 42:20,23,25
  43:10,17 62:13
  64:20
**united** 1:1 2:1
**upload** 36:20
**urban** 10:5
**use** 6:4 10:23 24:17
  25:13,15 29:18,20
  29:21 47:23 60:21
  60:23
**uses** 7:13,16 20:15
  20:19,24 21:17
  28:11 29:25 66:1
**uta** 10:5,9,14,16
  11:2,7,10,13,18
  12:2,5,7,8,12,15,15
  15:3,9,18,24,25
  16:5,18,19 17:3,4
  17:22 18:10 19:4,10
  19:14,16,17 20:1,9
  20:20 21:4 22:3,17
  24:4,7,9,20,25 25:1
  25:4,24 27:2,7,11
  27:13,16,17 28:10
  31:8,11 33:21 34:9
  35:12,22 45:20
  69:13,15,15,22
  70:21 71:3
**uta's** 35:23

| v |
| --- |

**v** 14:1
**vague** 8:7 11:3
  14:20 15:12,19 16:7
  17:15 19:6 20:18
  21:13 22:15 29:23
  33:9,10 35:24 37:16
  38:5,20 44:8 46:14
  48:5,13 57:16 60:24
  62:5 63:9 64:6
  65:24 66:22 68:15

72:8

**validate** 44:3 68:13
70:11,24 71:17
**value** 36:5 41:2,3
**varies** 7:24
**various** 21:19 24:24
25:17 39:5 45:1,19
**vary** 7:21
**vehicle** 6:6,11 16:11
21:23 23:1 24:16
28:2 29:22 30:3,6
31:21,23 34:7,14,15
35:6,9 36:17,21,23
37:3,11,12,13,18,23
37:25 38:8 40:7,15
40:16 42:6 43:24,24
56:8,11 57:6 59:16
61:3,3,5,6,8,20,21
62:7,10,12,12,15,19
62:23,25 63:5 72:6
**vehicles** 7:14 8:5,13
8:25 9:3,7,15 10:4
13:11 14:10 16:1
20:14 22:3 33:25
34:1,3 37:21 44:6
60:11 63:22,22 71:4
**verbatim** 73:6
**version** 50:14
**versus** 26:12
**view** 54:11,16,19,22
55:1,5,8,11,14
56:15 62:1
**volume** 1:17 2:17
4:4
**vs** 1:7 2:7

**w**

**wall** 26:7
**want** 11:25 15:9
23:16 38:10 52:13
53:8 56:1
**wanted** 53:1
**watching** 68:25
**way** 7:6 15:23 25:6
37:8 38:11,12,15

47:14 58:15 71:6
**ways** 16:4
**week** 51:9 69:12
70:5
**went** 47:12
**whereof** 73:18
**wi** 36:19
**wireless** 34:8,13
35:7 36:16 37:4
**wirelessly** 34:15
**witness** 4:2 8:8 11:5
14:21 15:13,20 16:8
17:17 20:19 22:16
29:25 30:9 32:13,18
33:10 35:25 36:13
37:17 38:6,21 44:9
46:15 47:21 48:6,14
53:25 57:17 61:1
62:6 63:11,20 64:7
65:25 66:23 67:8,17
68:16 72:9,21 73:18
**witnesses** 73:5
**wondering** 26:11
**woods** 54:23,25 55:2
**word** 40:5 43:22
**words** 35:16 66:4
70:12
**work** 14:11 20:17
48:11,15,16,21
51:17 60:20
**working** 37:15
**works** 17:14 18:23
19:5 20:1,4 23:19
47:8 67:24,25
**world** 19:9 30:20
31:6
**write** 31:9
**written** 71:7
**wrote** 31:7

**y**

**yard** 34:7 43:25
**yeah** 52:9
**year** 51:16,16,17

**years** 11:11 14:7
15:3 16:1,1,2 69:23
**ygr** 1:7 2:7
**young** 3:5 26:22
32:11,15 47:20

**z**

**zero** 42:8,12 44:1
54:2 65:4

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2014. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Exhibit G

```
 1              IN THE UNITED STATES DISTRICT COURT

 2           FOR THE NORTHERN DISTRICT OF CALIFORNIA

 3

 4    DARRYL A. STITT, TONY GRANDBERRY,

      and HEDI GRIFFIN, on behalf of

 5    themselves and all others similarly

      situated,

 6

                    Plaintiffs,

 7

         vs.                      No. 12-cv-03704-YGR

 8

      THE SAN FRANCISCO MUNICIPAL

 9    TRANSPORTATION AGENCY; CITY AND

      COUNTY OF SAN FRANCISCO; and

10    DOES 1-20,

11              Defendants.

12

13    _____

14

15         VIDEO-TELECONFERENCE DEPOSITION OF

16               CHESTER HANVEY, PH.D.

17              San Diego, California

18             Wednesday, July 20, 2016

19

20

21

22    Reported by:

23    Laura Taylor Martin

24    CSR No. 4158

25    Job No. 2351883
```

                                            Page 1

## Page 2

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DARRYL A. STITT, TONY GRANDBERRY,
and HEDI GRIFFIN, on behalf of
themselves and all others similarly
situated,

      Plaintiffs,

     vs.       No. 12-cv-03704-YGR

THE SAN FRANCISCO MUNICIPAL
TRANSPORTATION AGENCY; CITY AND
COUNTY OF SAN FRANCISCO; and
DOES 1-20,

      Defendants.

_____

     Video-teleconference Deposition of
CHESTER HANVEY, Ph.D., taken on behalf of Plaintiffs
at 550 West C Street, Suite 800, San Diego, California,
beginning at 3:39 p.m. and ending at 6:50 p.m. on
Wednesday, July 20, 2016, before Laura Taylor Martin,
Certified Shorthand Reporter No. 4158.

Page 2

## Page 3

APPEARANCES:

For Plaintiffs:

    THE TRIDRICK LAW FIRM
    BY: STEVEN G. TIDRICK, ESQ.
    (Via video-teleconference)
    2039 Shattuck Avenue, Suite 308
    Berkeley, California 94704
    (510) 788-5100
    sgt@tidricklaw.com

For Defendant City and County of San Francisco:

    RENNE, SLOAN, HOLTZMAN, SAKAI, LLP
    BY: GEOFFREY SPELLBERG, ESQ.
    (Via video-teleconference)
    350 Sansome Street, Suite 300
    San Francisco, California 94104
    (415) 678-3800
    gspellberg@publiclawgroup.com

Videographer:

    RENE SANCHEZ
    VERITEXT LEGAL SOLUTIONS
    550 West C Street, Suite 800,
    San Diego, California 92101
    (800) 567-8658

Page 3

## Page 4

INDEX

WITNESS              EXAMINATION
CHESTER HANVEY, Ph.D.

    BY MR. TIDRICK       7

EXHIBITS

PLAINTIFFS'           MARKED
Exhibit 149 Expert Report of Chester Hanvey, Ph.D.  20
Exhibit 150 Expert Report of Chester Hanvey, Ph.D.,
    Rebuttal to the Declaration of Richard
    Drogin         23
Exhibit 151 Declaration of Chester Hanvey, Ph.D.,
    in Support of Motion to Decertify
    Collective Action and Class Action    23
Exhibit 152 Plaintiffs' Second Notice of Depositions
    of Defendant's Experts and Demand for
    Production at Depositions     9
Exhibit 153 Printout of 318-page Excel file re
    work tasks       23

EXHIBITS FOR REFERENCE         PAGE
(Attached hereto)

Exhibit 100 Plaintiffs' Notice of Deposition of
    Defendant's Experts and Demand for
    Production at Deposition     *

Exhibit 105 BRG Observational Study of Operators at
    SFMTA       *
Exhibit 106 BRG Rebuttal Reort for SFMTA    *
Exhibit 107 Declaration of Elizabeth Arnold in
    Support of Motion to Decertify
    Collective Action and Class Action    85

Page 4

## Page 5

INDEX (Continued)

EXHIBITS FOR REFERENCE (CONTD.)      PAGE

Exhibit 112 MUNI Operator Time Study Site Visit
    Questions, Green Division    11
Exhibit 113 Muni Operator Time Study Site Visit
    Questions, Potrero Division    10

Exhibit 135 Declaration of Jonathan-Dat Lam    48

INFORMATION REQUESTED
    (None)
INSTRUCTION NOT TO ANSWER
    (None)

Page 5

2 (Pages 2 - 5)

| | |
|---|---|
| 1     San Diego, California, Wednesday, July 20, 2016 | 1   A. Yes. |
| 2       3:39 p.m. - 6:50 p.m. | 2   Q. Approximately how many times? |
| 3 | 3   A. Twice. |

Page 6:

1     San Diego, California, Wednesday, July 20, 2016
2       3:39 p.m. - 6:50 p.m.
3
4     THE VIDEOGRAPHER: Good afternoon. We are on
5 the record, 3:39 p.m. on July 12th, 2016. This is the   03:39
6 video-recorded deposition of Chester Harvey (sic). My
7 name is Rene Sanchez, here with our court reporter,
8 Laura Martin. This deposition is being held at 550 West
9 C Street, Suite 800, City of San Diego, California,
10 92101. The caption of this case is Darryl A. Stitt   03:39
11 versus the San Francisco Municipal Transportation Agency,
12 Case Number 12-cv-03704-YGR.
13     Please note that audio and video recording will
14 take place unless all parties go off the record.
15 Microphones are sensitive and may pick up whispers,   03:40
16 private conversations, and cellular interference.
17     I am not authorized to administer an oath. I
18 am not related to any party in this action, nor am I
19 financially interested in the outcome in any way.
20     If there are any objections to proceeding,   03:40
21 please state them at the time of your appearance,
22 beginning with noticing attorney.
23     So, Counsel, may you please identify yourself.
24     MR. TIDRICK: Steven Tidrick, for plaintiff and
25 the certified class.   03:40

*Page 6*

Page 7:

1     MR. SPELLBERG: Geoff Spellberg, representing
2 defendant.
3     THE VIDEOGRAPHER: Thank you.
4     The witness will be sworn.
5     I'm sorry. Go ahead, Counsel.   03:40
6     MR. TIDRICK: Madam Court Reporter, can you
7 please swear in the witness?
8     (Oath administered by reporter.)
9     THE VIDEOGRAPHER: Counsel, you may proceed.
10
11       CHESTER HANVEY, Ph.D.,
12 having been administered an oath, was examined and
13 testified as follows:
14
15       EXAMINATION   03:41
16 BY MR. TIDRICK:
17   Q. Hello, Mr. Harvey (sic). Good afternoon.
18   A. Good afternoon. Hanvey.
19   Q. Would you please state your full name for the
20 record.   03:41
21   A. Sure. It's Chester Hanvey, H-A-N, as in Nancy,
22 V, as in Victor, E-Y.
23   Q. Is it Dr. Hanvey or Mr. Hanvey?
24   A. Either is appropriate.
25   Q. Have you ever been deposed before?   03:41

*Page 7*

Page 8:

1   A. Yes.
2   Q. Approximately how many times?
3   A. Twice.
4   Q. When, approximately, did those two depositions
5 occur?   03:42
6   A. The most recent was a few months back, maybe
7 late 2015. The previous one was a few years before that,
8 maybe two to three years before that.
9   Q. Do you understand how a deposition works?
10   A. I do.   03:42
11   Q. Do you understand you're testifying under oath
12 today?
13   A. I do.
14   Q. Under penalty of perjury?
15   A. Yes.   03:42
16   Q. Have you ever qualified as an expert in any
17 litigation?
18   A. Yes.
19   Q. How many times?
20   A. One time. Well, actually, maybe I need to ask   03:42
21 for clarification on that. What defines qualifying as an
22 expert?
23   Q. Have you ever been presented to any court as a
24 potential expert and a judge made a determination whether
25 or not you were qualified to testify?   03:43

*Page 8*

Page 9:

1   A. I don't know about the second part of that. I
2 don't know whether a judge made any determination. But I
3 have been presented in several cases beyond the one I've
4 actually provided testimony in.
5   Q. Have you ever testified in a court?   03:43
6   A. No.
7     MR. TIDRICK: Will the court reporter please
8 provide to Mr. Hanvey the document entitled "Plaintiff's
9 Second Notice of Deposition of Defendant's Expert and
10 Demand for Production at Deposition"?   03:44
11     THE REPORTER: Yes.
12     MR. TIDRICK: And actually, before presenting
13 it, could you please mark it as Plaintiffs' Exhibit 152.
14     THE REPORTER: Yes. Let me locate it.
15     Okay. The witness has the document now.   03:45
16     (Exhibit 152 marked for identification.)
17 BY MR. TIDRICK:
18   Q. Mr. Hanvey, are you looking at a document
19 entitled "Plaintiffs' Second Notice of Deposition of
20 Defendant's Expert and Demand for Production at   03:46
21 Deposition"?
22   A. Yes, I am.
23   Q. It's marked Plaintiffs' Exhibit 152. Correct?
24   A. That's correct.
25   Q. Have you ever seen this document before?   03:46

*Page 9*

3 (Pages 6 - 9)

Page 10

1 A. Yes, I have.
2 Q. You understand that you are testifying today
3 pursuant to this deposition notice?
4 A. I don't exactly know what that means, but -- I
5 don't really know what that means.          03:46
6 Q. Do you understand that this deposition notice
7 called for you to produce documents?
8 A. I am not aware of that.
9 Q. Are you producing any documents today?
10 A. I -- the only thing that I brought with me was  03:47
11 my declaration.
12     MR. SPELLBERG: I think there are a number of
13 documents that he's asked you to give.
14 BY MR. TIDRICK:
15 Q. The declaration you're referring to, is that   03:47
16 the Declaration of Chester Hanvey, Ph.D., in the course
17 of motions to de-certify collective actions and class
18 actions?
19 A. Yes, that's correct.
20     MR. TIDRICK: Would the court reporter please   03:48
21 provide the document previously marked as Exhibit 113,
22 please. That's 113.
23     THE REPORTER: Yes.
24     THE WITNESS: Okay. I've got it.
25     MR. TIDRICK: And can the court reporter please 03:49

Page 11

1 also give the document labeled Exhibit 112.
2     THE REPORTER: Yes. The witness has it.
3 BY MR. TIDRICK:
4 Q. Mr. Hanvey, the document previously marked as
5 Exhibits 112 and 113, are these (inaudible) notes that  03:50
6 you took?
7 A. Partially, yes.
8 Q. When you say "partially," what do you mean by
9 that?
10 A. The information recorded here is partially from 03:50
11 interview and partially from observation.
12 Q. Understood. All the handwriting in
13 Exhibits 112 and 113 is yours. Is that correct?
14 A. Give me one second to look.
15     Yes, it appears to be.          03:51
16 Q. The Exhibits 112 and 113 documents, why did you
17 create those documents?
18 A. To clarify, do you mean why did I write the
19 responses or why was the document itself created?
20 Q. Why did you write the material on these         03:51
21 documents that you did?
22 A. The -- this was information that I learned from
23 visiting two different Muni divisions.
24 Q. And when you wrote what you did on the
25 Exhibit 112 and 113 documents, you were attempting to   03:52

Page 12

1 write down as accurate as you could information that you
2 learned from visiting the Potrero and Green divisions?
3 A. Yes, that was the idea.
4 Q. Did you rely on the notes that you took in
5 Exhibit 112 and 113 for your report?        03:52
6 A. No.
7 Q. Has anyone, to your knowledge, relied on either
8 of these documents, Exhibits 112 and 113, for anything?
9 A. I don't know.
10 Q. In the Exhibit 113 document, if you could,       03:53
11 please, turn to Question 15, which is at page 5.
12 A. Okay.
13 Q. If I understand correctly, you asked the
14 superintendent of the Potrero division the question:
15 "Are Operators expected to read the postings on any of  03:53
16 these bulletin boards every day?" Is that correct?
17 A. Yes, I believe that's correct.
18 Q. The superintendent responded that they are
19 supposed to check this every day. Is that correct?
20 A. That's what I recorded for the answer to 15.a.  03:54
21 Q. You understood that to be the response of the
22 Potrero superintendent to the question, "Are Operators
23 expected to read the postings on any of these bulletin
24 boards every day?" Is that correct?
25 A. Not exactly. There's -- that response is       03:55

Page 13

1 listed under a subquestion to that question that you just
2 stated.
3 Q. Based on what you wrote on this, what is your
4 understanding of what the answer was to the question,
5 "Are Operators expected to read the postings on any of   03:55
6 these bulletin boards every day"? What do you understand
7 the response to that to be?
8 A. I don't see a response listed to that specific
9 question.
10 Q. When you wrote, "They are supposed to check     03:55
11 this every day," was it your understanding that "they"
12 was referring to the operators?
13 A. Yes, that was my understanding.
14 Q. And was it your understanding that this refers
15 to the bulletin board?          03:56
16 A. I don't see the word "this" in that question.
17 Q. What I got out this a moment ago -- I thought I
18 understood your answer to say they are supposed to check
19 this every day.
20 A. Oh, I understand. I'm sorry. I thought you    03:56
21 were asking about the question.
22     I'm not entirely sure what he meant by this.
23 Q. Let me try to clarify it. What I'm asking is:
24 You're recording in response that the operators are
25 supposed to check the bulletin board every day. Is that 03:56

1  correct?
2      A.  That response wasn't given to that specific
3  question.  That is a response that I recorded.  I don't
4  know that it was directly related to the question.
5          The video screen died.                    03:57
6      Q.  So you think that that response may be to the
7  question a., "If so, which bulletin boards are they
8  expected to read"?
9      A.  Correct.  The response that you're -- that
10 you're reading, "They are supposed to check this every  03:57
11 day," is under the question, "If so, which bulletin
12 boards are they expected to read?"
13     Q.  All right.  So in light of what your question
14 was and what the answer was, do you have the
15 understanding that the operators are supposed to check  03:57
16 the bulletin board every day?
17     A.  I don't know whether that's true or not.
18     Q.  Why are you unsure?
19     A.  The response that you're reading isn't directly
20 related to the question of whether they're supposed to  03:58
21 read the boards every day, and I can't interpret what
22 that individual superintendent meant when he gave that
23 response.
24     Q.  Do you have any understanding one way or the
25 other whether the operators are supposed to check the  03:58

1  bulletin board every day?
2      A.  I don't know what the official policy is, and I
3  don't know what the actual practice is either.
4      Q.  What I'm trying to understand is -- well, let
5  me ask you this.  You had an assignment to, among other  03:59
6  things, conduct an interview with the superintendent of
7  the Potrero division.  Correct?
8      A.  Correct.
9      Q.  And part of your assignment was to ask this
10 Question 15.  Correct?                              03:59
11     A.  Correct.
12     Q.  And is it your testimony that you did not come
13 away from that interview with an understanding of what
14 the answer to Question 15 was, and specifically, either
15 Question 15 at the top, "Are Operators expected to read  04:00
16 the postings on any of these bulletin boards every day"?
17     A.  I don't recall what my interpretation was at
18 the time; but looking at this document, I do not know.
19     Q.  I'm sorry.  Did you say that you did have an
20 understanding at the time?                          04:00
21     A.  I said that I don't recall my understanding at
22 the time.  This was several months ago.
23     Q.  All right.  So sitting here today -- well,
24 first, as far as your handwriting, do you agree what you
25 wrote was, "They are supposed to check this every day"?  04:01

1  That's what you wrote.  Correct?
2      A.  Yes, that's correct.
3      Q.  And aside from whatever those words -- strike
4  that.
5          Are you able to tell me anything, sitting here  04:01
6  today, of what those words mean that you wrote?
7      A.  I would be speculating.
8      Q.  I don't want you to speculate, but do you have
9  even an approximate understanding of what you meant with
10 those words?                                        04:01
11     A.  What I meant was what --
12         MR. SPELLBERG:  I'm going to caution the
13 witness not to speculate.
14         If you have a recollection of any kind, you can
15 testify to that.                                    04:01
16         Go ahead.  Sorry.
17         THE WITNESS:  My understanding of those words
18 is that's what the superintendent said.  What he meant by
19 that exactly, I don't know.
20 BY MR. TIDRICK:                                     04:02
21     Q.  If you quickly turn the page to page 6 of
22 Exhibit 113, Question 20.
23     A.  Okay.
24     Q.  Under Question 20.a., I'd like to refer to your
25 handwriting.  Do you see where you wrote, and I quote, "A  04:02

1  lot of drivers do come back to the division after they
2  are relieved"?  Do you see those words you wrote?
3      A.  I do.
4      Q.  You wrote that based on what the superintendent
5  told you.  Is that correct?                         04:03
6      A.  I believe so, yes.
7      Q.  Sitting here today, are you able to tell me
8  anything that you understood with respect to that
9  statement, other than what that statement says?
10         MR. SPELLBERG:  Vague and ambiguous.       04:03
11         You may answer.
12         THE WITNESS:  Again, I only know that that's my
13 interpretation of what the superintendent said.
14 BY MR. TIDRICK:
15     Q.  All right.  So sitting here today, you can't  04:03
16 give me any more detail about what you understood about
17 that.  Is that correct?
18     A.  That's correct.  Not beyond the words that are
19 written there.
20     Q.  If you could, please, turn the page to page 7  04:04
21 of Exhibit 113, Question 28.
22         Do I understand correctly you asked the
23 question of the Potrero superintendent, and I quote, "In
24 the last six years, have there been any significant
25 changes in operations or procedures that affected what  04:04

Page 18

1  Operators do while at the end of their shifts"?  Correct?
2      A.  That's correct.
3      Q.  Do I understand correctly, you wrote something
4  in response to that question reflecting what the
5  superintendent said.  Correct?                04:05
6      A.  Yes, that's correct.
7      Q.  And I understand correctly you wrote, "Not
8  really.  The main thing is...make sure that they park the
9  bus.  That's always been required."  Is that correct?
10     A.  Yeah.  You missed one word.  It's "The main    04:05
11 thing is to," but the rest was correct.
12     Q.  If you could, please, set aside Exhibit 113,
13 and now I'd like to ask you some questions about
14 Exhibit 112.
15     A.  Okay.                                           04:06
16     Q.  Similar to Exhibit 113, Exhibit 112 reflects
17 notes that you took based upon your observations and
18 interview with a superintendent.  Is that correct?
19     A.  Yes, that's correct.
20     Q.  Exhibit 112 is based on your observations and   04:06
21 interview at the Green division.  Correct?
22     A.  That's correct.
23     Q.  Do you recall the name of the superintendent
24 that you interviewed at the Green division?
25     A.  I believe her first name was Michelle.  I don't  04:07

Page 19

1  remember her last name.
2      Q.  Getting back for a moment to the Potrero
3  division interview notes, Exhibit 113, do you know the
4  name of the superintendent of the Potrero division that
5  you interviewed?                                 04:07
6      A.  I believe his first name was David.  I don't
7  remember his last name.
8      Q.  Was David's last name Banbury?
9      A.  I don't recall for sure.  It could be, but I
10 don't know for sure.                             04:07
11     Q.  At the Green division, the superintendent you
12 interviewed, Michelle, do you believe her last name was
13 Enciso, spelled E-N-C-I-S-O?
14     A.  That sounds correct.
15     Q.  In Exhibit 112, could you please turn to page   04:08
16 5, section 15.
17         Do you understand correctly you asked the
18 superintendent of the Green division, "Are Operators
19 expected to read the postings on any of these bulletin
20 boards every day?"  You asked that question of her.    04:09
21 Correct?
22     A.  Yes, I believe so.
23     Q.  Her response was, "Yes."  Is that correct?
24     A.  Yeah, I can see that there is the word "Yes"
25 there.  It looks like that's associated with Question 15.  04:09

Page 20

1  So probably, yes.
2      Q.  If you could, please, turn to Question 28,
3  which is at page 7.
4          Do I understand correctly you asked the
5  superintendent of the Green division, and I quote, "In    04:09
6  the last six years, have there been any significant
7  changes in operations or procedures that affected what
8  Operators do while at the end of their shifts?"  Correct?
9      A.  That's correct.
10     Q.  The answer you received from the superintendent  04:10
11 of the Green division was, "Nothing."  Is that correct?
12     A.  That's what's recorded, yes.
13     Q.  When you recorded that, you were doing your
14 best to record responses accurately.  Is that right?
15     A.  Yes, that's correct.                            04:10
16         MR. TIDRICK:  If you could, please, would the
17 court reporter please mark the expert report of Chester
18 Hanvey, Ph.D., dated May 10th, 2016, as Exhibit 149,
19 please.
20         THE REPORTER:  Okay.  It's in front of the      04:11
21 witness.
22         (Exhibit 149 marked for identification.)
23 BY MR. TIDRICK:
24     Q.  Mr. Hanvey, do you have Exhibit 149 in front of
25 you?                                             04:12

Page 21

1      A.  I do.
2      Q.  Is Exhibit 149 your expert report dated May 10,
3  2016?
4      A.  It appears to be, yes.
5      Q.  Did anyone help you write this document?       04:12
6      A.  I had people assist me with editing, but the
7  content is from me.
8      Q.  I don't ask that you provide the content of any
9  communications of any lawyers.  Do you understand that?
10     A.  I do.                                          04:13
11     Q.  I'm not asking to reveal the substance of any
12 communications of any lawyers.  If you could, please,
13 just identify.  When you say people assisted with editing
14 the Exhibit 149 document, can you just identify who
15 you're referring to?                             04:13
16     A.  Sure.  I was referring to Elizabeth Arnold.
17     Q.  Anyone else?
18     A.  I don't believe so.
19     Q.  What documents did you rely upon to complete
20 the Exhibit 149 report?                          04:13
21     A.  They are listed in the report.  I'll find the
22 section here.
23         They're listed in paragraph 8 of the report.
24     Q.  From your answer, do I understand correctly
25 that the documents that you relied on to complete your   04:14

6 (Pages 18 - 21)

1 report were only the declaration of Richard Drogin,
2 Ph.D., filed December 31st, 2013, and the second amended
3 complaint filed March 6th, 2013?
4    A.   That, in addition to a few academic citations
5 that are included later in the report.          04:15
6    Q.   And you referring specifically to -- well,
7 can you please tell me, what academic citations are you
8 referring to?
9    A.   There are several listed in Footnotes 10 and 11
10 on page 9, and I believe that's all.          04:15
11   Q.   So other than the report of Dr. Drogin filed
12 December 31st, 2013, and the second amended complaint and
13 the academic work cited in Footnotes 10 and 11, were
14 there any other documents that you relied upon in
15 preparing the May 10, 2016 report?          04:16
16   A.   Yes, there were.
17   Q.   What else?
18   A.   There is a citation to a court decision on
19 page 6, Duran v. US Bank, and there is a reference to
20 data from the observational study on -- in paragraph 25.   04:17
21        THE VIDEOGRAPHER:  Counsel, I'm sorry to
22 interrupt, but can we go off the record for a few
23 minutes?
24        MR. TIDRICK:  Yeah, yeah.  That's fine.
25        THE VIDEOGRAPHER:  Okay.  Thank you.  We are   04:17

Page 22

1 off the record, 4:18 p.m.
2        (Recess.)
3        (Exhibits 150, 151, and 153 marked for
4        identification.)
5        THE VIDEOGRAPHER:  We are back on the record,   04:27
6 4:27 p.m.
7 BY MR. TIDRICK:
8    Q.   In the expert report that you did, Mr. Hanvey,
9 dated May 10th, 2016, do I understand correctly you
10 prepared this report based on the assignment that is laid   04:27
11 out in paragraph 1 of page 1 of the report?
12   A.   Yes, that's correct.
13   Q.   In that paragraph, you identify three things.
14 Was there anything else that you were assigned to do for
15 this report, other than what you've laid out in that    04:28
16 paragraph 1 of Exhibit 149?
17   A.   Not for purposes of this report, no.
18   Q.   If you could, please, turn to page 6 of
19 Exhibit 149, paragraph 15, discussing the Duran versus US
20 Bank case.                 04:28
21   A.   Okay.
22   Q.   Do you have an understanding what the Duran
23 versus US Bank case was about?
24   A.   I know it was a wage and hour case.  I don't
25 recall the allegation, whether it was -- I don't recall   04:29

Page 23

1 the allegation exactly.
2    Q.   Sitting here today, other than the fact that
3 it's a wage and hour case, do you know anything about
4 what the Duran versus US Bank case was about?
5    A.   Yeah, it had something to do -- it had     04:29
6 something to do -- at least the part that was relevant
7 for someone in my profession, it had to do with a sample
8 being chosen and testimony being collected from that
9 sample, and the usefulness of that in the court's eyes.
10   Q.   Do you know anything about what the facts of   04:30
11 that case were?
12   A.   I believe there were roughly 20 people selected
13 for random sample, which may or may not have included the
14 plaintiffs in the case.  They were selected to give
15 testimony.  I believe that several of them opted not to,   04:30
16 and they were replaced in the sample.
17        Ultimately, that testimony was used to
18 calculate damages for the entire class, and I believe
19 that procedure was ruled inadequate by the California
20 Supreme Court.                 04:30
21   Q.   Other than what you just described, do you know
22 anything about what the facts of the case were?
23   A.   I've read the decision, the Supreme Court
24 decision, so certainly there's a lot more in there.
25 Perhaps, could you narrow that down some?          04:31

Page 24

1    Q.   What I'm asking you is:  Other than what you've
2 already described, is there anything about what the facts
3 of the case were that you know?
4    A.   Sure.  Well, I believe there was some testimony
5 from some of the people who opted out of the case or    04:31
6 opted out of giving testimony, that they were
7 specifically instructed by plaintiff's counsel not to
8 give testimony.  I know that the Supreme Court took issue
9 with several aspects of the sampling plan, which included
10 the size of the sample, the representativeness of the    04:31
11 sample, and the issue that nonresponse bias caused in the
12 sample.
13   Q.   Other than what you've described during your
14 deposition today, is there anything else that you know
15 about the facts of the Duran versus US Bank case?   04:32
16   A.   I believe that Dr. Drogin was involved in that
17 plan, in the sampling plan.
18   Q.   Is there anything else that you know about the
19 facts of the Duran versus US Bank case?
20   A.   Not off the top of my head.          04:32
21   Q.   Have you ever read the full opinion of the
22 Court of Appeals decision in that case?
23   A.   I have not.
24   Q.   Have you ever read the full opinion of the
25 California Supreme Court in that case?          04:33

Page 25

7 (Pages 22 - 25)

| | |
|---|---|
| 1  A. I have. | 1  Q. Was part of that article that mentions the |
| 2  Q. Do you have any understanding how the Court of | 2  Duran versus US Bank case -- did you draft that part of |
| 3  Appeal ruled in that case? | 3  the article? |
| 4  A. I do not recall. | 4  A. It was collaborative. I had some part of it, |
| 5  Q. Other than what you testified about today, do  04:33 | 5  not -- not complete responsibility for that.  04:37 |
| 6  you have any understanding what the holding of the US | 6  Q. In paragraph 16 of your may 10th, 2016 report, |
| 7  Bank versus Duran case was? | 7  you make the statement, and I quote, "When members of the |
| 8  A. I'm not sure what you mean by "holding." | 8  sample choose not to participate for nonrandom reasons, |
| 9  Q. How did you become aware of the Duran versus | 9  the resulting sample is no longer random." |
| 10  US Bank case?  04:33 | 10  Is that a statement that you believe?  04:38 |
| 11  A. There were a number of articles written about | 11  A. Yes. |
| 12  it. We subscribed to Law360, and that's something that | 12  Q. What do you consider to be nonrandom reasons? |
| 13  came up regularly during the time this case was going on. | 13  A. There's countless examples of that, but in this |
| 14  There's been lots of articles written about the case | 14  case, maybe an obvious one would be people who choose not |
| 15  afterwards, including some by me. There's been -- it's  04:34 | 15  to participate because they don't feel that they have any  04:38 |
| 16  been cited in other cases. So variety of ways. | 16  damages. |
| 17  Q. Is there anything that you wrote about the | 17  Q. Do you have any evidence or any basis to |
| 18  Duran versus US Bank case that's not disclosed in your | 18  believe that that, in fact, has happened in this case? |
| 19  CV? | 19  MR. SPELLBERG: I'm going to object. That's |
| 20  A. No.  04:34 | 20  vague and ambiguous, as to what has happened.  04:38 |
| 21  Q. Can you identify in your CV which of the articles that you've | 21  You may answer. |
| 22  Exhibit 149 report which of the articles that you've | 22  THE WITNESS: I have no evidence, but I do |
| 23  written are about the Duran versus US Bank case? | 23  believe that motivational theory would support that |
| 24  A. None of them are specifically about that case, | 24  people who have less incentive are less likely to |
| 25  but there's one article that I co-wrote that mentions it,  04:35 | 25  participate.  04:39 |
| Page 26 | Page 28 |

| | |
|---|---|
| 1  which is the second article listed, titled "Wage and Hour | 1  BY MR. TIDRICK: |
| 2  Litigation Developments and Trends." | 2  Q. Do you have any evidence that in this |
| 3  Q. So when you say you'd written about the Duran | 3  litigation anyone did not provide a declaration because |
| 4  versus US Bank case, the only thing you're referring to | 4  they felt that they did not have any damages? |
| 5  is the article that you co-wrote that you just mentioned?  04:35 | 5  A. I do not know whether that's true or not.  04:39 |
| 6  A. No. | 6  Q. A moment ago, you said that there are countless |
| 7  Q. Sorry. Is there anything besides that article | 7  things that you would describe as nonrandom reasons. |
| 8  you just mentioned that you've written that even mentions | 8  Other than what you already identified, what other things |
| 9  the US Bank case? | 9  are nonrandom reasons? |
| 10  A. Yes.  04:35 | 10  A. Well, for example, if you're doing a telephone  04:40 |
| 11  Q. What else have you written that mentions it? | 11  survey, that's known to be biased because not everybody |
| 12  A. There's a book chapter that I also co-wrote. | 12  has a telephone. So that potentially could impact |
| 13  It's the second item under "Books and Chapters," titled | 13  results. If you do an online survey, the same would be |
| 14  "Wage and Hour Litigation." | 14  true for people with access to the Internet. So those |
| 15  Q. Other than that book chapter and the -- sorry.  04:36 | 15  are two pretty common examples.  04:40 |
| 16  What was the publication that your article appeared in? | 16  Q. Can you identify for me any nonrandom reason |
| 17  A. It was -- it's called The Industrial- | 17  that you believe caused anyone not to provide a |
| 18  Organizational Psychologist. | 18  declaration in this case, other than your prior statement |
| 19  Q. And the thing you wrote for The Industrial- | 19  about financial motivation? |
| 20  Organizational Psychologist, that's an article, or how is  04:36 | 20  A. The only information that I have related to why  04:41 |
| 21  that described? | 21  people did not participate was what was listed in |
| 22  A. Correct. It's in -- it's an article. | 22  Dr. Drogin's declaration, in one of the appendices. |
| 23  Q. It's an article. | 23  Q. Did you consider any of the information that |
| 24  Were you the principal author of that? | 24  you reviewed to provide a basis that there were nonrandom |
| 25  A. No, I was not.  04:36 | 25  reasons present in this case?  04:41 |
| Page 27 | Page 29 |

A. The descriptions that Dr. Drogin listed for why
people didn't participate were somewhat vague, but
several of them suggested that it was possible
individuals could opt out of participating, which is --
makes a sample susceptible to nonresponse bias.     04:42
Q. There was something that Dr. Drogin said that
made you believe that individuals could opt out?
A. He didn't use that term, but he listed reasons
why several people did not participate, and several of
them indicated that people could -- could choose not to     04:42
participate if they wanted to -- or if they did not want
to, I should say.
Q. What specifically did Dr. Drogin say that led
you to believe that?
A. I don't have his report in front of me. Is     04:43
that available to look at?
MR. SPELLBERG: We don't seem to have it.
MR. TIDRICK: We might come back to that.
THE WITNESS: Okay.
BY MR. TIDRICK:     04:43
Q. Do you recall that Dr. Drogin identified that
certain people did not provide affidavits because they
were deceased?
A. I do recall at least one example of that.
Q. Do you consider being dead to be a nonrandom     04:43

reason that affected the validity of Dr. Drogin's
conclusions?
A. I don't believe that would necessarily impact
the randomness of the sample.
Q. Could you quickly turn to paragraph 20. Strike     04:44
that.
If you could, please, turn to paragraph 26, at
page 11 of Exhibit 149.
A. Okay.
Q. You state, and I quote, "I have also been asked     04:45
to offer an opinion on whether data from declarations
and/or depositions could be used to reach conclusions
about the entire class."
Is that correct?
A. That's correct.     04:45
Q. When you say "the entire class," you're
referring to the entire class of operators in this case.
Is that correct?
A. Correct.
Q. Do I understand correctly, in the May 10th,     04:46
2016 report, Plaintiff's Exhibit 149, paragraph 26, when
you refer to "the entire class" in that paragraph, you
are referring to the entire class of operators in the
Stitt versus MTA case? Correct?
A. Correct. I -- whoever is in the     04:46

legally-defined class. I don't recall those are all
operators. I -- my understanding is that they are, but I
don't know that for sure.
Q. You also state in paragraph 26, and I quote,
"In order for data from declarations or depositions from     04:47
a sample of class members to be used to reach valid
conclusions about the entire class, several scientific
standards should be met including following an
appropriate procedure to select a representative sample
of class members to provide testimony and collecting     04:47
reliable data."
You stand by that statement today. Correct?
A. I do.
Q. With respect to the deposition, what scientific
standards should be met, in your opinion?     04:47
MR. SPELLBERG: With respect to deposition,
okay, I'm going to object. Vague and ambiguous.
Only answer if you understand the question.
THE WITNESS: Any time you're collecting
information via self-report, my position is that there     04:48
are possibility for biases to exist, and someone in my
profession is very interested in trying to design a
data-collection procedure to minimize or eliminate those
biases.
///     04:48

BY MR. TIDRICK:
Q. But I'm asking a slightly different question
than maybe you are understanding.
Okay. In paragraph 26 of your report dated
May 10, 2016, you refer to data from depositions, and you     04:48
also indicate that several scientific standards should be
met.
Am I misreading the paragraph, or are you
offering an opinion on what needs to happen in respect to
depositions?     04:49
A. A deposition -- in a deposition, the witness is
offering self-report, self-report testimony on something.
In this case, I was assuming that that self-report
testimony would have to do with the amount of time spent
on various activities. So my comments are related to     04:49
that.
Q. What scientific standards should be met with
respect to a deposition, in your opinion?
A. Well, one is listed there, which is, there
should be an appropriate procedure to select a     04:50
representative sample if the goal is to then take those
results and reach conclusions about others.
In addition, there's some very simple
principles in terms of asking questions that are clear
and unambiguous and offer appropriate response options.     04:50

Q. And to offer what options?

A. I said offer appropriate response options. For example, some questions are open-ended, where the person can essentially give any response they want. Other questions are closed-ended, where there are options to choose from.    04:50

Q. Other than what you've already described, are there any other scientific standards that, in your opinion, should be met with respect to depositions?

A. My comments are not related to depositions    04:51 generally, only if the goal of those depositions is to take the data and extrapolate to others.

Q. Other than what you've described in your deposition today, are there any other scientific standards that, in your opinion, should be met with    04:51 respect to a deposition?

A. Yes. If the goal is to statistically extrapolate, yes.

Q. What else?

A. Several of them are listed in my second report.    04:52 Some of the ones off the top of my head I can recall are the instructions that are given to people, the amount of time that they have to answer, the option of selecting that they don't know. Things like that are commonly embedded in a scientifically designed survey.    04:52

Page 34

---

Q. And those, you believe, are the scientific standards that are met with respect to a deposition?

A. If the goal is to perform a statistical extrapolation, then I believe it's important to have reliable data.    04:52

Q. So with respect to the deposition, what instructions do you believe need to be given in order for the information collected in the deposition to be reliable?

A. It depends entirely on what you're asking them.    04:53

Q. Are you aware that SFMTA took the depositions of approximately 40 operators in this case?

A. I was not aware of that.

Q. Have you reviewed transcripts of any of the approximately 40 depositions that SFMTA took of operators    04:53 in this case?

A. I have not.

Q. Do you have any reason do believe that the depositions taken by SFMTA did not meet the scientific standards that you believe are necessary in order for    04:53 information from those depositions to be used to reach valid conclusions?

MR. SPELLBERG: Objection. Assumes facts not in evidence.

You may answer.    04:53

Page 35

---

THE WITNESS: Would you -- can you repeat that, please?

MR. TIDRICK: Would the court reporter read it back, please?

(Record read.)    04:54

THE WITNESS: I don't have any information about those depositions, so I don't know.

BY MR. TIDRICK:

Q. Well, one of the things you mentioned a moment ago is that there needs to be sufficient time to answer.    04:54

Do I understand that correctly?

A. Sure. When you're asking people to give self-reports, they need to have the appropriate amount of time to answer.

Q. In the depositions of operators, how much time    04:54 do you believe is necessary to allow an operator to provide accurate information?

A. I think it depends on the question you're asking and the operator. Generally there's not a time limit.    04:55

Q. What do you mean, then, when you say there's some aspect of enough time to answer that's necessary in order for information from deposition to be used to reach all conclusions? What do you mean by that?

A. Simply that if a person doesn't have enough    04:55

Page 36

---

time to provide an adequate response, then they are not going to provide an adequate response.

Q. In a deposition of an operator, do you mean that a certain amount of time needs to elapse between the question being asked and the answer provided?    04:56

A. My response is really quite simple, that people need to have sufficient time to respond. That's -- that's really as far as it goes.

Q. I will represent to you that SFMTA's lawyers asked the operators numerous questions about time they    04:56 spent on various tasks.

How much time do you believe needed to be provided the operators seeking response to a question after the question is asked, before providing the answer, in order for the answer to be valid?    04:56

MR. SPELLBERG: Objection. Vague and ambiguous, incomplete hypothetical.

You may answer if you're able.

THE WITNESS: I don't have enough specifics to answer your question.    04:56

BY MR. TIDRICK:

Q. Do you believe that in order for information from the deposition to be reliable, that the operators needed to be advised beforehand that they could take a certain amount of time to answer the questions?    04:57

Page 37

---

10 (Pages 34 - 37)

1       MR. SPELLBERG:  Objection.  Vague and ambiguous
2   as to the use of the word "reliable."
3       You may answer.
4       THE WITNESS:  I don't know.
5   BY MR. TIDRICK:                          04:57
6   Q.   You mentioned the instructions given -- that
7   the instructions given are important for the reliability
8   of deposition testimony.
9       What specifically do you believe the operators
10  need to be instructed during the deposition in order for  04:57
11  the responses to be reliable?
12  A.   It depends entirely on what you're asking them.
13      MR. SPELLBERG:  Objection (inaudible).
14      You may answer.
15      THE WITNESS:  I said it depends entirely on  04:57
16  what you're asking them.
17  BY MR. TIDRICK:
18  Q.   Assume that the operators were asked various
19  questions by SFMTA's lawyers about how much time they
20  spend on various tasks, what instructions do you believe  04:58
21  need to be given to an operator in order for the
22  information obtained in response to questions of that
23  type be reliable?
24  A.   I don't know that there's any specific
25  instructions that must be given.  However, I think it's  04:58

1   important that the person understands the questions that
2   they're being asked.
3   Q.   So when you say that in order for data from
4   depositions to be reliable, there's no specific
5   instruction that you believe is necessary; rather, it's  04:58
6   simply important that the operator understand the
7   questions.  Is that fair?
8   A.   Not entirely.
9   Q.   What else do you believe is necessary as far as
10  an instruction that needs to be given?          04:59
11  A.   Part of it could be things that you should not
12  have in the instruction.  For example, you don't want to
13  telegraph the responses that you're looking for.  So that
14  would be something that you would not want to have in the
15  instruction.                              04:59
16  Q.   Do you understand that in a deposition setting
17  these lawyers were allowed to ask leading questions?
18  A.   I don't have any information about that.
19  Q.   I'll represent to you that in an adversarial
20  deposition, a lawyer is allowed to ask the other side  04:59
21  leading questions.
22      And my question for you is, simply:  Based on
23  your statement now that there shouldn't be anything
24  implicit in the question about the answer that you want,
25  do I take that to mean that leading questions of an  05:00

1   operator in a deposition are -- will not be reliable
2   answers?  Is that fair?
3       MR. SPELLBERG:  Objection.  Vague and ambiguous
4   with regard to "reliable."
5       You may answer.                      05:00
6       THE WITNESS:  I don't know the answer to that
7   question.  I would have to know the specifics.
8   BY MR. TIDRICK:
9   Q.   Well, explain what you mean when you say that
10  the question should not imply -- imply an answer.      05:00
11  A.   I don't believe I said that.
12  Q.   Do you have the professional opinion that the
13  questions asked should not imply a desired answer?  Is
14  that fair?
15      THE REPORTER:  I can't understand what you      05:00
16  said, Counsel.  Repeat.
17  BY MR. TIDRICK:
18  Q.   Is it your professional opinion that in order
19  for responses to questions to be reliable, that there
20  should not be any desired answer implicit in the      05:01
21  instructions in the question?
22  A.   In a survey, certainly that would -- that would
23  be the -- it would be desirable to avoid that.
24  Q.   What about in a deposition?
25  A.   I think it depends on the purpose of the      05:01

1   deposition.
2   Q.   Is it your belief and professional opinion that
3   the attorneys for SFMTA could have deposed the operators
4   in the class using the scientific standards that you
5   believe are necessary?                      05:02
6       MR. SPELLBERG:  Objection.  Lack of foundation,
7   vague and ambiguous.
8       You may answer.
9       THE WITNESS:  You're asking me if they could
10  have done that?                          05:02
11      MR. TIDRICK:  Yeah.
12      THE WITNESS:  Sure.  I imagine they could have
13  done just about anything.
14  BY MR. TIDRICK:
15  Q.   Well, I'm not asking you what they actually      05:02
16  did.  What I'm asking you is something different.
17      You expressed the professional opinion about
18  what is necessary for a deposition, specifically several
19  scientific standards that should be met in order for the
20  information from those depositions to be able to be used  05:02
21  to reach valid conclusions about the entire class.
22      You've expressed professional opinions about
23  that.  Correct?
24  A.   I have.
25  Q.   Do you believe that it is possible to conduct a  05:03

1 deposition of an operator in this case using those
2 scientific standards?
3        MR. SPELLBERG: Same objections. Lacks
4 foundation. Actually, I'm going to object on relevance
5 as well.                        05:03
6        You may answer the best you're able.
7        THE WITNESS: I don't know.
8 BY MR. TIDRICK:
9    Q.  The scientific standards that you've identified
10 as being necessary for depositions in order to generate   05:03
11 information that can be used to reach valid conclusions
12 about the entire class, are you aware of any deposition
13 that's ever been conducted applying the standards that
14 you've expressed?
15    A.  Yes.                        05:04
16    Q.  In what case were those depositions taken?
17    A.  I know one was -- the defendant was Catalina
18 Restaurant Group. The actual plaintiff, I'm not sure,
19 because I believe it started out as a class action, then
20 ultimately became individual plaintiff's cases. So I'm   05:04
21 not sure on the plaintiff on that one.
22    Q.  Any other case besides that one?
23    A.  I think there may have been one in a case
24 where -- against FedEx ground. The plaintiff was -- I'm
25 going to butcher the pronunciation, but it was -- started  05:05

Page 42

1 with a W. W-E-I-G-L-E, something like that.
2    Q.  Any other cases besides those two?
3    A.  I don't know. There may have been more, but
4 those are the two that I'm pretty certain used -- used
5 many of the recommendations I'm describing.        05:05
6    Q.  The Catalina Restaurant Group case, what state
7 was that in?
8    A.  California.
9    Q.  Do you know, Northern or Southern California?
10    A.  Southern.                        05:05
11    Q.  Do you know what court that was in?
12    A.  I believe it was in Superior Court of
13 San Diego.
14    Q.  Did you serve as an expert in that case?
15    A.  I did not.                        05:06
16    Q.  How did you come to know how the depositions
17 were conducted in that case?
18    A.  I helped to design the deposition protocol that
19 was used.
20    Q.  When was that?                        05:06
21    A.  Can you repeat that?
22    Q.  What year was that one?
23    A.  It was maybe -- I know it went to trial maybe
24 two or three years ago.
25    Q.  Do you know the name of the firm that you were  05:06

Page 43

1 assisting in that case?
2    A.  I don't.
3    Q.  The FedEx ground case, was that a case in
4 California?
5    A.  I think so. I'm not certain, though.        05:07
6    Q.  Do you know if it was state or federal court?
7    A.  I don't.
8    Q.  Do you know what law firm you were -- were you
9 assisting a law firm in that case?
10    A.  Yes.                        05:07
11    Q.  What firm?
12    A.  I don't remember.
13    Q.  Do you recall what city or state that law firm
14 was based in?
15    A.  I don't.                        05:07
16    Q.  Do you recall the names of any of the lawyers?
17    A.  No.
18    Q.  Do you recall, were you assisting the law firm
19 on the plaintiff's side or the defendant's side?
20    A.  It was for the defense side.        05:07
21    Q.  In the Catalina Restaurant Group case, were you
22 assisting the law firm on the defense side or the
23 plaintiff's side?
24    A.  The defense.
25    Q.  The scientific standard that you believe can be  05:08

Page 44

1 used in order for data from depositions to be used from a
2 sample to reach valid conclusions about the entire class,
3 would that apply to testimony taken at trial as well?
4        MR. SPELLBERG: Vague and ambiguous.
5        You may answer.                        05:09
6        Incomplete hypothetical.
7        THE WITNESS: I would say that all self-reports
8 are susceptible to similar biases.
9 BY MR. TIDRICK:
10    Q.  Let me try to ask the question in a different   05:09
11 way.
12        What scientific standards should be met, in
13 your professional opinion, in order for information from
14 trial testimony from a sample of class members in order
15 for it to be used to reach valid conclusions about the   05:09
16 entire class?
17        MR. SPELLBERG: Objection. Incomplete
18 hypothetical, vague and ambiguous.
19        THE WITNESS: Can you repeat the question?
20        MR. TIDRICK: Madam Court Reporter, can you   05:10
21 read it back, please?
22        (Record read.)
23        THE WITNESS: I think the same basic principles
24 apply, that you need to make sure people understand the
25 questions, have time to answer the questions. Those are  05:10

Page 45

12 (Pages 42 - 45)

| | |
|---|---|
| 1 pretty self-evident points, I think. | 1   A.  That's correct. |
| 2 BY MR. TIDRICK: | 2   Q.  Do I understand correctly from paragraph 2 of |
| 3   Q.  If you could, please -- strike that. | 3 your rebuttal report that in your professional opinion, |
| 4     Is it your belief that if those -- strike that. | 4 you believe that there are three flaws in Dr. Drogin's |
| 5     Is it your professional belief that then the   05:11 | 5 report.  Is that correct?                05:15 |
| 6 court or the jury could evaluate the testimony and make | 6   A.  Based on the information I've reviewed thus |
| 7 determinations about the veracity of the testimony? | 7 far, I identified three primary flaws, yes. |
| 8     MR. SPELLBERG:  I'm going to object to the form | 8   Q.  First, you believe that Dr. Drogin's |
| 9 of the question.  I'm not sure I understand it. | 9 calculations are based on flawed data.  Is that correct? |
| 10     Only answer if you understand.        05:11 | 10   A.  That's correct.                   05:16 |
| 11     THE WITNESS:  Would you mind repeating that? | 11   Q.  Second, you believe that Dr. Drogin's |
| 12     (Record read.) | 12 assumptions are false.  Is that correct? |
| 13     THE WITNESS:  I don't really know the | 13   A.  Several of them are, yes. |
| 14 procedures used in court, so I don't know. | 14   Q.  Third, you believe that the sample of operators |
| 15 BY MR. TIDRICK:                          05:12 | 15 who signed declarations are susceptible to nonresponse   05:16 |
| 16   Q.  If you could, please, look at the document | 16 bias.  Is that correct? |
| 17 that's been premarked as Plaintiffs' Exhibit 150.  It's | 17   A.  Well, the operators aren't susceptible, but the |
| 18 your rebuttal expert report dated June 13th, 2016. | 18 sample and the resulting data are susceptible. |
| 19   A.  Okay. | 19   Q.  That's your belief? |
| 20   Q.  You created the Plaintiffs' Exhibit 150   05:12 | 20   A.  Yes.                             05:16 |
| 21 rebuttal report.  Correct? | 21   Q.  If you could, please, look at the document |
| 22   A.  Yeah.  This is the -- looks like the report | 22 previously marked as Exhibit 135, the Declaration of |
| 23 that I wrote. | 23 Jonathan-Dat Lam. |
| 24   Q.  When did you create it? | 24   A.  Okay. |
| 25   A.  Well, it was finalized on June 13th.  Probably  05:13 | 25   Q.  Have you seen that document before?       05:17 |
| Page 46 | Page 48 |

| | |
|---|---|
| 1 took several weeks to prepare it. | 1   A.  I have not. |
| 2   Q.  Did anyone assist you in writing the | 2   Q.  Well, have you seen any of the declarations |
| 3 Plaintiffs' Exhibit 150 rebuttal report? | 3 provided by the operators that were in the sample that |
| 4   A.  I asked others to help me edit it. | 4 Dr. Drogin used for his analysis? |
| 5   Q.  Who specifically helped you edit it?       05:13 | 5   A.  Not that I recall.                 05:17 |
| 6   A.  Elizabeth Arnold. | 6   Q.  Do you know what a declaration is? |
| 7   Q.  Anyone else? | 7   A.  Generally. |
| 8   A.  Not that I recall. | 8   Q.  You understand a declaration is the same thing |
| 9   Q.  Paragraph 8 of your June 13th, 2016 report, | 9 as an affidavit? |
| 10 Exhibit 150, identifies various documents that you relied 05:13 | 10   A.  I -- I don't know if there is a difference    05:17 |
| 11 upon.  Correct? | 11 between the two.  I know some people use them |
| 12   A.  Yes, that's correct. | 12 interchangeably. |
| 13   Q.  Other than the documents identified in | 13   Q.  Do you know what penalty of perjury means? |
| 14 paragraph 8, was there anything else that you reviewed? | 14   A.  Yes. |
| 15   A.  Well, there's a note that says -- that   05:14 | 15   Q.  How long have you known what penalty of perjury  05:18 |
| 16 references academic sources.  So beyond that, no, I don't | 16 means? |
| 17 believe so. | 17   A.  I -- I don't know. |
| 18   Q.  In paragraph 1 of your rebuttal report, you | 18   Q.  Do you have any recollection how you first came |
| 19 have a description of your assignment.  Is that correct? | 19 to know what penalty of perjury means? |
| 20   A.  Yes, that's correct.              05:14 | 20   A.  No, I don't.                      05:18 |
| 21   Q.  Your assignment was to, quote, review and | 21   Q.  I'll represent to you other defendants' experts |
| 22 evaluate the second Drogin declaration to determine the | 22 in this case have indicated that they learned it from Law |
| 23 degree to which the results he reported can be relied | 23 and Order and from filing their taxes, seeing it on tax |
| 24 upon as an accurate estimate of class law damages. | 24 forms. |
| 25 That's what you did.  Correct?           05:15 | 25     I'm just bringing up those examples to ask if   05:18 |
| Page 47 | Page 49 |

13 (Pages 46 - 49)

1 that refreshes your recollection of how you first learned
2 what penalty of perjury meant.
3     MR. SPELLBERG: I'll object. Irrelevant.
4     THE WITNESS: I -- I don't know.
5 BY MR. TIDRICK:                                    05:19
6     Q. In paragraph 12 -- if you could please turn to
7 that, paragraph 12 of your rebuttal report, Exhibit 150.
8     A. Oh, okay.
9         Okay.
10     Q. Among other things, you make the statement, and  05:19
11 I quote, "...self-report data are subject to numerous
12 biases and inaccuracies."
13         Do you believe that to be true?
14     A. Well, that's -- that's part of the statement.
15 But with the entire statement, yes, I do.            05:20
16     Q. I understand you're pulling out the full
17 sentence as, "Without careful design, self-report data
18 are subject to numerous biases and accuracies." Is that
19 a statement you stand by?
20     A. Yes.                                        05:20
21     Q. If you could quickly turn to paragraph 15.
22     A. Did you say one five or one six?
23     Q. Paragraph one five.
24     A. Okay.
25     Q. 15 of your rebuttal report, Plaintiffs' Exhibit  05:21

Page 50

1 150.
2         Near the end of that paragraph, you make a
3 statement, and I'll quote, There is no way to determine
4 the extent to which the self-report data is biased.
5 Strike that.                                        05:21
6         You've made the statement, and I quote, "There
7 is no way to determine the extent to which the
8 self-reported data are biased."
9         Is that a true statement, in your professional
10 opinion?                                          05:21
11     MR. SPELLBERG: I'm going to object. It
12 misstates the sentence -- the sentence. That's a -- I'll
13 object. Misstates the sentence.
14         You may -- you may answer.
15     THE WITNESS: That's not the full statement,    05:22
16 but I do agree with the full statement.
17 BY MR. TIDRICK:
18     Q. Sitting here today, are you able to tell me --
19 strike that.
20         As you are sitting here today, you have no way  05:22
21 to determine the extent to which the data in any of the
22 declarations from the operators in Dr. Drogin's sample
23 are biased. Is that correct?
24     MR. SPELLBERG: Vague and ambiguous.
25         You may answer.                            05:23

Page 51

1     THE WITNESS: I think the issue is that there
2 is not enough information provided to make that
3 determination, which is highly problematic, in my
4 opinion.
5 BY MR. TIDRICK:                                    05:23
6     Q. Sitting here today, do you have any way of
7 determining the extent to which the information in the
8 operator declarations is biased?
9     A. Well, based upon the limited information that
10 was provided, it did seem as though attorneys for the    05:23
11 plaintiffs were directly involved in the data collection,
12 which is a pretty clear violation of professional
13 standards. So my opinion is that that probably biased
14 the data.
15     Q. Turning back to the Exhibit 135, the          05:24
16 declaration of Jonathan-Dat Lam. I will represent to you
17 that this is one of the declarations by operators in the
18 samples.
19         I understand you've already testified you don't
20 recall seeing this document. Correct?                 05:25
21     A. That's correct.
22     Q. For that matter, you don't recall reviewing any
23 of the declarations by the operators. Is that correct?
24     A. That's correct.
25     Q. So is it fair to say that, sitting here today,  05:25

Page 52

1 you have no opinion to offer as to whether there's
2 anything vague about the information in the operator
3 declarations. Is that fair?
4     A. I -- I don't really understand what you're
5 asking.                                            05:25
6     Q. Sitting here today, do you have any opinion to
7 offer about whether any of the information in the
8 operator declarations is vague?
9     A. Well, I haven't read them --
10     Q. Is it correct that --                       05:25
11     A. -- so -- I have not reviewed them, so I don't
12 know if there's anything in there vague or not.
13     Q. Are you aware of any evidence that any operator
14 signed his or her declaration under duress?
15     MR. SPELLBERG: Same objection. Lack of         05:26
16 foundation, vague and ambiguous.
17         You may answer.
18     THE WITNESS: I have no information one way or
19 the other about that.
20 BY MR. TIDRICK:                                    05:26
21     Q. Do you have any basis for believing that any
22 operator was coerced into signing his or her declaration?
23     MR. SPELLBERG: Same objection.
24     THE WITNESS: I have no information one way or
25 the other about that.                              05:26

Page 53

14 (Pages 50 - 53)

BY MR. TIDRICK:

Q. Do you have any basis for believing that any operator did not understand what he or she was signing?

MR. SPELLBERG: Same objections.

THE WITNESS: I have no information one way or the other about that.   05:26

BY MR. TIDRICK:

Q. If I could, please, refer you to paragraph 15 of your rebuttal report. So we're turning back to Plaintiffs' Exhibit 150.   05:27

Do you see the paragraph I'm referring to?

A. I do.

Q. Did you view the rebuttal report of Mary Furst and Adrian Fleissig?

A. I did.   05:27

Q. I understand you expressed your opinion that Ms. Rochelle Larry potentially exaggerated her time estimate with respect to her arriving at the division late. Is that correct?

A. Can you repeat that?   05:28

MR. SPELLBERG: Madam Court Reporter.

(Record read.)

THE WITNESS: Correct. I said that that is a possibility.

/// 05:29

Page 54

BY MR. TIDRICK:

Q. In paragraph 15, you refer to GPS data. Correct?

A. I do.

Q. Do you understand that the analysis by Mary Furst and Adrian Fleissig did not use GPS data; instead it's called APC data?   05:29

A. I'm not sure what the data is called.

Q. You're not aware of any data other than what's described in the rebuttal report of Mary Furst and Adrian Fleissig. Correct?   05:29

A. Did you say I'm not aware of any data?

MR. SPELLBERG: I'll object. Vague and ambiguous as to what data we're talking about.

MR. TIDRICK: Let me ask the question a different way.   05:29

BY MR. TIDRICK:

Q. You referred to GPS data, and you referred to rebuttal reports of Mary Furst and Adrian Fleissig. Is there anything that you reviewed other than the rebuttal reports of Mary Furst and Adrian Fleissig that led you to believe that there's any GPS data to be analyzed?   05:30

A. I believe there was a reference to something very similar to that in Dr. Drogin's report, but I haven't actually analyzed that data myself, so I'm not   05:30

Page 55

really sure what's in there.

Q. Your statement about an analysis of vehicle GPS data, the analysis of vehicle GPS data that you're referring to is the analysis in the rebuttal report of Mary Furst and Adrian Fleissig. Correct?   05:30

A. Correct. For that -- that sentence, there is a footnote citing, citing that report.

Q. So when you refer in paragraph 15 of your rebuttal report to an analysis of vehicle GPS data, you are referring to the rebuttal report of Mary Furst and Adrian Fleissig. Is that correct?   05:31

A. Correct. I did not perform that analysis myself.

Q. If you were performing an analysis comparing GPS data to the time estimate, would you analyze all of the available GPS data, or would you look at a subset?   05:31

MR. SPELLBERG: I'm going to object. It's an incomplete hypothetical. It's compound and vague and ambiguous and almost incomprehensible.

You may answer if you're able.   05:32

THE WITNESS: Without knowing the specifics, I'm not really sure which would be more appropriate.

BY MR. TIDRICK:

Q. Have you done anything to analyze the validity of the analysis done by Mary Furst and Adrian Fleissig?   05:32

Page 56

A. Beyond reviewing the reports, I don't know.

Q. So you answered that you don't know. Is that correct?

A. Correct.

Q. Do you think you're understanding it, when you refer to an analysis of vehicle GPS data, that there was analysis comparing GPS data to the time estimates of the operators? Is that your understanding?   05:32

A. My understanding is based on what's in the report. I don't know that it was described exactly that way, but it's -- it's based on whatever is in the report.   05:33

Q. To analyze the time period, is there any reason, in your professional opinion, that you can think of, why you would not look at all of the GPS data for data operator for that time period?   05:33

A. Without knowing the specifics, I -- I really don't know.

Q. If you could, please, turn ahead to paragraph 18 of your rebuttal report, Exhibit 150.

A. Okay.   05:34

Q. I'd like to draw your attention to Table 1 at page 9 of your rebuttal report, Plaintiffs' Exhibit 150.

Do you understand that column H represents the amount of travel time claimed?

MR. SPELLBERG: I'm going to object. Vague and   05:35

Page 57

Veritext Legal Solutions
866 299-5127

1 ambiguous.

2     THE WITNESS: Oh, I -- I'm sorry. I didn't

3 realize that was the full question. Can you repeat that?

4     MR. TIDRICK: Madam Court Reporter.

5     (Record read.)                    05:35

6     THE WITNESS: My understanding of column H is

7 that's the time -- the amount of time in minutes that

8 Dr. Drogin assumed someone who worked a run that started

9 at a specific location ended at a specific location.

10 They were the amount of time they were entitled to be    05:35

11 paid, for which they were not paid, specifically related

12 to the travel time issue.

13 BY MR. TIDRICK:

14     Q. Do I understand correctly, you assert that

15 there are inconsistencies in the calculations for travel    05:36

16 time? Is that correct?

17     A. Well, based on the Excel file that we received,

18 that appeared to be very similar to Exhibit 4 of

19 Dr. Drogin's report, yes, there are definitely

20 inconsistencies in the formula.                05:36

21     Q. Did you review an Excel file that was produced,

22 entitled "TravelTimeCalculations.xlsx"?

23     A. It's possible, yes.

24     Q. Did you, in reviewing the Excel file, actually

25 review the formulas in the travel time calculations?    05:36

Page 58

1     A. I did.

2     THE VIDEOGRAPHER: Counsel, I'm sorry to

3 interrupt.

4 BY MR. TIDRICK:

5     Q. You've identified in your rebuttal report    05:37

6 Table 1, row 3, column H indicates total travel time of

7 68.0.

8     Do you see that?

9     A. I do.

10     Q. Did you look in the Excel file at the equation    05:37

11 that was used to generate the number in column H of

12 row 3?

13     A. I don't know that I looked at that one

14 specifically, but I did look at many of the formulas.

15     THE VIDEOGRAPHER: Counsel, may we go off the    05:38

16 record? I have to change tape.

17     MR. TIDRICK: How much tape do you have?

18     THE VIDEOGRAPHER: There's about five minutes

19 left, so I have to switch over. It takes five minutes,

20 and then it's --                        05:38

21     MR. TIDRICK: All right.

22     THE VIDEOGRAPHER: All right. Thank you so

23 much.

24     MR. TIDRICK: Let me get -- I'll -- I can go

25 off the record in just a moment.            05:38

Page 59

1     THE VIDEOGRAPHER: Of course.

2 BY MR. TIDRICK:

3     Q. With respect to row 3, column H of Table 1, do

4 you have any understanding that the equation that was

5 used was set to equal the combination of rows C, D, E,    05:38

6 and G for the travel time calculations from Flynn

7 division to Bryant and Sixth, plus the rows C, D, E, and

8 G for the travel time from Transbay Terminal to the Flynn

9 division?

10     MR. SPELLBERG: I'm going to object. Vague and    05:39

11 ambiguous.

12     THE WITNESS: I -- as I said, I don't recall

13 what that specific formula was referencing.

14 BY MR. TIDRICK:

15     Q. You don't have an understanding how the figure    05:39

16 in the column H was generated. Is that correct?

17     A. Based on the data provided in Appendix 4, no,

18 there is no way to determine that.

19     MR. TIDRICK: We can go off the record and

20 change the tape.                        05:40

21     THE VIDEOGRAPHER: Thank you.

22     This marks the ends of Media 1. We are off the

23 record, 5:40 p.m.

24     (Recess.)

25     THE VIDEOGRAPHER: We are back on the record.    05:46

Page 60

1 This marks the beginning of Media Number 2. It's 5:46

2 p.m.

3 BY MR. TIDRICK:

4     Q. Mr. Hanvey, you believe that Dr. Drogin had

5 used inappropriate travel time assumptions. Is that    05:46

6 correct?

7     A. Yes.

8     Q. Your basis for that is the rebuttal report from

9 Elizabeth Arnold. Is that correct?

10     A. Yes.                        05:47

11     Q. Did you perform observations of whether

12 operators traveled from division to relief points prior

13 to shifts or whether they traveled from relief points to

14 stations after shifts?

15     A. I did not.                        05:47

16     Q. Do I understand correctly, the rebuttal report

17 of Elizabeth Arnold is your only basis for stating that

18 Dr. Drogin uses inappropriate travel time assumptions

19 with respect to the method of travel used by operators to

20 get from divisions to relief points or how they traveled    05:48

21 from relief points to divisions? Is that correct?

22     A. Can -- so I'm going ask, can you repeat that?

23     MR. TIDRICK: Madam Court Reporter.

24     (Record read.)

25     THE WITNESS: I would say that's -- based on    05:48

Page 61

16 (Pages 58 - 61)

1 the information that I've seen so far, that's the
2 primary -- primary justification for that.
3 BY MR. TIDRICK:
4    Q. What else is there besides the rebuttal report
5 of Elizabeth Arnold?                              05:49
6    A. Logic.
7    Q. Anything besides the rebuttal report of
8 Elizabeth Arnold and just basic logic?
9    A. Not that I can recall right now.
10    Q. You did not perform observations of how      05:49
11 operators traveled from division to relief points prior
12 to shifts or how they traveled from relief points to
13 divisions after shifts. Is that correct?
14    A. Yes, still correct.
15    Q. Did you perform any calculations to determine  05:49
16 whether what was observed in Arnold's report resulted in
17 a travel time damage amount that is different than what
18 Dr. Drogin calculated?
19    A. I'm not totally sure I understand your
20 question.                                          05:50
21    MR. TIDRICK: Madam Court Reporter, can you
22 read it back, please?
23    (Record read.)
24    THE WITNESS: I didn't attempt to replicate his
25 calculations or perform any quantification of damages   05:50
Page 62

1 myself.
2 BY MR. TIDRICK:
3    Q. Have you performed any analysis of whether
4 driving a car to a relief point would result in a
5 different travel time amount than what Dr. Drogin      05:51
6 calculated?
7    A. I have not performed any formal analysis of
8 that.
9    Q. If you would please turn to paragraph 25 and 26
10 of your rebuttal report --                           05:52
11    A. Okay.
12    Q. -- plaintiffs' Exhibit 150.
13    Footnote 29 on page 12 of your rebuttal report,
14 Plaintiffs' Exhibit 150, states, "A high response rate
15 has been defined as 80% or higher."                 05:52
16    Is that your professional belief?
17    A. Yeah. I'm basically reporting what --
18    MR. SPELLBERG: Wait a minute, Chester. I'm
19 going to object. It's vague and ambiguous as it's taken
20 out of context. There's no foundation for it.        05:52
21    You may answer.
22    THE WITNESS: It's my professional belief that
23 that author defined it that way, yes.
24 BY MR. TIDRICK:
25    Q. What is your professional opinion on what a    05:53
Page 63

1 high response rate is?
2    MR. SPELLBERG: I'm going to object again.
3 Lacks foundation, incomplete hypothetical.
4    THE WITNESS: I don't know that there is a
5 commonly accepted number that is generally considered to  05:53
6 be a high response rate, which is why I cited the source
7 that I did, which does attempt to quantify that.
8 BY MR. TIDRICK:
9    Q. Do you agree with the source that you cited in
10 Footnote 29 of your rebuttal report?                  05:53
11    A. I think it's reasonable.
12    Q. Dr. Drogin calculated damages based upon
13 individuals that were in the work assignment data, the
14 payroll data, and whose work assignment data could be
15 matched on a range of work.                          05:54
16    Do you understand that?
17    A. I believe he reported something to that effect.
18    Q. Do you understand that based on that
19 methodology, if an operator did not fix those criteria,
20 he or she was not included in Dr. Drogin's damages    05:54
21 calculations? You understand that?
22    MR. SPELLBERG: Objection. Facts not in
23 evidence.
24    THE WITNESS: I -- I do not know whether that's
25 true or not.                                         05:54
Page 64

1 BY MR. TIDRICK:
2    Q. Do you believe that operators who were not in
3 the work assignment data -- figures weren't included in
4 the sample results?
5    A. If they're actually class members, I don't know  05:55
6 why they would be excluded.
7    Q. Do you have, sitting here today, any
8 professional opinions to offer on whether operators who
9 are not in the work assignment data should have been
10 included in the sample results?                       05:56
11    MR. SPELLBERG: Lacks foundation.
12    THE WITNESS: I would say that the way that a
13 researcher would typically approach that question would
14 be to get data from everybody, unless there is a
15 compelling reason to not get data from that person. And  05:56
16 to my knowledge, I don't know of any compelling reason to
17 exclude them.
18 BY MR. TIDRICK:
19    Q. What, in your professional opinion, would
20 constitute a compelling reason?                      05:56
21    A. It depends on the circumstance. For example,
22 if we are studying a position, which we have done many
23 times to determine whether people are properly classified
24 as exempt, we would exclude people who are low performers
25 or have not been in the job for a sufficient period of  05:56
Page 65

17 (Pages 62 - 65)

1 time, because the person in that position is probably not
2 performing the job as expected. So in that situation, we
3 would not include that person in the eligible sample.
4 Q. Can you identify any other reasons that you
5 would describe as compelling?                05:57
6 A. Sure. So --
7 MR. SPELLBERG: Objection. It's vague and
8 ambiguous, an incomplete hypothetical.
9 Go ahead.
10 THE WITNESS: I -- I'm just thinking of        05:57
11 examples of times where we've excluded people. There's
12 been situations where if there's -- an individual is
13 aware of a lawsuit, and we believe that their data could
14 be tainted because of that, we might exclude them.
15 BY MR. TIDRICK:                05:57
16 Q. In this case, do you know what the work
17 assignment data is?
18 A. I believe it was -- I have a general
19 understanding, and I believe it was essentially just
20 which runs people -- operators were assigned to.       05:57
21 Q. Do you have any understanding beyond that of
22 what the work assignment data was?
23 A. I know there are several reports that are -- or
24 databases, I should say, that are quite similar. I know
25 that there was one that we reviewed in some detail called 05:58

Page 66

1 the range reports, and I -- which I think are different,
2 but I think there's some overlap between the two. So I
3 guess the answer is no.
4 Q. Do you understand what a range report is?
5 A. Yeah. Well, my understanding of the range       05:58
6 reports is based on essentially what's in them, which
7 is -- again, contains information on the runs and the
8 time that the run is supposed to leave and supposed to
9 arrive, and different locations, that sort of thing.
10 Q. Have you actually seen a range report in this    05:58
11 case?
12 A. I have.
13 Q. Have you actually seen the work assignment data
14 in this case?
15 A. I don't recall.                05:58
16 Q. A moment ago you indicated that you believe the
17 work assignment data indicates that an operator was
18 assigned to a run. Correct?
19 A. That was my general understanding. But like I
20 said, I haven't reviewed that data. That was based on    05:59
21 what I remembered from the way it was described in
22 Dr. Drogin's report.
23 Q. Based on just that general understanding of the
24 work assignment data, if the work assignment data
25 reflects the operators were assigned to runs, then why    05:59

Page 67

1 would it be improper to exclude operators from the sample
2 who are not in the work assignment data?
3 A. I don't --
4 MR. SPELLBERG: Vague and ambiguous, incomplete
5 hypothetical.                06:00
6 THE WITNESS: I don't know enough about the
7 work assignment data to answer that question.
8 BY MR. TIDRICK:
9 Q. What about the payroll data? Have you looked
10 at any of the payroll data?                06:00
11 A. I don't believe I've seen the payroll data, but
12 generally have an understanding of what payroll data
13 looks like.
14 Q. Have you looked at any of the payroll data in
15 this case?                06:00
16 A. I don't believe so.
17 Q. Do you believe it's reasonable to not include
18 in the sample results information -- strike that.
19 Do you believe it's reasonable to not include
20 in the sample results individuals for whom there is no    06:01
21 payroll data?
22 A. I -- I don't know enough about the payroll data
23 or why people were not included to -- to answer that.
24 Q. Do you have any understanding about the
25 matching of work assignment data to range reports?       06:01

Page 68

1 A. I believe Dr. Drogin described some of it, but
2 not very detailed knowledge, no.
3 Q. Sitting here today, is there any reason that
4 you can identify why it would be improper to exclude from
5 the sample results individuals whose work assignment data 06:01
6 could not be matched to the range report?
7 MR. SPELLBERG: Same objection.
8 THE WITNESS: I don't know enough about that
9 process to answer that question.
10 BY MR. TIDRICK:                06:02
11 Q. If you could, please, turn to the document that
12 has been premarked as Plaintiffs' Exhibit 151. This is
13 the Declaration of Chester Hanvey, Ph.D., in Support of
14 Motion to Decertify Collective Action and Class Action.
15 A. Okay.                06:02
16 Q. Who prepared this declaration?
17 A. I did.
18 Q. When did you prepare it?
19 A. It was finalized on July 1st, 2016. So
20 probably took a week or two to prepare it.       06:03
21 Q. Was the preparation of the Exhibit 151
22 declaration administered by a neutral party?
23 MR. SPELLBERG: I'm going to object. Vague and
24 ambiguous.
25 THE WITNESS: Yeah, I don't understand what     06:03

Page 69

18 (Pages 66 - 69)

1 that means.
2 BY MR. TIDRICK:
3    Q. Well, tell me what you meant when you said that
4 the declarations of operators would have had to have been
5 administered by a neutral party. What do you mean by   06:03
6 that?
7    MR. SPELLBERG: Vague and ambiguous.
8    THE WITNESS: Where did I say that?
9    MR. SPELLBERG: I'm going to object that it's
10 vague and ambiguous without the context of where it was   06:03
11 stated.
12    THE WITNESS: I'm not sure where I stated that.
13 Can you help me with that?
14 BY MR. TIDRICK:
15    Q. Is it your professional belief that in order   06:04
16 for the declaration provided by the operators could be
17 considered valid, that in some manner those declarations
18 needed to be overseen by a neutral party? Do you have
19 that belief?
20    MR. SPELLBERG: Vague and ambiguous.   06:04
21    THE WITNESS: Are you talking about -- I think
22 I understand what you're asking. I would restrict that
23 to situations where you're trying to collect self-report
24 data from individuals from a sample of individuals and
25 extrapolate to the class.   06:04

---

1 BY MR. TIDRICK:
2    Q. Why would you restrict it in that manner?
3    A. Because that's where those professional
4 guidelines are applicable.
5    Q. Well, what professional guidelines are you   06:04
6 referring to?
7    A. The one that you just cited.
8    Q. The importance of administration by a neutral
9 party?
10    A. That's correct.   06:05
11    Q. And what specifically -- what specific
12 professional guidelines are you referring to that
13 indicate that that's necessary?
14    A. Well, I cited it in my report. Should I do
15 it -- would you like me to locate that?   06:05
16    Q. Yes, please.
17    A. Okay. There's a chapter written by an author,
18 last name Diamond, and it's dated 2003, that addresses
19 that issue.
20    Q. And that's cited in your rebuttal report?   06:05
21    A. Yes. Well, hold on. Let me confirm that.
22    Yes, it is.
23    Q. On page 14 of your rebuttal report, I see
24 citations of Diamond 2003 Reference Guide on Survey
25 Research. Is that correct? That's the professional   06:06

---

1 guidelines you're referring to?
2    A. That's the one that I cited, yes.
3    Q. Your point is that Diamond indicates that for
4 survey research it's necessary for the survey to be
5 administered by a neutral party. Is that fair?   06:06
6    A. Yes, that is the position in that chapter.
7    Q. And is it your position that Exhibit 151, your
8 declaration, did not need to be administered by a neutral
9 party because it's a declaration?
10    MR. SPELLBERG: Incomplete question, vague and   06:07
11 ambiguous.
12    THE WITNESS: I don't -- I don't know how
13 the -- I don't understand your question.
14 BY MR. TIDRICK:
15    Q. What is -- if you could, please, comparing   06:07
16 Exhibit 151, your declaration, and Exhibit 135, the
17 declaration of an operator in this case, Declaration of
18 Jonathan-Dat Lam, why in your professional opinion is it
19 necessary that Jonathan-Dat Lam's declaration needs to be
20 administered by a neutral party but yours did not?   06:08
21    A. I'm not a class member, self-reporting, time
22 spent on various activities.
23    Q. Why does being a class member, self-reporting
24 on time spent on different activities -- why does that
25 make a difference?   06:08

---

1    A. It makes a difference when the data that's
2 collected is then used to statistically extrapolate to
3 the rest of the class.
4    Q. Why?
5    A. Because any analysis based on invalid data are,   06:08
6 by their nature, invalid as well.
7    Q. Is your basis for that the three studies that
8 you cite at Footnote 14 of your rebuttal report?
9    A. Can you repeat that question?
10    MR. TIDRICK: Madam Court Reporter.   06:09
11    (Record read.)
12    THE WITNESS: Can you remind me what that
13 refers to?
14 BY MR. TIDRICK:
15    Q. Sorry. What's the clarification you need?   06:09
16    A. The question was, "Is your basis for that," and
17 I'm trying to understand what "that" refers to.
18    Q. Your belief that information provided by the
19 class members is not reliable, is your basis for that the
20 three studies cited in Footnote 14 of your rebuttal   06:10
21 report?
22    A. Not necessarily.
23    Q. The Exhibit 135 document, the Declaration of
24 Jonathan-Dat Lam, can you identify specifically what
25 information in that declaration you believe needed to be   06:11

---

19 (Pages 70 - 73)

1 administered by a neutral party?
2    A. So the professional standards dictate that when
3 you're collecting self-report data such as average number
4 of minutes before the scheduled relief time or before
5 scheduled time of relief, and there are several other      06:11
6 locations in here where people are reporting time
7 estimates, that having that administered by a neutral
8 third party will increase your liability.
9    Q. The basis for that opinion is what?
10    A. The primary basis, the one that's cited, is the      06:12
11 chapter by Diamond that we discussed previously.
12    Q. Can you identify any other basis for that
13 opinion?
14    A. That's really the only one I know that deals
15 specifically with survey research in a legal context.      06:12
16 There's lots and lots and lots of books and articles that
17 talk about survey research generally, but for the
18 specific point about having attorneys involved, I believe
19 that that's the only one that I -- I'm aware of.
20    Q. The Diamond source that you're relying on, they      06:12
21 conducted a survey. Is that correct?
22        THE REPORTER: "They conducted a survey"?
23 Would you repeat the question?
24 BY MR. TIDRICK:
25    Q. The Diamond source that you're relying upon is      06:13

Page 74

1 about surveys. Correct?
2    A. It's about various methods for collecting
3 self-report data.
4    Q. Did it have any discussion of information
5 provided through affidavits or declarations?      06:14
6    A. No. It specifically said attorneys should not
7 be involved. So I assume that's why that was not
8 discussed any further.
9    Q. Is that just an assumption you're making, or do
10 you have any reason to believe that the author considered      06:14
11 the possibility of affidavits as a method of providing
12 information?
13    A. I don't think it makes sense for an author to
14 say you should not do something and then go on to explain
15 how you should do it.      06:15
16    Q. My question is different. Do you have any
17 reason to believe that Diamond has any opinion about the
18 validity of information provided through affidavits or
19 declarations?
20    A. If the --      06:15
21        MR. SPELLBERG: Vague and ambiguous, lack of
22 foundation.
23        Go ahead.
24        THE WITNESS: Based on what is in the article,
25 yes.      06:15

Page 75

1 BY MR. TIDRICK:
2    Q. Is there any concern in your professional
3 opinion about the reliability of information provided in
4 affidavits or declarations other than your belief that an
5 attorney may be involved?      06:16
6    A. Can you repeat that?
7        MR. TIDRICK: Madam Court Reporter.
8        (Record read.)
9        THE WITNESS: There may be. I've not -- I
10 would have to know the specifics to answer that.      06:16
11 BY MR. TIDRICK:
12    Q. What are the other concerns you have?
13    A. I would need to know how the information was
14 collected, what information was collected before I could
15 even begin to answer that.      06:16
16    Q. You're being paid to provide your opinions in
17 this case. Is that correct?
18    A. The company I work for is being paid, yes.
19    Q. What is your hourly rate?
20    A. I don't know what it was for this project.      06:17
21    Q. What is your hourly rate typically?
22    A. Currently, $400 per hour.
23    Q. Part of your belief that the declarations of
24 operators are not reliable is your belief that they have
25 a financial incentive to lie. Is that fair?      06:18

Page 76

1    A. No, I don't think that's fair.
2    Q. What is your concern about financial incentives
3 of operators?
4    A. Can you refer me to where this is coming up?
5    Q. Well, in this deposition you testified that you      06:18
6 have some concern about the fact that the information
7 provided relates to financial claims that the operators
8 are making. Is that incorrect?
9    A. Can you repeat that?
10        MR. TIDRICK: Madam Court Reporter.      06:19
11        (Record read.)
12        THE WITNESS: I don't recall that specifically.
13 I'm not sure what you're referring to.
14 BY MR. TIDRICK:
15    Q. In your professional opinion, do the operators      06:19
16 have a financial incentive to exaggerate the information
17 reported in their declarations?
18    A. They may.
19    Q. Do you believe that they are exaggerating their
20 information for financial reasons in this case? Is that      06:19
21 your professional belief?
22    A. I don't know what's going on inside any of
23 their heads, so I don't -- don't know.
24    Q. You really have no basis for saying one way or
25 another whether they are lying in their declarations.      06:19

Page 77

20 (Pages 74 - 77)

| | |
|---|---|
| 1   Correct? | 1   not in evidence. |
| 2       MR. SPELLBERG: Objection. Argumentative, | 2       THE WITNESS: That sounds reasonable, but I |
| 3   lacks foundation. | 3   don't remember the specific details of what each person |
| 4       THE WITNESS: Some of the self-reports were | 4   reported. |
| 5   inconsistent with other data.       06:20 | 5   BY MR. TIDRICK:       06:23 |
| 6   BY MR. TIDRICK: | 6     Q. In paragraph 14 of your rebuttal report, you |
| 7     Q. Is it possible that instances in which some | 7   used the phrase "work tasks," and you're citing those |
| 8   operators provided information different from others -- | 8   three studies for that point. |
| 9   strike that. | 9     A. Mm-hm. |
| 10       With respect to the three studies that you cite  06:20 | 10     Q. Do you believe that those three studies discuss  06:24 |
| 11   in Footnote 14 of your rebuttal report, Plaintiffs' | 11   the reporting of time spent on specific work tasks? |
| 12   Exhibit 150, Duncan & Hill, Robinson & Bostrom, Mellow & | 12       MR. SPELLBERG: Vague and ambiguous, |
| 13   Sider, you're familiar with those three studies you've | 13   irrelevant. |
| 14   cited in paragraph 14 of your rebuttal report? | 14       THE WITNESS: I think those are three good |
| 15     A. Yes.       06:21 | 15   citations to describe the pretty commonly accepted     06:24 |
| 16     Q. Now, the Robinson & Bostrom study was actually | 16   position that people do tend to overreport time. |
| 17   from 1994, not 1984. Correct? | 17   BY MR. TIDRICK: |
| 18     A. I'm not sure. | 18     Q. When people are asked about the total amount of |
| 19     Q. None of those three studies discussed | 19   time they spend working; correct? |
| 20   affidavits or declarations. Correct?       06:21 | 20     A. In those three studies, I believe that's --   06:24 |
| 21     A. I don't believe so. | 21   that's what they were reporting. But as I said, I don't |
| 22       MR. TIDRICK: Madam Court Reporter, can you | 22   recall the specific details. |
| 23   read back the response, please. | 23     Q. None of those three studies involved situations |
| 24     (Record read.) | 24   in which individuals were reporting time under penalty of |
| 25   ///       06:21 | 25   perjury. Correct?       06:25 |
| <div align="right">Page 78</div> | <div align="right">Page 80</div> |
| 1   BY MR. TIDRICK: | 1     A. I don't recall that -- |
| 2     Q. Do you understand that -- strike that. | 2       MR. SPELLBERG: Objection. Lacks foundation. |
| 3       The studies that you cited in Footnote 14 of | 3       THE WITNESS: I don't recall, but I would doubt |
| 4   your rebuttal report are the studies that you believe | 4   it. |
| 5   indicate that there is a tendency of people to overreport  06:22 | 5   BY MR. TIDRICK:       06:25 |
| 6   the amount of time they spend performing work tasks. Is | 6     Q. In your professional opinion, do you believe |
| 7   that correct? | 7   that providing information under penalty of perjury would |
| 8     A. Yeah. All three of those studies indicate | 8   have the tendency to cause someone to provide information |
| 9   that. | 9   more accurately? |
| 10     Q. Are there any other studies that you're aware   06:22 | 10       MR. SPELLBERG: Objection. Lacks foundation.   06:25 |
| 11   of that indicate that? | 11       THE WITNESS: I don't have an answer. I don't |
| 12     A. Not that I can cite off the top of my head. | 12   know that to be true one way or the other. |
| 13     Q. Sitting here today, there are no studies that | 13   BY MR. TIDRICK: |
| 14   you could identify other than the three cited in Footnote | 14     Q. As a general matter, do you believe that being |
| 15   14 for the proposition that there is a tendency to      06:22 | 15   under penalty of perjury causes someone to be more     06:25 |
| 16   overreport time spent performing work tasks. Is that | 16   truthful in their statements made? |
| 17   correct? | 17     A. I have no idea. |
| 18     A. Not that I can cite off the top of my head. | 18       MR. SPELLBERG: Objection. Lack of foundation, |
| 19     Q. Do you understand that the three studies that | 19   incomplete hypothetical, vague and ambiguous. |
| 20   you've cited in Footnote 14 all discuss situations in   06:23 | 20       THE WITNESS: I have no idea.       06:26 |
| 21   which individuals are reporting how many hours total | 21   BY MR. TIDRICK: |
| 22   spent working as opposed to estimates of discrete work | 22     Q. Are you aware of a publication by Valerie Ramey |
| 23   tasks? | 23   of the National Bureau of Economic Research from July |
| 24     A. That sounds -- | 24   2012, entitled "The Impact of Hours Measures on the Trend |
| 25       MR. SPELLBERG: Objection. Objection. Facts  06:23 | 25   and Cycle Behavior of U.S. Labor Productivity?     06:26 |
| <div align="right">Page 79</div> | <div align="right">Page 81</div> |

<div align="right">21 (Pages 78 - 81)</div>

| | |
|---|---|
| 1  A. I'm not. | 1  THE WITNESS: I have no reason to believe one |
| 2  Q. I'll represent to you that there was a finding | 2  way or the other on that. |
| 3  in that publication at page 4, and I quote, "Although | 3  BY MR. TIDRICK: |
| 4  some segments of the population had a tendency to | 4  Q. Did you do anything in this case to assess |
| 5  overstate their hours, others had a tendency to     06:26 | 5  whether the population in the class in this case has a     06:29 |
| 6  understate their hours, so there was no bias in the | 6  tendency to either overstate or understate their hours? |
| 7  aggregate." | 7  A. I didn't personally examine that other than |
| 8  Do you have any reason to believe that that | 8  reading what -- the analysis that others performed. |
| 9  finding is incorrect? | 9  Q. And specifically, you're referring to the |
| 10  MR. SPELLBERG: Objection. Complete lack of     06:27 | 10  observational analysis by Arnold. Is that correct?     06:30 |
| 11  foundation, incomplete hypothetical, irrelevant. | 11  A. No. I'm referring to the rebuttal report of |
| 12  THE WITNESS: Without reading the details of | 12  Mary Furst and Adrian Fleissig. |
| 13  that study, I cannot comment on it. | 13  Q. Other than what you read in that rebuttal |
| 14  BY MR. TIDRICK: | 14  report, you have no basis for saying whether the |
| 15  Q. The only studies on this subject that you've     06:27 | 15  population of operators in this case have a tendency to     06:31 |
| 16  cited are from Duncan & Hill, 1985, Mellow & Sider, 1983, | 16  understate or overstate their hours. Is that correct? |
| 17  and Robinson & Bostrom that you indicated that you | 17  A. No, that's not correct. |
| 18  thought it was from 1984. I'll represent to you that on | 18  Q. Are you aware that there is research indicating |
| 19  the face that it says 1994. | 19  that some segments of the population have a tendency to |
| 20  I guess my question for you is: Are you aware     06:27 | 20  understate their hours?     06:31 |
| 21  of any studies after any of those three that reached the | 21  A. Are you referring to the study that you just |
| 22  same conclusion that you're citing them for? | 22  talked about? |
| 23  A. I can't -- | 23  Q. You've already testified you're not aware of |
| 24  MR. SPELLBERG: Vague and ambiguous. | 24  that one. |
| 25  THE WITNESS: I can't cite any off the top of     06:28 | 25  I'm asking: Are you aware of any studies     06:31 |
| Page 82 | Page 84 |

| | |
|---|---|
| 1  my head. | 1  indicating that there are segments of the population that |
| 2  BY MR. TIDRICK: | 2  have a tendency to understate their hours? |
| 3  Q. I understand you are not familiar with the July | 3  A. I'm not. |
| 4  2012 paper by Valerie Ramey of the national Bureau of | 4  MR. SPELLBERG: Objection. Vague and |
| 5  Economic Research.     06:28 | 5  ambiguous.     06:31 |
| 6  Aside from her findings in that publication, | 6  BY MR. TIDRICK: |
| 7  let me just ask you about the following statements. Do | 7  Q. For the purpose of preparing your rebuttal |
| 8  you have any reason to believe that while some segments | 8  report in this case, did you do anything to attempt to |
| 9  of the population have a tendency to overstate their | 9  ascertain whether there is any research more recent than |
| 10  hours, that others have a tendency to understate their     06:28 | 10  the 1985, 1983, and 1994 studies that you cited in     06:32 |
| 11  hours? Do you have any reason to agree or disagree with | 11  Footnote 14? |
| 12  that? | 12  A. Sure. I performed a literature review. |
| 13  MR. SPELLBERG: Objection. It's vague and | 13  Q. What other studies did you identify that |
| 14  ambiguous. It's completely -- it's incomprehensible as | 14  addressed the same subject? |
| 15  asked. There is no foundation.     06:29 | 15  A. I didn't find any. That's why I cited the ones     06:32 |
| 16  You may -- you can do what you want with the | 16  that I cited. |
| 17  question. I'm not instructing you. | 17  Q. If you could, please, look at Exhibit 107, the |
| 18  THE WITNESS: I'll repeat my same answer. | 18  Declaration of Elizabeth Arnold. |
| 19  Without looking at the details of that study, I cannot | 19  A. Is that in this stack? |
| 20  comment on it.     06:29 | 20  Okay.     06:33 |
| 21  BY MR. TIDRICK: | 21  Q. Have you seen this document before? |
| 22  Q. In your professional opinion, do you believe | 22  A. I probably have. I don't recall specifically, |
| 23  that some segments of the population had a tendency to | 23  but probably. |
| 24  understate their hours? | 24  Q. Did you participate in the preparation of this |
| 25  MR. SPELLBERG: Same objections.     06:29 | 25  declaration?     06:33 |
| Page 83 | Page 85 |

22 (Pages 82 - 85)

1    A.  I reviewed it and gave feedback.
2    Q.  If I could, please, refer you to 46 --
3  paragraph 46 of Exhibit 107.
4    A.  Okay.
5    Q.  Did you help do the calculations that are        06:33
6  referenced in that paragraph?
7    A.  Yes, I did.
8    Q.  Are you able to tell me how the average of 5
9  minutes and 42 seconds that is referenced in paragraph 46
10  of Exhibit 107 was calculated?                      06:34
11    A.  You're asking me to explain how the average is
12  calculated?
13    Q.  How was it calculated?
14    A.  You add up all the numbers and divide by the
15  total number of data points.                         06:35
16    Q.  Is that what you did?
17        MR. SPELLBERG:  Objection.  He didn't draft it.
18  It's not his declaration.
19        THE WITNESS:  It's -- yeah, I mean, that's the
20  mathematical operation for how you compute an average.  06:35
21  BY MR. TIDRICK:
22    Q.  Are you the one who calculated the average of
23  5 minutes and 42 seconds?
24    A.  I believe so, yes.
25    Q.  Did you include bureau time data in running       06:35

1  that calculation?
2    A.  If an operator spent zero time, then yes.
3        (Exhibit 153 marked for identification.)
4  BY MR. TIDRICK:
5    Q.  If I could, please, refer you to the document   06:35
6  that's been premarked as Exhibit 153.  It's a 318-page
7  PDF that I will represent to you is a printout of the
8  Excel file that was produced to us by email on July 18th,
9  an Excel file entitled MUNI RAW Depo Production - V2, V
10  like version.                                        06:36
11    A.  Okay.
12    Q.  Do you see the Exhibit 153 document?
13    A.  I do.
14    Q.  Who prepared that document?
15    A.  Myself and Elizabeth Arnold.  Well, several   06:37
16  people contributed different aspects of it, so it's hard
17  to answer that question.
18    Q.  What is this document?
19    A.  This is essentially a list of all the tasks
20  that were observed.                                  06:37
21    Q.  Do you know what the meanings of the columns
22  are in the Exhibit 153 document?
23    A.  Yes.
24    Q.  Starting with the column that has the header
25  "Work_Task1."                                        06:38

1    A.  Okay.
2    Q.  What does the data in that column represent?
3    A.  That is coding that was done by someone who
4  reviewed these tasks.
5    Q.  Who did that coding?                            06:38
6    A.  I don't know.
7    Q.  The people who did that coding, what were they
8  instructed to do?
9    A.  I don't know.
10    Q.  Do you know what the zeros and 1's represent in  06:38
11  that column?
12    A.  Yeah.  A zero represents a task that
13  essentially is not counted, and a 1 represents a task
14  that is counted.
15    Q.  And by not counting, what do you mean?          06:39
16    A.  There was a running total, I believe, based on
17  the final -- final coding, which isn't reflected here,
18  but it basically summed up time that -- for all tasks
19  that had a number 1 next to it.
20    Q.  The column to the right of that, it's the       06:39
21  "Header_Task2."  What does the information in that column
22  reflect?
23    A.  It's --
24        (Unintelligible, overlapping dialogue.)
25        MR. SPELLBERG:  (Unintelligible.)               06:39

1        THE WITNESS:  It's the -- it's the same thing,
2  except a different coder.
3  BY MR. TIDRICK:
4    Q.  Are you able to tell me with any level of
5  precision with respect to the column Work_Task2 what that  06:40
6  means beyond what you said about Work_Task1?
7    A.  They are -- they are -- it's the same thing;
8  it's just a different coder.
9    Q.  To the right of the Work_Task2 column is a
10  column entitled "Work_Task3."  From your prior testimony,  06:40
11  do I understand correctly that's the same column as
12  Work_Task1 and Work_Task2; it's just a different coder?
13    A.  Probably.  That's -- that's not shown on the
14  printed version, so I'm -- but I -- that probably still
15  is the case.                                         06:41
16    Q.  If you turn ahead roughly two-thirds of the way
17  through this stack of pages -- I realize it's 318 pages
18  long.  If you're able to turn to the section that's
19  roughly two-thirds of the way through.  In the PDF
20  version it starts at page 213, but that section in the    06:41
21  document is a printout of that part of the worksheet.
22    A.  Okay.  I'll do my best.
23    Q.  Okay.  Now you see that the column there says
24  "Walk Time"?
25    A.  Oh, okay.  You mean all the -- okay.  I got    06:42

1 you. Yeah, okay. I've found a page that has that.
2 Q. What does the column entitled "Walk Time"
3 present?
4 A. My understanding is that that identifies tasks
5 that included walking at the division. But I don't have 06:42
6 the details on how exactly that was defined.
7 Q. And there are three columns that all start Walk
8 Time: Walk Time, Walk_Time 2, Walk_Time 3.
9 Is what you just said true for all three of
10 those; it's just three different observers? 06:42
11 A. It wouldn't necessarily be three different
12 observers, but I -- I believe it's three different
13 coders. But, you know, I didn't -- wasn't really
14 involved in that process.
15 Q. What does the column entitled "Code_Final" 06:42
16 represent?
17 A. The code -- Code_Final is the actual final --
18 final code that was given to that based on the coding of
19 the three, the three coders.
20 Q. Do you have any understanding how that value in 06:43
21 that column was arrived at?
22 A. I believe it -- it had to do with if everybody
23 agreed on the code, then certainly it would -- it would
24 take that code. I think if two out of -- at least two
25 out of three agreed on a code, then it would take that 06:43

Page 90

1 code, but I would -- I would need to verify that. I'm
2 not a hundred percent sure.
3 Q. The column immediately to the right of that,
4 "Work_Task_Final," what did that column represent?
5 A. That's the final coding for -- for that 06:44
6 particular variable.
7 Q. Are you able to tell me how that's different
8 than the code "_Final" column?
9 A. Well, it's coding on a different thing. So the
10 code column -- there were several specific tasks that we 06:44
11 were attempting to code, and then the work task was
12 broader than that, but I don't know exactly what that
13 included.
14 Q. The next column over -- sorry. Was there
15 something more you wanted to say on that? 06:44
16 A. Oh, no, no.
17 Q. The next column over, entitled "Walk_Time
18 Final," can you tell me what that means?
19 A. Sure. So that's, again, going to be the
20 final -- the final code for however walk time was defined 06:44
21 based on the -- the coding of the three coders.
22 Q. And can you tell me what the numbers in that
23 column represent? So for instance, if Walk_Time Final is
24 one, what did that mean?
25 A. I think there's probably only 1's. It's either 06:45

Page 91

1 probably 1 or blank. And that just essentially means it
2 was -- it was coded as being the criteria.
3 Q. The next column -- well, and when you say "the
4 criteria," what does that mean?
5 A. I don't know what the criteria was. It was -- 06:45
6 somehow walking time was defined, and so it was based on
7 that.
8 Q. Are you able to tell me what that definition
9 was?
10 A. I'm not. 06:45
11 Q. The next column over, "Task_Final," can you
12 tell me what that is?
13 A. That's the final wording of the task
14 description.
15 Q. Can you tell me how that was arrived at? 06:45
16 A. It was based on what the observer recorded; and
17 if there was anything unclear, that would be corrected.
18 Q. And the process for correcting what an observer
19 wrote, how did that process work?
20 A. I don't know. I wasn't involved with that 06:46
21 process.
22 Q. Who was?
23 A. Well, I'm not entirely sure. I know that
24 Elizabeth Arnold was involved. I don't know the extent
25 to which she involved others. 06:46

Page 92

1 Q. The next column over, the "Observer Final,"
2 what does that represent?
3 A. That's just a numeric sequence of observers.
4 So in some cases, the operator who was observed would be
5 observed partially by one observer, partially by a second 06:46
6 observer, partially by a third, et cetera. So that just
7 identified which observer observed which tasks.
8 Q. The next column over, "Code_Rev_QC," can you
9 tell me what that means?
10 A. I believe that represents whether or not in -- 06:46
11 the Coder 1 and Coder 2 provide the same -- the same code
12 for the --
13 Q. I don't want you --
14 A. Yeah.
15 Q. For the what? 06:47
16 A. Oh, for the -- for the coding, the specific
17 columns that are called code.
18 Q. I don't want you to speculate. Are you sure on
19 that, or is that a guess?
20 A. I'm reasonably sure. I would have to look at 06:47
21 the formula to verify that, but it's -- I mean, that's --
22 that's the intent. I know that that was the intent of
23 it.
24 Q. The next column over, "Work_Task_QC," can you
25 tell me what that represents? 06:47

Page 93

24 (Pages 90 - 93)

1    A.  So again, I believe that's just a comparison to
2  see whether Coder 1 and Coder 2 matched in the codes they
3  assigned.
4    Q.  With respect to the next column over, "Obs QC
5  Walk Code," can you tell me what that stands for?      06:48
6    A.  "Obs" is the abbreviation that we use for
7  observation.  "QC" is quality check.  So I -- I'm --
8  based on that, I'm assuming that this is the same as the
9  other two columns prior to that, except it's for the
10  walking code.                                           06:48
11    Q.  The three codes -- strike that.
12    The three columns you're referring to, the
13  three that have the letters "QC", quality check, in them,
14  do I understand correctly that when it says "match," it
15  indicated that the observer's observations matched, but   06:48
16  when they don't, they did not match?
17    A.  That appears to be the case.
18    MR. TIDRICK:  Thank you.  The deposition has
19  concluded.
20    THE VIDEOGRAPHER:  This concludes today's      06:49
21  deposition.  The number of media used was two.  We are
22  off the record, 6:49 p.m.
23    THE REPORTER:  As far as reading and signing of
24  the transcript, do you want to reach a stipulation on
25  that or go by California code?                           06:49

---

1    MR. TIDRICK:  Yeah, California code is fine for
2  that.  It can probably just come to me.  And what do you
3  usually do?  Do you send it to the witness, or do you
4  send it to me?
5    THE REPORTER:  Normally -- well, it's whatever
6  is agreeable, but we will send them to the witness and
7  then back to you, if that's agreeable.
8    MR. SPELLBERG:  That's fair.
9    THE REPORTER:  Okay.
10    Counsel, Mr. Spellberg, do you need a copy of   06:49
11  the transcript?
12    MR. SPELLBERG:  Yes.  I want a transcript and a
13  disk, and I'd like it electronically as well.
14    THE REPORTER:  You've got it.
15    MR. SPELLBERG:  Thank you.                      06:50
16    MR. TIDRICK:  And that was Spellberg talking.
17  This is Tidrick, and we'll communicate with the Veritext
18  office.  We're going to do what we normally do with the
19  transcript.
20    (Deposition concluded at 6:50 p.m.)
21                      * * *
22
23
24
25

---

1         DECLARATION UNDER PENALTY OF PERJURY
2
3
4    I, CHESTER HANVEY, Ph.D., do hereby declare
5  under penalty of perjury that I have read the foregoing
6  transcript; that I have made any corrections as appear
7  noted, in ink, initialed by me, or attached hereto; that
8  my testimony as contained herein, as corrected, is true
9  and correct.
10
11
12    EXECUTED this _____ day of _____,
13  2016, at _____,
14  California.
15
16
17
18
19
20
21         _____
22         CHESTER HANVEY, Ph.D.
23
24
25

---

1         REPORTER'S CERTIFICATION
2    I, the undersigned, a Certified Shorthand
3  Reporter of the State of California, do hereby certify:
4    That the foregoing proceedings were taken
5  before me at the time and place herein set forth; that
6  any witnesses in the foregoing proceedings, prior to
7  testifying, were duly sworn; that a record of the
8  proceedings was made by me using machine shorthand
9  which was thereafter transcribed under my direction;
10  that the foregoing transcript is a true record of the
11  testimony given.
12    Further, that if the foregoing pertains to
13  the original transcript of a deposition in a Federal
14  case, before completion of the proceedings, review of
15  the transcript [ ] was [ ] was not requested.
16    I further certify I am neither financially
17  interested in the action nor a relative or employee
18  of any attorney or party to this action.
19
20    IN WITNESS WHEREOF, I have this date subscribed my
    name.
21  Dated: July 27, 2016
22
23
24    _Laura T. Martin_
       LAURA TAYLOR MARTIN
25       CSR No. 4158

---

| & |
|---|
| **&** 78:12,12,12,16 82:16,16,17 |

| 0 |
|---|
| **03704** 1:7 2:7 6:12 |

| 1 |
|---|
| **1** 23:11,11,16 47:18 57:21 59:6 60:3,22 88:13,19 92:1 93:11 94:2 |
| **1's** 88:10 91:25 |
| **1-20** 1:10 2:10 |
| **10** 5:5 21:2 22:9,13 22:15 33:5 |
| **100** 4:19 |
| **105** 4:21 |
| **106** 4:23 |
| **107** 4:24 85:17 86:3 86:10 |
| **10th** 20:18 23:9 28:6 31:20 |
| **11** 5:4 22:9,13 31:8 |
| **112** 5:3 11:1,5,13,16 11:25 12:5,8 18:14 18:16,20 19:15 |
| **113** 5:5 10:21,22 11:5,13,16,25 12:5 12:8,10 16:22 17:21 18:12,16 19:3 |
| **12** 1:7 2:7 6:12 50:6 50:7 63:13 |
| **12th** 6:5 |
| **135** 5:6 48:22 52:15 72:16 73:23 |
| **13th** 46:18,25 47:9 |
| **14** 71:23 73:8,20 78:11,14 79:3,15,20 80:6 85:11 |
| **149** 4:9 20:18,22,24 21:2,14,20 23:16,19 26:22 31:8,21 |
| **15** 12:11 15:10,14 15:15 19:16,25 |

23:19 50:21,25 54:8 55:2 56:8
| **15.a.** 12:20 |
| **150** 4:10 23:3 46:17 46:20 47:3,10 50:7 51:1 54:10 57:19,22 63:12,14 78:12 |
| **151** 4:12 23:3 69:12 69:21 72:7,16 |
| **152** 4:14 9:13,16,23 |
| **153** 4:16 23:3 87:3,6 87:12,22 |
| **16** 28:6 |
| **18** 57:19 |
| **18th** 87:8 |
| **1983** 82:16 85:10 |
| **1984** 78:17 82:18 |
| **1985** 82:16 85:10 |
| **1994** 78:17 82:19 85:10 |
| **1st** 69:19 |

| 2 |
|---|
| **2** 48:2 61:1 90:8 93:11 94:2 |
| **20** 1:18 2:21 4:9 6:1 16:22 24:12 31:5 |
| **20.a.** 16:24 |
| **2003** 71:18,24 |
| **2012** 81:24 83:4 |
| **2013** 22:2,3,12 |
| **2015** 8:7 |
| **2016** 1:18 2:21 6:1,5 20:18 21:3 22:15 23:9 28:6 31:21 33:5 46:18 47:9 69:19 96:13 97:21 |
| **2039** 3:5 |
| **213** 89:20 |
| **23** 4:11,13,16 |
| **2351883** 1:25 |
| **25** 22:20 63:9 |
| **26** 31:7,21 32:4 33:4 63:9 |

| 27 | 97:21 |
|---|---|
| **28** | 17:21 20:2 |
| **29** | 63:13 64:10 |

| 3 |
|---|
| **3** 59:6,12 60:3 90:8 |
| **300** 3:11 |
| **308** 3:5 |
| **318** 4:16 87:6 89:17 |
| **31st** 22:2,12 |
| **350** 3:11 |

| 4 |
|---|
| **4** 58:18 60:17 82:3 |
| **40** 35:12,15 |
| **400** 76:22 |
| **415** 3:12 |
| **4158** 1:24 2:22 97:25 |
| **42** 86:9,23 |
| **46** 86:2,3,9 |
| **48** 5:6 |
| **4:18** 23:1 |
| **4:27** 23:6 |

| 5 |
|---|
| **5** 12:11 19:16 86:8 86:23 |
| **510** 3:6 |
| **550** 2:19 3:16 6:8 |
| **567-8658** 3:17 |
| **5:40** 60:23 |

| 6 |
|---|
| **6** 16:21 22:19 23:18 |
| **678-3800** 3:12 |
| **68.0.** 59:7 |
| **6:49** 94:22 |
| **6:50** 2:20 6:2 95:20 |
| **6th** 22:3 |

| 7 |
|---|
| **7** 4:4 17:20 20:3 |
| **788-5100** 3:6 |

| 8 |
|---|
| **8** 21:23 47:9,14 |
| **80** 63:15 |
| **800** 2:19 3:16,17 6:9 |
| **85** 4:25 |

| 9 |
|---|
| **9** 4:15 22:10 57:22 |
| **92101** 3:16 6:10 |
| **94104** 3:11 |
| **94704** 3:6 |

| a |
|---|
| **abbreviation** 94:6 |
| **able** 16:5 17:7 37:18 41:20 42:6 51:18 56:20 86:8 89:4,18 91:7 92:8 |
| **academic** 22:4,7,13 47:16 |
| **accepted** 64:5 80:15 |
| **access** 29:14 |
| **accuracies** 50:18 |
| **accurate** 12:1 36:17 47:24 |
| **accurately** 20:14 81:9 |
| **action** 4:13,13,25,25 6:18 42:19 69:14,14 97:17,18 |
| **actions** 10:17,18 |
| **activities** 33:15 72:22,24 |
| **actual** 15:3 42:18 90:17 |
| **add** 86:14 |
| **addition** 22:4 33:23 |
| **addressed** 85:14 |
| **addresses** 71:18 |
| **adequate** 37:1,2 |
| **administer** 6:17 |
| **administered** 7:8,12 69:22 70:5 72:5,8 72:20 74:1,7 |

**administration** 71:8
**adrian** 54:14 55:6
  55:10,19,21 56:5,11
  56:25 84:12
**adversarial** 39:19
**advised** 37:24
**affidavit** 49:9
**affidavits** 30:22
  75:5,11,18 76:4
  78:20
**afternoon** 6:4 7:17
  7:18
**agency** 1:9 2:9 6:11
**aggregate** 82:7
**ago** 13:17 15:22
  29:6 36:10 43:24
  67:16
**agree** 15:24 51:16
  64:9 83:11
**agreeable** 95:6,7
**agreed** 90:23,25
**ahead** 7:5 16:16
  57:18 66:9 75:23
  89:16
**allegation** 23:25
  24:1
**allow** 36:16
**allowed** 39:17,20
**ambiguous** 17:10
  28:20 32:17 37:17
  38:1 40:3 41:7 45:4
  45:18 51:24 53:16
  55:14 56:19 58:1
  60:11 63:19 66:8
  68:4 69:24 70:7,10
  70:20 72:11 75:21
  80:12 81:19 82:24
  83:14 85:5
**amended** 22:2,12
**amount** 33:14 34:22
  36:13 37:4,25 57:24
  58:7,10 62:17 63:5
  79:6 80:18
**analysis** 49:4 55:5
  56:2,3,4,9,12,14,25

57:6,7 63:3,7 73:5
  84:8,10
**analyze** 56:15,24
  57:12
**analyzed** 55:22,25
**answer** 5:11 12:20
  13:4,18 14:14 15:14
  17:11 20:10 21:24
  28:21 32:18 34:23
  35:25 36:10,14,22
  37:5,14,15,18,20,25
  38:3,14 39:24 40:5
  40:6,10,13,20 41:8
  42:6 45:5,25 46:10
  51:14,25 53:17
  56:20 63:21 67:3
  68:7,23 69:9 76:10
  76:15 81:11 83:18
  87:17
**answered** 57:2
**answers** 40:2
**apc** 55:7
**appeal** 26:3
**appeals** 25:22
**appear** 96:6
**appearance** 6:21
**appearances** 3:1
**appeared** 27:16
  58:18
**appears** 11:15 21:4
  94:17
**appendices** 29:22
**appendix** 60:17
**applicable** 71:4
**apply** 45:3,24
**applying** 42:13
**approach** 65:13
**appropriate** 7:24
  32:9 33:20,25 34:2
  36:13 56:22
**approximate** 16:9
**approximately** 8:2,4
  35:12,15
**argumentative** 78:2

**arnold** 4:24 21:16
  47:6 61:9,17 62:5,8
  84:10 85:18 87:15
  92:24
**arnold's** 62:16
**arrive** 67:9
**arrived** 90:21 92:15
**arriving** 54:18
**article** 26:25 27:1,5
  27:7,16,20,22,23
  28:1,3 75:24
**articles** 26:11,14,22
  74:16
**ascertain** 85:9
**aside** 16:3 18:12
  83:6
**asked** 10:13 12:13
  17:22 19:17,20 20:4
  31:10 37:5,10,14
  38:18 39:2 40:13
  47:4 80:18 83:15
**asking** 13:21,23
  21:11 25:1 33:2,24
  35:10 36:12,19
  38:12,16 41:9,15,16
  53:5 70:22 84:25
  86:11
**aspect** 36:22
**aspects** 25:9 87:16
**assert** 58:14
**assess** 84:4
**assigned** 23:14
  66:20 67:18,25 94:3
**assignment** 15:5,9
  23:10 47:19,21
  64:13,14 65:3,9
  66:17,22 67:13,17
  67:24,24 68:2,7,25
  69:5
**assist** 21:6 47:2
**assisted** 21:13
**assisting** 44:1,9,18
  44:22
**associated** 19:25

**assume** 38:18 75:7
**assumed** 58:8
**assumes** 35:23
**assuming** 33:13
  94:8
**assumption** 75:9
**assumptions** 48:12
  61:5,18
**attached** 4:18 26:21
  96:7
**attempt** 62:24 64:7
  85:8
**attempting** 11:25
  91:11
**attention** 57:21
**attorney** 6:22 76:5
  97:18
**attorneys** 41:3
  52:10 74:18 75:6
**audio** 6:13
**author** 27:24 63:23
  71:17 75:10,13
**authorized** 6:17
**available** 30:16
  56:16
**avenue** 3:5
**average** 74:3 86:8
  86:11,20,22
**avoid** 40:23
**aware** 10:8 26:9
  35:11,13 42:12
  53:13 55:9,12 66:13
  74:19 79:10 81:22
  82:20 84:18,23,25

|  b  |
| --- |

**back** 8:6 17:1 19:2
  23:5 30:18 36:4
  45:21 52:15 54:9
  60:25 62:22 78:23
  95:7
**banbury** 19:8
**bank** 22:19 23:20,23
  24:4 25:15,19 26:7
  26:10,18,23 27:4,9

28:2
**based** 13:3 17:4
18:17,20 23:10
39:22 44:14 48:6,9
52:9 57:9,11 58:17
60:17 61:25 64:12
64:18 67:6,20,23
73:5 75:24 88:16
90:18 91:21 92:6,16
94:8
**basic** 45:23 62:8
**basically** 63:17
88:18
**basis** 28:17 29:24
53:21 54:2 61:8,17
73:7,16,19 74:9,10
74:12 77:24 84:14
**beginning** 2:20 6:22
61:1
**behalf** 1:4 2:4,18
**behavior** 81:25
**belief** 41:2 46:4,5
48:19 63:16,22
70:15,19 73:18 76:4
76:23,24 77:21
**believe** 12:17 17:6
18:25 19:6,12,22
21:18 22:10 24:12
24:15,18 25:4,16
28:10,18,23 29:17
30:7,14 31:3 35:1,4
35:7,18,20 36:16
37:12,22 38:9,20
39:5,9 40:11 41:5
41:25 42:19 43:12
44:25 47:17 48:4,8
48:11,14 50:13
55:22,23 61:4 64:17
65:2 66:13,18,19
67:16 68:11,16,17
68:19 69:1 73:25
74:18 75:10,17
77:19 78:21 79:4
80:10,20 81:6,14
82:8 83:8,22 84:1

86:24 88:16 90:12
90:22 93:10 94:1
**believing** 53:21 54:2
**berkeley** 3:6
**best** 20:14 42:6
89:22
**beyond** 9:3 17:18
47:16 57:1 66:21
89:6
**bias** 25:11 30:5
48:16 82:6
**biased** 29:11 51:4,8
51:23 52:8,13
**biases** 32:21,24 45:8
50:12,18
**blank** 92:1
**board** 13:15,25
14:16 15:1
**boards** 12:16,24
13:6 14:7,12,21
15:16 19:20
**book** 27:12,15
**books** 27:13 74:16
**bostrom** 78:12,16
82:17
**brg** 4:21,23
**bringing** 49:25
**broader** 91:12
**brought** 10:10
**bryant** 60:7
**bulletin** 12:16,23
13:6,15,25 14:7,11
14:16 15:1,16 19:19
**bureau** 81:23 83:4
86:25
**bus** 18:9
**butcher** 42:25

**c**

**c** 2:19 3:16 6:9
19:13 60:5,7
**calculate** 24:18
**calculated** 62:18
63:6 64:12 86:10,12
86:13,22

**calculation** 87:1
**calculations** 48:9
58:15,25 60:6 62:15
62:25 64:21 86:5
**california** 1:2,17 2:2
2:19 3:6,11,16 6:1,9
24:19 25:25 43:8,9
44:4 94:25 95:1
96:14 97:3
**called** 10:7 27:17
55:7,8 66:25 93:17
**caption** 6:10
**car** 63:4
**careful** 50:17
**case** 6:10,12 23:20
23:23,24 24:3,4,11
24:14,22 25:3,5,15
25:19,22,25 26:3,7
26:10,13,14,18,23
26:24 27:4,9 28:2
28:14,18 29:18,25
31:17,24 33:13
35:12,16 42:1,16,22
42:23 43:6,14,17
44:1,3,3,9,21 49:22
66:16 67:11,14
68:15 72:17 76:17
77:20 84:4,5,15
85:8 89:15 94:17
97:14
**cases** 9:3 26:16
42:20 43:2 93:4
**catalina** 42:17 43:6
44:21
**cause** 81:8
**caused** 25:11 29:17
**causes** 81:15
**caution** 16:12
**cellular** 6:16
**certain** 30:22 37:4
37:25 43:44 44:5
**certainly** 24:24
40:22 90:23
**certification** 97:1

**certified** 2:22 6:25
97:2
**certify** 10:17 97:3
97:16
**cetera** 93:6
**change** 59:16 60:20
**changes** 17:25 20:7
**chapter** 27:12,15
71:17 72:6 74:11
**chapters** 27:13
**check** 12:19 13:10
13:18,25 14:10,15
14:25 15:25 94:7,13
**chester** 1:16 2:18
4:3,9,10,12 6:6 7:11
7:21 10:16 20:17
63:18 69:13 96:4,22
**choose** 28:8,14
30:10 34:6
**chosen** 24:8
**circumstance** 65:21
**citation** 22:18
**citations** 22:4,7
71:24 80:15
**cite** 73:8 78:10
79:12,18 82:25
**cited** 22:13 26:16
64:6,9 71:7,14,20
72:2 73:20 74:10
78:14 79:3,14,20
82:16 85:10,15,16
**citing** 56:7,7 80:7
82:22
**city** 1:9 2:9 3:8 6:9
44:13
**claimed** 57:24
**claims** 77:7
**clarification** 8:21
73:15
**clarify** 11:18 13:23
**class** 4:13,25 6:25
10:17 24:18 31:13
31:16,17,22,23 32:1
32:6,7,10 41:4,21
42:12,19 45:2,14,16

47:24 65:5 69:14
70:25 72:21,23 73:3
73:19 84:5
**classified** 65:23
**clear** 33:24 52:12
**closed** 34:5
**code** 90:15,17,18
90:23,24,25 91:1,8
91:10,11,20 93:8,11
93:17 94:5,10,25
95:1
**coded** 92:2
**coder** 89:2,8,12
93:11,11 94:2,2
**coders** 90:13,19
91:21
**codes** 94:2,11
**coding** 88:3,5,7,17
90:18 91:5,9,21
93:16
**coerced** 53:22
**collaborative** 28:4
**collect** 70:23
**collected** 24:8 35:8
73:2 76:14,14
**collecting** 32:10,19
74:3 75:2
**collection** 32:23
52:11
**collective** 4:13,25
10:17 69:14
**column** 57:23 58:6
59:6,11 60:3,16
87:24 88:2,11,20,21
89:5,9,10,11,23
90:2,15,21 91:3,4,8
91:10,14,17,23 92:3
92:11 93:1,8,24
94:4
**columns** 87:21 90:7
93:17 94:9,12
**combination** 60:5
**come** 15:12 17:1
30:18 43:16 95:2

**coming** 77:4
**comment** 82:13
83:20
**comments** 33:15
34:10
**common** 29:15
**commonly** 34:24
64:5 80:15
**communicate** 95:17
**communications**
21:9,12
**company** 76:18
**comparing** 56:14
57:7 72:15
**comparison** 94:1
**compelling** 65:15,16
65:20 66:5
**complaint** 22:3,12
**complete** 21:19,25
28:5 82:10
**completely** 83:14
**completion** 97:14
**compound** 56:18
**compute** 86:20
**concern** 76:2 77:2,6
**concerns** 76:12
**concluded** 94:19
95:20
**concludes** 94:20
**conclusion** 82:22
**conclusions** 31:2,12
32:7 33:22 35:22
36:24 41:21 42:11
45:2,15
**conduct** 15:6 41:25
**conducted** 42:13
43:17 74:21,22
**confirm** 71:21
**consider** 28:12
29:23 30:25
**considered** 64:5
70:17 75:10
**constitute** 65:20
**contained** 96:8

**contains** 67:7
**contd** 5:2
**content** 21:7,8
**context** 63:20 70:10
74:15
**continued** 5:1
**contributed** 87:16
**conversations** 6:16
**copy** 95:10
**correct** 9:23,24
10:19 11:13 12:16
12:17,19,24 14:1,9
15:7,8,10,11 16:1,2
17:5,17,18 18:1,2,5
18:6,9,11,18,19,21
18:22 19:14,21,23
20:8,9,11,15 23:12
27:22 31:14,15,18
31:19,24,25 32:12
41:23 46:21 47:11
47:12,19,20,25 48:1
48:5,9,10,12,16
51:23 52:20,21,23
52:24 53:10 54:19
54:23 55:3,11 56:5
56:6,11,12 57:3,4
58:16 60:16 61:6,9
61:21 62:13,14
67:18 71:10,25
74:21 75:1 76:17
78:1,17,20 79:7,17
80:19,25 84:10,16
84:17 96:9
**corrected** 92:17
96:8
**correcting** 92:18
**corrections** 96:6
**correctly** 12:13
17:22 18:3,7 19:17
20:4 21:24 23:9
31:20 36:11 48:2
58:14 61:16 89:11
94:14
**counsel** 6:23 7:5,9
22:21 25:7 40:16

59:2,15 95:10
**counted** 88:13,14
**counting** 88:15
**countless** 28:13 29:6
**county** 1:9 2:9 3:8
**course** 10:16 60:1
**court** 1:1 2:1 6:7 7:6
8:23 9:5,7 10:20,25
20:17 22:18 24:20
24:23 25:8,22,25
26:2 36:3 43:11,12
44:6 45:20 46:6,14
54:21 58:4 61:23
62:21 73:10 76:7
77:10 78:22
**court's** 24:9
**create** 11:17 46:24
**created** 11:19 46:20
**criteria** 64:19 92:2,4
92:5
**csr** 1:24 97:25
**currently** 76:22
**cv** 1:7 2:7 6:12
26:19,21
**cycle** 81:25

**d**

**d** 60:5,7
**damage** 62:17
**damages** 24:18
28:16 29:4 47:24
62:25 64:12,20
**darryl** 1:4 2:4 6:10
**dat** 5:6 48:23 52:16
72:18,19 73:24
**data** 22:20 31:11
32:5,11,23 33:5
34:12 35:5 39:3
45:1 48:9,18 50:11
50:17 51:4,8,21
52:11,14 55:2,6,7,8
55:9,12,14,18,22,25
56:3,3,9,15,16 57:6
57:7,14,15 60:17
64:13,14,14 65:3,9

Veritext Legal Solutions
866 299-5127

65:14,15 66:13,17
66:22 67:13,17,20
67:24,24 68:2,7,9
68:10,11,12,14,21
68:22,25 69:5 70:24
73:1,5 74:3 75:3
78:5 86:15,25 88:2
**databases** 66:24
**date** 97:20
**dated** 20:18 21:2
23:9 33:4 46:18
71:18 97:21
**david** 19:6
**david's** 19:8
**day** 12:16,19,24
13:6,11,19,25 14:11
14:16,21 15:1,16,25
19:20 96:12
**de** 10:17
**dead** 30:25
**deals** 74:14
**deceased** 30:23
**december** 22:2,12
**decertify** 4:12,24
69:14
**decision** 22:18 24:23
24:24 25:22
**declaration** 4:10,12
4:24 5:6 10:11,15
10:16 22:1 29:3,18
29:22 47:22 48:22
49:6,8 52:16 53:14
53:22 69:13,16,22
70:16 72:8,9,16,17
72:17,19 73:23,25
85:18,25 86:18 96:1
**declarations** 31:11
32:5 48:15 49:2
51:22 52:8,17,23
53:3,8 70:4,17 75:5
75:19 76:4,23 77:17
77:25 78:20
**declare** 96:4
**defendant** 3:8 7:2
42:17

**defendant's** 4:14,20
9:9,20 44:19
**defendants** 1:11
2:11 49:21
**defense** 44:20,22,24
**defined** 32:1 63:15
63:23 90:6 91:20
92:6
**defines** 8:21
**definitely** 58:19
**definition** 92:8
**degree** 47:23
**demand** 4:14,20
9:10,20
**depends** 35:10
36:18 38:12,15
40:25 65:21
**depo** 87:9
**deposed** 7:25 41:3
**deposition** 1:15 2:17
4:19,20 6:6,8 8:9
9:9,10,19,21 10:3,6
25:14 32:14,16
33:11,11,18 34:14
34:16 35:2,6,8
36:23 37:3,23 38:8
38:10 39:16,20 40:1
40:24 41:1,18 42:1
42:12 43:18 77:5
94:18,21 95:20
97:13
**depositions** 4:14,15
8:4 31:12 32:5 33:5
33:10 34:9,10,11
35:11,15,19,21 36:7
36:15 39:4 41:20
42:10,16 43:16 45:1
**describe** 29:7 66:5
80:15
**described** 24:21
25:2,13 27:21 34:7
34:13 55:10 57:10
67:21 69:1
**describing** 43:5

**description** 47:19
92:14
**descriptions** 30:1
**design** 32:22 43:18
50:17
**designed** 34:25
**desirable** 40:23
**desired** 40:13,20
**detail** 17:16 66:25
**detailed** 69:2
**details** 80:3,22
82:12 83:19 90:6
**determination** 8:24
9:2 52:3
**determinations** 46:7
**determine** 47:22
51:3,7,21 60:18
62:15 65:23
**determining** 52:7
**developments** 27:2
**dialogue** 88:24
**diamond** 71:18,24
72:3 74:11,20,25
75:17
**dictate** 74:2
**died** 14:5
**diego** 1:17 2:19 3:16
6:1,9 43:13
**difference** 49:10
72:25 73:1
**different** 11:23 33:2
41:16 45:10 55:16
62:17 63:5 67:1,9
72:24 75:16 78:8
87:16 89:2,8,12
90:10,11,12 91:7,9
**direction** 97:9
**directly** 14:4,19
52:11
**disagree** 83:11
**disclosed** 26:18
**discrete** 79:22
**discuss** 79:20 80:10
**discussed** 74:11
75:8 78:19

**discussing** 23:19
**discussion** 75:4
**disk** 95:13
**district** 1:1,2 2:1,2
**divide** 86:14
**division** 5:4,5 12:14
15:7 17:1 18:21,24
19:3,4,11,18 20:5
20:11 54:18 60:7,9
61:12 62:11 90:5
**divisions** 11:23 12:2
61:20,21 62:13
**document** 9:8,15,18
9:25 10:21 11:1,4
11:19 12:10 15:18
21:5,14 46:16 48:21
48:25 52:20 69:11
73:23 85:21 87:5,12
87:14,18,22 89:21
**documents** 10:7,9
10:13 11:16,17,21
11:25 12:8 21:19,25
22:14 47:10,13
**doing** 20:13 29:10
**doubt** 81:3
**dr** 7:23 22:11 25:16
29:22 30:1,6,13,21
31:1 48:4,8,11 49:4
51:22 55:24 58:8,19
61:4,18 62:18 63:5
64:12,20 67:22 69:1
**draft** 28:2 86:17
**draw** 57:21
**drivers** 17:1
**driving** 63:4
**drogin** 4:11 22:1,11
25:16 30:1,6,13,21
47:22 49:4 58:8
61:4,18 62:18 63:5
64:12 69:1
**drogin's** 29:22 31:1
48:4,8,11 51:22
55:24 58:19 64:20
67:22

**duly** 97:7
**duncan** 78:12 82:16
**duran** 22:19 23:19
  23:22 24:4 25:15,19
  26:7,9,18,23 27:3
  28:2
**duress** 53:14

**e**

**e** 7:22 19:13 43:1,1
  60:5,7
**economic** 81:23
  83:5
**edit** 47:4,5
**editing** 21:6,13
**effect** 64:17
**either** 7:24 12:7
  15:3,14 84:6 91:25
**elapse** 37:4
**electronically** 95:13
**eligible** 66:3
**eliminate** 32:23
**elizabeth** 4:24 21:16
  47:6 61:9,17 62:5,8
  85:18 87:15 92:24
**email** 87:8
**embedded** 34:25
**employee** 97:17
**enciso** 19:13
**ended** 34:3,5 58:9
**ends** 60:22
**entire** 24:18 31:13
  31:16,17,22,23 32:7
  41:21 42:12 45:2,16
  50:15
**entirely** 13:22 35:10
  38:12,15 39:8 92:23
**entitled** 9:8,19 58:10
  58:22 81:24 87:9
  89:10 90:2,15 91:17
**equal** 60:5
**equation** 59:10 60:4
**esq** 3:4,10
**essentially** 34:4
  66:19 67:6 87:19

88:13 92:1
**estimate** 47:24
  54:18 56:15
**estimates** 57:7 74:7
  79:22
**et** 93:6
**evaluate** 46:6 47:22
**everybody** 29:11
  65:14 90:22
**evidence** 28:17,22
  29:2 35:24 53:13
  64:23 80:1
**evident** 46:1
**exactly** 10:4 12:25
  16:19 24:1 57:10
  90:6 91:12
**exaggerate** 77:16
**exaggerated** 54:17
**exaggerating** 77:19
**examination** 4:2
  7:15
**examine** 84:7
**examined** 7:12
**example** 29:10
  30:24 34:3 39:12
  65:21
**examples** 28:13
  29:15 49:25 66:11
**excel** 4:16 58:17,21
  58:24 59:10 87:8,9
**exclude** 65:17,24
  66:14 68:1 69:4
**excluded** 65:6 66:11
**executed** 96:12
**exempt** 65:24
**exhibit** 4:9,10,12,14
  4:16,19,21,23,24
  5:3,5,6 9:13,16,23
  10:21 11:1,25 12:5
  12:10 16:22 17:21
  18:12,14,16,16,20
  19:3,15 20:18,22,24
  21:2,14,20 23:16,19
  26:22 31:8,21 46:17
  46:20 47:3,10 48:22

50:7,25 52:15 54:10
  57:19,22 58:18
  63:12,14 69:12,21
  72:7,16,16 73:23
  78:12 85:17 86:3,10
  87:3,6,12,22
**exhibits** 4:7,18 5:2
  11:5,13,16 12:8
  23:3
**exist** 32:21
**expected** 12:15,23
  13:5 14:8,12 15:15
  19:19 66:2
**expert** 4:9,10 8:16
  8:22,24 9:9,20
  20:17 21:2 23:8
  43:14 46:18
**experts** 4:14,20
  49:21
**explain** 40:9 75:14
  86:11
**expressed** 41:17,22
  42:14 54:16
**extent** 51:4,7,21
  52:7 92:24
**extrapolate** 34:12
  34:18 70:25 73:2
**extrapolation** 35:4
**eyes** 24:9

**f**

**face** 82:19
**fact** 24:2 28:18 77:6
**facts** 24:10,22 25:2
  25:15,19 35:23
  64:22 79:25
**fair** 39:7 40:2,14
  52:25 53:3 72:5
  76:25 77:1 95:8
**false** 48:12
**familiar** 78:13 83:3
**far** 15:24 37:8 39:9
  48:7 62:1 94:23
**federal** 44:6 97:13

**fedex** 42:24 44:3
**feedback** 86:1
**feel** 28:15
**felt** 29:4
**figure** 60:15
**figures** 65:3
**file** 4:16 58:17,21,24
  59:10 87:8,9
**filed** 22:2,3,11
**filing** 49:23
**final** 88:17,17 90:15
  90:17,17,18 91:4,5
  91:8,18,20,20,23
  92:11,13 93:1
**finalized** 46:25
  69:19
**financial** 29:19
  76:25 77:2,7,16,20
**financially** 6:19
  97:16
**find** 21:21 85:15
**finding** 82:2,9
**findings** 83:6
**fine** 22:24 95:1
**firm** 3:4 43:25 44:8
  44:9,11,13,18,22
**first** 15:24 18:25
  19:6 48:8 49:18
  50:1
**five** 50:22,23 59:18
  59:19
**fix** 64:19
**flawed** 48:9
**flaws** 48:4,7
**fleissig** 54:14 55:6
  55:11,19,21 56:5,11
  56:25 84:12
**flynn** 60:6,8
**following** 32:8 83:7
**follows** 7:13
**footnote** 56:7 63:13
  64:10 73:8,20 78:11
  79:3,14,20 85:11
**footnotes** 22:9,13

Veritext Legal Solutions
866 299-5127

**foregoing** 96:5 97:4
97:6,10,12
**form** 46:8
**formal** 63:7
**forms** 49:24
**formula** 58:20 60:13
93:21
**formulas** 58:25
59:14
**forth** 97:5
**found** 90:1
**foundation** 41:6
42:4 53:16 63:20
64:3 65:11 75:22
78:3 81:2,10,18
82:11 83:15
**francisco** 1:8,9 2:8,9
3:8,11 6:11
**front** 20:20,24 30:15
**full** 7:19 25:21,24
50:16 51:15,16 58:3
**furst** 54:13 55:6,10
55:19,21 56:5,10,25
84:12
**further** 75:8 97:12
97:16

**g**

**g** 3:4 43:1 60:6,8
**general** 66:18 67:19
67:23 81:14
**generally** 34:11
36:19 49:7 64:5
68:12 74:17
**generate** 42:10
59:11
**generated** 60:16
**geoff** 7:1
**geoffrey** 3:10
**getting** 19:2
**give** 10:13 11:1,14
17:16 24:14 25:8
34:4 36:12
**given** 14:2 34:22
35:7 38:6,7,21,25

39:10 90:18 97:11
**giving** 25:6
**go** 6:14 7:5 16:16
22:22 59:15,24
60:19 66:9 75:14,23
94:25
**goal** 33:21 34:11,17
35:3
**goes** 37:8
**going** 16:12 26:13
28:19 32:17 37:2
42:4,25 46:8 51:11
56:17 57:25 60:10
61:22 63:19 64:2
69:23 70:9 77:22
91:19 95:18
**good** 6:4 7:17,18
80:14
**gps** 55:2,6,18,22
56:2,3,9,15,16 57:6
57:7,14
**grandberry** 1:4 2:4
**green** 5:4 12:2 18:21
18:24 19:11,18 20:5
20:11
**griffin** 1:4 2:4
**ground** 42:24 44:3
**group** 42:18 43:6
44:21
**gspellberg** 3:12
**guess** 67:3 82:20
93:19
**guide** 71:24
**guidelines** 71:4,5,12
72:1

**h**

**h** 7:21 57:23 58:6
59:6,11 60:3,16
**handwriting** 11:12
15:24 16:25
**hanvey** 1:16 2:18
4:3,9,10,12 7:11,18
7:21,23,23 9:8,18
10:16 11:4 20:18,24

23:8 61:4 69:13
96:4,22
**happen** 33:9
**happened** 28:18,20
**hard** 87:16
**harvey** 6:6 7:17
**head** 25:20 34:21
79:12,18 83:1
**header** 87:24 88:21
**heads** 77:23
**hedi** 1:4 2:4
**held** 6:8
**hello** 7:17
**help** 21:5 47:4 70:13
86:5
**helped** 43:18 47:5
**hereto** 4:18 96:7
**high** 63:14 64:1,6
**higher** 63:15
**highly** 52:3
**hill** 78:12 82:16
**hm** 80:9
**hold** 71:21
**holding** 26:6,8
**holtzman** 3:9
**hour** 23:24 24:3
27:1,14 76:22
**hourly** 76:19,21
**hours** 79:21 81:24
82:5,6 83:10,11,24
84:6,16,20 85:2
**hundred** 91:2
**hypothetical** 37:17
45:6,18 56:18 64:3
66:8 68:5 81:19
82:11

**i**

**idea** 12:3 81:17,20
**identification** 9:16
20:22 23:4 87:3
**identified** 29:8
30:21 42:9 47:13
48:7 59:5 93:7

**identifies** 47:10 90:4
**identify** 6:23 21:13
21:14 23:13 26:21
29:16 66:4 69:4
73:24 74:12 79:14
85:13
**imagine** 41:12
**immediately** 91:3
**impact** 29:12 31:3
81:24
**implicit** 39:24 40:20
**imply** 40:10,10,13
**importance** 71:8
**important** 35:4 38:7
39:1,6
**improper** 68:1 69:4
**inaccuracies** 50:12
**inadequate** 24:19
**inappropriate** 61:5
61:18
**inaudible** 11:5
38:13
**incentive** 28:24
76:25 77:16
**incentives** 77:2
**include** 66:3 68:17
68:19 86:25
**included** 22:5 24:13
25:9 64:20 65:3,10
68:23 90:5 91:13
**including** 26:15
32:8
**incomplete** 37:17
45:6,17 56:18 64:3
66:8 68:4 72:10
81:19 82:11
**incomprehensible**
56:19 83:14
**inconsistencies**
58:15,20
**inconsistent** 78:5
**incorrect** 77:8 82:9
**increase** 74:8
**index** 4:1 5:1

Veritext Legal Solutions
866 299-5127

**indicate** 33:6 71:13
79:5,8,11
**indicated** 30:10
49:22 67:16 82:17
94:15
**indicates** 59:6 67:17
72:3
**indicating** 84:18
85:1
**individual** 14:22
42:20 66:12
**individuals** 30:4,7
64:13 68:20 69:5
70:24,24 79:21
80:24
**industrial** 27:17,19
**information** 5:9
11:10,22 12:1 29:20
29:23 32:20 35:8,21
36:6,17,23 37:22
38:22 39:18 41:20
42:11 45:13 48:6
52:2,7,9 53:2,7,18
53:24 54:5 62:1
67:7 68:18 73:18,25
75:4,12,18 76:3,13
76:14 77:6,16,20
78:8 81:7,8 88:21
**initialed** 96:7
**ink** 96:7
**inside** 77:22
**instance** 91:23
**instances** 78:7
**instructed** 25:7
38:10 88:8
**instructing** 83:17
**instruction** 5:11
39:5,10,12,15
**instructions** 34:22
35:7 38:6,7,20,25
40:21
**intent** 93:22,22
**interchangeably**
49:12

**interested** 6:19
32:22 97:17
**interference** 6:16
**internet** 29:14
**interpret** 14:21
**interpretation** 15:17
17:13
**interrupt** 22:22 59:3
**interview** 11:11
15:6,13 18:18,21
19:3
**interviewed** 18:24
19:5,12
**invalid** 73:5,6
**involved** 25:16
52:11 74:18 75:7
76:5 80:23 90:14
92:20,24,25
**irrelevant** 50:3
80:13 82:11
**issue** 25:8,11 52:1
58:12 71:19
**item** 27:13

### j

**job** 1:25 65:25 66:2
**jonathan** 5:6 48:23
52:16 72:18,19
73:24
**judge** 8:24 9:2
**july** 1:18 2:21 6:1,5
69:19 81:23 83:3
87:8 97:21
**june** 46:18,25 47:9
**jury** 46:6
**justification** 62:2

### k

**kind** 16:14
**know** 9:1,2 10:4,5
12:9 14:4,17 15:2,3
15:18 16:19 17:12
19:3,10 23:24 24:3
24:10,21 25:3,8,14
25:18 29:5 32:3
34:24 36:7 38:4,24

40:6,7 42:7,17 43:3
43:9,11,16,23,25
44:6,8 46:13,14
49:6,10,11,13,17,19
50:4 53:12 57:1,2
57:10,17 59:13 64:4
64:24 65:5,16 66:16
66:23,24 68:6,22
69:8 72:12 74:14
76:10,13,20 77:22
77:23 81:12 87:21
88:6,9,10 90:13
91:12 92:5,20,23,24
93:22
**knowing** 56:21
57:16
**knowledge** 12:7
65:16 69:2
**known** 29:11 49:15

### l

**l** 43:1
**labeled** 11:1
**labor** 81:25
**lack** 41:6 53:15
75:21 81:18 82:10
**lacks** 42:3 64:3
65:11 78:3 81:2,10
**laid** 23:10,15
**lam** 5:6 48:23 52:16
72:18 73:24
**lam's** 72:19
**larry** 54:17
**late** 8:7 54:19
**laura** 1:23 2:21 6:8
97:24
**law** 3:4 44:8,9,13,18
44:22 47:24 49:22
**law360** 26:12
**lawsuit** 66:13
**lawyer** 39:20
**lawyers** 21:9,12
37:9 38:19 39:17
44:16

**leading** 39:17,21,25
**learned** 11:22 12:2
49:22 50:1
**leave** 67:8
**led** 30:13 55:21
**left** 59:19
**legal** 3:15 74:15
**legally** 32:1
**letters** 94:13
**level** 89:4
**liability** 74:8
**lie** 76:25
**light** 14:13
**limit** 36:20
**limited** 52:9
**list** 87:19
**listed** 13:1,8 21:21
21:23 22:9 27:1
29:21 30:1,8 33:19
34:20
**literature** 85:12
**litigation** 8:17 27:2
27:14 29:3
**llp** 3:9
**locate** 9:14 71:15
**location** 58:9,9
**locations** 67:9 74:6
**logic** 62:6,8
**long** 49:15 89:18
**longer** 28:9
**look** 11:14 30:16
46:16 48:21 56:16
57:14 59:10,14
85:17 93:20
**looked** 59:13 68:9
68:14
**looking** 9:18 15:18
39:13 83:19
**looks** 19:25 46:22
68:13
**lot** 17:1 24:24
**lots** 26:14 74:16,16
74:16
**low** 65:24

Veritext Legal Solutions
866 299-5127

**lying** 77:25

**m**

**machine** 97:8
**madam** 7:6 45:20 54:21 58:4 61:23 62:21 73:10 76:7 77:10 78:22
**main** 18:8,10
**making** 75:9 77:8
**manner** 70:17 71:2
**march** 22:3
**mark** 9:13 20:17
**marked** 4:8 9:16,23 10:21 11:4 20:22 23:3 48:22 87:3
**marks** 60:22 61:1
**martin** 1:23 2:21 6:8 97:24
**mary** 54:13 55:5,10 55:19,21 56:5,10,25 84:12
**match** 94:14,16
**matched** 64:15 69:6 94:2,15
**matching** 68:25
**material** 11:20
**mathematical** 86:20
**matter** 52:22 81:14
**mean** 11:8,18 16:6 26:8 36:21,24 37:3 39:25 40:9 70:5 86:19 88:15 89:25 91:24 92:4 93:21
**meanings** 87:21
**means** 10:4,5 49:13 49:16,19 70:1 89:6 91:18 92:1 93:9
**meant** 13:22 14:22 16:9,11,18 50:2 70:3
**measures** 81:24
**media** 60:22 61:1 94:21

**meet** 35:19
**mellow** 78:12 82:16
**member** 72:21,23
**members** 28:7 32:6 32:10 45:14 65:5 73:19
**mentioned** 27:5,8 36:9 38:6
**mentions** 26:25 27:8 27:11 28:1
**met** 32:8,15 33:7,17 34:9,15 35:2 41:19 45:12
**method** 61:19 75:11
**methodology** 64:19
**methods** 75:2
**michelle** 18:25 19:12
**microphones** 6:15
**mind** 46:11
**minimize** 32:23
**minute** 63:18
**minutes** 22:23 58:7 59:18,19 74:4 86:9 86:23
**misreading** 33:8
**missed** 18:10
**misstates** 51:12,13
**mm** 80:9
**moment** 13:17 19:2 29:6 36:9 59:25 67:16
**months** 8:6 15:22
**motion** 4:12,24 69:14
**motions** 10:17
**motivation** 29:19
**motivational** 28:23
**mta** 31:24
**muni** 5:3,5 11:23 87:9
**municipal** 1:8 2:8 6:11

**n**

**n** 7:21 19:13
**name** 6:7 7:19 18:23 18:25 19:1,4,6,7,8 19:12 43:25 71:18 97:20
**names** 44:16
**nancy** 7:21
**narrow** 24:25
**national** 81:23 83:4
**nature** 73:6
**near** 51:2
**necessarily** 31:3 73:22 90:11
**necessary** 35:20 36:16,22 39:5,9 41:5,18 42:10 71:13 72:4,19
**need** 8:20 35:7 36:13 37:7 38:10,21 45:24 72:8 73:15 76:13 91:1 95:10
**needed** 37:12,24 70:18 73:25
**needs** 33:9 36:10 37:4 39:10 72:19
**neither** 97:16
**neutral** 69:22 70:5 70:18 71:8 72:5,8 72:20 74:1,7
**nonrandom** 28:8,12 29:7,9,16,24 30:25
**nonresponse** 25:11 30:5 48:15
**normally** 95:5,18
**northern** 1:2 2:2 43:9
**note** 6:13 47:15
**noted** 96:7
**notes** 11:5 12:4 18:17 19:3
**notice** 4:14,19 9:9 9:19 10:3,6

**noticing** 6:22
**number** 6:12 10:12 26:11 59:11 61:1 64:5 74:3 86:15 88:19 94:21
**numbers** 86:14 91:22
**numeric** 93:3
**numerous** 37:10 50:11,18

**o**

**o** 19:13
**oath** 6:17 7:8,12 8:11
**object** 28:19 32:17 42:4 46:8 50:3 51:11,13 55:13 56:17 57:25 60:10 63:19 64:2 69:23 70:9
**objection** 35:23 37:16 38:1,13 40:3 41:6 45:17 53:15,23 64:22 66:7 69:7 78:2 79:25,25 81:2 81:10,18 82:10 83:13 85:4 86:17
**objections** 6:20 42:3 54:4 83:25
**obs** 94:4,6
**observation** 11:11 94:7
**observational** 4:21 22:20 84:10
**observations** 18:17 18:20 61:11 62:10 94:15
**observed** 62:16 87:20 93:4,5,7
**observer** 92:16,18 93:1,5,6,7
**observer's** 94:15
**observers** 90:10,12 93:3

Veritext Legal Solutions
866 299-5127

**obtained** 38:22
**obvious** 28:14
**occur** 8:5
**offer** 31:11 33:25
  34:1,2 53:1,7 65:8
**offering** 33:9,12
**office** 95:18
**official** 15:2
**oh** 13:20 50:8 58:2
  89:25 91:16 93:16
**okay** 9:15 10:24
  12:12 16:23 18:15
  20:20 22:25 23:21
  30:19 31:9 32:17
  33:4 46:19 48:24
  50:8,9,24 57:20
  63:11 69:15 71:17
  85:20 86:4 87:11
  88:1 89:22,23,25,25
  90:1 95:9
**ones** 34:21 85:15
**online** 29:13
**open** 34:3
**operation** 86:20
**operations** 17:25
  20:7
**operator** 5:3,5 36:16
  36:19 37:3 38:21
  39:6 40:1 42:1 52:8
  53:2,8,13,22 54:3
  57:15 64:19 67:17
  72:17 87:2 93:4
**operators** 4:21
  12:15,22 13:5,12,24
  14:15,25 15:15 18:1
  19:18 20:8 31:17,23
  32:2 35:12,15 36:15
  37:10,13,23 38:9,18
  41:3 48:14,17 49:3
  51:22 52:17,23 57:8
  61:12,19 62:11 65:2
  65:8 66:20 67:25
  68:1 70:4,16 76:24
  77:3,7,15 78:8
  84:15

**opinion** 25:21,24
  31:11 32:15 33:9,18
  34:9,15 40:12,18
  41:2,17 45:13 48:3
  51:10 52:4,13 53:1
  53:6 54:16 57:13
  63:25 65:19 72:18
  74:9,13 75:17 76:3
  77:15 81:6 83:22
**opinions** 41:22 65:8
  76:16
**opposed** 79:22
**opt** 30:4,7
**opted** 24:15 25:5,6
**option** 34:23
**options** 33:25 34:1,2
  34:5
**order** 32:5 35:7,20
  36:23 37:15,22
  38:10,21 39:3 40:18
  41:19 42:10 45:1,13
  45:14 49:23 70:15
**organizational**
  27:18,20
**original** 97:13
**outcome** 6:19
**overlap** 67:2
**overlapping** 88:24
**overreport** 79:5,16
  80:16
**overseen** 70:18
**overstate** 82:5 83:9
  84:6,16

**p**

**p.m.** 2:20,20 6:2,2,5
  23:1,6 60:23 61:2
  94:22 95:20
**page** 4:16,18 5:2
  12:11 16:21,21
  17:20,20 19:15 20:3
  22:10,19 23:11,18
  31:8 57:22 63:13
  71:23 82:3 87:6
  89:20 90:1

**pages** 89:17,17
**paid** 58:11,11 76:16
  76:18
**paper** 83:4
**paragraph** 21:23
  22:20 23:11,13,16
  23:19 28:6 31:5,7
  31:21,22 32:4 33:4
  33:8 47:9,14,18
  48:2 50:6,7,21,23
  51:2 54:8,11 55:2
  56:8 57:18 63:9
  78:14 80:6 86:3,6,9
**park** 18:8
**part** 9:1 15:9 24:6
  28:1,2,4 39:11
  50:14 76:23 89:21
**partially** 11:7,8,10
  11:11 93:5,5,6
**participate** 28:8,15
  28:25 29:21 30:2,9
  30:11 85:24
**participating** 30:4
**particular** 91:6
**parties** 6:14
**party** 6:18 69:22
  70:5,18 71:9 72:5,9
  72:20 74:1,8 97:18
**payroll** 64:14 68:9
  68:10,11,12,14,21
  68:22
**pdf** 87:7 89:19
**penalty** 8:14 49:13
  49:15,19 50:2 80:24
  81:7,15 96:1,5
**people** 21:6,13
  24:12 25:5 28:14,24
  29:14,21 30:2,9,10
  30:22 34:22 36:12
  37:6 45:24 49:11
  65:23,24 66:11,20
  68:23 74:6 79:5
  80:16,18 87:16 88:7
**percent** 91:2

**perform** 35:3 56:12
  61:11 62:10,15,25
**performed** 63:3,7
  84:8 85:12
**performers** 65:24
**performing** 56:14
  66:2 79:6,16
**period** 57:12,15
  65:25
**perjury** 8:14 49:13
  49:15,19 50:2 80:25
  81:7,15 96:1,5
**person** 34:3 36:25
  39:1 65:15 66:1,3
  80:3
**personally** 84:7
**pertains** 97:12
**ph.d.** 1:16 2:18 4:3,9
  4:10,12 7:11 10:16
  20:18 22:2 69:13
  96:4,22
**phrase** 80:7
**pick** 6:15
**place** 6:14 97:5
**plaintiff** 6:24 42:18
  42:21,24
**plaintiff's** 9:8 25:7
  31:21 42:20 44:19
  44:23
**plaintiffs** 1:6 2:6,18
  3:3 4:8,14,19 9:13
  9:19,23 24:14 46:17
  46:20 47:3 50:25
  52:11 54:10 57:22
  63:12,14 69:12
  78:11
**plan** 25:9,17,17
**please** 6:13,21,23
  7:7,19 9:7,13 10:20
  10:22,25 12:11
  17:20 18:12 19:15
  20:2,16,17,19 21:12
  22:7 23:18 31:7
  36:2,4 45:21 46:3
  46:16 48:21 50:6

Veritext Legal Solutions
866 299-5127

54:8 57:18 62:22
63:9 69:11 71:16
72:15 78:23 85:17
86:2 87:5
**plus** 60:7
**point** 63:4 72:3
74:18 80:8
**points** 46:1 61:12,13
61:20,21 62:11,12
86:15
**policy** 15:2
**population** 82:4
83:9,23 84:5,15,19
85:1
**position** 32:20 65:22
66:1 72:6,7 80:16
**possibility** 32:21
54:24 75:11
**possible** 30:3 41:25
58:23 78:7
**postings** 12:15,23
13:5 15:16 19:19
**potential** 8:24
**potentially** 29:12
54:17
**potrero** 5:5 12:2,14
12:22 15:7 17:23
19:2,4
**practice** 15:3
**precision** 89:5
**premarked** 46:17
69:12 87:6
**preparation** 69:21
85:24
**prepare** 47:1 69:18
69:20
**prepared** 23:10
69:16 87:14
**preparing** 22:15
85:7
**present** 29:25 90:3
**presented** 8:23 9:3
**presenting** 9:12
**pretty** 29:15 43:4
46:1 52:12 80:15

**previous** 8:7
**previously** 10:21
11:4 48:22 74:11
**primary** 48:7 62:2,2
74:10
**principal** 27:24
**principles** 33:24
45:23
**printed** 89:14
**printout** 4:16 87:7
89:21
**prior** 29:18 61:12
62:11 89:10 94:9
97:6
**private** 6:16
**probably** 20:1 46:25
52:13 66:1 69:20
85:22,23 89:13,14
91:25 92:1 95:2
**problematic** 52:3
**procedure** 24:19
32:9,23 33:20
**procedures** 17:25
20:7 46:14
**proceed** 7:9
**proceeding** 6:20
**proceedings** 97:4,6
97:8,14
**process** 69:9 90:14
92:18,19,21
**produce** 10:7
**produced** 58:21
87:8
**producing** 10:9
**production** 4:15,20
9:10,20 87:9
**productivity** 81:25
**profession** 24:7
32:22
**professional** 40:12
40:18 41:2,17,22
45:13 46:5 48:3
51:9 52:12 57:13
63:16,22,25 65:8,19
70:15 71:3,5,12,25

72:18 74:2 76:2
77:15,21 81:6 83:22
**project** 76:20
**pronunciation**
42:25
**properly** 65:23
**proposition** 79:15
**protocol** 43:18
**provide** 9:8 10:21
21:8 29:3,17,24
30:22 32:10 36:17
37:1,2 76:16 81:8
93:11
**provided** 9:4 37:5
37:13 49:3 52:2,10
60:17 70:16 73:18
75:5,18 76:3 77:7
78:8
**providing** 37:14
75:11 81:7
**psychologist** 27:18
27:20
**publication** 27:16
81:22 82:3 83:6
**publiclawgroup.c.**
3:12
**pulling** 50:16
**purpose** 40:25 85:7
**purposes** 23:17
**pursuant** 10:3

**q**

**qc** 93:8,24 94:4,7,13
**qualified** 8:16,25
**qualifying** 8:21
**quality** 94:7,13
**quantification**
62:25
**quantify** 64:7
**question** 12:11,14
12:22 13:1,4,9,16
13:21 14:3,4,7,11
14:13,20 15:10,14
15:15 16:22,24
17:21,23 18:4 19:20

19:25 20:2 32:18
33:2 36:18 37:5,13
37:14,20 39:22,24
40:7,10,21 45:10,19
46:9 55:15 58:3
62:20 65:13 68:7
69:9 72:10,13 73:9
73:16 74:23 75:16
82:20 83:17 87:17
**questions** 5:4,5
18:13 33:24 34:3,5
37:10,25 38:19,22
39:1,7,17,21,25
40:13,19 45:25,25
**quickly** 16:21 31:5
50:21
**quite** 37:6 66:24
**quote** 16:25 17:23
20:5 28:7 31:10
32:4 47:21 50:11
51:3,6 82:3

**r**

**ramey** 81:22 83:4
**random** 24:13 28:9
**randomness** 31:4
**range** 64:15 67:1,4,5
67:10 68:25 69:6
**rate** 63:14 64:1,6
76:19,21
**raw** 87:9
**reach** 31:12 32:6
33:22 35:21 36:23
41:21 42:11 45:2,15
94:24
**reached** 82:21
**read** 12:15,23 13:5
14:8,12,21 15:15
19:19 24:23 25:21
25:24 36:3,5 45:21
45:22 46:12 53:9
54:22 58:5 61:24
62:22,23 73:11 76:8
77:11 78:23,24
84:13 96:5

Veritext Legal Solutions
866 299-5127

**reading** 14:10,19
82:12 84:8 94:23
**realize** 58:3 89:17
**really** 10:5 18:8 37:6
37:8 46:13 53:4
56:1,22 57:16 74:14
77:24 90:13
**reason** 29:16 31:1
35:18 57:13 65:15
65:16,20 69:3 75:10
75:17 82:8 83:8,11
84:1
**reasonable** 64:11
68:17,19 80:2
**reasonably** 93:20
**reasons** 28:8,12 29:7
29:9,25 30:8 66:4
77:20
**rebuttal** 4:10,23
46:18,21 47:3,18
48:3 50:7,25 54:9
54:13 55:10,19,20
56:4,9,10 57:19,22
59:5 61:8,16 62:4,7
63:10,13 64:10
71:20,23 73:8,20
78:11,14 79:4 80:6
84:11,13 85:7
**recall** 15:17,21
18:23 19:9 23:25,25
26:4 30:21,24 32:1
34:21 44:13,16,18
47:8 49:5 52:20,22
60:12 62:9 67:15
77:12 80:22 81:1,3
85:22
**received** 20:10
58:17
**recess** 23:2 60:24
**recollection** 16:14
49:18 50:1
**recommendations**
43:5
**record** 6:5,14 7:20
20:14 22:22 23:1,5

36:5 45:22 46:12
54:22 58:5 59:16,25
60:19,23,25 61:24
62:23 73:11 76:8
77:11 78:24 94:22
97:7,10
**recorded** 6:6 11:10
12:20 14:3 20:12,13
92:16
**recording** 6:13
13:24
**refer** 16:24 31:22
33:5 54:8 55:2 56:8
57:6 77:4 86:2 87:5
**reference** 4:18 5:2
22:19 55:23 71:24
**referenced** 86:6,9
**references** 47:16
**referencing** 60:13
**referred** 55:18,18
**referring** 10:15
13:12 21:15,16 22:6
22:8 27:4 31:17,23
54:11 56:4,10 71:6
71:12 72:1 77:13
84:9,11,21 94:12
**refers** 13:14 73:13
73:17
**reflect** 88:22
**reflected** 88:17
**reflecting** 18:4
**reflects** 18:16 67:25
**refreshes** 50:1
**regard** 40:4
**regularly** 26:13
**related** 6:18 14:4,20
29:20 33:15 34:10
58:11
**relates** 77:7
**relative** 97:17
**relevance** 42:4
**relevant** 24:6
**reliability** 38:7 76:3
**reliable** 32:11 35:5,9
37:23 38:2,11,23

39:4 40:1,4,19
73:19 76:24
**relied** 12:7 21:25
22:14 47:10,23
**relief** 61:12,13,20,21
62:11,12 63:4 74:4
74:5
**relieved** 17:2
**rely** 12:4 21:19
**relying** 74:20,25
**remember** 19:1,7
44:12 80:3
**remembered** 67:21
**remind** 73:12
**rene** 3:15 6:7
**renne** 3:9
**reort** 4:23
**repeat** 36:1 40:16
43:21 45:19 54:20
58:3 61:22 73:9
74:23 76:6 77:9
83:18
**repeating** 46:11
**replaced** 24:16
**replicate** 62:24
**report** 4:9,10 12:5
20:17 21:2,20,21,23
22:1,5,11,15 23:8
23:10,11,15,17
26:22 28:6 30:15
31:21 32:20 33:4,12
33:12,13 34:20
46:18,21,22 47:3,9
47:18 48:3,5 50:7
50:11,17,25 51:4
54:9,13 55:10,24
56:4,7,9,10 57:10
57:11,19,22 58:19
59:5 61:8,16 62:4,7
62:16 63:10,13
64:10 67:4,10,22
69:6 70:23 71:14,20
71:23 73:8,21 74:3
75:3 78:11,14 79:4
80:6 84:11,14 85:8

**reported** 1:22 47:23
51:8 64:17 77:17
80:4
**reporter** 2:22 6:7
7:6,8 9:7,11,14
10:20,23,25 11:2
20:17,20 36:3 40:15
45:20 54:21 58:4
61:23 62:21 73:10
74:22 76:7 77:10
78:22 94:23 95:5,9
95:14 97:3
**reporter's** 97:1
**reporting** 63:17
72:21,23 74:6 79:21
80:11,21,24
**reports** 36:13 45:7
55:19,21 57:1 66:23
67:1,6 68:25 78:4
**represent** 37:9
39:19 49:21 52:16
82:2,18 87:7 88:2
88:10 90:16 91:4,23
93:2
**representative** 32:9
33:21
**representativeness**
25:10
**representing** 7:1
**represents** 57:23
88:12,13 93:10,25
**requested** 5:9 97:15
**required** 18:9
**research** 71:25 72:4
74:15,17 81:23 83:5
84:18 85:9
**researcher** 65:13
**respect** 17:8 32:14
32:16 33:9,18 34:9
34:16 35:2,6 54:18
60:3 61:19 78:10
89:5 94:4
**respond** 37:7
**responded** 12:18

Veritext Legal Solutions
866 299-5127

**response** 12:21,25
13:7,8,24 14:2,3,6,9
14:19,23 18:4 19:23
33:25 34:2,4 37:1,2
37:6,13 38:22 63:14
64:1,6 78:23
**responses** 11:19
20:14 38:11 39:13
40:19
**responsibility** 28:5
**rest** 18:11 73:3
**restaurant** 42:18
43:6 44:21
**restrict** 70:22 71:2
**result** 63:4
**resulted** 62:16
**resulting** 28:9 48:18
**results** 29:13 33:22
47:23 65:4,10 68:18
68:20 69:5
**rev** 93:8
**reveal** 21:11
**review** 47:21 58:21
58:25 85:12 97:14
**reviewed** 29:24
35:14 47:14 48:6
53:11 55:20 66:25
67:20 86:1 88:4
**reviewing** 52:22
57:1 58:24
**richard** 4:10 22:1
**right** 14:13 15:23
17:15 20:14 59:21
59:22 62:9 88:20
89:9 91:3
**robinson** 78:12,16
82:17
**rochelle** 54:17
**roughly** 24:12 89:16
89:19
**row** 59:6,12 60:3
**rows** 60:5,7
**ruled** 24:19 26:3
**run** 58:8 67:8,18

**running** 86:25 88:16
**runs** 66:20 67:7,25

**s**

**s** 19:13
**sakai** 3:9
**sample** 24:7,9,13,16
25:10,11,12 28:8,9
30:5 31:4 32:6,9
33:21 45:2,14 48:14
48:18 49:3 51:22
65:4,10 66:3 68:1
68:18,20 69:5 70:24
**samples** 52:18
**sampling** 25:9,17
**san** 1:8,9,17 2:8,9,19
3:8,11,16 6:1,9,11
43:13
**sanchez** 3:15 6:7
**sansome** 3:11
**saying** 77:24 84:14
**says** 17:9 47:15
82:19 89:23 94:14
**scheduled** 74:4,5
**scientific** 32:7,14
33:6,17 34:8,14
35:1,19 41:4,19
42:2,9 44:25 45:12
**scientifically** 34:25
**screen** 14:5
**second** 4:14 9:1,9,19
11:14 22:2,12 27:1
27:13 34:20 47:22
48:11 93:5
**seconds** 86:9,23
**section** 19:16 21:22
89:18,20
**see** 13:8,16 16:25
17:2 19:24 54:11
59:8 71:23 87:12
89:23 94:2
**seeing** 49:23 52:20
**seeking** 37:13
**seen** 9:25 48:25 49:2
62:1 67:10,13 68:11

85:21
**segments** 82:4 83:8
83:23 84:19 85:1
**select** 32:9 33:20
**selected** 24:12,14
**selecting** 34:23
**self** 32:20 33:12,12
33:13 36:13 45:7
46:1 50:11,17 51:4
51:8 70:23 72:21,23
74:3 75:3 78:4
**send** 95:3,4,6
**sense** 75:13
**sensitive** 6:15
**sentence** 50:17
51:12,12,13 56:6
**sequence** 93:3
**serve** 43:14
**set** 18:12 60:5 97:5
**setting** 39:16
**sfmta** 4:22,23 35:11
35:15,19 41:3
**sfmta's** 37:9 38:19
**sgt** 3:7
**shattuck** 3:5
**shifts** 18:1 20:8
61:13,14 62:12,13
**shorthand** 2:22 97:2
97:8
**shown** 89:13
**sic** 6:6 7:17
**side** 39:20 44:19,19
44:20,22,23
**sider** 78:13 82:16
**signature** 97:24
**signed** 48:15 53:14
**significant** 17:24
20:6
**signing** 53:22 54:3
94:23
**similar** 18:16 45:8
55:24 58:18 66:24
**similarly** 1:5 2:5
**simple** 33:23 37:6

**simply** 36:25 39:6
39:22
**site** 5:3,5
**sitting** 15:23 16:5
17:7,15 24:2 51:18
51:20 52:6,25 53:6
65:7 69:3 79:13
**situated** 1:5 2:5
**situation** 66:2
**situations** 66:12
70:23 79:20 80:23
**six** 17:24 20:6 50:22
**sixth** 60:7
**size** 25:10
**slightly** 33:2
**sloan** 3:9
**solutions** 3:15
**somewhat** 30:2
**sorry** 7:5 13:20
15:19 16:16 22:21
27:7,15 58:2 59:2
73:15 91:14
**sort** 67:9
**sounds** 19:14 79:24
80:2
**source** 64:6,9 74:20
74:25
**sources** 47:16
**southern** 43:9,10
**specific** 13:8 14:2
38:24 39:4 58:9,9
60:13 71:11 74:18
80:3,11,22 91:10
93:16
**specifically** 15:14
22:6 25:7 26:24
30:13 38:9 41:18
47:5 58:11 59:14
71:11 73:24 74:15
75:6 77:12 84:9
85:22
**specifics** 37:19 40:7
56:21 57:16 76:10
**speculate** 16:8,13
93:18

Page 13

speculating 16:7
spellberg 3:10 7:1,1
10:12 16:12 17:10
28:19 30:17 32:16
35:23 37:16 38:1,13
40:3 41:6 42:3 45:4
45:17 46:8 50:3
51:11,24 53:15,23
54:4 55:13 56:17
57:25 60:10 63:18
64:2,22 65:11 66:7
68:4 69:7,23 70:7,9
70:20 72:10 75:21
78:2 79:25 80:12
81:2,10,18 82:10,24
83:13,25 85:4 86:17
88:25 95:8,10,12,15
95:16
spelled 19:13
spend 38:20 79:6
80:19
spent 33:14 37:11
72:22,24 79:16,22
80:11 87:2
stack 85:19 89:17
stand 32:12 50:19
standard 44:25
standards 32:8,15
33:6,17 34:8,15
35:2,20 41:4,19
42:2,9,13 45:12
52:13 74:2
stands 94:5
start 90:7
started 42:19,25
58:8
starting 87:24
starts 89:20
state 6:21 7:19
31:10 32:4 43:6
44:6,13 97:3
stated 13:2 70:11,12
statement 17:9,9
28:7,10 29:18 32:12
39:23 50:10,14,15

50:19 51:3,6,9,15
51:16 56:2
statements 81:16
83:7
states 1:1 2:1 63:14
stating 61:17
stations 61:14
statistical 35:3
statistically 34:17
73:2
steven 3:4 6:24
stipulation 94:24
stitt 1:4 2:4 6:10
31:24
street 2:19 3:11,16
6:9
strike 16:3 31:5 46:3
46:4 51:5,19 68:18
78:9 79:2 94:11
studies 73:7,20
78:10,13,19 79:3,4
79:8,10,13,19 80:8
80:10,20,23 82:15
82:21 84:25 85:10
85:13
study 4:21 5:3,5
22:20 78:16 82:13
83:19 84:21
studying 65:22
subject 50:11,18
82:15 85:14
subquestion 13:1
subscribed 26:12
97:20
subset 56:16
substance 21:11
sufficient 36:10 37:7
65:25
suggested 30:3
suite 2:19 3:5,11,16
6:9
summed 88:18
superintendent
12:14,18,22 14:22
15:6 16:18 17:4,13

17:23 18:5,18,23
19:4,11,18 20:5,10
superior 43:12
support 4:12,24
28:23 69:13
supposed 12:19
13:10,18,25 14:10
14:15,20,25 15:25
67:8,8
supreme 24:20,23
25:8,25
sure 7:21 13:22 18:8
19:9,10 21:16 25:4
26:8 32:3 36:12
41:12 42:18,21
45:24 46:9 55:8
56:1,22 62:19 66:6
70:12 77:13 78:18
85:12 91:2,19 92:23
93:18,20
survey 29:11,13
34:25 40:22 71:24
72:4,4 74:15,17,21
74:22
surveys 75:1
susceptible 30:5
45:8 48:15,17,18
swear 7:7
switch 59:19
sworn 7:4 97:7

**t**

table 57:21 59:6
60:3
tainted 66:14
take 6:14 33:21
34:12 37:24 39:25
90:24,25
taken 2:18 35:19
42:16 45:3 63:19
97:4
takes 59:19
talk 74:17
talked 84:22

talking 55:14 70:21
95:16
tape 59:16,17 60:20
task 88:12,13 91:4
91:11 92:11,13
93:24
task1 87:25 89:6,12
task2 88:21 89:5,9
89:12
task3 89:10
tasks 4:16 37:11
38:20 79:6,16,23
80:7,11 87:19 88:4
88:18 90:4 91:10
93:7
tax 49:23
taxes 49:23
taylor 1:23 2:21
97:24
teleconference 1:15
2:17 3:5,10
telegraph 39:13
telephone 29:10,12
tell 16:5 17:7 22:7
51:18 70:3 86:8
89:4 91:7,18,22
92:8,12,15 93:9,25
94:5
tend 80:16
tendency 79:5,15
81:8 82:4,5 83:9,10
83:23 84:6,15,19
85:2
term 30:8
terminal 60:8
terms 33:24
testified 7:13 9:5
26:5 52:19 77:5
84:23
testify 8:25 16:15
testifying 8:11 10:2
97:7
testimony 9:4 15:12
24:8,15,17 25:4,6,8
32:10 33:12,14 38:8

Veritext Legal Solutions
866 299-5127

45:3,14 46:6,7
89:10 96:8 97:11
**thank** 7:3 22:25
59:22 60:21 94:18
95:15
**theory** 28:23
**thing** 10:10 18:8,11
27:4,19 49:8 67:9
89:1,7 91:9
**things** 15:6 23:13
29:7,8 34:24 36:9
39:11 50:10
**think** 10:12 14:6
36:18 38:25 40:25
42:23 44:5 45:23
46:1 52:1 57:5,13
64:11 67:1,2 70:21
75:13 77:1 80:14
90:24 91:25
**thinking** 66:10
**third** 48:14 74:8
93:6
**thirds** 89:16,19
**thought** 13:17,20
82:18
**three** 8:8 23:13
43:24 48:4,7 73:7
73:20 78:10,13,19
79:8,14,19 80:8,10
80:14,20,23 82:21
90:7,9,10,11,12,19
90:19,25 91:21
94:11,12,13
**tidrick** 3:4 4:4 6:24
6:24 7:6,16 9:7,12
9:17 10:14,20,25
11:3 16:20 17:14
20:16,23 22:24 23:7
29:1 30:18,20 33:1
36:3,8 37:21 38:5
38:17 40:8,17 41:11
41:14 42:8 45:9,20
46:2,15 50:5 51:17
52:5 53:20 54:1,7
54:21 55:1,15,17

56:23 58:4,13 59:4
59:17,21,24 60:2,14
60:19 61:3,23 62:3
62:21 63:2,24 64:8
65:1,18 66:15 68:8
69:10 70:2,14 71:1
72:14 73:10,14
74:24 76:1,7,11
77:10,14 78:6,22
79:1 80:5,17 81:5
81:13,21 82:14 83:2
83:21 84:3 85:6
86:21 87:4 89:3
94:18 95:1,16,17
**tidricklaw.com** 3:7
**time** 5:3,5 6:21 8:20
15:18,20,22 26:13
32:19 33:14 34:23
36:10,14,15,19,22
37:1,4,7,10,12,25
38:19 45:25 54:17
56:15 57:7,12,15,24
58:7,7,10,12,16,25
59:6 60:6,8 61:5,18
62:17 63:5 66:1
67:8 72:21,24 74:4
74:5,6 79:6,16
80:11,16,19,24
86:25 87:2 88:18
89:24 90:2,8,8,8,8
91:17,20,23 92:6
97:5
**times** 8:2,19 65:23
66:11
**titled** 27:1,13
**today** 8:12 10:2,9
15:23 16:6 17:7,15
24:2 25:14 26:5
32:12 34:14 51:18
51:20 52:6,25 53:6
65:7 69:3 79:13
**today's** 94:20
**told** 17:5
**tony** 1:4 2:4

**top** 15:15 25:20
34:21 79:12,18
82:25
**total** 59:6 79:21
80:18 86:15 88:16
**totally** 62:19
**transbay** 60:8
**transcribed** 97:9
**transcript** 94:24
95:11,12,19 96:6
97:10,13,15
**transcripts** 35:14
**transportation** 1:9
2:9 6:11
**travel** 57:24 58:12
58:15,25 59:6 60:6
60:8 61:5,18,19
62:17 63:5
**traveled** 61:12,13,20
62:11,12
**traveltimecalculat...**
58:22
**trend** 81:24
**trends** 27:2
**trial** 43:23 45:3,14
**tridrick** 3:4
**true** 14:17 29:5,14
50:13 51:9 64:25
81:12 90:9 96:8
97:10
**truthful** 81:16
**try** 13:23 45:10
**trying** 15:4 32:22
70:23 73:17
**turn** 12:11 16:21
17:20 19:15 20:2
23:18 31:5,7 50:6
50:21 57:18 63:9
69:11 89:16,18
**turning** 52:15 54:9
**twice** 8:3
**two** 8:4,8 11:23
29:15 43:2,4,24
49:11 67:2 69:20
89:16,19 90:24,24

94:9,21
**type** 38:23
**typically** 65:13
76:21

**u**

**u.s.** 81:25
**ultimately** 24:17
42:20
**unambiguous** 33:25
**unclear** 92:17
**undersigned** 97:2
**understand** 8:9,11
10:2,6 12:13 13:6
13:20 15:4 17:22
18:3,7 19:17 20:4
21:9,24 23:9 31:20
32:18 36:11 39:6,16
40:15 45:24 46:9,10
48:2 49:8 50:16
52:19 53:4 54:3,16
55:5 57:23 58:14
61:16 62:19 64:16
64:18,21 67:4 69:25
70:22 72:13 73:17
79:2,19 83:3 89:11
94:14
**understanding** 13:4
13:11,13,14 14:15
14:24 15:13,20,21
16:9,17 23:22 26:2
26:6 32:2 33:3 57:5
57:8,9 58:6 60:4,15
66:19,21 67:5,19,23
68:12,24 90:4,20
**understands** 39:1
**understate** 82:6
83:10,24 84:6,16,20
85:2
**understood** 11:12
12:21 13:18 17:8,16
**unintelligible** 88:24
88:25
**united** 1:1 2:1

Veritext Legal Solutions
866 299-5127

**unsure** 14:18
**use** 30:8 38:2 49:11 55:6 94:6
**usefulness** 24:9
**uses** 61:18
**usually** 95:3

## v

**v** 7:22 22:19 87:9
**v2** 87:9
**vague** 17:10 28:20 30:2 32:17 37:16 38:1 40:3 41:7 45:4 45:18 51:24 53:2,8 53:12,16 55:13 56:18 57:25 60:10 63:19 66:7 68:4 69:23 70:7,10,20 72:10 75:21 80:12 81:19 82:24 83:13 85:4
**valerie** 81:22 83:4
**valid** 32:6 35:22 37:15 41:21 42:11 45:2,15 70:17
**validity** 31:1 56:24 75:18
**value** 90:20
**variable** 91:6
**variety** 26:16
**various** 33:15 37:11 38:18,20 47:10 72:22 75:2
**vehicle** 56:2,3,9 57:6
**veracity** 46:7
**verify** 91:1 93:21
**veritext** 3:15 95:17
**version** 87:10 89:14 89:20
**versus** 6:11 23:19,23 24:4 25:15,19 26:7 26:9,18,23 27:4 28:2 31:24
**victor** 7:22

**video** 1:15 2:17 3:5 3:10 6:6,13 14:5
**videographer** 3:14 6:4 7:3,9 22:21,25 23:5 59:2,15,18,22 60:1,21,25 94:20
**view** 54:13
**violation** 52:12
**visit** 5:3,5
**visiting** 11:23 12:2
**vs** 1:7 2:7

## w

**w** 43:1,1
**wage** 23:24 24:3 27:1,14
**wait** 63:18
**walk** 89:24 90:2,7,8 90:8,8 91:17,20,23 94:5
**walking** 90:5 92:6 94:10
**want** 16:8 30:11 34:4 39:12,14,24 83:16 93:13,18 94:24 95:12
**wanted** 30:11 91:15
**way** 6:19 14:24 45:11 51:3,7,20 52:6 53:18,24 54:5 55:16 57:11 60:18 63:23 65:12 67:21 77:24 81:12 84:2 89:16,19
**ways** 26:16
**we've** 66:11
**wednesday** 1:18 2:21 6:1
**week** 69:20
**weeks** 47:1
**went** 43:23
**west** 2:19 3:16 6:8
**whereof** 97:20
**whispers** 6:15

**witness** 4:2 7:4,7 9:15 10:24 11:2 16:13,17 17:12 20:21 28:22 30:19 32:19 33:11 36:1,6 37:19 38:4,15 40:6 41:9,12 42:7 45:7 45:19,23 46:11,13 50:4 51:15 52:1 53:18,24 54:5,23 56:21 58:2,6 60:12 61:25 62:24 63:22 64:4,24 65:12 66:10 68:6 69:8,25 70:8 70:12,21 72:12 73:12 75:24 76:9 77:12 78:4 80:2,14 81:3,11,20 82:12,25 83:18 84:1 86:19 89:1 95:3,6 97:20
**witnesses** 97:6
**word** 13:16 18:10 19:24 38:2
**wording** 92:13
**words** 16:3,6,10,17 17:2,18
**work** 4:16 22:13 64:13,14,15 65:3,9 66:16,22 67:13,17 67:24,24 68:2,7,25 69:5 76:18 79:6,16 79:22 80:7,11 87:25 89:5,6,9,10,12,12 91:4,11 92:19 93:24
**worked** 58:8
**working** 79:22 80:19
**works** 8:9
**worksheet** 89:21
**write** 11:18,20 12:1 21:5
**writing** 47:2
**written** 17:19 26:11 26:14,23 27:3,8,11 71:17

**wrote** 11:24 13:3,10 15:25 16:1,6,25 17:2,4 18:3,7 26:17 26:25 27:5,12,19 46:23 92:19

## y

**y** 7:22
**yeah** 18:10 19:24 22:24,24 24:5 41:11 46:22 63:17 67:5 69:25 79:8 86:19 88:12 90:1 93:14 95:1
**year** 43:22
**years** 8:7,8 17:24 20:6 43:24
**ygr** 1:7 2:7 6:12

## z

**zero** 87:2 88:12
**zeros** 88:10

Veritext Legal Solutions
866 299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF SEPTEMBER 1, 2014. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Exhibit H

```
 1            IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3   _____
                                     )
 4   DARRYL A. STITT, TONY          )
     GRANDBERRY, and HEDY GRIFFIN,)
 5   on behalf of themselves and   )
     all others similarly          )
 6   situated,                     )
                                   )
 7           Plaintiffs,           )
                                   ) No. C-12-03704-YGR
 8       vs.                       )
                                   )
 9   THE SAN FRANCISCO MUNICIPAL   )
     TRANSPORTATION AGENCY; CITY   )
10   AND COUNTY OF SAN FRANCISCO; )
     and DOES 1-20,                )
11                                 )
           Defendants.            )
12   _____)
13
14
15      VIDEOTAPED DEPOSITION OF ADRIAN FLEISSIG, Ph.D.
16                Irvine, California
17              Wednesday, July 27, 2016
18                    Volume I
19
20
21   Reported by:
     SHARON LINDSAY-MILNIKEL
22   CSR No. 5335
23   Job No. 2351884
24
25   PAGES 1 - 131
```

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

_____
                        )
DARRYL A. STITT, TONY      )
GRANDBERRY, and HEDY GRIFFIN,)
on behalf of themselves and  )
all others similarly      )
situated,                 )
                          )
        Plaintiffs,    )
                       )
    vs.              ) No. C-12-03704-YGR
                     )
THE SAN FRANCISCO MUNICIPAL  )
TRANSPORTATION AGENCY; CITY  )
AND COUNTY OF SAN FRANCISCO; )
and DOES 1-20,            )
                          )
        Defendants.    )
_____)

Videotaped deposition of ADRIAN FLEISSIG,
Ph.D., Volume I, taken on behalf of Plaintiffs and the
Certified Class, at 20 Corporate Park, Suite 350,
Irvine, California, beginning at 9:03 a.m. and ending
at 2:39 p.m. on Wednesday, July 27, 2016, before
SHARON LINDSAY-MILNIKEL, Certified Shorthand Reporter
No. 5335.

Page 2

INDEX

WITNESS                    EXAMINATION

ADRIAN FLEISSIG, Ph.D.

VOLUME I


        BY MR. TIDRICK          6


        EXHIBITS

        (None)

Page 4

APPEARANCES:

For Plaintiffs and Certified Class:

    THE TIDRICK LAW FIRM
    BY:  STEVEN G. TIDRICK
    BY:  JOEL B. YOUNG
    Attorneys at Law
    2039 Shattuck Avenue, Suite 308
    Berkeley, California 94704
    (510) 788-5100
    sgt@tidricklaw.com
    jby@tidricklaw.com
    (Telephonic appearances.)

For Defendants:

    RENNE SLOAN HOLTZMAN SAKAI
    BY:  GEOFF SPELLBERG
    Attorney at Law
    350 Sansome Street, Suite 300
    San Francisco, California 94104
    (415) 678-3800
    gspellberg@publiclawgroup.com

Videographer:
    STEVEN TOGAMI

Page 3

Irvine, California, Wednesday, July 27, 2016

        9:03 a.m.

        THE VIDEOGRAPHER:  Good morning.

    We are on the record at 9:03 a.m. on        09:03:51
July 27th, 2016.

    This is the video-recorded deposition of
Adrian Fleissig, Ph.D.

    My name is Steven Togami, here with our
court reporter, Sharon Lindsay-Milnikel.  We are       09:04:06
here from Veritext Legal Solutions at the request
of counsel for the plaintiffs.

    This deposition is being held at 20
Corporate Park, Irvine, California 92606.

    The caption of this case is Darrell A.        09:04:27
Stitt, et al. versus The San Francisco Municipal
Transportation Agency, et al., Civil Case Number
C -- slash -- C -- excuse me -- C-12-03704-YGR.

    Please note that audio and video recording
will take place unless all parties agree to go off
the record.

    Microphones are sensitive and may pick up
whispers, private conversations and cellular
interference.

    I am not related to any party in this

Page 5

2 (Pages 2 - 5)

| | |
|---|---|
| 1   action, nor am I financially interested in the | 1   A   So one case involved a statistical |
| 2   outcome in any way. | 2   analysis of a library where books and various other |
| 3      If there are any objections to proceeding, | 3   items had been damaged. |
| 4   please state them at the time of your appearance. | 4   Q   Do you recall the defendant in that case? |
| 5      At this time will counsel and all present   09:05:26 | 5   A   I don't recall the exact name of the    09:08:58 |
| 6   please identify themselves for record. | 6   defendant. |
| 7      MR. SPELLBERG: Geoff Spellberg | 7   Q   Do you recall where, geographically, the |
| 8   representing the defendant. | 8   defendant was located? |
| 9      THE WITNESS: Adrian Fleissig representing | 9   A   Yes, in Tulane, at Tulane University. |
| 10   the defendant.      09:05:38 | 10   Q   In South America?      09:09:17 |
| 11      MR. TIDRICK: Steven Tidrick appearing by | 11   A   No, here. In North America, Tulane |
| 12   telephone on behalf of plaintiffs and the certified | 12   University. |
| 13   class. | 13   Q   Can you -- can you spell the name of the |
| 14      THE VIDEOGRAPHER: Thank you. | 14   university, I may just not be able to hear -- |
| 15      Could we please have the oath.     09:05:57 | 15   A   Tulane --      09:09:32 |
| 16 | 16   Q   -- which university. |
| 17      ADRIAN FLEISSIG, Ph.D., | 17   A   -- University -- Tulane, T-u-l-a-n-e. |
| 18   having been administered an oath, was examined and | 18      MR. SPELLBERG: Tulane, in New Orleans. |
| 19   testified as follows: | 19   BY MR. TIDRICK: |
| 20 | 20   Q   In that case, was your work on behalf of   09:09:50 |
| 21      EXAMINATION | 21   the plaintiff or the defendant? |
| 22   BY MR. TIDRICK: | 22   A   The defendant. |
| 23   Q   Good morning, would you please state your | 23   Q   Do you recall, geographically, where was |
| 24   full name for the record. | 24   the court that you -- for that case? |
| 25   A   Adrian Roy Fleissig.      09:06:18 | 25   A   I don't.      09:10:11 |
| <div align="right">Page 6</div> | <div align="right">Page 8</div> |
| 1   Q   Could you spell that, please. | 1   Q   The other time that you were deposed, do |
| 2   A   A-d-r-i-a-n, and the middle name is Roy, | 2   you recall who the defendant was in the other case? |
| 3   R-o-y, and the last name is Fleissig, F, as in | 3   A   No, I don't. |
| 4   Frank, l-e-i-s, for sugar, s, for sugar, i-g. | 4   Q   Do you recall, generally, what was the |
| 5   Q   Have you ever been deposed before?    09:06:46 | 5   subject of your testimony in the other case?    09:10:34 |
| 6   A   Yes. | 6   A   It was about banking and analyzing |
| 7   Q   Approximately how many times. | 7   accounts, doing a statistical analysis of a sample. |
| 8   A   Two times. | 8   Q   Do you recall generally what the claim was |
| 9   Q   When, approximately, was that? | 9   in that case? |
| 10   A   It was more than four years ago.    09:07:07 | 10   A   I don't recall the full details behind   09:10:58 |
| 11   Q   Are you able to tell me approximately when | 11   that. |
| 12   were the two times that you were deposed before? | 12   Q   Do you recall, even generally, what was |
| 13   A   It was just more than four years ago. | 13   the claim in that case? |
| 14   Q   Other than the -- saying that it was more | 14   A   Lost customers. |
| 15   than four years ago, are you able to tell me    09:07:40 | 15   Q   Was that case a class action?     09:11:13 |
| 16   approximately what years you were deposed before? | 16   A   No. |
| 17   A   I can't give you exact years, but I've | 17   Q   The case against Tulane University where |
| 18   been working with RGL Forensics since 2006, so it's | 18   you were deposed, was that a class action? |
| 19   between then and four years. | 19   A   No, it wasn't. |
| 20   Q   Have you ever testified at any trial?    09:08:05 | 20   Q   You understand generally how a deposition   09:11:49 |
| 21   A   No, I haven't. | 21   proceeds? |
| 22   Q   The two times you were deposed before, are | 22   A   I have a general understanding. |
| 23   you able to tell me what those cases involved? | 23   Q   You understand that you're testifying |
| 24   A   Yes, I can. | 24   under oath today? |
| 25   Q   What did they involve?     09:08:28 | 25   A   I do.      09:12:07 |
| <div align="right">Page 7</div> | <div align="right">Page 9</div> |

<div align="right">3 (Pages 6 - 9)</div>

| | |
|---|---|
| 1 Q You understand that the oath that the | 1 A Yes. |
| 2 court reporter administered is the same oath that | 2 Q The question I'm asking is somewhat |
| 3 you would be taking in a court of law, you | 3 different. |
| 4 understand that? | 4 What I'm asking is are there any documents |
| 5 A I do. 09:12:21 | 5 that have been requested that you produced that you 09:17:02 |
| 6 Q And that you are testifying under penalty | 6 have not yet produced in this case and that you are |
| 7 of perjury today? | 7 producing today? |
| 8 Do you understand that? | 8 A I'm sorry, I didn't understand that |
| 9 A I certainly do. | 9 question there were a lot of "nots" in it. |
| 10 MR. TIDRICK: Madam Court Reporter, if you 09:12:37 | 10 Q Looking at the Exhibit 152 document -- 09:17:27 |
| 11 could, please, provide the deponent with the | 11 A Yes. |
| 12 exhibit that has been previously marked as | 12 Q -- you understand that that includes a |
| 13 Exhibit 152. | 13 list of items to be produced at deposition? |
| 14 THE REPORTER: Okay, give me a second, | 14 A I do. |
| 15 please. Hold on. 09:12:57 | 15 Q All that I'm asking -- and I believe from 09:17:37 |
| 16 (Interruption in the proceedings.) | 16 what you've already said, that the answer is no -- |
| 17 BY MR. TIDRICK: | 17 but all that I'm asking is are there any documents |
| 18 Q Are you looking at the document marked | 18 that you are producing to us today pursuant to this |
| 19 Exhibit 152? | 19 deposition notice. |
| 20 A Yes, I am. 09:14:23 | 20 A I don't believe I'm producing any 09:17:59 |
| 21 Q Have you seen that document before? | 21 documents. |
| 22 A Yes, I have. | 22 MR. TIDRICK: Madam Court Reporter, if you |
| 23 MR. TIDRICK: For the record, this is | 23 could, please, provide the deponent with the |
| 24 Plaintiffs' Second Notice Of Depositions Of | 24 document that has been previously marked as |
| 25 Defendant's Experts And Demand For Production At 09:14:40 | 25 Exhibit 102. 09:18:31 |
| Page 10 | Page 12 |

| | |
|---|---|
| 1 Depositions. | 1 THE REPORTER: Certainly. |
| 2 Q Do you understand that this is the | 2 Okay, he's got it. |
| 3 deposition notice pursuant to which you are | 3 BY MR. TIDRICK: |
| 4 testifying today? | 4 Q Exhibit 102 is your June 13, 2016 report, |
| 5 A I do. 09:14:56 | 5 correct? 09:19:02 |
| 6 Q Do you understand that this deposition | 6 A It's a report that I wrote with Mary |
| 7 notice calls for you to produce various documents? | 7 Furst. |
| 8 A I do understand that. | 8 Q Dated June 13, 2016, correct? |
| 9 Q Are you producing any documents today? | 9 A That's correct. |
| 10 A I have a copy of my report and Exhibit 152 09:15:20 | 10 Q If I could, please, refer you to 09:19:27 |
| 11 with me, my report with Mary Furst. | 11 Attachment 4 to Exhibit 102, which I understand to |
| 12 THE REPORTER: I'm sorry? | 12 be your CV. |
| 13 THE WITNESS: The report with Mary Furst. | 13 A Okay. I'm getting there. |
| 14 BY MR. TIDRICK: | 14 Yes, I have it. |
| 15 Q The report with Mary Furst that you're 09:15:58 | 15 Q Is Appendix 4 to Exhibit 102 your current 09:19:57 |
| 16 referring to, is that your report dated June 13, | 16 CV? |
| 17 2016? | 17 A This is the CV at the time I was asked to |
| 18 A That is correct. | 18 participate. There have been other things that |
| 19 Q Is the June 13th, 2016 report the only | 19 have been published since then. |
| 20 document that you are producing today? 09:16:31 | 20 Q What, specifically, has been published 09:20:28 |
| 21 A Well, I have the -- Exhibit 152 is the one | 21 since then? |
| 22 in front of me. | 22 A Just some journal articles and research |
| 23 Q Understood. The deposition notice -- | 23 that I've done, academic publications. |
| 24 A Yes. | 24 Q What journals have those been published |
| 25 Q -- correct? 09:16:40 | 25 in, the ones that are not listed in the CV? 09:20:55 |
| Page 11 | Page 13 |

4 (Pages 10 - 13)

1    A    I believe there's one in Atlantic Economic
2  Journal, and there may be another one that's either
3  been printed or it's in -- on the way.
4    Q    The other one that has been either printed
5  or on the way, what publication is that?          09:21:20
6    A    It's -- it's an academic publication for
7  an academic journal.
8    Q    Is that the same as the Atlantic Economic
9  Journal that you just referred to?
10    A    No, there's another one that's          09:21:40
11  forthcoming, I believe, and I don't remember the
12  name of the journal.  It's been a while.
13    Q    The recent publication that you have in
14  the Atlantic Economic Journal that is not reflected
15  in your CV in Exhibit 102, what, generally          09:22:07
16  speaking, is the subject of that journal article?
17    A    Analyzing consumer behavior and choices
18  over time.
19    Q    The other publication that is not
20  reflected in the CV in Exhibit 102 that you've          09:22:38
21  indicated has either been printed or on the way in
22  a journal other than Atlantic Economic Journal, I
23  understand that you can't remember the name of the
24  journal, but do you recall, even generally, what
25  the subject of that article is?          09:22:58

1    A    It's analyzing consumer behavior as well.
2    Q    That article analyzing consumer behavior
3  for which you do not remember the name of the
4  journal, what is your finding in that article
5  regarding consumer behavior?          09:23:40
6    A    You know, it was written a while ago and I
7  just -- I've written so many things and I just
8  don't remember what that one was about.
9    Q    That is one of your two most recent
10  articles, correct?          09:24:01
11    A    Yes, I believe so.
12    Q    Other than the recent publication in the
13  Atlantic Economic Journal and the other article on
14  consumer behavior in a journal, the title of which
15  you don't recall, are there any other publications          09:24:33
16  of yours that are not reflected in the Exhibit 102
17  CV?
18    A    I believe that's all that there is.
19    Q    Have you ever been employed by a transit
20  operation?          09:24:58
21        MR. SPELLBERG:  I'm going to object, vague
22  and ambiguous.
23        By "employment," do you mean as an actual
24  employee?
25        MR. TIDRICK:  Yes.          09:25:07

1        MR. SPELLBERG:  You can answer.
2        THE WITNESS:  I haven't been employed as
3  an employee by a transit industry.
4  BY MR. TIDRICK:
5    Q    Other than the work that you've done for          09:25:20
6  SFMTA in connection with this case, have you ever
7  done any work for any transit operations?
8    A    I'm -- I'm sorry, can you rephrase that
9  question one more time.
10        MR. TIDRICK:  Madam Court Reporter, could          09:25:44
11  you please read it back.
12        (Record read as follows:
13          "Q  Other than the work that
14          you've done for SFMTA in connection
15          with this case, have you ever done          09:25:27
16          any work for any transit
17          operations?")
18        THE WITNESS:  I've worked on other cases.
19  BY MR. TIDRICK:
20    Q    What -- what are the other cases you've          09:26:33
21  worked on involving transit operations?
22    A    There was another case in San Francisco
23  that involved transport.
24    Q    When I use the acronym SFMTA, you
25  understand that I'm referring to the San Francisco          09:27:11

1  Municipal Transit Agency?
2    A    I wasn't -- I wasn't aware that you
3  were -- that that's what you were referring to.
4  I -- it's -- it's -- I don't remember if it was
5  exactly that one, but it was another class action          09:27:24
6  case in San Francisco.
7    Q    Sometimes, just for ease of reference, in
8  this deposition I'll use the acronym SFMTA.
9        You understand that San Francisco
10  Municipal Transportation Agency is a defendant in          09:27:57
11  this case, you understand that?
12    A    Yes, I do.
13    Q    And I'll occasionally refer to that entity
14  as SFMTA.
15        Understood?          09:28:17
16    A    Yes, I do, I understand now.
17    Q    Now, just to clarify, I -- I was
18  previously asking if other than this case against
19  SFMTA, if you've ever worked on any other case
20  involving a transit operation, and I believe I          09:28:42
21  understand from your answer that you have worked on
22  another case in San Francisco that involved
23  transportation; is that correct?
24    A    Yes, that is.
25    Q    In that other case was the defendant a          09:29:06

1 private transportation operation?
2   A  I don't remember all those details.
3   Q  Was it a case against SFMTA?
4   A  I don't remember the details on who -- who
5 was involved, the parties involved.   09:29:28
6   Q  What year, approximately, did you work on
7 that other case in San Francisco involving a
8 transportation operation?
9   A  It was pretty recent.
10   Q  Do you recall, even generally, what was   09:29:53
11 the work that you did in that case?
12   A  It was a similar analysis to the kinds of
13 things that we're doing here.
14   Q  When you say it's similar, in what ways?
15   A  Issues -- issues related to unpaid   09:30:30
16 overtime work.
17   Q  This other case that you've done work on
18 pretty recently involving issues of unpaid overtime
19 work, do I understand correctly, you do not recall
20 who the defendant was or is in that case, correct?   09:31:20
21   A  I don't recall who they were.
22   Q  Are you able to tell me one way or the
23 other whether the defendant in that case was SFMTA?
24   A  I cannot remember. I'm sorry.
25   Q  So do I understand correctly, the   09:31:43

Page 18

1 defendants in that other case for which you've done
2 work, the defendant could have been SFMTA, it could
3 have been some operation other than SFMTA, you just
4 don't remember.
5   Is that fair?   09:32:14
6   A  I really don't remember.
7   Q  Other than this case against SFMTA and the
8 other case in San Francisco that you recall
9 involving issues of unpaid overtime work, are there
10 any other cases that you have worked on involving   09:32:55
11 transit operations?
12   A  I don't believe there are any other cases.
13   Q  Other than the work that you've done for
14 this case and/or the other case you worked on in
15 San Francisco involving issues of unpaid overtime   09:33:25
16 work, do you have any experience with the
17 transportation industry?
18   A  Not the San Francisco transportation
19 industry.
20   Q  What about the transportation industry   09:33:44
21 outside of San Francisco?
22   A  I've done some work for Orange County.
23   Q  Anywhere else, other than for Orange
24 County and the work you've done for SFMTA and in
25 San Francisco?   09:34:27

Page 19

1   A  I did another project that's related to
2 revenue for California.
3   Q  Transportation revenue?
4   A  Yes, from highway revenue, the highway
5 revenue fund.   09:34:49
6   Q  The work that you've done for Orange
7 County, what has that work involved?
8   A  Involved projecting revenue from
9 various -- various sources of highway revenue.
10   Q  Do you have any experience with   09:35:08
11 transportation planning?
12   A  No, I don't.
13   Q  Do you have any experience with vehicle
14 on-time performance?
15   A  No, I don't.   09:35:46
16   Q  Have you ever had any training or
17 experience regarding transit route scheduling?
18   A  No, I don't.
19   Q  In the Exhibit 102 report, at page 7,
20 paragraph 4. --   09:36:31
21   A  Am I on the right page -- are you talking
22 about my CV?
23   Q  I'm referring to Exhibit 102, the June 13,
24 2016 report --
25   A  Okay.   09:36:59

Page 20

1   Q  -- page 7 of the report, the paragraph
2 that is numbered 4.b.
3   A  Okay, yes, I have it now. Sorry about
4 that.
5   Q  I understand in your Exhibit 102 report   09:37:26
6 you've stated that you "have worked on numerous
7     cases performing statistical
8     analysis, sampling, forecasting,
9     probability, personal injury,
10     business interruption, economic and   09:37:49
11     market analysis."
12   Do I understand correctly you have worked
13 on numerous cases in that regard.
14   A  Yes, I have.
15   Q  Are you able to tell me, even   09:38:17
16 approximately, how many wage and hour cases you
17 have worked on as an expert?
18   A  One, I believe.
19   Q  And Is that the present case against
20 SFMTA?   09:38:42
21   A  No, that was a different case.
22   Q  The other wage and hour case that you've
23 worked on, who was the defendant in that case?
24   A  I'm sorry, I don't recall.
25   Q  Do you recall, what was the industry of   09:39:01

Page 21

6 (Pages 18 - 21)

Page 22

1 the employer in that case?
2　A　No, I don't recall.
3　Q　Do you recall approximately what year you
4 worked on that wage and hour case?
5　A　Sorry, I don't recall that.　09:39:24
6　Q　Are you able to tell me what decade you
7 worked on that case?
8　A　Well, I've been employed at RGL Forensics
9 from 2006 to date, so it's probably -- it wasn't
10 within the last four years.　09:39:50
11　Q　Do I understand correctly, the only two
12 wage and hour cases that you have ever worked on is
13 the present case against SFMTA and one other case
14 that you worked on sometime between 2006 and the
15 present?　09:40:29
16　A　I'm -- my understanding of this wage and
17 hour case, that was a different one, that was
18 dealing with people changing uniforms and the
19 amount of time to do that. That was the case.
20　　When you referred to wage per hour, my　09:40:42
21 understanding was that that was the issue, not the
22 case that we're working on.
23　Q　Is the term "wage and hour case" a term
24 that you're familiar with?
25　A　I -- well, I guess my understanding -- my　09:41:08
Page 22

1 understanding was that it just dealt with -- the
2 case that I worked on dealt with the time it took
3 people to change and -- and unchange, to dress and
4 undress, that they weren't compensated for that
5 time and that was called a wage-per-hour case, so　09:41:26
6 that was my understanding.
7　Q　Approximately how many cases have you
8 worked on in which there have been claims made for
9 failure to pay overtime or failure to pay wages
10 that are due?　09:41:58
11　A　I would say three to four.
12　Q　Are you able to tell me what industries
13 those cases involved?
14　A　Well, there's the two in the San Francisco
15 transportation industry that we've discussed and　09:42:27
16 then there was the other case, which I just told
17 you about, where it dealt with people changing
18 their uniforms and not being compensated for that.
19　Q　Are there any others?
20　A　Not that I can recall.　09:42:49
21　Q　Have you ever designed a survey for
22 gathering data in any case involving claims of
23 unpaid wages or unpaid overtime?
24　A　No, I haven't.
25　Q　Have you ever designed a survey in any　09:43:22
Page 23

1 case?
2　A　I have been -- I've worked with a survey
3 expert to design a survey, yes.
4　Q　Who was that expert?
5　A　That was at Cal State Fullerton　09:43:46
6 University.
7　Q　This survey expert that you've worked with
8 before was a professor at Cal State Fullerton?
9　A　Not a professor, but the director.
10　Q　The director of what?　09:44:30
11　A　Social science research cen- -- center.
12　Q　Do you recall what his or her name was?
13　A　I do recall her name.
14　Q　What is it?
15　A　Her name is Laura Gil-Trejo.　09:44:50
16　Q　Can you spell that, please?
17　A　The first name I certainly can, which is
18 L-a-u-r-a, and the last name I will try to get it
19 as best as I can. It's G-i-l, hyphen, T-r-e-j-o.
20　Q　You consider Laura Gil-Trejo to be a　09:45:17
21 survey expert?
22　A　Yes, she is.
23　Q　Do you consider yourself to be a survey
24 expert?
25　A　I participate in writing surveys.　09:45:47
Page 24

1　Q　When you refer to Laura Gil-Trejo as a
2 survey expert, do you have some understanding that
3 there is an area of expertise in the area of
4 surveys?
5　A　Oh, there is definitely an area of　09:46:17
6 expertise when creating a survey.
7　Q　The area of expertise in creating a
8 survey, is that based on academic training?
9　A　It is based on a combination of academic
10 training and field practice and experience over　09:46:52
11 time.
12　Q　Do you consider yourself to be a survey
13 expert?
14　A　No, I don't.
15　MR. TIDRICK: Madam Court Reporter, if you　09:47:18
16 could, please, hand the deponent the exhibit that
17 was previously marked as Exhibit 101.
18　THE REPORTER: Certainly. One moment.
19　The witness has it, sir.
20　MR. TIDRICK: For the record, Exhibit 101　09:48:00
21 is the expert report of Mary Furst dated May 10th,
22 2016.
23　Is this a document that you've seen
24 before?
25　A　Let me have a look.　09:48:22
Page 25

| | |
|---|---|
| 1      I believe I've seen this one. | 1    Q   Yes, please do. |
| 2    Q   Did you participate in any way in the | 2    A   So under the "Qualifications" on page 7 |
| 3 creation of the Exhibit 101 report? | 3 where -- point 4 where I talk about myself, so 4.a. |
| 4    A   I do not believe I was involved in this. | 4 and 4.b. |
| 5    Q   Let's set that document aside for a      09:49:19 | 5      The compensation, what I'm being paid.    09:54:04 |
| 6 moment, please, and look again at the Exhibit 102 | 6      The summary of opinions I participated |
| 7 report. | 7 in -- |
| 8    A   Sure. | 8    Q   And if you could, please, I apologize for |
| 9    Q   At page 41 of the Exhibit 101 report, is | 9 cutting you off but -- |
| 10 your signature, correct?      09:49:45 | 10    A   Yes.      09:54:23 |
| 11    A   Let me find it. | 11    Q   -- for a clear record, if you can identify |
| 12    Q   And I apologize, I -- I may have misstated | 12 these sections by paragraph number, that would be |
| 13 the exhibit number, so let me restate just to make | 13 helpful. |
| 14 sure. | 14      So just to -- |
| 15      In the Exhibit 102 report, does your    09:50:05 | 15    A   Would you like --      09:54:31 |
| 16 signature appear at page 41? | 16    Q   -- reiterate, I understand that you've |
| 17    A   Let me get to page 41. Yes, that's my | 17 already identified paragraph 4.a. and 4.b -- |
| 18 signature. | 18    A   That's correct. |
| 19    Q   Is -- is it fair to say that the | 19    Q   And paragraph 5 -- |
| 20 Exhibit 102 report was a document that you    09:50:45 | 20    A   Yes.      09:54:44 |
| 21 collaborated with Mary Furst in creating? | 21    Q   -- correct? |
| 22      Do you understand the question? | 22    A   Yes. |
| 23    A   I'm sorry, I thought you were continuing. | 23      Paragraph 6. |
| 24      MR. TIDRICK: Madam Court Reporter, can | 24    Q   And -- |
| 25 you read back the question, please.      09:52:09 | 25    A   I'm sorry, did you -- can I continue?    09:54:53 |
| Page 26 | Page 28 |

| | |
|---|---|
| 1      (Record read as follows: | 1    Q   Yes, please do. |
| 2      "Q   Is -- is it fair to say that | 2    A   Sure. |
| 3      the Exhibit 102 report was a document | 3      Paragraph 7, I contributed there. |
| 4      that you collaborated with Mary Furst | 4      Paragraph 8, I contributed there. |
| 5      in creating?")      09:51:01 | 5      Paragraph 9, I was part of that one.    09:55:09 |
| 6      THE WITNESS: Oh, yes, I'm sorry, I | 6      Paragraph 12. |
| 7 thought you were continuing. I apologize. | 7      And I believe paragraph 13. |
| 8 BY MR. TIDRICK: | 8      I believe paragraph 14. |
| 9    Q   The answer to the last question is yes -- | 9      I believe paragraph 15. |
| 10    A   Yes.      09:52:32 | 10      I believe paragraph 16.      09:56:09 |
| 11    Q   -- correct? | 11      And I believe paragraph 17. |
| 12    A   Yes, it is. | 12      And I believe paragraph 18. |
| 13    Q   Is it fair to say that there are parts of | 13      I believe paragraph 20. |
| 14 this Exhibit 102 report that you wrote and there | 14      I believe paragraph 21, 22 and 23, 24, 25, |
| 15 are parts that Mary Furst wrote?      09:52:46 | 15 I believe I participated in all of those.    09:56:50 |
| 16    A   That is correct. | 16      26, 27, 28, 29, 30, 31, 32 -- when I say |
| 17    Q   Is it fair to say that there are only -- | 17 32, I mean a), b) and c), the whole paragraph, of |
| 18 only certain specific sections of this report that | 18 course, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, |
| 19 you are offering your opinion on? | 19 44, 47, 48, 49, 50, 53, 54, 55, 56, 59, 60. |
| 20    A   Yes, that is correct.      09:53:14 | 20    Q   I'm sorry, I heard you say 59, did you say   10:00:08 |
| 21    Q   Are you able to identify for me what | 21 anything after that? |
| 22 sections of this report that you are offering your | 22    A   Yes, I did, 60. |
| 23 opinion on? | 23      61, 62, 63, 64, 65, 83. |
| 24    A   I would need to look at the report and -- | 24    Q   Sorry, I just want to make sure that I |
| 25 I can do that.      09:53:39 | 25 heard properly, you listed 65 and then the next   10:02:16 |
| Page 27 | Page 29 |

1  after 65 is 83; is that correct?
2    A   Let me go back and check.
3        Yes, I believe so.
4    Q   And I apologize, I didn't mean to cut off.
5  If you could keep continuing from --        10:02:50
6    A   Yes.
7    Q   -- 83 onward.
8    A   -- I am, the last one was 83 and I'm
9  looking at the next one.
10        84, I believe 93, I believe 94, I believe   10:03:48
11  95, 96, 97, I believe 99, I believe 100, I believe
12  101, I believe 103, I believe 106, I believe 107, I
13  believe 108.
14        I -- I believe those are the paragraphs
15  that I did work on, I'm -- I believe those are the   10:06:01
16  ones.
17        Is there anything else?
18    Q   I do have additional questions for you,
19  but just so the record is clear, the various
20  paragraphs that you've just identified are the      10:06:26
21  ones, the only ones for which you are offering your
22  expert opinion; is that correct?
23    A   No, that's not correct.  These are the
24  paragraphs that I believe I worked on.
25    Q   In your mind, is there a difference       10:07:01

                                                    Page 30

1  between which paragraphs you worked on versus the
2  paragraphs for which you are offering your expert
3  opinion?
4    A   When you write a report, there are numbers
5  of drafts and the paragraphs change and so, from my   10:07:19
6  memory, I recall these are the ones that I worked
7  on and I'll give opinions on what I'm asked to give
8  opinions on.
9    Q   I'm still trying to understand what
10  distinction, if any, you see between paragraphs      10:08:25
11  that you worked on versus paragraphs for which you
12  are offering an opinion -- let me try it this way.
13        There are a number of paragraphs that you
14  have not identified as paragraphs that you worked
15  on, correct?                                        10:08:50
16    A   There are paragraphs that I believe I did
17  not work on, correct.
18    Q   The paragraphs that you didn't work on,
19  are you intending to offer your expert opinion with
20  respect to those?                                   10:09:11
21    A   The paragraphs that I believe that I did
22  not work on, if I'm asked to give an opinion, then
23  I may add information to that.
24    Q   Are there any parts of this report for
25  which you're not prepared to offer your opinion?   10:09:36

                                                    Page 31

1        MR. SPELLBERG:  I'm going to object.
2  Vague and ambiguous.
3        He's here to testify about anything that
4  he has knowledge about related to the report.
5  BY MR. TIDRICK:                                     10:10:10
6    Q   Do you understand the question?
7    A   Yes.  As -- if more information becomes
8  available and I'm required to provide opinions on
9  any parts of the report, I will add to the
10  explanation.                                        10:10:24
11    Q   Do you have knowledge about everything in
12  the Exhibit 102 report?
13    A   Everything in the report?  I have an
14  understanding of most of the stuff but I don't have
15  knowledge on everything in the report.             10:10:49
16    Q   You have knowledge that there's no place
17  in the report where you have identified the parts
18  that you have knowledge about, correct?
19    A   I'm sorry, there was -- there was a noise
20  and I didn't hear what the question was, I'm -- I   10:11:09
21  apologize.
22        MR. TIDRICK:  Madam Court Reporter, can
23  you read it back, please.
24        (Record read as follows:
25        "Q   You have knowledge that            10:10:56

                                                    Page 32

1        there's no place in the report where
2        you have identified the parts that
3        you have knowledge about, correct?")
4        THE WITNESS:  I don't understand that
5  question.                                           10:11:35
6  BY MR. TIDRICK:
7    Q   Can you point me to someplace in the
8  report where you've identified which parts of the
9  report you have knowledge about.
10    A   Those are the paragraphs that I discussed   10:11:53
11  that I have knowledge about.  I mean those are the
12  ones that I participated in.  I have knowledge
13  about a lot of things in the report, but those are
14  the ones that I participated in.  This is a joint
15  report, I didn't write everything.                 10:12:15
16        THE REPORTER:  I'm sorry?
17        THE WITNESS:  -- this is joint report and
18  I didn't write everything.
19  BY MR. TIDRICK:
20    Q   Did you read the entire report before you   10:12:21
21  signed it?
22    A   I did.
23    Q   Are you prepared to offer your opinion
24  with respect to everything in the report?
25    A   I will offer my opinion on everything     10:12:41

                                                    Page 33

9 (Pages 30 - 33)

| | | |
|---|---|---|
| 1 that I'm knowledgeable about, yes, I would do that. | | 1 MR. TIDRICK: Madam Court Reporter -- |
| 2 Q Are there any parts of the Exhibit 102 | | 2 Madam Court Reporter, can you read back my |
| 3 report that you are not knowledgeable about? | | 3 question, please. |
| 4 A I have a knowledge about a lot of the | | 4 THE REPORTER: One moment. |
| 5 things in the report, but some of the details, I 10:13:06 | | 5 MR. TIDRICK: And before you -- before you 10:16:58 |
| 6 don't know all the details. | | 6 read it back, if I could just state for the record, |
| 7 Q Are you able to identify which parts of | | 7 Mr. Spellberg, I'm not asking for your opinion on |
| 8 the Exhibit 102 report you are not knowledgeable | | 8 this, I'm asking for the deponent's opinion and |
| 9 about? | | 9 answer to this question. |
| 10 A I'm knowledgeable about the whole report, 10:13:37 | | 10 So, Madam Court Reporter, if you could 10:17:12 |
| 11 but there's some details, there's a lot of data and | | 11 please read back the question. |
| 12 stuff here that obviously I can't know everything | | 12 MR. SPELLBERG: Right, but I -- I mean the |
| 13 about the data, but I'm knowledgeable about the | | 13 reason I'm objecting is because I think it's an |
| 14 report. | | 14 unfair question. |
| 15 Q Are you able to identify which of the 10:13:57 | | 15 He may have worked on -- 10:17:22 |
| 16 details and data you are not knowledgeable about? | | 16 MR. TIDRICK: Well, you can state your |
| 17 MR. SPELLBERG: Do you have an answer to | | 17 objection -- Mr. Spellberg -- |
| 18 that question? | | 18 MR. SPELLBERG: I just did. |
| 19 THE WITNESS: I don't think I can answer | | 19 MR. TIDRICK: -- you can state your |
| 20 that question. 10:14:26 | | 20 objection for the record without explaining in the 10:17:27 |
| 21 Are you asking -- | | 21 level of detail you have that essentially coaches |
| 22 BY MR. TIDRICK: | | 22 the witness on an answer. |
| 23 Q Why is that? | | 23 So if I could, please, I'm requesting that |
| 24 A Are you asking if in this appendix of | | 24 the deponent answer the question after the court |
| 25 millions of observations, that I understand all of 10:14:40 | | 25 reporter reads it back, and I understand that 10:17:40 |
| Page 34 | | Page 36 |

| | | |
|---|---|---|
| 1 those observations, that's not possible. | | 1 you've stated an objection for the record. |
| 2 Q Why is that not possible? | | 2 MR. SPELLBERG: Okay. |
| 3 A To read every single observation and | | 3 (Record read as follows: |
| 4 understand what every single one means and is, | | 4 "Q Do I understand correctly, |
| 5 it's -- that's what I have computers for. I don't 10:15:13 | | 5 then, that you -- you're not 10:16:09 |
| 6 understand every single one. I haven't read every | | 6 intending to testify with respect to |
| 7 single one. I'm knowledgeable about the report. | | 7 the various paragraphs that you have |
| 8 Q Are you prepared to testify with respect | | 8 not identified earlier today?") |
| 9 to each and every paragraph of the Exhibit 102 | | 9 MR. SPELLBERG: I've interposed my |
| 10 report? 10:15:55 | | 10 objection, the witness may answer -- 10:18:19 |
| 11 A I will testify about the paragraphs that I | | 11 THE REPORTER: I'm sorry, I couldn't -- |
| 12 have contributed towards. | | 12 MR. SPELLBERG: I have interposed my |
| 13 Q Do I understand correctly, then, that | | 13 objection, the witness may answer. |
| 14 you -- you're not intending to testify with respect | | 14 THE WITNESS: First of all, I object |
| 15 to the various paragraphs that you have not 10:16:16 | | 15 strongly to you suggesting that I am being coached 10:18:26 |
| 16 identified earlier today? | | 16 to answer the question. This is my answer. I will |
| 17 MR. SPELLBERG: I'm going to object. The | | 17 testify to the report and I will answer questions |
| 18 witness is going to testify about this report. | | 18 that I am asked and I'll answer on things that I'm |
| 19 We'll be asking his opinion at trial and to the | | 19 knowledgeable about, and I can be asked questions |
| 20 extent there's overlap in issues or facts between 10:16:31 | | 20 about the entire report and I will answer them. 10:18:45 |
| 21 differing paragraphs, whether he's identified or | | 21 BY MR. TIDRICK: |
| 22 not, he wouldn't be limited -- in our view, he | | 22 Q Do I understand correctly, then, you are |
| 23 won't be limited in his ability to testify about | | 23 prepared to address substantively each and every |
| 24 those topics he's familiar with. | | 24 paragraph of the Exhibit 102 report? |
| 25 THE WITNESS: Do you want me to continue? 10:16:45 | | 25 A That's not what I said. I said that I 10:19:42 |
| Page 35 | | Page 37 |

1 will give an opinion on the report and I will
2 answer according to my knowledge on each part of
3 the report.
4     MR. TIDRICK: Madam Court Reporter, if you
5 could, please, read back the question.     10:19:57
6     (Record read as follows:
7     "Q   Do I understand correctly,
8     then, you are prepared to address
9     substantively each and every
10     paragraph of the Exhibit 102     10:19:39
11     report?")
12     THE WITNESS: I will answer questions
13 about the report to the best of my knowledge.
14 BY MR. TIDRICK:
15   Q   Is there any guidance that you can offer   10:20:37
16 as to which paragraphs of the report you have
17 knowledge about?
18     MR. SPELLBERG: Vague and ambiguous.
19     THE WITNESS: I have knowledge about the
20 whole report and I will provide comments about the   10:20:50
21 whole report to the best of my knowledge.
22 BY MR. TIDRICK:
23   Q   Do I understand correctly that Attachment
24 5 to your Exhibit 102 report identifies the
25 documents and data that you relied upon in forming   10:21:30

Page 38

1 your opinion?
2   A   I'm sorry -- I'm sorry, which appendix, 5?
3   Q   Yes.
4   A   Let me find that.
5     Do you know where Appendix 5 is in this?   10:22:06
6     MR. SPELLBERG: Let's see if I can find
7 it. I don't know.
8     Is it an appendix or is it an exhibit,
9 Steve?
10     MR. TIDRICK: Well, the terminology that's   10:22:18
11 used on the page is -- it says "Attachment 5."
12     MR. SPELLBERG: Okay.
13     MR. TIDRICK: Unfortunately, the document
14 is not numbered, page-numbered, it's 54 pages into
15 the report.     10:22:34
16     THE WITNESS: I'm sorry, how many pages.
17     MR. SPELLBERG: 54 into the report.
18     So we're on -- I mean we're Exhibit 5, but
19 that's different --
20     THE WITNESS: This is Exhibit 8.   10:22:46
21     MR. SPELLBERG: Yeah.
22     I have Exhibit 5 here but that's -- that's
23 not what you're talking, it's "Comparison of
24 Employment Periods," you're --
25     MR. TIDRICK: There's a page -- there's a   10:22:54

Page 39

1 page that is the described as "Attachment 5."
2     MR. SPELLBERG: Okay. We'll -- we're --
3 do you know where it is in relation to the exhibit
4 sections?
5     MR. TIDRICK: It's page 54, as you turn   10:23:13
6 the pages from front to back.
7     MR. SPELLBERG: I guess we may have to do
8 that.
9     MR. TIDRICK: So if you see the -- the
10 last numbered page of the report is page 41 --   10:23:23
11     MR. SPELLBERG: Okay.
12     MR. TIDRICK: -- if you flip ahead 13
13 pages, you'll be there.
14     MR. SPELLBERG: Okay. Attachment 5,
15 "Document List"?     10:24:08
16     MR. TIDRICK: Yes.
17   Q   Are you looking at the page that's labeled
18 "Attachment 5" of Exhibit 102 -- it's a page that
19 is labeled "Attachment 5" --
20   A   Yes, I have --     10:24:20
21   Q   -- "Document List"?
22   A   Yes, I have that document.
23   Q   Does that page identify all of the
24 documents and data that you relied upon in forming
25 your opinions in this case?     10:24:34

Page 40

1   A   The -- the data that I relied upon was
2 provided by Mary Furst to me, and Mary had used
3 these data sets and probably other stuff I'm not
4 aware of.
5   Q   Can you explain what you mean by "probably   10:25:03
6 other stuff I'm not aware of"?
7   A   I'm not sure what data -- what other data
8 that she may have had. If this is the data that
9 she lists, then that's what she used.
10   Q   I'm asking what documents and data that   10:25:22
11 you personally relied upon in forming your opinions
12 in this case.
13     Is it fair to say that it's a subset of
14 what is listed at Attachment 5 of Exhibit 102?
15   A   So Attachment 5, I did not work with the   10:25:44
16 data, the data was provided to me by Mary Furst.
17   Q   What data did Mary Furst provide you with?
18   A   She provided statistics and information
19 that we used in the report.
20   Q   When you say that Mary Furst provided   10:26:26
21 statistics and information that you used in the
22 report, what, specifically, are you referring to?
23   A   Any data that I requested to performed my
24 analysis.
25   Q   Are there any documents or data that you   10:26:56

Page 41

11 (Pages 38 - 41)

Page 42

1  relied upon in forming your opinions other than
2  what's listed at Attachment 5 of Exhibit 102?
3      A   I -- if I'm understanding correctly, I
4  mean Dr. Drogin's report had all of the surveys and
5  everything in there, because I used that as well.    10:27:24
6  I used whatever was listed in the documents, I used
7  some of the stuff.
8      Q   Are -- are you able to tell me, one way or
9  another, whether there are any documents or data
10  that you relied upon that are not listed in the    10:27:53
11  Attachment 5 to Exhibit 102?
12      A   Well, are you referring to Exhibit 101,
13  for example?
14      Q   Is Exhibit 101 a document that you relied
15  upon in forming your opinions?    10:28:34
16      A   Yes.  I read that, I mean is that -- the
17  question is vague, so I don't know if you're
18  referring to a document such as 101 that is on this
19  Attachment 5, because I -- I don't see it there, so
20  I don't know if it was part of -- of anything here,    10:28:52
21  but it doesn't look like it's on here, so I used
22  the information that was listed in our report, but
23  I don't know if that one is included in here.
24      Q   If I could refer back to paragraph 5 of
25  the Exhibit 102 report, it's a paragraph that spans    10:29:15

Page 43

1  pages 7 to 8.
2          MR. SPELLBERG:  Paragraph 5.
3          THE WITNESS:  Yes, I'm on paragraph 5.
4  BY MR. TIDRICK:
5      Q   The final sentence of paragraph 5 of your    10:29:42
6  June 13th, 2016 report says, and I quote:
7          "Appendix 5 of this report is a list
8          of information we considered in
9          preparing our work."
10          Is that statement accurate?    10:30:04
11      A   Well, if it included -- well, I mean it
12  looks accurate to me if it included the 101 exhibit
13  in there.
14      Q   I don't see the Exhibit 101 document
15  listed in Attachment 5 to Exhibit 102.    10:30:47
16          Am I missing something or is it just
17  described differently?
18      A   I'm not sure.
19      Q   Other than the Exhibit 101 document, are
20  there any other documents that should have been    10:31:21
21  listed -- and when I say "documents," I refer to
22  both documents and data, is there anything else
23  that should have been listed in the Attachment 5
24  that was not listed?
25      A   I don't believe there are any other    10:31:48

Page 44

1  documents, I don't think so.
2      Q   If I could, please, refer you to page 6 of
3  the Exhibit 102 report.
4      A   Page 6.  Okay.
5      Q   Paragraph 1 includes the sentence, and I    10:32:26
6  quote:
7          "Specifically, we have been asked to
8          provide rebuttal comments regarding
9          Dr. Drogin's May 10, 2016 report.
10          We have been asked to opine on    10:32:47
11          Plaintiffs' and Dr. Drogin's simple
12          random sample and computations
13          developed therefore."
14          Do I understand correctly that was the
15  scope of your assignment?    10:33:07
16      A   I believe that's the scope of my
17  assignment.
18      Q   Have you performed any calculations
19  regarding the total number of instances in which
20  operators arrived at divisions or relief points    10:33:38
21  after their scheduled arrival points?
22      A   I have not done those calculations.
23      Q   Is there a reason for that, other than it
24  just being outside of your assignment?
25      A   It was outside the scope of my assignment.    10:34:07

Page 45

1      Q   Have you performed any calculations
2  regarding the total number of instances in which
3  operators submitted transit operator vehicle logs?
4      A   No, I haven't.
5      Q   Is there any reason for that, other than    10:34:37
6  it simply being outside the scope of your
7  assignment?
8      A   It's just outside the scope of my
9  assignment.
10      Q   Do you know what a transit operator    10:34:55
11  vehicle log is?
12      A   I have -- would have a basic understanding
13  of it.
14      Q   What is your basic understanding of it?
15      A   It's just a record of the activity that a    10:35:09
16  particular operator was involved in.
17      Q   Do you have any understanding of what the
18  purpose of the transit operator vehicle log is?
19      A   To record what a operator had done during
20  the workday.    10:35:45
21      Q   Is it your understanding that the transit
22  operator vehicle log is a document for recording
23  all work done during the workday?
24      A   That is my understanding.
25      Q   Have you performed any calculation    10:36:23

Page 46

1  regarding the number of times -- strike that.
2       Is it your understanding that operators
3  fill out transit operator vehicle logs for every
4  day that they work run assignments?
5       A  I -- I'm not sure of the frequency, but I    10:37:02
6  believe they -- they fill in some kind of a log.
7       Q  You understand that the transit operator
8  vehicle log is a document that an operator fills
9  out each day that he or she works, correct?
10      A  It's my understanding that they're          10:37:19
11 supposed to complete them.
12      Q  Every day, correct?
13      A  I don't know the frequency.
14      Q  Do you have an understanding whether --
15 strike that.                                         10:37:52
16      Have you performed any calculations
17 regarding the number of instances when operators
18 have driven their transit vehicle after the
19 scheduled ending time but did not submit transit
20 operator vehicle logs?                               10:38:29
21      MR. SPELLBERG:  Vague and ambiguous, lacks
22 foundation.
23      THE WITNESS:  I didn't do any of those
24 calculations.
25 BY MR. TIDRICK:                                      10:38:40

Page 47

1       Q  Is there any reason that you didn't do
2  that, other than it being outside the scope of your
3  assignment?
4       A  It's outside the scope of my assignment.
5       Q  Have you performed any calculations         10:38:55
6  offsetting the total number of minutes that
7  operators operated transit vehicles after scheduled
8  ending times versus the total number of minutes
9  operators arrived earlier than their scheduled
10 ending time?                                         10:39:24
11      A  Well, that's a seriously complex question,
12 but I didn't do any calculation.
13      Q  Is there any reason that you didn't, other
14 than it being outside of your assignment?
15      A  Outside the scope of my assignment.         10:39:45
16      Q  Have you performed any calculations
17 regarding the total number of minutes that
18 operators spend parking transit vehicles,
19 performing post-trip inspections and turning in
20 defect cards and transfers?                          10:40:24
21      THE REPORTER:  I'm sorry, "turning in" --
22 BY MR. TIDRICK:
23      Q  -- defect cards and transfers?
24      A  That's beyond the scope of my work.
25      Q  Did I understand correctly that you did     10:40:39

Page 48

1  not perform that kind of calculation because it was
2  outside the scope of your assignment; is that
3  correct?
4       A  I did not perform those calculations
5  because it was outside the scope of my assignment.   10:40:49
6       Q  You understand that there are various
7  places in this report where you refer to on-time
8  performance, correct?
9       A  That is correct.
10      Q  What definition did you use for on-time      10:41:14
11 performance?
12      A  The definitions were provided by Mary
13 Furst.
14      Q  What were the definitions of on-time
15 performance that Mary Furst provided you?            10:41:45
16      A  I mean she didn't provide them to me, she
17 just did the calculations based on those
18 parameters.
19      Q  Did you do any calculations based on any
20 understanding of what the term "on-time              10:42:26
21 performance" refers to?
22      A  I did not work with the data because that
23 was beyond the scope of my assignment.
24      Q  When you say you didn't work with the
25 data, can you help me understand, what did you do    10:43:02

Page 49

1  with the data that Mary Furst provided you with.
2       A  Okay.  So the data that's in Attachment 5,
3  I did not manipulate the data or open that data.  I
4  just was provided with various statistics from Mary
5  Furst.                                               10:43:36
6       Q  What statistics did Mary Furst provide you
7  with?
8       A  The data that's -- some of the data here
9  that's in the report.
10      Q  Is it fair to say that the calculations in   10:43:46
11 the report were performed by Mary Furst, not you?
12      A  The calculations were done by Mary Furst,
13 that is correct.
14      Q  Sitting here today, are you able to tell
15 me how on-time performance is defined for purposes   10:44:39
16 of the analysis in the Exhibit 102 report?
17      A  Mary Furst had done those and they're in
18 the report there, and there were some variations on
19 it to.
20      Q  What variations were there?                   10:45:06
21      A  It's in the report.
22      Q  In which report?
23      A  I believe it's in this report here in
24 front of us here.
25      Q  You believe that the Exhibit 102 report      10:45:25

13 (Pages 46 - 49)

| | |
|---|---|
| 1 defines on-time performance? | 1  Q    If -- if I could, please, refer you in the |
| 2    A    It's my understanding that it was | 2  Exhibit 102 report to page 11, paragraph 18? |
| 3  somewhere in this report, yeah. | 3    A    Okay.  Yeah, I have that now. |
| 4    Q    Are you able to tell me where in the | 4    Q    Do I understand correctly that you believe |
| 5  Exhibit 102 report is the definition of on-time    10:45:50 | 5  that the actual class size is 4,018 people?        10:52:43 |
| 6  performance? | 6    A    That's incorrect.  That's a typo. |
| 7    A    I'd have to have a look through the | 7        MR. SPELLBERG:  I should note, Steve -- |
| 8  report. | 8        MR. TIDRICK:  What -- |
| 9    Q    Do you consider the definition of on-time | 9        MR. SPELLBERG:  -- we're -- we're going to |
| 10  performance to be important for the analysis in the    10:46:32 | 10  be correcting that.  There's a -- a corrected        10:53:06 |
| 11  Exhibit 102 report? | 11  report that's going to be coming out that fixes |
| 12    A    Yes, it is. | 12  typos and things like that, and I know that's one |
| 13    Q    If -- if I could, please, refer you to | 13  of them that -- that is identified. |
| 14  Exhibit 101 report, the initial report by Mary | 14        MR. TIDRICK:  Have you already identified |
| 15  Furst.                                        10:47:05 | 15  that to -- to plaintiffs in this case?  I'm -- I'm    10:53:24 |
| 16    A    Okay. | 16  just -- when you say it's been identified, you mean |
| 17    Q    At page 8. | 17  identified internally or have you already provided |
| 18    A    Yes. | 18  something to us that identifies that? |
| 19    Q    Footnote 2, on page 8, states, and I | 19        MR. SPELLBERG:  No, no, internally. |
| 20  quote:                                        10:47:40 | 20  There's a -- there's a couple of errors that were    10:53:37 |
| 21        "SFMTA considers a coach to be on- | 21  identified internally.  I mean I think you |
| 22        time if it is between 1 minute early | 22  identified some of them in -- during the first |
| 23        and 4 minutes late."  And it goes on. | 23  deposition so those are going be corrected. |
| 24        Do you understand that to be the | 24        It's relatively -- in fact, it is very |
| 25  definition of on-time performance that is used for    10:48:01 | 25  minor but I know that's one of them that we -- we    10:53:51 |
| Page 50 | Page 52 |

| | |
|---|---|
| 1  your analysis in the Exhibit 102 report? | 1  identified, that that number is an error. |
| 2    A    That was one of the definitions that was | 2        MR. TIDRICK:  Are there other errors in |
| 3  used, I believe. | 3  the Exhibit 102 report that have been identified |
| 4    Q    What other definitions did you use? | 4  that you're intending to correct? |
| 5    A    I believe it's in the report there, there    10:48:29 | 5        MR. SPELLBERG:  Yes.                    10:54:12 |
| 6  were just different ranges that were tried. | 6        MR. TIDRICK:  Are you able to tell me what |
| 7    Q    Sitting here today, are you able to tell | 7  they are? |
| 8  me what were the other ranges of minutes that were | 8        MR. SPELLBERG:  Yeah, let me -- I haven't |
| 9  used in your analysis as a definition of on time? | 9  looked it all yet.  Hang on a second. |
| 10    A    I believe I've answered that question.    10:49:00 | 10        I will tell you this, with the caveat that    10:54:37 |
| 11  It's in the report. | 11  I -- I just received this yesterday and haven't |
| 12    Q    Where in the report? | 12  looked at it yet and it's not -- I don't know if |
| 13    A    I don't know.  I'd have to look through | 13  it's -- if it's -- if it's been finalized yet, but |
| 14  the report. | 14  it looks like there's going to be corrections to |
| 15    Q    Please do tell me where it is.  We can    10:49:13 | 15  not only that paragraph 18, but there's going to be    10:55:02 |
| 16  come back to this question later -- | 16  corrections to paragraphs 47, 48, 49, 50, 51, 52, |
| 17    A    Okay, I just -- yeah.  Okay. | 17  53, 54, 55, 56, 57, 58, 59, 65. |
| 18    Q    Had -- in -- in the review that you've | 18        It looks like that -- that error with |
| 19  done so far, is there anything that you would say | 19  the -- the number of class members is corrected in |
| 20  on this?  And I'm -- I'm not asking you if -- if    10:51:55 | 20  a number of different places.                    10:56:02 |
| 21  you don't. | 21        There's an edit to 70 -- 7- -- 72, 73, 74, |
| 22    A    I'm sorry, I didn't hear the question. | 22  75, 76, 77, 78, 79, 84, 88, 89, and it looks like |
| 23    Q    Have you found anything on the subject | 23  that's all that is going to be fixed -- or -- or |
| 24  that's based on your review of the report so far? | 24  edited. |
| 25    A    No, I haven't found anything yet.        10:52:05 | 25        MR. TIDRICK:  And I -- I don't mean to put    10:56:46 |
| Page 51 | Page 53 |

Veritext Legal Solutions
866 299-5127

Page 54

1 you on the spot, but do you have any time estimate
2 as to when we'll receive the -- the -- those
3 corrections.
4     MR. SPELLBERG: Well, I was hoping that I
5 would be able to look at those today and just -- I  10:56:57
6 mean I just wanted to look at them from Mary before
7 they went out, obviously, and I was hoping I would
8 have that done today, I was hoping to do that
9 during the deposition. So I'm hoping by Friday.
10     MR. TIDRICK: And -- and I suppose this  10:57:22
11 is -- this is a question -- I'm just trying to
12 think about how to handle this efficiently. So I
13 mean this -- this either could be a question to
14 you, Mr. Spellberg, or to the deponent, and that is
15 whether Dr. Fleissig is prepared to identify what  10:57:36
16 the various corrections will be or will we just
17 have to wait on that?
18     MR. SPELLBERG: I don't think he -- I mean
19 he's not involved in those, those are -- those
20 are for --  10:57:49
21     Is that right?
22     THE WITNESS: I -- I -- I did not make
23 those corrections and I haven't had a chance to
24 exam them in detail.
25     MR. TIDRICK: I think those corrections  10:57:59

Page 55

1 are coming from Mary first, and I know you're not
2 finished with her -- her deposition, which is why
3 we've been trying to get this out to you before
4 you --
5     THE WITNESS: Yeah.  10:58:09
6     MR. SPELLBERG: -- obviously before you
7 set the second day.
8     So I don't it's going to affect this
9 witness's opinions. Obviously if there's anything
10 that does, you -- you know, you're entitled to --  10:58:14
11 to depose the witness again on -- on that --
12 whatever change is or isn't in his opinion, but I
13 don't believe that any of these corrections relate
14 to what Dr. Fleissig has done.
15     MR. TIDRICK: All right. Understood.  10:58:37
16     Q So if I'm understanding correctly,
17 Dr. Fleissig, sitting here today, you are not
18 prepared to identify the various corrections to the
19 Exhibit 102 report; is that correct?
20     A I haven't had a chance to look at them  10:58:53
21 properly so I wouldn't be able to comment on them.
22     Q Understood.
23     Do you have an understanding, one way or
24 another, whether the error in paragraph 18 with
25 respect to the size of the class impacts the -- any  10:59:14

Page 56

1 of the analysis in the rest of the report?
2     A I -- I don't believe that's going to have
3 an impact, but I didn't do a lot of the
4 calculations so I can't really comment on that.
5     It doesn't affect my analysis, but I don't  10:59:45
6 know about Mary Furst's.
7     Q Are there aspects of Mary Furst's analysis
8 that you have in mind when you say that it may
9 affect aspects of her analysis?
10     A I'm sorry, that was a complex question. I  11:00:11
11 just didn't get the question.
12     Could you rephrase it, please.
13     Q Are you able to tell me what -- what parts
14 of Mary Furst's analysis in the Exhibit 102 report
15 may be affected by the error in the number of class  11:00:33
16 members?
17     A I don't know that, you'd have to ask her.
18     Q In sitting here today, do you have in mind
19 what is the actual number of class members in this
20 case?  11:00:55
21     A I believe it was 4,180. I believe it was
22 that, I don't recall exactly.
23     Q Do you have any understanding how that
24 number of class members was arrived at?
25     A No, I don't.  11:01:15

Page 57

1     MR. TIDRICK: Madam Court Reporter, if you
2 could, please, provide the deponent with the
3 Exhibit 135 document.
4     THE REPORTER: Certainly. One moment.
5     He has it.  11:02:12
6 BY MR. TIDRICK:
7     Q Is the Exhibit 135 document, which, for
8 the record, is entitled "Declaration of
9 Jonathan-Dat Lam," a document that you have seen
10 before?  11:02:33
11     A Yes, this is a document I've seen.
12     Q What is your understanding of what this
13 document is?
14     A This document is some kind of an attempt  11:02:58
15 to determine average minutes for being late --
16 average minutes for the start travel time, end
17 travel time, turn-in time, routinely late. This is
18 some kind of attempt to get some kind of answers
19 from defendant.
20     Q Do you understand that Exhibit 135 is a  11:03:30
21 declaration signed under penalty of perjury?
22     A I do understand that.
23     Q Do you understand what penalty of perjury
24 means?
25     A I have a general understanding of that.  11:03:50

15 (Pages 54 - 57)

1  Q   What is your general understanding of
2  that?
3     A   That there are serious consequences if you
4  don't answer truthfully.
5     Q   Do you recall where you developed that      11:04:13
6  understanding of what the penalty of perjury means?
7     A   I'm not an attorney, that's not part of
8  the scope of my work.
9     Q   I'm not asking for a legal definition.
10  All -- all I'm asking is -- you have a -- a      11:04:32
11  layperson's understanding of what the penalty of
12  perjury is.
13     Is it fair?
14     A   Yes, I would say I would have a
15  layperson's understanding.                       11:04:48
16     Q   For example, you understand that taxes are
17  submitted under penalty of perjury?
18     A   I understand that.
19     Q   Is it fair to say that you've had an
20  understanding of what penalty of perjury is      11:05:08
21  throughout your adult life?
22     A   I understand that there are consequences
23  if you don't answer certain things truthfully.
24     Q   Do you recall how you developed that
25  understanding?                                   11:05:33

Page 58

1     A   I have no idea how I got that
2  understanding.  I mean just -- no idea.  It's just
3  stuff that you read about.
4     Q   Have you had an understanding of what
5  penalty of perjury is as long as you've done your      11:06:01
6  taxes?
7     A   Oh, yes, I understand that.
8     Q   So is it fair to say you've -- you've
9  understood what the penalty of perjury is your
10  whole adult life, correct?                       11:06:13
11     A   Yes, I understand that, yes.
12     Q   You understand that the Exhibit 135
13  document was signed under penalty of perjury; is
14  that right?
15     A   I understand that.                        11:06:37
16     Q   Do you believe that the Exhibit 135
17  document is not truthful?
18     MR. SPELLBERG:  Objection.  Lack of
19  foundation.
20     THE WITNESS:  What do you mean by "not      11:06:51
21  truthful"?
22  BY MR. TIDRICK:
23     Q   I really don't know what to say on that.
24     Do you have a layperson's understanding of
25  the difference between what is true and false?      11:07:22

Page 59

1     A   There are statements made here and they're
2  legal statements that I don't have an opinion on
3  and so I can't comment whether all of the language
4  used here is appropriate or not, that's beyond my
5  expertise.                                       11:07:36
6     Q   Do you have any expert opinion to offer as
7  to whether there is any false information in the
8  Exhibit 135 declaration?
9     MR. SPELLBERG:  Objection.  Vague and
10  ambiguous as the use of the word "false" --      11:08:02
11     THE WITNESS:  There's --
12     MR. SPELLBERG:  -- whether it just means
13  inaccurate or whether there's an intentional
14  component to it.
15     THE WITNESS:  There are legal statements      11:08:13
16  made here that I am not familiar with related to
17  this case here, so I cannot comment on that.
18  BY MR. TIDRICK:
19     Q   Are there any statements in the
20  Exhibit 135 document that you believe to be false?      11:08:30
21     A   That's beyond my expertise.
22     Q   If you could, please, turn back to the
23  Exhibit 102 document.
24     A   Okay, I'll do that.
25     Q   And specifically -- and specifically if      11:09:04

Page 60

1  you could turn to paragraph 32.
2     A   Okay.
3     Q   Actually, setting aside the Exhibit 102
4  document, are you able to provide a definition of a
5  survey?                                          11:10:04
6     A   I could give a general definition of a
7  survey.  There's no one standard definition.
8     Q   Are you aware of whether there is a
9  definition of survey that survey experts use?
10     A   I'm not aware that there's one single      11:10:49
11  definition.
12     Q   What are the definitions of a survey that
13  you understand that survey experts use?
14     A   I mean I -- I can answer what I understand
15  a survey to be, and a survey is one or more      11:11:17
16  questions that ask for an opinion or some fact
17  about some issue.
18     Q   Are there any other definitions of survey
19  that you're aware that survey experts use?
20     A   I'm sure there are many others.           11:11:49
21     Q   Sitting here today, are there any other
22  definitions that you're able to tell me that survey
23  experts use to define a -- a survey?
24     A   I -- I mean there -- there must be --
25  there are others and I'm -- you know, just gave you      11:12:10

Page 61

16 (Pages 58 - 61)

| | |
|---|---|
| 1 my definition, what my understanding is, and it's a | 1 What I'm asking is very specifically the |
| 2 general understanding. | 2 following: Did you work with any survey expert in |
| 3 Q When you say "there are others," sitting | 3 preparing the Exhibit 102 report? |
| 4 here today, are you able to tell me what any of the | 4 A I did not work with a survey expert |
| 5 other definitions are? 11:12:32 | 5 because there was no survey involved here, it was a 11:15:25 |
| 6 A It -- it depends on what details you're | 6 declaration. |
| 7 looking for. I mean the goal of a survey is to get | 7 Q Are you able to provide me with any |
| 8 information about a particular issue and, in | 8 examples of declarations signed under penalty of |
| 9 particular, you want to get unbiased and correct | 9 perjury being described as a survey? |
| 10 information so that the sample is going to 11:12:49 | 10 A I have no idea. 11:16:07 |
| 11 represent the population, and that's where you need | 11 Q If I could refer you to paragraph 32 -- |
| 12 a survey expert to make sure that the questions and | 12 I'm referring to the other report, so if you could |
| 13 everything is clear and that the sample is taken to | 13 set aside the 102 -- |
| 14 represent the population. | 14 MR. SPELLBERG: Are you going to 101? |
| 15 Now, if you mistakenly make a bad sample, 11:13:07 | 15 MR. TIDRICK: Yes. 11:16:32 |
| 16 you will get wrong results that can be very biased | 16 Q And, actually, I apologize -- yeah, please |
| 17 and very, very incorrect. | 17 look at Exhibit 101, I -- I think I gave you the |
| 18 Q The definition of survey that you just | 18 wrong paragraph number, just a moment. |
| 19 identified, are you able to identify any textbook | 19 MR. SPELLBERG: Steve, when you get a |
| 20 or other learned treatise that provides that 11:13:33 | 20 chance, why don't you take a break. I think 11:16:52 |
| 21 definition? | 21 everybody is getting a little bit tired here. |
| 22 A There are a bunch of texts out there, but, | 22 MR. TIDRICK: Can we go for about five |
| 23 you know, this is for a survey expert and I rely on | 23 more minutes and then take a break? |
| 24 the survey expert at the university, she's the | 24 MR. SPELLBERG: Yeah, yeah, no problem. |
| 25 director very familiar with this material and I 11:13:50 | 25 But, I mean, the court reporter has been at it for 11:17:07 |
| Page 62 | Page 64 |

| | |
|---|---|
| 1 would work with her. I would never do it by | 1 almost two and a half hours. Sure, no problem. |
| 2 myself. | 2 BY MR. TIDRICK: |
| 3 Q The survey expert you're referring to, | 3 Q The Exhibit 135 document -- |
| 4 this is the individual whose name you mentioned | 4 MR. SPELLBERG: 135. |
| 5 earlier today? 11:14:12 | 5 THE WITNESS: I have it here. 11:17:23 |
| 6 A Laura Gil-Trejo. | 6 Yes, I have it. |
| 7 Q Okay. Was she involved -- | 7 Q -- you understand that numerous operators |
| 8 A Well -- | 8 completed declarations similar to the Exhibit 135 |
| 9 THE REPORTER: I'm -- wait, wait. | 9 document, correct? |
| 10 Go ahead, somebody. 11:14:21 | 10 A I understand that they were -- were 11:17:40 |
| 11 THE WITNESS: Would you like me to | 11 completed, yes. |
| 12 continue or -- | 12 Q Are you aware -- strike that. |
| 13 BY MR. TIDRICK: | 13 Do you have any reason to believe that any |
| 14 Q Yes, sorry, I didn't mean to interrupt. | 14 operator signed his or her declaration under |
| 15 Please, continue your answer? 11:14:35 | 15 duress? 11:18:07 |
| 16 A I will work with a survey expert, she's | 16 MR. SPELLBERG: Objection. Lack of |
| 17 one example. It's not only her that I would work | 17 foundation, vague and ambiguous. |
| 18 with, I would work with any survey expert. | 18 THE WITNESS: I do not know how the survey |
| 19 Q Did you work with any survey expert in | 19 was administered so I cannot answer the question. |
| 20 preparing the Exhibit 102 report? 11:14:47 | 20 BY MR. TIDRICK: 11:18:16 |
| 21 A I was not involved in a survey. I didn't | 21 Q Is the answer, then, that you don't know? |
| 22 perform a survey. | 22 A I do not know it because I don't know how |
| 23 Q Did you work with any -- I think you're | 23 the survey was administered -- or -- sorry -- the |
| 24 answering a different question, not one that I | 24 declaration, how the declaration was administered, |
| 25 asked. 11:15:10 | 25 it's not a survey. 11:18:41 |
| Page 63 | Page 65 |

17 (Pages 62 - 65)

1  Q   Are you aware of any evidence that any
2  operator signed his or her declaration under
3  duress?
4      MR. SPELLBERG:  Same objections.
5      THE WITNESS:  I believe I've answered   11:18:54
6  this, but I'll answer it again.  I'm not aware how
7  the declaration was administered so I do not have
8  an opinion.
9  BY MR. TIDRICK:
10     Q   Do you have any opinion as to whether any   11:19:10
11 operator was coerced into signing his or her
12 declaration?
13     A   As I said, I do not know how the
14 declaration was administered, so I do not know.  I
15 do not have an opinion.                  11:19:27
16     Q   Do you have any opinion as to whether any
17 operator did not understand what he or she was
18 signing?
19     A   I'm not exactly clear on what you're
20 saying.                         11:19:53
21     Q   Do you have any reason to believe that any
22 operator did not understand what he or she was
23 signing?
24     A   That they have to answer truthfully, I
25 understand that.  Understanding the wording of the   11:20:18

1  up to some point, but I do not have an opinion,
2  that's not my scope of work.
3  BY MR. TIDRICK:
4      Q   And when you say you're not an expert in
5  this, just to save me time, what is it about that   11:21:44
6  question that is outside the scope of your
7  expertise?
8      A   I mean this is a legal document, I'm not a
9  legal expert.
10     Q   I'm -- I'm not meaning to ask you a legal   11:22:02
11 question.
12     A   Then what is the question that you are
13 trying to ask me, because I do not understand it.
14     Q   Do you have any expert opinion to offer as
15 to whether -- strike that.            11:22:40
16         I'm trying to -- my best to ask the
17 question in a -- in a way that will be clear to
18 you.
19         You stated a moment ago that you're not an
20 expert in this, those were your words.  I'm trying   11:23:02
21 to understand.  Can you explain what you meant by
22 that?
23     A   What I mean by that, this is a legal
24 document, I'm not familiar with the -- the jargon
25 or all of the -- the consequences of it, so I don't   11:23:16

1  declaration, I'm not sure about that.
2      Q   Do you have any expert opinion to offer as
3  to whether any operator did not understand the
4  substance of what he or she was signing?
5      A   So I need to understand the question.  If   11:20:42
6  you're saying do they understand that there are
7  legal consequences for signing this document, I
8  believe they understand that.
9          Is that the question?
10         MR. SPELLBERG:  How do you have a        11:20:56
11 foundation for that?
12 BY MR. TIDRICK:
13     Q   All right, well, let's start with that.
14         So I -- I think you've already said this,
15 I don't mean to be repetitive, but you -- you do   11:21:04
16 believe that the operators understood that they
17 were signing the declarations under penalty of
18 perjury, correct?
19         MR. SPELLBERG:  I'm going to object,
20 there's no foundation for -- lack of foundation.   11:21:21
21         THE WITNESS:  I mean I'm not an expert in
22 this.  And, you know, they -- it just -- I'm not an
23 expert in this, so I -- I -- I really don't have an
24 opinion on this one.
25         I believe they understood the consequences   11:21:32

1  have an opinion on this document, on the legal
2  issues of this document.  I -- I'm not an expert in
3  this area.  I have no opinion on that.
4      Q   Do I understand correctly, because the
5  Exhibit 135 is a legal document, you do not have   11:23:40
6  expertise to evaluate it.
7          Is that fair?
8      A   I don't have expertise to evaluate the
9  legal issues of this document.
10     Q   If you could, please, turn to page 16 of   11:24:37
11 the Exhibit 102 report.
12         MR. SPELLBERG:  Let's take a break, Steve,
13 while -- since you're shifting gears.
14         MR. TIDRICK:  Oh, sorry.  Sorry.  Yes,
15 yes -- yes, that's fine.              11:25:15
16         We can take a break.
17         THE WITNESS:  Okay.  Thank you.
18         THE VIDEOGRAPHER:  This marks the end of
19 Media Number 1.
20         Going off the record at 11:25 a.m.      11:25:23
21         (Recess.)
22         THE VIDEOGRAPHER:  This marks the
23 beginning of Media Number 2.  Going back on the
24 record at 11:58 a.m.
25 BY MR. TIDRICK:                     11:58:47

Page 70 (top left):

1   Q   You understand that you're still under
2 oath?
3   A   I do.
4   Q   In the Exhibit 102 report at page 13,
5 paragraph 25, the first sentence states:     11:59:18
6     "The failure to allow Operators the
7     option of being on time or early will
8     most likely result in upwardly biased
9     and inaccurate responses."
10     Do you see that?     11:59:47
11   A   I do.
12   Q   You have not identified any other reason
13 why the time estimates provided by operators would
14 be upwardly biased; is that correct?
15     MR. SPELLBERG:  Vague and ambiguous --  12:00:07
16 vague and ambiguous.
17     THE WITNESS:  No, that's not correct.
18 BY MR. TIDRICK:
19   Q   What other reasons have you identified why
20 the time estimate provided by operators would be  12:00:25
21 upwardly biased?
22   A   Well, the results were done using the APC
23 data to show that the responses and what was
24 actually recorded can be very different for some of
25 the respondents.     12:00:45

Page 70

---

Page 71 (bottom left):

1   Q   Do I understand correctly, you believe
2 that the APC data shows that the operators
3 estimates are inaccurate.
4     Is that fair?
5   A   I believe that the APC data is one of the  12:01:17
6 data sources that can be used to verify the
7 responses from the declaration, and there are
8 differences.
9   Q   Do you believe -- strike that.
10     Is it your expert opinion that there has  12:02:11
11 been some failure to allow operators the ability to
12 state that they are on time or early that has most
13 likely resulted in upwardly biased and inaccurate
14 responses?
15   A   I believe that the declaration was  12:02:42
16 designed in a way that they were not able to say
17 that they were early and that would obviously bias
18 the estimates.
19   Q   Is there any reason that you're aware of
20 that a operator could not have stricken any  12:03:24
21 language in the declaration that he or she
22 disagreed with?
23   A   I'm sorry, I missed the word before "out."
24   Q   "Stricken."
25     And for a clear record, Madam Court  12:03:43

Page 71

---

Page 72 (top right):

1 Reporter, could you read back the question, please.
2     (Record read as follows:
3     "Q  Is there any reason that
4     you're aware of that a operator could
5     not have stricken out any language in  12:03:26
6     the declaration that he or she
7     disagreed with?")
8     MR. SPELLBERG:  I'm going to object as
9 incomplete -- incomplete hypothetical and lacks
10 foundation.     12:04:12
11     THE WITNESS:  It's not my area of
12 expertise.  I don't have an opinion on that.
13 BY MR. TIDRICK:
14   Q   In the statements in paragraph 25, the
15 sentence, "The failure to allow Operators  12:04:42
16     the option of being on time or early
17     will most likely result in upwardly
18     biased and inaccurate responses,"
19 when you say "most likely," are you saying that the
20 probability is greater than 50 percent?   12:05:03
21   A   I don't know what the probability is.
22   Q   How, then, can you say that the -- that it
23 is most likely?
24   A   I can tell you that.  Based on the APC
25 data, most of the transportation was on time or  12:05:29

Page 72

---

Page 73 (bottom right):

1 early, so, therefore, if you're going to apply this
2 average to all the operators and assuming all of
3 the -- or most of the routes, which I believe is
4 what that Dr. Drogin did, were late, that would be
5 incorrect.     12:05:53
6   Q   I'm asking something different, which is,
7 the opinions that you're offering in paragraph
8 25 -- okay, am I reading paragraph 25 incorrectly?
9 I don't see any reference to APC data in paragraph
10 25.     12:06:21
11     Let me ask the question this way.  Does
12 paragraph 25 rely upon APC data?
13   A   Well, the paragraph, after looking at the
14 APC data and seeing that so many people were early
15 or on time, that information needs to be used to  12:06:40
16 validate the -- the responses?
17   Q   You're assuming that -- that the APC data
18 accurately reflects the time when operators pull
19 their transit vehicles into the division gates,
20 correct?     12:07:04
21   A   I believe it is an accurate
22 representation.
23   Q   What is the basis for your belief that the
24 APC data is an accurate representation of the times
25 when the operators pull the transit vehicles into  12:07:24

Page 73

---

19 (Pages 70 - 73)

1 the division gates?
2    THE REPORTER: Did you say "inaccurate,"
3 Counsel?
4    MR. TIDRICK: An accurate --
5    THE REPORTER: Thank you.          12:07:36
6    MR. TIDRICK: A-n, space, accurate.
7    And with that clarification, just so we
8 have a clear record, Madam Court Reporter, could
9 you please read back the question.
10    THE REPORTER: Yes.
11    That's what I had but I was concerned.
12 Thank you.
13    MR. TIDRICK: Thank you.
14    (Record read as follows:
15    "Q What is the basis for your      12:07:13
16    belief that the APC data is an
17    accurate representation of the times
18    when the operators pull the transit
19    vehicles into the division gates?")
20    THE WITNESS: It's my understanding that  12:08:16
21 there's a recording device that is activated when
22 the doors are opened and shut.
23 BY MR. TIDRICK:
24    Q What is the basis for that understanding?
25    A That these devices have been installed on  12:09:14
                                                    Page 74

1 when the doors open, the device records that the
2 door has been opened.
3 BY MR. TIDRICK:
4    Q You believe that the APC data accurately
5 reflects the location where the doors opened,    12:12:38
6 correct?
7    A I believe it gives an accurate
8 representation of where the doors are opened.
9    Q You believe that the APC data indicates
10 that operators have inaccurately identified      12:13:09
11 information provided in the declaration in the
12 routinely late section; is that correct?
13    A It's -- was my understanding, from the APC
14 data, that the routinely late times from some of
15 the declarations are very different to that that  12:13:46
16 was recorded in the APC data.
17    Q The APC data, in your opinion, discredits
18 the information that operators have provided with
19 respect to routinely late times; is that correct?
20    A The APC data shows averages that are   12:14:19
21 very -- averages max- -- averages including maximum
22 and minimum and early times that do differ from
23 what is in the declaration.
24    Q Specifically with respect to routinely
25 late time, correct?                      12:14:42
                                                    Page 76

1 many of the transit vehicles and it's been used by
2 the -- it's been used to determine revenue stops.
3    Q Do you understand that there is a
4 geographic area known as a geo-fence, g-e-o, dash,
5 f-e-n-c-e, within which if a operator opens the   12:10:13
6 transit vehicle door, that door opening will
7 register as having been at the division?
8    A I'm -- I'm not entirely sure how it
9 measures it, but it does record the times when
10 you -- the -- the last stop at the division.   12:10:42
11    Q What, specifically, do you believe that
12 the APC data records?
13    A I mean it -- it records the revenue stops
14 so it -- and then when the doors open, as they go
15 into the division, it is determining when those   12:11:07
16 doors are opened.
17    Q Do you understand that the APC technology
18 will record a door opening as being at the division
19 even when that door opening occurs between the last
20 revenue stop and the division?           12:12:03
21    MR. SPELLBERG: Objection. Fact not in
22 evidence, incomplete hypothetical.
23    You can testify to what you know, what you
24 understand.
25    THE WITNESS: All I understand is that  12:12:19
                                                    Page 75

1    A I would have to look at the report,
2 whether it was just specifically for routinely
3 late, but I believe it was for all the categories.
4    Q You believe that the APC data indicates
5 that estimates of turn-in time are inaccurate?   12:15:09
6    A I believe that the APC data is showing
7 different estimates compared to what's in the
8 declaration.
9    Q How does the APC data show that the
10 operators' estimates of turn-in time are not   12:15:32
11 accurate?
12    A I'm -- I'm sorry, I -- I'm sorry, can you
13 say that again.
14    MR. TIDRICK: Madam Court Reporter, can
15 you read it back, please.              12:15:43
16    (Record read as follows:
17    "Q How does the APC data show
18    that the operators' estimates of
19    turn-in time are not accurate?")
20    THE WITNESS: The APC data is for   12:16:01
21 routinely late and going back to division.
22 BY MR. TIDRICK:
23    Q The APC data is only relevant to the claim
24 for routinely late time for runs pulling into the
25 division, correct?                     12:16:25
                                                    Page 77

1    A    That's my understanding, yes.
2    Q    Going back to the paragraph I was
3   referencing in the report, paragraph 25 of
4   Exhibit 102, do I understand correctly when you say
5   "most likely" in the sentence "The failure to          12:17:12
6        allow Operators the option of being
7        on time or early will most likely
8        result in a upwardly biased and
9        inaccurate responses" -- what do you
10   mean by "most likely"?                                12:17:43
11    A    For any operator that arrived early, if
12   they do not have the option to record that they
13   were early, that is going to upwardly bias the
14   results and produce incorrect estimates and
15   responses.                                            12:18:07
16    Q    When you use the phrase "most likely," in
17   paragraph 25, are you leaving open the possibility
18   that the responses are not upwardly biased or
19   inaccurate?
20    A    What is meant by that is you could take a       12:18:42
21   sample, and that's what happens when you take a
22   sample, you may not find anybody in there, but if
23   you do, which is likely as well, then the results
24   will be upwardly biased.
25    Q    Have you done any kind of study to assess       12:19:10

1   whether including an option of being on time or
2   early would result in different information?
3    A    I'm -- I do not understand that question,
4   I'm sorry.
5        Can you rephrase it, please.                      12:19:35
6    Q    In paragraph 25 of the Exhibit 102 report,
7   you state:
8        "The failure to allow Operators the
9        option of being on time or early will
10       most likely result in upwardly biased         12:19:51
11       and inaccurate responses."
12       I'm simply asking you whether you actually
13   conducted any kind of a study to assess whether
14   including an option of being on time or early
15   results in different responses.                        12:20:14
16    A    I have not done a study -- for this
17   declaration, I have not done a study.
18    Q    Turning back to the Exhibit 135 document,
19   paragraph 5 includes the following statement:
20       "Furthermore, each day that I have          12:21:13
21       worked a run that begins at a relief
22       location, I have arrived at the
23       relief location an average of
24       8 minutes before the scheduled time
25       of the relief."                              12:21:31

1    A    Okay, I have that.
2    Q    Are you offering any expert opinion as to
3   whether the information provided in that sentence
4   of the declaration is upwardly biased?
5    A    The question does not give the person         12:22:14
6   options to answer about even arriving late and it's
7   an average, which is a -- very difficult to
8   determine over a long period of time, as was the
9   case with many of these operators.
10    Q    You acknowledge that an operator could        12:23:20
11   have stricken out any language in the declaration
12   that he or she disagreed with, correct?
13       MR. SPELLBERG:  Objection.  Misstates his
14   testimony.
15       THE WITNESS:  I -- this is a legal            12:23:32
16   document and I'm -- do not have an opinion on that.
17   BY MR. TIDRICK:
18    Q    Sitting here today, are you able to offer
19   any opinion as to the exact number of minutes by
20   which the information in paragraph 5 of the        12:24:04
21   operator declaration is upwardly biased?
22       THE WITNESS:  I'm sorry, can you just read
23   the question to me again, please.
24       (Record read as follows:
25       "Q    Sitting here today, are you          12:23:44

1        able to offer any opinion as to the
2        exact number of minutes by which the
3        information in paragraph 5 of the
4        operator declaration is upwardly
5        biased?")                                      12:24:18
6        THE WITNESS:  They appear to be up- --
7   upwardly biased, and I wouldn't know the exact
8   amount, but based on the APC data they're upwardly
9   biased, for the most of them.
10   BY MR. TIDRICK:                                     12:25:23
11    Q    Do you believe that the APC data provides
12   information on the number of minutes early that
13   operators arrive at the relief location prior to
14   the scheduled time of relief?
15    A    The APC data is only for the routinely       12:25:50
16   late.
17    Q    Understood.
18       Did you do anything to study the number of
19   minutes before the scheduled time of a relief that
20   operators arrive at relief locations?              12:26:14
21    A    I did not do --
22    Q    -- when making a relief?
23    A    I did not do a study on that.
24       MR. TIDRICK:  Madam Court Reporter, can
25   you read back the answer, please.                  12:26:31

21 (Pages 78 - 81)

1    (Record read as follows:
2      "A  I did not do a study on
3    that.")
4 BY MR. TIDRICK:
5    Q   With respect to the information in the    12:26:56
6 operators' declarations in the turn-in time
7 section, the average number of minutes that
8 operators spend between pulling into the gate at
9 the division and completing the tasks identified in
10 the declaration, have you done anything to study    12:27:23
11 the number of minutes?
12      MR. SPELLBERG:  Wait, could I have that
13 question back.
14      MR. TIDRICK:  Let -- let me rephrase it.
15    Q   Have you done anything to study the number    12:27:51
16 of minutes that operators spend between pulling
17 into the gate and completing the tasks identified
18 at turn-in time?
19    A   That was not part of my assignment here.
20    Q   Are you able to offer any expert opinion    12:28:14
21 about the extent to which you believe that the
22 turn-in time information is upwardly biased?
23    A   I don't have an opinion on that.
24    Q   Do you have any opinion as to the time
25 estimates provided by operators with respect to    12:29:42

Page 82

1 routinely late times, specifically, do you have an
2 expert opinion on the number of minutes by which
3 the information provided by operators was upwardly
4 biased?
5    A   Well, the routinely late, we use the APC    12:30:12
6 data to verify what was in the declaration.
7    Q   Did you use anything other than APC data
8 to analyze the amount of time that operators have
9 attested to in the routinely late-time section in
10 the declaration?    12:30:56
11    A   Well, I didn't look at the data, that was
12 Mary Furst who took the data, so you'd have to ask
13 her.
14    Q   Your report states -- strike that.
15      If you could, please, turn to page 16 of    12:31:32
16 your report, Exhibit 102, and specifically the
17 section that starts at paragraph 33.
18      Are you offering any expert opinion as to
19 whether a stratified sample is necessary in this
20 case?    12:32:41
21    A   It looks like for this case if you had
22 stratified the data, the results would be
23 substantially more accurate, if you'd done it -- if
24 you'd done the dec- -- if the declaration was done
25 correctly or survey was done.    12:33:07

Page 83

1    Q   I'm asking specifically about
2 stratification.
3    A   Yeah, the results would -- would most
4 likely be a lot better if you -- to do the analysis
5 using appropriate data.  Stratifying, in this case,    12:33:42
6 would have been a much better approach.
7    Q   In your expert opinion, how, specifically,
8 should the class be stratified in this case?
9    A   Well, there are a number of approaches
10 that one could take, you could look at different    12:34:05
11 routes, divisions, time of the day, weekends,
12 seasonal issues.  There's lots of things that you
13 could have taken into account to stratify so that
14 you can represent the population, so the sample can
15 represent the population.    12:34:32
16    Q   Have you done any analysis of -- whether
17 stratifying by routes has any impact on accuracy in
18 this case?
19    A   That was not part of my assignment.
20    Q   Have you done any analysis whether    12:35:02
21 stratifying by division would have any impact on
22 the accuracy in this case?
23    A   That was not part of my assignment.
24    Q   Have you done any analysis whether
25 stratifying by time of day would have any impact on    12:35:21

Page 84

1 accuracy in this case?
2    A   That was not part of my assignment.
3    Q   Have you done any analysis whether
4 stratifying by weekday and weekends has any impact
5 on accuracy in this case?    12:35:41
6    A   That was not part of my assignment.
7    Q   Have you done any analysis whether
8 stratifying by seasonal issues has any impact on
9 accuracy in this case?
10    A   That was not part of my assignment.    12:35:59
11    Q   Have you done any analysis whether
12 stratifying in any manner has impact on accuracy in
13 this case?
14    A   It's not part of my assignment.
15      MR. SPELLBERG:  You know what, I'd like to    12:36:17
16 take a break.
17      MR. TIDRICK:  All right.  We can take a
18 break.
19      How long, Geoff?
20      MR. SPELLBERG:  Five minutes.  I want to    12:36:27
21 use the restroom.
22      MR. TIDRICK:  All right.
23      THE VIDEOGRAPHER:  Going off the record at
24 12:36 p.m.
25      (Recess.)    12:41:37

Page 85

22 (Pages 82 - 85)

**Page 86**

1    THE VIDEOGRAPHER:  Going back on the
2  record at 12:44 p.m.
3  BY MR. TIDRICK:
4    Q   You understand that you're still under
5  oath?                         12:44:50
6    A   I do.
7    Q   In the Exhibit 102 report, could you
8  please turn to page 19, the section that starts at
9  paragraph 43.
10   A   Okay.                    12:45:09
11   Q   The question that I have for you is
12 specific to the APC data.
13       Are you able to tell me how the APC data
14 was matched to the work assignment data?
15   A   You'd need to ask Mary Furst that, because  12:45:43
16 she did the work.
17   Q   Based on that, I -- I assume that she's
18 the one to ask on these other questions that I have
19 about the APC data, but let me -- let me see just
20 in case.                      12:46:18
21       Are you able to tell me why you compared
22 APC data for selected periods of the operators
23 rather than all of the APC data for a particular
24 operator?
25   A   I'm -- I didn't understand the question.    12:46:54

**Page 87**

1    Q   You -- you understand correctly the
2  analysis of APC data for a operator does not look
3  at all available APC data for that operator, but
4  rather looks at specific segments of time, not the
5  entire period of time for which the APC data is    12:47:35
6  available; is that correct?
7    A   You have to ask Mary Furst.  I didn't do
8  the calculations.
9        MR. TIDRICK:  Madam Court Reporter, can
10 you read back the answer, please, it just trailed  12:47:59
11 off, I couldn't hear the end of it.
12       (Record read as follows:
13        "A   You have to ask Mary Furst.
14    I didn't do the calculations.")
15 BY MR. TIDRICK:                12:48:05
16   Q   Are you aware, one way or the other,
17 whether Mary Furst used all available APC data in
18 her analysis of -- strike that.
19       Are you aware, one way or another, whether
20 all APC data available for a operator was used in   12:48:24
21 Mary Furst's analysis?
22   A   You'll -- you'll have to ask Mary that.
23   Q   If you could, please, turn to page 25 of
24 the report, the analysis of average
25 start-travel-wait time.       12:49:27

**Page 88**

1    Do I understand correctly that someone
2  identified as Windell Burnside, as an example --
3  were you involved in the decision to identify
4  Windell Burnside as an example?
5    A   No, I was not involved in that.  I didn't   12:49:52
6  look at the APC data.
7    Q   Do I understand correctly you were not
8  involved in the decision to use Windell Burnside as
9  an example for the analysis of average
10 start-travel-wait time; is that correct?       12:50:35
11   A   I discussed various of the operators and
12 suggested that we have a look at them and then Mary
13 Furst pulled the data for them.
14   Q   The only reason that I am asking
15 essentially the same question as before, is I --    12:50:53
16 you mentioned APC data in your answer, and you
17 understand APC data has nothing to do with
18 average --
19   A   Yeah.
20   Q   -- start- --                 12:51:05
21   A   Yeah --
22   Q   -- travel-wait --
23   A   Yeah, yeah -- no, I'm -- I'm sorry, I
24 didn't --
25   Q   Well, I was just confused.  When you       12:51:09

**Page 89**

1  mentioned APC data as part of your answer, I -- I
2  didn't -- it didn't make sense.
3    A   That was -- that was incorrect, it's
4  the OW -- what -- the OW data.  I didn't look at
5  any of the data, is -- is the general statement and  12:51:22
6  I'm -- I just used the wrong data set there.  I
7  didn't use any of the data so I did not do any of
8  these calculations.
9    Q   Do I understand correctly that you,
10 Dr. Fleissig, did not review any of the data and,    12:51:45
11 therefore, the calculations in the Exhibit 102
12 report are not calculations that you are able to
13 attest to.
14       Is that fair?
15   A   They're not calculations that I did, yeah.   12:52:00
16   Q   Are you able to tell me -- or is this a
17 question for Mary Furst -- as to why an NA response
18 would be treated as a zero?
19   A   It's best for you to ask Mary Furst.
20   Q   With respect to cable car operators, are   12:52:25
21 you able to tell me why cable car operators
22 should be included in the calculation for
23 start-travel-wait time?
24   A   That was not part of my assignment.
25   Q   Similarly, with respect to paragraph 54 of  12:53:21

Page 86
Page 87
Page 88
Page 89

Veritext Legal Solutions
866 299-5127

1 Exhibit 102, and the discussion of excluding NA
2 responses, are you able to tell me, or is it a
3 question for Mary Furst, whether NA responses
4 should be treated as zero?
5  A  As a statistician, when you get a  12:54:05
6 nonresponse or no response like that, you need to
7 try and understand what that person was actually
8 saying.
9  Q  I will represent to you that -- strike
10 that.  12:54:21
11     Let me put it this way.  If you could,
12 please, assume that cable car operators are not
13 making a claim for start-travel-wait time, assuming
14 that, would you agree that NA responses by cable
15 car operators -- strike that.  Too convoluted.  12:55:00
16     Let me try again.
17     Please assume that cable car operators are
18 not making a claim for start-travel-wait time,
19 assuming that, would you agree that NA responses
20 should not be treated as zeros?  12:55:33
21     MR. SPELLBERG:  I'm going to object, it's
22 vague and ambiguous, it's a double negative, it's
23 an incomplete hypothetical.
24     You may answer if you're able.
25     THE WITNESS:  I really can't answer that,  12:55:55
Page 90

1 I'm sorry.
2 BY MR. TIDRICK:
3  Q  Is -- is there a reason that you can't
4 answer that?
5  A  I'm not sure I really understand what the  12:56:05
6 question is.
7  Q  Well, let me try to explain the assumption
8 better.
9     Assume, please, that cable car operators
10 are not making a claim for start-travel-wait time,  12:56:28
11 under that assumption, do you agree that NA
12 responses should not be treated as zeros?
13     MR. SPELLBERG:  Objection.  It's the same
14 objections.  It's -- it's -- you're talking apples
15 and oranges, it's a incomplete hypothetical.  12:56:56
16     Only answer if you understand what he's
17 asking.
18     THE WITNESS:  I'm not sure why I would
19 make the assumption, so I -- I can't answer that.
20 BY MR. TIDRICK:  12:57:19
21  Q  Let me try and break it down in a
22 simplistic manner.
23     Assume that you have three operators,
24 Operators 1, 2 and 3.  The first operator is not
25 making a claim for a certain category of unpaid  12:57:36
Page 91

1 time, Operators 2 and 3 are making a claim for
2 unpaid time and Operator 2 provides an estimate of
3 five minutes, Operator 3 provides an estimate of
4 seven minutes.
5     Would you agree that the appropriate  12:57:59
6 calculation of the average for those making the
7 claim is simply the average of five and seven, in
8 other words, the average would be six?
9     MR. SPELLBERG:  Same objections.
10 Incomplete hypothetical.  12:58:22
11     THE WITNESS:  You're calculating a
12 different average there, so this hypothetical is
13 not making sense to me.
14 BY MR. TIDRICK:
15  Q  Let me try again.  12:58:49
16     Imagine three operators, Operator Number 1
17 is not making a claim, Operators 2 and 3 have
18 offered estimates of five minutes and
19 seven minutes, respectively, would you agree
20 that the average for those making a claim is six?  12:59:11
21  A  Yeah, I've -- I've answered the question.
22 The hypothetical is not really making a lot of
23 sense for -- for the question, so I can't answer
24 that.
25  Q  What about the hypothetical is not making  12:59:36
Page 92

1 sense?
2  A  I'm not sure what average and what
3 calculation you're trying to get done here and I'm
4 just not understanding what you're getting at.
5  Q  Paragraph 55 of the 102 report, can you  12:59:55
6 explain the opinion that you're offering in -- in
7 paragraph 55?
8  A  This is something that you're going to
9 need to ask Mary about.
10  Q  Mary Furst?  01:00:59
11  A  Mary Furst, yes.
12  Q  If you could, please, turn to page 27 of
13 the Exhibit 102 report at paragraph 61 -- setting
14 aside the -- the document for a moment, let me ask
15 you a different question.  01:02:11
16     Did you review any transit operator
17 vehicle logs in this case?
18  A  No, I didn't.
19  Q  How do you know that operators submitted
20 transit operator vehicle logs for being late at a  01:02:41
21 division?
22  A  That's beyond the scope of my work.
23  Q  In paragraph 61 you state:
24     "...if an Operator had some late
25     times on the APC records but was paid  01:03:24
Page 93

| | |
|---|---|
| 1 overtime for all of the minutes, then | 1 work assignment data, payroll data, and whose work |
| 2 the Operator was compensated." | 2 assignment data could be matched to range reports? |
| 3 Do you agree, based on the model laid out | 3 THE REPORTER: To -- I'm sorry, to what |
| 4 in Exhibit 6, that if there is no overtime paid on | 4 reports. |
| 5 instances in which an operator had some late times, 01:04:08 | 5 THE WITNESS: Range. |
| 6 then that operator was not compensated for that | 6 MR. TIDRICK: Range reports. |
| 7 time? | 7 THE REPORTER: Thank you. Got it. |
| 8 A You'll -- you'll have to ask Mary about | 8 MR. TIDRICK: That's r-a- -- r-a-n-g-e. |
| 9 the -- the compensation on that, I didn't -- I was | 9 And just for a clear record, Madam Court |
| 10 not involved in that. 01:04:29 | 10 Reporter, can you read back the question, please. 01:08:13 |
| 11 Q Were you involved in evaluating the | 11 (Record read as follows: |
| 12 amounts of unpaid time in the examples listed in | 12 "Q You understand that |
| 13 Exhibit 6 to the Exhibit 102 report? | 13 Dr. Drogin calculated damages based |
| 14 A Exhibit 6. Oh, I have to find Exhibit 6. | 14 upon individuals for whom there is |
| 15 Where is that? Is that in our report here? Is 01:04:53 | 15 work assignment data, payroll data, 01:07:39 |
| 16 there a page number? | 16 and whose work assignment data could |
| 17 Q You didn't number the pages for the | 17 be matched to range reports?") |
| 18 exhibits, so, unfortunately, you'll just have to | 18 THE WITNESS: Am -- am I supposed to |
| 19 flip ahead to locate Exhibit 6 -- | 19 answer or are you going to be adding to that? |
| 20 MR. SPELLBERG: Which -- 01:05:13 | 20 MR. SPELLBERG: I think the question was 01:08:48 |
| 21 MR. TIDRICK: We're talking about | 21 did you understand that's what he -- he relied on. |
| 22 Exhibit 6, Exhibit 6 to Exhibit 102. | 22 THE WITNESS: I believe that's what he |
| 23 MR. SPELLBERG: 102. | 23 relied on. |
| 24 BY MR. TIDRICK: | 24 BY MR. TIDRICK: |
| 25 Q We're still in the rebuttal report, 01:05:21 | 25 Q Do you understand that if an operator did 01:09:00 |
| Page 94 | Page 96 |

| | |
|---|---|
| 1 Exhibit 102, there's -- there's a section in it | 1 not fit those criteria, he or she was not included |
| 2 that you've labeled as Exhibit 6. | 2 in the sample, correct? |
| 3 A Oh, here we go. | 3 A I'm not entirely sure on the methodology |
| 4 MR. SPELLBERG: I'm looking. | 4 that Dr. Drogin used to include or exclude people |
| 5 Is it -- it's the Summary of Unscheduled 01:05:33 | 5 from the sample -- or the population, I should say. 01:09:34 |
| 6 Overtime For Selected Operators? | 6 Q Do you have any expert opinion on whether |
| 7 MR. TIDRICK: You know, let -- let me come | 7 operators for whom there was no work assignment |
| 8 back to it. Let me come back to it. It's -- it's | 8 data should have been included in the sample |
| 9 all right. | 9 results? |
| 10 THE WITNESS: Okay. 01:05:52 | 10 A Where there was no sample data, you mean 01:10:01 |
| 11 BY MR. TIDRICK: | 11 the declaration data? |
| 12 Q Let's -- let's flip to a page that's | 12 Q No, I'm asking about the work assignment |
| 13 numbered, page 28. | 13 data, are you familiar with what the work |
| 14 Can you flip to page 28 of the report. | 14 assignment data is? |
| 15 A Okay, I'm on page 28. 01:06:02 | 15 A I have a limited understanding of that. 01:10:18 |
| 16 Q In the Exhibit 102 report you have offered | 16 Q My question simply is do you have any |
| 17 an opinion about what an adequate nonresponse rate | 17 expert opinions to offer on whether operators for |
| 18 is; is that correct? | 18 whom there is no work assignment data should be |
| 19 A I don't think that there was an opinion | 19 included or excluded from the sample results? |
| 20 about an adequate response rate. 01:06:46 | 20 A You're -- I'm not understanding the 01:10:53 |
| 21 Q Do you have an expert opinion on what an | 21 question because they've been included or excluded |
| 22 acceptable nonresponse rate would be in this case? | 22 in the population, not the sample, would be my |
| 23 A In this case, I don't. | 23 understanding of what you're asking. |
| 24 Q You understand that Dr. Drogin calculated | 24 Q Do you believe that operators whose run |
| 25 damages based upon individuals for whom there was 01:07:29 | 25 numbers are in the work assignment data but could 01:11:50 |
| Page 95 | Page 97 |

25 (Pages 94 - 97)

| | |
|---|---|
| 1 not be matched to runs in the range report, should | 1 A The declarations. |
| 2 be included in the sample results? | 2 Q You're referring to Dr. Drogin's |
| 3 A It just -- it really depends. I'd have to | 3 declaration? |
| 4 look at the analysis. | 4 A The use of the declarations, yes. |
| 5 Q Is that something that you've looked at in 01:12:16 | 5 Q The use of Dr. Drogin's declaration -- do 01:16:44 |
| 6 this case? | 6 you mean Dr. Drogin's expert report? |
| 7 A I've not been involved in the data -- | 7 A These declarations here, the declarations, |
| 8 working with the data. | 8 135, there were 400 of them, I believe, that went |
| 9 Q Is it fair to say that -- strike that. | 9 out and 305 responded, that information, that |
| 10 Are you offering any expert opinion on who 01:12:35 | 10 sample. 01:17:14 |
| 11 should be included or excluded from the sample | 11 Q Paragraph 62 of the Exhibit 102 report -- |
| 12 results? | 12 the -- the opinions expressed in that paragraph -- |
| 13 A I'm really not understanding the question. | 13 are those questions that I should direct to Mary |
| 14 The sample is something that was already taken, | 14 Furst? |
| 15 so -- I mean if you can rephrase the question. 01:12:58 | 15 A Some of the questions. 01:17:43 |
| 16 Q Well, do you have any expert opinions to | 16 Q The final sentence of paragraph 62 in your |
| 17 offer on how a damage analysis should account for | 17 Exhibit 102 report states, and I quote: |
| 18 individuals for whom there is no work assignment | 18 "The balance that were excluded |
| 19 data? | 19 because OWA and/or run numbers could |
| 20 MR. SPELLBERG: Vague and ambiguous. 01:13:57 | 20 not be matched with the Operator, or 01:18:27 |
| 21 I'm not sure that I understand it. | 21 the Operator was deceased." |
| 22 THE WITNESS: You're -- you're -- you're | 22 I think you had a typo in that sentence. |
| 23 taking a sample which you hope is representative of | 23 I think you didn't mean to say that. What I |
| 24 the population and then you extrapolate to the | 24 believe you meant to say in that paragraph was |
| 25 population, but if the sample is not appropriate, 01:14:11 | 25 "The balance were excluded because 01:18:45 |
| Page 98 | Page 100 |

| | |
|---|---|
| 1 then the results are going to be rather poor and | 1 OWA and/or run numbers could not be |
| 2 inaccurate. | 2 matched with the Operator or the |
| 3 BY MR. TIDRICK: | 3 Operator was deceased." |
| 4 Q Are you aware that Dr. Drogin performed a | 4 You're making a statement of fact in that |
| 5 sample? 01:15:07 | 5 sentence, correct? 01:19:02 |
| 6 MR. SPELLBERG: Objection. Fact not in | 6 A That's not -- you'll have to ask Mary |
| 7 evidence, vague and ambiguous. | 7 about that. |
| 8 THE WITNESS: What do you mean by | 8 Q Do you have any opinion to offer on |
| 9 "Dr. Drogin performed a sample"? | 9 whether the exclusions referenced in that sentence |
| 10 BY MR. TIDRICK: 01:15:24 | 10 are appropriate or not? 01:19:16 |
| 11 Q Are you aware that Dr. Drogin took a | 11 A You'll have to ask Mary about that. |
| 12 sample? | 12 Q If you could, please, turn to page 31, the |
| 13 MR. SPELLBERG: Same objections. | 13 paragraph 72 and the section for which that's the |
| 14 THE WITNESS: Took a sample of what? | 14 first paragraph. |
| 15 BY MR. TIDRICK: 01:15:42 | 15 I'd like to ask you some questions about 01:20:03 |
| 16 Q Are you aware that Dr. Drogin took a | 16 examples of time added by Dr. Drogin to these runs. |
| 17 sample of the class? | 17 Okay? |
| 18 A Are you referring to the declaration? | 18 A Sure. |
| 19 Q Let me ask you about paragraph 62 of your | 19 Q Why do you believe that Dr. Drogin added |
| 20 report. 01:16:07 | 20 travel time between the first piece and the second 01:20:26 |
| 21 Paragraph 62 of your expert report, | 21 piece of a two-part run? |
| 22 Exhibit 102, refers to Dr. Drogin's simple random | 22 A That's something that you're going to need |
| 23 sample. | 23 to ask Mary about, Mary Furst. |
| 24 What were you referring to in that | 24 Q In order to perform your analysis, you |
| 25 paragraph? 01:16:29 | 25 analyzed some of the details of Dr. Drogin's 01:20:51 |
| Page 99 | Page 101 |

26 (Pages 98 - 101)

1 computations; is that correct?
2   A   I -- I missed the first part of your
3 sentence, I'm sorry, I didn't hear it.
4   Q   Did you analyze any of the details of
5 Dr. Drogin's computations?                    01:21:11
6   A   I analyzed some of those details, yes.
7   Q   You analyzed details sent out in the
8 electronic files that Dr. Drogin provided?
9   A   I analyzed his report.
10  Q   Did you analyze any of the backup      01:21:45
11 materials that Dr. Drogin provided?
12  A   Only what was in his report.
13  Q   Do you understand that aside from the
14 written report itself, that Dr. Drogin also
15 provided numerous electronic files?          01:22:06
16  A   I'm aware of that.
17  Q   Did you analyze any of the computations in
18 the electronic files?
19  A   I -- that was not my assignment.
20  Q   Whether or not it was your assignment, did  01:22:29
21 you analyze any of the computations in Dr. Drogin's
22 electronic files?
23  A   I don't believe I did.
24  Q   If could you, please, turn ahead to
25 paragraph 86.                                01:22:59
                                        Page 102

1      In paragraph 86 you make the statement:
2      "It seems unlikely that an Operator
3      would wait 20+ minutes at a relief
4      location that is no more than a four
5      minute walk from the division."          01:23:51
6      What study, if any, did you undertake to
7 reach that conclusion?
8   A   You'll need to ask Mary Furst about that.
9   Q   Are you able to offer any expert opinion
10 for the basis for that opinion that I just read   01:24:19
11 from paragraph 86 of the 102 report?
12  A   That's a question for Mary Furst.
13  Q   At paragraph 91, which is at page 38 of
14 Exhibit 102, you state, and I quote:
15      "Dr. Drogin has wrongfully assumed       01:24:57
16      that on average Operator's arrived
17      20 minutes before starting their run
18      from a relief location that was
19      two blocks or less from a division."
20      I believe there's a typo -- there's no   01:25:21
21 apostrophe on "Operators" there -- or there
22 shouldn't be.
23      Did you undertake any study to ascertain
24 whether the assumption stated there was correct or
25 incorrect?                                   01:25:46
                                        Page 103

1   A   You'll need to ask Mary Furst about that.
2   Q   In the section discussing "Turn-in Time"
3 of the Exhibit 102 report, starting at paragraph
4 92, if I could ask you specifically about footnote
5 14 --                                        01:26:18
6      MR. SPELLBERG: 13?
7      THE WITNESS: 14.
8 BY MR. TIDRICK:
9   Q   -- and the statement that "If on-time
10      is set to zero, then the sampled          01:26:32
11      Operators that end at a division are
12      early 43% of the time."
13      When you set the on-time to zero, how,
14 exactly, did you calculate that?
15  A   Well, these were the range of minutes that  01:26:58
16 we had spoken about earlier and you'd have to talk
17 to Mary Furst because I didn't work with the data.
18  Q   Do you know, one way or another, if an
19 operator arrived 59 seconds after their scheduled
20 ending time, whether that was counted as untime or  01:27:28
21 late in your analysis?
22  A   You'll have to ask Mary Furst about that.
23  Q   In paragraph 94 of Exhibit 102, you make a
24 statement:
25      "Dr. Drogin does not account             01:27:56
                                        Page 104

1      for the additional time that
2      Operators are paid for unscheduled
3      overtime."
4      Are you able to explain the basis for that
5 opinion?                                     01:28:11
6   A   That's something that you'll need to ask
7 Mary Furst about.
8   Q   At paragraph 96, you make the statement
9 that -- and I quote:
10      "Of the responses, 81% are in            01:28:41
11      increments of 5 minutes which is
12      unlikely to match actual data."
13      You think that it's unlikely because you
14 didn't, in fact, have any actual data to compare it
15 against; is that correct?                    01:29:10
16  A   No, that's not correct.
17  Q   Do I take it from your answer you consider
18 the APC data to be actual data?
19  A   We consider the APC data to give an
20 accurate representation of the data.          01:29:37
21  Q   Well, when you say "actual data,"
22 information provided by the operators in their
23 declarations is actual data, correct?
24  A   It's -- it's not actual data. It's
25 estimates based on their memory over a long period  01:30:07
                                        Page 105

27 (Pages 102 - 105)

1 of time and then it's an average as well, very
2 difficult to do, those are estimates.
3      Q   I -- I understand that you do not believe
4 that the operator declarations are reliable.  I'm
5 asking you a different question.          01:30:36
6          Information provided by the operators is,
7 in fact, true, correct?
8      A   In their declaration -- are you talking
9 about the declaration, the declaration, 135?
10     Q   Yes, the declaration of which Exhibit 135   01:30:51
11 is an example.
12         Information provided by the operators in
13 declarations is data, correct?
14     A   It's data but it's very misleading data,
15 so -- I'm not sure what your question is.  We need   01:31:16
16 data to represent the sample.
17     Q   Do I understand correctly -- in paragraph
18 96, are you essentially offering the opinion that a
19 disproportionately high number of five-minute
20 increments reporting reflects that operators are     01:32:12
21 rounding?
22     A   When you have -- when you ask questions,
23 like in the declaration, they need to provide some
24 estimates, they're doing this from memory.  And
25 when they all seem to be -- a large majority of      01:32:40

Page 106

1 them seem to be in increments of five minutes, that
2 seems unlikely to match their actual data and
3 that's what I'm saying.
4      Q   And --
5      A   It's -- it's the poorly designed          01:33:03
6 declaration that leads to those kind of statements.
7      Q   If operators round to the nearest 5-minute
8 interval, for example, 5 minutes, 10 minutes,
9 15 minutes, isn't it just as likely that operators
10 are rounding down as rounding up?                   01:33:33
11     A   It's not clear that that's the case.
12     Q   Why is that?
13     A   In this -- from this declaration, then
14 there would have -- you'd expect to see two
15 minutes, three, seven, other numbers other than    01:34:01
16 multiples of five, 81 percent are in increments of
17 five.  That's -- that's a lot.
18     Q   Are you suggesting that operators are
19 rounding?
20     A   I'm suggesting that operators are trying   01:34:24
21 to go from memory and are having a hard time giving
22 estimates for the various questions they asked
23 because these are averages over a long period of
24 time.
25     Q   Assume that the APC data is not reliable   01:34:47

Page 107

1 and that the only data that we have is what the
2 operators can recall from memory.
3          Under that assumption, if you're seeing a
4 disproportionate number of time recording in
5 intervals of 5, such as 5 minutes, 10 minutes,      01:35:10
6 15 minutes, isn't it just as likely that operators
7 are rounding up as rounding down?
8      A   Well, first of all, I'm not going to
9 assume that the APC data is incorrect, because
10 that's recorded --                                  01:35:27
11     Q   I do want you to assume that.
12     A   -- data.
13         I'm sorry?
14     Q   I -- I do want you to assume that --
15     A   I cannot assume --                         01:35:33
16     Q   -- for purposes of this question.
17     A   I cannot assume it because the data is
18 coded data so I cannot assume that it's incorrect.
19     Q   I -- I do need you to assume it, sir, for
20 this question.  There is substantial evidence in    01:35:46
21 this case that the APC data is unreliable and
22 inaccurate for the purposes for which you're trying
23 to use it?
24         MR. SPELLBERG:  Where is -- I'm going to
25 object to that comment.                             01:35:59

Page 108

1          Why don't you start your question over and
2 let's see if we get it -- get -- you can do a
3 question that the witness can understand.
4          MR. TIDRICK:  Well, Mr. -- Mr. Spellberg,
5 maybe you can explain to the witness that it's      01:36:11
6 proper in an expert deposition to present an
7 assumption.
8          MR. SPELLBERG:  Go ahead, I'm listening.
9          MR. TIDRICK:  Madam Court Reporter, can
10 you read back the last question, please.           01:36:24
11         (Record read as follows:
12            "Q   I -- I do need you to assume
13            it, sir, for this question.  There is
14            substantial evidence in this case
15            that the APC data is unreliable and    01:35:49
16            inaccurate for the purposes for which
17            you're trying to use it?")
18         MR. SPELLBERG:  I -- I mean that doesn't
19 help me.  I mean what's your -- what's your
20 question and what's your assumption, I've lost      01:37:01
21 track of it.
22         MR. TIDRICK:  Let me start with another
23 question.
24     Q   Paragraph 96 of the Exhibit 102 report is
25 in a section which you're discussing turn-in time;  01:37:33

Page 109

1 is that correct?
2         MR. SPELLBERG: I'm sorry, which
3 paragraph?
4         THE WITNESS: 96. Turn-in time.
5 BY MR. TIDRICK:                    01:38:02
6     Q   Do you understand the question?
7         MR. SPELLBERG: I don't understand the
8 question. What -- what is your question.
9         You asked him to look at paragraph 96.
10 We're looking at it.              01:38:13
11 BY MR. TIDRICK:
12     Q   Paragraph 96 presents an opinion with
13 respect to turn-in time; is that correct?
14         MR. SPELLBERG: I don't think it's turn-in
15 time, is it?                      01:38:35
16         Well -- answer.
17         THE WITNESS: Yeah, I mean it's under that
18 section, yes.
19 BY MR. TIDRICK:
20     Q   In paragraph 96, when you say, quote,   01:38:45
21 "Of the responses, 81% are in
22     increments of 5 minutes," are you
23 referring to the responses with respect to turn-in
24 times exclusively?
25     A   In this -- I believe that this is the   01:39:05

Page 110

1 section on turn-in time, I believe that's correct,
2 yes.
3     Q   When you say that "81% are in
4     increments of 5 minutes which is
5     unlikely to match actual data," what    01:39:38
6 actual data are you referring to?
7     A   So the five minutes -- the increments of
8 five minutes came from the declarations and that is
9 based on their memory from a long time ago over
10 different routes and they have to estimate that,    01:40:07
11 and actual data is hard written data, the actual
12 minutes for turn-in time, and it's unlikely --
13     Q   What's actual --
14     A   The true data -- the true data.
15     Q   What actual data do you believe exists for   01:40:31
16 turn-in times?
17     A   That's -- that's not the point in the
18 question -- in -- in the statement. The statement
19 says when you see these increments of five minutes,
20 it would be unlikely to match the true data.    01:40:48
21     Q   What true data are you referring to?
22     A   The actual -- if the -- the actual late --
23 the actual turn-in time data.
24     Q   What actual turn-in time data do you
25 believe exists?                   01:41:09

Page 111

1     A   It's not us -- it's not -- it's not a
2 statement about whether it ex- -- whether it
3 exists. It's just the sample is not going to match
4 the population data, that's the population data.
5     Q   So in paragraph 96, when you say that the   01:41:26
6 information provided by operators "is
7     unlikely to match actual data,"
8 you're not referring to any actual data, there is
9 no actual data that you're referring to; is that
10 correct?                         01:41:47
11     A   I'm referring to the population. You're
12 taking a sample to approximate the population, and
13 what this is showing is that the sample is unlikely
14 to be representative of the population data.
15     Q   Are you saying that paragraph 96 is a    01:42:16
16 critique of the sampling?
17     A   Paragraph 96 is saying that based on these
18 estimates that we're getting, they seem highly
19 unlikely to be representative of the population.
20     Q   What actual data did you compare them    01:42:40
21 against?
22     A   Okay, that's not what I'm saying. I keep
23 telling you that, but that's not what I'm saying.
24         You're taking a sample that you hope will
25 represent the population. And what I'm saying    01:42:52

Page 112

1 there, since they're in increments of five minutes
2 and 81 percent, that is unlikely to represent the
3 population.
4     Q   The population of operators?
5     A   The turn-in time that you're trying to    01:43:16
6 estimate here for the whole population.
7     Q   Is it possible or even plausible that
8 five minutes is an accurate amount of time for how
9 long it takes to perform the turn-in time
10 activities?                       01:43:47
11     A   They're increments of five minutes. It's
12 not just five minutes, it's the increments of
13 five minutes, which suggests that the sample will
14 not match or represent the population and will give
15 biased and incorrect estimates.              01:44:04
16     Q   But what percent of the responses were
17 five minutes?
18     A   I do not know the answer to that.
19     Q   Do I understand correctly -- strike that.
20         In paragraph 96 of the Exhibit 102 report    01:44:25
21 when you say that "81% are in increments
22     of 5 minutes which is unlikely to
23     match actual data," do I understand
24 correctly, when you say "actual data," you mean if
25 there were actual hard data, you don't believe it    01:44:53

Page 113

29 (Pages 110 - 113)

| | |
|---|---|
| **Page 114** | **Page 116** |

Page 114:

1 would match, is that what you're saying?
2    A  I think you understand, yes, that that
3 declaration was so poorly designed that it's not
4 going to represent the population so you will not
5 get precise estimates, I think that you understand   01:45:16
6 that. That's what I'm saying.
7    Q  Are you aware of the existence of any hard
8 data, in your words, reflecting the amount of time
9 it takes to perform turn-in time activities?
10    A  I did not look at the data so I can't   01:46:08
11 answer that question.
12    Q  If I could, please, refer you to page 40
13 of your Exhibit 102 report, Footnote 15.
14    That footnote refers to a snapshot of
15 sample data that SFMTA provided.   01:47:11
16    Are you able to tell me specifically what
17 data was provided that that's referring to?
18    A  You'll have to ask Mary Furst about that.
19    Q  Did you analyze that data?
20    A  I didn't use the data, I didn't analyze   01:47:40
21 the data, that's Mary Furst who did the work.
22    Q  In paragraph 104 of your Exhibit 102
23 report, you discussed offsets.
24    Did you perform any population of offsets
25 in this case?   01:48:43
Page 114

Page 115:

1    A  That was not part of my assignment.
2    Q  Whether or not it was part of your
3 assignment, did you perform any calculations of
4 offset in this case?
5    A  I did not perform any calculations.   01:49:01
6    Q  Are you able to tell me whether you've
7 identified any offsets other than what are listed
8 in paragraph 104 of the Exhibit 102 report?
9    A  You'll need to ask Mary about that.
10    MR. TIDRICK: Let's take a short break,   01:50:02
11 maybe ten minutes, please.
12    THE WITNESS: Sure.
13    MR. SPELLBERG: Okay.
14    THE VIDEOGRAPHER: This marks the end of
15 Media Number 2.   01:50:18
16    Going off the record at 1:50 p.m.
17    (Recess.)
18    THE VIDEOGRAPHER: This marks the
19 beginning of Media Number 3.
20    Going back on the record at 2:05 p.m.   02:05:40
21 BY MR. TIDRICK:
22    Q  You understand that you're still under
23 oath?
24    A  I do.
25    Q  Your analysis of on-time performance, the   02:05:51
Page 115

Page 116:

1 data that you base that on was the APC data,
2 correct?
3    A  For the division, yes.
4    Q  There was no other data besides APC data
5 that you base your on-time performance analysis on,   02:06:20
6 correct?
7    A  You have to talk to Mary about what data
8 she used for that.
9    Q  Mary Furst?
10    A  Mary Furst, yes. I'm sorry, I keep   02:06:34
11 saying Mary -- Mary Furst.
12    Q  Do you understand that there is a
13 difference between what is called processed APC
14 data as opposed to unprocessed or raw APC data?
15    A  You'll have to ask Mary, I didn't work   02:07:04
16 with the data.
17    Q  Do you have any understanding of whether
18 what Mary Furst received was processed APC data or
19 unprocessed or raw APC data?
20    A  I'm sorry, you'll have to ask Mary Furst   02:07:28
21 about that.
22    Q  Do you have any understanding who the
23 manufacturers of SFMTA's automatic passenger
24 counters are?
25    A  You'll have to ask Mary about that, Mary   02:07:47
Page 116

Page 117:

1 Furst.
2    Q  You understand that APC stands for
3 automatic passenger --
4    THE REPORTER: Automatic -- you went
5 out -- we --   02:07:55
6 BY MR. TIDRICK:
7    Q  -- automatic passenger counter?
8    A  Yes, I -- I believe that's the correct
9 one.
10    Q  Do you have any understanding where,   02:08:11
11 physically, on the transit vehicles the automatic
12 passenger counters are located?
13    A  That's not my area of expertise.
14    Q  Do you have any expertise about automatic
15 passenger counters?   02:08:33
16    A  No, that's not part of my expertise.
17    Q  Do you have any understanding of how APC
18 data is organized?
19    A  You will have to ask Mary Furst about
20 that.   02:08:58
21    Q  Do you have any understanding of what data
22 fields are provided in APC data?
23    A  You'll have to ask Mary Furst about that.
24    Q  Did you perform any study to assess the
25 validity or reliability of the APC data?   02:09:26
Page 117

30 (Pages 114 - 117)

1    A    You'll have to ask Mary about that, Mary
2  Furst.
3    Q    Are you aware of anything that's been done
4  to assess the validity or the reliability of the
5  APC data?                                    02:09:48
6    A    You'll have to ask Mary Furst about that.
7    Q    Have you ever, personally, or had someone
8  on -- on your behalf ride a transit vehicle and
9  track the door openings to confirm that the data
10  generated by the door openings was reliable?    02:10:16
11    A    I have not.
12    Q    To your knowledge, has that happened in
13  this case, do you know one way or the other?
14    A    That's not my area of expertise.
15    Q    I understand you stated it's not your area  02:10:38
16  of expertise, my -- my question is simply do you
17  know, one way or another, whether anyone has done
18  that?
19    A    I'm not aware of it.  It could have
20  happened, I have no idea.                      02:10:58
21    Q    When you say, "It could have happened,"
22  you're really just speculating, though, correct?
23    A    I have no idea whether it's happened or
24  not, I have no idea.
25    Q    Do you know what the automatic passenger    02:11:11

Page 118

1  counters report when a vehicle opens its doors prior
2  to reaching a stop?
3    A    You'll have to ask Mary about that.
4    Q    Do you know what APC data is generated
5  when a vehicle opens its doors prior to reaching a    02:11:46
6  division?
7        MR. SPELLBERG:  Objection.  It's vague and
8  ambiguous, it's an incomplete hypothetical.
9        THE WITNESS:  You'll have to ask Mary
10  these questions about the data, Mary Furst.       02:12:01
11  BY MR. TIDRICK:
12    Q    The opinions that you've offered in the
13  Exhibit 102 report with respect to on-time
14  performance of transit vehicles is limited only to
15  vehicles that are equipped with automatic passenger   02:12:29
16  counters; is that correct?
17    A    No, that's not correct.
18    Q    Do you understand that only a subset of
19  the transit vehicles have automatic passenger
20  counters?                                       02:12:51
21    A    But your question was on all transit
22  vehicles and I have opinions to the best of my
23  knowledge.
24    Q    Well, let me break this out, then.
25        You understand that only a subset of SFMTA    02:13:09

Page 119

1  transit vehicles have automatic passenger counters,
2  correct?
3    A    That is correct.
4    Q    If -- if I showed you a printout of the
5  APC data that Mary Furst was provided -- well,     02:14:12
6  strike that.
7        Have you ever looked at any of the APC
8  data that Mary Furst was provided?
9    A    I have not.
10    Q    Do I understand correctly you're not      02:14:27
11  holding yourself out as an expert in APC data,
12  correct?
13    A    I have not analyzed the data.
14    Q    You don't claim to have any expertise with
15  respect to APC data, correct?                   02:15:01
16    A    I haven't analyzed the data.
17    Q    Have you ever analyzed APC data before?
18    A    I have not analyzed these -- this APC
19  data.
20    Q    But I'm trying to ask a -- a broader      02:15:24
21  question, because I -- I was asking about your
22  expertise with respect to APC data and you said a
23  couple of times now you didn't analyze the APC
24  data, so I'm trying to understand, more generally,
25  whether you have expertise -- strike that.       02:15:41

Page 120

1        Do you have expertise in APC data?
2    A    Well, I've answered the question, that I
3  haven't analyzed the data.
4    Q    What expertise do you have with respect to
5  APC data?                                       02:16:05
6    A    I've answered the question.  I haven't
7  analyzed the data.
8    Q    Do you have any professional training or
9  education with respect to APC data?
10    A    I haven't looked at the data.          02:16:29
11    Q    I -- I understand you have not looked at
12  the APC data in this case, you've made that clear.
13        Do you have any professional training with
14  respect to APC data?
15    A    There is professional training available?   02:17:03
16    Q    Are you -- you have received training with
17  respect to APC data?
18    A    I -- I -- I didn't know that there's
19  training.  I wanted to knois there -- is there
20  training available, is there a course, because I'm   02:17:38
21  not aware of that.
22    Q    It's fair to say, then, you -- you have
23  not had any training with respect to APC data,
24  correct?
25    A    There're no training courses that I'm      02:18:03

Page 121

31 (Pages 118 - 121)

1 aware of.
2    Q   Have you had any training with respect to
3 APC data?
4    A   I haven't analyzed the data.
5    Q   Have you had any training with respect to   02:18:26
6 APC data?
7    A   I have not -- no training.
8    Q   The opinions that you've offered with
9 respect to on-time performance of the defendant's
10 transit vehicles is limited only to instances of   02:18:55
11 vehicles pulling into division, correct?
12       THE WITNESS:  I'm sorry, just -- can we --
13 can you read the question again to me, please.
14    (Record read as follows:
15       "Q   The opinions that you've   02:18:48
16       offered with respect to on-time
17       performance of the defendant's
18       transit vehicles is limited only to
19       instances of vehicles pulling into
20       division, correct?")   02:19:01
21       THE WITNESS:  I looked -- we looked at the
22 APC data for transits going into division.
23 BY MR. TIDRICK:
24    Q   Did you analyze on-time performance of
25 transit vehicles arriving at relief locations?   02:19:44
Page 122

1    A   I didn't analyze the data.
2    Q   Are you offering any opinion with respect
3 to on-time performance of transit vehicles arriving
4 at relief locations?
5    A   I am offering opinions in the report based   02:20:09
6 on the declaration and the other information that
7 has been provided to me by Mary Furst.
8    Q   With respect to on-time performance at
9 relief locations?
10    A   Anything that's in this report, I will   02:20:31
11 have an opinion if I'm knowledgeable about it, so
12 any of these issues.
13    Q   Are you knowledgeable about on-time
14 performance at relief locations?
15    A   What do you mean by that?   02:20:44
16    Q   Do you know what a relief location is?
17    A   Yes, I do.
18    Q   Are you able to offer any expert opinion
19 with respect to on-time performance at relief
20 locations?   02:21:06
21    A   I can offer an opinion based on the work
22 that was done in the -- Dr. Drogin's report and
23 based on the declarations and the analysis that --
24 any analysis that was performed by Mary Furst and
25 provided to me.   02:21:26
Page 123

1    Q   What conclusions have you reached about
2 on-time performance at relief locations?
3    A   The conclusions that -- based on the
4 statements made in the declaration, that these do
5 not represent the population and should not be used   02:22:07
6 in the -- any calculations.
7    Q   Are you offering any other opinion with
8 respect to on-time performance at relief locations?
9    A   The opinions are in the report, whatever
10 those opinions are related to your question, and if   02:22:41
11 I'm asked for other opinions, I'll certainly
12 provide.
13    Q   Are you aware of any other opinions that
14 you have offered with respect to on-time
15 performance at relief locations?   02:23:06
16    A   I do not have any additional opinions at
17 this stage other than what's in the report, but
18 should I be asked, I will certainly provide.
19    Q   Have you ever asked to be provided with
20 copies of transit operator vehicle logs?   02:23:32
21    A   I do not work with the data.
22    Q   What data are you referring to?
23    A   The transit logs, I haven't been working
24 with them, I didn't use them.  That information was
25 provided by Mary Furst.   02:23:54
Page 124

1    Q   Do you understand that transit operator
2 vehicle logs are hard-copy documents?
3    A   I did not work with the data, so I don't
4 have any opinion on that.
5    Q   I'm not asking about any data.  I'm asking   02:24:08
6 about the transit operator vehicle logs.
7       Have you ever asked -- strike that.
8       Have you asked to be provided with the
9 transit operator vehicle logs?
10    A   I haven't been asked to be provided with   02:24:28
11 those logs.
12    Q   Have you asked to be provided with the
13 transit operator vehicle?
14    A   I thought that's just the question that
15 you just asked me.   02:24:55
16    Q   Your answer seemed to indicate that you
17 didn't understand the question.
18       Madam Court Reporter, can you read it
19 back, please.
20       MR. SPELLBERG:  I think I disagree with   02:25:12
21 that.  I mean I think you've just asked the same
22 question a couple of different times and he's given
23 the you same answer.
24    (Record read as follows:
25       "A   I haven't been asked to be   02:24:28
Page 125

32 (Pages 122 - 125)

1    provided with those logs.")
2    THE WITNESS: Is there a question?
3    MR. SPELLBERG: Huh-uh. No.
4 BY MR. TIDRICK:
5    Q  Do you understand that I'm not asking what   02:25:50
6 was asked of you.  I'm asking what you asked --
7 what you asked.
8    Do you understand the difference?
9    A  I have not asked for the logs.
10    Q  Why have you not asked for the logs?   02:26:13
11    A  It's not --
12    MR. SPELLBERG: Objection. Assumes a fact
13 not in evidence.
14    Go ahead.
15    THE WITNESS: Not part of my assignment.   02:26:22
16 My assignment is to evaluate Dr. Drogin's report.
17 BY MR. TIDRICK:
18    Q  Did you consider whether it would be
19 important to look at the transit operator vehicle
20 logs in order to analyze Dr. Drogin's report?   02:26:43
21    A  Well, that's what Mary Furst was doing for
22 me when I asked for things, data and statistics, of
23 course.
24    Q  Do you have any understanding why Mary
25 Furst did not provide you with any transit operator

Page 126

1 vehicle logs?
2    A  Yes --
3    MR. SPELLBERG: Calls for speculation.
4    You may answer.
5    THE WITNESS: Yes -- yes, I do, because   02:27:21
6 that was not part of my assignment, and Mary Furst
7 was doing the data analysis.
8 BY MR. TIDRICK:
9    Q  Do you have any understanding whether Mary
10 Furst reviewed any transit operator vehicle logs?   02:27:37
11    A  I don't have any idea of what she looked
12 at.
13    Q  Is it possible, in your opinion, to use
14 the work assignment data to determine where an
15 operator started his or her work assignment?   02:28:03
16    A  That's not -- I didn't work with the data
17 so I don't know the answer to that.
18    Q  If I could, please, refer you in
19 Exhibit 102 to page 25.
20    In your Exhibit 102 report at page 25, the   02:29:20
21 paragraph numbered 53.a), there's a statement that
22 an operator by the name of Burnside, "Windell
23    Burnside had 400 assignments during
24    the period July 16, 2009 to
25    October 27, 2015 that started at   02:29:47

Page 127

1    relief locations."
2    A  Yes.
3    Q  How did you determine -- how did you
4 determine that number, 400?
5    A  You'd have to ask Mary Furst about it, she   02:29:58
6 did the analysis.
7    MR. SPELLBERG: You know, I can tell you,
8 Steve, that number changes in the amended report.
9    MR. TIDRICK: Let's go off the record and
10 take a -- a very short break, it may be just two or   02:30:23
11 three minutes.
12    MR. SPELLBERG: Okay, I'm going to run to
13 the bathroom.
14    THE VIDEOGRAPHER: Going off the record at
15 2:30 p.m.                              02:30:33
16    (Recess.)
17    THE VIDEOGRAPHER: Going back on the
18 record at 2:36 p.m.
19    MR. TIDRICK: At this time we will suspend
20 the deposition.                        02:36:09
21    MR. SPELLBERG: And why are you suspending
22 and not completing?
23    MR. TIDRICK: We will need to review the
24 various corrections to the report that you've
25 indicated we'll be receiving by Friday and we'll   02:36:30

Page 128

1 plan on reaching back out to you after we have a
2 chance to receive and review that to reschedule
3 the -- resume the deposition.
4    MR. SPELLBERG: Well, here's my view on
5 that.  The edits have no relation to or relevance   02:36:47
6 to the issues that this witness has been designated
7 to testify about as an expert.  So if you bring him
8 back once he -- once you have the edited report,
9 we're not going to let you ask questions unless
10 it's related to the edited report, and I can --   02:37:14
11 it's certainly my view that there's nothing in
12 here, in the edited report that -- that change or
13 modify his opinions about Dr. Drogin's work.
14    So my recommendation is that if you have
15 questions about his actual opinion, about, you   02:37:28
16 know, the -- his statistical criticisms of
17 Dr. Drogin's methodology and analysis, and so on,
18 you need to ask that today because we're not going
19 to bring the witness back and allow you to ask
20 those questions that you could have asked today.   02:37:48
21    MR. TIDRICK: Well, we disagree with that.
22 I think it's unproductive and inefficient to force
23 us to continue asking other questions at this time.
24    He's identified numerous paragraphs that
25 he said he contributed to and, in some cases, he   02:38:09

Page 129

33 (Pages 126 - 129)

1 said he believed he contributed to, that overlap
2 with the paragraphs that you've identified are
3 going to be corrected, and it's inefficient and
4 wasteful for us to have to ask about topics more
5 than once.                          02:38:28
6      So we are suspending the deposition and
7 reserving our right to resume the deposition after
8 we receive the corrected report.
9      MR. SPELLBERG:  Yeah, okay.  And you have
10 my position --                      02:38:39
11      MR. TIDRICK:  I understand your position.
12      MR. SPELLBERG:  Yeah, very good.
13      MR. TIDRICK:  You've stated it for the
14 record.
15      MR. SPELLBERG:  Okay.              02:38:45
16      MR. TIDRICK:  We can go off the record.
17      THE WITNESS:  Thank you.
18      MR. SPELLBERG:  Thank you.
19      THE VIDEOGRAPHER:  We are off the record
20 at 2:39 p.m. and this concludes today's testimony    02:38:58
21 given by Adrian Fleissig, Ph.D.
22      The total number of media used was three
23 and will be retained by Veritext Legal Solutions.
24
25      (TIME NOTED: 2:36 p.m.)

Page 130

1      I, the undersigned, a Certified Shorthand
2 Reporter of the State of California, do hereby certify:
3      That the foregoing proceedings were taken
4 before me at the time and place herein set forth; that
5 any witnesses in the foregoing proceedings, prior to
6 testifying, were administered an oath; that a record of
7 the proceedings was made by me using machine shorthand
8 which was thereafter transcribed under my direction;
9 that the foregoing transcript is a true record of the
10 testimony given.
11      Further, that if the foregoing pertains to the
12 original transcript of a deposition in a Federal Case,
   before completion of the proceedings, review of the
13 transcript ( ) was (X) was not requested.
14      I further certify that I am neither
15 financially interested in the action nor a relative or
   employee of any attorney of any party to this action.
16      IN WITNESS WHEREOF, I have this date
17 subscribed my name.
18 Dated: 7/29/2016
19
20
21
22
23      SHARON LINDSAY-MILNIKEL
24      CSR No. 5335
25

Page 131

34 (Pages 130 - 131)

Veritext Legal Solutions
866 299-5127

**1**

**1**  1:25 44:5 50:22
69:19 91:24 92:16
**1-20**  1:10 2:10
**10**  44:9 107:8 108:5
**100**  30:11
**101**  25:17,20 26:3,9
30:12 42:12,14,18
43:12,14,19 50:14
64:14,17
**102**  12:25 13:4,11
13:15 14:15,20
15:16 20:19,23 21:5
26:6,15,20 27:3,14
32:12 34:2,8 35:9
37:24 38:10,24
40:18 41:14 42:2,11
42:25 43:15 44:3
49:16,25 50:5,11
51:1 52:2 53:3
55:19 56:14 60:23
61:3 63:20 64:3,13
69:11 70:4 78:4
79:6 83:16 86:7
89:11 90:1 93:5,13
94:13,22,23 95:1,16
99:22 100:11,17
103:11,14 104:3,23
109:24 113:20
114:13,22 115:8
119:13 127:19,20
**103**  30:12
**104**  114:22 115:8
**106**  30:12
**107**  30:12
**108**  30:13
**10th**  25:21
**11**  52:2
**11:25**  69:20
**11:58**  69:24
**12**  29:6
**12-03704**  1:7 2:8
5:18

**12:36**  85:24
**12:44**  86:2
**13**  11:16 13:4,8
20:23 29:7 40:12
70:4 104:6
**131**  1:25
**135**  57:3,7,20 59:12
59:16 60:8,20 65:3
65:4,8 69:5 79:18
100:8 106:9,10
**13th**  11:19 43:6
**14**  29:8 104:5,7
**15**  29:9 107:9 108:6
114:13
**152**  10:13,19 11:10
11:21 12:10
**16**  29:10 69:10
83:15 127:24
**17**  29:11
**18**  29:12 52:2 53:15
55:24
**19**  86:8
**1:50**  115:16

**2**

**2**  50:19 69:23 91:24
92:1,2,17 115:15
**20**  2:17 5:13 29:13
103:3,17
**2006**  7:18 22:9,14
**2009**  127:24
**2015**  127:25
**2016**  1:17 2:19 5:1,6
11:17,19 13:4,8
20:24 25:22 43:6
44:9
**2039**  3:8
**21**  29:14
**22**  29:14
**23**  29:14
**2351884**  1:23
**24**  29:14
**25**  29:14 70:5 72:14
73:8,8,10,12 78:3
78:17 79:6 87:23

127:19,20
**26**  29:16
**27**  1:17 2:19 5:1
29:16 93:12 127:25
**27th**  5:6
**28**  29:16 95:13,14
95:15
**29**  29:16
**2:05**  115:20
**2:30**  128:15
**2:36**  128:18 130:25
**2:39**  2:19 130:20

**3**

**3**  91:24 92:1,3,17
115:19
**30**  29:16
**300**  3:19
**305**  100:9
**308**  3:8
**31**  29:16 101:12
**32**  29:16,17 61:1
64:11
**33**  29:18 83:17
**34**  29:18
**35**  29:18
**350**  2:17 3:19
**36**  29:18
**37**  29:18
**38**  29:18 103:13
**39**  29:18

**4**

**4**  13:11,15 20:20
28:3 50:23
**4,018**  52:5
**4,180**  56:21
**4.a.**  28:3,17
**4.b**  28:17
**4.b.**  21:2 28:4
**40**  29:18 114:12
**400**  100:8 127:23
128:4
**41**  26:9,16,17 29:18
40:10

**415**  3:21
**42**  29:18
**43**  29:18 86:9
104:12
**44**  29:19
**47**  29:19 53:16
**48**  29:19 53:16
**49**  29:19 53:16

**5**

**5**  28:19 38:24 39:2,5
39:11,18,22 40:1,14
40:18,19 41:14,15
42:2,11,19,24 43:2
43:3,5,7,15,23 49:2
79:19 80:20 81:3
105:11 107:7,8
108:5,5 110:22
111:4 113:22
**50**  29:19 53:16
72:20
**51**  53:16
**510**  3:10
**52**  53:16
**53**  29:19 53:17
**53.a**  127:21
**5335**  1:22 2:21
131:24
**54**  29:19 39:14,17
40:5 53:17 89:25
**55**  29:19 53:17 93:5
93:7
**56**  29:19 53:16
**57**  53:17
**58**  53:17
**59**  29:19,20 53:17
104:19

**6**

**6**  4:6 28:23 44:2,4
94:4,13,14,14,19,22
94:22 95:2
**60**  29:19,22
**61**  29:23 93:13,23
**62**  29:23 99:19,21
100:11,16

Veritext Legal Solutions
866 299-5127

**63** 29:23
**64** 29:23
**65** 29:23,25 30:1 53:17
**678-3800** 3:21

**7**

**7** 20:19 21:1 28:2 29:3 43:1 53:21
**7/29/2016** 131:18
**70** 53:21
**72** 53:21 101:13
**73** 53:21
**74** 53:21
**75** 53:22
**76** 53:22
**77** 53:22
**78** 53:22
**788-5100** 3:10
**79** 53:22

**8**

**8** 29:4 39:20 43:1 50:17,19 79:24
**81** 105:10 107:16 110:21 111:3 113:2 113:21
**83** 29:23 30:1,7,8
**84** 30:10 53:22
**86** 102:25 103:1,11
**88** 53:22
**89** 53:22

**9**

**9** 29:5
**91** 103:13
**92** 104:4
**92606** 5:14
**93** 30:10
**94** 30:10 104:23
**94104** 3:20
**94704** 3:9
**95** 30:11
**96** 30:11 105:8 106:18 109:24 110:4,9,12,20 112:5

112:15,17 113:20
**97** 30:11
**99** 30:11
**9:03** 2:18 5:2,5

**a**

**a.m.** 2:18 5:2,5 69:20,24
**ability** 35:23 71:11
**able** 7:11,15,23 8:14 18:22 21:15 22:6 23:12 27:21 34:7,15 42:8 49:14 50:4 51:7 53:6 54:5 55:21 56:13 61:4,22 62:4,19 64:7 71:16 80:18 81:1 82:20 86:13,21 89:12,16 89:21 90:2,24 103:9 105:4 114:16 115:6 123:18
**academic** 13:23 14:6,7 25:8,9
**acceptable** 95:22
**account** 84:13 98:17 104:25
**accounts** 9:7
**accuracy** 84:17,22 85:1,5,9,12
**accurate** 43:10,12 73:21,24 74:4,6,17 76:7 77:11,19 83:23 105:20 113:8
**accurately** 73:18 76:4
**acknowledge** 80:10
**acronym** 16:24 17:8
**action** 6:1 9:15,18 17:5 131:15,15
**activated** 74:21
**activities** 113:10 114:9
**activity** 45:15
**actual** 15:23 52:5 56:19 105:12,14,18

105:21,23,24 107:2 111:5,6,11,11,13,15 111:22,22,23,24 112:7,8,9,20 113:23 113:24,25 129:15
**add** 31:23 32:9
**added** 101:16,19
**adding** 96:19
**additional** 30:18 105:1 124:16
**address** 37:23 38:8
**adequate** 95:17,20
**administered** 6:18 10:2 65:19,23,24 66:7,14 131:6
**adrian** 1:15 2:15 4:3 5:8 6:9,17,25 130:21
**adult** 58:21 59:10
**affect** 55:8 56:5,9
**agency** 1:9 2:9 5:17 17:1,10
**ago** 7:10,13,15 15:6 68:19 111:9
**agree** 5:20 90:14,19 91:11 92:5,19 94:3
**ahead** 40:12 63:10 94:19 102:24 109:8 126:14
**al** 5:16,17
**allow** 70:6 71:11 72:15 78:6 79:8 129:19
**ambiguous** 15:22 32:2 38:18 46:21 60:10 65:17 70:15 70:16 90:22 98:20 99:7 119:8
**amended** 128:8
**america** 8:10,11
**amount** 22:19 81:8 83:8 113:8 114:8
**amounts** 94:12
**analysis** 8:2 9:7 18:12 21:8,11 41:24

49:16 50:10 51:1,9 56:1,5,7,9,14 84:4 84:16,20,24 85:3,7 85:11 87:2,18,21,24 88:9 98:4,17 101:24 104:21 115:25 116:5 123:23,24 127:7 128:6 129:17
**analyze** 83:8 102:4 102:10,17,21 114:19,20 120:23 122:24 123:1 126:20
**analyzed** 101:25 102:6,7,9 120:13,16 120:17,18 121:3,7 122:4
**analyzing** 9:6 14:17 15:1,2
**answer** 12:16 16:1 17:21 27:9 34:17,19 36:9,22,24 37:10,13 37:16,16,17,18,20 38:2,12 58:4,23 61:14 63:15 65:19 65:21 66:6,24 80:6 81:25 87:10 88:16 89:1 90:24,25 91:4 91:16,19 92:23 96:19 105:17 110:16 113:18 114:11 125:16,23 127:4,17
**answered** 51:10 66:5 92:21 121:2,6
**answering** 63:24
**answers** 57:18
**anybody** 78:22
**apc** 70:22 71:2,5 72:24 73:9,12,14,17 73:24 74:16 75:12 75:17 76:4,9,13,16 76:17,20 77:4,6,9 77:17,20,23 81:8,11 81:15 83:5,7 86:12

Veritext Legal Solutions
866 299-5127

86:13,19,22,23 87:2
87:3,5,17,20 88:6
88:16,17 89:1 93:25
105:18,19 107:25
108:9,21 109:15
116:1,4,13,14,18,19
117:2,17,22,25
118:5 119:4 120:5,7
120:11,15,17,18,22
120:23 121:1,5,9,12
121:14,17,23 122:3
122:6,22
**apologize** 26:12
27:7 28:8 30:4
32:21 64:16
**apostrophe** 103:21
**appear** 26:16 81:6
**appearance** 6:4
**appearances** 3:1,13
**appearing** 6:11
**appendix** 13:15
34:24 39:2,5,8 43:7
**apples** 91:14
**apply** 73:1
**approach** 84:6
**approaches** 84:9
**appropriate** 60:4
84:5 92:5 98:25
101:10
**approximate** 112:12
**approximately** 7:7,9
7:11,16 18:6 21:16
22:3 23:7
**area** 25:3,3,5,7 69:3
72:11 75:4 117:13
118:14,15
**arrival** 44:21
**arrive** 81:13,20
**arrived** 44:20 47:9
56:24 78:11 79:22
103:16 104:19
**arriving** 80:6
122:25 123:3
**article** 14:16,25 15:2
15:4,13

**articles** 13:22 15:10
**ascertain** 103:23
**aside** 26:5 61:3
64:13 93:14 102:13
**asked** 13:17 31:7,22
37:18,19 44:7,10
63:25 107:22 110:9
124:11,18,19 125:7
125:8,10,12,15,21
125:25 126:6,6,7,9
126:10,22 129:20
**asking** 12:2,4,15,17
17:18 34:21,24
35:19 36:7,8 41:10
51:20 58:9,10 64:1
73:6 79:12 84:1
88:14 91:17 97:12
97:23 106:5 120:21
125:5,5 126:5,6
129:23
**aspects** 56:7,9
**assess** 78:25 79:13
117:24 118:4
**assignment** 44:15
44:17,24,25 45:7,9
47:3,4,14,15 48:2,5
48:23 82:19 84:19
84:23 85:2,6,10,14
86:14 89:24 96:1,2
96:15,16 97:7,12,14
97:18,25 98:18
102:19,20 115:1,3
126:15,16 127:6,14
127:15
**assignments** 46:4
127:23
**assume** 86:17 90:12
90:17 91:9,23
107:25 108:9,11,14
108:15,17,18,19
109:12
**assumed** 103:15
**assumes** 126:12
**assuming** 73:2,17
90:13,19

**assumption** 91:7,11
91:19 103:24 108:3
109:7,20
**atlantic** 14:1,8,14,22
15:13
**attachment** 13:11
38:23 39:11 40:1,14
40:18,19 41:14,15
42:2,11,19 43:15,23
49:2
**attempt** 57:14,18
**attest** 89:13
**attested** 83:9
**attorney** 3:18 58:7
131:15
**attorneys** 3:7
**audio** 5:19
**automatic** 116:23
117:3,4,7,11,14
118:25 119:15,19
120:1
**available** 32:8 87:3
87:6,17,20 121:15
121:20
**avenue** 3:8
**average** 57:15,16
73:2 79:23 80:7
82:7 87:24 88:9,18
92:6,7,8,12,20 93:2
103:16 106:1
**averages** 76:20,21
76:21 107:23
**aware** 17:2 41:4,6
61:8,10,19 65:12
66:1,6 71:19 72:4
87:16,19 99:4,11,16
102:16 114:7 118:3
118:19 121:21
122:1 124:13

### b

**b** 3:6 29:17
**back** 16:11 26:25
30:2 32:23 36:2,6
36:11,25 38:5 40:6

42:24 51:16 60:22
69:23 72:1 74:9
77:15,21 78:2 79:18
81:25 82:13 86:1
87:10 95:8,8 96:10
109:10 115:20
125:19 128:17
129:1,8,19
**backup** 102:10
**bad** 62:15
**balance** 100:18,25
**banking** 9:6
**base** 116:1,5
**based** 25:8,9 48:17
48:19 51:24 72:24
81:8 86:17 94:3
95:25 96:13 105:25
111:9 112:17 123:5
123:21,23 124:3
**basic** 45:12,14
**basis** 73:23 74:15,24
103:10 105:4
**bathroom** 128:13
**beginning** 2:18
69:23 115:19
**begins** 79:21
**behalf** 1:5 2:5,16
6:12 8:20 118:8
**behavior** 14:17 15:1
15:2,5,14
**belief** 73:23 74:16
**believe** 12:15,20
14:1,11 15:11,18
17:20 19:12 21:18
26:1,4 29:7,8,9,10
29:11,12,13,14,15
30:3,10,10,10,11,11
30:11,12,12,12,13
30:14,15,24 31:16
31:21 43:25 44:16
46:6 49:23,25 51:3
51:5,10 52:4 55:13
56:2,21,21 59:16
60:20 65:13 66:5,21
67:8,16,25 71:1,5,9

Veritext Legal Solutions
866 299-5127

71:15 73:3,21 75:11
76:4,7,9 77:3,4,6
81:11 82:21 96:22
97:24 100:8,24
101:19 102:23
103:20 106:3
110:25 111:1,15,25
113:25 117:8
**believed** 130:1
**berkeley** 3:9
**best** 24:19 38:13,21
68:16 89:19 119:22
**better** 84:4,6 91:8
**beyond** 47:24 48:23
60:4,21 93:22
**bias** 71:17 78:13
**biased** 62:16 70:8
70:14,21 71:13
72:18 78:8,18,24
79:10 80:4,21 81:5
81:7,9 82:22 83:4
113:15
**bit** 64:21
**blocks** 103:19
**books** 8:2
**break** 64:20,23
69:12,16 85:16,18
91:21 115:10
119:24 128:10
**bring** 129:7,19
**broader** 120:20
**bunch** 62:22
**burnside** 88:2,4,8
127:22,23
**business** 21:10

**c**

**c** 1:7 2:8 5:18,18,18
29:17 75:5
**cable** 89:20,21 90:12
90:14,17 91:9
**cal** 24:5,8
**calculate** 104:14
**calculated** 95:24
96:13

**calculating** 92:11
**calculation** 45:25
47:12 48:1 89:22
92:6 93:3
**calculations** 44:18
44:22 45:1 46:16,24
47:5,16 48:4,17,19
49:10,12 56:4 87:8
87:14 89:8,11,12,15
115:3,5 124:6
**california** 1:2,16 2:2
2:18 3:9,20 5:1,14
20:2 131:2
**called** 23:5 116:13
**calls** 11:7 127:3
**caption** 5:15
**car** 89:20,21 90:12
90:15,17 91:9
**cards** 47:20,23
**case** 5:15,17 8:1,4
8:20,24 9:2,5,9,13
9:15,17 12:6 16:6
16:15,22 17:6,11,18
17:19,22,25 18:3,7
18:11,17,20,23 19:1
19:7,8,14,14 21:19
21:21,22,23 22:1,4
22:7,13,13,13,17,19,22
22:23 23:2,5,16,22
24:1 40:25 41:12
52:15 56:20 60:17
80:9 83:20,21 84:5
84:8,18,22 85:1,5,9
85:13 86:20 93:17
95:22,23 98:6
107:11 108:21
109:14 114:25
115:4 118:13
121:12 131:12
**cases** 7:23 16:18,20
19:10,12 21:7,13,16
22:12 23:7,13
129:25
**categories** 77:3

**category** 91:25
**caveat** 53:10
**cellular** 5:23
**cen** 24:11
**center** 24:11
**certain** 27:18 58:23
91:25
**certainly** 10:9 13:1
24:17 25:18 57:4
124:11,18 129:11
**certified** 2:17,20 3:3
6:12 131:1
**certify** 131:2,14
**chance** 54:23 55:20
64:20 129:2
**change** 23:3 31:5
55:12 129:12
**changes** 128:8
**changing** 22:18
23:17
**check** 30:2
**choices** 14:17
**city** 1:9 2:9
**civil** 5:17
**claim** 9:8,13 77:23
90:13,18 91:10,25
92:1,7,17,20 120:14
**claims** 23:8,22
**clarification** 74:7
**clarify** 17:17
**class** 2:17 3:3 6:13
9:15,18 17:5 52:5
53:19 55:25 56:15
56:19,24 84:8 99:17
**clear** 28:11 30:19
62:13 66:19 68:17
71:25 74:8 96:9
107:11 121:12
**coach** 50:21
**coached** 37:15
**coaches** 36:21
**coded** 108:18
**coerced** 66:11
**collaborated** 26:21
27:4

**combination** 25:9
**come** 51:16 95:7,8
**coming** 52:11 55:1
**comment** 55:21 56:4
60:3,17 108:25
**comments** 38:20
44:8
**compare** 105:14
112:20
**compared** 77:7
86:21
**comparison** 39:23
**compensated** 23:4
23:18 94:2,6
**compensation** 28:5
94:9
**complete** 46:11
**completed** 65:8,11
**completing** 82:9,17
128:22
**completion** 131:12
**complex** 47:11
56:10
**component** 60:14
**computations** 44:12
102:1,5,17,21
**computers** 35:5
**concerned** 74:11
**concludes** 130:20
**conclusion** 103:7
**conclusions** 124:1,3
**conducted** 79:13
**confirm** 118:9
**confused** 88:25
**connection** 16:6,14
**consequences** 58:3
58:22 67:7,25 68:25
**consider** 24:20,23
25:12 50:9 105:17
105:19 126:18
**considered** 43:8
**considers** 50:21
**consumer** 14:17
15:1,2,5,14

Veritext Legal Solutions
866 299-5127

**continue** 28:25
35:25 63:12,15
129:23
**continuing** 26:23
27:7 30:5
**contributed** 29:3,4
35:12 129:25 130:1
**conversations** 5:23
**convoluted** 90:15
**copies** 124:20
**copy** 11:10 125:2
**corporate** 2:17 5:14
**correct** 11:18,25
13:5,8,9 15:10
17:23 18:20 26:10
27:11,16,20 28:18
28:21 30:1,22,23
31:15,17 32:18 33:3
46:9,12 48:3,8,9
49:13 53:4 55:19
59:10 62:9 65:9
67:18 70:14,17
73:20 76:6,12,19,25
77:25 80:12 87:6
88:10 95:18 97:2
101:5 102:1 103:24
105:15,16,23 106:7
106:13 110:1,13
111:1 112:10 116:2
116:6 117:8 118:22
119:16,17 120:2,3
120:12,15 121:24
122:11,20
**corrected** 52:10,23
53:19 130:3,8
**correcting** 52:10
**corrections** 53:14
53:16 54:3,16,23,25
55:13,18 128:24
**correctly** 18:19,25
21:12 22:11 35:13
37:4,22 38:7,23
42:3 44:14 47:25
52:4 55:16 69:4
71:1 78:4 83:25

87:1 88:1,7 89:9
106:17 113:19,24
120:10
**counsel** 5:12 6:5
74:3
**counted** 104:20
**counter** 117:7
**counters** 116:24
117:12,15 119:1,16
119:20 120:1
**county** 1:10 2:10
19:22,24 20:7
**couple** 52:20 120:23
125:22
**course** 29:18 121:20
126:23
**courses** 121:25
**court** 1:1 2:1 5:10
8:24 10:2,3,10
12:22 16:10 25:15
26:24 32:22 36:1,2
36:10,24 38:4 57:1
64:25 71:25 74:8
77:14 81:24 87:9
96:9 109:9 125:18
**creating** 25:6,7
26:21 27:5
**creation** 26:3
**criteria** 97:1
**criticisms** 129:16
**critique** 112:16
**csr** 1:22 131:24
**current** 13:15
**customers** 9:14
**cut** 30:4
**cutting** 28:9
**cv** 13:12,16,17,25
14:15,20 15:17
20:22

**d**

**d** 7:2
**damage** 98:17
**damaged** 8:3

**damages** 95:25
96:13
**darrell** 5:15
**darryl** 1:4 2:4
**dash** 75:4
**dat** 57:9
**data** 23:22 34:11,13
34:16 38:25 40:24
41:1,3,7,7,8,10,16
41:16,17,23,25 42:9
43:22 48:22,25 49:1
49:2,3,3,8,8 70:23
71:2,5,6 72:25 73:9
73:12,14,17,24
74:16 75:12 76:4,9
76:14,16,17,20 77:4
77:6,9,17,20,23
81:8,11,15 83:6,7
83:11,12,22 84:5
86:12,13,14,19,22
86:23 87:2,3,5,17
87:20 88:6,13,16,17
89:1,4,5,6,7,10 96:1
96:1,2,15,15,16
97:8,10,11,13,14,18
97:25 98:7,8,19
104:17 105:12,14
105:18,18,19,20,21
105:23,24 106:7,13
106:14,14,16 107:2
107:25 108:1,9,12
108:17,18,21
109:15 111:5,6,11
111:11,14,14,15,20
111:21,23,24 112:4
112:4,7,8,9,14,20
113:23,24,25 114:8
114:10,15,17,19,20
114:21 116:1,1,4,4
116:7,14,14,16,18
116:19 117:18,21
117:22,25 118:5,9
119:4,10 120:5,8,11
120:13,15,16,17,19
120:22,24 121:1,3,5

121:7,9,10,12,14,17
121:23 122:3,4,6,22
123:1 124:21,22
125:3,5 126:22
127:7,14,16
**date** 22:9 131:16
**dated** 11:16 13:8
25:21 131:18
**day** 46:4,9,12 55:7
79:20 84:11,25
**dealing** 22:18
**dealt** 23:1,2,17
**dec** 83:24
**decade** 22:6
**deceased** 100:21
101:3
**decision** 88:3,8
**declaration** 57:8,21
60:8 64:6 65:14,24
65:24 66:2,7,12,14
67:1 71:7,15,21
72:6 76:11,23 77:8
79:17 80:4,11,21
81:4 82:10 83:6,10
83:24 97:11 99:18
100:3,5 106:8,9,9
106:10,23 107:6,13
114:3 123:6 124:4
**declarations** 64:8
65:8 67:17 76:15
82:6 100:1,4,7,7
105:23 106:4,13
111:8 123:23
**defect** 47:20,23
**defendant** 6:8,10
8:4,6,8,21,22 9:2
17:10,25 18:20,23
19:2 21:23 57:19
**defendant's** 10:25
122:9,17
**defendants** 1:11
2:11 3:15 19:1
**define** 61:23
**defined** 49:15

Veritext Legal Solutions
866 299-5127

**defines** 50:1
**definitely** 25:5
**definition** 48:10
  50:5,9,25 51:9 58:9
  61:4,6,7,9,11 62:1
  62:18,21
**definitions** 48:12,14
  51:2,4 61:12,18,22
  62:5
**demand** 10:25
**depends** 62:6 98:3
**deponent** 10:11
  12:23 25:16 36:24
  54:14 57:2
**deponent's** 36:8
**depose** 55:11
**deposed** 7:5,12,16
  7:22 9:1,18
**deposition** 1:15 2:15
  5:7,13 9:20 11:3,6
  11:23 12:13,19 17:8
  52:23 54:9 55:2
  109:6 128:20 129:3
  130:6,7 131:12
**depositions** 10:24
  11:1
**described** 40:1
  43:17 64:9
**design** 24:3
**designated** 129:6
**designed** 23:21,25
  71:16 107:5 114:3
**detail** 36:21 54:24
**details** 9:10 18:2,4
  34:5,6,11,16 62:6
  101:25 102:4,6,7
**determine** 57:15
  75:2 80:8 127:14
  128:3,4
**determining** 75:15
**developed** 44:13
  58:5,24
**device** 74:21 76:1
**devices** 74:25

**differ** 76:22
**difference** 30:25
  59:25 116:13 126:8
**differences** 71:8
**different** 12:3 21:21
  22:17 39:19 51:6
  53:20 63:24 70:24
  73:6 76:15 77:7
  79:2,15 84:10 92:12
  93:15 106:5 111:10
  125:22
**differently** 43:17
**differing** 35:21
**difficult** 80:7 106:2
**direct** 100:13
**direction** 131:8
**director** 24:9,10
  62:25
**disagree** 125:20
  129:21
**disagreed** 71:12
  72:7 80:12
**discredits** 76:17
**discussed** 23:15
  33:10 88:11 114:23
**discussing** 104:2
  109:25
**discussion** 90:1
**disproportionate**
  108:4
**disproportionately**
  106:19
**distinction** 31:10
**district** 1:1,2 2:1,2
**division** 73:19 74:1
  74:19 75:7,10,15,18
  75:20 77:21,25 82:9
  84:21 93:21 103:5
  103:19 104:11
  116:3 119:6 122:11
  122:20,22
**divisions** 44:20
  84:11
**document** 10:18,21
  11:20 12:10,24

25:23 26:5,20 27:3
  39:13 40:15,21,22
  42:14,18 43:14,19
  45:22 46:8 57:3,7,9
  57:11,13,14 59:13
  59:17 60:20,23 61:4
  65:3,9 67:7 68:8,24
  69:1,2,5,9 79:18
  80:16 93:14
**documents** 11:7,9
  12:4,17,21 38:25
  40:24 41:10,25 42:6
  42:9 43:20,21,22
  44:1 125:2
**doing** 9:7 18:13
  106:24 126:21
  127:7
**door** 75:6,6,18,19
  76:2 118:9,10
**doors** 74:22 75:14
  75:16 76:1,5,8
  119:1,5
**double** 90:22
**dr** 42:4 44:9,11
  54:15 55:14,17 73:4
  89:10 95:24 96:13
  97:4 99:4,9,11,16
  99:22 100:2,5,6
  101:16,19,25 102:5
  102:8,11,14,21
  103:15 104:25
  123:22 126:16,20
  129:13,17
**drafts** 31:5
**dress** 23:3
**driven** 46:18
**drogin** 73:4 95:24
  96:13 97:4 99:4,9
  99:11,16 101:16,19
  102:8,11,14 103:15
  104:25
**drogin's** 42:4 44:9
  44:11 99:22 100:2,5
  100:6 101:25 102:5
  102:21 123:22

126:16,20 129:13
  129:17
**due** 23:10
**duress** 65:15 66:3

**e**

**e** 7:4 8:17 24:19
  75:4,5,5 96:8
**earlier** 35:16 37:8
  47:9 63:5 104:16
**early** 50:22 70:7
  71:12,17 72:16 73:1
  73:14 76:22 78:7,11
  78:13 79:2,9,14
  81:12 104:12
**ease** 17:7
**economic** 14:1,8,14
  14:22 15:13 21:10
**edit** 53:21
**edited** 53:24 129:8
  129:10,12
**edits** 129:5
**education** 121:9
**efficiently** 54:12
**either** 14:2,4,21
  54:13
**electronic** 102:8,15
  102:18,22
**employed** 15:19
  16:2 22:8
**employee** 15:24
  16:3 131:15
**employer** 22:1
**employment** 15:23
  39:24
**entire** 33:20 37:20
  87:5
**entirely** 75:8 97:3
**entitled** 55:10 57:8
**entity** 17:13
**equipped** 119:15
**error** 53:1,18 55:24
  56:15
**errors** 52:20 53:2

Veritext Legal Solutions
866 299-5127

**essentially** 36:21
88:15 106:18
**estimate** 54:1 70:20
92:2,3 111:10 113:6
**estimates** 70:13 71:3
71:18 77:5,7,10,18
78:14 82:25 92:18
105:25 106:2,24
107:22 112:18
113:15 114:5
**et** 5:16,17
**evaluate** 69:6,8
126:16
**evaluating** 94:11
**everybody** 64:21
**evidence** 66:1 75:22
99:7 108:20 109:14
126:13
**ex** 112:2
**exact** 7:17 8:5 80:19
81:2,7
**exactly** 17:5 56:22
66:19 104:14
**exam** 54:24
**examination** 4:2
6:21
**examined** 6:18
**example** 42:13
58:16 63:17 88:2,4
88:9 106:11 107:8
**examples** 64:8 94:12
101:16
**exclude** 97:4
**excluded** 97:19,21
98:11 100:18,25
**excluding** 90:1
**exclusions** 101:9
**exclusively** 110:24
**excuse** 5:18
**exhibit** 10:12,13,19
11:10,21 12:10,25
13:4,11,15 14:15,20
15:16 20:19,23 21:5
25:16,17,20 26:3,6
26:9,13,15,20 27:3

27:14 32:12 34:2,8
35:9 37:24 38:10,24
39:8,18,20,22 40:3
40:18 41:14 42:2,11
42:12,14,25 43:12
43:14,15,19 44:3
49:16,25 50:5,11,14
51:1 52:2 53:3
55:19 56:14 57:3,7
57:20 59:12,16 60:8
60:20,23 61:3 63:20
64:3,17 65:3,8 69:5
69:11 70:4 78:4
79:6,18 83:16 86:7
89:11 90:1 93:13
94:4,13,13,14,14,19
94:22,22,22 95:1,2
95:16 99:22 100:11
100:17 103:14
104:3,23 106:10
109:24 113:20
114:13,22 115:8
119:13 127:19,20
**exhibits** 4:8 94:18
**existence** 114:7
**exists** 111:15,25
112:3
**expect** 107:14
**experience** 19:16
20:10,13,17 25:10
**expert** 21:17 24:3,4
24:7,21,24 25:2,13
25:21 30:22 31:2,19
60:6 62:12,23,24
63:3,16,18,19 64:2
64:4 67:2,21,23
68:4,9,14,20 69:2
71:10 80:2 82:20
83:2,18 84:7 95:21
97:6,17 98:10,16
99:21 100:6 103:9
109:6 120:11
123:18 129:7
**expertise** 25:3,6,7
60:5,21 68:7 69:6,8

72:12 117:13,14,16
118:14,16 120:14
120:22,25 121:1,4
**experts** 10:25 61:9
61:13,19,23
**explain** 41:5 68:21
91:7 93:6 105:4
109:5
**explaining** 36:20
**explanation** 32:10
**expressed** 100:12
**extent** 35:20 82:21
**extrapolate** 98:24

**f**

**f** 7:3 75:5
**fact** 52:24 61:16
75:21 99:6 101:4
105:14 106:7
126:12
**facts** 35:20
**failure** 23:9,9 70:6
71:11 72:15 78:5
79:8
**fair** 19:5 26:19 27:2
27:13,17 41:13
49:10 58:13,19 59:8
69:7 71:4 89:14
98:9 121:22
**false** 59:25 60:7,10
60:20
**familiar** 22:24 35:24
60:16 62:25 68:24
97:13
**far** 51:19,24
**federal** 131:12
**fence** 75:4
**field** 25:10
**fields** 117:22
**files** 102:8,15,18,22
**fill** 46:3,6
**fills** 46:8
**final** 43:5 100:16
**finalized** 53:13

**financially** 6:1
131:15
**find** 26:11 39:4,6
78:22 94:14
**finding** 15:4
**fine** 69:15
**finished** 55:2
**firm** 3:4
**first** 24:17 37:14
52:22 55:1 70:5
91:24 101:14,20
102:2 108:8
**fit** 97:1
**five** 64:22 85:20
92:3,7,18 106:19
107:1,16,17 111:7,8
111:19 113:1,8,11
113:12,13,17
**fixed** 53:23
**fixes** 52:11
**fleissig** 1:15 2:15 4:3
5:8 6:9,17,25 7:3
54:15 55:14,17
89:10 130:21
**flip** 40:12 94:19
95:12,14
**following** 64:2 79:19
**follows** 6:19 16:12
27:1 32:24 37:3
38:6 72:2 74:14
77:16 80:24 82:1
87:12 96:11 109:11
122:14 125:24
**footnote** 50:19
104:4 114:13,14
**force** 129:22
**forecasting** 21:8
**foregoing** 131:3,5,9
131:11
**forensics** 7:18 22:8
**forming** 38:25 40:24
41:11 42:1,15
**forth** 131:4
**forthcoming** 14:11

Veritext Legal Solutions
866 299-5127

**found** 51:23,25
**foundation** 46:22
  59:19 65:17 67:11
  67:20,20 72:10
**four** 7:10,13,15,19
  22:10 23:11 103:4
**francisco** 1:9,10 2:9
  2:10 3:20 5:16
  16:22,25 17:6,9,22
  18:7 19:8,15,18,21
  19:25 23:14
**frank** 7:4
**frequency** 46:5,13
**friday** 54:9 128:25
**front** 11:22 40:6
  49:24
**full** 6:24 9:10
**fullerton** 24:5,8
**fund** 20:5
**furst** 11:11,13,15
  13:7 25:21 26:21
  27:4,15 41:2,16,17
  41:20 48:13,15 49:1
  49:5,6,11,12,17
  50:15 83:12 86:15
  87:7,13,17 88:13
  89:17,19 90:3 93:10
  93:11 100:14
  101:23 103:8,12
  104:1,17,22 105:7
  114:18,21 116:9,10
  116:11,18,20 117:1
  117:19,23 118:2,6
  119:10 120:5,8
  123:7,24 124:25
  126:21,25 127:6,10
  128:5
**furst's** 56:6,7,14
  87:21
**further** 131:11,14
**furthermore** 79:20

**g**

**g** 3:5 7:4 24:19 75:4
  96:8

**gate** 82:8,17
**gates** 73:19 74:1,19
**gathering** 23:22
**gears** 69:13
**general** 9:22 57:25
  58:1 61:6 62:2 89:5
**generally** 9:4,8,12
  9:20 14:15,24 18:10
  120:24
**generated** 118:10
  119:4
**geo** 75:4
**geoff** 3:17 6:7 85:19
**geographic** 75:4
**geographically** 8:7
  8:23
**getting** 13:13 64:21
  93:4 112:18
**gil** 24:15,20 25:1
  63:6
**give** 7:17 10:14 31:7
  31:7,22 38:1 61:6
  80:5 105:19 113:14
**given** 125:22 130:21
  131:10
**gives** 76:7
**giving** 107:21
**go** 5:20 30:2 63:10
  64:22 75:14 95:3
  107:21 109:8
  126:14 128:9
  130:16
**goal** 62:7
**goes** 50:23
**going** 15:21 32:1
  35:17,18 52:9,11,23
  53:14,15,23 55:8
  56:2 62:10 64:14
  67:19 69:20,23 72:8
  73:1 77:21 78:2,13
  85:23 86:1 90:21
  93:8 96:19 99:1
  101:22 108:8,24
  112:3 114:4 115:16
  115:20 122:22

  128:12,14,17 129:9
  129:18 130:3
**good** 5:4 6:23
  130:12
**grandberry** 1:4 2:4
**greater** 72:20
**griffin** 1:4 2:4
**gspellberg** 3:22
**guess** 22:25 40:7
**guidance** 38:15

**h**

**half** 65:1
**hand** 25:16
**handle** 54:12
**hang** 53:9
**happened** 118:12,20
  118:21,23
**happens** 78:21
**hard** 107:21 111:11
  113:25 114:7 125:2
**hear** 8:14 32:20
  51:22 87:11 102:3
**heard** 29:20,25
**hedy** 1:4 2:4
**held** 5:13
**help** 48:25 109:19
**helpful** 28:13
**high** 106:19
**highly** 112:18
**highway** 20:4,4,9
**hold** 10:15
**holding** 120:11
**holtzman** 3:16
**hope** 98:23 112:24
**hoping** 54:4,7,8,9
**hour** 21:16,22 22:4
  22:12,17,20,23 23:5
**hours** 65:1
**huh** 126:3
**hyphen** 24:19
**hypothetical** 72:9
  75:22 90:23 91:15
  92:10,12,22,25
  119:8

**i**

**idea** 59:1,2 64:10
  118:20,23,24
  127:11
**identified** 28:17
  30:20 31:14 32:17
  33:2,8 35:16,21
  37:8 52:13,14,16,17
  52:21,22 53:1,3
  62:19 70:12,19
  76:10 82:9,17 88:2
  115:7 129:24 130:2
**identifies** 38:24
  52:18
**identify** 6:6 27:21
  28:11 34:7,15 40:23
  54:15 55:18 62:19
  88:3
**imagine** 92:16
**impact** 56:3 84:17
  84:21,25 85:4,8,12
**impacts** 55:25
**important** 50:10
  126:19
**inaccurate** 60:13
  70:9 71:3,13 72:18
  74:2 77:5 78:9,19
  79:11 99:2 108:22
  109:16
**inaccurately** 76:10
**include** 97:4
**included** 42:23
  43:11,12 89:22 97:1
  97:8,19,21 98:2,11
**includes** 12:12 44:5
  79:19
**including** 76:21
  79:1,14
**incomplete** 72:9,9
  75:22 90:23 91:15
  92:10 119:8
**incorrect** 52:6 62:17
  73:5 78:14 89:3
  103:25 108:9,18

113:15
**incorrectly** 73:8
**increments** 105:11
106:20 107:1,16
110:22 111:4,7,19
113:1,11,12,21
**index** 4:1
**indicate** 125:16
**indicated** 14:21
128:25
**indicates** 76:9 77:4
**individual** 63:4
**individuals** 95:25
96:14 98:18
**industries** 23:12
**industry** 16:3 19:17
19:19,20 21:25
23:15
**inefficient** 129:22
130:3
**information** 31:23
32:7 41:18,21 42:22
43:8 60:7 62:8,10
73:15 76:11,18 79:2
80:3,20 81:3,12
82:5,22 83:3 100:9
105:22 106:6,12
112:6 123:6 124:24
**initial** 50:14
**injury** 21:9
**inspections** 47:19
**installed** 74:25
**instances** 44:19 45:2
46:17 94:5 122:10
122:19
**intending** 31:19
35:14 37:6 53:4
**intentional** 60:13
**interested** 6:1
131:15
**interference** 5:24
**internally** 52:17,19
52:21
**interposed** 37:9,12

**interrupt** 63:14
**interruption** 10:16
21:10
**interval** 107:8
**intervals** 108:5
**involve** 7:25
**involved** 7:23 8:1
16:23 17:22 18:5,5
20:7,8 23:13 26:4
45:16 54:19 63:7,21
64:5 88:3,5,8 94:10
94:11 98:7
**involving** 16:21
17:20 18:7,18 19:9
19:10,15 23:22
**irvine** 1:16 2:18 5:1
5:14
**issue** 22:21 61:17
62:8
**issues** 18:15,15,18
19:9,15 35:20 69:2
69:9 84:12 85:8
123:12 129:6
**items** 8:3 12:13

**j**

**j** 24:19
**jargon** 68:24
**jby** 3:12
**job** 1:23
**joel** 3:6
**joint** 33:14,17
**jonathan** 57:9
**journal** 13:22 14:2,7
14:9,12,14,16,22,22
14:24 15:4,13,14
**journals** 13:24
**july** 1:17 2:19 5:1,6
127:24
**june** 11:16,19 13:4,8
20:23 43:6

**k**

**keep** 30:5 112:22
116:10

**kind** 46:6 48:1
57:14,18,18 78:25
79:13 107:6
**kinds** 18:12
**know** 15:6 34:6,12
39:5,7 40:3 42:17
42:20,23 45:10
46:13 51:13 52:12
52:25 53:12 55:1,10
56:6,17 59:23 61:25
62:23 65:18,21,22
65:22 66:13,14
67:22 72:21 75:23
81:7 85:15 93:19
95:7 104:18 113:18
118:13,17,25 119:4
121:18,19 123:16
127:17 128:7
129:16
**knowledge** 32:4,11
32:15,16,18,25 33:3
33:9,11,12 34:4
38:2,13,17,19,21
118:12 119:23
**knowledgeable** 34:1
34:3,8,10,13,16
35:7 37:19 123:11
123:13
**known** 75:4

**l**

**l** 7:4 8:17 24:18,19
**labeled** 40:17,19
95:2
**lack** 59:18 65:16
67:20
**lacks** 46:21 72:9
**laid** 94:3
**lam** 57:9
**language** 60:3 71:21
72:5 80:11
**large** 106:25
**late** 50:23 57:15,17
73:4 76:12,14,19,25
77:3,21,24 80:6

81:16 83:1,5,9
93:20,24 94:5
104:21 111:22
**laura** 24:15,20 25:1
63:6
**law** 3:4,7,18 10:3
**layperson's** 58:11
58:15 59:24
**leads** 107:6
**learned** 62:20
**leaving** 78:17
**legal** 5:11 58:9 60:2
60:15 67:7 68:8,9
68:10,23 69:1,5,9
80:15 130:23
**level** 36:21
**library** 8:2
**life** 58:21 59:10
**limited** 35:22,23
97:15 119:14
122:10,18
**lindsay** 1:21 2:20
5:10 131:23
**list** 12:13 40:15,21
43:7
**listed** 13:25 29:25
41:14 42:2,6,10,22
43:15,21,23,24
94:12 115:7
**listening** 109:8
**lists** 41:9
**little** 64:21
**locate** 94:19
**located** 8:8 117:12
**location** 76:5 79:22
79:23 81:13 103:4
103:18 123:16
**locations** 81:20
122:25 123:4,9,14
123:20 124:2,8,15
128:1
**log** 45:11,18,22 46:6
46:8
**logs** 45:3 46:3,20
93:17,20 124:20,23

Veritext Legal Solutions
866 299-5127

125:2,6,9,11 126:1
126:9,10,20 127:1
127:10
**long** 59:5 80:8 85:19
105:25 107:23
111:9 113:9
**look** 25:25 26:6
27:24 42:21 50:7
51:13 54:5,6 55:20
64:17 77:1 83:11
84:10 87:2 88:6,12
89:4 98:4 110:9
114:10 126:19
**looked** 53:9,12 98:5
120:7 121:10,11
122:21,21 127:11
**looking** 10:18 12:10
30:9 40:17 62:7
73:13 95:4 110:10
**looks** 43:12 53:14
53:18,22 83:21 87:4
**lost** 9:14 109:20
**lot** 12:9 33:13 34:4
34:11 56:3 84:4
92:22 107:17
**lots** 84:12

## m

**machine** 131:7
**madam** 10:10 12:22
16:10 25:15 26:24
32:22 36:1,2,10
38:4 57:1 71:25
74:8 77:14 81:24
87:9 96:9 109:9
125:18
**majority** 106:25
**making** 81:22 90:13
90:18 91:10,25 92:1
92:6,13,17,20,22,25
101:4
**manipulate** 49:3
**manner** 85:12 91:22
**manufacturers**
116:23

**marked** 10:12,18
12:24 25:17
**market** 21:11
**marks** 69:18,22
115:14,18
**mary** 11:11,13,15
13:6 25:21 26:21
27:4,15 41:2,2,16
41:17,20 48:12,15
49:1,4,6,11,12,17
50:14 54:6 55:1
56:6,7,14 83:12
86:15 87:7,13,17,21
87:22 88:12 89:17
89:19 90:3 93:9,10
93:11 94:8 100:13
101:6,11,23,23
103:8,12 104:1,17
104:22 105:7
114:18,21 115:9
116:7,9,10,11,11,15
116:18,20,25,25
117:19,23 118:1,1,6
119:3,9,10 120:5,8
123:7,24 124:25
126:21,24 127:6,9
128:5
**match** 105:12 107:2
111:5,20 112:3,7
113:14,23 114:1
**matched** 86:14 96:2
96:17 98:1 100:20
101:2
**material** 62:25
**materials** 102:11
**max** 76:21
**maximum** 76:21
**mean** 15:23 29:17
30:4 33:11 36:12
39:18 41:5 42:4,16
43:11 48:16 52:16
52:21 53:25 54:6,13
54:18 59:2,20 61:14
61:24 62:7 63:14
64:25 67:15,21 68:8

68:23 75:13 78:10
97:10 98:15 99:8
100:6,23 109:18,19
110:17 113:24
123:15 125:21
**meaning** 68:10
**means** 35:4 57:24
58:6 60:12
**meant** 68:21 78:20
100:24
**measures** 75:9
**media** 69:19,23
115:15,19 130:22
**members** 53:19
56:16,19,24
**memory** 31:6
105:25 106:24
107:21 108:2 111:9
**mentioned** 63:4
88:16 89:1
**methodology** 97:3
129:17
**microphones** 5:22
**middle** 7:2
**millions** 34:25
**milnikel** 1:21 2:20
5:10 131:23
**mind** 30:25 56:8,18
**minimum** 76:22
**minor** 52:25
**minute** 50:22 103:5
106:19 107:7
**minutes** 47:6,8,17
50:23 51:8 57:15,16
64:23 79:24 80:19
81:2,12,19 82:7,11
82:16 83:2 85:20
92:3,4,18,19 94:1
103:3,17 104:15
105:11 107:1,8,8,9
107:15 108:5,5,6
110:22 111:4,7,8,12
111:19 113:1,8,11
113:12,13,17,22
115:11 128:11

**misleading** 106:14
**missed** 71:23 102:2
**missing** 43:16
**misstated** 26:12
**misstates** 80:13
**mistakenly** 62:15
**model** 94:3
**modify** 129:13
**moment** 25:18 26:6
36:4 57:4 64:18
68:19 93:14
**morning** 5:4 6:23
**multiples** 107:16
**municipal** 1:9 2:9
5:16 17:1,10

## n

**n** 7:2 8:17 74:6 75:5
96:8
**name** 5:9 6:24 7:2,3
8:5,13 14:12,23
15:3 24:12,13,15,17
24:18 63:4 127:22
131:17
**nearest** 107:7
**necessary** 83:19
**need** 27:24 62:11
67:5 86:15 90:6
93:9 101:22 103:8
104:1 105:6 106:15
106:23 108:19
109:12 115:9
128:23 129:18
**needs** 73:15
**negative** 90:22
**neither** 131:14
**never** 63:1
**new** 8:18
**noise** 32:19
**nonresponse** 90:6
95:17,22
**north** 8:11
**northern** 1:2 2:2
**note** 5:19 52:7

Veritext Legal Solutions
866 299-5127

**noted** 130:25
**notice** 10:24 11:3,7
11:23 12:19
**nots** 12:9
**number** 5:17 26:13
28:12 31:13 44:19
45:2 46:1,17 47:6,8
47:17 53:1,19,20
56:15,19,24 64:18
69:19,23 80:19 81:2
81:12,18 82:7,11,15
83:2 84:9 92:16
94:16,17 106:19
108:4 115:15,19
128:4,8 130:22
**numbered** 21:2
39:14,14 40:10
95:13 127:21
**numbers** 31:4 97:25
100:19 101:1
107:15
**numerous** 21:6,13
65:7 102:15 129:24

**o**

**o** 7:3 24:19 75:4
**oath** 6:15,18 9:24
10:1,2 70:2 86:5
115:23 131:6
**object** 15:21 32:1
35:17 37:14 67:19
72:8 90:21 108:25
**objecting** 36:13
**objection** 36:17,20
37:1,10,13 59:18
60:9 65:16 75:21
80:13 91:13 99:6
119:7 126:12
**objections** 6:3 66:4
91:14 92:9 99:13
**observation** 35:3
**observations** 34:25
35:1
**obviously** 34:12
54:7 55:6,9 71:17

**occasionally** 17:13
**occurs** 75:19
**october** 127:25
**offer** 31:19,25 33:23
33:25 38:15 60:6
67:2 68:14 80:18
81:1 82:20 97:17
98:17 101:8 103:9
123:18,21
**offered** 92:18 95:16
119:12 122:8,16
124:14
**offering** 27:19,22
30:21 31:2,12 73:7
80:2 83:18 93:6
98:10 106:18 123:2
123:5 124:7
**offset** 115:4
**offsets** 114:23,24
115:7
**offsetting** 47:6
**oh** 25:5 27:6 59:7
69:14 94:14 95:3
**okay** 10:14 13:2,13
20:25 21:3 37:2
39:12 40:2,11,14
44:4 49:2 50:16
51:17,17 52:3 60:24
61:2 63:7 69:17
73:8 80:1 86:10
95:10,15 101:17
112:22 115:13
128:12 130:9,15
**once** 129:8,8 130:5
**ones** 13:25 30:16,21
30:21 31:6 33:12,14
**onward** 30:7
**open** 49:3 75:14
76:1 78:17 119:1
**opened** 74:22 75:16
76:2,5,8
**opening** 75:6,18,19
**openings** 118:9,10
**opens** 75:5 119:5

**operated** 47:7
**operation** 15:20
17:20 18:1,8 19:3
**operations** 16:7,17
16:21 19:11
**operator** 45:3,10,16
45:18,19,22 46:3,7
46:8,20 65:14 66:2
66:11,17,22 67:3
71:20 72:4 75:5
78:11 80:10,21 81:4
86:24 87:2,3,20
91:24 92:2,3,16
93:16,20,24 94:2,5
94:6 96:25 100:20
100:21 101:2,3
103:2 104:19 106:4
124:20 125:1,6,9,13
126:19,25 127:10
127:15,22
**operator's** 103:16
**operators** 44:20
45:3 46:2,17 47:7,9
47:18 65:7 67:16
70:6,13,20 71:2,11
72:15 73:2,18,25
74:18 76:10,18
77:10,18 78:6 79:8
80:9 81:13,20 82:6
82:8,16,25 83:3,8
86:22 88:11 89:20
89:21 90:12,15,17
91:9,23,24 92:1,16
92:17 93:19 95:6
97:7,17,24 103:21
104:11 105:2,22
106:6,12,20 107:7,9
107:18,20 108:2,6
112:6 113:4
**opine** 44:10
**opinion** 27:19,23
30:22 31:3,12,19,22
31:25 33:23,25
35:19 36:7,8 38:1
39:1 55:12 60:2,6

61:16 66:8,10,15,16
67:2,24 68:1,14
69:1,3 71:10 72:12
76:17 80:2,16,19
81:1 82:20,23,24
83:2,18 84:7 93:6
95:17,19,21 97:6
98:10 101:8 103:9
103:10 105:5
106:18 110:12
123:2,11,18,21
124:7 125:4 127:13
129:15
**opinions** 28:6 31:7,8
32:8 40:25 41:11
42:1,15 55:9 73:7
97:17 98:16 100:12
119:12,22 122:8,15
123:5 124:9,10,11
124:13,16 129:13
**opposed** 116:14
**option** 70:7 72:16
78:6,12 79:1,9,14
**options** 80:6
**orange** 19:22,23
20:6
**oranges** 91:15
**order** 101:24 126:20
**organized** 117:18
**original** 131:12
**orleans** 8:18
**outcome** 6:2
**outside** 19:21 44:24
44:25 45:6,8 47:2,4
47:14,15 48:2,5
68:6
**overlap** 35:20 130:1
**overtime** 18:16,18
19:9,15 23:9,23
94:1,4 95:6 105:3
**ow** 89:4,4
**owa** 100:19 101:1

Veritext Legal Solutions
866 299-5127

| **p** | 31:10,11,13,14,16 | **performance** 20:14 | 24:16 25:16 26:6,25 |
|---|---|---|---|

**p.m.** 2:19 85:24 86:2
115:16,20 128:15
128:18 130:20,25
**page** 20:19,21 21:1
26:9,16,17 28:2
39:11,14,25 40:1,5
40:10,10,17,18,23
44:2,4 50:17,19
52:2 69:10 70:4
83:15 86:8 87:23
93:12 94:16 95:12
95:13,14,15 101:12
103:13 114:12
127:19,20
**pages** 1:25 39:14,16
40:6,13 43:1 94:17
**paid** 28:5 93:25 94:4
105:2
**paragraph** 20:20
21:1 28:12,17,19,23
29:3,4,5,6,7,8,9,10
29:11,12,13,14,17
35:9 37:24 38:10
42:24,25 43:2,3,5
44:5 52:2 53:15
55:24 61:1 64:11,18
70:5 72:14 73:7,8,9
73:12,13 78:2,3,17
79:6,19 80:20 81:3
83:17 86:9 89:25
93:5,7,13,23 99:19
99:21,25 100:11,12
100:16,24 101:13
101:14 102:25
103:1,11,13 104:3
104:23 105:8
106:17 109:24
110:3,9,12,20 112:5
112:15,17 113:20
114:22 115:8
127:21
**paragraphs** 30:14
30:20,24 31:1,2,5

31:10,11,13,14,16
31:18,21 33:10
35:11,15,21 37:7
38:16 53:16 129:24
130:2
**parameters** 48:18
**park** 2:17 5:14
**parking** 47:18
**part** 29:5 38:2 42:20
58:7 82:19 84:19,23
85:2,6,10,14 89:1
89:24 101:21 102:2
115:1,2 117:16
126:15 127:6
**participate** 13:18
24:25 26:2
**participated** 28:6
29:15 33:12,14
**particular** 45:16
62:8,9 86:23
**parties** 5:20 18:5
**parts** 27:13,15 31:24
32:9,17 33:2,8 34:2
34:7 56:13
**party** 5:25 131:15
**passenger** 116:23
117:3,7,12,15
118:25 119:15,19
120:1
**pay** 23:9,9
**payroll** 96:1,15
**penalty** 10:6 57:21
57:23 58:6,11,17,20
59:5,9,13 64:8
67:17
**people** 22:18 23:3
23:17 52:5 73:14
97:4
**percent** 72:20
107:16 113:2,16
**perform** 48:1,4
63:22 101:24 113:9
114:9,24 115:3,5
117:24

**performance** 20:14
48:8,11,15,21 49:15
50:1,6,10,25 115:25
116:5 119:14 122:9
122:17,24 123:3,8
123:14,19 124:2,8
124:15
**performed** 41:23
44:18 45:1,25 46:16
47:5,16 49:11 99:4
99:9 123:24
**performing** 21:7
47:19
**period** 80:8 87:5
105:25 107:23
127:24
**periods** 39:24 86:22
**perjury** 10:7 57:21
57:23 58:6,12,17,20
59:5,9,13 64:9
67:18
**person** 80:5 90:7
**personal** 21:9
**personally** 41:11
118:7
**pertains** 131:11
**ph.d.** 1:15 2:16 4:3
5:8 6:17 130:21
**phrase** 78:16
**physically** 117:11
**pick** 5:22
**piece** 101:20,21
**place** 5:20 32:16
33:1 131:4
**places** 48:7 53:20
**plaintiff** 8:21
**plaintiffs** 1:7 2:7,16
3:3 5:12 6:12 10:24
44:11 52:15
**plan** 129:1
**planning** 20:11
**plausible** 113:7
**please** 5:19 6:4,6,15
6:23 7:1 10:11,15
12:23 13:10 16:11

24:16 25:16 26:6,25
28:1,8 29:1 32:23
36:3,11,23 38:5
44:2 50:13 51:15
52:1 56:12 57:2
60:22 63:15 64:16
69:10 72:1 74:9
77:15 79:5 80:23
81:25 83:15 86:8
87:10,23 90:12,17
91:9 93:12 96:10
101:12 102:24
109:10 114:12
115:11 122:13
125:19 127:18
**point** 28:3 33:7 68:1
111:17
**points** 44:20,21
**poor** 99:1
**poorly** 107:5 114:3
**population** 62:11,14
84:14,15 97:5,22
98:24,25 112:4,4,11
112:12,14,19,25
113:3,4,6,14 114:4
114:24 124:5
**position** 130:10,11
**possibility** 78:17
**possible** 35:1,2
113:7 127:13
**post** 47:19
**practice** 25:10
**precise** 114:5
**prepared** 31:25
33:23 35:8 37:23
38:8 54:15 55:18
**preparing** 43:9
63:20 64:3
**present** 6:5 21:19
22:13,15 109:6
**presents** 110:12
**pretty** 18:9,18
**previously** 10:12
12:24 17:18 25:17

Veritext Legal Solutions
866 299-5127

**printed** 14:3,4,21
**printout** 120:4
**prior** 81:13 119:1,5
  131:5
**private** 5:23 18:1
**probability** 21:9
  72:20,21
**probably** 22:9 41:3
  41:5
**problem** 64:24 65:1
**proceeding** 6:3
**proceedings** 10:16
  131:3,5,7,12
**proceeds** 9:21
**processed** 116:13,18
**produce** 11:7 78:14
**produced** 12:5,6,13
**producing** 11:9,20
  12:7,18,20
**production** 10:25
**professional** 121:8
  121:13,15
**professor** 24:8,9
**project** 20:1
**projecting** 20:8
**proper** 109:6
**properly** 29:25
  55:21
**provide** 10:11 12:23
  32:8 38:20 41:17
  44:8 48:16 49:6
  57:2 61:4 64:7
  106:23 124:12,18
  126:25
**provided** 41:2,16,18
  41:20 48:12,15 49:1
  49:4 52:17 70:13,20
  76:11,18 80:3 82:25
  83:3 102:8,11,15
  105:22 106:6,12
  112:6 114:15,17
  117:22 120:5,8
  123:7,25 124:19,25
  125:8,10,12 126:1

**provides** 62:20
  81:11 92:2,3
**publication** 14:5,6
  14:13,19 15:12
**publications** 13:23
  15:15
**publiclawgroup.c...**
  3:22
**published** 13:19,20
  13:24
**pull** 73:18,25 74:18
**pulled** 88:13
**pulling** 77:24 82:8
  82:16 122:11,19
**purpose** 45:18
**purposes** 49:15
  108:16,22 109:16
**pursuant** 11:3 12:18
**put** 53:25 90:11

**q**

**qualifications** 28:2
**question** 12:2,9 16:9
  26:22,25 27:9 32:6
  32:20 33:5 34:18,20
  36:3,9,11,14,24
  37:16 38:5 42:17
  47:11 51:10,16,22
  54:11,13 56:10,11
  63:24 65:19 67:5,9
  68:6,11,12,17 72:1
  73:11 74:9 79:3
  80:5,23 82:13 86:11
  86:25 88:15 89:17
  90:3 91:6 92:21,23
  93:15 96:10,20
  97:16,21 98:13,15
  103:12 106:5,15
  108:16,20 109:1,3
  109:10,13,20,23
  110:6,8,8 111:18
  114:11 118:16
  119:21 120:21
  121:2,6 122:13
  124:10 125:14,17

125:22 126:2
**questions** 30:18
  37:17,19 38:12
  61:16 62:12 86:18
  100:13,15 101:15
  106:22 107:22
  119:10 129:9,15,20
  129:23
**quote** 43:6 44:6
  50:20 100:17
  103:14 105:9
  110:20

**r**

**r** 7:2,3 24:18,19 96:8
  96:8
**random** 44:12 99:22
**range** 96:2,5,6,17
  98:1 104:15
**ranges** 51:6,8
**rate** 95:17,20,22
**raw** 116:14,19
**reach** 103:7
**reached** 124:1
**reaching** 119:2,5
  129:1
**read** 16:11,12 26:25
  27:1 32:23,24 33:20
  35:3,6 36:2,6,11
  37:3 38:5,6 42:16
  59:3 72:1,2 74:9,14
  77:15,16 80:22,24
  81:25 82:1 87:10,12
  96:10,11 103:10
  109:10,11 122:13
  122:14 125:18,24
**reading** 73:8
**reads** 36:25
**really** 19:6 56:4
  59:23 67:23 90:25
  91:5 92:22 98:3,13
  118:22
**reason** 36:13 44:23
  45:5 47:1,13 65:13
  66:21 70:12 71:19

72:3 88:14 91:3
**reasons** 70:19
**rebuttal** 44:8 94:25
**recall** 8:4,5,7,23 9:2
  9:4,8,10,12 14:24
  15:15 18:10,19,21
  19:8 21:24,25 22:2
  22:3,5 23:20 24:12
  24:13 31:6 56:22
  58:5,24 108:2
**receive** 54:2 129:2
  130:8
**received** 53:11
  116:18 121:16
**receiving** 128:25
**recess** 69:21 85:25
  115:17 128:16
**recommendation**
  129:14
**record** 5:5,21 6:6,24
  10:23 16:12 25:20
  27:1 28:11 30:19
  32:24 36:6,20 37:1
  37:3 38:6 45:15,19
  57:8 69:20,24 71:25
  72:2 74:8,14 75:9
  75:18 77:16 78:12
  80:24 82:1 85:23
  86:2 87:12 96:9,11
  109:11 115:16,20
  122:14 125:24
  128:9,14,18 130:14
  130:16,19 131:6,9
**recorded** 5:7 70:24
  76:16 108:10
**recording** 5:19
  45:22 74:21 108:4
**records** 75:12,13
  76:1 93:25
**refer** 13:10 17:13
  25:1 42:24 43:21
  44:2 48:7 50:13
  52:1 64:11 114:12
  127:18

Veritext Legal Solutions
866 299-5127